1  RON BENDER (SBN 143364)
   JULIET Y. OH (SBN 211414)
2  LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
3  10250 Constellation Boulevard, Suite 1700
   Los Angeles, California 90067
4  Telephone:  (310) 229-1234
   Facsimile:  (310) 229-1244
5  Email:  RB@LNBYB.COM; JYO@LNBYB.COM

6  Proposed Attorneys for Chapter 11 Debtor and
7  Debtor-in-Possession

8
                **UNITED STATES BANKRUPTCY COURT**
9
                **CENTRAL DISTRICT OF CALIFORNIA**
10
                      **SANTA ANA DIVISION**
11

12

13  In re:                                    Case No.: 8:21-bk-10525-ES

14  THE SOURCE HOTEL, LLC, a                  Chapter 11
15  California limited liability company,
                                             **NOTICE OF MOTION AND MOTION FOR
16       Debtor and Debtor in  Possession.   ENTRY OF AN ORDER: (A) REQUIRING
                                             TURNOVER OF ESTATE CASH BY
17                                           EVERTRUST BANK; (B) AUTHORIZING
                                             DEBTOR TO USE CASH COLLATERAL;
18                                           AND (C) AUTHORIZING DEBTOR TO
19                                           OBTAIN POST-PETITION FINANCING
                                             FROM M+D PROPERTIES ON AN
20                                           UNSECURED BASIS; MEMORANDUM OF
                                             POINTS AND AUTHORITIES;
21                                           DECLARATIONS OF DONALD CHAE
22                                           AND JULIET Y. OH IN SUPPORT
                                             THEREOF**

23                                           [APPLICATION FOR ORDER SETTING
24                                           HEARING ON SHORTENED TIME FILED
                                             CONCURRENTLY HEREWITH]
25
                                             Date:     [To be set]
26                                           Time:     [To be set]
27                                           Place:    ZoomGov

28

                                  1

**TO THE HONORABLE ERITHE A. SMITH, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, EVERTRUST BANK, ALL KNOWN SECURED CREDITORS, TWENTY LARGEST UNSECURED CREDITORS, AND ALL PARTIES REQUESTING SPECIAL NOTICE:**

The Source Hotel, LLC, a California limited liability company and the Chapter 11 debtor and debtor-in-possession herein (the "Debtor"), hereby files this motion (the "Motion") for the entry of an order: (A) requiring Evertrust Bank ("Evertrust") to turn over and deliver to the Debtor cash belonging to the Debtor and its bankruptcy estate; (B) authorizing the Debtor to use cash collateral in accordance with the Debtor's proposed 13-week operating budget (the "Budget"), a true and correct copy of which is attached as **Exhibit "A"** to the Declaration of Donald Chae (the "Chae Declaration") annexed hereto; and (C) authorizing the Debtor to obtain post-petition financing up to $100,000 on a general unsecured basis from the Debtor's affiliate and non-member Manager, M+D Properties, a California corporation ("M+D"), on an as-needed basis to cover any shortfalls in the Budget.  The specific grounds for the Motion are set forth in detailed in the attached Memorandum of Points and Authorities.

The Debtor filed a voluntary petition under  Chapter 11 of 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code") on February 26, 2021 (the "Petition Date").

Since 2014, Debtor has been developing a full-service, seven-story hotel with 178 rooms in the City of Buena Park, County of Orange, State of California (the "Hotel"), which upon completion will include conference rooms, an executive lounge, fitness center, restaurant, bars, and cleaning services.  The Debtor does not own the real property on which the Hotel is being constructed, but is a lessee pursuant to a 99-year ground lease for such real property with the Debtor's affiliate, The Source at Beach, LLC (the "Ground Lease").

Construction of the Hotel began in 2016.  To finance the construction of the Hotel, on May 24, 2016, the Debtor obtained a $29.5 million construction loan (the "Loan") from Evertrust as well as financing by three tranches of EB-5 investments totaling $25 million.  The Debtor's obligations under the Loan are secured by liens against substantially all of the Debtor's assets,

including the Hotel.   Approximately 85% of the Hotel construction has been completed. However, in late 2019, the Debtor was forced to cease construction activities when Evertrust refused to issue the final $4 million of the Loan.  The Debtor's efforts to refinance the Loan from Evertrust Bank were ultimately unsuccessful due to the effects of the COVID-19 pandemic. During 2020, the Debtor engaged in active forbearance negotiations with Evertrust to be able to allow the Hotel to recover from the effects of the COVID-19 pandemic, to obtain refinancing or additional investments, and ultimately to recommence construction of the Hotel.   However, in December 2020, Evertrust sold its interests in the Loan to Shady Bird Lending, LLC ("Shady Bird") at a significant discount, for a reported purchase price of approximately $19 million. Even though Shady Bird repeatedly represented to Debtor that it would provide Debtor with a two-year period within which to complete the construction of the Hotel, Shady Bird immediately took steps to foreclose on the Hotel and scheduled a Trustee's Sale for the Hotel on March 1, 2021.   In addition, Shady Bird obtained an *ex parte* order appointing a receiver, who then immediately took possession of the Hotel.

As a result of the foregoing, Debtor sought chapter 11 bankruptcy protection to prevent the impending foreclosure of the Hotel (which is the Debtor's primary asset), to preserve the equity in the Hotel for the benefit of all creditors (not just Shady Bird), to obtain refinancing or investments to enable the Debtor to complete construction of the Hotel, and to be afforded a reasonable opportunity to restructure its financial affairs and repay its debts in an orderly fashion.

As noted above, the Hotel is approximately 85% complete and is not operating.   As a result, the Debtor has had no income stream, and none of the cash held by the Debtor as of the Petition Date (in the total approximate sum of $38,000) is from rental income or any proceeds of rental income.  All of the Debtor's cash on hand is derived from advances made to the Debtor by its affiliate, M+D.  As of the Petition Date, approximately $35,000 of the Debtor's current cash were held in the Debtor's pre-petition bank accounts at Evertrust (the "Evertrust Account Funds").  Although the Debtor took steps immediately after the Petition Date to close its pre-

petition bank accounts at Evertrust and to withdraw the Evertrust Account Funds to deposit such funds into the Debtor's newly-established debtor-in-possession bank accounts, the Debtor has been advised by Evertrust that it will not honor the checks that were issued by the Debtor to withdraw the Evertrust Account Funds, unless Shady Bird confirms its consent. Shady Bird has refused to provide such consent.

There is no question that the Evertrust Account Funds constitute property of the Debtor's bankruptcy estate over which the Debtor maintains sole control and possession. None of the Evertrust Accounts Funds is from rental income or any proceeds of rental income. Accordingly, while Shady Bird may hold a security interest and lien against the Evertrust Account Funds, Shady Bird is not entitled to control or possession of such funds pursuant to the Loan documents. No party other than Shady Bird holds a valid, properly perfected lien against the Debtor's cash. Based on the foregoing, the Debtor requests that the Court enter an order, pursuant to 11 U.S.C. § 542 requiring Evertrust to immediately turn over and deliver to the Debtor all of the Evertrust Account Funds.

In addition, pursuant to this Motion, the Debtor seeks an order of the Court authorizing the Debtor to use its cash collateral, through and including May 28, 2021, to pay the operating and maintenance expenses set forth in the Budget as well as all quarterly fees payable to the Office of the United States Trustee and all expenses payable to the Clerk of the Bankruptcy Court. The Debtor also seeks authority to deviate from the line items contained in the Budget by not more than 20%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s).

As of the Petition Date, the Debtor's primary assets consisted of: (i) its cash on hand of approximately $38,000, (ii) the Hotel, which was appraised for an "as is" value of $40,900,000 in October, 2019 and which appraised value the Debtor believes remains applicable today, and (iii) furniture, fixtures and equipment with an estimated value (at cost, excluding fabrication labor costs) of $2,700,000 (the "FF&E"). Based on the foregoing, Shady Bird, which contends that it was owed approximately $30,720,000 in its Notice of Trustee's Sale recorded against the

Hotel on February 3, 2021 and which is the only secured creditor that holds a security interest in the Debtor's cash, is adequately protected by a substantial equity cushion in the assets owned by the Debtor.  As additional protection for the Debtor's use of cash collateral, the Debtor proposes that Shady Bird be granted a replacement lien on the Debtor's assets, to the extent of any diminution in value of Shady Bird's interest in the Debtor's pre-petition collateral, and to the same extent, validity, scope and priority of its pre-petition lien.

As reflected in the Budget, the Debtor's current cash (assuming that the Evertrust Account Funds are turned over) is not sufficient to pay all of the expenses which the Debtor will need to pay in the near future to maintain and preserve the Hotel, including utility expenses, insurance premiums, and property taxes totaling approximately $94,000 which will need to be paid by early April, 2021 under the terms of the Debtor's Ground Lease.  The Debtor therefore requires post-petition funding to pay such expenses to maintain and preserve the Hotel. Fortunately, M+D has agreed to provide the Debtor with post-petition financing in an amount up to $100,000 on a general unsecured basis and on an as-needed basis, subject to the discretion of M+D (the "DIP Loan").  The DIP Loan has been offered by M+D on an interest-free basis.  The Debtor believes that the proposed DIP Loan from M+D will provide the Debtor with sufficient funds to meet its immediate post-petition obligations.

The Debtor respectfully submits that (i) the terms and conditions of the DIP Loan are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duty and are supported by reasonably equivalent value and fair consideration, (ii) the DIP Loan has been negotiated in good faith between the Debtor and M+D, and (iii) any DIP Loan advances made to the Debtor by M+D will be made in "good faith" within the meaning of 11 U.S.C. § 364(e).  In the absence of the proposed DIP Loan, the Debtor's estate would suffer irreparable harm, including, without limitation, damage to the Hotel (which is the Debtor's primary asset) due to the Debtor's inability to pay expenses critical to the maintenance and preservation of the Hotel.  Such harm would, in turn, negatively impact the Debtor's ability to

successfully reorganize in this case.  The preservation and maintenance of the Hotel and the Debtor's other assets are critical to a successful restructuring in this case.

Since the Debtor is required under 11 U.S.C. § 366 to provide adequate assurance to its utility companies in the form of cash deposits (which the Debtor seeks to pay using the Debtor's cash on hand or the proceeds of the DIP Loan) within the first thirty days after the Petition Date (*i.e.*, by Sunday, March 28, 2021), and the Debtor will be required to make utility payments and insurance premium payments in the ordinary course of business during the next two to three weeks, the Debtor has filed concurrently herewith an *ex parte* application for an order shortening time on notice for hearing on the Motion, pursuant to which **the Debtor is seeking to have the Motion heard on or before Wednesday, March 24, 2021**.

Pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), while the Court cannot conduct a final hearing on the Motion earlier than 14 days after service of this Motion, the Court may conduct a preliminary hearing before such 14-day period expires to enable the Debtor to use cash collateral and obtain post-petition financing as is necessary to avoid immediate and irreparable harm to the Debtor's estate pending a final hearing. In the event that the hearing on the Motion is set less than 14 days after service of the Motion, the Debtor respectfully requests that Debtor be authorized to use its cash collateral and obtain the DIP Loan to pay the expenses set forth in the Budget, pending a final hearing, in order to avoid immediate and irreparable harm to the Debtor's assets and bankruptcy estate.

This Motion is based upon Local Bankruptcy Rules 2081-1 and 4001-2, 11 U.S.C. §§ 363, 364, 503(b)(1), and 542, and Bankruptcy Rule 4001, this Notice of Motion and Motion, the Memorandum of Points and Authorities, Chae Declaration, and Declaration of Juliet Y. Oh annexed hereto (the "Oh Declaration"), the entire record in the Debtor's case, the statements, arguments and representations of counsel to be made at the hearing on the Motion, and any other evidence properly presented to the Court at or prior to the hearing on the Motion.

/ / /

/ / /

**WHEREFORE**, the Debtor respectfully requests that this Court enter an Order, in substantially the form attached as **Exhibit "I"** to the Oh Declaration annexed hereto:

(1)    granting the relief requested in the Motion on a final basis or, if the hearing on the Motion is held less than 14 days after service of the Motion, granting the Motion on an interim basis, pending a final hearing;

(2)    requiring Evertrust to immediately turn over and deliver to the Debtor all of the Evertrust Account Funds;

(3)    authorizing the Debtor to use cash collateral to pay (i) all of the expenses set forth in the Budget, with authority to deviate from the line items contained in the Budget by up to 20%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s); and (ii) all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court;

(4)    authorizing the Debtor to obtain the DIP Loan from M+D in an amount up to $100,000, at the discretion of M+D, to cover any shortfalls in the Debtor's Budget;

(5)    if necessary, setting a final hearing to consider the entry of a final order granting the relief requested in the Motion; and

(6)    granting such further relief as the Court deems just and proper.

Dated:  March 11, 2021                    THE SOURCE HOTEL, LLC

By:_____
                                          RON BENDER
                                          JULIET Y. OH
                                          LEVENE, NEALE, BENDER, YOO
                                             & BRILL L.L.P.
                                          Proposed Attorneys for Chapter 11 Debtor
                                          and Debtor-in-Possession

7

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## STATEMENT OF FACTS

**A.    Background.**

1.      On February 26, 2021 (the "Petition Date"), The Source Hotel, LLC, a California limited liability company and the debtor and debtor-in-possession herein (the "Debtor"), filed a voluntary petition for relief under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). The Debtor is continuing to manage its financial affairs and operate its bankruptcy estate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.      The Debtor is a limited liability company that was organized in November, 2012 in the State of California.   DMC Investment Holdings, LLC is the sole member of the Debtor. Donald Chae and Min S. Chae, who are brothers, are the members and principals of DMC Investment Holdings, LLC.

3.      Since 2014, the Debtor has been developing a full-service seven-story hotel with 178 rooms in the City of Buena Park, County of Orange, State of California (the "Hotel"), which will include conference rooms, an executive lounge, fitness center, restaurant, bars, and cleaning services.   The Hotel is part of a larger 12.8-acre mixed-use development project (the "Master Development"), which includes a 400,000 square-foot retail center and a 50,000 square-foot seven-story office building which were completed in 2016.   The Debtor does not own the real property on which the Hotel is being constructed (which is located at the southeast corner of the Master Development), but is a lessee pursuant to a 99-year ground lease for such real property (the "Ground Lease") with the Debtor's affiliate, The Source at Beach, LLC.   A true and correct copy of the Ground Lease is attached as **Exhibit "B"** to the Declaration of Donald Chae annexed hereto (the "Chae Declaration").   Pursuant to Article 5 of the Ground Lease, the Debtor is required to pay all property taxes attributable to the real property on which the Hotel is located as additional rent.

4.      Construction of the Hotel began in 2016.   To finance the construction of the Hotel, on May 24, 2016, the Debtor obtained a $29.5 million construction loan (the "Loan") from

Evertrust Bank ("Evertrust") as well as financing by three tranches of EB-5 investments totaling $25 million. The Debtor's obligations under the Loan are secured by liens against substantially all of the Debtor's assets, pursuant to the parties' Commercial Security Agreement and the Construction Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing (Leasehold) recorded in the County of Orange on June 3, 2016 as Document No. 2016000252446 (the "Deed of Trust"). True and correct copies of the Construction Loan Agreement, Promissory Note, Commercial Security Agreement, and Deed of Trust which evidence the Loan are collectively attached as **Exhibit "C"** to the Chae Declaration.

5.      Through October 2019, approximately 85% of the Hotel construction had been completed, including: substantial completion of the core and shell, exterior painting, porte cochère, street lighting, ceiling framing, kitchen framing and glass block installation, food storages, all glass storefronts, electrical wiring and switchgear, guestroom flooring, ceiling fixtures, pool bar canopy structure, deck drains, window washing system, roof membrane, roof ductwork and HVAC vibration installation; nearly complete installation of bathroom fixtures (95%), acoustic ceiling system (80%), HVAC electrical connections (90%), piping for HVAC and plumbing equipment (95%), and rooftop ductwork (99%). In addition, substantial materials have been procured and/or fabricated and are ready for installation pending completion of other items, such as first and second floor flooring, corridor carpeting, millwork (wall and ceiling panels, pool bar), passenger elevators, fire sprinklers, egress and accent lighting, pool equipment, guest room doors, locks and closures, bathroom fixtures, and rooftop HVAC equipment.

6.      In late 2019, Evertrust refused to issue the remaining $4 million of the Loan, claiming a cost overrun on the construction of the Hotel. As a result of Evertrust's refusal to provide the final $4 million of the Loan, the Debtor was forced to cease construction activities. However, the Debtor believes strongly that, had Evertrust funded the final $4 million as expected, construction of the Hotel would have been completed, as the Debtor believes that its contractors would have carried fifty percent of the cost overrun and the Debtor would have covered the remaining fifty percent of the overrun.

7.      The Debtor immediately and actively sought to refinance the Loan and was able to reach agreement for refinancing for a total of $42 million through a new lender named Hall Structured Finance ("Hall").  Although the Debtor was ready to execute the refinancing agreement with Hall, in March 2020, Hall put an indefinite hold on such refinancing due to the effects of the COVID-19 pandemic.

8.      Between March 2020 and December 2020, the Debtor engaged in active forbearance negotiations with Evertrust to be able to allow the Hotel to recover from the effects of the COVID-19 pandemic, to obtain refinancing or additional investments, and ultimately to recommence construction of the Hotel.  During the course of such negotiations, and in light of the effects of the COVID-19 pandemic, the Debtor requested that Evertrust convert the Loan (in the funded amount of approximately $25 million) into a two-year term loan, and even offered to set aside one year's worth of loan payments as assurance of repayment of such two-year term loan.  Evertrust declined the Debtor's offer.

9.      Instead, in December 2020, Evertrust sold its interests in the Loan to Shady Bird Lending, LLC ("Shady Bird") at a significant discount, for a reported purchase price of approximately $19 million.  Prior to Shady Bird's acquisition of the Loan, representations were repeatedly made to the Debtor by Ed Choi, the loan broker working with Ronald N. Richards of Shady Bird and Michael Schlesinger of Cambra Realty, that Mr. Richards would sell Shady Bird's interests in the Loan back to the Debtor in two years for $24-25 million, and that the Debtor would be provided with a new loan for $10-14 million by Mr. Schlesinger in the meantime so that the Debtor could complete construction of the Hotel.  Even though Mr. Richards repeatedly represented to the Debtor that Shady Bird would provide the Debtor with this two-year period within which to complete the construction of the Hotel, when the Debtor refused to commence a chapter 11 bankruptcy case to eliminate the junior liens held by the EB-5 lenders (as Mr. Richards suggested), Shady Bird immediately took steps to foreclose on the Hotel and issued a Notice of a Trustee's Sale for the Hotel to be held on March 1, 2021.

10.     On February 8, 2021, Shady Bird filed a complaint against the Debtor in the Superior Court of the State of California for the County of Orange ("Superior Court") for (i) specific performance and appointment of a receiver, and (ii) waste, thereby commencing the Superior Court action bearing the case number 30-2021-01183489-CU-OR-CJC (the "State Court Action").  Shortly after filing such complaint, Shady Bird filed an *ex parte* application for an order appointing a receiver and other related relief.  On or about February 17, 2021, the Superior Court entered an order in the State Court Action appointing Bellann Raile as receiver to, among other things, take possession of the Hotel and all goods, furniture, fixtures, and equipment attached and/or related to the Hotel.

11.     As a result of all of the foregoing, the Debtor sought chapter 11 bankruptcy protection on the Petition Date in order to prevent the impending foreclosure of the Hotel (which is the Debtor's primary asset), to preserve the equity in the Hotel for the benefit of all creditors (not just Shady Bird), to regain possession of the Hotel and related assets and obtain refinancing or investments to enable the Debtor to complete construction of the Hotel, and to be afforded a reasonable opportunity to restructure its financial affairs and repay its debts in an orderly fashion.

**B.     Description Of The Debtor's Assets And Secured Liabilities.**

12.     As noted above, the Hotel is approximately 85% complete and is not operating.  As a result, the Debtor has had no income stream, and none of the cash held by the Debtor as of the Petition Date (in the total sum of $38,076.77) is from rental income or any proceeds of rental income.  All of the cash currently held by the Debtor is derived from advances made to the Debtor by its non-member Manager, M+D Properties, a California corporation ("M+D").

13.     As of the Petition Date, $35,246.75 of the Debtor's cash (the "Evertrust Account Funds") were held in the following two (2) pre-petition bank accounts at Evertrust:

| Account No. | Cash Balances |
|---|---|
| -0272 | $32,572.70 |
| -1348 | $2,674.05 |
| Total: | $35,246.75 |

14.    The Debtor took steps immediately after the Petition Date to close its pre-petition bank accounts at Evertrust and to withdraw the Evertrust Account Funds to deposit such funds into the Debtor's newly-established debtor-in-possession bank accounts at Axos Bank.

15.    However, on March 8, 2021, counsel for Evertrust contacted proposed counsel for the Debtor (as well as counsel for Shady Bird and counsel for Donald Chae and Min Chae) to advise that Evertrust would not honor the checks that were issued by the Debtor to withdraw the Evertrust Account Funds, unless all parties provided written consent.  A true and correct copy of the correspondence from counsel for Evertrust dated March 8, 2021 is attached as **Exhibit "D"** to the Declaration of Juliet Y. Oh annexed hereto (the "Oh Declaration").  Shady Bird refused to provide such consent.[1]

16.    In addition to the Debtor's cash, the Debtor's primary assets consist of the Hotel and furniture, fixtures and equipment (the "FF&E").  The Hotel was appraised for an "as is" value of $40,900,000 million in October, 2019, and the Debtor believes that such appraised value remains applicable today.[2]  The Debtor believes that the total value of the FF&E (at cost, excluding fabrication labor costs) is approximately $2,700,000.

17.    As noted above, the Debtor's primary secured creditor is Shady Bird.  According to the Notice of Trustee's Sale recorded by Shady Bird on February 3, 2021, a true and correct copy of which is attached as **Exhibit "E"** to the Chae Declaration, Shady Bird contends that the current balance of the Loan is approximately $30,720,000.  The Debtor's obligations under the Loan are secured by liens against substantially all of the Debtor's assets, including the Hotel, the FF&E, and the Debtor's cash.  Shady Bird's liens against the Debtor's FF&E and cash are evidenced by the UCC-1 financing statements recorded by Evertrust asserting liens against substantially all assets of the Debtor.  True and correct copies of such UCC-1 financing statements are included in **Exhibit "F"** to the Oh Declarations.

---

[1] Counsel for Evertrust has advised of a third bank account at Evertrust (account number ending in -5539) under the Debtor's name, which currently holds cash in the sum $25,783.654. The Debtor is currently investigating this account, which Evertrust believes is a bank-controlled account.  This Motion does not seek relief with respect to this third account.

[2] The Debtor is currently in the process of obtaining an updated appraisal of the Hotel.

18.     There are a number of subcontractors that have recorded mechanics' liens against the Hotel.  The Debtor believes that the total amount of the mechanics' liens recorded against the Hotel is approximately $3,700,000.  A list of asserted mechanic's liens prepared by the Debtor as well as a preliminary title report for the Hotel dated December 22, 2020 are attached as **Exhibit "G"** to the Chae Declaration.  While the holders of these mechanics' liens may hold valid and properly perfected liens against the Hotel and the Debtor's leasehold interest in the real property on which the Hotel is located (the "Leasehold Interest"), they have not filed UCC-1 financing statements against the Debtor and therefore do not hold valid, properly perfected liens against the Debtor's cash.

19.     The Debtor also received three tranches of EB-5 loans totaling approximately $25 million from Beach Orangethorpe, LLC, Beach Orangethorpe II, LLC, and Beach Orangethorpe III, LLC (collectively, the "EB-5 Lenders").  The Debtor's obligations under the loans from the two of the EB-5 Lenders (*i.e.*, Beach Orangethorpe, LLC and Beach Orangethorpe II, LLC) are secured by junior liens against the Hotel and the Leasehold Interest.  True and correct copies of the Deeds of Trust recorded against the Hotel by the two EB-5 Lenders are attached as **Exhibit "H"** to the Chae Declaration.  None of the EB-5 Lenders have filed UCC-1 financing statements against the Debtor and therefore do not hold valid, properly perfected liens against the Debtor's cash.

20.     A UCC search for the Debtor, the results of which are attached as **Exhibit "F"** to the Oh Declaration, reflect that there are no parties other than Shady Bird (as the successor-in-interest to Evertrust) that holds a properly perfected lien against the Debtor's cash.

## C.     The Need For Use Of Cash Collateral.

21.     As reflected in the Debtor's proposed 13-week operating budget (the "Budget"), a true and correct copy of which is attached as **Exhibit "A"** to the Chae Declaration, the Debtor requires the immediate use of its cash (including the Evertrust Account Funds) to pay expenses which are critical to the maintenance and preservation of the Hotel, such as utility expenses,

insurance premiums, and the post-petition utility deposits proposed to be paid to the Debtor's utility companies to ensure uninterrupted service (the "Utility Deposits").[3]

22.    Accordingly, pursuant to this Motion, the Debtor requests that the Court enter an order requiring Evertrust to immediately turn over and deliver to the Debtor all of the Evertrust Account Funds.

23.    In addition, pursuant to this Motion, the Debtor seeks an order of the Court authorizing the Debtor to use its cash collateral, through and including May 28, 2021, to pay the expenses set forth in the Budget as well as all quarterly fees payable to the Office of the United States Trustee and all expenses payable to the Clerk of the Bankruptcy Court.  The Debtor also seeks authority to deviate from the line items contained in the Budget by not more than 20%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s).

24.    The Debtor must be able to use its cash (including the Evertrust Account Funds), in accordance with the Budget, to pay expenses which are critical to the maintenance and preservation of the Hotel.  If the Debtor does not obtain authority to use its cash collateral, the Debtor's estate will suffer immediate and irreparable harm, including, without limitation, the termination of utility services at the Hotel and the termination of insurance coverage for the Hotel, which in turn will jeopardize the value of the Hotel and the FF&E which are maintained at the Hotel.

**D.    The Need For Post-Petition Financing.**

25.    As further reflected in the Budget, the Debtor's current cash (even assuming that the Evertrust Account Funds are turned over) is not sufficient to pay all of the expenses which the Debtor will need to pay in the near future to maintain and preserve the Hotel, including recurring utility expenses, insurance premiums, and property taxes totaling approximately $94,000 which will need to be paid by early April, 2021 under the terms of the Debtor's Ground

---

[3] The Debtor has filed concurrently herewith a motion seeking Court authority to provide adequate assurance of future payment to its utility companies in the form of the Utility Deposits, in accordance with 11 U.S.C. § 366.

Lease. The Debtor therefore requires post-petition funding to pay such expenses to maintain and preserve the Hotel.

26. Fortunately, M+D (the Debtor's non-member Manager) has agreed to provide the Debtor with post-petition financing in an amount up to $100,000 on a general unsecured basis and on an as-needed basis, subject to the discretion of M+D (the "DIP Loan"). The DIP Loan has been offered by M+D on an interest-free basis. Any advance made to the Debtor by M+D shall be deemed an allowed general unsecured claim against the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 364(b).

27. As reflected by the Budget, the Debtor believes that the proposed DIP Loan from M+D will provide the Debtor with sufficient funds to meet its immediate post-petition obligations, including its obligation to provide adequate assurance to the Debtor's utility companies.

28. Since the Debtor is required under 11 U.S.C. § 366 to provide adequate assurance to its utility companies in the form of the Utility Deposits (which the Debtor seeks to pay using the Evertrust Account Funds or the proceeds of the DIP Loan) within the first thirty days after the Petition Date (*i.e.*, by Sunday, March 28, 2021), and the Debtor will be required to make utility payments and insurance premium payments in the ordinary course of business during the next two to three weeks, the Debtor has filed concurrently herewith an *ex parte* application for an order shortening time on notice for hearing on the Motion, pursuant to which **the Debtor is seeking to have the Motion heard on or before Wednesday, March 24, 2021**.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

# II.

## DISCUSSION

**A.    Evertrust Should Be Required To Turn Over The Debtor's Cash.**

11 U.S.C. § 542(a) provides, in relevant part, "an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. § 542(a).

Here, there is no question that the Evertrust Account Funds constitute property of the Debtor's bankruptcy estate over which the Debtor maintains sole control and possession. The Debtor has had no income stream. As a result, none of the cash held by the Debtor as of the Petition Date (including the Evertrust Account Funds) is from rental income or any proceeds of rental income. In fact, all of the Debtor's cash on hand is derived from pre-petition advances made to the Debtor by M+D. Accordingly, while Shady Bird may hold a security interest and lien against the Evertrust Account Funds, Shady Bird is not entitled to control or possession of such funds. Moreover, as the UCC search attached as Exhibit "G" to the Oh Declaration reflects, no party other than Shady Bird holds a valid, properly perfected lien against the Debtor's cash.

Based on the foregoing, the Debtor is entitled to control and possession of the Evertrust Account Funds and, if permitted by the Court, the use of the Evertrust Account Funds pursuant to 11 U.S.C. § 363. Evertrust is therefore required by 11 U.S.C. § 542(a) to immediately turn over and deliver the Evertrust Account Funds to the Debtor.

**B.    The Debtor Should Be Authorized To Use Cash Collateral.**

The Debtor's use of property of its bankruptcy estate is governed by Section 363 of the Bankruptcy Code. Section 363(c)(l) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section. . .1108. . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without

1               notice or a hearing, and may use property of the estate in the ordinary

2               course of business without notice or a hearing.

3    11 U.S.C. § 363(c)(l).

4        A debtor in possession has all of the rights and powers of a trustee with respect to

5    property of the estate, including the right to use property of the estate in compliance with Section

6    363.  *See* 11 U.S.C. §1107(a).

7        "Cash collateral" is defined as "cash, negotiable instruments, documents of title,

8    securities, deposit accounts or other cash equivalents in which the estate and an entity other than

9    the estate have an interest. . . ."  11 U.S.C. §363(a).  Section 363(c)(2) establishes a special

10   requirement with respect to "cash collateral," providing that the trustee or debtor in possession

11   may use "cash collateral" under subsection (c)(l) if:

12               (A) each entity that has an interest in such cash collateral consents; or

13               (B)     the court, after notice and a hearing, authorizes such use, sale
                  or lease in accordance with the provisions of this section.

14

15   *See* 11 U. S.C. § 363(c)(2)(A) and (B).

16        It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the

17   purpose of maintaining and operating its property.  11 U.S.C. § 363(c)(2)(B); *In re Oak Glen R-*

18   *Vee*, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); *In re Tucson Industrial Partners*, 129 B.R. 614

19   (9th Cir. BAP 1991).

20        The critical expenses that the Debtor must be able to pay to maintain and preserve the

21   Hotel and the Debtor's other assets during the first 13 weeks of the Debtor's bankruptcy case are

22   set forth in the Budget attached as Exhibit "A" to the Chae Declaration.  The Debtor must be

23   able to use its cash collateral to pay such expenses, which include utility expenses, insurance

24   premiums, and property taxes.  The Debtor's inability to pay such expenses would result in the

25   cessation of utility services to the Hotel and the termination of insurance coverage for the Hotel

26   and related assets, thereby causing immediate and irreparable harm to the Debtor's bankruptcy

27

28

1   estate.  The preservation and maximization of the Debtor's assets are of the utmost significance

2   and will facilitate a successful reorganization of the Debtor through this Chapter 11 case.

3          In addition to the expenses set forth in the Budget, the Debtor seeks authority to use cash

4   collateral to pay all quarterly fees owing to the Office of the United States Trustee and all

5   expenses owing to the Clerk of the Bankruptcy Court.  To provide the Debtor with reasonable

6   flexibility in the event that the amounts of the Debtor's utility bills and/or insurance premiums

7   are higher than projected, the Debtor also seeks authority to deviate from the line items contained

8   in the Budget by not more than 20%, on both a line item and aggregate basis, with any unused

9   portions to be carried over into the following week(s).

10         Pursuant to Section 363(c)(2), the Court may authorize a debtor in possession to use a

11  secured creditor's cash collateral if the secured creditor consents to the use of cash collateral or is

12  adequately protected.  *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984).  *See also In re*

13  *O'Connor*, 808 F.2d 1393, 1398 (10th Cir. 1987); *In re McCombs Properties VI, Ltd.*, 88 B.R.

14  261, 265 (Bankr. C.D. Cal. l988) ("*McCombs*").

15         Even if Shady Bird, which is the only creditor that holds a valid and properly perfected

16  lien in the Debtor's cash, does not consent to the Debtor's use of cash collateral, the Debtor

17  submits that the value of Shady Bird's interests in the Debtor's cash and other assets will be

18  adequately protected by a substantial equity cushion.

19         Pursuant to the Supreme Court case of *United Savings Association v. Timbers of Inwood*

20  *Forest Associates*, 108 S.Ct. 626, 629 (1988) ("*Timbers*") and subsequent case law, the property

21  interest that a debtor must adequately protect pursuant to Sections 361(1) and (2) of the

22  Bankruptcy Code is only the value of the lien that secures the creditor's claim.  *Timbers*, 108

23  S.Ct. at 630.  *See also McCombs, supra*, at 266.  Section 506(a) "limit[s] the secured status of a

24  creditor (*i.e.*, the secured creditor's claim) to the lesser of the [allowed amount of the] claim or

25  the value of the collateral."  *McCombs* at 266.

26         The Ninth Circuit made clear in *Mellor, Id.* at 1401, that an equity cushion of 20% is

27  considered clear adequate protection of a secured creditor's interest in cash collateral.  *See also*

28

*In re McGowan,* 6 B.R. 241, 243 (Bankr. E.D. Pa. 1980) (holding a 10% cushion is sufficient to be adequate protection); *In re Rogers Development Corp.*, 2 B.R. 679, 685 (Bankr. E.D. Vir. 1980) (court decided that an equity cushion of approximately 15% to 20% was sufficient adequate protection to the creditor, even though the debtors had no equity in the property).

Furthermore, in determining whether a secured creditor has equity in property, the Court should consider the "entire security package" not just a portion thereof.   *In re Opelika Manufacturing Corporation*, 66 B.R. 444, 447-48 (Bankr. N.D. Ill. 1986).

As of the Petition Date, the Debtor was holding the following assets: (i) cash on hand of approximately $38,000; (ii) the Hotel, which was appraised for an "as is" value of $40,900,000 in October, 2019; and (iii) FF&E with an estimated value (at cost, excluding fabrication labor costs) of $2,700,000.  Based on the foregoing, the aggregate value of the Debtor's assets as of the Petition Date is estimated to be $43,638,000.

As noted above, based on the Notice of Trustee's Sale recorded by Shady Bird, the total amount currently owed to Shady Bird is approximately $30,720,000.  Given the aggregate value of the Debtor's assets (*i.e.*, approximately $43,638,000), and the total estimated amount currently owed to Shady Bird (*i.e.*, approximately $30,720,000), Shady Bird is adequately protected by an equity cushion of more than 40%, which far exceeds the 20% range that the Ninth Circuit has indicated constitutes clear adequate protection of a secured creditor's interest in cash collateral.

As additional protection for the Debtor's use of cash collateral, the Debtor proposes to provide Shady Bird with a replacement lien and security interest against the Debtor's post-petition assets, to the extent of any diminution in value of Shady Bird's interest in the Debtor's pre-petition collateral, with such replacement liens to have the same extent, validity, and priority as the pre-petition lien held by Shady Bird.  Such replacement lien will provide Shady Bird with further adequate protection.

Given the foregoing forms of adequate protection being provided to Shady Bird for the Debtor's use of cash collateral, the Debtor submits that the requirements of Bankruptcy Code

1    Section 363(c)(2) have been satisfied and that the Debtor should be authorized to use cash

2    collateral in accordance with the terms set forth in this Motion.

3    **C.      The Debtor Should Be Authorized To Obtain The Proposed DIP Loan From M+D**

4    **        To Cover Any Shortfalls In The Budget.**

5           Pursuant to Section 364(b) of the Bankruptcy Code, the Debtor requests authority to

6    obtain the proposed DIP Loan from its Manager, M+D, on a general unsecured basis, in a sum up

7    to $100,000, as necessary and at the discretion of M+D, to cover any shortfalls in the Budget.

8           Section 364 of the Bankruptcy Code is structured with an escalating series of

9    inducements which a debtor in possession may offer to attract credit during the post-petition

10   period. *In re Photo Promotion Associates, Inc.*, 87 B.R. 835, 839 (Bankr. S.D.N.Y. 1988), *aff'd*,

11   881 F.2d 6 (2d. Cir. 1989). Therefore, where a trustee or debtor in possession cannot otherwise

12   obtain unsecured post-petition credit, such credit may be obtained under certain carefully

13   proscribed conditions. *In re T.M. Sweeney & Sons LTL Services, Inc.*, 131 B.R. 984, 989

14   (Bankr.N.D.Ill.1991). For example, if creditors are unwilling to extend unsecured credit to a

15   debtor in possession, further inducements are offered, with court approval after notice and a

16   hearing, including, without limitation, liens equal to or senior to existing liens on encumbered

17   property in accordance with 11 U.S.C. § 364(d). *In re Photo Promotion Associates, Inc.,* 87 B.R.

18   at 839.

19          Section 364(c) of the Bankruptcy Code also enumerates certain incentives that a court

20   may grant to post-petition lenders. The Section 364(c) list, however, is not exhaustive. Courts

21   frequently have authorized the use of inducements not specified in the statute. *See, e.g., In re

22   Ellingsen MacLean Oil Co.*, 834 F.2d 599 (6th Cir. 1987) (affirming financing order which

23   prohibited any challenges to the validity of already existing liens); *In re Defender Drug Stores*,

24   126 B.R. 76 (Bankr. D. Ariz. 1991) (authorizing enhancement fee to post-petition lender), aff'd

25   145 B.R. 312, 316 (Bankr. 9th Cir. 1992) ("[b]ankruptcy courts . . . have regularly authorized

26   postpetition financial arrangements containing lender incentives beyond the explicit priorities

27   and liens specified in section 364"); *In re Antico Mfg. Co.,* 31 B.R. 103 (Bankr. E.D.N.Y. 1983)

28

1  (authorizing lien on pre-petition collateral to secure post-petition indebtedness).

2      Two factors courts consider in determining whether to authorize post-petition financing

3  which contemplates the granting of a security interest in favor of the lender are (1) whether the

4  debtor is unable to obtain unsecured credit per 11 U.S.C. § 364(b), *i.e.*, by allowing a lender only

5  an administrative claim per 11 U.S.C. § 364(b)(1)(A); and (2) whether the terms of the

6  transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and

7  the proposed lender. *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D.Pa. 1987); *see also*

8  *In re Aqua Assoc.*, 123 B.R. 192, 195 (Bankr. E.D.Pa. 1991).

9      M+D, the Debtor's non-member Manager, has agreed to provide the DIP Loan to the

10  Debtor on a general unsecured basis, so the Debtor does not need to grant any liens to secure

11  such DIP Loan. While 11 U.S.C. § 364(b) permits a lender to be allowed an administrative

12  claim for unsecured post-petition financing, M+D has agreed to assert only a general unsecured

13  claim (rather than an administrative claim) against the Debtor's estate for the amount of the DIP

14  Loan.

15      While in determining whether to approve such a transaction, a Court is authorized to act

16  in its informed discretion, *In re Ames Department Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y.

17  1990), the Court should give broad deference to the business decision of a Chapter 11 debtor,

18  particularly with respect to a debtor's business judgment regarding the need for and proposed use

19  of funds. *Richmond Leasing Co. v. Capital Bank N.A.,* 762 F.2d 1303, 1311 (5th Cir. 1985). As

20  the Court noted in *In re Ames Dept. Stores Inc., supra*, "the court's discretion under section 364

21  is to be utilized on the grounds that permit the reasonable business judgment [of the Debtor] to

22  be exercised . . ." *In re Ames Department Stores, Inc.,* 115 B.R. at 40.

23      The Debtor, in the exercise of its business judgment, has concluded that obtaining the

24  proposed DIP Loan from its affiliate, M+D, is in the clear best interests of the Debtor's estate

25  because, without such funds, the Debtor will be unable to pay the expenses set forth in the

26  Budget, which are critical to the maintenance and preservation of the Hotel and FF&E. The

27  Debtor believes that it is fortunate that M+D has agreed to provide the DIP Loan to the Debtor

28

on a general unsecured basis under the circumstances.

The Debtor respectfully submits that (i) the terms and conditions of the DIP Loan are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duty and are supported by reasonably equivalent value and fair consideration, (ii) the DIP Loan has been negotiated in good faith between the Debtor and M+D, and (iii) any DIP Loan advances to be made to the Debtor by M+D will be made in "good faith" within the meaning of 11 U.S.C. § 364(e).

In the absence of the proposed DIP Loan, the Debtor's estate would suffer irreparable harm, including, without limitation, damage to the Hotel (which is the Debtor's primary asset) due to the Debtor's inability to pay expenses critical to the maintenance and preservation of the Hotel. Such harm would, in turn, negatively impact the Debtor's ability to successfully reorganize in this case. The Debtor submits that the preservation and maintenance of the Hotel and the Debtor's other assets are critical to a successful restructuring in this case.

**D.** **The Debtor Has Satisfied The Procedural Requirements Regarding Approval Of The Proposed DIP Loan**.

Rule 4001(c) of the Federal Rules of Bankruptcy Procedure ("<u>Bankruptcy Rules</u>") sets forth procedural requirements for obtaining post-petition financing. There are three general procedural requirements. The Debtor submits that it has complied with these procedural requirements. First, the Motion must contain a copy of any financing agreement and the proposed form of order granting the Motion. There is no written financing agreement between the Debtor and M+D, so no such agreement has been attached hereto. However, the proposed form of order granting the Motion is attached as **Exhibit "I"** to the Oh Declaration. Second, the Motion must provide a concise statement of the relief requested, which was done above. Third, the Motion is required to be served on any committee appointed or the twenty largest unsecured creditors if there is no committee, and on such other parties as the Court directs. Here, the Debtor has served a copy of the Motion and all supportive papers upon the Office of the United States Trustee, all known secured creditors, the twenty largest unsecured creditors of the Debtor,

and parties requesting special notice.  Accordingly, the Motion complies with the requirements of Bankruptcy Rule 4001(c).

In addition, in compliance with Bankruptcy Rule 4001(c)(1)(B) and Local Bankruptcy Rule 4001-2, the Debtor has filed concurrently herewith the mandatory Court-approved Form F4001-2 (Statement Regarding Cash Collateral Or Debtor In Possession Financing), which discloses whether the proposed order granting the motion and authorizing the Debtor to obtain the proposed DIP Loan from M+D contains certain provisions of findings of fact.  Accordingly, the Motion complies with the procedural requirements of Local Bankruptcy Rule 4001-2.

Finally, while the Court cannot conduct a final hearing on the Motion earlier than 14 days after service of this Motion, pursuant to Bankruptcy Rule 4001, the Court may conduct a preliminary hearing before such 14-day period expires to enable the Debtor to use cash collateral and obtain post-petition financing as is necessary to avoid immediate and irreparable harm to the Debtor's estate, pending a final hearing.  In the event that the hearing on the Motion is set less than 14 days after service of the Motion, the Debtor respectfully requests that Debtor be authorized to use its cash collateral and obtain the DIP Loan to pay the expenses set forth in the Budget on an interim basis, pending a final hearing, in order to avoid immediate and irreparable harm to the Debtor's assets and bankruptcy estate.

**III.**

**<u>CONCLUSION</u>**

Based upon all of the foregoing, the Debtor respectfully requests that this Court enter an Order, in substantially the form attached as **<u>Exhibit "I"</u>** to the Oh Declaration annexed hereto:

(1)    granting the relief requested in the Motion on a final basis or, if the hearing on the Motion is held less than 14 days after service of the Motion, granting the Motion on an interim basis, pending a final hearing;

(2)    requiring Evertrust to immediately turn over and deliver to the Debtor all of the Evertrust Account Funds;

(3)      authorizing the Debtor to use cash collateral to pay (i) all of the expenses set forth in the Budget, with authority to deviate from the line items contained in the Budget by up to 20%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s); and (ii) all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court;

(4)      authorizing the Debtor to obtain the DIP Loan from M+D in an amount up to $100,000, at the discretion of M+D, to cover any shortfalls in the Debtor's Budget;

(5)      if necessary, setting a final hearing to consider the entry of a final order granting the relief requested in the Motion; and

(6)      granting such further relief as the Court deems just and proper.

Dated:  March 11, 2021                          THE SOURCE HOTEL, LLC

By: _____
                                                RON BENDER
                                                JULIET Y. OH
                                                LEVENE, NEALE, BENDER, YOO
                                                    & BRILL L.L.P.
                                                Proposed Attorneys for Chapter 11 Debtor
                                                and Debtor-in-Possession

# DECLARATION OF DONALD CHAE

I, Donald Chae, hereby declare as follows:

1.     I am the Manager and a member of DMC Investment Holdings, LLC, which is the sole member of The Source Hotel, LLC, a California limited liability company and the debtor and debtor-in-possession herein (the "Debtor"), and I am therefore familiar with the business operations and financial records of the Debtor. I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

2.     I make this declaration in support of that certain *Notice Of Motion And Motion For Entry Of An Order: (A) Requiring Turnover Of Estate Cash By Evertrust Bank; (B) Authorizing Debtor To Use Cash Collateral; And (C) Authorizing Debtor To Obtain Post-Petition Financing From M+D Properties On An Unsecured Basis* (the "Motion"), to which this declaration is attached. All capitalized terms not specifically defined herein shall have the meanings ascribed to them in the Motion.

## A.    Background

3.     On February 26, 2021 (the "Petition Date"), the Debtor fled a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor is continuing to manage its financial affairs and operate its bankruptcy estate as a debtor-in-possession.

4.     The Debtor is a limited liability company that was organized in November, 2012 in the State of California. DMC Investment Holdings, LLC is the sole member of the Debtor. My brother, Min S. Chae, and I are the members and principals of DMC Investment Holdings, LLC.

5.     Since 2014, the Debtor has been developing a full-service seven-story hotel with 178 rooms in the City of Buena Park, County of Orange, State of California (the "Hotel"), which will include conference rooms, an executive lounge, fitness center, restaurant, bars, and cleaning services. The Hotel is part of a larger 12.8-acre mixed-use development project (the "Master Development"), which includes a 400,000 square-foot retail center and a 50,000 square-foot seven-story office building which were completed in 2016. The Debtor does not own the real property on which the Hotel is being constructed (which is located at the southeast corner of the Master

Development), but is a lessee pursuant to a 99-year ground lease for such real property (the "<u>Ground Lease</u>") with the Debtor's affiliate, The Source at Beach, LLC.  A true and correct copy of the Ground Lease is attached as **Exhibit "B"** hereto.  Pursuant to Article 5 of the Ground Lease, the Debtor is required to pay all property taxes attributable to the real property on which the Hotel is located as additional rent.

6.     Construction of the Hotel began in 2016.  To finance the construction of the Hotel, on May 24, 2016, the Debtor obtained a $29.5 million construction loan (the "<u>Loan</u>") from Evertrust Bank ("<u>Evertrust</u>") as well as financing by three tranches of EB-5 investments totaling $25 million.  The Debtor's obligations under the Loan are secured by liens against substantially all of the Debtor's assets, pursuant to the parties' Commercial Security Agreement and the Construction Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing (Leasehold) recorded in the County of Orange on June 3, 2016 as Document No. 2016000252446 (the "<u>Deed of Trust</u>").  True and correct copies of the Construction Loan Agreement, Promissory Note, Commercial Security Agreement, and Deed of Trust which evidence the Loan are collectively attached as **Exhibit "C"** hereto.

7.     Through October 2019, approximately 85% of the Hotel construction had been completed, including: substantial completion of the core and shell, exterior painting, porte cochère, street lighting, ceiling framing, kitchen framing and glass block installation, food storages, all glass storefronts, electrical wiring and switchgear, guestroom flooring, ceiling fixtures, pool bar canopy structure, deck drains, window washing system, roof membrane, roof ductwork and HVAC vibration installation; nearly complete installation of bathroom fixtures (95%), acoustic ceiling system (80%), HVAC electrical connections (90%), piping for HVAC and plumbing equipment (95%), and rooftop ductwork (99%).  In addition, substantial materials have been procured and/or fabricated and are ready for installation pending completion of other items, such as first and second floor flooring, corridor carpeting, millwork (wall and ceiling panels, pool bar), passenger elevators, fire sprinklers, egress and accent lighting, pool equipment, guest room doors, locks and closures, bathroom fixtures, and rooftop HVAC equipment.

8.      In late 2019, Evertrust refused to issue the remaining $4 million of the Loan, claiming a cost overrun on the construction of the Hotel.  As a result of Evertrust's refusal to provide the final $4 million of the Loan, the Debtor was forced to cease construction activities.  However, I believe strongly that, had Evertrust funded the final $4 million as expected, construction of the Hotel would have been completed, as I believe that the Debtor's contractors would have carried fifty percent of the cost overrun and the Debtor would have covered the remaining fifty percent of the overrun.

9.      The Debtor immediately and actively sought to refinance the Loan and was able to reach agreement for refinancing for a total of $42 million through a new lender named Hall Structured Finance ("Hall").  Although the Debtor was ready to execute the refinancing agreement with Hall, in March 2020, Hall put an indefinite hold on such refinancing due to the effects of the COVID-19 pandemic.

10.    Between March 2020 and December 2020, the Debtor engaged in active forbearance negotiations with Evertrust to be able to allow the Hotel to recover from the effects of the COVID-19 pandemic, to obtain refinancing or additional investments, and ultimately to recommence construction of the Hotel.  During the course of such negotiations, and in light of the effects of the COVID-19 pandemic, the Debtor requested that Evertrust convert the Loan (in the funded amount of approximately $25 million) into a two-year term loan, and even offered to set aside one year's worth of loan payments as assurance of repayment of such two-year term loan.  Evertrust declined the Debtor's offer.

11.    Instead, in December 2020, Evertrust sold its interests in the Loan to Shady Bird Lending, LLC ("Shady Bird") at a significant discount, for a reported purchase price of approximately $19 million.  Prior to Shady Bird's acquisition of the Loan, representations were repeatedly made to me by Ed Choi, the loan broker working with Ronald N. Richards of Shady Bird and Michael Schlesinger of Cambra Realty, that Mr. Richards would sell Shady Bird's interests in the Loan back to the Debtor in two years for $24-25 million, and that the Debtor would be provided with a new loan for $10-14 million by Mr. Schlesinger in the meantime so that the

Debtor could complete construction of the Hotel. Even though Mr. Richards repeatedly represented to the Debtor that Shady Bird would provide the Debtor with this two-year period within which to complete the construction of the Hotel, when the Debtor refused to commence a chapter 11 bankruptcy case to eliminate the junior liens held by the EB-5 lenders (as Mr. Richards suggested), Shady Bird immediately took steps to foreclose on the Hotel and issued a Notice of a Trustee's Sale for the Hotel to be held on March 1, 2021.

12.     On February 8, 2021, Shady Bird filed a complaint against the Debtor in the Superior Court of the State of California for the County of Orange ("Superior Court") for (i) specific performance and appointment of a receiver, and (ii) waste, thereby commencing the Superior Court action bearing the case number 30-2021-01183489-CU-OR-CJC (the "State Court Action"). Shortly after filing such complaint, Shady Bird filed an *ex parte* application for an order appointing a receiver and other related relief. I am advised and believe that, on or about February 17, 2021, the Superior Court entered an order in the State Court Action appointing Bellann Raile as receiver to, among other things, take possession of the Hotel and all goods, furniture, fixtures, and equipment attached and/or related to the Hotel.

13.     As a result of all of the foregoing, the Debtor sought chapter 11 bankruptcy protection on the Petition Date in order to prevent the impending foreclosure of the Hotel (which is the Debtor's primary asset), to preserve the equity in the Hotel for the benefit of all creditors (not just Shady Bird), to regain possession of the Hotel and related assets and obtain refinancing or investments to enable the Debtor to complete construction of the Hotel, and to be afforded a reasonable opportunity to restructure its financial affairs and repay its debts in an orderly fashion.

**B.     Description Of The Debtor's Assets And Secured Liabilities.**

14.     The Hotel is approximately 85% complete and is not operating. As a result, the Debtor has had no income stream, and none of the cash held by the Debtor as of the Petition Date (in the total sum of $38,076.77) is from rental income or any proceeds of rental income. All of the cash currently held by the Debtor is derived from pre-petition advances made to the Debtor by its non-member Manager, M+D Properties, a California corporation ("M+D").

15.     As of the Petition Date, $35,246.75 of the Debtor's cash (the "Evertrust Account Funds") were held in the following two (2) pre-petition bank accounts at Evertrust:

| Account No. | Cash Balances |
|---|---|
| -0272 | $32,572.70 |
| -1348 | $2,674.05 |
| Total: | $35,246.75 |

16.     The Debtor took steps immediately after the Petition Date to close its pre-petition bank accounts at Evertrust and to withdraw the Evertrust Account Funds to deposit such funds into the Debtor's newly-established debtor-in-possession bank accounts at Axos Bank.

17.     However, I am advised and believe that Evertrust has refused to honor the checks that were issued by the Debtor to withdraw the Evertrust Account Funds, unless Shady Bird provides written consent. I am further advised and believe that Shady Bird has refused to provide such consent.

18.     I am advised that there is a third bank account at Evertrust (account number ending in -5539) under the Debtor's name, which currently holds cash in the sum $25,783.654, which account Evertrust believes is a bank-controlled account. The Debtor is currently investigating this account. The Motion does not seek relief with respect to this account.

19.     In addition to the Debtor's cash, the Debtor's primary assets consist of the Hotel and furniture, fixtures and equipment (the "FF&E"). The Hotel was appraised for an "as is" value of $40,900,000 in October, 2019 and, based on my experience and knowledge of the commercial real estate industry, particularly in the area in which the Hotel is located, I believe that the $40,900,000 appraised value for the Hotel remains applicable today.[4]

20.     Based on the Debtor's books and records, I believe that the total value of the FF&E (at cost, excluding fabrication labor costs) is approximately $2,700,000.

21.     The Debtor's primary secured creditor is Shady Bird. According to the Notice of Trustee's Sale recorded by Shady Bird on February 3, 2021, a true and correct copy of which is

---

[4] The Debtor is currently in the process of obtaining an updated appraisal of the Hotel.

attached as **Exhibit "E"** hereto, Shady Bird contends that the current balance of the Loan is approximately $30,720,000. The Debtor's obligations under the Loan are secured by liens against substantially all of the Debtor's assets, including the Hotel, the FF&E, and the Debtor's cash. Shady Bird's liens against the Debtor's FF&E and cash are evidenced by the UCC-1 financing statements recorded by Evertrust asserting liens against substantially all assets of the Debtor. True and correct copies of the UCC-1 financing statements recorded by Evergreen are attached as Exhibit "F" to the Declaration of Juliet Y. Oh annexed hereto.

22.    There are a number of subcontractors that have recorded mechanics' liens against the Hotel. The Debtor believes that the total amount of the mechanics' liens recorded against the Hotel is approximately $3,700,000. A list of asserted mechanic's liens prepared by the Debtor as well as a preliminary title report for the Hotel dated December 22, 2020 are attached as **Exhibit "G"** hereto. While the holders of these mechanics' liens may hold valid and properly perfected liens against the Hotel and the Debtor's leasehold interest in the real property on which the Hotel is located (the "Leasehold Interest"), they have not filed UCC-1 financing statements against the Debtor and therefore do not hold valid, properly perfected liens against the Debtor's cash.

23.    The Debtor also received three tranches of EB-5 loans totaling approximately $25 million from Beach Orangethorpe, LLC, Beach Orangethorpe II, LLC, and Beach Orangethorpe III, LLC (collectively, the "EB-5 Lenders"). The Debtor's obligations under the loans from the two of the EB-5 Lenders (*i.e.*, Beach Orangethorpe, LLC and Beach Orangethorpe II, LLC) are secured by junior liens against the Hotel and the Leasehold Interest. True and correct copies of the Deeds of Trust recorded against the Hotel by the two EB-5 Lenders are attached as **Exhibit "H"** hereto. None of the EB-5 Lenders have filed UCC-1 financing statements against the Debtor and therefore do not hold valid, properly perfected liens against the Debtor's cash.

C.    **The Need For Use Of Cash Collateral**.

24.    As reflected in the Debtor's proposed 13-week operating budget (the "Budget"), a true and correct copy of which is attached as **Exhibit "A"** hereto, the Debtor requires the immediate use of its cash (including the Evertrust Account Funds) to pay expenses which are

critical to the maintenance and preservation of the Hotel, such as utility expenses, insurance premiums, and the post-petition utility deposits proposed to be paid to the Debtor's utility companies to ensure uninterrupted service (the "Utility Deposits").

25.    Accordingly, the Debtor is requesting that the Court enter an order requiring Evertrust to immediately turn over and deliver to the Debtor all of the Evertrust Account Funds.

26.    In addition, pursuant to the Motion, the Debtor is seeking an order of the Court authorizing the Debtor to use its cash collateral, through and including May 28, 2021, to pay the expenses set forth in the Budget as well as all quarterly fees payable to the Office of the United States Trustee and all expenses payable to the Clerk of the Bankruptcy Court.  The Debtor also seeks authority to deviate from the line items contained in the Budget by not more than 20%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s).

27.    The Debtor must be able to use its cash (including the Evertrust Account Funds), in accordance with the Budget, to pay expenses which are critical to the maintenance and preservation of the Hotel.  If the Debtor does not obtain authority to use its cash collateral, I believe that the Debtor's estate will suffer immediate and irreparable harm, including, without limitation, the termination of utility services at the Hotel and the termination of insurance coverage for the Hotel, which in turn will jeopardize the value of the Hotel and the FF&E which are maintained at the Hotel.

**D.    The Need For Post-Petition Financing.**

28.    As further reflected in the Budget, the Debtor's current cash (even assuming that the Evertrust Account Funds are turned over) is not sufficient to pay all of the expenses which the Debtor will need to pay in the near future to maintain and preserve the Hotel, including recurring utility expenses, insurance premiums, and property taxes totaling approximately $94,000 which will need to be paid by early April, 2021 under the terms of the Debtor's Ground Lease.  The Debtor therefore requires post-petition funding to pay such expenses to maintain and preserve the Hotel.

29.     M+D (the Debtor's non-member Manager) has agreed to provide the Debtor with post-petition financing in an amount up to $100,000 on a general unsecured basis and on an as-needed basis, subject to the discretion of M+D (the "DIP Loan"). The DIP Loan has been offered by M+D on an interest-free basis. Any advance made to the Debtor by M+D shall be deemed an allowed general unsecured claim against the Debtor's bankruptcy estate.

30.     As reflected by the Budget, I believe that the proposed DIP Loan from M+D will provide the Debtor with sufficient funds to meet its immediate post-petition obligations, including its obligation to provide adequate assurance to the Debtor's utility companies.

31.     Since the Debtor is required under 11 U.S.C. § 366 to provide adequate assurance to its utility companies in the form of the Utility Deposits (which the Debtor seeks to pay using the Evertrust Account Funds or the proceeds of the DIP Loan) within the first thirty days after the Petition Date (*i.e.*, by Sunday, March 28, 2021), and the Debtor will be required to make utility payments and insurance premium payments in the ordinary course of business during the next two to three weeks, the Debtor has filed concurrently with the Motion an *ex parte* application for an order shortening time on notice for hearing on the Motion, pursuant to which the Debtor is seeking to have the Motion heard on or before Wednesday, March 24, 2021.

32.     I believe that the terms and conditions of the DIP Loan are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duty and are supported by reasonably equivalent value and fair consideration. The DIP Loan has been negotiated in good faith between the Debtor and M+D, with the Debtor being represented by able counsel.

///

///

///

///

///

///

33.    I believe that, in the absence of the proposed DIP Loan, the Debtor's estate would suffer irreparable harm, including, without limitation, damage to the Hotel (which is the Debtor's primary asset) due to the Debtor's inability to pay expenses critical to the maintenance and preservation of the Hotel.  I believe such harm would, in turn, negatively impact the Debtor's ability to successfully reorganize in this case since the preservation and maintenance of the Hotel and the Debtor's other assets are critical to a successful restructuring in this case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 11th day of March, 2021, at Buena Park, California.

_____
DONALD CHAE

## DECLARATION OF JULIET Y. OH

I, Juliet Y. Oh, Esq., hereby declare as follows:

1.      I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.  I am a partner of the law firm of Levene, Neale, Bender, Yoo & Brill L.L.P. ("LNBYB"), proposed bankruptcy counsel to The Source Hotel, LLC (the "Debtor"), the debtor and debtor in possession herein.  I am an attorney licensed to practice law in the State of California, in the United States District Court and the Bankruptcy Courts for the Southern, Central, Northern and Eastern Districts of California, and in the United States Court of Appeals for the Ninth Circuit.

2.      I make this declaration in support of that certain *Notice Of Motion And Motion For Entry Of An Order: (A) Requiring Turnover Of Estate Cash By Evertrust Bank; (B) Authorizing Debtor To Use Cash Collateral; And (C) Authorizing Debtor To Obtain Post-Petition Financing From M+D Properties On An Unsecured Basis* (the "Motion"), to which this declaration is attached.  All capitalized terms not specifically defined herein shall have the meanings ascribed to them in the Motion.

3.      On March 8, 2021, counsel for Evertrust Bank ("Evertrust"), Michael Fletcher, contacted me (as well as counsel for Shady Bird Lending, LLC and personal counsel for Min Chae and me) to advise that Evertrust would not honor the checks that were issued by the Debtor to withdraw funds totaling $35,246.75 (the "Evertrust Account Funds") which were held in the Debtor's two (2) pre-petition bank accounts at Evertrust, unless all parties provided written consent.  A true and correct copy of the correspondence from counsel for Evertrust dated March 8, 2021 is attached as **Exhibit "D"** hereto.  To the best of my knowledge, Shady Bird has refused to provide such consent.

4.      In his March 8, 2021 email correspondence, Mr. Fletcher advised of a third bank account at Evertrust (account number ending in -5539) under the Debtor's name, which currently holds cash in the sum $25,783.654.  Evertrust believes this is a bank-controlled account, and the

Debtor is currently investigating.  The Motion does not seek relief with respect to this third account.

5.     I am informed and advised by the Debtor that it is a limited liability company which was formed and incorporated in the State of California.

6.     On March 1, 2021, I obtained copies of financing statements recorded against the Debtor with the California Secretary of State's office (copies of which are attached as **Exhibit "F"** hereto).  A summary of the financing statements recorded against the Debtor in California is also included in Exhibit "F" hereto.

7.     A proposed form of the interim order granting the Motion is attached as **Exhibit "I"** hereto.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 11th day of March, 2021, at Los Angeles, California.


_____
JULIET Y. OH, ESQ., Declarant

# EXHIBIT "A"

[Budget]

The Source Hotel, LLC - Debtor in Possession
13-Week Cash Flow Projection

| | | | | | | WEEK ENDING | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 3/5/2021 | 3/12/2021 | 3/19/2021 | 3/26/2021 | 4/2/2021 | 4/9/2021 | 4/16/2021 | 4/23/2021 | 4/30/2021 | 5/7/2021 | 5/14/2021 | 5/21/2021 | 5/28/2021 |
| **BEGINNING CASH BALANCE** | $ - | $ 36,326.77 | $ 36,276.77 | $ 36,276.77 | $ 26,651.88 | $ 24,901.88 | $ 30,854.27 | $ 30,854.27 | $ 30,354.27 | $ 24,229.38 | $ 22,479.38 | $ 22,479.38 | $ 21,979.38 |
| **RECEIPTS:** | | | | | | | | | | | | | |
| New bank accts opened, 3/4/21 | 38,076.77 | | | | | | | | | | | | |
| Operating acct = $5,504.07 | | | | | | | | | | | | | |
| Tax acct = $32,572.70 | | | | | | | | | | | | | |
| Proposed DIP Loan from Affiliates | | | | | | 100,000.00 | | | | | | | |
| *Total Receipts* | *38,076.77* | *-* | *-* | *-* | *-* | *100,000.00* | *-* | *-* | *-* | *-* | *-* | *-* | *-* |
| **DISBURSEMENTS:** | | | | | | | | | | | | | |
| Insurance | | | | 6,124.89 | | | | | 6,124.89 | | | | 6,124.89 |
| Utilities | 1,750.00 | 50.00 | | 500.00 | 1,750.00 | 50.00 | | 500.00 | | 1,750.00 | | 500.00 | |
| Post-Petition Utility Deposits (est) | | | | 3,000.00 | | | | | | | | | |
| Property Taxes | | | | | | 93,997.61 | | | | | | | |
| *Total Disbursements* | *1,750.00* | *50.00* | *-* | *9,624.89* | *1,750.00* | *94,047.61* | *-* | *500.00* | *6,124.89* | *1,750.00* | *-* | *500.00* | *6,124.89* |
| Net Change in Cash Position | *36,326.77* | *(50.00)* | *-* | *(9,624.89)* | *(1,750.00)* | *5,952.39* | *-* | *(500.00)* | *(6,124.89)* | *(1,750.00)* | *-* | *(500.00)* | *(6,124.89)* |
| **ENDING CASH POSITION** | $ 36,326.77 | $ 36,276.77 | $ 36,276.77 | $ 26,651.88 | $ 24,901.88 | $ 30,854.27 | $ 30,854.27 | $ 30,354.27 | $ 24,229.38 | $ 22,479.38 | $ 22,479.38 | $ 21,979.38 | $ 15,854.49 |

# EXHIBIT "B"

[Ground Lease]

## GROUND LEASE

by and between

### THE SOURCE AT BEACH, LLC,

a California limited liability company ("**Lessor**")

and

### THE SOURCE HOTEL, LLC,

a California limited liability company ("**Lessee**")

TABLE OF CONTENTS

Page

**ARTICLE 1** LEASE OF PARCEL ........................................................................................................ - 1 -
**ARTICLE 2** TERM ............................................................................................................................... - 2 -
**ARTICLE 3** RESERVED ..................................................................................................................... - 2 -
**ARTICLE 4** MINIMUM RENT ........................................................................................................... - 2 -
**ARTICLE 5** ADDITIONAL RENT/TAXES ......................................................................................... - 3 -
**ARTICLE 6** SECURITY DEPOSIT ..................................................................................................... - 4 -
**ARTICLE 7** POSSESSION AND USE ................................................................................................. - 4 -
**ARTICLE 8** UTILITIES ....................................................................................................................... - 5 -
**ARTICLE 9** INDEMNITY; INSURANCE ........................................................................................... - 6 -
**ARTICLE 10** TITLE TO PREMISES ................................................................................................... - 8 -
**ARTICLE 11** CONSTRUCTION OF IMPROVEMENTS.................................................................... - 9 -
**ARTICLE 12** MECHANICS' LIENS .................................................................................................. - 10 -
**ARTICLE 13** SIGNS .......................................................................................................................... - 10 -
**ARTICLE 14** PERSONAL PROPERTY ............................................................................................ - 10 -
**ARTICLE 15** ASSIGNMENT AND SUBLETTING ......................................................................... - 11 -
**ARTICLE 16** NON-DISCRIMINATION AND NON-SEGREGATION COVENANT..................... - 13 -
**ARTICLE 17** REPAIRS; MAINTENANCE ....................................................................................... - 13 -
**ARTICLE 18** RECONSTRUCTION .................................................................................................. - 14 -
**ARTICLE 19** LEASEHOLD FINANCING ........................................................................................ - 15 -
**ARTICLE 20** BANKRUPTCY; INVOLUNTARY TRANSFERS ..................................................... - 18 -
**ARTICLE 21** DEFAULTS BY LESSEE; REMEDIES ...................................................................... - 19 -
**ARTICLE 22** DEFAULTS BY LESSOR; REMEDIES ..................................................................... - 20 -
**ARTICLE 23** CONDEMNATION ...................................................................................................... - 21 -
**ARTICLE 24** ATTORNEY FEES ...................................................................................................... - 22 -
**ARTICLE 25** SALE OR MORTGAGE BY LESSOR ....................................................................... - 23 -
**ARTICLE 26** MORTGAGE; SUBORDINATION; ATTORNMENT ................................................ - 23 -
**ARTICLE 27** NOTICES ..................................................................................................................... - 24 -
**ARTICLE 28** MISCELLANEOUS ..................................................................................................... - 24 -

EXHIBIT "A-1"  Legal Description of Parcel
EXHIBIT "A-2"  Depiction of Parcel

INDEX

Page(s)

Additional Rent ..........................................................................................................................4
Affiliate ....................................................................................................................................13
Assignee ...................................................................................................................................22
Claims ........................................................................................................................................7
Condemnation ..........................................................................................................................22
condemnation proceedings .......................................................................................................22
Depository ................................................................................................................................16
Event of Default .......................................................................................................................20
Governmental Agencies .............................................................................................................4
Hazardous Materials ...................................................................................................................6
holder .......................................................................................................................................24
Improvements .............................................................................................................................1
Interest Rate .............................................................................................................................27
Leasehold Mortgage ................................................................................................................17
Lessee's Funds .........................................................................................................................16
Lessee's Signage ......................................................................................................................12
Minimum Rent ...........................................................................................................................3
mortgage ..................................................................................................................................24
mortgagee ................................................................................................................................24
New Lease ................................................................................................................................18
Hotel Complex Premises ............................................................................................................1
Permitted Uses ...........................................................................................................................5
Personal Property .....................................................................................................................12
Proceeds ...................................................................................................................................16
Rent ............................................................................................................................................4
Rent Year ....................................................................................................................................3
Restoration ...............................................................................................................................23
Sale ..........................................................................................................................................24
Special Causes of Loss ...............................................................................................................8
Taking ......................................................................................................................................22
Taxes ..........................................................................................................................................4
Transfer ....................................................................................................................................12
Utilities ......................................................................................................................................7
Vesting Date .............................................................................................................................22
worth at the time of award .......................................................................................................21

## GROUND LEASE

This Ground Lease (this "**Lease**"), dated as of the 6th day of April, 2015 (the "**Effective Date**"), is made and entered into by and between **THE SOURCE AT BEACH, LLC**, a California limited liability company ("**Lessor**"), and **THE SOURCE HOTEL, LLC**, a California limited liability company ("**Lessee**").

## R E C I T A L S :

A.      Lessor is the owner of that certain real property located in the City of Buena Park, County of Orange, State of California, legally described on **Exhibit A-1** and generally depicted on **Exhibit A-2** attached hereto (the "**Parcel**"). The Parcel is a portion of Assessor's Parcel Nos. 276-361-20 and 276-361-22 (collectively the "**Tax Parcel**").

B.      Lessor desires to lease to Lessee the entire Parcel to enable Lessee to construct a hotel facility and related facilities and amenities (collectively, the "**Improvements**") on the Parcel, subject to the terms and conditions contained herein. The Parcel and the Improvements are collectively referred to herein as the "**Hotel Complex Premises**." The parties acknowledge that such Hotel Complex Premises are intended to be part of a world class mixed-use, retail lifestyle shopping center with an office tower, a residential complex and parking (the "**Development Project**") as further provided in the CC&Rs, as defined in Section 1.2.

NOW, THEREFORE, with reference to the foregoing Recitals and upon the terms and conditions contained herein, Lessor and Lessee hereby agree as follows:

## ARTICLE 1

## LEASE OF PARCEL

1.1      Lease of Parcel. Lessor hereby leases to Lessee and Lessee hereby leases from Lessor the Parcel, together with all easements, rights and appurtenances relating thereto for the consideration and subject to the terms and conditions hereinafter set forth.

1.2      CC&Rs and Other Matters of Record. Concurrently with the execution of this Lease, Lessor, Lessee and The Source Office, LLC have entered into that certain Amended and Restated Declaration of Covenants, Conditions, Restrictions and Reciprocal Easement Agreement (the "**CC&Rs**"). Except as expressly set forth in Article 26 (relating to subordination), Lessee's leasehold interest in the Parcel is subject to all mortgages, deeds of trust, covenants, conditions and restrictions, easements, rights-of-way and other matters of record covering the Parcel (collectively "**Matters of Record**").

1.3      Reservation of Oil, Gas and Mineral Rights. Lessor reserves to itself the sole and exclusive right to all water rights, coal, oil, gas and other hydrocarbons, geothermal resources, precious metals ores, base metals ores, industrial-grade silicates and carbonates, fissionable minerals of every kind and character, metallic or otherwise, whether or not presently known to science or industry, now known to exist or hereafter discovered upon, within or underlying the surface of said land regardless of the depth below the surface at which any such substance may be found; however, Lessor or its successors and assigns, shall not have the right for any purpose whatsoever to enter upon, into or through the surface or the first five hundred (500) feet of the subsurface of the Parcel in connection therewith. Lessor covenants that Lessee shall not be disturbed in its quiet enjoyment and peaceful use of the Hotel Complex Premises by any drilling and production activities.

1.4      Lessee's Investigation. Lessee accepts the Parcel "AS IS" without any representations or warranties, express or implied, or statutory, of any kind, except as expressly set forth in this Lease. Without limiting the foregoing, Lessee acknowledges that, except as set forth in this Lease, neither Lessor nor any other party has made any representations or warranties express or implied, on which Lessee is relating a to any matters, directly or indirectly concerning the Parcel, including but not limited to, the land, the square footage of the Parcel, improvements and infrastructure, if any, development rights and exactions, expenses associated with the Parcel, taxes, assessments, bonds, permissible uses, title exceptions, water or water rights, topography, utilities, zoning of the Parcel, soil, subsoil the purposes for which the Parcel is to be used, drainage, environmental or building laws, rules or regulations, toxic waste or Hazardous Materials (as defined in Section 7.3) or any other matters affecting or relating to the Parcel. Lessee acknowledges that: (i) Lessee has had the advice of such independent professional consultants and experts as it deems necessary in connection with its investigation and study of the Parcel; (ii) Lessee has, to the extent it has deemed necessary, independently investigated the condition of the Parcel, including the soils,

hydrology and seismology thereof, and the laws and regulations relating to the construction and operation of the Improvements, including environmental, zoning and other land use entitlement requirements; and (iii) Lessee has not relied upon any statement, representation or warranty of Lessor of any kind or nature in connection with its decision to execute and deliver this Lease and its agreement to perform the obligations of Lessee hereunder, except as expressly set forth in this Lease. Lessee acknowledges and agrees that any information provided or to be provided by or on behalf of Lessor with respect to the Hotel Complex Premises was obtained from a variety of sources and that Lessor has not made any independent investigation or verification of such information and makes no representation as to the accuracy or completeness of such information.

## ARTICLE 2

### TERM

2.1     Initial Term. The "Initial Term" of this Lease shall commence on the date of this Lease and shall continue for a period of ninety-nine (99) years, plus any partial calendar month in which the Initial Term commences (as hereinafter defined) occurs, unless sooner terminated as provided in this Lease.

2.2     Acceptance of the Parcel. Lessor hereby delivers to Lessee, and Lessee hereby accepts from Lessor, possession of the Parcel together with all easements, rights and appurtenances relating thereto, subject to the Permitted Exceptions, as defined in Section 10.1, and the CC&Rs. Lessee shall commence construction of the Improvements promptly and shall diligently prosecute such construction to completion and shall thereafter immediately open the Hotel Complex Premises for business.

2.3     Certificate of Occupancy. Within ten (10) days following the substantial completion of construction of Improvements, Lessee shall deliver to Lessor the original of the Certificate of Occupancy for the Hotel Complex Premises issued by the appropriate governmental agency, copies of all mechanics' lien releases or other lien releases on account of Lessee's Work, notarized and unconditional, in such form as Lessor shall have approved, copies of all building permits and inspection cards evidencing inspection and approval by the issuer of the work authorized in such permits, and an architect's certification that the Improvements are complete.

2.4     Surrender of the Hotel Complex Premises. Subject to Lessee's right to remove its Personal Property (as defined in Section 14.1) pursuant to the terms and conditions of Section 14.1, Lessee shall, upon the expiration of the Lease Term or the earlier termination of this Lease, surrender possession of the Hotel Complex Premises and deliver the same to Lessor in good order, condition and state of repair, ordinary wear and tear excepted. If Lessee remains in possession of the Hotel Complex Premises or any part thereof after the expiration or earlier termination of the Lease Term without the express written consent of Lessor, such occupancy shall in no event be deemed a renewal or extension of this Lease for any term whatsoever nor shall such occupancy be deemed to create a month-to-month tenancy notwithstanding any acceptance of Rent by Lessor but Lessee shall be deemed a tenant at sufferance subject to all of the terms and conditions of this Lease except that Lessee shall pay to Lessor for each month or portion of a month in which Lessee holds over in the Hotel Complex Premises, an amount equal to the Market Rent (as defined below), plus all Additional Rent payable in accordance with the terms of this Lease. Such amount shall be payable in advance on the first day of each and every calendar month. In no event shall any provision contained in this Lease be deemed to permit Lessee to retain possession of the Hotel Complex Premises after the expiration of the Lease Term or any earlier termination of this Lease. Nothing contained in this Section 2.4 shall deemed to limit or constitute a waiver of any other right or remedies Lessor may have under this Lease or at law or in equity. If Lessee fails to surrender the Hotel Complex Premises upon the expiration or sooner termination of the Lease Term, Lessee shall indemnify, defend (with counsel satisfactory to Lessor) and hold harmless Lessor from any and all loss, costs and expenses (including attorneys' fees and expenses) and liability arising from such failure, including, without limiting the generality of the foregoing, any claims made by any succeeding tenant arising out of such failure to surrender the Hotel Complex Premises and any lost profits and other consequential damages to Lessor resulting therefrom.

## ARTICLE 3
## RESERVED

## ARTICLE 4
## MINIMUM RENT

4.1    Initial Term Rent. On the date of this Lease, Lessee shall pay Lessor as "**Minimum Rent**" the amount of Five Million Dollars ($5,000,000.00), which is a lump sum payment of all Minimum Rent for the entire Initial Term and, without limitation, includes full payment for Lessee's parking rights for 222 parking stalls as set forth in the Declaration.

4.2    Payment of Minimum Rent. The Minimum Rent set forth above shall be payable by Lessee to Lessor in lawful money of the United States, without setoff, deduction, prior notice or demand.

## ARTICLE 5

## ADDITIONAL RENT/TAXES

5.1    Taxes. At all times during the Lease Term, Lessee agrees to pay, or cause to be paid, without setoff or deduction, as Additional Rent, a portion of the amount of all Taxes assessed for any reason and levied on the Tax Parcel (including land and improvements) equal to a fraction the numerator of which is number of square feet covered by the Improvements on the Parcel and the denominator of which is the number of square feet covered by all improvements on the Tax Parcel. Lessor shall provide Lessee a copy of the tax bill and notice of the amount owed at least thirty (30) days prior to the delinquency date, and Lessee shall pay the amount owed by Lessee pursuant to this Section 5.1 to Lessor within ten (10) days after such notice.

(a)    Definition of Taxes. The term "**Taxes**" levied on the Tax Parcel or the improvements thereon shall mean any form of tax, special tax, assessment, lien, bond obligation, license fee, license tax, tax or excise on rent, possessory interest tax or any other levy, charge or expense, together with any statutory interest thereon, imposed or required at any time by any federal, state, county, city or quasi-governmental authority having jurisdiction, or any political subdivision thereof, or any school, agricultural, lighting, drainage or other improvement or special assessment district thereof (hereinafter individually and collectively referred to as "**Governmental Agencies**"), on any interest of Lessor or Lessee or both (including any legal or equitable interest of Lessor or its mortgagee, if any) in any land or improvement within the Tax Parcel including without limitation: (i) any impositions by Governmental Agencies (whether or not such impositions constitute tax receipts) or any other payments to Governmental Agencies (whether involuntarily imposed by any such Governmental Agencies or voluntarily agreed to by Lessor) in substitution, partially or totally, of any impositions now or previously included within the definition of real property taxes, including without limitation, those calculated to increase tax increments to Governmental Agencies and to pay for such services as fire protection, street, sidewalk and road maintenance, refuse removal or other governmental services formerly provided without charge to property owners or occupants; (ii) any impositions allocable to or measured by the area of the Parcel or the improvements thereon, or any rental payable hereunder, including, without limitation, any gross income tax or excise tax levied by the federal, state, county or city government, or any political subdivision thereof, with respect to the receipt of such rent, or upon or with respect to the possession, leasing, operation, management, maintenance, alteration, repair, use or occupancy by Lessee of the Hotel Complex Premises, or any portion thereof; (iii) any impositions upon this Lease or any document to which Lessee is a party, creating or transferring an interest or an estate in the Hotel Complex Premises; and (iv) any and all costs (including, without limitation, the fees of experts, tax consultants and attorneys) incurred by Lessor should Lessor elect to negotiate or contest the amount of said Taxes in formal or informal proceedings before the taxing Governmental Agency; provided, however, Taxes shall in no event include Lessor's general income, inheritance, estate or gift taxes.

5.2    Personal Property Taxes. Before delinquency, Lessee shall pay all taxes and assessments levied on all Personal Property (as defined in Section 14.1 below) located or installed on the Hotel Complex Premises by or on behalf of Lessee that are owned by Lessee; and Lessee shall provide Lessor with copies of receipts for payment of all such taxes and assessments on receipt of request therefor from Lessor. To the extent any such taxes are not separately assessed or billed to Lessee, Lessee shall pay the amount as invoiced by Lessor.

5.3    Additional Rent. All sums of money or charges required to be paid by Lessee under this Lease, with the exception of Minimum Rent, are collectively referred to in this Lease as "**Additional Rent.**" If such amounts or charges are not paid at the time provided in this Lease, they shall nevertheless be collectible as Additional Rent, but nothing herein contained shall be deemed to suspend or delay the payment of any amount of money or charge at the time the same becomes due and payable hereunder or to limit any other remedy of Lessor.

All amounts of Additional Rent payable in a given month (also collectively sometimes referred to in this Lease as "**Rent**") shall be deemed to comprise a single rental obligation of Lessee to Lessor.

5.4     Failure to Pay; Interest.  If Lessee fails to pay, when due and payable, the Minimum Rent or any Additional Rent, such unpaid amounts shall bear interest at the Interest Rate, from the date due to the date of payment, compounded monthly, based upon actual days elapsed compared to a 360-day year.

5.5     Address for Payments.  All Rent and other payments shall be paid by Lessee to Lessor at the address specified for notice to Lessor in Article 27, or at such other place as may from time to time be designated by Lessor in writing at least ten (10) days prior to the next ensuing payment date.

5.6     Lessee Responsible for All Costs.  Lessor and Lessee acknowledge and agree that this is a triple-net lease and that all obligations relating to the Parcel and the Hotel Complex Premises, including, without limitation, all Minimum Rent, Additional Rent (including without limitation, Taxes), and assessments and costs of compliance with Lessee's obligations under the CC&Rs, together with all applicable Laws (as defined in Section 17.1) and any insurance underwriter's requirements, shall be the sole and exclusive obligation of Lessee, except as expressly otherwise provided in this Lease.  Lessor shall not be responsible or liable for any expenses and upkeep of the Parcel or the Improvements, except as expressly otherwise provided in this Lease.

5.7     DDA Payments.  Lessee acknowledges that Lessor will receive certain payments pursuant to that certain Disposition and Development Agreement dated October 26, 2010 between Lessor and the Community Redevelopment Agency of the City of Buena Park (the "**DDA Payments**"), including without limitation payments based in part on the amount of property tax revenue collected from the Development Project or portions thereof. Lessee further acknowledges that Lessee has no right, title or interest in or to any portion of the DDA Payments and that Lessor has no obligation to Lessee of any kind or character in connection with the DDA Payments.

# ARTICLE 6

## SECURITY DEPOSIT

### INTENTIONALLY OMITTED

# ARTICLE 7

## POSSESSION AND USE

7.1     Permitted Uses.  Subject to the provisions of Section 7.2, Lessee shall use the Hotel Complex Premises for the Permitted Uses and for no other uses or purposes.  "**Permitted Uses**" shall mean and consist of the construction of the Improvements and sublease thereof subject to the restrictions contained herein (including without limitation the use restrictions set forth in this Article 7) and those contained in the CC&Rs affecting the Hotel Complex Premises.  At Lessee's sole expense, Lessee shall procure, maintain and hold available for Lessor's inspection any governmental licenses and permits required for the proper and lawful conduct of Lessee's business.

7.2     Duties and Prohibited Conduct.  Throughout the Lease Term, Lessee shall perform all obligations of Lessee under the CC&Rs and shall abide by and comply with all easements, rights-of-way and other matters now or hereafter of record with respect to the Hotel Complex Premises.  Lessee shall not use or permit any person or persons to use the Hotel Complex Premises in any way that competes with any use of the Development Project or for the sale or display of pornography, nudity, graphic violence, or drug paraphernalia.  Lessee shall not use, or suffer or permit any person or persons to use, the Hotel Complex Premises or any part thereof as a massage parlor, adult bookstore or second-hand store or to conduct an auction, distress, fire, bankruptcy or going-out-of-business sale.  Lessee shall not use the Hotel Complex Premises or Permit the use of the Hotel Complex Premises for any purpose or in any manner that violates any applicable Laws.  Lessee shall not cause or permit waste to occur in the Hotel Complex Premises.  Lessee shall not burn or permit the burning of trash or rubbish in or about the Hotel Complex Premises.  Lessee shall cause trash receptacles at the Hotel Complex Premises to be emptied and trash removed at Lessee's expense with such frequency as may be necessary to avoid an unsightly or unhealthy accumulation of trash.  Lessee shall keep the Hotel Complex Premises, and every part thereof, in a clean and wholesome condition, free from any objectionable noises, music volumes, odors or nuisances, and shall comply with all health and police regulations in all respects.  Except as required to comply with laws, Lessee shall keep no live animals of any kind in the Hotel Complex Premises.

7.3     Hazardous Materials. Lessee shall not use, generate, manufacture, produce, store, treat, dispose or permit the escape on, under, about or from the Hotel Complex Premises, or any part thereof, any asbestos or any flammable, explosive, radioactive, hazardous, toxic, contaminating, polluting matter, waste, substance or related injurious materials, whether injurious by themselves or in combination with other materials (collectively, "**Hazardous Materials**"). Further, Lessee shall not use, generate, manufacture, produce, store, treat, dispose or permit the escape on, under, about or from the Hotel Complex Premises of any material, substance or chemical which is regulated by any Law (collectively "**Regulated Materials**"). Notwithstanding the foregoing, in the event Lessee's permitted use of the Hotel Complex Premises requires the use and/or storage of any Hazardous Materials and/or Regulated Materials on, under or about the Hotel Complex Premises, Lessee shall provide written notice to Lessor, prior to final execution of this Lease, of the description of such materials and Lessee's proposed plan for the use, storage and disposal of such materials. Such use, storage and disposal shall be subject to Lessor's approval, in Lessor's sole discretion. In the event Lessor approves the proposed use, storage and disposal of specific Hazardous Materials and/or Regulated Materials in the Hotel Complex Premises, Lessee may use and store upon the Hotel Complex Premises such approved materials. Lessee shall comply with all Laws with respect to such use and storage, including, without limitation, the removal and disposal of such Hazardous Materials and/or Regulated Materials at all times during and at the expiration or earlier termination of the Lease Term. Notwithstanding anything to the contrary contained in this Lease, in the event any of the equipment serving the Hotel Complex Premises such as, but not limited to, refrigerators, air conditioning systems, and supplemental HVAC systems, utilize refrigerants containing chlorofluorocarbons ("**CFCs**"), Lessor, in its sole discretion, shall have the option to require Lessee to remove such equipment at the expiration or earlier termination of the Lease Term. In addition, Lessee shall be responsible for compliance with all Laws with respect to such equipment and/or the use of CFCs which may include the removal and disposal of such equipment.

Lessee shall defend (by counsel reasonably acceptable to Lessor), indemnify, protect and hold Lessor and each of Lessor's partners, employees, agents, attorneys, successors and assigns, free and harmless from and against any and all claims, liabilities, penalties, forfeitures, losses (including diminution in value of the Hotel Complex Premises or the Parcel) or expenses (including attorney's fees), or death of or injury to any person or damage to any property whatsoever, arising from or caused in whole or in part, directly or indirectly by:

(a)     The presence in, on, under or about the Hotel Complex Premises, or discharge in or from the Hotel Complex Premises of any Hazardous Materials and/or Regulated Materials, or Lessee's use, analysis, storage, removal, transportation, disposal, release, threatened release, discharge or generation of Hazardous Materials and/or Regulated Materials to, in, on, under, about or from the Hotel Complex Premises, or;

(b)     Lessee's failure to comply with any federal, state, county, municipal, local or other law, rule, ordinance and regulation now or hereafter in effect relating to the industrial hygiene, environmental protection, use, analysis, generation, manufacture, purchase, transportation, storage, removal and disposal of Hazardous Materials and/or Regulated Materials.

Lessee's obligations hereunder shall include, without limitation and whether foreseeable or unforeseeable, all costs of any required or necessary testing, repair, cleanup, removal costs, detoxification or decontamination of the Hotel Complex Premises and the preparation and implementation of any closure, remedial action, site assessment costs or other required plans in connection therewith. In addition, upon request from Lessor at any time during the Lease Term, Lessee shall execute affidavits, representations, and any other similar documents concerning Lessee's best knowledge and belief regarding the presence of Hazardous Materials and/or Regulated Materials on, under or about the Hotel Complex Premises. Further, Lessee's obligations hereunder shall survive the expiration or earlier termination of this Lease. For purposes of this Section 7.3, any acts or omissions of Lessee whereby employees, agents, assignees, contractors or subcontractors of Lessee or others are acting for or on behalf of Lessee (whether or not they are negligent, intentional, willful or unlawful), will be strictly attributable to Lessee.

## ARTICLE 8
## UTILITIES

8.1     Utilities. Lessee shall pay or cause to be paid, all charges (including, without limitation, meter fees, connection fees, impact fees and/or any other fees or assessments) for water, gas, electrical power, telephone, sewer, trash collection and all other utilities and services supplied to or for the Hotel Complex Premises (hereinafter referred to as "**Utilities**") from and after the Effective Date, and agrees to hold Lessor harmless with respect to any charges for said Utilities. If any such charges are not paid when due, Lessor may, but shall not be required to, pay

the same, and any amount so paid by Lessor shall immediately thereafter become due to Lessor from Lessee as Additional Rent.

Lessee shall also procure, or cause to be procured, without cost to Lessor, any and all necessary permits, licenses or other authorizations required for the lawful and proper installation and maintenance upon the Hotel Complex Premises of wires, pipes, conduits, tubes and other equipment and appliances for use in supplying any Utilities to and upon the Hotel Complex Premises. If required by the applicable utility company, Lessor, upon request of Lessee, and at the sole expense and liability of Lessee, will join with Lessee in any application required for obtaining or continuing any Utilities.

8.2     No Liability. Lessor shall not be liable in damages or otherwise for any discontinuance, failure or interruption of Utility service to the Hotel Complex Premises. No such discontinuance, failure or interruption shall be deemed a constructive eviction of Lessee or entitle Lessee to terminate this Lease or withhold payment of any Rent due under this Lease.

8.3     Consent to Districts. Lessee hereby acknowledges that the Hotel Complex Premises may be subject to special assessment and/or utility districts (e.g., water districts), and acknowledges that its use and occupancy of the Hotel Complex Premises shall comply with any requirements of the same.

## ARTICLE 9

### INDEMNITY; INSURANCE

9.1     Indemnity by Lessee. Lessee shall indemnify, protect, defend, and hold Lessor (and Lessor's partners, joint venturers, shareholders, mortgagees, affiliates, and property managers, and their respective officers, directors, employees, and agents) (collectively "**Lessor Parties**") harmless from and against any and all claims, demands, investigations, proceedings, actions, suits, judgments, awards, fines, liens, loss, damage, expense, charge or cost of any kind or character and liability (including reasonable attorney fees and court costs) (collectively, "**Claims**") arising out of or in connection with loss of life, personal injury, property damage or otherwise arising from (a) the construction, use, occupation, improvement or maintenance of the Hotel Complex Premises or any work or activity in or about the Hotel Complex Premises by Lessee or its assignees or subtenants or their respective agents, employees, contractors, licensees or invitees, (b) any activity, condition or occurrence in or about the Hotel Complex Premises, (c) the filing or potential filing of any mechanics' or materialmen's liens against the Hotel Complex Premises in connection with any work done or caused to be done by Lessee, (d) any breach or failure to perform any obligation imposed on Lessee under this Lease, or (e) any act or omission of Lessee or its assignees or subtenants or their respective agents, contractors, employees, customers, invitees or licensees. Upon notice from any of the Lessor Parties, Lessee shall, at Lessee's sole expense and by counsel satisfactory to Lessor, defend any action or proceeding brought against Lessor Parties, or any of them, by reason of any such Claim. If any of the Lessor Parties is made a party to any litigation commenced by or against Lessee, then Lessee shall indemnify, protect, defend, and hold each of such Lessor Parties harmless from and against any and all Claims arising out of, incurred or paid by any such person in connection with such litigation. The obligations of this Section 9.1 shall survive the expiration or earlier termination of this Lease.

9.2     Lessee's Insurance Obligations. Lessee further covenants and agrees that it will carry and maintain insurance, at its sole cost and expense, (1) of the types and in the amounts as set forth in this Section 9.2 from and after the Effective Date, and (2) as reasonably determined, from time to time, by an insurance consultant that regularly provides insurance consulting services to institutional lenders and is approved by Lessor's Mortgagees. The following requirements will remain in force throughout the term of this Lease, or as otherwise specified herein; provided, however, that if any required insurance coverage cannot reasonably be obtained or maintained because of insurance market, legislative or other factors, then Lessee may substitute therefor a suitable alternative form of insurance or other risk management technique, subject to the approval of Lessor's Mortgagees, which approval will not be unreasonably withheld, conditioned or delayed. Lessee shall directly implement the insurance requirements or cause them to be implemented to protect Lessee's and Lessor's interests as described herein.

(a)     Public Liability. Commercial general liability insurance for bodily injury, death, personal injury and property damage (including contingent liability, completed operations and broad form contractual liability coverage) with coverage limits of not less than Five Million Dollars ($5,000,000.00) combined single limit, per occurrence, in the aggregate, insuring against any and all liability of the insured with respect to the Hotel

Complex Premises or arising out of the maintenance, use or occupancy thereof and shall specifically include liquor liability insurance covering consumption of alcoholic beverages, if the sale of alcoholic beverages is a Permitted Use hereunder. All such personal injury liability insurance and property damage liability insurance shall specifically insure the performance by Lessee of that part of the indemnity agreement contained in Section 9.1 relating to liability for injury to or death of persons and damage to property and shall name Lessor, its successors and assigns as an additional insured.

(b)     Workers' Compensation. Statutory amount of workers' compensation insurance required by the state in which the Hotel Complex Premises are located for the benefit of Lessee's employees. During construction of the Improvements, Lessee shall cause its contractors to maintain workers' compensation insurance with limits of liability as required by the state in which the Hotel Complex Premises are located and employer's liability insurance with limits of liability of at least One Million Dollars ($1,000,000.00), each containing a waiver of subrogation executed by the insurance company, if the same can be obtained, in favor of Lessor.

(c)     Plate Glass. Insurance covering the full replacement cost of all plate glass on the Hotel Complex Premises. Lessee shall have the option either to insure commercially or to self-insure this risk.

(d)     Equipment. Machinery insurance on all air conditioning equipment and systems serving the Hotel Complex Premises. If said equipment and the damage it may cause are not covered by Lessee's property insurance (as specified in subparagraph (e), below), then the insurance specified in this subparagraph (d) shall be in an amount not less than the full replacement cost of such equipment and systems. If Lessee requires boilers or other pressure vessels to serve the Hotel Complex Premises, they shall also be insured in the amount required by this subparagraph (d).

(e)     Improvements; Personal Property and Merchandise.     Insurance covering (1) the Improvements, (2) the Personal Property, and (3) Lessee's merchandise, from time to time, in, on or upon the Hotel Complex Premises, in an amount not less than one hundred percent (100%) of their full replacement cost from time to time, providing protection against any peril included within the classification "**Special Causes of Loss**" including, without limitation, coverage for sprinkler and flood damage and theft and earthquake coverage. During remodeling or construction of the Improvements, Lessee shall maintain builder's risk insurance covering the Improvements for fire, lightning, extended coverage perils, vandalism, malicious mischief and sprinkler leakage, in an amount not less than one hundred percent (100%) of their projected replacement cost. Any policy proceeds shall be used for the repair or replacement of the property damaged or destroyed, unless this Lease shall cease and terminate under the provisions of Article 18.

(f)     Business Interruption. Business interruption insurance in such an amount as will cover Lessee's Rent obligations hereunder and reimburse Lessee for loss of direct or indirect earnings attributable to all perils insured against as required by Section 9.2(e) above or attributable to prevention of access to the Hotel Complex Premises as the result of such perils for a period of at least twelve (12) months.

(g)     Automobile Liability. Comprehensive automobile liability insurance with employer's non-ownership liability endorsement, with a combined single limit (for both bodily injury and property damage) of not less than Three Million Dollars ($3,000,000.00).

(h)     Additional Insurance. Lessee shall carry and maintain during the Lease Term such other types of insurance coverage and in such amounts covering the Hotel Complex Premises and Lessee's operations therein as may be reasonably required by Lessor from time to time. In addition, the limits of liability for the insurance required under subparagraphs (a), (b) and (g) above shall be subject to increase from time to time as may be reasonably required by Lessor.

(i)     Construction Defect Insurance. Lessee shall maintain or cause to be maintained construction defect insurance in accordance with the CC&Rs.

All policies of insurance provided for herein shall be issued by insurance companies with a general policyholder's rating of not less than "A" and a financial rating of not less than "VIII" as rated in the most current available "Best's" Insurance Reports, and qualified to do business in the state where the Hotel Complex Premises are located. The policy of insurance under subparagraph (a) above shall contain a cross-liability endorsement and the policies of insurance under subparagraphs (a) and (g) above shall name Lessor, Lessor's Mortgagees, property managers, and such other individuals or entities as Lessor may from time to time designate as "additional insureds." In addition, the insurance under subparagraphs (d), (e) and (i) above shall name Lessor and/or Lessor's Mortgagees as loss-

payee. Executed copies of all policies of insurance required hereunder or certificates thereof shall be delivered to Lessor (i) with regard to the public liability insurance identified in Section 9.2(a), within five (5) days following Lessee's execution and delivery of this Lease to Lessor, (ii) with regard to the construction insurance identified in Section 9.2(e), on or before Lessee's commencement of construction of the Improvements, and (iii) with regard to the remaining insurance required under this Section 9.2, on or before the completion of construction of such Improvements, and thereafter executed copies of renewal policies or certificates thereof shall be delivered to Lessor within thirty (30) days prior to the expiration of the term of each such policy. As often as any policy shall expire or terminate, renewal or additional policies shall be procured and maintained by Lessee in like manner and to like extent. All policies of insurance delivered to Lessor must contain a provision that the company writing said policy will give to Lessor (and any other additional insureds) thirty (30) days' advance written notice of any cancellation, lapse, reduction or other adverse change respecting such insurance. All public liability, property damage or other casualty policies shall be written as primary policies, not contributing with or secondary to coverage which Lessor may carry.

Lessee's obligations to carry the insurance provided for above may be satisfied by inclusion of the Hotel Complex Premises within the coverage of a so-called blanket policy or policies of insurance carried and maintained by Lessee; provided, however, that Lessor and those persons or entities identified in the preceding paragraph shall be named as additional insureds or loss-payees thereunder as their interests may appear and that the coverage afforded Lessor will not be reduced or diminished by reason of the use of such blanket policies of insurance, and provided further that the requirements set forth herein are otherwise satisfied. Lessee agrees to permit Lessor at all reasonable times to inspect any policies of insurance of Lessee which Lessee has not delivered to Lessor.

9.3    Waiver of Rights. Lessee (for itself and its insurer) hereby waives any rights, including rights of subrogation, that Lessee may have against Lessor for compensation of any loss or damage occasioned to Lessee with regard to its property and the Hotel Complex Premises arising from any peril generally covered by the insurance Lessee is required to carry and maintain under Sections 9.2(c), (d), (e) and (f).

9.4    Exemption of Lessor from Liability. Lessee, as a material part of the consideration to Lessor, assumes all risk of damage to property, including, but not limited to, Improvements, fixtures, equipment, furniture, and alterations or injury to persons in, on, under or about the Hotel Complex Premises, arising from any cause, and Lessee expressly releases Lessor and waives all claims in respect thereof against Lessor, except only such claims that are caused solely by the gross negligence or willful misconduct of Lessor and it Authorized Representatives, subject to Section 9.3. Lessee agrees that Lessor shall not be liable for injury to Lessee's business or any loss of income therefrom or for any damage to the property of Lessee, or injury or death or illness of Lessee, Lessee's Authorized Representative, invitees, customers, or any other person in or about the Hotel Complex Premises, whether such damage, illness, or injury is caused by fire, steam, electricity, gas, water, or rain, or from the breakage, leakage, or other defects of sprinklers, wires, appliances, plumbing, ventilation, air conditioning, or lighting fixtures, or from any other cause, and whether such damage, illness or injury results from conditions arising on the Hotel Complex Premises, or from other sources or places, and regardless of whether the cause of such damage, illness or injury or the means of repairing the same is inaccessible to Lessee, excepting only damage, illness or injury caused solely by the gross negligence or willful misconduct of Lessor and its Authorized Representatives, subject to Section 9.3. Lessor shall not be liable for any damages arising from any act or neglect of any other tenant, if any, or Lessor's failure to enforce the terms of any agreement with parties other than Lessee.

## ARTICLE 10

### TITLE TO PREMISES

10.1    Real Property. Lessee acknowledges that Lessor's title to the Parcel is subject to: (a) the effect of any and all Matters of Record; (b) the effect of any applicable Laws, including without limitation zoning, building and other land-use laws of the city, county and state where the Hotel Complex Premises are located; (c) general and special Taxes not delinquent; (d) all matters discoverable by physical inspection of the Hotel Complex Premises; and (e) all matters known to Lessee of which Lessee has notice constructive or otherwise (collectively, the "**Permitted Exceptions**"). As to its leasehold estate, Lessee and all persons in possession of the Hotel Complex Premises will conform to and will not violate any of the foregoing.

10.2    Personal Property. All of Lessee's and its subtenants' Personal Property must be new when installed in, or attached to, the Hotel Complex Premises by Lessee or its subtenants and shall remain the property of Lessee and its subtenants.

00905865.6                                    -- 8 --

10.3    Ownership and Removal of Improvements. Lessor and Lessee hereby acknowledge and agree that all Improvements constructed upon the Parcel and any of Lessee's trade fixtures or other property that is permanently affixed to the Hotel Complex Premises such that they are an integral part of the Improvements shall be deemed Improvements as defined in this Lease. Lessee shall be the owner of all Improvements constructed on the Parcel, as the same may be altered, expanded and/or improved from time to time. Lessee shall retain all rights to depreciation deductions and tax credits arising from its ownership of the Improvements. On expiration or earlier termination of this Lease, all such Improvements shall automatically vest in, revert to, and become the property of Lessor without compensation to, or requirement of consent or other act of Lessee and without the necessity of executing a deed, bill of sale, conveyance or other act or agreement of Lessee, and without any payment of any kind or nature by Lessor to Lessee or to any other person, including any leasehold mortgagee or other lender who has a lien against all or any portion of Lessee's interest in this Lease. Lessee shall thereafter have no further rights or interest therein. On or at any time after the date of expiration of this Lease, if requested by Lessor, Lessee shall, without charge to Lessor, promptly execute, acknowledge and deliver to Lessor a deed and bill of sale (in form and content acceptable to Lessor) which conveys all of Lessee's right, title, and interest in and to the Improvements and any modifications thereto. In addition, at any time after the expiration or earlier termination of this Lease, if so requested by Lessor, Lessee shall, without charge to Lessor, promptly execute, acknowledge and deliver to Lessor an assignment (in form and content acceptable to Lessor) which (i) conveys all of Lessee's right, title and interest in and to the Hotel Complex Premises; (ii) assigns all contracts designated by Lessor, relating to the operation, management or maintenance of the Hotel Complex Premises or any part thereof; and (iii) conveys or assigns, as the case may be, all plans, records, registers, permits, and all other papers and documents which may be necessary or appropriate for the proper operation and management of the Hotel Complex Premises.

## ARTICLE 11

## CONSTRUCTION OF IMPROVEMENTS

11.1    Improvements. After commencement of construction of the Improvements shall have occurred, Lessee's construction of the Improvements shall, subject to force majeure events, be prosecuted continuously and diligently to completion. Lessee agrees to construct or cause to be constructed to substantial completion upon the Hotel Complex Premises on or prior to June 30, 2017 all Improvements, which Improvements shall be constructed in accordance with plans and specifications first approved in writing by Lessor. Lessee covenants and agrees that Lessee shall obtain all approvals required under applicable Laws before constructing the Improvements. In no event shall the gross building area of the Improvements exceed the maximum square footage allowed pursuant to applicable zoning, governmental requirements and applicable law. Lessor agrees that Lessor shall, at no material cost to Lessor, cooperate with Lessee in obtaining any approvals required for the initial Improvements under applicable Laws.

11.2    Alteration of Improvements. In no event shall any structural or exterior alterations, additions, changes or improvements (collectively "**Alterations**") be made to the Hotel Complex Premises, without obtaining the prior written approval of Lessor, which approval shall not be unreasonably withheld, conditioned or delayed. Lessee agrees to reimburse Lessor for all actual costs and expenses (including, without limitation, any architect and/or engineer fees) reasonably incurred by Lessor in approving or disapproving Lessee's plans for Improvements or any alterations, additions or changes thereto.

11.3    Construction and Maintenance Requirements. All Improvements and Alterations shall be performed in accordance with all applicable Laws, insurance underwriter's requirements, the CC&Rs and other Matters of Record by duly licensed contractors under the supervision of a qualified architect or licensed structural engineer. Work shall not commence until Lessee (a) has obtained and delivered to Lessor a copy of all legally required permits and approvals and (b) has complied with the requirements of Section 12.5 below. All work with respect to any Improvements must be performed in a good and workmanlike manner and diligently prosecuted to completion to the end that the Hotel Complex Premises shall at all times be a complete unit except during the period of work. Lessee shall deliver to Lessor, prior to commencement of said work, a copy of the building permit with respect thereto.

## ARTICLE 12

### MECHANICS' LIENS

12.1    Lessee's Covenants. Lessee agrees that it will pay, or cause to be paid, all costs of labor, services and/or materials supplied in the prosecution of any work, done, or caused to be done, on the Hotel Complex Premises, and Lessee will keep the Hotel Complex Premises free and clear of all mechanics' liens and other liens on account of work done for Lessee or persons claiming under Lessee.

12.2    Contest of Lien. If Lessee desires to contest any mechanics' lien claim it shall (a) either (i) post a mechanics' lien release bond issued by a responsible corporate surety in an amount and in a manner sufficient to satisfy statutory requirements for the release of such mechanics' lien in the state where the Hotel Complex Premises are located or (ii) furnish Lessor with adequate security for the amount of the claim plus estimated costs and interest, and (b) promptly pay or cause to be paid all sums awarded to the claimant on its suit.

12.3    Lessor's Right to Cure. If Lessee shall be in default of any of its covenants in this Article 12 by failing to provide security for or satisfaction of any mechanics' lien, then Lessor, in addition to any other rights or remedies it may have, may (but shall not be obligated to) discharge said lien by (a) paying the claimant an amount sufficient to settle and discharge the claim, (b) posting a mechanics' lien release bond, or (c) taking such action as Lessor shall deem appropriate, in which event Lessee shall pay, as Additional Rent, on Lessor's demand, all costs (including reasonable attorneys' fees) incurred by Lessor in settling and discharging said lien together with interest thereon in accordance with Section 5.5, from the date of Lessor's payment of said costs. Lessor's payment of said costs shall not waive any default of Lessee under this Article 12.

12.4    Notice of Lien. Lessee shall forthwith notify Lessor in writing of any claim or lien filed against the Hotel Complex Premises or the commencement of any action affecting the title thereto.

12.5    Notice of Non-responsibility. Lessor or its representatives shall have the right to go upon and inspect the Hotel Complex Premises at all reasonable times and shall have the right to post and keep posted thereon notices of non-responsibility or such other notices which Lessor may deem to be proper for the protection of Lessor's interest in the Hotel Complex Premises. Before the commencement of any work which might result in any such lien, Lessee shall give to Lessor (at least ten (10) business days' written notice of its intention to do so in sufficient time to enable Lessor to post such notices. Lessee shall also notify Lessor on the day when such work is actually commenced.

## ARTICLE 13

### SIGNS

13.1    Lessee's Signage. Lessee be permitted, at Lessee's sole cost and expense and subject to the remaining provisions of this Section 13.1, to install (a) on the façade of the Hotel Complex Premises building, the maximum signage allowed by applicable code, any applicable permits and all other requirements of the applicable governmental entities, (b) a pylon sign on the Parcel in a location to be mutually, reasonably determined by Lessor and Lessee, (c) interior signage in such building (which interior signage may, at times, be illuminated and/or visible from the exterior of such building) so long as such interior signage is of a first-class nature and complies with all applicable codes and other governmental requirements, and all applicable requirements of the CC&Rs. Lessee agrees, at Lessee's sole cost and expense, to maintain, in good condition and repair at all times, any such pylon, sign, awning, canopy, decoration, lettering or advertising matter (collectively, "Lessee's Signage"). Lessee's Signage shall be installed prior to Lessee's opening for business. If Lessee fails to maintain any Lessee's Signage in accordance with the terms of this Article 13, Lessor may do so and Lessee shall reimburse Lessor for such cost plus a twenty percent (20%) overhead fee. Upon the expiration or earlier termination of this Lease, Lessee shall, at its expense, remove Lessee's signs and repair any damage resulting from the installation or removal thereof.

## ARTICLE 14

### PERSONAL PROPERTY

14.1    Removal and Replacement. All of Lessee's trade fixtures, furniture, furnishings, signs, merchandise, inventory and other personal property not permanently affixed to the Hotel Complex Premises (hereinafter collectively referred to as "Personal Property") must be new when installed in, or attached to, the Hotel Complex Premises by Lessee. Subject to the provisions of Section 14.2, any such Personal Property shall

remain the property of Lessee. Provided Lessee is not in default under the terms of this Lease, Lessee shall have the right to remove any or all of its Personal Property which it may have stored or installed in the Hotel Complex Premises, including, without limitation, counters, shelving, showcases, mirrors and other movable Personal Property, so long as Lessee shall immediately replace the same with similar Personal Property of comparable or better quality, except Lessee shall not be obligated to replace such Personal Property at the expiration or earlier termination of this Lease. Lessee shall, at its expense, immediately repair any damage occasioned to the Hotel Complex Premises by reason of the removal of any such Personal Property.

14.2    Improvements. Any of Lessee's trade fixtures, furniture, furnishings or other property which is permanently affixed to the Hotel Complex Premises shall be deemed Improvements as defined in this Lease.

14.3    Personal Property Taxes. In addition to Lessee's obligations set forth in Section 5.3, Lessee shall pay before delinquency all taxes (including sales and use taxes), assessments, license fees and public charges levied, assessed or imposed upon its business operations as well as upon its Personal Property. No taxes, assessments, fees or charges referred to in this Section shall be considered as Taxes under the provisions of Section 5.3.

## ARTICLE 15

## ASSIGNMENT AND SUBLETTING

15.1    Assignment and Subletting. Lessee shall not sublet or assign this Lease or any interest herein (hereinafter, a "**Transfer**") without the prior written consent of Lessor, which consent will not be unreasonably withheld, subject to the conditions set forth in Section 15.2 and Lessor's rights under Section 15.6. A consent by Lessor to one Transfer, whether by operation of law or otherwise, shall not be deemed to be a consent to any subsequent Transfer. Any Transfer made contrary to the terms of this Section shall, at Lessor's election, be void. For purposes of this Lease, the term "Transfer" shall also include (a) the transfer, whether voluntary, involuntary or by operation of law, of fifty percent (50%) or more of the ownership or voting interest of Lessee in the aggregate through one transfer or a series of transfers, or (b) the dissolution, merger, consolidation or other reorganization of Lessee.

15.2    Restrictions. By way of example and without limitation, the parties agree it shall be reasonable for Lessor to withhold its consent if any of the following situations exist or may exist:

(a)    The transferee's contemplated use of the Hotel Complex Premises following the proposed Transfer conflicts with the use restrictions set forth in Article 7 hereof;

(b)    In Lessor's reasonable business judgment, the transferee has failed to demonstrate sufficient business reputation, skill or experience to manage a successful development and project of the type and quality permitted under this Lease and consistent with the types and quality of businesses anticipated by Lessor in the Development Project as a whole;

(c)    In Lessor's reasonable business judgment, the present net worth of the transferee is less than the greater of Lessee's net worth as of the date Lessor and Lessee entered into this Lease or Lessee's net worth at the date of Lessee's request for consent;

(d)    The proposed Transfer would breach any covenant of Lessor respecting radius, location, use or exclusivity in any other lease, financing agreement, CC&Rs or any other agreement to which Lessor is bound;

(e)    Lessor has given notice of election to purchase pursuant to Section 15.6.

15.3    Condition Precedent. Lessee shall not have the right or power to request or effect a Transfer at any time an Event of Default shall exist.

15.4    Procedures. Should Lessee desire to effect a Transfer, Lessee shall give notice thereof to Lessor by requesting in writing Lessor's consent to such Transfer at least sixty (60) days before the effective date thereof and shall provide Lessor with the following:

(a)    The full particulars of the proposed transaction, including its nature, effective date, and terms and conditions including the purchase price and payment terms of the purchase price. Such documentation shall include, without limitation, copies of any offers, draft agreements, subleases, letters of commitment or intent, and other documents pertaining to such proposed transaction;

(b)       A description of the identity, net worth and previous business experience of the transferee, including, without limitation, copies of such transferee's latest income statement, balance sheet and statement of cash flows (with accompanying notes and disclosures of all material changes thereto) in audited form, if available, and certified as accurate by the transferee along with a written statement authorizing Lessor or its designated representative(s) to investigate such transferee's business experience, credit and financial responsibility;

(c)       A statement that Lessee intends to consummate the transaction if Lessor consents thereto; and

(d)       Any further information relevant to the transaction which Lessor shall reasonably request.

A proposed Transfer which has not complied with the notice provisions set forth in this Section 15.4 shall be of no force or effect until Lessor's consent has been obtained in accordance with this Article 15. Within thirty (30) days after receipt of Lessee's written request for consent in accordance with this Section 15.4, Lessor shall respond to the request for consent to the proposed Transfer.

15.5     Documentation and Expenses. Each Transfer made by Lessee shall be evidenced by an instrument acceptable to Lessor, which shall be executed by Lessor, Lessee and the transferee. By such instrument, the transferee shall assume and promise to perform the terms, covenants and conditions of this Lease which are obligations of Lessee. Lessee shall remain fully liable throughout the remainder of the Lease Term to perform its duties under this Lease following the Transfer. Lessee shall, promptly following receipt of an invoice therefor, reimburse Lessor for Lessor's reasonable costs, including legal fees, incurred in obtaining advice and preparing documentation for each Transfer.

15.6     Lessor's Option to Acquire. Except with respect to any Transfer that does not require Lessor's consent pursuant to Section 15.7, Lessor shall have the right to elect to purchase Lessee's interest in this Lease, or the applicable portion thereof, by giving notice of such election to Lessee within thirty (30) days after Lessor receives Lessee's notice of a proposed Transfer and all information required under Section 15.4. The purchase price and terms and conditions for Lessee's purchase shall be the same as specified in the information provided by Lessee pursuant to Section 15.4, except that the purchase price and other consideration to be paid or given by Lessor shall not exceed fair market value, as determined by a qualified independent appraiser selected by Lessor and approved by Lessee, which approval shall not be unreasonably withheld. If and to the extent that it is not feasible for Lessor to perform as contemplated in the terms provided by Lessee pursuant to Section 15.4 (such as because such terms provide for a transfer of property owned by the proposed transferee), a commercially reasonable term that is feasible for Lessor to perform shall be substituted.

15.7     Transfers That Do Not Require Lessor's Consent. Notwithstanding anything to the contrary contained in this Lease, Lessee shall not be required to obtain Lessor's consent to the following transactions:

(a)       Exempt Transfers. Lessee may Transfer all or any part of its interest in this Lease to an entity which directly or indirectly, through one or more intermediaries, is controlled by, controls or is under common control with Lessee, as "control" is defined hereafter (an "Affiliate"), provided that such Transfer is not a subterfuge by Lessee to avoid its obligations under this Lease. For purposes of this Section 15.7, "control" of an entity shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of such entity.

(b)       Subleases. Lessee may, subject to the terms and conditions of Section 15.8, enter into subleases, concession agreements, license agreements and/or other occupancy agreements with respect to space in the Improvements (each a "Sublease") without Lessor's consent, provided that Lessee shall not enter into any Sublease on terms that violate or are incompatible with this Lease (including without limitation the use restrictions set forth in Article 7) or any CC&Rs affecting the Hotel Complex Premises.

(c)       Leasehold Mortgages. Subject to the provisions of Article 19, Lessee may enter into a Leasehold Mortgage or Leasehold Mortgages without Lessor's consent, and Leasehold Mortgages may be enforced or foreclosed in accordance with Article 19, including, without limitation, the Transfer of Lessee's interest in this Lease in connection with foreclosure proceedings as provided in Article 19.

15.8     Subletting and Occupancy Agreements.

(a)       Permitted Subleases; Conditions. Lessee shall not be required to obtain Lessor's prior written consent with respect to any Sublease unless (i) Lessee requests that Lessor execute a subordination,

nondisturbance and attornment agreement ("SNDA") pursuant to Section 15.8(b), or (ii) the proposed Sublease is not an arm's-length Sublease entered into in the ordinary course of Lessee's business on commercially reasonable terms for occupancy by the Subtenant, hereafter defined. Lessee further agrees for the benefit of Lessor that each Sublease (A) shall state that it is subject to the terms and provisions of this Lease, and (B) shall require that the subtenant or other party under the Sublease ("**Subtenant**") attorn to and accept the Lessor as the sublessor or other party to the Sublease in the event this Lease is terminated and Lessor requests such attornment. Notwithstanding the fact that Lessee shall not be required to obtain Lessor's prior written consent to Subleases, Lessor understands that Lessee may request that Lessor affirmatively approve or consent to certain Subleases, which approval or consent may be for the benefit of Lessee or the Subtenant. In such instances, Lessor agrees that its approval or consent to such Subleases shall not be withheld as long as such Subleases comply with the requirements of this Section 15.8. Lessor shall notify Lessee of its approval or disapproval of a proposed Sublease within thirty (30) days after its receipt of Lessee's written request for approval.

(b)      Nondisturbance Agreement. If Lessee requests that Lessor enter into an SNDA for a particular Sublease and Lessor approves the proposed Subtenant and the proposed Sublease, Lessor, Lessee and the proposed Subtenant shall negotiate the terms and conditions of the SNDA in good faith.

15.9     Nullity. Any purported Transfer consummated in violation of the provisions of this Article 15 shall be, at Lessor's election, null and void and of no force or effect.

## ARTICLE 16

## NON-DISCRIMINATION AND NON-SEGREGATION COVENANT

16.1     Lessee's Covenant. Lessee herein covenants for itself, its successors and assigns and all persons and entities claiming under or through Lessee, and this Lease is made and accepted upon the following conditions:

(a)      There shall be no discrimination against or segregation of any person or group of persons on account of any basis listed in Subdivision (a) or (d) of Section 12955 of the Government Code, as those bases are defined in Sections 12926, 12926.1, subdivision (m) and paragraph (1) of subdivision (p) of Section 12955, and Section 12955.2 of the Government Code, in the leasing, subleasing, transferring, use, occupancy, tenure or enjoyment of the land herein leased, nor shall the lessee, himself or herself, or any person or entity claiming under or through him or her, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy or tenants, lessees, subleases, subtenants or vendees in the land herein leased.

(b)      Notwithstanding paragraph (a), with respect to familial status, paragraph (a) shall not be construed to apply to housing for older persons, as defined in Section 12955.9 of the Government Code. With respect to familial status, nothing in paragraph (a) shall be construed to affect Sections 51.2, 51.3, 51.4, 51.10, 51.11 and 799.5 of the California Civil Code, relating to housing for senior citizens. Subdivision (d) of Section 512 and Section 1360 of the California Civil Code and subdivision (n), (o) and (p) of Section 12955 of the Government Code shall apply to paragraph (a).

16.2     Inclusion of Covenant in Subleases and Other Agreements. All Subleases and any other document evidencing the Transfer of Lessee's leasehold interest herein or any part thereof, shall contain and be subject to the same or substantially the same non-discrimination and non-segregation clauses as those set forth in this Article 16.

## ARTICLE 17

## REPAIRS; MAINTENANCE

17.1     Repairs and Maintenance. Lessor shall have no obligation of any kind to maintain, repair, alter, construct, replace, or improve the Hotel Complex Premises or to comply with any applicable Laws or with any other legal or insurance requirement concerning the condition or repair of the Hotel Complex Premises. At all times Lessee, at no cost to Lessor, shall (a) maintain the Hotel Complex Premises in compliance with the requirements of applicable Laws, applicable mortgages, deeds of trust, insurance policies and CC&Rs affecting the Hotel Complex Premises, and (b) perform all repairs and replacements required to keep the Hotel Complex Premises in a structurally sound, sanitary, safe and first-class condition. Lessee agrees at all times from and after delivery of the Hotel Complex Premises, at its own cost and expense, to repair, maintain in good and tenantable condition and

replace and improve, as necessary, the Hotel Complex Premises and every part thereof, whether or not such items are structural or non-structural, including, without limitation, the following: all Improvements, ancillary components, pavement, sidewalks, curbs, gutters, exterior lighting, all meters, pipes, conduits, equipment, components and facilities (whether or not within or outside of any building which is part of the Improvements) that supply the Hotel Complex Premises with Utilities (except to the extent the appropriate utility company has assumed these duties); all equipment installed in the Hotel Complex Premises; all exterior and interior glass installed in the Hotel Complex Premises; all elevators installed in the Hotel Complex Premises; the storefront(s); all signs, locks and closing devices; all window sashes, casements and frames; doors and door frames; floor coverings, including carpeting, terrazzo or other special flooring; and all such items of repair, maintenance, alteration, improvement, replacement or reconstruction as may be required at any time or from time to time to keep the Hotel Complex Premises in first class condition and repair and to comply with all applicable laws, ordinances, rules or regulations of any public authority, the requirements of any insurance underwriter or any similar body now existing or which may become applicable in the future (collectively **"Laws"**). Lessee's obligations under this Section 17.1 shall include, without limitation, any of the foregoing which are required because of (i) the enforcement of or any change in any applicable Law, (ii) any act or omission of Lessee or (iii) to comply with any requirements of any governmental or quasi-governmental agency or any insurer. All replacements made by Lessee in accordance with this Section shall be of like size, kind and quality to the items replaced as they existed when originally installed.

17.2     Lessee's Failure to Maintain. If Lessee refuses or neglects to comply with any of its obligations in Section 17.1 in a manner reasonably satisfactory to Lessor, without waiving Lessee's default and in addition to its other rights and remedies, Lessor shall have the right (but not the obligation), upon giving Lessee reasonable written notice of its election to do so (except that no notice will be required in the event of an emergency), to take such actions on behalf of and for the account of Lessee. In such event, Lessee shall pay the cost of such work as Additional Rent promptly upon receipt of an invoice therefor. Lessor shall have no liability for interference with any business conducted on the Hotel Complex Premises or any other injury, loss, liability, or damage as a consequence of such entry or repairs. Lessee expressly waives (i) all defenses to its maintenance obligations under this Lease; (ii) the right to require Lessor to make repairs; (iii) any right to make repairs at the expense of Lessor; (iv) the right to reduce or offset rent as a consequence of the condition of the Hotel Complex Premises or the Improvements; (v) the benefits of California Civil Code Sections 1932, 1941 and 1942, as amended, or common law principles similar thereto, now or hereafter in effect or otherwise inconsistent with the provisions of this Lease.

17.3     Right to Enter. Lessee agrees to permit Lessor, or its authorized representatives, to enter the Hotel Complex Premises at all times during usual business hours upon giving Lessee reasonable written notice (except that no notice will be required in the event of an emergency) to inspect the same and to perform any work therein that (a) may be necessary to comply with any applicable Laws or conditions, covenants and restrictions, or (b) Lessor may deem necessary to prevent waste or deterioration in connection with the Hotel Complex Premises. Nothing herein contained shall imply any duty on the part of Lessor to do any such work which, under any provision of this Lease, Lessee is required to do, nor shall Lessor's performance of any work on behalf of Lessee constitute a waiver of Lessee's default in failing to do the same. No exercise by Lessor of any rights herein reserved shall entitle Lessee to any compensation, damages or abatement of Rent from Lessor for any injury or inconvenience occasioned thereby. If Lessor makes or causes any such repairs to be made or performed, as provided for herein, Lessee shall pay the cost thereof to Lessor, as Additional Rent, promptly upon receipt of an invoice therefor.

## ARTICLE 18

## RECONSTRUCTION

18.1     Obligations of Lessee. Except as hereinafter otherwise provided and subject to the provisions of Section 18.4 below, in case of damage to or destruction of the Improvements or any part of the Hotel Complex Premises by fire or other cause, Lessee, at Lessee's sole cost and expense, whether or not the insurance proceeds, if any, shall be sufficient for the purpose, and irrespective of the amount of any loss, shall restore, repair, replace, rebuild or alter the same as nearly as possible to their value, condition and character immediately prior to such damage or destruction or with such changes or alterations as may be made at Lessee's election in accordance with and subject to the conditions of Article 11 hereof. Such restoration, repairs, replacements, rebuilding or alterations shall be commenced within thirty (30) days following the occurrence of such damage or destruction (or, if Section 18.4 is applicable, within thirty (30) days after Lessor waives its right to terminate under Section 18.4 or such right expires by the terms of Section 18.4) and prosecuted to completion with due diligence and in good faith. Lessee shall continue the operation of its business on the Hotel Complex Premises to the extent reasonably practicable from

the standpoint of prudent business management, and the obligation of Lessee to pay Rent shall remain in full force and effect regardless of whether Lessee is able to operate its business. Lessee shall not be entitled to any compensation or damages from Lessor for loss of use of the whole or any part of the Hotel Complex Premises or Lessee's Personal Property located on the Hotel Complex Premises or for any inconvenience or annoyance occasioned by such damage.

18.2    Disbursement of Insurance Proceeds. All property insurance proceeds recovered on account of damage or destruction to the Improvements (the "**Proceeds**") shall be applied to the payment of the cost of repairing and replacing the Improvements so damaged; provided, however, that if this Lease terminates pursuant to Section 18.4, the Proceeds shall be disbursed in accordance with Section 18.4. Except for reconstruction that is reasonably expected to cost less than One Hundred Thousand Dollars ($100,000.00), all proceeds shall be deposited with a depository acceptable to Lessor and Lessee (the "**Depository**"). If the Proceeds are insufficient to cover the anticipated cost of reconstruction, Lessee shall deposit with the Depository prior to the commencement of reconstruction funds in the amount of such deficiency ("**Lessee's Funds**"). The Depository shall disburse the Proceeds and Lessee Funds, if applicable, during the course of reconstruction in accordance with customary construction disbursements, including a ten percent (10%) retention. If, after the reconstruction has been completed in accordance with the terms of this Lease, there are remaining funds held by the Depository, then such funds (after first deducting from such funds the fees and expenses of the Depository) shall be delivered to Lessee. If there are not sufficient funds remaining to pay for the Depository's fees and expenses, Lessee shall be responsible for the payment of same.

18.3    Destruction Not A Release. Except as expressly provided for in this Lease, no destruction of or damage to the Improvements located on the Hotel Complex Premises or any part thereof by fire or any other cause shall permit Lessee to terminate this Lease or shall relieve Lessee from its obligation to pay the full Rent under this Lease or from any of its other obligations under this Lease, and, except as otherwise expressly set forth herein, Lessee waives any rights now or hereafter conferred upon it by statute or otherwise to quit or surrender this Lease or the Hotel Complex Premises or any suspension, diminution, abatement or reduction of Rent on account of any such destruction or damage.

18.4    Termination of Lease. Notwithstanding anything contained in this Article 18 to the contrary, in the event that Substantial Damage, hereafter defined, of the Improvements occurs during the last five (5) years of the Initial Term, Lessee may, at any time within six (6) months from the date of such damage or destruction, upon thirty (30) days' written notice to Lessor of its intention to do so, terminate this Lease. Such option may be exercised by serving such notice upon Lessor, without any liability on the part of either party except for the payment of the Rent and all additional sums required to be paid by Lessee under the terms of this Lease up to the date of such termination and full performance by Lessee, at its sole cost and expense, of the work of demolition and removal of the remaining portions of the Improvements located on the Hotel Complex Premises so damaged or destroyed and removal of all debris from the Hotel Complex Premises; provided, however, that any available insurance proceeds shall be applied, to the extent such funds are available for demolition and removal, to payment of the cost of such demolition and removal. For the purposes of this Section, "Substantial Damage" shall mean damage to or destruction of the Improvements such that the estimated cost of restoring same as nearly as possible to their value, condition and character immediately prior to such damage or destruction is fifty percent (50%) or more of the estimated total replacement cost of the Improvements.

In the event this Lease shall be terminated pursuant to the provisions of this Section, Lessee shall (prior to and as a condition precedent to any termination) contribute to the insurance proceeds hereinafter mentioned a sum equal to the amount, if any, deducted from such insurance payment under any deductible, retention or co-insurance provisions, by Law or otherwise, and such contributed sum and the insurance proceeds recovered on account of such damage or destruction (after deducting all reasonable expenses incurred by Lessee in connection with the adjustment or collection of such loss and the costs of demolition and removal of the Improvements, as provided above) shall be allocated and distributed first to satisfy any Leasehold Mortgage and any remaining proceeds shall be allocated and distributed to Lessor.

## ARTICLE 19

## LEASEHOLD FINANCING

19.1    Non-Subordination. Lessor shall not be required to subject its fee estate and interest in the Property to the lien of any leasehold financing or mortgage sought or obtained by Lessee.

19.2     Lessee's Right to Encumber.  Lessee is hereby given the right (exercisable at any time and from time to time) by Lessor, in addition to any other rights herein granted, without Lessor's prior written consent, approval or authorization, to hypothecate, pledge, encumber or mortgage its interest in this Lease, the leasehold estate in the Hotel Complex Premises created hereby, or any part or parts thereof or interest therein, and/or its interest in any Sublease(s), under one or more leasehold mortgage(s) ("**Leasehold Mortgage**"), and to assign such interest in this Lease, the leasehold estate in the Hotel Complex Premises created hereby, or any part or parts thereof or interest therein, and/or in any Sublease(s), as collateral security for such Leasehold Mortgage(s) (or to assign its interest in the same in connection with an assignment and leaseback transaction).  Such rights to encumber are expressly conditioned upon the following conditions:  (a) all rights acquired under such Leasehold Mortgage(s) shall, except as expressly provided in this Article 19, be subject to each and all of the CC&Rs affecting the Hotel Complex Premises, and to all rights and interests of Lessor herein, and (b) no such Leasehold Mortgage shall be cross-defaulted with any other loan or encumber this Lease in connection with any blanket encumbrance or cross-collateralization covering properties other than Lessee's interest in this Lease.  None of such CC&Rs are or shall be waived by Lessor by reason of the right given to mortgage such interest in this Lease.  The holder of any Leasehold Mortgage upon the leasehold estate created by this Lease shall be referred to herein as the "**Leasehold Mortgagee**" and shall be entitled to the rights and benefits as provided herein.

19.3     Notices.  Provided that Leasehold Mortgagee shall have notified Lessor in writing of its status as a Leasehold Mortgagee and its name and address, Lessor thereafter shall give to such Leasehold Mortgagee a copy of each notice of default at the same time as any such notice shall be given by Lessor to Lessee, such copy to be addressed to Leasehold Mortgagee at the address last furnished to Lessor as hereinabove provided.  Lessor shall not serve a notice of cancellation or termination upon Lessee unless a copy of any prior notice of default shall have been given to Leasehold Mortgagee as hereinabove provided and the time as hereinafter specified for the curing of such default shall have expired without the same having been cured, and no such notice of default shall be effective as to such Leasehold Mortgagee not receiving actual notice thereof.  Lessor agrees to notify Leasehold Mortgagee in writing of the failure of Lessee to cure a default within any applicable grace period and of the curing of any default by Lessee.  The performance by Leasehold Mortgagee of any condition or agreement on the part of Lessee to be performed hereunder will be deemed to have been performed with the same force and effect as though performed by Lessee.

19.4     Right to Cure.  Lessor will accept performance by Leasehold Mortgagee within the following periods of any obligation to be performed by Lessee hereunder, with the same force and effect as though timely performed by Lessee:

(a)     as to any Rent and other sums payable hereunder, within (10) days after written notice from Lessor to Leasehold Mortgagee that Lessee has not cured such default within the period provided in Article 21;

(b)     as to all other defaults which by their nature can be cured, within forty-five (45) days after written notice from Lessor to Leasehold Mortgagee of Lessee's failure to perform, or, if within such period such failure to perform cannot be cured, to commence to so cure within such period and diligently and continuously proceed therewith to completion provided such cure is complete in no more than ninety (90) days after the initial notice to Leasehold Mortgagee.

19.5     Exercise of Remedies.  With respect to any default that cannot be cured by Leasehold Mortgagee or that reasonably requires Leasehold Mortgagee to be in possession of the Hotel Complex Premises to effect a cure, Lessor shall not exercise its right to terminate this Lease during the time that Leasehold Mortgagee shall reasonably require to complete its remedies under its Leasehold Mortgage, if Leasehold Mortgagee has informed Lessor in writing that Leasehold Morgagee will proceed under this Section 19.5 and:

(a)     Leasehold Mortgagee proceeds, promptly and with due diligence, to exercise the remedies under its Leasehold Mortgage necessary to obtain possession of the Hotel Complex Premises and thereafter prosecutes and completes the same with all due diligence; and

(b)     Leasehold Mortgagee pays or causes to be paid to Lessor the Rent and all other charges required to be paid by Lessee hereunder which have accrued and those which shall become due and payable during said period and performs or causes to be performed all obligations of Lessee that can reasonably be performed by Leasehold Mortgagee without possession of the Hotel Complex Premises.

Upon the completion of any foreclosure proceedings or acquisition of Lessee's interest in this Lease by Leasehold Mortgagee, any default not susceptible of being cured by Leasehold Mortgagee shall be deemed waived by Lessor as to Leasehold Mortgagee, any purchaser at a foreclosure sale, and their respective successors and assigns, upon payment to Lessor of an amount equal to all losses, claims, liabilities, expenses and reasonable attorneys' fees incurred by Lessor in connection with such default.

19.6    Cancellation. Lessor shall also be obligated to give any notice of cancellation and termination to Leasehold Mortgagee, simultaneously with such notice given to Lessee. No such notice to Lessee shall be effective with respect to termination of this Lease unless Leasehold Mortgagee shall also have been so notified. Leasehold Mortgagee shall then have the right to notify Lessor in writing, within thirty (30) days after receipt by Leasehold Mortgagee of such notice of cancellation and termination, that (a) Leasehold Mortgagee, or any designee or nominee which Leasehold Mortgagee may designate or name in such notice, elects to lease the Hotel Complex Premises from the date of termination of this Lease for the remainder of the term of this Lease, at the Rent and other charges herein reserved and otherwise upon the same terms, covenants and conditions as are herein set forth, with the same relative priority in time and in right as this Lease (to the extent possible) and having the benefit of and vesting in Leasehold Mortgagee, or the nominee, of all the rights, title, interest, powers and privileges of the Lessee hereunder (the "New Lease"), and (b) Leasehold Mortgagee or the nominee further obligates itself to (and in fact does) within ten (10) days after delivery to Lessor of such election:

(i)    cure the default upon which such termination was based, or with respect to any default not capable of being cured within such ten (10) day period, or which cannot be cured without entry into possession, proceed and effect cure with due diligence following delivery of possession;

(ii)   pay to Lessor all Rent and other sums due under this Lease up to and including the date of commencement of the term of such New Lease less any net rental income received by Lessor for such period; and

(iii)  pay to Lessor all costs, claims, liabilities, expenses and reasonable attorneys' fees incurred by Lessor in connection with any such default and the preparation, execution and delivery of such New Lease.

19.7    New Lease Terms. After such cancellation and termination of this Lease and upon compliance with the provisions of Section 19.6 by Leasehold Mortgagee, or the approved nominee, within such time, Lessor shall thereupon execute and deliver such New Lease to Leasehold Mortgagee or the approved nominee, having the same relative priority in time and right as this Lease (to the extent reasonably possible) and having the benefit of all of the right, title, interest, powers and privileges of Lessee hereunder in and to the Hotel Complex Premises.

19.8    Title to Improvements. Upon execution and delivery of the New Lease, title to the Improvements shall automatically vest in the Leasehold Mortgagee or the approved nominee until the expiration or earlier termination of the term of the New Lease.

19.9    Assignment. In the event that Leasehold Mortgagee exercises its right under Section 19.6 to enter into a New Lease (or to designate its approved nominee to enter into a New Lease), a Transfer of such New Lease shall be subject to the conditions of said New Lease governing any such Transfers which conditions shall be as set forth in Article 15 of this Lease.

19.10   No Modifications. Anything herein contained to the contrary notwithstanding, Lessor and Lessee mutually agree that so long as there exists an unpaid Leasehold Mortgage on the leasehold estate of Lessee, this Lease or any renewal thereof shall not be modified, amended or altered and Lessor shall not accept a surrender of the Hotel Complex Premises or a cancellation of this Lease (provided Leasehold Mortgagee remedies any default and keeps this Lease current, all as provided above) prior to the expiration or sooner termination thereof, without the prior written consent of Leasehold Mortgagee.

19.11   No Merger. So long as any debt secured by a Leasehold Mortgage upon the leasehold created by this Lease shall remain unpaid, unless Leasehold Mortgagee shall otherwise consent in writing, the fee title to the Hotel Complex Premises and the leasehold estate in the Hotel Complex Premises shall not merge but shall always be kept separate estates, notwithstanding the union of such estates either in Lessor or in Lessee or in a third party by purchase or otherwise.

19.12   Estoppel Certificate. Lessor agrees for the benefit of any Leasehold Mortgagee that at any time, and from time to time, upon not less than twenty (20) days' prior notice from Lessee or from Leasehold Mortgagee, to deliver a certificate to Lessee and to Leasehold Mortgagee stating that this Lease is unmodified (or, if there have

been modifications, setting them forth) and in full force and effect, the dates to which Rent and other charges have been paid, and that either Lessee is not in default in the performance of any of the terms or provisions of this Lease or, if there are defaults, specifying the nature thereof with sufficient particularity that Lessee and Leasehold Mortgagee will know the nature of the acts which must be performed and the amounts of the payments which must be made to cure any such default, it being agreed that any such certificate delivered pursuant to this Section 19.12 may be relied upon by any prospective assignee of Lessee's interest in this Lease or by any Leasehold Mortgagee or prospective Leasehold Mortgagee.

19.13    Assignment of Revenue. Lessor consents to a provision in any Leasehold Mortgage or otherwise for an assignment of rents and income from Subleases, or other revenue from the Hotel Complex Premises to the Leasehold Mortgagee, effective on any conditions defined under any Leasehold Mortgage, and to any customary "lock box" payment arrangement that may be applicable, subject however to Leasehold Mortgagee's written agreement in form and content reasonably satisfactory to Lessor to comply with and be bound by the provisions of Article 4 and Section 5.1 hereof to the extent that funds are deposited by Lessee for the applicable period.

19.14    Consent of Lessor to Foreclosure Not Required. The foreclosure of a Leasehold Mortgage, or any sale thereunder, whether by judicial proceedings or by virtue of any power contained in any Leasehold Mortgage, or any conveyance of the leasehold estate created hereby from Lessee by any Leasehold Mortgagee or its Affiliate through, or in lieu of, foreclosure or other appropriate proceedings in the nature thereof, shall not breach any provision of or constitute a default under this Lease, and upon such foreclosure, sale or conveyance Lessor shall recognize any Leasehold Mortgagee or such Affiliate or designee of any Leasehold Mortgagee, or any purchaser at such foreclosure sale, as Lessee hereunder.

19.15    No Conflict. In the event of a default under the Leasehold Mortgage, such Leasehold Mortgagee may exercise with respect to the Hotel Complex Premises any right, power, or remedy under the Leasehold Mortgage that is not in conflict with the provisions of this Lease.

19.16    Amendments. Lessor shall consider and respond in good faith with respect to any proposed amendments to this Lease that are reasonably requested by a Leasehold Mortgagee; provided, however, that Lessor shall have no obligation to consider any proposed amendments to the description of the Hotel Complex Premises, Term, Rent, or any other amendments that would materially change the rights or obligations of Lessor under this Lease.

19.17    Lessor's Right to Cure. Lessee agrees that it shall obtain from any Leasehold Mortgagee an agreement to the effect that (i) such Leasehold Mortgagee shall notify Lessor of any default by Lessee under the Leasehold Mortgage in favor of such Leasehold Mortgagee at the time that Leasehold Mortgagee serves upon Lessee any notice of such default, (ii) Lessor shall have the right, but not the obligation, to cure any default under such Leasehold Mortgage on Lessee's behalf within the time permitted for Lessee to cure such default and for a period of thirty (30) days thereafter, and (iii) if Lessor recovers possession of the Hotel Complex Premises by reason of a default by Lessee under this Lease, such Leasehold Mortgagee shall not take any action to foreclose upon its Leasehold Mortgage so long as Lessor shall cure any default thereunder within the time permitted for Lessee to cure such default and shall thereafter timely satisfy the obligations of Lessee under such Leasehold Mortgage as they accrue.

## ARTICLE 20

### BANKRUPTCY; INVOLUNTARY TRANSFERS

20.1    Right of Termination. Subject to a Leasehold Mortgagee's rights pursuant to Article 19, should any of the following events occur, Lessor may terminate this Lease and any interest of Lessee herein, effective with the commencement of the event: (a) The making by Lessee of any assignment or arrangement for the benefit of creditors; (b) the filing by or against Lessee of a petition to have Lessee adjudged a bankrupt or a petition for reorganization or arrangement under any law relating to bankruptcy (unless, in the case of a petition filed against Lessee, the same is dismissed within sixty (60) days); (c) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Hotel Complex Premises or of Lessee's interest in this Lease; (d) the attachment, execution or other judicial seizure of at least fifty percent (50%) in value of Lessee's assets located at the Hotel Complex Premises or of Lessee's interest in this Lease; or (e) Lessee becoming a "debtor" as defined in 11 U.S.C. § 101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within sixty (60) days); provided, however, in the event that any provision of this subsection is contrary to

any applicable law, such provision shall be of no force or effect and shall not affect the validity of the remaining provisions.

20.2    Request for Information. Within ten (10) days after Lessor's request therefor, Lessee shall provide Lessor and Lessor's mortgagee or proposed mortgagee, as Lessor shall specify, such financial, legal and business information concerning any of the events described in Section 20.1 as Lessor shall request.

## ARTICLE 21

### DEFAULTS BY LESSEE; REMEDIES

21.1    Events of Default. The occurrence of any of the following shall constitute an **"Event of Default"** by Lessee:

(a)    Any failure by Lessee to pay Minimum Rent, Additional Rent or any other Rent or other payment required to be made by Lessee hereunder, where such failure continues for ten (10) days after written notice thereof by Lessor to Lessee;

(b)    A failure by Lessee to observe and perform any provision of this Lease to be observed or performed by Lessee (other than those specified in subsections (a), (c), (d), (e) and (f) of this Section 21.1), where such failure continues for thirty (30) days after written notice thereof by Lessor to Lessee; provided, however, that if the nature of such default is such that the same cannot reasonably be cured within such thirty (30) day period, Lessee shall not be deemed to be in default if Lessee shall within such period commence such cure and at all times thereafter diligently prosecute the same to completion;

(c)    Entering into a Transfer contrary to the provisions of Article 15;

(d)    Violating the provisions of Article 16;

(e)    The occurrence of any of the events specified in Article 20;

(f)    The failure or refusal of Lessee to execute, acknowledge and deliver to Lessor any estoppel certificate referred to in Article 26 within the time period required by Article 26; or

(g)    The foreclosure of any mechanic's lien.

Notwithstanding anything to the contrary contained in this Lease regarding notice and cure periods, in the event of a failure by Lessee to pay the Rent or any other payment required to be made hereunder on the due date, said sum shall bear interest from and after such due date at the Interest Rate from the due date until paid. Any notice and cure periods provided for herein shall be in lieu of, and not in addition to, any applicable time periods prescribed by applicable state law as a condition precedent to the commencement of legal action against Lessee for possession of the Hotel Complex Premises.

21.2    Rights of Lessor. Subject to the provisions of Article 19, following an Event of Default by Lessee, then in addition to any other remedies available to Lessor at law or in equity, Lessor shall have the immediate option to terminate this Lease and all rights of Lessee hereunder by giving written notice to Lessee of such intention to terminate. In the event that Lessor so terminates this Lease, then Lessor may recover from Lessee:

(a)    The worth at the time of award of any unpaid Rent which had been earned at the time of such termination; plus

(b)    The worth at the time of award of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such Rent loss Lessee proves could have been reasonably avoided; plus

(c)    The worth at the time of award of the amount by which the unpaid Rent for the balance of the Lease Term after the time of award exceeds the amount of such Rent loss that Lessee proves could be reasonably avoided; plus

(d)    Any other amount necessary to compensate Lessor for all the detriment proximately caused by Lessee's failure to perform its obligations under this Lease or which in the ordinary course of events would be likely to result therefrom including, without limitation, all costs and expenses incurred by Lessor in (i) retaking possession of the Hotel Complex Premises, including reasonable attorney's fees, (ii) maintaining or

preserving the Hotel Complex Premises, (iii) preparing the Hotel Complex Premises for a new Lessee, including repairs or alterations to the Hotel Complex Premises, and (iv) leasing commissions; plus

(e)     Such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable state law.

As used in subsections (a) and (b) above, the "**worth at the time of award**" is computed by allowing interest at the Interest Rate. As used in subsection (c) above, the "**worth at the time of award**" is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%).

21.3     Lessor's Right of Re-Entry. Following an Event of Default by Lessee, Lessor shall also have the right, with or without terminating this Lease, to re-enter the Hotel Complex Premises pursuant to legal proceedings and to eject all parties in possession therefrom following issuance of an order of a court of competent jurisdiction allowing such entry and ejection. Lessor may, at any time and from time to time following an Event of Default, enforce its rights under 1951.4 of the California Civil Code, to collect rent from Lessee as it becomes due and, in such case, this Lease shall continue in full force and effect.

21.4     No Automatic Termination. No reentry or taking possession of the Hotel Complex Premises by Lessor pursuant to Section 21.3 shall be construed as an election to terminate this Lease or Lessee's liability for the payment of Rent or other charges due or accruing hereunder, or as an acceptance of Lessee's surrender of the Hotel Complex Premises, unless a written notice of such intention is given to Lessee or unless the termination thereof is decreed by a court of competent jurisdiction.

21.5     Personal Property. Upon the occurrence of an Event of Default, all of Lessee's merchandise and Personal Property shall remain on the Hotel Complex Premises and, continuing during the length of said Event of Default, Lessor shall have the right to take exclusive possession of same and to use the same free of rent or charge until all defaults have been cured or, at its option, to require Lessee to remove the same forthwith.

21.6     No Waiver. The waiver by Lessor of any breach of any term, covenant or condition contained in this Lease shall not be deemed a waiver of such term, covenant or condition of any subsequent breach thereof, or of any other term, covenant or condition contained in this Lease. Lessor's subsequent acceptance of partial Rent or performance by Lessee shall not be deemed to be an accord and satisfaction or a waiver of any preceding breach by Lessee of any term, covenant or condition of this Lease or of any right of Lessor to a forfeiture of this Lease by reason of such breach, regardless of Lessor's knowledge of such preceding breach at the time of Lessor's acceptance. No term, covenant or condition of this Lease shall be deemed to have been waived by Lessor unless such waiver is in writing and signed by Lessor.

21.7     Right to Cure. If Lessee fails, refuses or neglects to perform any obligation under this Lease in the time and manner required herein, Lessor shall have the right, but not the obligation, to do the same at the expense and for the account of Lessee. The amount of money so expended or obligation so incurred by Lessor, together with interest thereon at the Interest Rate, shall be repaid to Lessor as Additional Rent within five (5) days of Lessee's receipt of written notice thereof. Lessor's performance of such obligations shall not waive any default by Lessee hereunder.

## ARTICLE 22

### DEFAULTS BY LESSOR; REMEDIES

22.1     Defaults. If Lessor or any of Lessor's agents shall neglect or fail to perform or observe any of the terms, covenants or conditions contained in this Lease on its part to be performed or observed within thirty (30) days after written notice of default or, when more than thirty (30) days shall be required because of the nature of the default, if Lessor shall fail to proceed diligently to cure such default after written notice thereof, then Lessor shall be liable to Lessee for any and all actual damages sustained by Lessee as a result of Lessor's breach; provided, however, it is expressly understood and agreed that (a) any money judgment resulting from any default or other claim arising under this Lease shall be satisfied only out of Lessor's interest in the Parcel (but in no event shall any such recovery exceed an amount equal to twenty percent (20%) of the fair market value of Lessor's interest in the Parcel at the time of the judgment), (b) no other real, personal or mixed property of Lessor, wherever located, shall be subject to levy on any such judgment obtained against Lessor, (c) if Lessor's interest in the Parcel is insufficient to satisfy such judgment, Lessee will not institute any further action, suit, claim or demand, in law or in equity,

against Lessor or any of Lessor's agents, officers, directors, employees, partners, members or affiliates (collectively "**Lessor Parties**") for or on the account of such deficiency, (d) such neglect or failure shall not constitute consent by Lessor for Lessee to perform or observe such terms, covenants or conditions at Lessor's expense, and (e) Lessee shall not have the right to terminate this Lease as a result of any such default. Lessee hereby waives, to the extent permitted by law, any right to satisfy said money judgment against Lessor or any of the Lessor Parties, except from Lessor's interest in the Parcel, as limited above. In no event shall Lessor or any of the Lessor Parties be liable to the Lessee, in tort, contract or otherwise, except to the extent set forth in this Section 22.1 and in no event shall any of them be liable to Lessee for special, extraordinary, consequential or punitive damages.

22.2  Notice to Lenders.  If the Hotel Complex Premises or any part thereof are at any time subject to any mortgage or deed of trust and this Lease or the Rent due from Lessee hereunder are assigned to such mortgagee, trustee or beneficiary (called "**Assignee**" for purposes of this Article 22 only) and Lessee is given written notice thereof, including the post office address of such Assignee, then Lessee shall give written notice to such Assignee, specifying the default in reasonable detail, and affording such Assignee a reasonable opportunity to cure such default for and on behalf of Lessor. If and when such Assignee has performed on behalf of Lessor, such default shall be deemed cured.

## ARTICLE 23

### CONDEMNATION

23.1  Definitions.  Whenever used in this Section, the following words shall have the following respective meanings:

(a)  "**Condemnation**" or "condemnation proceedings" shall mean any action or proceeding brought by competent authority for the purpose of any taking of the Hotel Complex Premises or any part thereof as a result of the exercise of the power of eminent domain, including a voluntary sale to such authority either under threat of or in lieu of condemnation or while such action or proceeding is pending.

(b)  "**Taking**" shall mean the event of vesting of title to the Hotel Complex Premises or any part thereof in such competent authority pursuant to condemnation.

(c)  "**Vesting Date**" shall mean the date of the Taking.

23.2  Total Taking.  In case of a Taking of all of the Hotel Complex Premises, this Lease shall terminate as of the Vesting Date and the Rent under this Lease shall abate as of, and be apportioned to the date of termination.

23.3  Partial Taking.  In case of a Taking of less than all of the Hotel Complex Premises (other than for a temporary use), Lessor and Lessee shall mutually determine, within sixty (60) days after the Vesting Date, whether the remaining portion of the Hotel Complex Premises after "**Restoration**" (as hereinafter defined) can economically and feasibly be used by Lessee.

If it is determined that the remaining portion of the Hotel Complex Premises cannot be economically and feasibly used by Lessee, either Lessor or Lessee may, at its option, terminate this Lease by delivery of written notice to the other within thirty (30) days after such determination. Upon any such termination, the Rent shall be apportioned to the date of termination, which date, for purposes of apportioning rental, shall be determined by mutual agreement of the parties.

If neither party elects to terminate this Lease within the period aforementioned, this Lease shall continue in full force and effect as to the remaining portion of the Hotel Complex Premises.

23.4  Allocation of Award: Total Taking.  If this Lease shall terminate pursuant to the provisions of Section 23.2 or 23.3, the total award in the condemnation proceedings shall be apportioned and paid, to the extent available, in the following order of priority:

(a)  Lessor, Lessee and any Leasehold Mortgagee shall be entitled to their expenses and charges, including, without limitation, reasonable attorneys' fees incurred in connection with the Taking.

(b)  Any Leasehold Mortgagee shall be entitled to satisfy its Leasehold Mortgage (but in no event greater than the value of the Improvements).

(c)  Lessor shall next be entitled to that portion of the award which represents the sum of: (i) the value of the Parcel, encumbered by this Lease, together with all surface or subsurface Utility installations,

(ii) the value of Lessor's reversionary interest in the Improvements and (iii) the "bonus value" of the leasehold estate created by this Lease.

     (d)    The balance of the award, including any portion of the award attributable to Lessee's Personal Property, shall be paid to Lessee.

     23.5    Allocation of Award: Partial Taking. If this Lease shall not terminate as provided in Section 23.3, Lessee, at its expense, shall commence and proceed with reasonable diligence to repair or reconstruct the remaining Improvements to a complete architectural unit or units. All such repair, reconstruction and work shall hereinafter in this Section be referred to as "**Restoration**."

     The total award in the condemnation proceedings, in the event of such partial taking, shall be apportioned and paid, to the extent available, in the following order of priority:

     (a)    Lessee shall first be entitled to an amount equal to the cost of Restoration.

     (b)    Lessor, and to the extent available Lessee, shall next be entitled to their expenses and charges, including, without limitation, reasonable attorneys' fees incurred in connection with the Taking.

     (c)    Lessor shall be entitled to a portion of the award based on the then-value of the portion of the Parcel subject to the partial taking (which shall be deemed to be zero if no Renal reduction occurs pursuant to Section 23.3 above).

     (d)    The balance of the award shall be paid to Lessor, excluding any portion of the award attributable to Lessee's Personal Property, which shall be paid to Lessee.

     23.6    Temporary Taking. In the event of a Taking of all or any portion of the Hotel Complex Premises for temporary use, the foregoing provisions of this Article shall be inapplicable thereto, this Lease shall continue in full force and effect without reduction or abatement of Rent and Lessee, alone, shall be entitled to make claim for, recover and retain any award recoverable in respect of such temporary use whether in the form of Rent or otherwise. If the award is made in a lump sum covering a period beyond the expiration of the Lease Term, Lessor also shall be entitled to make claim for and participate in the award proportionately.

     If any portion of the award for such temporary use is intended to cover the cost of Restoration of the Improvements located on the Hotel Complex Premises to the condition they were in prior to such temporary use or to make repairs occasioned by or resulting from such temporary use, such portion shall be used by Lessee to cover the cost of such Restoration and repair, and any balance remaining shall belong to and be paid to Lessee.

     23.7    Settlement. Lessor shall not make any settlement with the condemning authority or convey any portion of the Hotel Complex Premises to such authority in lieu of condemnation or consent to any Taking without the consent of Lessee.

     23.8    Waiver. Except as otherwise expressly set forth herein, Lessee waives any rights now or hereafter conferred upon it by statute otherwise to quit or surrender this Lease or the Hotel Complex Premises or any suspension, diminution, abatement or reduction of Rent on account of any Taking.

## ARTICLE 24

## ATTORNEY FEES

     If either Lessor or Lessee institutes any action or proceeding against the other relating to the provisions of this Lease or any default hereunder, the non-prevailing party in such action or proceeding shall reimburse the prevailing party for the reasonable expenses of attorney fees and all costs and disbursements incurred therein by the prevailing party, including, without limitation, any such fees, costs or disbursements incurred on any appeal from such action or proceeding. Subject to the provisions of local law, the prevailing party shall recover all such fees, costs or disbursements as costs taxable by the court or arbiter in the action or proceeding itself without the necessity for a cross-action by the prevailing party.

## ARTICLE 25

### SALE OR MORTGAGE BY LESSOR

Lessor may, at any time, without the consent of Lessee, contract to and/or perform any of the following transactions with respect to an interest in Lessor, this Lease or the Hotel Complex Premises: sale, purchase, exchange, transfer, assignment, lease or conveyance (collectively referred to as a "**Sale**"). From and after a Sale, Lessor shall be released from all liability toward Lessee and Lessee's successors and assigns arising from this Lease except for any liability that accrued prior to such Sale.

## ARTICLE 26

### MORTGAGE; SUBORDINATION; ATTORNMENT

As used in this Lease, all references to a "**mortgage**" shall be deemed to include a deed of trust and a lease in an assignment and leaseback transaction, and all references to the "**holder**" of a mortgage or to a "**mortgagee**" shall be deemed to include the beneficiary and/or trustee under a deed of trust and the lessor in an assignment and leaseback transaction. Concurrently with the execution and delivery of this Lease, Lessor, Lessee, the Leasehold Mortgagee and Beach Orangethorpe, LLC, Beach Orangethorpe II, LLC, Beach Orangethorpe Ventures, LLC and Beach Orangethorpe Source, LLC (the "**Lessor's Mortgagees**") have entered into that certain Ground Lessor's Consent, Estoppel Certificate and Fee Mortgagee Agreement dated as of the date hereof. Upon written request of Lessor, or an existing or prospective mortgagee of Lessor, Lessee will subordinate, pursuant to such document(s) as the mortgagee may require, its rights hereunder to any mortgage, CC&Rs or amendments thereto.

In the event any proceedings are brought for foreclosure, or in the event of the exercise of the power of sale under any mortgage or deed of trust made by Lessor covering the Hotel Complex Premises, Lessee shall attorn to the purchaser upon any such foreclosure, sale or lease termination and recognize such purchaser as Lessor under this Lease, provided that the purchaser shall acquire and accept the Hotel Complex Premises subject to this Lease. Lessee shall execute and deliver to Lessor such document(s) required by a mortgagee to confirm Lessee's agreement to so attorn within twenty (20) days following written request therefor.

Lessee agrees at any time and from time to time and within twenty (20) days after written request from Lessor, to execute, acknowledge and deliver to Lessor an estoppel certificate in such form as Lessor may reasonably request, (a) certifying that this Lease represents the entire agreement between Lessor and Lessee, and is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease, as so modified, is in full force and effect) and the dates to which the Rent and other charges are paid in advance, if any; (b) certifying the commencement and termination dates of the Lease Term; (c) certifying that there has been no assignment or other transfer by Lessee of this Lease, or any interest therein; (d) acknowledging that there are not, to Lessee's knowledge, any uncured defaults on the part of Lessor hereunder and that Lessee has no right of offset, counterclaim or deduction against Rent, or specifying such defaults if any are claimed together with the amount of any offset, counterclaim or deduction alleged by Lessee; and (e) certifying or acknowledging such other matters as Lessor may reasonably request. Lessee's failure to deliver such estoppel certificate within such time shall be conclusive and binding upon Lessee that this Lease is in full force and effect, without modification except as may be represented by Lessor, that there are no uncured defaults in Lessor's performance and that Lessee has no right of offset, counterclaim or deduction against Rent and that no more than one month's Rent has been paid in advance, it being understood, however, that such certification based on failure to deliver shall not relieve Lessee from its obligations under this paragraph. It is intended that any estoppel certificate or statement that becomes conclusive and binding on Lessee pursuant to this Section may be relied upon by any prospective purchaser or mortgagee of Lessor's interest in the Hotel Complex Premises or as Lessor under this Lease. If any such certification by Lessee shall allege nonperformance by Lessor, the nature and extent of such nonperformance shall, insofar as actually known by Lessee, be summarized therein.

## ARTICLE 27

### NOTICES

All notices, approvals, requests, demands and other communications submitted or required to be given under this Lease shall be in writing and shall be personally delivered or sent by a recognized overnight courier service or by certified mail and shall deemed duly served or given when actually delivered or refused. Such notices shall be sent with all charges and postage paid by the sender and shall be addressed to the parties as set forth below:

| | |
|---|---|
| To Lessor: | The Source at Beach, LLC<br>3100 E. Imperial Highway<br>Lynwood, CA 90262<br>Attention: Min Chae and Donald Chae |
| with a copy to: | Lim, Ruger & Kim, LLP<br>1055 West Seventh Street, Suite 2800<br>Los Angeles, CA 90017<br>Attention: Real Estate Department |
| To Lessee: | The Source Hotel, LLC<br>3100 E. Imperial Highway<br>Lynwood, CA 90262<br>Attention: Min Chae and Donald Chae |
| with a copy to: | Lim, Ruger & Kim, LLP<br>1055 West Seventh Street, Suite 2800<br>Los Angeles, CA 90017<br>Attention: Real Estate Department |

Either party may change such address by providing written notice to the other. The foregoing method of service shall be exclusive and Lessee hereby waives, to the fullest extent permitted under law, the right to any other method of service required by any statute or law now or hereafter in force. Whenever a party is served with a notice both personally and by mail, such party's time to perform any covenant, cure any default, or make any response shall not be extended by operation of law because of such service by mail beyond the time period prescribed in such notice.

## ARTICLE 28

### MISCELLANEOUS

28.1     Relationship of the Parties. Nothing contained in this Lease shall be deemed or construed as creating a partnership, joint venture, principal-agent, or employer-employee relationship between Lessor and any other person or entity (including, without limitation, Lessee) or as causing Lessor to be responsible in any way for the debts or obligations of such other person or entity.

28.2     Severability. It is agreed that, if any provision of this Lease shall be determined to be void by any court of competent jurisdiction, then such determination shall not affect any other provision of this Lease and all such other provisions shall remain in full force and effect. It is the intention of the parties hereto that, if any provision of this Lease is capable of two (2) constructions, one of which would render the provision void and the other of which would render the provision valid, then the provision shall have the meaning which renders it valid.

28.3     Warranty of Authority. If Lessee is an entity, the person or persons executing this Lease on behalf of Lessee represent, covenant and warrant to Lessor as of the date Lessee executes and delivers this Lease that: (a) Lessee is duly constituted and in good standing and qualified to do business in the state where the Hotel Complex Premises are located, (b) Lessee has paid all applicable taxes, (c) Lessee will file when due all forms,

reports, fees and other documents necessary to comply with applicable laws, and (d) the signatories signing on behalf of Lessee have the requisite authority to bind Lessee.

28.4 Entire Agreement. It is understood that there are no oral or written agreements or representations between the parties hereto affecting this Lease, and that this Lease supersedes and cancels any and all previous negotiations, arrangements, representations, brochures, displays, projections, estimates, agreements and understandings, if any, made by or between Lessor and Lessee with respect to the subject matter thereof, and none shall be used to interpret, construe, supplement or contradict this Lease. This Lease, and all amendments thereto, is and shall be considered to be the only agreement between the parties hereto and their representatives and agents. All negotiations and oral agreements acceptable to both parties have been merged into and are included in this Lease. There are no other representations, covenants or warranties between the parties and all reliance with respect to representations is solely upon the express representations, covenants and warranties contained in this Lease. Although the printed provisions of this Lease were drawn by Lessor, the parties hereto agree that this circumstance alone shall not create any presumption, canon of construction or implication favoring the position of either Lessor or Lessee. The parties agree that any deletion of language from this Lease prior to its mutual execution by Lessor and Lessee shall not be construed to have any particular meaning or to raise any presumption, canon of construction or implication, including, without limitation, any implication that the parties intended thereby to state the converse, obverse or opposite of the deleted language.

28.5 Governing Law. The laws of the State of California shall govern the validity, performance and enforcement of this Lease.

28.6 Waiver or Consent Limitation. A waiver of any given breach or default shall not be a waiver of any other breach or default. Lessor's consent to or approval of any act by Lessee requiring Lessor's consent or approval shall not be deemed to waive or render unnecessary Lessor's consent to or approval of any subsequent similar act by Lessee.

28.7 Force Majeure. "Excusable delay" shall mean a temporary prevention of a party's performance by reason of forces without the fault and beyond the reasonable control of such party (excluding financial inability) such as the following: strike, lockout or other labor disturbance, civil disturbance, act of the public enemy, war, riot, sabotage, blockade, embargo, inability to secure customary materials, supplies or labor through ordinary sources, regulation or order of any government or regulatory body, severe weather, earthquake, fire, storm, hurricane, tornado, flood, washout or explosion. Any prevention of performance due to an excusable delay shall excuse the performance of the party affected for a period of time equal to any such prevention, provided that the party claiming the excusable delay notifies the other party of the excusable delay within a reasonable time (not to exceed ten (10) business days) after the commencement of the excusable delay; and provided, further, that if notice is not given within such reasonable time (not to exceed ten (10) business days), the extension of time shall not begin until the date on which written notice of the excusable delay is given by the party claiming the excusable delay to the other party.

28.8 Waiver of Rights of Redemption. Lessee hereby expressly waives any and all rights of redemption granted by or under any present or future laws in the event Lessee is evicted or dispossessed for any cause or in the event Lessor obtains possession of the Hotel Complex Premises by reason of the violation by Lessee of any of the terms, covenants and conditions of this Lease or otherwise. The rights given to Lessor herein are in addition to any rights that may be given to Lessor by any statute or otherwise.

28.9 Amendments. To be effective and binding on Lessor and Lessee, any amendment, modification, addition or deletion to the provisions of this Lease must be made in writing and executed by both parties in the same manner as this Lease.

28.10 Right to Enter. Lessor and/or its authorized representatives shall have the right to enter the Hotel Complex Premises at all reasonable times for the purpose of showing the Hotel Complex Premises to prospective purchasers or lenders.

28.11 Time of Essence. Time is of the essence in the performance of all covenants and conditions in this Lease for which time is a factor.

28.12 Rate of Interest. The rate of interest to be charged under the provisions of this Lease (the "**Interest Rate**"), unless expressly stated otherwise, shall be four percent (4%) above the annualized rate of interest publicly announced from time to time by Bank of America National Trust and Savings Association (or its

successor), as its "prime rate" (or if such bank no longer announces or publishes a prime rate, then whatever rate is then currently being published or announced by such bank in lieu of publishing or announcing a prime rate). Such interest shall be computed on the basis of a 360-day year and actual days elapsed and shall compound monthly. If any law limits the maximum rate of interest which may be charged on a particular amount payable with interest at the Interest Rate hereunder, then the Interest Rate shall, for such purposes, be limited to the maximum lawful rate of interest which may be charged on such amount.

28.13    Nonmerger of Fee and Leasehold Estates. If both Lessor's and Lessee's estates in the Hotel Complex Premises, or any portions thereof, become vested in the same owner, this Lease shall not be extinguished by application of the doctrine of merger except at the express election of the owner and with the express written consent of the beneficiary or beneficiaries under all trust deeds affecting the Hotel Complex Premises and Lessee's leasehold estate.

28.14    Waiver of Trial by Jury. To the extent permitted by applicable Laws, Lessor and Lessee hereby waive any and all rights to a trial by jury in any action, proceeding or counterclaim (including any claim for injury or damage and any emergency and other statutory remedy in respect thereof) brought by either against the other on any matter arising out of or in any way connected with this Lease, the relationship of Lessor and Lessee, and/or Lessee's use or occupancy of the Hotel Complex Premises.

28.15    Captions. The captions of the Articles and Sections of this Lease are for convenience only, are not operative parts of this Lease and do not in any way limit or amplify the terms and provisions of this Lease.

28.16    Multiple Parties. If two (2) or more persons or corporations execute this Lease as Lessee, then and in such event the word "Lessee" as used in this Lease shall refer to all such persons or corporations, and the liability of such persons or corporations for compliance with and performance of all of the terms, covenants and conditions of this Lease shall be joint and several. The masculine pronoun used herein shall include the feminine or the neuter, as the case may be, and the use of the singular shall include the plural.

28.17    Successors and Assigns. The parties hereto agree that all the provisions of this Lease are to be construed as covenants and agreements and, except as otherwise specified, that said provisions shall bind and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

28.18    Consent of Lessor and Lessee. Wherever in this Lease consent or approval is required, such consent or approval shall be given in writing and shall not be unreasonably withheld, unless otherwise provided (including without limitation where a different standard, such as "good faith" or "sole and absolute discretion," is provided). Lessor shall not be deemed to have withheld its consent unreasonably where Lessor's right to give its consent is conditioned on Lessor obtaining the consent of any person, agency or authority with the right to withhold its consent pursuant to any agreement, Law or tax, as described in Article 10 and such person, agency or authority reasonably or unreasonably withholds its consent.

If Lessor or Lessee fails to give any such consent, the other party hereto shall be entitled to specific performance and shall have such other remedies as are reserved to it under this Lease, but in no event shall Lessor or Lessee be responsible for monetary damages or be entitled to terminate this Lease as a result of such failure to give consent (including any right to damages or termination under applicable Laws).

28.19    Memorandum of Lease. Neither Lessee nor Lessor shall record this Lease. However, Lessee may record a memorandum of this Lease in form and substance acceptable to Lessor at any time during the Lease Term, if required by any Leasehold Mortgagee. In the event a Lessee's Leasehold Mortgagee requires the recordation of a memorandum of this Lease, (i) all costs arising out of the recordation of the memorandum shall be borne solely by Lessee and (ii) Lessee shall deliver to Lessor a quitclaim deed for the Hotel Complex Premises upon the expiration or earlier termination of this Lease.

28.20    Brokers. Each party hereto shall indemnify and hold harmless the other party hereto from and against any all Claims that may be asserted against such other party by any real estate broker, finder or intermediary arising from any acts of the indemnifying party in connection with this Lease.

[*signature page immediately follows*]

IN WITNESS WHEREOF, the parties hereto have executed this Lease upon the day and year first above written.

"LESSOR"

**THE SOURCE AT BEACH, LLC,**
a California limited liability company

By:     M + D Properties, a California corporation
Its:     Manager

By:     _____
        Donald Chae, President

"LESSEE"

**THE SOURCE HOTEL, LLC,**
a California limited liability company

By:     M + D Properties, a California corporation
Its:     Manager

By:     _____
        Donald Chae, President

<u>**EXHIBIT "A-1"**</u>

<u>**LEGAL DESCRIPTION OF PARCEL**</u>

# EXHIBIT_____

SHT 1 OF 7 SHTS

# LEGAL DESCRIPTION

# HOTEL AIRSPACE PARCEL

LEGAL DESCRIPTION OF AIRSPACE PARCEL 4 OF PRELIMINARY
PARCEL MAP NO. 2014—173, IN THE CITY OF BUENA PARK

THAT PORTION OF LOT 2 IN BLOCK 61 OF BUENA PARK, IN THE
CITY OF BUENA PARK, COUNTY OF ORANGE, STATE OF CALIFORNIA,
AS PER MAP RECORDED IN BOOK 18, PAGES 50 TO 52 INCLUSIVE,
OF MISCELLANEOUS MAPS, AND THOSE PORTIONS OF LOTS 5 TO 9
INCLUSIVE OF TRACT NO. 1756, AS PER MAP RECORDED IN BOOK
60 PAGES 20 AND 21 OF MISCELLANEOUS MAPS, ALL IN THE OFFICE OF
THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

## PARCEL 4A (LEVEL 1 – GROUND FLOOR LOBBY & ENTRANCE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE
AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756;
THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID
MAP N0°27'49"E 215.36 FEET;   THENCE LEAVING SAID CENTERLINE
N89°32'11"W 45.77 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN
DESCRIBED PARCEL; THENCE S00°00'02"W 86.05 FEET, THENCE N89°59'59"W
22.68 FEET, THENCE S00°01'05"W 13.56 FEET, THENCE S89°59'59"E 22.57
FEET, THENCE S00°00'02"W 8.22 FEET, THENCE N89°59'58"W 0.77 FEET,
THENCE S00°00'02"W 34.16, THENCE N89°59'58"W 110.62 FEET, THENCE
N00°00'02"E 34.17 FEET, THENCE N89°59'58"W 30.58 FEET, THENCE
N00°00'02"E 107.52 FEET, THENCE N89°59'58"W 0.83 FEET, THENCE
N00°00'02"E 8.95 FEET, THENCE S89°59'58"E 24.08 FEET, THENCE
N46°29'04"E 12.47 FEET, THENCE N00°00'02"E 16.97 FEET, THENCE
S89°59'58"E 18.12 FEET, THENCE N00°00'02"E 5.22 FEET, THENCE
N89°57'39"E 30.73 FEET, THENCE N00°00'02"E 32.17 FEET, THENCE
N89°59'58"W 11.92 FEET, THENCE N00°00'02"E 1.00 FEET, THENCE
S89°59'58"E 0.50 FEET, THENCE N00°00'02"E 14.21 FEET, THENCE
S89°59'58"E 39.78 FEET, THENCE S00°00'02"W 86.82 FEET, THENCE
S89°59'58"E 32.58 FEET, TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE
HAVING AN ELEVATION OF 95.76 FEET AND ABOVE A HORIZONTAL PLANE
HAVING AN ELEVATION OF 77.76 FEET.

CONTAINING 23,584 SQUARE FEET, MORE OR LESS.

| | |
|---|---|
| DATE: SEPT 29, 2015 | **HENNON** ————— |
| THOM. GDE: 767–H2 | |
| FILE:2898HTLBLDG.DWG | **Surveying & Mapping, Inc.** |
| PROJECT NO: 2898 | |

601 E. GLENOAKS BLVD., SUITE 208
GLENDALE, CALIFORNIA   91207
(818)243–0640
*FAX: (818)243–0650*

SHT 2 OF 7 SHTS

## PARCEL 4B (LEVEL 1 – GROUND FLOOR STAIRS ON ORANGETHORPE AVE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE
AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756;
THENCE ALONG THE CENTERLINE OF ORANGETHORPE AVENUE AS SHOWN ON
SAID MAP S89°27'51"E 199.02 FEET;   THENCE LEAVING SAID CENTERLINE
N0°32'09"E 60.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND
60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID
CENTERLINE OF ORANGETHORPE AVENUE, AND THE TRUE POINT OF BEGINNING
OF THE HEREIN DESCRIBED PARCEL;   THENCE N0°00'02"E 36.96 FEET;
THENCE S89°59'58"E 14.74 FEET;   THENCE S0°00'02"W TO A POINT
ON SAID PARALLEL LINE;   THENCE ALONG SAID PARALLEL LINE N89°27'51"W
14.74 TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE
HAVING AN ELEVATION OF 95.76 FEET AND ABOVE A HORIZONTAL PLANE
HAVING AN ELEVATION OF 77.76 FEET.

CONTAINING 546 SQUARE FEET, MORE OR LESS.

## PARCEL 4C (LEVEL 1 – GROUND FLOOR STAIRS ON BRENNER AVE.)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE
AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756;
THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID
MAP N0°27'49"E 339.38 FEET;   THENCE LEAVING SAID CENTERLINE
N89°32'11"W 46.71 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN
DESCRIBED PARCEL;   THENCE WEST 23.40 FEET;   THENCE SOUTH 7.24 FEET;
THENCE WEST 5.88 FEET;   THENCE SOUTH 6.55 FEET;   THENCE WEST 29.28
FEET;   THENCE NORTH 13.79 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE
HAVING AN ELEVATION OF 95.76 FEET AND ABOVE A HORIZONTAL PLANE
HAVING AN ELEVATION OF 77.76 FEET.

CONTAINING 361 SQUARE FEET, MORE OR LESS.

DATE: SEPT 29, 2015
THOM. GDE: 767–H2
FILE:2898HTLBLDG.DWG
PROJECT NO: 2898

HENNON
Surveying & Mapping, Inc.

601 E. GLENOAKS BLVD., SUITE 208
GLENDALE, CALIFORNIA  91207
(818)243–0640
FAX: (818)243–0650

SHT 3 OF 7 SHTS

## PARCEL 4D (LEVEL 2 — SECOND FLOOR HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N0°27'49"E 223.82 FEET;   THENCE LEAVING SAID CENTERLINE N89°32'11"W 36.00 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE S00°27'49"W 94.43 FEET; THENCE N89°59'59"W 31.75 FEET;   THENCE S00°01'05"W 13.56 FEET; THENCE S89°59'59"E 31.65 FEET; THENCE S00°27'49"W 36.79 FEET; THENCE S45°29'59"W 26.85 FEET; THENCE N89°27'51"W 110.52 FEET; THENCE N00°00'02"E 36.98 FEET; THENCE N89°59'58"W 19.37 FEET; THENCE S00°00'02"W 25.13 FEET; THENCE N89°59'58"W 12.81 FEET; THENCE N00°00'02"E 90.73 FEET; THENCE S89°59'58"E 62.50 FEET; THENCE N00°00'00"E 30.00 FEET; THENCE S89°59'58"E 15.42 FEET; THENCE N00°00'02"E 29.98 FEET; THENCE S89°59'58"E 85.09 FEET; TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET.

CONTAINING 20,780 SQUARE FEET, MORE OR LESS.

## PARCEL 4E (LEVEL 2 — SECOND FLOOR STAIRS ON BRENNER AVE.)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N0°27'49"E 339.38 FEET;   THENCE LEAVING SAID CENTERLINE N89°32'11"W 46.71 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL;   THENCE WEST 23.40 FEET;   THENCE SOUTH 7.24 FEET; THENCE WEST 5.88 FEET;   THENCE SOUTH 6.55 FEET;   THENCE WEST 29.28 FEET;   THENCE NORTH 13.79 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET.

CONTAINING 361 SQUARE FEET, MORE OR LESS.

| DATE: SEPT 29, 2015 | **HENNON** | 601 E. GLENOAKS BLVD., SUITE 208 |
| THOM. GDE: 767–H2 | | GLENDALE, CALIFORNIA  91207 |
| FILE:2898HTLBLDG.DWG | Surveying & Mapping, Inc. | (818)243–0640 |
| PROJECT NO: 2898 | | FAX: (818)243–0650 |

SHT 4 OF 7 SHTS

## PARCEL 4F (LEVEL 3 – THIRD FLOOR STAIRS ON BRENNER AVE.)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N0°27'49"E 339.38 FEET;   THENCE LEAVING SAID CENTERLINE N89°32'11"W 46.71 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL;   THENCE WEST 23.40 FEET;   THENCE SOUTH 7.24 FEET; THENCE WEST 5.88 FEET;   THENCE SOUTH 6.55 FEET;   THENCE WEST 29.28 FEET;   THENCE NORTH 13.79 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET.

CONTAINING 361 SQUARE FEET, MORE OR LESS.

## PARCEL 4G (LEVEL 3 – THIRD FLOOR STAIRS ON BRENNER AVE.)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N0°27'49"E 186.84 FEET; THENCE LEAVING SAID CENTERLINE N89°32'11"W 45.54 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 22.05 FEET; THENCE SOUTH 9.15 FEET; THENCE EAST 5.84 FEET; THENCE SOUTH 10.38 FEET; THENCE WEST 1.58 FEET; THENCE SOUTH 4.17 FEET; THENCE EAST 9.81 FEET; THENCE SOUTH 10.37 FEET; THENCE EAST 12.08 FEET; THENCE NORTH 9.62 FEET; THENCE EAST 1.44 FEET; THENCE NORTH 24.44 FEET TO THE SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET.

CONTAINING 738 SQUARE FEET, MORE OR LESS.

## PARCEL 4H (LEVEL 3 – THIRD FLOOR STAIRS ON ORANGETHORPE AVE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF ORANGETHORPE AVENUE AS SHOWN ON   SAID MAP S89°27'51"E 199.02 FEET; THENCE LEAVING SAID CENTERLINE N0°32'09"E 60.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE N0°00'02"E 36.96 FEET; THENCE S89°59'58"E 14.74 FEET; THENCE S0°00'02"W TO A POINT ON SAID PARALLEL LINE; THENCE ALONG SAID PARALLEL LINE N89°27'51"W 14.74 TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET.

CONTAINING 546 SQUARE FEET, MORE OR LESS.

SHT 5 OF 7 SHTS

## PARCEL 4I (LEVEL 4 – FOURTH FLOOR HOTEL PARCEL INCLUDING DECK)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N0°27'49"E 353.11 FEET;  THENCE LEAVING SAID CENTERLINE N89°32'11"W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL;  THENCE WEST 72.90 FEET; THENCE SOUTH 13.76 FEET;  THENCE WEST 18.27 FEET;  THENCE SOUTH 114.50 FEET;  THENCE WEST 92.89 FEET;  THENCE SOUTH 130.52 FEET;  THENCE EAST 12.99 FEET;  THENCE SOUTH 32.75 FEET TO A POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE;  THENCE ALONG SAID PARALLEL LINE S89°27'51"E 143.94 FEET;  THENCE N45°29'59"E 26.85 FEET TO A POING ON SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE;  THENCE ALONG LAST SAID PARALLEL LINE N0°27'49"E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 161.18 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76 FEET.

CONTAINING 40,480 SQUARE FEET, MORE OR LESS.

## PARCEL 4J (LEVEL 5 – FIFTH FLOOR HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N0°27'49"E 353.11 FEET;  THENCE LEAVING SAID CENTERLINE N89°32'11"W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL;  THENCE WEST 72.90 FEET; THENCE SOUTH 165.38 FEET;  THENCE WEST 6.81 FEET;  THENCE SOUTH 20.33 FEET;  THENCE EAST 6.81 FEET;  THENCE SOUTH 28.65 FEET;  THENCE WEST 105.43 FEET;  THENCE SOUTH 44.42 FEET; THENCE EAST 12.99 FEET; THENCE SOUTH 32.75 FEET TO A POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE;  THENCE ALONG SAID PARALLEL LINE S89°27'51"E 143.94 FEET;  THENCE N45°29'59"E 26.85 FEET TO A POING ON SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE;  THENCE ALONG LAST SAID PARALLEL LINE N0°27'49"E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 171.60 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 161.18 FEET.

CONTAINING 28,699 SQUARE FEET, MORE OR LESS.

# PARCEL 4K (LEVEL 6 — SIXTH FLOOR HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE
AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756;
THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID
MAP N0°27'49"E 353.11 FEET;   THENCE LEAVING SAID CENTERLINE
N89°32'11"W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND
36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID
CENTERLINE OF BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING
OF THE HEREIN DESCRIBED PARCEL;   THENCE WEST 72.90 FEET;
THENCE SOUTH 165.38 FEET;   THENCE WEST 6.81 FEET;   THENCE
SOUTH 20.33 FEET;   THENCE EAST 6.81 FEET;   THENCE SOUTH 28.65
FEET;   THENCE WEST 105.43 FEET;   THENCE SOUTH 44.42 FEET;
THENCE EAST 11.33 FEET; THENCE SOUTH 32.75 FEET TO A
POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF,
MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE
AVENUE;   THENCE ALONG SAID PARALLEL LINE S89°27'51"E 145.60
FEET;   THENCE N45°29'59"E 26.85 FEET TO A POING ON SAID
PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE;   THENCE
ALONG LAST SAID PARALLEL LINE N0°27'49"E 274.06 FEET TO SAID
TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE
HAVING AN ELEVATION OF 182.02 FEET AND ABOVE A HORIZONTAL PLANE
HAVING AN ELEVATION OF 171.60 FEET.

CONTAINING 28,753 SQUARE FEET, MORE OR LESS.

# PARCEL 4L (LEVEL 7 — SEVENTH FLOOR & ROOF HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE
AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756;
THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID
MAP N0°27'49"E 353.11 FEET;   THENCE LEAVING SAID CENTERLINE
N89°32'11"W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND
36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID
CENTERLINE OF BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING
OF THE HEREIN DESCRIBED PARCEL;   THENCE WEST 72.90 FEET;
THENCE SOUTH 165.38 FEET;   THENCE WEST 6.81 FEET;   THENCE
SOUTH 20.33 FEET;   THENCE EAST 6.81 FEET;   THENCE SOUTH 28.65
FEET;   THENCE WEST 105.43 FEET;   THENCE SOUTH 44.42 FEET;
THENCE EAST 12.99 FEET; THENCE SOUTH 32.75 FEET TO A
POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF,
MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE
AVENUE;   THENCE ALONG SAID PARALLEL LINE S89°27'51"E 143.94
FEET;   THENCE N45°29'59"E 26.85 FEET TO A POING ON SAID
PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE;   THENCE
ALONG LAST SAID PARALLEL LINE N0°27'49"E 274.06 FEET TO SAID
TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE
HAVING AN ELEVATION OF 210.00 FEET AND ABOVE A HORIZONTAL PLANE
HAVING AN ELEVATION OF 182.02 FEET.

CONTAINING 28,699 SQUARE FEET, MORE OR LESS.

SHT 7 OF 7 SHTS

ELEVATIONS STATED HEREON ARE BASED ON THE NORTH AMERICAN
VERTICAL DATUM OF 1988 (NAVD88) PER THE YEAR 2005 ADJUSTMENT
BY THE ORANGE COUNTY SURVEYOR, USING THE FOLLOWING BENCHMARK:

OCS BM 404−31−05   ELEV.=80.151 FEET (NAVD88, YEAR 2005 LEVELED)
STATION IS AN OCS ALUMINUM DISK STAMPED 404−31−05 SET IN THE SE'LY
CORNER OF A 15 FT. X 4.5 FT. CONCRETE CATCH BASIN, LOCATED IN NE'LY
PORTION OF INTERSECTION OF STANTON AVE. & ARTESIA BLVD., 28 FT. N'LY
OF THE CENTERLINE OF ARTESIA BLVD. & 81 FT. E'LY OF THE CENTERLINE
OF STANTON AVENUE.   MONUMENT IS LEVEL WITH THE SIDEWALK

SEE ATTACHED "AIRSPACE PARCEL 4 EXHIBIT MAP"
FOR INFORMATIONAL PUPOSES MADE A PART HEREOF BY REFERENCE HEREON.

THIS LEGAL DESCRIPTION IS INTENDED TO DESCRIBE AIRSPACE PARCEL 4
OF PRELIMINARY PARCEL MAP NO. 2014−173, IN THE CITY OF BUENA
PARK, COUNTY OF ORANGE, STATE OF CALIFORNIA, SAID PARCEL MAP
NOT YET RECORDED.

THIS LEGAL DESCRIPTION WAS PREPARED BY ME OR UNDER MY DIRECTION
IN CONFORMANCE WITH THE LAND SURVEYORS' ACT OF THE STATE OF
CALIFORNIA.   THIS LEGAL DESCRIPTION IS NOT TO BE USED FOR THE FEE
TITLE CONVEYANCE OF REAL PROPERTY IN VIOLATION OF THE SUBDIVISION
MAP ACT OF THE STATE OF CALIFORNIA.

ROBERT D. HENNON, PLS 5573
LICENSE EXPIRES 9/30/2017

| | |
|---|---|
| DATE: SEPT 29, 2015 | **HENNON** |
| THOM. GDE: 767−H2 | |
| FILE:2898HTLBLDG.DWG | **Surveying & Mapping, Inc.** |
| PROJECT NO: 2898 | |

601 E. GLENOAKS BLVD., SUITE 208
GLENDALE, CALIFORNIA   91207
(818)243−0640
FAX: (818)243−0650







SHT.  3   OF 9 SHTS

TRACT 1756
MM 60/20–21

PARCEL 4
LEVEL 3 – THIRD FLOOR

PARCEL PARCEL LEVEL 3 – THIRD FLOOR
U.E.=150.76 FT.
L.E.=113.76 FT.

0'      25'    50'      100'

SCALE:   1"=50'

PARCEL 4F TRUE
PT. OF BEGINNING
LEVEL 3 – THIRD FLOOR
BUILDING LINE

N90°00'00"W   23.40'
N0°00'00"W   7.24'
N90°00'00"E   5.88'
N0°00'00"W   6.55'

N90°00'00"E   29.28'

AREA=361 SQ. FT.

EXISTING
TRACT LINE

LOT 2 PRELIMINARY
PARCEL  MAP 2014–173

PARCEL 4G TRUE
PT. OF BEGINNING
N89°32'11"W
45.54'
N90°00'00"W   29.17'
LEVEL 3 – THIRD FLOOR
BUILDING LINE
N0°00'00"W   9.15'
N90°00'00"E   5.84'
N90°00'00"W   10.38'
N90°00'00"W   1.58'

N0°00'00"W   4.17'
N90°00'00"E   11.40'
N0°00'00"W   10.37'

AREA=738 SQ. FT.
N90°00'00"E   12.08'

N0°00'00"W   24.44'
N90°00'00"E
1.44'
N0°00'00"W
9.62'

POR LOT 2

BLOCK 61

MRLA 18/50–52

N89°32'11"W
46.71'

6.00'

30'

809.33'

567.33'

N0°00'00"W
13.79'

N0°27'49"E   152.54'

B R E N N E R   A V E N U E

BRENNER AVE.

EXISTING P/L

LOT LINE
LOT 2 OF PM

AREA=546 SQ. FT.

LOT LINE
LOT 2 OF PM
LEVEL 3 – THIRD FLOOR
BUILDING LINE

S89°59'58"E
14.74'

S0°00'02"W
37.10'

N0°00'02"E
36.96'

N89°27'51"W

PARCEL 4H TRUE
PT. OF BEGINNING

N89°27'51"W

N45°29'59"E
26.85'

6.00'

137.20'

567.88'

24.03'
N45°29'59"E

N0°27'49"E   186.84'

N0°32'09"E
60.00'

N89°27'51"W
14.74'

60'

POINT OF
COMMENCEMENT

A

A

B

B

O R A N G E T H O R P E   A V E.

N89°27'51"W

199.02

1319.52'

60'

DATE: SEPT 29, 2015

THOM. GDE: 767 H2

FILE: 2898–HOTEL–EX

PROJECT NO: 2898

HENNON
Surveying & Mapping, Inc.

601 E. GLENOAKS BLVD., SUITE 208
GLENDALE, CALIFORNIA  91207
(818)243–0640
EMAIL: HENNON@AOL.COM
WEB: HENNON.COM



SHT. 4 OF 9 SHTS

PARCEL 4
LEVEL 4 – FOURTH FLOOR

PARCEL LEVEL 4 – FOURTH FLOOR
U.E.=161.18 FT.
L.E.=150.76 FT.

0'   25'   50'   100'
SCALE:   1"=50'

EXISTING
TRACT LINE

TRACT 1756
MM 60/20–21

LOT 2 PRELIMINARY
PARCEL MAP 2014–173

LEVEL 4 – FOURTH
FLOOR BUILDING LINE

AIRSPACE PARCEL 4
LEGAL DESCRIPTION PARCEL 4I

POR LOT 2

BLOCK 61

MRLA 18/50–52

AREA=40,480 SQ. FT.

N90°00'00"W 18.27'

S0°00'00"E 13.76'

B

72.90'   6.00'
N90°00'00"W

30'

809.33'

PARCEL 4I TRUE
PT. OF BEGINNING

N89°32'11"W
36.00'
LOT LINE
LOT 2 OF PM

EXISTING P/L

B R E N N E R   A V E N U E

567.33'
N0°27'49"E

BRENNER AVE.

274.06'
N0°27'49"E

353.11'

–6.00'

92.89'
N90°00'00"W

130.52'
S0°00'00"E

114.50'
S0°00'00"W

A   A

N90°00'00"E
18.75'

32.75'
S0°00'00"E

N0°32'09"E
60.00'

143.94'

N89°27'51"W

FEE BOUNDARY LINE

567.88'

24.03'
N45°29'59"E

.60'

B

LOT LINE
LOT 2 OF PM

N0°27'49"E

N89°27'51"W

O R A N G E T H O R P E   A V E.

POINT OF
COMMENCEMENT

1319.52'
199.02'

| DATE: SEPT 29, 2015 |
| THOM. GDE: 767 H2 |
| FILE: 2898–HOTEL–EX |
| PROJECT NO: 2898 |

HENNON
Surveying & Mapping, Inc.

601 E. GLENOAKS BLVD., SUITE 208
GLENDALE, CALIFORNIA   91207
(818)243–0640
EMAIL: HENNON@AOL.COM
WEB: HENNON.COM



SHT. 5 OF 9 SHTS

PARCEL 4
LEVEL 5 – FIFTH FLOOR

PARCEL LEVEL 5 – FIFTH FLOOR
U.E.=171.60 FT.
L.E.=161.18 FT.

TRACT 1756
MM 60/20-21

SCALE: 1"=50'
0'   25'   50'   100'

EXISTING
TRACT LINE

LOT 2 PRELIMINARY
PARCEL MAP 2014-173

AIRSPACE
PARCEL 4
LEGAL DESCRIPTION PARCEL 4J

PARCEL 4J TRUE
PT. OF BEGINNING

B

72.90'
N90°00'00"W

6.00'
30'

N89°32'11"W
36.00'
LOT LINE
LOT 2 OF PM

EXISTING P/L

809.33'

BRENNER AVENUE

C

165.38'
S0°00'00"E

N90°00'00"W
6.81'

S0°00'00"E
20.33'

N90°00'00"E
6.81'

LEVEL 5 – FIFTH
FLOOR BUILDING
LINE

28.65'
S0°00'00"E

105.43'
N90°00'00"W

AREA=28,699 SQ. FT.

N27°49'E 274.06'

N27°49'E 567.33'

BRENNER AVE.

353.11'

-6.00'

A                A

44.42'
S0°02'25"E

N90°00'00"E
12.99'

LOT LINE
LOT 2 OF PM

32.75'
S0°00'00"E

N45°29'59"E
26.85'

N45°29'59"E
24.03'

567.88'

N27°49'E

POR LOT 2

BLOCK 61

MRLA 18/50-52

N89°27'51"W

143.94'

FEE BOUNDARY LINE

B

60.00'
N0°32'09"E

60'

POINT OF
COMMENCEMENT

ORANGETHORPE AVE.

N89°27'51"W

199.02'

C       1319.52'

DATE: SEPT 29, 2015
THOM. GDE: 767 H2
FILE: 2898-HOTEL-EX
PROJECT NO: 2898

HENNON
Surveying & Mapping, Inc.

601 E. GLENOAKS BLVD., SUITE 208
GLENDALE, CALIFORNIA 91207
(818)243-0640
EMAIL: HENNON@AOL.COM
WEB: HENNON.COM



SHT. 6  OF 9 SHTS

PARCEL 4
LEVEL 6 – SIXTH FLOOR

PARCEL LEVEL 6 – SIXTH FLOOR
U.E.=182.02 FT.
L.E.=171.60 FT.

SCALE:  1"=50'

LOT 2 PRELIMINARY
PARCEL MAP 2014-173

POR LOT 2

BLOCK 61

MRLA 18/50-52

TRACT 1756
MM 60/20-21

AIRSPACE PARCEL 4
LEGAL DESCRIPTION PARCEL 4K

AREA=28,753 SQ. FT.

O R A N G E T H O R P E   A V E.

B R E N N E R   A V E N U E

POINT OF COMMENCEMENT

---

DATE: SEPT 29, 2015
THOM. GDE: 767 H2
FILE: 2898–HOTEL–EX
PROJECT NO: 2898

**HENNON**
Surveying & Mapping, Inc.

601 E. GLENOAKS BLVD., SUITE 208
GLENDALE, CALIFORNIA  91207
(818)243-0640
EMAIL: HENNON@AOL.COM
WEB: HENNON.COM



SHT. 8   OF 9 SHTS



PARCEL MAP BOUNDARY

AVENUE

BRENNER

ELEV=210.00'

U.E.=210.00 FT.

27.98'

**PAR. 4 LEVEL 7 — SEVENTH FLOOR & ROOF**

L.E.=182.02 FT.

ELEV=182.02'

U.E.=182.02 FT.

10.42'

**PAR. 4 LEVEL 6 — 6TH FLOOR**

L.E.=171.60 FT.

ELEV=171.60'

U.E.=171.60 FT.

10.42'

**PAR. 4 LEVEL 5 — 5TH FLOOR**

L.E.=161.18 FT.

ELEV=161.18'

U.E.=161.18 FT.

10.42'

**PAR. 4 LEVEL 4 — 4TH FLOOR**

L.E.=150.76 FT.

ELEV=150.76'

U.E.=150.76 FT.

**PAR. 4 LEVEL 3 — SECOND FLOOR**

U.E.=150.76 FT.

**PAR. 4 LEVEL 3 — SECOND FLOOR**

37.00'

L.E.=113.76 FT.

L.E.=113.76 FT.

6'

BRENNER AVE

ELEV=113.76'

U.E.=113.76 FT.

18.00'

**PAR. 4 LEVEL 2 — SECOND FLOOR**

L.E.=95.76 FT.

ELEV=95.76'

U.E.=95.76 FT.

18.00'

**PAR. 4 LEVEL 1 — GROUND FLOOR**

L.E.=77.76 FT.

ELEV=77.76'

# SECTION A—A
NO SCALE

| DATE: SEPT 29, 2015 |
|---|
| THOM. GDE: 767 H2 |
| FILE: 2898-HOTEL-EX |
| PROJECT NO: 2898 |

**HENNON**
Surveying & Mapping, Inc.

601 E. GLENOAKS BLVD., SUITE 208
GLENDALE, CALIFORNIA  91207
(818)243-0640
EMAIL: HENNON@AOL.COM
WEB: HENNON.COM

SHT.  9   OF 9 SHTS



# SECTION B-B

NO SCALE

| DATE: SEPT 29, 2015 |
| THOM. GDE: 767 H2 |
| FILE: 2898-HOTEL-EX |
| PROJECT NO: 2898 |

**HENNON**

**Surveying & Mapping, Inc.**

601 E. GLENOAKS BLVD., SUITE 208
GLENDALE, CALIFORNIA  91207
(818)243-0640
EMAIL: HENNON@AOL.COM
WEB: HENNON.COM

## EXHIBIT "A-2"

## DEPICTION OF PARCEL

00905865 6



# EXHIBIT "C"

[Construction Loan Agreement, Promissory Note,
Commercial Security Agreement, and Deed of Trust]

Loan No. 3215011734

## CONSTRUCTION LOAN AGREEMENT

This Construction Loan Agreement (the "Agreement") is made as of May 24, 2016, by and between THE SOURCE HOTEL, LLC, a California limited liability company ("Borrower"), and EVERTRUST BANK, a California banking corporation ("Lender"), with respect to the following facts:

## RECITALS

A.     Borrower has applied to Lender for a loan in the maximum principal amount of Twenty Nine Million Five Hundred Thousand and No/100 Dollars ($29,500,000.00) ("Loan") for (i) the purposes of financing, in part, the construction of a portion of a 174-room, seven (7) story hotel building to be located on the Property (as hereinafter defined), and (ii) those purposes expressly set forth herein.

B.     Lender has agreed to make the Loan to Borrower for such purpose upon the terms and conditions set forth herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I.
## DEFINITIONS

1.     The definitions set forth in the Recitals or elsewhere in this Agreement are incorporated herein by reference.

For purposes of this Agreement, the following terms shall have the following meanings:

"Advance" shall mean any advance or disbursement of Construction Loan Proceeds by Lender pursuant to this Agreement.

"Advance Date" shall mean the date of each Advance.

"Affiliate" shall mean any Person, directly or indirectly, related to, in control of, controlled by, or under the common control of, Borrower, or of a successor thereof, whether through merger, consolidation, transfer of assets or otherwise.

"Agreement" shall mean this Construction Loan Agreement, as originally executed and as it may from time to time be supplemented, extended, renewed, modified, or amended.

"Agreement To Furnish Insurance" shall mean the Agreement To Furnish Insurance duly executed by Borrower in form and content as required by Lender.

"Anti-Money Laundering Laws" shall mean the USA Patriot Act of 2001, the Bank Secrecy Act, as amended through the date hereof, Executive Order 1 3324—Blocking Property and

Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, as amended through the date hereof, and other federal laws and regulations and executive orders administered by OFAC which prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals (such individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanction and embargo programs), and such additional laws and programs administered by OFAC which prohibit dealing with individuals or entities in certain countries regardless of whether such individuals or entities appear on any of the OFAC lists.

"Application for Payment" shall mean a written application in form satisfactory to Lender requesting an Advance of Construction Loan Proceeds, together with a certificate signed by Borrower, Fund Control and Contractor certifying, in regard to the Improvements completed at the time, inter alia, (a) that each Subcontractor or other Person specified in the Application for Payment has satisfactorily completed the work or furnished the materials for which payment is requested, in accordance with the applicable contract; (b) that all work for which an Application for Payment is made conforms to the Contract Documents and any approved changes, and is in place; (c) that each Subcontractor or other Person specified in the Application for Payment has been paid in full for the work performed or materials provided (together with evidence of such payment, including, without limitation, cancelled checks) or will be paid in full from the Construction Loan Proceeds; (d) if any Subcontractors or other Persons specified in the Application for Payment have not already been paid in full, the identity of each such Subcontractor or other Person for the work performed and materials supplied and the amount to be paid to each such Subcontractor or other Person, along with copies of any applicable invoices and evidence of any partial payment thereon; (e) that sufficient funds remain of the Undisbursed Project Funds to complete the Project; and (f) that all funds previously disbursed have been applied in accordance with previous Applications for Payment.

"Appraisal" shall mean an appraisal of the Project, as reviewed, adjusted and approved by Lender, performed and prepared for Lender at Borrower's sole expense by a duly licensed or certified appraiser designated by Lender and possessing all qualifications required by Lender and applicable Laws, setting forth the appraiser's opinion and determination of the fair market value of the Property before construction of the Improvements and the fair market value of the Project as though all Improvements thereon have been completed in full and timely compliance with this Agreement; said Appraisal shall be prepared in full narrative form meeting all requirements and approaches to value as shall be necessary or appropriate in order to comply with all customary and generally accepted appraisal standards within the appraisal industry and in accordance with Lender's requirements, and to Lender's satisfaction and all applicable Laws governing Lender's operations.

"Approved Costs" shall mean third party expenses in regard to the Project, including, without limitation, the cost of construction, FF&E (excluding leased items), fixed asset supplies, interest during construction, Loan Closing Costs, and other expenses described in this Agreement.

"Approved Lease" shall mean a lease between Borrower and any tenant for all or any portion of the Property, which lease is (a) substantially in a form pre-approved by Lender, the terms of which are satisfactory to Lender, and which tenant is satisfactory to Lender, all in Lender's reasonable discretion, or (b) for premises having a floor area not exceeding 5,000 square feet.

"Architect" shall mean Gene Fong Associates, the duly licensed and qualified architect to be retained by Borrower pursuant to the Architect's Contract, or such other duly licensed and qualified architect as may be retained by Borrower pursuant to an Architect's Contract and approved by Lender in its reasonable discretion.

"Architect's Contract" shall mean that certain written contract between Ground Lessor and Architect for architectural professional services in regard to the planning, design, and construction of the Project, in form and content approved by Lender, as originally executed and as it may from time to time be supplemented, modified or amended.

"Assignment of Architect's Contract/ Engineer's Consents / Plans and Specifications" shall mean the Assignment of Architect's Contract and Assignment of Plans and Specifications, along with the (i) Architect's Consent Certification and Assignment, attached thereto, (ii) Engineer's Consent and Certification (Englekirk Structural Engineers) in connection with the Englekirk Contract, attached thereto, (iii) Engineer's Consent and Certification (Jensen Hughes) in connection with the Jensen Contract, attached thereto, and (iv) Engineer's Consent and Certification (Syska Hennessy Group, Inc.) in connection with the Syska Contract, attached thereto; all in form and content as required by Lender, as originally executed, and as they may from time to time be supplemented, modified or amended.

"Assignment of Construction Contract/Engineer's Consents / Plans and Specifications" shall mean the Assignment of Construction Contract and Assignment of Plans and Specifications, along with (i) Contractor's Consent, Certification and Assignment, attached thereto, Engineer's Consent and Certification (Control Air Conditioning Corporation) in connection with the CACC Contract, attached thereto, (iii) Engineer's Consent and Certification (Pan-Pacific Plumbing Company) in connection with the PPPC Contract, attached thereto, and (iv) Engineer's Consent and Certification (Morrow Meadows Corporation) in connection with the MMC Contract, attached thereto; all in form and content as required by Lender, as originally executed, and as they may from time to time be supplemented, modified or amended.

"Assignment of Construction Manager's Contract" shall mean the Assignment of Construction Management Contract and Manager's Consent and Certification, in form and content as required by Lender, as originally executed, and as they may from time to time be supplemented, modified or amended.

"Assignment of Deposit Accounts" shall mean the Security Agreement (Assignment of Deposit Accounts), executed by Borrower, assigning to Lender all of its right, title and interest in and to certain deposit accounts maintained with Lender, including, without limitation, the Operating Account.

"Assignment of Deposit Accounts (EB5 Funds)" shall mean the Security Agreement (Assignment of Deposit Accounts) (EB5 Funds), executed by Borrower, assigning to Lender all of its right, title and interest in and to the EB5 Account.

"Assignment of Leases (Leasehold)" shall mean the Absolute Assignment of Leases, Lease Guaranties, Rents, Issues and Profits duly executed by Borrower, assigning to Lender all existing leases, subleases, rents and concession rights, if any, and all future leases, subleases and concession

rights affecting the leasehold estate established by the Ground Lease on the Property or any part thereof, and shall include delivery to Lender of the executed originals of each of said leases.

"Beach Orangethorpe Deeds of Trust" shall mean, individually and collectively, the following:

1.1    Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated as of June 23, 2011, executed by Ground Lessor, as trustor, in favor of Beach Orangethorpe, LLC, a California limited liability company, as beneficiary, and recorded in the Official Records of Orange County, California, as Document No. 2011000306739 on June 23, 201.1 (as amended pursuant to that certain (i) Amendment to Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated as of September 14, 2011, executed by and between Beach Orangethorpe, LLC, and Ground Lessor, and recorded as Document No. 2011000458073 on September 15, 2011, (ii) Second Amendment to Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated as of October 21, 2011, executed by and between Beach Orangethorpe, LLC, and Ground Lessor, and recorded as Document No. 2011000544533 on October 28, 2011, and (iii) Third Amendment to Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated as of October 8, 2012, executed by and between Beach Orangethorpe, LLC, and Ground Lessor, and recorded as Document No. 2012000625295 on October 15, 2012);

1.2    Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated as of October 8, 2012, executed by Ground Lessor, as trustor, in favor of Beach Orangethorpe II, LLC, a California limited liability company, as beneficiary, and recorded in the Official Records of Orange County, California, as Document No. 2012000625296 on October 15, 2012;

1.3    Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated as of October 8, 2012, executed by Ground Lessor, as trustor, in favor of Beach Orangethorpe Ventures, LLC, a California limited liability company, as beneficiary, and recorded in the Official Records of Orange County, California, as Document No. 2012000625297 on October 15, 2012; and

1.4    Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated as of January 6, 2014, executed by Ground Lessor, as trustor, in favor of Beach Orangethorpe Source, LLC, a California limited liability company, as beneficiary, and recorded in the Official Records of Orange County, California, as Document No. 2014000163784 on April 29, 2014.

The Beach Orangethorpe Deeds of Trust are attached to the fee simple absolute interest in the Property, but are not attached to, and shall not attach to, any leasehold interest in the Property or the Ground Lease.

"Beach Orangethorpe Hotel Financing" shall mean, individually and collectively, the following:

1.1    Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated as of June 1, 2014, to be executed by Ground Lessor and in favor of BEACH ORANGETHORPE HOTEL, LLC, a California limited liability company; and

1.2    Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated as of December 31, 2015, to be executed by Ground Lessor and in favor of BEACH ORANGETHORPE HOTEL II, LLC, a California limited liability company.

"Beach Orangethorpe Hotel Financing Loan Documents" shall mean the Beach Orangethorpe Hotel Financing, and any and all loan agreements, notes, guaranties, instruments, agreements and documents evidencing the loans by the Beach Orangethorpe Hotel EB5 Lenders.

"Beach Orangethorpe Hotel EB5 Lenders" shall mean, individually and collectively, (a) BEACH ORANGETHORPE HOTEL LLC, a California limited liability company, and (b) BEACH ORANGETHORPE HOTEL II, LLC, a California limited liability company, who are lending the EB5 Funds to Borrower.

"Borrower's Deposit" shall mean the sum or sums of cash deposited or required to be deposited by Borrower, with Lender, and funded into the Project prior to the first disbursement of Construction Loan Proceeds (consisting of the sum of $14,100,635.22, which is in the form of invoices and cancelled checks to demonstrate the work to the Project completed to date), and the deposit by Borrower and/or Guarantor of any additional sums as described in and required from time to time by this Agreement. The Borrower's Deposit shall not bear interest.

"Business Day" shall mean Monday through Friday, excluding any day of the year on which banks are required or authorized to close in California.

"CACC" shall mean CONTROL AIR CONDITIONING CORPORATION.

"CACC Contract" shall mean that certain agreement Letter Agreement dated February 3, 2015 (as the same has been amended, supplemented and modified from time to time, and together with all attachments and addenda thereto) by and between Contractor and CACC.

"Collateral" shall mean all real and personal property of Borrower, or others, in which Lender has been and may hereafter be granted a lien, assignment or security interest to secure payment and performance of Borrower's obligations under the Loan.

"Commencement Date" shall mean the date by which Borrower must commence construction of Improvements upon the Property, which shall be no later than June 30, 2016.

"Completion Date" shall mean the date scheduled for completion of the Improvements as provided in the Construction Contract, which shall be no later than the Maturity Date, provided that the Completion Date shall be extended for a period equal to any extension of the Maturity Date if Borrower elects such an extension pursuant to Section 3.4 of this Agreement.

"Completion Guaranty" shall mean that certain agreement or agreements by that title described in Section 3.8 of this Agreement duly executed by each Guarantor.

"Construction Contract" shall mean the written building contract, with a stipulated maximum sum of $40,752,518.00, between Borrower and Contractor, in form approved by Lender, for the furnishing of labor, services, and materials to the Property in connection with the construction of the

Improvements, as originally executed and as it may from time to time be supplemented, modified or amended.

"Construction Deed of Trust (Leasehold)" shall mean the Construction Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing (Leasehold) duly executed and acknowledged by Borrower, for the benefit of Lender, as beneficiary, and any and all supplements, modifications or amendments thereto, to secure the Loan and encumbering the leasehold estate established by the Ground Lease on the Property and other assets and rights as therein provided, together with all such riders and exhibits thereto as Lender shall require.

"Construction Hard Costs" shall mean the cost of labor and/or materials incorporated into the work of improvement for construction of the Improvements, including the cost of shipping and other transportation, fringe benefits in accordance with labor contracts and the fees, Contractor's insurance, profit and overhead of the Contractor and Subcontractors actually paid directly as part of the Construction Contract or Subcontracts, as set forth in Exhibit "B-1" attached hereto.

"Construction Loan Proceeds" shall mean funds advanced by Lender to Borrower for purposes of paying Construction Hard Costs, the creation of an Interest Reserve, Loan and Carrying Costs and any other items identified in the Cost Breakdown, to the extent applicable hereunder, pursuant to the terms of this Agreement.

"Construction Soft Costs" shall mean the costs and expenses set forth in Exhibit "B-2" attached hereto. No Construction Loan Proceeds will be available for, and Lender shall have no obligation to make any Advances toward, Construction Soft Costs, except for Advances for the Construction Soft Costs Contingency.

"Construction Soft Costs Contingency" shall mean a reserve used to fund changes to the Cost Breakdown in connection with the Project in the event of overruns related to the Construction Soft Costs. In the event that any funds in the Construction Soft Costs Contingency are insufficient to cover the costs in connection with any changes to the Cost Breakdown, the same shall be paid by Borrower from Borrower's own funds. The sum of the Construction Soft Costs Contingency shall not exceed $363,749.00 and shall only be available for Construction Soft Costs.

"Construction Manager" shall mean SWINERTON BUILDERS, INC., a California corporation, the duly licensed and qualified construction manager to be retained by Borrower pursuant to the Construction Manager's Contract, or such other duly licensed and qualified construction manager as may be retained by Borrower pursuant to the Construction Manager's Contract and approved by Lender in its reasonable discretion.

"Construction Manager's Contract" shall mean that certain written contract between Borrower and Construction Manager for services in regard to the construction management of the Project, in form and content approved by Lender, as originally executed and as it may from time to time be supplemented, modified or amended.

"Contingency Reserve" shall mean a reserve used to fund changes to the Cost Breakdown for Construction Hard Costs in connection with the Project in the event of overruns related to the Project. In the event that any funds in the Contingency Reserve are insufficient to cover the costs in connection with any changes to the Cost Breakdown, the same shall be paid by Borrower from

Borrower's own funds. The sum of the Contingency Reserve shall not exceed $1,861,987.00 and shall only be available for Construction Hard Costs.

"Continuing Guaranty" shall mean that certain agreement or agreements by that title, duly executed by each Guarantor, unconditionally and irrevocably guaranteeing payment and performance of Borrower's obligations to Lender in connection with the Loan, as such agreement or agreements are originally executed and as such agreement or agreements may from time to time be reaffirmed, supplemented, modified or amended.

"Contract Documents" shall mean the Architect's Contract, the Construction Contract, the Engineer's Contract, the Plans and Specifications, the Construction Manager's Contract, the Englekird Contract, the Jensen Contract, the Syska Contract, the CACC Contract, the PPPC Contract, the MMC Contract and all other documents ancillary thereto, all of which shall be satisfactory to Lender in Lender's sole and absolute opinion and judgment.

"Contractor" shall mean GREENLAND CONSTRUCTION SERVICE, LLC, a California limited liability company, the duly licensed and qualified general building contractor retained by Borrower pursuant to the Construction Contract. Contractor is an Affiliate of Borrower.

"Cost Breakdown" shall mean the cost of constructing the Improvements, including, without limitation, the Construction Hard Costs as more specifically identified in Exhibit "B-1" hereto, and the Construction Soft Costs as more specifically identified in Exhibit "B-2" hereto. Borrower acknowledges and agrees that Borrower shall be responsible to pay all costs of constructing the Improvements from Borrower's own funds other than Construction Loan Proceeds in the event the Construction Loan Proceeds, the Contingency Reserve and the Construction Soft Costs Contingency have been disbursed in their entirety.

"Declaration (2016)" shall mean that certain Amended and Restated Declaration of Covenants, Conditions and Reciprocal Easement Agreement dated as of May 24, 2016 and to be recorded in the Official Records of Orange County, California.

"Development Fee" shall mean the development fee payable to Borrower for Borrower's development of the Property which shall be an amount not to exceed $1,043,283.00 and which shall be paid solely from EB5 Funds.

"Disbursement" shall mean any disbursement of Project Funds.

"EB5 Account" shall mean that certain deposit account to be maintained by Borrower with Lender, and into which Borrower shall deposit a sum equal to the full amount of Tranche 2B and Tranche 3. The EB5 Account shall be assigned to Lender pursuant to the Assignment of Deposit Accounts (EB5 Funds) as additional security for the Loan.

"EB5 Funds" shall mean, individually and collectively, Tranche 2B and Tranche 3, comprising of the proceeds of the loans made by Beach Orangethorpe Hotel EB5 Lenders and/or equity contribution of BEACH ORANGETHORPE HOTEL III, LLC, a California limited liability company, to Borrower. The EB5 Funds shall be deemed a "Borrower's Deposit" and shall be presumed disbursed first and prior to the Construction Loan Proceeds, as set forth in Article III, below.

"Englekirk" shall mean ENGLEKIRK STRUCTURAL ENGINEERS.

"Englekirk Contract" shall mean that certain agreement originally dated as of November 20, 2012 (as the same has been amended, supplemented and modified from time to time, and together with all attachments and addenda thereto) by and between Architect and Englekirk.

"Environmental Indemnity" shall mean that certain Hazardous Substances Indemnity Agreement duly executed by Borrower and Guarantor as required by Lender, pursuant to which said parties shall indemnify and defend Lender from and against any loss or liability, direct or indirect, with respect to the presence or release of any hazardous or toxic material in, on, about or under the Property.

"Event of Default" shall mean any of those events specified in Article V hereof.

"Extension Fee" shall mean the sum of three-eighths of one percent (0.375%) of the then outstanding principal balance of the Loan, plus any Undisbursed Project Funds, payable by Borrower to Lender for any extension of the Maturity Date if requested in accordance with the provisions of Section 3.4, below.

"Fee Lenders" shall mean, individually and collectively, (a) BEACH ORANGETHORPE, LLC, a California limited liability company, (b) BEACH ORANGETHORPE II, LLC, a California limited liability company, (c) BEACH ORANGETHORPE VENTURES, LLC, a California limited liability company, and (d) BEACH ORANGETHORPE SOURCE, LLC, a California limited liability company.

"FF&E" shall mean all furniture, fixtures, machinery, tools, inventory and equipment owned by Borrower and used, or intended to be used, in connection with the Project.

"Financial Statements" shall mean balance sheets, income statements, reconciliations of capital structure, statements of sources and applications of funds, and income tax returns, all prepared in accordance with GAAP.

"Financing Statements" shall mean one or more financing statements (form UCC-1) given by Borrower to Lender, if required by Lender, covering the FF&E, Contract Documents, Project Rights, contracts, Construction Loan Proceeds, fees and all other personal property and/or fixtures included in the Project.

"Fiscal Year" shall mean Borrower's fiscal year, ending on December 31 of each calendar year.

"Force Majeure Events" shall mean Acts of God (which for purposes of the Loan Documents constitute earthquake, flood, tornado, rain and lightning) and Acts of War.

"Fund Control" shall mean HASZ FUND CONTROL, INC., a California corporation, the duly licensed and qualified fund control company to be retained by Lender.

"Fund Control Agreement" shall mean that certain agreement entered into by and among Lender, Borrower, Contractor and Fund Control, in form and content acceptable to Lender, for the

inspection of work in progress in connection with the construction and installation of the Improvements, and for the receipt and processing of documentation supporting each Application for Payment, and providing procedures for the review and control of Disbursements of Project Funds (excluding amounts disbursed to Lender under this Agreement or any other Loan Documents) in connection therewith.

"GAAP" shall mean generally accepted accounting principles consistently maintained and applied throughout the period indicated and consistent with the prior financial practice of the Person providing such financial information.

"General Contractors Fee" shall mean the fee paid to Contractor to compensate Contractor pursuant to the Construction Contract, as set forth in Exhibit "B-1" hereto.

"Governmental Agency" shall mean any governmental or quasi-governmental agency, authority, board, bureau, commission, department, instrumentality or public body, court, administrative tribunal, or public utility.

"Ground Lease" shall mean that certain Ground Lease dated as of April 6, 2015 entered into by and between Borrower, as lessee, and Ground Lessor, as lessor.

"Ground Lessor" shall mean THE SOURCE AT BEACH, LLC, a California limited liability company. Ground Lessor is an Affiliate of Borrower.

"Ground Lessor's Consent" shall mean the Ground Lessor's Consent, Estoppel Certificate and Fee Mortgagee Agreement for the Property, duly executed by (a) Ground Lessor, (b) Borrower, (c) Lender, and (d) Fee Lenders.

"Guarantor" shall mean (i) DONALD CHAE, an individual, and (ii) MIN CHAE, an individual.

"Hazard Insurance Disclosure" shall mean the Hazard Insurance Disclosure duly executed by Borrower in form and content as required by Lender.

"Hilton" shall mean Hilton Franchise Holding LLC, a Delaware limited liability company.

"Hilton Comfort Letter" shall mean that certain letter agreement by and among Hilton, Borrower and Lender, governing, among other things, the terms and conditions upon which Lender may succeed to Borrower's right, title and interest in, to and under the Hilton Franchise Agreement.

"Hilton Franchise Agreement" shall mean that certain Franchise Agreement dated August 4, 2015 by Borrower and dated August 19, 2015 by Hilton, and executed by each, in connection with the franchising of the hotel to be constructed on the Property.

"Improvements" shall mean the materials, structures and other improvements and fixtures to be constructed or installed on or about the Property in connection with the Project according to and as described in the Plans and Specifications, including, but not limited to, off-site and on-site improvements.

"Insurance Policies" shall mean any of the policies of insurance specified in Section 4.2 hereof.

"Interest Reserve" shall mean that portion of the Project Funds, totaling $1,700,000.00, for payment of interest due under the Note. Notwithstanding the existence of the Interest Reserve, Borrower shall be responsible to pay the interest due under the terms of the Note from funds other than the Construction Loan Proceeds in the event the Interest Reserve has been disbursed in its entirety or upon the occurrence of an Event of Default. The Interest Reserve shall remain undisbursed as to Borrower; provided, however, the Interest Reserve shall be funded from the Construction Loan Proceeds on a monthly basis for payment of interest due under the Note and subject to the terms of the Loan Documents.

"Interstate-Rim" shall mean Interstate-Rim Management Company, LLC, a Delaware limited liability company.

"Interstate-Rim Consent, Assignment and Subordination Agreement" shall mean that certain Consent, Assignment and Subordination Agreement (Management Agreement) by and among Interstate-Rim, Borrower and Lender, governing, among other things, the terms and conditions upon which Interstate-Rim shall subordinate all of its right, title and interest in and to the Interstate Rim Hotel Management Agreement to the Construction Deed of Trust (Leasehold), and by which Borrower shall assign all of its right, title and interest in and to the Interstate Rim Hotel Management Agreement to Lender.

"Interstate Rim Hotel Management Agreement" shall mean that certain Hotel Management Agreement dated October 8, 2015, and executed by Borrower and Interstate-Rim, in connection with the management by Interstate-Rim of the hotel to be constructed on the Property.

"Jensen" shall mean JENSEN HUGHES, formerly known as Rolf, Jensen & Associates, Inc.

"Jensen Contract" shall mean that certain Proposal for Fire Protection Consulting Services originally dated November 9, 2012 (as the same has been amended, supplemented and modified from time to time, and together with all attachments and addenda thereto) by and between Architect and Jensen.

"Laws" shall mean, individually and collectively, all federal, state, and local laws, rules, regulations, ordinances, and codes.

"Loan" shall mean the loan described in the Recitals and in Article III of this Agreement.

"Loan and Carrying Costs" shall mean those costs incurred in the Project other than labor, materials, and fees payable to Contractor or any Subcontractor (including, but not limited to, loan fees for the Loan, legal fees, interest, permits, hook-up fees, appraisals, and the like, and the other matters identified on the Cost Breakdown), but not including any cost of refinancing or financing other than the Loan.

"Loan Closing" shall mean the date on which the Loan closes in accordance with Section 3.2 of this Agreement, and the Construction Deed of Trust (Leasehold) is recorded.

"Loan Closing Costs" shall mean collectively, the Loan Fee, Processing Fee, Title Company recording fees and charges, attorneys' fees and costs, and other costs related to closing the transaction set forth herein.

"Loan Documents" shall mean this Agreement, the Note, Construction Deed of Trust (Leasehold), Financing Statements, Completion Guaranty, Continuing Guaranty, Applications for Payment, Assignment of Leases (Leasehold), Hazard Insurance Disclosure, Environmental Indemnity, Assignment of Architect's Contract/ Engineer's Consents / Plans and Specifications, Assignment of Construction Contract/Engineer's Consents / Plans and Specifications, Assignment of Construction Manager's Contract, Assignment of Engineer's Contract, Agreement To Furnish Insurance, Security Agreement, Assignment of Deposit Accounts, Assignment of Deposit Accounts (EB5 Funds), Fund Control Agreement, Ground Lessor's Consent, Hilton Comfort Letter, Interstate-Rim Consent, Assignment and Subordination Agreement, Subordination Agreement (Beach Orangethorpe Hotel, LLC), Subordination Agreement (Beach Orangethorpe Hotel II, LLC), and such other documents as Lender may require Borrower or any third party to give to Lender as authority for and/or evidence of and/or security for and/or guaranty of the Loan, as such documents are originally executed and as such documents may from time to time be reaffirmed, supplemented, extended, renewed, modified and/or amended.

"Loan Fee" shall mean the sum of $295,000.00, for the granting of the Loan, which shall be made payable to Lender as follows: (a) the sum of $261,810.00 from Construction Loan Proceeds, and (b) the sum of $33,190.00 payable by Borrower to Lender from Borrower's own funds, as provided in Section 3.3 of this Agreement. Except as set forth herein, no portion of the Construction Loan Proceeds shall be allocated to the Loan Fee.

"Maturity Date" shall mean December 1, 2017, at which time the entire principal balance of the Loan, plus accrued interest thereon, is and shall be due and payable as provided in this Agreement and the Note, subject to acceleration as provided in the Loan Documents, and also subject to the extension provision of Section 3.4 below.

"Minimum Equity" shall mean the minimum amount of equity investment by Borrower in the Project (including any cash down payment, other investments of Borrower's cash in the Project, land acquisition and/or carrying cost, evidence of payment of Project soft costs and Borrower's Deposit), which amount shall not be less than the sum of $14,100,635.22, which Borrower shall have expended on the Project at the time of Loan Closing, as set forth in evidence satisfactory to Lender, in its sole opinion and judgment.

"MMC" shall mean MORROW MEADOWS CORPORATION.

"PPPC Contract" shall mean that certain agreement Letter Agreement dated February 19, 2015 (as the same has been amended, supplemented and modified from time to time, and together with all attachments and addenda thereto) by and between Contractor and MMC.

"Note" shall mean the Promissory Note of Borrower in the amount of the Loan payable to the order of Lender, duly executed by Borrower, as required by Lender to evidence the Loan, as originally executed and as it may from time to time be supplemented, modified or amended.

"OFAC" shall mean the United States Department of the Treasury, Office of Foreign Assets Control.

"OFAC Prohibited Person" shall mean a country, territory, individual or person (i) listed on, included within or associated with any of the countries, territories, individuals or entities referred to on The Office of Foreign Assets Control's List of Specially Designated Nationals and Blocked Persons or any other prohibited person lists maintained by governmental authorities, or otherwise included within or associated with any of the countries, territories, individuals or entities referred to in or prohibited by OFAC or any other Anti-Money Laundering Laws, or (ii) which is obligated or has any interest to pay, donate, transfer or otherwise assign any property, money, goods, services, or other benefits from the Property directly or indirectly, to any countries, territories, individuals or entities on or associated with anyone on such list or in such laws.

"Operating Account" shall mean that certain deposit account to be maintained by Borrower with Lender, (i) which Borrower shall use as the sole operating account for the Property, and (ii) from which Borrower shall pay all monthly principal and interest payments under the Note in accordance with Sections 3.6 and 3.15 of this Agreement. The Operating Account shall be assigned to Lender pursuant to the Assignment of Deposit Accounts as additional security for the Loan.

"Organizational Documents" shall mean the duly filed, certified and/or executed documents or instruments evidencing or confirming the lawful formation and existence of Borrower and Guarantor, as applicable, and all written consents and certifications required by Lender from Persons having management and/or ownership interests in Borrower or Guarantor, as applicable.

"Permitted Encumbrances" shall mean only those matters and exceptions to title to the Property approved by Lender, as expressly disclosed in this Agreement or shown in the preliminary report of title and all supplements thereto issued by the Title Company in regard to the Property.

"Person" shall mean an individual, corporation, limited liability company, partnership, joint venture, trust or unincorporated organization or a Governmental Agency.

"Plans and Specifications" shall mean: (i) the plans and specifications for the Project prepared by the Architect, Engineer, Contractor and/or Construction Manager, as applicable, and approved by Borrower, which are submitted to Lender and approved by Lender, in Lender's sole opinion and judgment, all prior to the first Disbursement of Construction Loan Proceeds, and (ii) any changes, modifications or supplements thereto, which changes, modifications or supplements must be submitted to Lender and approved by Lender in writing, in Lender's sole opinion and judgment, prior to any Disbursement of Construction Loan Proceeds by reason of such change, modification or supplement.

"Pledge Agreement (Fee Lenders)" shall mean that certain Pledge Agreement entered into by and among DMC Investment Holdings, LLC, a Delaware limited liability company, and the Fee Lenders, whereby, among other things, DMC Investment Holdings, LLC, a Delaware limited liability company, has agreed to pledge its membership interest in Borrower as additional security for the performance of Ground Lessor's payment obligations under the loans in connection with the Beach Orangethorpe Deeds of Trust.

"PPPC" shall mean PAN-PACIFIC PLUMBING COMPANY.

"PPPC Contract" shall mean that certain agreement Letter Agreement dated February 19, 2015 (as the same has been amended, supplemented and modified from time to time, and together with all attachments and addenda thereto) by and between Contractor and PPPC.

"Processing Fee" shall mean the sum of $1,500.00, which shall be fully earned by Lender upon the making of the Loan, and shall be paid by Borrower from Borrower's own funds. No portion of the Construction Loan Proceeds shall be allocated to the Processing Fee.

"Project" shall mean the aggregate of the Property, the construction and installation of the Improvements, and the furnishing and equipping of the Improvements which, when completed, will consist of, without limitation, a portion of a 174-room, seven (7) story hotel building, all as set forth in the Plans and Specifications.

"Project Costs" shall mean those costs paid or incurred by Borrower in connection with constructing and financing the Project, including, but not limited to, Construction Hard Costs and Loan and Carrying Costs.

"Project Funds" shall mean the sum of the Construction Loan Proceeds plus Borrower's Deposit, if any.

"Project Rights" shall mean all those rights and interests relating to the Project and the Property as provided in Section 4.14 of this Agreement.

"Property" shall mean the real property described in Exhibit "A" hereto and in the Construction Deed of Trust (Leasehold) and all present and future improvements thereon and appurtenances thereto.

"Retentions" shall mean ten percent (10%) of Construction Hard Costs approved by Lender included in each Application for Payment, other than the final Application for Payment.

"Security Agreement" shall mean the Commercial Security Agreement executed by Borrower in favor of Lender.

"Subcontractors" shall mean those Persons furnishing labor or materials for the Project pursuant to the Subcontracts. All major Subcontractors, as determined by Lender in its sole opinion and judgment, shall be qualified for bonding.

"Subcontracts" shall mean the contracts between Contractor and its Subcontractors for the furnishing of labor or materials for the Project.

Subordination Agreement (Beach Orangethorpe Hotel, LLC)" shall mean that certain Subordination Agreement entered into by and among Lender, Borrower and BEACH ORANGETHORPE HOTEL, LLC, as originally executed and as it may from time to time be supplemented, modified or amended.

Subordination Agreement (Beach Orangethorpe Hotel II, LLC)" shall mean that certain Subordination Agreement entered into by and among Lender, Borrower and BEACH

ORANGETHORPE HOTEL II, LLC, as originally executed and as it may from time to time be supplemented, modified or amended.

"SNDA" shall mean a subordination, nondisturbance and attornment agreement by a tenant on the Property, in form and content satisfactory to Lender.

"Syska" shall mean SYSKA HENNESSY GROUP, INC.

"Syska Contract" shall mean that certain agreement originally dated as of November 21, 2012 (as the same has been amended, supplemented and modified from time to time, and together with all attachments and addenda thereto) by and between Architect and Syska.

"Tenant Estoppel" shall mean a tenant estoppel certificate by a tenant on the Property, in form and content satisfactory to Lender.

"The Source Office LLC" shall mean THE SOURCE OFFICE, LLC, a California limited liability company.

"Title Company" shall mean the title insurer designated by Lender, in its sole opinion and judgment, which shall issue the Title Policy (Leasehold).

"Title Policy (Leasehold)" shall mean an ALTA Loan Policy (2006 Policy Form) with ALTA Form 1 coverage, written as such at Loan Closing and rewritten upon the completion of construction (sometimes called an LP-10 policy form package) with such endorsements as Lender shall require, issued by the Title Company, with liability equal to the full amount of the Loan, in favor of Lender, as insured, insuring the lien of the Construction Deed of Trust (Leasehold) to be a valid first lien on the leasehold estate of the Ground Lease on the Property upon which the Project shall be completed subject only to the Permitted Encumbrances. Following the installation of foundation forms and before footings are poured, Borrower shall cause Title Company to furnish to Lender at least the following CLTA endorsements: CLTA Endorsement No. 102.5 disclosing no encroachment of foundations onto adjacent property, CLTA Endorsement No. 122 insuring against loss of priority of the lien of the Construction Deed of Trust (Leasehold) due to any mechanic's lien and related claims, and CLTA Endorsement Nos. 100 or 100.2, 101.6, 116 and 116.7, issued upon completion of construction with respect to all Improvements upon the Property, and all such other endorsements thereto as Lender shall require. If required by Lender, the title insurance coverage will provide for reinsurance.

"Tranche 2B" shall mean the sum of $7,399,364.78 and solely comprised of EB5 Funds.

"Tranche 3" shall mean the sum of $6,500,000.00 and solely comprised of EB5 Funds.

"Undisbursed Project Funds" shall mean the remaining undisbursed balance of the Project Funds existing from time to time under this Agreement.

## ARTICLE II.
## REPRESENTATIONS AND WARRANTIES OF BORROWER

2.    REPRESENTATIONS AND WARRANTIES. Borrower hereby represents, warrants and covenants to Lender as of the date of this Agreement, the date of Loan Closing, the date of each Application for Payment, each Advance Date, and each and every date during the existence of the Loan, or any portion thereof, as the context admits or requires, that:

2.1    BORROWER'S CAPACITY - Borrower is a limited liability company, duly organized and existing under the Laws of the State of California, duly qualified to do business in California and in any other state in which the nature of its business requires it to be so qualified, and is lawfully empowered and possesses the capacity to enter into and carry out the provisions of this Agreement.

2.2    VALIDITY OF LOAN DOCUMENTS - The Loan Documents are in all respects valid and binding upon Borrower according to their terms, subject to all applicable Laws, including equitable principles, insolvency Laws, and other matters applying to creditors generally; provided, however, that the implementation of such Laws do not and will not affect the ultimate realization of the obligations and security afforded therefore. The execution and delivery by Borrower of and the performance by Borrower of all its obligations under the Loan Documents have been duly authorized by all necessary action and do not and will not:

2.2.1    Require any consent or approval not heretofore obtained of any other Person holding any interest in or entitled to receive any interest issued or to be issued by Borrower or otherwise; or

2.2.2    Violate any provision of the Organizational Documents or other agreements to which Borrower is bound; or

2.2.3    Result in or require the creation or imposition of any mortgage, deed of trust, pledge, lien, security interest, claim, charge, right of others, or other encumbrance of any nature (other than under the Loan Documents) upon or with respect to any property now owned or leased or hereafter acquired by Borrower; or

2.2.4    Violate any order, writ, judgment, injunction, decree, determination, or award of any court or of any Governmental Agency, or violate any provision of any Laws; or

2.2.5    Result in a breach of or constitute a default under, cause or permit the acceleration of any obligation owed under, or require any consent under any indenture or loan or credit agreement or any other agreement, lease, or instrument to which Borrower is a party or by which Borrower or any property of Borrower is bound or affected.

2.3    BORROWER NOT IN DEFAULT - Borrower is not in default under any order, writ, judgment, injunction, decree, determination, award, indenture, agreement, lease, or instrument of the type described in Section 2.2 above.

2.4    NO GOVERNMENTAL APPROVALS REQUIRED - No authorization, consent, approval, order, license, exemption from, or filing, registration, or qualification with, any Governmental Agency is or will be required to authorize, or is otherwise required in connection with:

2.4.1    The execution, delivery and the performance by Borrower of all or any of its obligations under the Loan Documents (excluding those required for construction of the Improvements); or

2.4.2    The creation of the liens, security interests, or other charges or encumbrances described in the Loan Documents, except that filing and/or recording with Governmental Agencies may be required to perfect such liens, security interests, or other charges or encumbrances.

2.5    TAX LIABILITY - Borrower has timely filed all tax returns (federal, state, and local) required to be filed by it and has paid all taxes shown thereon to be due and all property taxes due, including interest and penalties, if any.

2.6    FINANCIAL STATEMENTS - All Financial Statements of Borrower, Guarantor or any other Persons having an interest in Borrower or Guarantor (if Borrower or Guarantor is other than a natural person), which have heretofore been submitted to Lender fairly present the financial position of Borrower, Guarantor and of such other Persons at the respective dates of their preparation, in conformity with GAAP. Since the dates of such Financial Statements, there have been no adverse changes in the financial conditions of Borrower, Guarantor or such other Persons.

2.7    PENDING LITIGATION - Except as disclosed in Schedule 2.7 attached hereto, there are no actions, suits, or proceedings pending and served, or to the knowledge of Borrower, threatened against or affecting Borrower, Guarantor, the Property, the Project, or involving the validity or enforceability of any of the Loan Documents or the priority of the lien thereof, at Law or in equity, or before or by any Governmental Agency, except actions, suits, and proceedings that are fully covered by insurance or which, if adversely determined, would not substantially impair the ability of Borrower or Guarantor to perform each and every one of their obligations under and by virtue of the Loan Documents; and neither Borrower nor Guarantor is in default with respect to any order, writ, injunction, decree, or demand of any court or any Governmental Agency.

2.8    VIOLATIONS OF LAWS - There are no violations or notices of violations of any Laws relating to the Project or any of the Collateral.

2.9    COMPLIANCE WITH ZONING ORDINANCES AND SIMILAR LAWS —

2.9.1    The Plans and Specifications and construction and installation of the Improvements pursuant thereto and the use of the Project contemplated thereby comply with all applicable Laws and all permits and approvals issued thereunder, affecting the Project, the sale, operation, leasing or financing of the Project and the intended occupancy, use and enjoyment of the Project, including, but not limited to, applicable subdivision Laws, licenses and permits, building

codes, zoning ordinances, flood disaster, environmental protection and equal employment regulations and appropriate supervising boards of fire underwriters and similar agencies.

        2.9.2   Borrower shall not seek, make or consent to any change in the zoning, conditions of use, or any other applicable land use permits, approvals or regulations pertaining to the Project, or any portion thereof, which would constitute a violation of the warranties and representations herein contained, or would otherwise impair the ability of Borrower or any other Person to complete construction of any Improvements constituting the Project, or would change the nature of the use or occupancy of the Project.

    2.10    <u>AVAILABILITY OF UTILITIES</u> -

        2.10.1  All utility services necessary for the proper operation of the Project for its intended purposes are available at the Project or will be made available to the Project prior to completion of the Improvements, at standard utility rates and hook-up charges, including water supply, storm and septic tank systems, sanitary sewer facilities, gas, electricity, and telephone facilities.

        2.10.2  Borrower shall furnish to Lender service letters to evidence availability of utilities.

    2.11    <u>BUILDING PERMITS</u> - All building permits, by every name, required for the construction and installation of the Improvements have been or will be obtained prior to such construction and/or installation, and prior to the Disbursement of any Construction Loan Proceeds for such construction and/or installation, copies of the same will be delivered to Lender.

    2.12    <u>CONDITION OF PROPERTY</u> - Neither the Project nor the Property is now damaged or injured as a result of any fire, explosion, accident, flood, or other casualty, nor subject to any action in eminent domain.

    2.13    <u>APPROVAL OF PLANS AND SPECIFICATIONS</u> — The Plans and Specifications for the Project shall conform to the requirements and conditions set out by applicable Laws or any effective restrictive covenant of all Governmental Agencies that exercise jurisdiction over the Property or the construction thereon, or any private restrictions. No material changes are to be made in the Plans and Specifications or any other Contract Documents as approved by Lender without Lender's prior written consent.

    2.14    <u>CONSTRUCTION CONTRACT</u> — Borrower shall permit no default to exist under the Construction Contract and will timely perform its obligations thereunder and cause the Contractor to perform all of its obligations. Upon demand by Lender, Borrower will cause the Contractor to furnish Lender with a complete list of all Subcontractors which Contractor proposes to engage to furnish labor and/or materials, and/or the FF&E in constructing, furnishing, and equipping the Project, and will, from time to time, furnish Lender with true copies of all Contracts, Subcontracts therefor, and all other contracts and agreements therefor, as the same come into existence, all in accordance with the provisions of Section 4.13.3 hereof.

    2.15    <u>BROKERAGE COMMISSIONS</u> - No brokerage commissions are or will be owed by Borrower in connection with the Loan, or if there are commissions due or payable,

the same will be paid by Borrower from Borrower's own funds. Borrower agrees to and shall indemnify and hold Lender harmless from all liability, claims, or losses arising by reason of any such brokerage commissions related to any or all acts of Borrower in connection with the Loan. This provision shall survive the repayment of the Loan and shall continue in full force and effect so long as the possibility of such liability, claims, or losses exists.

2.16    ENVIRONMENTAL IMPACT STATEMENT - All required environmental impact statements as required by any Governmental Agency having jurisdiction over the Property or the construction of the Improvements have been duly filed and approved or a negative declaration has been issued.

2.17    ACCESS - The Property fronts on a publicly maintained road or street and has both legal and practical access to the same, or will when the offsite improvements constituting a portion of the Project are completed. There also exists both practical and legal access to the leasehold estate under the Ground Lease.

2.18    PROJECT COMPLETION - The Project can be completed at a total cost not exceeding the Project Funds, and Borrower will cause the completion of the Project at a total cost equal to or less than the Project Funds, free of liens, demands and claims, not later than the Completion Date.

2.19    SUBORDINATE FINANCING AND LEASES - Borrower will not cause there to be deeds of trust, mortgages, security agreements, liens or encumbrances on the Project or any portion thereof or interest therein, except (a) the Beach Orangethorpe Deeds of Trust, (b) the Beach Orantethorpe Hotel Financing, and (c) as otherwise permitted by Lender with Lender's prior written consent. Except as expressly set forth in this Agreement, Borrower will not cause there to be deeds of trust, mortgages, security agreements, liens or encumbrances on the leasehold estate, or any portion thereof or interest therein, on the Ground Lease or the Property. Except for Approved Leases, Borrower will not, without the prior written consent of Lender, enter into a lease for all or any portion of the Property.

2.20    AIR RIGHTS - Borrower has not and will not transfer, assign, convey, hypothecate or encumber any of the air rights pertaining to the Property.

2.21    PRIORITY OF LIEN ON PERSONALTY - No lease, chattel mortgage, bill of sale, security agreement, financing statement, or other title retention agreement (except those executed in favor of Lender) has or will be executed by Borrower with respect to any personal property, chattel, or FF&E of Borrower used in conjunction with construction, operation, or maintenance of the Project, except with respect to removable trade fixtures, inventory, and personal property of any tenant of the Project or under an Approved Lease.

2.22    COMPLIANCE WITH ENVIRONMENTAL LAWS — Borrower will not use, store, manufacture, generate, transport to or from, or dispose of any toxic substances, hazardous materials, hazardous wastes, radioactive materials, flammable explosives, or related material on or in connection with any property or the business of Borrower on any property, including the Property. Borrower will not permit any lessee on any property to use, store, manufacture, generate, transport to or from, or dispose of any toxic substances, hazardous materials,

hazardous waste, radioactive materials, flammable explosives, related material on or in connection with any property or the business on any property. ("Toxic substances," "hazardous materials," and "hazardous waste" shall include, but not be limited to, such substances, materials and wastes which are or become regulated under applicable Laws or which are classified as hazardous or toxic under applicable Laws.)

2.23    SOLVENCY — Borrower is and shall continue to be able to pay its debts as they mature and the realizable value of its Collateral is, and at all times that it may have obligations hereunder shall continue to be, sufficient to satisfy any and all obligations hereunder.

2.24    PERMITS — Borrower possesses all licenses, approvals, permits, franchises, patents, copyrights, trademarks, and trade names, or rights thereto, that are necessary to own the Property and conduct business on the Property substantially as now conducted and as presently proposed to be conducted, and Borrower is not in material violation of any valid rights of others with respect to the foregoing. Additionally, all permits, by every name, required for the construction or renovation of any improvements on the Property have been or will be obtained prior to such construction or renovation.

2.25    NO ERISA PLAN — Borrower does not maintain a plan under the Employee Retirement Income Security Act of 1974.

2.26    FULL DISCLOSURE — All information in the loan application, Financial Statement, certificate, or other document and all information prepared and delivered by Borrower or its Affiliates to Lender in obtaining the Loan is correct and complete in all respects, and there are no omissions therefrom that result in such information being incomplete, incorrect, or misleading in any material adverse respect as of the date thereof. All information in any loan application, Financial Statement, certificate or other document prepared and delivered to Lender on behalf of Borrower by Persons other than Borrower or its Affiliates, and all other information prepared and delivered to Lender on behalf of Borrower by Persons other than Borrower or its Affiliates in applying for the Loan is true, correct and complete in all respects, and there are no omissions therefrom that result in any such information being incomplete, incorrect, or misleading in any material adverse respect as of the date thereof.

2.27    USE OF PROCEEDS; MARGIN STOCK — The proceeds of each Advance and Disbursement will be used by Borrower solely for the purposes specified in this Agreement. None of such proceeds will be used for the purpose of purchasing or carrying any "margin stock" as defined in Regulation U of the Board of Governors of the Federal Reserve System (12 C.F.R. Part 221), or for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase or carry a margin stock or for any other purpose which might constitute this transaction a "purpose credit" within the meaning of such Regulation U. Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock. Neither Borrower nor any Person acting on behalf of Borrower has taken or will take any action which might cause any Loan Documents to violate Regulation U or any other regulations of the Board of Governors of the Federal Reserve System or to violate Section 7 of the Securities Exchange Act of 1934, or any rule or regulation thereunder, in each case as now in effect or as the same may hereafter be in effect. Borrower and Borrower's Affiliates own no "margin stock".

2.28    GOVERNMENTAL REGULATION — Borrower is not subject to regulation under the Federal Power Act, the Investment Company Act of 1940, the Interstate Commerce Act (as any of the preceding have been amended), or any other Law which regulates the incurring by Borrower of indebtedness, including but not limited to Laws relating to common or contract carriers or the sale of electricity, gas, steam, water, or other public utility services.

2.29    NO CONDEMNATION — No condemnation proceedings are pending, or threatened against the Property.

ARTICLE III.
THE LOAN

3.    THE LOAN.

3.1    LOAN AMOUNT - The Loan will be in an amount not exceeding the sum of Twenty Nine Million Five Hundred Thousand and No/100 Dollars ($29,500,000.00).

3.2    LOAN CLOSING

3.2.1    The Loan will close if, and only if, on or before June 3, 2016, Borrower, shall at its sole expense, deposit or cause to be deposited with Lender, the following in form and substance satisfactory to Lender, in Lender's sole opinion and judgment, duly executed by the party to be charged and acknowledged where required for recordation or other methods of perfection:

(a)    This Agreement;

(b)    The Loan Closing Costs;

(c)    The Note;

(d)    The Construction Deed of Trust (Leasehold);

(e)    The Assignment of Leases (Leasehold);

(f)    The Continuing Guaranty;

(g)    The Completion Guaranty;

(h)    The Environmental Indemnity;

(i)    The Security Agreement;

(j)    The Assignment of Deposit Accounts, and Borrower shall have opened the Operating Account with Lender;

(k)    The Assignment of Architect's Contract / Engineer's Consents / Plans and Specifications and a copy of the executed Architect's Contract and the Plans and Specifications for the Project;

2123922.6                                   20

(l)      The Assignment of Construction Contract/Engineer's Consents / Plans and Specifications, and a copy of the executed Construction Contract;

(m)      Evidence satisfactory to Lender, in Lender's sole discretion, that (i) the Property is free of mechanic's liens and (ii) no stop payment notices (whether bonded, unbonded or otherwise) have been served upon Lender.

(n)      The Assignment of Construction Management Contract and a copy of the executed Construction Management Contract;

(o)      The Agreement To Furnish Insurance including a flood insurance certificate or a certificate that the Property is not located in a flood zone, and the Hazard Insurance Disclosure;

(p)      Such resolutions or other authorizations as Lender shall require of Borrower and any Person holding an interest in Borrower authorizing the Loan, or such other matters as Lender shall require;

(q)      The Title Policy (Leasehold) or evidence of a commitment therefor.  In connection therewith, Borrower shall have provided Lender true and complete copies of all covenants, conditions, declarations, restrictions, reciprocal easements, impositions, encumbrances, association documents, common area agreements, management and operating agreements, and all other documents, instruments, and agreements (hereinafter, "Title Matters") affecting the title, use, enjoyment, security, management and/or possession of the Property, and Lender shall have approved all such Title Matters, in its sole opinion and judgment. The Title Policy (Leasehold) shall show no blanket exceptions for anything a survey would show;

(r)      The Appraisal, which shall be acceptable to Lender in Lender's sole discretion;

(s)      A survey or surveys prepared by a licensed surveyor satisfactory to Lender, showing all easements and all improvements on the Property. The survey shall be conducted in compliance with ALTA standards as applied in California and shall be certified to the Title Company, Lender and its successors, nominees, and assigns, and Borrower in form and content acceptable to Lender;

(t)      A Phase I, and if indicated, a Phase II environmental survey by a qualified environmental engineer indicating an absence of environmental concerns in regard to the Property, satisfactory to Lender and its counsel;

(u)      A property inspection of the Property prepared by an inspection company approved by Lender;

(v)      One or more Financing Statements;

(w)      If required by Lender, UCC search certificates showing the Financing Statements to be subject only to such prior filings as are acceptable to Lender, in its sole opinion and judgment;

(x)     Assignment of Project Rights, which is provided for in Section 4.14 herein;

(y)     The Fund Control Agreement;

(z)     True and correct copies of Borrower's Organizational Documents, certificate(s) of fictitious business name, and Financial Statements, all of which documents must be first reviewed and approved by Lender, its counsel, or both;

(aa)     True and correct copies of Contractor's license, resume and Financial Statements, all of which documents must be first reviewed and approved by Lender, its counsel, or both;

(bb)     Evidence satisfactory to Lender in its sole opinion and judgment, that the Contractor and major Subcontractors, as determined by Lender, are bondable;

(cc)     Such seismic, soils and/or geology reports as Lender may require, which reports shall be satisfactory in all respects to Lender, in its sole and absolute discretion, prepared by such geologists, engineers and/or other consultants as are approved by Lender;

(dd)     Such reports as Lender may require, prepared by such cost engineers, project analysis consultants and/or other consultants as are approved by Lender (individually and collectively, "Budget Consultant"), setting forth such Budget Consultant's review, analysis and conclusions with respect to Borrower's construction budget and/or cost breakdown (including the Cost Breakdown), which reports must be satisfactory in all respects to Lender, in its sole and absolute discretion. Borrower shall be solely responsible for any and all fees, expenses, charges and payments relating to the Budget Consultant, from Borrower's own funds;

(ee)     Evidence of Minimum Equity, as well as verification (as determined by Lender and Fund Control in their sole discretion) that monies spent on the first three (3) floors of the hotel on the Property is proportionate to the work performed on the Property in accordance with the Cost Breakdown;

(ff)     To the extent that Borrower has not furnished evidence of sufficient Minimum Equity pursuant to Section 3.2.1(ee), above, Borrower shall deposit with Lender into the Deposit Account or the EB5 Account, as the case may be, in an amount equal to the difference between the Minimum Equity and the amounts actually expended by Borrower on the Project;

(gg)     Flood certification search, acceptable to Lender in Lender's discretion;

(hh)     Review and approval of Borrower's and Guarantor's Financial Statements, real estate schedules and tax returns (with all form K-1 s attached), either self-prepared or prepared by a certified public accountant satisfactory to Lender;

(ii)     True, complete and correct copies of the Plans and Specifications, construction plans and any other architectural, structural or other plans or specifications requested by Lender, and all permits, authorizations and other approvals required for the development and/or construction of the Project and/or for the operation and use of the Property, all of which must be first reviewed and approved by Lender;

(jj)     Satisfactory review and approval of a BICA report for Contractor;

(kk)     Verification and approval of the Cost Breakdown;

(ll)     If required by Lender, a favorable opinion of independent counsel to Borrower acceptable to Lender and its counsel opining to, among other things, Borrower being a validly organized and existing business entity in good standing with full power and authority to carry on its business as now being conducted, Borrower's execution and authority to execute the Loan Documents, the validity and binding effect of the Loan Documents, that the assignments, if any, are valid and enforceable in accordance with their terms against the parties thereto, the nonusurious character of the Loan, the absence of any agreement, covenant, judgment, order, restriction; or contract that would prohibit the Loan or the granting of the Construction Deed of Trust (Leasehold) or which would require consent be given to Borrower for the application for the Loan or for the granting of the Construction Deed of Trust (Leasehold), which consent has not been obtained, and further opining as to any additional matters required by Lender's counsel due to the nature of the Project;

(mm)     IRS Form 4506 executed by Borrower, and IRS Form 4506 executed by Guarantor;

(nn)     Evidence satisfactory to Lender in its sole opinion and judgment of the approval by all appropriate Governmental Agencies for the completion of the Project, in accordance with the applicable laws of the State of California, along with copies of the same;

(oo)     SNDA's and Tenant Estoppels in connection with any Approved Leases on the Property, as Lender may require in its sole discretion;

(pp)     Subordination Agreement (Beach Orangethorpe Hotel, LLC), and copies of all documents evidencing the loan by Beach Orangethorpe Hotel, LLC, to Ground Lessor, in the principal sum of $10,000,000.00;

(qq)     Subordination Agreement (Beach Orangethorpe Hotel II, LLC), and copies of all documents evidencing the loan by Beach Orangethorpe Hotel II, LLC, to Ground Lessor, in the principal sum of $11,500,000.00;

(rr)     Subordination agreements and related documents (including estoppel certificates) executed by Borrower and any entities affiliated with Borrower;

(ss)     Ground Lessor's Consent and a copy of the fully executed Ground Lease;

(tt)     If required by Lender, an amendment to the Declaration (2016);

(uu)     Borrower shall have opened and shall maintain the Operating Account with Lender, and Borrower shall have executed and delivered to Lender such agreements and other documents as Lender shall require, in form and content satisfactory to Lender in its sole opinion and judgment, to establish, with respect to the Operating Account, an automatic debit system for the payment of the monthly principal and interest payments due under the Note;

(vv)     Borrower shall deliver to Lender evidence satisfactory to Lender that Borrower has obtained all hazard, liability and other insurance coverages required by Lender (including, without limitation, builder's risk-all risk insurance covering 100% of the replacement cost of all improvements during the course of construction in the event of fire or other risks normally covered by "all risk" coverage policies), and that such insurance coverages are in full force and effect with all premiums paid;

(ww)     Recertification of Phase I and Phase II reports, if required by Lender;

(xx)     Lender shall have received, reviewed and approved copies of all permits, approvals and authorizations required to operate and use the Property;

(yy)     An indemnity or indemnities acceptable to Title Company;

(zz)     A fully executed copy of the Hilton Franchise Agreement;

(aaa)     A fully executed copy of the Interstate-Rim Hotel Management Agreement, as well as the Interstate-Rim Consent, Assignment and Subordination Agreement executed by Borrower and Interstate-Rim;

(bbb)     Any and all incidental fees and charges incurred by Lender in connection with the Loan and the Loan Documents are to be paid to Lender by Borrower from Borrower's own funds;

(ccc)     Borrower shall have provided additional EB5 Funds and additional proof of costs paid to date totaling an amount equal to the sum of Tranche 2B, with the unutilized portion being deposited into the EB5 Account and assigned to Lender pursuant to the Assignment of Deposit Accounts (EB5 Funds).

(ddd)     The Assignment of Deposit Accounts (EB5 Funds) and Borrower shall have opened the EB5 Account with Lender;

(eee)     A fully executed copy of the Construction Manager's Contract, and the Assignment of Construction Manager's Contract, fully executed by the parties thereto;

(fff)    A fully executed copy of the Englekirk Contract;

(ggg)    A fully executed copy of the Jensen Contract;

(hhh)    A fully executed copy of the Syska Contract;

(iii)    A fully executed copy of that certain Pledge Agreement entered into by and among DMC Investment Holdings, LLC, a Delaware limited liability company, and the Fee Lenders;

(jjj)    A complete set of the fully executed Beach Orangethorpe Hotel Financing Loan Documents;

(kkk)    A fully executed copy of the CACC Contract;

(lll)    A fully executed copy of the PPPC Contract;

(mmm) A fully executed copy of the MMC Contract; and

(nnn)    Such additional assignments, agreements, certificates, reports, approvals, instruments, documents, financing statements, consents, and opinions as Lender may request, including, but not limited to any zoning variances, conditional use permits, development agreements or other land use requirements Borrower shall be required to obtain in connection with the construction and operation of the Property and any and all subordination agreements, SNDA's and Tenant Estoppels as Lender, in its sole and absolute discretion, shall require Borrower to obtain from the holders of any liens, claims, demands charges or encumbrances against the Property and/or tenants of the Project, due to the nature of the Project.

3.2.2    Notwithstanding the closing of the Loan, the obligation of Lender to disburse Project Funds, or any portion thereof, is also subject to, without limitation, the conditions precedent to Disbursement set forth in Section 3.13 below.

3.2.3    Subject to the terms of this Agreement, Borrower acknowledges that at Loan Closing, (a) the only Disbursement which Lender will be undertaking is with respect to the funding of Loan Closing Costs, and only the Loan Closing Costs, and (b) other than the Loan Closing Costs, Lender shall have no obligation to fund or otherwise disburse any other Construction Loan Proceeds unless and until Borrower completely and unconditionally satisfies any and all conditions set forth in Section 3.22, below.

3.3    LOAN FEE AND PROCESSING FEE – The full amount of the Processing Fee, and a portion of the Loan Fee totaling $33,190.00, shall be paid by Borrower to Lender at Loan Closing from Borrower's own funds. The remainder of the Loan Fee shall be paid from a Disbursement of Construction Loan Proceeds. The Loan Fee and the Processing Fee will be in addition to all other fees mentioned in this Agreement. The Loan Fee and Processing Fee shall be deemed fully earned and non-refundable when paid, whether or not any Construction Loan Proceeds are disbursed at any time.

3.4    <u>LOAN TERM</u> –

(a)    The term of the Loan will commence on the date of Loan Closing and the Loan will mature upon the Maturity Date, subject to acceleration or adjustment as provided in this Agreement and the other Loan Documents.

(b)    If, as of the Maturity Date of December 1, 2017, there is not an uncured Event of Default under this Agreement or any of the Loan Documents, upon (i) Borrower's written request made not later than November 1, 2017, for an extension of the Maturity Date to June 1, 2018, (ii) payment to Lender and Lender's actual receipt of an Extension Fee concurrently with Borrower's written request in Section 3.4(b)(i), (iii) if required by Lender, execution by Borrower, Guarantor and Lender of a modification and/or extension agreement in form and content satisfactory to Lender, in Lender's reasonable opinion and judgment (and any other documents required by Lender), (iv) if required by Lender, Borrower's deposit of additional funds into the Interest Reserve, in an amount determined by Lender, in its sole and absolute opinion and judgment, and (v) if required by Lender, issuance of such endorsements to the Title Policy (Leasehold) as shall be satisfactory to Lender, in Lender's reasonable opinion and judgment, then the Maturity Date will be extended to June 1, 2018.

(c)    If the Maturity Date is extended under Section 3.4(b), above, and if, as of the Maturity Date of June 1, 2018, there is not an uncured Event of Default under this Agreement or any of the Loan Documents, upon (i) Borrower's written request made not later than May 1, 2018, for an extension of the Maturity Date to December 1, 2018, (ii) payment to Lender and Lender's actual receipt of an Extension Fee concurrently with Borrower's written request in Section 3.4(c)(i), (iii) if required by Lender, execution by Borrower, Guarantor and Lender of a modification and/or extension agreement in form and content satisfactory to Lender, in ]Lender's reasonable opinion and judgment (and any other documents required by Lender), (iv) if required by Lender, Borrower's deposit of additional funds into the Interest Reserve, in an amount determined by Lender, in its sole and absolute opinion and judgment, and (v) if required by Lender, issuance of such endorsements to the Title Policy (Leasehold) as shall be satisfactory to Lender, in Lender's reasonable opinion and judgment, the then Maturity Date will be extended to December 1, 2018.

(d)    The granting of any such extension, however, is not intended to imply any agreement for any further extension to the Maturity Date.

3.5    <u>INTEREST RATE</u> - The interest rate will be as set forth in the Note.

3.6    <u>REPAYMENT</u> - In addition to any other provisions set forth herein, repayment of the Loan will be required as follows:

3.6.1    Interest and principal payments under the Loan shall be due and payable to Lender pursuant to the provisions of the Note;

3.6.2    Borrower hereby authorizes Lender to charge against any account of Borrower with Lender (including, the Operating Account) an amount equal to the

principal and accrued interest from time to time due and payable to Lender under the Note or otherwise;

        3.6.3    All payments hereunder or under the Note shall be made by Borrower without any offset or deduction for or on account of any present or future taxes, imposts or duties, of whatever nature, imposed or levied by or on behalf of any Governmental Agency. If at any time, whether by reason of any present or future Law or other requirement, Borrower shall be compelled by such Law or other requirement to deduct or withhold such taxes, imposts or duties, Borrower shall pay such additional amounts to Lender as may be necessary such that every net payment under this Agreement and the Note on which Borrower is obligated, after such deduction or withholding, will not be less than the amount required hereunder or thereunder; and

        3.6.4    Whenever any payment to be made under this Agreement and the Note shall be due on a day other than a Business Day of Lender, such payment may be made on the next succeeding Business Day, and such extension of time shall in such cases be included in the computation of payment of interest hereunder and under the Note.

        3.7    SECURITY - The Loan shall be secured by the following, in each case subject only to the respective Permitted Encumbrances:

        3.7.1    A first priority lien upon the entire leasehold estate under the Ground Lease on the Property, along with the Improvements and other assets and rights as evidenced by the Construction Deed of Trust (Leasehold);

        3.7.2    [Intentionally deleted.]

        3.7.3    The Assignment of Leases (Leasehold);

        3.7.4    A first priority perfected security interest in all existing and future tangible and intangible personal property and/or fixtures relating to the Project owned by Borrower, as evidenced by the Construction Deed of Trust (Leasehold) and the Security Agreement, as applicable;

        3.7.5    The assignment of the rights of Borrower in the Project Funds;

        3.7.6    The assignment of the rights of Borrower in the Architect's Contract, the Construction Manager's Contract, the Plans and Specifications, the Construction Contract, the Engineer's Contract, the Englekirk Contract, the Jensen Contract, the Syska Contract, the CACC Contract, the PPPC Contract, and the MMC Contract;

        3.7.7    The assignment by Borrower of Borrower's rights in each and all of the agreements described in this Agreement;

        3.7.8    The Assignment of Project Rights pursuant to Section 4.14 of this Agreement;

        3.7.9    The Security Agreement;

3.7.10  The Assignment of Deposit Accounts; and

3.7.11  The Assignment of Deposit Accounts (EB5 Funds).

3.8  <u>COMPLETION GUARANTY AND CONTINUING GUARANTY</u> - Completion of the Project in accordance with the terms of this Agreement shall be guaranteed to Lender pursuant to the Completion Guaranty and the obligations of Borrower shall be guaranteed to Lender pursuant to the Continuing Guaranty.

3.9  <u>CONSTRUCTION ADVANCES; INTEREST RESERVE</u> -

3.9.1  Subject to compliance with the terms and conditions of this Agreement, Lender shall make Disbursements of Construction Loan Proceeds to Borrower and Borrower shall borrow Construction Loan Proceeds from Lender, but in a total amount not to exceed the amount of the Loan and as otherwise set forth in this Agreement.

3.9.2  Lender shall make Disbursements to Borrower, Contractor and/or Subcontractors (at Lender's option and discretion as to whom and the amounts in which payments are made) an amount equal to the costs listed in the Applications for Payment approved by Lender less Retentions, subject to the terms of this Agreement.

3.9.3  Borrower hereby authorizes Lender on a monthly basis to disburse from the Interest Reserve the amount of interest accrued and unpaid to Lender under the terms of the Loan, without further authorization on the part of Borrower. Upon the occurrence of any Event of Default, Lender may continue to make Disbursements from the Interest Reserve of the amounts of interest accrued and unpaid, in Lender's sole and absolute opinion and judgment, without further authorization on the part of Borrower. Notwithstanding the existence of the Interest Reserve, Borrower shall be responsible to pay interest due under the terms of the Note from funds other than Construction Loan Proceeds in the event the Interest Reserve has been disbursed in its entirety or upon the occurrence of an Event of Default. In the event that the Interest Reserve is insufficient to pay interest due under the terms of the Note, Borrower shall, within ten (10) calendar days after demand of Lender, deposit with Lender additional funds for the Interest Reserve, in such amounts as Lender may designate, in Lender's sole opinion and judgment. Borrower acknowledges that Lender has made no representation or warranty concerning the adequacy or sufficiency of the Interest Reserve for payment of interest on the Loan or any portion thereof.

3.9.4  Borrower hereby authorizes Lender to make Disbursements from Construction Loan Proceeds, without further authorization from Borrower, the amount of any Loan and Carrying Costs or other amounts due and payable to Lender under this Agreement including, without limitation, general and administrative fees, out of pocket costs, and title insurance fees.

3.10  <u>DISBURSEMENT PRESUMPTIONS</u> - Borrower hereby agrees that all Disbursements of Project Funds shall conclusively be deemed to have been made first from the funds deposited by Borrower, as Borrower's Deposit, or otherwise so that all funds so deposited by Borrower as Borrower's Deposit or otherwise shall be the first disbursed by Lender. Without limiting the foregoing, any and all sums deposited by Borrower with Lender into the Deposit Account pursuant to Section 3.2.1(ff), above, shall be treated as a Borrower's Deposit and shall be deemed

Advanced first (including any EB5 Funds), before any Advance of Construction Loan Proceeds subject to any and all conditions in this Agreement, including, without limitation, the conditions in Section 3.13, below. Without limiting the foregoing, Lender shall have no obligation to make any Advances or any Disbursements unless and until the requirements of Borrower's Deposit and Minimum Equity are satisfied in full, with such satisfaction acceptable to Lender in Lender's sole discretion.

      3.11   USE OF UNDISBURSED PROJECT FUNDS - Borrower acknowledges and agrees that in regard to Undisbursed Project Funds:

      3.11.1  Borrower has no right to Project Funds other than to have the same disbursed by Lender in accordance with this Agreement, which Disbursements Lender, upon acceptance of this Agreement, agrees to make for the purposes and on the conditions set forth herein;

      3.11.2  All funds received by or on behalf of Borrower hereunder are for the purpose of paying in full all duly licensed Contractors and Subcontractors (other than Borrower) engaged in construction of the Project, for the completion of on-site and off-site improvements as set forth in the Plans and Specifications, and for the purpose of furnishing and equipping the Project with the FF&E, all in accordance with the Cost Breakdown, and Borrower shall not have any beneficial interest in said funds unless and until said purpose has been fulfilled; and

      3.11.3  The amount to be disbursed hereunder for each item of the work of construction and/or for the FF&E, is not to exceed the amount specified therefor in the Cost Breakdown.

      3.12   DEPOSIT ACCOUNT - Borrower hereby grants, assigns, pledges and hypothecates to Lender all of Borrower's right, title and interest in and to all deposit accounts maintained by Borrower with Lender (including the Operating Account and the EB5 Account), as security for each and all of the obligations of Borrower to Lender under the Loan Documents.

      3.13   CONDITIONS PRECEDENT TO DISBURSEMENT - Prior to and as conditions precedent to any duty on the part of Lender to make the first, or any other, Disbursement of Construction Loan Proceeds (except for Advances made pursuant to Sections 3.9.3 or 3.9.4 of this Agreement), all of the following shall have occurred and/or have been furnished to Lender (and, where stated, Fund Control), as applicable (any matter once having been submitted and approved need not be resubmitted unless modified or superseded):

      3.13.1  The Loan shall have closed, the Loan Closing Costs shall have been paid, and all Loan Documents shall have been duly executed, acknowledged where appropriate, and delivered to Lender, all such documents and instruments shall be in full force and effect with no Event of Default thereunder, and all conditions therein shall have been satisfied.

      3.13.2  If required by Lender, issuance by the Title Company of (i) a CLTA 122 title policy endorsement insuring the continued priority of the lien of the Construction Deed of Trust (Leasehold) from all potential mechanic's lienholders, liens, encumbrances and defects except the Permitted Encumbrances, and (ii) such other title policy endorsements to the Title Policy (Leasehold) as Lender shall request.

2123922.6                29

3.13.3  Duly executed satisfactory forms of conditional waiver and release upon progress payment with respect to such Disbursement, and an unconditional waiver and release upon progress payment therefor within thirty (30) days from said payment.

3.13.4  Payment of all outstanding real estate taxes and assessments.

3.13.5  Evidence of soil compaction and/or borings and other soil tests indicating that the subsoil and geological conditions are suitable for the Improvements, and demonstrating that the quality of the land is such that it will support the Improvements in the manner contemplated by the Contract Documents. Such reports shall contain a recommendation with respect to the preferred types of footings and foundations.

3.13.6  Evidence satisfactory to Lender that all zoning and municipal approvals and all governmental or private contracts necessary for the development of the Project, including utilities, water, parking, storm, and sanitary sewers, have been obtained.

3.13.7  Evidence satisfactory to Lender that all utilities and water, storm, and sanitary sewer facilities are adequate, have the capacity to service the Project, are located and available at the boundaries of the Project, and may be utilized by Borrower for the Improvements.

3.13.8  Prior to the Disbursement of any Construction Loan Proceeds, Borrower shall submit to Lender copies of all permits and other approvals required for the development and/or construction of the Project, together with at least two (2) copies of the complete and final approved Plans and Specifications approved by Lender, and the appropriate Governmental Agencies (together with written confirmation by Borrower that such Plans and Specifications have received such approvals). All fees and costs of such review will be paid by Borrower. Each set of Plans and Specifications shall be signed and affixed with the Architect's registration seal. No changes or amendments to the Plans and Specifications shall be made, and no extra material shall be ordered, without Lender's prior written approval.

3.13.9  Certification from the Architect or other construction professionals such as soil engineers, geologists, mechanical engineers or environmental engineers, or other evidence approved by Lender:

(a)    Certifying that the soil conditions and geology of the Property are suitable for the Project, that all necessary soil tests have been made, and such other matters required by Lender;

(b)    Certifying that upon completion in accordance with the Contract Documents, the Project will comply with all applicable Laws, zoning ordinances, plat maps, subdivision Laws, environmental protection Laws, and building codes in effect at the time of such certification;

(c)    Evidencing that all pollution and environmental Laws that are applicable to the Project and the use thereof have been satisfied. At Lender's option, Borrower shall cause to be prepared and delivered to Lender a complete written preliminary site assessment of the Property and all Improvements thereon, prepared exclusively for Lender by such

environmental consultants or other engineering firms approved by Lender, in its sole opinion and judgment, setting forth the results of an on-site inspection, evaluation, and reconnaissance of the Property, identification and description of surrounding land uses, a site history review, survey of geological and hydro geological conditions, review of regulatory agency records and lists, and other information and analysis which may be required by Lender in accordance with its policies and practices for loans secured by commercial real estate. The results of such preliminary site assessment must not indicate the presence or potential release or presence of any hazardous waste or other substance identified as such by any Governmental Agency having jurisdiction or responsibility for identifying, investigating, and/or remediation of hazardous or potentially hazardous environmental conditions; and

(d)    Evidencing no presence of asbestos on or about the Property.

3.13.10  A favorable Environmental Impact Report for the Project, when required by any Governmental Agency, or a negative declaration.

3.13.11  Evidence that the Architect, the Engineer, the Contractor, the Construction Manager, Englekirk, Jensen, Syska, CACC, PPPC, MMC and major Subcontractors are licensed to do business and practice in the State of California.

3.13.12  Submission to Lender of executed copies of the Construction Contract, the Architect's Contract, the Construction Manager's Contract, the Engineer's Contract, the Englekirk Contract, the Jensen Contract, the Syska Contract, the CACC Contract, the PPPC Contract, and the MMC Contract. All contracts for work in connection with the construction of the Improvements shall be subject to approval by Lender and its counsel, and if reasonably required by Lender, shall be fully bonded with payment and completion bonds naming Lender as joint beneficiary and providing for guaranteed fixed prices for the work of construction. Said bonds shall issued by an insurer or insurers satisfactory to Lender and in form and content reasonably satisfactory to Lender, and shall, at the request of Lender, be recorded in the official records of the County Recorder in which the Property is located.

3.13.13  An agreement from selected Subcontractors as Lender shall choose, agreeing that, if there is an Event of Default on the part of Borrower under the Loan Documents, the Subcontractor will complete its contract for the Project. Upon the request of Lender, Borrower shall cause to be assigned to Lender such Subcontracts as Lender shall request. Further, upon request by Lender or Fund Control, Borrower shall cause Contractor to provide to Lender or Fund Control, as the case may be, a copy of any contracts between Contractor and a Subcontractor.

3.13.14  Lender's rights and security in the Property shall not be subject to any right of first refusal, option, use restriction, covenant, condition, declaration or reciprocal easement which may, in Lender's reasonable opinion and judgment, adversely affect or impair Lender's security in the Property by any act or omission of Borrower or any other user or occupier of the Property, or impose upon Lender, directly or indirectly, a duty or condition which would require Lender to take any affirmative action to protect, preserve, or defend its rights and security in the Property. Additionally, prior to recording declarations of covenants, conditions, reciprocal easements and restrictions that are created or to be recorded after the Loan Closing, the

same shall be submitted to Lender for its prior review and approval and shall not be recorded unless and until Lender has provided its written approval, all in Lender's reasonable discretion.

3.13.15  No improvements currently existing (or which are otherwise the basis for the appraised value of the Property) shall have been damaged or destroyed by any casualty whatsoever, or shall have been removed or replaced without the prior written consent of Lender.

3.13.16  No eminent domain proceeding shall have been instituted against the Property.

3.13.17  Lender shall have received, reviewed and approved, in its sole and absolute judgment, the final construction budget and/or Cost Breakdown.

3.13.18  Evidence that the total amount of the Project Funds on hand shall be sufficient, in the reasonable judgment of Lender, to complete the Improvements free of liens and to pay interest and other sums as and when due under the Loan Documents. Borrower shall immediately pay any and all cost overruns in excess of the Contingency Reserve. Further, to the extent the total of Project Funds shall be insufficient at any time, in Lender's reasonable judgment, to complete the Project, or be less than the Project Costs, Borrower shall within ten (10) Business Days after demand of Lender deposit with Lender, an additional Borrower's Deposit in an amount equal to such deficiency.

3.13.19  The Cost Breakdown and a timetable with a schedule of anticipated Advances, Disbursements and an estimate of initial and final Disbursements shall have been approved by Lender, in Lender's reasonable opinion and judgment.

3.13.20  No Event of Default (or event which, with the giving of notice or the passage of time, or both, would become an Event of Default) shall exist under any of the Loan Documents.

3.13.21  Each of the representations and warranties in Article II hereof shall be true and correct in all respects on and as of the date of each Disbursement.

3.13.22  Borrower shall have complied with all of the covenants made by Borrower in Article IV hereof.

3.13.23  A sworn statement of all Loan and Carrying Costs certified to Lender.

3.13.24  An Application for Payment, submitted not more frequently than two (2) times per month, unless Lender and Borrower agree, in writing, to more frequent Disbursements. Materials for the Project may not be included within the Application for Payment unless segregated and irrevocably owned as part of the Project and, if off-site, warehoused, to the satisfaction of Lender in its sole opinion and judgment and unless Borrower provides to Lender proof of adequate insurance covering the materials and proof of actual payment for such materials. Lender may cause an inspection, at any time and from time to time, to be made of the progress of the construction. If any such inspection shows that the construction has reached a stage consistent with

the work and materials represented in the Application for Payment to have been incorporated into the work of improvement and upon the occurrence of all other conditions set forth in this Section 3.13, Lender will make Disbursements in accordance with this Agreement.

3.13.25  Submission of:

(a)      Proof that a period of twenty (20) days has expired after the furnishing of the labor, services and/or materials described in the Application for Payment, with no preliminary notice describing such labor, services and/or materials having been served upon Lender except by the Person named in the Application for Payment or the accompanying invoice(s);

(b)      Such evidence as Fund Control or Lender may require that all funds disbursed pursuant to the immediately preceding Application for Payment have been utilized to pay the labor, services and/or materials described therein, and that such labor, services and/or materials have been paid in full; and

(c)      Any other or further documentation required by Fund Control or Lender.

3.13.26  The total amount of Undisbursed Project Funds shall be at least ten percent (10%) of the Construction Hard Costs.

3.13.27  Borrower shall have deposited with Lender (a) the full amount of the Tranche 2B, as set forth herein, and (b) Tranche 3, as set forth in Section 3.22, below.

3.13.28  By no later than thirty (30) calendar days after Loan Closing, Lender shall have actually received the Hilton Comfort Letter, fully executed by Borrower and Hilton.

3.14    FINAL DISBURSEMENT OF FUNDS; NOTICE OF COMPLETION

3.14.1  The Retentions for each subcontract shall be disbursed when:

(a)      Each Subcontractor has completed the work for which it was engaged or provided the materials in accordance with the Contract Documents, the Plans and Specifications, and the work completed complies with all applicable Laws, and the Contractor and Architect have certified to the foregoing.

(b)      Borrower has deposited with Lender an affidavit stating that all bills for labor and/or materials used in or related to such construction have been paid or ordered to be paid pursuant to Sections 3.13.24 and 3.13.25, except for bills against which appropriate bonds or funds are in the possession of Lender;

(c)      Borrower shall have received final sign-off from the applicable Governmental Agency for the work or materials that are subject to the contract;

(d)      [Reserved.]

(e)     The prescribed lien period has expired by time, and no liens shall be recorded against the title to the Property, and no bonded stop notices shall have been served and not released;

(f)     Each Subcontractor shall submit an unconditional lien release and waiver from Contractor; and

(g)     Borrower has submitted proof which, in the reasonable judgment of Lender, establishes that the amount available for construction has been used for the direct cost of the completion of the proposed Improvements, based upon an accounting and reconciliation or back-up provided by Borrower.

3.14.2 Promptly upon completion of the Project, Borrower shall ensure that the following occurs:

(a)     A valid notice of completion has been recorded;

(b)     A certificate of occupancy or other applicable approval from the appropriate Governmental Agency has been issued as to the Improvements;

(c)     All bonds, if any, have been exonerated; and

(d)     The Title Policy (Leasehold) has been rewritten and the required mechanic's lien endorsements are secured or equivalent coverage is obtained.

3.15    OPERATING ACCOUNT —

3.15.1 At or before Loan Closing, Borrower shall establish the Operating Account with Lender, which shall be assigned to Lender pursuant to the Assignment of Deposit Accounts. Borrower shall use the Operating Account as the sole operating account for the Property.

3.15.2 [Reserved.]

3.15.3 Notwithstanding the foregoing or anything else stated herein or in the other Loan Documents to the contrary, upon the occurrence and during the continuance of any Event of Default (or an event the occurrence of which with the giving of notice or passage of time would constitute an Event of Default hereunder), any and all rights of Borrower to utilize any or all of the funds in the Operating Account shall terminate without notice to Borrower, and thereafter, Borrower shall have no right to utilize funds from the Operating Account or to reduce the balance in the Operating Account in any manner or for any purpose; provided, however, that Lender shall at all times be entitled to exercise and enforce any and all rights and remedies accorded to Lender wider this Agreement, the Assignment of Deposit Accounts, and/or any of the other Loan Documents, including, without limitation, Lender's rights and remedies under Section 3.15.4 below.

3.15.4 Upon the occurrence and during the continuance of any Event of Default, Lender may continue to withdraw any funds from the Operating Account to pay any

amounts of principal and/or interest due and unpaid under the Note, in Lender's sole and absolute opinion and judgment, without further authorization on the part of Borrower.

3.15.5 If, with respect to the Operating Account, an automatic debit is entered to pay amounts of principal and/or interest due under the terms of the Note, but there are insufficient funds in the Operating Account to pay such amounts of principal and/or interest in full on the date such debit is entered, then Lender may, in its sole and absolute discretion, reverse such debit.

3.15.6 Borrower acknowledges that Lender has made no representation or warranty concerning the adequacy or sufficiency of the funds that may, at any time, be maintained in the Operating Account for payment of interest and/or principal on the Loan or any portion thereof.

3.16     WAIVER OF MECHANIC'S LIEN AND STOP PAYMENT NOTICE -Borrower hereby unconditionally and irrevocably waives all of its rights (and the rights of any successors and assigns) to assert any mechanic's liens, stop notice and stop payment notice claims with respect to the Property, the Project, the Project Funds and the Construction Loan Proceeds.

3.17     EB5 ACCOUNT

3.17.1 At or before Loan Closing, Borrower shall establish the EB5 Account with Lender, which shall be assigned to Lender pursuant to the Assignment of Deposit Accounts (EB5 Funds). Borrower shall use the EB5 Account as the sole deposit account for EB5 Funds.

3.17.2 As more particularly set forth in Section 3.22, below, Disbursements and/or Advances shall first be made from the EB5 Funds before the Construction Loan Proceeds, as and when required by the terms and conditions of this Agreement. Except and only to the extent EB5 Funds are Advanced by Lender pursuant to this Agreement, Borrower shall have no right to utilize funds from the EB5 Account or to reduce the balance in the EB5 Account in any manner or for any purpose; provided, however, that Lender shall at all times be entitled to exercise and enforce any and all rights and remedies accorded to Lender wider this Agreement, the Assignment of Deposit Accounts (EB5 Funds), and/or any of the other Loan Documents, including, without limitation, Lender's rights and remedies under Section 3.17.3 below.

3.17.3 Upon the occurrence and during the continuance of any Event of Default, Lender may continue to withdraw any EB5 Funds from the EB5 Account to be used toward the Project or otherwise, in Lender's sole and absolute opinion and judgment, without further authorization on the part of Borrower.

3.17.4 Borrower acknowledges that Lender has made no representation or warranty concerning the adequacy or sufficiency of the EB5 Funds that may, at any time, be maintained in the EB5 Account.

3.18    CHANGE ORDERS — Any and all change orders with respect to the Project, Cost Breakdown, the Construction Loan Proceeds and/or the Project Funds must first be approved by Lender, in Lender's sole discretion, and, if so approved, paid for by Borrower from Borrower's own funds.

3.19    GENERAL CONTRACTORS FEE – Subject to Borrower's satisfaction of any and all conditions in Section 3.13 above, Advances may be made for payment of the General Contractors Fee; provided, however, that (i) the maximum amount of the General Contractors Fee shall not exceed the amount of $89,686.00 and (ii) such fees shall be payable in equal monthly installments over the initial 18 calendar months of the Loan.

3.20    DEVELOPMENT FEE - Subject to Borrower's satisfaction of any and all conditions in Section 3.13 above, Advances may be made for payment of the Development Fee; provided, however, that (i) the maximum amount of the Development Fee shall not exceed the amount of $1,043,283.00, (ii) subject to Section 3.20(iii), below, such fees shall be payable in equal monthly installments over the initial 18 calendar months of the Loan, and (iii) no portion of the Construction Loan Proceeds shall be used for payment of the Development Fee, which shall only be paid from EB5 Funds, subject to the terms and conditions of this Agreement (including, but not limited to, Section 3.13, above). Any sums payable toward the Development Fee shall only be made available to Borrower upon Lender's actual receipt of the Development Fee from the Beach Orangethorpe Hotel EB5 Lenders and BEACH ORANGETHORPE HOTEL III, LLC, a California limited liability company.

3.21    RELEASE OF FF&E FUNDS – Borrower acknowledges and agrees with Lender that Borrower has budgeted the sum of $4,300,000.00 toward FF&E, which shall be comprised of Construction Loan Proceeds of $13,220.00 and EB5 Funds of $4,286,780.00. Subject and in addition to the terms and conditions of the Loan Documents, no Construction Loan Proceeds nor any EB5 Funds that are allocated for FF&E shall be disbursed or otherwise Advanced unless and until Borrower delivers to Lender a letter showing approval by Hilton of the interior design plan of the hotel to be constructed on the Property under the Loan Documents, and which letter must be acceptable to Lender in Lender's sole discretion.

3.22    ADDITIONAL EB5 FUNDS –

3.22.1 Subject to the terms and conditions of the Loan Documents, the EB5 Funds comprising Tranche 2B will be utilized first and prior to any Disbursement or Advances of Construction Loan Proceeds as Borrower's Deposit, and Lender shall have no obligation to make any Advances of any Construction Loan Proceeds unless and until all EB5 Funds comprising Tranche 2B are disbursed in their entirety. The EB5 Funds comprising Tranche 2 shall be deemed a Borrower's Deposit, and upon the deposit by Borrower with Lender of such EB5 Funds, the same shall be disbursed and advanced pursuant to the terms and conditions of this Agreement, including, without limitation, Section 3.13, above.

3.22.2 By no later than December 1, 2016, Borrower shall deposit the full amount of the EB5 Funds comprising Tranche 3 into the EB5 Account. The EB5 Funds comprising Tranche 3 shall be deemed a Borrower's Deposit, and upon the deposit by Borrower with Lender of such EB5 Funds, the same shall be disbursed and Advanced pursuant to the terms

and conditions of this Agreement, including, without limitation, Section 3.13, above. The EB5 Funds comprising Tranche 3 shall be deposited by Borrower into the EB5 Account and shall be pledged by Borrower to Lender pursuant to the Assignment of Deposit Accounts (EB5 Funds).

   3.22.3 Borrower's failure to comply with the terms and conditions of this Section 3.22 shall constitute an Event of Default hereunder.

ARTICLE IV.
BORROWER'S COVENANTS

  4.  In addition to anything else herein stated, Borrower agrees:

   4.1  PROMPTLY COMMENCE AND COMPLETE CONSTRUCTION -

     (a)  To commence construction and installation of the proposed Improvements promptly, and in no event later than the Commencement Date and to continue such construction and installation with speed and in a workmanlike manner. Borrower will complete such Improvements promptly, and in no event later than the Completion Date, in accordance with the Plans and Specifications, including any specifications prescribed by Lender, and with all requirements of all Governmental Agencies having or asserting jurisdiction, and will pay the cost thereof.

     (b)  If there is any difference between any such governmentally prescribed specifications and those furnished Lender pursuant hereto, the requirements of whichever thereof are the higher shall be met in construction and installation of the Improvements.

   4.2  INSURANCE - To obtain and at all times maintain such insurance policies and coverages as are required under the Construction Deed of Trust (Leasehold), the Agreement To Furnish Insurance and/or any other Loan Documents, in amount, form and issued by a company or companies satisfactory to Lender.

   4.3  REMEDY DEFECTS AND PROTECT PROPERTY - To remedy any defects and to cause any protective measures to be taken as may be apparent from any report(s) obtained pursuant to or described in this Agreement.

   4.4  NO CHANGES IN CONTRACT DOCUMENTS - No changes in the Contract Documents shall be made after the same have been approved by Lender, without first obtaining the written consent of Lender, which approval shall not be unreasonably withheld.

   4.5  REIMBURSE OR PAY ATTORNEYS' FEES AND COSTS - In the event that Lender shall be made a party to any legal proceedings instituted in connection with or arising out of the construction of said Improvements or the Loan herein provided for, to pay to Lender all sums paid and/or incurred by it as costs in said legal proceedings, together with such sums as may be paid or incurred by it in the employment of an attorney or attorneys to represent it in such legal proceedings.

4.6    <u>PRESERVE ITS EXISTENCE</u> - Borrower will, so long as Borrower remains obligated on the Loan, do all things necessary to preserve and keep in full force and effect its organizational status and will comply with all Laws, orders and decrees of any Governmental Agency or court applicable to Borrower and/or the Project.

4.7    <u>COMPLY WITH APPLICABLE LAWS</u> - Borrower shall comply with all applicable restrictive covenants, zoning and subdivision ordinances, building codes, health and environmental Laws and all other applicable Laws, directions, orders and notices of violations issued by any Governmental Agency relating to or affecting the premises or the business or activity being conducted thereon, whether by Borrower or by any occupant thereof, including without limitation, any and all Laws relating to hazardous or toxic waste or waste products or hazardous substances. Additionally, Borrower shall indemnify and hold Lender and the Trustee under the Construction Deed of Trust (Leasehold) harmless from the failure by Borrower to comply with such Laws in any respect.

4.8    <u>PAYMENT OF TAXES AND OTHER DEBT</u> — Borrower shall pay, or cause to be paid, and discharge, or cause to be discharged, (a) before delinquency all taxes, assessments, and governmental charges or levies imposed upon it, upon its income or profits, or upon any property belonging to it (including, without limitation, the Property); (b) when due all lawful claims (including, without limitation, claims for labor, materials, and supplies), which, if unpaid, might become a lien, charge, claim, demand or encumbrance upon any of its assets or property (including, without limitation, the Property); and (c) all its other obligations and indebtedness when due; provided, however, that Borrower may contest any of the foregoing in good faith and by appropriate proceedings diligently prosecuted by Borrower as long as Borrower has adequate reserves to pay any adverse determination or has otherwise provided Lender evidence of a surety or bond to pay any adverse determination.

4.9    <u>LIENS</u> - Borrower will not create, incur, assume or suffer to exist any mortgage, deed of trust, lease, pledge, lien, assignment, security interest or other charge or encumbrance (including the lien or retained security title of a conditional vendor) of any nature upon or with respect to the Property, or assign or otherwise convey any right to receive income; except that the foregoing restrictions shall not apply to (a) mortgages, deeds of trust, assignments, pledges, liens, security interests or other charges or encumbrances, including the Construction Deed of Trust (Leasehold), and the Assignment of Leases (Leasehold), covering the Property and created by or pursuant to or permitted by this Agreement; (b) taxes, assessments or governmental charges or levies on property of Borrower, or in respect of a judgment or award against Borrower, (i) if the same shall not at the time be delinquent or thereafter can be paid without penalty, or (ii) if Borrower shall have set aside adequate reserves therefor as determined or approved by its certified independent accounting firm, or, (iii) if, in the case of a judgment or award, execution on the same shall have been effectively stayed pending appeal or review or insured or bonded to the extent of Borrower's liability in respect thereof, and in the case of all of the foregoing, the same are being contested in good faith and by appropriate proceedings; (c) the Beach Orangethorpe Deeds of Trust (but not as to the leasehold estate associated with the Ground Lease or the Property); and (e) the Beach Orangethorpe Hotel Financing.

4.10    <u>TERRORISM AND ANTI-MONEY LAUNDERING</u> — Borrower warrants and agrees as follows:

(a)      As of the date hereof and throughout the term of the Loan: (i) Borrower; (ii) any Person controlling or controlled by Borrower; (iii) if Borrower is a privately held entity, any Person having a beneficial interest in Borrower; or (iv) any Person for whom Borrower is acting as agent or nominee in connection with this transaction, is not an OFAC Prohibited Person.

(b)      To comply with applicable U.S. Anti-Money Laundering Laws and regulations, all payments by Borrower to Lender or from Lender to Borrower will only be made in Borrower's name and to and from a bank account of a bank based or incorporated in or formed under the laws of the United States or a bank that is not a "foreign shell bank" within the meaning of the U.S. Bank Secrecy Act (31 U.S.C. § 5311 et seq.), as amended, and the regulations promulgated thereunder by the U.S. Department of the Treasury, as such regulations may be amended from time to time.

(c)      To provide Lender at any time and from time to time during the term of the Loan with such information as Lender determines to be necessary or appropriate to comply with the Anti-Money Laundering Laws and regulations of any applicable jurisdiction, or to respond to requests for information concerning the identity of Borrower, any Person controlling or controlled by Borrower or any Person having a beneficial interest in Borrower, from any governmental authority, self-regulatory organization or financial institution in connection with its anti-money laundering compliance procedures, or to update such information.

(d)      The representations and warranties set forth in this Section 4.10 shall be deemed repeated and reaffirmed by Borrower as of each date that Borrower makes a payment to Lender under the Note, this Agreement and the other Loan Documents or receives any payment from Lender. Borrower agrees promptly to notify Lender in writing should Borrower become aware of any change in the information set forth in these representations.

4.11      REPORTING REQUIREMENTS - So long as Borrower shall have any obligation to Lender under this Agreement and/or the other Loan Documents, Borrower shall prepare, or cause to be prepared, and deliver, or cause to be delivered, to Lender the following Financial Statements and reports:

4.11.1  As soon as practicable and in any event within ten (10) days after Borrower knows or should reasonably have known, of the commencement of any legal action against it, except actions seeking money judgments that are fully insured or bonded, a report of the commencement of such action containing a statement signed by all managers or managing members of Borrower setting forth details of such legal action and any action Borrower proposes to take with respect thereto;

4.11.2  Within five (5) days of the occurrence of any Event of Default or event which, with the giving of notice or lapse of time, or both, would constitute an Event of Default, a report regarding such Event of Default or event setting forth details and describing any action which Borrower proposes to take with respect thereto, signed by Borrower;

4.11.3  Any change in the name of Borrower or use of any trade names or trade styles not presently used;

4.11.4 Borrower will cause DMC Investment Holdings, LLC, a Delaware limited liability company, to provide Lender with copies of all signed income tax returns (with all forms K-1 attached) of DMC Investment Holdings, LLC, a Delaware limited liability company, prepared and reviewed by a certified public accountant acceptable to Lender shall be furnished to Lender no later than thirty (30) days after they are filed with the relevant taxing authorities;

4.11.5 As soon as available, and in any event within ninety (90) days following the end of each calendar year during which the Loan has not been fully repaid and performed, and discharged, Borrower will cause each Guarantor to provide complete and accurate Financial Statements representing the financial condition of such Guarantor as of the date such Financial Statements are prepared and delivered to Lender, including such supplemental reports and schedules as Lender shall require in its sole and absolute discretion. All Financial Statements may be self-prepared, and shall contain a certification signed by any individual providing a Financial Statement certifying to the completeness and accuracy of all information, without exception. All such Financial Statements shall be prepared and presented in accordance with GAAP, consistently applied, or in such other form and content as Lender may permit, in its sole opinion and judgment. Additionally, Borrower shall cause each Guarantor to furnish to Lender copies of all signed income tax returns (with all forms K-1 attached) of such Guarantor no later than thirty (30) days after they are filed with the relevant taxing authorities;

4.11.6 Promptly upon receipt thereof, Borrower shall provide to Lender one (1) copy of any other report submitted to Borrower by independent accountants in connection with any annual, interim or special audit made by them of the books of Borrower;

4.11.7 Within ten (10) days of (i) any contact from any Governmental Agency concerning any environmental protection Laws, including, but not limited to, any notice of any proceeding or inquiry with respect to the presence of any hazardous waste, toxic substances or hazardous materials on the Property or the migration thereof from or to other property, (ii) any and all claims made or threatened by any third Person against or relating to the Property concerning any loss or injury resulting from toxic substances, hazardous waste, or hazardous materials, or (iii) Borrower's discovery of any occurrence or condition on any property adjoining or in the vicinity of the Property that could cause the Property, or any part thereof, to be subject to any restrictions on the ownership, occupancy, transferability, or loss of the Property under any Law, Borrower shall deliver to Lender a report regarding such contact and setting forth in detail and describing any action which Borrower proposes to take with respect thereto, signed by Borrower;

4.11.8 Within thirty (30) days following the end of each calendar month during which the Loan has not been fully repaid and performed, Borrower shall cause Fund Control to deliver to Lender a progress report on the construction of the Project in form and content satisfactory to Lender, in its sole and absolute discretion;

4.11.9 Within five (5) days of becoming aware of any developments or other information which may materially and adversely affect Borrower's properties, business, prospects, profits or condition (financial or otherwise) or Borrower's ability to perform this Agreement or the other Loan Documents, telephonic or written notice (delivered via facsimile)

specifying the nature of such development or information and such anticipated effect, which shall be promptly confirmed in writing;

    4.11.10 Following issuance of the certificate of occupancy (or certificate of completion) for the Project, and no later than fifteen (15) days following the end of each calendar quarter (i.e., March 31, June 30, September 30 and December 31) during which the Loan has not been fully repaid and performed, a current operating statement for the immediately preceding calendar quarter for the Property, including income and expense statements, and such other information as Lender may request; and

    4.11.11 Borrower shall prepare, or cause to be prepared, and deliver, or cause to be delivered, to Lender such other information respecting the business, properties or the condition or operations, financial or otherwise, of Borrower and/or Guarantor as Lender may from time to time reasonably request.

    4.12 <u>CONSTRUCTION COST OVERRUNS</u> - Borrower will be responsible for and shall pay all costs not covered by the Loan including, but not limited to, title and recording charges, appraisal fees, interest and any other construction costs.

    4.13 <u>ADDITIONAL ITEMS TO BE FURNISHED BY BORROWER</u> - In addition to anything else stated herein, and whether or not previously requested and/or provided, Borrower agrees to furnish to Lender each and all of the following:

    4.13.1 <u>FUNDS TO SUPPLEMENT THE UNDISBURSED PROJECT FUNDS</u> - If and whenever Lender shall determine and notify Borrower that the Undisbursed Project Funds, after deduction of amounts theretofore paid out pursuant hereto, is less than the then estimated amount required to fully complete and pay for the Project, and Lender demands that Borrower make a Borrower's Deposit thereof with Lender in an amount equal to such deficiency, Borrower shall comply with such demand within ten (10) Business Days from the date thereof; the judgment of Lender shall be final and conclusive in this respect;

    4.13.2 <u>PRELIMINARY NOTICES</u> - Promptly when received, copies of all preliminary notices delivered pursuant to section 8200 of the California Civil Code or any similar Law (a) to Borrower and/or (b) to the Property, addressed to Lender or to "Construction Lender";

    4.13.3 <u>LISTS OF SUBCONTRACTORS</u> - From time to time, upon Lender's demand to Borrower or Contractor, or both, a true and correct list of every material Subcontractor employed in connection with the construction and/or installation of the Improvements and/or the furnishing of FF&E to the Project, including, but not limited to, contracts for grading, concrete, framing, roofing, HVAC/heating, landscaping, paving, electrical and plumbing. Each said list shall show, in regard to each such Subcontractor, (a) name, (b) address and telephone number, (c) an approximate estimate of the dollar value of the work, labor, and materials to be done or supplied, (d) a general statement of the nature of the work to be done, (e) the amount paid to date, and (f) the amount still owing. Each such demand shall be made in writing by Lender, and Borrower shall be responsible to see that each such list be delivered to Lender within ten (10) Business Days

after each such demand. Borrower acknowledges that Lender may directly contact the Subcontractors in connection with verifying the information contained in each such list;

4.13.4  GENERAL CONTRACTS AND SUBCONTRACTS - Copies of all contracts and agreements described in Section 4.13.3, above, within ten (10) Business Days after execution thereof, if required by Lender; and

4.13.5  FOUNDATION SURVEY - Upon request, a survey, made and certified by a licensed engineer or surveyor, showing that the foundations are located entirely within the property lines and do not encroach upon any easement or breach or violate any covenant, condition, or restriction of record, or any building or zoning Laws;

4.14    SECURITY INTEREST IN PROJECT RIGHTS - As additional security for the payment and performance of Borrower's obligations pursuant to the Loan Documents, Borrower hereby assigns and grants to Lender a security interest in and to all of Borrower's right, title, and interest in and to each and all of the rights, interests, property, privileges, licenses, reports, permits, instruments, general intangibles and documents, and all proceeds thereof (hereinafter, collectively, "Project Rights") relating to the Project:

4.14.1  As used herein, the term Project Rights shall include, but is not limited to, the following:

(a)    All building permits, governmental permits, licenses, and authorizations, whether now issued or issued hereafter;

(b)    All fees paid to or on behalf of Governmental Agencies, for whatever purpose and by whatever name;

(c)    All utility deposits and rights to refund of utility deposits;

(d)    All soils and/or geological studies and reports;

(e)    All economic, marketing, and/or feasibility studies and reports;

(f)    All other studies and reports obtained, or to be obtained, by Borrower, including, but not limited to, reports of architects, engineers, and other professionals relating to the Project;

(g)    All appraisals and reports of appraisers;

(h)    All water shares and water rights, if any;

(i)    All licenses and privileges obtained by Borrower from non-governmental sources;

(j)      All claims, rights, causes of action, and choses in action in regard to damage done to the Property, FF&E, Improvements, and/or personal property thereon;

(k)      All certificates, certifications, approvals, and other documents;

(l)      All other fees, deposits, and rights to refunds held by Borrower;

(m)      All other tangible and intangible property rights, property interests, privileges, licenses, reports, instruments, and documents obtained by Borrower in connection with the Project;

(n)      All of the foregoing described items as and when the same come into existence in the future; and

(o)      All proceeds and products of the foregoing.

4.14.2  BORROWER'S REPRESENTATIONS AND WARRANTIES AS TO PROJECT RIGHTS - Borrower hereby represents and warrants to Lender that:

(a)      Borrower is the sole owner of the Project Rights, and each of them;

(b)      Borrower has the right to make this assignment and such Project Rights are granted and assigned free from liens, encumbrances, claims, and setoffs of every kind whatsoever;

(c)      The full title and right to Borrower's interests in the Project Rights are vested in Lender hereby;

(d)      The Project Rights are valid and in full force and effect in accordance with their terms;

(e)      Borrower is not in default under any of the terms, conditions, or covenants with respect to the Project Rights;

(f)      Borrower has not heretofore assigned or pledged Borrower's interest in the Project Rights, or any of them, and Borrower will not further pledge or assign Borrower's interest in the Project Rights, or any of them; and

(g)      In the event Persons that are not parties to this Agreement are required to consent to the assignment of all or any part of the Project Rights, Borrower shall obtain such consent.

4.14.3  ASSIGNMENT IRREVOCABLE - This assignment is irrevocable and shall remain in full force and effect until and unless the Loan is paid in full, and no event of termination or release shall have any effect unless and until Lender shall execute, in writing,

a certification that such event has occurred; and, until such certification is so executed by Lender and delivered, all Persons may rely upon this Agreement as an effective assignment of the Project Rights, and each of them, as hereinabove described.

### 4.14.4 BORROWER'S COVENANTS WITH RESPECT TO PROJECT RIGHTS - Borrower hereby covenants and agrees:

(a)    If Borrower's legal ability to assign any of the Project Rights to Lender is based upon the need for approval or consent from another Person, to obtain such approval or consent and furnish evidence thereof to Lender;

(b)    To observe and perform all obligations imposed on Borrower in regard to the Project Rights and to indemnify Lender from the consequences of any failure to do so;

(c)    To preserve the Project Rights in full force and effect for the benefit of Lender;

(d)    Not to execute any other assignment of Borrower's interest in the Project Rights;

(e)    Not to alter, amend, modify, terminate, cancel, or release the Project Rights without the prior written consent of Lender, which consent Lender may give or withhold in Lender's sole opinion and judgment;

(f)    That upon an Event of Default by Borrower under the Loan, and notice having been given in the manner and to the extent required by the Loan Documents:

(i)    Lender, at its option, without any requirement that it do so, may perform and enforce the Project Rights, or any of them, in its own name or in the name of Borrower; and

(ii)    For the purposes of completing the Project, Lender may reassign its right, title, and interest in the Project Rights, or any of them, to any Persons without any further requirement of Borrower's consent, and any such reassignment shall be valid and binding upon Borrower and all other Persons with any relationship to the Project Rights, or any of them, as fully as if each had expressly approved the same;

(g)    Borrower hereby indemnifies and holds Lender harmless from and against any and all claims, demands, liabilities, losses, lawsuits, judgments, awards, costs, and expenses, including, but not limited to, attorneys' fees, to which Lender may become subject, or which Lender may incur, in exercising any of its rights under this assignment.

### 4.14.5 NO DUTY OF LENDER - This assignment is made for security purposes only and, except to the extent the same is exercised by Lender upon notice, Lender shall have no obligation to perform any obligation with respect to the Project Rights, or any of them, nor shall Lender be required to enforce any obligations or duties of any Persons, and Borrower

hereby specifically waives any and all rights that Borrower may have to require Lender to undertake any duties or obligations relating to the Project Rights, to utilize the Project Rights, or any of them, in any manner whatsoever, or to enforce the Project Rights, or any of them, whether such duties may arise expressly, impliedly, by operation of Law, or otherwise.

4.14.6  POWER OF ATTORNEY - Upon the occurrence and during the continuance of any Event of Default, Borrower hereby irrevocably constitutes and appoints Lender as Borrower's attorney-in-fact, which power is deemed coupled with an interest and is, therefore, irrevocable, to demand, receive, and enforce Borrower's rights with respect to the Project Rights, and each of them, to make payments under the Project Rights, and to give appropriate receipts, releases, and satisfactions for, on behalf of, and in the name of Borrower, or, at the option of Lender, in the name of Lender, with the same force and effect as Borrower could do if this appointment had not been made.

4.15    LENDER HAS NO DUTY TO CONSTRUCT OR SUPERVISE - Lender is under no obligation to construct or supervise construction of the Project, or any portion thereof, and any inspection by or on behalf of Lender of the construction of said Project is for the sole purpose of protecting the security of Lender. Such inspection is not to be construed as a representation that there will be a strict compliance on the part of Borrower with the Plans and Specifications, or that the construction will be free from faulty materials or workmanship. Borrower will make or cause to be made such other independent inspections as Borrower may desire for Borrower's own protection.

4.16    RIGHT OF ENTRY - Lender and Lender's employees or agents shall have the right at all times to enter upon the Property for whatever purpose Lender deems appropriate, including, without limitation, inspection of the premises and the posting of such notices and other written or printed material thereon as Lender may deem appropriate or desirable.

4.17    LENDER'S RIGHT TO STOP WORK - If Lender determines that said work put in place since the last inspection is not in substantial conformance with the Plans and Specifications and/or the terms of this Agreement, Lender shall have the right (a) to stop said work ("Stoppage"), and/or order its replacement and/or repair, whether or not said unsatisfactory work has theretofore been incorporated in said Improvements, and/or (b) to withhold all further disbursements and advances until such work is satisfactory to it.

4.18    LENDER MAY EXAMINE BOOKS AND RECORDS - Lender and Lender's employees and agents shall have the right, from time to time, acting by and through its employees or agents, to examine the books, records, and accounting data of Borrower, and to make extracts therefrom or copies thereof. Borrower shall promptly make such books, records, and accounting data available to Lender, as stated above, upon written request, and upon like request shall promptly advise Lender, in writing, of the location of such books, records, and accounting data.

4.19    SIGNS - Lender may place a sign or signs on the construction premises, appropriate thereto, evidencing that construction financing is being made by Lender. Additionally, Lender shall have the right, at its option, to publish announcements concerning the Loan in the media, including newspapers and trade journals.

4.20   NO AUTOMATIC SET-OFF - That the existence of Undisbursed Project Funds, the Construction Loan Proceeds and/or the fact of any sum or sums being on deposit with Lender shall in no way constitute a set-off against or be deemed to compensate the obligations of the Loan or any payment or performance due under the Loan Documents or this Agreement, unless and until Lender, by affirmative action, shall so apply said accounts or any portion thereof, and then only to the extent thereof as so designated by Lender.

4.21   RELIANCE BY LENDER AND ACQUITTANCE - Lender may conclusively assume that the statements, facts, information, and representations contained herein and/or in any affidavits, orders, receipts, or other written instrument(s) that are filed with Lender or exhibited to it, are true and correct, and Lender may rely thereon without any investigation or inquiry, and any payment made by Lender in reliance thereon shall be a complete release in its favor for all sums so paid.

4.22   CIVIL CODE § 8700 ET SEQ. — Borrower shall provide evidence satisfactory to Lender that Borrower has complied with the provisions of California Civil Code § 8700 et seq., if applicable to Borrower.

4.23   NO LEASE, TRANSFER OR FURTHER ENCUMBRANCE — Borrower shall not, without the prior written consent of Lender:

(a)   Create, incur, assume, permit or suffer to exist, any mortgage, deed of trust, pledge, lien, hypothecation, charge (fixed or floating), security interest or other encumbrance whatsoever on the Property or any interest therein, except for the Permitted Encumbrances and otherwise expressly disclosed in this Agreement;

(b)   Transfer the Property, or any interest therein, or permit the same to occur;

(c)   Become a party to any transaction whereby the Property or any portion thereof, or all or any substantial part of the properties, assets or undertakings of Borrower (whether legally or beneficially owned by Borrower), would become the property of any other Person, whether by way of transfer, sale, conveyance, lease, sale and leaseback, or otherwise;

(d)   Change the use of the Property, or permit the same to occur;

(e)   Transfer, convey, hypothecate, or sell membership interests in Borrower, or permit the same to occur;

(f)   Change the manager of Borrower; or

(g)   Enter into any leases for all or any portion of the Property, except for the Approved Leases.

4.24   MAINTENANCE OF PROPERTIES AND PRESERVE EXISTENCE -Borrower shall maintain and preserve, or cause to be maintained and preserved, all of its properties, necessary or useful in the proper conduct of its business, including such as may be under lease, in

good working order and condition, ordinary wear and tear excepted. Borrower, so long as Borrower remains obligated on the Loan, shall do all things necessary to preserve and keep in full force and effect Borrower's organizational status, and will comply with all Laws, orders and decrees of any Governmental Agency or court applicable to Borrower or to the Property.

4.25    BOOKS AND RECORDS; AUDIT AND EXAMINATION — Borrower shall keep and maintain all books and records in original form, as shall be required and as shall otherwise be appropriate, in Lender's opinion and judgment, pertaining to the performance by Borrower of its covenants and other obligations hereunder, and otherwise pertaining to its operations and activities. Borrower shall at all times permit Lender to review, audit and examine all such books and records, either directly or through one or more auditors designated by Lender, including independent contractors.

4.26    PROTECTION OF LIENS — Borrower shall maintain the lien of the Construction Deed of Trust (Leasehold) as a first priority lien on the entire leasehold estate under the Ground Lease on the Property and take all actions, and execute and deliver to Lender all documents, required by Lender from time to time in connection therewith.

4.27    TITLE INSURANCE ENDORSEMENTS — Borrower shall deliver to Lender, at Borrower's sole expense and in form and content required by Lender from time to time, in Lender's sole discretion, such endorsements to the Title Policy (Leasehold) as Lender shall request.

4.28    CORPORATION RESTRICTIONS — Borrower will not consolidate or merge with any corporation, any limited partnership, any limited liability company, or any other Person.

4.29    NAME, FISCAL YEAR, ACCOUNTING METHOD, AND LINES OF BUSINESS — Borrower will not change its name, Fiscal Year, or method of accounting. Borrower will not directly or indirectly engage in any business other than the business in which Borrower is engaged on the date of this Agreement, discontinue any existing lines of business that are material to the business or operations of Borrower, or substantially alter its method of doing business.

4.30    LOANS - Borrower will not directly or indirectly (a) make any loan or advance to any other Person other than advances made in the ordinary course of Borrower's business; (b) purchase or otherwise acquire any capital stock or any securities of any other Person, any limited liability company interest or partnership interest in any other Person, or any warrants or other options or rights to acquire any capital stock or securities of any other Person or any limited liability company interest or partnership interest in any other Person; (c) make any capital contribution to any other Person; (d) otherwise invest in or acquire any interest in any other Person or establish any subsidiaries, (e) guarantee or otherwise become obligated in respect of any indebtedness of any other Person, or (f) subordinate any claim against or obligation of any other Person to Borrower to any other indebtedness of such Person.

4.31    INDEBTEDNESS - Borrower shall not assume, create, incur, or permit to exist any obligations or indebtedness in favor of any Person except trade obligations and

normal accruals in the ordinary course of business not yet due and payable. Borrower shall not assume, create, incur, or permit to exist any contingent liabilities, including, without limitation, contingent reimbursement obligations under letters of credit.

4.32    ACQUISITION OF ASSETS - Borrower shall not acquire by purchase, lease or otherwise all or substantially all the assets of any other Person.

4.33    DISTRIBUTIONS - Borrower shall not make, declare or permit any distribution to any officer, member or manager, partner or other direct or indirect beneficial owner of Borrower at any time that an Event of Default (or event that with the giving of notice or passage of time, or both, would constitute an Event of Default) has occurred and is continuing or if any such distribution would cause or contribute to an Event of Default (or event that with the giving of notice or passage of time, or both, would constitute an Event of Default).

4.34    TRANSACTIONS WITH AFFILIATES - Borrower will not enter into, or cause, suffer or permit to exist, any arrangement or contract with any of its Affiliates, including, without limitation, any management contract, unless such transaction is on terms that are no less favorable to Borrower than those that could have been obtained in a comparable transaction on an arms' length basis from a Person that is not an Affiliate.

4.35    LEASES -

(a)    Borrower shall only enter into Approved Leases for the Property (this restriction shall apply to all leases for the Property entered into by Borrower, including, without limitation, all new and renewal leases).

(b)    If requested by Lender, Borrower shall, immediately upon execution by Borrower of any new or renewal lease with respect to the Property, provide Lender with a true, correct and complete copy of such lease, as signed by all parties thereto.

4.36    SINGLE PURPOSE ENTITY - Borrower shall, at all times, remain an entity which (i) exists solely for the purpose of owning and operating the Ground Lease on Property, (ii) conducts business only in its own name, (iii) does not engage in any business other than the ownership, management and operation of the Ground Lease on the Property, (iv) does not hold, directly or indirectly, any ownership interest (legal or equitable) in any entity or any real or personal property other than the interest which it owns in the Ground Lease on the Property, (v) does not have any Assets other than those related to its interest in the Ground Lease in the Property and does not have any debt other than as permitted by this Agreement and does not guarantee or otherwise obligate itself with respect to the debts of any other Person, (vi) has its own separate books, records, accounts, financial statements and tax returns (with no commingling of funds or assets), (vii) hold itself out as being a company separate and apart from any other entity, and (viii) observes limited liability company formalities, independent of any other entity.

4.37    GROUND LEASE — Borrower shall pay and perform any and all of its obligations under the Ground Lease on or before the date any such payment or performance is due and Borrower shall not permit to exist any condition that would give the Ground Lessor the right to terminate the Ground Lease. Borrower shall also not terminate, amend, modify or alter the Ground Lease (or permit the same to occur), but shall keep the Ground Lease in full force and effect.

4.38    ENGINEER'S CONTRACT — If required by Lender, in Lender's sole discretion, Borrower shall cause Architect and Engineer to assign any and all rights with respect to the Engineer's Contract to Lender, pursuant to the Assignment of Engineer's Contract.

4.39    INITIAL CAPITAL CONTRIBUTION – Consistent with the capital requirements applicable to a Federal Deposit Insurance Corporation-supervised institution described in Part 324, "Capital Adequacy of FDIC-Supervised Institutions," of Chapter III of Title 12, Code of Federal Regulations, Borrower represents, warrants and agrees as follows:

4.39.1    Borrower has contributed capital to the Project in the form of cash or unencumbered readily marketable assets (or has paid development expenses out-of-pocket) in an amount equal to at least fifteen (15%) of the appraised "as completed" value of the Project ("Initial Capital Contribution"), and the Initial Capital Contribution was made prior to any Advance (the appraised "as completed" value shall be determined by an Appraisal prepared for Lender); and

4.39.2    Throughout the term of the Loan, Borrower will continuously maintain the Initial Capital Contribution and retain such Initial Capital Contribution in the Project until the Loan is paid in full.

4.40    HILTON FRANCHISE AGREEMENT – Borrower shall not enter into, permit or consent to any amendments, modifications, restatements or termination of the Hilton Franchise Agreement without Lender's prior written consent, which consent may be granted, denied or conditioned by Lender in Lender's commercially reasonable discretion.

4.41    INTERSTATE RIM HOTEL MANAGEMENT AGREEMENT – Borrower shall not enter into, permit or consent to any amendments, modifications, restatements or termination of the Interstate Rim Hotel Management Agreement without Lender's prior written consent, which consent may be granted, denied or conditioned by Lender in Lender's commercially reasonable discretion.

4.42    PLEDGE AGREEMENT (FEE LENDERS) – Except as expressly set forth in the Pledge Agreement (Fee Lenders), Borrower shall not permit any further pledge, assignment, transfer, hypothecation or any other conveyance of the membership interest of DMC Investment Holdings, LLC, a Delaware limited liability company.

4.43    BEACH ORANGETHORPE HOTEL FINANCING LOAN DOCUMENTS – Borrower shall perform, as and when due, any and all of Borrower's obligations in connection with the Beach Orangethorpe Hotel Financing Loan Documents.

## ARTICLE V.
## EVENTS OF DEFAULT

5.    An "Event of Default" occurs hereunder if:

5.1    DEFAULT UNDER LOAN DOCUMENTS. (a) Borrower shall fail to pay principal or interest, or both, when due under the terms of the Note within five (5) days of the

due date of such payment; or (b) Borrower shall fail to pay an amount owing under this Agreement or any of the other Loan Documents when due within five (5) days following notice of failure to perform from Lender; or (c) Borrower shall fail to perform or observe any term, covenant, or agreement contained in this Agreement or in any of the other Loan Documents within fifteen (15) days following notice of failure to perform from Lender (or if the failure of such performance cannot reasonably be cured by Borrower within such period of fifteen (15) days, then Borrower shall have promptly commenced, and diligently prosecute, such cure within such fifteen (15) day period, but in no event shall such cure exceed forty five (45) days); or

5.2    FAILURE TO COMPLETE CONSTRUCTION - Except for Force Majeure Events which may delay construction (but such Force Majeure Events shall not serve to extend the Maturity Date), the construction of the Improvements shall not have been completed by the Maturity Date with a valid notice of completion having been recorded by Borrower; or

5.3    BREACH OF REPRESENTATIONS OR WARRANTIES - Any representations or warranties made or agreed to be made in any of the Loan Documents or this Agreement, or otherwise in connection with the Loan, shall be breached in any material respect or shall prove to be false or misleading in any material respect when made; or

5.4    LITIGATION AGAINST BORROWER - Any suit shall be filed against Borrower, which, if adversely determined, could substantially impair the ability of Borrower to perform any or all of its obligations under and by virtue of this Agreement or any of the other Loan Documents, unless Borrower's counsel furnishes to Lender its opinion, to the satisfaction of Lender and Lender's counsel, that, in Borrower's counsel's judgment, the suit is essentially without merit; or

5.5    LEVY UPON THE PROPERTY - A levy be made on the Property or any other Collateral under any process or any lien creditor commences suit to enforce a judgment lien against the Property or any other Collateral, and such levy or action shall not be bonded against by sureties deemed by Lender to be sufficient in its reasonable opinion and judgment; or

5.6    CROSS-DEFAULT; OTHER OBLIGATIONS - Borrower commits a breach or default in the payment or performance of any other obligation of Borrower, or breaches any warranty or representation of Borrower, under the provisions of any other instrument, agreement, guaranty, or document evidencing, supporting, or securing any other loan or credit extended by Lender, or by any affiliate of Lender, to Borrower or to any Affiliate of Borrower (said financing is hereinafter referred to as "other financing"), including, but not limited to, any and all term loans, revolving credits, or flooring lines of credit extended from time to time to Borrower (or any Person signing this Agreement on behalf of Borrower), or any other Person with which Borrower is affiliated and is conducting business on the Property; or Borrower causes the other financing, or any portion thereof, to be refinanced or repaid with funds lent, advanced, paid, or contributed, in whole or in part, directly or indirectly, by any other commercial lender to or for the benefit of Borrower, or any Affiliate of Borrower, and any such matter referenced in this Section 5.6 is not cured within fifteen (15) days following notice of failure to perform from Lender. For purposes of this Agreement, the term "commercial lender," shall mean any bank, savings and loan association, savings association, savings bank, credit union, insurance company, commercial finance

lender, and any other person or entity which engages in the business of lending money for commercial, investment, or business purposes; or

5.7    TRANSFER OF PROPERTY - Borrower shall voluntarily or by operation of Law, sell, transfer, convey, lease, or encumber the Property, or any interest therein (except as otherwise permitted under the Construction Deed of Trust (Leasehold) or this Agreement), or shall contract for such sale, transfer, conveyance, or encumbrance without the prior written consent of Lender, which consent Lender may either give or withhold in its sole and absolute opinion and judgment; or

5.8    ABANDONMENT – Subject to any notice and applicable cure period set forth in Section 5.1(c), the Project is abandoned by Borrower or work ceases or is delayed thereon for a period of thirty (30) calendar days or more, or construction is delayed for any period of time for any reason whatsoever so that completion of the Improvements cannot be accomplished, in the reasonable judgment of Lender, on or before the Completion Date; or

5.9    INSOLVENCY - (i) Borrower shall fail to pay its debts as they become due, or shall make an assignment for the benefit of its creditors, or shall admit, in writing, its inability to pay its debts as they become due, or (ii) Borrower shall file a petition under any chapter of the United States Bankruptcy Code or any similar Law, now or hereafter existing, or shall become "insolvent" as that term is generally defined under the United States Bankruptcy Code, or shall in any involuntary bankruptcy case commenced against it file an answer admitting insolvency or inability to pay its debts as they become due, or shall fail to obtain a dismissal of such case within thirty (30) calendar days after its commencement or shall convert the case from one chapter of the United States Bankruptcy Code to another chapter, or be the subject of an order for relief in such bankruptcy case, or be adjudged a bankrupt or insolvent, or shall have a custodian, trustee, or receiver appointed for, or have any court take jurisdiction of, its property, or any part thereof, in any voluntary or involuntary proceeding, including, but not limited to, those for the purpose of reorganization, arrangement, dissolution, or liquidation, and such custodian, trustee, or receiver shall not be discharged, or such jurisdiction shall not be relinquished, vacated, or stayed within thirty (30) calendar days after the appointment; or

5.10    BORROWER STATUS - Without Lender's prior written consent, Borrower shall be liquidated, dissolved, or fail to maintain its status as a going concern or there shall be a change in the manager or entity form of Borrower; or

5.11    ATTACHMENT - Any proceeding shall be brought the object of which is that any part of Lender's commitment to make the Advances hereunder shall at any time be subject or liable to attachment or levy during the course of the suit of any creditor of Borrower unless Borrower's counsel furnishes to Lender its opinion, to the satisfaction of Lender and Lender's counsel, that, in its judgment and after investigation, the suit is essentially without merit; or

5.12    EXECUTION LEVY - Execution shall have been levied against the Property or any lien creditor(s) commence(s) suit to enforce a judgment lien against the Property and such action or suit shall not have been bonded over and shall continue unstayed and in effect for a period of more than thirty (30) calendar days.

5.13    DESTRUCTION - Any part of the Improvements or any other Collateral are materially damaged or destroyed by fire or other casualty and the loss shall prove to be inadequately covered by insurance actually collected or in the process of collection; or

5.14    EMINENT DOMAIN - The Property shall be the subject of an eminent domain proceeding or a taking adverse to the security interest of Lender; or

5.15    NONCONFORMANCE OF CONSTRUCTION - If work is not made satisfactory to Lender, and Borrower has not commenced to make works satisfactory to Lender, within fifteen (15) calendar days from the date of a Stoppage by Lender; or

5.16    STOP NOTICE OR MECHANIC'S LIEN - In the event of the filing with Lender of a notice to withhold or the recording of a mechanic's lien pursuant to section 8000, et seq., of the California Civil Code relating to liens upon real property or any similar Law, and Borrower fails to furnish Lender a sufficient bond causing such notice or lien to be released, or give other indemnity, satisfactory to Lender, within ten (10) calendar days after such filing or recording, unless Borrower's counsel furnishes to Lender its opinion, without qualification, and in form and content satisfactory to Lender, that the Construction Deed of Trust (Leasehold) has priority over such notice or such lien; or

5.17    FINANCIAL CONDITION - There shall be any material adverse changes in the financial condition of Borrower or any Guarantor; or

5.18    DEFAULT UNDER GUARANTY - Any Guarantor fails to perform any term, condition or agreement contained in the Continuing Guaranty or the Completion Guaranty, and fails to cure the same within fifteen (15) days following notice of failure to perform from Lender, or revokes or notifies Lender of an intention to revoke the Continuing Guaranty or the Completion Guaranty; or

5.19    MISREPRESENTATION AND/OR NON-DISCLOSURE - Borrower has made certain written statements and written disclosures in order to induce Lender to make the Loan and enter into this Agreement, and, in the event Borrower has made material misrepresentations in written or failed to disclose any material fact which causes any such written statement or written disclosure to be materially misleading, Lender may treat such misrepresentation or omission as a breach of this Agreement. Such action shall not affect any remedies Lender may have for such misrepresentation or non-disclosure, as such, or under the Construction Deed of Trust (Leasehold) for such misrepresentation or concealment; or

5.20    DEFAULT UNDER GROUND LEASE – There exists one or more beaches, defaults or events of default under the Ground Lease, and the same is (are) not cured under any applicable notice and cure periods under the Ground Lease; or

5.21    DEFAULT UNDER HILTON FRANCHISE AGREEMENT – (a)There exists one or more beaches, defaults or events of default under the Hilton Franchise Agreement, and the same is (are) not cured under any applicable notice and cure periods under the Hilton Franchise Agreement; or (b) Borrower fails to comply with Section 4.40 of this Agreement; or

5.22    <u>DEFAULT UNDER INTERSTATE RIM HOTEL MANAGEMENT AGREEMENT</u> – (a) There exists one or more beaches, defaults or events of default under the Interstate Rim Hotel Management Agreement, and the same is (are) not cured under any applicable notice and cure periods under the Interstate Rim Hotel Management Agreement; or (b) Borrower fails to comply with Section 4.41 of this Agreement; or

5.23    <u>DEFAULT UNDER PLEDGE AGREEMENT (FEE LENDERS)</u> – (a) Any or all of the Fee Lenders exercise any of their rights and remedies with respect to the Pledge Agreement (Fee Lenders) (including, without limitation, the transfer of any membership interest in Borrower or the exercise of any voting rights in Borrower by or on behalf of the Fee Lenders); or (b) except as expressly permitted in Section 4.42 of this Agreement, there exists one or more pledges, assignments, transfers, hypothecations or any other conveyances of (i) the membership interest of DMC Investment Holdings, LLC, a Delaware limited liability company, in Borrower, or (ii) any of the membership interests in DMC Investment Holdings, LLC, a Delaware limited liability company; or

5.24    <u>DEFAULT UNDER BEACH ORANGETHORPE HOTEL FINANCING LOAN DOCUMENTS</u> – (a) There exists one or more beaches, defaults or events of default under the Beach Orangethorpe Hotel Financing Loan Documents, and the same is (are) not cured under any applicable notice and cure periods under the Beach Orangethorpe Hotel Financing Loan Documents; or (b) Borrower fails to comply with Section 4.43 of this Agreement; or

5.25    <u>DEFAULT UNDER BEACH ORANGETHORPE DEEDS OF TRUST</u> – There exists one or more beaches, defaults or events of default under the Beach Orangethorpe Deeds of Trust or any documents in connection therewith, and the same is (are) not cured under any applicable notice and cure periods thereunder.

ARTICLE VI.
REMEDIES

6.    <u>REMEDIES.</u>

6.1    <u>CEASE DISBURSEMENT AND/OR ACCELERATE</u> -

6.1.1    Upon, or at any time after, the occurrence of an Event of Default and during the continuance thereof, Lender shall have no obligation to disburse any further Project Funds, all obligations to repay Construction Loan Proceeds disbursed or advanced by Lender and all accrued and unpaid interest thereon shall, at the option of Lender, become immediately due and payable, and Lender shall be released from any and all obligations of performance to Borrower under the terms of this Agreement.

6.1.2    Upon, or at any time after, the occurrence of an Event of Default and during the continuance thereof, Lender shall have no obligation to advance any further Construction Loan Proceeds, all obligations to repay Construction Loan Proceeds advanced by Lender and all accrued and unpaid interest thereon shall, at the option of Lender, become immediately due and payable, and Lender shall be released from any and all obligations of performance to Borrower under the terms of this Agreement.

6.2    LENDER'S RIGHT TO APPLY UNDISBURSED PROJECT FUNDS
– Upon, or at any time after, the occurrence of an Event of Default and during the continuance thereof, Lender may, at its option, withdraw any sum or sums on deposit with Lender constituting Undisbursed Project Funds under the terms of this Agreement and credit the same upon the interest and/or principal of the Note. Thereupon, Lender shall be released from any and all obligations to Borrower under the terms of this Agreement to the extent of the sum or sums so credited. It is further understood and agreed that in the event such sums are so credited on the Note, the same shall not in any respect cure or waive any default under the Note, the Construction Deed of Trust (Leasehold), or any notice of default, or invalidate any act done pursuant to any such notice, and such credit on said Note shall not change, alter, or prejudice any rights of the beneficiary given by the Construction Deed of Trust (Leasehold).

6.3    RIGHT TO COMPLETE CONSTRUCTION - Upon, or at any time after, the occurrence of an Event of Default and during the continuance thereof, and in addition to any other right or remedy described in this Agreement, Lender shall have the right, but not the obligation, to take over and complete the work of construction and, for that purpose, Lender may (a) take possession of the Property, the Project, and each part and portion thereof, (b) employ watchmen to protect the Project from injury, (c) let contracts for and/or proceed with the finishing of the Improvements, and pay the cost thereof, plus additional fees for supervision of construction, (d) make any payment or cure any default in regard to any obligation of Borrower to any contractor(s), subcontractors, materialmen and/or suppliers of work, labor, services and/or material furnished in regard to the work of improvement, and (e) charge Borrower a fee for Lender's work in supervision and/or administration of such construction, and for the costs and expenses of appointment of a receiver in aid of such completion, disbursing all or any part of the Project Funds for such purposes. Should the cost of completing the Improvements plus such fee amount to more than the undisbursed balance of the Undisbursed Project Funds, then such additional costs may be expended by Lender, at its option, in which event such expenditure shall be considered and be an additional loan to Borrower and the repayment thereof, together with interest thereon at the rate provided in the Loan, shall be secured by the Construction Deed of Trust (Leasehold), and repaid within thirty (30) calendar days after written demand made by Lender. Borrower agrees to repay such expenditures. Lender may contest any claims and/or liens related to the work of improvement. Any contract entered into, indebtedness incurred, or claim or lien so contested upon the exercise of such right may be in the name of Borrower. Lender is irrevocably appointed attorney-in-fact (said appointment being coupled with an interest) to enter into said contracts, incur such obligations, enforce any contracts or agreements theretofore made by or on behalf of Borrower, contest such claims and/or liens, and do any and all things necessary or proper to complete the work of construction, including the signing of Borrower's name to such contracts and documents as may be deemed necessary by Lender.

6.4    RIGHT TO ACT TO CAUSE CONSTRUCTION TO BE COMPLETED - Borrower further hereby authorizes Lender, at its option, upon or at any time after an Event of Default and during the continuance thereof, and in addition to any other right or remedy described in this Agreement, either in its own name or in the name of Borrower and/or Contractor, to do any and all things necessary or expedient in the opinion of Lender to secure the performance of the construction contracts and to secure the erection and completion of the Improvements substantially in accordance with the Plans and Specifications, and to accept the Improvements as completed or substantially completed, and to do any and every act or thing pertaining to or arising

out of the construction or completion of the Improvements or any contract therefor, disbursing all or any part of the Undisbursed Project Funds for such purposes.

6.5 <u>COLLATERAL</u> — Upon the occurrence of an Event of Default and during the continuance thereof, Lender may, at its option, without notice to Borrower or any Affiliate of Borrower or without regard to the adequacy of the Collateral for the payment of the Loan, appoint one or more receivers of the Collateral, and Borrower hereby irrevocably consents to such appointment, with such receivers having all the usual powers and duties of receivers in similar cases, including the full power to maintain, sell, dispose and otherwise operate the Collateral upon such terms that may be approved by a court of competent jurisdiction.

6.6 <u>RIGHTS AND REMEDIES NON-EXCLUSIVE</u> - In addition to the specific rights and remedies hereinabove mentioned, upon the occurrence of an Event of Default and during the continuance thereof, Lender shall have the right to avail itself of any other rights or remedies to which it may be entitled under any then existing Laws including, but not limited to, the right to realize upon any or all of the Collateral and/or the right to enforce the Continuing Guaranty and/or the Completion Guaranty, and to do so in any order. Furthermore, the rights and remedies set forth above are not exclusive, and Lender may avail itself of any individual right or remedy set forth in this Agreement, or available under such Laws, without utilizing any other right or remedy. By way of example, and not by way of limitation, no remedy set forth herein shall affect any statutory or common law remedies that Lender may have for any misrepresentation, non-disclosure or concealment by Borrower.

6.7 <u>ENFORCEMENT OF RIGHTS</u> - Upon, or at any time after, the occurrence of an Event of Default, Lender may enforce any and all rights and remedies under the Loan Documents, the Construction Deed of Trust (Leasehold) and all other documents delivered in connection therewith and against any or all Collateral and may pursue all rights and remedies available at Law or in equity.

ARTICLE VII.
<u>GENERAL CONDITIONS AND MISCELLANEOUS</u>

7.

7.1 <u>NONLIABILITY OF LENDER</u> - Borrower acknowledges and agrees that by accepting or approving anything required to be observed, performed, fulfilled, or given to Lender pursuant to the Loan Documents, including any certificate, statement of profit and loss, or other Financial Statement, survey, appraisal or insurance policy, Lender shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision, or condition thereof, and such acceptance or approval thereof shall not be or constitute any warranty or representation to anyone with respect thereto by Lender.

7.2 <u>NO THIRD PARTIES BENEFITTED</u> - This Agreement is made for the purpose of defining and setting forth certain obligations, rights, and duties of Borrower and Lender in connection with the Loan and shall be deemed a supplement to the Note and the Loan Documents, and shall not be construed as a modification of the Note or the Loan Documents, except as provided herein. This Agreement is made for the sole protection of Borrower and Lender, and

Lender's successors and assigns. No Persons other than Borrower and Lender shall have any rights of any nature hereunder or by reason hereof or the right to rely hereon. In the event of a conflict between this Agreement and the Note, the provisions of the Note shall control. In the event of a conflict between this Agreement and the Construction Deed of Trust (Leasehold), this Agreement shall control.

7.3     INDEMNITY BY BORROWER - Except to the extent arising from Lender's gross negligence or willful misconduct, Borrower hereby indemnifies and agrees to hold Lender and its directors, officers, agents, and employees (individually and collectively, the "Indemnitee(s)") harmless from and against:

7.3.1     Any and all claims, demands, actions, or causes of action that are asserted against any Indemnitee by any Person if the claim, demand, action, or cause of action, directly or indirectly, relates to a claim, demand, action, or cause of action that the Person has or asserts against Borrower;

7.3.2     Any and all claims, demands, actions, or causes of action that are asserted against any Indemnitee by any Person which arise from or relate to any stop notice, stop payment notice, mechanics' lien or related proceeding relating to the Property, the fee estate in the real property which is bounded by Orantethorpe Avenue, Brenner Avenue, Melrose Street and Beach Boulevard to the extent now owned or hereafter owned by Borrower, Ground Lessor, or any affiliate of Borrower or Ground Lessor (the "Block"), (including the Property described in Exhibit "C"), the Project, the Project Funds, the Undisbursed Project Funds, the Construction Loan Proceeds, or any other actual or alleged failure to pay or perform in connection with the Property, the Block (including the fee estate in the Property described in Exhibit "C"), the Project, the Project Funds, the Undisbursed Project Funds, or the Construction Loan Proceeds; or

7.3.3     Any and all liabilities, losses, costs, or expenses (including court costs and attorneys' fees) that any Indemnitee suffers or incurs as a result of the assertion of any claim, demand, action, cause of action, mechanics' lien or other matter specified in this Section 7.3.

7.4     CHANGE IN LAWS - In the event of the enactment, after the date of this Agreement, of any Laws: (a) deducting from the value of property for the purpose of taxation any lien or security interest thereon; (b) imposing upon Lender the payment of the whole or any part of the taxes or assessments or charges or liens herein required to be paid by Borrower; (c) changing in any way the Laws relating to the taxation of deeds of trust or mortgages or security agreements, or debts secured by deeds of trust or mortgages or security agreements, or the interest of the mortgage or secured party in the property covered thereby; or (d) the manner of collection of such taxes; then, to the extent any of the foregoing may affect the Construction Deed of Trust (Leasehold) or the indebtedness secured thereby, or Lender, then, and in any such event, Borrower, upon demand by Lender, shall pay such taxes, assessments, charges, or liens, or reimburse Lender therefor. If Borrower shall be prohibited from paying such tax or from reimbursing Lender for the amount thereof, Borrower shall execute a modification to the Loan Documents and the Note, which modification shall increase the interest rate payable pursuant to the Note so as to permit Lender to maintain its yield as if such tax had not been imposed. If Borrower shall be prohibited from executing the above-referenced modifications, Lender may, in Lender's sole discretion, declare the

principal of all amounts disbursed and owing under the Note, this Agreement, and the other Loan Documents (including all obligations secured by the Loan Documents) and all other indebtedness of Borrower to Lender, together with interest thereon, to be forthwith due and payable, regardless of any other specified maturity or due date.

7.5    POWER OF ATTORNEY - Upon the occurrence of an Event of Default and during the continuance thereof, Borrower does hereby irrevocably appoint, designate, empower, and authorize Lender, as Borrower's agent, under power of attorney, coupled with an interest, to sign and file for record any notices of completion, notices of cessation of labor, or any other notice or written document that it may deem necessary to file or record to protect Lender's interests.

7.6    NONRESPONSIBILITY - Lender shall in no way be liable for any acts or omissions of Borrower, Borrower's agents or employees, Contractor, and Subcontractor, or any Person furnishing labor and/or materials used in or related to such construction.

7.7    TIME IS OF THE ESSENCE - Time is of the essence of this Agreement and of each and every provision hereof, to the full extent that time can be of the essence of an agreement under the Laws of the State of California.

7.8    NON-WAIVER - The waiver by Lender of any breach or breaches hereof shall not be deemed, nor shall the same constitute, a waiver of any subsequent breach or breaches.

7.9    BINDING EFFECT; ASSIGNMENT - This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns, except that Borrower may not assign its rights hereunder or any interest therein without the prior written consent of Lender. Lender shall have the right to assign its rights under this Agreement and to grant participations in the Loan to others, but all waivers or abridgements of Borrower's obligations that may be granted from time to time by Lender shall be binding upon such assignees or participants, but any such waivers or agreements, to be effective, must be in writing and signed by Lender. Borrower shall, promptly upon demand, provide Lender or any such purchaser or participant, one or more written statements confirming Borrower's indebtedness to Lender and all obligations in connection with the Loan, including the existence of any default thereunder.

7.10    EXECUTION IN COUNTERPARTS - This Agreement and any other Loan Documents, except the Note, the Construction Deed of Trust (Leasehold), and the Assignment of Leases (Leasehold), may be executed in any number of counterparts, and any party hereto or thereto may execute any counterpart, each of which, when executed and delivered, will be deemed to be an original, and all of which counterparts of this Agreement or any other Loan Document, as the case may be, taken together will be deemed to be but one and the same instrument. The execution of this Agreement or any other Loan Document by any party or parties hereto will not become effective until counterparts hereof or thereof, as the case may be, have been executed by all the parties hereto or thereto.

7.11    INTEGRATION; AMENDMENTS; CONSENTS - This Agreement, together with the documents referred to herein, constitutes the entire agreement of the parties

touching upon the subject matter hereof, and supersedes any prior negotiations or agreements on such subject matter. No amendment, modification, or supplement of any provision of this Agreement or any of the other Loan Documents shall be effective unless in writing, signed by Lender and Borrower; and no waiver of any of Borrower's obligations under this Agreement or any of the other Loan Documents or consent to any departure by Borrower therefrom shall be effective unless in writing, signed by Lender,, and then only in the specific instance and for the specific purpose given.

7.12   NEUTRAL INTERPRETATION - This Agreement is the product of the negotiations between the parties, and in the interpretation and/or enforcement hereof is not to be interpreted more strongly in favor of one party or the other.

7.13   COSTS, EXPENSES, AND TAXES - Borrower shall pay to Lender, on demand:

7.13.1  Attorneys' fees and out-of-pocket expenses incurred by Lender in connection with the negotiation, preparation, execution, delivery, and administration of this Agreement and any other Loan Document and any matter related thereto, including, but not limited to, consultants and appraisal of the Project, all of which shall also be deemed to be Approved Costs;

7.13.2  The costs and expenses of Lender in connection with theenforcement of this Agreement and any other Loan Document and any matter related thereto, including the fees and out-of-pocket expenses of any legal counsel, independent public accountants, and other outside experts retained by Lender and including all costs and expenses of enforcing any judgment or prosecuting any appeal of any judgment, order or award arising out of or in any way related to the Loan, this Agreement, or the Loan Documents; and

7.13.3  All costs, expenses, fees, premiums, and other charges relating to or arising from the Loan Documents or any transactions contemplated thereby or the compliance with any of the terms and conditions thereof, including, but not limited to, recording fees, filing fees, credit report fees, release or reconveyance fees, title insurance premiums, all fees, costs and charges of the Fund Control, all fees costs and charges in connection with any third party project analysis, construction inspection fees, and the cost of realty tax service for the term of the Loan.

Except as otherwise provided in the Environmental Indemnity, all sums paid or expended by Lender under the terms of this Agreement shall be considered to be, and shall be, a part of the Loan. All such sums, together with all amounts to be paid by Borrower pursuant to this Agreement, shall bear interest from the date of expenditure at the rate provided in the Note, shall be secured by the Loan Documents, and shall be immediately due and payable by Borrower upon demand.

7.14   SURVIVAL OF REPRESENTATIONS AND WARRANTIES - All representations and warranties of Borrower contained herein or in any and all other Loan Documents shall survive the making of the Loan and the execution and delivery of the Note, and are material and have been or will be relied upon by Lender, notwithstanding any investigation made by Lender or on behalf of Lender. For the purpose of this Agreement, all statements contained in any certificate, agreement, Financial Statement, appraisal or other writing certified and by or on behalf of Borrower, delivered by or on behalf of Borrower pursuant hereto or to any other Loan Document or

in connection with the transactions contemplated hereby or thereby shall be deemed to be representations and warranties of Borrower contained herein or in the other Loan Documents, as the case may be.

7.15    NOTICES - Except as provided in the Construction Deed of Trust (Leasehold), all notices, requests, demands, directions, and other communications provided for hereunder and under any other Loan Document (a "Notice") must be in writing and must be mailed, delivered, or sent by facsimile transmission to the appropriate party at its respective address set forth below or, as to any party, at any other address as may be designated by it in a written Notice sent to the other parties in accordance with this Section 7.15. Any Notice given by facsimile transmission must be confirmed within forty-eight (48) hours by letter mailed or delivered to the appropriate party at its respective address. If any Notice is given by mail it will be effective three (3) calendar days after being deposited in the mails with first-class or airmail postage prepaid; if given by facsimile transmission, when sent; or if given by personal delivery, when delivered.

7.16    FURTHER ASSURANCES - Borrower shall, at its sole expense and without expense to Lender, do, execute, and deliver such further acts and documents as Lender from time to time may reasonably require for the purpose of assuring and confirming unto Lender the rights hereby created or intended, or for carrying out the intention or facilitating the performance of the terms of any Loan Document, or for assuring the validity of any security interest.

7.17    GOVERNING LAW - The Loan shall be deemed to have been made in California, and the Loan Documents shall be governed by and construed and enforced in accordance with the Laws of the State of California. If there is a lawsuit, Borrower agrees, upon Lender's request, to submit to the jurisdiction of the courts, state or federal, of Los Angeles County, California.

7.18    SEVERABILITY OF PROVISIONS - Any provision in any Loan Document that is held to be inoperative, unenforceable, or invalid shall be inoperative, unenforceable, or invalid without affecting the remaining provisions, and to this end the provisions of all Loan Documents are declared to be severable.

7.19    JOINT AND SEVERAL OBLIGATIONS - If this Agreement is executed by more than one Person as Borrower, the obligations of each of such Persons hereunder shall be joint and several obligations.

7.20    CONSTRUCTION - Whenever the context of this Agreement requires, the singular shall include the plural and the masculine gender shall include the feminine and/or neuter.

7.21    HEADINGS - Article and section headings in this Agreement are included for convenience of reference only and are not part of this Agreement for any other purpose.

7.22    AGENCY — Nothing in this Agreement shall be construed to constitute the creation of a partnership or joint venture between Lender and Borrower. Lender is not an agent or representative of Borrower.

7.23   USA PATRIOT ACT NOTICE — Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account or obtains a loan. Lender will ask for Borrower's legal name, address, tax ID number or social security number and other identifying information. Lender may also ask for additional information or documentation or take other actions reasonably necessary to verify the identity of Borrower, Guarantor or other related persons.

7.24   WAIVER OF RIGHT TO TRIAL BY JURY; JUDICIAL REFERENCE IN THE EVENT OF JURY TRIAL WAIVER UNENFORCEABILITY.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (1) ARISING UNDER THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION THEREWITH, OR (2) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY. NOTWITHSTANDING THE FOREGOING TO THE CONTRARY, IN THE EVENT THAT THE JURY TRIAL WAIVER CONTAINED HEREIN SHALL BE HELD OR DEEMED TO BE UNENFORCEABLE, EACH PARTY HERETO HEREBY EXPRESSLY AGREES TO SUBMIT TO JUDICIAL REFERENCE ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION ARISING HEREUNDER FOR WHICH A JURY TRIAL WOULD OTHERWISE BE APPLICABLE OR AVAILABLE. PURSUANT TO SUCH JUDICIAL REFERENCE, THE PARTIES AGREE TO THE APPOINTMENT OF A SINGLE REFEREE AND SHALL USE THEIR BEST EFFORTS TO AGREE ON THE SELECTION OF A REFEREE. IF THE PARTIES ARE UNABLE TO AGREE ON A SINGLE REFEREE, A REFEREE SHALL BE APPOINTED BY THE COURT TO HEAR ANY DISPUTES HEREUNDER IN LIEU OF ANY SUCH JURY TRIAL. EACH PARTY ACKNOWLEDGES AND AGREES THAT THE APPOINTED REFEREE SHALL HAVE THE POWER TO DECIDE ALL ISSUES IN THE APPLICABLE ACTION OR PROCEEDING, WHETHER OF FACT OR LAW, AND SHALL REPORT A STATEMENT OF DECISION THEREON; PROVIDED, HOWEVER, THAT ANY MATTERS WHICH WOULD NOT OTHERWISE BE THE SUBJECT OF A JURY TRIAL WILL BE UNAFFECTED BY THIS WAIVER AND THE AGREEMENTS CONTAINED HEREIN. THE PARTIES HERETO HEREBY AGREE THAT THE PROVISIONS CONTAINED HEREIN HAVE BEEN FAIRLY NEGOTIATED ON AN ARM'S-LENGTH BASIS, WITH BOTH SIDES AGREEING TO THE SAME KNOWINGLY AND BEING AFFORDED THE OPPORTUNITY TO HAVE THEIR RESPECTIVE LEGAL COUNSEL CONSENT TO THE MATTERS CONTAINED HEREIN. ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY AND THE AGREEMENTS CONTAINED HEREIN REGARDING THE APPLICATION OF JUDICIAL REFERENCE IN THE EVENT OF THE INVALIDITY OF SUCH JURY TRIAL WAIVER.

Borrower and Lender have each initialed this Section 7.24 to further indicate their awareness and acceptance of each and every provision hereof.

_____          _____
Borrower's Initials                          Lender's Initials

IN WITNESS WHEREOF, Borrower and Lender have hereunto caused this Agreement to be executed as of the date first above written.

BORROWER:

THE SOURCE HOTEL, LLC,
a California limited liability company

By: M + D Properties, a California corporation
Its:    Manager

By:    _Ponula Quee_
Name: Donald Chae
Its:    President

LENDER:

EVERTRUST BANK,
a California banking corporation

By:    _Jell_
Name: _Robert Soto_
Its:    _EVP/COO_

Borrower's Address:

Borrower's Address:
3100 East Imperial Highway
Lynwood, California 90262
Attn: Donald Chae & Min Chae
Fax:  _714-521-4256_

With a copy to:
LIM, RUGER & KIM, LLP
1055 West 7th Street, Suite 2800
Los Angeles, California 90017
Attn: Real Estate Department
Fax: (213) 955-9511

Lender's Address:
18645 E. Gale Avenue, Suite 110
City of Industry, California 91748
Attn: Annie Ng, First Vice President / Loan
Service Manager Administration
Fax: (626) 854-9710

# EXHIBIT "A"
LEGAL DESCRIPTION

[SEE ATTACHED.]

The land referred to herein is situated in the State of California, County of Orange and described as follows:

THAT PORTION OF LOT 2 IN BLOCK 61 OF BUENA PARK, IN THE CITY OF BUENA PARK, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 18, PAGES 50 TO 52 INCLUSIVE, OF MISCELLANEOUS MAPS, AND THOSE PORTIONS OF LOTS 5 TO 9 INCLUSIVE OF TRACT NO. 1756, AS PER MAP RECORDED IN BOOK 60 PAGES 20 AND 21 OF MISCELLANEOUS MAPS, ALL IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

PARCEL 4A (LEVEL 1 - GROUND FLOOR LOBBY & ENTRANCE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 215.36 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 45.77 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE S 00°00'02" W 86.05 FEET, THENCE N 89°59'59" W 22.68 FEET, THENCE S 00°01'05" W 13.56 FEET, THENCE S 89°59'59" E 22.57 FEET, THENCE S 00° 00'02" W 8.22 FEET, THENCE N 89°59'58" W 0.77 FEET, THENCE S 00°00'02" W 34.16, THENCE N 89°59'58" W 110.62 FEET, THENCE N 00°00'02" E 34.17 FEET, THENCE N 89°59'58" W 30.58 FEET, THENCE N 00°00'02" E 107.52 FEET, THENCE N 89°59'58" W 0.83 FEET; THENCE N 00°00'02" E 8.95 FEET, THENCE S 89°59'58" E 24.08 FEET, THENCE N 46°29'04" E 12.47 FEET, THENCE N 00°00'02" E 16.97 FEET, THENCE S 89°59'58" E 18.12 FEET, THENCE N 00°00'02" E 5.22 FEET, THENCE N 89°57'39" E 30.73 FEET, THENCE N 00°00'02" E 32.17 FEET, THENCE N 89°59'58" W 11.92 FEET, THENCE N 00°00'02" E 1.00 FEET, THENCE S 89°59'58" E 0.50 FEET, THENCE N 00°00'02" E 14.21 FEET, THENCE S 89°59'58" E 39.78 FEET, THENCE S 00°00'02" W 86.82 FEET, THENCE S 89°59'58" E 32.58 FEEL TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 77.76 FEET.

PARCEL 4B (LEVEL 1 - GROUND FLOOR STAIRS ON ORANGETHORPE AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF ORANGETHORPE AVENUE AS SHOWN ON SAID MAP S 89°27'51" E 199.02 FEET; THENCE LEAVING SAID CENTERLINE N 0°32'09" E 60.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE N 0°00'02" E 36.96 FEET; THENCE S 89°59'58" E 14.74 FEET; THENCE S 0°00'02" W TO A POINT ON SAID PARALLEL LINE; THENCE ALONG SAID PARALLEL LINE N 89°27'51" W 14.74 TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 77.76 FEET.

PARCEL 4C (LEVEL 1 - GROUND FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 339.38 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 46.71 FEET TO THE TRUE POINT OF

BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 23.40 FEET; THENCE SOUTH 7.24 FEET; THENCE WEST 5.88 FEET; THENCE SOUTH 6.55 FEET; THENCE WEST 29.28 FEET; THENCE NORTH 13.79 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 77.76 FEET.

PARCEL 4D (LEVEL 2 - SECOND FLOOR HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 223.82 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE S 00°27'49" W 94.43 FEET; THENCE N 89°59'59" W 31.75 FEET; THENCE S 00°01'05" W 13.56 FEET; THENCE S 89°59'59" E 31.65 FEET; THENCE S 00°27'49" W 36.79 FEET; THENCE S 45°29'59" W 26.85 FEET; THENCE N 89°27'51" W 110.52 FEET; THENCE N 00°00'02" E 36.98 FEET; THENCE N 89°59'58" W 19.37 FEET; THENCE S 00°00'02" W 25.13 FEET; THENCE N 89°59'58" W 12.81 FEET; THENCE N 00°00'02" E 90.73 FEET; THENCE S 89°59'58" E 62.50 FEET; THENCE N 00°00'00" E 30.00 FEET; THENCE S 89°59'58" E 15.42 FEET; THENCE N 00°00'02" E 29.98 FEET; THENCE S 89°59'58" E 85.09 FEET; TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET.

PARCEL 4E (LEVEL 2 - SECOND FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 339.38 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 46.71 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 23.40 FEET; THENCE SOUTH 7.24 FEET; THENCE WEST 5.88 FEET; THENCE SOUTH 6.55 FEET; THENCE WEST 29.28 FEET; THENCE NORTH 13.79 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET.

PARCEL 4F (LEVEL 3 -THIRD FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 339.38 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 46.71 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 23.40 FEET; THENCE SOUTH 7.24 FEET; THENCE WEST 5.88 FEET; THENCE SOUTH 6.55 FEET; THENCE WEST 29.28 FEET; THENCE NORTH 13.79 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET.

PARCEL 4G (LEVEL 3 - THIRD FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND

BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE
CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 186.84 FEET; THENCE
LEAVING SAID CENTERLINE N 89°32'11" W 45.54 FEET TO THE TRUE POINT OF BEGINNING OF
THE HEREIN DESCRIBED PARCEL; THENCE WEST 22.05 FEET; THENCE SOUTH 9.15 FEET;
THENCE EAST 5.84 FEET; THENCE SOUTH 10.38 FEET; THENCE WEST 1.58 FEET; THENCE
SOUTH 4.17 FEET; THENCE EAST 9.81 FEET; THENCE SOUTH 10.37 FEET; THENCE EAST 12.08
FEET; THENCE NORTH 9.62 FEET; THENCE EAST 1.44 FEET; THENCE NORTH 24.44 FEET TO THE
SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN
ELEVATION OF 150.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76
FEET.

PARCEL 4H (LEVEL 3 - THIRD FLOOR STAIRS ON ORANGETHORPE AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND
BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE
CENTERLINE OF ORANGETHOPE AVENUE AS SHOWN ON SAID MAP S 89°27'51" E 199.02 FEET;
THENCE LEAVING SAID CENTERLINE N 0°32'09" E 60.00 FEET TO A POINT ON A LINE PARALLEL
WITH, AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE
OF ORANGETHORPE AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN
DESCRIBED PARCEL; THENCE N 0°00'02" E 36.96 FEET; THENCE S 89°59'58" E 14.74 FEET;
THENCE S 0°00'02" W TO A POINT ON SAID PARALLEL LINE; THENCE ALONG SAID PARALLEL
LINE N 89°27'51" W 14.74 TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN
ELEVATION OF 150.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76
FEET.

PARCEL 4I (LEVEL 4 - FOURTH FLOOR HOTEL PARCEL INCLUDING DECK)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND
BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE
CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE
LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH,
AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF
BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL;
THENCE WEST 72.90 FEET; THENCE SOUTH 13.76 FEET; THENCE WEST 18.27 FEET; THENCE
SOUTH 114.50 FEET; THENCE WEST 92.89 FEET; THENCE SOUTH 130.52 FEET; THENCE EAST
12.99 FEET; THENCE SOUTH 32.75 FEET TO A POINT ON A LINE PARALLEL WITH AND 60.00 FEET
NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE
AVENUE; THENCE ALONG SAID PARALLEL LINE S 89°27'51" E 143.94 FEET; THENCE N 45°29'59" E
26.85 FEET TO A POINT ON SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE;
THENCE ALONG LAST SAID PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF
BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN
ELEVATION OF 161.18 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76
FEET.

PARCEL 4J (LEVEL 5 - FIFTH FLOOR HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND
BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE
CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE
LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH,
AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF
BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL;
THENCE WEST 72.90 FEET; THENCE SOUTH 165.38 FEET; THENCE WEST 6.81 FEET; THENCE

SOUTH 20.33 FEET; THENCE EAST 6.81 FEET; THENCE SOUTH 28.65 FEET; THENCE WEST 105.43
FEET; THENCE SOUTH 44.42 FEET; THENCE EAST 12.99 FEET; THENCE SOUTH 32.75 FEET TO A
POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT
ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE; THENCE ALONG SAID
PARALLEL LINE S 89°27'51" E 143.94 FEET; THENCE N 45°29'59" E 26.85 FEET TO A POINT ON
SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE; THENCE ALONG LAST SAID
PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN
ELEVATION OF 171.60 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 161.18
FEET.

PARCEL 4K (LEVEL 6 - SIXTH FLOOR HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE
AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE
CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE
LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH,
AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF
BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL;
THENCE WEST 72.90 FEET; THENCE SOUTH 165.38 FEET; THENCE WEST 6.81 FEET; THENCE
SOUTH 20.33 FEET; THENCE EAST 6.81 FEET; THENCE SOUTH 28.65 FEET; THENCE WEST 105.43
FEET; THENCE SOUTH 44.42 FEET; THENCE EAST 11.33 FEET; THENCE SOUTH 32.75 FEET TO A
POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT
ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE; THENCE ALONG SAID
PARALLEL LINE S 89°27'51" E 145.60 FEET; THENCE N 45°29'59" E 26.85 FEET TO A POINT ON
SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE; THENCE ALONG LAST SAID
PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN
ELEVATION OF 182.02 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 171.60
FEET.

PARCEL 4L (LEVEL 7 - SEVENTH FLOOR & ROOF HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE
AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE
CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE
LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH,
AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF
BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL;
THENCE WEST 72.90 FEET; THENCE SOUTH 165.38 FEET; THENCE WEST 6.81 FEET; THENCE
SOUTH 20.33 FEET; THENCE EAST 6.81 FEET; THENCE SOUTH 28.65 FEET; THENCE WEST 105.43
FEET; THENCE SOUTH 44.42 FEET; THENCE EAST 12.99 FEET; THENCE SOUTH 32.75 FEET TO A
POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT
ANGLES FROM, SAID CENTERLINE OF OANGETHORPE AVENUE; THENCE ALONG SAID
PARALLEL LINE S 89°27'51" E 143.94 FEET; THENCE N 45°29'59" E 26.85 FEET TO A POINT ON
SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE; THENCE ALONG LAST SAID
PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN
ELEVATION OF 210.00 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 182.02
FEET.

ELEVATIONS STATED HEREON ARE BASED ON THE NORTH AMERICAN VERTICAL DATUM OF
1988 (NAVD88) PER THE YEAR 2005 ADJUSTMENT BY THE ORANGE COUNTY SURVEYOR, USING
THE FOLLOWING BENCHMARK:

OCS BM 404-31-05 ELEV.=80.151 FEET (NAVD88, YEAR 2005 LEVELED) STATION IS AN OCS

ALUMINUM DISK STAMPED 404-31-05 SET IN THE SE'LY CORNER OF A 15 FT. X 4.5 FT.
CONCRETE CATCH BASIN, LOCATED IN NE'LY PORTION OF INTERSECTION OF STANTON AVE. &
ARTESIA BLVD., 28 FT. N'LY OF THE CENTERLINE OF ARTESIA BLVD. & 81 FT. E'LY OF THE
CENTERLINE OF STANTON AVENUE. MONUMENT IS LEVEL WITH THE SIDEWALK

APN: 276-361-20 and 276-361-22
(End of Legal Description)

2123922.6

68

**<u>EXHIBIT "B-1"</u>**

COST BREAKDOWN / CONSTRUCTION HARD COSTS


[See attached.]

the Source Hotel - HC budget
2/18/2016

| | Subcontractors | Description | Current Budget | Payments to Date (Net) | Total Retention | Paid-to-date incl. Retention | Balance incl. Retention | Balance less Retention | Total Cost to Compl. |
|---|---|---|---|---|---|---|---|---|---|
| 1 | | Surveying | $ 57,640.00 | $ | $ | | $ 57,640.00 | $ 57,640.00 | $ 57,640.00 |
| 1a | Cabrillo Hoist | Manhoist | $ 160,590.00 | $ 55,073.50 | $ | $ 55,073.50 | $ 104,916.50 | $ 104,916.50 | $ 160,590.00 |
| 2 | Malcolm Engineering | Shoring | $ 30,540.00 | $ 30,540.00 | $ | $ 30,540.00 | $ | $ | $ 30,540.00 |
| 3 | LD Anderson | Earthwork | $ 259,551.11 | $ 235,418.00 | $ 23,933.11 | $ 259,351.11 | $ 25,933.11 | $ 0.00 | $ 259,551.11 |
| 4 | Svinicki Concrete Services | Concrete Lvl 1-3 | $ 1,705,512.00 | $ 1,377,588.00 | $ 8,163.00 | $ 1,705,512.00 | $ 8,163.00 | $ 10.00 | $ 1,705,512.00 |
| 4a | | Concrete | $ 1,871,725.00 | $ | $ | | $ 1,871,725.00 | $ 1,871,725.00 | $ 1,871,725.00 |
| 5 | Rebar Engineering | Rebar | $ 684,870.00 | $ | $ | | $ 684,870.00 | $ 684,870.00 | $ 684,870.00 |
| 5a | Rebar Engineering | Rebar- Lvl 1-3 | $ 876,594.00 | $ 769,935.00 | $ 87,059.00 | $ 876,994.00 | $ 87,059.00 | $ 0.00 | $ 876,594.00 |
| 6 | Foundation Service | Graphics | $ 344,400.00 | $ 344,400.00 | $ | $ 344,400.00 | $ | $ | $ 344,400.00 |
| 7 | Columbia Steel | Structural Steel | $ 321,417.00 | $ 109,276.90 | $ 12,141.79 | $ 121,417.00 | $ 12,141.79 | $ | $ 321,417.00 |
| 7b | Columbia Steel | Podium Steel | $ 1,027,022.00 | $ 572,069.70 | $ 100,567.89 | $ 673,566.76 | $ 454,552.28 | $ 353,185.24 | $ 1,027,022.00 |
| 7A | Coolteck, Inc | Struct Steel lvl 1-3 | $ 2,513,860.00 | $ 2,186,420.56 | $ 97,827.29 | $ 2,290,247.79 | $ 519,439.44 | $ 225,612.31 | $ 2,513,680.00 |
| 8 | | Mist Steel | $ 295,982.00 | $ | $ | | $ 295,982.00 | $ 295,982.00 | $ 295,982.00 |
| 9 | | Decking | $ 583,426.00 | $ | $ | | $ 583,426.00 | $ 583,426.00 | $ 583,426.00 |
| 10 | | Fireproofing | $ 504,960.00 | $ | $ | | $ 584,960.00 | $ 504,960.00 | $ 504,960.00 |
| 11 | | Exterior Framing | $ 835,913.00 | $ | $ | | $ 835,913.00 | $ 835,913.00 | $ 835,913.00 |
| 11A | | Interior Framing | $ 5,437,078.00 | $ | $ | | $ 5,437,078.00 | $ 5,437,078.00 | $ 5,437,078.00 |
| 11B | | Insulation | $ 361,856.00 | $ | $ | | $ 361,856.00 | $ 361,856.00 | $ 361,856.00 |
| 12 | | Waterproofing | $ 135,650.00 | $ | $ | | $ 135,650.00 | $ 135,650.00 | $ 135,650.00 |
| 13 | | Sheet Metal | $ 253,465.00 | $ | $ | | $ 253,465.00 | $ 253,465.00 | $ 253,465.00 |
| 14 | | Doors & Hardware | $ 940,500.00 | $ | $ | | $ 940,500.00 | $ 940,500.00 | $ 940,500.00 |
| 15 | | Ext. Glass and Glazing | $ 1,173,995.00 | $ | $ | | $ 1,173,995.00 | $ 1,173,995.00 | $ 1,173,995.00 |
| 15A | | Int. Glass and Glazing | $ 349,000.00 | $ | $ | | $ 349,000.00 | $ 349,000.00 | $ 349,000.00 |
| 15B | | Railing | $ 279,655.00 | $ | $ | | $ 279,655.00 | $ 279,655.00 | $ 379,655.00 |
| 16 | | Painting S&C | $ 133,657.00 | $ | $ | | $ 133,657.01 | $ 133,657.00 | $ 133,657.00 |
| 16A | | Int. Painting | $ 192,721.00 | $ | $ | | $ 192,721.00 | $ 192,721.00 | $ 192,721.00 |
| 17 | | Signage | $ 64,250.00 | $ | $ | | $ 64,250.00 | $ 64,250.00 | $ 64,250.00 |
| 18 | | Roofing | $ 542,860.00 | $ | $ | | $ 542,860.00 | $ 542,500.00 | $ 542,860.00 |
| 19 | | Finish Carpentry | $ 409,400.00 | $ | $ | | $ 409,400.00 | $ 409,400.00 | $ 409,400.00 |
| 20 | | Misc Specialties | $ 63,150.00 | $ | $ | | $ 63,150.00 | $ 63,150.00 | $ 63,150.00 |
| 21 | | Stairs | $ 816,690.00 | $ | $ | | $ 816,690.00 | $ 816,690.00 | $ 816,690.00 |
| 21A | American Stairs | Stairs- FOB Embeds | $ 13,000.00 | $ 13,700.00 | $ 1,300.00 | $ 13,000.00 | $ 1,300.00 | $ | $ 13,000.00 |
| 22 | | Ceramic Tile | $ 3,378,785.00 | $ | $ | | $ 3,378,785.00 | $ 3,378,785.00 | $ 3,378,785.00 |
| 23 | | Acoustical Ceilings | $ 105,291.00 | $ | $ | | $ 104,591.00 | $ 105,291.00 | $ 105,291.00 |
| 24 | | Flooring | $ 626,817.00 | $ | $ | | $ 626,817.00 | $ 626,817.00 | $ 626,817.00 |
| 25 | | Wall Coverings | $ 625,068.00 | $ | $ | | $ 625,068.00 | $ 625,068.00 | $ 625,068.00 |
| 26 | | Conveying | $ 860,000.00 | $ | $ | | $ 860,000.00 | $ 860,000.00 | $ 860,000.00 |
| 27 | | Mechanical S&C | $ 573,087.00 | $ | $ | | $ 573,087.00 | $ 573,087.00 | $ 573,087.00 |
| 27a | Control Air | Mech.- S&C Design | $ 62,400.00 | $ 62,400.00 | $ | $ 62,400.00 | $ | $ | $ 62,400.00 |
| 27b | | Mech.- Build Out | $ 2,134,203.00 | $ | $ | | $ 2,184,203.00 | $ 2,184,203.00 | $ 2,184,203.00 |
| 28 | | Electrical | $ 2,224,805.00 | $ | $ | | $ 2,224,805.00 | $ 2,224,805.00 | $ 2,224,805.00 |
| 29 | Pan Pacific | Plumb- Lvl 1-3 | $ 982,479.00 | $ 828,763.30 | $ 92,084.50 | $ 920,848.80 | $ 135,715.50 | $ 61,656.00 | $ 982,479.00 |
| 29A | Pan Pacific | Plumbing S&C | $ 3,442,852.00 | $ | $ | | $ 3,442,852.03 | $ 3,442,852.00 | $ 3,442,852.00 |
| 29b | Pan Pacific | Plumb.- S&C Design | $ 654,993.00 | $ 29,304.23 | $ 3,124.91 | $ 32,449.14 | $ 625,735.77 | $ 622,541.86 | $ 654,993.00 |
| 29c | | Plumbing Build Out | $ 32,448.88 | $ | $ | | $ 32,448.88 | $ 32,448.88 | $ 32,448.88 |
| 30 | | Fire Protection | $ 981,250.00 | $ | $ | | $ 981,250.00 | $ 981,250.00 | $ 981,250.00 |
| 31 | | Equipment | $ 234,769.00 | $ | $ | | $ 234,769.00 | $ 234,769.00 | $ 234,769.00 |
| 32 | | Furnishings | $ 80,964.00 | $ | $ | | $ 80,964.00 | $ 80,964.00 | $ 80,964.00 |
| 01 | Subtotal Direct Costs | Subtotal Direct Costs | $ 37,298,746.00 | $ 6,559,903.25 | $ 429,352.45 | $ 7,988,336.50 | $ 30,280,242.14 | $ 29,851,429.70 | $ 37,298,746.00 |
| 021 | General Requirement | | $ 372,307.30 | $ 29,236.72 | $ | $ 29,236.72 | $ 369,060.31 | $ 569,060.28 | $ 372,307.00 |
| 022 | General Conditions | CM Staffing & Labor | $ 690,000.00 | $ | $ | | $ 690,000.00 | $ 690,000.00 | $ 690,000.00 |
| 023 | General Contractors Fee | CM Fee - 1.10% | $ 583,308.00 | $ 155,353.00 | $ | $ 155,353.00 | $ 453,035.00 | $ 453,035.00 | $ 583,308.00 |
| 024 | Contingency | 5% of Direct HC | $ 1,863,937.00 | $ | $ | | $ 1,863,937.00 | $ 1,863,937.00 | $ 1,863,937.00 |
| 02 | Subtotal - GENERAL CONDITION | Subtotal - GENERAL CONDITION | $ 3,340,375.00 | $ 235,359.00 | $ | $ 195,359.00 | $ 3,005,022.00 | $ 3,005,022.00 | $ 3,340,375.00 |
| 99 | Subtotal. | Total Direct Hard Cost | $ 40,752,518.00 | $ 7,217,693.97 | $ 429,352.45 | $ 7,547,096.50 | $ 33,036,824.43 | $ 35,205,311.86 | $ 40,752,518.00 |

## SCHEDULE 2.7
### ACTIONS

1.      Placo San Bernardino, LLC, an Affiliate of Borrower, filed an action in the SuperiorCourt for San Bernardino County against the City of San Bernardino and its redevelopment agency known as Economic Development Agency (the "Agency"), with respect to a project known as Carousel Mall, in which plaintiff seeks damages and equitable relief for inverse condemnation, violation of civil rights (equal protection, due process), violation of contract rights, breach of contract, and interference with prospective economic advantage. The Agency filed an action in the Superior Court for San Bernardino County against DMC Investment Holdings, LLC, Min Chae and Donald Chae alleging breach of contract with respect to the Carousel Mall project. The City of San Bernardino is the successor agency for the Agency, which by statute has ceased to exist. The litigation is presently subject to an automatic stay because the City has commenced a Chapter 9 bankruptcy proceeding. Borrower is not directly involved in either litigation, and it is not anticipated that the Project or the obligations of Borrower or Guarantor under the Loan Documents will be adversely affected by such litigation.

2.      *Lucky J C Plumbing Co. Inc., a California corporation, v. The Source at Beach, LLC, a California limited liability company; Greenland Construction, LLC, a California limited liability company; 61 South Fair Oaks, LLC d.b.a. 61 S. Fair Oaks, LLC, a business entity of unknown form; Beach Orangethorpe LLC, a California limited liability company; Lexon Insurance Company, a business entity of unknown form; Donald Chae, an individual; and M +D Properties, Inc., a California corporation; and Does 1 to 50, inclusive*, Los Angeles Superior Court Case No. BC541399.

# PROMISSORY NOTE

$29,500,000.00 CITY OF INDUSTRY, CALIFORNIA May 24, 2016

FOR VALUE RECEIVED, THE SOURCE HOTEL, LLC, a California limited liability company ("Borrower"), promises to pay to EVERTRUST BANK, a California banking corporation ("Lender"), or its order, at its office located at 18645 E. Gale Avenue, Suite 110, City of Industry, California 91748, or at such other place as the holder hereof may designate, in lawful money of the United States of America, the maximum principal sum of Twenty Nine Million Five Hundred Thousand and No/100 Dollars ($29,500,000.00), or so much thereof as shall have been advanced and is outstanding together with interest, on the outstanding principal balance, until paid in full in accordance with the terms, conditions and provisions as hereinafter set forth in this Promissory Note (this "Note").

1. **LOAN AGREEMENT.** This Note is the "Note" as defined in that certain Construction Loan Agreement (the "Loan Agreement") of even date herewith, entered into by and between Borrower and Lender, as it may be amended from time to time, and is subject to all of the terms and conditions thereof. All terms not defined herein shall have the same meaning as in the Loan Agreement. In the event of a conflict between the terms of this Note and the Loan Agreement, the terms of this Note shall prevail. Advances under this Note shall be made pursuant to Article III of the Loan Agreement.

2. **INTEREST RATE.** Interest on the outstanding principal balance of this Note shall be computed and calculated based upon a three hundred sixty (360)-day year and actual days elapsed and shall accrue at the per annum rate (the "Note Rate") equal to the greater of (i) five and one half of one percent (5.50%) or (ii) one percent (1.00%) over "The Wall Street Journal Prime Rate", as the rate may change from time to time. The Wall Street Journal Prime Rate is and shall mean the variable rate of interest, on a per annum basis, which is announced and/or published in the Money Rates section of The Wall Street Journal from time to time as its "Prime Rate". The Note Rate shall be redetermined whenever The Wall Street Journal Prime Rate changes. Borrower understands and acknowledges that The Wall Street Journal Prime Rate is one of Lender's base rates, and only serves as a basis upon which effective rates of interest are calculated for loans making, reference thereto and may not be the lowest of Lender's base rates. If The Wall Street Journal Prime Rate becomes unavailable during the term of this Note, Lender may designate a substitute index after written notice to Borrower. Borrower acknowledges that Borrower understands that the calculation of interest based on the foregoing method will result in a higher effective rate of interest than if calculated on a three hundred sixty-five (365)-day year.

3. **PRINCIPAL AND INTEREST PAYMENTS.**

a. Interest shall be due and payable monthly, in arrears, based upon the actual number of days elapsed for that monthly period, commencing on July 1, 2016, and shall continue to be due and payable, in arrears, on the same day of each and every calendar month thereafter until the Maturity Date (as hereinafter defined).

b. Upon the Maturity Date, the entire unpaid obligation outstanding under this Note, the Construction Deed of Trust, the Loan Agreement, and any other Loan Documents shall become due and payable in full.

c. All payments due hereunder, including payments of principal and/or interest, shall be made to Lender in United States Dollars and shall be in the form of immediately available funds acceptable to the holder of this Note.

**4.** **APPLICATION OF PAYMENTS.** All payments received by Lender from, or for the account of Borrower, due hereunder shall be applied by Lender, in its sole and absolute discretion, in the following manner, or in any other order or manner as Lender chooses:

    a.    First. To pay any and all interest due, owing and accrued;

    b.    Second. To pay any and all costs, advances, expenses or fees due, owing and payable to Lender, or paid or incurred by Lender, arising from or out of this Note, the Construction Deed of Trust, the Loan Agreement, and any Loan Documents; and

    c.    Third. To pay the outstanding principal balance of this Note.

All records of payments received by Lender shall be maintained at Lender's office, and the records of Lender shall, absent manifest error, be binding and conclusive upon Borrower. The failure of Lender to record any payment or expense shall not limit or otherwise affect the obligations of Borrower under this Note.

**5.** **MATURITY DATE.** On December 1, 2017 (as such date may be extended pursuant to Section 3.4 of the Loan Agreement, the "Maturity Date"), the entire unpaid principal balance, and all unpaid accrued interest thereon, shall be due and payable without demand or notice. In the event that Borrower does not pay this Note in full on the Maturity Date then, as of the Maturity Date and thereafter until paid in full, the interest accruing on the outstanding principal balance hereunder shall be computed, calculated and accrued on a daily basis at the Default Rate (as hereinafter defined).

**6.** **UNPAID INTEREST, CHARGES AND COSTS.** Interest, late charges, costs or expenses that are not received by Lender within ten (10) calendar days from the date such interest, late charges, costs, or expenses become due, shall, at the sole discretion of Lender, be added to the principal balance and shall from the date due bear interest at the Default Rate.

**7.** **HOLIDAY.** Whenever any payment to be made under this Note shall be due on a day other than a Business Day, including Saturdays, Sundays and legal holidays generally recognized by banks doing business in California, then the due date for such payment shall be automatically extended to the next succeeding Business Day, and such extension of time shall in such cases be included in the computation of the interest portion of any payment due hereunder.

**8.** **NO OFFSETS OR DEDUCTIONS.** All payments under this Note shall be made by Borrower without any offset, decrease, reduction or deduction of any kind or nature whatsoever, including, but not limited to, any decrease, reduction or deduction for, or on account of, any offset, present or future taxes, present or future reserves, imposts or duties of any kind or nature, that are imposed or levied by or on behalf of any government or taxing agency, body or authority by or for any municipality, state or country. If at any time, present or future, Lender shall be compelled, by any Law, rule, regulation or any other such requirement which on its face or by its application requires or establishes reserves, or payment, deduction or withholding of taxes, imposts or duties, to act such that it causes or results in a decrease, reduction or deduction (as described above) in payment received by Lender, then Borrower shall pay to Lender such additional amounts, as Lender shall deem necessary and appropriate, such that every payment received under this Note, after such decrease, reserve, reduction, deduction, payment or required withholding, shall not be reduced in any manner whatsoever.

9.      **DEFAULT.** An Event of Default under the Loan Agreement shall constitute a default under this Note (hereinafter "Default"). Upon the occurrence of a Default hereunder, Lender may, in its sole and absolute discretion, declare the entire unpaid principal balance, together with all accrued and unpaid interest thereon, and all other amounts and payments due hereunder, immediately due and payable, without notice or demand.

10.     **DEFAULT RATE.** From and after the occurrence of any Default in this Note whether by non-payment, maturity, acceleration, non-performance or otherwise, and until such Default has been cured, all outstanding amounts under this Note (including, but not limited to, interest, costs and late charges) shall bear interest at a per annum rate ("Default Rate") equal to five percent (5%) over the Note Rate.

11.     **PREPAYMENT.** Borrower shall have the right at any time following five (5) calendar days prior written notice to Lender, to prepay any portion of the principal amount of this Note. Any such prepayment shall not result in a reamortization, deferral, postponement, suspension, or waiver of any and all principal or other payments due under this Note.

12.     **LATE CHARGES.** Time is of the essence for all payments and other obligations due under this Note. Borrower acknowledges that if any payment required under this Note is not received by Lender within ten (10) calendar days after the same becomes due and payable, Lender will incur extra administrative expenses (i.e., in addition to expenses incident to receipt of timely payment) and the loss of the use of funds in connection with the delinquency in payment. Because, from the nature of the case, the actual damages suffered by Lender by reason of such administrative expenses and loss of the use of funds would be impracticable or extremely difficult to ascertain, Borrower agrees that a sum equal to the greater of $10.00, or five percent (5%) of the amount of the delinquent payment, together with interest accruing on the entire principal balance of this Note at the Default Rate, as provided above (in either case, a "Late Charge"), shall be the amount of damages which Lender is entitled to receive upon Borrower's failure to make a payment of principal or interest when due, in compensation therefor. Therefore, Borrower shall, in such event, without further demand or notice, pay to Lender, as Lender's monetary recovery for such extra administrative expenses and loss of use of funds, liquidated damages in the amount of the Late Charge (in addition to interest at the Default Rate). The provisions of this paragraph are intended to govern only the determination of damages in the event of a breach in the performance of Borrower to make timely payments hereunder. Nothing in this Note shall be construed as in any way giving Borrower the right, express or implied, to fail to make timely payments hereunder, whether upon payment of such damages or otherwise. The right of Lender to receive payment of such Late Charge, and receipt thereof, are without prejudice to the right of Lender to collect such delinquent payments and any other amounts provided to be paid hereunder or under any of the Loan Documents, or to declare a default hereunder or under any of the Loan Documents.

13.     **SECURITY AND ACCELERATION.** This Note is secured by, among other things, the Property pursuant to the Construction Deed of Trust. The Construction Deed of Trust contains, among other provisions, a provision for the immediate acceleration of this Note upon the occurrence of any Default hereunder, any event of default under the Construction Deed of Trust, or upon any sale, transfer, conveyance, encumbrance and/or alienation of Borrower's right, title or interest (or any portion thereof) in the real or personal property described in the Construction Deed of Trust. Reference is made to the Construction Deed of Trust for the specific provisions thereof.

14.     **COSTS AND EXPENSES.** Borrower hereby agrees to pay any and all costs or expenses paid or incurred by Lender by reason of, as a result of, or in connection with this Note, the Construction Deed of Trust or any other Loan Documents, including, but not limited to, any and all

attorneys' fees and related costs whether such costs or expenses are paid or incurred in connection with the enforcement of this Note, the Construction Deed of Trust and the other Loan Documents, or any of them, the protection or preservation of the collateral or security for this Note or any other rights, remedies or interests of Lender, whether or not suit is filed. Borrower's agreement to pay any and all such costs and expenses includes, but is not limited to, costs and expenses incurred in or in connection with any bankruptcy proceeding, in enforcing any judgment obtained by Lender and in connection with any and all appeals therefrom, and in connection with the monitoring of any bankruptcy proceeding and its effect on Lender's rights and claims for recovery of the amounts due hereunder, any proceeding concerning relief from the automatic stay, use of cash collateral, proofs of claim, approval of a disclosure statement or confirmation of, or objections to confirmation of, any plan of reorganization. All such costs and expenses are immediately due and payable to Lender by Borrower whether or not demand therefor is made by Lender.

15.    **WAIVERS.** Borrower hereby waives grace, diligence, presentment, demand, notice of demand, dishonor, notice of dishonor, protest, notice of protest, any and all exemption rights against the indebtedness evidenced by this Note and the right to plead any statute of limitations as a defense to the repayment of all or any portion of this Note, and interest thereon, to the fullest extent allowed by law, and all compensation of cross-demands pursuant to California Code of Civil Procedure Section 431.70. No delay, omission or failure on the part of Lender in exercising any right or remedy hereunder shall operate as a waiver of such right or remedy or any other right or remedy of Lender.

16.    **MAXIMUM LEGAL RATE.** This Note is subject to the express condition that at no time shall Borrower be obligated, or required, to pay interest on the principal balance at a rate which could subject Lender to either civil or criminal liability as a result of such rate being in excess of the maximum rate which Lender is permitted to charge. If, by the terms of this Note, Borrower is, at any time, required or obligated to pay interest on the principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate and interest payable hereunder shall be computed at such maximum rate and any portion of all prior interest payments in excess of such maximum rate shall be applied, or shall retroactively be deemed to have been payments made, in reduction of the principal balance, as the case may be.

17.    **AMENDMENT; GOVERNING LAW.** This Note may be amended, changed, modified, terminated or canceled only by a written agreement signed by the party against whom enforcement is .sought for any such action. This Note shall be governed by, and construed under, the Laws of the State of California.

18.    **AUTHORITY.** Borrower, and each person executing this Note on Borrower's behalf, hereby represents and warrants to Lender that, by its execution below, Borrower has the full power, authority and legal right to execute and deliver this Note and that the indebtedness evidenced hereby constitutes a valid and binding obligation of Borrower without exception or limitation. In the event that this Note is executed by more than one person or entity, the liability hereunder shall be joint and several. Any married person who is obligated on this Note, directly or indirectly, agrees that recourse may be had to such person's separate property in addition to any and all community property of such person.

**19.**     **USA PATRIOT ACT NOTICE.** Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account or obtains a loan. Lender will ask for Borrower's legal name, address, tax ID number or social security number and other identifying information. Lender may also ask for additional information or documentation or take other actions reasonably necessary to verify the identity of Borrower, Guarantor or other related Persons.

[SIGNATURE PAGE FOLLOWS.]

"Borrower":

THE SOURCE HOTEL, LLC,
a California limited liability company

By:    M + D Properties,
       a California corporation
Its:    Manager

       By:    _____
       Name:    Donald Chae
       Its:    President

## COMMERCIAL SECURITY AGREEMENT

1.     THE SECURITY. The undersigned, THE SOURCE HOTEL, LLC, a California limited liability company ("Grantor"), hereby assigns and grants to EVERTRUST BANK, a California banking corporation ("Lender"), a security interest in and to all assets of Grantor, now owned or hereafter acquired by Grantor, including, without limitation, the following described property (collectively, the "Collateral"):

(a)     All accounts, contract rights, chattel paper, instruments, deposit accounts, letter of credit rights, payment intangibles and general intangibles; and all returned or repossessed goods which, on sale or lease, resulted in an account or chattel paper.

(b)     All inventory, including all materials, work in process and finished goods:

(c)     All machinery, furniture, fixtures and other equipment of every type now owned or hereafter acquired by Grantor.

(d)     All of Grantor's deposit accounts with Lender. The Collateral shall include any renewals or rollovers of the deposit accounts, any successor accounts, and any general intangibles and choses in action arising therefrom or related thereto.

(e)     All instruments, notes, chattel paper, documents, certificates of deposit, securities and investment property of every type. The Collateral shall include all liens, security agreements, leases and other contracts securing or otherwise relating to the foregoing.

(f)     All general intangibles, including, but not limited to, (i) all patents, and all unpatented or unpatentable inventions; (ii) all trademarks, service marks, and trade names; (iii) all copyrights and literary rights; (iv) all computer software programs; (v) all mask works of semiconductor chip products; (vi) all trade secrets, proprietary information, customer lists, manufacturing, engineering and production plans, drawings, specifications, processes and systems. The Collateral shall include all good will connected with or symbolized by any of such general intangibles; all contract rights, documents, applications, licenses, materials and other matters related to such general intangibles; all tangible property embodying or incorporating any such general intangibles; and all chattel paper and instruments relating to such general intangibles.

(g)     All negotiable and nonnegotiable documents of title covering any Collateral.

(h)     All accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral.

(i)     All substitutes or replacements for any Collateral, all cash or non-cash proceeds, product, rents and profits of any Collateral, all income, benefits and property receivable on account of the Collateral, all rights under warranties and insurance contracts, letters of credit, guaranties or other supporting obligations covering the Collateral, and any causes of action relating to the Collateral.

2062513.4                                    1

(j)     All books and records pertaining to any Collateral, including but not limited to any computer-readable memory and any computer hardware or software necessary to process such memory ("Books and Records").

2.     THE INDEBTEDNESS. The Collateral secures and will secure all Indebtedness of Grantor to Lender. "Indebtedness" means all debts, obligations or liabilities now or hereafter existing, absolute or contingent of Grantor to Lender arising out of and/or in connection with that certain loan made or to be made by Lender to Grantor pursuant to that certain Construction Loan Agreement of even date herewith ("Loan Agreement"), executed by and between Lender and Grantor, and evidenced by, among other things, that certain Promissory Note of even date herewith ("Note"), in the principal amount of $29,500,000.00, executed by Grantor in favor of Lender, whether voluntary or involuntary, whether due or not due, or whether incurred directly or indirectly or acquired by Lender by assignment or otherwise.

3.     PLEDGOR'S COVENANTS. Grantor represents, covenants and warrants that unless compliance is waived by Lender in writing:

(a)     Grantor will use commercially reasonable efforts to preserve the Collateral; defend the Collateral against any adverse claims and demands; and keep accurate Books and Records.

(b)     Grantor's chief executive office is located in the State of California. In addition, Grantor is incorporated in or organized under the laws of the State of California. Grantor shall give Lender at least thirty (30) days notice before changing its residence or its chief executive office or state of incorporation or organization. Grantor will notify Lender in writing prior to any change in the location of any Collateral, including the Books and Records.

(c)     Grantor will notify Lender in writing prior to any change in Grantor's name, identity or business structure.

(d)     Unless otherwise agreed in writing and approved by Lender in Lender's sole discretion, Grantor has not granted and will not grant any security interest in any of the Collateral except to Lender, and will keep the Collateral free of all liens, claims, security interests and encumbrances of any kind or nature except the security interest of Lender.

(e)     Grantor will promptly notify Lender in writing of any event which affects the value of the Collateral, the ability of Grantor or Lender to dispose of the Collateral, or the rights and remedies of Lender in relation thereto, including, but not limited to, the levy of any legal process against any Collateral and the adoption of any marketing order, arrangement or procedure affecting the Collateral, whether governmental or otherwise.

(f)     Grantor shall pay all costs necessary to preserve, defend, enforce and collect the Collateral, including but not limited to taxes, assessments, insurance premiums, repairs, rent, storage costs and expenses of sales, and any costs to perfect Lender's security interest (collectively, the "Collateral Costs"). Without waiving Grantor's default for failure to make any such payment, Lender at its option may pay any such Collateral Costs, and discharge encumbrances on the Collateral, and such Collateral Costs payments shall be a part of the

Indebtedness and bear interest at the rate set out in the Indebtedness. Grantor agrees to reimburse Lender on demand for any Collateral Costs so incurred.

(g)    Until Lender exercises its rights to make collection, Grantor will diligently collect all Collateral.

(h)    If any Collateral is or becomes the subject of any registration certificate, certificate of deposit or negotiable document of title, including any warehouse receipt or bill of lading, Grantor shall immediately deliver such document to Lender, together with any necessary endorsements.

(i)    Grantor will not sell, lease, agree to sell or lease, or otherwise dispose of any Collateral except with the prior written consent of Lender; provided, however, that Grantor may sell inventory in the ordinary course of business.

(j)    Grantor will maintain and keep in force insurance covering the Collateral against fire and extended coverages (including without limitation windstorm coverage, and hurricane coverage as applicable), to the extent that any Collateral is of a type which can be so insured. Such insurance shall require losses to be paid on a replacement cost basis, be issued by insurance companies acceptable to Lender and include a loss payable endorsement in favor of Lender in a form acceptable to Lender. Upon the request of Lender, Grantor will deliver to the bank a copy of each insurance policy, or, if permitted by Lender, a certificate of insurance listing all insurance in force.

(k)    Grantor will not attach any Collateral to any real property or fixture in a manner which might cause such Collateral to become a part thereof unless Grantor first obtains the written consent of any owner, holder of any lien on the real property or fixture, or other person having an interest in such property to the removal by Lender of the Collateral from such real property or fixture. Such written consent shall be in form and substance acceptable to Lender and shall provide that Lender has no liability to such owner, holder of any lien, or any other person.

(l)    Grantor shall not withdraw funds from any deposit account which is part of the Collateral without Lender's prior written consent unless otherwise permitted under the Loan Agreement or any of the other Loan Documents (as defined in the Loan Agreement).

(m)    Exhibit "A" to this Agreement is a complete list of all patents, trademark and service mark registrations, copyright registrations, mask work registrations, and all applications therefor, in which Grantor has any right, title, or interest, throughout the world. To the extent required by Lender in its discretion, Grantor will promptly notify Lender of any acquisition (by adoption and use, purchase, license or otherwise) of any patent, trademark or service mark registration, copyright registration, mask work registration, and applications therefor, and unregistered trademarks and service marks and copyrights, throughout the world, which are granted or filed or acquired after the date hereof or which are not listed on the Exhibit. Grantor authorizes Lender, without notice to Grantor, to modify this Agreement by amending the Exhibit to include any such Collateral.

(n)    Grantor will, at its expense, diligently prosecute all patent, trademark or service mark or copyright applications pending on or after the date hereof, will maintain in effect all issued patents and will renew all trademark and service mark registrations, including payment of any and all maintenance and renewal fees relating thereto, except for such patents, service marks and trademarks that are being sold, donated or abandoned by Grantor pursuant to the terms of its intellectual property management program. Grantor also will promptly make application on any patentable but unpatented inventions, registerable but unregistered trademarks and service marks, and copyrightable but uncopyrighted works. Grantor will at its expense protect and defend all rights in the Collateral against any material claims and demands of all persons other than Lender and will, at its expense, enforce all rights in the Collateral against any and all infringers of the Collateral where such infringement would materially impair the value or use of the Collateral to Grantor or Lender. Grantor will not license or transfer any of the Collateral, except for such licenses as are customary in the ordinary course of Grantor's business, or except with Lender's prior written consent.

4.    ADDITIONAL OPTIONAL REQUIREMENTS. Grantor agrees that Lender may, upon five (5) days notice, whether or not Grantor is in default:

(a)    Require Grantor to deliver to Lender (i) copies of or extracts from the Books and Records, and (ii) information on any contracts or other matters affecting the Collateral.

(b)    Examine the Collateral, including the Books and Records, and make copies of or extracts from the Books and Records, and for such purposes enter at any reasonable time upon the property where any Collateral or any Books and Records are located. Require Grantor to deliver to Lender any instruments, chattel paper or letters of credit which are part of the Collateral, and to assign to Lender the proceeds of any such letters of credit.

(c)    Notify any account debtors, any buyers of the Collateral, or any other persons of Lender's interest in the Collateral.

5.    DEFAULTS. Subject to any applicable notice and cure periods set forth in the Loan Agreement, any one or more of the following shall be a default hereunder:

(a)    Any Indebtedness is not paid when due, or any default occurs under any agreement relating to the Indebtedness, after giving effect to any applicable grace or cure periods.

(b)    Grantor breaches any term, provision, warranty or representation under this Agreement, or under any other obligation of Grantor to Lender, and such breach remains uncured after any applicable cure period.

(c)    Lender fails to have an enforceable first lien (except for any prior liens to which Lender has consented in writing) on or security interest in the Collateral.

(d)    Any custodian, receiver or trustee is appointed to take possession, custody or control of all or a substantial portion of the property of Grantor or of any guarantor or other party obligated under any Indebtedness.

(e)    Grantor or any guarantor or other party obligated under any Indebtedness becomes insolvent, or is generally not paying or admits in writing its inability to pay its debts as they become due, fails in business, makes a general assignment for the benefit of creditors, dies, or commences any case, proceeding or other action under any bankruptcy or other law for the relief of, or relating to, debtors.

(f)    Any case, proceeding or other action is commenced against Grantor or any guarantor or other party obligated under any Indebtedness under any bankruptcy or other law for the relief of, or relating to, debtors.

(g)    Any involuntary lien of any kind or character attaches to any Collateral, except for liens for taxes not yet due.

(h)    Grantor has given Lender any false or misleading information or representations.

(i)    An Event of Default (as defined in the Loan Agreement) occurs under the Loan Agreement.

6.    BANK'S REMEDIES AFTER DEFAULT. Subject to any applicable notice and cure periods set forth in the Loan Agreement, in the event of any default, Lender may do any one or more of the following, to the extent permitted by law:

(a)    Declare any Indebtedness immediately due and payable, without notice or demand.

(b)    Enforce the security interest given hereunder pursuant to the California Commercial Code and any other applicable law.

(c)    Enforce the security interest of Lender in any deposit account of Grantor maintained with Lender by applying such account to the Indebtedness.

(d)    Require Grantor to obtain Lender's prior written consent to any sale, lease, agreement to sell or lease, or other disposition of any Collateral consisting of inventory.

(e)    Require Grantor to segregate all collections and proceeds of the Collateral so that they are capable of identification and deliver daily such collections and proceeds to Lender in kind.

(f)    Require Grantor to direct all account debtors to forward all payments and proceeds of the Collateral to a post office box under Lender's exclusive control.

(g)    Require Grantor to assemble the Collateral, including the Books and Records, and make them available to Lender at a place designated by Lender.

(h)    Enter upon the property where any Collateral, including any Books and Records, are located and take possession of such Collateral and such Books and Records, and use such property (including any buildings and facilities) and any of Grantor's equipment, if Lender

deems such use necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral.

(i)    Demand and collect any payments on and proceeds of the Collateral. In connection therewith Grantor irrevocably authorizes Lender to endorse or sign Grantor's name on all checks, drafts, collections, receipts and other documents, and to take possession of and open the mail addressed to Grantor and remove therefrom any payments and proceeds of the Collateral.

(j)    Grant extensions and compromise or settle claims with respect to the Collateral for less than face value, all without prior notice to Grantor.

(k)    Use or transfer any of Grantor's rights and interests in any Intellectual Property now owned or hereafter acquired by Grantor, if Lender deems such use or transfer necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral. Grantor agrees that any such use or transfer shall be without any additional consideration to Grantor. As used in this paragraph, "Intellectual Property" includes, but is not limited to, all trade secrets, computer software, service marks, trademarks, trade names, trade styles, copyrights, patents, applications for any of the foregoing, customer lists, working drawings, instructional manuals, and rights in processes for technical manufacturing, packaging and labeling, in which Grantor has any right or interest, whether by ownership, license, contract or otherwise.

(l)    Have a receiver appointed by any court of competent jurisdiction to take possession of the Collateral. Grantor hereby consents to the appointment of such a receiver and agrees not to oppose any such appointment.

(m)    Take such measures as Lender may deem necessary or advisable to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, and Grantor hereby irrevocably constitutes and appoints Lender as Grantor's attorney-in-fact to perform all acts and execute all documents in connection therewith.

(n)    Without notice or demand to Grantor, set off and apply against any and all of the Indebtedness any and all deposits (general or special, time or demand, provisional or final) and any other indebtedness, at any time held or owing by Lender or any of Lender's agents or affiliates to or for the credit of the account of Grantor or any guarantor or endorser of Grantor's Indebtedness.

(o)    Exercise any other remedies available to Lender at law or in equity.

7.    MISCELLANEOUS.

(a)    Any waiver, express or implied, of any provision hereunder and any delay or failure by Lender to enforce any provision shall not preclude Lender from enforcing any such provision thereafter.

(b)      Grantor shall, at the request of Lender, execute such other agreements, documents, instruments, or financing statements in connection with this Agreement as Lender may reasonably deem necessary.

(c)      All notes, security agreements, subordination agreements and other documents executed by Grantor or furnished to Lender in connection with this Agreement must be in form and substance satisfactory to Lender.

(d)      This Agreement shall be governed by and construed in accordance 'with the laws of the State of California.

(e)      All rights and remedies herein provided are cumulative and not exclusive of any rights or remedies otherwise provided by law. Any single or partial exercise of any right or remedy shall not preclude the further exercise thereof or the exercise of any other right or remedy.

(f)      All terms not defined herein are used as set forth in the California Commercial Code.

(g)      In the event of any action by Lender to enforce this Agreement or to protect the security interest of Lender in the Collateral, or to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, Grantor agrees to pay immediately the costs and expenses thereof, together with reasonable attorneys' fees and allocated costs for in-house legal services to the extent permitted by law.

(h)      In the event Lender seeks to take possession of any or all of the Collateral by judicial process, Grantor hereby irrevocably waives any bonds and any surety or security relating thereto that may be required by applicable law as an incident to such possession, and waives any demand for possession prior to the commencement of any such suit or action.

(i)      This Agreement shall constitute a continuing agreement, applying to all future as well as existing transactions, whether or not of the character contemplated at the date of this Agreement, and if all transactions between Lender and Grantor shall be closed at any time, shall be equally applicable to any new transactions thereafter.

(j)      Lender's rights hereunder shall inure to the benefit of its successors and assigns. In the event of any assignment or transfer by Lender of any of the Indebtedness or the Collateral, Lender thereafter shall be fully discharged from any responsibility with respect to the Collateral so assigned or transferred, but Lender shall retain all rights and powers hereby given with respect to any of the Indebtedness or the Collateral not so assigned or transferred. All representations, warranties and agreements of Grantor if more than one are joint and several and all shall be binding upon the personal representatives, heirs, successors and assigns of Grantor.

8.      FINAL AGREEMENT. BY SIGNING THIS DOCUMENT EACH PARTY REPRESENTS AND AGREES THAT: (A) THIS DOCUMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS DOCUMENT SUPERSEDES ANY COMMITMENT LETTER, TERM

SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO
THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM
SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY
PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL
AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS DOCUMENT MAY NOT BE
CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR
SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.

**[Signature Page Follows]**

IN WITNESS WHEREOF, Grantor has executed this Commercial Security Agreement as of the 24th day of May 2016.

GRANTOR:

THE SOURCE HOTEL, LLC,
a California limited liability company

By:    M + D Properties,
        a California corporation
Its:    Manager

By:    _____
        Name: Donald Chae
        Its:    President

**EXHIBIT "A"**

PATENTS, TRADEMARK AND SERVICE MARK REGISTRATIONS, COPYRIGHT
REGISTRATIONS, MASK WORK REGISTRATIONS, AND RELATED APPLICATIONS

1.      None.

**Stewart Title of California, Inc.**
**Santa Ana**

Recorded in Official Records, Orange County
Hugh Nguyen, Clerk-Recorder

**RECORDING REQUESTED BY
AND WHEN RECORDED, MAIL TO:**

129.00

*$R00084266634$*

**2016000252446 4:30 pm 06/03/16**

156 403 C36 A36 S02 F15    35
0.00 0.00 0.00 0.00 102.00 0.00 0.00 0.00

EVERTRUST BANK
18645 E. Gale Avenue, Suite 110
City of Industry, California 91748
Attention: Annie Ng, First Vice President /
   Loan Service Manager

Assessor's Parcel Nos.: See Exhibit A

01180 - 186406        276-361-20 & 22

## CONSTRUCTION DEED OF TRUST, ASSIGNMENT OF RENTS,
## SECURITY AGREEMENT AND FIXTURE FILING
### (Leasehold)

This Construction Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing (Leasehold) ("Deed of Trust") is made to be effective as of May 24, 2016, by THE SOURCE HOTEL, LLC, a California limited liability company ("Trustor"), to STEWART TITLE OF CALIFORNIA, INC., as Trustee ("Trustee"), for the benefit of EVERTRUST BANK, a California banking corporation, as Beneficiary ("Lender").

THIS DEED OF TRUST ALSO CONSTITUTES A FIXTURE FILING UNDER DIVISION 9 OF THE CALIFORNIA UNIFORM COMMERCIAL CODE AND COVERS GOODS WHICH ARE OR ARE TO BECOME FIXTURES ON THE REAL PROPERTY DESCRIBED ON EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF. TRUSTOR IS A RECORD OWNER OF AN INTEREST IN SAID REAL PROPERTY.

GRANT IN TRUST:

Trustor irrevocably grants, transfers and assigns to Trustee, in trust, for the benefit of Lender, with power of sale, all of Trustor's interest in that certain real property located in the County of Orange, State of California, described as:

SEE EXHIBIT "A" ATTACHED HERETO AND
INCORPORATED HEREIN BY THIS REFERENCE.

TOGETHER WITH: All right, title and interest of Trustor in and to the Property (as hereinafter defined) arising from and created under that certain Ground Lease dated as of April 6, 2015 by and between THE SOURCE AT BEACH, LLC, a California limited liability company, as lessor, and Borrower, as lessee (the "Ground Lease"), together with (a) all of Trustor's rights of use, occupancy and enjoyment, (b) all of Trustor's rights in and to all rents, income and profits arising from or pursuant to the Ground Lease together with all amendments, extensions, renewals or modifications thereof, (c) all of Trustor's credits, deposits, options and privileges of Trustor as lessee under the Ground Lease, including without limitation, the right to renew or extend the Ground Lease for a succeeding term or terms, the right to purchase the Land (as hereinafter defined), if any, and (d) all

rights of Trustor as lessee under the Ground Lease in connection with any bankruptcy or insolvency proceedings of the fee owner of the Land;

TOGETHER WITH: All right, title and interest which Trustor now has or may later acquire in such real property and all appurtenances, easements, covenants, rights of way, tenements, hereditaments and appurtenances thereunto belonging or in any way appertaining thereto now or hereafter, and all of the estate, right, title, interest, claim, demand, reversion or remainder whatsoever of Trustor therein or thereto, at law or in equity, now or hereafter in possession or expectancy, including, without limitation, all mineral, oil, and gas rights and royalties and profits therefrom, all water and water rights and shares of stock pertaining to water and water rights, and all sewers, pipes, conduits, wires and other facilities furnishing utility or services to the real property (collectively, the "Land");

TOGETHER WITH: All right, title and interest which Trustor now has or may later acquire in and to all buildings, structures and improvements now or hereafter erected on the Land, including, without limitation, all plant equipment, apparatus, machinery and fixtures of every kind and nature whatsoever now or hereafter located on or forming part of said buildings, structures and improvements (collectively, the "Improvements"; the Land and Improvements being hereinafter sometimes collectively referred to as the "Premises");

TOGETHER WITH: All right, title and interest which Trustor now has or may later acquire in and to the land lying in the bed of any street, road, highway or avenue now or hereafter in front of or adjoining the Premises;

TOGETHER WITH: All right, title and interest which Trustor now has or may later acquire in Any and all awards heretofore or hereafter made by any governmental authorities (federal, state, local or otherwise) to Trustor and all subsequent owners of the Premises which may be made with respect to the Premises as a result of the exercise of the right of eminent domain, the alteration of the grade of any street or any other injury to or decrease of value of the Premises, which said award or awards are hereby assigned to Lender;

TOGETHER WITH: All right, title and interest which Trustor now has or may later acquire in any and all claims under and proceeds of any insurance policies by reason of or related to a loss of any kind sustained to the Premises, now or hereafter, whether or not such policies name Lender as an insured and whether or not such policies are required by Lender, and whether or not such claims thereunder are characterized as personal claims;

TOGETHER WITH: All right, title and interest which Trustor now has or may later acquire in any and all unearned premiums accrued, accruing or to accrue, and the proceeds of insurance now or hereafter in effect with respect to all or any portion of the Premises;

TOGETHER WITH: Any and all claims or demands which Trustor now has or may hereafter acquire against anyone with respect to any damage to all or any portion of the Premises;

TOGETHER WITH: All right, title and interest which Trustor now has or may later acquire in all goods, equipment, machinery, furniture, furnishings, trade fixtures, appliances, inventory, building materials, apparatus, utensils, vehicles, wiring, pipes, conduits, elevators, escalators, heating and air

conditioning equipment, chattels and articles of personal property, including, without limitation, any interest therein now or at any time hereafter affixed to, attached to or used in any way in connection with or to be incorporated at any time into the Premises or placed on any part thereof wheresoever located, whether or not attached to or incorporated in the Premises, together with any and all accessions, accessories, attachments, and replacements thereof, appertaining and adapted to the complete and compatible use, enjoyment, occupancy, operation or improvement of the Premises;

TOGETHER WITH: All right, title and interest which Trustor now has or may later acquire in all instruments, investment property, deposit accounts, accounts, contract rights, general intangibles, and other intangible property and rights now or hereafter relating to the foregoing property, or the operation thereof or used in connection therewith, including, without limitation, all options, letters of intent, and rights of first refusal of any nature whatsoever, covering all or any portion of such property, together with any modifications thereof, and deposits or other payments made in connection therewith, existing and future development rights, permits and approvals, air rights, density bonus rights, and transferable development rights; all of Trustor's right, title, and interest in and to any awards, remunerations, settlements, or compensation heretofore made or hereafter made by any and all courts, boards, agencies, commissions, offices, or authorities, of any nature whatsoever for any governmental unit (federal, state, local or otherwise) to the present or any subsequent owner of the foregoing property, including those for any vacation of, or change of grade in, any streets affecting the foregoing property and any and all licenses and privileges obtained by Trustor from non-governmental sources;

TOGETHER WITH: All right, title and interest which Trustor now has or may later acquire in all leases of the Premises, Personalty, Fixtures, or any part thereof, now or hereafter entered into and all right, title and interest of Trustor thereunder, including, without limitation, cash or securities deposited thereunder to secure performance by the lessees of their obligations thereunder (whether such cash or securities are to be held until the expiration of the terms of such leases or applied to one or more of the installments of rent coming due immediately prior to the expiration of such terms); all other rights and easements of Trustor now or hereafter existing pertaining to the use and enjoyment of the Premises; and all right, title and interest of Trustor in and to all declarations of covenants, conditions and restrictions as may affect or otherwise relate to the Premises;

TOGETHER WITH: All right, title and interest which Trustor now has or may later acquire in all permits, plans, licenses, specifications, subdivision rights, security interests, contracts, contract rights, public utility deposits, prepaid sewer and water hook-up charges, or other rights as may affect or otherwise relate to the Property (as hereinafter defined);

TOGETHER WITH: All rents, income, issues and profits (subject, however, to the rights given in this Deed of Trust to Lender to collect and apply same), including, without limitation, the accounts, revenues, and proceeds of any business operation conducted by or on behalf of Trustor on or through the use of the Premises, prepaid municipal and utility fees, bonds, revenues, income, and other benefits to which Trustor may now or hereafter be entitled to, or which are derived from, the Property or any portion thereof or interest therein.

The foregoing listing is intended only to be descriptive of the property encumbered hereby, and not exclusive or all inclusive. It is the intent of Trustor to encumber hereby all property located or to be

located upon the above-described real property. Said real property (or the leasehold estate if this Deed of Trust encumbers a leasehold estate), buildings, improvements, appurtenances, Fixtures, Personalty, additions, accretions, and other property are herein referred to as the "Property." As used herein, the term "Fixtures" shall include all articles of personal property hereinabove described, now or hereafter attached to, placed upon for a definite term, or otherwise used in connection with the Property, and shall include trade fixtures and goods which are or are to become fixtures. As used herein, the term "Personalty" shall include all furniture, furnishings, equipment, machinery, goods, contract rights, general intangibles, money, deposit accounts, instruments, accounts, leases, chattel paper and other personal property described in this Deed of Trust (other than Fixtures) of any kind or character now existing or hereafter arising or acquired, now or hereafter located upon, within or about the Property, or which otherwise pertains to the use, ownership, management, operation, construction, leasing and sale of the Property, and all products and proceeds thereof, and all of Trustor's right, title, and interest in and to all such property.

Trustor makes the foregoing grant to Trustee, and to Lender, as applicable, to hold the Property in trust for the benefit of Lender and for the purposes and upon the terms and conditions hereinafter set forth.

FOR THE PURPOSE OF SECURING:

(1)     Payment of the maximum principal sum of Twenty Nine Million Five Hundred Thousand and No/100 Dollars ($29,500,000.00), together with interest thereon and certain additional costs and expenses related to or incurred in connection with or as provided in that certain Promissory Note (the "Note") of even date herewith, in the original principal amount of Twenty Nine Million Five Hundred Thousand and No/100 Dollars ($29,500,000.00), executed by Trustor, payable to Lender, or order, and all extensions, modifications or renewals thereof (including, without limitation, any extension, modification, or renewal of the Note at a different rate of interest or on different terms);

(2)     Performance of each and every term, covenant and condition of that certain Construction Loan Agreement of even date herewith by and between Trustor and Lender, and all modifications, renewals or extensions thereof ("Agreement");

(3)     Payment of all other sums, with interest, advanced, paid, or incurred by Lender or Trustee under the terms of this Deed of Trust to protect the Property or Lender's security interest therein;

(4)     Payment of such additional sums, with interest, as Trustor and/or the then record owner of the Property may later borrow from Lender, in those instances in which the later obligations are evidenced by a promissory note or notes reciting that it or they are so secured (which additional obligations shall be referred to as "future advances" in this Deed of Trust);

(5)     Trustor's compliance with and performance of each provision of the Ground Lease; and

(6)     Trustor's performance of each agreement in this Deed of Trust.

## TRUSTOR AND LENDER AGREE AS FOLLOWS:

### RIGHTS AND DUTIES OF THE PARTIES.

1.      **Payment And Performance By Trustor; Title**. Trustor represents and warrants to, and for the benefit of Lender and Trustee that Trustor holds good and marketable title of record to the leasehold estate of the Property as provided in the Ground Lease. Trustor shall promptly: (a) perform each and every term, covenant and condition of this Deed of Trust and any other obligation secured by this Deed of Trust; (b) pay when due any future advances; and (c) pay when due all sums payable under the Note.

2.      **Payment By Trustor Of Taxes And Other Impositions**. The term "Taxes" shall mean all taxes, bonds and assessments, both general and special, affecting or levied upon the Property or any part thereof, assessments on water company stock, if any, all taxes or excises levied or assessed against Trustor, the Property, or any part thereof, in addition to or as a substitution in whole or in part for any real estate taxes or assessments, all taxes or excises measured by or based in whole or in part upon the rents, operating income, or any other factor relating to the Property, or any part thereof, and all license fees, taxes and excises imposed upon Lender (but not any federal or state income taxes imposed upon Lender) and measured by or based in whole or in part upon the obligations secured hereby. The term "Other Impositions" shall mean any fine, fee, charge, or other imposition in connection with the Property or Trustor, payment of which Lender shall deem to be necessary to protect, preserve, and defend Lender's interests hereunder. Trustor shall pay all Taxes, insurance premiums, and Other Impositions attributable to the Property, at least fifteen (15) days before delinquency directly to the payee thereof, or in such other manner as Lender may designate in writing. Trustor shall promptly furnish to Lender all notices of amounts due under this paragraph 2, and if Trustor shall make payment directly, Trustor shall promptly furnish to Lender evidence of payments of Taxes and evidence of all other payments above required.

At the request of Lender, or otherwise upon written agreement between Trustor and Lender, or as provided by applicable law, Trustor shall pay to Lender, on each day on which monthly installments of principal and/or interest are payable under the Note, until the Note is paid in full, an amount equal to one-twelfth (1/12) of the sum of annual Taxes and Other Impositions, together with annual insurance premiums on all policies of insurance required by this Deed of Trust, plus additional amounts reasonably estimated by Lender for the purpose of paying future installments of Taxes, Other Impositions, and insurance premiums. In such event, Trustor further agrees to cause all bills, statements, or other documents relating to Taxes, Other Impositions, and insurance premiums to be sent or mailed directly to Lender. Upon receipt of such bills, statements, or other documents, and provided Trustor has deposited sufficient funds with Lender pursuant to this paragraph 2 and the Agreement, Lender shall pay such amounts as may be due thereunder out of the funds so deposited with Lender for that purpose, subject to Lender's rights to utilize and apply said funds to satisfy, in whole or in part, any default by Trustor. If at any time and for any reason the funds deposited with Lender are or will be insufficient to pay such amounts as may then or subsequently be due, Lender shall notify Trustor and Trustor shall immediately deposit an amount equal to such deficiency with Lender. Notwithstanding the foregoing, nothing contained herein shall cause Lender to be deemed a trustee of said funds or to be obligated to pay any amounts in excess of the amount of funds

deposited with Lender pursuant to this paragraph 2. Lender shall not be obligated to pay or allow any interest on any sums held by Lender pending disbursement or application hereunder, and Lender may impound or reserve for future payment of Taxes, Other Impositions, and insurance such portion of such payments as Lender may in its absolute discretion deem proper, applying the balance on the principal of or interest on the obligations secured hereby. Should Trustor fail to deposit with Lender (exclusive of that portion of said payments which has been applied by Lender on principal of or interest on the indebtedness secured hereby) sums sufficient to fully pay such Taxes, Other Impositions, or insurance premiums, at least thirty (30) days before delinquency thereof, Lender may, at Lender's election, but without any obligation so to do, advance any amounts required to make up the deficiency, which advances, if any, shall be secured hereby and shall be repayable to Lender as herein elsewhere provided, or at the option of Lender, the latter may, without making any advance whatsoever, apply any sums held by it upon any obligation of Trustor secured hereby. Shall any default occur or exist in connection with the Note, Lender may, at Lender's option, apply any sums or amounts in its possession or under its control, received pursuant hereto or as rents or income of the Property or otherwise, upon any indebtedness or obligation secured by this Deed of Trust in such manner and order as Lender may elect. The receipt, use or application of any such sums paid by Trustor to Lender hereunder shall not be construed to affect the maturity of any indebtedness secured by this Deed of Trust or any of the rights or powers of Lender or said Trustee under this Deed of Trust or any other obligation secured hereby.

In the event of the passage, after the date of this Deed of Trust, of any law or judicial decision deducting from the value of the Property for the purposes of taxation any lien thereon, or changing in any way the laws now in force for the taxation of deeds of trust or obligations secured by deeds of trust, or the manner of operation of any such Taxes so as to adversely affect the interest of Lender, or imposing payment of the whole or any portion of any Taxes upon Lender, then and in such event, Trustor shall bear and pay the full amount of such Taxes; provided that if for any reason payment by Trustor of any such new or additional Taxes would be unlawful or if the payment thereof would constitute usury or render the Note, or other indebtedness secured hereby, wholly or partially usurious under any of the terms or provisions of the Note, or this Deed of Trust, or otherwise, Lender may, at its option, upon thirty (30) days' written notice to Trustor, (i) declare the whole indebtedness secured by this Deed of Trust, together with accrued interest thereon, to be immediately due and payable, or (ii) pay that amount or portion of such Taxes as renders the Note, or other indebtedness secured hereby, unlawful or usurious, in which event Trustor shall concurrently therewith pay the remaining lawful non-usurious portion or balance of such Taxes.

3.    **Trustor To Pay Ground Rents And Obligations That Could Result In Liens On The Property**. Trustor shall fully and faithfully pay and perform each and every obligation, and otherwise satisfy all conditions and covenants, which are or may be secured by any deed of trust or other lien, charge or encumbrance upon the Property, or any portion thereof, existing of record as of the date this Deed of Trust is recorded. Trustor shall pay at or prior to maturity any and all ground rents and any liens, charges and encumbrances that are, later become, claim to be or appear to Lender to be prior or superior to the lien of this Deed of Trust, including, without limiting the generality of the foregoing, any and all claims for (a) work or labor performed, (b) materials and services supplied in connection with any work of demolition, alteration, improvement of or construction upon the Property, and (c) fees, charges and liens for utilities provided to the Property.

4.    **Trustor To Maintain Insurance**.  (a) Trustor shall maintain insurance covering the Property against loss or damage by fire and other risks as shall from time to time be required by Lender, in Lender's sole and absolute opinion and judgment, as necessary to protect the security interest of Lender in the Property. The insurance shall be maintained with such companies, in such amounts, for such terms, and in form and content satisfactory to Lender, in Lender's sole and absolute opinion and judgment. Lender shall be named as the primary loss payee under all of the insurance policies, and Trustor shall assure that Lender receive a certificate from each insurance company that acknowledges Lender's position as loss payee and that states that the insurance policy cannot be terminated as to Lender except upon thirty (30) days' prior written notice to Lender. Such policies of insurance shall include, without limitation, the following: (i) insurance against loss or damage to the Property (including contents) by fire or other risk embraced by coverage of the type known as the broad form or extended coverage (or special extended coverage) in the amount required by Lender, but in no event less than one hundred percent (100%) of the full replacement cost of the Improvements, Fixtures and Personalty included within the Property without deduction for depreciation of any kind or the unpaid balance of the Note, whichever is greater, (ii) insurance against the loss of rental value of the Property on a "rented or vacant basis," including business interruption insurance, arising out of the perils insured against pursuant to clause (i) above in the amount required by Lender, but in no event less than one (1) year's gross rental income and other revenues from the Property, and (iii) comprehensive public liability insurance against claims for personal injury, death, or property damage occurring on, in, or about the Property, or arising from or connected with the use, conduct, or operation of Trustor's business in the amount from time to time required by Lender. (b) If such insurance, together with written evidence of the premium having been paid, are not delivered to Lender at least five (5) days prior to the delinquency of the invoice of such insurance if such insurance is still in effect, otherwise at least five (5) days prior to the expiration of such insurance, Lender shall have the right, but without obligation to do so, without notice to or demand upon Trustor and without releasing Trustor from any obligation under this Deed of Trust, to obtain such insurance or like insurance through or from any insurance agency or company acceptable to it, pay the premium for such insurance, and add the amount of the premium to the loan secured by this Deed of Trust, and this amount shall bear interest at the applicable rate of interest set forth in the Note. Neither the Trustee nor Lender shall be responsible for such insurance or for the collection of any insurance monies, or for any insolvency of any insurer or insurance underwriter. (c) In the event that the Property is sold to Lender at any trustee's sale under this Deed of Trust (see paragraph 17, below), Trustor hereby assigns to Lender all unearned premiums on all policies of insurance covering the Property and agrees that any and all unexpired insurance covering the Property shall inure to the benefit of and pass to Lender at the time of such Trustee's sale.

5.    **Insurance Proceeds, Condemnation Proceeds And Other Recoveries**.

(a)    All settlements, awards, damages and proceeds received by Trustor or any other person under any fire or other hazard insurance policy, for losses existing as of or occurring 'after the effective date of this Deed of Trust, or in connection with any condemnation for public use of or injury to the Property (or any part of or interest in the Property) are assigned to Lender and may, at the option of Lender, be applied by Lender as provided in section (c) of this Paragraph 5. Trustor shall give prompt written notice to Lender of any casualty or condemnation affecting the Property resulting in damage or diminution in value in an amount greater than $200,000.00.

(b)     All right, title and interest which Trustor now has or may later acquire in and to all causes of action against any Person or entity other than Lender, whether accrued before or after the date of this Deed of Trust, of any type for any damage or injury to the Property (or any portion of or interest in the Property), or in connection with the sale or other transaction being financed by the funds that are secured by this Deed of Trust, or in connection with or affecting the Property (or any portion of or interest in the Property), including causes of action arising in tort or contract and causes of action in fraud or concealment of a material fact, are assigned to Lender, and the proceeds of any such causes of action shall be applied by Lender as provided in section (c) of this Paragraph 5. Subsequent to a default hereunder (and subject to any applicable cure period under the Agreement), Lender may, at its option, appear in and prosecute in its own name any action or proceeding to enforce any such cause of action and may make any compromise or settlement of any such action or proceeding. Trustor agrees to execute such further assignments of any settlements, awards, damages and causes of action as Lender from time to time may reasonably request.

(c)     Settlements, awards, proceeds and damages (collectively, "Awards") received by Lender under the provisions of section (a) and section (b) of this Paragraph 5 shall be applied in accordance with this Paragraph 5(c). Except as expressly set forth herein below, all Awards, at the option of Lender, may be applied by Lender (i) to the outstanding balance due on the Note, or any other obligation secured by this Deed of Trust, in such order as Lender may determine, (ii) to replace, restore or reconstruct the Property to a condition satisfactory to Lender, without reducing the principal balance of the Note or any other obligation secured by this Deed of Trust, or (iii) to Trustor. Any such amount may be divided in any manner among any such application, use or release. No such application, use or release of the Award shall cure or waive any Event of Default or notice of default under this Deed of Trust or invalidate any act done pursuant to such notice.

Notwithstanding the foregoing, in the event the Property is damaged or destroyed by fire or other casualty, and provided that no Event of Default (subject to any applicable cure period under the Agreement) has occurred and is continuing as of the date of such casualty or damage and/or at any time thereafter until all Awards that have been paid in connection therewith have been applied or exhausted in accordance with this Deed of Trust, any and all Awards paid as a result of the same shall be applied as follows:

(i)     With respect to Award(s) that, in the aggregate, are less than $200,000.00, (A) Trustor may settle any such claims for Awards without Lender's consent provided that Trustor provides Lender with prompt written notice thereof, and (B) Awards with respect to any one or more casualties that, in the aggregate, are less than $200,000.00, may be retained by Trustor; provided, however, if a continuing Event of Default (subject to any applicable cure period under the Agreement) exists as of the date of payment of any such Award(s), then Trustor shall not retain any such Award(s), and Trustor agrees that any and all such Awards shall be paid directly to Lender and, following actual receipt by Lender, shall be applied by Lender in accordance with the first paragraph of this Section 5(c), above.

(ii)     With respect to any Award(s) that, in the aggregate, equal or exceed $200,000.00, the entirety of such Award(s) shall be payable to Lender and Trustor authorizes and empowers Lender, at Lender's option and in Lender's reasonable discretion as attorney-in-fact for Trustor, to make proof of loss, to adjust and compromise any claim under insurance policies, to appear in and prosecute any action arising from such insurance policies, to collect and receive

**8**

insurance proceeds, and to deduct from such proceeds Lender's expenses incurred in their collection. Lender may, in its sole discretion, (1) apply the Awards to the outstanding balance of the Loan, or (2) if Lender does not elect (1), then hold the balance of all such proceeds (the "Restoration Proceeds") to be used to reimburse Trustor for the costs of reconstruction of the Improvements if all of the following conditions are satisfied:

(A)     Within ninety (90) days from the date of such damage or destruction, Trustor satisfies Lender that after the reconstruction is completed, the value of the Property as reasonably determined by Lender, will be not less than the value of the Property set forth in the appraisal on which Lender based its decision to make the Loan evidenced by the Note;

(B)     Within ninety (90) days from the date of such damage or destruction, Trustor satisfies Lender, in Lender's reasonable judgment, that such insurance proceeds are sufficient to pay all costs of reconstruction of the Improvements, including the making of payments required under the Note; or if such proceeds are not sufficient, Trustor deposits additional funds with Lender sufficient to pay such additional costs of reconstructing the Improvements;

(C)     Within ninety (90) days from the date of such damage or destruction, Trustor satisfies Lender, in Lender's reasonable judgment, that the damage or destruction can be repaired or restored and the Property as repaired or restored will comply with all applicable Laws;

(D)     Within one hundred eighty (180) days from the date of suchdamage or destruction, Lender has received and approved (1) a budget of all costs of repair or restoration, and (2) a construction schedule for such repair or restoration; and

(E)     Within one hundred eighty (180) days from the date of such damage or destruction, Trustor has delivered to Lender final plans and specifications for the repair or restoration of the Property which shall have received all governmental approvals and a construction contract for the work of reconstruction, both in form and content reasonably satisfactory to Lender and with a contractor reasonably satisfactory to Lender; provided, however, if Trustor has used commercially reasonable efforts of a similarly situated sophisticated real estate developer, and despite such efforts Trustor is unable to satisfy the foregoing condition within the one hundred eighty (180) days specified above for reasons beyond Trustor's reasonable control (such as delays at the City or County level with permitting and similar issues), then Trustor shall have an additional sixty (60) days to satisfy the conditions of this paragraph (E), provided that during such 60 day extension, Trustor shall continue to keep Lender apprised of the status of the restoration process (including responding promptly to reasonably requests for information) and Trustor shall otherwise exercise the aforementioned commercially reasonable efforts to continue to attempt to obtain final plans and specifications for the repair or restoration of the Property, all governmental approvals, and/or a construction contract for the work of reconstruction.

With respect to any items submitted to Lender pursuant to paragraphs (A) through (E), inclusive, above, Lender shall notify Trustor in writing, within fifteen (15) Business Days of Lender's receipt, whether or not the same are acceptable to Lender, and if not acceptable to Lender, Lender shall set forth in reasonable detail an explanation as to why the same have been disapproved by Lender, whereupon Trustor shall have five (5) Business Days, but in any event, not later than the expiration

of the 90-day period described above, to address the disapproved items to Lender's reasonable satisfaction.

So long as Trustor receives the Restoration Proceeds from Lender, Trustor shall promptly and diligently restore the Improvements to the equivalent of their condition immediately prior to the casualty or to such other improved condition as is necessary to comply with the requirements of this Deed of Trust or any applicable governmental entity. Disbursements of the Restoration Proceeds shall be in accordance with Lender's customary construction loan disbursement procedures, with disbursements of the Restoration Proceeds to be requested by Trustor, and made by Lender, in increments of not less than $20,000.00 per disbursement. Lender shall notify Trustor in writing no later than ten (10) Business Days after Trustor's delivery to Lender of a disbursement request (together with any and all other information and/or documentation Trustor may be required to deliver to Lender pursuant to Lender's customary construction loan disbursement procedures) whether or not Trustor's disbursement request has been approved or disapproved by Lender. If such disbursement request is disapproved by Lender, Lender shall set forth in reasonable detail an explanation as to why the same has been disapproved by Lender concurrently with notifying Trustor of its disapproval. If such disbursement request is approved by Lender, Lender shall fund the amount of the disbursement request approved for funding by Lender within three (3) Business Days of notifying Trustor of such approval. Any Restoration Proceeds held by Lender upon Trustor's failure to satisfy the conditions to disbursement within the time allowed above, or upon the occurrence and during the continuance of an Event of Default (subject to any applicable cure period under the Agreement), shall be applied by Lender to the obligations outstanding under the Note. Any Restoration Proceeds not required to reconstruct the Improvements shall be paid to Trustor provided that no continuing Event of Default (subject to any applicable cure period under the Agreement) exists hereunder.

6.   **Maintenance And Preservation Of The Property.**

(a)   Trustor shall: (i) keep the Property, and every portion thereof, in good condition and repair and replace from time to time, or at any time, any Fixtures, Personalty or other items comprising the Property which may become obsolete or worn out, with Fixtures, Personalty or other items of at least the same utility, quality and value, each such replacement to be free of any liens or security interests of any kind or character other than the lien of this Deed of Trust, or any other document or instrument securing the indebtedness hereunder; (ii) except as expressly permitted under the Agreement, not remove or demolish the Property, or any part thereof; (iii) use commercially reasonable efforts to complete or restore promptly and in good and workmanlike manner the Property, or any part thereof, which may be damaged or destroyed; (iv) comply with and not suffer violations of (A) any and all laws, ordinances, rules, regulations, standards and orders, including, without limitation, making any alterations or additions required to be made to, or safety appliances and devices required to be installed or maintained in or about, the Property, or any portion thereof, under any such laws, ordinances, rules, regulations, standards or orders now or hereafter adopted, enacted or made applicable to the Property, or any portion thereof, and payment of any fees, charges or assessments arising out of or in any way related to treatment of the Property, or any portion thereof, as a source of air pollution, traffic, storm water runoff, or other adverse environmental impacts or effects, (B) any and all covenants, conditions, restrictions, equitable servitudes and easements, whether public or private, of every kind and character, and (C) any and all requirements of insurance companies and any bureau or agency which establishes standards of

insurability, which laws, covenants or requirements affect the Property and/or pertain to acts committed or conditions existing thereon, or the use, management, operation or occupancy thereof by Trustor and anyone holding under Trustor, including (but without limitation) such work of alteration, improvement or demolition as such laws, covenants or requirements mandate; (v) not commit or permit material physical waste of the Property, or any portion thereof; (vi) do all other acts which from the character or use of the Property may be reasonably necessary to maintain, preserve and enhance its value, including, without limitation, keeping all plants, lawns and other landscaping in a good and thriving condition, and otherwise performing such appropriate upkeep and maintenance to the Property to insure that the Property, and each part thereof, is maintained in a first-class manner and retains at all times a first-class appearance and condition, such upkeep to include, without limitation, appropriate measures to protect wood, stucco and concrete surfaces from weathering, deterioration and aging, and to protect from and immediately remove graffiti or other defacement from such surfaces; (vii) perform all obligations required to be performed in leases or conditional sales or like agreements affecting the Property or the operation, occupation or use thereof (and, if not previously assigned, in the event of default, all right, title and interest of Trustor under any such leases, conditional sales or like agreements shall be automatically assigned to Lender hereunder, together with any deposits made in connection therewith); (viii) make payment of any and all charges, assessments or fees imposed in connection with the delivery, installation or maintenance of any utility services or installations on, to or for the Property, or any portion thereof; (ix) not create any deed of trust, liens or encumbrances upon the Property subsequent hereto, except as expressly permitted under the Agreement, the parties hereby having specifically bargained in contemplation of the fact that any subsequent encumbrance upon the Property not expressly permitted under the Agreement would adversely affect Lender's security interests hereunder; (x) make no further assignment of rents of the Property; and (xi) execute and, where appropriate, acknowledge and deliver such further documents or instruments as Lender or Trustee deem necessary or appropriate to preserve, continue, perfect and enjoy the security provided for herein, including (but without limitation) assignments of Trustor's interest in leases of the Property.

(b)      Except as otherwise permitted under the Agreement, Trustor shall not undertake or suffer to be made pursuant to section (a) of this paragraph 6, any material alterations, additions, repairs, expansions, relocations, remodeling or demolition of, or structural or other material changes in, any buildings, improvements (including Improvements), Fixtures or Personalty comprising the Property, without the prior written consent of Lender. No material changes are to be made in any plans and/or specifications as approved by Lender without Lender's prior written consent. All such work shall be performed promptly and in good and workmanlike manner, using first quality materials in conformity with plans and specifications approved in advance by Lender, and shall be diligently prosecuted to completion free of liens and encumbrances, other than this Deed of Trust and any other document or instrument evidencing or securing the indebtedness secured hereby.

(c)      Without limiting the generality of this paragraph 6, Trustor hereby warrants and represents to Lender and covenants with Lender that Trustor and the Property presently comply with, and will in the future comply fully with, all applicable federal, state and local laws, ordinances, rules and regulations, and all permits and approvals issued thereunder, affecting Trustor's qualification to do business, the construction of any improvements to be located upon the Property, the sale, operation, leasing or financing of the Property and the intended occupancy, use and enjoyment thereof, including, but not limited to, all applicable subdivision laws, licenses and

permits, building codes, zoning ordinances, environmental protection laws, flood disaster laws, and all laws pertaining to industrial hygiene and the environmental conditions on, under or about the Property, including, but not limited to, soil and groundwater condition. Trustor further warrants and represents to Lender and covenants with Lender that Trustor does not presently, and will not in the future, use, store, manufacture, generate, transport to or from, or dispose of any toxic substances, hazardous wastes, radioactive materials, flammable explosives or related material on or in connection with the Property or the business of Trustor on the Property, except as are described in Exhibit "B" attached hereto and incorporated herein, and which are used, stored or maintained in full and complete compliance with all such laws ("Permitted Toxic Materials"). Trustor further warrants and represents to Lender and covenants with Lender that Trustor does not presently, and will not, permit any lessee or other user of the Property to use, store, manufacture, generate, transport to or from, release or dispose of any toxic substances, hazardous materials, hazardous wastes, radioactive materials, flammable explosives or related materials on or in connection with the Property or the business of said lessee or other user of the Property, except for Permitted Toxic Materials. Trustor further warrants and represents to Lender and covenants with Lender that as to the Permitted Toxic Materials, Trustor shall obtain and continue to maintain all necessary permits and approvals for the Permitted Toxic Materials, and comply with all laws, ordinances, rules and regulations, and all permits and approvals issued thereunder, pertaining thereto. ("Toxic substances," "hazardous materials" and "hazardous wastes" shall include, but not be limited to, such substances, materials and wastes which are or become regulated under applicable federal, state or local laws, ordinances, rules or regulations.) Without the prior written consent of Lender, Trustor shall not seek, make or consent to any change in the zoning, conditions of use, or any other applicable land use permits, approvals or regulations pertaining to the Property, or any portion thereof, which would constitute a violation of the warranties, representations and covenants herein contained, or would otherwise impair the ability of Trustor to complete construction of any improvements now underway or to be constructed, constituting the Property, or would change the nature of the use or occupancy of the Property. Within ten (10) days of (i) any contact from any federal, state, or local governmental agency concerning any environmental protection laws, including, but not limited to, any notice of any proceeding or inquiry with respect to the presence of any hazardous wastes, toxic substances or hazardous materials on the Property or the migration thereof from or to other property, (ii) any and all claims made or threatened by any third party against or relating to the Property concerning any loss or injury resulting from toxic substances, hazardous wastes, or hazardous materials, or (iii) Trustor's discovery of any occurrence or condition on any property adjoining or in the vicinity of the Property that could cause the Property, or any part thereof, to be subject to any restrictions on the ownership, occupancy, transferability, or loss of the Property under any federal, state, or local laws, ordinances, rules, or regulations, Trustor shall deliver to Lender a report regarding such contact and setting forth in detail and describing any action which Trustor proposes to take with respect thereto, signed by Trustor.

(d)    If Trustor has executed any unsecured agreement regarding hazardous materials containing any warranties and/or indemnities by Trustor in favor of Lender pertaining to the presence or release of hazardous and/or toxic materials or other similar substances upon, within or from the Property (hereinafter "Environmental Indemnity"), then the covenants, duties, and liabilities of Trustor, and the rights and remedies of Lender with respect to the subject of hazardous and/or toxic materials, shall be governed by the provisions of the Environmental Indemnity in addition to the provisions of this Deed of Trust; provided, however, that the provisions of the Environmental Indemnity shall prevail and exclusively govern the subject matter to the extent of any

duplication, conflict or inconsistency between such provisions and the provisions of this Deed of Trust, and payment or performance of Trustor's obligations under said Environmental Indemnity shall not be secured by this Deed of Trust but shall be and remain unsecured obligations of Trustor.

(e)     Trustor shall deliver to Lender such affidavits, reports, certificates or other written instruments as may be requested by Lender, in Lender's sole and absolute opinion and judgment, pertaining to Trustor's compliance with this paragraph 6. Lender may conclusively assume that the statements, facts, information and representations contained herein and/or in any affidavits, orders, receipts or other written instruments that are filed with Lender or exhibited to it, are true, complete and correct. Lender may rely thereon without any investigation or inquiry. By accepting or approving anything required to be observed, performed, fulfilled, or given to Lender pursuant to this paragraph 6, Lender shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision or condition thereof, or of Trustor's compliance with the terms of this Deed of Trust, and such acceptance or approval thereof shall not be or constitute any warranty or representation to anyone with respect thereto by Lender.

7.     **Legal Actions And Payment Of Related Costs**. Trustor shall appear in and defend any action or proceeding that may, in Lender's sole and absolute judgment, affect Lender's security interest under this Deed of Trust or any of the rights or powers of Lender or Trustee under this Deed of Trust. Whether or not Trustor so appears or defends, Trustor shall pay all costs and expenses, including, without limitation, costs of evidence of title, costs of any environmental assessment, and attorneys' fees, that are incurred by Trustor, Lender or Trustee in any such action or proceeding in which Lender or Trustee may appear, by virtue of being made a party defendant or otherwise, and irrespective of whether the interest of Lender or Trustee in the Property is directly questioned by such action or proceeding or whether Lender's rights or interests are otherwise adversely affected thereby, or whether Lender is or shall become a party, including by way of intervention. Trustor promises and agrees to give Lender notice in writing of the pendency of any such action or proceeding promptly, but in any event no later than ten (10) days, after Trustor first obtains knowledge (or should reasonably have obtained such knowledge) of the pendency of such action or proceeding. Trustor shall cooperate with Lender in any action that is brought by Lender to protect its security interest under this Deed of Trust. Trustor will, upon demand by Lender, commence any action or proceeding required to protect or facilitate Lender's recovery of Awards under paragraph 5 of this Deed of Trust. If Trustor fails to bring any such action or proceeding, then Lender may, but need not, do so, and Trustor shall pay to Lender all costs, expenses and attorneys' fees that are incurred by Lender in doing so. Whenever, under this Deed of Trust, or any other document or instrument evidencing or securing the indebtedness secured hereby, Trustor is obligated to appear in and defend Lender or defend or prosecute any action or proceeding, Lender shall have the right of full participation in any such action or proceeding, with counsel of Lender's choice, and all costs and expenses incurred by Lender in connection with such participation (including, without limitation, attorneys' fees) shall be reimbursed by Trustor to Lender within thirty (30) days upon written demand sent by Lender. In addition, Lender shall have the right to approve any counsel retained by Trustor in connection with the prosecution or defense of any such action or proceeding by Trustor, which approval shall not be unreasonably withheld. All costs or expenses required to be reimbursed by Trustor to Lender hereunder shall, if not paid within such thirty (30) day period, thereafter bear interest at the applicable rate of interest set forth in the Note. As used herein, "proceeding" shall include litigation (whether by way of complaint, answer, cross-complaint, counter claim or third party claim), arbitration and administrative hearings or proceedings, and shall include

commencement of any case or the filing of any petition for relief or other action under any Chapter of the U.S. Bankruptcy Code.

8. **Lender's Rights To Inspect The Property**. Lender and its agents, employees and contractors, may enter upon the Property at any time to inspect the Property for any purpose relating to Lender's rights and interests under the terms of this Deed of Trust, including, but not limited to, Trustor's compliance with the terms of paragraph 6.

9. **Substitution Of Trustee**. From time to time, by an instrument signed and acknowledged by Lender, and recorded in the Office of the Recorder of the County in which the Property is located, Lender may appoint a substitute trustee or trustees in place of the Trustee named in this Deed of Trust. Such instrument shall refer to this Deed of Trust and shall set forth the date and instrument number or book and page of its recordation. Upon recordation of such instrument, the Trustee named in this Deed of Trust shall be discharged and the new Trustee so appointed shall be substituted as trustee under this Deed of Trust with the same effect as if originally named Trustee in this Deed of Trust. An instrument recorded pursuant to the provisions of this paragraph 9 shall be conclusive proof of the proper substitution of such new Trustee.

10. **Miscellaneous Powers Of Lender And Trustee**. In addition to any other powers granted in this Deed of Trust to the Trustee, from time to time, upon the written request of Lender and upon the presentation of this Deed of Trust and any obligation secured by this Deed of Trust for endorsement, and without affecting any obligation secured by this Deed of Trust or the performance of the obligations set forth in this Deed of Trust, the Trustee may, without liability and without notice to any person: (a) reconvey all or any part of the Property to Trustor, (b) consent to the making of any map or plat of the Property, (c) join in granting any easement on the Property, (d) join in any agreement subordinating the lien of this Deed of Trust, (e) release any obligation secured by this Deed of Trust, in whole or in part, with regard to Trustor, extend or renew the Note or any other obligation secured by this Deed of Trust, (g) accept or release any additional security under this Deed of Trust, or (h) accept and release the guaranty of any additional person or any obligation secured by this Deed of Trust.

11. **Assignment And Collection Of Rents**. (a) Trustor hereby assigns absolutely to Lender the rents of the Property, with a revocable license to collect such rents as they become due and payable, prior to any default by Trustor under paragraph 14 of this Deed of Trust, being retained by Trustor. (b) Upon any default by Trustor under paragraph 14 of this Deed of Trust, such license will, automatically, be deemed revoked without the necessity for any act or notice by Lender, and Lender, in person, by agent or by judicially appointed receiver, shall be entitled to enter upon, take possession of and manage the Property and may collect the rents of the Property, and, after so taking possession, shall be entitled to collect any rents that are past due. Lender has, however, no duty to produce rents from the Property nor any responsibility for pursuing or collecting claims or rights of Trustor. If Trustor, at or immediately prior to such taking of possession by or on behalf of Lender, has operated a business upon the Property other than the rental thereof, the authority granted herein to so take possession of the Property shall also include the authority and power to take possession of the receipts of such business and, if appropriate, to operate such business, and the receipts thereof shall be deemed herein to be a form of rents. All rents collected by Lender or the receiver shall be applied first to payment of the costs of management of the Property and of collection of rents, including, but not limited to, costs and expenses of any receivership and attorneys' fees incurred by

2051003.4                                              14

Lender in connection with the receivership, and then to the Note (in such order as Lender may determine) and any other obligations secured by this Deed of Trust. Lender and the receiver shall be liable to account only for those rents actually received. (c) At any time whether or not an event of default exists under this Deed of Trust, or any other agreement or obligation secured by this Deed of Trust, Trustor shall, on demand, deliver to Lender from time to time all security deposits made by lessees to Trustor under the terms of any lease of all or part of the Property. These funds shall be held by Lender without interest payable to Trustor and as a part of and commingled with Lender's general funds. These funds, however, will be repayable to lessees pursuant to the provisions of the leases under which security deposits are made. In the event of any conflict between the provisions of this paragraph 11 and the provisions of a specific separate assignment of rents andor assignment of lease(s), the provisions of the specific assignment(s) shall be deemed to govern over the provisions of this paragraph.

12.    **Reconveyance Of The Property**. Upon the written request of Lender stating that the Note and all other obligations secured by this Deed of Trust have been discharged, and upon surrender of this Deed of Trust, the Note or any other notes or instruments evidencing such other obligations to the Trustee, and upon payment of the Trustee's fees, the Trustee shall reconvey, without warranty, the Property or that portion of the Property then held by the Trustee under this Deed of Trust. The recitals in any such reconveyance of any matters or facts shall be conclusive proof of the truthfulness of such matters or facts. The grantee in such reconveyance may be described as "the person or persons legally entitled thereto." When the Property has been fully reconveyed, the last such reconveyance shall operate as a reassignment of all of the rents of the Property to the person or persons legally entitled to such rents. Five (5) years after issuance of such full reconveyance, the Trustee may destroy this Deed of Trust and any such notes, unless directed in such request to retain them.

13.    **Change Of Lender's Records**. In the event Trustor requests Lender to change any of its records relating to the Property, the Note or this Deed of Trust (including, but not limited to, changes in mailing address or ownership of the Property), Trustor shall pay a reasonable fee prescribed by Lender to so change its records.

## ACCELERATION AND DEFAULT.

14.    **Conditions Under Which Lender May Declare A Default By Trustor**. A default under this Deed of Trust shall occur in the event that: (a) any sum payable under the Note is not made when due; (b) any sum the payment of which is required or secured by this Deed of Trust is not made when due; (c) Trustor fails to perform any other obligation required to be performed by Trustor under this Deed of Trust or secured by this Deed of Trust; (d) the Property is or becomes subject to any proceedings for abatement of a public nuisance; (e) any material information given to Lender by Trustor, intended to or which does, in fact, induce the granting of any loan secured by this Deed of Trust, was not true in any respect when given, or any material information requested or required by Lender is withheld or concealed by Trustor; or (f) an Event of Default (as defined under the Agreement) under the Agreement occurs.

15.    **Lender's Right To Require Immediate Payment In Full**. In the event: (a) of a default under this Deed of Trust, or (b) Trustor sells, transfers, grants, hypothecates, conveys, encumbers, alienates, or assigns (voluntarily, involuntarily, or by operation of law), enters into a

contract of sale of, or leases, the Property, or any portion of the Property or any interest therein, or (c) any interest in Trustor is sold, transferred, granted, hypothecated, conveyed, encumbered, alienated or assigned (voluntarily, involuntarily or by operation of law), except as permitted by the Agreement, Lender may, at its option and without further notice to any person, declare the entire principal balance and any other obligations under the Note and/or any other obligations secured by this Deed of Trust, together with accrued interest thereon and any prepayment penalties, immediately due and payable. As used herein, the term "transfer" includes, without limitation thereto, (i) the transfer of any general partnership or joint venture interest in Trustor or in any general partner of Trustor, or change in the general partners or joint venturers of Trustor or of any general partner of Trustor (if Trustor or any such general partner of Trustor is a partnership or a joint venture), and the transfer of any common or voting stock in Trustor or in any general partner of Trustor (if Trustor or any general partner of Trustor is a corporation), (ii) if Trustor is a limited partnership or limited liability company, any transfer of a limited partnership interest or limited liability company interest in a single transaction, or series of transactions, intended to transfer all or substantially all of the beneficial interest of the Property, or any part thereof, and (iii) if Trustor is not an individual, corporation, partnership or limited liability company, the transfer, directly or indirectly, of any beneficial interest in Trustor. Trustor shall provide to Lender a complete and exact duplicate copy of any contract providing for the transfer of any interest in the Property, or any deed of trust or similar instrument creating a lien or encumbrance on the Property, immediately upon the execution of any such contract, deed of trust, or other instrument. No waiver of Lender's right to accelerate shall be effective unless it is in writing.

16.    **Lender's Right To Perform Acts Trustor Fails To Perform And Indemnification**.

(a)    After the occurrence and during the continuance of a default under this Deed of Trust, Lender or Trustee, without notice to or demand upon Trustor and without releasing Trustor from any obligation under this Deed of Trust, may, but are not required to, make or do the same in such manner and to such extent as either may deem necessary or desirable to protect the security of this Deed of Trust. Lender and Trustee are authorized to (i) enter upon the Property for such purposes; (ii) appear in and defend any action or proceeding purporting to affect the security of this Deed of Trust or the rights or powers of Lender or Trustee; and (iii) pay, purchase, contest or compromise any encumbrance, charge, lien or claim of lien, in whole, in part and/or in installments, which in the judgment of either Lender or Trustee appears to be prior or superior to the lien of this Deed of Trust, the judgment of Lender or Trustee being conclusive of the matter as among the parties to this Deed of Trust. In exercising the above powers, Lender or Trustee may pay necessary costs and expenses, employ counsel, consultants, any other agents or independent contractors, and pay fees, compensation, and costs thereof. Trustor promises and agrees to pay to Lender within thirty (30) days upon written demand sent by Lender all amounts so expended by Lender or Trustee (including all such costs, expenses and attorneys' fees) under this paragraph 16, together with any fees charged by Lender in regard to such activity by Lender and interest from the date of expenditure at the applicable rate of interest set forth in the Note, with payment of such amounts being secured by this Deed of Trust.

(b)    Trustor hereby indemnifies and agrees to defend and hold harmless Lender and Trustee and their directors, officers, shareholders, agents and employees (individually and collectively the "Indemnitees") from and against: (i) any and all claims, demands, actions, liabilities, or causes of action that are asserted against any Indemnitee by any person or entity if the claim,

demand, action, liability, or cause of action, directly or indirectly, relates to a claim, demand, action, liability, or cause of action that the person or entity has or asserts based upon, arising out of, or in connection with, the Property, the conduct of Trustor, any action or non-action by Trustor in connection with the Property, or this Deed of Trust; and (ii) any and all claims, liabilities, losses, costs, or expenses (including court costs and attorneys' fees) that any Indemnitee suffers or incurs as a result of the assertion of any such claim, demand, action, liability or cause of action. The foregoing indemnity shall survive the release of this Deed of Trust, whether such release is as a result of payment of the indebtedness secured hereby, foreclosure, acceptance of a deed in lieu of foreclosure, other action, or otherwise.

17.   **Trustee's Rights And Duties To Sell The Property**.  (a) In the event of a default under this Deed of Trust by Trustor, Lender may then or thereafter execute or cause the Trustee to execute a written notice of such default and of its election to have the Property sold to satisfy the obligations secured by this Deed of Trust. Such notice shall be recorded in the office of the Recorder of the County where the Property is located. (b) When the minimum period of time required by law following recordation of such notice of default has elapsed, and notice of sale having been given as then required by law, the Trustee, without demand upon Trustor, shall sell the Property at the time and place of sale fixed by it in the notice of sale, either as a whole or in separate parcels, and in such order as Lender may determine, at public auction to the highest bidder for cash or a cash equivalent acceptable to Trustee, in lawful money of the United States, payable at time of sale. Lender shall have the right, at its option, to offset Lender's bid(s) to the extent of the total amount due Lender, including but not limited to all Trustee's fees, costs, expenses (including, without limitation, premiums for guarantees or other evidence of title), and other amounts secured by this Deed of Trust. The Trustee may postpone the sale of all or any portion of the Property by public notice at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement at the time fixed by the preceding postponement. Additionally, Lender, from time to time before any Trustee's sale, may rescind or cause to be rescinded any notice of default and election to sell or notice of sale by executing and delivering to Trustee a written notice of such rescission, which notice, when recorded, shall also constitute a cancellation of any prior declaration of default and demand for sale. The exercise by Lender of such right of rescission shall not constitute a waiver of any breach or default then existing or subsequently occurring, or impair the right of Lender to execute and deliver to Trustee, as above provided, other declarations or notices of default and demand for sale of the Property to satisfy the obligations hereof, nor otherwise affect any provision, covenant or condition of the Note or the Agreement or any of the rights, obligations or remedies of Trustee to Lender. (c) The Trustee shall deliver to the purchaser at such sale its deed conveying the Property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. (d) Any person, including Trustor, Lender or Trustee may purchase at such sale. After deducting all costs, fees and expenses of the Trustee and of this Deed of Trust, including, without limitation, cost of evidence of title, cost of environmental assessment, and attorneys' fees in connection with the sale, the Trustee shall apply the proceeds of the sale to the payment of: first, all sums expended under the terms of this Deed of Trust not then repaid, with interest at the applicable rate of interest set forth in the Note; second, the payment of all other sums then secured by this Deed of Trust; and third, the remainder, if any, to the person or persons legally entitled to such proceeds.

18.   **Other Remedies If Trustor Defaults**.  (a) All of the remedies of Lender and Trustee set forth in this Deed of Trust are intended to be in addition to and not in substitution for any other

remedies available to Lender or Trustee at law or in equity. It is expressly understood and agreed that Lender or Trustee, or both, may bring suit in any court of competent jurisdiction to foreclose this Deed of Trust by judicial action or to obtain specific performance of the assignment of rents contained in this Deed of Trust. In connection with any such action, Lender or Trustee may apply to the court for the appointment of a receiver to take possession of the Property, operate the business of Trustor being conducted on the Property, utilize and enforce all agreements of Trustor in respect of the operation of such business, the utilization of any such agreement being at the election of Lender or the receiver, to be exercised at any time after declaration of a default hereunder, receive the rents of the Property and apply the same to the obligations of Trustor under this Deed of Trust and under the Note and any other obligations secured by this Deed of Trust. (b) Neither the acceptance of this Deed of Trust nor its enforcement in any manner shall prejudice the right of Lender or Trustee to realize upon or enforce any other security now or later held by Lender or Trustee. Trustor promises and agrees that the rights of Lender and Trustee under this Deed of Trust, and with respect to any other security now or later held by Lender, may be enforced in such order and manner as Lender and Trustee, or either of them, may determine in their sole and absolute discretion.

19.     **Trustor's Obligations And Lender's Rights Not Waived**. By accepting payment of any sum secured by this Deed of Trust after its due date, or by accepting late performance of any obligation secured by this Deed of Trust, or by making any payment or performing any act on behalf of Trustor that Trustor was obligated to make or perform under this Deed of Trust but failed to make or perform, or by adding any payment so made by Lender to the Note secured by this Deed of Trust, Lender does not waive its right either to require prompt payment when due of all other sums so secured or to declare default for failure to make any such prompt payment or to perform any such act. No failure or delay on the part of Lender, Trustee, or any holder of the Note or this Deed of Trust in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any such power, right or privilege shall preclude any other or further exercise thereof or of any other right, power or privilege. No exercise of any right or remedy of Lender or Trustee under this Deed of Trust shall constitute a waiver of any other right or remedy contained in this Deed of Trust or provided by law. All rights and remedies existing under this Deed of Trust are cumulative to, and not exclusive of, any rights or remedies otherwise available.

20.     **Successors In Interest**. The terms, agreements, and conditions contained in this Deed of Trust shall apply to, be binding upon and inure to the benefit of, all of the parties to this Deed of Trust, their heirs, personal representatives, successors and assigns.

21.     **Statements Concerning The Status Of The Loan**. From time to time as required by law, Lender shall furnish to Trustor such statements as may be required concerning the status of the obligations secured by this Deed of Trust. Trustor promises and agrees to pay to Lender within thirty (30) days upon written demand sent by Lender for such statements the maximum amount permitted by law.

22.     **Trustee's Obligations**. The Trustee accepts this trust when this Deed of Trust, duly executed and acknowledged, is made a public record as provided by law. The Trustee is not obligated to notify any party to this Deed of Trust of a pending sale under any other deed of trust or of any action or proceeding in which Trustor, Lender or Trustee is a party unless such action is brought by the Trustee. The Trustee shall not be obligated to perform any act required of it under this

Deed of Trust unless the performance of such act is requested in writing and the Trustee is reasonably indemnified against loss, costs, liability and expense.

23. **Obligations Of Trustor Are Joint And Several; Gender And Number**. If more than one person has executed this Deed of Trust as "Trustor," the obligations of all such persons under this Deed of Trust shall be joint and several. In this Deed of Trust, whenever the context so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

24. **No Offsets**. No offset or claims which Trustor now or in the future may have against Lender shall relieve Trustor from making payments or performing any other obligations contained in or secured by this Deed of Trust. Despite any right or option that may be granted to Lender or Trustee by this Deed of Trust or in the evidence of any obligations secured by this Deed of Trust or document ancillary to this Deed of Trust to receive, collect, accept deposit of, use, apply or in any other manner obtain or dispose of any funds or property, the same shall not be deemed to constitute any credit against or to satisfy any obligation secured by this Deed of Trust, in whole or in part, unless and until such funds or property shall be both so obtained and expressly so applied by Lender or Trustee to such satisfaction of such obligation and then only in the manner and to the extent of such application.

25. **Governing Law**. The loan secured by this Deed of Trust is made pursuant to the laws of the State of California, and the rules and regulations promulgated thereunder. The loan contracts between the parties, including this Deed of Trust, shall be construed and governed by such laws, rules, and regulations.

26. **Agreement Changed Only By Writing**. This Deed of Trust cannot be changed except by agreement in writing signed by Trustor and Lender.

27. **Time**. Time is of the essence in connection with all of Trustor's obligations under this Deed of Trust.

28. **Notice**.

(a)     Except for any notice required under applicable law to be given in another manner, any notice to Trustor, Trustee or Lender provided for in this Deed of Trust shall be addressed to Trustor, Trustee or Lender at their respective address set forth below, or to such other address as they may designate by notice to the other parties hereto pursuant to the terms of paragraph 28 from time to time:

Lender:

EVERTRUST BANK
18645 E. Gale Avenue, Suite 110
City of Industry, California 91748
Attention: Annie Ng, First Vice President / Loan Service Manager

Trustor:

THE SOURCE HOTEL, LLC
3100 East Imperial Highway
Lynwood, California 90262
Attention: Donald Chae & Min Chae

With a copy to:

LIM, RUGER & KIM, LLP
1055 West Seventh Street, Suite 2800
Los Angeles, California 90017-2554
Attention: Real Estate Department
Facsimile: (213) 955-9511

Trustee:
STEWART TITLE OF CALIFORNIA, INC.
200 E. Sandpointe Ave., Suite 150
Santa Ana, California 92707

　　　　(b)　　　Except as otherwise provided by law, all notices, requests, demands, directions, and other communications provided for in this Deed of Trust must be in writing and sent by facsimile and mail or certified mail to the appropriate party at its respective address. Any notice given by facsimile must be confirmed within forty-eight (48) hours by letter mailed via regular mail to the appropriate party at its respective address. If any notice is given by certified mail, it will be effective when deposited in the mails with first class or airmail postage prepaid; or if given by facsimile and mail, when the facsimile is sent.

　　　　29.　　**Titles, Captions, And Headings**.  The titles, captions, and headings to paragraphs contained in this Deed of Trust are for assistance in identification only and are not to be considered part of the substance of the provisions of this Deed of Trust.

　　　　30.　　**Severability Of Provisions**.  If any paragraph, clause or provision of this Deed of Trust is construed or interpreted by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those paragraphs, clauses or provisions so construed or interpreted and shall not affect the remaining paragraphs, clauses and provisions of this Deed of Trust.

　　　　31.　　**Acknowledgment Of Trustor's Understanding Of Deed Of Trust**.  The foregoing terms, provisions and conditions of this Deed of Trust have been read and are understood by Trustor. Trustor hereby acknowledges receipt of a copy of this Deed of Trust.

　　　　32.　　**Lender's Reliance**.  The financial accommodations made or to be made by Lender to Trustor are being made, renewed or extended, as applicable, by Lender to Trustor at the request and urging of Trustor and this Deed of Trust is being given in consideration of such financial

2051003.4

accommodations, and Lender may rely upon the validity and enforceability of this Deed of Trust in making such financial accommodations.

33. **Security Agreement and Fixture Filing**.

(a)    <u>Security Interest and Fixture Filing</u>. This Deed of Trust shall also constitute and serve as a security agreement and financing statement for Personalty, Fixtures, and any of the Property in which a security interest can be perfected under and within the meaning of Division 9 of the California Uniform Commercial Code, and shall grant to Lender, until the obligations secured hereby shall be satisfied, a first priority security interest, including but not limited to a fixture filing, pursuant to Division 9 of the California Uniform Commercial Code with respect to the Personalty and Fixtures. To this end, Trustor shall and hereby does grant to Lender, a first priority security interest in, under and to the Personalty, Fixtures, and any of the Property in which a security interest can be perfected under Division 9 of the California Uniform Commercial Code.

(b)    <u>Financing Statements</u>. Trustor shall deliver to Lender, in form and substance satisfactory to Lender, such financing statements and further assurances as Lender may, from time to time, require to create, perfect, and preserve Lender's security interest herein granted, and Lender may cause such financing statements and assurances to be recorded and filed at such times and places as may be required or permitted by law to so create, perfect and preserve such security interest

(c)    <u>Remedies on Default</u>. Upon default, Lender may, at its option: (i) exercise any remedy permitted by law or in equity, including without limitation, all the rights and remedies of a secured party under the California Uniform Commercial Code in any jurisdiction where enforcement is sought, whether in California or elsewhere; (ii) notify any parties obligated on any of the Personalty or Fixtures to make payment to Lender and enforce collection thereof; and (iii) apply any sums received or collected from or on account of any Personalty or Fixtures, including the proceeds of any sales thereof, to the payment of any indebtedness of Trustor to Lender in any order, including the costs and expenses incurred in preserving and enforcing the rights of Lender and attorneys' fees, in such order and manner as Lender in Lender's sole discretion determines. All of Lender's rights and remedies shall be cumulative and not exclusive.

(d)    <u>Fixture Filing</u>. This Deed of Trust shall constitute a fixture filing under the California Uniform Commercial Code. Lender's address from which information concerning Lender's security interest can be obtained is set forth in paragraph 28 above, subject to change as therein provided.

34. **Sale Of Interest**. Trustor acknowledges and accepts that Lender may, at any time, in Lender's sole discretion sell all or any portion of Lender's interest in the Note and this Deed of Trust to one or more third parties. The sale of all or any part of Lender's interest in the Note or Deed of Trust shall not relieve Trustor of any of Trustor's obligations hereunder.

35. **Separate Property**. Any married person executing this Deed of Trust in an individual capacity agrees that recourse may be had to his or her separate property for satisfaction of all sums secured under this Deed of Trust.

36.     **Books And Records**.  Trustor shall keep and maintain at all times at Trustor's address stated above, or at such other place as Lender may approve in writing from time to time, complete and accurate books or accounts and records adequate to reflect correctly the results of the operation of the Property and copies of all written contracts, leases, rental agreements, concessions, licenses, and other documents and instruments which affect the Property, or any portion thereof or interest therein. Such books, records, contracts, leases, documents, and other instruments shall be subject to examination and inspection by Lender, or Lender's agents or designated auditors, at any time. Trustor shall furnish to Lender, as provided in the Agreement, a balance sheet, a statement of income and expense of the Property, and a statement of changes in financial position, each in reasonable detail and if requested by Lender, prepared in accordance with generally accepted accounting principles consistently applied, and certified by Trustor and, if Lender shall so require, by an independent certified public accountant. As provided for in the Agreement, Trustor shall furnish, together with the foregoing financial statements, and at any other time upon Lender's request, a rent schedule for the Property, certified by Trustor, showing the name of each tenant and, for each tenant, the space occupied, the expiration date of the lease or rental agreement, the rent payable and the rent paid, the security deposit held, and such other information regarding the leasing of the Property as Lender shall require. Upon Lender's request, Trustor shall also provide to Lender, within fifteen (15) days after request, such interim statements of income and expense as Lender shall require, and current financial statements of Trustor and any manager of Trustor, and any Guarantor. Such statements shall be prepared in accordance with generally accepted accounting principles consistently applied, certified as being complete and accurate by the party whose statement is being furnished and, if required by Lender, by an independent certified public accountant.

37.     **Financial Statements**.  Trustor, and any other person or entity liable for any of the obligations of Trustor hereunder, or to which the Deed of Trust refers, shall, upon Lender's request, or as provided in the Agreement, provide to Lender complete and accurate financial statements presenting the financial condition of Trustor and each such obligor as of the date of such financial statements are prepared and delivered to Lender, including but limited to all audited financial statements and accompanying opinions, qualifications, and footnotes of the auditor preparing them, or in the absence of such audited financial statements, their respective consolidated and consolidated balance sheets, income statements, sources and uses of funds, and such other supplemental reports and schedules as Lender shall require. If requested by Lender, all such financial statements shall be prepared in accordance with generally accepted accounting principles consistently applied, or in such other form and content as Lender may permit, in its sole opinion and judgment. All such financial statements shall contain a certification signed by one or more authorized representative of Trustor and such other obligors certifying the completeness and accuracy of all information therein, without exception.

38.     **Inspection, Appraisal, And Assessments**.  Lender may, at any time and from time to time and as and when Lender deems it to be appropriate, whether or not Trustor is then in default, (a) enter upon the Premises directly or through one or more agents or independent contractors, to inspect any and all Property which is security for the obligations herein described, and (b) cause to be performed and prepared one or more appraisals and/or preliminary or other environmental assessments of the Property, or any portion thereof, in form and content satisfactory to Lender and meeting all requirements or standards of applicable laws, regulations, ordinances, orders, and generally recognized industry standards relating thereto. All costs and expenses incurred by Lender or Trustee in connection with any such inspection, appraisal, or assessment, shall be payable by

Trustor to Lender within thirty (30) days upon written demand sent by Lender and shall be secured by this Deed of Trust. All reports and other evidence and work papers relating to such inspections, appraisals, and assessments, shall be and remain the sole property of Lender, and Trustor hereby waives any right which Trustor may have by agreement or by operation of law to receive an original or duplicate thereof. Any appraisal or assessment may, at Lender's sole election, be relied upon by Lender in taking any action Lender deems to be necessary or appropriate in connection with the enforcement of its rights and exercise of remedies under or by virtue of this Deed of Trust, or under any obligation secured hereby, or under any separate obligation pertaining to the Property, or in connection with the protection, maintenance, preservation, remediation, restoration, or repair of the Property. Unless Lender otherwise expressly declares in writing, neither said appraisal nor assessment shall constitute conclusive evidence of the value or condition of the Property or as a representation or warranty by Lender as to the value or condition of the Property, and may not be used or relied upon by Trustor for any purpose.

39.    **Definitions**.  All terms not defined herein shall be defined as set forth in the Agreement.

40.    **Ground Lease**.  The property granted by this Deed of Trust includes a leasehold interest, and there is attached hereto an Leasehold Rider to Deed of Trust, the terms of which are incorporated herein by reference as though fully set forth in the main text.

41.    **No Merger of Ground Lease**.  Trustor is the lessee under the Ground Lease. No merger of the Ground Lease with the Property shall occur by reason of any fact or circumstance whatsoever, including, without limitation, Trustor's acquisition of the fee title to the Property. It is the intention of Trustor that Trustor's fee interest in the Property be and remain separate from Trustor's leasehold interest in the Ground Lease.

THE UNDERSIGNED TRUSTOR REQUESTS THAT A COPY OF ANY NOTICE OF DEFAULT AND ANY NOTICE OF SALE HEREUNDER BE MAILED TO TRUSTOR, AT TRUSTOR'S ADDRESS SET FORTH ABOVE.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Trustor has executed this Construction Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing (Leasehold) as of the date and year first above written.

**TRUSTOR:**

THE SOURCE HOTEL, LLC,
a California limited liability company

By:    M + D Properties,
       a California corporation
Its:    Manager

       By:      _____
       Name: Donald Chae
       Its:    President

(ALL SIGNATURES MUST BE ACKNOWLEDGED)

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California    )
County of _Los Angeles_    )

On _May 31, 2016_, before me, _Connie Dang_, a Notary Public, personally appeared _Donald Chae_,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

CONNIE DANG
Commission # 2030624
Notary Public - California
Los Angeles County
My Comm. Expires Jun 23, 2017

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California    )
County of _____    )

On _____, before me, _____, a Notary Public, personally appeared _____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

# EXHIBIT "A"
# LEGAL DESCRIPTION

[SEE ATTACHED.]

**The land referred to herein is situated in the State of California, County of Orange and described as follows:**

THAT PORTION OF LOT 2 IN BLOCK 61 OF BUENA PARK, IN THE CITY OF BUENA PARK, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 18, PAGES 50 TO 52 INCLUSIVE, OF MISCELLANEOUS MAPS, AND THOSE PORTIONS OF LOTS 5 TO 9 INCLUSIVE OF TRACT NO. 1756, AS PER MAP RECORDED IN <u>BOOK 60 PAGES 20 AND 21</u> OF MISCELLANEOUS MAPS, ALL IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

PARCEL 4A (LEVEL 1 - GROUND FLOOR LOBBY & ENTRANCE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 215.36 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 45.77 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE S 00°00'02" W 86.05 FEET, THENCE N 89°59'59" W 22.68 FEET, THENCE S 00°01'05" W 13.56 FEET, THENCE S 89°59'59" E 22.57 FEET, THENCE S 00°00'02" W 8.22 FEET, THENCE N 89°59'58" W 0.77 FEET, THENCE S 00°00'02" W 34.16, THENCE N 89°59'59" W 110.62 FEET, THENCE N 00°00'02" E 34.17 FEET, THENCE N 89°59'58" W 30.58 FEET, THENCE N 00°00'02" E 107.52 FEET, THENCE N 89°59'58" W 0.83 FEET, THENCE N 00°00'02" E 8.95 FEET, THENCE S 89°59'58" E 24.08 FEET, THENCE N 46°29'04" E 12.47 FEET, THENCE N 00°00'02" E 16.97 FEET, THENCE S 89°59'58" E 18.12 FEET, THENCE N 00°00'02" E 5.22 FEET, THENCE N 89°57'39" E 30.73 FEET, THENCE N 00°00'02" E 32.17 FEET, THENCE N 89°59'58" W 11.92 FEET, THENCE N 00°02' E 1.00 FEET, THENCE S 89°59'58" E 0.50 FEET, THENCE N 00°00'02" E 14.21 FEET, THENCE S 89°59'58" E 39.78 FEET, THENCE S 00°00'02" W 86.82 FEET, THENCE S 89°59'58" E 32.58 FEEL TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 77.76 FEET.

PARCEL 4B (LEVEL 1 - GROUND FLOOR STAIRS ON ORANGETHORPE AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF ORANGETHORPE AVENUE AS SHOWN ON SAID MAP S 89°27'51" E 199.02 FEET; THENCE LEAVING SAID CENTERLINE N 0°32'09" E 60.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE N 0°00'02" E 36.96 FEET; THENCE S 89°59'58" E 14.74 FEET; THENCE S 0°00'02" W TO A POINT ON SAID PARALLEL LINE; THENCE ALONG SAID PARALLEL LINE N 89°27'51" W 14.74 TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 77.76 FEET.

PARCEL 4C (LEVEL 1 - GROUND FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 339.38 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 46.71 FEET TO THE TRUE POINT OF

BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 23.40 FEET; THENCE SOUTH 7.24 FEET; THENCE WEST 5.88 FEET; THENCE SOUTH 6.55 FEET; THENCE WEST 29.28 FEET; THENCE NORTH 13.79 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 77.76 FEET.

PARCEL 4D (LEVEL 2 - SECOND FLOOR HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 223.82 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE S 00°27'49" W 94.43 FEET; THENCE N 89°59'59" W 31.75 FEET; THENCE S 00°01'05" W 13.56 FEET; THENCE S 89°59'59" E 31.65 FEET; THENCE S 00° 27'49" W 36.79 FEET; THENCE S 45°29'59" W 26.85 FEET; THENCE N 89°27'51" W 110.52 FEET; THENCE N 00°00'02" E 36.98 FEET; THENCE N 89°59'58" W 19.37 FEET; THENCE S 00°00'02" W 25.13 FEET; THENCE N 89°59'58" W 12.81 FEET; THENCE N 00°00'02" E 90.73 FEET; THENCE S 89° 59'58" E 62.50 FEET; THENCE N 00°00'00" E 30.00 FEET; THENCE S 89°59'58" E 15.42 FEET; THENCE N 00°00'02" E 29.98 FEET; THENCE S 89°59'58" E 85.09 FEET; TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET.

PARCEL 4E (LEVEL 2 - SECOND FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 339.38 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 46.71 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 23.40 FEET; THENCE SOUTH 7.24 FEET; THENCE WEST 5.88 FEET; THENCE SOUTH 6.55 FEET; THENCE WEST 29.28 FEET; THENCE NORTH 13.79 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET.

PARCEL 4F (LEVEL 3 -THIRD FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 339.38 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 46.71 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 23.40 FEET; THENCE SOUTH 7.24 FEET; THENCE WEST 5.88 FEET; THENCE SOUTH 6.55 FEET; THENCE WEST 29.28 FEET; THENCE NORTH 13.79 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET.

PARCEL 4G (LEVEL 3  - THIRD FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND

28

BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 186.84 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 45.54 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 22.05 FEET; THENCE SOUTH 9.15 FEET; THENCE EAST 5.84 FEET; THENCE SOUTH 10.38 FEET; THENCE WEST 1.58 FEET; THENCE SOUTH 4.17 FEET; THENCE EAST 9.81 FEET; THENCE SOUTH 10.37 FEET; THENCE EAST 12.08 FEET; THENCE NORTH 9.62 FEET; THENCE EAST 1.44 FEET; THENCE NORTH 24.44 FEET TO THE SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET.

PARCEL 4H (LEVEL 3 - THIRD FLOOR STAIRS ON ORANGETHORPE AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF ORANGETHOPE AVENUE AS SHOWN ON SAID MAP S 89°27'51" E 199.02 FEET; THENCE LEAVING SAID CENTERLINE N 0°32'09" E 60.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE N 0°00'02" E 36.96 FEET; THENCE S 89°59'58" E 14.74 FEET; THENCE S 0°00'02" W TO A POINT ON SAID PARALLEL LINE; THENCE ALONG SAID PARALLEL LINE N 89°27'51" W 14.74 TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET.

PARCEL 4I (LEVEL 4 - FOURTH FLOOR HOTEL PARCEL INCLUDING DECK)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 72.90 FEET; THENCE SOUTH 13.76 FEET; THENCE WEST 18.27 FEET; THENCE SOUTH 114.50 FEET; THENCE WEST 92.89 FEET; THENCE SOUTH 130.52 FEET; THENCE EAST 12,99 FEET; THENCE SOUTH 32.75 FEET TO A POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE; THENCE ALONG SAID PARALLEL LINE S 89°27'51" E 143.94 FEET; THENCE N 45°29'59" E 26.85 FEET TO A POINT ON SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE; THENCE ALONG LAST SAID PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 161.18 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76 FEET.

PARCEL 4J (LEVEL 5 - FIFTH FLOOR HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 72.90 FEET; THENCE SOUTH 165.38 FEET; THENCE WEST 6.81 FEET; THENCE

SOUTH 20.33 FEET; THENCE EAST 6.81 FEET; THENCE SOUTH 28.65 FEET; THENCE WEST 105.43 FEET; THENCE SOUTH 44.42 FEET; THENCE EAST 12.99 FEET; THENCE SOUTH 32.75 FEET TO A POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE; THENCE ALONG SAID PARALLEL LINE S 89°27'51" E 143.94 FEET; THENCE N 45°29'59" E 26.85 FEET TO A POINT ON SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE; THENCE ALONG LAST SAID PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 171.60 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 161.18 FEET.

PARCEL 4K (LEVEL 6 - SIXTH FLOOR HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 72.90 FEET; THENCE SOUTH 165.38 FEET; THENCE WEST 6.81 FEET; THENCE SOUTH 20.33 FEET; THENCE EAST 6.81 FEET; THENCE SOUTH 28.65 FEET; THENCE WEST 105.43 FEET; THENCE SOUTH 44.42 FEET; THENCE EAST 11.33 FEET; THENCE SOUTH 32.75 FEET TO A POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE; THENCE ALONG SAID PARALLEL LINE S 89°27'51" E 145.60 FEET; THENCE N 45°29'59" E 26.85 FEET TO A POINT ON SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE; THENCE ALONG LAST SAID PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 182.02 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 171.60 FEET.

PARCEL 4L (LEVEL 7 - SEVENTH FLOOR & ROOF HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 72.90 FEET; THENCE SOUTH 165.38 FEET; THENCE WEST 6.81 FEET; THENCE SOUTH 20.33 FEET; THENCE EAST 6.81 FEET; THENCE SOUTH 28.65 FEET; THENCE WEST 105.43 FEET; THENCE SOUTH 44.42 FEET; THENCE EAST 12.99 FEET; THENCE SOUTH 32.75 FEET TO A POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF OANGETHORPE AVENUE; THENCE ALONG SAID PARALLEL LINE S 89°27'51" E 143.94 FEET; THENCE N 45°29'59" E 26.85 FEET TO A POINT ON SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE; THENCE ALONG LAST SAID PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 210.00 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 182.02 FEET.

ELEVATIONS STATED HEREON ARE BASED ON THE NORTH AMERICAN VERTICAL DATUM OF 1988 (NAVD88) PER THE YEAR 2005 ADJUSTMENT BY THE ORANGE COUNTY SURVEYOR, USING THE FOLLOWING BENCHMARK:

OCS BM 404-31-05 ELEV.=80.151 FEET (NAVD88, YEAR 2005 LEVELED) STATION IS AN OCS

**ALUMINUM DISK STAMPED 404-31-05 SET IN THE SE'LY CORNER OF A 15 FT. X 4.5 FT. CONCRETE CATCH BASIN, LOCATED IN NE'LY PORTION OF INTERSECTION OF STANTON AVE. & ARTESIA BLVD., 28 FT. N'LY OF THE CENTERLINE OF ARTESIA BLVD. & 81 FT. E'LY OF THE CENTERLINE OF STANTON AVENUE. MONUMENT IS LEVEL WITH THE SIDEWALK**

**APN:  276-361-20 and 276-361-22**
**(End of Legal Description)**

# EXHIBIT "B"
## (Permitted Toxic Materials)

There shall not be any hazardous and/or toxic materials at, on, in, around and/or under the Property and improvements, other than those as used in the regular course of business and for which Trustor has licenses from the proper authority, such as a government agency or regulatory body, and further, notwithstanding the foregoing, Trustor hereby expressly covenants, represents and warrants to Lender that all such materials shall be used or stored in strict compliance with the provisions as set forth in paragraph 6(c) of said Deed of Trust for compliance with all state and federal laws, rules, regulations, relating to or governing the use, storage and/or presence of toxic substances and/or hazardous materials.

Notwithstanding any provisions to the contrary contained in this Exhibit "B" and paragraph 6(c) of the Deed of Trust, in the event Trustor has executed any unsecured Environmental Indemnity in favor of Lender pertaining to the presence or release of hazardous materials and/or toxic substances or other similar substances upon, within or from the Property, then the covenants, duties and liabilities of Trustor, and the rights and remedies of Lender with respect to the subject of hazardous materials and/or toxic substances, shall be governed by the provisions of the Environmental Indemnity in addition to the provisions of the Deed of Trust; provided, however, that the provisions of said Environmental Indemnity shall prevail and exclusively govern the subject matter to the extent of any duplication, conflict or inconsistency between such provisions and the provisions of this Deed of Trust, and payment or performance of Trustor's obligations under said Environmental Indemnity shall not be secured by this Deed of Trust, but shall be and remain unsecured obligations of the Trustor.

## LEASEHOLD RIDER TO CONSTRUCTION DEED OF TRUST

This Leasehold Rider to Construction Deed of Trust ("Rider") is attached to and made a part of the Construction Deed of Trust, Assignment of Rents, Security agreement and Fixture Filing (Leasehold) dated as of May 24, 2016 (the "Deed of Trust"), executed by THE SOURCE HOTEL, LLC, a California limited liability company ("Trustor"), naming EVERTRUST BANK, a California banking corporation, ("Beneficiary"), as beneficiary, and encumbering the real property which is described in the Deed of Trust.

For valuable consideration, the Deed of Trust is amended by adding the following new paragraphs:

**GROUND LEASE.**

A.    Trustor (a) shall perform each and every obligation of the tenant under the Ground Lease (as defined in the Deed of Trust) and shall not permit or suffer any default under the terms of the Ground Lease; (b) shall not amend, modify, terminate, cancel, or surrender its interest in the Ground Lease without Lender's prior written consent; (c) shall give immediate written notice to Lender of (i) any default by the landlord under the Ground Lease (the "Lessor") actually known to Trustor; (ii) any notice received by Trustor from the Lessor of any default by Trustor under the Ground Lease; and (iii) any other default by Trustor under the Ground Lease; and (d) shall furnish to Lender all information which Lender may from time to time request regarding Trustor's performance under the Ground Lease.

B.    Whenever the context of this Deed of Trust reasonably requires, the term "Property," as used in this Deed of Trust, shall be deemed to include the leasehold estate under the Ground Lease and any other leasehold interest of Trustor in the Land and/or other real or personal property which is the subject of the Ground Lease (the "Ground Lease Premises").

C.    If Trustor shall, directly or indirectly, acquire fee title or any other estate or interest in the Ground Lease Premises, this Deed of Trust shall attach to and encumber such fee title or other estate or interest without further action by Trustor, the Trustee under the Deed of Trust, or Lender.

D.    There shall be no merger of the leasehold estate arising under the Ground Lease with all or any portion of the fee estate in the Ground Lease Premises by reason of the fact that such leasehold estate may be held by any person who shall hold all or any portion of such fee estate in the Ground Lease Premises, unless Lender shall expressly agree otherwise in writing.

E.    If Trustor fails to perform any of its obligations as tenant under the Ground Lease, Lender, at its option, shall have the right to pay or perform any or all of such obligations in such manner and to such extent as Lender determines to be necessary or appropriate to preserve or protect the security for the indebtedness and obligations secured by this Deed of Trust (collectively, the "Obligations"). All costs, expenses, and advances, including without limitation attorneys' fees, incurred or made by Lender in connection with the payment or performance of such Obligations under the Ground Lease shall be payable by Trustor to Lender on Lender's demand, shall bear interest at the rate specified in the promissory note secured hereby (the "Note") from the date of expenditure by Lender, and shall be deemed to be secured by this Deed of Trust and all other

agreements given by Trustor to secure the Note. Nothing contained in this Deed of Trust shall be construed to obligate Lender to pay or perform such Obligations or shall constitute a waiver of any default by Trustor under this Deed of Trust or of any of Lender's rights in connection with the Loan.

F.    Upon obtaining knowledge of any filing of a petition by or against the Lessor under the Bankruptcy Code, 11 U.S.C. § 101 et seq., Trustor shall, within three (3) days, give written notice of such filing to Lender setting forth any information available to Trustor as to the date of such filing, the court in which such petition was filed, and the relief sought therein. Trustor shall deliver to Lender a copy of all notices, pleadings, applications and other documents received by Trustor in connection with any such petition and any proceedings relating thereto promptly following Trustor's receipt of any such documents or items.

G.    The lien of this Deed of Trust shall attach to all of Trustor's rights and remedies arising from time to time under or pursuant to Section 365(h) of the Bankruptcy Code, 11 U.S.C. § 365(h), including without limitation all of Trustor's rights to remain in possession of the Ground Lease Premises.

H.    Trustor shall not elect to treat the Ground Lease as terminated under Section 365(h)(1) of the Bankruptcy Code, 11 U.S.C. §365(h)(1), without Lender's prior written consent, and any exercise or attempted exercise by Trustor of such election without Lender's prior written consent shall be void.

I.    Trustor absolutely and unconditionally assigns and transfers to Lender all of Trustor's claims and rights to the payment of damages (collectively, the "claims") arising from any rejection of the Ground Lease by the Lessor pursuant to the Bankruptcy Code, 11 U.S.C. § 101 et seq. Lender, at its option, shall have the right to proceed in its own name or in the name of Trustor with respect to any claim, suit, action or proceeding relating to the Lessor's rejection of the Ground Lease, including without limitation the right to file and prosecute, to the exclusion of Trustor, any proofs of claim, complaints, motions, applications, notices and other documents in any case filed by or against the Lessor under the Bankruptcy Code. Notwithstanding anything to the contrary contained in this Deed of Trust, the assignment contained herein is an absolute assignment and not an assignment as security. Any amounts received by Lender pursuant to this paragraph as damages arising out of the Lessor's rejection of the Ground Lease shall be applied to the Obligations at such time and in such order and amounts as Lender shall determine in its sole and absolute discretion.

J.    If pursuant to Section 365(h) of the Bankruptcy Code, 11 U.S.C. § 365(h)(2), Trustor seeks to offset against the rent reserved in the Ground Lease the amount of any damages caused by the non-performance by the Lessor of any of the Lessor's obligations under the Ground Lease after the Lessor's rejection of the Ground Lease under the Bankruptcy Code, prior to effecting such offset, Trustor shall provide Lender with written notice of Trustor's intent to do so setting forth the amounts which Trustor proposes to offset and the basis for the proposed offset (the "Offset Notice"). Lender, at its option, shall have the right to object to all or any part of such offset. In the event of such objection by Lender, Trustor shall not effect any offset of the amounts as to which Lender has objected. If Lender fails to give Trustor written notice of Lender's objections within thirty (30) days after Lender's receipt of the Offset Notice, Trustor may proceed to effect such offset in the amounts set forth in the Offset Notice. Neither Lender's failure to object, in whole or in part, to any proposed

offset by Trustor nor any communication between Lender and Trustor relating to such offset shall constitute Lender's approval of any such offset.

K.    If any action, proceeding, motion or notice is commenced or filed in connection with any case by or against the Lessor under the Bankruptcy Code, 11 U.S.C. §101 et seq., Lender shall have the right, at its option and to the exclusion of Trustor, exercisable upon ten (10) days' prior written notice from Lender to Trustor to conduct and control any such litigation with counsel of Lender's choice. Lender may proceed in its own name or in the name of Trustor in connection with any such litigation, and Trustor agrees to execute and deliver to Lender such powers, authorizations, consents and other documents as may be required by Lender in connection with such litigation. All costs, expenses, and advances, including without limitation attorneys' fees, incurred or made by Lender in connection with the prosecution or conduct of any such litigation shall be payable by Trustor to Lender on Lender's demand, shall bear interest at the rate specified in the Note from the date of expenditure by Lender, and shall be deemed to be secured by this Deed of Trust and all other agreements given by Trustor to secure the Note. Trustor shall not commence any action, suit, or proceeding or file any application or make any motion regarding the Ground Lease in any such case by or against Lessor under the Bankruptcy Code without Lender's prior written consent.

L.    If a petition under the Bankruptcy Code, 11 U.S.C. § 101 et seq., is filed by or against Trustor, and if Trustor, as lessee under the Ground Lease, proposes either to reject the Ground Lease pursuant to Section 365(a) of the Bankruptcy Code or to permit the Ground Lease to be deemed to be rejected pursuant to Section 365(d)(4) of the Bankruptcy Code, Trustor shall give Lender not less than ten (10) days prior written notice of the date on which Trustor shall apply to the Bankruptcy Court for authority to reject the Ground Lease or the date on which the Ground Lease would be deemed to be rejected (the "Rejection Notice"). Within ten (10) days after receipt of the Rejection Notice, Lender shall have the right, but not the obligation, to serve on Trustor a written notice (the "Assumption Notice") stating that (a) Lender demands that Trustor assume the Ground Lease and assign the Ground Lease to Lender pursuant to Section 365 of the Bankruptcy Code; and (b) Lender intends to cure or provide adequate assurance of the prompt cure of all defaults by Trustor under the Ground Lease which are reasonably susceptible to being cured by Lender and to provide adequate assurance of future performance under the Ground Lease. If Lender serves the Assumption Notice within thirty (30) days after the date of the Assumption Notice, subject to Lender's ability (i) to cure or provide adequate assurance that it will promptly cure Trustor's defaults under the Ground Lease in accordance with the Assumption Notice; and (ii) to provide adequate assurance of future performance under the Ground Lease, Trustor shall assume the Ground Lease and assign the Ground Lease to Lender.

M.    Trustor shall indemnify and hold Lender and its officers, directors, shareholders, loan participants, representatives, agents, successors and assigns harmless from and against any and all claims, demands, actions, suits, proceedings, damages, liabilities, losses, costs and expenses of every nature whatsoever, including without limitation attorneys' fees, arising out of or relating to Lender's exercise of any of its rights or remedies under this paragraph.

[SIGNATURE PAGE FOLLOWS]

2051003.4                                    35

# EXHIBIT "D"

[March 8, 2021 E-mail Correspondence]

**Juliet Y. Oh**

| | |
|---|---|
| **From:** | Michael Fletcher <mfletcher@frandzel.com> |
| **Sent:** | Monday, March 8, 2021 4:39 PM |
| **To:** | Ron Bender; Richard Pachulski; Steven J. Kahn; Teddy M. Kapur; Ronald Richards; Juliet Y. Oh |
| **Cc:** | Charles Hsieh; Jesse C. K. Kung; Loren R. Gordon, Esq.; Bruce D. Poltrock |
| **Subject:** | Source Accounts and Administrative Hold |
| **Attachments:** | Checks and Demand Deposit Account Information  03-08-21.PDF |

Dear Counsel:  We represent Evertrust Bank ("Bank"), the former lender to The Source Hotel, LLC ("Source").  The Bank has received the attached 2 checks ("Checks") attempting to withdraw approximately $35,000 in aggregate funds from a Source small business account and from a Source money market account, both at the Bank.  Additionally, the Bank is also holding a Bank control account which holds an additional balance of $25,783.64 related to Source (collectively, the "Accounts").

From what the Bank understands, Source is in bankruptcy ("Bankruptcy").  The Bank has placed an administrative hold on the Accounts in light of the Bankruptcy filing.  The Bank has also rejected honoring the 2 Checks, and returned them "refer to maker."

The Bank doesn't really know who is purporting to withdraw funds from the Accounts or where the proceeds of those checks would end up or what your intentions are concerning the Accounts.  The Bank further understands that each of your clients does, or may, claim the funds in the Accounts.

The Bank wants joint written instructions from you as to the disposition of the funds in the Accounts.  Please provide that, including instructions to close all of the Accounts once the balances are paid.

**Michael Fletcher**
FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 Wilshire Boulevard, 19th Floor
Los Angeles, CA  90017-2427
Phone:       (323) 852-1000
Mobile:       (310) 279-6003
Facsimile:   (323) 651-2577
E-mail:        mfletcher@frandzel.com
Web:          http://www.frandzel.com

FRANDZEL
🚶 **GO GREEN: Please consider the environment before you print.**

This electronic message contains information which may be confidential and privileged and is intended only for the named addressee.  Unless you are the addressee of this message you may not use, copy or disclose the contents of this message to anyone.   If you have received this message in error, please delete the message and advise the sender by reply e-mail or by calling (323) 852-1000.   Thank you.

To ensure compliance with Internal Revenue Service Circular 230, we inform you that any U.S. Federal Tax advice contained in this communication is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matter(s) addressed herein.

# EVERTRUST® Bank
**A Subsidiary of O-Bank**

華信商業銀行

Current Date:                      March 08, 2021

| | |
|---|---|
| Account Number: | 8501348 |
| Capture Date: | March 05, 2021 |
| Item Number: | 5250218245247 |
| Posted Date: | March 05, 2021 |
| Posted Item Number: | 64000105 |
| Amount: | 2,674.05 |
| Record Type: | Debit |

THE SOURCE HOTEL, LLC
PO BOX 489
BUENA PARK CA 90621-1000

---

🔒 THE FACE OF THIS DOCUMENT HAS MICROPRINTING. DO NOT CASH IF MISSING. THE BACKGROUND WILL EXPOSE A HIDDEN VOID WHEN PHOTOCOPIED. 🔒

The Source Hotel, LLC
3100 E. Imperial Hwy.
Lynwood, CA 90262

EverTrust Bank
2 North Lake Ave., Ste 110
Pasadena, CA 91101

90-4229
1222

| Date | Check No. | | Check Amount |
|---|---|---|---|
| 3/3/2021 | 000423 | | $2,674.05 |

**Two Thousand Six Hundred Seventy Four AND 05/100 DOLLARS**

Pay to the order of:

The Source Hotel, LLC

3100 E. Imperial Hwy
Lynwood, CA  90262

⑈"000423"⑈ ⑆1222 4229 6⑆ 008 501 348⑈"

32992190000900    03-04-2021    >122287251<
Axos Bank
San Diego, CA

Credit to the Account
of the Within Named Payee
Lack of Endorsement Guaranteed
Axos Bank™ #122287251

# EVERTRUST® Bank

A Subsidiary of O-Bank

## 華信商業銀行

Current Date:                     March 08, 2021

| | |
|---|---|
| Account Number: | 8600272 |
| Capture Date: | March 05, 2021 |
| Item Number: | 5250218245246 |
| Posted Date: | March 05, 2021 |
| Posted Item Number: | 64000104 |
| Amount: | 32,572.70 |
| Record Type: | Debit |

THE SOURCE HOTEL, LLC
PO BOX 489
BUENA PARK CA 90621-1000

---

THE FACE OF THIS DOCUMENT HAS MICROPRINTING. DO NOT CASH IF MISSING. THE BACKGROUND WILL EXPOSE A HIDDEN VOID WHEN PHOTOCOPIED

**The Source Hotel, LLC**
**3100 E Imperial Hwy.**
**Lynwood, CA 90262**

EverTrust Bank
2 North Lake Ave., Ste 110
Pasadena, CA 91101

90-4229
1222

|  | Date | Check No. | Check Amount |
|---|---|---|---|
|  | 3/3/2021 | 000011 | **$32,572.70** |

**Thirty Two Thousand Five Hundred Seventy Two AND 70/100 DOLLARS**

Pay to the order of:

**The Source Hotel, LLC**

**3100 E. Imperial Hwy**
**Lynwood, CA 90262**

⑈000011⑈ ⑆122242296⑆ 008 600272⑈

32992190000300   03-04-2021   >122287251<
Axos Bank
San Diego, CA

Credit to the Account
of the Within Named Payee
- Lack of Endorsement Guarantee -
Axos Bank™ #122287251



EVERTRUST BANK

Unposted Item Inquiry

Current

3/08/21    09:27:02

Main   Quick Launch   Recent   Last Menu   My Menu   Applications   Operations   Controls   Options   Inquiry

| Application | #Debits | Total Debits | #Credits | Total Credits |
|---|---|---|---|---|
| Safe Deposit | 0 | .00 | 0 | .00 |
| Certificates | 0 | .00 | 0 | .00 |
| Demand Deposit | 2 | 35,246.75 | 0 | .00 |
| General Ledger | 0 | .00 | 2 | 264.08 |
| Retirement | 0 | .00 | 0 | .00 |
| Loans | 0 | .00 | 0 | .00 |
| Master Cmmt | 0 | .00 | 0 | .00 |
| Mortgage Loans | 0 | .00 | 0 | .00 |
| Savings | 0 | .00 | 0 | .00 |

Transactions    Disposition Counters



Main   Quick Launch   Recent   Last Menu   My Menu   Applications   Operations   Controls   Options   Inquiry

EVERTRUST BANK

Unposted Item Inquiry        Demand Deposit

Current   x   +

3/08/21        09:27:36

Short Name  *Source Hotel, LLC*

**Restricted**                          **Unposted Reason**

Count                1
Appl/Account Nbr      DD        8600272
Transaction Code      0090    Reversals    Orig Trcd
Transaction Desc      CHECK
Effective Date        03/05/2021
Transaction Amt                      32,572.70  Debit
Check Nbr             11

**Current**                    **Original**
Source        UIR        Source        POD
Sub Source               Sub Source
Batch         DD         Batch         090
Seq Number    20         Seq Number    64000104
                         Post Dt       03/05/21

Item Disposition
* *Waiting Correction * *                PEP Detail | Image

**Maintenance Information**
Branch          0008    PASADENA MAIN OFFICE
Officer 1       JJ      Joe Jung
Trace Number    20210305-0000000052502182452246

User ID              Maint Date    00/00/0000
Override ID          Maint Time    00:00:00
Workstation



Main  Quick Launch  Recent  Last Menu  My Menu  Applications  Operations  Controls  Options  Inquiry

EVERTRUST BANK                                          3/08/21          09:43:26

Unposted Item Inquiry          Demand Deposit

Current   [ x ] [ + ]

Short Name  *Source Hotel, LLC*

**Restricted**                                **Unposted Reason**

Count                    1

Appl/Account Nbr         DD            8501348

Transaction Code         0090   Reversals   Orig Trcd

Transaction Desc         CHECK

Effective Date           03/05/2021

Transaction Amt                              2,674.05  *Debit*

Check Nbr                423

**Current**                    **Original**

Source          UIR            Source          POD

Sub Source      DD             Sub Source      090

Batch           10             Batch           090

Seq Number                     Seq Number      64000105

                               Post Dt         03/05/21

Item Disposition
* Waiting Correction *                          PEP Detail   Image

**Maintenance Information**

User ID                        Branch      0008     *PASADENA MAIN OFFICE*
Override ID                    Officer 1   JJ       *Joe Jung*
Workstation                    Trace Number  20210305-00000000525021B245247

Maint Date   00/00/0000
Maint Time   00:00:00

# EXHIBIT "E"

[Notice of Trustee's Sale]

Recorded in Official Records, Orange County
Hugh Nguyen, Clerk-Recorder

*$ R 0 0 1 2 4 9 4 6 6 4 $*    112.00

2021000077595 2:28 pm 02/03/21

93 RW14A N34  10

0.00 0.00 0.00 0.00 27.00 0.00 0.000.0075.00 3.00

RECORDING REQUESTED BY

~Same~ As Below

AND WHEN RECORDED MAIL TO

Lender's Foreclosure Services
P. O. Box 92086
City of Industry, CA  91715-2086

---

Trustee Sale No. 20-07-916          Loan No. 3216011734          Space above this line for recorder's use only
APN  276-361-29,30,32,33, 35 through 45 inclusive, 57, 60          Title Order No. 1618569CAD

## NOTICE OF TRUSTEE'S SALE
## **UNIFIED SALE**

**NOTE: THERE IS A SUMMARY OF THE INFORMATION IN THIS DOCUMENT ATTACHED***
注：本文件包含一个信息摘要
참고사항: 본 첨부 문서에 정보 요약서가 있습니다
NOTA: SE ADJUNTA UN RESUMEN DE LA INFORMACIÓN DE ESTE DOCUMENTO
TALA: MAYROONG BUOD NG IMPORMASYON SA DOKUMENTONG ITO NA NAKALAKIP
LƯU Ý: KÈM THEO ĐÂY LÀ BẢN TRÌNH BÀY TÓM LƯỢC VỀ THÔNG TIN TRONG TÀI LIỆU NÀY

*PURSUANT TO CIVIL CODE § 2923.3(a), THE SUMMARY OF INFORMATION REFERRED TO ABOVE IS NOT
ATTACHED TO THE RECORDED COPY OF THIS DOCUMENT BUT ONLY TO THE COPIES PROVIDED TO THE
TRUSTOR.

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 05/24/2016.  UNLESS YOU TAKE
ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE.  IF YOU
NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDINGS AGAINST YOU, YOU
SHOULD CONTACT A LAWYER.**

---

On 03/01/2021 at 03:00PM, Lender's Foreclosure Services as the duly appointed Trustee under and pursuant
to Deed of Trust **Recorded on 06/03/2016 as instrument number 2016000252446** of official records in the
Office of the Recorder of Orange County, California, executed by:  **The Source Hotel, LLC a California
limited liability company,** as Trustor, WILL SELL AT PUBLIC AUCTION TO THE HIGHEST BIDDER
FOR CASH (payable at time of sale in lawful money of the United States, by cash, a cashier's check drawn by
a state or national bank, a check drawn by a state or federal credit union, or a check drawn by a state or federal
savings and loan association, savings association, or savings bank specified in section 5102 of the Financial
Code and authorized to do business in this state).  At: **ON THE FRONT STEPS TO THE ENTRANCE OF
THE ORANGE CIVIC CENTER AT 300 E. CHAPMAN, ORANGE, CA 92866,** all right, title and
interest conveyed to and now held by it under said Deed of Trust in the property situated in said County,
California describing the land therein:  **See Exhibit A for a description of real property and Exhibit B for
a description of other collateral**

The property heretofore described is being sold "as is".  The street address and other common designation, if
any, of the real property described above is purported to be: **6986-6988 Beach Blvd., Buena Park, CA 90621**

The undersigned Trustee disclaims any liability for any incorrectness of the street address and other common
designation, if any, shown herein.  Said sale will be made, but without covenant or warranty, expressed or
implied, regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s)
secured by said Deed of Trust, with interest thereon, as provided in said note(s), advances, if any, under the

Trustee Sale No. 20-07-916        Loan No. 3216011734        Title Order No. 1618569CAD        APN 276-361-29,30, 32, etc.

terms of the Deed of Trust, estimated fees, charges and expenses of the Trustee and of the trusts created by said Deed of Trust, to-wit: **$30,719,919.39 (Estimated)**.

Accrued interest and additional advances, if any, will increase this figure prior to sale. The Beneficiary may elect to bid less than the full credit bid.

The beneficiary under said Deed of Trust heretofore executed and delivered to the undersigned a written Declaration of Default and Demand for Sale, and a written Notice of Default and Election to Sell. The undersigned caused said Notice of Default and Election to Sell to be recorded in the county where the real property is located and more than three months have elapsed since such recordation.

**NOTICE TO POTENTIAL BIDDERS**: If you are considering bidding on this property lien, you should understand that there are risks involved in bidding at a trustee auction. You will be bidding on a lien, not on the property itself. Placing the highest bid at a trustee auction does not automatically entitle you to free and clear ownership of the property. You should also be aware that the lien being auctioned off may be a junior lien. If you are the highest bidder at the auction, you are or may be responsible for paying off all liens senior to the lien being auctioned off, before you can receive clear title to the property. You are encouraged to investigate the existence, priority, and size of outstanding liens that may exist on this property by contacting the county recorder's office or a title insurance company, either of which may charge you a fee for this information. If you consult either of these resources, you should be aware that the same lender may hold more than one mortgage or deed of trust on the property.

If the Trustee is unable to convey title for any reason, the successful bidder's sole and exclusive remedy shall be the return of monies paid to the Trustee, and the successful bidder shall have no further recourse. If the sale is set aside for any reason, the Purchaser at the sale shall be entitled only to a return of the deposit paid. The Purchaser shall have no further recourse against the Trustor, the Lender, or the Trustee.

**NOTICE TO PROPERTY OWNER**: The sale date shown on this notice of sale may be postponed one or more times by the mortgagee, beneficiary, trustee, or a court, pursuant to Section 2924g of the California Civil Code. The law requires that information about trustee sale postponements be made available to you and to the public, as a courtesy to those not present at the sale. If you wish to learn whether your sale date has been postponed, and, if applicable, the rescheduled time and date for the sale of this property, you may call (626) 579-5350 or visit this Internet Web site www.superiordefault.com, using the file number assigned to this case 20-07-916. Information about postponements that are very short in duration or that occur close in time to the scheduled sale may not immediately be reflected in the telephone information or on the Internet Web site. The best way to verify postponement information is to attend the scheduled sale.

The undersigned Trustee disclaims any liability for any incorrectness of the property address or other common designation, if any, shown herein. If no street address or other common designation in shown, directions to the location of the property may be obtained by sending written request to the beneficiary within 10 days of the date of first publication of this Notice of Sale.

Date: 2/2/21
Lender's Foreclosure Services, As Trustee

Louisa Zavala, Trustee's Sale Officer

2

Trustee Sale No. 20-07-916      Loan No. 3216011734      Title Order No. 1618569CAD      APN  276-361-29,30, 32, etc.

## EXHIBIT A
## DESCRIPTION OF REAL PROPERTY

A Leasehold interest in and to the following:

The land referred to herein is situated in the State of California, County of Orange and described as follows:

That portion of Lot 2 in Block 61 of Buena Park, in the City of Buena Park, County of Orange, State of California, as per Map recorded in Book 18, Pages 50 to 52 inclusive, of Miscellaneous Maps, and those portions of Lots 5 to 9 inclusive of Tract No. 1756, as per Map recorded in Book 60 Pages 20 and 21 of Miscellaneous Maps, all in the Office of the County Recorder of said County and also now known as that portion of Parcel 4 of Parcel Map No. 2014-173, filed May 30, 2017 in Book 391, Pages 4 through 16, inclusive, of Parcel Maps, described as follows:

Parcel 4A (Level 1 - Ground Floor Lobby & Entrance)

Commencing at the centerline intersection of Orangethorpe Avenue and Brenner Avenue as shown on said Map of Tract No. 1756; thence along the centerline of Brenner Avenue as shown on said Map N 0°27'49" E 215.36 feet; thence leaving said centerline N 89°32'11" W 45.77 feet to the true point of beginning of the herein described Parcel; thence S 00°00'02" W 86:05 feet, thence N 89°59'59" W 22.68 feet, thence S 00°01'05" W 13.56 feet, thence S 89°59'59" E 22.57 feet, thence S 00° 00'02" W 8.22 feet, thence N 89°59'58" W 0.77 feet, thence S 00°00'02" W 34.16, thence N 89°59'58" W 110.62 feet, thence N 00°00'02" E 34.17 feet, thence N 89°59'58" W 30.58 feet, thence N 00°00'02" E 107.52 feet, thence N 89°59'58" W 0.83 feet, thence N 00°00'02" E 8.95 feet, thence S 89°59'58" E 24.08 feet, thence N 46°29'04" E 12.47 feet, thence N 00°00'02" E 16.97 feet, thence S 89°59'58" E 18.12 feet, thence N 00°00'02" E 5.22 feet, thence N 89°57'39" E 30.73 feet, thence N 00°00'02" E 32.17 feet, thence N 89°56'58" W 11.92 feet, thence N 00°02" E 1.00 feet, thence S 89°59'58" E 0.50 feet, thence N 00°00'02" E 14.21 feet, thence S 89°59'58" E 39.78 feet, thence S 00°00'02" W 86.82 feet, thence S 89°59'58" E 32.58 feet to said true point of beginning.

Except therefrom those portions lying below a horizontal plane having an elevation of 95.76 feet and above a horizontal plane having an elevation of 77.76 feet.

Parcel 4B (Level 1 - Ground Floor Stairs on Orangethorpe Avenue)

Commencing at the centerline intersection of Orangethorpe Avenue and Brenner Avenue as shown on said Map of Tract No. 1756; thence along the centerline of Orangethorpe Avenue as shown on said Map S 89°27'51" E 199.02 feet; thence leaving said centerline N 0°32'09"E 60,00 feet to a point on a line parallel with, and 60.00 feet northerly of, measured at right angles from, said centerline of Orangethorpe Avenue, and the true point of beginning of the herein described parcel; thence N 0°00'02" E 36.96 feet; thence S 89°56'58" E 14.74 feet; thence s 0°00'02" W to a point on said parallel line; thence along said parallel line N 89°27'51" W 14.74 to said true point of beginning.

Except therefrom those portions lying below a horizontal plane having an elevation of 95.76 feet and above a horizontal plane having an elevation of 77.76 feet.

Parcel 4C (Level 1 - Ground Floor Stairs on Brenner Avenue)

Commencing at the centerline intersection of Orangethorpe Avenue and Brenner Avenue as shown on said Map of Tract No. 1756; thence along the centerline of Brenner Avenue as shown on said map N 0°27'49" E 339.33 feet; thence leaving said centerline N 89°32'11" W 46.71 feet to the true point of beginning of the herein described parcel; thence west 23.40 feet; thence south 7,24 feet; thence west 5.88 feet; thence south 6.55 feet; thence west 29.28 feet; thence north 13.79 feet to said true point of beginning.

Except therefrom those portions lying below a horizontal plane having an elevation of 95.76 feet and above a horizontal plane having an elevation of 77.76 feet.

Trustee Sale No. 20-07-916    Loan No. 3216011734    Title Order No. 1618569CAD    APN 276-361-29,30, 32, etc.

Parcel 4D (Level 2 - Second Floor Hotel Parcel)

Commencing at the centerline intersection of Orangethorpe Avenue and Brenner Avenue as shown on said Map of Tract No. 1756; thence along the centerline of Brenner Avenue as shown on said Map N 0°27'49" E 223.82 feet; thence leaving said centerline N 89°32'11" W 36.00 feet to the true point of beginning of the herein described parcel; thence S 00°27'49" W 94.43 feet; thence N 89°59'59" W 31.75 feet; thence S 00°01'05" W 13,53 feet; thence S 89°59'59" 31.65 feet; thence S 00°27'49" W 36.79 feet, thence S 45°29'59" W 26.85 feet; thence N 89°27'51" W 110.52 feet; Thence N 00°00'02" E 36.98 feet; thence N 89°59'58" W 19.37 feet; thence S 00°00'02" W 25.13 feet; thence N 89°59'58" W 12.81 feet; thence N 00°00'02" E 90.73 feet; thence S 89°59'58" E 62.50 feet; thence N 00°00'00" E 30.00 feet; thence S 89°59'58" E 15.42 feet; Thence N 00°00'02" E 29.98 feet; thence S 89°59'58" E 85.09 feet; to said true point of beginning.

Except therefrom those portions lying below a horizontal plane having an elevation of 113.76 feet and above a horizontal plane having an elevation of 95.76 feet.

Parcel 4E (Level 2 - Second Floor Stairs on Brenner Avenue)

Commencing at the centerline intersection of Orangethorpe Avenue and Brenner Avenue as shown on said Map of Tract No. 1756; thence along the centerline of Brenner Avenue as shown on said Map N 0°27'49" E 339.38 feet; thence leaving said centerline N 89°32'11" W 46.71 feet to the true point of beginning of the herein described parcel; thence west 23.40 feet; thence south 7.24 feet; thence west 5.88 feet; thence south 6.55 feet; thence west 29.28 feet; thence north 13.79 feet to said true point of beginning.

Except therefrom those portions lying below a horizontal plane having an elevation of 113.76 feet and above a horizontal plane having an elevation of 95.76 feet.

Parcel 4F (Level 3 -Third Floor Stairs on Brenner Avenue)

Commencing at the centerline intersection of Orangethorpe Avenue and Brenner Avenue as shown on said Map of Tract No. 1756; thence along the centerline of Brenner Avenue as shown on said Map N 0°27'49" E 339.38 feet; thence leaving said centerline N 89°32'11" W 46.71 feet to the true point of beginning of the herein described parcel; thence west 23.40 feet; thence south 7.24 feet; thence west 5.88 feet; thence south 6.55 feet; thence west 29.28 feet; thence north 13.79 feet to said true point of beginning.

Except therefrom those portions lying below a horizontal plane having an elevation of 150.76 feet and above a horizontal plane having an elevation of 113.76 feet.

Parcel 4G (Level 3 -Third Floor Stairs on Brenner Avenue)

Commencing at the centerline intersection of Orangethorpe Avenue and Brenner Avenue as shown on said Map of Tract No. 1756; thence along the centerline of Brenner Avenue as shown on said Map N 0°27'49" E 186.84 feet; thence leaving said centerline N 89°32'11" W 45.54 feet to the true point of beginning of the herein described parcel; thence west 22.05 feet; thence south 9.15 feet; thence east 5.84 feet; thence south 10.38 feet; thence west 1.58 feet; thence south 4.17 feet; thence east 9.81 feet; thence south 10.37 feet; thence east 12.08 feet; thence north 9.62 feet; thence east 1.44 feet; thence north 24.44 feet to the said true point of beginning.

Except therefrom those portions lying below a horizontal plane having an elevation of 150.76 feet and above a horizontal plane having an elevation of 113 76 feet.

Parcel 4H (Level 3 - Third Floor Stairs on Orangethorpe Avenue)

Commencing at the centerline intersection of Orangethorpe Avenue and Brenner Avenue as shown on said Map of Tract No. 1756; thence along the centerline of Orangethorpe Avenue as shown on said Map S 89°27'51" E 199.02 feet thence leaving said centerline N 0°32'09" E 60.00 feet to a point on a ling parallel with, and 60.00 feet northerly

4

Trustee Sale No. 20-07-916      Loan No. 3216011734      Title Order No. 1618569CAD      APN 276-361-29,30, 32, etc.

of, measured at right angles from, said centerline of Orangethorpe Avenue, and the true point of beginning of the herein described parcel; thence N 0°00'02" E 30.96 feet; thence S 89°59'58" E 14.74 feet; thence S 0°00'02" W to a point on said parallel line; thence along said parallel line N 89°27'51" W 14.74 to said true point of beginning.

Except therefrom those portions lying below a horizontal plane having an elevation of 150.76 feet and above a horizontal plane having an elevation of 113.76 feet.

Parcel 4I (Level 4 - Fourth Floor Hotel Parcel including Deck)

Commencing at the centerline intersection of Orangethorpe Avenue and Brenner Avenue as shown on said Map of Tract No. 1766; thence along the Centerline of Brenner Avenue as shown on said Map N 00°27'49" E 353.11 feet; thence leaving said centerline N 89°32'11" W 36.00 feet to a point on a line parallel with and 36.00 feet westerly of, measured at right angles from, said centerline of Brenner Avenue, and the true point of beginning of the herein described parcel; thence west 72.90 feet; thence South 13.76 feet; thence west 18.27 feet; thence south 114.50 feet; thence west 92.89 feet; thence south 130.52 feet; thence east 12.99 feet; thence south 32.75 feet to a point on a line parallel with and 60.00 feet northerly of, measured at right angles from, said centerline of Orangethorpe Avenue; thence along said parallel line S 89°27'51" E 143.94 feet; thence N 45°29'59" E 26.85 feet to a point on said parallel line with the centerline of Brenner Avenue; thence along last said parallel line N 0°27'49" E 274.06 feet to said true point of beginning.

Except therefrom those portions lying below a horizontal plane having an elevation of 161.18 feet and above a horizontal plane having an elevation of 150.76 feet.

Parcel 4J (Level 5 - Fifth Floor Hotel Parcel)

Commencing at the centerline intersection of Orangethorpe Avenue and Brenner avenue as shown on said Map of Tract No. 1756; thence along the centerline of Brenner Avenue as shown on said Map N 0°27'49" E 353.11 feet; thence leaving said centerline N 89°32'11" W 36.00 feet to a point on a line parallel with, and 36.00 feet westerly of, measured at right angles from, said centerline of Brenner Avenue, and the true point of beginning of the herein described parcel; thence west 72.90 feet; thence south 165.38 feet; thence west 6.81 feet; thence south 20.33 feet; thence east 6.81 feet; thence south 28.65 feet; thence west 105.43 feet; thence south 44.42 feet; thence east 12.99 feet; thence south 32.75 feet to a point on a line parallel with and 60.00 feet northerly of, measured at right angles from, said centerline of Orangethorpe Avenue; thence along said parallel line S 89°27'51" E 143.94 feet; thence N 45°29'59" E 26.86 feet to a point on said parallel line with the centerline of Brenner Avenue; thence along last said parallel line N 0°27'49" E 274.06 feet to said true point of beginning.

Except therefrom those portions lying below a horizontal plane having an elevation of 171.60 feet and above a horizontal plane having an elevation of 161.18 feet.

Parcel 4K (Level 6 - Sixth Floor Hotel Parcel)

Commencing at the centerline intersection of Orangethorpe Avenue and Brenner Avenue as shown on said Map of Tract No, 1756; thence along the centerline of Brenner Avenue as shown on said Map N 0°27'49" E 353.11 feet; thence leaving said centerline N 89°32'11" W 36.00 feet to a point on a line parallel with, and 36.00 feet westerly of, measured at right angles from, said centerline of Brenner Avenue, and the true point of beginning of the herein described Parcel; thence west 72.90 feet; thence south 165.38 feet; thence west 6.81 feet; thence south 20.33 feet; thence east 6.81 feet; thence south 28.65 feet; thence west 105.43 feet; thence south 44.42 feet; thence east 11.33 feet; thence south 32.75 feet to a point on a line parallel with and 60.00 feet northerly of, measured at right angles from, said centerline of Orangethorpe Avenue; thence along said parallel line S 89°27'51" E 145.60 feet; thence N 45°29'59" E 26.85 feet to a point on said parallel line with the centerline of Brenner Avenue; thence along last said parallel line N 0° 27' 49" E 274.06 feet to said true point of beginning

Except therefrom those portions lying below a horizontal plane having an elevation of 182.02 feet and above a horizontal plane having an elevation of 171.60 feet.

Trustee Sale No. 20-07-916      Loan No. 3216011734      Title Order No. 1618569CAD      APN 276-361-29,30, 32, etc.

Parcel 4L (Level 7 - Seventh Floor & Roof Hotel Parcel)

Commencing at the centerline intersection of Orangethorpe Avenue and Brenner Avenue as shown on said Map of Tract No. 1756; thence along the centerline of Brenner Avenue as shown on said Map N 0°27'49" E 333.11 feet; thence leaving said centerline N 89°32'11" W 36.00 feet to a point on a line parallel with, and 36.00 feet westerly of, measured at right angles from, said centerline of Brenner Avenue, and the true point of beginning of the herein described parcel; thence west 72.90 feet; thence south 165.38 feet; thence west 6.81 feet; thence south 20.33 feet thence east 6.81 feet; thence south 28.65 feet; thence west 105.43 feet; thence south 44.42 feet; thence east 12.99 feet; thence south 32.75 feet to a point on a line parallel with and 60.00 feet northerly of, measured at right angles from, said centerline of Orangethorpe Avenue; thence along said parallel line S 89°27'51" E 143.94 feet; thence N 45°29'59" E 26.85 feet to a point on said parallel line with the centerline of Brenner Avenue; thence along last said parallel line N 0°27'49" E 274.06 feet to said true point of beginning.

Except therefrom those portions lying below a horizontal plane having an elevation of 210.00 feet and above a horizontal plane having an elevation of 182.02 feet.

Elevations stated hereon are based on the North American Vertical Datum of 1988 (NAVD88) per the year 2005 adjustment by the Orange County Surveyor, using the following benchmark:

OCS BM 404-31-05 Elev. =80.151 Feet (NAVD88, Year 2005 Leveled) station is an OCS aluminum disk stamped 404-31-05 set in the SE'ly corner of a 15 ft. x 4.5 ft. concrete catch basin, located in NE'ly portion of intersection of Stanton Ave. Artesia Blvd., 28 ft N'ly of the centerline of Artesia Blvd., & 81 ft. E'ly of the centerline of Stanton Avenue. Monument is level with the sidewalk.

Trustee Sale No. 20-07-916      Loan No. 3216011734      Title Order No. 1618569CAD      APN 276-361-29,30, 32, etc.

## EXHIBIT B
## DESCRIPTION OF OTHER COLLATERAL

All right, title and interest of Debtor in and to the Property (as hereinafter defined) arising from and created under that certain Ground Lease dated as of April 6, 2015 by and between The Source At Beach, LLC, a California limited liability company, as lessor, and Debtor, as lessee (the "Ground Lease"), together with (a) all of Debtor's rights of use, occupancy and enjoyment, (b) all of Debtor's rights in and to all rents, income and profits arising from or pursuant to the Ground Lease together with all amendments, extensions, renewals or modifications thereof, (c) all of Debtor's credits, deposits, options and privileges of Debtor as lessee under the Ground Lease, including without limitation, the right to renew or extend the Ground Lease for a succeeding term or terms, the right to purchase the Land (as hereinafter defined), if any, and (d) all rights of Debtor as lessee under the Ground Lease in connection with any bankruptcy or insolvency proceedings of the fee owner of the Land;

All right, title and interest which Debtor now has or may later acquire in such real property and all appurtenances, easements, covenants, rights of way, tenements, hereditaments and appurtenances thereunto belonging or in any way appertaining thereto now or hereafter, and all of the estate, right, title, interest, claim, demand, reversion or remainder whatsoever of Debtor therein or thereto, at law or in equity, now or hereafter in possession or expectancy, including, without limitation, all mineral, oil, and gas rights and royalties and profits therefrom, all water and water rights and shares of stock pertaining to water and water rights, and all sewers, pipes, conduits, wires and other facilities furnishing utility or services to the real property (collectively, the "Land");

All right, title and interest which Debtor now has or may later acquire in and to all buildings, structures and improvements now or hereafter erected on the Land, including, without limitation, all plant equipment, apparatus, machinery and fixtures of every kind and nature whatsoever now or hereafter located on or forming part of said buildings, structures and improvements (collectively, the "Improvements"; the Land and Improvements being hereinafter sometimes collectively referred to as the "Premises");

All right, title and interest which Debtor now has or may later acquire in and to the land lying in the bed of any street, road, highway or avenue now or hereafter in front of or adjoining the Premises;

All right, title and interest which Debtor now has or may later acquire in any and all awards heretofore and hereafter made by any governmental authorities (federal, state, local or otherwise) to Debtor and all subsequent owners of the Premises which may be made with respect to the Premises as a result of the exercise of the right of eminent domain, the alteration of the grade of any street or any other injury to or decrease of value of the Premises, which said award or awards are hereby assigned to Lender;

All right, title and interest which Debtor now has or may later acquire in any and all claims under proceeds of any insurance policies by reason of or related to a loss of any kind sustained to the Premises, now or hereafter, whether or not such policies name lender as an insured and whether or not such policies are required by Lender, and whether or not such claims thereunder are characterized as personal claims;

All right, title and interest which Debtor now has or may later acquire in any and all unearned premiums accrued, accruing or to accrue, and the proceeds of insurance now or hereafter in effect with respect to all or any portion of the Premises;

Any and all claims or demands which Debtor now has or may hereafter acquire against anyone with respect to any damage to all or any portion of the Premises;

All right, title and interest which Debtor now has or may later acquire in all goods, equipment, machinery, furniture, furnishings, trade fixtures, appliances, inventory, building materials, apparatus, utensils, vehicles, wiring, pipes, conduits, elevators, escalators, heating and air conditioning equipment, chattels and articles of personal property, including, without limitation, any interest therein now or at any time hereafter affixed to, attached to or used in any way in connection with or to be incorporated at any time into the Premises or placed on any part thereof wheresoever located, whether or not attached to or incorporated in the Premises, together with any and all accessions, accessories, attachments, and replacements thereof, appertaining and adapted to the complete and compatible use, enjoyment, occupancy, operation or improvement of the Premises;

All right, title and interest which Debtor now has or may later acquire in all instruments, investment property, deposit accounts, accounts, contract rights, general intangibles, and other intangible property and rights now or hereafter relating to the foregoing property, or the operation thereof or used in connection therewith, including, without limitation, all options, letters of intent, and rights of first refusal of any nature whatsoever, covering all or any portion of such property, together with any modifications thereof, and deposits or other payments made in connection therewith, existing and future development rights, permits and approvals, air rights, density bonus rights, and transferable development rights; all of Debtor's right, title, and interest in and to any awards, remunerations, settlements, or compensation heretofore made or hereafter made by any and all courts, boards, agencies, commissions, offices, or authorities, of any nature whatsoever for any governmental unit (federal, state, local or otherwise) to the present or any subsequent owner of the foregoing property, including those for any vacation of, or change of grade in, any streets affecting the foregoing property and any and all licenses and privileges obtained by Debtor from non-governmental sources;

All right, title and interest which Debtor now has or may later acquire in all leases of the Premises, Personalty, Fixtures, or any part thereof, now or hereafter entered into and all right, title and interest of Debtor thereunder, including, without limitation, cash or securities deposited thereunder to secure performance by the lessees of their obligations thereunder (whether such cash or securities are to be held until the expiration of the terms of such leases or applied to one or more of the installments of rent coming due immediately prior to the expiration of such terms); all other rights and easements of Debtor now or hereafter existing pertaining to the use and enjoyment of the Premises; and all right, title and interest of Debtor in and to all declarations of covenants, conditions and restrictions as may affect or otherwise relate to the Premises;

All right, title and interest which Debtor now has or may later acquire in all permits, plans, licenses, specifications, subdivision rights, security interests, contracts, contract rights, public utility deposits, prepaid sewer and water hook-up charges, or other rights as may affect or otherwise relate to the Property (as hereinafter defined);

All rents, income, issues and profits, including, without limitation, the accounts, revenues, and proceeds of any business operation conducted by or on behalf of Debtor on or through the use of the Premises, prepaid municipal and utility fees, bonds, revenues, income, and other benefits to which Debtor may now or hereafter be entitled to, or which are derived from, the Property or any portion thereof or interest therein.

The foregoing listing is intended only to be descriptive of the property encumbered hereby, and not exclusive

or all inclusive. It is the intent of Debtor to encumber hereby all property located or to be located upon the above-described real property. Said real property, leasehold estate, buildings, improvements, appurtenances, Fixtures, Personalty, additions, accretions, and other property are herein referred to as the "Property." As used herein, the term "Fixtures" shall include all articles of personal property hereinabove described, now or hereafter attached to, placed upon for a definite term, or otherwise used in connection with the Property, and shall include trade fixtures and goods which are or are to become fixtures. As used herein, the term "Personalty" shall include all furniture, furnishings, equipment, machinery, goods, contract rights, general intangibles, money, deposit accounts, instruments, accounts, leases, chattel paper and other personal property described in this Exhibit "B" (other than Fixtures) of any kind or character now existing or hereafter arising or acquired, now or hereafter located upon, within or about the Property, or which otherwise pertains to the use, ownership, management, operation, construction, leasing and sale of the Property, and all products and proceeds thereof, and all of Debtor's right, title, and interest in and to all such property.

Nothing herein contained shall be construed as creating a mortgage of real property, it being understood and agreed that only that portion of the foregoing description of collateral which constitutes personal property is intended to be included herein and that Secured Party has taken a separate deed of trust encumbering all of Debtor's interest in the leasehold estate and real property to which the foregoing description refers.

(a)  All accounts, contract rights, chattel paper, instruments, deposit accounts, letter of credit rights, payment intangibles and general intangibles; and all returned or repossessed goods which, on sale or lease, resulted in an account or chattel paper.

(b)  All inventory, including all materials, work in process and finished goods.

(c)  All machinery, furniture, fixtures and other equipment of every type now owned or hereafter acquired by Grantor.

(d)  All of Grantor's deposit accounts with Lender.  The Collateral shall include any renewals or rollovers of the deposit accounts, any successor accounts, and any general intangibles and choses in action arising therefrom or related thereto.

(e)  All instruments, notes, chattel paper, documents, certificates of deposit, securities and investment property of every type.  The Collateral shall include all liens, security agreements, leases, and other contracts securing or otherwise relating to the foregoing.

(f)  All general intangibles, including, but not limited to, (i) all patents, and all unpatented or unpatentable inventions; (ii) all trademarks, service marks, and trade names; (iii) all copyrights and literary rights; (iv) all computer software programs; (v) all mask works of semiconductor chip products; (vi) all trade secrets, proprietary information, customer lists, manufacturing, engineering and production plans, drawings, specifications, processes and systems.  The Collateral shall include all good will connected with or symbolized by any of such general intangibles; all contract rights, documents, applications, licenses, materials and other matters related to such general intangibles; all tangible property embodying or incorporating any such general intangibles; and all chattel paper and instruments relating to such general intangibles.

(g)  All negotiable and nonnegotiable documents of title covering any Collateral.

(h)  All accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral.

(i)  All substitutes or replacements for any Collateral, all cash or non-cash proceeds, product, rents and profits of any Collateral, all income, benefits and property receivable on account of the Collateral, all rights under warranties and insurance contracts, letters of credit, guaranties or other supporting obligations covering the Collateral, and any causes of action relating to the Collateral.

(j)  All books and records pertaining to any Collateral, including but not limited to any computer-readable memory and any computer hardware or software necessary to process such memory ("Books and Records").

## NOTICE OF SALE
## SUMMARY OF KEY INFORMATION

The attached notice of sale was sent to The Source Hotel, LLC a California limited liability company, in relation to 6986-6988 Beach Blvd., Buena Park, CA 90621

YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 05/24/2016.  UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE.

IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER.

The total amount due in the notice of sale is $30,719,919.39.

Your property is scheduled to be sold on 03/01/2021 at 03:00PM at ON THE FRONT STEPS TO THE ENTRANCE OF THE ORANGE CIVIC CENTER AT 300 E. CHAPMAN, ORANGE, CA 92866.

However, the sale date shown on the attached notice of sale may be postponed one or more times by the mortgagee, beneficiary, trustee, or a court, pursuant to Section 2924g of the California Civil Code.  The law requires that information about trustee sale postponements be made available to you and to the public, as a courtesy to those not present at the sale. If you wish to learn whether your sale date has been postponed, and, if applicable, the rescheduled time and date for the sale of this property, you may call (626) 579-5350, using the file number assigned to this case 20-07-916.  The best way to verify postponement information is to attend the scheduled sale.

If you would like additional copies of this summary, you may obtain them by calling (626) 579-5350.


## 出售通知
## 關鍵信息摘要

本文中包含的有關, 6986-6988 Beach Blvd., Buena Park, CA 90621, 的出售通知發送給 The Source Hotel, LLC a California limited liability company。

你的 DEED OF TRUST 於05/24/2016 已經逾期違約。除非你採取行動保護你的房產, 否則該房產將被公開 出售。

如果你需要了解對你的訴訟程序的性質, 應該聯系一名律師。

法拍書面通知的總金額是 $30,719,919.39。

你的房產預計出售的時間 03/01/2021 03:00PM 出售地點 ON THE FRONT STEPS TO THE ENTRANCE OF THE ORANGE CIVIC CENTER AT 300 E. CHAPMAN, ORANGE, CA 92866。

然而, 根據加州民法第2924章g條款, 本文中包含的法拍書面通知上顯示的出售日期可能會被抵押權人、受益人、受托人, 或法院一次或多次推遲。該法規定, 作為對不在法拍現場人士的一種寬慰, 有關受托人推遲出售的信息要提供給你和公眾。如果你想了解你的房產出售日期是否已被推遲, 以及 ( 如適用 ) 重新安排的法拍時間和日期, 可致電 (626) 579-5350, 用指定的檔案編號 20-07-916 查找。最好驗証推遲信息的方法是, 出席預定的拍賣。

如果你想獲得更多的本摘要副本, 請撥打下列電話 (626) 579-5350。

# AVISO DE VENTA
## RESUMEN DE LA INFORMACIÓN CLAVE

El aviso de venta adjunto se envió a The Source Hotel, LLC a California limited liability company, en relación con 6986-6988 Beach Blvd., Buena Park, CA 90621.

USTED HA INCUMPLIDO LOS TÉRMINOS DE UNA ESCRITURA DE FIDEICOMISO DE FECHA 05/24/2016. SI NO TOMA MEDIDAS PARA PROTEGER SU PROPIEDAD, PODRÁ SER VENDIDO EN UNA SUBASTA PÚBLICA.

SI USTED NECESITA QUE LE EXPLIQUEN LA NATURALEZA DEL PROCEDIMIENTO EN SU CONTRA, DEBE CONSULTAR A UN ABOGADO.

El importe total adeudado correspondiente al aviso de venta es $30,719,919.39.

La subasta de la propiedad se ha programado para el día 03/01/2021 03:00PM en ON THE FRONT STEPS TO THE ENTRANCE OF THE ORANGE CIVIC CENTER AT 300 E. CHAPMAN, ORANGE, CA 92866.

No obstante, conforme al Artículo 2924g del Código Civil de California, la fecha de la subasta que figura en el aviso adjunto podrá ser postergada una o más veces por el acreedor hipotecario, el beneficiario, el fideicomisario o un tribunal. La ley exige que, como cortesía para quienes no hayan asistido a la subasta, la información sobre las postergaciones solicitadas por el fideicomisario es ponga a disposición suya y del público en general. Si desea saber si la subasta de su propiedad se ha postergado, y, en tal caso, la nueva fecha propuesta para la subasta de esta propiedad, puede llamar al teléfono (626) 579-5350 usando el número de registro asignado a este caso 20-07-916. La mejor forma de verificar la información sobre las postergaciones es asistir a la subasta que se ha programado.

Si desea recibir copias adicionales de este resumen, puede llamar al teléfono (626) 579-5350.

# NOTICE OF SALE (PABATID NG PAGBEBENTA)
## BUOD NG PANGUNAHING IMPORMASYON

Ang nakakalip na notice of sale (pabatid ng pagbebenta) ay ipinadala kay The Source Hotel, LLC a California limited liability company, bilang kaugnayan sa 6986-6988 Beach Blvd., Buena Park, CA 9062.

IKAW AY HINDI NAKABAYAD SA ILALIM NG DEED OF TRUST NA MAY PETSA NA 05/24/2016. MALIBAN KUNG KAYO AY KUMILOS UPANG MAPROTEKTAHAN ANG INYONG ARI-ARIAN, MAAARI ITONG IBENTA SA ISANG PAMPUBLIKONG PAGBEBENTA.

KUNG KINAKAILANGAN NINYO NG PAGPAPALIWANAG SA KALIKASAN NG PAGLILITIS LABAN SA INYO, KAILANGAN NINYONG MAKIPAG-UGNAYAN SA ISANG ABOGADO.

Ang kabuuang halaga na dapat bayaran sa notice of sale (pabatid ng pagbebenta) ay $30,719,919.39.

Ang inyong ari-arian ay nakatakdang mabenta sa 03/01/2021 03:00PM sa ON THE FRONT STEPS TO THE ENTRANCE OF THE ORANGE CIVIC CENTER AT 300 E. CHAPMAN, ORANGE, CA 92866.

Gayunman, ang petsa ng pagbebenta na ipinapakita sa nakakalip na notice of sale (pabatid ng pagbebenta) ay maaaring maantala ng isa o mas marami pang beses ng nagkaloob ng isinangla, benepisyaryo, pinagkatiwalaan, o ng korte, alinsunod sa Seksyon 2924g ng Kodigong Sibil ng California. Hinihiling ng batas na ang impormasyon tungkol sa mga pagpaantala sa pagbebenta ng pinagkatiwalaan ay handang maibigay sa inyo at sa publiko, bilang isang kagandahang-loob doon sa mga hindi makakadalo sa bentahan. Kung nais ninyong lubos pang matutunan kung naantala ang inyong petsa sa pagbebenta, at kung naaangkop, ang natakda muli na oras at petsa sa bentahan ng ari-arian, maaari kayong tumawag sa (626) 579-5053 gamit ang numero ng file na itinalaga sa kasong ito 20-07-916. Ang pinakamainam na paraan upang mapatotohanan ang impormasyon sa pagpaaantala ng petsa ay ang pagdalo sa nakatakdang petsa ng bentahan.

Kung nais ninyo ng karagdagang mga kopya ng buod na ito, maaari ninyong makuha ang mga ito sa pamamagitna ng pagtawag sa (626) 579-5350.

### THÔNG BÁO BÁN
### BẢN TRÌNH BÀY TÓM LƯỢC VỀ THÔNG TIN CHÍNH

Thông báo rao bán kèm theo được gửi tới cho The Source Hotel, LLC a California limited liability company, trong mối quan hệ với 6986-6988 Beach Blvd., Buena Park, CA 90621.

QUÝ VỊ VI PHẠM QUI ĐỊNH GHI THEO DEED OF TRUST NGÀY 05/24/2016.  TRỪ KHI QUÝ VỊ CÓ HÀNH ĐỘNG BẢO VỆ CĂN NHÀ CỦA QUÝ VỊ, CĂN NHÀ CÓ THỂ BỊ BÁN CÔNG KHAI.
NẾU QUÝ VỊ CẦN MỘT PHẦN GIẢI THÍCH VỀ TÍNH CHẤT CỦA THỦ TỤC CHỐNG LẠI QUÝ VỊ, QUÝ VỊ NÊN LIÊN LẠC VỚI LUẬT SƯ.

Toàn bộ số tiền phải trả trong thông báo bán là $30,719,919.39.

Căn nhà của quý vị được dự kiến sẽ bán vào 03/01/2021 03:00PM tại ON THE FRONT STEPS TO THE ENTRANCE OF THE ORANGE CIVIC CENTER AT 300 E. CHAPMAN, ORANGE, CA 92866.

Tuy nhiên, ngày bán ghi trong thông báo bán kèm theo có thể bị trì hoãn một hoặc nhiều lần bởi bên cho vay thế chấp, người thụ hưởng, người được ủy quyền, hoặc tòa án, chiếu theo Mục 2924g của Bộ Luật Dân Sự California.  Luật pháp qui định thông tin về các trường hợp trì hoãn bán nhà của bên được ủy quyền phải được cung cấp cho quý vị và công chúng, để cập nhật cho những người không có mặt tại buổi rao bán. Nếu quý vị muốn biết ngày rao bán của quý vị có bị trì hoãn hay không, và, nếu thích hợp, ngày giờ mới cho việc rao bán căn nhà này, quý vị có thể gọi (626) 579-5350 dựa trên mã số hồ sơ được ấn định cho hộ quý vị 20-07-916.  Cách tốt nhất để xác minh thông tin trì hoãn là tham dự buổi rao bán đã ấn định.

Nếu quý vị muốn có thêm bản sao của tài liệu trình bày tóm lược này, vui lòng gọi số (626) 579-5350.

### 매각 공고
### 주요 정보 요약

첨부된 매각 공고는 The Source Hotel, LLC a California limited liability company 에게 발송되는 것이며, 이는 6986-6988 Beach Blvd., Buena Park, CA 90621 에 관한 것입니다.

귀하는 DEED OF TRUST 현재 날짜로 05/24/2016 하에서 채무 불이행 상태입니다. 귀하의 부동산을 보호하기 위해 조치를 취하시지 않는 한, 귀하의 부동산은 공매로 매각 처분될 수 있습니다. 귀하에게 취해지는 이러한 법적 절차에 대한 설명이 필요하신 경우 변호사와 상담하십시오.

매각 공고에서 지불되어야 할 총액은 $30,719,919.39 입니다.

귀하의 부동산은 03/01/2021 03:00PM 에 ON THE FRONT STEPS TO THE ENTRANCE OF THE ORANGE CIVIC CENTER AT 300 E. CHAPMAN, ORANGE, CA 92866 에서 매각되기로 일정이 잡혀 있습니다.

그러나 캘리포니아주 민법 2924g 항에 준하여, 첨부된 매각 공고에 나타난 매각 일자는 저당권자, 신탁수익자, 수탁자, 또는 법정에 의해 한 번 이상 연기될 수 있습니다. 법에 따라, 수탁자 매각 연기에 관한정보는 매각에 참석하지 않는 사람들에 대한 호의로서 귀하 및 일반 대중에게 제공되어야 합니다. 매각 일자가 연기되었는 지, 그리고 해당되는 경우 이 부동산의 연기된 매각 일자 및 시간에 대해 알기 원하시는경우, (626) 579-5350 를 방문해 본 사례 배정 파일 번호 20-07-916 를 사용하시면 됩니다.

본 요약서의 추가적인 사본을 원하시는 경우, (626) 579-5350 (으)로 전화하시면 보내드립니다.

EXHIBIT "A"

LEGAL DESCRIPTION

A Leasehold interest in and to the following:

The land referred to herein is situated in the State of California, County of Orange and described as follows:

That portion of Lot 2 in Block 61 of Buena Park, in the City of Buena Park, County of Orange, State of California, as per Map recorded in Book 16, Pages 50 to 52 inclusive, of Miscellaneous Maps, and those portions of Lots 5 to 9 inclusive of Tract No. 1756, as per Map recorded in Book 60 Pages 20 and 21 of Miscellaneous Maps, all in the Office of the County Recorder of said County, described as follows:

Parcel 4A (Level 1 - Ground Floor Lobby & Entrance)

Commencing at the centerline intersection of Orangethorpe Avenue and Brenner Avenue as shown on said Map of Tract No. 1756; thence along the centerline of Brenner Avenue as shown on said Map N 0°27'49" E 215.36 feet; thence leaving said centerline N 89°32'11" W 45.77 feet to the true point of beginning of the herein described Parcel; thence S 00°00'02" W 86:05 feet, thence N 89°59'59" W 22.68 feet, thence S 00°01'05" W 13.56 feet, thence S 89°59'59" E 22.57 feet, thence S 00° 00'02" W 8.22 feet, thence N 89°59'58" W 0.77 feet, thence S 00°00'02" W 34.16, thence N 89°59'58" W 110.62 feet, thence N 00°00'02" E 34.17 feet, thence N 89°59'58" W 30.58 feet, thence N 00°00'02" E 107.52 feet, thence N 89°59'58" W 0.83 feet, thence N 00°00'02" E 8.95 feet, thence S 89°59'58" E 24.08 feet, thence N 46°29'04" E 12.47 feet, thence N 00°00'02" E 16.97 feet, thence S 89°59'58" E 18.12 feet, thence N 00°00'02" E 5.22 feet, thence N 89°57'39" E 30.73 feet, thence N 00°00'02" E 32.17 feet, thence N 89°56'58" W 11.92 feet, thence N 00°02" E 1.00 feet, thence S 89°59'58" E 0.50 feet, thence N 00°00'02" E 14.21 feet, thence S 89°59'58" E 39.78 feet, thence S 00°00'02" W 86.82 feet, thence S 89°59'58" E 32.58 feet to said true point of beginning.

Except therefrom those portions lying below a horizontal plane having an elevation of 95.76 feet and above a horizontal plane having an elevation of 77.76 feet.

Parcel 4B (Level 1 - Ground Floor Stairs on Orangethorpe Avenue)

Commencing at the centerline intersection of Orangethorpe Avenue and Brenner Avenue as shown on said Map of Tract No. 1756; thence along the centerline of Orangethorpe Avenue as shown on said Map S 89°27'51" E 199.02 feet; thence leaving said centerline N 0°32'09"E 60,00 feet to a point on a line parallel with, and 60.00 feet northerly of, measured at right angles from, said centerline of Orangethorpe Avenue, and the true point of beginning of the herein described parcel; thence N 0°00'02" E 36.96 feet; thence S 89°56'58" E 14.74 feet; thence s 0°00'02" W to a point on said parallel line; thence along said parallel line N 89°27'51" W 14.74 to said true point of beginning.

Except therefrom those portions lying below a horizontal plane having an elevation of 95.76 feet and above a horizontal plane having an elevation of 77.76 feet.

Parcel 4C (Level 1 - Ground Floor Stairs on Brenner Avenue)

Commencing at the centerline intersection of Orangethorpe Avenue and Brenner Avenue as shown on said Map of Tract No. 1756; thence along the centerline of Brenner Avenue as shown on said map N 0°27'49" E 339.33 feet; thence leaving said centerline N 89°32'11" W 46.71 feet to the true point of beginning of the herein described parcel; thence west 23.40 feet; thence south 7,24 feet; thence west 5.88 feet; thence south 6.55 feet; thence west 29.28 feet; thence north 13.79 feet to said true point of beginning.

Except therefrom those portions lying below a horizontal plane having an elevation of 95.76 feet and above a horizontal plane having an elevation of 77.76 feet.

Parcel 4D (Level2 - Second Floor Hotel Parcel)

Commencing at the centerline intersection of Orangethorpe Avenue and Brenner Avenue as shown on said Map of Tract No. 1756; thence along the centerline of Brenner Avenue as shown on said Map N 0°27'49" E 223.82 feet; thence leaving said centerline N 89°32'11" W 36.00 feet to the true point of beginning of the herein described parcel; thence S 00°27'49" W 94.43 feet; thence N 89°59'59" W 31.75 feet; thence S 00°01'05" W 13.53 feet; thence S 89°59'59" 31.65 feet; thence S 00°27'49" W 36.79 feet, thence S 45°29'59" W 26.85 feet; thence N 89°27'51" W 110.52 feet; Thence N 00°00'02" E 36.98 feet; thence N 89°59'58" W 19.37 feet; thence S 00°00'02" W 25.13 feet; thence N 89°59'58" W 12.81 feet; thence N 00°00'02" E 90.73 feet; thence S 89°59'58" E 62.50 feet; thence N 00°00'00" E 30.00 feet; thence S 89°59'58" E 15.42 feet; Thence N 00°00'02" E 29.98 feet; thence S 89°59'58" E 85.09 feet; to said true point of beginning.

Except therefrom those portions lying below a horizontal plane having an elevation of 113.76 feet and above a horizontal plane having an elevation of 95.76 feet.

Parcel 4E (Level 2 - Second Floor Stairs on Brenner Avenue)

Commencing at the centerline intersection of Orangethorpe Avenue and Brenner Avenue as shown on said Map of Tract No. 1756; thence along the centerline of Brenner Avenue as shown on said Map N 0°27'49" E 339.38 feet; thence leaving said centerline N 89°32'11" W 46.71 feet to the true point of beginning of the herein described parcel; thence west 23.40 feet; thence south 7.24 feet; thence west 5.88 feet; thence south 6.55 feet; thence west 29.28 feet; thence north 13.79 feet to said true point of beginning.

Except therefrom those portions lying below a horizontal plane having an elevation of 113.76 feet and above a horizontal plane having an elevation of 95.76 feet.

Parcel 4F (Level 3 -Third floor Stairs on Brenner Avenue)

Commencing at the centerline intersection of Orangethorpe Avenue and Brenner Avenue as shown on said Map of Tract No. 1756; thence along the centerline of Brenner Avenue as shown on said Map N 0°27'49" E 186.84 feet; thence leaving said centerline N W 46.71 feet to the true point of beginning of the herein described parcel; thence west 23.40 feet; thence south 7.24 feet; thence west 5.88 feet; thence south 6.55 feet; thence west 29.28 feet; thence north 13.79 feet to said true point of beginning.

Except therefrom those portions lying below a horizontal plane having an elevation of 150.76 feet and above a horizontal plane having an elevation of 113.76 feet.

Parcel 4G (Level 3 -Third floor Stairs on Brenner Avenue)

Commencing at the centerline intersection of Orangethorpe Avenue and Brenner Avenue as shown on said Map of Tract No. 1756; thence along the centerline of Brenner Avenue as shown on said Map N 0°27'49" E 186.84 feet; thence leaving said centerline N 89°32'11" W 45.54 feet to the true point of beginning of the herein described parcel; thence west 22.05 feet; thence south 9.15 feet; thence east 5.84 feet; thence south 10.38 feet; thence west 1.58 feet; thence south 4.17 feet; thence east 9.81 feet; thence south 10.37 feet; thence east 12.08 feet; thence north 9.62 feet; thence east 1.44 feet; thence north 24.44 feet to the said true point of beginning.

Except therefrom those portions lying below a horizontal plane having an elevation of 150.76 feet and above a horizontal plane having an elevation of 113 76 feet.

Parcel 4H (Level 3 - Third Floor Stairs on Orangethorpe Avenue)

Commencing at the centerline intersection of Orangethorpe Avenue and Brenner Avenue as shown on said Map of Tract No. 1756; thence along the centerline of Orangethorpe Avenue as shown on said Map S 89°27'51" E 199.02 feet thence leaving said centerline N 0°32'09" E 60.00 feet to a point on a ling parallel with, and 60.00 feet northerly of, measured at right angles from, said centerline of Orangethorpe Avenue, and the true point of beginning of the herein described parcel; thence N 0°00'02" E 30.96 feet; thence S 89°59'58" E 14.74 feet; thence S 0°00'02" W to a point on said parallel line; thence along said parallel line N 89°27'51" E 14.74 to said true point of beginning.

Except therefrom those portions lying below a horizontal plane having an elevation of 150.76 feet and above a horizontal plane having an elevation of 113.76 feet.

Parcel 4I (Level 4 - Fourth Floor Hotel Parcel including Deck)

Commencing at the centerline intersection of Orangethorpe Avenue and Brenner Avenue as shown on said Map of Tract No. 1766; thence along the Centerline of Brenner Avenue as shown on said Map N 00°27'49" E 353.11 feet; thence leaving said centerline N 89°32'11" W 36.00 feet to a point on a line parallel with and 36.00 feet westerly of, measured at right angles from, said centerline of Brenner Avenue, and the true point of beginning of the herein described parcel; thence South 72.90 feet; thence South 13.76 feet; thence west 18.27 feet; thence south 114.50 feet; thence west 92.89 feet; thence south 130.52 feet; thence east 12.99 feet; thence south 32.75 feet to a point on a line parallel with and 60.00 feet northerly of, measured at right angles from, said centerline of Orangethorpe Avenue; thence along said parallel line S 89°27'51" E 143.94 feet; thence N 45°29'59" E 26.85 feet to a point on said parallel line with the centerline of Brenner Avenue; thence along last said parallel line N 0°27'49" E 274.06 feet to said true point of beginning.

Except therefrom those portions lying below a horizontal plane having an elevation of 161.18 feet and above a horizontal plane having an elevation of 150.76 feet.

Parcel 4J (Level 5 - Fifth Floor Hotel Parcel)

Commencing at the centerline intersection of Orangethorpe Avenue and Brenner avenue as shown on said Map of Tract No. 1756; thence along the Centerline of Brenner Avenue as shown on said Map N 0°27'49" E 353.11 feet; thence leaving said centerline N 89°32'11" W 36.00 feet to a point on a line parallel with, and 36.00 feet westerly of, measured at right angles from, said centerline of Brenner Avenue, and the true point of beginning of the herein described parcel; thence west 72.90 feet; thence south 165.38 feet; thence west 6.81 feet; thence south 20.33 feet; thence east 6.81 feet; thence south 28.65 feet; thence west 105.43 feet; thence south 44.42 feet; thence east 12.99 feet; thence south 32.75 feet to a point on a line parallel with and 60.00 feet northerly of, measured at right angles from, said centerline of Orangethorpe Avenue; thence along said parallel line S 89°27'51" E 143.94 feet; thence N 45°29'59" E 26.86 feet to a point on said parallel line with the centerline of Brenner Avenue; thence along last said parallel line N 0°27'49" E 274.06 feet to said true point of beginning.

Except therefrom those portions lying below a horizontal plane having an elevation of 171.60 feet and above a horizontal plane having an elevation of 161.18 feet.

Parcel 4K (Level 6 - Sixth Floor Hotel Parcel)

Commencing at the centerline intersection of Orangethorpe Avenue and Brenner Avenue as shown on said Map of Tract No, 1756; thence along the centerline of Brenner Avenue as shown on said Map N 0°27'49" E 353.11 feet; thence leaving said centerline N 89°32'11" w 36.00 feet to a point on a line parallel with, and 36.00 feet westerly of, measured at right angles from, said centerline of Brenner Avenue, and the true point of beginning of the herein described Parcel; thence west 72.90 feet; thence south 165.38 feet; thence west 6.81 feet; thence south 20.33 feet; thence east 6.81 feet; thence south 28.65 feet; thence west 105.43 feet; thence south 44.42 feet; thence east 11.33 feet; thence south 32.75 feet to a point on a line parallel with and 60.00 feet northerly of, measured at right angles from, said centerline of Orangethorpe Avenue; thence along said parallel line S 89°27'51" E 145.60 feet; thence N 45°29'59" E 26.85 feet to a point on said parallel line with the centerline of Brenner Avenue; thence along last said parallel line N 0° 27' 49" E 274.06 feet to said true point of beginning

Except therefrom those portions lying below a horizontal plane having an elevation of 182.02 feet and above a horizontal plane having an elevation of 171.60 feet.

Parcel 4L (Level 7 - Seventh Floor & Roof Hotel Parcel)

Commencing at the centerline intersection of Orangethorpe Avenue and Brenner Avenue as shown on said Map of Tract No. 1756; thence along the centerline of Brenner Avenue as shown on said Map N 0°27'49" E 333.11 feet; thence leaving said centerline N 89°32'11" W 36.00 feet to a point on a line parallel with, and 36.00 feet westerly of, measured at right angles from, said centerline of Brenner Avenue, and the true point of beginning of the herein described parcel; thence west 72.90 feet; thence south 165.38 feet; thence west 6.81 feet; thence south 20.33 feet thence east 6.81 feet; thence south 28,65 feet; thence west 105.43 feet; thence south 44.42 feet; thence east 12.99 feet; thence south 32.75 feet to a point on a line parallel with and 60.00 feet northerly of, measured at right angles from, said centerline of Orangethorpe Avenue; thence along said parallel line S 89°27'51" E 143.94 feet; thence N

45°29'59" E 26.85 feet to a point on said parallel line with the centerline of Brenner Avenue; thence along last said parallel line N 0°27'49" E 274.06 feet to said true point of beginning.

Except therefrom those portions lying below a horizontal plane having an elevation of 210.00 feet and above a horizontal plane having an elevation of 182.02 feet.

Elevations stated hereon are based on the North American Vertical Datum of 1988 (NAVD88) per the year 2005 adjustment by the Orange County Surveyor, using the following benchmark:

OCS BM 404-31-05  Elev. =80.151 Feet (NAVD88, Year 2005 Leveled) station is an OCS aluminum disk stamped 404-31-05 set in the SE'ly corner of a 16 ft. x 4.5 ft. concrete catch basin, located in NE'ly portion of intersection of Stanton Ave. Artesia Blvd., 28 ft N'ly of the centerline of Artesia Blvd., & 81 ft. E'ly of the centerline of Stanton Avenue. Monument is level with the sidewalk

which real property is also known as:

Parcel A:

Parcel 4 of Parcel Map No. 2014-173, filed May 30, 2017 in Book 391, Pages 4 through 16, inclusive, of Parcel Maps.

Parcel B:

Easements for pedestrian access, utilities, and other uses set forth in the Declaration of Covenants, Conditions and Restrictions and Reciprocal Easement Agreement recorded March 5, 2014 as Instrument No. 2014-000084685 of Official Records as amended by the document entitled "Amended and Restated Declaration of Covenants, Conditions and Restrictions and Reciprocal Easement Agreement" recorded June 3,2016 as Instrument No. 2016-0002524450 of Official Records and as amended in the document entitled "First Amendment to Amended and Restated Declaration of Covenants, Conditions and Restrictions and Reciprocal Easement Agreement" recorded May 8, 2017 as Instrument No. 2017-000185903 of Official Records.

NOTE:   For information purposes only, for which the Company assumes no liability for any inaccuracies or omissions, the purported street address of said land as determined from the latest County Assessor's Roll is:

6986-6988 BEACH BLVD, Buena Park, CA 90621

# EXHIBIT "F"

[UCC-1 Financing Statements and Summary]



2020 Hurley Way, Suite 350
Sacramento, CA 95825
clasorders@clasinfo.com || 800.952.5696

# UCC Search Report

|  |  |
|---|---|
| Indices searched: | UCCs, Federal Tax Liens, State Tax Liens, Judgment Liens |
| Jurisdiction: | California Secretary of State, Uniform Commercial Code Division |
| Index date: | 02/16/2021 |
| Search date: | 03/01/2021 |
| Search type: | Debtor Name Search |
| Debtor name: |  |
| Search key entered: | The Source Hotel, LLC |

## Results

*Based on a search of the indices of the California Secretary of State, Uniform Commercial Code Division, there are no active liens of record other than those set out below. Liens reflected in this report were based on the searcher's individual search parameters, the search key entered, as well asthe searcher's choice of the liens ultimately induded or excluded herein.*
**Certification can only be obtained through the California Secretary of State, Uniform Commercial Code Division.**

*For online searches, index dates are calculated using an algorithm that analyzes record counts and filing dates contained in the UCC and Lien data. Due to the implementation of new state filing systems as well as the effects of COVID-19 closures, state data has become more prone to inconsistencies making it difficult to assign index dates accurately. We encourage clients to consider these results as preliminary and to request an official search in addition.*

---

1.  **UCC** *(Active)*  Lapse Date: **06/06/2021**
    Document number: **20167529451818**  Filed: **06/06/2016**

| **Debtor(s)** | **Secured Part(ies)** |
|---|---|
| THE SOURCE HOTEL, LLC | EVERTRUST BANK |
| 3100 EAST IMPERIAL HIGHWAY  LYNWOOD, CA 90262 | 18645 E. GATE AVENUE, SUITE 110  CITY OF INDUSTRY, CA 91748 |

**Amendments**
Termination
Filing number: **201675312524**  Filing date: **06/15/2016**

---

2.  **UCC** *(Active)*  Lapse Date: **06/06/2021**
    Document number: **20167529452566**  Filed: **06/06/2016**

| **Debtor(s)** | **Secured Part(ies)** |
|---|---|
| THE SOURCE HOTEL, LLC | EVERTRUST BANK |
| 3100 EAST IMPERIAL HIGHWAY  LYNWOOD, CA 90262 | 18645 E. GALE AVENUE, SUITE 110  CITY OF INDUSTRY, CA 91748 |

**Amendments**

Termination

Filing number: **201675312525**  Filing date: **06/15/2016**

---

3.  **UCC** *(Active)*  Lapse Date: **06/07/2021**
     Document number: **20167529702594**  Filed: **06/07/2016**

| **Debtor(s)** | **Secured Part(ies)** |
|---|---|
| THE SOURCE HOTEL, LLC | EVERTRUST BANK |
| 3100 EAST IMPERIAL HIGHWAY  LYNWOOD, CA 90262 | 18645 E. GALE AVENUE, SUITE 110  CITY OF INDUSTRY, CA 91748 |

---

4.  **UCC** *(Active)*  Lapse Date: **06/07/2021**
     Document number: **20167529702736**  Filed: **06/07/2016**

| **Debtor(s)** | **Secured Part(ies)** |
|---|---|
| THE SOURCE HOTEL, LLC | EVERTRUST BANK |
| 3100 EAST IMPERIAL HIGHWAY  LYNWOOD, CA 90262 | 18645 E. GALE AVENUE, SUITE 110  CITY OF INDUSTRY, CA 91748 |

---

*We assume no liability with respect to the identity of any party named or referred to in this report, nor with respect to the validity, legal effect or priority of any matter shown herein; nor, due to our inability to independently verify the accuracy of this data as provided by government and other sources, do we make any guaranty or representation as to its accuracy.*

**Report Parameters**
*The UCC Revised Article 9 Model Administrative Rules (MARS) provide state filing offices with a set of guidelines for producing a legally compliant UCC lien search report. The search tool used to create this search report was designed to satisfy the requirements under MARS while providing the searcher with increased flexibility.*
*Flexible search logic generates a more inclusive search report and addresses the inconsistencies in searches performed within states that did not effectively adopt the MARS guidelines. Further, these specially designed broad-based searching features aid in the location of involuntary liens such as Federal and State Tax Liens and Judgment Liens and liens that may not be located in state databases limited to the MARS guidelines for the reporting of UCCs.*

-------------- End Of Report -----------------



## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Brian Bloom (323) 852-1000

**B. E-MAIL CONTACT AT FILER (optional)**
bbloom@frandzel.com

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**

***PLEASE RETURN TO***
CSC
2710 Gateway Oaks Drive, Suite 150N
Sacramento, CA 95833
Acct. #10011306

**16-7529451818**

**06/06/2016  16:37**

**FILED**
CALIFORNIA
SECRETARY OF STATE

SOS

55539150002  UCC 1 FILING

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| THE SOURCE HOTEL, LLC | | | | |

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3100 East Imperial Highway | Lynwood | CA | 90262 | US |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| EVERTRUST BANK | | | | |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 18645 E. Gale Avenue, Suite 110 | City of Industry | CA | 91748 | US |

**4. COLLATERAL:** This financing statement covers the following collateral:
Please see Exhibits "A" and "B" attached hereto and incorporated herein by this reference.

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

**6b.** Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
100385-0146 [BB:slb]

## EXHIBIT "A"
## COLLATERAL DESCRIPTION

DEBTOR:              THE SOURCE HOTEL, LLC

SECURED PARTY:       EVERTRUST BANK

All of Debtor's interest in that certain real property located in the County of Orange, State of California, described in Exhibit "B" attached hereto and made a part hereof by this reference and all right, title and interest of Debtor in and to the Property (as hereinafter defined) arising from and created under that certain Ground Lease dated as of April 6, 2015 by and between THE SOURCE AT BEACH, LLC, a California limited liability company, as lessor, and Debtor, as lessee (the "Ground Lease"), together with (a) all of Debtor's rights of use, occupancy and enjoyment, (b) all of Debtor's rights in and to all rents, income and profits arising from or pursuant to the Ground Lease together with all amendments, extensions, renewals or modifications thereof, (c) all of Debtor's credits, deposits, options and privileges of Debtor as lessee under the Ground Lease, including without limitation, the right to renew or extend the Ground Lease for a succeeding term or terms, the right to purchase the Land (as hereinafter defined), if any, and (d) all rights of Debtor as lessee under the Ground Lease in connection with any bankruptcy or insolvency proceedings of the fee owner of the Land;

All right, title and interest which Debtor now has or may later acquire in such real property and all appurtenances, easements, covenants, rights of way, tenements, hereditaments and appurtenances thereunto belonging or in any way appertaining thereto now or hereafter, and all of the estate, right, title, interest, claim, demand, reversion or remainder whatsoever of Debtor therein or thereto, at law or in equity, now or hereafter in possession or expectancy, including, without limitation, all mineral, oil, and gas rights and royalties and profits therefrom, all water and water rights and shares of stock pertaining to water and water rights, and all sewers, pipes, conduits, wires and other facilities furnishing utility or services to the real property (collectively, the "Land");

All right, title and interest which Debtor now has or may later acquire in and to all buildings, structures and improvements now or hereafter erected on the Land, including, without limitation, all plant equipment, apparatus, machinery and fixtures of every kind and nature whatsoever now or hereafter located on or forming part of said buildings, structures and improvements (collectively, the "Improvements"; the Land and Improvements being hereinafter sometimes collectively referred to as the "Premises");

All right, title and interest which Debtor now has or may later acquire in and to the land lying in the bed of any street, road, highway or avenue now or hereafter in front of or adjoining the Premises;

All right, title and interest which Debtor now has or may later acquire in Any and all awards heretofore or hereafter made by any governmental authorities (federal, state, local or otherwise)

to Debtor and all subsequent owners of the Premises which may be made with respect to the Premises as a result of the exercise of the right of eminent domain, the alteration of the grade of any street or any other injury to or decrease of value of the Premises, which said award or awards are hereby assigned to Lender;

All right, title and interest which Debtor now has or may later acquire in any and all claims under and proceeds of any insurance policies by reason of or related to a loss of any kind sustained to the Premises, now or hereafter, whether or not such policies name Lender as an insured and whether or not such policies are required by Lender, and whether or not such claims thereunder are characterized as personal claims;

All right, title and interest which Debtor now has or may later acquire in any and all unearned premiums accrued, accruing or to accrue, and the proceeds of insurance now or hereafter in effect with respect to all or any portion of the Premises;

Any and all claims or demands which Debtor now has or may hereafter acquire against anyone with respect to any damage to all or any portion of the Premises;

All right, title and interest which Debtor now has or may later acquire in all goods, equipment, machinery, furniture, furnishings, trade fixtures, appliances, inventory, building materials, apparatus, utensils, vehicles, wiring, pipes, conduits, elevators, escalators, heating and air conditioning equipment, chattels and articles of personal property, including, without limitation, any interest therein now or at any time hereafter affixed to, attached to or used in any way in connection with or to be incorporated at any time into the Premises or placed on any part thereof wheresoever located, whether or not attached to or incorporated in the Premises, together with any and all accessions, accessories, attachments, and replacements thereof, appertaining and adapted to the complete and compatible use, enjoyment, occupancy, operation or improvement of the Premises;

All right, title and interest which Debtor now has or may later acquire in all instruments, investment property, deposit accounts, accounts, contract rights, general intangibles, and other intangible property and rights now or hereafter relating to the foregoing property, or the operation thereof or used in connection therewith, including, without limitation, all options, letters of intent, and rights of first refusal of any nature whatsoever, covering all or any portion of such property, together with any modifications thereof, and deposits or other payments made in connection therewith, existing and future development rights, permits and approvals, air rights, density bonus rights, and transferable development rights; all of Debtor's right, title, and interest in and to any awards, remunerations, settlements, or compensation heretofore made or hereafter made by any and all courts, boards, agencies, commissions, offices, or authorities, of any nature whatsoever for any governmental unit (federal, state, local or otherwise) to the present or any subsequent owner of the foregoing property, including those for any vacation of, or change of grade in, any streets affecting the foregoing property and any and all licenses and privileges obtained by Debtor from non-governmental sources;

All right, title and interest which Debtor now has or may later acquire in all leases of the Premises, Personalty, Fixtures, or any part thereof, now or hereafter entered into and all right,

title and interest of Debtor thereunder, including, without limitation, cash or securities deposited thereunder to secure performance by the lessees of their obligations thereunder (whether such cash or securities are to be held until the expiration of the terms of such leases or applied to one or more of the installments of rent coming due immediately prior to the expiration of such terms); all other rights and easements of Debtor now or hereafter existing pertaining to the use and enjoyment of the Premises; and all right, title and interest of Debtor in and to all declarations of covenants, conditions and restrictions as may affect or otherwise relate to the Premises;

All right, title and interest which Debtor now has or may later acquire in all permits, plans, licenses, specifications, subdivision rights, security interests, contracts, contract rights, public utility deposits, prepaid sewer and water hook-up charges, or other rights as may affect or otherwise relate to the Property (as hereinafter defined);

All rents, income, issues and profits, including, without limitation, the accounts, revenues, and proceeds of any business operation conducted by or on behalf of Debtor on or through the use of the Premises, prepaid municipal and utility fees, bonds, revenues, income, and other benefits to which Debtor may now or hereafter be entitled to, or which are derived from, the Property or any portion thereof or interest therein.

The foregoing listing is intended only to be descriptive of the property encumbered hereby, and not exclusive or all inclusive. It is the intent of Debtor to encumber hereby all property located or to be located upon the above-described real property. Said real property, leasehold estate, buildings, improvements, appurtenances, Fixtures, Personalty, additions, accretions, and other property are herein referred to as the "Property." As used herein, the term "Fixtures" shall include all articles of personal property hereinabove described, now or hereafter attached to, placed upon for a definite term, or otherwise used in connection with the Property, and shall include trade fixtures and goods which are or are to become fixtures. As used herein, the term "Personalty" shall include all furniture, furnishings, equipment, machinery, goods, contract rights, general intangibles, money, deposit accounts, instruments, accounts, leases, chattel paper and other personal property described in this Exhibit "A" (other than Fixtures) of any kind or character now existing or hereafter arising or acquired, now or hereafter located upon, within or about the Property, or which otherwise pertains to the use, ownership, management, operation, construction, leasing and sale of the Property, and all products and proceeds thereof, and all of Debtor's right, title, and interest in and to all such property.

Nothing herein contained shall be construed as creating a mortgage of real property, it being understood and agreed that only that portion of the foregoing description of collateral which constitutes personal property is intended to be included herein and that Secured Party has taken a separate deed of trust encumbering all of Debtor's interest in the leasehold estate and real property to which the foregoing description refers.

## EXHIBIT "B"
## LEGAL DESCRIPTION

**The land referred to herein is situated in the State of California, County of Orange and described as follows:**

THAT PORTION OF LOT 2 IN BLOCK 61 OF BUENA PARK, IN THE CITY OF BUENA PARK, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 18, PAGES 50 TO 52 INCLUSIVE, OF MISCELLANEOUS MAPS, AND THOSE PORTIONS OF LOTS 5 TO 9 INCLUSIVE OF TRACT NO. 1756, AS PER MAP RECORDED IN BOOK 60 PAGES 20 AND 21 OF MISCELLANEOUS MAPS, ALL IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

PARCEL 4A (LEVEL 1 - GROUND FLOOR LOBBY & ENTRANCE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 215.36 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 45.77 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE S 00°00'02" W 86.05 FEET, THENCE N 89°59'59" W 22.68 FEET, THENCE S 00°01'05" W 13.56 FEET, THENCE S 89°59'59" E 22.57 FEET, THENCE S 00°00'02" W 8.22 FEET, THENCE N 89°59'58" W 0.77 FEET, THENCE S 00°00'02" W 34.16, THENCE N 89°59'58" W 110.62 FEET, THENCE N 00°00'02" E 34.17 FEET, THENCE N 89°59'58" W 30.58 FEET, THENCE N 00°00'02" E 107.52 FEET, THENCE N 89°59'58" W 0.83 FEET, THENCE N 00°00'02" E 8.95 FEET, THENCE S 89°59'58" E 24.08 FEET, THENCE N 46°29'04" E 12.47 FEET, THENCE N 00°00'02" E 16.97 FEET, THENCE S 89°59'58" E 18.12 FEET, THENCE N 00°00'02" E 5.22 FEET, THENCE N 89°57'39" E 30.73 FEET, THENCE N 00°00'02" E 32.17 FEET, THENCE N 89°59'58" W 11.92 FEET, THENCE N 00°02" E 1.00 FEET, THENCE S 89°59'58" E 0.50 FEET, THENCE N 00°00'02" E 14.21 FEET, THENCE S 89°59'58" E 39.78 FEET, THENCE S 00°00'02" W 86.82 FEET, THENCE S 89°59'58" E 32.58 FEEL TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 77.76 FEET.

PARCEL 4B (LEVEL 1 - GROUND FLOOR STAIRS ON ORANGETHORPE AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF ORANGETHORPE AVENUE AS SHOWN ON SAID MAP S 89°27'51" E 199.02 FEET; THENCE LEAVING SAID CENTERLINE N 0°32'09" E 60.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE N 0°00'02" E 36.96 FEET; THENCE S 89°59'58" E 14.74 FEET; THENCE S 0°00'02" W TO A POINT ON SAID PARALLEL LINE; THENCE ALONG SAID PARALLEL LINE N 89°27'51" W 14.74 TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 77.76 FEET.

PARCEL 4C (LEVEL 1 - GROUND FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 339.38 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 46.71 FEET TO THE TRUE POINT OF

BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 23.40 FEET; THENCE SOUTH 7.24 FEET; THENCE WEST 5.88 FEET; THENCE SOUTH 6.55 FEET; THENCE WEST 29.28 FEET; THENCE NORTH 13.79 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 77.76 FEET.

PARCEL 4D (LEVEL 2 - SECOND FLOOR HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 223.82 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE S 00°27'49" W 94.43 FEET; THENCE N 89°59'59" W 31.75 FEET; THENCE S 00°01'05" W 13.56 FEET; THENCE S 89°59'59" E 31.65 FEET; THENCE S 00° 27'49" W 36.79 FEET; THENCE S 45°29'59" W 26.85 FEET; THENCE N 89°27'51" W 110.52 FEET; THENCE N 00°00'02" E 36.98 FEET; THENCE N 89°59'58" W 19.37 FEET; THENCE S 00°00'02" W 25.13 FEET; THENCE N 89°59'58" W 12.81 FEET; THENCE N 00°00'02" E 90.73 FEET; THENCE S 89° 59'58" E 62.50 FEET; THENCE N 00°00'00" E 30.00 FEET; THENCE S 89°59'58" E 15.42 FEET; THENCE N 00°00'02" E 29.98 FEET; THENCE S 89°59'58" E 85.09 FEET; TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET.

PARCEL 4E (LEVEL 2 - SECOND FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 339.38 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 46.71 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 23.40 FEET; THENCE SOUTH 7.24 FEET; THENCE WEST 5.88 FEET; THENCE SOUTH 6.55 FEET; THENCE WEST 29.28 FEET; THENCE NORTH 13.79 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET.

PARCEL 4F (LEVEL 3 -THIRD FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 339.38 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 46.71 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 23.40 FEET; THENCE SOUTH 7.24 FEET; THENCE WEST 5.88 FEET; THENCE SOUTH 6.55 FEET; THENCE WEST 29.28 FEET; THENCE NORTH 13.79 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET.

PARCEL 4G (LEVEL 3 - THIRD FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND

BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 186.84 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 45.54 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 22.05 FEET; THENCE SOUTH 9.15 FEET; THENCE EAST 5.84 FEET; THENCE SOUTH 10.38 FEET; THENCE WEST 1.58 FEET; THENCE SOUTH 4.17 FEET; THENCE EAST 9.81 FEET; THENCE SOUTH 10.37 FEET; THENCE EAST 12.08 FEET; THENCE NORTH 9.62 FEET; THENCE EAST 1.44 FEET; THENCE NORTH 24.44 FEET TO THE SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET.

PARCEL 4H (LEVEL 3 - THIRD FLOOR STAIRS ON ORANGETHORPE AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF ORANGETHOPE AVENUE AS SHOWN ON SAID MAP S 89°27'51" E 199.02 FEET; THENCE LEAVING SAID CENTERLINE N 0°32'09" E 60.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE N 0°00'02" E 36.96 FEET; THENCE S 89°59'58" E 14.74 FEET; THENCE S 0°00'02" W TO A POINT ON SAID PARALLEL LINE; THENCE ALONG SAID PARALLEL LINE N 89°27'51" W 14.74 TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET.

PARCEL 4I (LEVEL 4 - FOURTH FLOOR HOTEL PARCEL INCLUDING DECK)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 72.90 FEET; THENCE SOUTH 13.76 FEET; THENCE WEST 18.27 FEET; THENCE SOUTH 114.50 FEET; THENCE WEST 92.89 FEET; THENCE SOUTH 130.52 FEET; THENCE EAST 12.99 FEET; THENCE SOUTH 32.75 FEET TO A POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE; THENCE ALONG SAID PARALLEL LINE S 89°27'51" E 143.94 FEET; THENCE N 45°29'59" E 26.85 FEET TO A POINT ON SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE; THENCE ALONG LAST SAID PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 161.18 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76 FEET.

PARCEL 4J (LEVEL 5 - FIFTH FLOOR HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 72.90 FEET; THENCE SOUTH 165.38 FEET; THENCE WEST 6.81 FEET; THENCE

6

SOUTH 20.33 FEET; THENCE EAST 6.81 FEET; THENCE SOUTH 28.65 FEET; THENCE WEST 105.43 FEET; THENCE SOUTH 44.42 FEET; THENCE EAST 12.99 FEET; THENCE SOUTH 32.75 FEET TO A POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE; THENCE ALONG SAID PARALLEL LINE S 89°27'51" E 143.94 FEET; THENCE N 45°29'59" E 26.85 FEET TO A POINT ON SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE; THENCE ALONG LAST SAID PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 171.60 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 161.18 FEET.

PARCEL 4K (LEVEL 6 - SIXTH FLOOR HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 72.90 FEET; THENCE SOUTH 165.38 FEET; THENCE WEST 6.81 FEET; THENCE SOUTH 20.33 FEET; THENCE EAST 6.81 FEET; THENCE SOUTH 28.65 FEET; THENCE WEST 105.43 FEET; THENCE SOUTH 44.42 FEET; THENCE EAST 11.33 FEET; THENCE SOUTH 32.75 FEET TO A POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE; THENCE ALONG SAID PARALLEL LINE S 89°27'51" E 145.60 FEET; THENCE N 45°29'59" E 26.85 FEET TO A POINT ON SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE; THENCE ALONG LAST SAID PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 182.02 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 171.60 FEET.

PARCEL 4L (LEVEL 7 - SEVENTH FLOOR & ROOF HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 72.90 FEET; THENCE SOUTH 165.38 FEET; THENCE WEST 6.81 FEET; THENCE SOUTH 20.33 FEET; THENCE EAST 6.81 FEET; THENCE SOUTH 28.65 FEET; THENCE WEST 105.43 FEET; THENCE SOUTH 44.42 FEET; THENCE EAST 12.99 FEET; THENCE SOUTH 32.75 FEET TO A POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF OANGETHORPE AVENUE; THENCE ALONG SAID PARALLEL LINE S 89°27'51" E 143.94 FEET; THENCE N 45°29'59" E 26.85 FEET TO A POINT ON SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE; THENCE ALONG LAST SAID PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 210.00 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 182.02 FEET.

ELEVATIONS STATED HEREON ARE BASED ON THE NORTH AMERICAN VERTICAL DATUM OF 1988 (NAVD88) PER THE YEAR 2005 ADJUSTMENT BY THE ORANGE COUNTY SURVEYOR, USING THE FOLLOWING BENCHMARK:

OCS BM 404-31-05 ELEV.=80.151 FEET (NAVD88, YEAR 2005 LEVELED) STATION IS AN OCS

ALUMINUM DISK STAMPED 404-31-05 SET IN THE SE'LY CORNER OF A 15 FT. X 4.5 FT.
CONCRETE CATCH BASIN, LOCATED IN NE'LY PORTION OF INTERSECTION OF STANTON AVE. &
ARTESIA BLVD., 28 FT. N'LY OF THE CENTERLINE OF ARTESIA BLVD. & 81 FT. E'LY OF THE
CENTERLINE OF STANTON AVENUE. MONUMENT IS LEVEL WITH THE SIDEWALK

APN: 276-361-20 and 276-361-22
(End of Legal Description)

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**16-7529452566**

**06/06/2016 16:37**

**FILED**
CALIFORNIA
SECRETARY OF STATE

SOS

55539150003  UCC 1 FILING

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| Brian Bloom (323) 852-1000 |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| bbloom@frandzel.com |

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

***PLEASE RETURN TO***

CSC
2710 Gateway Oaks Drive, Suite 150N
Sacramento, CA 95833
Acct. #10011306

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| THE SOURCE HOTEL, LLC | | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 3100 East Imperial Highway | Lynwood | | CA | 90262 | US |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| EVERTRUST BANK | | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 18645 E. Gale Avenue, Suite 110 | City of Industry | | CA | 91748 | US |

4. COLLATERAL: This financing statement covers the following collateral:
Please see Exhibit "A" attached hereto and incorporated herein by this reference.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
100385-0146 [BB:slb]

# EXHIBIT "A"
## COLLATERAL DESCRIPTION

DEBTOR:          THE SOURCE HOTEL, LLC

SECURED PARTY:  EVERTRUST BANK

COLLATERAL:

The word "Collateral" means the following described property of Debtor whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

a.    All accounts, contract rights, chattel paper, instruments, deposit accounts, letter of credit rights, payment intangibles and general intangibles; and all returned or repossessed goods which, on sale or lease, resulted in an account or chattel paper.

b.    All inventory, including all materials, work in process and finished goods:

c.    All machinery, furniture, fixtures and other equipment of every type now owned or hereafter acquired by Debtor.

d.    All of Debtor's deposit accounts with Secured Party. The Collateral shall include any renewals or rollovers of the deposit accounts, any successor accounts, and any general intangibles and choses in action arising therefrom or related thereto.

e.    All instruments, notes, chattel paper, documents, certificates of deposit, securities and investment property of every type. The Collateral shall include all liens, security agreements, leases and other contracts securing or otherwise relating to the foregoing.

f.    All general intangibles, including, but not limited to, (i) all patents, and all unpatented or unpatentable inventions; (ii) all trademarks, service marks, and trade names; (iii) all copyrights and literary rights; (iv) all computer software programs; (v) all mask works of semiconductor chip products; (vi) all trade secrets, proprietary information, customer lists, manufacturing, engineering and production plans, drawings, specifications, processes and systems. The Collateral shall include all good will connected with or symbolized by any of such general intangibles; all contract rights, documents, applications, licenses, materials and other matters related to such general intangibles; all tangible property embodying or incorporating any such general intangibles; and all chattel paper and instruments relating to such general intangibles.

g.    All negotiable and nonnegotiable documents of title covering any Collateral.

h.    All accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral.

          i.      All substitutes or replacements for any Collateral, all cash or non-cash proceeds, product, rents and profits of any Collateral, all income, benefits and property receivable on account of the Collateral, all rights under warranties and insurance contracts, letters of credit, guaranties or other supporting obligations covering the Collateral, and any causes of action relating to the Collateral.

          j.      All books and records pertaining to any Collateral, including but not limited to any computer-readable memory and any computer hardware or software necessary to process such memory ("Books and Records").

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**16-7529702594**

**06/07/2016  13:19**

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| Brian Bloom (323) 852-1000 |

**FILED**
CALIFORNIA
SECRETARY OF STATE
SOS

| B. E-MAIL CONTACT AT FILER (optional) |
| bbloom@frandzel.com |

| C. SEND ACKNOWLEDGMENT TO: (Name and Address) |

**55567640003**    UCC 1 FILING

***PLEASE RETURN TO***
CSC
2710 Gateway Oaks Drive, Suite 150N
Sacramento, CA 95833
Acct. #10011306

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| THE SOURCE HOTEL, LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 3100 East Imperial Highway | Lynwood | CA | 90262 | US |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| EVERTRUST BANK | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 18645 E. Gale Avenue, Suite 110 | City of Industry | CA | 91748 | US |

4. COLLATERAL: This financing statement covers the following collateral:
Please see Exhibit "A" attached hereto and incorporated herein by this reference.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:  ☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility
6b. Check only if applicable and check only one box:  ☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
100385-0146 [BB:slb]

UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

## EXHIBIT "A"
## COLLATERAL DESCRIPTION

55567640003

DEBTOR:          THE SOURCE HOTEL, LLC

SECURED PARTY:  EVERTRUST BANK

COLLATERAL:

The word "Collateral" means the following described property of Debtor whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

a.      All accounts, contract rights, chattel paper, instruments, deposit accounts, letter of credit rights, payment intangibles and general intangibles; and all returned or repossessed goods which, on sale or lease, resulted in an account or chattel paper.

b.      All inventory, including all materials, work in process and finished goods:

c.      All machinery, furniture, fixtures and other equipment of every type now owned or hereafter acquired by Debtor.

d.      All of Debtor's deposit accounts with Secured Party. The Collateral shall include any renewals or rollovers of the deposit accounts, any successor accounts, and any general intangibles and choses in action arising therefrom or related thereto.

e.      All instruments, notes, chattel paper, documents, certificates of deposit, securities and investment property of every type. The Collateral shall include all liens, security agreements, leases and other contracts securing or otherwise relating to the foregoing.

f.      All general intangibles, including, but not limited to, (i) all patents, and all unpatented or unpatentable inventions; (ii) all trademarks, service marks, and trade names; (iii) all copyrights and literary rights; (iv) all computer software programs; (v) all mask works of semiconductor chip products; (vi) all trade secrets, proprietary information, customer lists, manufacturing, engineering and production plans, drawings, specifications, processes and systems. The Collateral shall include all good will connected with or symbolized by any of such general intangibles; all contract rights, documents, applications, licenses, materials and other matters related to such general intangibles; all tangible property embodying or incorporating any such general intangibles; and all chattel paper and instruments relating to such general intangibles.

g.      All negotiable and nonnegotiable documents of title covering any Collateral.

h.      All accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral.

55567640003

   i. All substitutes or replacements for any Collateral, all cash or non-cash proceeds, product, rents and profits of any Collateral, all income, benefits and property receivable on account of the Collateral, all rights under warranties and insurance contracts, letters of credit, guaranties or other supporting obligations covering the Collateral, and any causes of action relating to the Collateral.

   j. All books and records pertaining to any Collateral, including but not limited to any computer-readable memory and any computer hardware or software necessary to process such memory ("Books and Records").

2



## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

16-7529702736

06/07/2016 13:19

**FILED**
CALIFORNIA
SECRETARY OF STATE

SOS

55567640004    UCC 1 FILING

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| Brian Bloom (323) 852-1000 |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| bbloom@frandzel.com |

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

***PLEASE RETURN TO***

CSC
2710 Gateway Oaks Drive, Suite 150N
Sacramento, CA 95833
Acct. #10011306

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| THE SOURCE HOTEL, LLC | | | |

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3100 East Imperial Highway | Lynwood | CA | 90262 | US |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| EVERTRUST BANK | | | |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 18645 E. Gale Avenue, Suite 110 | City of Industry | CA | 91748 | US |

4. COLLATERAL: This financing statement covers the following collateral:

Please see Exhibits "A" and "B" attached hereto and incorporated herein by this reference.

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) | ☐ being administered by a Decedent's Personal Representative |
|---|---|

| 6a. Check only if applicable and check only one box: | | 6b. Check only if applicable and check only one box: |
|---|---|---|
| ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | | ☐ Agricultural Lien ☐ Non-UCC Filing |

| 7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor |
|---|

| 8. OPTIONAL FILER REFERENCE DATA: |
|---|
| 100385-0146 [BB:slb] |

UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

## EXHIBIT "A"
## COLLATERAL DESCRIPTION

55567640004

DEBTOR:                  THE SOURCE HOTEL, LLC

SECURED PARTY:           EVERTRUST BANK

All of Debtor's interest in that certain real property located in the County of Orange, State of California, described in Exhibit "B" attached hereto and made a part hereof by this reference and all right, title and interest of Debtor in and to the Property (as hereinafter defined) arising from and created under that certain Ground Lease dated as of April 6, 2015 by and between THE SOURCE AT BEACH, LLC, a California limited liability company, as lessor, and Debtor, as lessee (the "Ground Lease"), together with (a) all of Debtor's rights of use, occupancy and enjoyment, (b) all of Debtor's rights in and to all rents, income and profits arising from or pursuant to the Ground Lease together with all amendments, extensions, renewals or modifications thereof, (c) all of Debtor's credits, deposits, options and privileges of Debtor as lessee under the Ground Lease, including without limitation, the right to renew or extend the Ground Lease for a succeeding term or terms, the right to purchase the Land (as hereinafter defined), if any, and (d) all rights of Debtor as lessee under the Ground Lease in connection with any bankruptcy or insolvency proceedings of the fee owner of the Land;

All right, title and interest which Debtor now has or may later acquire in such real property and all appurtenances, easements, covenants, rights of way, tenements, hereditaments and appurtenances thereunto belonging or in any way appertaining thereto now or hereafter, and all of the estate, right, title, interest, claim, demand, reversion or remainder whatsoever of Debtor therein or thereto, at law or in equity, now or hereafter in possession or expectancy, including, without limitation, all mineral, oil, and gas rights and royalties and profits therefrom, all water and water rights and shares of stock pertaining to water and water rights, and all sewers, pipes, conduits, wires and other facilities furnishing utility or services to the real property (collectively, the "Land");

All right, title and interest which Debtor now has or may later acquire in and to all buildings, structures and improvements now or hereafter erected on the Land, including, without limitation, all plant equipment, apparatus, machinery and fixtures of every kind and nature whatsoever now or hereafter located on or forming part of said buildings, structures and improvements (collectively, the "Improvements"; the Land and Improvements being hereinafter sometimes collectively referred to as the "Premises");

All right, title and interest which Debtor now has or may later acquire in and to the land lying in the bed of any street, road, highway or avenue now or hereafter in front of or adjoining the Premises;

All right, title and interest which Debtor now has or may later acquire in Any and all awards heretofore or hereafter made by any governmental authorities (federal, state, local or otherwise)

2197214.2                              1

55567640004

to Debtor and all subsequent owners of the Premises which may be made with respect to the Premises as a result of the exercise of the right of eminent domain, the alteration of the grade of any street or any other injury to or decrease of value of the Premises, which said award or awards are hereby assigned to Lender;

All right, title and interest which Debtor now has or may later acquire in any and all claims under and proceeds of any insurance policies by reason of or related to a loss of any kind sustained to the Premises, now or hereafter, whether or not such policies name Lender as an insured and whether or not such policies are required by Lender, and whether or not such claims thereunder are characterized as personal claims;

All right, title and interest which Debtor now has or may later acquire in any and all unearned premiums accrued, accruing or to accrue, and the proceeds of insurance now or hereafter in effect with respect to all or any portion of the Premises;

Any and all claims or demands which Debtor now has or may hereafter acquire against anyone with respect to any damage to all or any portion of the Premises;

All right, title and interest which Debtor now has or may later acquire in all goods, equipment, machinery, furniture, furnishings, trade fixtures, appliances, inventory, building materials, apparatus, utensils, vehicles, wiring, pipes, conduits, elevators, escalators, heating and air conditioning equipment, chattels and articles of personal property, including, without limitation, any interest therein now or at any time hereafter affixed to, attached to or used in any way in connection with or to be incorporated at any time into the Premises or placed on any part thereof wheresoever located, whether or not attached to or incorporated in the Premises, together with any and all accessions, accessories, attachments, and replacements thereof, appertaining and adapted to the complete and compatible use, enjoyment, occupancy, operation or improvement of the Premises;

All right, title and interest which Debtor now has or may later acquire in all instruments, investment property, deposit accounts, accounts, contract rights, general intangibles, and other intangible property and rights now or hereafter relating to the foregoing property, or the operation thereof or used in connection therewith, including, without limitation, all options, letters of intent, and rights of first refusal of any nature whatsoever, covering all or any portion of such property, together with any modifications thereof, and deposits or other payments made in connection therewith, existing and future development rights, permits and approvals, air rights, density bonus rights, and transferable development rights; all of Debtor's right, title, and interest in and to any awards, remunerations, settlements, or compensation heretofore made or hereafter made by any and all courts, boards, agencies, commissions, offices, or authorities, of any nature whatsoever for any governmental unit (federal, state, local or otherwise) to the present or any subsequent owner of the foregoing property, including those for any vacation of, or change of grade in, any streets affecting the foregoing property and any and all licenses and privileges obtained by Debtor from non-governmental sources;

All right, title and interest which Debtor now has or may later acquire in all leases of the Premises, Personalty, Fixtures, or any part thereof, now or hereafter entered into and all right,

2197214.2                                              2

55567640004

title and interest of Debtor thereunder, including, without limitation, cash or securities deposited thereunder to secure performance by the lessees of their obligations thereunder (whether such cash or securities are to be held until the expiration of the terms of such leases or applied to one or more of the installments of rent coming due immediately prior to the expiration of such terms); all other rights and easements of Debtor now or hereafter existing pertaining to the use and enjoyment of the Premises; and all right, title and interest of Debtor in and to all declarations of covenants, conditions and restrictions as may affect or otherwise relate to the Premises;

All right, title and interest which Debtor now has or may later acquire in all permits, plans, licenses, specifications, subdivision rights, security interests, contracts, contract rights, public utility deposits, prepaid sewer and water hook-up charges, or other rights as may affect or otherwise relate to the Property (as hereinafter defined);

All rents, income, issues and profits, including, without limitation, the accounts, revenues, and proceeds of any business operation conducted by or on behalf of Debtor on or through the use of the Premises, prepaid municipal and utility fees, bonds, revenues, income, and other benefits to which Debtor may now or hereafter be entitled to, or which are derived from, the Property or any portion thereof or interest therein.

The foregoing listing is intended only to be descriptive of the property encumbered hereby, and not exclusive or all inclusive. It is the intent of Debtor to encumber hereby all property located or to be located upon the above-described real property. Said real property, leasehold estate, buildings, improvements, appurtenances, Fixtures, Personalty, additions, accretions, and other property are herein referred to as the "Property." As used herein, the term "Fixtures" shall include all articles of personal property hereinabove described, now or hereafter attached to, placed upon for a definite term, or otherwise used in connection with the Property, and shall include trade fixtures and goods which are or are to become fixtures. As used herein, the term "Personalty" shall include all furniture, furnishings, equipment, machinery, goods, contract rights, general intangibles, money, deposit accounts, instruments, accounts, leases, chattel paper and other personal property described in this Exhibit "A" (other than Fixtures) of any kind or character now existing or hereafter arising or acquired, now or hereafter located upon, within or about the Property, or which otherwise pertains to the use, ownership, management, operation, construction, leasing and sale of the Property, and all products and proceeds thereof, and all of Debtor's right, title, and interest in and to all such property.

Nothing herein contained shall be construed as creating a mortgage of real property, it being understood and agreed that only that portion of the foregoing description of collateral which constitutes personal property is intended to be included herein and that Secured Party has taken a separate deed of trust encumbering all of Debtor's interest in the leasehold estate and real property to which the foregoing description refers.

55567640004

## EXHIBIT "B"
## LEGAL DESCRIPTION

**The land referred to herein is situated in the State of California, County of Orange and described as follows:**

THAT PORTION OF LOT 2 IN BLOCK 61 OF BUENA PARK, IN THE CITY OF BUENA PARK, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 18, PAGES 50 TO 52 INCLUSIVE, OF MISCELLANEOUS MAPS, AND THOSE PORTIONS OF LOTS 5 TO 9 INCLUSIVE OF TRACT NO. 1756, AS PER MAP RECORDED IN BOOK 60 PAGES 20 AND 21 OF MISCELLANEOUS MAPS, ALL IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

PARCEL 4A (LEVEL 1 - GROUND FLOOR LOBBY & ENTRANCE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 215.36 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 45.77 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE S 00°00'02" W 86.05 FEET, THENCE N 89°59'59" W 22.68 FEET, THENCE S 00°01'05" W 13.56 FEET, THENCE S 89°59'59" E 22.57 FEET, THENCE S 00°00'02" W 8.22 FEET, THENCE N 89°59'58" W 0.77 FEET, THENCE S 00°00'02" W 34.16, THENCE N 89°59'58" W 110.62 FEET, THENCE N 00°00'02" E 34.17 FEET, THENCE N 89°59'58" W 30.58 FEET, THENCE N 00°00'02" E 107.52 FEET, THENCE N 89°59'58" W 0.83 FEET, THENCE N 00°00'02" E 8.95 FEET, THENCE S 89°59'58" E 24.08 FEET, THENCE N 46°29'04" E 12.47 FEET, THENCE N 00°00'02" E 16.97 FEET, THENCE S 89°59'58" E 18.12 FEET, THENCE N 00°00'02" E 5.22 FEET, THENCE N 89°57'39" E 30.73 FEET, THENCE N 00°00'02" E 32.17 FEET, THENCE N 89°59'58" W 11.92 FEET, THENCE N 00°02" E 1.00 FEET, THENCE S 89°59'58" E 0.50 FEET, THENCE N 00°00'02" E 14.21 FEET, THENCE S 89°59'58" E 39.78 FEET, THENCE S 00°00'02" W 86.82 FEET, THENCE S 89°59'58" E 32.58 FEEL TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 77.76 FEET.

PARCEL 4B (LEVEL 1 - GROUND FLOOR STAIRS ON ORANGETHORPE AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF ORANGETHORPE AVENUE AS SHOWN ON SAID MAP S 89°27'51" E 199.02 FEET; THENCE LEAVING SAID CENTERLINE N 0°32'09" E 60.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE N 0°00'02" E 36.96 FEET; THENCE S 89°59'58" E 14.74 FEET; THENCE S 0°00'02" W TO A POINT ON SAID PARALLEL LINE; THENCE ALONG SAID PARALLEL LINE N 89°27'51" W 14.74 TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 77.76 FEET.

PARCEL 4C (LEVEL 1 - GROUND FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 339.38 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 46.71 FEET TO THE TRUE POINT OF

55567640004

BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 23.40 FEET; THENCE SOUTH 7.24 FEET; THENCE WEST 5.88 FEET; THENCE SOUTH 6.55 FEET; THENCE WEST 29.28 FEET; THENCE NORTH 13.79 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 77.76 FEET.

PARCEL 4D (LEVEL 2 - SECOND FLOOR HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 223.82 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE S 00°27'49" W 94.43 FEET; THENCE N 89°59'59" W 31.75 FEET; THENCE S 00°01'05" W 13.56 FEET; THENCE S 89°59'59" E 31.65 FEET; THENCE S 00° 27'49" W 36.79 FEET; THENCE S 45°29'59" W 26.85 FEET; THENCE N 89°27'51" W 110.52 FEET; THENCE N 00°00'02" E 36.98 FEET; THENCE N 89°59'58" W 19.37 FEET; THENCE S 00°00'02" W 25.13 FEET; THENCE N 89°59'58" W 12.81 FEET; THENCE N 00°00'02" E 90.73 FEET; THENCE S 89° 59'58" E 62.50 FEET; THENCE N 00°00'00" E 30.00 FEET; THENCE S 89°59'58" E 15.42 FEET; THENCE N 00°00'02" E 29.98 FEET; THENCE S 89°59'58" E 85.09 FEET; TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET.

PARCEL 4E (LEVEL 2 - SECOND FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 339.38 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 46.71 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 23.40 FEET; THENCE SOUTH 7.24 FEET; THENCE WEST 5.88 FEET; THENCE SOUTH 6.55 FEET; THENCE WEST 29.28 FEET; THENCE NORTH 13.79 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET.

PARCEL 4F (LEVEL 3 -THIRD FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 339.38 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 46.71 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 23.40 FEET; THENCE SOUTH 7.24 FEET; THENCE WEST 5.88 FEET; THENCE SOUTH 6.55 FEET; THENCE WEST 29.28 FEET; THENCE NORTH 13.79 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET.

PARCEL 4G (LEVEL 3 - THIRD FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND

55567640004

BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 186.84 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 45.54 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 22.05 FEET; THENCE SOUTH 9.15 FEET; THENCE EAST 5.84 FEET; THENCE SOUTH 10.38 FEET; THENCE WEST 1.58 FEET; THENCE SOUTH 4.17 FEET; THENCE EAST 9.81 FEET; THENCE SOUTH 10.37 FEET; THENCE EAST 12.08 FEET; THENCE NORTH 9.62 FEET; THENCE EAST 1.44 FEET; THENCE NORTH 24.44 FEET TO THE SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET.

PARCEL 4H (LEVEL 3 - THIRD FLOOR STAIRS ON ORANGETHORPE AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF ORANGETHOPE AVENUE AS SHOWN ON SAID MAP S 89°27'51" E 199.02 FEET; THENCE LEAVING SAID CENTERLINE N 0°32'09" E 60.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE N 0°00'02" E 36.96 FEET; THENCE S 89°59'58" E 14.74 FEET; THENCE S 0°00'02" W TO A POINT ON SAID PARALLEL LINE; THENCE ALONG SAID PARALLEL LINE N 89°27'51" W 14.74 TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET.

PARCEL 4I (LEVEL 4 - FOURTH FLOOR HOTEL PARCEL INCLUDING DECK)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 72.90 FEET; THENCE SOUTH 13.76 FEET; THENCE WEST 18.27 FEET; THENCE SOUTH 114.50 FEET; THENCE WEST 92.89 FEET; THENCE SOUTH 130.52 FEET; THENCE EAST 12.99 FEET; THENCE SOUTH 32.75 FEET TO A POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE, THENCE ALONG SAID PARALLEL LINE S 89°27'51" E 143.94 FEET; THENCE N 45°29'59" E 26.85 FEET TO A POINT ON SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE; THENCE ALONG LAST SAID PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 161.18 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76 FEET.

PARCEL 4J (LEVEL 5 - FIFTH FLOOR HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 72.90 FEET; THENCE SOUTH 165.38 FEET; THENCE WEST 6.81 FEET; THENCE

55567640004

SOUTH 20.33 FEET; THENCE EAST 6.81 FEET; THENCE SOUTH 28.65 FEET; THENCE WEST 105.43 FEET; THENCE SOUTH 44.42 FEET; THENCE EAST 12.99 FEET; THENCE SOUTH 32.75 FEET TO A POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE; THENCE ALONG SAID PARALLEL LINE S 89°27'51" E 143.94 FEET; THENCE N 45°29'59" E 26.85 FEET TO A POINT ON SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE; THENCE ALONG LAST SAID PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 171.60 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 161.18 FEET.

PARCEL 4K (LEVEL 6 - SIXTH FLOOR HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756, THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 72.90 FEET; THENCE SOUTH 165.38 FEET; THENCE WEST 6.81 FEET; THENCE SOUTH 20.33 FEET; THENCE EAST 6.81 FEET; THENCE SOUTH 28.65 FEET; THENCE WEST 105.43 FEET; THENCE SOUTH 44.42 FEET; THENCE EAST 11.33 FEET; THENCE SOUTH 32.75 FEET TO A POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE; THENCE ALONG SAID PARALLEL LINE S 89°27'51" E 145.60 FEET; THENCE N 45°29'59" E 26.85 FEET TO A POINT ON SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE; THENCE ALONG LAST SAID PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 182.02 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 171.60 FEET.

PARCEL 4L (LEVEL 7 - SEVENTH FLOOR & ROOF HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 72.90 FEET; THENCE SOUTH 165.38 FEET; THENCE WEST 6.81 FEET; THENCE SOUTH 20.33 FEET; THENCE EAST 6.81 FEET; THENCE SOUTH 28.65 FEET; THENCE WEST 105.43 FEET; THENCE SOUTH 44.42 FEET; THENCE EAST 12.99 FEET; THENCE SOUTH 32.75 FEET TO A POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF OANGETHORPE AVENUE; THENCE ALONG SAID PARALLEL LINE S 89°27'51" E 143.94 FEET; THENCE N 45°29'59" E 26.85 FEET TO A POINT ON SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE; THENCE ALONG LAST SAID PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 210.00 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 182.02 FEET.

ELEVATIONS STATED HEREON ARE BASED ON THE NORTH AMERICAN VERTICAL DATUM OF 1988 (NAVD88) PER THE YEAR 2005 ADJUSTMENT BY THE ORANGE COUNTY SURVEYOR, USING THE FOLLOWING BENCHMARK:

OCS BM 404-31-05 ELEV.=80.151 FEET (NAVD88. YEAR 2005 LEVELED) STATION IS AN OCS

55567640004

ALUMINUM DISK STAMPED 404-31-05 SET IN THE SE'LY CORNER OF A 15 FT. X 4.5 FT.
CONCRETE CATCH BASIN, LOCATED IN NE'LY PORTION OF INTERSECTION OF STANTON AVE. &
ARTESIA BLVD., 28 FT. N'LY OF THE CENTERLINE OF ARTESIA BLVD. & 81 FT. E'LY OF THE
CENTERLINE OF STANTON AVENUE. MONUMENT IS LEVEL WITH THE SIDEWALK

APN: 276-361-20 and 276-361-22
(End of Legal Description)

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

| | |
|---|---|
| **A. NAME & PHONE OF CONTACT AT FILER (optional)**<br>janette mcintyre<br>916-641-5100 | |
| **B. E-MAIL CONTACT AT FILER (optional)** | |
| **C. SEND ACKNOWLEDGMENT TO: (Name and Address)**<br>CSC<br>2710 GATEWAY OAKS DRIVE, SUITE 150N<br>SACRAMENTO, CA 95833<br>USA | **DOCUMENT NUMBER: 55717090004**<br>**FILING NUMBER: 16-75312524**<br>**FILING DATE: 06/15/2016 13:52**<br><br>**IMAGE GENERATED ELECTRONICALLY FOR WEB FILING**<br>**THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY** |

| | |
|---|---|
| **1a. INITIAL FINANCING STATEMENT FILE NUMBER**<br>16-7529451818 | **1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Filer: Attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

**2.** ☑ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9 For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**
Check one of these two boxes:      AND Check one of these three boxes to:
This Change affects ☐ Debtor or ☐ Secured Party of record.    ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a and 7b and item 7c    ☐ ADD name: Complete item 7a or 7b, and item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

| 6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b) | | | |
|---|---|---|---|
| **6a. ORGANIZATION'S NAME** | | | |
| **6b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

OR (to the left of 6a/6b)

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | | | |
|---|---|---|---|
| **7a. ORGANIZATION'S NAME** | | | |
| **7b. INDIVIDUAL'S SURNAME** | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

OR (to the left of 7a/7b)

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**8.** ☐ **COLLATERAL CHANGE: Also check one of these four boxes:** ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| a. ORGANIZATION'S NAME<br>EVERTRUST BANK | | | |
|---|---|---|---|
| b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

OR (to the left of 9a/9b)

**10. OPTIONAL FILER REFERENCE DATA:**

**FILING OFFICE COPY**

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

| | |
|---|---|
| **A. NAME & PHONE OF CONTACT AT FILER (optional)**<br>janette mcintyre<br>916-641-5100 | |
| **B. E-MAIL CONTACT AT FILER (optional)** | |
| **C. SEND ACKNOWLEDGMENT TO: (Name and Address)**<br>CSC<br>2710 GATEWAY OAKS DRIVE, SUITE 150N<br>SACRAMENTO, CA 95833<br>USA | **DOCUMENT NUMBER: 55717090005**<br>**FILING NUMBER: 16-75312525**<br>**FILING DATE: 06/15/2016 13:53**<br><br>**IMAGE GENERATED ELECTRONICALLY FOR WEB FILING**<br>**THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY** |

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER<br>16-7529452566 | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Filer: Attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |
|---|---|

2. ☑ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:  AND Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record. | ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a and 7b and item 7c | ☐ ADD name: Complete item 7a or 7b, and item 7c | ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

| OR | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| OR | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | 7b. INDIVIDUAL'S SURNAME | | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

8. ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| OR | a. ORGANIZATION'S NAME<br>EVERTRUST BANK | | | |
|---|---|---|---|---|
| | b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:

**FILING OFFICE COPY**

# EXHIBIT "G"

[List of Asserted Mechanic's Liens and
Preliminary Title Report]

**The Source Hotel, LLC**
**Asserted Mechanics' Liens**

** This list is provided for informational purposes only to identify those parties who have asserted mechanics' liens against The Source Hotel, LLC ("Debtor") and its hotel property.  The Debtor does not concede the validity, extent, or priority of any of the mechanics' liens asserted by the parties identified below.

| Pay to | Total per Subcontractor | Notes |
|---|---|---|
| 3D Design | 99,121.57 | Liened for $99,121.57 as of 7/14. Also filed claim against GCS bond as of 7/15, Lis pendens filed 11/10/2020, summons as of 12/21 |
| Aragon Construction | 66,123.20 | Liened as of 8/21/2020, Summons as of 10/13/2020 (incl Business Alliance), Notice of Related Case as of 11/30/20 |
| Best Quality Painting | 80,000.00 | Liened $80,000 as of 1/21, liened 8/5/2020 |
| Buchanan | 5,344.06 | Liened as of 7/14/2020 |
| Certified Tile | 100,958.93 | Liened for $100,958.93, lawsuit as of 5/26/2020 |
| Evergreen Electric Construction | 528,260.00 | Liened amount of $528,260 aso f 07/30/2020 |
| Harbor All Glass & Mirror | 165,166.11 | Lien filed for $1166.638 but expired (?) |
| Hill Crane Service | | Liened as of 3/17/2020 |
| Iron Mechanical | 861,412.09 | Liened $521,640.49 as of 12/16/2019, released 12/16/2019, again as of 4/17/2020, lawsuit received 7/23/20 (incl Evertrust). Lis pendens recorded 8/13/2020. Notice of Pendency of Action (lis pendens) as of 8/4/2020, Amended Notice of Pendency of Action as of 10/30/2020, Evertrust Met and Confer 11/16, Iron + Evertrust served discoveries |
| KS Steel | 21,195.00 | Liened $21,195 (per Joseph's notes) on 3/3/2020 |
| Mirae Construction | 10,000.00 | As of 12/10/2020 |
| Mirae Construction | 20,000.00 | As of 12/10/2020 |
| Nemo & Rami | 35,680.66 | Liened as of 1/21/2020 |
| NorthStar | 53,948.00 | Liened as of 9/17, lawsuit as of 10/20 (incl Evertrust), Notice of Lis Pendens 10/27 |
| OJ Insulation LP | 25,448.00 | Liened $25,448 as of 1/3/2020, asking for payment |
| Pan Pacific | 94,303.92 | Lien as of 6/22, intent to lien  9/11/2020, lien as of 11/24/2020 |
| PDG Wallcoverings | 56,927.20 | Liened $56,927.20, lis pendens filed 9/10/2020, lawsuit as of 8/26/2020 (incl Evertrust) |
| Prime Concrete Coatings | 64,000.00 | Liened as of 2/27/2020, liened 8/21/2020, liened 10/15/2020 (Total $71k including interest & fees) |
| Resco Electric | 84,305.87 | Liened $84,305.87 as of 12/5/2019 and lawsuit -- MSC set for 3/11/22, w/ trial on 4/11/22 |
| Resco Electric | 95,088.60 | Liened $95,088.60 as of 1/27/2020 and lawsuit 4/21/2020, lis pendens filed 3/3/2020, MSC set for 11/19/2021 |
| Retrolock Corporation | 258,225.27 | Liened for $258,225.27 as of 7/23/2019, lawsuit 10/22/2020, pendency of action 10/2, Hearing set for 5/2/2022, request for entry of default as of 12/8/2020 |
| Salamander Fire Protection, Inc | 55,599.99 | Lien filed for $57,599.99 but expired (?); subvendor Glendale Plumbing filed lien 1/18 for $14,845.76 |
| Sierra Finish | 26,166.30 | Liened as of 12/9/2020 for $26,166.30 |

**The Source Hotel, LLC**
**Asserted Mechanics' Liens**

** This list is provided for informational purposes only to identify those parties who have asserted mechanics' liens against The Source Hotel, LLC ("Debtor") and its hotel property.  The Debtor does not concede the validity, extent, or priority of any of the mechanics' liens asserted by the parties identified below.

| Pay to | Total per Subcontractor | Notes |
|---|---|---|
| Solid Construction | 700,000.00 | Stop work notice filed as of 6/25/20 notes outstanding balance $640,840.05, liened 7/31/2020, lawsuit filed 10/22/2020 (incl Evertrust), Notice of Pending Action 10/28, posted request for entry of default as of 12/8/2020 |
| Sunbelt Rentals, Inc. | 998.79 | Liened 1/31/2020 against Iron, lawsuit; additional collections against 3000 E Imperial (borrowed for TSH under different entity) |
| Western Concrete Pumping | 9,544.23 | Liened for $9544.23 as of 7/17 (amount not initially on acct list), incorrectly liened TSTR 11/10/20 |

                                    TOTAL:    **3,517,817.79**

# stewart title®

**Frank Green**

Stewart Title Guaranty Company
Commercial Services (San Diego)
7676 Hazard Center Drive, Ste 1400
San Diego, CA 92108
Phone (619) 398-8035
Fax
fgreen@stewart.com

## PRELIMINARY REPORT

| | | |
|---|---|---|
| Order No. | : | 19000480715 |
| Title Unit No. | : | 48 |
| Your File No. | : | 475445 |
| Buyer/Borrower Name | : | |
| Seller Name | : | The Source at the Beach |

Property Address:  6940 Beach Blvd., Buena Park, CA 90621

In response to the above referenced application for a Policy of Title Insurance, Stewart Title Guaranty Company Commercial Services (San Diego) hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a Stewart Title Guaranty Company Policy or Policies of Title Insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referenced to as an Exception on Schedule B or not excluded from coverage pursuant to the printed Schedules, Conditions, and Stipulations of said Policy forms.

The printed Exceptions and Exclusions from the coverage and Limitations on covered Risks of said policy or policies are set forth in Exhibit A attached. The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties.  Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limits of Liability for certain coverages are also set forth in Exhibit A.  Copies of the policy forms should be read. They are available from the office which issued this report.

Please read the exceptions shown or referred to below and the exceptions and exclusions set forth in Exhibit A of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters, which are not covered under the terms of the title insurance policy and should be carefully considered.

It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects, and encumbrances affecting title to the land.

This report, (and any supplements or amendments thereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance a binder or commitment should be requested.

Dated as of December 22, 2020 at 7:30 a.m.

**Update No. Three**

Frank Green, Title Officer

**When replying, please contact:**  Frank Green, Title Officer

# PRELIMINARY REPORT

**The form of Policy of Title Insurance contemplated by this report is:**

☐  CLTA Standard Coverage Policy

☐  CLTA/ALTA Homeowners Policy

☐  2006 ALTA Owner's Policy

☐  2006 ALTA Loan Policy

☐  ALTA Short Form Residential Loan Policy

☒  Preliminary Report

# SCHEDULE A

**The estate or interest in the land hereinafter described or referred to covered by this report is:**

A Leasehold Estate as created by that certain Memorandum of Ground Lease for the term and upon and subject to all the provisions contained in said document and in said lease, dated April 6, 2015, executed by The Source at Beach, LLC a California Limited Liability Company, as lessor and The Source Hotel, LLC, a California Limited Liability Company, as lessee, as referenced in the instrument recorded May 16, 2016 as Instrument No. 2016000217348, of Official Records.

Modification of the lease was recorded July 5, 2018 as Instrument No. 2018000246367, of Official Records.

Memorandum of the second amendment to Ground Lease Agreement, dated June 14, 2019, recorded June 26, 2019 as Instrument No. 2019-000225955 of Official Records.

**Title to said estate or interest at the date hereof is vested in:**

The Source Hotel, LLC, a California limited liability company

# LEGAL DESCRIPTION

**The land referred to herein is situated in the State of California, County of Orange, City of Buena Park and described as follows:**

THAT PORTION OF LOT 2 IN BLOCK 61 OF BUENA PARK, IN THE CITY OF BUENA PARK, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 18, PAGES 50 TO 52 INCLUSIVE, OF MISCELLANEOUS MAPS, AND THOSE PORTIONS OF LOTS 5 TO 9 INCLUSIVE OF TRACT NO. 1756, AS PER MAP RECORDED IN BOOK 60 PAGES 20 AND 21 OF MISCELLANEOUS MAPS, ALL IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

PARCEL 4A (LEVEL 1 - GROUND FLOOR LOBBY & ENTRANCE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 215.36 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 45.77 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE S 00°00'02" W 86:05 FEET, THENCE N 89°59'59" W 22.68 FEET, THENCE S 00°01'05" W 13.56 FEET, THENCE S 89°59'59" E 22.57 FEET, THENCE S 00°00'02" W 8.22 FEET, THENCE N 89°59'58" W 0.77 FEET, THENCE S 00°00'02" W 34.16, THENCE N 89°59'58" W 110.62 FEET, THENCE N 00°00'02" E 34.17 FEET, THENCE N 89°59'58" W 30.58 FEET, THENCE N 00°00'02" E 107.52 FEET, THENCE N 89°59'58" W 0.83 FEET, THENCE N 00°00'02" E 8.95 FEET, THENCE S 89°59'58" E 24.08 FEET, THENCE N 46°29'04" E 12.47 FEET, THENCE N 00°00'02" E 16.97 FEET, THENCE S 89°59'58" E 18.12 FEET, THENCE N 00°00'02" E 5.22 FEET, THENCE N 89°57'39" E 30.73 FEET, THENCE N 00°00'02" E 32.17 FEET, THENCE N 89°59'58" W 11.92 FEET, THENCE N 00°02" E 1.00 FEET, THENCE S 89°59'58" E 0.50 FEET, THENCE N 00°00'02" E 14.21 FEET, THENCE S 89°59'58" E 39.78 FEET, THENCE S 00°00'02" W 86.82 FEET, THENCE S 89°59'58" E 32.58 FEEL TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 77.76 FEET.

PARCEL 4B (LEVEL 1 - GROUND FLOOR STAIRS ON ORANGETHORPE AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF ORANGETHORPE AVENUE AS SHOWN ON SAID MAP S 89°27'51" E 199.02 FEET; THENCE LEAVING SAID CENTERLINE N 0°32'09" E 60.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE N 0°00'02" E 36.96 FEET; THENCE S 89°59'58" E 14.74 FEET; THENCE S 0°00'02" W TO A POINT ON SAID PARALLEL LINE; THENCE ALONG SAID PARALLEL LINE N 89°27'51" W 14.74 TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 77.76 FEET.

PARCEL 4C (LEVEL 1 - GROUND FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 339.38 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 46.71 FEET TO THE TRUE POINT OF

BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 23.40 FEET; THENCE SOUTH 7.24 FEET; THENCE WEST 5.88 FEET; THENCE SOUTH 6.55 FEET; THENCE WEST 29.28 FEET; THENCE NORTH 13.79 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 77.76 FEET.

PARCEL 4D (LEVEL 2 - SECOND FLOOR HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 223.82 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE S 00°27'49" W 94.43 FEET; THENCE N 89°59'59" W 31.75 FEET; THENCE S 00°01'05" W 13.56 FEET; THENCE S 89°59'59" E 31.65 FEET; THENCE S 00°27'49" W 36.79 FEET; THENCE S 45°29'59" W 26.85 FEET; THENCE N 89°27'51" W 110.52 FEET; THENCE N 00°00'02" E 36.98 FEET; THENCE N 89°59'58" W 19.37 FEET; THENCE S 00°00'02" W 25.13 FEET; THENCE N 89°59'58" W 12.81 FEET; THENCE N 00°00'02" E 90.73 FEET; THENCE S 89°59'58" E 62.50 FEET; THENCE N 00°00'00" E 30.00 FEET; THENCE S 89°59'58" E 15.42 FEET; THENCE N 00°00'02" E 29.98 FEET; THENCE S 89°59'58" E 85.09 FEET; TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET.

PARCEL 4E (LEVEL 2 - SECOND FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 339.38 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 46.71 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 23.40 FEET; THENCE SOUTH 7.24 FEET; THENCE WEST 5.88 FEET; THENCE SOUTH 6.55 FEET; THENCE WEST 29.28 FEET; THENCE NORTH 13.79 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET.

PARCEL 4F (LEVEL 3 -THIRD FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 339.38 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 46.71 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 23.40 FEET; THENCE SOUTH 7.24 FEET; THENCE WEST 5.88 FEET; THENCE SOUTH 6.55 FEET; THENCE WEST 29.28 FEET; THENCE NORTH 13.79 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET.

PARCEL 4G (LEVEL 3 - THIRD FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND

BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 186.84 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 45.54 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 22.05 FEET; THENCE SOUTH 9.15 FEET; THENCE EAST 5.84 FEET; THENCE SOUTH 10.38 FEET; THENCE WEST 1.58 FEET; THENCE SOUTH 4.17 FEET; THENCE EAST 9.81 FEET; THENCE SOUTH 10.37 FEET; THENCE EAST 12.08 FEET; THENCE NORTH 9.62 FEET; THENCE EAST 1.44 FEET; THENCE NORTH 24.44 FEET TO THE SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET.

PARCEL 4H (LEVEL 3 - THIRD FLOOR STAIRS ON ORANGETHORPE AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF ORANGETHORPE AVENUE AS SHOWN ON SAID MAP S 89°27'51" E 199.02 FEET; THENCE LEAVING SAID CENTERLINE N 0°32'09" E 60.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE N 0°00'02" E 36.96 FEET; THENCE S 89°59'58" E 14.74 FEET; THENCE S 0°00'02" W TO A POINT ON SAID PARALLEL LINE; THENCE ALONG SAID PARALLEL LINE N 89°27'51" W 14.74 TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET.

PARCEL 4I (LEVEL 4 - FOURTH FLOOR HOTEL PARCEL INCLUDING DECK)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 72.90 FEET; THENCE SOUTH 13.76 FEET; THENCE WEST 18.27 FEET; THENCE SOUTH 114.50 FEET; THENCE WEST 92.89 FEET; THENCE SOUTH 130.52 FEET; THENCE EAST 12,99 FEET; THENCE SOUTH 32.75 FEET TO A POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE; THENCE ALONG SAID PARALLEL LINE S 89°27'51" E 143.94 FEET; THENCE N 45°29'59" E 26.85 FEET TO A POINT ON SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE; THENCE ALONG LAST SAID PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 161.18 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76 FEET.

PARCEL 4J (LEVEL 5 - FIFTH FLOOR HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 72.90 FEET; THENCE SOUTH 165.38 FEET; THENCE WEST 6.81 FEET; THENCE

SOUTH 20.33 FEET; THENCE EAST 6.81 FEET; THENCE SOUTH 28.65 FEET; THENCE WEST 105.43 FEET; THENCE SOUTH 44.42 FEET; THENCE EAST 12.99 FEET; THENCE SOUTH 32.75 FEET TO A POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE; THENCE ALONG SAID PARALLEL LINE S 89°27'51" E 143.94 FEET; THENCE N 45°29'59" E 26.85 FEET TO A POINT ON SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE; THENCE ALONG LAST SAID PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 171.60 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 161.18 FEET.

PARCEL 4K (LEVEL 6 - SIXTH FLOOR HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 72.90 FEET; THENCE SOUTH 165.38 FEET; THENCE WEST 6.81 FEET; THENCE SOUTH 20.33 FEET; THENCE EAST 6.81 FEET; THENCE SOUTH 28.65 FEET; THENCE WEST 105.43 FEET; THENCE SOUTH 44.42 FEET; THENCE EAST 11.33 FEET; THENCE SOUTH 32.75 FEET TO A POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE; THENCE ALONG SAID PARALLEL LINE S 89°27'51" E 145.60 FEET; THENCE N 45°29'59" E 26.85 FEET TO A POINT ON SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE; THENCE ALONG LAST SAID PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 182.02 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 171.60 FEET.

PARCEL 4L (LEVEL 7 - SEVENTH FLOOR & ROOF HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 72.90 FEET; THENCE SOUTH 165.38 FEET; THENCE WEST 6.81 FEET; THENCE SOUTH 20.33 FEET; THENCE EAST 6.81 FEET; THENCE SOUTH 28.65 FEET; THENCE WEST 105.43 FEET; THENCE SOUTH 44.42 FEET; THENCE EAST 12.99 FEET; THENCE SOUTH 32.75 FEET TO A POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF OANGETHORPE AVENUE; THENCE ALONG SAID PARALLEL LINE S 89°27'51" E 143.94 FEET; THENCE N 45°29'59" E 26.85 FEET TO A POINT ON SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE; THENCE ALONG LAST SAID PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 210.00 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 182.02 FEET.

ELEVATIONS STATED HEREON ARE BASED ON THE NORTH AMERICAN VERTICAL DATUM OF 1988 (NAVD88) PER THE YEAR 2005 ADJUSTMENT BY THE ORANGE COUNTY SURVEYOR, USING THE FOLLOWING BENCHMARK:

OCS BM 404-31-05 ELEV.=80.151 FEET (NAVD88, YEAR 2005 LEVELED) STATION IS AN OCS

ALUMINUM DISK STAMPED 404-31-05 SET IN THE SE'LY CORNER OF A 15 FT. X 4.5 FT. CONCRETE CATCH BASIN, LOCATED IN NE'LY PORTION OF INTERSECTION OF STANTON AVE. & ARTESIA BLVD., 28 FT. N'LY OF THE CENTERLINE OF ARTESIA BLVD. & 81 FT. E'LY OF THE CENTERLINE OF STANTON AVENUE. MONUMENT IS LEVEL WITH THE SIDEWALK

SAID LEGAL IS ALSO SHOWN AS PARCEL 4 OF PARCEL MAP NO. 2014-173, IN THE CITY OF BUENA PARK, COUNTY OF ORANGE, STATE OF CALIFORNIA, FILED IN BOOK 391, PAGES 4 THROUGH 16, INCLUSIVE OF PARCEL MAP, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

APN:

276-361-29; 276-361-30; 276-361-32; 276-361-33; 276-361-35; 276-361-36; 276-361-37; 276-361-38; 276-361-39; 276-361-40; 276-361-41; 276-361-42; 276-361-43; 276-361-44; 276-361-45; 276-361-57; 276-361-58; 276-361-60; 276-361-61


APN:  276-361-22 and 276-361-20
(End of Legal Description)

**THE MAP ATTACHED THROUGH THE HYPERLINK ABOVE IS BEING PROVIDED AS A COURTESY AND FOR INFORMATION PURPOSES ONLY; THIS MAP SHOULD NOT BE RELIED UPON. FURTHERMORE, THE PARCELS SET OUT ON THIS MAP MAY NOT COMPLY WITH LOCAL SUBDIVISION OR BUILDING ORDINANCES. THERE WILL BE NO LIABILITY, RESPONSIBILITY OR INDEMNIFICATION RELATED TO ANY MATTERS CONCERNING THE CONTENTS OR ACCURACY OF THE MAP.**

# <u>SCHEDULE B</u>

**At the date hereof, exceptions to coverage in addition to the printed exceptions and exclusions contained in said policy or policies would be as follows:**

**Taxes:**

A.  General and Special City and/or County taxes, including any personal property taxes and any assessments collected with taxes, for the fiscal year 2020 - 2021:
   1st Installment:          $189.70 Paid
   2nd Installment:         $189.70 Open
   Parcel No.:                276-361-29
   Code Area:                14-064

   Affects                           :  A portion of the land described herein.

B.  General and Special City and/or County taxes, including any personal property taxes and any assessments collected with taxes, for the fiscal year 2020 - 2021:
   1st Installment:          $154.82 Paid
   2nd Installment:         $154.82 Open
   Parcel No.:                276-361-30
   Code Area:                14-064

   Affects                           :  A portion of the land described herein.

C.  General and Special City and/or County taxes, including any personal property taxes and any assessments collected with taxes, for the fiscal year 2020 - 2021:
   1st Installment:          $193.86 Paid
   2nd Installment:         $193.86 Open
   Parcel No.:                276-361-32
   Code Area:                14-014

   Affects                           :  A portion of the land described herein.

D.  General and Special City and/or County taxes, including any personal property taxes and any assessments collected with taxes, for the fiscal year 2020 - 2021:
   1st Installment:          $189.70 Paid
   2nd Installment:         $189.70 Open
   Parcel No.:                276-361-33
   Code Area:                14-064

   Affects                           :  A portion of the land described herein.

E.  General and Special City and/or County taxes, including any personal property taxes and any assessments collected with taxes, for the fiscal year 2020 - 2021:
   1st Installment:          $184.26  Paid
   2nd Installment:         $184.26 Open
   Parcel No.:                276-361-35
   Code Area:                14-064

   Affects                           :  A portion of the land described herein.

F.  General and Special City and/or County taxes, including any personal property taxes and any assessments collected with taxes, for the fiscal year 2020 - 2021:
   1st Installment:          $357.06 Paid
   2nd Installment:         $357.06 Open

Parcel No.:               276-361-36
Code Area:              14-014

Affects                    : A portion of the land described herein.

G. General and Special City and/or County taxes, including any personal property taxes and any assessments collected with taxes, for the fiscal year 2020 - 2021:
1st Installment:        $205.80 Paid
2nd Installment:      $205.80 Open
Parcel No.:            276-361-37
Code Area:           14-014

Affects                 : A portion of the land described herein.

H. General and Special City and/or County taxes, including any personal property taxes and any assessments collected with taxes, for the fiscal year 2020 - 2021:
1st Installment:        $267.62  Paid
2nd Installment:      $267.62 Open
Parcel No.:           276-361-38
Code Area:         14-064

Affects               : A portion of the land described herein.

I. General and Special City and/or County taxes, including any personal property taxes and any assessments collected with taxes, for the fiscal year 2020 - 2021:
1st Installment:        $17,039.09 Paid
2nd Installment:      $17,039.09 Open
Parcel No.:         276-361-39
Code Area:      14-014

Affects             : A portion of the land described herein.

J. General and Special City and/or County taxes, including any personal property taxes and any assessments collected with taxes, for the fiscal year 2020 - 2021:
1st Installment:        $226.32 Paid
2nd Installment:      $226.32 Open
Parcel No.:         276-361-40
Code Area:      14-064

Affects             : A portion of the land described herein.

K. General and Special City and/or County taxes, including any personal property taxes and any assessments collected with taxes, for the fiscal year 2020 - 2021:
1st Installment:        $15,586.59 Paid
2nd Installment:      $15,586.59 Open
Parcel No.:         276-361-41
Code Area:      14-014

Affects             : A portion of the land described herein.

L. General and Special City and/or County taxes, including any personal property taxes and any assessments collected with taxes, for the fiscal year 2020 - 2021:
1st Installment:        $226.32 Paid
2nd Installment:      $226.32 Open
Parcel No.:         276-361-42
Code Area:      14-064

Affects             : A portion of the land described herein.

M.  General and Special City and/or County taxes, including any personal property taxes and any
assessments collected with taxes, for the fiscal year 2020 - 2021:
1st Installment:               $15,835.82  Paid
2nd Installment:              $15,835.82 Open
Parcel No.:                     276-361-43
Code Area:                     14-014

Affects                           :  A portion of the land described herein.

N.  General and Special City and/or County taxes, including any personal property taxes and any
assessments collected with taxes, for the fiscal year 2020 - 2021:
1st Installment:               $226.32 Paid
2nd Installment:              $226.32 Open
Parcel No.:                     276-361-44
Code Area:                     14-064

Affects                           :  A portion of the land described herein.

O.  General and Special City and/or County taxes, including any personal property taxes and any
assessments collected with taxes, for the fiscal year 2020 - 2021:
1st Installment:               $15,515.22 Paid
2nd Installment:              $15,515.22 Open
Parcel No.:                     276-361-45
Code Area:                     14-014

Affects                           :  A portion of the land described herein.

P.  General and Special City and/or County taxes, including any personal property taxes and any
assessments collected with taxes, for the fiscal year 2020 - 2021:
1st Installment:               $16,144.12  Paid
2nd Installment:              $16,144.12 Open
Parcel No.:                     276-361-57
Code Area:                     14-014

Affects                           :  A portion of the land described herein.

Q.  General and Special City and/or County taxes, including any personal property taxes and any
assessments collected with taxes, for the fiscal year 2020 - 2021:
1st Installment:               $75.44 Paid
2nd Installment:              $75.44 Open
Parcel No.:                     276-361-58
Code Area:                     14-014

Affects                           :  A portion of the land described herein.

R.  General and Special City and/or County taxes, including any personal property taxes and any
assessments collected with taxes, for the fiscal year 2020 - 2021:
1st Installment:               $11,304.05 Paid
2nd Installment:              $11,304.06 Open
Parcel No.:                     276-361-60
Code Area:                     14-014

Affects                           :  A portion of the land described herein.

S.  General and Special City and/or County taxes, including any personal property taxes and any
assessments collected with taxes, for the fiscal year 2020 - 2021:
1st Installment:               $75.50 Paid
2nd Installment:              $75.50 Open (Due by 4/10/20)
Parcel No.:                     276-361-61

Code Area:                    14-014

Affects                    :  A portion of the land described herein.

T.  The lien of supplemental taxes, if any, assessed pursuant to the provisions of Chapter 3.5 (commencing with Section 75) of the revenue and taxation code of the State of California.

U.  Assessments, if any, for Community Facility Districts affecting said land which may exist by virtue of assessment maps or notices filed by said districts.  Said assessments are collected with the County Taxes.

**Exceptions:**

1.  Water rights, claims or title to water in or under said land, whether or not shown by the public records.

2.  Minerals of whatsoever kind, subsurface and surface substances, including but not limited to coal, lignite, oil, gas, uranium, clay, rock, sand and gravel in, on, under and that may be produced from the Land, together with all rights, privileges, and immunities relating thereto, whether or not appearing in the Public Records or listed in Schedule B. The Company makes no representation as to the present ownership of any such interests.  There may be leases, grants, exceptions or reservations of interests that are not listed.

3.  Any facts, rights, interests or claims that may exist or arise by reason of matters, if any, disclosed by that certain Record of Survey filed in Book 115, Page 27 of Records of Survey.

4.  Covenants, conditions, and restrictions as set forth in instrument recorded April 16, 1946 in Book 1407 Page 66, Official Records, but omitted any covenant, condition or restriction, if any, based on race, color, religion, sex, handicap, familial status or national origin unless and only to the extent that the Covenant, condition or restriction; (a) is exempt under title 42 of the united states code; or (b) relates to handicap, but does not discriminate against handicapped persons.

    Note: section 12956.1 of the government code provides the following: if this document contains any restrictions based on race, color, religion, sex, familial status, marital status, disability, national origin, or ancestry, that restriction violates state and federal fair housing laws and is void, and may be removed pursuant to section 12956.1 of the government code. Lawful restrictions under state and federal law on the age of occupants in senior housing or for older persons shall not be construed as restrictions based on familial status.

5.  Covenants, conditions, and restrictions as set forth in instrument recorded in Book 1430 Page 449, Official Records, but omitted any covenant, condition or restriction, if any, based on race, color, religion, sex, handicap, familial status or national origin unless and only to the extent that the Covenant, condition or restriction; (a) is exempt under title 42 of the united states code; or (b) relates to handicap, but does not discriminate against handicapped persons.

    Note: section 12956.1 of the government code provides the following: if this document contains any restrictions based on race, color, religion, sex, familial status, marital status, disability, national origin, or ancestry, that restriction violates state and federal fair housing laws and is void, and may be removed pursuant to section 12956.1 of the government code. Lawful restrictions under state and federal law on the age of occupants in senior housing or for older persons shall not be construed as restrictions based on familial status.

6.  Covenants, conditions, and restrictions as set forth in instrument recorded March 24, 1948 in Book 1741 Page 495, Official Records, but omitted any covenant, condition or restriction, if any, based on race, color, religion, sex, handicap, familial status or national origin unless and only to the extent that the Covenant, condition or restriction; (a) is exempt under title 42 of the united states code; or (b) relates to handicap, but does not discriminate against handicapped persons.

    Note: section 12956.1 of the government code provides the following: if this document contains

any restrictions based on race, color, religion, sex, familial status, marital status, disability, national origin, or ancestry, that restriction violates state and federal fair housing laws and is void, and may be removed pursuant to section 12956.1 of the government code. Lawful restrictions under state and federal law on the age of occupants in senior housing or for older persons shall not be construed as restrictions based on familial status.

7. An easement for the purpose shown below and rights incidental thereto as set forth in a document:
   Purpose:              highway
   Recorded:             August 8, 1949 in Book 1887 Page 16, of Official Records
   Affects:              the Southerly 10 feet of said land

8. An easement for public utilities and rights incidental thereto as set forth in a document recorded June 21, 1950 in Book 2030, Page 319, of Official Records, affects as more particularly described therein.

   The effect of the following:

   The matters contained in an instrument entitled Quitclaim Easement, by and between Southern California Edison Company, a Corporation and The Source at Beach, LLC, a California limited liability company upon the terms therein provided recorded August 23, 2012 as Instrument No. 2012000486780, of Official Records.

9. An easement for road and rights incidental thereto as set forth in a document recorded February 19, 1952 in Book 2296, Page 272, of Official Records, affects the South 40 feet of said land.

10. An easement for the purpose shown below and rights incidental thereto as set forth in a document:
    Grantee:             City of Buena Park, a municipal corporation
    Purpose:             sewer and water facilities
    Recorded:            February 20, 1956, as Instrument No. 26285,
                         in Book 3404 Page 549, of Official Records
    Affects:             a portion of said land

11. An easement for the purpose shown below and rights incidental thereto as set forth in a document:
    Grantee:             Pacific Telephone and Telegraph Company
    Purpose:             public utilities
    Recorded:            September 18, 1956, as Instrument No. 125771,
                         in Book 3648 Page 58, of Official Records
    Affects:             a portion of said land

12. A non-exclusive easement for ingress and egress and vehicular traffic over the herein described land as disclosed by deed executed by Theresa J. Milt, a widow to Robert Burglin and Lois Jare Burglin, husband and wife, dated August 7, 1963 and recorded August 12, 1963 in Book 6670 Page(s) 106 of Official Records, and in subsequent documents or record.

13. An easement for the purpose shown below and rights incidental thereto as set forth in a document:
    Grantee:             City of Buena Park, a municipal corporation
    Purpose:             Street and highway
    Recorded:            July 5, 1979, as Instrument No. 4803,
                         in Book 13216 Page 1105, Official Records
    Affects:             portion of said land

14. An easement for the purpose shown below and rights incidental thereto as set forth in a document.
    Purpose:             street and highway and public utilities
    Recorded:            August 27, 1979 as Instrument No. 37693

in Book 13286, Page 859 of Official Records

Affects:                portion of said land as described in the document attached hereto.

15. An easement for the purpose shown below and rights incidental thereto as set forth in a document:

Grantee:             City Buena Park
Purpose:             Street and Highway
Recorded:            June 10, 1980 in Book 13630 Page(s) 1220, Official Records
Affects:             Said land

16. An easement for the purpose shown below and rights incidental thereto as set forth in a document:

Grantee:             City of Buena Park, a municipal corporation
Purpose:             street and highway
Recorded:            June 24, 1980, as Instrument No. 25584,
                     in Book 13644 Page 917, Official Records
Affects:             a portion of said land

17. An easement for the purpose shown below and rights incidental thereto as set forth in a document:

Grantee:             City of Buena Park, a municipal corporation
Purpose:             street and highway
Recorded:            June 24, 1980, as Instrument No. 25585,
                     in Book 13644 Page 920, of Official Records
Affects:             a portion of said land

18. An easement for the purpose shown below and rights incidental thereto as set forth in a document:

Grantee:             City of Buena Park, a municipal corporation
Purpose:             street and highway
Recorded:            June 24, 1980, as Instrument No. 25586,
                     in Book 13644 Page 923, of Official Records
Affects:             a portion of said land

19. The fact that said land is included within the Buena Park's Business District Redevelopment Project Area, and that proceedings for redevelopment have been instituted.

Recorded:            November 17, 1981 as Instrument No. 18882
                     in Book 14293, Page 476 of Official Records.

20. The fact that said land is included within the Buena Park Redevelopment Project II Area, and that proceedings for redevelopment have been instituted.

Recorded:             October 4, 1984 as Instrument No. 84-411958
                     of Official Records

21. An easement for the purpose shown below and rights incidental thereto as set forth in a document:

Grantee:             Southern California Edison Company
Purpose:             public utilities
Recorded:            March 7, 1985, as Instrument No. 85-079664, Official Records
Affects:             a portion of said land

The effect of the following:

The matters contained in an instrument entitled "Quitclaim Easement" dated August 17, 2012, by The Source at Beach, LLC, a California limited liability company upon the terms therein provided recorded August 23, 2012 as Instrument No. 2012000486782 of Official Records.

22. An easement for the purpose shown below and rights incidental thereto as set forth in a document:

    Grantee:             Southern California Edison Company, a corporation
    Purpose:             electrical supply systems and communication systems
    Recorded:           June 13, 1985 as Instrument No. 85-215346 Official Records
    Affects:              Said land

23. The matters contained in an instrument entitled "Grant of Easement" upon the terms therein provided recorded January 23, 2001 as Instrument No. 01-038721, of Official Records.

24. The fact that said land is included within the Central Business District Redevelopment Project Area, and that proceedings for redevelopment have been instituted.

    Recorded:           April 20, 2007 as Instrument No. 2007-0257354 of Official Records

25. A Development Agreement, subject to all the terms, provisions and conditions therein contained, recorded November 17, 2008 as Instrument No. 2008-00537057 of Official Records.

    Reference is hereby made to said document for full particulars.

26. An easement for the purpose shown below and rights incidental thereto as set forth in a document:

    Grantee:             Southern California Edison Company, a Corporation
    Purpose:             public utilities
    Recorded:           March 21, 2012, as Instrument No. 2012000162340, Official Records
    Affects:              said land

27. An easement for the purpose shown below and rights incidental thereto as set forth in a document:

    Grantee:             Southern California Edison Company, a Corporation
    Purpose:             public utilities
    Recorded:           July 11, 2012, as Instrument No. 2012000392621, Official Records
    Affects:              said land

    Affects                    : The herein described land and other land.

28. Covenants, conditions, and restrictions as set forth in instrument recorded September 11, 2012 as Instrument No. 2012000530408, Official Records, but omitted any covenant, condition or restriction, if any, based on race, color, religion, sex, handicap, familial status or national origin unless and only to the extent that the Covenant, condition or restriction; (a) is exempt under title 42 of the united states code; or (b) relates to handicap, but does not discriminate against handicapped persons.

    Note: section 12956.1 of the government code provides the following: if this document contains any restrictions based on race, color, religion, sex, familial status, marital status, disability, national origin, or ancestry, that restriction violates state and federal fair housing laws and is void, and may be removed pursuant to section 12956.1 of the government code. Lawful restrictions under state and federal law on the age of occupants in senior housing or for older persons shall not be construed as restrictions based on familial status.

    Said document was re-recorded October 9, 2012 as Instrument No. 2012000609610 of Official Records.

    Affects                    : The herein described land and other land.

29. The matters contained in an instrument entitled "Memorandum of Disposition and Development Agreement" dated September 4, 2012, by and between City of Buena Park, as successor agency and The Source at Beach, LLC, a California limited liability company upon the terms therein provided recorded September 11, 2012 as Instrument No. 2012000530409 of Official Records.

Said document was re-recorded October 9, 2012 as Instrument No. 2012000609611 of Official Records.

Affects                                   : The herein described land and other land.

30. The matters contained in an instrument entitled "Declaration of Covenants, Conditions and Restrictions and Reciprocal Easement Agreement" dated March 3, 2014, by and between The Source at Beach, LLC, a California limited liability company and The Source Office, LLC, a California limited liability company  upon the terms therein provided recorded March 5, 2014 as Instrument No. 2014000084685 of Official Records.

Reference is made to said document for full particulars.

Affects                                   : The herein described land and other land.

A document entitled "Amended and Restated Declaration of Covenants, Conditions and Restrictions and Reciprocal Easement Agreement",  Executed by and between The Source at Beach, LLC, a California limited liability company ("Master Developer"); The Source Office, LLC, a California limited liability company ("Office Developer"); and The Source Hotel, LLC, a California limited liability company ("Hotel Developer"), dated May 24, 2016 and recorded June 3, 2016 as Instrument No. 2016000252445, of Official Records.

Said document was modified by an instrument recorded May 8, 2017 as Instrument No. 2017000185903, of Official Records.

31. The matters contained in an instrument entitled "Agreement" dated January 6, 2014, by Beach Orangethorpe, LLC, a California limited liability company, Beach Orangethorpe II, LLC, a California limited liability company and Beach Orangethorpe Ventures, LLC, a California limited liability company upon the terms therein provided recorded April 29, 2014 as Instrument No. 2014000163785 of Official Records.

Reference is made to said document for full particulars.

Affects                                   : The herein described land and other land.

32. An easement for public utilities  and rights incidental thereto in favor of Southern California Edison Company, a corporation as set forth in a document recorded June 25, 2014 as Instrument No. 201400024996 of Official Records, affects said land.

33. An easement for public utilities and rights incidental thereto in favor of Southern California Edison Company, a Corporation as set forth in a document recorded July 23, 2014 as Instrument no. 201400292902, of Official Records, affects said land.

34. A Record of Survey which recorded in Book 277 Page 37 and 38 of Record of Surveys in said County.

35. The effect of the following:

The matters contained in an instrument entitled "Certificate of Completion" dated September 8, 2015, by and between The Successor Agency to the Community Redevelopment Agency of the City of Buena Park and The Source at Beach, LLC, a California limited liability company upon the terms therein provided recorded September 15, 2015 as Instrument No. 2015000477121 of Official Records.

36. A Construction Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:
Dated              : May 24, 2016
Trustor           : The Source Hotel, LLC,

|  |  |
|---|---|
|  | : a California limited liability company |
| Trustee | : Stewart Title of California, Inc. |
| Beneficiary | : Evertrust Bank, |
|  | : a California banking corporation |
| Recorded | : June 3, 2016, as Instrument No. 2016000252446 |
|  | : of Official Records |

An assignment of rents and leases, executed by The Source Hotel, LLC, a California limited liability company, to Evertrust Bank, a California banking corporation, recorded June 3, 2016 as Instrument No. 2016000252447, of Official Records.

The matters contained in an instrument entitled Memorandum of Second Extension Agreement dated June 29, 2018, by and between The Source Hotel, LLC, a California limited liability company and Evertrust Bank, a California banking corporation upon the terms therein provided recorded July 5, 2018 as Instrument No. 2018000246363, of Official Records.

The matters contained in an instrument entitled Memorandum of Third Extension Agreement dated December 20, 2018, by and between The Source Hotel, LLC, a California limited liability company and Evertrust Bank, a California banking corporation upon the terms therein provided recorded December 28, 2018 as Instrument No. 2018000483687 of Official Records.

The matters contained in an instrument entitled Memorandum of Fourth Extension Agreement dated June 18, 2019, by and between The Source Hotel, LLC, a California limited liability company and Evertrust Bank, a California banking corporation upon the terms therein provided recorded June 26, 2019 as Instrument No. 2019000225954 of Official Records.

37. Any claims for mechanic's liens that may be recorded, by reason of a work of improvement that is disclosed by the Constructions Deed of Trust shown above.

38. The matters contained in an instrument entitled Ground Lessor's Consent, Estoppel Certificate ad Fee Mortgage Agreement, by and between The Source Hotel, LLc, a California limited liability company, The Source at Beach, LLC, a California limited liability company, Beach Orangethorpe, LLC, a California limited liability company, Beach Orangethorpe II, LLC, a California limited liability company, Beach Orangethorpe Ventures, LLC, a California limited liability company and Evertrust Bank, a California banking corporation upon the terms therein provided recorded June 3, 2016 as Instrument No. 2016000252448, of Official Records.

Said document was modified by an instrument recorded July 5, 2018 as Instrument No. 2018000246364, of Official Records.

39. Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:

|  |  |
|---|---|
| Amount | : $10,000,000.00 |
| Dated | : June 1, 2014 |
| Trustor | : The Source Hotel, LLC, |
|  | : a California limited liability company |
| Trustee | : Stewart Title of California, Inc. |
| Beneficiary | : Beach Orangethorpe Hotel, LLC, |
|  | : a California limited liability company |
| Recorded | : August 28, 2017, as Instrument No. 2017000364569 |
|  | : of Official Records |

The matters contained in an instrument entitled Subordination Agreement (Beach Orangethorpe Hotel, LLC) dated May 24, 2016, by and between The Source Hotel, LLC, a California limited liability company, Beach Orangethorpe Hotel, LLC, a California limited liability company, Donald Chae, an individual, Min Chae, an individual and Evertrust Bank, a California banking corporation upon the terms therein provided recorded June 3, 2016 as Instrument No. 2016000252450, of Official Records.

The matters contained in an instrument entitled Reaffirmation of Subordination Agreement (Beach Orangethorpe Hotel, LLC) dated June 29, 2018, by and between The Source Hotel, LLC, a California limited liability company, Beach Orangethorpe Hotel, LLC, a California limited liability company, Donald Chae, and individual, Min Chae, an individual and Evertrust Bank, a California banking corporation upon the terms therein provided recorded July 5, 2018 as Instrument No. 2018000246365, of Official Records.

The above instrument has been subordinated to Deed of Trust shown as item No. 36 by that certain agreement recorded July 5, 2018 as Instrument No. 2018000246365, of Official Records

40. Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:

| | | |
|---|---|---|
| Amount | : | $11,500,000.00 |
| Dated | : | December 31, 2015 |
| Trustor | : | The Source Hotel, LLC, |
| | : | a California limited liability company |
| Trustee | : | Stewart Title of California, Inc. |
| Beneficiary | : | Beach Orangethorpe Hotel II, LLC, |
| | : | a California limited liability company |
| Recorded | : | August 28, 2017, as Instrument No. 2017000364570 |
| | : | of Official Records |

The matters contained in an instrument entitled Subordination Agreement (Beach Orangethorpe Hotel II, LLC) dated May 24, 2016, by and between The Source Hotel, LLC, a California limited liability company, Beach Orangethorpe Hotel II, LLC, a California limited liability company, Donald Chae, an individual, Min Chae, an individual and Evertrust Bank, a California banking corporation upon the terms therein provided recorded June 3, 2016 as Instrument No. 2016000252449, of Official Records.

The matters contained in an instrument entitled Reaffirmation of Subordination Agreement (Beach Orangethorpe Hotel II, LLC) dated June 29, 2018, by and between The Source Hotel, LLC, a California limited liability company, Beach Orangethorpe Hotel II, LLC, a California limited liability company, Donald Chae, an individual, Min Chae, an individual and Evertrust Bank, a California banking corporation upon the terms therein provided recorded July 5, 2018 as Instrument No. 2018000246366, of Official Records.

The above instrument has been subordinated to Deed of Trust shown as item No. 36 by that certain agreement recorded July 5, 2018 as Instrument No. 2018000246366, of Official Records.

41. A claim of Mechanic's Lien recorded January 3, 2020 as Instrument No. 2020000002714, of Official Records, by OJ Insulation, LP, Claimant, in the amount of $25,448.00, and any other amounts due thereunder.

42. A Claim of Mechanic's Lien by Mirae Construction Company, in the amount of $10,000.00, and any other amounts due thereunder, recorded December 10, 2020 as Instrument No. 2020000726764, of Official Records.

43. A Claim of Mechanic's Lien by Mirae Construction Co., in the amount of $20,000.00, and any other amounts due thereunder, recorded December 10, 2020 as Instrument No. 2020000726765, of Official Records.

44. A Claim of Mechanic's Lien by Prime Concrete Coatings , in the amount of $64,000.00, and any other amounts due thereunder, recorded December 18, 2020 as Instrument no. 2020000748061, of Official Records.

45. Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by making inquiry of the lessors and their successors in interest, in the lease described or referred to in Schedule A.

46.  The effect of any failure to comply with the terms, covenants and provisions of the lease described or referred to in Schedule A.

47.  Rights of tenants in possession of said land by reason of unrecorded leases.  Kindly forward said lease, or a current certified tenant rent roll.

48.  Matters which may be disclosed by an inspection or by a survey of said land satisfactory to this Company or by inquiry of the parties in possession thereof.

49.  Any discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments or protrusions, or overlapping of improvements which would be disclosed by an inspection and accurate survey of the premises.

(End of Exceptions)

# NOTES AND REQUIREMENTS

A.  There are no conveyances affecting said land, recorded with the County Recorder within 24 months of the date of this report.

B.

C.  This Company will require the following documents in order to insure a conveyance or encumbrance by the limited liability company named below:

Limited liability company:    The Source Hotel, LLC, a California limited liability company

a. A certified copy of the articles of organization (LLC-1), and any amendment (LLC-2) or restatement (LLC-10) to be recorded in the appropriate county.

b. A copy of the operating agreement and any amendment.

c. Evidence that the limited liability company remains in good standing with active status.

d. Other requirements that the Company may set forth following its review of said documents.

# CALIFORNIA "GOOD FUNDS" LAW

California Insurance Code Section 12413.1 regulates the disbursement of escrow and sub-escrow funds by title companies.  The law requires that funds be deposited in the title company escrow account and available for withdrawal prior to disbursement.  Funds received by Stewart Title Guaranty Company Commercial Services (San Diego) via wire transfer may be disbursed upon receipt.  Funds received via cashier's checks or teller checks drawn on a California Bank may be disbursed on the next business day after the day of deposit.  If funds are received by any other means, recording and/or disbursement may be delayed, and you should contact your title or escrow officer.  All escrow and sub-escrow funds received will be deposited with other escrow funds in one or more non-interest bearing escrow accounts in a financial institution selected by Stewart Title Guaranty Company Commercial Services (San Diego).

Stewart Title Guaranty Company Commercial Services (San Diego) may receive certain direct or indirect benefits from the financial institution by reason of the deposit of such funds or the maintenance of such accounts with the financial institution, and Stewart Title Guaranty Company Commercial Services (San Diego) shall have no obligation to account to the depositing party in any manner for the value of, or to pay to such party, any benefit received by Stewart Title Guaranty Company Commercial Services (San Diego) .  Such benefits shall be deemed additional compensation to Stewart Title Guaranty Company Commercial Services (San Diego) for its services in connection with the escrow or sub-escrow.

If any check submitted is dishonored upon presentation for payment, you are authorized to notify all principals and/or their respective agents of such nonpayment.

# OWNER'S AFFIDAVIT AND INDEMNITY

**Order Number: 19000480715**
**Address/Location: 6940 Beach Blvd., Buena Park, CA 90621**
**APN:** 276-361-22 and 276-361-20

In connection with the request of the Undersigned ("Affiant") for the preparation and issuance of insurance, Affiant makes the following statements and representations for the benefit of, and reliance by, title insurer Stewart Title Guaranty Company (hereafter referred to as "STEWART TITLE"):

1. Affiant owns and holds title to property described in Schedule A of the Preliminary Report or Commitment issued in connection with the above referenced Order Number (the "Property").

2. The Affiant's possession of the Property has been peaceful and undisturbed, and title thereto has never been disputed, questioned or rejected, nor has the issuance of title insurance ever been refused, except as follows: **(If none, please state "none")**
_____

3. Other than the Affiant, there are no parties entitled to possession of the Property other than the following: **(If none, please state "none")**
_____

4. There are no leases, licenses, options, rights of first refusal, or contracts to sell, affecting the Property, or any parties currently in possession, of the Property, except the following: **(If none, please state "none")**
_____

5. All assessments by a management, common area, building maintenance or homeowner association, if any, are paid current or are not yet due and payable.

6. There are no pending contemplated repairs/improvements to the Property, except the following: **(If none, please state "none")**
_____

7. No building materials, repairs, or improvements have been provided, furnished or delivered within the last 12 months, except the following: **(If none, please state "none")**
_____

8. Affiant is not aware of the existence of any of the following::
   a. Improvements encroaching into any easements or over any boundary lines of the Property.
   b. Adjoining property improvements encroaching onto the Property.
   c. Liens against the Property and/or judgments or tax liens against Affiant or any other property owner currently in title, except those described in the Preliminary Report or Commitment issued in connection with the above referenced Order Number.
   d. Outstanding claims or persons entitled to claims for mechanics' or materialman liens against the Property.
   e. Pending repairs/improvements to the adjacent street(s).
   f. Any pending litigation involving the Property, the Affiant or any other property owner currently in title.
   g. Recent improvements completed or being made to any common area(s) located within the subdivision in which the Property is located.
   h. Violations of any recorded covenants, conditions and/or restrictions imposed on the Property.
   i. Any pending assessments for Community Facility Districts.
   j. Any new, pending or existing obligation or loan including any home improvements on the Property pursuant to the PACE or HERO program, or any other similar type program.
   k. Any use of the property for the production, sale, warehousing or transporting of fresh fruits, vegetables, livestock or poultry (e.g. supermarkets, restaurants, wineries, breweries and meat packing plants).

    **With regard to 8a.-8k, except as follows**:

_____

9.  No proceedings in bankruptcy or receivership have been instituted by or against the Affiant or any other property owner currently in title.

10. There are no unpaid utility type bills including but not limited to bills for water, sewer, hazardous waste, recycling, storm drain and/or rubbish and there are no liens related to such utilities from or on the Property, with the exception of the following: **(If none, please state "none")**
_____

11. There are no financial obligations secured by trust deeds, mortgages, financing statements, vendor's liens, security agreements or otherwise, against the Property, except as set forth in the Preliminary Report, proforma and/or Commitment, and as set forth below: **(If none, please state "none")**

<u>Creditor</u>                                                      <u>Approximate Balance</u>

_____                    _____

_____                    _____

12. There has been no harvesting or production of any oil, gas, geothermal materials or other minerals from or on the Property and there are no oil, gas, geothermal and/or mineral leases, licenses, options, rights of first refusal, and/or contracts to sell, affecting the mineral rights associated with the Property, or other parties currently in possession, of the mineral rights of the Property, except the following: **(If none, please state "none")**
_____

13. Other than the Affiant, there are no other parties currently in possession of the Property, including but not limited to, any possessory interest associated with the harvesting of any oil, gas, geothermal materials or other minerals, except the following: **(If none, please state "none")**

This is a sworn affidavit and is made for the purpose of inducing STEWART TITLE to provide certain insurance coverage to a purchaser and/or lender, and the representations contained herein are material to such insurance coverage.  The undersigned hereby indemnifies and holds STEWART TITLE harmless from any loss or damage, liability, costs, expenses and attorneys' fees which it may sustain under its policies of title insurance or commitments to the extent any representation contained herein is incorrect. The undersigned understands that STEWART TITLE may decide not to provide the requested title insurance despite the information and affirmations contained herein.

**PLEASE READ, COMPLETE AND RESPOND TO ALL STATEMENTS CONTAINED IN THIS AFFIDAVIT BEFORE SIGNING IN THE PRESENCE OF A NOTARY PUBLIC. THE NOTARY PUBLIC WILL EXECUTE THE ACKNOWLEDGMENT ON THE FOLLOWING PAGE. HOWEVER, IF YOU DO NOT UNDERSTAND OR HAVE ANY QUESTIONS ABOUT THIS AFFIDAVIT, YOU SHOULD SEEK THE ASSISTANCE OF YOUR INDEPENDENT FINANCIAL AND/OR LEGAL ADVISOR BEFORE SIGNING.**

_____
The Source at the Beach

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached and not the truthfulness, accuracy, or validity of that document.

State of California                    )
                                       ) ss.
County of _____)

Subscribed and sworn to (or affirmed) before me on this _____ day of _____, 20____, by _____, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.


_____
Notary Signature

# EXHIBIT "A"

## LEGAL DESCRIPTION

Order No.:      19000480715
Escrow No.:    19000480715

The land referred to herein is situated in the State of California, County of Orange,  City of Buena Park and described as follows:

THAT PORTION OF LOT 2 IN BLOCK 61 OF BUENA PARK, IN THE CITY OF BUENA PARK, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 18, PAGES 50 TO 52 INCLUSIVE, OF MISCELLANEOUS MAPS, AND THOSE PORTIONS OF LOTS 5 TO 9 INCLUSIVE OF TRACT NO. 1756, AS PER MAP RECORDED IN BOOK 60 PAGES 20 AND 21 OF MISCELLANEOUS MAPS, ALL IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

PARCEL 4A (LEVEL 1 - GROUND FLOOR LOBBY & ENTRANCE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 215.36 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 45.77 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE S 00°00'02" W 86:05 FEET, THENCE N 89°59'59" W 22.68 FEET, THENCE S 00°01'05" W 13.56 FEET, THENCE S 89°59'59" E 22.57 FEET, THENCE S 00°00'02" W 8.22 FEET, THENCE N 89°59'58" W 0.77 FEET, THENCE S 00°00'02" W 34.16, THENCE N 89°59'58" W 110.62 FEET, THENCE N 00°00'02" E 34.17 FEET, THENCE N 89°59'58" W 30.58 FEET, THENCE N 00°00'02" E 107.52 FEET, THENCE N 89°59'58" W 0.83 FEET, THENCE N 00°00'02" E 8.95 FEET, THENCE S 89°59'58" E 24.08 FEET, THENCE N 46°29'04" E 12.47 FEET, THENCE N 00°00'02" E 16.97 FEET, THENCE S 89°59'58" E 18.12 FEET, THENCE N 00°00'02" E 5.22 FEET, THENCE N 89°57'39" E 30.73 FEET, THENCE N 00°00'02" E 32.17 FEET, THENCE N 89°59'58" W 11.92 FEET, THENCE N 00°02" E 1.00 FEET, THENCE S 89°59'58" E 0.50 FEET, THENCE N 00°00'02" E 14.21 FEET, THENCE S 89°59'58" E 39.78 FEET, THENCE S 00°00'02" W 86.82 FEET, THENCE S 89°59'58" E 32.58 FEEL TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 77.76 FEET.

PARCEL 4B (LEVEL 1 - GROUND FLOOR STAIRS ON ORANGETHORPE AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF ORANGETHORPE AVENUE AS SHOWN ON SAID MAP S 89°27'51" E 199.02 FEET; THENCE LEAVING SAID CENTERLINE N 0°32'09" E 60.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE N 0°00'02" E 36.96 FEET; THENCE S 89°59'58" E 14.74 FEET; THENCE S 0°00'02" W TO A POINT ON SAID PARALLEL LINE; THENCE ALONG SAID PARALLEL LINE N 89°27'51" W 14.74 TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 77.76 FEET.

PARCEL 4C (LEVEL 1 - GROUND FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND
BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE
CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 339.38 FEET;
THENCE LEAVING SAID CENTERLINE N 89°32'11" W 46.71 FEET TO THE TRUE POINT OF
BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 23.40 FEET; THENCE SOUTH
7.24 FEET; THENCE WEST 5.88 FEET; THENCE SOUTH 6.55 FEET; THENCE WEST 29.28 FEET;
THENCE NORTH 13.79 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN
ELEVATION OF 95.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 77.76
FEET.

PARCEL 4D (LEVEL 2 - SECOND FLOOR HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND
BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE
CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 223.82 FEET; THENCE
LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO THE TRUE POINT OF BEGINNING OF
THE HEREIN DESCRIBED PARCEL; THENCE S 00°27'49" W 94.43 FEET; THENCE N 89°59'59" W
31.75 FEET; THENCE S 00°01'05" W 13.56 FEET; THENCE S 89°59'59" E 31.65 FEET; THENCE S 00°
27'49" W 36.79 FEET; THENCE S 45°29'59" W 26.85 FEET; THENCE N 89°27'51" W 110.52 FEET;
THENCE N 00°00'02" E 36.98 FEET; THENCE N 89°59'58" W 19.37 FEET; THENCE S 00°00'02" W
25.13 FEET; THENCE N 89°59'58" W 12.81 FEET; THENCE N 00°00'02" E 90.73 FEET; THENCE S 89°
59'58" E 62.50 FEET; THENCE N 00°00'00" E 30.00 FEET; THENCE S 89°59'58" E 15.42 FEET;
THENCE N 00°00'02" E 29.98 FEET; THENCE S 89°59'58" E 85.09 FEET; TO SAID TRUE POINT OF
BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN
ELEVATION OF 113.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76
FEET.

PARCEL 4E (LEVEL 2 - SECOND FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND
BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE
CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 339.38 FEET; THENCE
LEAVING SAID CENTERLINE N 89°32'11" W 46.71 FEET TO THE TRUE POINT OF BEGINNING OF
THE HEREIN DESCRIBED PARCEL; THENCE WEST 23.40 FEET; THENCE SOUTH 7.24 FEET;
THENCE WEST 5.88 FEET; THENCE SOUTH 6.55 FEET; THENCE WEST 29.28 FEET; THENCE
NORTH 13.79 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN
ELEVATION OF 113.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76
FEET.

PARCEL 4F (LEVEL 3 -THIRD FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND
BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE
CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 339.38 FEET; THENCE
LEAVING SAID CENTERLINE N 89°32'11" W 46.71 FEET TO THE TRUE POINT OF BEGINNING OF
THE HEREIN DESCRIBED PARCEL; THENCE WEST 23.40 FEET; THENCE SOUTH 7.24 FEET;
THENCE WEST 5.88 FEET; THENCE SOUTH 6.55 FEET; THENCE WEST 29.28 FEET; THENCE
NORTH 13.79 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET.

PARCEL 4G (LEVEL 3  - THIRD FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 186.84 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 45.54 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 22.05 FEET; THENCE SOUTH 9.15 FEET; THENCE EAST 5.84 FEET; THENCE SOUTH 10.38 FEET; THENCE WEST 1.58 FEET; THENCE SOUTH 4.17 FEET; THENCE EAST 9.81 FEET; THENCE SOUTH 10.37 FEET; THENCE EAST 12.08 FEET; THENCE NORTH 9.62 FEET; THENCE EAST 1.44 FEET; THENCE NORTH 24.44 FEET TO THE SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET.

PARCEL 4H (LEVEL 3 - THIRD FLOOR STAIRS ON ORANGETHORPE AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF ORANGETHORPE AVENUE AS SHOWN ON SAID MAP S 89°27'51" E 199.02 FEET; THENCE LEAVING SAID CENTERLINE N 0°32'09" E 60.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE N 0°00'02" E 36.96 FEET; THENCE S 89°59'58" E 14.74 FEET; THENCE S 0°00'02" W TO A POINT ON SAID PARALLEL LINE; THENCE ALONG SAID PARALLEL LINE N 89°27'51" W 14.74 TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET.

PARCEL 4I (LEVEL 4 - FOURTH FLOOR HOTEL PARCEL INCLUDING DECK)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 72.90 FEET; THENCE SOUTH 13.76 FEET; THENCE WEST 18.27 FEET; THENCE SOUTH 114.50 FEET; THENCE WEST 92.89 FEET; THENCE SOUTH 130.52 FEET; THENCE EAST 12,99 FEET; THENCE SOUTH 32.75 FEET TO A POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE; THENCE ALONG SAID PARALLEL LINE S 89°27'51" E 143.94 FEET; THENCE N 45°29'59" E 26.85 FEET TO A POINT ON SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE; THENCE ALONG LAST SAID PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN

ELEVATION OF 161.18 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76 FEET.

PARCEL 4J (LEVEL 5 - FIFTH FLOOR HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 72.90 FEET; THENCE SOUTH 165.38 FEET; THENCE WEST 6.81 FEET; THENCE SOUTH 20.33 FEET; THENCE EAST 6.81 FEET; THENCE SOUTH 28.65 FEET; THENCE WEST 105.43 FEET; THENCE SOUTH 44.42 FEET; THENCE EAST 12.99 FEET; THENCE SOUTH 32.75 FEET TO A POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE; THENCE ALONG SAID PARALLEL LINE S 89°27'51" E 143.94 FEET; THENCE N 45°29'59" E 26.85 FEET TO A POINT ON SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE; THENCE ALONG LAST SAID PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 171.60 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 161.18 FEET.

PARCEL 4K (LEVEL 6 - SIXTH FLOOR HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 72.90 FEET; THENCE SOUTH 165.38 FEET; THENCE WEST 6.81 FEET; THENCE SOUTH 20.33 FEET; THENCE EAST 6.81 FEET; THENCE SOUTH 28.65 FEET; THENCE WEST 105.43 FEET; THENCE SOUTH 44.42 FEET; THENCE EAST 11.33 FEET; THENCE SOUTH 32.75 FEET TO A POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE; THENCE ALONG SAID PARALLEL LINE S 89°27'51" E 145.60 FEET; THENCE N 45°29'59" E 26.85 FEET TO A POINT ON SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE; THENCE ALONG LAST SAID PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 182.02 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 171.60 FEET.

PARCEL 4L (LEVEL 7 - SEVENTH FLOOR & ROOF HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 72.90 FEET; THENCE SOUTH 165.38 FEET; THENCE WEST 6.81 FEET; THENCE SOUTH 20.33 FEET; THENCE EAST 6.81 FEET; THENCE SOUTH 28.65 FEET; THENCE WEST 105.43 FEET; THENCE SOUTH 44.42 FEET; THENCE EAST 12.99 FEET; THENCE SOUTH 32.75 FEET TO A

POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF OANGETHORPE AVENUE; THENCE ALONG SAID PARALLEL LINE S 89°27'51" E 143.94 FEET; THENCE N 45°29'59" E 26.85 FEET TO A POINT ON SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE; THENCE ALONG LAST SAID PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 210.00 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 182.02 FEET.

ELEVATIONS STATED HEREON ARE BASED ON THE NORTH AMERICAN VERTICAL DATUM OF 1988 (NAVD88) PER THE YEAR 2005 ADJUSTMENT BY THE ORANGE COUNTY SURVEYOR, USING THE FOLLOWING BENCHMARK:

OCS BM 404-31-05 ELEV.=80.151 FEET (NAVD88, YEAR 2005 LEVELED) STATION IS AN OCS ALUMINUM DISK STAMPED 404-31-05 SET IN THE SE'LY CORNER OF A 15 FT. X 4.5 FT. CONCRETE CATCH BASIN, LOCATED IN NE'LY PORTION OF INTERSECTION OF STANTON AVE. & ARTESIA BLVD., 28 FT. N'LY OF THE CENTERLINE OF ARTESIA BLVD. & 81 FT. E'LY OF THE CENTERLINE OF STANTON AVENUE. MONUMENT IS LEVEL WITH THE SIDEWALK

SAID LEGAL IS ALSO SHOWN AS PARCEL 4 OF PARCEL MAP NO. 2014-173, IN THE CITY OF BUENA PARK, COUNTY OF ORANGE, STATE OF CALIFORNIA, FILED IN BOOK 391, PAGES 4 THROUGH 16, INCLUSIVE OF PARCEL MAP, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

APN:

276-361-29; 276-361-30; 276-361-32; 276-361-33; 276-361-35; 276-361-36; 276-361-37; 276-361-38; 276-361-39; 276-361-40; 276-361-41; 276-361-42; 276-361-43; 276-361-44; 276-361-45; 276-361-57; 276-361-58; 276-361-60; 276-361-61

APN:  276-361-22 and 276-361-20

(End of Legal Description)

# AFFILIATED BUSINESS ARRANGEMENT DISCLOSURE STATEMENT

Date:          December 31, 2020

Escrow No.: 19000480715

Property:    6940 Beach Blvd., Buena Park, CA 90621

From:        Stewart Title Guaranty Company - Commercial Services

This is to give you notice that Stewart Title Guaranty Company - Commercial Services ("Stewart Title") has a business relationship with Stewart Solutions, LLC, DBA – Stewart Specialty Insurance Services, LLC ("Stewart  Insurance").  Stewart Information Services Corporation owns 100% of Stewart Insurance and Stewart Title of California.  Because of this relationship, this referral may provide Stewart Title a financial or other benefit.

Set forth below is the estimated charge or range of charges for the settlement services listed.  You are NOT required to use the listed provider(s) as a condition for purchase, sale, or refinance of the subject Property.  THERE ARE FREQUENTLY OTHER SETTLEMENT SERVICE PROVIDERS AVAILABLE WITH SIMILAR SERVICES.  YOU ARE FREE TO SHOP AROUND TO DETERMINE THAT YOU ARE RECEIVING THE BEST SERVICES AND THE BEST RATE FOR THESE SERVICES.

| *Stewart Insurance Settlement Service* | *Charge or range of charges* |
|---|---|
| Hazard Insurance | $400.00 to $6,500.00 |
| Home Warranty | $255.00 to $  780.00 |
| Natural Hazard Disclosure Report | $  42.50 to $   149.50 |

**CLTA Preliminary Report Form**

**Exhibit A (Revised 06-03-11)**

# CALIFORNIA LAND TITLE ASSOCIATION
## STANDARD COVERAGE POLICY – 1990
## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1.  (a) Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
    (b)  Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
    (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2.  Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3.  Defects, liens, encumbrances, adverse claims or other matters:
    (a) whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;
    (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
    (c) resulting in no loss or damage to the insured claimant;
    (d) attaching or created subsequent to Date of Policy; or
    (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.

4.  Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.

5.  Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6.  Any claim, which arises out of the transaction vesting in the insured the estate of interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

## EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART I

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1.  Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
    Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2.  Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3.  Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.

4.  Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5.  (a)  Unpatented mining claims;  (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof;  (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

6.  Any lien or right to a lien for services, labor or material not shown by the public records.

## CLTA HOMEOWNER'S POLICY OF TITLE INSURANCE (02-03-10)
## ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE
## EXCLUSIONS

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1.    Governmental police power, and the existence or violation of those portions of any law or government regulation concerning:

     a. building;
     b. zoning;
     c. land use;
     d. improvements on the Land;
     e. land division;
     f. environmental protection.
This Exclusion does not limit the coverage described in Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23 or 27.

2.    The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes.    This Exclusion does not limit the coverage described in Covered Risk 14 or 15.

3.    The right to take the Land by condemning it. This Exclusion does not limit the coverage described in Covered Risk 17.

4.    Risks:
     a. that are created, allowed, or agreed to by You, whether or not they appear in the Public Records;
     b. that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date;
     c. that result in no loss to You; or
     d. that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e., 25, 26, 27 or 28.

5.    Failure to pay value for Your Title.

6.    Lack of a right:
     a. to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
     b. in streets, alleys, or waterways that touch the Land.
This Exclusion does not limit the coverage described in Covered Risk 11 or 21.

7.    The transfer of the Title to You is invalid as a preferential transfer or as a fraudulent transfer or conveyance under federal  bankruptcy.

### LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:
*      For Covered Risk 16, 18, 19, and 21 Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.
The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

|  | Your Deductible  Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 16: | 1% of Policy Amount or  $2,500.00 (whichever is less) | $10,000.00 |
| Covered Risk 18: | 1% of Policy Amount or  $5,000.00 (whichever is less) | $25,000.00 |
| Covered Risk 19: | 1% of Policy Amount or  $5,000.00 (whichever is less) | $25,000.00 |
| Covered Risk 21: | 1% of Policy Amount or  $2,500.00 (whichever is less) | $5,000.00 |

## 2006 ALTA LOAN POLICY (06-17-06)
## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (i)    the occupancy, use, or enjoyment of the Land;
   (ii)   the character, dimensions, or location of any improvement erected on the Land;
   (iii)  the subdivision of land; or
   (iv)  environmental protection;
   or the effect of any violation of these laws, ordinances, or governmental regulations.  This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2. Rights of eminent domain.  This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.

5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.

6. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
   (a) a fraudulent conveyance or fraudulent transfer, or
   (b) a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.

7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records.  This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

The above policy form may be issued to afford either Standard Coverage or Extended Coverage.  In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

# EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency  that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by  persons in possession of the Land.

3. Easements, liens or encumbrances, or claims thereof, which are not shown by the Public Records.

4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.

5. (a) unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

6. Any lien or right to a lien for services, labor or material not shown by the public records.

## 2006 ALTA OWNER'S POLICY (06-17-06)
## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
    (i)   the occupancy, use, or enjoyment of the Land;
    (ii)  the character, dimensions, or location of any improvement erected on the Land;
    (iii) the subdivision of land; or
    (iv)  environmental protection;
          or the effect of any violation of these laws, ordinances, or governmental regulations.  This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
    (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2.  Rights of eminent domain.  This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3.  Defects, liens, encumbrances, adverse claims, or other matters
    (a) created, suffered, assumed, or agreed to by the Insured Claimant;
    (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    (c) resulting in no loss or damage to the Insured Claimant;
    (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or
    (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.

4.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
    (a) a fraudulent conveyance or fraudulent transfer; or
    (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.

5.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage.  In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1.  (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency  that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2.  Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or by making inquiry of persons in possession thereof.

3.  Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.

4.  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and that are not shown by the Public Records.

5.  (a) unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

6.  Any lien or right to a lien for services, labor or material not shown by the public records.

# STG Privacy Notice
## Stewart Title Companies

### WHAT DO THE STEWART TITLE COMPANIES DO WITH YOUR PERSONAL INFORMATION?

Federal and applicable state law and regulations give consumers the right to limit some but not all sharing. Federal and applicable state law regulations also require us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand how we use your personal information. This privacy notice is distributed on behalf of the Stewart Title Guaranty Company and its title affiliates (the Stewart Title Companies), pursuant to Title V of the Gramm-Leach-Bliley Act (GLBA).

The types of personal information we collect and share depend on the product or service that you have sought through us. This information can include social security numbers and driver's license number.

All financial companies, such as the Stewart Title Companies, need to share customers' personal information to run their everyday business—to process transactions and maintain customer accounts. In the section below, we list the reasons that we can share customers' personal information; the reasons that we choose to share; and whether you can limit this sharing.

| Reasons we can share your personal information. | Do we share | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes**— to process your transactions and maintain your account. This may include running the business and managing customer accounts, such as processing transactions, mailing, and auditing services, and responding to court orders and legal investigations. | Yes | No |
| **For our marketing purposes**— to offer our products and services to you. | Yes | No |
| **For joint marketing with other financial companies** | No | We don't share |
| **For our affiliates' everyday business purposes**— information about your transactions and experiences. Affiliates are companies related by common ownership or control. They can be financial and non-financial companies. *Our affiliates may include companies with a Stewart name; financial companies, such as Stewart Title  Company* | Yes | No |
| **For our affiliates' everyday business purposes**— information about your creditworthiness. | No | We don't share |
| **For our affiliates to market to you** — For your convenience, Stewart has developed a means for you to opt out from its affiliates marketing even though such mechanism is not legally required. | Yes | Yes, send your first and last name, the email address used in your transaction, your Stewart file number and the Stewart office location that is handling your transaction by email to optout@stewart.com or fax to 1-800-335-9591. |
| **For non-affiliates to market to you.** Non-affiliates are companies not related by common ownership or control. They can be financial and non-financial companies. | No | We don't share |

We may disclose your personal information to our affiliates or to non-affiliates as permitted by law. If you request a transaction with a non-affiliate, such as a third party insurance company, we will disclose your personal information to that non-affiliate. [We do not control their subsequent use of information, and suggest you refer to their privacy notices.]

### SHARING PRACTICES

| | |
|---|---|
| **How often do the Stewart Title Companies notify me about their practices?** | We must notify you about our sharing practices when you request a transaction. |
| **How do the Stewart Title Companies protect my personal information?** | To protect your personal information from unauthorized access and use, we use security measures that comply with federal  law. These measures include computer, file, and building safeguards. |
| **How do the Stewart Title Companies collect my personal information?** | We collect your personal information, for example, when you<br>• request insurance-related services<br>• provide such information to us<br>We also collect your personal information from others, such as the real estate agent or lender involved in your transaction, credit reporting agencies, affiliates or other companies. |
| **What sharing can I limit?** | Although federal and state law give you the right to limit sharing (e.g., opt out) in certain instances, we do not share your personal information in those instances. |

***Contact us:   If you have any questions about this privacy notice, please contact us at:* Stewart Title Guaranty Company, 1360 Post Oak Blvd., Ste. 100, Privacy Officer, Houston, Texas 77056**

# EXHIBIT "H"

[Deeds of Trust by Beach Orangethorpe Hotel, LLC
and Beach Orangethorpe Hotel II, LLC]

**RECORDING REQUESTED BY
AND WHEN RECORDED, MAIL TO:**

BEACH ORANGETHORPE HOTEL, LLC
3100 E. Imperial Hwy.
Lynwood California 90262

Assessor's Parcel Nos.: See <u>Exhibit A</u>
276-361-20 & 22

Recorded in Official Records, Orange County
Hugh Nguyen, Clerk-Recorder

96.00

\* $ R 0 0 0 9 5 2 0 6 0 4 $ \*

**2017000364569 1:22 pm 08/28/17**

47 NC-5 D11 A36 U08 F15   24

0.00 0.00 0.00 0.00 69.00 0.00 0.00 0.00



SPACE ABOVE THIS LINE FOR RECORDER'S USE

### DEED OF TRUST, ASSIGNMENT OF RENTS,
### SECURITY AGREEMENT AND FIXTURE FILING

This Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing (this "**Deed of Trust**") is made as of June 1, 2014 by THE SOURCE HOTEL, LLC, a California limited liability company ("**Trustor**"), whose address is 3100 East Imperial Highway, Lynwood, California 90262, to STEWART TITLE OF CALIFORNIA, INC., as Trustee ("**Trustee**"), for the benefit of BEACH ORANGETHORPE HOTEL, LLC, a California limited liability company, as Beneficiary ("**Lender**" or "**Beneficiary**").

THIS DEED OF TRUST ALSO CONSTITUTES A FIXTURE FILING UNDER DIVISION 9 OF THE CALIFORNIA UNIFORM COMMERCIAL CODE AND COVERS GOODS WHICH ARE OR ARE TO BECOME FIXTURES ON THE REAL PROPERTY DESCRIBED ON EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.  TRUSTOR IS A RECORD OWNER OF AN INTEREST IN SAID REAL PROPERTY.

<u>GRANT IN TRUST</u>:

Trustor irrevocably grants, transfers, warrants and assigns to Trustee, in trust, for the benefit of Lender, with power of sale, all of Trustor's interest in that certain real property located in the County of Orange, California, described as:

SEE EXHIBIT "A" ATTACHED HERETO AND
INCORPORATED HEREIN BY THIS REFERENCE.

TOGETHER WITH:  All right, title and interest which Trustor now has or may later acquire in such real property and all appurtenances, easements, covenants, rights of way, tenements, hereditaments and appurtenances thereunto belonging or in any way appertaining thereto now or hereafter, and all of the estate, right, title, interest, claim, demand, reversion or remainder whatsoever of Trustor therein or thereto, at law or in equity, now or hereafter in possession or expectancy, including, without limitation, all mineral, oil, and gas rights and royalties and profits therefrom, all water and water rights and shares of stock pertaining to water and water rights, and

-1-

{01018586}

all sewers, pipes, conduits, wires and other facilities furnishing utility or services to the real property (collectively, the "**Land**");

TOGETHER WITH:  All right, title and interest which Trustor now has or may later acquire in and to all buildings, structures and improvements now or hereafter erected on the Land, including, without limitation, all plant equipment, apparatus, machinery and fixtures of every kind and nature whatsoever now or hereafter located on or forming part of said buildings, structures and improvements (collectively, the "**Improvements**"; the Land and Improvements being hereinafter sometimes collectively referred to as the "**Premises**");

TOGETHER WITH:  All right, title and interest which Trustor now has or may later acquire in and to the land lying in the bed of any street, road, highway or avenue now or hereafter in front of or adjoining the Premises;

TOGETHER WITH:  Any and all awards heretofore or hereafter made by any governmental authorities (federal, state, local or otherwise) to Trustor and all subsequent owners of the Premises which may be made with respect to the Premises as a result of the exercise of the right of eminent domain, the alteration of the grade of any street or any other injury to or decrease of value of the Premises, which said award or awards are hereby assigned to Lender;

TOGETHER WITH:  Any claims under and proceeds of any insurance policies by reason of or related to a loss of any kind sustained to the Premises, now or hereafter, whether or not such policies name Lender as an insured and whether or not such policies are required by Lender, and whether or not such claims thereunder are characterized as personal claims;

TOGETHER WITH:  Any and all unearned premiums accrued, accruing or to accrue, and the proceeds of insurance now or hereafter in effect with respect to all or any portion of the Premises;

TOGETHER WITH:  Any and all claims or demands which Trustor now has or may hereafter acquire against anyone with respect to any damage to all or any portion of the Premises;

TOGETHER WITH:  All goods, equipment, machinery, furniture, furnishings, trade fixtures, appliances, inventory, building materials, apparatus, utensils, vehicles, wiring, pipes, conduits, elevators, escalators, heating and air conditioning equipment, chattels and articles of personal property, including, without limitation, any interest therein now or at any time hereafter affixed to, attached to or used in any way in connection with or to be incorporated at any time into the Premises or placed on any part thereof wheresoever located, whether or not attached to or incorporated in the Premises, together with any and all accessions, accessories, attachments, and replacements thereof, appertaining and adapted to the complete and compatible use, enjoyment, occupancy, operation or improvement of the Premises;

TOGETHER WITH:  All instruments, investment property, deposit accounts, accounts, contract rights, general intangibles, rights to receive refunds, including utility and real estate tax refunds, and other intangible property and rights now or hereafter relating to the foregoing property, or the operation thereof or used in connection therewith, including, without limitation, all options, letters of intent, and rights of first refusal of any nature whatsoever, covering all or any portion

-2-

of such property, together with any modifications thereof, and deposits or other payments made in connection therewith, existing and future development rights, permits and approvals, air rights, density bonus rights, and transferable development rights; all of Trustor's right, title, and interest in and to any awards, remunerations, settlements, or compensation heretofore made or hereafter made by any and all courts, boards, agencies, commissions, offices, or authorities, of any nature whatsoever for any governmental unit (federal, state, local or otherwise) to the present or any subsequent owner of the foregoing property, including those for any vacation of, or change of grade in, any streets affecting the foregoing property and any and all licenses and privileges obtained by Trustor from non-governmental sources;

TOGETHER WITH:  All leases of the Premises, Personalty, Fixtures, or any part thereof, now or hereafter entered into and all right, title and interest of Trustor thereunder, including, without limitation, cash or securities deposited thereunder to secure performance by the lessees of their obligations thereunder (whether such cash or securities are to be held until the expiration of the terms of such leases or applied to one or more of the installments of rent coming due immediately prior to the expiration of such terms); all other rights and easements of Trustor now or hereafter existing pertaining to the use and enjoyment of the Premises; and all right, title and interest of Trustor in and to all declarations of covenants, conditions and restrictions as may affect or otherwise relate to the Premises;

TOGETHER WITH:  All permits, plans, licenses, specifications, subdivision rights, security interests, contracts, contract rights, public utility deposits, prepaid sewer and water hook-up charges, or other rights as may affect or otherwise relate to the Property (as hereinafter defined);

TOGETHER WITH:  All rents, income, issues and profits (subject, however, to the rights given in this Deed of Trust to Lender to collect and apply same), including, without limitation, the accounts, revenues, and proceeds of any business operation conducted by or on behalf of Trustor on or through the use of the Premises, prepaid municipal and utility fees, bonds, revenues, income, and other benefits to which Trustor may now or hereafter be entitled to, or which are derived from, the Property or any portion thereof or interest therein.

The foregoing listing is intended only to be descriptive of the property encumbered hereby, and not exclusive or all inclusive.  It is the intent of Trustor to encumber hereby all property located or to be located upon the above-described real property. Said real property (or the leasehold estate if this Deed of Trust encumbers a leasehold estate), buildings, improvements, appurtenances, Fixtures, Personalty, additions, accretions, and other property are herein referred to as the "**Property**."  As used herein, the term "**Fixtures**" shall include all articles of personal property hereinabove described, now or hereafter attached to, placed upon for a definite term, or otherwise used in connection with the Property, and shall include trade fixtures and goods which are or are to become fixtures. As used herein, the term "**Personalty**" shall include all furniture, furnishings, equipment, machinery, goods, contract rights, general intangibles, money, deposit accounts, instruments, accounts, leases, chattel paper and other personal property described in this Deed of Trust (other than Fixtures) of any kind or character now existing or hereafter arising or acquired, now or hereafter located upon, within or about the Property, or which otherwise pertains to the use, ownership, management, operation, construction, leasing and sale of the

-3-

Property, and all products and proceeds thereof, and all of Trustor's right, title, and interest in and to all such property.

Trustor makes the foregoing grant to Trustee, and to Lender, as applicable, to hold the Property in trust for the benefit of Lender and for the purposes and upon the terms and conditions hereinafter set forth.

FOR THE PURPOSE OF SECURING:

(1)     Payment of the sum of Ten Million and No/100 Dollars ($10,000,000.00), or such portion thereof as is advanced to Trustor pursuant to the Agreement, hereafter defined, together with interest thereon and certain additional costs and expenses related to or incurred in connection with or as provided in that certain Promissory Note, in the maximum principal amount of Ten Million and No/100 Dollars ($10,000,000.00), executed by Trustor, payable to Lender, or order, and all extensions, modifications or renewals thereof (including, without limitation, any extension, modification, or renewal of the Note at a different rate of interest or on different terms) (individually and collectively, the "**Note**");

(2)     Performance of each and every term, covenant and condition of that certain Loan Agreement, by and between Trustor and Lender, and all modifications, renewals or extensions thereof (the "**Agreement**");

(3)     Payment of all other sums, with interest, advanced, paid, or incurred by Lender or Trustee under the terms of this Deed of Trust to protect the Property or Lender's security interest therein;

(4)     Payment of such additional sums, with interest, as the then record owner of the Property may later borrow from Lender, in those instances in which the later obligations are evidenced by a promissory note or notes reciting that it or they are so secured (which additional obligations shall be referred to as "future advances" in this Deed of Trust);

(5)     Trustor's performance of each agreement in this Deed of Trust.

**TRUSTOR AND LENDER AGREE AS FOLLOWS:**

**RIGHTS AND DUTIES OF THE PARTIES**.

1.     **Payment And Performance By Trustor**.  Trustor shall promptly: (a) perform each and every term, covenant and condition of this Deed of Trust and any other obligation secured by this Deed of Trust; (b) pay when due the Note; and (c) pay when due any future advances.

2.     **Payment By Trustor Of Taxes And Other Impositions**.  The term "**Taxes**" shall mean all taxes, bonds and assessments, both general and special, affecting or levied upon the Property or any part thereof, assessments on water company stock, if any, all taxes or excises levied or assessed against Trustor, the Property, or any part thereof, in addition to or as a substitution in whole or in part for any real estate taxes or assessments, all taxes or excises

-4-

measured by or based in whole or in part upon the rents, operating income, or any other factor relating to the Property, or any part thereof, and all license fees, taxes and excises imposed upon Lender (but not any federal or state income taxes imposed upon Lender) and measured by or based in whole or in part upon the obligations secured hereby. The term "**Other Impositions**" shall mean any fine, fee, charge, or other imposition in connection with the Property or Trustor, payment of which Lender shall deem to be necessary to protect, preserve, and defend Lender's interests hereunder. Trustor shall pay all Taxes, insurance premiums, and Other Impositions attributable to the Property, at least fifteen (15) days before delinquency directly to the payee thereof, or in such other manner as Lender may designate in writing. Trustor shall promptly furnish to Lender all notices of amounts due under this paragraph, and if Trustor shall make payment directly, Trustor shall furnish to Lender receipts evidencing payments of Taxes at least ten (10) days before delinquency and shall promptly deliver to Lender receipts evidencing all other payments above required.

      3.    **Trustor To Pay Senior Obligations and Other Obligations**. Trustor shall fully and faithfully pay and perform each and every obligation, and otherwise satisfy all conditions and covenants, which are or may be secured by any deed of trust upon the Property, or any portion thereof, existing of record as of the date this Deed of Trust is recorded, and/or to which this Deed of Trust may be subordinate. Trustor shall pay at or prior to maturity any and all liens, charges and encumbrances that are, later become, claim to be or appear to Lender to be prior or superior to the lien of this Deed of Trust, including, without limiting the generality of the foregoing, any and all claims for (a) work or labor performed, (b) materials and services supplied in connection with any work of demolition, alteration, improvement of or construction upon the Property, and (c) fees, charges and liens for utilities provided to the Property. Trustor acknowledges that its obligations to EverTrust Bank in connection with the loan referenced in paragraph 13(a) below are senior to the lien of this Deed of Trust.

      4.    **Trustor To Maintain Insurance**. (a) Trustor shall maintain (i) insurance covering the Property against loss or damage by fire and other risks customarily included in an "all risk" insurance policy, and (ii) a policy of liability insurance for claims resulting from injury to or death of any person, or the damage to property belonging to any person, bu reason of Trustor's ownership, use or occupancy of the Property or Beneficiary's interest hereunder. The insurance policies shall be maintained with such companies, in such amounts, for such terms, and in form and content satisfactory to Lender, in Lender's reasonable opinion and judgment. Lender shall be named as an additional insured. (b) If such insurance, together with written evidence of the premium having been paid, are not delivered to Lender at least five (5) days prior to the expiration of such insurance, Lender shall have the right, but without obligation to do so, without notice to or demand upon Trustor and without releasing the Trustor from any obligation under this Deed of Trust, to obtain such insurance or like insurance through or from any insurance agency or company acceptable to it, pay the premium for such insurance, and add the amount of the premium to the loan secured by this Deed of Trust, and this amount shall bear interest at the applicable rate of interest set forth in the Note. Neither the Trustee nor Lender shall be responsible for such insurance or for the collection of any insurance monies, or for any insolvency of any insurer or insurance underwriter. (c) In the event that the Property is sold to Lender at any trustee's sale under this Deed of Trust (see paragraph 17, below), Trustor hereby assigns to Lender all unearned premiums on all policies of insurance covering the Property and

{01018586}

agrees that any and all unexpired insurance covering the Property shall inure to the benefit of and pass to Lender at the time of such Trustee's sale.

5.      **Condemnation Proceeds**.    All settlements, awards, damages and proceeds received by Trustor or any other person in connection with any condemnation for public use of or injury to the Property (or any part of or interest in the Property) (collectively "**Awards**") shall be applied in accordance with the documents evidencing and securing the loan to Trustor by EverTrust Bank referenced in paragraph 13(a) below.    Subject to the preceding sentence, all Awards shall be applied by Trustor to reduce the principal balance of the Note or any other obligation secured by this Deed of Trust and/or to replace, restore or reconstruct the Property to a condition reasonably satisfactory to Lender.    Any remaining portion of the Award shall be released to Trustor.

6.      **Maintenance And Preservation Of The Property**.    Trustor shall:  (i) keep the Property, and every portion thereof, in good condition and repair; (ii) not remove or demolish the Property, or any part thereof, except as may be commercially reasonable under the circumstances; (iii) complete or restore promptly and in good and workmanlike manner the Property, or any part thereof, which may be damaged or destroyed, to the extent that it is commercially reasonable to do so; (iv) comply with (A) any and all applicable and legally valid laws, ordinances, governmental rules, regulations, standards and orders; (B) any and all covenants, conditions, restrictions, equitable servitudes and easements, whether public or private, of every kind and character, and (C) any and all requirements of insurance companies and any bureau or agency which establishes standards of insurability, which laws, covenants or requirements affect the Property and/or pertain to acts committed or conditions existing thereon, or the use, management, operation or occupancy thereof by Trustor and anyone holding under Trustor, including (but without limitation) such work of alteration, improvement or demolition as such laws, covenants or requirements mandate; (v) not commit or permit waste of the Property, or any portion thereof; and (vi) do all other acts which from the character or use of the Property may be reasonably necessary to maintain and preserve its value.

7.      **Lender's Rights To Inspect The Property**.    Lender and its agents, employees and contractors, may enter upon the Property at any reasonable time to inspect the Property for any purpose relating to Lender's rights and interests under the terms of this Deed of Trust.

8.      **Substitution Of Trustee**.    From time to time, by an instrument signed and acknowledged by Lender, and recorded in the Office of the Recorder of the County in which the Property is located, Lender may appoint a substitute Trustee or Trustees in place of the Trustee named in this Deed of Trust.    Such instrument shall refer to this Deed of Trust and shall set forth the date and instrument number or book and page of its recordation.    Upon recordation of such instrument, the Trustee named in this Deed of Trust shall be discharged and the new Trustee so appointed shall be substituted as Trustee under this Deed of Trust with the same effect as if originally named Trustee in this Deed of Trust.    An instrument recorded pursuant to the provisions of this paragraph 8 shall be conclusive proof of the proper substitution of such new Trustee.

-6-

**9.**    **Miscellaneous Powers Of Lender And Trustee**. In addition to any other powers granted in this Deed of Trust to the Trustee, from time to time, upon the written request of Lender and upon the presentation of this Deed of Trust and any obligation secured by this Deed of Trust for endorsement, and without affecting any obligation secured by this Deed of Trust or the performance of the obligations set forth in this Deed of Trust, the Trustee may, without liability and without notice to any person: reconvey all or any part of the Property to Trustor, consent to the making of any map or plat of the Property, join in granting any easement on the Property, join in any agreement subordinating the lien of this Deed of Trust, release any obligation secured by this Deed of Trust, in whole or in part, with regard to any Trustor, extend or renew the Note or any other obligation secured by this Deed of Trust, accept or release any additional security under this Deed of Trust, or accept and release the guaranty of any additional person or any obligation secured by this Deed of Trust.

**10.**    **Assignment And Collection Of Rents**. (a) Trustor hereby assigns absolutely to Lender the rents of the Property, with a revocable license to collect such rents as they become due and payable, prior to any default by Trustor (as defined in paragraph 14 of this Deed of Trust), being retained by Trustor. (b) Upon any default by Trustor under paragraph 14 of this Deed of Trust, such license will, automatically, be deemed revoked without the necessity for any act or notice by Lender, and Lender, in person, by agent or by judicially appointed receiver, shall be entitled to enter upon, take possession of and manage the Property and may collect the rents of the Property, and, after so taking possession, shall be entitled to collect any rents that are past due. If Trustor, at or immediately prior to such taking of possession by or on behalf of Lender, has operated a business upon the Property other than the rental thereof, the authority granted herein to so take possession of the Property shall also include the authority and power to take possession of the receipts of such business and, if appropriate, to operate such business, and the receipts thereof shall be deemed herein to be a form of rents. All rents collected by Lender or the receiver shall be applied first to payment of the costs of management of the Property and of collection of rents, including, but not limited to, costs and expenses of any receivership and reasonable attorneys' fees incurred by Lender in connection with the receivership, and then to the Note and any other obligations secured by this Deed of Trust. Lender and the receiver shall be liable to account only for those rents actually received. The assignment of rents and leases herein is junior to the obligations of Trustor in favor of EverTrust Bank in connection with the loan referenced in paragraph 13(a) below.

**11.**    **Reconveyance Of The Property**. (a) Upon the written request of Lender stating that the Note and all other obligations secured by this Deed of Trust have been discharged, and upon surrender of this Deed of Trust, the Note or any other notes or instruments evidencing such other obligations to the Trustee, and upon payment of the Trustee's fees, the Trustee shall reconvey, without warranty, the Property or that portion of the Property then held by the Trustee under this Deed of Trust. (b) If the I-829 petitions of any investor members of Beneficiary have not been finally determined, Trustor shall have the right to obtain a reconveyance of this Deed of Trust by depositing cash collateral into an escrow account reasonably satisfactory to Beneficiary. Such cash collateral, which shall be in an amount equal to the outstanding balance of principal and interest payable under the Note plus any other amounts owed by Trustor pursuant to the Loan Documents, shall be payable to Beneficiary upon the final determination of the I-829 petitions of Beneficiary's investor members. (c) The recitals in any such reconveyance of any

{01018586}

matters or facts shall be conclusive proof of the truthfulness of such matters or facts. The grantee in such reconveyance may be described as "the person or persons legally entitled thereto." When the Property has been fully reconveyed, the last such reconveyance shall operate as a reassignment of all of the rents of the Property to the person or persons legally entitled to such rents. Five (5) years after issuance of such full reconveyance, the Trustee may destroy this Deed of Trust and any such notes, unless directed in such request to retain them.

**12.    Change Of Lender's Records**. In the event Trustor requests Lender to change any of its records relating to the Property, the Note or this Deed of Trust (including, but not limited to, changes in mailing address or ownership of the Property), Trustor shall pay a commercially reasonable fee not to exceed $100 prescribed by the Lender to so change its records.

**13.    Senior Lien; Co-Equal Lien**. Notwithstanding any provision of this Deed of Trust to the contrary: (a) the deed of trust and/or other financing documents in connection with the loan procured by Trustor from EverTrust Bank in an original principal amount not to exceed $29,500,000.00 shall be senior to this Deed of Trust; and (b) the deed of trust and/or other financing documents in connection with the loan procured by Trustor from Beach Orangethorpe Hotel II, LLC in an original principal amount not to exceed $11,500,000.00 shall be of equal priority and seniority with this Deed of Trust.

## ACCELERATION AND DEFAULT.

**14.    Conditions Under Which Lender May Declare A Default By Trustor**. A "default" under this Deed of Trust shall occur in the event that any of the following shall occur, after any applicable notice period and beyond any applicable cure period: (a) an Event of Default (as defined in the Note) under the Note occurs; (b) any sum the payment of which is required or secured by this Deed of Trust is not made when due; (c) Trustor fails in any material respect to perform any other obligation required to be performed by Trustor under this Deed of Trust or secured by this Deed of Trust; (d) the Property is or becomes subject to any proceedings for abatement of a public nuisance; (e) any material information given to Lender by Trustor, intended to or which does, in fact, induce the granting of any loan secured by this Deed of Trust, was not true in any respect when given, or any material information requested or required by Lender is withheld or concealed from such application by Trustor; or (f) an Event of Default (as defined in the Agreement) under the Agreement occurs.

**15.    Lender's Right To Require Immediate Payment In Full**. In the event of a default (as defined in paragraph 14) under this Deed of Trust, Lender may, at its option and without further notice to any person, declare the entire principal balance and any other obligations under the Note and/or any other obligations secured by this Deed of Trust, together with accrued interest thereon and any prepayment penalties, immediately due and payable.

**16.    Lender's Right To Perform Acts Trustor Fails To Perform; Indemnification**.

(a)    In the event of a default by Trustor under this Deed of Trust, then Lender or Trustee, without notice to or demand upon Trustor and without releasing Trustor from any obligation under this Deed of Trust, may, but are not required to, make or do the same in such

-8-

commercially reasonable manner and to such extent as either may deem necessary or desirable to protect the security of this Deed of Trust. Subject to the foregoing, Lender and Trustee are authorized to (i) enter upon the Property for such purposes; (ii) appear in and defend any action or proceeding purporting to affect the security of this Deed of Trust or the rights or powers of Lender or Trustee; and (iii) pay, purchase, contest or compromise any encumbrance, charge, lien or claim of lien, in whole, in part and/or in installments, which is prior or superior to the lien of this Deed of Trust. In exercising the above powers, Lender or Trustee may pay reasonably necessary costs and expenses, employ counsel, consultants, any other agents or independent contractors, and pay reasonable fees, compensation, and costs thereof. Trustor promises and agrees to pay immediately upon demand all amounts so expended by Lender or Trustee (including all such costs, expenses and attorneys' fees) under this paragraph 16, with payment of such amounts being secured by this Deed of Trust.

(b)    Trustor hereby indemnifies and agrees to hold harmless Lender and Trustee and their directors, officers, shareholders, agents and employees (individually and collectively the "**Indemnitees**") from and against: (i) any and all claims, demands, actions, liabilities, or causes of action that are asserted against any Indemnitee by any person or entity if the claim, demand, action, liability, or cause of action, directly or indirectly, relates to a claim, demand, action, liability, or cause of action that the person or entity has or asserts based upon, arising out of, or in connection with, the Property, the conduct of Trustor, any action or non-action by Trustor in connection with the Property, or this Deed of Trust; and (ii) any and all claims, liabilities, losses, costs, or expenses (including court costs and attorneys' fees) that any Indemnitee suffers or incurs as a result of the assertion of any such claim, demand, action, liability or cause of action, except with respect to both (i) and (ii) to the extent that matters arise from the negligence, breach of contract or wrongful conduct of Trustor or Lender. The foregoing indemnity shall survive the release of this Deed of Trust, whether such release is as a result of payment of the indebtedness secured hereby, foreclosure, acceptance of a deed in lieu of foreclosure, other action, or otherwise.

**17.    Trustee's Rights And Duties To Sell The Property**. (a) In the event of a default under this Deed of Trust by Trustor, Lender may then or thereafter execute or cause the Trustee to execute a written notice of such default and of its election to have the Property sold to satisfy the obligations secured by this Deed of Trust. Such notice shall be recorded in the office of the Recorder of the County where the Property is located. (b) When the minimum period of time required by law following recordation of such notice of default has elapsed, and notice of sale having been given as then required by law, the Trustee, without demand upon Trustor, shall sell the Property at the time and place of sale fixed by it in the notice of sale, either as a whole or in separate parcels, and in such order as Lender may determine, at public auction to the highest bidder for cash or a cash equivalent acceptable to Trustee, in lawful money of the United States, payable at time of sale. Lender shall have the right, at its option, to offset Lender's bid(s) to the extent of the total amount due Lender, including but not limited to all Trustee's fees, costs, expenses (including, without limitation, premiums for guarantees or other evidence of title), and other amounts secured by this Deed of Trust. The Trustee may postpone the sale of all or any portion of the Property by public notice at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement at the time fixed by the preceding postponement. Additionally, Lender, from time to time before any Trustee's sale, may rescind or

{01018586}

cause to be rescinded any notice of default and election to sell or notice of sale by executing and delivering to Trustee a written notice of such rescission, which notice, when recorded, shall also constitute a cancellation of any prior declaration of default and demand for sale. The exercise by Lender of such right of rescission shall not constitute a waiver of any breach or default then existing or subsequently occurring, or impair the right of Lender to execute and deliver to Trustee, as above provided, other declarations or notices of default and demand for sale of the Property to satisfy the obligations hereof, nor otherwise affect any provision, covenant or condition of the Note or the Agreement or any of the rights, obligations or remedies of Trustee to Lender. (c) The Trustee shall deliver to the purchaser at such sale its deed conveying the Property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. (d) Any person, including Trustor, Lender or Trustee may purchase at such sale. After deducting all costs, fees and expenses of the Trustee and of this Trust, including, without limitation, cost of evidence of title and attorneys' fees in connection with the sale, the Trustee shall apply the proceeds of the sale to the payment of: first, all sums expended under the terms of this Deed of Trust not then repaid, with interest at the applicable rate of interest set forth in the Note; second, the payment of all other sums then secured by this Deed of Trust; and third, the remainder, if any, to the person or persons legally entitled to such proceeds.

     **18.**   **Other Remedies If Trustor Defaults**.  (a) All of the remedies of Lender and Trustee set forth in this Deed of Trust are intended to be in addition to and not in substitution for any other remedies available to Lender or Trustee at law or in equity. It is expressly understood and agreed that Lender or Trustee, or both, may bring suit in any court of competent jurisdiction to foreclose this Deed of Trust by judicial action or to obtain specific performance of the assignment of rents contained in this Deed of Trust. In connection with any such action, Lender or Trustee may apply to the court for the appointment of a receiver to take possession of the Property, operate the business of Trustor being conducted on the Property, utilize and enforce all agreements of Trustor in respect of the operation of such business, the utilization of any such agreement being at the election of Lender or the receiver, to be exercised at any time after declaration of a default hereunder, receive the rents of the Property and apply the same to the obligations of Trustor under this Deed of Trust and under the Note and any other obligations secured by this Deed of Trust. (b) Neither the acceptance of this Deed of Trust nor its enforcement in any manner shall prejudice the right of Lender or Trustee to realize upon or enforce any other security now or later held by Lender or Trustee. Trustor promises and agrees that the rights of Lender and Trustee under this Deed of Trust, and with respect to any other security now or later held by Lender, may be enforced in such order and manner as Lender and Trustee, or either of them, may determine in their sole and absolute discretion.

     **19.**   **Trustor's Obligations And Lender's Rights Not Waived**.  By accepting payment of any sum secured by this Deed of Trust after its due date, or by accepting late performance of any obligation secured by this Deed of Trust, or by making any payment or performing any act on behalf of Trustor that Trustor was obligated to make or perform under this Deed of Trust but failed to make or perform, or by adding any payment so made by Lender to the Note secured by this Deed of Trust, Lender does not waive its right either to require prompt payment when due of all other sums so secured or to declare default for failure to make any such

-10-

prompt payment or to perform any such act.  No failure or delay on the part of Lender, Trustee, or any holder of the Note or this Deed of Trust in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof.  No single or partial exercise of any such power, right or privilege shall preclude other or further exercise thereof or of any other right, power or privilege.  No exercise of any right or remedy of Lender or Trustee under this Deed of Trust shall constitute a waiver of any other right or remedy contained in this Deed of Trust or provided by law.  All rights and remedies existing under this Deed of Trust are cumulative to, and not exclusive of, any rights or remedies otherwise available.

    20.    **Successors In Interest**.  The terms, agreements, and conditions contained in this Deed of Trust shall apply to, be binding upon and inure to the benefit of, all of the parties to this Deed of Trust, their heirs, personal representatives, successors and assigns.

    21.    **Statements Concerning The Status Of The Loan**.  From time to time as required by law, Lender shall furnish to Trustor such statements as may be required concerning the status of the obligations secured by this Deed of Trust.  Trustor promises and agrees to pay upon demand for such statements a commercially reasonable amount prescribed by Lender.

    22.    **Trustee's Obligations**.  The Trustee accepts this Trust when this Deed of Trust, duly executed and acknowledged, is made a public record as provided by law.  The Trustee is not obligated to notify any party to this Deed of Trust of pending sale under any other deed of trust or of any action or proceeding in which Trustor, Lender or Trustee is a party unless such action is brought by the Trustee.  The Trustee shall not be obligated to perform any act required of it under this Deed of Trust unless the performance of such act is requested in writing and the Trustee is reasonably indemnified against loss, costs, liability and expense.

    23.    **Obligations Of Trustor Are Joint And Several; Gender And Number**.  If more than one person has executed this Deed of Trust as "Trustor," the obligations of all such persons under this Deed of Trust shall be joint and several.  In this Deed of Trust, whenever the context so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

    24.    **No Offsets**.  No offset or claims which Trustor now or in the future may have against Lender shall relieve Trustor from making payments or performing any other obligations contained in or secured by this Deed of Trust.  Despite any right or option that may be granted to Lender or Trustee by this Deed of Trust or in the evidence of any obligations secured by this Deed of Trust or document ancillary to this Deed of Trust to receive, collect, accept deposit of, use, apply or in any other manner obtain or dispose of any funds or property, the same shall not be deemed to constitute any credit against or to satisfy any obligation secured by this Deed of Trust, in whole or in part, unless and until such funds or property shall be both so obtained and expressly so applied by Lender or Trustee to such satisfaction of such obligation and then only in the manner and to the extent of such application.

    25.    **Beneficiary Not Responsible.**  Under no circumstances shall Beneficiary have any duty to produce rents from the Property.  Regardless of whether or not Beneficiary, in person

-11-

{01018586}

or by agent, takes actual possession of the Premises and Improvements, unless Beneficiary agrees in writing to the contrary, Beneficiary is not and shall not be deemed to be:

        (a)     A "mortgagee in possession" for any purpose; or

        (b)     Responsible for performing any of the obligations of the lessor under any lease; or

        (c)     Responsible for any waste committed by lessees or any other parties, any dangerous or defective condition of the Property, or any negligence in the management, upkeep, repair or control of the Property; or

        (d)     Except in cases of Beneficiary's gross negligence or willful misconduct, liable in any manner for the Property or the use, occupancy, enjoyment or operation of all or any part of it.

    **26.**    **Representations and Warranties**. Trustor represents and warrants that:

        (a)     Subject to the Permitted Exceptions (as defined in the Loan Agreement), Trustor lawfully possesses and holds fee simple title to all of the Premises and Improvements;

        (b)     Trustor has the full and unlimited power, right and authority to encumber the Property and assign the rents; and

        (c)     This Deed of Trust, when properly recorded in the appropriate records, creates a first and prior lien on the Property, subject only to the Permitted Exceptions (as defined in the Agreement) and any mechanics' liens insured against by a tile policy in accordance with Section 2.14 of the Agreement.

    **27.**    **Subrogation**.  Beneficiary shall be subrogated to the liens of all encumbrances, whether released of record or not, which are discharged in whole or in part by Beneficiary in accordance with this Deed of Trust or with the proceeds of any loan secured by this Deed of Trust.

    **28.**    **Postponement of Trustee's Sale**.  Trustee may postpone the sale of all or any portion of the Property in accordance with California Civil Code §2924g, by public announcement at the time and place of sale, and from time to time thereafter Trustee may postpone such sale by public announcement at the time fixed by the preceding postponement or as otherwise allowed by said statute.

    **29.**    **Governing Law**.  The loan secured by this Deed of Trust is made pursuant to the laws of the State of California, and the rules and regulations promulgated thereunder.  The loan contracts between the parties, including this Deed of Trust, shall be construed and governed by such laws, rules, and regulations.

    **30.**    **Agreement Changed Only By Writing**.  This Deed of Trust cannot be changed except by agreement in writing signed by Trustor and Lender.

{01018586}

31.    **Time**. Time is of the essence in connection with all of Trustor's obligations under this Deed of Trust.

32.    **Notice**. Except for any notice required under applicable law to be given in another manner:

(a)    any notice to Trustor provided for in this Deed of Trust shall be addressed to Trustor at the address of Trustor set forth above, or to such other address as Trustor may designate by notice to Lender pursuant to the terms of paragraph 32(c),

(b)    any notice to Lender provided for in this Deed of Trust shall be addressed to Lender as follows:

Beach Orangethorpe Hotel, LLC
3100 E. Imperial Highway
Lynwood, California 90262
Telephone: 310-631-6789

and to such other address as Lender may designate by notice to Trustor, pursuant to the terms of paragraph 32(c);

(c)    Except as otherwise provided by law, all notices, requests, demands, directions, and other communications provided for in this Deed of Trust must be in writing mailed, telegraphed, delivered, or sent by telex, facsimile, cable or other form of electronic written communication to the appropriate party at its respective address. Any notice given by telegram, telex, facsimile, cable or other form of electronic written communication must be confirmed within forty-eight (48) hours by letter mailed or delivered to the appropriate party at its respective address. If any notice is given by mail it will be effective when deposited in the mails with first-class or airmail postage prepaid; if given by telegraph or cable, when delivered to the telegraph company with charges prepaid; if given by telex, facsimile or other form of electronic written communication, when sent; or if given by personal delivery, when delivered.

33.    **Titles, Captions, And Headings**. The titles, captions, and headings to paragraphs contained in this Deed of Trust are for assistance in identification only and are not to be considered part of the substance of the provisions of this Deed of Trust.

34.    **Severability Of Provisions**. If any paragraph, clause or provision of this Deed of Trust is construed or interpreted by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those paragraphs, clauses or provisions so construed or interpreted and shall not affect the remaining paragraphs, clauses and provisions of this Deed of Trust.

35.    **Acknowledgment Of Trustor's Understanding Of Deed Of Trust**.    The foregoing terms, provisions and conditions of this Deed of Trust have been read and are understood by Trustor. Trustor hereby acknowledges receipt of a copy of this Deed of Trust.

{01018586}

36.   **Lender's Reliance**.  The financial accommodations made or to be made by Lender to Trustor are being made, renewed or extended, as applicable, by Lender to Trustor at the request and urging of Trustor and this Deed of Trust is being given in consideration of such financial accommodations, and Lender may rely upon the validity and enforceability of this Deed of Trust in making such financial accommodations.

37.   **Security Agreement**.

(a)   Security Interest.  This Deed of Trust shall also constitute and serve as a security agreement and financing statement for Personalty, Fixtures, and any of the Property in which a security interest can be perfected under and within the meaning of Division 9 of the California Uniform Commercial Code, and shall grant to Lender, until the obligations secured hereby shall be satisfied, a second priority security interest (i.e., junior to the security interest referenced in Paragraph 13(a) above), including but not limited to a fixture filing, pursuant to Division 9 of the California Uniform Commercial Code with respect to the Personalty and Fixtures.  To this end, Trustor shall and hereby does grant to Lender, a second priority security interest (i.e., junior to the security interest referenced in Paragraph 13(a) above) in, under and to the Personalty, Fixtures, and any of the Property in which a security interest can be perfected under Division 9 of the California Uniform Commercial Code.

(b)   Financing Statements.  Trustor shall deliver to Lender, in form and substance satisfactory to Lender, such financing statements and further assurances as Lender may, from time to time, require to create, perfect, and preserve Lender's security interest herein granted, and Lender may cause such financing statements and assurances to be recorded and filed at such times and places as may be required or permitted by law to so create, perfect and preserve such security interest.

(c)   Remedies on Default.  Upon default, Lender may, at its option: (i) exercise any remedy permitted by law or in equity, including without limitation, all the rights and remedies of a secured party under the California Uniform Commercial Code in any jurisdiction where enforcement is sought, whether in California or elsewhere; (ii) notify any parties obligated on any of the Personalty or Fixtures to make payment to Lender and enforce collection thereof; (iii) apply any sums received or collected from or on account of any Personalty or Fixtures, including the proceeds of any sales thereof, to the payment of any indebtedness of Trustor to Lender in any order, including the costs and expenses incurred in preserving and enforcing the rights of Lender and attorneys' fees, in such order and manner as Lender in Lender's sole discretion determines.  All of Lender's rights and remedies shall be cumulative and not exclusive.

(d)   Fixture Filing.  This Deed of Trust shall constitute a fixture filing under the California Uniform Commercial Code.  Lender's address from which information concerning Lender's security interest can be obtained is set forth in paragraph 32 above, subject to change as therein provided.

38.   **Sale Of Interest**.  Trustor acknowledges and accepts that Lender may, at any time, in Lender's sole discretion sell all or any portion of Lender's interest in the Note and this

-14-

Deed of Trust to one or more third parties. The sale of all or any part of Lender's interest in the Note or Deed of Trust shall not relieve Trustor of any of Trustor's obligations hereunder.

39.     **Separate Property**.  Any married person executing this Deed of Trust in an individual capacity agrees that recourse may be had to his or her separate property for satisfaction of all sums secured under this Deed of Trust.

40.     **Books And Records**.  Trustor shall keep and maintain copies of all written contracts, leases, rental agreements, concessions, licenses, and other documents and instruments which affect the Property, or any portion thereof or interest therein.  Such books, records, contracts, leases, documents, and other instruments shall be subject to examination and inspection by Lender, or Lender's agents or designated auditors, from time to time, at reasonable times after five (5) days notice to Trustor.

41.     **Inspection, Appraisal, And Assessments**.  Lender may, at any time and from time to time and as and when Lender deems it to be appropriate, whether or not Trustor is then in default, (a) enter upon the Premises, directly or through one or more agents or independent contractors, to inspect any and all Property which is security for the obligations herein described, and (b) cause to be performed and prepared one or more appraisals and/or preliminary or other environmental assessments of the Property, or any portion thereof, in form and content satisfactory to Lender and meeting all requirements or standards of applicable laws, regulations, ordinances, orders, and generally recognized industry standards relating thereto.  If Trustor is then in default under this Deed of Trust, all costs and expenses incurred by Lender or Trustee in connection with any such inspection, appraisal, or assessment, shall be payable by Trustor upon demand and shall be secured by this Deed of Trust.

42.     **WAIVER**.  FURTHER, TRUSTOR AND LENDER, TO THE EXTENT PERMITTED BY LAW, EACH HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THIS DEED OF TRUST, THE NOTE OR ANY CONDUCT, ACT OR OMISSION OF LENDER OR TRUSTOR, OR ANY OF THEIR RESPECTIVE DIRECTORS, OFFICERS, MANAGERS, MEMBERS, TRUSTEES, EMPLOYEES OR AGENTS, OR ANY OTHER PERSONS AFFILIATED WITH LENDER OR TRUSTOR, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

43.     **Definitions**.  All terms not defined herein shall be defined as set forth in the Agreement.

THE UNDERSIGNED TRUSTOR REQUESTS THAT A COPY OF ANY NOTICE OF DEFAULT AND ANY NOTICE OF SALE HEREUNDER BE MAILED TO TRUSTOR AT TRUSTOR'S ADDRESS SET FORTH ABOVE.

-15-

{01018586}

[SIGNATURE PAGE FOLLOWS]

{01018586}

IN WITNESS WHEREOF, Trustor has executed this Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing as of the date first above written.

**TRUSTOR:**

THE SOURCE HOTEL, LLC,
a California limited liability company

By: M+D Properties,
a California corporation,
its Manager

By: _____
Donald Chae, CEO

**(ALL SIGNATURES MUST BE ACKNOWLEDGED)**

S-1

# ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of CALIFORNIA                    )
County of ___Orange___                )

On __August 25, 2017__ before me, __Justine Chae_____, a Notary Public, personally appeared _____Donald Chae_____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_Justine Chae_____
Notary Public                          (Seal)

JUSTINE CHAE
COMM. #2170402
NOTARY PUBLIC ● CALIFORNIA
ORANGE COUNTY
Comm. Expires Nov. 3, 2020

{01018586}

Notarization for Deed of Trust, Assignment of Rents,
Security Agreement and Fixture Filing

## EXHIBIT "A"
LEGAL DESCRIPTION

**The land referred to herein is situated in the State of California, County of Orange, City of Buena Park, and described as follows:**

**The land referred to herein is situated in the State of California, County of Orange and described as follows:**

THAT PORTION OF LOT 2 IN BLOCK 61 OF BUENA PARK, IN THE CITY OF BUENA PARK, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 18, PAGES 50 TO 52 INCLUSIVE, OF MISCELLANEOUS MAPS, AND THOSE PORTIONS OF LOTS 5 TO 9 INCLUSIVE OF TRACT NO. 1756, AS PER MAP RECORDED IN BOOK 60 PAGES 20 AND 21 OF MISCELLANEOUS MAPS, ALL IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

PARCEL 4A (LEVEL 1 - GROUND FLOOR LOBBY & ENTRANCE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 215.36 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 45.77 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE S 00°00'02" W 86.05 FEET, THENCE N 89°59'59" W 22.68 FEET, THENCE S 00°01'05" W 13.56 FEET, THENCE S 89°59'59" E 22.57 FEET, THENCE S 00° 00'02" W 8.22 FEET, THENCE N 89°59'58" W 0.77 FEET, THENCE S 00°00'02" W 34.16, THENCE N 89°59'58" W 110.62 FEET, THENCE N 00°00'02" E 34.17 FEET, THENCE N 89°59'58" W 30.58 FEET, THENCE N 00°00'02" E 107.52 FEET, THENCE N 89°59'58" W 0.83 FEET, THENCE N 00°00'02" E 8.95 FEET, THENCE S 89°59'58" E 24.08 FEET, THENCE N 46°29'04" E 12.47 FEET, THENCE N 00°00'02" E 16.97 FEET, THENCE S 89°59'58" E 18.12 FEET, THENCE N 00°00'02" E 5.22 FEET, THENCE N 89°57'39" E 30.73 FEET, THENCE N 00°00'02" E 32.17 FEET, THENCE N 89°59'58" W 11.92 FEET, THENCE N 00°00'02" E 1.00 FEET, THENCE S 89°59'58" E 0.50 FEET, THENCE N 00°00'02" E 14.21 FEET, THENCE S 89°59'58" E 39.78 FEET, THENCE S 00°00'02" W 86.82 FEET, THENCE S 89°59'58" E 32.58 FEEL TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 77.76 FEET.

PARCEL 4B (LEVEL 1 - GROUND FLOOR STAIRS ON ORANGETHORPE AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF ORANGETHORPE AVENUE AS SHOWN ON SAID MAP S 89°27'51" E 199.02 FEET; THENCE LEAVING SAID CENTERLINE N 0°32'09" E 60.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE N 0°00'02" E 36.96 FEET; THENCE S 89°59'58" E 14.74 FEET; THENCE S 0°00'02" W TO A POINT ON SAID PARALLEL LINE; THENCE ALONG SAID PARALLEL LINE N 89°27'51" W 14.74 TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 77.76 FEET.

PARCEL 4C (LEVEL 1 - GROUND FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 339.38 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 46.71 FEET TO THE TRUE POINT OF

BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 23.40 FEET; THENCE SOUTH 7.24 FEET; THENCE WEST 5.88 FEET; THENCE SOUTH 6.55 FEET; THENCE WEST 29.28 FEET; THENCE NORTH 13.79 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 77.76 FEET.

PARCEL 4D (LEVEL 2 - SECOND FLOOR HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 223.82 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE S 00°27'49" W 94.43 FEET; THENCE N 89°59'59" W 31.75 FEET; THENCE S 00°01'05" W 13.56 FEET; THENCE S 89°59'59" E 31.65 FEET; THENCE S 00° 27'49" W 36.79 FEET; THENCE S 45°29'59" W 26.85 FEET; THENCE N 89°27'51" W 110.52 FEET; THENCE N 00°00'02" E 36.98 FEET; THENCE N 89°59'58" W 19.37 FEET; THENCE S 00°00'02" W 25.13 FEET; THENCE N 89°59'58" W 12.81 FEET; THENCE N 00°00'02" E 90.73 FEET; THENCE S 89° 59'58" E 62.50 FEET; THENCE N 00°00'00" E 30.00 FEET; THENCE S 89°59'58" E 15.42 FEET; THENCE N 00°00'02" E 29.98 FEET; THENCE S 89°59'58" E 85.09 FEET; TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET.

PARCEL 4E (LEVEL 2 - SECOND FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 339.38 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 46.71 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 23.40 FEET; THENCE SOUTH 7.24 FEET; THENCE WEST 5.88 FEET; THENCE SOUTH 6.55 FEET; THENCE WEST 29.28 FEET; THENCE NORTH 13.79 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET.

PARCEL 4F (LEVEL 3 -THIRD FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 339.38 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 46.71 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 23.40 FEET; THENCE SOUTH 7.24 FEET; THENCE WEST 5.88 FEET; THENCE SOUTH 6.55 FEET; THENCE WEST 29.28 FEET; THENCE NORTH 13.79 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET.

PARCEL 4G (LEVEL 3 - THIRD FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND

BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE
CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 186.84 FEET; THENCE
LEAVING SAID CENTERLINE N 89°32'11" W 45.54 FEET TO THE TRUE POINT OF BEGINNING OF
THE HEREIN DESCRIBED PARCEL; THENCE WEST 22.05 FEET; THENCE SOUTH 9.15 FEET;
THENCE EAST 5.84 FEET; THENCE SOUTH 10.38 FEET; THENCE WEST 1.58 FEET; THENCE
SOUTH 4.17 FEET; THENCE EAST 9.81 FEET; THENCE SOUTH 10.37 FEET; THENCE EAST 12.08
FEET; THENCE NORTH 9.62 FEET; THENCE EAST 1.44 FEET; THENCE NORTH 24.44 FEET TO THE
SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN
ELEVATION OF 150.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76
FEET.

PARCEL 4H (LEVEL 3 - THIRD FLOOR STAIRS ON ORANGETHORPE AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND
BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE
CENTERLINE OF ORANGETHOPE AVENUE AS SHOWN ON SAID MAP S 89°27'51" E 199.02 FEET;
THENCE LEAVING SAID CENTERLINE N 0°32'09" E 60.00 FEET TO A POINT ON A LINE PARALLEL
WITH, AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE
OF ORANGETHORPE AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN
DESCRIBED PARCEL; THENCE N 0°00'02" E 36.96 FEET; THENCE S 89°59'58" E 14.74 FEET;
THENCE S 0°00'02" W TO A POINT ON SAID PARALLEL LINE; THENCE ALONG SAID PARALLEL
LINE N 89°27'51" W 14.74 TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN
ELEVATION OF 150.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76
FEET.

PARCEL 4I (LEVEL 4 - FOURTH FLOOR HOTEL PARCEL INCLUDING DECK)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND
BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE
CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE
LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH,
AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF
BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL;
THENCE WEST 72.90 FEET; THENCE SOUTH 13.76 FEET; THENCE WEST 18.27 FEET; THENCE
SOUTH 114.50 FEET; THENCE WEST 92.89 FEET; THENCE SOUTH 130.52 FEET; THENCE EAST
12.99 FEET; THENCE SOUTH 32.75 FEET TO A POINT ON A LINE PARALLEL WITH AND 60.00 FEET
NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE
AVENUE; THENCE ALONG SAID PARALLEL LINE S 89°27'51" E 143.94 FEET; THENCE N 45°29'59" E
26.85 FEET TO A POINT ON SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE;
THENCE ALONG LAST SAID PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF
BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN
ELEVATION OF 161.18 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76
FEET.

PARCEL 4J (LEVEL 5 - FIFTH FLOOR HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND
BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE
CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE
LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH,
AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF
BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL;
THENCE WEST 72.90 FEET; THENCE SOUTH 165.38 FEET; THENCE WEST 6.81 FEET; THENCE

SOUTH 20.33 FEET; THENCE EAST 6.81 FEET; THENCE SOUTH 28.65 FEET; THENCE WEST 105.43
FEET; THENCE SOUTH 44.42 FEET; THENCE EAST 12.99 FEET; THENCE SOUTH 32.75 FEET TO A
POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT
ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE; THENCE ALONG SAID
PARALLEL LINE S 89°27'51" E 143.94 FEET; THENCE N 45°29'59" E 26.85 FEET TO A POINT ON
SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE; THENCE ALONG LAST SAID
PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN
ELEVATION OF 171.60 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 161.18
FEET.

PARCEL 4K (LEVEL 6 - SIXTH FLOOR HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE
AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE
CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE
LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH,
AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF
BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL;
THENCE WEST 72.90 FEET; THENCE SOUTH 165.38 FEET; THENCE WEST 6.81 FEET; THENCE
SOUTH 20.33 FEET; THENCE EAST 6.81 FEET; THENCE SOUTH 28.65 FEET; THENCE WEST 105.43
FEET; THENCE SOUTH 44.42 FEET; THENCE EAST 11.33 FEET; THENCE SOUTH 32.75 FEET TO A
POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT
ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE; THENCE ALONG SAID
PARALLEL LINE S 89°27'51" E 145.60 FEET; THENCE N 45°29'59" E 26.85 FEET TO A POINT ON
SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE; THENCE ALONG LAST SAID
PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN
ELEVATION OF 182.02 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 171.60
FEET.

PARCEL 4L (LEVEL 7 - SEVENTH FLOOR & ROOF HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE
AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE
CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE
LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH,
AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF
BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL;
THENCE WEST 72.90 FEET; THENCE SOUTH 165.38 FEET; THENCE WEST 6.81 FEET; THENCE
SOUTH 20.33 FEET; THENCE EAST 6.81 FEET; THENCE SOUTH 28.65 FEET; THENCE WEST 105.43
FEET; THENCE SOUTH 44.42 FEET; THENCE EAST 12.99 FEET; THENCE SOUTH 32.75 FEET TO A
POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT
ANGLES FROM, SAID CENTERLINE OF OANGETHORPE AVENUE; THENCE ALONG SAID
PARALLEL LINE S 89°27'51" E 143.94 FEET; THENCE N 45°29'59" E 26.85 FEET TO A POINT ON
SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE; THENCE ALONG LAST SAID
PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN
ELEVATION OF 210.00 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 182.02
FEET.

ELEVATIONS STATED HEREON ARE BASED ON THE NORTH AMERICAN VERTICAL DATUM OF
1988 (NAVD88) PER THE YEAR 2005 ADJUSTMENT BY THE ORANGE COUNTY SURVEYOR, USING
THE FOLLOWING BENCHMARK:

OCS BM 404-31-05 ELEV.=80.151 FEET (NAVD88, YEAR 2005 LEVELED) STATION IS AN OCS

ALUMINUM DISK STAMPED 404-31-05 SET IN THE SE'LY CORNER OF A 15 FT. X 4.5 FT. CONCRETE CATCH BASIN, LOCATED IN NE'LY PORTION OF INTERSECTION OF STANTON AVE. & ARTESIA BLVD., 28 FT. N'LY OF THE CENTERLINE OF ARTESIA BLVD. & 81 FT. E'LY OF THE CENTERLINE OF STANTON AVENUE. MONUMENT IS LEVEL WITH THE SIDEWALK

APN:  276-361-20 and 276-361-22
(End of Legal Description)



RECORDING REQUESTED BY
AND WHEN RECORDED, MAIL TO:

BEACH ORANGETHORPE HOTEL II, LLC
3100 E. Imperial Hwy.
Lynwood California 90262

Recorded in Official Records, Orange County
Hugh Nguyen, Clerk-Recorder

|| ||||||| ||| |||||||||||||||||||| |||||| 96.00
* $ R 0 0 0 9 5 2 0 6 0 5 $ *
2017000364570 1:22 pm 08/28/17
47 NC-5 D11 A36 U08 F15   24
0.00 0.00 0.00 0.00 69.00 0.00 0.00 0.00

Assessor's Parcel Nos.: See <u>Exhibit A</u>
276-361-20 & 22

===================================================

SPACE ABOVE THIS LINE FOR RECORDER'S USE

**DEED OF TRUST, ASSIGNMENT OF RENTS,
SECURITY AGREEMENT AND FIXTURE FILING**

This Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing (this "**Deed of Trust**") is made as of December 31, 2015 by THE SOURCE HOTEL, LLC, a California limited liability company ("**Trustor**"), whose address is 3100 East Imperial Highway, Lynwood, California 90262, to STEWART TITLE OF CALIFORNIA, INC., as Trustee ("**Trustee**"), for the benefit of BEACH ORANGETHORPE HOTEL II, LLC, a California limited liability company, as Beneficiary ("**Lender**" or "**Beneficiary**").

THIS DEED OF TRUST ALSO CONSTITUTES A FIXTURE FILING UNDER DIVISION 9 OF THE CALIFORNIA UNIFORM COMMERCIAL CODE AND COVERS GOODS WHICH ARE OR ARE TO BECOME FIXTURES ON THE REAL PROPERTY DESCRIBED ON EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.  TRUSTOR IS A RECORD OWNER OF AN INTEREST IN SAID REAL PROPERTY.

<u>GRANT IN TRUST</u>:

Trustor irrevocably grants, transfers, warrants and assigns to Trustee, in trust, for the benefit of Lender, with power of sale, all of Trustor's interest in that certain real property located in the County of Orange, California, described as:

SEE EXHIBIT "A" ATTACHED HERETO AND
INCORPORATED HEREIN BY THIS REFERENCE.

TOGETHER WITH:  All right, title and interest which Trustor now has or may later acquire in such real property and all appurtenances, easements, covenants, rights of way, tenements, hereditaments and appurtenances thereunto belonging or in any way appertaining thereto now or hereafter, and all of the estate, right, title, interest, claim, demand, reversion or remainder whatsoever of Trustor therein or thereto, at law or in equity, now or hereafter in possession or expectancy, including, without limitation, all mineral, oil, and gas rights and royalties and profits therefrom, all water and water rights and shares of stock pertaining to water and water rights, and all sewers, pipes, conduits, wires and other facilities furnishing utility or services to the real property (collectively, the "**Land**");

-1-

{01077355}

TOGETHER WITH: All right, title and interest which Trustor now has or may later acquire in and to all buildings, structures and improvements now or hereafter erected on the Land, including, without limitation, all plant equipment, apparatus, machinery and fixtures of every kind and nature whatsoever now or hereafter located on or forming part of said buildings, structures and improvements (collectively, the "**Improvements**"; the Land and Improvements being hereinafter sometimes collectively referred to as the "**Premises**");

TOGETHER WITH: All right, title and interest which Trustor now has or may later acquire in and to the land lying in the bed of any street, road, highway or avenue now or hereafter in front of or adjoining the Premises;

TOGETHER WITH: Any and all awards heretofore or hereafter made by any governmental authorities (federal, state, local or otherwise) to Trustor and all subsequent owners of the Premises which may be made with respect to the Premises as a result of the exercise of the right of eminent domain, the alteration of the grade of any street or any other injury to or decrease of value of the Premises, which said award or awards are hereby assigned to Lender;

TOGETHER WITH: Any claims under and proceeds of any insurance policies by reason of or related to a loss of any kind sustained to the Premises, now or hereafter, whether or not such policies name Lender as an insured and whether or not such policies are required by Lender, and whether or not such claims thereunder are characterized as personal claims;

TOGETHER WITH: Any and all unearned premiums accrued, accruing or to accrue, and the proceeds of insurance now or hereafter in effect with respect to all or any portion of the Premises;

TOGETHER WITH: Any and all claims or demands which Trustor now has or may hereafter acquire against anyone with respect to any damage to all or any portion of the Premises;

TOGETHER WITH: All goods, equipment, machinery, furniture, furnishings, trade fixtures, appliances, inventory, building materials, apparatus, utensils, vehicles, wiring, pipes, conduits, elevators, escalators, heating and air conditioning equipment, chattels and articles of personal property, including, without limitation, any interest therein now or at any time hereafter affixed to, attached to or used in any way in connection with or to be incorporated at any time into the Premises or placed on any part thereof wheresoever located, whether or not attached to or incorporated in the Premises, together with any and all accessions, accessories, attachments, and replacements thereof, appertaining and adapted to the complete and compatible use, enjoyment, occupancy, operation or improvement of the Premises;

TOGETHER WITH: All instruments, investment property, deposit accounts, accounts, contract rights, general intangibles, rights to receive refunds, including utility and real estate tax refunds, and other intangible property and rights now or hereafter relating to the foregoing property, or the operation thereof or used in connection therewith, including, without limitation, all options, letters of intent, and rights of first refusal of any nature whatsoever, covering all or any portion of such property, together with any modifications thereof, and deposits or other payments made in connection therewith, existing and future development rights, permits and approvals, air rights, density bonus rights, and transferable development rights; all of Trustor's right, title, and

{01077355}

interest in and to any awards, remunerations, settlements, or compensation heretofore made or hereafter made by any and all courts, boards, agencies, commissions, offices, or authorities, of any nature whatsoever for any governmental unit (federal, state, local or otherwise) to the present or any subsequent owner of the foregoing property, including those for any vacation of, or change of grade in, any streets affecting the foregoing property and any and all licenses and privileges obtained by Trustor from non-governmental sources;

TOGETHER WITH:  All leases of the Premises, Personalty, Fixtures, or any part thereof, now or hereafter entered into and all right, title and interest of Trustor thereunder, including, without limitation, cash or securities deposited thereunder to secure performance by the lessees of their obligations thereunder (whether such cash or securities are to be held until the expiration of the terms of such leases or applied to one or more of the installments of rent coming due immediately prior to the expiration of such terms); all other rights and easements of Trustor now or hereafter existing pertaining to the use and enjoyment of the Premises; and all right, title and interest of Trustor in and to all declarations of covenants, conditions and restrictions as may affect or otherwise relate to the Premises;

TOGETHER WITH:  All permits, plans, licenses, specifications, subdivision rights, security interests, contracts, contract rights, public utility deposits, prepaid sewer and water hook-up charges, or other rights as may affect or otherwise relate to the Property (as hereinafter defined);

TOGETHER WITH:  All rents, income, issues and profits (subject, however, to the rights given in this Deed of Trust to Lender to collect and apply same), including, without limitation, the accounts, revenues, and proceeds of any business operation conducted by or on behalf of Trustor on or through the use of the Premises, prepaid municipal and utility fees, bonds, revenues, income, and other benefits to which Trustor may now or hereafter be entitled to, or which are derived from, the Property or any portion thereof or interest therein.

The foregoing listing is intended only to be descriptive of the property encumbered hereby, and not exclusive or all inclusive.  It is the intent of Trustor to encumber hereby all property located or to be located upon the above-described real property. Said real property (or the leasehold estate if this Deed of Trust encumbers a leasehold estate), buildings, improvements, appurtenances, Fixtures, Personalty, additions, accretions, and other property are herein referred to as the "**Property**." As used herein, the term "**Fixtures**" shall include all articles of personal property hereinabove described, now or hereafter attached to, placed upon for a definite term, or otherwise used in connection with the Property, and shall include trade fixtures and goods which are or are to become fixtures. As used herein, the term "**Personalty**" shall include all furniture, furnishings, equipment, machinery, goods, contract rights, general intangibles, money, deposit accounts, instruments, accounts, leases, chattel paper and other personal property described in this Deed of Trust (other than Fixtures) of any kind or character now existing or hereafter arising or acquired, now or hereafter located upon, within or about the Property, or which otherwise pertains to the use, ownership, management, operation, construction, leasing and sale of the Property, and all products and proceeds thereof, and all of Trustor's right, title, and interest in and to all such property.

{01077355}

Trustor makes the foregoing grant to Trustee, and to Lender, as applicable, to hold the Property in trust for the benefit of Lender and for the purposes and upon the terms and conditions hereinafter set forth.

FOR THE PURPOSE OF SECURING:

(1)    Payment of the sum of Eleven Million Five Hundred Thousand and No/100 Dollars ($11,500,000.00), or such portion thereof as is advanced to Trustor pursuant to the Agreement, hereafter defined, together with interest thereon and certain additional costs and expenses related to or incurred in connection with or as provided in that certain Promissory Note, in the maximum principal amount of Eleven Million Five Hundred Thousand and No/100 Dollars ($11,500,000.00), executed by Trustor, payable to Lender, or order, and all extensions, modifications or renewals thereof (including, without limitation, any extension, modification, or renewal of the Note at a different rate of interest or on different terms) (individually and collectively, the "**Note**");

(2)    Performance of each and every term, covenant and condition of that certain Loan Agreement, by and between Trustor and Lender, and all modifications, renewals or extensions thereof (the "**Agreement**");

(3)    Payment of all other sums, with interest, advanced, paid, or incurred by Lender or Trustee under the terms of this Deed of Trust to protect the Property or Lender's security interest therein;

(4)    Payment of such additional sums, with interest, as the then record owner of the Property may later borrow from Lender, in those instances in which the later obligations are evidenced by a promissory note or notes reciting that it or they are so secured (which additional obligations shall be referred to as "future advances" in this Deed of Trust);

(5)    Trustor's performance of each agreement in this Deed of Trust.

**TRUSTOR AND LENDER AGREE AS FOLLOWS:**

**RIGHTS AND DUTIES OF THE PARTIES**.

1.    **Payment And Performance By Trustor**.  Trustor shall promptly: (a) perform each and every term, covenant and condition of this Deed of Trust and any other obligation secured by this Deed of Trust; (b) pay when due the Note; and (c) pay when due any future advances.

2.    **Payment By Trustor Of Taxes And Other Impositions**.  The term "**Taxes**" shall mean all taxes, bonds and assessments, both general and special, affecting or levied upon the Property or any part thereof, assessments on water company stock, if any, all taxes or excises levied or assessed against Trustor, the Property, or any part thereof, in addition to or as a substitution in whole or in part for any real estate taxes or assessments, all taxes or excises measured by or based in whole or in part upon the rents, operating income, or any other factor relating to the Property, or any part thereof, and all license fees, taxes and excises imposed upon Lender (but not any federal or state income taxes imposed upon Lender) and measured by or

-4-

{01077355}

based in whole or in part upon the obligations secured hereby. The term "**Other Impositions**" shall mean any fine, fee, charge, or other imposition in connection with the Property or Trustor, payment of which Lender shall deem to be necessary to protect, preserve, and defend Lender's interests hereunder.  Trustor shall pay all Taxes, insurance premiums, and Other Impositions attributable to the Property, at least fifteen (15) days before delinquency directly to the payee thereof, or in such other manner as Lender may designate in writing.  Trustor shall promptly furnish to Lender all notices of amounts due under this paragraph, and if Trustor shall make payment directly, Trustor shall furnish to Lender receipts evidencing payments of Taxes at least ten (10) days before delinquency and shall promptly deliver to Lender receipts evidencing all other payments above required.

  **3.**  <u>**Trustor To Pay Senior Obligations and Other Obligations**</u>. Trustor shall fully and faithfully pay and perform each and every obligation, and otherwise satisfy all conditions and covenants, which are or may be secured by any deed of trust upon the Property, or any portion thereof, existing of record as of the date this Deed of Trust is recorded, and/or to which this Deed of Trust may be subordinate.  Trustor shall pay at or prior to maturity any and all liens, charges and encumbrances that are, later become, claim to be or appear to Lender to be prior or superior to the lien of this Deed of Trust, including, without limiting the generality of the foregoing, any and all claims for (a) work or labor performed, (b) materials and services supplied in connection with any work of demolition, alteration, improvement of or construction upon the Property, and (c) fees, charges and liens for utilities provided to the Property. Trustor acknowledges that its obligations to EverTrust Bank in connection with the loan referenced in paragraph 13(a) below are senior to the lien of this Deed of Trust.

  **4.**  <u>**Trustor To Maintain Insurance**</u>.  (a) Trustor shall maintain (i) insurance covering the Property against loss or damage by fire and other risks customarily included in an "all risk" insurance policy, and (ii) a policy of liability insurance for claims resulting from injury to or death of any person, or the damage to property belonging to any person, bu reason of Trustor's ownership, use or occupancy of the Property or Beneficiary's interest hereunder.  The insurance policies shall be maintained with such companies, in such amounts, for such terms, and in form and content satisfactory to Lender, in Lender's reasonable opinion and judgment. Lender shall be named as an additional insured.  (b) If such insurance, together with written evidence of the premium having been paid, are not delivered to Lender at least five (5) days prior to the expiration of such insurance, Lender shall have the right, but without obligation to do so, without notice to or demand upon Trustor and without releasing the Trustor from any obligation under this Deed of Trust, to obtain such insurance or like insurance through or from any insurance agency or company acceptable to it, pay the premium for such insurance, and add the amount of the premium to the loan secured by this Deed of Trust, and this amount shall bear interest at the applicable rate of interest set forth in the Note. Neither the Trustee nor Lender shall be responsible for such insurance or for the collection of any insurance monies, or for any insolvency of any insurer or insurance underwriter. (c) In the event that the Property is sold to Lender at any trustee's sale under this Deed of Trust (see paragraph 17, below), Trustor hereby assigns to Lender all unearned premiums on all policies of insurance covering the Property and agrees that any and all unexpired insurance covering the Property shall inure to the benefit of and pass to Lender at the time of such Trustee's sale.

{01077355}

**5.     Condemnation Proceeds**.  All settlements, awards, damages and proceeds received by Trustor or any other person in connection with any condemnation for public use of or injury to the Property (or any part of or interest in the Property) (collectively "**Awards**") shall be applied in accordance with the documents evidencing and securing the loan to Trustor by EverTrust Bank referenced in paragraph 13(a) below.  Subject to the preceding sentence, all Awards shall be applied by Trustor to reduce the principal balance of the Note or any other obligation secured by this Deed of Trust and/or to replace, restore or reconstruct the Property to a condition reasonably satisfactory to Lender.  Any remaining portion of the Award shall be released to Trustor.

**6.     Maintenance And Preservation Of The Property**.  Trustor shall:  (i) keep the Property, and every portion thereof, in good condition and repair; (ii) not remove or demolish the Property, or any part thereof, except as may be commercially reasonable under the circumstances; (iii) complete or restore promptly and in good and workmanlike manner the Property, or any part thereof, which may be damaged or destroyed, to the extent that it is commercially reasonable to do so; (iv) comply with (A) any and all applicable and legally valid laws, ordinances, governmental rules, regulations, standards and orders; (B) any and all covenants, conditions, restrictions, equitable servitudes and easements, whether public or private, of every kind and character, and (C) any and all requirements of insurance companies and any bureau or agency which establishes standards of insurability, which laws, covenants or requirements affect the Property and/or pertain to acts committed or conditions existing thereon, or the use, management, operation or occupancy thereof by Trustor and anyone holding under Trustor, including (but without limitation) such work of alteration, improvement or demolition as such laws, covenants or requirements mandate; (v) not commit or permit waste of the Property, or any portion thereof; and (vi) do all other acts which from the character or use of the Property may be reasonably necessary to maintain and preserve its value.

**7.     Lender's Rights To Inspect The Property**.  Lender and its agents, employees and contractors, may enter upon the Property at any reasonable time to inspect the Property for any purpose relating to Lender's rights and interests under the terms of this Deed of Trust.

**8.     Substitution Of Trustee**.  From time to time, by an instrument signed and acknowledged by Lender, and recorded in the Office of the Recorder of the County in which the Property is located, Lender may appoint a substitute Trustee or Trustees in place of the Trustee named in this Deed of Trust.  Such instrument shall refer to this Deed of Trust and shall set forth the date and instrument number or book and page of its recordation.  Upon recordation of such instrument, the Trustee named in this Deed of Trust shall be discharged and the new Trustee so appointed shall be substituted as Trustee under this Deed of Trust with the same effect as if originally named Trustee in this Deed of Trust.  An instrument recorded pursuant to the provisions of this paragraph 8 shall be conclusive proof of the proper substitution of such new Trustee.

**9.     Miscellaneous Powers Of Lender And Trustee**.  In addition to any other powers granted in this Deed of Trust to the Trustee, from time to time, upon the written request of Lender and upon the presentation of this Deed of Trust and any obligation secured by this Deed of Trust for endorsement, and without affecting any obligation secured by this Deed of Trust or the performance of the obligations set forth in this Deed of Trust, the Trustee may, without

-6-

liability and without notice to any person: reconvey all or any part of the Property to Trustor, consent to the making of any map or plat of the Property, join in granting any easement on the Property, join in any agreement subordinating the lien of this Deed of Trust, release any obligation secured by this Deed of Trust, in whole or in part, with regard to any Trustor, extend or renew the Note or any other obligation secured by this Deed of Trust, accept or release any additional security under this Deed of Trust, or accept and release the guaranty of any additional person or any obligation secured by this Deed of Trust.

     **10.**    <u>**Assignment And Collection Of Rents**</u>. (a) Trustor hereby assigns absolutely to Lender the rents of the Property, with a revocable license to collect such rents as they become due and payable, prior to any default by Trustor (as defined in paragraph 14 of this Deed of Trust), being retained by Trustor. (b) Upon any default by Trustor under paragraph 14 of this Deed of Trust, such license will, automatically, be deemed revoked without the necessity for any act or notice by Lender, and Lender, in person, by agent or by judicially appointed receiver, shall be entitled to enter upon, take possession of and manage the Property and may collect the rents of the Property, and, after so taking possession, shall be entitled to collect any rents that are past due. If Trustor, at or immediately prior to such taking of possession by or on behalf of Lender, has operated a business upon the Property other than the rental thereof, the authority granted herein to so take possession of the Property shall also include the authority and power to take possession of the receipts of such business and, if appropriate, to operate such business, and the receipts thereof shall be deemed herein to be a form of rents. All rents collected by Lender or the receiver shall be applied first to payment of the costs of management of the Property and of collection of rents, including, but not limited to, costs and expenses of any receivership and reasonable attorneys' fees incurred by Lender in connection with the receivership, and then to the Note and any other obligations secured by this Deed of Trust. Lender and the receiver shall be liable to account only for those rents actually received. The assignment of rents and leases herein is junior to the obligations of Trustor in favor of EverTrust Bank in connection with the loan referenced in paragraph 13(a) below.

     **11.**    <u>**Reconveyance Of The Property**</u>. (a) Upon the written request of Lender stating that the Note and all other obligations secured by this Deed of Trust have been discharged, and upon surrender of this Deed of Trust, the Note or any other notes or instruments evidencing such other obligations to the Trustee, and upon payment of the Trustee's fees, the Trustee shall reconvey, without warranty, the Property or that portion of the Property then held by the Trustee under this Deed of Trust. (b) If the I-829 petitions of any investor members of Beneficiary have not been finally determined, Trustor shall have the right to obtain a reconveyance of this Deed of Trust by depositing cash collateral into an escrow account reasonably satisfactory to Beneficiary. Such cash collateral, which shall be in an amount equal to the outstanding balance of principal and interest payable under the Note plus any other amounts owed by Trustor pursuant to the Loan Documents, shall be payable to Beneficiary upon the final determination of the I-829 petitions of Beneficiary's investor members. (c) The recitals in any such reconveyance of any matters or facts shall be conclusive proof of the truthfulness of such matters or facts. The grantee in such reconveyance may be described as "the person or persons legally entitled thereto." When the Property has been fully reconveyed, the last such reconveyance shall operate as a reassignment of all of the rents of the Property to the person or persons legally entitled to such rents. Five (5) years after issuance of such full reconveyance, the Trustee may destroy this Deed of Trust and any such notes, unless directed in such request to retain them.

{01077355}

**12.    Change Of Lender's Records**.  In the event Trustor requests Lender to change any of its records relating to the Property, the Note or this Deed of Trust (including, but not limited to, changes in mailing address or ownership of the Property), Trustor shall pay a commercially reasonable fee not to exceed $100 prescribed by the Lender to so change its records.

**13.    Senior Lien; Co-Equal Lien**.  Notwithstanding any provision of this Deed of Trust to the contrary: (a) the deed of trust and/or other financing documents in connection with the loan procured by Trustor from EverTrust Bank in an original principal amount not to exceed $29,500,000.00 shall be senior to this Deed of Trust; and (b) the deed of trust and/or other financing documents in connection with the loan procured by Trustor from Beach Orangethorpe Hotel, LLC in an original principal amount not to exceed $10,000,000.00 shall be of equal priority and seniority with this Deed of Trust.

## ACCELERATION AND DEFAULT.

**14.    Conditions Under Which Lender May Declare A Default By Trustor**.  A "default" under this Deed of Trust shall occur in the event that any of the following shall occur, after any applicable notice period and beyond any applicable cure period:  (a) an Event of Default (as defined in the Note) under the Note occurs; (b) any sum the payment of which is required or secured by this Deed of Trust is not made when due; (c) Trustor fails in any  material respect  to perform any other obligation required to be performed by Trustor under this Deed of Trust or secured by this Deed of Trust; (d) the Property is or becomes subject to any proceedings for abatement of a public nuisance; (e) any material information given to Lender by Trustor, intended to or which does, in fact, induce the granting of any loan secured by this Deed of Trust, was not true in any respect when given, or any material information requested or required by Lender is withheld or concealed from such application by Trustor; or (f) an Event of Default (as defined in the Agreement) under the Agreement occurs.

**15.    Lender's Right To Require Immediate Payment In Full**.  In the event of a default (as defined in paragraph 14) under this Deed of Trust, Lender may, at its option and without further notice to any person, declare the entire principal balance and any other obligations under the Note and/or any other obligations secured by this Deed of Trust, together with accrued interest thereon and any prepayment penalties, immediately due and payable.

**16.    Lender's Right To Perform Acts Trustor Fails To Perform; Indemnification**.

(a)    In the event of a default by Trustor under this Deed of Trust, then Lender or Trustee, without notice to or demand upon Trustor and without releasing Trustor from any obligation under this Deed of Trust, may, but are not required to, make or do the same in such commercially reasonable manner and to such extent as either may deem necessary or desirable to protect the security of this Deed of Trust.  Subject to the foregoing, Lender and Trustee are authorized to (i) enter upon the Property for such purposes; (ii) appear in and defend any action or proceeding purporting to affect the security of this Deed of Trust or the rights or powers of Lender or Trustee; and (iii) pay, purchase, contest or compromise any encumbrance, charge, lien or claim of lien, in whole, in part and/or in installments, which is prior or superior to the lien of this Deed of Trust.  In exercising the above powers, Lender or Trustee may pay reasonably

-8-

necessary costs and expenses, employ counsel, consultants, any other agents or independent contractors, and pay reasonable fees, compensation, and costs thereof. Trustor promises and agrees to pay immediately upon demand all amounts so expended by Lender or Trustee (including all such costs, expenses and attorneys' fees) under this paragraph 16, with payment of such amounts being secured by this Deed of Trust.

(b)    Trustor hereby indemnifies and agrees to hold harmless Lender and Trustee and their directors, officers, shareholders, agents and employees (individually and collectively the "**Indemnitees**") from and against: (i) any and all claims, demands, actions, liabilities, or causes of action that are asserted against any Indemnitee by any person or entity if the claim, demand, action, liability, or cause of action, directly or indirectly, relates to a claim, demand, action, liability, or cause of action that the person or entity has or asserts based upon, arising out of, or in connection with, the Property, the conduct of Trustor, any action or non-action by Trustor in connection with the Property, or this Deed of Trust; and (ii) any and all claims, liabilities, losses, costs, or expenses (including court costs and attorneys' fees) that any Indemnitee suffers or incurs as a result of the assertion of any such claim, demand, action, liability or cause of action, except with respect to both (i) and (ii) to the extent that matters arise from the negligence, breach of contract or wrongful conduct of Trustor or Lender. The foregoing indemnity shall survive the release of this Deed of Trust, whether such release is as a result of payment of the indebtedness secured hereby, foreclosure, acceptance of a deed in lieu of foreclosure, other action, or otherwise.

17.    **Trustee's Rights And Duties To Sell The Property**. (a) In the event of a default under this Deed of Trust by Trustor, Lender may then or thereafter execute or cause the Trustee to execute a written notice of such default and of its election to have the Property sold to satisfy the obligations secured by this Deed of Trust. Such notice shall be recorded in the office of the Recorder of the County where the Property is located. (b) When the minimum period of time required by law following recordation of such notice of default has elapsed, and notice of sale having been given as then required by law, the Trustee, without demand upon Trustor, shall sell the Property at the time and place of sale fixed by it in the notice of sale, either as a whole or in separate parcels, and in such order as Lender may determine, at public auction to the highest bidder for cash or a cash equivalent acceptable to Trustee, in lawful money of the United States, payable at time of sale. Lender shall have the right, at its option, to offset Lender's bid(s) to the extent of the total amount due Lender, including but not limited to all Trustee's fees, costs, expenses (including, without limitation, premiums for guarantees or other evidence of title), and other amounts secured by this Deed of Trust. The Trustee may postpone the sale of all or any portion of the Property by public notice at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement at the time fixed by the preceding postponement. Additionally, Lender, from time to time before any Trustee's sale, may rescind or cause to be rescinded any notice of default and election to sell or notice of sale by executing and delivering to Trustee a written notice of such rescission, which notice, when recorded, shall also constitute a cancellation of any prior declaration of default and demand for sale. The exercise by Lender of such right of rescission shall not constitute a waiver of any breach or default then existing or subsequently occurring, or impair the right of Lender to execute and deliver to Trustee, as above provided, other declarations or notices of default and demand for sale of the Property to satisfy the obligations hereof, nor otherwise affect any provision, covenant or condition of the Note or the Agreement or any of the rights, obligations or remedies of Trustee to

-9-

Lender. (c) The Trustee shall deliver to the purchaser at such sale its deed conveying the Property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. (d) Any person, including Trustor, Lender or Trustee may purchase at such sale. After deducting all costs, fees and expenses of the Trustee and of this Trust, including, without limitation, cost of evidence of title and attorneys' fees in connection with the sale, the Trustee shall apply the proceeds of the sale to the payment of: first, all sums expended under the terms of this Deed of Trust not then repaid, with interest at the applicable rate of interest set forth in the Note; second, the payment of all other sums then secured by this Deed of Trust; and third, the remainder, if any, to the person or persons legally entitled to such proceeds.

      **18.**    **Other Remedies If Trustor Defaults**. (a) All of the remedies of Lender and Trustee set forth in this Deed of Trust are intended to be in addition to and not in substitution for any other remedies available to Lender or Trustee at law or in equity. It is expressly understood and agreed that Lender or Trustee, or both, may bring suit in any court of competent jurisdiction to foreclose this Deed of Trust by judicial action or to obtain specific performance of the assignment of rents contained in this Deed of Trust. In connection with any such action, Lender or Trustee may apply to the court for the appointment of a receiver to take possession of the Property, operate the business of Trustor being conducted on the Property, utilize and enforce all agreements of Trustor in respect of the operation of such business, the utilization of any such agreement being at the election of Lender or the receiver, to be exercised at any time after declaration of a default hereunder, receive the rents of the Property and apply the same to the obligations of Trustor under this Deed of Trust and under the Note and any other obligations secured by this Deed of Trust. (b) Neither the acceptance of this Deed of Trust nor its enforcement in any manner shall prejudice the right of Lender or Trustee to realize upon or enforce any other security now or later held by Lender or Trustee. Trustor promises and agrees that the rights of Lender and Trustee under this Deed of Trust, and with respect to any other security now or later held by Lender, may be enforced in such order and manner as Lender and Trustee, or either of them, may determine in their sole and absolute discretion.

      **19.**    **Trustor's Obligations And Lender's Rights Not Waived**. By accepting payment of any sum secured by this Deed of Trust after its due date, or by accepting late performance of any obligation secured by this Deed of Trust, or by making any payment or performing any act on behalf of Trustor that Trustor was obligated to make or perform under this Deed of Trust but failed to make or perform, or by adding any payment so made by Lender to the Note secured by this Deed of Trust, Lender does not waive its right either to require prompt payment when due of all other sums so secured or to declare default for failure to make any such prompt payment or to perform any such act. No failure or delay on the part of Lender, Trustee, or any holder of the Note or this Deed of Trust in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any such power, right or privilege shall preclude other or further exercise thereof or of any other right, power or privilege. No exercise of any right or remedy of Lender or Trustee under this Deed of Trust shall constitute a waiver of any other right or remedy contained in this Deed of Trust or provided by law. All rights and remedies existing under this Deed of Trust are cumulative to, and not exclusive of, any rights or remedies otherwise available.

{01077355}

**20.    Successors In Interest**.  The terms, agreements, and conditions contained in this Deed of Trust shall apply to, be binding upon and inure to the benefit of, all of the parties to this Deed of Trust, their heirs, personal representatives, successors and assigns.

**21.    Statements Concerning The Status Of The Loan**.  From time to time as required by law, Lender shall furnish to Trustor such statements as may be required concerning the status of the obligations secured by this Deed of Trust.  Trustor promises and agrees to pay upon demand for such statements a commercially reasonable amount prescribed by Lender.

**22.    Trustee's Obligations**.  The Trustee accepts this Trust when this Deed of Trust, duly executed and acknowledged, is made a public record as provided by law.  The Trustee is not obligated to notify any party to this Deed of Trust of pending sale under any other deed of trust or of any action or proceeding in which Trustor, Lender or Trustee is a party unless such action is brought by the Trustee.  The Trustee shall not be obligated to perform any act required of it under this Deed of Trust unless the performance of such act is requested in writing and the Trustee is reasonably indemnified against loss, costs, liability and expense.

**23.    Obligations Of Trustor Are Joint And Several; Gender And Number**.  If more than one person has executed this Deed of Trust as "Trustor," the obligations of all such persons under this Deed of Trust shall be joint and several.  In this Deed of Trust, whenever the context so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

**24.    No Offsets**.  No offset or claims which Trustor now or in the future may have against Lender shall relieve Trustor from making payments or performing any other obligations contained in or secured by this Deed of Trust.  Despite any right or option that may be granted to Lender or Trustee by this Deed of Trust or in the evidence of any obligations secured by this Deed of Trust or document ancillary to this Deed of Trust to receive, collect, accept deposit of, use, apply or in any other manner obtain or dispose of any funds or property, the same shall not be deemed to constitute any credit against or to satisfy any obligation secured by this Deed of Trust, in whole or in part, unless and until such funds or property shall be both so obtained and expressly so applied by Lender or Trustee to such satisfaction of such obligation and then only in the manner and to the extent of such application.

**25.    Beneficiary Not Responsible.**  Under no circumstances shall Beneficiary have any duty to produce rents from the Property.  Regardless of whether or not Beneficiary, in person or by agent, takes actual possession of the Premises and Improvements, unless Beneficiary agrees in writing to the contrary, Beneficiary is not and shall not be deemed to be:

(a)    A "mortgagee in possession" for any purpose; or

(b)    Responsible for performing any of the obligations of the lessor under any lease; or

(c)    Responsible for any waste committed by lessees or any other parties, any dangerous or defective condition of the Property, or any negligence in the management, upkeep, repair or control of the Property; or

-11-

(d)     Except in cases of Beneficiary's gross negligence or willful misconduct, liable in any manner for the Property or the use, occupancy, enjoyment or operation of all or any part of it.

**26.    Representations and Warranties**. Trustor represents and warrants that:

(a)     Subject to the Permitted Exceptions (as defined in the Loan Agreement), Trustor lawfully possesses and holds fee simple title to all of the Premises and Improvements;

(b)     Trustor has the full and unlimited power, right and authority to encumber the Property and assign the rents; and

(c)     This Deed of Trust, when properly recorded in the appropriate records, creates a first and prior lien on the Property, subject only to the Permitted Exceptions (as defined in the Agreement) and any mechanics' liens insured against by a tile policy in accordance with Section 2.14 of the Agreement.

**27.    Subrogation**.  Beneficiary shall be subrogated to the liens of all encumbrances, whether released of record or not, which are discharged in whole or in part by Beneficiary in accordance with this Deed of Trust or with the proceeds of any loan secured by this Deed of Trust.

**28.    Postponement of Trustee's Sale**.  Trustee may postpone the sale of all or any portion of the Property in accordance with California Civil Code §2924g, by public announcement at the time and place of sale, and from time to time thereafter Trustee may postpone such sale by public announcement at the time fixed by the preceding postponement or as otherwise allowed by said statute.

**29.    Governing Law**.  The loan secured by this Deed of Trust is made pursuant to the laws of the State of California, and the rules and regulations promulgated thereunder.  The loan contracts between the parties, including this Deed of Trust, shall be construed and governed by such laws, rules, and regulations.

**30.    Agreement Changed Only By Writing**.  This Deed of Trust cannot be changed except by agreement in writing signed by Trustor and Lender.

**31.    Time**.  Time is of the essence in connection with all of Trustor's obligations under this Deed of Trust.

**32.    Notice**.  Except for any notice required under applicable law to be given in another manner:

(a)     any notice to Trustor provided for in this Deed of Trust shall be addressed to Trustor at the address of Trustor set forth above, or to such other address as Trustor may designate by notice to Lender pursuant to the terms of paragraph 32(c),

(b)     any notice to Lender provided for in this Deed of Trust shall be addressed to Lender as follows:

-12-

{01077355}

Beach Orangethorpe Hotel II, LLC
3100 E. Imperial Highway
Lynwood, California 90262
Telephone: 310-631-6789

and to such other address as Lender may designate by notice to Trustor, pursuant to the terms of paragraph 32(c);

(c)    Except as otherwise provided by law, all notices, requests, demands, directions, and other communications provided for in this Deed of Trust must be in writing mailed, telegraphed, delivered, or sent by telex, facsimile, cable or other form of electronic written communication to the appropriate party at its respective address.  Any notice given by telegram, telex, facsimile, cable or other form of electronic written communication must be confirmed within forty-eight (48) hours by letter mailed or delivered to the appropriate party at its respective address.  If any notice is given by mail it will be effective when deposited in the mails with first-class or airmail postage prepaid; if given by telegraph or cable, when delivered to the telegraph company with charges prepaid; if given by telex, facsimile or other form of electronic written communication, when sent; or if given by personal delivery, when delivered.

**33.**    **Titles, Captions, And Headings**. The titles, captions, and headings to paragraphs contained in this Deed of Trust are for assistance in identification only and are not to be considered part of the substance of the provisions of this Deed of Trust.

**34.**    **Severability Of Provisions**.  If any paragraph, clause or provision of this Deed of Trust is construed or interpreted by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those paragraphs, clauses or provisions so construed or interpreted and shall not affect the remaining paragraphs, clauses and provisions of this Deed of Trust.

**35.**    **Acknowledgment Of Trustor's Understanding Of Deed Of Trust**.   The foregoing terms, provisions and conditions of this Deed of Trust have been read and are understood by Trustor.  Trustor hereby acknowledges receipt of a copy of this Deed of Trust.

**36.**    **Lender's Reliance**.  The financial accommodations made or to be made by Lender to Trustor are being made, renewed or extended, as applicable, by Lender to Trustor at the request and urging of Trustor and this Deed of Trust is being given in consideration of such financial accommodations, and Lender may rely upon the validity and enforceability of this Deed of Trust in making such financial accommodations.

**37.**    **Security Agreement**.

(a)    Security Interest.  This Deed of Trust shall also constitute and serve as a security agreement and financing statement for Personalty, Fixtures, and any of the Property in which a security interest can be perfected under and within the meaning of Division 9 of the California Uniform Commercial Code, and shall grant to Lender, until the obligations secured hereby shall be satisfied, a second priority security interest(i.e., junior to the security interest referenced in, Paragraph 13(a) above), including but not limited to a fixture filing, pursuant to

-13-

{01077355}

Division 9 of the California Uniform Commercial Code with respect to the Personalty and Fixtures. To this end, Trustor shall and hereby does grant to Lender, a first priority security interest, subject to Paragraph 13 above, in, under and to the Personalty, Fixtures, and any of the Property in which a security interest can be perfected under Division 9 of the California Uniform Commercial Code.

(b)    Financing Statements.    Trustor shall deliver to Lender, in form and substance satisfactory to Lender, such financing statements and further assurances as Lender may, from time to time, require to create, perfect, and preserve Lender's security interest herein granted, and Lender may cause such financing statements and assurances to be recorded and filed at such times and places as may be required or permitted by law to so create, perfect and preserve such security interest.

(c)    Remedies on Default.    Upon default, Lender may, at its option: (i) exercise any remedy permitted by law or in equity, including without limitation, all the rights and remedies of a secured party under the California Uniform Commercial Code in any jurisdiction where enforcement is sought, whether in California or elsewhere; (ii) notify any parties obligated on any of the Personalty or Fixtures to make payment to Lender and enforce collection thereof; (iii) apply any sums received or collected from or on account of any Personalty or Fixtures, including the proceeds of any sales thereof, to the payment of any indebtedness of Trustor to Lender in any order, including the costs and expenses incurred in preserving and enforcing the rights of Lender and attorneys' fees, in such order and manner as Lender in Lender's sole discretion determines.    All of Lender's rights and remedies shall be cumulative and not exclusive.

(d)    Fixture Filing.    This Deed of Trust shall constitute a fixture filing under the California Uniform Commercial Code. Lender's address from which information concerning Lender's security interest can be obtained is set forth in paragraph 32 above, subject to change as therein provided.

**38.    Sale Of Interest.**    Trustor acknowledges and accepts that Lender may, at any time, in Lender's sole discretion sell all or any portion of Lender's interest in the Note and this Deed of Trust to one or more third parties. The sale of all or any part of Lender's interest in the Note or Deed of Trust shall not relieve Trustor of any of Trustor's obligations hereunder.

**39.    Separate Property.**    Any married person executing this Deed of Trust in an individual capacity agrees that recourse may be had to his or her separate property for satisfaction of all sums secured under this Deed of Trust.

**40.    Books And Records.**    Trustor shall keep and maintain copies of all written contracts, leases, rental agreements, concessions, licenses, and other documents and instruments which affect the Property, or any portion thereof or interest therein. Such books, records, contracts, leases, documents, and other instruments shall be subject to examination and inspection by Lender, or Lender's agents or designated auditors, from time to time, at reasonable times after five (5) days notice to Trustor.

{01077355}

**41.    Inspection, Appraisal, And Assessments**.  Lender may, at any time and from time to time and as and when Lender deems it to be appropriate, whether or not Trustor is then in default, (a) enter upon the Premises, directly or through one or more agents or independent contractors, to inspect any and all Property which is security for the obligations herein described, and (b) cause to be performed and prepared one or more appraisals and/or preliminary or other environmental assessments of the Property, or any portion thereof, in form and content satisfactory to Lender and meeting all requirements or standards of applicable laws, regulations, ordinances, orders, and generally recognized industry standards relating thereto.  If Trustor is then in default under this Deed of Trust, all costs and expenses incurred by Lender or Trustee in connection with any such inspection, appraisal, or assessment, shall be payable by Trustor upon demand and shall be secured by this Deed of Trust.

**42.    WAIVER**.  FURTHER, TRUSTOR AND LENDER, TO THE EXTENT PERMITTED BY LAW, EACH HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THIS DEED OF TRUST, THE NOTE OR ANY CONDUCT, ACT OR OMISSION OF LENDER OR TRUSTOR, OR ANY OF THEIR RESPECTIVE DIRECTORS, OFFICERS, MANAGERS, MEMBERS, TRUSTEES, EMPLOYEES OR AGENTS, OR ANY OTHER PERSONS AFFILIATED WITH LENDER OR TRUSTOR, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

**43.    Definitions**.  All terms not defined herein shall be defined as set forth in the Agreement.

THE UNDERSIGNED TRUSTOR REQUESTS THAT A COPY OF ANY NOTICE OF DEFAULT AND ANY NOTICE OF SALE HEREUNDER BE MAILED TO TRUSTOR AT TRUSTOR'S ADDRESS SET FORTH ABOVE.

[SIGNATURE PAGE FOLLOWS]

-15-

{01077355}

IN WITNESS WHEREOF, Trustor has executed this Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing as of the date first above written.

**TRUSTOR:**

THE SOURCE HOTEL, LLC,
a California limited liability company

By: M+D Properties,
a California corporation,
its Manager

By: _____
Donald Chae, CEO

**(ALL SIGNATURES MUST BE ACKNOWLEDGED)**

S-1

# ACKNOWLEDGMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of CALIFORNIA          )
County of ___Orange_____ )

On __August 25, 2017__ before me, _____Justine Chae_____, a Notary Public, personally appeared _____Donald Chae_____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____          Notary Public (Seal)

JUSTINE CHAE
COMM. #2170402
NOTARY PUBLIC • CALIFORNIA
ORANGE COUNTY
Comm. Expires Nov. 3, 2020

Notarization for Deed of Trust, Assignment of Rents,
Security Agreement and Fixture Filing

**EXHIBIT "A"**
LEGAL DESCRIPTION

**The land referred to herein is situated in the State of California, County of Orange, City of Buena Park, and described as follows:**

**The land referred to herein is situated in the State of California, County of Orange and described as follows:**

THAT PORTION OF LOT 2 IN BLOCK 61 OF BUENA PARK, IN THE CITY OF BUENA PARK, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 18, PAGES 50 TO 52 INCLUSIVE, OF MISCELLANEOUS MAPS, AND THOSE PORTIONS OF LOTS 5 TO 9 INCLUSIVE OF TRACT NO. 1756, AS PER MAP RECORDED IN <u>BOOK 60 PAGES 20 AND 21</u> OF MISCELLANEOUS MAPS, ALL IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

PARCEL 4A (LEVEL 1 - GROUND FLOOR LOBBY & ENTRANCE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 215.36 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 45.77 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE S 00°00'02" W 86.05 FEET, THENCE N 89°59'59" W 22.68 FEET, THENCE S 00°01'05" W 13.56 FEET, THENCE S 89°59'59" E 22.57 FEET, THENCE S 00° 00'02" W 8.22 FEET, THENCE N 89°59'58" W 0.77 FEET, THENCE S 00°00'02" W 34.16, THENCE N 89°59'58" W 110.62 FEET, THENCE N 00°00'02" E 34.17 FEET, THENCE N 89°59'58" W 30.58 FEET, THENCE N 00°00'02" E 107.52 FEET, THENCE N 89°59'58" W 0.83 FEET, THENCE N 00°00'02" E 8.95 FEET, THENCE S 89°59'58" E 24.08 FEET, THENCE N 46°29'04" E 12.47 FEET, THENCE N 00°00'02" E 16.97 FEET, THENCE S 89°59'58" E 18.12 FEET, THENCE N 00°00'02" E 5.22 FEET, THENCE N 89°57'39" E 30.73 FEET, THENCE N 00°00'02" E 32.17 FEET, THENCE N 89°59'58" W 11.92 FEET, THENCE N 00°02' E 1.00 FEET, THENCE S 89°59'58" E 0.50 FEET, THENCE N 00°00'02" E 14.21 FEET, THENCE S 89°59'58" E 39.78 FEET, THENCE S 00°00'02" W 86.82 FEET, THENCE S 89°59'58" E 32.58 FEEL TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 77.76 FEET.

PARCEL 4B (LEVEL 1 - GROUND FLOOR STAIRS ON ORANGETHORPE AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF ORANGETHORPE AVENUE AS SHOWN ON SAID MAP S 89°27'51" E 199.02 FEET; THENCE LEAVING SAID CENTERLINE N 0°32'09" E 60.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE N 0°00'02" E 36.96 FEET; THENCE S 89°59'58" E 14.74 FEET; THENCE S 0°00'02" W TO A POINT ON SAID PARALLEL LINE; THENCE ALONG SAID PARALLEL LINE N 89°27'51" W 14.74 TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 77.76 FEET.

PARCEL 4C (LEVEL 1 - GROUND FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 339.38 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 46.71 FEET TO THE TRUE POINT OF

BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 23.40 FEET; THENCE SOUTH 7.24 FEET; THENCE WEST 5.88 FEET; THENCE SOUTH 6.55 FEET; THENCE WEST 29.28 FEET; THENCE NORTH 13.79 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 77.76 FEET.

PARCEL 4D (LEVEL 2 - SECOND FLOOR HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 223.82 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE S 00°27'49" W 94.43 FEET; THENCE N 89°59'59" W 31.75 FEET; THENCE S 00°01'05" W 13.56 FEET; THENCE S 89°59'59" E 31.65 FEET; THENCE S 00°27'49" W 36.79 FEET; THENCE S 45°29'59" W 26.85 FEET; THENCE N 89°27'51" W 110.52 FEET; THENCE N 00°00'02" E 36.98 FEET; THENCE N 89°59'58" W 19.37 FEET; THENCE S 00°00'02" W 25.13 FEET; THENCE N 89°59'58" W 12.81 FEET; THENCE N 00°00'02" E 90.73 FEET; THENCE S 89°59'58" E 62.50 FEET; THENCE N 00°00'00" E 30.00 FEET; THENCE S 89°59'58" E 15.42 FEET; THENCE N 00°00'02" E 29.98 FEET; THENCE S 89°59'58" E 85.09 FEET; TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET.

PARCEL 4E (LEVEL 2 - SECOND FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 339.38 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 46.71 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 23.40 FEET; THENCE SOUTH 7.24 FEET; THENCE WEST 5.88 FEET; THENCE SOUTH 6.55 FEET; THENCE WEST 29.28 FEET; THENCE NORTH 13.79 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 95.76 FEET.

PARCEL 4F (LEVEL 3 -THIRD FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 339.38 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 46.71 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 23.40 FEET; THENCE WEST 5.88 FEET; THENCE SOUTH 6.55 FEET; THENCE WEST 29.28 FEET; THENCE NORTH 13.79 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET.

PARCEL 4G (LEVEL 3 - THIRD FLOOR STAIRS ON BRENNER AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND

BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 186.84 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 45.54 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 22.05 FEET; THENCE SOUTH 9.15 FEET; THENCE EAST 5.84 FEET; THENCE SOUTH 10.38 FEET; THENCE WEST 1.58 FEET; THENCE SOUTH 4.17 FEET; THENCE EAST 9.81 FEET; THENCE SOUTH 10.37 FEET; THENCE EAST 12.08 FEET; THENCE NORTH 9.62 FEET; THENCE EAST 1.44 FEET; THENCE NORTH 24.44 FEET TO THE SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET.

PARCEL 4H (LEVEL 3 - THIRD FLOOR STAIRS ON ORANGETHORPE AVENUE)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF ORANGETHOPE AVENUE AS SHOWN ON SAID MAP S 89°27'51" E 199.02 FEET; THENCE LEAVING SAID CENTERLINE N 0°32'09" E 60.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE N 0°00'02" E 36.96 FEET; THENCE S 89°59'58" E 14.74 FEET; THENCE S 0°00'02" W TO A POINT ON SAID PARALLEL LINE; THENCE ALONG SAID PARALLEL LINE N 89°27'51" W 14.74 TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 113.76 FEET.

PARCEL 4I (LEVEL 4 - FOURTH FLOOR HOTEL PARCEL INCLUDING DECK)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 72.90 FEET; THENCE SOUTH 13.76 FEET; THENCE WEST 18.27 FEET; THENCE SOUTH 114.50 FEET; THENCE WEST 92.89 FEET; THENCE SOUTH 130.52 FEET; THENCE EAST 12.99 FEET; THENCE SOUTH 32.75 FEET TO A POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE; THENCE ALONG SAID PARALLEL LINE S 89°27'51" E 143.94 FEET; THENCE N 45°29'59" E 26.85 FEET TO A POINT ON SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE; THENCE ALONG LAST SAID PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 161.18 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 150.76 FEET.

PARCEL 4J (LEVEL 5 - FIFTH FLOOR HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 72.90 FEET; THENCE SOUTH 165.38 FEET; THENCE WEST 6.81 FEET; THENCE

SOUTH 20.33 FEET; THENCE EAST 6.81 FEET; THENCE SOUTH 28.65 FEET; THENCE WEST 105.43 FEET; THENCE SOUTH 44.42 FEET; THENCE EAST 12.99 FEET; THENCE SOUTH 32.75 FEET TO A POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE; THENCE ALONG SAID PARALLEL LINE S 89°27'51" E 143.94 FEET; THENCE N 45°29'59" E 26.85 FEET TO A POINT ON SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE; THENCE ALONG LAST SAID PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 171.60 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 161.18 FEET.

PARCEL 4K (LEVEL 6 - SIXTH FLOOR HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 72.90 FEET; THENCE SOUTH 165.38 FEET; THENCE WEST 6.81 FEET; THENCE SOUTH 20.33 FEET; THENCE EAST 6.81 FEET; THENCE SOUTH 28.65 FEET; THENCE WEST 105.43 FEET; THENCE SOUTH 44.42 FEET; THENCE EAST 11.33 FEET; THENCE SOUTH 32.75 FEET TO A POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF ORANGETHORPE AVENUE; THENCE ALONG SAID PARALLEL LINE S 89°27'51" E 145.60 FEET; THENCE N 45°29'59" E 26.85 FEET TO A POINT ON SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE; THENCE ALONG LAST SAID PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 182.02 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 171.60 FEET.

PARCEL 4L (LEVEL 7 - SEVENTH FLOOR & ROOF HOTEL PARCEL)

COMMENCING AT THE CENTERLINE INTERSECTION OF ORANGETHORPE AVENUE AND BRENNER AVENUE AS SHOWN ON SAID MAP OF TRACT NO. 1756; THENCE ALONG THE CENTERLINE OF BRENNER AVENUE AS SHOWN ON SAID MAP N 0°27'49" E 353.11 FEET; THENCE LEAVING SAID CENTERLINE N 89°32'11" W 36.00 FEET TO A POINT ON A LINE PARALLEL WITH, AND 36.00 FEET WESTERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF BRENNER AVENUE, AND THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE WEST 72.90 FEET; THENCE SOUTH 165.38 FEET; THENCE WEST 6.81 FEET; THENCE SOUTH 20.33 FEET; THENCE EAST 6.81 FEET; THENCE SOUTH 28.65 FEET; THENCE WEST 105.43 FEET; THENCE SOUTH 44.42 FEET; THENCE EAST 12.99 FEET; THENCE SOUTH 32.75 FEET TO A POINT ON A LINE PARALLEL WITH AND 60.00 FEET NORTHERLY OF, MEASURED AT RIGHT ANGLES FROM, SAID CENTERLINE OF OANGETHORPE AVENUE; THENCE ALONG SAID PARALLEL LINE S 89°27'51" E 143.94 FEET; THENCE N 45°29'59" E 26.85 FEET TO A POINT ON SAID PARALLEL LINE WITH THE CENTERLINE OF BRENNER AVENUE; THENCE ALONG LAST SAID PARALLEL LINE N 0°27'49" E 274.06 FEET TO SAID TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS LYING BELOW A HORIZONTAL PLANE HAVING AN ELEVATION OF 210.00 FEET AND ABOVE A HORIZONTAL PLANE HAVING AN ELEVATION OF 182.02 FEET.

ELEVATIONS STATED HEREON ARE BASED ON THE NORTH AMERICAN VERTICAL DATUM OF 1988 (NAVD88) PER THE YEAR 2005 ADJUSTMENT BY THE ORANGE COUNTY SURVEYOR, USING THE FOLLOWING BENCHMARK:

OCS BM 404-31-05 ELEV.=80.151 FEET (NAVD88, YEAR 2005 LEVELED) STATION IS AN OCS

ALUMINUM DISK STAMPED 404-31-05 SET IN THE SE'LY CORNER OF A 15 FT. X 4.5 FT. CONCRETE CATCH BASIN, LOCATED IN NE'LY PORTION OF INTERSECTION OF STANTON AVE. & ARTESIA BLVD., 28 FT. N'LY OF THE CENTERLINE OF ARTESIA BLVD. & 81 FT. E'LY OF THE CENTERLINE OF STANTON AVENUE. MONUMENT IS LEVEL WITH THE SIDEWALK

APN:  276-361-20 and 276-361-22
(End of Legal Description)

**J
U
R
A
T**

State of California
County of _____

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

Subscribed and sworn to (or affirmed) before me on this _____ day of _____ 20____, by _____, proved to me on this basis of satisfactory evidence to be the

        (insert name of person(s) appearing before notary)

person(s) who appeared before me.

Notary Signature: _____ (Seal)

---

**A
C
K
N
O
W
L
E
D
G
M
E
N
T**

State of California
County of_____

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

On _____ before me, _____, personally appeared

        (date)                                        (insert name and title of the officer)

_____ who proved to me

        (insert name of person(s) appearing before notary)

on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Notary Signature _____ (Seal)

---

**L
E
G
I
B
I
L
I
T
Y**

I certify under penalty of perjury and the laws of the State of California that the illegible portion of this document to which this statement is attached reads as follows:

Place of Execution: _____    Date: _____    Signature:_____

---

**S
E
A
L**

### Government Code 27361.7

I certify under penalty of perjury that the Notary Seal on the document to which this statement is attached reads as follows:

Name of the Notary: _Justine Chae_    Commission Number: _2170402_

Date Commission Expires: _11/3/2020_    Manufacturer/Vendor No: _IMOI_

County Where Bond is Filed: _Orange_    _(4 digit number on the side of the notary stamp)_

Place of Execution: _Fullerton, CA_    Date: _8/28/17_    Signature: _NCR_

REV 4/24/12

# EXHIBIT "I"

[Proposed Order]

RON BENDER (SBN 143364)
JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email:  RB@LNBYB.COM; JYO@LNBYB.COM

Proposed Attorneys for Chapter 11 Debtor and
Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re: | Case No.: 8:21-bk-10525-ES |
| THE SOURCE HOTEL, LLC, a California limited liability company, | Chapter 11 |
| Debtor and Debtor in Possession. | **[INTERIM] ORDER GRANTING MOTION FOR ENTRY OF AN ORDER: (A) REQUIRING TURNOVER OF ESTATE CASH BY EVERTRUST BANK; (B) AUTHORIZING DEBTOR TO USE CASH COLLATERAL; AND (C) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING FROM M+D PROPERTIES ON AN UNSECURED BASIS** |
| | Hearing: |
| | Date:       [To be set] |
| | Time:       [To be set] |
| | Place:      ZoomGov |

1

A hearing was held on March ___, 2021 at _____.m., before the Honorable Erithe A. Smith, United States Bankruptcy Judge for the Central District of California, Los Angeles Division, in Courtroom "5A" located at 411 West Fourth Street, Santa Ana, California 92701 (via ZoomGov), to consider the motion (the "<u>Motion</u>") filed by The Source Hotel, LLC, a California limited liability company and the debtor and debtor-in-possession in the above-captioned Chapter 11 bankruptcy case (the "<u>Debtor</u>"), for the entry of an interim order, pending a final hearing: (A) requiring Evertrust Bank ("<u>Evertrust</u>") to turn over and deliver to the Debtor cash belonging to the Debtor and its bankruptcy estate; (B) authorizing the Debtor to use cash collateral in accordance with the Debtor's proposed 13-week operating budget (the "<u>Budget</u>"), a true and correct copy of which is attached as <u>Exhibit "A"</u> to the Declaration of Donald Chae (the "<u>Chae Declaration</u>") annexed to the Motion; and (C) authorizing the Debtor to obtain post-petition financing up to $100,000 on a general unsecured basis (the "<u>DIP Loan</u>") from the Debtor's affiliate and non-member Manager, M+D Properties, a California corporation ("<u>M+D</u>"), on an as-needed basis to cover any shortfalls in the Budget.  Appearances at the hearing on the Motion were made as noted on the record of the Court.

The Court, having considered the Motion and all papers filed by the Debtor in support of the Motion, all oppositions to the Motion, the oral arguments, statements and representations of counsel made at the hearing on the Motion, and all matters of record in the Debtor's Chapter 11 bankruptcy case, proper and adequate notice of the Motion and the hearing on the Motion having been provided, finding that the relief requested in the Motion is necessary to avoid immediate and irreparable harm, and other good cause appearing therefor,

IT IS HEREBY ORDERED AS FOLLOWS:

A.    The Motion is granted on an interim basis.

B.    Evertrust is hereby ordered to immediately turn over and deliver to the Debtor all of the Evertrust Account Funds (as that term is defined in the Motion);

C.    The Debtor is authorized to use cash collateral, on an interim basis pending a final hearing, to pay (i) all of the expenses set forth in the Budget, with authority to deviate from the

line items contained in the Budget by up to 20%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s) and (ii) all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court.

D.    As adequate protection to Shady Bird Lending, LLC ("Shady Bird") on account of the Debtor's use of cash collateral, Shady Bird shall be granted a valid, enforceable, non-avoidable and fully perfected replacement lien on, and security interest in, the Debtor's post-petition assets ("Replacement Lien"), to the extent of any diminution in value of Shady Bird's interest in the Debtor's pre-petition collateral, and to the same extent, validity, scope and priority of Shady Bird's pre-petition lien.

E.    The Debtor is authorized to obtain the DIP Loan from M+D in an amount up to $100,000, at the discretion of M+D, to cover any shortfalls in the Debtor's Budget.

F.    A final hearing regarding the Motion will be held on _____, 2021 at _____.m.

IT IS SO ORDERED.

### ###

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **NOTICE OF MOTION AND MOTION FOR ENTRY OF AN ORDER: (A) REQUIRING TURNOVER OF ESTATE CASH BY EVERTRUST BANK; (B) AUTHORIZING DEBTOR TO USE CASH COLLATERAL; AND (C) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING FROM M+D PROPERTIES ON AN UNSECURED BASIS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF DONALD CHAE AND JULIET Y. OH IN SUPPORT THEREOF** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1.    TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **March 12, 2021**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Ron Bender    rb@lnbyb.com
- Nancy S Goldenberg    nancy.goldenberg@usdoj.gov
- Daniel A Lev    dlev@sulmeyerlaw.com, ccaldwell@sulmeyerlaw.com;dlev@ecf.inforuptcy.com
- Grant A Nigolian    grant@gnpclaw.com, process@gnpclaw.com;grant.nigolian@gmail.com
- Juliet Y Oh    jyo@lnbrb.com, jyo@lnbrb.com
- Ho-El Park    hpark@hparklaw.com
- Ronald N Richards    ron@ronaldrichards.com, morani@ronaldrichards.com,justin@ronaldrichards.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

**2.  SERVED BY UNITED STATES MAIL**: On **March 12, 2021**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

*None.*

**3.    SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **March 12, 2021**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

***Served via Attorney Service***

The Honorable Erithe A. Smith
United States Bankruptcy Court
Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 5040 / Courtroom 5A
Santa Ana, CA 92701-4593

☒ Service List served by Overnight Mail on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| March 12, 2021 | Stephanie Reichert | /s/ Stephanie Reichert |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                    **F 9013-3.1.PROOF.SERVICE**

The Source Hotel, LLC
OUST, Secured, Top 20, RSN, Utilities

*Counsel to Evertrust Bank*
Michael Fletcher, Esq.
Frandzel Robins Bloom & Csato, L.C.
1000 Wilshire Boulevard, 19th Floor
Los Angeles, CA 90017-2427

United States Trustee (SA)
411 W Fourth St., Suite 7160
Santa Ana, CA 92701-4500

**Secured Creditors:**

3D Design - Millwork
8152 Indianapolis Ave.
Huntington Beach, CA 92646

Aragon Construction, Inc.
5440 Arrow Highway
Montclair, CA 91763

Beach Orangethorpe II, LLC
P.O. Box 489
Buena Park, CA 90621

Beach Orangethorpe III, LLC
P.O. Box 489
Buena Park, CA 90621

Beach Orangethorpe, LLC
P.O. Box 489
Buena Park, CA 90621

Beachamp Distributing Co.
1911 South Santa Fe Avenue
Compton, CA 90221

Best Quality Painting
818 N. Pacific Ave., #C
Glendale, CA 91203

Certified Tile
14557 Calvert St.
Van Nuys, CA 91411

Evergreen Electric Construction
629 Grove View Lane
La Canada, CA 91011

Iron Mechanical
721 North B Street
Suite 100
Sacramento, CA 95811

KS Steel Corp.
1748 Industrial Way
Los Angeles, CA 90023

Nemo & Rami
1930 W. Holt Ave.
Pomona, CA 91768

Northstar
404 North Berry Street
Brea, CA 92821-3104

Pan Pacific
18250 Euclid Street
Fountain Valley, CA 92708

PDG Wallcoverings
26492 Via Juanita
Mission Viejo, CA 92691

Prime Concrete Coatings
6127 James Alan St.
Cypress, CA 90630

Resco Electric Inc.
2431 W. Washington Blvd. Suite B
Los Angeles, CA 90018

Retrolock Corp
17915 Railroad Street
City of Insdustry, CA 91748

Salamander Fire Protection, Inc
6103 Tyrone Street
Van Nuys, CA 91401

Shady Bird Lending, LLC
c/o Law Offices of Ronald Richards
P.O. Box 11480
Beverly Hills, CA 90213

Solid Construction
883 Crenshaw Blvd.
Los Angeles, CA 90005

Sunbelt Controls, Inc.
888 E. Walnut Street
Pasadena, CA 91101

Grant Nigolian, P.C.
695 Town Center Drive, Suite 700
Costa Mesa, CA 92626

Hunt Ortmann Palffy Nieves et al.
301 North Lake Avenue, 7th Floor
Pasadena, CA 91101-1807

Law Office of Ho-El Park, P.C.
333 City Blvd. West, Suite 1700
Orange, CA 92868

Law Office of Michael N. Berke
25001 The Old Road
Santa Clara, CA 91381

Law Offices of Dennis G. Cosso
345 Oxford Drive
Arcadia, CA 91007

Porter Law Group, Inc.
7801 Folsom Blvd., Suite 101
Sacramento, CA 95826

Robinson & Robinson, LLP
2301 Dupont Drive, Sute 530
Irvine, CA 92612-7502

Shady Bird Lending, LLC
c/o Law Offices of Geoffrey Long
1601 N. Sepulveda Blvd., No. 729
Manhattan Beach, CA 90266

Splinter & Thai, LLP
25124 Narbonne Ave., Suite 106
Lomita, CA 90717-2140

**Top 20 Unsecured Creditors:**

Newgens, Inc.
14241 Foster Rd.
La Mirada, CA 90638

Cabrillo Hoist
P.O. Box 3179
Rancho Cucamonga, CA 91729

WESCO Distribution Inc.
6251 Knott Ave.
Buena Park, CA 90620

Harbor All Glass & Mirror, Inc.
1926 Placentia Ave.
Costa Mesa, CA 92627

Diablo Consulting
13200 Crossroads Parkway N
Ste. 115
City of Industry, CA 91746

Ace Tek Roofing Co.
747 S. Ardmore Ave., Suite 405
Los Angeles, CA 90005

Morrow Meadows
231 Benton Court
City of Industry, CA 91789

Chefs Toys
18430 Pacific Street
Fountain Valley, CA 92708

Stumbaugh & Associates, Inc.
3303 N. San Fernando Blvd
Burbank, CA 91504

HBA Procurement, Inc.
3216 Nebraska Ave.
Santa Monica, CA 90404

OJ Insulation LP
600 S Vincent Ave.
Azusa, CA 91702

DKY Architects
15375 Barranca Pkwy.
Suite A-210
Irivne, CA 92618

Master Glass
2225 W. Pico Blvd, Unit C
Los Angeles, CA 90006

Universal Flooring Systems
15573 Commerce Lane
Huntington Beach, CA 92649

L2 Specialties
3613 W. Macarthur Blvd., #611
Santa Ana, CA 92704

Ficcadenti Waggoner
16969 Von Karman Avenue
Suite 240
Irivne, CA 92606

Retrolock Corp
17915 Railroad Street
City of Industry, CA 91748

American Engineering Laboratories Inc.
PO Box 1816
Whittier, CA 90609

**Utilities List:**

AT&T
P.O. Box  5025
Carol Stream, IL 60197-5025

So. Cal. Edison
P.O. Box 6400
Rancho Cucamonga, CA 91729-6400