RON BENDER (SBN 143364)
JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email:  RB@LNBYB.COM; JYO@LNBYB.COM

Proposed Attorneys for Chapter 11 Debtor and
Debtor-in-Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re: | Case No.: 8:21-bk-10525-ES |
| THE SOURCE HOTEL, LLC, a California limited liability company, | Chapter 11 |
| Debtor and Debtor in  Possession. | **OPPOSITION TO MOTION OF SHADY BIRD LENDING, LLC FOR ORDER DESIGNATING CHAPTER 11 CASE AS SINGLE ASSET REAL ESTATE CASE PURSUANT TO 11 U.S.C. §§ 101(51B) AND 362(d)(3); DECLARATION OF DONALD CHAE IN SUPPORT THEREOF** |
| | <u>Hearing:</u><br>Date:      April 15, 2021<br>Time:     10:30 a.m.<br>Place:    ZoomGov |

1

The Source Hotel, LLC, a California limited liability company and the chapter 11 debtor and debtor-in-possession herein (the "Debtor"), hereby files this opposition (the "Opposition") to that certain *Motion Of Shady Bird Lending, LLC For Order Designating Chapter 11 Case As Single Asset Real Estate Case Pursuant To 11 U.S.C. §§ 101(51B) And 362(d)(3)* [Doc. No. 49] (the "Motion") filed by Shady Bird Lending, LLC ("Shady Bird").

## I.

## INTRODUCTORY STATEMENT

Pursuant to the Motion, Shady Bird seeks the entry of a Court order designating the Debtor's chapter 11 bankruptcy case as a "single asset real estate" case pursuant to 11 U.S.C. §§ 101(51B) and 362(d)(3).

The Debtor has spent an extraordinary amount of money, time, and resources during the last several years developing and constructing a seven-story full-service hotel with 178 rooms in the City of Buena Park, County of Orange, State of California (the "Hotel"). The Debtor does not actually own the real property (the "dirt") on which the Hotel is situated, but is a lessee pursuant to a 99-year ground lease for such real property. Upon completion, the Hotel will include conference rooms, an executive lounge, fitness center, restaurant, bars, and cleaning services. The Hotel is not simply a piece of undeveloped land upon which the Debtor "hopes" to one day develop and construct income-generating businesses. The Hotel is, at this point, approximately 85% complete, with the outstanding construction work consisting of mostly "finish work" such as the installation of flooring and carpeting, lighting, appliances, trade fixtures, furniture, furnishings and equipment already purchased by the Debtor. While the Debtor acknowledges that the Hotel is not yet complete and is not currently generating any income, given the mostly completed state of construction of the Hotel, and given further the fact that, upon completion, the Debtor will be operating substantial business other than the mere ownership and management of real property, including, without limitation, the operation of a full-service hotel as well as the operation of a restaurant and bars within the premises, the Debtor submits that the Hotel falls outside the definition of a "single asset real estate" under 11 U.S.C. §

1    101(51B).

2                                      **II.**

3                      **STATEMENT OF RELEVANT FACTS**

4    **A.    Background.**

5            1.        On February 26, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for

6    relief under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").   The Debtor is

7    continuing to manage its financial affairs and operate its bankruptcy estate as a debtor-in-

8    possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

9            2.        Since 2014, the Debtor has been developing the Hotel, which will include

10   conference rooms, an executive lounge, fitness center, restaurant, bars, and cleaning services.   The

11   Hotel is part of a larger 12.8-acre mixed-use development project (the "Master Development"),

12   which includes a 400,000 square-foot retail center and a 50,000 square-foot seven-story office

13   building which were completed in 2016.   The Debtor does not own the real property on which the

14   Hotel is being constructed (which is located at the southeast corner of the Master Development),

15   but is a lessee pursuant to a 99-year ground lease for such real property (the "Ground Lease") with

16   the Debtor's affiliate, The Source at Beach, LLC.

17           3.        Construction of the Hotel began in 2016.   To finance the construction of the Hotel,

18   on May 24, 2016, the Debtor obtained a $29.5 million construction loan (the "Loan") from

19   Evertrust Bank ("Evertrust") as well as financing by three tranches of EB-5 investments totaling

20   $35.5 million.   The Debtor's obligations under the Loan are secured by liens against substantially

21   all of the Debtor's assets, including the Hotel and the Debtor's leasehold interest in the real

22   property that is the subject of the Ground Lease (the "Leasehold Interest").   The original maturity

23   date for the Loan was December 1, 2017, but was extended to November 1, 2019 pursuant to

24   written extension agreements entered into by the parties.

25           4.        Through October 2019, approximately 85% of the Hotel construction had been

26   completed, including: substantial completion of the core and shell, exterior painting, porte cochère,

27   street lighting, ceiling framing, kitchen framing and glass block installation, food storages, all glass

28

storefronts, electrical wiring and switchgear, guestroom flooring, ceiling fixtures, pool bar canopy structure, deck drains, window washing system, roof membrane, roof ductwork and HVAC vibration installation; nearly complete installation of bathroom fixtures (95%), acoustic ceiling system (80%), HVAC electrical connections (90%), piping for HVAC and plumbing equipment (95%), and rooftop ductwork (99%).  In addition, substantial materials have been procured and/or fabricated and are ready for installation pending completion of other items, such as first and second floor flooring, corridor carpeting, millwork (wall and ceiling panels, pool bar), passenger elevators, fire sprinklers, egress and accent lighting, pool equipment, guest room doors, locks and closures, bathroom fixtures, and rooftop HVAC equipment.   Current photos of the Hotel, which reflect the current state of completion of the Hotel, are attached as **Exhibit A** to the Declaration of Donald Chae annexed hereto (the "Chae Declaration").

