1  Daniel A. Lev (CA Bar No. 129622)
     dlev@sulmeyerlaw.com
2  **Sulmeyer**Kupetz
   A Professional Corporation
3  333 South Grand Avenue, Suite 3400
   Los Angeles, California 90071-1406
4  Telephone: 213.626.2311
   Facsimile: 213.629.4520
5
   Ronald Richards (CA Bar No. 176246)
6    ron@ronaldrichards.com
   Law Offices of Ronald Richards & Associates, APC
7  P.O. Box 11480
   Beverly Hills, California 90213
8  Telephone:  310.556.1001
   Facsimile:  310.277.3325
9
   Attorneys for Shady Bird Lending, LLC
10

11              **UNITED STATES BANKRUPTCY COURT**

12       **CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION**

13
   In re                                Case No. 8:21-bk-10525-ES
14
   THE SOURCE HOTEL, LLC,               Chapter 11
15
                                        **SHADY BIRD LENDING LLC'S REPLY
16          Debtor.                      TO OPPOSITION TO MOTION OF
                                        SHADY BIRD LENDING, LLC FOR
17                                       ORDER EXCUSING STATE COURT
                                        RECEIVER FROM TURNOVER OF
18                                       ASSETS PURSUANT TO 11 U.S.C. §
                                        543; DECLARATIONS OF BELLANN R.
19                                       RAILE, BRENT LITTLE, AND ANDREW
                                        TROST IN SUPPORT THEREOF
20
                                        DATE:   April 15, 2021
21                                       TIME:    10:30 a.m.
                                        PLACE: Courtroom "5A"
22

23

24

25

26

27

28

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

DAL 2710806v1

1    Shady Bird Lending, LLC ("Shady Bird"), herby submits its "Shady Bird

2   Lending, LLC's Reply to Opposition to Motion of Shady Bird Lending, LLC for Order

3   Excusing State Court Receiver From Turnover of Assets Pursuant to 11 U.S.C. § 543;

4   Declarations of Bellann R. Raile, Brent Little, and Andrew Trost in Support Thereof" (the

5   "Reply"), in response to the "Opposition to Motion of Shady Bird Lending, LLC for Order

6   Excusing State Court Receiver From Turnover of Assets Pursuant to 11 U.S.C. § 543;

7   Memorandum of Points and Authorities; Declarations of Donald Chae in Support Thereof"

8   (the "Opposition"), filed in response to the "Motion of Shady Bird Lending, LLC for Order

9   Excusing State Court Receiver From Turnover of Assets Pursuant to 11 U.S.C. § 543;

10   Memorandum of Points and Authorities; Declarations of Ronald Richards, Bellann R.

11   Raile, and Brent Little in Support Thereof" (the "Motion"), filed by Shady Bird, and

12   represents as follows:

13    **I.**

14    **PREFATORY STATEMENT**

15    Expectedly, the Debtor blames Shady Bird, Evertrust, its numerous unpaid

16   mechanic's lien claimants, and even the Receiver, for its financial woes and the current

17   degraded state of the Project.[1]  This is the playbook debtors often follow in bankruptcy

18   cases, shifting the blame for their own ineptitude, incompetence, and dishonesty to their

19   lenders and creditors.  However, the Court should not be fooled by the Debtor's feigned

20   innocence and its new-found desire to act in the best interests of its creditors.

21    The Debtor has a seven-year track record of shoddy construction, defaults

22   of its Loan Agreement with Shady Bird, defaults of its development agreement with the

23   City of Buena Park, expired permits, mechanic's liens approaching $3,000,000, and a

24   demonstrated inability to cure any of the financial and physical problems plaguing the

25   _____

26   [1] Unless otherwise stated, the use of capitalized terms herein shall have the meaning ascribed to them in
the "Motion of Shady Bird Lending, LLC for Order Excusing State Court Receiver From Turnover of Assets

27   Pursuant to 11 U.S.C. § 543; Memorandum of Points and Authorities; Declarations of Ronald Richards,
Bellann R. Raile, and Brent Little in Support Thereof" (the "Motion").

28

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  Project.  As opposed to the Debtor, who is ill-equipped to once again take control of this

2  Project, the Receiver will manage the Project with only one goal in mind - to preserve the

3  Project's value during this chapter 11 case.  Conversely, the Debtor has proven unable to

4  ensure that the Project will not continue to suffer an appreciable decline in value

5  jeopardizing the recovery of all creditors.

6          As such, the Receiver's ongoing supervision and maintenance of the

7  Project, which will not interfere in any way with the Debtor's reorganization efforts, must

8  be secured.  The Debtor does not require actual physical possession of the Project in

9  order to locate new financing or develop a confirmable plan.  And what does the Debtor

10 intend to accomplish if the Receiver is forced to turn over the Project?  Admittedly, the

11 Debtor has no income or available funds for this cash-starved construction project, which

12 even the Debtor concedes will require at least $20 million to finish.  Notably, when the

13 Debtor needed funds to simply keep the Project insured and maintain basic utility

14 services, its only path was to obtain a $100,000 unsecured line of credit from its non-

15 member Manager, M+D Properties, a California corporation ("M+D") and force the

16 turnover of approximately $60,000 in three accounts at Evertrust.  There are no other

17 funds in this estate, and none on the horizon.

18          The suggestion, therefore, that if the Project is returned to the Debtor new

19 construction will begin or new measures will be taken to secured and remediate the

20 significant safety and construction defects discovered by the Receiver and her

21 consultants is a complete ruse.  The Receiver, not the Debtor, is the only party the Court

22 and creditors should trust to preserve the Project's value while the Debtor meanders

23 through this short-lived chapter 11 case.

24

25

26

27

28

**SulmeyerKupetz,** A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL: 213.626.2311 • FAX 213.629.4520

II.

## THE DEBTOR'S RELIANCE ON HEARSAY ALLEGATIONS NOT CORROBORATED BY ANY ADMISSIBLE EVIDENCE REINFORCES WHY THE COURT SHOULD EXCUSE THE RECEIVER FROM COMPLIANCE WITH 11 U.S.C. § 543(b)

The Debtor spends page after page attacking Shady Bird, Evertrust, its unpaid vendors, and even the Receiver, for its financial woes and colossal failures. The allegations, which range from Evertrust's refusal to fund the remaining $4,000,000 of its Loan, to the refusal of a potential lender to fund a $42 million financing agreement due to COVID-19, to Evertrust's litigation against the Chae's and the commencement of foreclosure proceedings, to the broken oral and unsubstantiated promises of Cambra Realty to fund construction costs, to Shady Bird's subjective egregious demands, to the Receiver's failure to maintain and preserve the hotel, are nothing more than pathetic attempts to shield the Debtor from its own incompetence. Not only is the Debtor's tale of events leading to its chapter 11 pure fiction, comprised almost entirely of inadmissible hearsay statements not supported by a shred of competent evidence, but it reinforces the ends the Debtor will go to cover up its own inadequacies and outright dishonesty. Shady Bird welcomes the opportunity to refute the Debtor's outlandish series of lies, but need not do so at this time since the singular issue before the Court is whether, based solely on the credible and admissible evidence before it, the Receiver should be excused from compliance with Section 543(b).[2]

---

[2] In support of its Opposition, the Debtor also submitted the declaration of Robert "Charlie" Cervantes (the "Cervantes Declaration"), an employee of one of the Chae's affiliated entities. Although Mr. Cervantes attempts to attack the conclusions of the Receiver and Urban Advisory regarding the physical condition of the Project, Mr. Cervantes admittedly has no expertise in building construction, general contracting, design, or engineering. In fact, Mr. Cervantes states that he simply "oversee[s] maintenance and security" of the Project. The Court, therefore, should discount and disregard the entirety of Mr. Cervantes' declaration which is meant to undermine and contradict the findings of the Receiver and her consultants regarding the significant safety and construction issues at the Project.

**III.**

**THE RECEIVER SHOULD BE EXCUSED FROM COMPLIANCE WITH THE**

**TURNOVER REQUIREMENTS OF  11 U.S.C. § 543(b) BASED ON THE**

**DEBTOR'S HISTORY OF GROSS MISMANAGEMENT**

The Debtor's attempt to refute the reports of the Receiver and her experts showing the extensive damage to the Project is comical.  As opposed to trained and licensed professionals with decades of experience in commercial construction, the Debtor simply offers the unqualified views of a maintenance and security employee of M+D, one of the many Chae related entities used to prop up the Project.  The Debtor cannot seriously believe that this Court should reject the expert opinions of the Receiver and two consultants, who together have more than 60 years of experience investigating and assessing defects in construction projects, in favor of one of the Chae's paid employees who simply provides maintenance services.

In order to demonstrate the multitude of inaccuracies found in the Cervantes Declaration, the Receiver again called on Urban Advisory to provide an updated report of the current physical condition of the Project.  See declaration of Brent Little affixed hereto.  At the Receiver's request, an updated report dated April 5, 2021 (the "Second Report") was prepared by Urban Advisory.  A true and correct copy of the Second Report is attached hereto as Exhibit "F" and incorporated herein by reference.

As noted in the Second Report, the Cervantes Declaration appears to be a response to the statements and observations contained in the initial Report.  Although Mr. Cervantes states he completed a walk-through inspection of the Project on March 25, 2021, it appears his inspection was limited to his interpretation of the original Report. The Second Report establishes, without question, that contrary to the statements of Mr. Cervantes, the Project remains incumbered with serious construction defects and flaws.

For instance, as detailed in the two Urban Advisory reports, the roof has numerous penetrations and is the primary location for much of the HVAC equipment. Because the HVAC system has not been completed, significant and large openings exist

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

through the roof and into ductwork.  The Debtor has placed plastic sheeting (polyethylene film), sometimes referred to as Visqueen, to cover the openings.  Unfortunately, this is not an appropriate long-term solution for the reasons stated below:

•    The application of plastic is not universal and numerous opening did not contain any covering (see Picture 1 in the Second Report);

•    Several roof vents are missing, which will allow water and pests to enter the building (see Picture 2 in the Second Report);

•    In the Cervantes Declaration, Mr. Cervantes seems to indicate the placement of plastic film is acceptable, however, polyethylene plastic is highly susceptible to degradation from exposure to the sun, through UV radiation.  As a result, the correct permanent solution is a sheet metal duct cap (see Picture 3 in the Second Report); and

•    A review of Google Earth pictures seem to indicate the roof has had a long-term temporary solution to water intrusion (see Picture 4 in the Second Report).

In addition, the Second Report details the incomplete construction assemblies water intrusion.  The term construction assembly is an industry recognized term that refers to all the components of a given portion of a building, which when assembled together serve a specific purpose.  In the case of the roof, the assembly is comprised of all components designed to protect the structure from water intrusion.  As can be seen from Pictures 5 and 6 in the Second Report, a roof failure existed and was in the midst of being repaired when construction ceased.  Picture 5 shows the completed repair with flashing covering, while Picture 4 shows the roof torn off and exposed wood. Picture 7 in the Second Report is a close up of the incomplete repair.  Furthermore, as noted in the Second Report, it was evident the Debtor had tried to mitigate water intrusion by use of sand bags and plastic that were located near or on the roof at this area.