5.      The approximately 15% of the Hotel construction which remains outstanding consists of mostly "finish work" such as the installation of flooring and carpeting, lighting, appliances, trade fixtures, furniture, furnishings and equipment already purchased by the Debtor (collectively, "FF&E").  The Debtor and M+D believe that the Debtor can successfully complete the construction of the Hotel within 6-12 months with additional funding of approximately $12,000,000 - $16,000,000 (which funding would provide for, among other things, the satisfaction of valid and effective mechanics' liens).

6.      In late 2019, Evertrust refused to issue the remaining $4 million of the Loan, claiming a cost overrun on the construction of the Hotel.  As a result of Evertrust's refusal to provide the final $4 million of the Loan, the Debtor was forced to cease construction activities. However, the Debtor believes strongly that, had Evertrust funded the final $4 million as expected, construction of the Hotel would have been completed, as the Debtor believes that its contractors would have carried fifty percent of the cost overrun and the Debtor and its affiliates would have covered the remaining fifty percent of the overrun.

///

///

**B.      Events Leading To Debtor's Bankruptcy Filing.**

7.      When Evertrust refused to issue the remaining $4 million of the Loan, the Debtor immediately and actively sought to refinance the Loan.  The Debtor began discussions with a new lender named Hall Structured Finance ("Hall") in the fall of 2019 and was ultimately able to reach an agreement with Hall for refinancing in the total sum of $42 million.  During the course of the Debtor's refinancing discussions with Hall, the Debtor kept Evertrust apprised of all developments, and even provided Evertrust with a copy of the loan commitment letter from Hall in early 2020. The Debtor and Hall were on the verge of closing on the refinancing, with a target closing date of March 20, 2020, when local, county, and State officials issued lockdown orders as a result of the COVID-19 pandemic.  At that point, Hall put an indefinite hold on the closing of the refinancing with the Debtor.

8.      As a result, the Debtor went back to Evertrust and, between March 2020 and December 2020, engaged in active forbearance negotiations with Evertrust to obtain a further extension of the Loan maturity date so that the Hotel could recover from the effects of the COVID-19 pandemic, and the Debtor could obtain refinancing or additional construction financing and ultimately recommence construction of the Hotel.

9.      In the summer of 2020, while the Debtor and Evertrust were still engaged in forbearance negotiations, Evertrust commenced litigation against the guarantors of the Loan, Donald Chae and Min Chae, and recorded a Notice of Default against the Hotel (the "NOD").  In light of such litigation and the recordation of the NOD, and given the ongoing COVID-19 pandemic, the Debtor requested that Evertrust convert the Loan (in the funded amount of approximately $25 million) into a two-year term loan, and even offered to set aside one year's worth of loan payments in escrow as assurance of repayment of such two-year term loan.  Evertrust declined the Debtor's offer.

10.      During the latter half of 2020, while the Debtor was engaged in forbearance negotiations with Evertrust, the Debtor was also working actively with its loan broker, Ed Choi, to identify and obtain alternative financing for the Hotel.  In November or December, 2020, Mr. Choi

advised the Debtor that he had introduced Michael Schlesinger of Cambra Realty ("Cambra") to Evertrust to potentially purchase the Loan from Evertrust.

11.     Ed Choi, who represented that he was in direct discussions with Mr. Schlesinger regarding Cambra's pending purchase of the Loan, repeatedly assured the Debtor that, in conjunction with its purchase of the Loan, Cambra would extend the Loan maturity date for two years (at which time the Debtor could purchase back Cambra's interest in the Loan for $24-25 million) and Cambra would provide additional construction financing of $10-14 million so that the Debtor could complete the construction of the Hotel.  The Debtor and the guarantors repeatedly requested that the foregoing terms be reduced to writing and were assured by Ed Choi and Mr. Schlesinger that the terms would be set forth in a written offer or term sheet.  Ultimately, the terms discussed by the Debtor, the guarantors, Ed Choi and Mr. Schlesinger were never reduced to writing.

12.     On December 30, 2020, Donald Chae was asked to meet with Ed Choi and Mr. Schlesinger at an office building in Beverly Hills, where they introduced him to Ronald Richards for the first time, introducing Mr. Richards only as an attorney and not as the principal for Shady Bird.  Unbeknownst to Debtor, Shady Bird had just purchased Evertrust's interests in the Loan the day before at a significant discount, for a reported purchase price of approximately $19 million. Thereafter, the Debtor was advised that Mr. Richards of Shady Bird would be the Debtor's new contact.

13.     On January 2, 2021, the Debtor received initial deal points in writing from Mr. Richards which were generally egregious and not at all reflective of the terms that had been previously discussed by the parties.  On January 7, 2021, the Debtor returned a written counteroffer which reflected the terms that the Debtor understood had been previously agreed to by the parties. In response to the Debtor's counteroffer, Mr. Richards requested information from the Debtor regarding its maintenance contracts, architectural contracts, and construction management contract with Swinerton Builders.

14.     At this point, the relationship between the Debtor and Shady Bird was severely strained, and the Debtor feared that Shady Bird had no intention of following through with the terms that the parties had previously discussed, that Shady Bird was not engaged in negotiations with the Debtor in good faith and was instead gathering information to take the Hotel from the Debtor.