The Second Report further supports Urban Advisory's prior determination that the fire protection system was incomplete.  In his declaration, Mr. Cervantes accurately points out that the fire protection system has temporary construction covers over many sprinklers.  This confirms what Urban Advisory identified in its initial Report,

Sulmeyer Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    specifically, that the fire protection system is not capable of providing life-safety

2    protection for the Project.  Until construction is remobilized and completed, the building

3    will be at risk in the event of a fire.

4          The Second Report also supports the serious problems associated with the

5    pool deck, as identified in the first Report accompanying the Motion.  In sum, it is clear

6    the pool deck water proofing has been exposed to years of excess exposure.  Picture 8 in

7    the Second Report is a screen shot from Google Earth in May of 2019.  In this picture,

8    the pool deck is completely uncovered.  Moreover, the damage from excessive sun and

9    UV exposure was readily noticeable by the amount of friable roof material readily

10   sloughing off.  This can be seen in Picture 9 in the Second Report.  In addition, Urban

11   Advisory expressed its concern with Mr. Cervantes' statement that his construction crew

12   applied sealant over the area.  Typically, a contractor engaged in roofing or waterproofing

13   would have either a C-39 roofing or C-33 painting license.  Moreover, most manufactures

14   of waterproofing systems require trained and licensed installers to perform maintenance

15   and installation of their system or the warranty may be voided.

16         The Second Report further supports the conclusion that the water and trash

17   had been in the pool for some period of time.  A review of both Weather.com and

18   Weather Underground did not reveal any periods of rain between February 17, 2021 (the

19   onset of the receivership) and March 3, 3021, the first day of Urban Advisory's inspection.

20   Several inches of rain occurred prior to the Receivership Order and it appears as though

21   this water may not have been removed.

22         In addition, the Second Report reveals that the construction phasing was

23   performed in such a manner that completed finishes (i.e., carpet, floor tile, showers,

24   plumbing fixtures, wall coverings, and cabinetry) are subject to construction traffic and

25   exposure.  Very little protective measures were instituted to guard against damage and

26   destruction and both the tile and carpet flooring are uncovered and being subjected to

27   unusual damage.

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    With respect to the sewer system hazard, Mr. Cervantes alleges the sewer

2  system has been connected to the public system, which may be the case.  However, it

3  would be unusual for the sewer provider to provide this connection before the building

4  receives its final inspection.  This is an issue that can be understood, but needs to be

5  verified.  In the event the line is not connected, a potentially hazardous situation exists

6  due to the current sewer use in the building with no outlet.  This creates head pressure

7  on the sewer system.  Mr. Cervantes also claims he regularly refilled all the P traps to

8  prevent sewer gas migration into the building, but many of the P traps are not connected

9  to active water systems, so it is hard to imagine this was routinely performed.

10    In addition, at the door that leads to the roof, it is apparent that someone

11  other than a qualified PVC or PTO roofing contractor has patched a previous leak.

12  Previously, this area leaked into the building as demonstrated by the Second Report.

13  The concern Urban Advisory has is that the improper repair may leak again and damage

14  the unit below.  Further, according to Mr. Cervantes, the missing flashing is "more a

15  construction issue" which is typically addressed during the completion of construction and

16  not a maintenance issue.  While it is true the completion would ordinarily follow

17  construction, the course of construction has been interrupted for a protracted period of

18  time and these openings will readily allow water and pests to enter the building.

19  Moreover, even during the course of an active project, one would protect an opening

20  when inclement weather is forthcoming and that has clearly not been done.

21    These conclusions are further buttressed by the findings of Andrew Trost of

22  Carine Consulting ("Carine"), a consulting firm retained by the Receiver.  See declaration

23  of Andrew Trost affixed hereto.  According to Mr. Trost, the Debtor's contention that it has

24  been extremely diligent in maintaining and protecting the Project is demonstrably false.

25  According to Mr. Trost, the following are just some examples demonstrating why this is

26  not the case:

27

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    •    The pool deck waterproofing has been exposed to UV rays for many

2    months, reducing its elasticity and rendering the membrane ineffective and out of

3    warranty; based on input from waterproofing experts, it must be replaced;

4    •    The roof membrane on the 7-story tower exhibits signs of lifting and

5    separation from the substrate; it is highly likely that water intrusion has occurred, and the

6    membrane must be repaired.  Signs of leaks are visible in the 7th floor corridor, and may

7    have occurred elsewhere on the 7th floor;

8    •    Mechanical shaft openings at the roof are not properly sealed,

9    contributing to additional water intrusion;

10    •    The Debtor's statement that the building is 85% complete is not

11    accurate; at best, the Project is no more than 70% complete;

12    •    Four exterior doors at the 4th floor perimeter building line that lead to

13    the pool deck area are not installed allowing moisture into the building, therefore, in my

14    opinion, this has adversely affected the interior areas on the 4th floor and possibly other

15    levels with excessive amount of moisture and possibly mold;

16    •    The pool deck membrane replacement (mentioned above) may also

17    require a re-sloping of the deck in some areas, so that it will properly drain as ponding on

18    the deck is evident;

19    •    The TPO (roof membrane) at the mechanical equipment roof area

20    adjacent to the pool deck at the northside of the Project between the parking structure

21    appears to be damaged, and water may be seeping into the retail level below; moisture

22    and mold can be a factor whenever there is water intrusion;

23    •    Standing water in mechanical system pipes that are not being used

24    could be also a significant issue; corrosion can develop, attacking the walls of the pipe

25    and sediment can lead to performance issues in the system.  Extensive flushing will be

26    necessary to remediate this problem;

27    •    One of the structural equipment platforms at the 4th floor central plant

28    is reported (by the installing contractor of the equipment) to not be verified for structural

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  capacity; in other words, a structural engineer has not confirmed the platform's ability to

2  support the current equipment and the balance of equipment to be installed.  In addition,

3  several large pieces of mechanical equipment on the existing structural platforms are not

4  structurally anchored, which creates an immediate structural and safety issue;

5  • One fire alarm contractor involved with the Project's installation

6  reported that OCFA will require a separate fire alarm panel for the hotel; currently, the

7  main fire alarm panel serves the hotel, retail, and other areas of the Project.  A separate

8  hotel panel will require new drawings, OCFA approval, and permits;

9  • In its current state, the interstitial space above the 3rd floor and below

10  the 4th floor has access for maintenance; fire sprinkler code requires this space to be

11  sprinklered, as confirmed by the installing contractor for the Project.  The area currently is

12  not sprinklered, and it remains a risk for the Project;

13  • The $4,000,000 estimate to complete the balance of work is grossly

14  understated as indicated in Carine's preliminary due diligence report (Phase 1); hard

15  construction costs alone are currently estimated at between $8,000,000 and $9,000,000,

16  plus FF&E installation and soft costs; and

17  • Additionally, with the permits expired and the failure to maintain the

18  development agreement with the City of Buena Park, this Project will be severely

19  scrutinized by all governing agencies such as the Community Development, Building &

20  Safety, Orange County Fire Authority (OCFA), Orange County Health Department

21  (OCHD), and the State Elevator Inspector.  This Project will have to be re-evaluated by

22  all agencies to confirm if the codes and local ordinances will be applicable under the

23  original permit or if the new code and local ordinances will be required to be administered

24  to obtain new permits and certificate of occupancy moving forward.

25  These expert reports, together with the opinions of the Receiver, belie the

26  Debtor's contention that it has diligently maintained, protected, and secured the Project.

27  The fact that the Debtor has invested significant time and money (borrowed

28  from Evertrust and its two wholly undersecured EB-5 lenders) is irrelevant to whether the

1  Receiver should now be displaced in favor of the Debtor which is incapable of securing

2  and preserving the Project during this chapter 11 case.  The additional fact that Shady

3  Bird undertook the extraordinary step of seeking the *ex parte* appointment of a receiver

4  demonstrates its commitment to preserving the Project's value.  Shady Bird is not, as the

5  Debtor cavalierly suggests, intent on watching the hotel fall into a further state of disrepair

6  for some ulterior means.  Truth be told, had the Debtor not defaulted under its Loan

7  Agreement and not allowed the hotel to fall into a state of disrepair, the Receiver would

8  not have been appointed in the first place.  Therefore, the Debtor actually should be

9  applauding Shady Bird for taking the steps necessary to protect the Project from further

10  degradation.

11        As such, Shady Bird has more than satisfied its burden of proof by

12  demonstrating, by a preponderance of the evidence, why the Receiver should be

13  excused from compliance with Section 543(b).

14        As noted in the Motion, and not refuted by the Debtor, there presently is a

15  complete lack of income, much less sufficient income, to maintain the Project or fund a

16  successful reorganization.  The Debtor has been in default of its obligations under the

17  Loan since November 1, 2019.  Since that time, there has been no refinancing of Shady

18  Bird's debt, and a complete lack of any evidence showing that either take out financing or

19  additional construction financing has been (or will be) secured.  In reality, construction

20  came to a halt in 2019 due to the simple fact that the Debtor lacks the funds to carry out

21  even the most basic construction projects.  Given the plight and continuing deterioration

22  of the Project, there is no basis to assume that anything will change in the short term.

23  And, during this time, the Project will continue to deteriorate as its infrastructure remains

24  subject to the elements and ongoing vandalism, which already has occurred.

25        Second, the Project already has suffered dramatically during the Debtor's

26  ownership and its embarrassing attempt at construction, and it will continue to suffer the

27  longer it remains in the Debtor's hands.  The Debtor lacks the ability to cure the existing

28  loan default or service Shady Bird's debt, and it has no ability to restart, let alone

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1   complete, construction, which could cost at least $20 million to finish.  Importantly, many

2   of the construction permits issued by the City of Buena Park have expired, further

3   complicating any future construction efforts.  This says nothing of the Debtor's inability to

4   compensate the multitude of vendors and contractors who are owed millions of dollars,

5   many of whom have filed mechanic's liens and *lis pendens* against the Project.

6          Finally, the evidence of mismanagement and negligence is overwhelming.

7   The events surrounding the pre-petition termination and post-petition resuscitation of the

8   Ground Lease more than demonstrates the Debtor's dishonesty and mismanagement.

9   The Debtor's concocted excuse that the Ground Lease was terminated by Ground Lessor

10  due to *Shady Bird's* conduct in an attempt to stave off foreclosure, and it was never

11  intended to be effectuated, is a shocking admission.  If this explanation is to be believed,

12  the Debtor conspired with Ground Lessor just one day prior to Shady Bird's hearing to

13  appoint a receiver in order to fraudulently induce Shady Bird to either continue its

14  foreclosure sale, refrain from pursuing the appointment of a receiver, or forego other

15  remedies.  To actually admit that the termination was never meant to be a termination

16  and was, in fact, a complete ruse meant to induce Shady Bird to take actions to its own

17  detriment, constitutes grounds for the *sua sponte* appointment of a chapter 11 trustee.

18         Regardless, the fact that the Receiver was appointed despite the Debtor

19  and Ground Lessor's shenanigans establishes that the state court agreed with Shady

20  Bird's concerns that the current state of neglect, disrepair, and lack of insurance

21  warranted the drastic remedy of appointing a receiver to assume control over the Project.