15.     Ultimately, the Debtor's concerns about Shady Bird were validated when, on February 8, 2021, Shady Bird filed a complaint against the Debtor in the Superior Court of the State of California for the County of Orange ("Superior Court") for (i) specific performance and appointment of a receiver, and (ii) waste, thereby commencing the Superior Court action bearing the case number 30-2021-01183489-CU-OR-CJC (the "State Court Action").  Shady Bird also took steps to immediately foreclose on the Hotel and issued a Notice of a Trustee's Sale for the Hotel to be held on March 1, 2021.

16.     Shortly after filing its complaint to initiate the State Court Action, Shady Bird filed an ex parte application for an order appointing a receiver and other related relief.  On February 17, 2021, the Superior Court entered an order in the State Court Action appointing Bellann R. Raile as Receiver to, among other things, take possession of the Hotel and all goods, furniture, fixtures, and equipment attached and/or related to the Hotel.

17.     As a result of all of the foregoing, the Debtor sought chapter 11 bankruptcy protection in order to prevent the impending foreclosure of the Hotel, to regain possession of the Hotel and related assets and obtain refinancing or investments to enable the Debtor to complete construction of the Hotel, and to be afforded a reasonable opportunity to restructure its financial affairs and repay its debts in an orderly fashion.

**C.    The Debtor's Reorganization Efforts And Strategy.**

18.     The Debtor's primary assets consist of the Hotel, the Leasehold Interest, and the FF&E.   The Debtor believes that the current value of the Hotel in "as is" condition is approximately $50,000,000 and that its fair market value upon completion will be at least

$60,000,000.[1]  As reflected in the Debtor's Schedules, the Debtor believes that the total value of the FF&E (calculated at cost, excluding fabrication labor costs) is approximately $2,700,000.[2]

19.    The Debtor's primary secured creditor is Shady Bird.  According to the Notice of Trustee's Sale recorded by Shady Bird on February 3, 2021,[3] Shady Bird contends that the current balance of the Loan is approximately $30,720,000.  The Debtor's obligations under the Loan are secured by liens against substantially all of the Debtor's assets, including the Hotel, the Leasehold Interest, the FF&E, and the Debtor's cash.

20.    There are a number of subcontractors that have recorded mechanics' liens against the Debtor and/or Hotel.  As reflected in the Debtor's Schedules, the Debtor believes that the total amount of the mechanics' liens recorded against the Debtor and/or Hotel is approximately $2,900,000.[4]  Some of these recorded mechanics' liens are disputed by the Debtor.  In addition, there appear to be a number of other mechanic's liens asserted against the Hotel; however, such purported liens do not appear to have been properly perfected and are therefore likely invalid.

21.    The Debtor also received three tranches of EB-5 loans totaling approximately $35.5 million from Beach Orangethorpe Hotel, LLC, Beach Orangethorpe Hotel II, LLC, and Beach Orangethorpe Hotel III, LLC (collectively, the "EB-5 Lenders").    The Debtor's

---

[1]  Pursuant to Rule 201 of the Rules of Evidence ("Evidence Rules"), the Debtor respectfully requests that the Court take judicial notice of the appraisal report of the Hotel dated October 14, 2019, which is attached as Exhibit 4 to the Declaration of Donald Chae annexed to that certain *Opposition To Motion Of Shady Bird Lending, LLC For Order Excusing State Court Receiver From Turnover Of Assets Pursuant To 11 U.S.C. § 543* filed concurrently herewith (the "Opposition to Receiver Motion").  As reflected in the foregoing appraisal report, the Hotel was appraised at an "as is" value of $40,900,000 as of October 14, 2019, was projected to have a value of $55,800,000 upon completion, and was projected to have a value of $61,300,00 upon stabilization.  The Debtor's manager is in the process of obtaining an updated appraisal of the Hotel.

[2]  Pursuant to Evidence Rule 201, the Debtor respectfully requests that the Court take judicial notice of the Debtor's Schedule A/B Assets – Real and Personal Property [Doc. No. 32, pages 3-25 of 66].

[3]  Pursuant to Evidence Rule 201, the Debtor respectfully requests that the Court take judicial notice of the Notice of Trustee's Sale, which is attached as Exhibit E to the Declaration of Donald Chae annexed to the CC/Financing Motion [Doc. No. 21 pages 219-235 of 358].

[4]  Pursuant to Evidence Rule 201, the Debtor respectfully requests that the Court take judicial notice of the Debtor's Schedule D: Creditors Who Have Claims Secured by Property [Doc. No. 32, pages 26-37 of 66].

obligations under the loans from two of the EB-5 Lenders (*i.e.*, Beach Orangethorpe Hotel, LLC and Beach Orangethorpe Hotel II, LLC) are secured by junior liens against the Hotel and the Leasehold Interest.[5]

22.    The Debtor believes that the EB-5 Lenders and the vast majority of its creditors will support the Debtor's efforts to reorganize through its chapter 11 bankruptcy case.    The Debtor makes no secret of its intended exit strategy in this case.    The Debtor has been, and continues to be, engaged in active discussions with numerous prospective lenders regarding the terms for debtor-in-possession financing, which will provide the Debtor with the funding necessary to complete the construction of the Hotel, service debt, and operate the Hotel until operations can be stabilized.    The Debtor has already received a written commitment letter from one prospective lender for debtor-in-possession financing in the sum of $17,900,000 but, as noted above, the Debtor is still in the process of "vetting" terms with a number of prospective lenders.    The Debtor intends to finalize loan terms with a lender and file a motion for Court approval of debtor-in-possession financing in this case in an expeditious manner.