22  As noted, the reports prepared by Urban Advisory and Carine only reinforce why the

23  appointment of a receiver was desperately needed and why there is a real threat to

24  Shady Bird's collateral if the Project is returned to the Debtor's hands.

25         In the face of this overwhelming evidence, the Debtor does not deserve the

26  benefit of the doubt like the debtors in <u>In re Northgate Terrace Apartments, Ltd.</u>, 117 B.R.

27  328 (Bankr. S.D. Ohio 1990) and <u>In re Willowood East Apartments of Indianapolis II, Ltd.</u>,

28  117 B.R. 320 (Bankr. S.D. Ohio 1990).  Unlike the debtors in <u>Northgate</u> and <u>Willowood</u>,

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    the Debtor has not diligently and competently managed and maintained the Project,

2    particularly in the two years since construction ended.  Moreover, the evidence shows

3    that the Debtor is incapable of managing the Project for the benefit of creditors during this

4    case.

5    Aside from the pronounced lack of cash, which barely is enough to keep the

6    Project insured and maintain a semblance of utility service, the Debtor's history

7    undermines even the suggestion that the Debtor and the Chae's are competent and can

8    be trusted to act as fiduciaries for creditors.  This Project cannot be preserved and

9    maintained on the shoe-string budget the Debtor has proposed, especially given the

10    significant construction defects and problems which much be rectified in the short term.

11    All of this compels the conclusion that the Debtor has no ability to complete

12    the Project, never mind complete and stabilize the Project while it attempts to locate a

13    DIP lender or file a plan.  That leaves the existing state court receivership as the only

14    viable option for ensuring that the Project's value does not further depreciate, and for

15    stabilizing the Project pending a confirmable plan, take out financing, sale, or foreclosure.

16    The Debtor's contention that the Receiver lacks the experience, knowledge,

17    or resources to maintain and preserve the value the Project as cost-effectively as the

18    Debtor also is patently false.  In fact, the Receiver has decades of experience managing

19    these types of commercial projects, whether finished or unfinished.  See declaration of

20    Bellann R. Raile affixed hereto.  The mere fact that the Receiver was in place for only ten

21    days prior to the petition date also is entirely irrelevant to her qualifications and ability to

22    manage the Project in the Debtor's stead.  The Receiver already has taken a number of

23    steps, subject to the limitations imposed upon her by the Receivership Order, to protect

24    and preserve the Project, and will continue to do so for the duration of her tenure.

25    Under these circumstances, when the interests of creditors are taken into

26    account, as they must be, the only realistic choice is for this Court to allow the Receiver

27    to continue to perform and control the stabilization of the Project.  That, in turn, requires

28    this Court to excuse the Receiver's compliance with Section 543(b).  Not only is this

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    decision compelled by the circumstances, but it will also avoid what appear to be delays

2    and inefficiencies that inevitably would result if the Debtor were permitted to displace the

3    Receiver and regain control of the Project.

4                                                    **IV.**

5    **SHADY BIRD DISPUTES THE DEBTOR'S UNSUPPORTED CONTENTION THAT DIP**

6    **FINANCING IS READILY AVAILABLE, SO IF THE MOTION TURNS ON THAT**

7    **ISSUE, SHADY BIRD REQUESTS A CONTINUANCE AND DISCOVERY**

8                   The Court's decision is of paramount importance not only to Shady Bird, but

9    to other legitimate creditors, including the countless holders of mechanic's liens against

10   the Project.  The Debtor's expectation that DIP financing or a confirmable plan is in the

11   offing is a pipe dream, and merely one in a series of misrepresentations the Chae's have

12   been spreading for years.  There is no financing in prospect; and there certainly will not

13   be not only due to the degraded condition of the Project, but the Chae's lack of financial

14   credibility rendering any guaranty (which would be required by any DIP lender) worthless.

15   Shady Bird is entitled to put these contentions, as well as the Debtor's alleged

16   redevelopment and reorganization plan, to the test if the Court finds any merit to the

17   arguments.

18                   As a reminder, the permits for this Project have expired.  The City of Buena

19   Park has lost all confidence in the debtor and the Chae's, as evidenced by the most

20   recent letter from the City dated April 2, 2021, revealing the dismal state of the permits

21   and this blighted Project.  A true and correct copy of the April 2, 2021, letter is attached

22   hereto as Exhibit "E" and incorporated herein by reference.  According to the City, the

23   following permits have now expired, rendering the Debtor's dreams of completing the

24   Project largely unattainable:

25                   •       B13-1389:  Shell retail work, various retail components, and hotel

26   lobby.  This permit was issued as of January 29, 2015, and is still open.  The last

27   inspection was conducted on December 6, 2016, meaning the permit has now expired.

28   The permit owner is "Source at Beach."

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    •    B13-1391:  Shell for Hotel Tower, Floors 4-7, Elevators, Stairwells,

2  etc.  This permit was issued on January 19, 2016, and remains open.  The last inspection

3  was January 10, 2020, meaning the permit has now expired.  The permit owner is

4  "Source at Beach."

5    •    B15-2102:  Enclosed 3rd Floor walkway between retail and hotel

6  portions of Mixed-Use Project.  This permit was issued on February 10, 2016, and is still

7  open.  The last inspection was conducted on July 13, 2016, meaning the permit has now

8  expired.  The permit owner is "Source at Beach."

9    •    B13-2294:  Hotel interior tenant improvements.  This permit was

10  issued on May 26, 2017, and remains open.  The last inspection was July 2, 2019,

11  meaning the permit has now expired.  The permit owner is "The Source Hotel."

12    •    Various Sub-Permits Issued:  Various sub-building permits have

13  been issued which authorize a specific scope of work related to one of the above main

14  permits.  The status of the sub-permits mirror that of the Main Permit under which it was

15  issued; meaning any outstanding sub-permits for the Project have now also expired.

16        In short, the Debtor and the Chae's know that, under these circumstances,

17  they will be unable to file a plan that has a reasonable possibility of being confirmed

18  within a reasonable time, particularly in the next sixty plus days if the Court, as expected,

19  designates the Debtor as a "single asset real estate" case.  As a result, at a minimum, the

20  Court should grant the Motion, on an interim basis, and allow the Receiver to be excused

21  from compliance with Section 543(b) until such time as the Debtor (i) obtains an order

22  authorizing DIP financing in an amount to pay off Shady Bird's debt, in full, or (ii) files a

23  plan of reorganization that the Court has determined has a reasonable possibility of being

24  confirmed with a reasonable time.  If the Court adopts this option, and grants the Motion,

25  on an interim basis, Shady Bird suggest a continuance of the hearing for a period of sixty

26  days to chart the Debtor's progress on these two issues.

27

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

# V.

## CONCLUSION

Based on the foregoing, Shady Bird respectfully requests that the Opposition be overruled in its entirety, that the Motion be granted in all respects, and for such other and further relief as the Court deems just and proper under the circumstances.

DATED: April 8, 2021

**Sulmeyer**Kupetz
A Professional Corporation


By: /s/ *Daniel A. Lev*
     Daniel A. Lev
     Attorneys for Shady Bird Lending, LLC

DATED: April 8, 2021

Law Offices of Ronald Richards & Associates, APC


By: /s/ *Ronald Richards*
     Ronald Richards
     Attorneys for Shady Bird Lending, LLC

1    **DECLARATION OF BELLANN R. RAILE**

2        I, Bellann R. Raile, declare and state as follows:

3        1.      I am over the age of eighteen, am a managing director of Cordes

4    and Company, LLC ("Cordes"), and am the duly appointed, qualified, and acting state

5    court receiver for the real property bearing APN Nos. 276-361-20 and 276-361-22,

6    consisting of a partially constructed 178-room, seven story hotel building located in

7    Buena Park, California (the "Project") owned by the debtor The Source Hotel, LLC (the

8    "Debtor").  The facts stated herein are true of my own personal knowledge and I could

9    and would competently testify thereto as follows.

10       2.      I make this declaration in support of "Shady Bird Lending, LLC's

11   Reply to Opposition to Motion of Shady Bird Lending, LLC for Order Excusing State Court

12   Receiver From Turnover of Assets Pursuant to 11 U.S.C. § 543; Declarations of Bellann

13   R. Raile, Brent Little, and Andrew Trost in Support Thereof" (the "Reply").

14       3.      In preparing this declaration, I have reviewed the "Opposition to

15   Motion of Shady Bird Lending, LLC for Order Excusing State Court Receiver From

16   Turnover of Assets Pursuant to 11 U.S.C. § 543; Memorandum of Points and Authorities;

17   Declarations of Donald Chae in Support Thereof" (the "Opposition"), filed by the Debtor in

18   response to the "Motion of Shady Bird Lending, LLC for Order Excusing State Court

19   Receiver From Turnover of Assets Pursuant to 11 U.S.C. § 543; Memorandum of Points

20   and Authorities; Declarations of Ronald Richards, Bellann R. Raile, and Brent Little in

21   Support Thereof" (the "Motion"), filed by Shady Bird.  I also reviewed the declaration of

22   Donald Chae (the "Chae Declaration") and the declaration of Robert "Charlie" Cervantes

23   (the "Cervantes Declaration") filed in support of the Opposition.  As explained in detail

24   below, I find each of the declarations to be misleading and inaccurate.  I submit this

25   declaration to correct the record as to the misstatements, specifically those of Mr.

26   Cervantes.

27       4.      As background, I have nearly 30 years-experience serving as a

28   state-court receiver and/or a custodian under federal bankruptcy courts.  A true and

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  correct copy of my resume is attached hereto as Exhibit "A" and incorporated herein by

2  reference.  I have been a receiver in hundreds of different types of cases, ranging from

3  small cases involving apartment buildings to large cases involving operating businesses

4  to massive development projects.   Most recently, Cordes and I served as a custodian in

5  a case before this court styled In re Air Force Village West, Inc. d/b/a Altavita Village,

6  bearing Case No. 6:19-bk-11920-SC, which involved the sale of a $50 million plus senior

7  living community comprised largely of military veterans.  Regardless of the size of the

8  case, I take my receivership responsibilities very seriously.  The goal is always to

9  preserve and protect the receivership estate in the most efficient and prudent way

10  possible.

11        5.      To put things in perspective, from the date of my appointment to the

12  petition date of this case, I served as receiver for the Debtor for a mere ten days before it

13  filed for bankruptcy.  As is common with many receiverships, I inherited a complicated

14  situation involving a mess, and put forth my best efforts to resolve things impartially

15  pursuant to my duties under the February 17, 2021, order appointing me as receiver (the

16  "Receivership Order"), a true and correct copy of which was attached as Exhibit "B" to the

17  Motion.  After my appointment, my oath and bond were filed on February 18, 2021, and I

18  assumed my duties that day.

19        6.      That same day, I sent an email asking Donald Chae, a principal of

20  the Debtor, to contact me.  We spoke that same day, and Mr. Chae told me that he would

21  have Robert "Charlie" Cervantes contact me and that Mr. Cervantes would be my primary

22  contact for items that I needed related to the Project.

23        7.      The next day, February 19, 2021, Mr. Cervantes met with Gloria

24  Torres, an employee of Cordes and a member of my receivership team.  Mr. Cervantes

25  showed Ms. Torres around the Project, including areas where considerable FFE was

26  stored.  Ms. Torres took extensive photos of the property, and also had the locks

27  changed.  True and correct copies of the photos that Ms. Torres took at my direction are

28  attached hereto as Exhibit "B" and incorporated herein by reference.  In order to

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  streamline the numerous problems plaguing this Project for the Court, I am summarizing

2  the results of Ms. Torres' photos and inspection.  These photos, in addition to the photos

3  attached to the Motion as Exhibit "C", reveal that virtually every problem that Mr.