23.    In conjunction with obtaining debtor-in-possession financing, the Debtor intends to file a plan of reorganization in this case which restructures and provides for repayment of the Debtor's secured debt (including the debt owed to Shady Bird) based upon market terms, and provides for a recovery to the Debtor's general unsecured creditors who would otherwise receive nothing (particularly upon a foreclosure of the Hotel by Shady Bird).

///

///

///

///

///

---

[5] Pursuant to Evidence Rule 201, the Debtor respectfully requests that the Court take judicial notice of the Deeds of Trust recorded against the Hotel by Beach Orangethorpe Hotel, LLC and Beach Orangethorpe Hotel II, LLC, which are attached as Exhibit H to the Declaration of Donald Chae annexed to the CC/Financing Motion [Doc. No. 21 pages 303-350 of 358].

### III.

### ARGUMENT

11 U.S.C. § 101(51B) defines the term "single asset real estate" as follows:

> "real property constituting a single property or project other than
> residential property with fewer than 4 residential units, which
> generates substantially all of the gross income of a debtor who is
> not a family farmer and on which no substantial business is being
> conducted by a debtor other than the business of operating the real
> property and activities incidental thereto."

11 U.S.C. § 101(51B).

The movant bears the burden of proof to demonstrate that the debtor's property or project is a "single asset real estate" under the Bankruptcy Code. *In re Hassen Imports Partnership*, 466 B.R. 492, 507 (Bankr. C.D. Cal. 2012); *In re Meeks*, 349 B.R. 19, 21 (Bankr. E.D. Cal. 2006) (a "moving party … carries the burden of proof on all factors."); *see also In re Alvion Properties, Inc.*, 538 B.R. 527, 532 (Bankr. S.D. Ill. 2015).

There is no question that, if the Hotel was completed and operating, it would ***not*** constitute a "single asset real estate" within the definition of 11 U.S.C. § 101(51B).

In *Centofante v. CBJ Development, Inc. (In re CBJ Development, Inc.)*, 202 B.R. 467 (9th Cir. BAP 1996), the Ninth Circuit Bankruptcy Appellate Panel held that the debtor's operation of a gift shop, restaurant and bar in its hotel constituted substantial other business and, thus, the debtor's hotel was not a single asset real estate. In *CBJ Development*, the debtor's primary asset consisted of a 63-room hotel, and all of the debtor's income was generated from the rental of hotel rooms and the operation of the bar, restaurant, and gift shop located on the hotel premises. Notably, at the time that the debtor's bankruptcy case filed, the hotel's gift shop, restaurant, and bar were closed for renovations which the debtor had begun shortly after obtaining possession of the hotel. However, at the time the bankruptcy case was filed, the debtor was operating the hotel. The debtor's secured creditor filed a motion for relief from the automatic stay based upon

the assumption that the debtor was a "single asset real estate" debtor.  By the time that the secured creditor's motion was heard, the debtor's gift shop was open and the restaurant and the bar were about to reopen.  The Bankruptcy Appellate Panel noted that a full-service hotel such as the debtor's must employ a substantial number of people since "[r]ooms must be cleaned, sheets and towels laundered, phone and other services provided[,]" that "the operation of the [debtor's h]otel requires substantially more day to day activity than does the operation of an apartment complex[,]" and therefore the operation of the hotel is sufficiently active in nature to constitute a business other than the mere operation of property.  *Id.* at 472.

Similarly, in *In re Whispering Pines Estate, Inc.*, 341 B.R. 134, 136 (Bankr. D. N.H. 2006), the court found that the operation of a hotel, even one that does not include services such as a gift shop or a restaurant, is sufficiently active in nature to constitute a business other than mere operation of property.  *See also*, *In re Iowa Hotel Investors, LLC*, 464 BR. 848 (Bankr. N.D. Iowa 2011) (holding that a hotel that has no gift shop, restaurant, or bar, but has conference rooms that may be rented separate and apart from guest rooms, is not a single asset real estate).

The Bankruptcy Appellate Panel in *CBJ Development* did note that the use of the present tense by Congress in Bankruptcy Code Section 101(51B) suggests that only current activities may be considered in determining whether the debtor is conducting substantial business activities other than the operation of the property, and that a non-operational hotel may be considered a single asset real estate because it has "no substantial business" other than the business of operating the real property and activities incidental thereto.  The Panel stated that "[a]ny other conclusion would allow all debtors with unrented commercial space to evade the provisions applicable to single asset real estate debtors in 11 U.S.C. § 362(d)(3) by simply declaring an intention to start a business.  *Id.*  at 473.  However, the debtor in *CBJ Development* was not operating the restaurant and bar at the time that the secured creditor's motion was filed and heard.  Nevertheless, the Panel noted that the debtor had operated those businesses shortly before filing its bankruptcy case (and those businesses were operated even prior to the debtor's acquisition of the hotel) and were only closed for renovations which were being carried out

1    promptly, with a substantial amount of money invested by the debtor's investors.  *Id.*  Under

2    those circumstances, the Panel concluded that the restaurant and bar could be considered in

3    determining whether there was substantial other business activity on the property.  *Id.*

4        As the Bankruptcy Appellate Panel in *CBJ Development* suggests, most cases have held

5    that construction and land development activities that do not generate any significant income do

6    not constitute substantial business activity separate from operation of the property, and therefore

7    are "single asset real estate" within the definition of § 101(51B).  In *In re Oceanside Mission*