4  Cervantes is complaining about in his declaration pre-existed my appointment, as there

5  were already serious problems with the construction and development with the Project.

6  In particular, Ms. Torres identified the following issues, which I confirmed a few days later

7  when I completed a thorough walk-through:

8          •    The building appeared abandoned some time ago;

9          •    There were no electrical accounts;

10         •    The elevator certificate had expired in June 2018;

11         •    There was a strong sewer smell on the second floor of the building

12  that was also noticeable on the floors above;

13         •    Tarps protecting the decking by the pool were no longer covering the

14  deck and were in poor condition;

15         •    The pool was partially filled with water and was stagnant;

16         •    The roof had vent openings that were not screened which is unusual

17  in my experience; and

18         •    It appeared that the roof was being damaged by the rain as there

19  were soft spots when you walked on it and pooling water.

20         8.    Given these initial visible problems, I immediately hired a property

21  inspector to quantify the problems and report back to me so that I could determine the

22  best way to proceed.  In this regard, I retained Brent Little of Urban Advisory & Building

23  Group, LLC ("Urban Advisory") to review and advise me of what needed to be done to

24  protect and secure the Project from further damage during my tenure.  As detailed in the

25  declaration of Brent Little filed in support of the Motion, both Mr. Little and Steve

26  Cienfuegos, a licensed general contractor employed by Urban Advisory, conducted two

27  on-stie inspections of the Project, the first on March 3, and the second on March 9, 2021.

28  In addition to their personal inspection, Mr. Little and Mr. Cienfuegos also reviewed

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

1   various stamped approved plans and interviewed several individuals either familiar with

2   the Project or a particularly relevant building system.  As a result of their on-site

3   inspections and analysis, Urban Advisory prepared and sent to me a "Property Inspection

4   Report for The Source OC Hilton Hotel," dated March 10, 2021 (the "Report").  A true and

5   correct copy of the Report was attached to the Motion as Exhibit "D".

6            9.      Among other things, the Report confirmed the following serious

7   problems:

8            •       Substantial roof issues exist which currently permit the intrusion of

9   water into the structure;

10           •       Incomplete construction on the roof, creating an opportunity for water

11  infiltration;

12           •       The pool deck was neglected and needed substantial repair;

13           •       Building finishes are not being protected and are exposed to waste

14  or damage;

15           •       A potentially hazardous situation may exist if the building sewer

16  system is not connected to the public system; and

17           •       The roof HVAC equipment is poorly protected with plastic and should

18  be covered with sheet metal.

19           10.     In response to these significant problems, the Cervantes Declaration

20  incorrectly asserts in paragraph 5 that I have neglected my duties.  However, the items

21  that the Cervantes Declaration identifies were lifted from the Urban Advisory Report

22  which I commissioned.  Put another way, Mr. Cervantes is inaccurately and

23  inappropriately trying to blame me for acts that occurred well before I was appointed as

24  receiver.  This is further confirmed by a review of Ms. Torres' photographs, which were

25  taken within three days of my appointment.

26           11.     In addition, the Cervantes Declaration misleadingly asserts that I

27  failed to take any action to remediate these problems.  To be clear, I was receiver for only

28  ten days before there was a bankruptcy filing.  And, under the terms of the Receivership

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    Order, my powers are limited if there is a bankruptcy.  Specifically, paragraph 27(b)(4) of

2    the Receivership Order provides that "the receiver shall do nothing that would effect a

3    material change in the circumstances of the property."

4                12.    In my experience as a receiver and a custodian in bankruptcy in the

5    time before turnover is decided, it is best to ascertain if either of the primary parties to the

6    case object to my taking action to correct some of the most important maintenance

7    issues.  This is precisely what I did in this case.

8                13.    In this regard, following my receipt and review of the Report, on

9    March 17, 2021, I contacted Ronald Richards, attorney for Shady Bird, and explained that

10   I was concerned about a number of the issues at the Project needing to be addressed

11   prior to the hearing on the "Motion of Shady Bird Lending, LLC for Order Excusing State

12   Court Receiver From Turnover of Assets Pursuant to 11 U.S.C. § 543; Memorandum of

13   Points and Authorities; Declarations of Ronald Richards, Bellann R. Raile, and Brent

14   Little in Support Thereof" (the "Section 543 Motion") seeking to excuse my turnover of the

15   Project, and authorizing me, as state court receiver, on an interim basis, to take the steps

16   necessary and appropriate to preserve and protect the assets of the Debtor pursuant to

17   11 U.S.C. § 543(d)(1).  In response, Mr. Richards stated that Shady Bird did object to my

18   taking care of the elevator, sewer smell, and roof leakage issues.

19               14.    As a result, On March 17, 2021, I then contacted Steven Kahn,

20   attorney for the Chae's and the Debtor, to ascertain if they were going to object to my

21   taking action to correct the most serious issues.  I explained to Mr. Kahn that I was

22   concerned about the elevator and the sewer smell and I needed to get contractors out to

23   address these issues as they could be safety concerns.  I also explained to Mr. Kahn that

24   the roof issues were concerning, not for safety reasons, but, rather, for risk of causing on-

25   going damage to the Project.  I also discussed with Mr. Kahn the problems associated

26   with the pool deck.  Mr. Kahn indicated that he wanted to "run it up the flag pole" and

27   would get back to me.  As of this date, Mr. Kahn has never responded to my requests

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

1   with respect to these issues, nor did he otherwise request or authorize me to take any

2   action to protect and secure the Project.

3       15.   Following Mr. Kahn's statement that he would "run it up the flag

4   pole," I was contacted by Juliet Oh, attorney for the Debtor, via email on March 24, 2021.

5   A true and correct copy of this email is attached hereto as Exhibit "C" and incorporated

6   herein by reference.  Ms. Oh stated that "Steve [Kahn] informed The Source Hotel, LLC

7   (Debtor) of your concerns about the elevator inspection and sewer gas smell on the

8   building….  The Debtor would like to access the building to get a gauge on these issues

9   so it can work with you to address them in a timely and cost-effective manner."  Ms. Oh

10   then asked me to coordinate a time and date to access the building, which I did.  The

11   next day, I granted Mr. Cervantes access to the building pursuant to his counsel's

12   request.  Therefore, I was extremely surprised and quite disappointed by Mr. Cervantes'

13   declaration accusing me of failing to timely act, when, in fact, I did act promptly and

14   worked in good faith with the Debtor's and the Chae's counsel.  To be clear, despite my

15   identifying problems that needed immediate attention, and their making statements that

16   they would look at it, neither the Debtor nor the Chae's, not their counsel, ever got back

17   to me, and instead, chose to file the Cervantes Declaration, which was simply not

18   accurate.

19       16.   In addition to falsely creating the impression that I created or caused

20   problems to exist, the Cervantes Declaration incorrectly states that "[n]either the Receiver

21   nor I are aware of any leaks."  Actually, I am aware of some stained ceiling tiles in the

22   rooms on the 7th floor.  True and correct copies of photographs I commissioned

23   evidencing potential leaks are attached hereto as Exhibit "D" and incorporated herein by

24   reference.

25       17.   Furthermore, this past week I learned that The City of Buena Park

26   has a number of problematic issues with the project, including expired permits and

27   multiple events of default.  Attached hereto as Exhibit "E" and incorporated herein by

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1 reference is a true and correct copy of a report dated April 2, 2021, provided to me by the

2 City of Buena Park summarizing the City's perspective.

3        18.    Finally, in order to address the inaccurate and misleading statements

4 contained in the Cervantes Declaration, I commissioned a second report from Urban

5 Advisory. A true and correct copy of the updated report dated April 5, 2021 (the "Second

6 Report"), prepared by Urban Advisory is attached hereto as Exhibit "F" and incorporated

7 herein by reference.

8        19.    In sum, the Debtor's partially constructed hotel is plagued by serious

9 problems, is completely non-operational, and is not generating a single dollar of income.

10 In this regard, I have assumed control over the Project, and have taken the steps to

11 ensure that the Project and the improvements located at the site are insured and

12 secured. Given the current physical state of the Project, and the lack of any income to

13 allow for construction to be completed, in my experience, the only viable alternative is to

14 allow me to continue to perform and control the stabilization of the Project, which, in turn,

15 requires this Court excuse my compliance with Section 543(b). I believe that such a

16 decision would be in the best interests of creditors of the Debtor's estate.

17        I declare under penalty of perjury under the laws of the United States of

18 America that the foregoing is true and correct.

19        Executed this 8th day of April, 2021, at Irvine, California.

20

21                    Bellann Raile

22

23

24

25

26

27

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**DECLARATION OF BRENT LITTLE**

I, Brent Little, declare and state as follows:

1. I am over the age of eighteen and am a principal of Urban Advisory and Building Group, LLC ("Urban Advisory"). I am a licensed general contractor (License No. B1038963) and hold a bachelor of arts degree in Geography from California State University, Fullerton, with an emphasis in urban planning. I have been the principal of several construction, development, and consulting firms for the past twenty-five years. The facts stated herein are true of my own personal knowledge and I could and would competently testify thereto as follows.

2. I make this declaration in support of "Shady Bird Lending, LLC's Reply to Opposition to Motion of Shady Bird Lending, LLC for Order Excusing State Court Receiver From Turnover of Assets Pursuant to 11 U.S.C. § 543; Declarations of Bellann R. Raile, Brent Little, and Andrew Trost in Support Thereof" (the "Reply").

3. In preparing this declaration, I have reviewed the declaration of Robert "Charlie" Cervantes (the "Cervantes Declaration") filed in support of the "Opposition to Motion of Shady Bird Lending, LLC for Order Designating Chapter 11 Case As Single Asset Real Estate Case Pursuant to 11 U.S.C. §§ 101(51B) and 362(d)(3); Declaration of Donald Chae in Support Thereof" (the "Opposition"), filed by the Debtor in response to the "Motion of Shady Bird Lending, LLC for Order Designating Chapter 11 Case As Single Asset Real Estate Case Pursuant to 11 U.S.C. §§ 101(51B) and 362(d)(3); Memorandum of Points and Authorities; Declarations of Ronald Richards, Bellann R. Raile, and Brent Little in Support Thereof" (the "Motion"), filed by Shady Bird. As explained in detail below, I find the Cervantes Declaration to be misleading and inaccurate. I submit this declaration to correct the record as to the misstatements of Mr. Cervantes, who I have discovered is not a licensed contractor.

4. Recently, Urban Advisory was retained by Bellann R. Raile (the "Receiver"), who I understand is duly appointed, qualified, and acting state court receiver for the real property bearing APN Nos. 276-361-20 and 276-361-22, consisting of a

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  partially constructed 178-room, seven story hotel building located in Buena Park,

2  California (the "Project") owned by the debtor The Source Hotel, LLC (the "Debtor").

3  Urban Advisory specifically was retained by the Receiver to provide her an updated

4  report of the current physical condition of the Project in response to the Cervantes

5  Declaration.  At the Receiver's request, we prepared and sent to the Receiver an updated

6  report dated April 5, 2021 (the "Second Report").  A true and correct copy of the Second

7  Report is attached hereto as Exhibit "F" and incorporated herein by reference.

8        5.      As noted in the Second Report, the Cervantes Declaration appears

9  to be a response to the statements and observations contained in the initial report.