8    *Associates*, 192 B.R. 232, 236 (Bankr. S.D. Cal. 1996), the bankruptcy court concluded that

9    "single asset real estate" includes undeveloped real property which generates no income.  In *In re*

10   *Kara Homes, Inc.*, 363 B.R. 399, 406 (Bankr. D. N.J. 2007), the bankruptcy court held that a

11   group of affiliated chapter 11 debtors, each of which owned separate real estate development

12   projects for the construction of single family residences and condominiums, qualified as single

13   asset real estate cases.  *See In re Webb MTN, LLC*, 2008 WL 656271, at *5 (finding that "even

14   though the Debtor has plans to develop a number of different business on the Webb Mountain

15   Property, the plans are still part and parcel of one large land development" and holding that the

16   the debtor was a single asset real estate debtor).  *See also In re Sargent Ranch, LLC*, 2010 WL

17   3189714 at *3 (Bankr. S.D. Cal. 2010) (court held that because the debtor owned undeveloped

18   real property on which no substantial business was being conducted, the debtor had a "single

19   project" and was a single asset real estate debtor, noting "Debtor attempts to avoid the single

20   asset real estate label by trotting the numerous plans it has for developing the Property.

21   However, intentions do not constitute projects.  There is no disputing the fact that at the time the

22   case was filed, as well as at the time of the hearing, every inch of every parcel of the Property,

23   with the exception of a small portion being leased to third parties, is part of the same operation –

24   namely, waiting and planning for future development).

25       The real estate owned by the debtors in *Oceanside Mission Associates, In re Kara*

26   *Homes, Inc.*, *In re Webb MTN, LLC*, and *In re Sargent Ranch, LLC* consisted of undeveloped

27   raw land.  *See Oceanside Mission Associates*, 192 B.R. 232 (undeveloped raw land); *In re Kara*

28

*Homes, Inc.*, 363 B.R. 399 (undeveloped land upon which the debtors intended to design homes and/or condominiums), *In re Webb MTN, LLC*, 2008 WL 656271 (1,865 acres of undeveloped raw land), and *In re Sargent Ranch, LLC*, 2010 WL 3189714 (6,400 acres of undeveloped raw land). Here, the Hotel is not simply a piece of undeveloped land upon which the Debtor "hopes" to one day develop and construct income-generating businesses. The Hotel is, at this point, approximately 85% complete, with the outstanding construction work consisting of mostly "finish work" such as the installation of flooring and carpeting, lighting, appliances, trade fixtures, furniture, furnishings and equipment already purchased by the Debtor. Accordingly, the Debtor submits that the Hotel is easily distinguished from the parcels of entirely undeveloped real property owned by the debtors in the foregoing cases and should not automatically be deemed a "single asset real estate" based upon its current non-operation.

In addition, the Debtor is not simply a developer of the Hotel. The Debtor anticipates operating the Hotel and its related businesses, including the restaurant and bars within the Hotel premises. While the Debtor acknowledges that the Hotel is not yet complete and is not currently operating or generating any income, given the mostly completed state of construction of the Hotel, and given further the fact that, upon completion, the Debtor will be operating substantial business other than the mere ownership and management of real property (such as the operation of the hotel, restaurant, and bars), the Debtor submits that the Hotel should not be categorized as a "single asset real estate" under 11 U.S.C. § 101(51B).

Moreover, the Debtor has spent an extraordinary amount of money, time, and resources during the last several years developing and constructing the Hotel, and commenced its chapter 11 bankruptcy case to save the Hotel from foreclosure and preserve the equity in the Hotel for the benefit of all creditors (not just Shady Bird), to obtain a "breathing spell" to obtain financing to perform the remaining 15% construction work required to complete the Hotel, and to be afforded a reasonable opportunity to restructure its financial affairs and repay its debts in an orderly fashion. As Shady Bird notes in its Motion, the designation of the Hotel as a "single asset real estate" has serious implications for the Debtor and its bankruptcy case, including the

deadlines imposed by 11 U.S.C. § 362(d)(3).  It is no secret that the Debtor's efforts to reorganize will be easier, or at least subject to less intense time pressure, if the Debtor's case is *not* designated as a "single asset real estate" case.  While Shady Bird tries to attribute some nefarious intent by the Debtor because the Debtor contests that the Hotel is a "single asset real estate," the Debtor believes that there are legitimate legal and factual grounds to support the Debtor's position, and the Debtor is entitled to take steps that it believes are necessary and appropriate to facilitate a successful reorganization in this case, for the benefit of all creditors (not just Shady Bird).

As the bankruptcy court in *In re Kkemko, Inc.*, 181 B.R. 47, 49 (Bankr. S.D. Ohio 1995) noted:

> "[I]n enacting  §§ 101(51B) and 362(d)(3), providing for extraordinary expedition in single asset real estate cases, Congress was motivated by a desire to accord relief in a particular familiar bankruptcy situation. That situation is where the owner of an encumbered building is attempting to avert loss of his building to his major lender who is grossly undersecured, and where there is no real hope that the owner can come forth with a viable confirmable Chapter 11 plan."

*Kkemko*, 181 B.R. at 51.

Here, there is substantial equity in the Hotel and Shady Bird is far from undersecured. Given the estimated fair market value of the Hotel (even in "as is" condition), there is substantial equity in the Hotel which supports the Debtor's efforts to obtain post-petition financing to complete the construction of the Hotel and to propose a feasible plan of reorganization.  Under the circumstances, there is more than a reasonable possibility of a successful reorganization in the Debtor's case, and the Debtor should be provided an adequate and fair opportunity to effectuate such a reorganization.