10 Although Mr. Cervantes states he completed a walk-through inspection of the Project on

11 March 25, 2021, it appears his inspection was limited to his interpretation of the first

12 report.

13       6.      As detailed in the two reports, the roof has numerous penetrations

14 and is the primary location for much of the HVAC equipment.  Because the HVAC system

15 has not been completed, significant and large openings exist through the roof and into

16 ductwork.  The Debtor has placed plastic sheeting (polyethylene film), sometimes

17 referred to as Visqueen, to cover the openings.  Unfortunately, this is not an appropriate

18 long-term solution for the reasons stated below:

19       •       The application of plastic is not universal and numerous opening did

20 not contain any covering (see Picture 1 in the Second Report);

21       •       Several roof vents are missing, which will allow water and pests to

22 enter the building (see Picture 2 in the Second Report);

23       •       In the Cervantes Declaration, Mr. Cervantes seems to indicate the

24 placement of plastic film is acceptable, however, polyethylene plastic is highly susceptible

25 to degradation from exposure to the sun, through UV radiation.  As a result, the correct

26 permanent solution is a sheet metal duct cap (see Picture 3 in the Second Report); and

27       •       A review of Google Earth pictures seem to indicate the roof has had

28 a long-term temporary solution to water intrusion (see Picture 4 in the Second Report).

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

7.     In addition, the Second Report details the incomplete construction assemblies water intrusion.  The term construction assembly is an industry recognized term that refers to all the components of a given portion of a building, which when assembled together serve a specific purpose.  In the case of the roof, the assembly is comprised of all components designed to protect the structure from water intrusion.  As can be seen from Pictures 5 and 6 in the Second Report, a roof failure existed and was in the midst of being repaired when construction ceased.  Picture 5 shows the completed repair with flashing covering, while Picture 4 shows the roof torn off and exposed wood.  Picture 7 in the Second Report is a close up of the incomplete repair.  Furthermore, as noted in the Second Report, it was evident the Debtor had tried to mitigate water intrusion by use of sand bags and plastic that were located near or on the roof at this area.

8.     The Second Report supports Urban Advisory's prior determination that the fire protection system was incomplete.  In the Cervantes Declaration, Mr. Cervantes accurately points out that the fire protection system has temporary construction covers over many sprinklers.  This confirms what Urban Advisory identified in its initial Report, specifically, that the fire protection system is not capable of providing life-safety protection for the Project.  Until construction is remobilized and completed, the building will be at risk in the event of a fire.

9.     The Second Report also supports the serious problems associated with the pool deck, as identified in the initial Report.  In sum, it is clear the pool deck water proofing has been exposed to years of excess exposure.  Picture 8 in the Second Report is a screen shot from Google Earth in May of 2019.  In this picture, the pool deck is completely uncovered.  Moreover, the damage from excessive sun and UV exposure was readily noticeable by the amount of friable roof material readily sloughing off.  This can be seen in Picture 9 in the Second Report.  In addition, I also am concerned by Mr. Cervantes' statement that his construction crew applied sealant over the area.  Typically, a contractor engaged in roofing or waterproofing would have either a C-39 roofing or C-33 painting license.  Moreover, most manufactures of waterproofing systems require

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  trained and licensed installers to perform maintenance and installation of their system or

2  the warranty may be voided.

3          10.     The Second Report also supports the conclusion that the water and

4  trash had been in the pool for some period of time.  A review of both Weather.com and

5  Weather Underground did not reveal any periods of rain between February 17, 2021 (the

6  onset of the receivership) and March 3, 3021, the first day of Urban Advisory's inspection.

7  Several inches of rain occurred prior to the Receivership Order and it appears as though

8  this water may not have been removed.

9          11.     In addition, the Second Report reveals that the construction phasing

10  was performed in such a manner that completed finishes (i.e., carpet, floor tile, showers,

11  plumbing fixtures, wall coverings, and cabinetry) are subject to construction traffic and

12  exposure.  Very little protective measures were instituted to guard against damage and

13  destruction and both the tile and carpet flooring are uncovered and being subjected to

14  unusual damage.

15          12.     With respect to the sewer system hazard, Mr. Cervantes alleges the

16  sewer system has been connected to the public system, which may be the case.

17  However, it would be unusual for the sewer provider to provide this connection before the

18  building receives its final inspection.  This is an issue that can be understood, but needs

19  to be verified.  In the event the line is not connected, a potentially hazardous situation

20  exists due to the current sewer use in the building with no outlet.  This creates head

21  pressure on the sewer system.  Mr. Cervantes also claims he regularly refilled all the P

22  traps to prevent sewer gas migration into the building, but many of the P traps are not

23  connected to active water systems, so it is hard to imagine this was routinely performed.

24          13.     In addition, at the door that leads to the roof, it is apparent that

25  someone other than a qualified PVC or PTO roofing contractor has patched a previous

26  leak.  Previously, this area leaked into the building as demonstrated by the Second

27  Report.  The concern I have is that the improper repair may leak again and damage the

28  unit below.  Further, according to Mr. Cervantes, the missing flashing is "more a

1  construction issue" which is typically addressed during the completion of construction and

2  not a maintenance issue.  While it is true the completion would ordinarily follow

3  construction, the course of construction has been interrupted for a protracted period of

4  time and these openings will readily allow water and pests to enter the building.

5  Moreover, even during the course of an active project, one would protect an opening

6  when inclement weather is forthcoming and that has clearly not been done.

7         14.    In sum, and as detailed in the Report and the Second Report, the

8  hotel is an idled construction project which is roughly 70% complete.  Crucially, there are

9  significant issues of neglect, potential hazardous situations, and safety and

10  environmental concerns at the Project.

11         I declare under penalty of perjury under the laws of the United States of

12  America that the foregoing is true and correct.

13         Executed this 8th day of April, 2021, at Irvine, California.

14

15  Brent Little

16

17

18

19

20

21

22

23

24

25

26

27

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1

**DECLARATION OF ANDREW TROST**

2         I, Andrew Trost, declare and state as follows:

3         1.       I am over the age of eighteen and am a principal of Carine

4    Consulting ("Carine") which I formed in 2012 to provide project solutions and complete

5    project management from inception to completion.  I have spent almost 30 years in all

6    facets of the industry, as a subcontractor, design consultant, general contractor, and

7    project/construction manager.  I hold a bachelor of science degree in Chemistry/Materials

8    Science from UCLA 1986, and I hold a Certificate, Fire Protection, from the University of

9    California, Irvine.  I also am registered as a Professional Engineer, Fire Protection, in the

10   State of California, and have the following professional affiliations:  PMI, CMAA, SFPE,

11   NFPA, and AIA.  The facts stated herein are true of my own personal knowledge and I

12   could and would competently testify thereto as follows.

13        2.       I make this declaration in support of "Shady Bird Lending, LLC's

14   Reply to Opposition to Motion of Shady Bird Lending, LLC for Order Excusing State Court

15   Receiver From Turnover of Assets Pursuant to 11 U.S.C. § 543; Declarations of Bellann

16   R. Raile, Brent Little, and Andrew Trost in Support Thereof" (the "Reply").

17        3.       In preparing this declaration, I have reviewed the "Opposition to

18   Motion of Shady Bird Lending, LLC for Order Excusing State Court Receiver From

19   Turnover of Assets Pursuant to 11 U.S.C. § 543; Memorandum of Points and Authorities;

20   Declarations of Donald Chae in Support Thereof" (the "Opposition"), filed by the Debtor in

21   response to the "Motion of Shady Bird Lending, LLC for Order Excusing State Court

22   Receiver From Turnover of Assets Pursuant to 11 U.S.C. § 543; Memorandum of Points

23   and Authorities; Declarations of Ronald Richards, Bellann R. Raile, and Brent Little in

24   Support Thereof" (the "Motion"), filed by Shady Bird.  I also reviewed the declaration of

25   Donald Chae (the "Chae Declaration") and the declaration of Robert "Charlie" Cervantes

26   (the "Cervantes Declaration") filed in support of the Opposition.  As explained in detail

27   below, I find each of the declarations to be misleading and inaccurate.  I submit this

28

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    declaration to correct the record as to the misstatements, specifically those of Mr.

2    Cervantes.

3            4.        Recently, Carine was retained by Bellann R. Raile (the "Receiver"),

4    who I understand is duly appointed, qualified, and acting state court receiver for the real

5    property bearing APN Nos. 276-361-20 and 276-361-22, consisting of a partially

6    constructed 178-room, seven story hotel building located in Buena Park, California (the

7    "Project") owned by the debtor The Source Hotel, LLC (the "Debtor").  Carine specifically

8    was retained by the Receiver to provide her a report of the Project in response to the

9    Opposition.

10            5.        Initially, the Debtor insinuates that it has been extremely diligent in

11   maintaining and protecting the Project.  However, the following are just some examples

12   demonstrating why this is not the case:

13           •        The pool deck waterproofing has been exposed to UV rays for many

14   months, reducing its elasticity and rendering the membrane ineffective and out of

15   warranty; based on input from waterproofing experts, it must be replaced;

16           •        The roof membrane on the 7-story tower exhibits signs of lifting and

17   separation from the substrate; it is highly likely that water intrusion has occurred, and the

18   membrane must be repaired.  Signs of leaks are visible in the 7th floor corridor, and may

19   have occurred elsewhere on the 7th floor;

20           •        Mechanical shaft openings at the roof are not properly sealed,

21   contributing to additional water intrusion;

22           •        The Debtor's statement that the building is 85% complete is not

23   accurate in my opinion; at best, the Project is no more than 70% complete;

24           •        Four exterior doors at the 4th floor perimeter building line that lead to

25   the pool deck area are not installed allowing moisture into the building, therefore, in my

26   opinion, this has adversely affected the interior areas on the 4th floor and possibly other

27   levels with excessive amount of moisture and possibly mold;

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    •    The pool deck membrane replacement (mentioned above) may also

2    require a re-sloping of the deck in some areas, so that it will properly drain as ponding on

3    the deck is evident;

4    •    The TPO (roof membrane) at the mechanical equipment roof area

5    adjacent to the pool deck at the northside of the Project between the parking structure

6    appears to be damaged, and water may be seeping into the retail level below; moisture

7    and mold can be a factor whenever there is water intrusion;

8    •    Standing water in mechanical system pipes that are not being used

9    could be also a significant issue; corrosion can develop, attacking the walls of the pipe

10    and sediment can lead to performance issues in the system.  Extensive flushing will be

11    necessary to remediate this problem;

12    •    One of the structural equipment platforms at the 4th floor central plant

13    is reported (by the installing contractor of the equipment) to not be verified for structural

14    capacity; in other words, a structural engineer has not confirmed the platform's ability to

15    support the current equipment and the balance of equipment to be installed.  In addition,

16    several large pieces of mechanical equipment on the existing structural platforms are not

17    structurally anchored, which creates an immediate structural and safety issue;

18    •    One fire alarm contractor involved with the Project's installation

19    reported that OCFA will require a separate fire alarm panel for the hotel; currently, the

20    main fire alarm panel serves the hotel, retail, and other areas of the Project.  A separate

21    hotel panel will require new drawings, OCFA approval, and permits;

22    •    In its current state, the interstitial space above the 3rd floor and below

23    the 4th floor has access for maintenance; fire sprinkler code requires this space to be

24    sprinklered, as confirmed by the installing contractor for the Project.  The area currently is

25    not sprinklered, and it remains a risk for the Project;

26    •    The $4,000,000 estimate to complete the balance of work is grossly

27    understated as indicated in Carine's preliminary due diligence report (Phase 1); hard

28

1  construction costs alone are currently estimated at between $8,000,000 and $9,000,000,

2  plus FF&E installation and soft costs; and

3  •       Additionally, with the permits expired and the failure to maintain the

4  development agreement with the City of Buena Park, this Project will be severely

5  scrutinized by all governing agencies such as the Community Development, Building &

6  Safety, Orange County Fire Authority (OCFA), Orange County Health Department

7  (OCHD), and the State Elevator Inspector.  This Project will have to be re-evaluated by

8  all agencies to confirm if the codes and local ordinances will be applicable under the

9  original permit or if the new code and local ordinances will be required to be administered

10 to obtain new permits and certificate of occupancy moving forward.