///

///

**IV.**

**CONCLUSION**

Based upon all of the foregoing, the Debtor respectfully requests that this Court enter an Order:

(1)     sustaining the Opposition and denying the Motion; and

(2)     granting such further relief as the Court deems just and proper.

Dated:  April 1, 2021                                THE SOURCE HOTEL, LLC

By:_____
              RON BENDER
              JULIET Y. OH
              LEVENE, NEALE, BENDER, YOO
                 & BRILL L.L.P.
              Proposed Attorneys for Chapter 11 Debtor
              and Debtor-in-Possession

### **DECLARATION OF DONALD CHAE**

I, Donald Chae, hereby declare as follows:

1.      I am the Manager and a member of DMC Investment Holdings, LLC, which is the sole member of The Source Hotel, LLC, a California limited liability company and the debtor and debtor-in-possession herein (the "Debtor"), and I am therefore familiar with the business operations and financial records of the Debtor.  I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

2.      I make this declaration in support of the Debtor's opposition (the "Opposition") to that certain *Motion Of Shady Bird Lending, LLC For Order Designating Chapter 11 Case As Single Asset Real Estate Case Pursuant To 11 U.S.C. §§ 101(51B) And 362(d)(3)* [Doc. No. 49] (the "Motion") filed by Shady Bird Lending, LLC ("Shady Bird").  All capitalized terms not specifically defined herein shall have the meanings ascribed to them in the Opposition.

3.      On February 26, 2021 (the "Petition Date"), the Debtor fled a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor is continuing to manage its financial affairs and operate its bankruptcy estate as a debtor-in-possession.

4.      Since 2014, the Debtor has been developing the Hotel, which will include conference rooms, an executive lounge, fitness center, restaurant, bars, and cleaning services.  The Hotel is part of a larger 12.8-acre mixed-use development project (the "Master Development"), which includes a 400,000 square-foot retail center and a 50,000 square-foot seven-story office building which were completed in 2016.  The Debtor does not own the real property on which the Hotel is being constructed (which is located at the southeast corner of the Master Development), but is a lessee pursuant to a 99-year ground lease for such real property (the "Ground Lease") with the Debtor's affiliate, The Source at Beach, LLC.

5.      Construction of the Hotel began in 2016.  To finance the construction of the Hotel, on May 24, 2016, the Debtor obtained a $29.5 million construction loan (the "Loan") from Evertrust Bank ("Evertrust") as well as financing by three tranches of EB-5 investments totaling $35.5 million.  The Debtor's obligations under the Loan are secured by liens against substantially

all of the Debtor's assets, including the Hotel and the Debtor's leasehold interest in the real property that is the subject of the Ground Lease (the "Leasehold Interest").  The original maturity date for the Loan was December 1, 2017, but was extended to November 1, 2019 pursuant to written extension agreements entered into by the parties.

6.      Through October 2019, approximately 85% of the Hotel construction had been completed, including: substantial completion of the core and shell, exterior painting, porte cochère, street lighting, ceiling framing, kitchen framing and glass block installation, food storages, all glass storefronts, electrical wiring and switchgear, guestroom flooring, ceiling fixtures, pool bar canopy structure, deck drains, window washing system, roof membrane, roof ductwork and HVAC vibration installation; nearly complete installation of bathroom fixtures (95%), acoustic ceiling system (80%), HVAC electrical connections (90%), piping for HVAC and plumbing equipment (95%), and rooftop ductwork (99%).  In addition, substantial materials have been procured and/or fabricated and are ready for installation pending completion of other items, such as first and second floor flooring, corridor carpeting, millwork (wall and ceiling panels, pool bar), passenger elevators, fire sprinklers, egress and accent lighting, pool equipment, guest room doors, locks and closures, bathroom fixtures, and rooftop HVAC equipment.   Current photos of the Hotel, which reflect the current state of completion of the Hotel, are attached as **Exhibit A** hereto.

7.      The approximately 15% of the Hotel construction which remains outstanding consists of mostly "finish work" such as the installation of flooring and carpeting, lighting, appliances, trade fixtures, furniture, furnishings and equipment already purchased by the Debtor (collectively, "FF&E").  I believe that the Debtor can successfully complete the construction of the Hotel within 6-12 months with additional funding of approximately $12,000,000 - $16,000,000 (which funding would provide for, among other things, the satisfaction of valid and effective mechanics' liens).

8.      The Debtor is not simply a developer of the Hotel.  I anticipate that the Debtor will also be the operator of the Hotel and its related businesses, including the restaurant and bars within the Hotel premises.

9.      In late 2019, Evertrust refused to issue the remaining $4 million of the Loan, claiming a cost overrun on the construction of the Hotel.  As a result of Evertrust's refusal to provide the final $4 million of the Loan, the Debtor was forced to cease construction activities. However, I believe strongly that, had Evertrust funded the final $4 million as expected, construction of the Hotel would have been completed, as I believe that the Debtor's contractors would have carried fifty percent of the cost overrun and the Debtor and its affiliates would have covered the remaining fifty percent of the overrun.

10.      When Evertrust refused to issue the remaining $4 million of the Loan, the Debtor immediately and actively sought to refinance the Loan.  The Debtor began discussions with a new lender named Hall Structured Finance ("Hall") in the fall of 2019 and was ultimately able to reach an agreement with Hall for refinancing in the total sum of $42 million.  During the course of the Debtor's refinancing discussions with Hall, the Debtor kept Evertrust apprised of all developments, and even provided Evertrust with a copy of the loan commitment letter from Hall in early 2020. The Debtor and Hall were on the verge of closing on the refinancing, with a target closing date of March 20, 2020, when local, county, and State officials issued lockdown orders as a result of the COVID-19 pandemic.  At that point, Hall put an indefinite hold on the closing of the refinancing with the Debtor.