11        I declare under penalty of perjury under the laws of the United States of

12 America that the foregoing is true and correct.

13        Executed this 8th day of April, 2021, at Los Angeles, California.

14

15                                   Andrew Trost

16

17

18

19

20

21

22

23

24

25

26

27

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

EXHIBIT A



**CORDES**
CORDES&COMPANY

Bellann Raile
Statement of Qualifications

## COURT APPOINTED RECEIVER

**Bellann Raile** is a managing director with Cordes & Company. She has over 20 years of experience managing receiverships with Cordes & Company. With a total of 30 years' experience in operations management, she has managed businesses, both large and small, in a wide variety of industries. She and other members of Cordes & Company have been appointed as receiver in many real estate cases and have extensive experience as receivers in development-related projects. Ms. Raile works closely with the other experts in the firm who provide accounting, project management and technical support. She puts together the best and most cost-effective group to work on each particular project.

Cordes and Company has offices in Denver, Irvine and Minneapolis. Ms. Raile leads the California office that manages most Cordes & Company engagements located in the Western region.

Ms. Raile is widely recognized as an effective negotiator, mediator and focused businessperson who adds considerable value in every engagement she leads.

## EXPERIENCE

Ms. Raile has led or been personally appointed as a receiver in well over 200 cases. Below is a representative list of real estate development engagements she and Cordes & Company have played a significant role:

- **Laing-CP Lake Elsinore** (Lake Elsinore, CA) – a development project that consisted of 1,261 raw lots, a raw commercial site, a raw school site and an operating golf course. *(Receiver)*

- **Peterson** (Various CA locations) – Post-judgement receivership including liquation of development properties *(Receiver)*

- **Victory Plaza,** (Los Angeles, CA) - a 133,000 sf retail shopping center entitled for redevelopment into a City Center type development with environmental issues. *(Receiver)*

- **Rutter/Pacifica** (Newport Beach, CA) – 32 unit residential town house condominium units adjacent to a 5-story parking facility plus 206 acres of vacant land approved for future development. *(Receiver)*

- **Village Court** (Palm Desert, CA) – Partially compete 42,000 square foot medical/office condominium. *(Receiver)*

- **Irvine Partners, LLC** (Irvine, CA) - a 314,000 sf Class A office building-mostly completed. *(Receiver)*

- **Angeleno Properties, LLC** (Glendale, CA) – Completed construction and liquidated 5-unit two story condominium building. *(Receiver)*

- **New Town** (St. Charles, MO) – a $100 million planned community development project in severe financial distress where Cordes was advisor to the secured lender. *(Advisor)*

- **Kings Road** (Los Angeles, CA) - a vacant, primarily constructed three story, twelve (12) unit condominium/townhome project with one level of subterranean parking with a total building area of 18,399 square feet. *(Receiver)*

- **Opus Northwest** (Minneapolis, Denver, Seattle) – a development company with a $400 million distressed portfolio. Cordes was advisor to the company board of directors and built restructure plan. *(Advisor)*



033



# Bellann Raile Appointments

| Engagement Name | Brief Description | State |
|---|---|---|
| *Receivership Appointments* | | |
| A Lotta Storage | Storage Units | AZ |
| Blackhawk Enterprises | Real Estate Arizona | AZ |
| Bullhead City Chevron AZ | Gas Station/Convenience Store in Bullhead City, AZ | AZ |
| CF2, LLC | Executive Office Suites | AZ |
| Cottonwood Medical Office | Vacant Medical Office | AZ |
| Desert Sunshine | 214 Unit Apartment Complex located in Phoenix, AZ | AZ |
| Glen Harbor | Vacant Office Building | AZ |
| Greer Lodge | Recreational Lodge - Hospitality | AZ |
| Grotte | Office Building | AZ |
| Grow Trust | Retail Center- Good Year, AZ | AZ |
| Hipolito Trust | 32 Unit Apartment Complex located in Phoenix, AZ | AZ |
| Lionshops Inc | Strip mall in Phoenix, AZ 99th and Grand | AZ |
| Marina Vista | Office/Retail Plaza | AZ |
| Mirage Crossing | Real Estate | AZ |
| Palm Creek | Apartment Complex/small | AZ |
| Parkway Village | Commercial office/business space | AZ |
| Plaza 777 | Strip Mall - Scottsdale, AZ | AZ |
| Quality Mart | C-Store | AZ |
| Reems | Office Suites | AZ |
| RF BESD AZ | Solar Panels in AZ | AZ |
| Sabah Properties - Phoenix & Mesa | two retail strip malls | AZ |
| Sunrise Valero Nogales | Gas Stations | AZ |
| Sunrise Valero Tuscon | Gas Station | AZ |
| Triple E Holdings Phoenix | Retail Commercial Complex | AZ |
| 1617 Westcliff | Commercial | CA |
| 4th Street Investors | Self Storage in Lancaster, CA | CA |
| 801 Gateway | 801 Gateway - 5 Story 136K sq ft office building | CA |
| Advocacy for Domestic Violence | Non-profit woman's shelter | CA |
| Angeleno Properties LLC | 5 Condo Project LA | CA |
| Arbuckle Shell | Closed Shell Station in Arbuckle, CA | CA |
| Barcelo Enterprises | Commercial Nurseries | CA |
| Bi_Coastal | 7 Unit Condominium Project located in North Hollywood, CA | CA |
| Bonilla | Meat Market- Partnership dispute | CA |
| Calexico Crossings LLC | Warehouse - Calexico | CA |
| Camarillo Ranch | Office Condo located in Camarillo, CA | CA |
| Commons at Chino Hills | Power Center Development | CA |
| Cornelio | 9 Unit Apartment Complex located in Long Beach, CA | CA |
| Creative Video Logic | 27 Unit apartments in 15 buildings | CA |
| David L Shane Kings | Apartment complex | CA |
| David L Shane Laurel | Apartment Complex | CA |
| David L. Phares | Industrial Buildings | CA |
| Days Inn Stockton | Hotel located in Stockton, CA | CA |
| Del Sur | 17 SFH Lots and 4 model homes | CA |
| Desert Brook | 18 Hole Golf Course/development located in Desert Hot Springs | CA |
| Dorothy Heller Rev Trust | 2 industrial buildings | CA |
| El Cajon Lexington | Residential Real Estate | CA |
| Encino | Office Building | CA |
| Esplanade Commercernter | Light Industrial complex in Hemet CA. | CA |



 **Bellann Raile Appointments**

| Engagement Name | Brief Description | State |
|---|---|---|
| Fallbrook Development Group | Apt complex- 30 units Class C Fallbrook | CA |
| Fremont Shell | Shell Station Stockton, CA | CA |
| Fremont Tech Center | 10 Flex (Office/R&D) Buildings | CA |
| Granger Villa Apartments | Apartment Complex in Modesto, CA | CA |
| Irvine Center Partners III | Class A Office Building located in Irvine, CA | CA |
| Kang Medical | Medical Commercial Center | CA |
| Kathy A. Hoke | Office Property/Building | CA |
| Kings Road | 12 Unit Condominium Project located in West Hollywood, CA | CA |
| L and W Stone | Stone Quarry and Distribution Centers | CA |
| Links at Summerly | Golf course and residental development, Lake Elsinore | CA |
| Majestic Hotel | 58 Room Hotel located in San Francisco, CA | CA |
| Medi Pedic Bedding | Mattress Manufacturer | CA |
| Medina Antioch | Commercial | CA |
| Medina Maie Ave | Commercial | CA |
| Medina Pacific | Commercial | CA |
| Medina San Jose | Commercial | CA |
| Medina Slauson Ave | Commercial | CA |
| Melrose Harper LLC | Strip Mall/2 apartments in Hollywood, CA | CA |
| Menifee/Gallery Project | 8 Unit Housing Project and 23 finished lots located in Menifee | CA |
| Mustang Market | Chevron-branded convenience store and gas station | CA |
| Nickel Back | Commercial building in Costa Mesa, CA | CA |
| NP Gas 2 | NP Gas revised | CA |
| NP Gas I | Gas Station | CA |
| NP Gas US Gasup | Gas Station/C Store | CA |
| O.R.E.P., Inc. | 2 story Office Building in Orange County | CA |
| Old Church LLC | Banquet Center | CA |
| Old Town La Quinta | Office/Retail | CA |
| Oroville Post Judgement | Post judgement involving rental property and land | CA |
| Oroville Self Storage | 660 Unit Self Storage- Oroville, CA | CA |
| Oxnard Arts Lofts | Live/Work 18 unit space | CA |
| Oxnard Shell | Convenience Store in Oxnard, CA | CA |
| Pacific Property Assets Long Beach | Vacant 3 story office building | CA |
| Palacio Del Sol LLC | Residential | CA |
| Peterson | Rental property and land | CA |
| Pine Manor Guest Home Inc | Adult Personal Care Home | CA |
| PLI Las Vegas LLC | 100k sf office building in Pomona, CA. | CA |
| PPA Holdings Fountain Blue | 18 unit apartment complex - Riverside, CA | CA |
| Punla | Strip Mall | CA |
| Rutter/Pacifica | 28 Unit Townhome Project located in Costa Mesa, CA | CA |
| SAL-PDC | Assisted living facility | CA |
| San Ramon Court | Apartment Buildings, Fresno, CA | CA |
| Scripps Ranch | 3 Building Business Park located in San Diego, CA | CA |
| Shoppes at Chino Hills | Large lifestyle retail and office center | CA |
| Strata Realty LLC | Multi-building mixed use business park | CA |
| Style Up Inc | Commercial Warehouse | CA |
| Sunflower Apartments | 39 unit apartment complex in Downey | CA |
| Sunland Ventures, Inc. | Dial Automotive & Sourdough Pizza | CA |
| Ten Forward Dining | 2- leased Jack in the Box's Retail Strip Center | CA |
| Trustee Properties W 48 Street | Commercial Property | CA |
| Trustee Properties W 62 Street | Commercial Property | CA |