11.      As a result, the Debtor went back to Evertrust and, between March 2020 and December 2020, engaged in active forbearance negotiations with Evertrust to obtain a further extension of the Loan maturity date so that the Hotel could recover from the effects of the COVID-19 pandemic, and the Debtor could obtain refinancing or additional construction financing and ultimately recommence construction of the Hotel.

12.      In the summer of 2020, while the Debtor and Evertrust were still engaged in forbearance negotiations, Evertrust commenced litigation against the guarantors of the Loan, my brother Min Chae and I, and recorded a Notice of Default against the Hotel (the "NOD").  In light of such litigation and the recordation of the NOD, and given the ongoing COVID-19 pandemic, the Debtor requested that Evertrust convert the Loan (in the funded amount of approximately $25

18

million) into a two-year term loan, and even offered to set aside one year's worth of loan payments in escrow as assurance of repayment of such two-year term loan.  Evertrust declined the Debtor's offer.

13.     During the latter half of 2020, while the Debtor was engaged in forbearance negotiations with Evertrust, the Debtor was also working actively with its loan broker, Ed Choi, to identify and obtain alternative financing for the Hotel.  In November or December, 2020, Mr. Choi advised me that he had introduced Cambra Realty ("Cambra") to Evertrust to potentially purchase the Loan from Evertrust.

14.     Ed Choi, who represented to me that he was in direct discussions with Michael Schlesinger, the principal for Cambra, regarding Cambra's pending purchase of the Loan, repeatedly assured me that, in conjunction with its purchase of the Loan, Cambra would extend the Loan maturity date for two years (at which time the Debtor could purchase back Cambra's interest in the Loan for $24-25 million) and Cambra would provide additional construction financing of $10-14 million so that the Debtor could complete the construction of the Hotel.  I repeatedly requested that the foregoing terms be reduced to writing and were assured by Ed Choi and Mr. Schlesinger that the terms would be set forth in a written offer or term sheet.  Ultimately, the terms discussed by Ed Choi, Mr. Schlesinger and me were never reduced to writing.

15.     On December 30, 2020, I was asked to meet with Ed Choi and Mr. Schlesinger at an office building in Beverly Hills, where they introduced me to Ronald Richards for the first time, introducing him to me only as an attorney and not as the principal for Shady Bird.  Unbeknownst to me, Shady Bird had just purchased Evertrust's interests in the Loan at a significant discount, for a reported purchase price of approximately $19 million.  Shortly thereafter, the Debtor was advised that Mr. Richards of Shady Bird would be the Debtor's new contact, even though Ed Choi advised me that Cambria had purchased the Loan from Evertrust.

16.     On January 2, 2021, the Debtor received initial deal points in writing from Mr. Richards which were generally egregious and not at all reflective of the terms that had been previously discussed by the parties.  On January 7, 2021, the Debtor returned a written counteroffer

which reflected the terms that I understood had been previously agreed to by the parties.  In response to the Debtor's counteroffer, Mr. Richards requested information from the Debtor regarding its maintenance contracts, architectural contracts, and construction management contract with Swinerton Builders.

17.    At this point, the relationship between the Debtor and Shady Bird was severely strained, and I feared that Shady Bird had no intention of following through with the terms that the parties had previously discussed, that Shady Bird was not engaged in negotiations with the Debtor in good faith and was instead gathering information to take the Hotel from the Debtor.

18.    Ultimately, the Debtor's concerns about Shady Bird were validated when, on February 8, 2021, Shady Bird filed a complaint against the Debtor in the Superior Court of the State of California for the County of Orange ("Superior Court") for (i) specific performance and appointment of a receiver, and (ii) waste, thereby commencing the Superior Court action bearing the case number 30-2021-01183489-CU-OR-CJC (the "State Court Action").  Shady Bird also took steps to immediately foreclose on the Hotel and issued a Notice of a Trustee's Sale for the Hotel to be held on March 1, 2021.

19.    Shortly after filing its complaint to initiate the State Court Action, Shady Bird filed an ex parte application for an order appointing a receiver and other related relief.  On February 17, 2021, the Superior Court entered an order in the State Court Action appointing Bellann R. Raile as Receiver to, among other things, take possession of the Hotel and all goods, furniture, fixtures, and equipment attached and/or related to the Hotel.

20.    As a result of all of the foregoing, the Debtor sought chapter 11 bankruptcy protection in order to prevent the impending foreclosure of the Hotel, to regain possession of the Hotel and related assets and obtain refinancing or investments to enable the Debtor to complete construction of the Hotel, and to be afforded a reasonable opportunity to restructure its financial affairs and repay its debts in an orderly fashion.

21.    The Debtor's primary assets consist of the Hotel, the Leasehold Interest, and the FF&E.  I believe that the current value of the Hotel in "as is" condition is approximately

$50,000,000 and that its fair market value upon completion will be at least $60,000,000.[6]   As reflected in the Debtor's Schedules of Assets and Liabilities filed in its case, I believe that the total value of the Debtor's FF&E (calculated at cost, excluding fabrication labor costs) is approximately $2,700,000.