**Bellann Raile Appointments**

| Engagement Name | Brief Description | State |
| --- | --- | --- |
| Twin Springs LLC | Large office-older buildings | CA |
| Vanatta Show Low | Single Family Residence | CA |
| Victory Boulevard Shopping Center | Shopping Center- LA | CA |
| Village at Nipomo | Real Property Located in the County of San Luis Obispo | CA |
| Village Court | Medical Office Condo | CA |
| Watsonville Self Storage | Self-Storage Facility in Watsonville, CA | CA |
| WL Newland | Land & Improvements 123 Bungalow Triplexes & 27 SFH | CA |
| Zander | Vacant Building | CA |
| Zarate | Trucking company and yard. | CA |
| Triple E Holdings Idaho | Retail Commercial Complex | ID |
| Incred A Bowl LLC | Bowling Alley | KS |
| 305 Las Vegas LLC | Parking Lot and 3 separate 2 Story office buildings | NV |
| Chaddah | 107 Unit Apartment Complex located in Las Vegas, NV | NV |
| Chai Storage | 2 large storage complexes in N Las Vegas | NV |
| Crossroads Las Vegas | Apartment Complex- Las Vegas | NV |
| Douglas J. Seip MD LTD | Physician office | NV |
| Hop Over LLC | 228 Unit apartment complex | NV |
| Jed Property | Commercial Real Estate | NV |
| KB Worldwide Holdings LLC | 4,057 sf commercial sing story medical office building | NV |
| Korte Revocable Indenture of Trust | Mini Storage | NV |
| LMGC Apartments | 28 Unit Apartment Building | NV |
| MP AMS Holdings LLC | Mini Storage Facility | NV |
| Rustigian Receivership | Abandoned property in Elco NV | NV |
| Save Most Alicia Hills | Commercial Property | NV |

## Bankruptcy Advisor Cases (for Creditor)

| | | |
| --- | --- | --- |
| South Loop 2600 LLC | Bankruptcy Plan Agent | CA |
| BHG El Paso | Disbursement of cash assets | TX |
| Arizona Oil | 16 C- Stores throughout AZ | AZ |
| Black Hawk | C- Store | AZ |
| Jump Oil | 73 C-Stores in Missouri and Oklahoma | MO |
| Stacy's Greenhouses | Creditor advisor in Ch 11 BK proceeding. | SC |
| Ws China Bistro | Restaurant - Redondo Beach | CA |

## Other Engagements

| | | |
| --- | --- | --- |
| Trademark Visual | Retail liquidation | AZ |
| 7 Elephants | Liquidation of electronics  inventory | CA |
| Tile Outlet | Multi State Tile Company Liquidation | CA |
| Paradise Kay Marina | Validate rent roll reporting | CA |
| Hemet West | Partnership dissolution | CA |
| 801 Gateway Asset Management | Asset Management services | CA |
| Barcelona Motorcoach LLC | 3 phase (238 space) RV Park | NV |
| Camino El Norte | Commercial property | NV |
| Greer Lodge Asset Management | Post receiver asset management | AZ |
| JED Property Management | Post receiver asset management | NV |
| Miss Donuts | Commercial property | CA |

# EXHIBIT B







3





















13















18

# EXHIBIT C

**From:** Juliet Y. Oh <jyo@lnbyb.com>
**Sent:** Wednesday, March 24, 2021 11:51 AM
**To:** Bellann Raile <bellann@cordesco.com>
**Cc:** Clayton Tanaka <ctanaka@mdproperties.com>; 'Steven J. Kahn' <skahn@pszjlaw.com>
**Subject:** The Source Hotel, LLC - Building Access

Hi Bellann,

Steve informed The Source Hotel, LLC (Debtor) of your concerns about the elevator inspection and sewer gas smell on the second floor of the building.  In addition, Shady Bird has raised concerns about (among other things) water intrusion on the roof and pool issues.  The Debtor would like to access the building to get a gauge on these issues so it can work with you to address them in a timely and cost-effective manner.  I have copied Clay Tanaka from the Debtor on this e-mail – would you please coordinate a date/time for the Debtor and its maintenance person(s) to access the building over the next day or two?

Thank you very much.

Best,
Juliet


**JULIET Y. OH,** Esq.

**LEVENE, NEALE, BENDER, YOO & BRILL  L.L.P.**
10250 Constellation Blvd.  |  Suite 1700  |  Los Angeles, CA  90067
Phone  310 229 1234  |  Direct  310 229 3348  |  Fax  310 229 1244
JYO@lnbyb.com  |  www.lnbyb.com

The preceding E-mail message is subject to Levene, Neale, Bender, Yoo & Brill  L.L.P.'s
email policies which can be found at http://www.lnbyb.com/disclaimers.htm.

🌐 Please consider the environment before printing this email

1

# EXHIBIT D

Room 738:



Room 739:



Room 747:





# EXHIBIT E

April 2, 2021



## INTRODUCTION

This document summarizes the background and status of the "Source Hotel Project" ("Hotel Project") located at 6986 Beach Boulevard, Buena Park, California. This document was prepared by the City of Buena Park ("City") with reference to public records and includes observations from the City's perspective as opposed to the legal views, conclusions, or position of the City. Copies of any of the public documents or records referenced may be obtained by submitting a request to the City Clerk under California's Public Records Act.[1]

## SUMMARY OF THE SOURCE HOTEL PROJECT

The Source Hotel Project is part of the larger mixed-use project known as "The Source" ("Mixed-Use Project") that is located immediately adjacent (and structurally connected) to the Hotel. The Source Hotel Project remains partially constructed and is governed by a variety of contracts, land use regulations and covenants, approvals and permits issued by the City. The general terms and conditions of the foregoing most material to the Hotel Project are described below.

- **Development Agreement.**   On October 14, 2008, the City approved Development Agreement No. DA008-003 ("Development Agreement" or "DA") with 6940 Beach LLC. The Development Agreement was recorded on the Property as of November 17, 2008 and remains in effect.

  - Permitted Use (DA §§ 1(d), 11).   The DA allows a mixed-use development featuring upscale retail, restaurants, entertainment, residential, hotel, and office uses as well as parking and open space amenities as provided in the Beach Orangethorpe Mixed Use Specific Plan ("BOSP"). More specifically the DA allows:

    - Retail – 350,000 square feet
    - Hotel – 300-room / 277,000 square feet in multi-level landmark building with conference facilities
    - Residential – 1,000 multifamily units
    - Office Alternative – 195,000 square feet per market demands in lieu of 177 multifamily units
    - Open Space / Amenities– 350,000 square feet of open area amenities

---

[1] **DISCLAIMER: This document was created and is being made available for informational purposes only and does not represent nor shall the legal or factual conclusions or the City. THE CITY EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES OR REPRESENTATIONS AS TO THE TRUTH OR ACCURACY OF THE INFORMATION PROVIDED OR THE POSITIONS TAKEN IN THIS DOCUMENT, and this document should not be relied for legal, due diligence, investigatory, or any other purpose by any person with an interest in the Property, any third-parties, institutions, or courts, or any member of the public. This document is intended as an informational and educational document only to give context to the complex history and nature of the subject project.**

o **Term (DA §§ 6, 7)**. Developer commenced construction activities within five (5) years form the effective date of the DA, as required, and thus the DA is scheduled to remain in place until December 4, 2028 (unless earlier terminated).

o **Construction Schedule (DA § 7)**. Developer was required to commence construction work pursuant to building permits issued by the City. If Developer fails to do so, the Development Agreement becomes null and void and the site reverts to the BOSP. Only one (1) extension of the schedule is permitted for up to two (2) years. There have been no known construction activities since the date of the last inspection (noted below).

o **Rights of Secured Lenders (DA § 19)**. Secured lenders have the right to do anything required by Developer under the DA and otherwise realize their security interest by acquiring or transferring the project. To forestall adverse action by the City, secured lenders are required to cure any defaults and keep and perform the terms, covenants, and conditions of the Development Agreement.

- **Beach Orangethorpe Mixed Use Specific Plan.** In October 2008, the City approved the BOSP allowing the aggregate site to be developed with a mix of upscale retail, restaurant, entertainment, residential, hotel, and office uses as detailed below. The BOSP remains effective and represents the "baseline" land use regulations governing the site.

| Phase | Residential | Commercial | Office (Alternative) | Hotel | Parking |
|-------|-------------|------------|----------------------|-------|---------|
| Phase I | 681 units | 255,000 sqft. | 195,000 sqft. in lieu of 177 units | 270,000 sqft. hotel / 300 rooms | 2,920 stalls (subterranean and above-grade level) |
| Phase II | 319 units | 100,000 sqft. | - | - | 1,640 stalls |
| Total | 1000 units | 355,000 sqft. | 195,000 sqft. in lieu of 177 units | 270,000 sqft. hotel / 300 rooms | 4,560 stalls |

- **Disposition and Development Agreement.** On October 26, 2010, the former Redevelopment Agency ("RDA") approved a Disposition and Development Agreement ("DDA") with the "Source at Beach LLC" ("Source at Beach"). A memorandum of DDA was recorded on October 9, 2012. After the RDA's dissolution in February 2012, all rights to enforce and manage the DDA passed to the City as the RDA's "successor agency." (Health & Safety Code § *34170* et seq.)

o **Effect / Purpose**. The DDA does not replace the DA or BOSP but rather: (1) effectuated the sale of certain RDA-owned properties to Developer for subsequent development consistent with the DA and BOSP; and (2) provided financial assistance to incentivize Developer's completion of the Mixed Use Project described in the DDA; including installation of a high-quality tenant in the Hotel Project.

o   <u>Key Terms and Provisions of DDA</u>.

- *RDA Property Sale (DDA § 2)*.  RDA sold several properties to Developer for consolidation with adjacent properties already owned by Developer. No money was paid for the RDA properties; rather the return consideration was public benefit resulting from Developer's completion and operation of the Mixed-Use Project.

- *Development Obligations (DDA § 3)*.  Developer is required to construct a three (3) phased "Mixed-Use Project" on the Property:

  - Phase I – 428,000 square feet of retail space with a movie theatre, spa, entertainment uses, retail stores, and parking.
  - Phase II – 193,220 square feet of office space
  - Phase III – Mobil 3-5 star or AAA 3-5 diamond full-service hotel and parking.

- *Financial Assistance from RDA (DDA § 4)*.

  - Property Tax Pledge – RDA returns 100% of tax increment revenues generated by the property by virtue of the Mixed-Use Project. Pledge expires in Fiscal Year 2029-2030 (unless earlier terminated for default).

  - Sales Tax Pledge – Return of sales tax revenue generated by the Mixed-Use Project at the general rate of 55% of revenues more than $1,712,000 (variable over time). Duration is 30 years (unless earlier terminated for default).

  - Termination for Default – This financial assistance may be terminated by the City upon expiration of the above deadlines or upon a default by Developer.

- *Prohibition on Transfers and Security Interests (DDA § 5)*. Developer is prohibited from mortgaging or encumbering the property or Mixed-Use Project (or any part), or transferring or assigning its rights, prior to completing the Mixed-Use Project without City's advanced approval. Construction financing for each phase of the Project is a permitted exception if the financing satisfies the criteria in DDA § 3.4.

- *Events of Default (DDA § 7.1)*.