22.    The Debtor's primary secured creditor is Shady Bird.  According to the Notice of Trustee's Sale recorded by Shady Bird on February 3, 2021,[7] Shady Bird contends that the current balance of the Loan is approximately $30,720,000.  I am advised and believe that the Debtor's obligations under the Loan are secured by liens against substantially all of the Debtor's assets, including the Hotel, the Leasehold Interest, the FF&E, and the Debtor's cash.

23.    There are a number of subcontractors that have recorded mechanics' liens against the Debtor and/or Hotel.  As reflected in the Debtor's Schedules of Assets and Liabilities filed in its case, I believe that the total amount of the mechanics' liens recorded against the Debtor and/or Hotel is approximately $2,900,000.  Some of these recorded mechanics' liens are disputed by the Debtor.  In addition, I am advised and believe that there may be a number of other mechanic's liens asserted against the Hotel; however, such purported liens do not appear to have been properly perfected and may be invalid.

24.    The Debtor also received three tranches of EB-5 loans totaling approximately $35.5 million from Beach Orangethorpe Hotel, LLC, Beach Orangethorpe Hotel II, LLC, and Beach Orangethorpe Hotel III, LLC (collectively, the "EB-5 Lenders").  The Debtor's obligations under the loans from two of the EB-5 Lenders (*i.e.*, Beach Orangethorpe Hotel, LLC and Beach Orangethorpe Hotel II, LLC) are secured by junior liens against the Hotel and the Leasehold

---

[6] An appraisal report of the Hotel dated October 14, 2019 is attached as Exhibit 4 to my declaration annexed to that certain *Opposition To Motion Of Shady Bird Lending, LLC For Order Excusing State Court Receiver From Turnover Of Assets Pursuant To 11 U.S.C. § 543* filed concurrently herewith (the "Opposition to Receiver Motion").  As reflected in the foregoing appraisal report, the Hotel was appraised at an "as is" value of $40,900,000 as of October 14, 2019, was projected to have a value of $55,800,000 upon completion, and was projected to have a value of $61,300,00 upon stabilization.  M+D Properties, the Debtor's manager, is in the process of obtaining an updated appraisal of the Hotel.

[7] Pursuant to Evidence Rule 201, the Debtor respectfully requests that the Court take judicial notice of the Notice of Trustee's Sale, which is attached as Exhibit E to the Declaration of Donald Chae annexed to the CC/Financing Motion [Doc. No. 21 pages 219-235 of 358].

1 Interest.

2     25.     I believe that the EB-5 Lenders and the vast majority of its creditors will support

3 the Debtor's efforts to reorganize through its chapter 11 bankruptcy case. The Debtor makes no

4 secret of its intended exit strategy in this case. The Debtor has been, and continues to be, engaged

5 in active discussions with numerous prospective lenders regarding the terms for debtor-in-

6 possession financing, which will provide the Debtor with the funding necessary to complete the

7 construction of the Hotel, service debt, and operate the Hotel until operations can be stabilized.

8 The Debtor has already received a written commitment letter from one prospective lender for

9 debtor-in-possession financing in the sum of $17,900,000 but, as noted above, the Debtor is still in

10 the process of "vetting" terms with a number of prospective lenders. The Debtor intends to finalize

11 loan terms with a lender and file a motion for Court approval of debtor-in-possession financing in

12 this case in an expeditious manner.

13     26.     In conjunction with obtaining debtor-in-possession financing, the Debtor intends to

14 file a plan of reorganization in this case which restructures and provides for repayment of the

15 Debtor's secured debt (including the debt owed to Shady Bird) based upon market terms, and

16 provides for a recovery to the Debtor's general unsecured creditors who would otherwise receive

17 nothing (particularly upon a foreclosure of the Hotel by Shady Bird).

18      I declare under penalty of perjury under the laws of the United States of America that the

19 foregoing is true and correct.

20      Executed this 1st day of April, 2021, at Buena Park, California.

21

22

23                              DONALD CHAE

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **<u>EXHIBIT A</u>**













# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **OPPOSITION TO MOTION OF SHADY BIRD LENDING, LLC FOR ORDER DESIGNATING CHAPTER 11 CASE AS SINGLE ASSET REAL ESTATE CASE PURSUANT TO 11 U.S.C. §§ 101(51B) AND 362(d)(3)** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:   Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **April 1, 2021**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Ron Bender    rb@lnbyb.com**
- **Michael G Fletcher    mfletcher@frandzel.com, sking@frandzel.com**
- **Nancy S Goldenberg    nancy.goldenberg@usdoj.gov**
- **Daniel A Lev    dlev@sulmeyerlaw.com, ccaldwell@sulmeyerlaw.com;dlev@ecf.inforuptcy.com**
- **Grant A Nigolian    grant@gnpclaw.com, process@gnpclaw.com;grant.nigolian@gmail.com**
- **Juliet Y Oh    jyo@lnbrb.com, jyo@lnbrb.com**
- **Ho-El Park    hpark@hparklaw.com**
- **Ronald N Richards    ron@ronaldrichards.com, morani@ronaldrichards.com**
- **United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov**

**2.   SERVED BY UNITED STATES MAIL**: On **April 1, 2021**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

*None.*

☐ Service List continued on attached page

**3.   SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **April 1, 2021**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

***Served via Overnight Mail***
The Honorable Erithe A. Smith
United States Bankruptcy Court
Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 5040 / Courtroom 5A
Santa Ana, CA 92701-4593

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| April 1, 2021 | Stephanie Reichert | /s/ Stephanie Reichert |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                    **F 9013-3.1.PROOF.SERVICE**