  - Developer's failure to perform the Schedule of Performance in a timely manner.
  - A breach of the DDA consisting solely of the payment of money and continuing for ten (10) days or more.
  - The filing of a petition in bankruptcy or the appointment of a receiver or trustee over any property included in the Mixed-Use Project.

- *Remedies (DDA § 7.2)*. The City has the right to terminate the DDA in the event of default by the Developer.

- **Interdepartmental Reviews.** Section 15 of the Development Agreement allows minor modifications and changes to the Mixed-Use Project to be approved by the City's Director of Community Development. Several such "Interdepartmental Review Approvals" have been issued for the Mixed-Use Project but those most relevant to the Hotel Project are below. Several "conditions of approval" for Interdepartmental Reviews remain incomplete for both portions.

  o Interdepartmental Review No. ID14-005.  Approved on December 8, 2014 and made revisions to architectural features, landscaping, colors and materials for the parking structure, as well as site plan and architectural review of the Phase 1.5 building that includes the Hotel Project.

  o Interdepartmental Review No. ID17-003.  Approved on March 21, 2017 and authorized modifications to the exterior and hardscaping for the Hotel Project.

- **Building Permits Status.** There are five (5) main building permits issued for the Hotel Project and most overlap or authorize related improvements associated with the Mixed-Use Project. Not all of these main permits were issued to the same legal entity all have now expired.

  - *B13-1388*: Foundations for Building B (or Phase 1.5) which houses both a portion of the retail and the hotel portion of the Mixed-Use Project.  This permit was issued as of 7.11.2014 and was complete as of 3.27.2018. Permit owner is "Source at Beach."

  - *B13-1389*: Shell retail work, various retail components, and hotel lobby. This permit was issued as of 1.29.2015 and is still open. The last inspection was conducted on 12.6.2016 meaning the permit has now expired. Permit owner is "Source at Beach."

  - *B13-1391*: Shell for Hotel Tower, Floors 4-7, Elevators, Stairwells, etc. This permit was issued on 1.19.2016 and remains open. The last inspection was 1.10.2020 meaning the permit has now expired. Permit owner is "Source at Beach."

  - *B15*-2102: Enclosed 3rd-Floor walkway between retail and hotel portions of Mixed-Use Project. This permit was issued on 2.10.2016 and is still open. The last inspection was conducted on 7.13.2016 meaning the permit has now expired. Permit owner is "Source at Beach."

  - *B13-2294*: Hotel interior tenant improvements. This permit was issued on 5.26.2017 and remains open. The last inspection was 7.2.2019 meaning the permit has now expired. Permit owner is "The Source Hotel."

  - *Various Sub-Permits Issued*: Various sub-building permits have been issued which authorize a specific scope of work related to one of the above main permits. The status of the sub-permits mirror that of the Main Permit under which it was issued; meaning any outstanding sub-permits for the Hotel Project have now also expired.

4

# EXHIBIT F



April 5, 2021

Mr. Bellann Raile
Cordes & Company
2030 Main Street, Suite 1300
Irvine, CA 92614

Re:  **Source Hilton Hotel Buena Park Follow Declaration**

Dear Ms. Raile:

This document has been prepared in response to statements made by Robert "Charlie" Cervantes in his Declaration in opposition to certain motions made by Shady Bird Lending, LLC.

The Declaration made by Mr. Cervantes appears to be a response to the statements and observations contained in our report following our March 9, 2021 inspection.  Although Mr. Cervantes states he completed a walk-through inspection of the property on March 25, 2021, it appears his inspection was limited to his interpretation of our report.

1.  **Roof Issues** – The roof has numerous penetrations and is the primary location for much of the HVAC equipment.  Because the HVAC system has not been completed, significant and large openings exist through the roof and into ductwork.  The Debtor has placed plastic sheeting (polyethylene film), sometimes referred to as Visqueen, to cover the openings.  Unfortunately, this is not an appropriate long-term solution for the reasons stated below:

    a.  The application of plastic is not universal and numerous opening did not contain any covering.  See Picture 1 below.
    b.  Several roof vents are missing, which will allow water and pests to enter the building.  See Picture 2 below.
    c.  In the Declaration by Mr. Cervantes, he seems to indicate the placement of plastic film is acceptable.  However, polyethylene plastic is highly susceptible to degradation from exposure to the sun, through UV radiation.  The correct permanent solution is a sheet metal duct cap, as seen in Picture 3.
    d.  A review of Google Earth pictures seem to indicate the roof has had a long-term temporary solution to water intrusion.  See Picture 4 below:

---



Picture 1 – Unprotected vent.



Picture 2 – Missing flashing.



Picture 3 – Duct cap.



Picture 4 – Roof in April 2018 with temp coverings.

2.  **Incomplete Construction Assemblies Water Intrusion** – The term construction assembly is an industry recognized term that refers to all the components of given portion of building, which when assembled together serve a specific purpose.  In the case of the roof, the assembly is comprised of all components designed to protect the structure from water intrusion.  As can be seen from Pictures 5 and 6, a roof failure existed and was in the midst of being repaired when construction ceased.  Picture 5 shows the completed repair with flashing covering, while Picture 4 shows the roof torn off and exposed wood. Picture 7 is a close up of the incomplete repair.  Furthermore, it was evident the Debtor had tried to mitigate water intrusion by use of sand bags and plastic that were located near or on the roof at this area.



Picture 5 – Exposed roof substrate.



Picture 6 – Repaired area, opposite from the exposed area.



Picture 7 – Repaired area, opposite from the exposed area.

3. **Incomplete Fire Protection –** Mr. Cervantes accurately points out that the fire protection system has temporary construction covers over many sprinklers.  This confirms what we identified in our report – the fire protection system is not capable of providing life-safety protection for the project.  Until construction is remobilized and completed, the building will be at risk in the event of a fire.

4. **Pool Deck –** It is clear the pool deck water proofing has been exposed to years of excess exposure.  Picture 8 below is a screen shot from Google Earth in May of 2019.  In this picture, the pool deck is completely uncovered.  Moreover, the damage from excessive sun and UV exposure was readily noticeable by the amount of friable roof material readily sloughing off.  This can be seen in Picture 9 below.  I am also concerned by Mr. Cervantes' statement that his construction crew applied sealant over the area.  Typically, a contractor engaged in roofing or waterproofing would have either a C-39 roofing or C-

33 painting license.  Moreover, most manufactures of waterproofing systems require trained and licensed installers to performing maintenance and installation of their system or the warranty may be voided.



Picture 8 – Exposed pool deck 5/2019.



Picture 9 – Deteriorating and friable pool deck.

5. **Pool Water & Trash** – From our observations, the water and trash had been in the pool for some period of time.  A review of both Weather.com and Weather Underground did not reveal any periods of rain between 2/17 (onset of Receivership) and 3/3 (first inspection).  Several inches of rain occurred prior to the Receivership and it appears as though this water may not have been removed.

6. **Completed Business Finish Waste** – The construction phasing was performed in such a manner that completed finishes (carpet, floor tile, showers, plumbing fixtures, wall coverings and cabinetry) are subject to construction traffic and exposure.  Very little protective measures have been instituted to guard against damage and destruction.  Both the tile and carpet flooring are uncovered and being subjected to unusual damage.  See pictures below:





7. **Sewer System Hazard** – Mr. Cervantes alleges the sewer system has been connected to the public system, which may be the case. However, it would be unusual for the sewer provider to provide this connection before the building receives its final inspection. This is an issue that can be understood, but needs to be verified. In the event the line is not connect, a potentially hazardous situation exists due to the current sewer use in the building with no outlet. This creates head pressure on the sewer system. Mr. Cervantes also claims he regularly refilled all the P traps to prevent sewer gas migration into the building, but many of the P traps are not connected to active water systems, so it is hard to imagine this was routinely performed.

8. **Roof Door Patch** – At the door that leads to the roof, it is apparent that someone other than a qualified PVC or PTO roofing contractor has patched a previous leak. Previously, this area leaked into the building below. The concern we have is that the improper repair may leak again and damage the unit below.

9. **Missing Flashing** – According to Mr. Cervantes the missing flashing is "more a construction issue (which is typically addressed during the completion of construction and not a maintenance issue." While it is true the completion would ordinarily follow construction, the course of construction has been interrupted for a protracted period of time and these openings will readily allow water and pests to enter the building. Moreover, even during the course of an active project, one would protect an opening when inclement weather is forthcoming and that has clearly not been done.

Should you have any question, please feel free to call me.

Sincerely,

*Brent Little*

Brent Little
Principal

070

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 333 South Grand Avenue, Suite 3400, Los Angeles, CA 90071.

A true and correct copy of the foregoing document entitled (*specify*): **SHADY BIRD LENDING LLC'S REPLY TO OPPOSITION TO MOTION OF SHADY BIRD LENDING, LLC FOR ORDER EXCUSING STATE COURT RECEIVER FROM TURNOVER OF ASSETS PURSUANT TO 11 U.S.C. § 543; DECLARATIONS OF BELLANN R. RAILE, BRENT LITTLE, AND ANDREW TROST IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) April 8, 2021, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

**See Attached**

☒ Service information continued on attached page.

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) April 8, 2021 , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**VIA OVERNIGHT MAIL**
The Honorable Erithe A. Smith
U.S. Bankruptcy Court
Ronald Reagan Federal Building
411 W. Fourth Street, Suite 5040
Santa Ana, CA 92701

**VIA OVERNIGHT MAIL**
Nancy S Goldenberg
Office of the United States Trustee
411 W Fourth St Ste 7160
Santa Ana, CA 92701-8000

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 8, 2021 | Cheryl Caldwell | /s/Cheryl Caldwell |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

CC 2710485v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                         **F 9013-3.1.PROOF.SERVICE**

**ADDITIONAL SERVICE INFORMATION** (if needed):

**1.**  **SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

Ron Bender on behalf of Debtor The Source Hotel, LLC
rb@lnbyb.com

Michael G Fletcher on behalf of Creditor Evertrust bank
mfletcher@frandzel.com, sking@frandzel.com

Robert P Goe on behalf of Creditor Westranco, Inc.
kmurphy@goeforlaw.com, rgoe@goeforlaw.com;goeforecf@gmail.com

Nancy S Goldenberg on behalf of U.S. Trustee United States Trustee (SA)
nancy.goldenberg@usdoj.gov

Daniel A Lev on behalf of Creditor Shady Bird Lending, LLC
dlev@sulmeyerlaw.com, ccaldwell@sulmeyerlaw.com;dlev@ecf.inforuptcy.com

Daniel A Lev on behalf of Interested Party Courtesy NEF
dlev@sulmeyerlaw.com, ccaldwell@sulmeyerlaw.com;dlev@ecf.inforuptcy.com

Grant A Nigolian on behalf of Interested Party Courtesy NEF
grant@gnpclaw.com, process@gnpclaw.com;grant.nigolian@gmail.com

Juliet Y Oh on behalf of Debtor The Source Hotel, LLC
jyo@lnbrb.com, jyo@lnbrb.com

Ho-El Park on behalf of Interested Party Courtesy NEF
hpark@hparklaw.com

Ronald N Richards on behalf of Interested Party Courtesy NEF
ron@ronaldrichards.com, morani@ronaldrichards.com

United States Trustee (SA)
ustpregion16.sa.ecf@usdoj.gov

CC 2710485v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                    **F 9013-3.1.PROOF.SERVICE**