Daniel A. Lev (CA Bar No. 129622)
  dlev@sulmeyerlaw.com
**Sulmeyer**Kupetz
A Professional Corporation
333 South Grand Avenue, Suite 3400
Los Angeles, California 90071-1406
Telephone: 213.626.2311
Facsimile: 213.629.4520

Ronald Richards (CA Bar No. 176246)
  ron@ronaldrichards.com
Law Offices of Ronald Richards & Associates, APC
P.O. Box 11480
Beverly Hills, California 90213
Telephone:  310.556.1001
Facsimile:  310.277.3325

Attorneys for Shady Bird Lending, LLC

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br>THE SOURCE HOTEL, LLC,<br><br>        Debtor. | Case No. 8:21-bk-10525-ES<br><br>Chapter 11<br><br>**SHADY BIRD LENDING LLC'S REPLY TO OPPOSITION TO MOTION OF SHADY BIRD LENDING, LLC FOR ORDER DESIGNATING CHAPTER 11 CASE AS SINGLE ASSET REAL ESTATE CASE PURSUANT TO 11 U.S.C. §§ 101(51B) AND 362(d)(3); DECLARATIONS OF BELLANN R. RAILE, BRENT LITTLE, AND ANDREW TROST IN SUPPORT THEREOF**<br><br>DATE:   April 15, 2021<br>TIME:    10:30 a.m.<br>PLACE:  Courtroom "5A" |

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

Shady Bird Lending, LLC ("Shady Bird"), hereby submits its "Shady Bird Lending LLC's Reply to Opposition to Motion of Shady Bird Lending, LLC for Order Designating Chapter 11 Case As Single Asset Real Estate Case Pursuant to 11 U.S.C. §§ 101(51B) and 362(d)(3); Declarations of Bellann R. Raile, Brent Little, and Andrew Trost in Support Thereof" (the "Reply"), in response to the "Opposition to Motion of Shady Bird Lending, LLC for Order Designating Chapter 11 Case As Single Asset Real Estate Case Pursuant to 11 U.S.C. §§ 101(51B) and 362(d)(3); Declaration of Donald Chae in Support Thereof" (the "Opposition"), filed in response to the "Motion of Shady Bird Lending, LLC for Order Designating Chapter 11 Case As Single Asset Real Estate Case Pursuant to 11 U.S.C. §§ 101(51B) and 362(d)(3); Memorandum of Points and Authorities; Declarations of Ronald Richards, Bellann R. Raile, and Brent Little in Support Thereof" (the "Motion"), filed by Shady Bird, and represents as follows:

I.

## PREFATORY STATEMENT

Sections 101(51B) and 362(d)(3) of the Code were enacted specifically for this type of chapter 11 case.  The terms "single asset case," or "single asset real estate case," are well-known and often used colloquialisms which essentially refer to real estate entities attempting to cling to ownership of distressed real property in a depressed market, much like the Debtor, rather than businesses involving manufacturing, sales, or services.[1]  See In re Mayer Pollock Steel Corp., 174 B.R. 414, 422-23 (Bankr. E.D. Pa. 1994).  The drafters of Sections of 101(51B) and 362(d)(3) were aware of the colloquial use of the phrase "single asset real estate," and their intention in using that phrase grew out of its previous colloquial and common usage.  Moreover, the drafters of Sections 101(51B) and 362(d)(3) were obviously attempting to implement a mechanism by which a

---

[1] Unless otherwise stated, the use of capitalized terms herein shall have the meaning ascribed to them in the "Motion of Shady Bird Lending, LLC for Order Designating Chapter 11 Case As Single Asset Real Estate Case Pursuant to 11 U.S.C. §§ 101(51B) and 362(d)(3); Memorandum of Points and Authorities; Declarations of Ronald Richards, Bellann R. Raile, and Brent Little in Support Thereof" (the "Motion").

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

1  species of cases - "single asset real estate" chapter 11 cases - would be forced to

2  proceed on an expedited track.  In re Light Foot Group LLC, 2011 Bankr. LEXIS 4399

3  (Bankr. D. Md. 2011) (citing In re Philmont Development Co., 181 B.R. 220, 223 (Bankr.

4  E.D. Pa. 1995)).

5         Here, despite the Debtor's attempt to portray the Project as being on the

6  cusp of completion, the facts demonstrate otherwise.  This is not a hotel which is 85%

7  complete, with only "finish work" remaining to be completed before the Debtor can start

8  taking its first reservation, which is, in any event, entirely irrelevant to a "SARE" finding.

9  In fact, as Shady Bird accurately detailed in the Motion, and as buttressed by the

10  evidence in support of this Reply, this Project is saddled with substantial issues of waste

11  and neglect which contradicts the Debtor's rosy portrayal of the hotel.  Other than the

12  self-serving declaration from Donald Chae, all the Debtor offers to rebut Shady Bird's

13  overwhelming evidence is a declaration from an unlicensed employee and self-described

14  maintenance worker which proves nothing.

15         And rather than submit pictures of what the Project may one day look like if

16  it is ever constructed, Shady Bird has submitted pictures of what this dilapidated Project

17  looks like today.  These pictures do not lie; this is a hotel which is years and tens of

18  millions of dollars away from ever being completed, assuming the Debtor could ever

19  locate a lender foolish enough to finance construction of this albatross.  Even the Debtor

20  concedes that it will take nearly $20 million to finish construction.  While the Debtor clings

21  to the hope that one day it can complete construction, there is no competent evidence

22  demonstrating an exit strategy.  So although the Debtor mentions an illusory commitment

23  letter from a DIP lender and possible avenues for confirmation of a plan, the Opposition is

24  nothing more than a smoke screen from a debtor who has had seven years to build this

25  relatively modest hotel, but has failed miserably.

26         Attempting to shift the blame for its own malfeasance and incompetence to

27  Evertrust, Shady Bird, its unpaid vendors, and the Receiver is the ultimate act of

28  desperation.  Neither Evertrust nor Shady Bird had any role in the Debtor's admitted

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  inability to complete this Project.  Nor did the Debtor's unpaid contractors and suppliers

2  who basically gifted close to $3,000,000 of services and supplies to the Project.  And

3  since her appointment, the Receiver has undertaken all steps necessary to preserve the

4  Project and prevent a further decline in value.

5        The Debtor, on the other hand, has been in default of its loan for years, and

6  during that time has accomplished nothing more than allowing this ramshackle, partially

7  built structure to further erode and depreciate in value.  If the Project truly had the value

8  claimed by the Debtor, financing would have been secured long ago.  Therefore, what the

9  Debtor dreams this Project may become years in the future is insufficient to overcome the

10  demonstrable evidence showing that this is, inarguably, a single asset real estate case

11  generating no income and performing no business.

12                           **II.**

13  **THE DEBTOR'S RELIANCE ON HEARSAY ALLEGATIONS NOT CORROBORATED**

14  **BY ANY ADMISSIBLE EVIDENCE CANNOT SAVE IT**

15  **FROM A SARE DESIGNATION**

16        The Debtor spends page after page attacking Shady Bird, Evertrust, its

17  unpaid vendors, and even the Receiver, for its financial problems and colossal failures.

18  The allegations - which range from Evertrust's refusal to fund the remaining $4,000,000

19  of its Loan, to the refusal of a potential lender to fund a $42 million financing agreement

20  due to COVID-19, to Evertrust's litigation against the Chae's and the commencement of

21  foreclosure proceedings, to the broken oral and unsubstantiated promises of Cambra

22  Realty to fund construction costs, to Shady Bird's subjective egregious demands, to the

23  Receiver's failure to maintain and preserve the hotel - are nothing more than pathetic

24  attempts to shield the Debtor from its own incompetence.  Not only is the Debtor's tale of

25  events leading to its chapter 11 pure fiction, comprised almost entirely of inadmissible

26  hearsay statements not supported by a shred of competent evidence, but it reinforces the

27  ends the Debtor will go to cover up its own inadequacies and outright dishonesty.  Shady

28  Bird welcomes the opportunity to refute the Debtor's outlandish series of lies, but need

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  not do so at this time since the singular issue before the Court is whether the Project

2  qualifies as SARE under Section 101(51B).[2]

3  **III.**

4  **WITHOUT QUESTION, A PARTIALLY BUILT, NON-OPERATING HOTEL QUALIFIES**

5  **AS A SINGLE ASSET REAL ESTATE CASE PURSUANT**

6  **TO 11 U.S.C. §§ 101(51B) AND 362(d)(3)**

7  Shockingly, the Debtor claims it does not qualify for a SARE designation

8  since "*if* the Hotel was completed and operating, it would *not* constitute a 'single asset

9  real estate' within the definition of 11 U.S.C. § 101(51B)." This is an Alice in Wonderland

10  argument, where up is down and down is up. A Section 101(51B) determination is not

11  based on what may be based on sheer hope and conjecture, but is based exclusively on

12  what is. Simply put, the Debtor's outlandish misinterpretation of Section 101(51B) is not

13  supported by a single decision, particularly the three cases which Shady Bird already

14  proved have no similarity to the facts of this case.

15  First, the Debtor cites to the Bankruptcy Appellate Panel's decision in

16  Centofante v. CBJ Dev., Inc. (In re CBJ Dev., Inc.), 202 B.R. 467 (B.A.P. 9th Cir. 1996),

17  where the Panel expressly noted that a SARE determination in hotel cases is to be made

18  "on a case by case basis, *emphasizing the number of persons employed by the hotel and*

19  *the services it provides*." CBJ Dev., 202 B.R. at 471 (emphasis added). As the Debtor

20  acknowledges, in CBJ Dev., the debtor actually was operating its hotel as of the date of

21  the petition, even though its restaurant and bar, which, prior to the petition were fully

22

23  ───────────────

24  [2] In support of its Opposition, the Debtor also submitted the declaration of Robert "Charlie" Cervantes (the "Cervantes Declaration"), an employee of one of the Chae's affiliated entities. Although Mr. Cervantes

25  attempts to attack the conclusions of the Receiver and Urban Advisory regarding the physical condition of the Project, Mr. Cervantes admittedly has no expertise in building construction, general contracting, design,

26  or engineering. In fact, Mr. Cervantes states that he simply "oversee[s] maintenance and security" of the Project. The Court, therefore, should discount and disregard the entirety of Mr. Cervantes' declaration

27  which is meant to undermine and contradict the findings of the Receiver and her consultants regarding the significant safety and construction issues at the Project.

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    operational, were undergoing renovations.  The Debtor certainly bears no resemblance to

2    the debtor in CBJ Dev..

3         Importantly, the Debtor concedes that the CBJ Dev. Panel found that only

4    current activities are to be considered in determining whether a debtor is conducting

5    substantial business activities other than the operation of the property, and that a non-

6    operational hotel may be considered a single asset real estate case because it has no

7    substantial business other than the business of operating the real property and activities

8    incidental thereto.  This is exactly the case before this Court.

9         To reiterate, the Debtor has no business operations of any kind.  It is

10   nothing more than a standing liability trap.  The Project is not permitted for occupancy

11   and is not generating a single dollar of income.  There are no rooms for let, there is no

12   electricity, there is no running water, there are no functioning systems for HVAC or fire-

13   life safety, there are no restaurants, there are no bars, there are no gift shops, there are

14   no retail stores, there are no pools or spas, there are no ballrooms, there is no fitness or

15   business center, and there is no convention space.  In other words, this is not a

16   functioning hotel; it is nothing more than an idled construction project burdened with

17   enormous debt and plagued by serious issues of waste and disrepair.

18        To sum up, the Debtor is years away from a certificate of occupancy and

19   tens of millions of dollars away from the day it could ever be characterized as anything

20   other than a SARE case.

21        Similarly, in In re Whispering Pines Estate, Inc., 341 B.R. 134 (Bankr. D.

22   N.H. 2006), the court declined to designate the debtor's hotel as a SARE case since it

23   had many of the same attributes as the hotel property in CBJ Dev..  As the court noted:

24              Debtor's hotel is an eighty-nine room hotel *that serves*

25              *continental breakfast, maintains a swimming pool and*

26              *common areas, provides local and long distance phone*

27              *service, provides high speed Internet service, and operates*

28              *room-cleaning and towel-laundering services*.  Based on

1    these facts, the Court holds that, like the hotel in CBJ, the

2    Debtor's hotel "*is sufficiently active in nature to constitute a*

3    *business other than the mere operation of property.*"

4    Id., at 135 (quoting CBJ Dev., 202 B.R. at 472) (emphasis added).

5    And in In re Iowa Hotel Investors, LLC, 464 B.R. 848 (Bankr. N.D. Iowa

6    2011), the court refused to apply a SARE designation to a debtor who operated two

7    hotels which offered room cleaning, complimentary breakfast, a whirlpool and swimming

8    pool, a fitness center, laundry services, dry cleaning pickup and delivery, and internet and

9    phone service.  The hotels also included a business center and they had separate

10    meeting rooms that hotel customers or members of the public could rent for functions,

11    meetings, and events.  As such, the court held that the creditor had not shown that there

12    was no substantial business being conducted by the debtor other than the business of

13    operating the real property and activities incidental thereto.  Although there was no gift

14    shop, restaurant, or bar in the hotels, there was a separate conference room that

15    functioned independently from the hotels' core business of providing rooms to sleep.

16    "Even if there was not a separate conference room, *the services involved in the operation*

17    *of the hotels* could be reason enough to remove the hotels from the definition of 'single

18    asset real estate.'" Id., at 853 (quoting Whispering Pines, 341 B.R. at 136) (emphasis

19    added).

20    As these three cases indicate, in order for a hotel to escape a Section

21    101(51B) SARE designation, there must be substantial services being performed for

22    hotel and non-hotel guests from which the debtor is generating income.  Here, as

23    opposed to the fully operational hotels in CBJ Dev., Whispering Pines, and Iowa Hotel

24    Investors, the construction of the Debtor's hotel is far from ever being finished and not a

25    single service can be performed for anyone.  In fact, it is years and millions of dollars

26    away from completion, assuming further construction and take out financing could ever

27    be located, which is unrealistic, especially given the Project's current run-down condition

28    and the Chae's utter lack of credibility and financial wherewithal.

Sulmeyer Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    In sum, the Debtor cannot host a single guest or visitor, let alone offer the

2    array of services and benefits ordinarily associated with a full-service hotel.  A partially

3    constructed, non-operating hotel, therefore, unquestionably falls within the confines of

4    Section 101(51B).

5    The Debtor's attempt to distinguish itself from the "undeveloped raw land"

6    cases such as In re Oceanside Mission Assoc's, 192 B.R. 232, 234 (Bankr. S.D. Cal.

7    1996), Kara Homes, Inc. v. National City Bank, et al, (In re Kara Homes, Inc.), 363 B.R.

8    399, 405 (Bankr. D.N.J. 2007), In re Sargent Ranch LLC, 2010 Bankr. LEXIS 2607

9    (Bankr. S.D. Cal. Aug. 6, 2010), In re Webb Mtn, LLC, 2008 Bankr. LEXIS 691 (Bankr.

10    E.D. Tenn. Mar. 6, 2008) also fails.

11    By arguing that it falls outside the definition of Section 101(51B) merely

12    because its hotel is allegedly 85% complete and it one day "anticipates operating the

13    Hotel and its related businesses, including the restaurant and bars within the Hotel

14    Premises" misses the point.  The test is not whether there is some form of construction

15    underway and whether development funds have been spent in the past.  In fact, in each

16    of the foregoing cases, there was some measure of development costs spent by each of

17    the debtors prior to initiating chapter 11.  The ultimate issue, however, was not whether

18    these debtors had some potential to exit bankruptcy and complete the development; the

19    test was whether the specific debtor generated substantially all of its income from the

20    project and whether any substantial business was being conducted other than operating

21    the property as of the petition date.  Moreover, even if the 85% completion figure was

22    accurate, which it is not, it is the finishing's and final 15% which is the most expensive

23    part of any hotel or commercial construction project.  Framing is not finishes.

24    The Debtor, essentially, is trying to graft a new exception into Section

25    101(51B) by arguing that if a debtor has a project in prospect, but still is generating no

26    income and conducting no business, then Section 101(51B) does not apply.  This

27    improper reading of Section 101(51B) is not borne out by its plain meaning, or by the

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**SulmeyerKupetz,** A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  numerous decisions which have applied it to the present day circumstances of a case,

2  not what might occur some day in the future.[3]

3       Here, it is indisputable that there are no core-hotel activities being

4  performed by the Debtor because it is not performing any activities of any kind, and

5  admittedly has not been since construction ceased in 2019.  It is not "operating the

6  property" in the traditional sense, and the Project is nothing more than a vacant shell

7  afflicted with serious construction and safety concerns.  See declarations of Bellann R.

8  Raile and Brent Little affixed to the Motion, and declarations of Bellann R. Raile, Brent

9  Little, and Andrew Trost affixed hereto.

10      Hence, it is inarguable that "no substantial business is being conducted by

11 [the Debtor] other than the business of operating the real property and activities incidental

12 thereto."  11 U.S.C. §101(51B).  The Debtor is merely holding the partially built Project for

13 potential development and future operation.  And aside from endlessly searching for

14 financing in the hopes of forestalling a foreclosure sale, there is no business being

15 conducted at the Project.  Therefore, the lack of any income or business operations

16 supports a SARE designation.

17                              **IV.**

18 **SHADY BIRD DISPUTES THE DEBTOR'S UNSUPPORTED CONTENTION THAT DIP**

19     **FINANCING IS READILY AVAILABLE, SO IF THE MOTION TURNS ON THAT**

20        **ISSUE, SHADY BIRD REQUESTS A CONTINUANCE AND DISCOVERY**

21      The Court's decision is of paramount importance not only to Shady Bird, but

22 to other legitimate creditors, including the countless holders of mechanic's liens against

23

24 ───────────────────

25 [3] In ascertaining the meaning of Section 101(51B), this Court must begin with the statutory text.  BedRoc
Ltd., LLC v. United States, 541 U.S. 176, 183, 124 S. Ct. 1587, 158 L. Ed. 2d 338 (2004).  Because the
Court must presume that the legislature says in a statute what it means and means in a statute what it
26 says, its "sole function . . . is to enforce it according to its terms."  United States v. Ron Pair Enters., 489
U.S. 235, 241, 109 S. Ct. 1026, 103 L. Ed. 2d 290 (1989) (quoting Caminetti v. United States, 242 U.S.
27 470, 485, 37 S. Ct. 192, 61 L. Ed. 442 (1917)).  See also Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-
54, 112 S. Ct. 1146, 117 L. Ed. 2d 391 (1992)).

28

1    the Project.  The Debtor's expectation that DIP financing or a confirmable plan is in the

2    offing is a pipe dream, and merely one in a series of misrepresentations the Chae's have

3    been spreading for years.  There is no financing in prospect; and there certainly will not

4    be not only due to the degraded condition of the Project, but the Chae's lack of financial

5    credibility rendering any guaranty (which would be required by any DIP lender) worthless.

6    Shady Bird is entitled to put these contentions, as well as the Debtor's alleged

7    redevelopment and reorganization plan, to the test if the Court finds any merit to the

8    arguments.

9         As a reminder, the permits for this Project have expired.  The City of Buena

10   Park has lost all confidence in the debtor and the Chae's, as evidenced by the most

11   recent letter from the City dated April 2, 2021, revealing the dismal state of the permits

12   and this blighted Project.  A true and correct copy of the April 2, 2021, letter is attached

13   hereto as Exhibit "E" and incorporated herein by reference.  According to the City, the

14   following permits have now expired, rendering the Debtor's dreams of completing the

15   Project largely unattainable:

16       •    B13-1389:  Shell retail work, various retail components, and hotel

17   lobby.  This permit was issued as of January 29, 2015, and is still open.  The last

18   inspection was conducted on December 6, 2016, meaning the permit has now expired.

19   The permit owner is "Source at Beach."

20       •    B13-1391:  Shell for Hotel Tower, Floors 4-7, Elevators, Stairwells,

21   etc.  This permit was issued on January 19, 2016, and remains open.  The last inspection

22   was January 10, 2020, meaning the permit has now expired.  The permit owner is

23   "Source at Beach."

24       •    B15-2102:  Enclosed 3rd Floor walkway between retail and hotel

25   portions of Mixed-Use Project.  This permit was issued on February 10, 2016, and is still

26   open.  The last inspection was conducted on July 13, 2016, meaning the permit has now

27   expired.  The permit owner is "Source at Beach."

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

DAL 2710794v1

1    •    B13-2294:  Hotel interior tenant improvements.  This permit was

2    issued on May 26, 2017, and remains open.  The last inspection was July 2, 2019,

3    meaning the permit has now expired.  The permit owner is "The Source Hotel."

4    •    Various Sub-Permits Issued:  Various sub-building permits have

5    been issued which authorize a specific scope of work related to one of the above main

6    permits.  The status of the sub-permits mirror that of the Main Permit under which it was

7    issued; meaning any outstanding sub-permits for the Project have now also expired.

8    In short, the Debtor and the Chae's know that, under these circumstances,

9    they will be unable to file a plan that has a reasonable possibility of being confirmed

10    within a reasonable time in the next sixty plus days.  They also know that they lack the

11    ability to commence monthly payments to Shady Bird in an amount equal to interest at

12    the then applicable nondefault contract rate of interest on the value of Shady Bird's

13    interest in the Project.  As a result, if the Court is inclined to deny the Motion based on

14    the current evidentiary record, it should permit Shady Bird the opportunity to undertake

15    discovery and present its findings to this Court to demonstrate why a single asset real

16    estate designation is appropriate.

17    *[Remainder of page intentionally left blank]*

18

19

20

21

22

23

24

25

26

27

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

## V.

## CONCLUSION

At the heart of the single asset real estate analysis is the question of whether the real estate is used in the operation of a business or whether it is simply held for possible future income.  Here, the Debtor is not actively operating any business on its Project, and is generating no income.  The Project is years and tens of millions of dollars away from completion, and bears no similarity to the functioning hotel properties in CBJ Dev., Whispering Pines, and Iowa Hotel Investors.  As such, the Debtor qualifies for a "single asset real estate" designation and must be held to the strict timing requirements of Section 362(d)(3).

DATED: April 8, 2021

**Sulmeyer**Kupetz
A Professional Corporation


By: /s/ *Daniel A. Lev*
Daniel A. Lev
Attorneys for Shady Bird Lending, LLC

DATED: April 8, 2021

Law Offices of Ronald Richards & Associates, APC


By: /s/ *Ronald Richards*
Ronald Richards
Attorneys for Shady Bird Lending, LLC

1

### <u>DECLARATION OF BELLANN R. RAILE</u>

2      I, Bellann R. Raile, declare and state as follows:

3      1.    I am over the age of eighteen, am a managing director of Cordes

4  and Company, LLC ("Cordes"), and am the duly appointed, qualified, and acting state

5  court receiver for the real property bearing APN Nos. 276-361-20 and 276-361-22,

6  consisting of a partially constructed 178-room, seven story hotel building located in

7  Buena Park, California (the "Project") owned by the debtor The Source Hotel, LLC (the

8  "Debtor").  The facts stated herein are true of my own personal knowledge and I could

9  and would competently testify thereto as follows.

10      2.    I make this declaration in support of "Shady Bird Lending LLC's

11  Reply to Opposition to Motion of Shady Bird Lending, LLC for Order Designating Chapter

12  11 Case As Single Asset Real Estate Case Pursuant to 11 U.S.C. §§ 101(51B) and

13  362(d)(3); Declarations of Bellann R. Raile, Brent Little, and Andrew Trost in Support

14  Thereof" (the "Reply").

15      3.    In preparing this declaration, I have reviewed the "Opposition to

16  Motion of Shady Bird Lending, LLC for Order Designating Chapter 11 Case As Single

17  Asset Real Estate Case Pursuant to 11 U.S.C. §§ 101(51B) and 362(d)(3); Declaration of

18  Donald Chae in Support Thereof" (the "Opposition"), filed by the Debtor in response to

19  the "Motion of Shady Bird Lending, LLC for Order Designating Chapter 11 Case As

20  Single Asset Real Estate Case Pursuant to 11 U.S.C. §§ 101(51B) and 362(d)(3);

21  Memorandum of Points and Authorities; Declarations of Ronald Richards, Bellann R.

22  Raile, and Brent Little in Support Thereof" (the "Motion"), filed by Shady Bird.  I also

23  reviewed the declaration of Donald Chae (the "Chae Declaration") and the declaration of

24  Robert "Charlie" Cervantes (the "Cervantes Declaration") filed in support of the

25  Opposition.  As explained in detail below, I find each of the declarations to be misleading

26  and inaccurate.  I submit this declaration to correct the record as to the misstatements,

27  specifically those of Mr. Cervantes.

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    4.    As background, I have nearly 30 years-experience serving as a

2  state-court receiver and/or a custodian under federal bankruptcy courts. A true and

3  correct copy of my resume is attached hereto as Exhibit "A" and incorporated herein by

4  reference. I have been a receiver in hundreds of different types of cases, ranging from

5  small cases involving apartment buildings to large cases involving operating businesses

6  to massive development projects. Most recently, Cordes and I served as a custodian in

7  a case before this court styled In re Air Force Village West, Inc. d/b/a Altavita Village,

8  bearing Case No. 6:19-bk-11920-SC, which involved the sale of a $50 million plus senior

9  living community comprised largely of military veterans. Regardless of the size of the

10  case, I take my receivership responsibilities very seriously. The goal is always to

11  preserve and protect the receivership estate in the most efficient and prudent way

12  possible.

13    5.    To put things in perspective, from the date of my appointment to the

14  petition date of this case, I served as receiver for the Debtor for a mere ten days before it

15  filed for bankruptcy. As is common with many receiverships, I inherited a complicated

16  situation involving a mess, and put forth my best efforts to resolve things impartially

17  pursuant to my duties under the February 17, 2021, order appointing me as receiver (the

18  "Receivership Order"), a true and correct copy of which was attached as Exhibit "B" to the

19  Motion. After my appointment, my oath and bond were filed on February 18, 2021, and I

20  assumed my duties that day.

21    6.    That same day, I sent an email asking Donald Chae, a principal of

22  the Debtor, to contact me. We spoke that same day, and Mr. Chae told me that he would

23  have Robert "Charlie" Cervantes contact me and that Mr. Cervantes would be my primary

24  contact for items that I needed related to the Project.

25    7.    The next day, February 19, 2021, Mr. Cervantes met with Gloria

26  Torres, an employee of Cordes and a member of my receivership team. Mr. Cervantes

27  showed Ms. Torres around the Project, including areas where considerable FFE was

28  stored. Ms. Torres took extensive photos of the property, and also had the locks

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    changed.  True and correct copies of the photos that Ms. Torres took at my direction are

2    attached hereto as Exhibit "B" and incorporated herein by reference.  In order to

3    streamline the numerous problems plaguing this Project for the Court, I am summarizing

4    the results of Ms. Torres' photos and inspection.  These photos, in addition to the photos

5    attached to the Motion as Exhibit "C", reveal that virtually every problem that Mr.

6    Cervantes is complaining about in his declaration pre-existed my appointment, as there

7    were already serious problems with the construction and development with the Project.

8    In particular, Ms. Torres identified the following issues, which I confirmed a few days later

9    when I completed a thorough walk-through:

10            •       The building appeared abandoned some time ago;

11            •       There were no electrical accounts;

12            •       The elevator certificate had expired in June 2018;

13            •       There was a strong sewer smell on the second floor of the building

14    that was also noticeable on the floors above;

15            •       Tarps protecting the decking by the pool were no longer covering the

16    deck and were in poor condition;

17            •       The pool was partially filled with water and was stagnant;

18            •       The roof had vent openings that were not screened which is unusual

19    in my experience; and

20            •       It appeared that the roof was being damaged by the rain as there

21    were soft spots when you walked on it and pooling water.

22          8.       Given these initial visible problems, I immediately hired a property

23    inspector to quantify the problems and report back to me so that I could determine the

24    best way to proceed.  In this regard, I retained Brent Little of Urban Advisory & Building

25    Group, LLC ("Urban Advisory") to review and advise me of what needed to be done to

26    protect and secure the Project from further damage during my tenure.  As detailed in the

27    declaration of Brent Little filed in support of the Motion, both Mr. Little and Steve

28    Cienfuegos, a licensed general contractor employed by Urban Advisory, conducted two

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  on-stie inspections of the Project, the first on March 3, and the second on March 9, 2021.

2  In addition to their personal inspection, Mr. Little and Mr. Cienfuegos also reviewed

3  various stamped approved plans and interviewed several individuals either familiar with

4  the Project or a particularly relevant building system.  As a result of their on-site

5  inspections and analysis, Urban Advisory prepared and sent to me a "Property Inspection

6  Report for The Source OC Hilton Hotel," dated March 10, 2021 (the "Report").  A true and

7  correct copy of the Report was attached to the Motion as Exhibit "D".

8          9.      Among other things, the Report confirmed the following serious

9  problems:

10         •       Substantial roof issues exist which currently permit the intrusion of

11  water into the structure;

12         •       Incomplete construction on the roof, creating an opportunity for water

13  infiltration;

14         •       The pool deck was neglected and needed substantial repair;

15         •       Building finishes are not being protected and are exposed to waste

16  or damage;

17         •       A potentially hazardous situation may exist if the building sewer

18  system is not connected to the public system; and

19         •       The roof HVAC equipment is poorly protected with plastic and should

20  be covered with sheet metal.

21         10.     In response to these significant problems, the Cervantes Declaration

22  incorrectly asserts in paragraph 5 that I have neglected my duties.  However, the items

23  that the Cervantes Declaration identifies were lifted from the Urban Advisory Report

24  which I commissioned.  Put another way, Mr. Cervantes is inaccurately and

25  inappropriately trying to blame me for acts that occurred well before I was appointed as

26  receiver.  This is further confirmed by a review of Ms. Torres' photographs, which were

27  taken within three days of my appointment.

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

DAL 2710794v1

16

11.    In addition, the Cervantes Declaration misleadingly asserts that I failed to take any action to remediate these problems.  To be clear, I was receiver for only ten days before there was a bankruptcy filing.  And, under the terms of the Receivership Order, my powers are limited if there is a bankruptcy.  Specifically, paragraph 27(b)(4) of the Receivership Order provides that "the receiver shall do nothing that would effect a material change in the circumstances of the property."

12.    In my experience as a receiver and a custodian in bankruptcy in the time before turnover is decided, it is best to ascertain if either of the primary parties to the case object to my taking action to correct some of the most important maintenance issues.  This is precisely what I did in this case.

13.    In this regard, following my receipt and review of the Report, on March 17, 2021, I contacted Ronald Richards, attorney for Shady Bird, and explained that I was concerned about a number of the issues at the Project needing to be addressed prior to the hearing on the "Motion of Shady Bird Lending, LLC for Order Excusing State Court Receiver From Turnover of Assets Pursuant to 11 U.S.C. § 543; Memorandum of Points and Authorities; Declarations of Ronald Richards, Bellann R. Raile, and Brent Little in Support Thereof" (the "Section 543 Motion") seeking to excuse my turnover of the Project, and authorizing me, as state court receiver, on an interim basis, to take the steps necessary and appropriate to preserve and protect the assets of the Debtor pursuant to 11 U.S.C. § 543(d)(1).  In response, Mr. Richards stated that Shady Bird did object to my taking care of the elevator, sewer smell, and roof leakage issues.

14.    As a result, On March 17, 2021, I then contacted Steven Kahn, attorney for the Chae's and the Debtor, to ascertain if they were going to object to my taking action to correct the most serious issues.  I explained to Mr. Kahn that I was concerned about the elevator and the sewer smell and I needed to get contractors out to address these issues as they could be safety concerns.  I also explained to Mr. Kahn that the roof issues were concerning, not for safety reasons, but, rather, for risk of causing on-going damage to the Project.  I also discussed with Mr. Kahn the problems associated

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1   with the pool deck.  Mr. Kahn indicated that he wanted to "run it up the flag pole" and

2   would get back to me.  As of this date, Mr. Kahn has never responded to my requests

3   with respect to these issues, nor did he otherwise request or authorize me to take any

4   action to protect and secure the Project.

5            15.      Following Mr. Kahn's statement that he would "run it up the flag

6   pole," I was contacted by Juliet Oh, attorney for the Debtor, via email on March 24, 2021.

7   A true and correct copy of this email is attached hereto as Exhibit "C" and incorporated

8   herein by reference.  Ms. Oh stated that "Steve [Kahn] informed The Source Hotel, LLC

9   (Debtor) of your concerns about the elevator inspection and sewer gas smell on the

10  building….  The Debtor would like to access the building to get a gauge on these issues

11  so it can work with you to address them in a timely and cost-effective manner."  Ms. Oh

12  then asked me to coordinate a time and date to access the building, which I did.  The

13  next day, I granted Mr. Cervantes access to the building pursuant to his counsel's

14  request.  Therefore, I was extremely surprised and quite disappointed by Mr. Cervantes'

15  declaration accusing me of failing to timely act, when, in fact, I did act promptly and

16  worked in good faith with the Debtor's and the Chae's counsel.  To be clear, despite my

17  identifying problems that needed immediate attention, and their making statements that

18  they would look at it, neither the Debtor nor the Chae's, not their counsel, ever got back

19  to me, and instead, chose to file the Cervantes Declaration, which was simply not

20  accurate.

21            16.      In addition to falsely creating the impression that I created or caused

22  problems to exist, the Cervantes Declaration incorrectly states that "[n]either the Receiver

23  nor I are aware of any leaks."  Actually, I am aware of some stained ceiling tiles in the

24  rooms on the 7th floor.  True and correct copies of photographs I commissioned

25  evidencing potential leaks are attached hereto as Exhibit "D" and incorporated herein by

26  reference.

27            17.      Furthermore, this past week I learned that The City of Buena Park

28  has a number of problematic issues with the project, including expired permits and

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  multiple events of default.  Attached hereto as Exhibit "E" and incorporated herein by

2  reference is a true and correct copy of a report dated April 2, 2021, provided to me by the

3  City of Buena Park summarizing the City's perspective.

4          18.     Finally, in order to address the inaccurate and misleading statements

5  contained in the Cervantes Declaration, I commissioned a second report from Urban

6  Advisory.  A true and correct copy of the updated report dated April 5, 2021 (the "Second

7  Report"), prepared by Urban Advisory is attached hereto as Exhibit "F" and incorporated

8  herein by reference.

9          19.     In sum, the Debtor's partially constructed hotel is plagued by serious

10  problems, is completely non-operational, and is not generating a single dollar of income.

11          I declare under penalty of perjury under the laws of the United States of

12  America that the foregoing is true and correct.

13          Executed this 8th day of April, 2021, at Irvine, California.

14

15                          Bellann Raile

16

17

18

19

20

21

22

23

24

25

26

27

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    **DECLARATION OF BRENT LITTLE**

2         I, Brent Little, declare and state as follows:

3         1.   I am over the age of eighteen and am a principal of Urban Advisory

4    and Building Group, LLC ("Urban Advisory").  I am a licensed general contractor (License

5    No. B1038963) and hold a bachelor of arts degree in Geography from California State

6    University, Fullerton, with an emphasis in urban planning.  I have been the principal of

7    several construction, development, and consulting firms for the past twenty-five years.

8    The facts stated herein are true of my own personal knowledge and I could and would

9    competently testify thereto as follows.

10        2.   I make this declaration in support of "Shady Bird Lending LLC's

11   Reply to Opposition to Motion of Shady Bird Lending, LLC for Order Designating Chapter

12   11 Case As Single Asset Real Estate Case Pursuant to 11 U.S.C. §§ 101(51B) and

13   362(d)(3); Declarations of Bellann R. Raile, Brent Little, and Andrew Trost in Support

14   Thereof" (the "Reply").

15        3.   In preparing this declaration, I have reviewed the declaration of

16   Robert "Charlie" Cervantes (the "Cervantes Declaration") filed in support of the

17   "Opposition to Motion of Shady Bird Lending, LLC for Order Designating Chapter 11

18   Case As Single Asset Real Estate Case Pursuant to 11 U.S.C. §§ 101(51B) and

19   362(d)(3); Declaration of Donald Chae in Support Thereof" (the "Opposition"), filed by the

20   Debtor in response to the "Motion of Shady Bird Lending, LLC for Order Designating

21   Chapter 11 Case As Single Asset Real Estate Case Pursuant to 11 U.S.C. §§ 101(51B)

22   and 362(d)(3); Memorandum of Points and Authorities; Declarations of Ronald Richards,

23   Bellann R. Raile, and Brent Little in Support Thereof" (the "Motion"), filed by Shady Bird.

24   As explained in detail below, I find the Cervantes Declaration to be misleading and

25   inaccurate.  I submit this declaration to correct the record as to the misstatements of Mr.

26   Cervantes, who I have discovered is not a licensed contractor.

27        4.   Recently, Urban Advisory was retained by Bellann R. Raile (the

28   "Receiver"), who I understand is duly appointed, qualified, and acting state court receiver

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  for the real property bearing APN Nos. 276-361-20 and 276-361-22, consisting of a

2  partially constructed 178-room, seven story hotel building located in Buena Park,

3  California (the "Project") owned by the debtor The Source Hotel, LLC (the "Debtor").

4  Urban Advisory specifically was retained by the Receiver to provide her an updated

5  report of the current physical condition of the Project in response to the Cervantes

6  Declaration.  At the Receiver's request, we prepared and sent to the Receiver an updated

7  report dated April 5, 2021 (the "Second Report").  A true and correct copy of the Second

8  Report is attached hereto as Exhibit "F" and incorporated herein by reference.

9          5.      As noted in the Second Report, the Cervantes Declaration appears

10  to be a response to the statements and observations contained in the initial report.

11  Although Mr. Cervantes states he completed a walk-through inspection of the Project on

12  March 25, 2021, it appears his inspection was limited to his interpretation of the first

13  report.

14          6.      As detailed in the two reports, the roof has numerous penetrations

15  and is the primary location for much of the HVAC equipment.  Because the HVAC system

16  has not been completed, significant and large openings exist through the roof and into

17  ductwork.  The Debtor has placed plastic sheeting (polyethylene film), sometimes

18  referred to as Visqueen, to cover the openings.  Unfortunately, this is not an appropriate

19  long-term solution for the reasons stated below:

20          •       The application of plastic is not universal and numerous opening did

21  not contain any covering (see Picture 1 in the Second Report);

22          •       Several roof vents are missing, which will allow water and pests to

23  enter the building (see Picture 2 in the Second Report);

24          •       In the Cervantes Declaration, Mr. Cervantes seems to indicate the

25  placement of plastic film is acceptable, however, polyethylene plastic is highly susceptible

26  to degradation from exposure to the sun, through UV radiation.  As a result, the correct

27  permanent solution is a sheet metal duct cap (see Picture 3 in the Second Report); and

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    • A review of Google Earth pictures seem to indicate the roof has had

2    a long-term temporary solution to water intrusion (see Picture 4 in the Second Report).

3    7.    In addition, the Second Report details the incomplete construction

4    assemblies water intrusion.  The term construction assembly is an industry recognized

5    term that refers to all the components of a given portion of a building, which when

6    assembled together serve a specific purpose.  In the case of the roof, the assembly is

7    comprised of all components designed to protect the structure from water intrusion.  As

8    can be seen from Pictures 5 and 6 in the Second Report, a roof failure existed and was in

9    the midst of being repaired when construction ceased.  Picture 5 shows the completed

10   repair with flashing covering, while Picture 4 shows the roof torn off and exposed wood.

11   Picture 7 in the Second Report is a close up of the incomplete repair.  Furthermore, as

12   noted in the Second Report, it was evident the Debtor had tried to mitigate water intrusion

13   by use of sand bags and plastic that were located near or on the roof at this area.

14   8.    The Second Report supports Urban Advisory's prior determination

15   that the fire protection system was incomplete.  In the Cervantes Declaration, Mr.

16   Cervantes accurately points out that the fire protection system has temporary

17   construction covers over many sprinklers.  This confirms what Urban Advisory identified

18   in its initial Report, specifically, that the fire protection system is not capable of providing

19   life-safety protection for the Project.  Until construction is remobilized and completed, the

20   building will be at risk in the event of a fire.

21   9.    The Second Report also supports the serious problems associated

22   with the pool deck, as identified in the initial Report.  In sum, it is clear the pool deck

23   water proofing has been exposed to years of excess exposure.  Picture 8 in the Second

24   Report is a screen shot from Google Earth in May of 2019.  In this picture, the pool deck

25   is completely uncovered.  Moreover, the damage from excessive sun and UV exposure

26   was readily noticeable by the amount of friable roof material readily sloughing off.  This

27   can be seen in Picture 9 in the Second Report.  In addition, I also am concerned by Mr.

28   Cervantes' statement that his construction crew applied sealant over the area.  Typically,

1   a contractor engaged in roofing or waterproofing would have either a C-39 roofing or C-

2   33 painting license.  Moreover, most manufactures of waterproofing systems require

3   trained and licensed installers to perform maintenance and installation of their system or

4   the warranty may be voided.

5           10.    The Second Report also supports the conclusion that the water and

6   trash had been in the pool for some period of time.  A review of both Weather.com and

7   Weather Underground did not reveal any periods of rain between February 17, 2021 (the

8   onset of the receivership) and March 3, 3021, the first day of Urban Advisory's inspection.

9   Several inches of rain occurred prior to the Receivership Order and it appears as though

10  this water may not have been removed.

11          11.    In addition, the Second Report reveals that the construction phasing

12  was performed in such a manner that completed finishes (i.e., carpet, floor tile, showers,

13  plumbing fixtures, wall coverings, and cabinetry) are subject to construction traffic and

14  exposure.  Very little protective measures were instituted to guard against damage and

15  destruction and both the tile and carpet flooring are uncovered and being subjected to

16  unusual damage.

17          12.    With respect to the sewer system hazard, Mr. Cervantes alleges the

18  sewer system has been connected to the public system, which may be the case.

19  However, it would be unusual for the sewer provider to provide this connection before the

20  building receives its final inspection.  This is an issue that can be understood, but needs

21  to be verified.  In the event the line is not connected, a potentially hazardous situation

22  exists due to the current sewer use in the building with no outlet.  This creates head

23  pressure on the sewer system.  Mr. Cervantes also claims he regularly refilled all the P

24  traps to prevent sewer gas migration into the building, but many of the P traps are not

25  connected to active water systems, so it is hard to imagine this was routinely performed.

26          13.    In addition, at the door that leads to the roof, it is apparent that

27  someone other than a qualified PVC or PTO roofing contractor has patched a previous

28  leak.  Previously, this area leaked into the building as demonstrated by the Second

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    Report.  The concern I have is that the improper repair may leak again and damage the

2    unit below.  Further, according to Mr. Cervantes, the missing flashing is "more a

3    construction issue" which is typically addressed during the completion of construction and

4    not a maintenance issue.  While it is true the completion would ordinarily follow

5    construction, the course of construction has been interrupted for a protracted period of

6    time and these openings will readily allow water and pests to enter the building.

7    Moreover, even during the course of an active project, one would protect an opening

8    when inclement weather is forthcoming and that has clearly not been done.

9            14.      In sum, and as detailed in the Report and the Second Report, the

10   hotel is an idled construction project which is roughly 70% complete.  Crucially, there are

11   significant issues of neglect, potential hazardous situations, and safety and

12   environmental concerns at the Project.  For purposes of the Motion, however, it is clear to

13   me that the hotel is non-operational and there are no substantial business operations

14   being performed by the Debtor at the Project.

15           I declare under penalty of perjury under the laws of the United States of

16   America that the foregoing is true and correct.

17           Executed this 8th day of April, 2021, at Irvine, California.

18
19                                            Brent Little

20

21

22

23

24

25

26

27

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

## DECLARATION OF ANDREW TROST

I, Andrew Trost, declare and state as follows:

1.      I am over the age of eighteen and am a principal of Carine Consulting ("Carine") which I formed in 2012 to provide project solutions and complete project management from inception to completion.  I have spent almost 30 years in all facets of the industry, as a subcontractor, design consultant, general contractor, and project/construction manager.  I hold a bachelor of science degree in Chemistry/Materials Science from UCLA 1986, and I hold a Certificate, Fire Protection, from the University of California, Irvine.  I also am registered as a Professional Engineer, Fire Protection, in the State of California, and have the following professional affiliations:  PMI, CMAA, SFPE, NFPA, and AIA.  The facts stated herein are true of my own personal knowledge and I could and would competently testify thereto as follows.

2.      I make this declaration in support of "Shady Bird Lending LLC's Reply to Opposition to Motion of Shady Bird Lending, LLC for Order Designating Chapter 11 Case As Single Asset Real Estate Case Pursuant to 11 U.S.C. §§ 101(51B) and 362(d)(3); Declarations of Bellann R. Raile, Brent Little, and Andrew Trost in Support Thereof" (the "Reply").

3.      In preparing this declaration, I have reviewed the "Opposition to Motion of Shady Bird Lending, LLC for Order Designating Chapter 11 Case As Single Asset Real Estate Case Pursuant to 11 U.S.C. §§ 101(51B) and 362(d)(3); Declaration of Donald Chae in Support Thereof" (the "Opposition"), filed by the Debtor in response to the "Motion of Shady Bird Lending, LLC for Order Designating Chapter 11 Case As Single Asset Real Estate Case Pursuant to 11 U.S.C. §§ 101(51B) and 362(d)(3); Memorandum of Points and Authorities; Declarations of Ronald Richards, Bellann R. Raile, and Brent Little in Support Thereof" (the "Motion"), filed by Shady Bird.  I also reviewed the declaration of Donald Chae (the "Chae Declaration") and the declaration of Robert "Charlie" Cervantes (the "Cervantes Declaration") filed in support of the Opposition.  As explained in detail below, I find each of the declarations to be misleading

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    and inaccurate.  I submit this declaration to correct the record as to the misstatements,

2    specifically those of Mr. Cervantes.

3            4.       Recently, Carine was retained by Bellann R. Raile (the "Receiver"),

4    who I understand is duly appointed, qualified, and acting state court receiver for the real

5    property bearing APN Nos. 276-361-20 and 276-361-22, consisting of a partially

6    constructed 178-room, seven story hotel building located in Buena Park, California (the

7    "Project") owned by the debtor The Source Hotel, LLC (the "Debtor").  Carine specifically

8    was retained by the Receiver to provide her a report of the Project in response to the

9    Opposition.

10           5.       Initially, the Debtor insinuates that it has been extremely diligent in

11   maintaining and protecting the Project.  However, the following are just some examples

12   demonstrating why this is not the case:

13           •       The pool deck waterproofing has been exposed to UV rays for many

14   months, reducing its elasticity and rendering the membrane ineffective and out of

15   warranty; based on input from waterproofing experts, it must be replaced;

16           •       The roof membrane on the 7-story tower exhibits signs of lifting and

17   separation from the substrate; it is highly likely that water intrusion has occurred, and the

18   membrane must be repaired.  Signs of leaks are visible in the 7th floor corridor, and may

19   have occurred elsewhere on the 7th floor;

20           •       Mechanical shaft openings at the roof are not properly sealed,

21   contributing to additional water intrusion;

22           •       The Debtor's statement that the building is 85% complete is not

23   accurate in my opinion; at best, the Project is no more than 70% complete;

24           •       Four exterior doors at the 4th floor perimeter building line that lead to

25   the pool deck area are not installed allowing moisture into the building, therefore, in my

26   opinion, this has adversely affected the interior areas on the 4th floor and possibly other

27   levels with excessive amount of moisture and possibly mold;

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    •    The pool deck membrane replacement (mentioned above) may also

2    require a re-sloping of the deck in some areas, so that it will properly drain as ponding on

3    the deck is evident;

4    •    The TPO (roof membrane) at the mechanical equipment roof area

5    adjacent to the pool deck at the northside of the Project between the parking structure

6    appears to be damaged, and water may be seeping into the retail level below; moisture

7    and mold can be a factor whenever there is water intrusion;

8    •    Standing water in mechanical system pipes that are not being used

9    could be also a significant issue; corrosion can develop, attacking the walls of the pipe

10    and sediment can lead to performance issues in the system.  Extensive flushing will be

11    necessary to remediate this problem;

12    •    One of the structural equipment platforms at the 4th floor central plant

13    is reported (by the installing contractor of the equipment) to not be verified for structural

14    capacity; in other words, a structural engineer has not confirmed the platform's ability to

15    support the current equipment and the balance of equipment to be installed.  In addition,

16    several large pieces of mechanical equipment on the existing structural platforms are not

17    structurally anchored, which creates an immediate structural and safety issue;

18    •    One fire alarm contractor involved with the Project's installation

19    reported that OCFA will require a separate fire alarm panel for the hotel; currently, the

20    main fire alarm panel serves the hotel, retail, and other areas of the Project.  A separate

21    hotel panel will require new drawings, OCFA approval, and permits;

22    •    In its current state, the interstitial space above the 3rd floor and below

23    the 4th floor has access for maintenance; fire sprinkler code requires this space to be

24    sprinklered, as confirmed by the installing contractor for the Project.  The area currently is

25    not sprinklered, and it remains a risk for the Project;

26    •    The $4,000,000 estimate to complete the balance of work is grossly

27    understated as indicated in Carine's preliminary due diligence report (Phase 1); hard

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1 | construction costs alone are currently estimated at between $8,000,000 and $9,000,000,

2 | plus FF&E installation and soft costs; and

3 |       •     Additionally, with the permits expired and the failure to maintain the

4 | development agreement with the City of Buena Park, this Project will be severely

5 | scrutinized by all governing agencies such as the Community Development, Building &

6 | Safety, Orange County Fire Authority (OCFA), Orange County Health Department

7 | (OCHD), and the State Elevator Inspector.  This Project will have to be re-evaluated by

8 | all agencies to confirm if the codes and local ordinances will be applicable under the

9 | original permit or if the new code and local ordinances will be required to be administered

10 | to obtain new permits and certificate of occupancy moving forward.

11 |       I declare under penalty of perjury under the laws of the United States of

12 | America that the foregoing is true and correct.

13 |       Executed this 8th day of April, 2021, at Los Angeles, California.

15 | Andrew Trost

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA, 90071-1406
TEL. 213.626.2311  ·  FAX 213.629.4520

# EXHIBIT A



**Bellann Raile**
**Statement of Qualifications**

## COURT APPOINTED RECEIVER

**Bellann Raile** is a managing director with Cordes & Company. She has o v e r 20 years of experience managing receiverships with Cordes & Company. With a total of 30 years' experience in operations management, she has managed businesses, both large and small, in a wide variety of industries. She and other members of Cordes & Company have been appointed as receiver in many real estate cases and have extensive experience as receivers in development-related projects. Ms. Raile works closely with the other experts in the firm who provide accounting, project management and technical support. She puts together the best and most cost-effective group to work on each particular project.

Cordes and Company has offices in Denver, Irvine and Minneapolis. Ms. Raile leads the California office that manages most Cordes & Company engagements located in the Western region.

Ms. Raile is widely recognized as an effective negotiator, mediator and focused businessperson who adds considerable value in every engagement she leads.

## EXPERIENCE

Ms. Raile has led or been personally appointed as a receiver in well over 200 cases. Below is a representative list of real estate development engagements she and Cordes & Company have played a significant role:

- **Laing-CP Lake Elsinore** (Lake Elsinore, CA) – a development project that consisted of 1,261 raw lots, a raw commercial site, a raw school site and an operating golf course. *(Receiver)*

- **Peterson** (Various CA locations) – Post-judgement receivership including liquation of development properties *(Receiver)*

- **Victory Plaza,** (Los Angeles, CA) - a 133,000 sf retail shopping center entitled for redevelopment into a City Center type development with environmental issues. *(Receiver)*

- **Rutter/Pacifica** (Newport Beach, CA) – 32 unit residential town house condominium units adjacent to a 5-story parking facility plus 206 acres of vacant land approved for future development. *(Receiver)*

- **Village Court** (Palm Desert, CA) – Partially compete 42,000 square foot medical/office condominium. *(Receiver)*

- **Irvine Partners, LLC** (Irvine, CA) - a 314,000 sf Class A office building-mostly completed. *(Receiver)*

- **Angeleno Properties, LLC** (Glendale, CA) – Completed construction and liquidated 5-unit two story condominium building. *(Receiver)*

- **New Town** (St. Charles, MO) – a $100 million planned community development project in severe financial distress where Cordes was advisor to the secured lender. *(Advisor)*

- **Kings Road** (Los Angeles, CA) - a vacant, primarily constructed three story, twelve (12) unit condominium/townhome project with one level of subterranean parking with a total building area of 18,399 square feet. *(Receiver)*

- **Opus Northwest (**Minneapolis, Denver, Seattle) – a development company with a $400 million distressed portfolio. Cordes was advisor to the company board of directors and built restructure plan. *(Advisor)*



029



# Bellann Raile Appointments

| Engagement Name | Brief Description | State |
| --- | --- | --- |
| *Receivership Appointments* | | |
| A Lotta Storage | Storage Units | AZ |
| Blackhawk Enterprises | Real Estate Arizona | AZ |
| Bullhead City Chevron AZ | Gas Station/Convenience Store in Bullhead City, AZ | AZ |
| CF2, LLC | Executive Office Suites | AZ |
| Cottonwood Medical Office | Vacant Medical Office | AZ |
| Desert Sunshine | 214 Unit Apartment Complex located in Phoenix, AZ | AZ |
| Glen Harbor | Vacant Office Building | AZ |
| Greer Lodge | Recreational Lodge - Hospitality | AZ |
| Grotte | Office Building | AZ |
| Grow Trust | Retail Center- Good Year, AZ | AZ |
| Hipolito Trust | 32 Unit Apartment Complex located in Phoenix, AZ | AZ |
| Lionshops Inc | Strip mall in Phoenix, AZ 99th and Grand | AZ |
| Marina Vista | Office/Retail Plaza | AZ |
| Mirage Crossing | Real Estate | AZ |
| Palm Creek | Apartment Complex/small | AZ |
| Parkway Village | Commercial office/business space | AZ |
| Plaza 777 | Strip Mall - Scottsdale, AZ | AZ |
| Quality Mart | C-Store | AZ |
| Reems | Office Suites | AZ |
| RF BESD AZ | Solar Panels in AZ | AZ |
| Sabah Properties - Phoenix & Mesa | two retail strip malls | AZ |
| Sunrise Valero Nogales | Gas Stations | AZ |
| Sunrise Valero Tuscon | Gas Station | AZ |
| Triple E Holdings Phoenix | Retail Commercial Complex | AZ |
| 1617 Westcliff | Commercial | CA |
| 4th Street Investors | Self Storage in Lancaster, CA | CA |
| 801 Gateway | 801 Gateway - 5 Story 136K sq ft office building | CA |
| Advocacy for Domestic Violence | Non-profit woman's shelter | CA |
| Angeleno Properties LLC | 5 Condo Project LA | CA |
| Arbuckle Shell | Closed Shell Station in Arbuckle, CA | CA |
| Barcelo Enterprises | Commercial Nurseries | CA |
| Bi_Coastal | 7 Unit Condominium Project located in North Hollywood, CA | CA |
| Bonilla | Meat Market- Partnership dispute | CA |
| Calexico Crossings LLC | Warehouse - Calexico | CA |
| Camarillo Ranch | Office Condo located in Camarillo, CA | CA |
| Commons at Chino Hills | Power Center Development | CA |
| Cornelio | 9 Unit Apartment Complex located in Long Beach, CA | CA |
| Creative Video Logic | 27 Unit apartments in 15 buildings | CA |
| David L Shane Kings | Apartment complex | CA |
| David L Shane Laurel | Apartment Complex | CA |
| David L. Phares | Industrial Buildings | CA |
| Days Inn Stockton | Hotel located in Stockton, CA | CA |
| Del Sur | 17 SFH Lots and 4 model homes | CA |
| Desert Brook | 18 Hole Golf Course/development located in Desert Hot Springs | CA |
| Dorothy Heller Rev Trust | 2 industrial buildings | CA |
| El Cajon Lexington | Residential Real Estate | CA |
| Encino | Office Building | CA |
| Esplanade Commercernter | Light Industrial complex in Hemet CA. | CA |



**Bellann Raile Appointments**

| Engagement Name | Brief Description | State |
|---|---|---|
| Fallbrook Development Group | Apt complex- 30 units Class C Fallbrook | CA |
| Fremont Shell | Shell Station Stockton, CA | CA |
| Fremont Tech Center | 10 Flex (Office/R&D) Buildings | CA |
| Granger Villa Apartments | Apartment Complex in Modesto, CA | CA |
| Irvine Center Partners III | Class A Office Building located in Irvine, CA | CA |
| Kang Medical | Medical Commercial Center | CA |
| Kathy A. Hoke | Office Property/Building | CA |
| Kings Road | 12 Unit Condominium Project located in West Hollywood, CA | CA |
| L and W Stone | Stone Quarry and Distribution Centers | CA |
| Links at Summerly | Golf course and residental development, Lake Elsinore | CA |
| Majestic Hotel | 58 Room Hotel located in San Francisco, CA | CA |
| Medi Pedic Bedding | Mattress Manufacturer | CA |
| Medina Antioch | Commercial | CA |
| Medina Maie Ave | Commercial | CA |
| Medina Pacific | Commercial | CA |
| Medina San Jose | Commercial | CA |
| Medina Slauson Ave | Commercial | CA |
| Melrose Harper LLC | Strip Mall/2 apartments in Hollywood, CA | CA |
| Menifee/Gallery Project | 8 Unit Housing Project and 23 finished lots located in Menifee | CA |
| Mustang Market | Chevron-branded convenience store and gas station | CA |
| Nickel Back | Commercial building in Costa Mesa, CA | CA |
| NP Gas 2 | NP Gas revised | CA |
| NP Gas I | Gas Station | CA |
| NP Gas US Gasup | Gas Station/C Store | CA |
| O.R.E.P., Inc. | 2 story Office Building in Orange County | CA |
| Old Church LLC | Banquet Center | CA |
| Old Town La Quinta | Office/Retail | CA |
| Oroville Post Judgement | Post judgement involving rental property and land | CA |
| Oroville Self Storage | 660 Unit Self Storage- Oroville, CA | CA |
| Oxnard Arts Lofts | Live/Work 18 unit space | CA |
| Oxnard Shell | Convenience Store in Oxnard, CA | CA |
| Pacific Property Assets Long Beach | Vacant 3 story office building | CA |
| Palacio Del Sol LLC | Residential | CA |
| Peterson | Rental property and land | CA |
| Pine Manor Guest Home Inc | Adult Personal Care Home | CA |
| PLI Las Vegas LLC | 100k sf office building in Pomona, CA. | CA |
| PPA Holdings Fountain Blue | 18 unit apartment complex - Riverside, CA | CA |
| Punla | Strip Mall | CA |
| Rutter/Pacifica | 28 Unit Townhome Project located in Costa Mesa, CA | CA |
| SAL-PDC | Assisted living facility | CA |
| San Ramon Court | Apartment Buildings, Fresno, CA | CA |
| Scripps Ranch | 3 Building Business Park located in San Diego, CA | CA |
| Shoppes at Chino Hills | Large lifestyle retail and office center | CA |
| Strata Realty LLC | Multi-building mixed use business park | CA |
| Style Up Inc | Commercial Warehouse | CA |
| Sunflower Apartments | 39 unit apartment complex in Downey | CA |
| Sunland Ventures, Inc. | Dial Automotive & Sourdough Pizza | CA |
| Ten Forward Dining | 2- leased Jack in the Box's Retail Strip Center | CA |
| Trustee Properties W 48 Street | Commercial Property | CA |
| Trustee Properties W 62 Street | Commercial Property | CA |

031



**Bellann Raile Appointments**

| Engagement Name | Brief Description | State |
|---|---|---|
| Twin Springs LLC | Large office-older buildings | CA |
| Vanatta Show Low | Single Family Residence | CA |
| Victory Boulevard Shopping Center | Shopping Center- LA | CA |
| Village at Nipomo | Real Property Located in the County of San Luis Obispo | CA |
| Village Court | Medical Office Condo | CA |
| Watsonville Self Storage | Self-Storage Facility in Watsonville, CA | CA |
| WL Newland | Land & Improvements 123 Bungalow Triplexes & 27 SFH | CA |
| Zander | Vacant Building | CA |
| Zarate | Trucking company and yard. | CA |
| Triple E Holdings Idaho | Retail Commercial Complex | ID |
| Incred A Bowl LLC | Bowling Alley | KS |
| 305 Las Vegas LLC | Parking Lot and 3 separate 2 Story office buildings | NV |
| Chaddah | 107 Unit Apartment Complex located in Las Vegas, NV | NV |
| Chai Storage | 2 large storage complexes in N Las Vegas | NV |
| Crossroads Las Vegas | Apartment Complex- Las Vegas | NV |
| Douglas J. Seip MD LTD | Physician office | NV |
| Hop Over LLC | 228 Unit apartment complex | NV |
| Jed Property | Commercial Real Estate | NV |
| KB Worldwide Holdings LLC | 4,057 sf commercial sing story medical office building | NV |
| Korte Revocable Indenture of Trust | Mini Storage | NV |
| LMGC Apartments | 28 Unit Apartment Building | NV |
| MP AMS Holdings LLC | Mini Storage Facility | NV |
| Rustigian Receivership | Abandoned property in Elco NV | NV |
| Save Most Alicia Hills | Commercial Property | NV |

## Bankruptcy Advisor Cases (for Creditor)

| | | |
|---|---|---|
| South Loop 2600 LLC | Bankruptcy Plan Agent | CA |
| BHG El Paso | Disbursement of cash assets | TX |
| Arizona Oil | 16 C- Stores throughout AZ | AZ |
| Black Hawk | C- Store | AZ |
| Jump Oil | 73 C-Stores in Missouri and Oklahoma | MO |
| Stacy's Greenhouses | Creditor advisor in Ch 11 BK proceeding. | SC |
| Ws China Bistro | Restaurant - Redondo Beach | CA |

## Other Engagements

| | | |
|---|---|---|
| Trademark Visual | Retail liquidation | AZ |
| 7 Elephants | Liquidation of electronics inventory | CA |
| Tile Outlet | Multi State Tile Company Liquidation | CA |
| Paradise Kay Marina | Validate rent roll reporting | CA |
| Hemet West | Partnership dissolution | CA |
| 801 Gateway Asset Management | Asset Management services | CA |
| Barcelona Motorcoach LLC | 3 phase (238 space) RV Park | NV |
| Camino El Norte | Commercial property | NV |
| Greer Lodge Asset Management | Post receiver asset management | AZ |
| JED Property Management | Post receiver asset management | NV |
| Miss Donuts | Commercial property | CA |

# EXHIBIT B











037





6















13



14











17



# EXHIBIT C

**From:** Juliet Y. Oh <jyo@lnbyb.com>
**Sent:** Wednesday, March 24, 2021 11:51 AM
**To:** Bellann Raile <bellann@cordesco.com>
**Cc:** Clayton Tanaka <ctanaka@mdproperties.com>; 'Steven J. Kahn' <skahn@pszjlaw.com>
**Subject:** The Source Hotel, LLC - Building Access

Hi Bellann,

Steve informed The Source Hotel, LLC (Debtor) of your concerns about the elevator inspection and sewer gas smell on the second floor of the building.  In addition, Shady Bird has raised concerns about (among other things) water intrusion on the roof and pool issues.  The Debtor would like to access the building to get a gauge on these issues so it can work with you to address them in a timely and cost-effective manner.  I have copied Clay Tanaka from the Debtor on this e-mail – would you please coordinate a date/time for the Debtor and its maintenance person(s) to access the building over the next day or two?

Thank you very much.

Best,
Juliet


**JULIET Y. OH,** Esq.

**LEVENE, NEALE, BENDER, YOO & BRILL  L.L.P.**
10250 Constellation Blvd.   |   Suite 1700   |   Los Angeles, CA   90067
Phone  310 229 1234   |   Direct  310 229 3348   |   Fax  310 229 1244
JYO@lnbyb.com   |   www.lnbyb.com

The preceding E-mail message is subject to Levene, Neale, Bender, Yoo & Brill  L.L.P.'s
email policies which can be found at http://www.lnbyb.com/disclaimers.htm.

🌐 Please consider the environment before printing this email

# EXHIBIT D

Room 738:



Room 739:



Room 747:





# EXHIBIT E

April 2, 2021



### INTRODUCTION

This document summarizes the background and status of the "Source Hotel Project" ("Hotel Project") located at 6986 Beach Boulevard, Buena Park, California. This document was prepared by the City of Buena Park ("City") with reference to public records and includes observations from the City's perspective as opposed to the legal views, conclusions, or position of the City. Copies of any of the public documents or records referenced may be obtained by submitting a request to the City Clerk under California's Public Records Act.[1]

### SUMMARY OF THE SOURCE HOTEL PROJECT

The Source Hotel Project is part of the larger mixed-use project known as "The Source" ("Mixed-Use Project") that is located immediately adjacent (and structurally connected) to the Hotel. The Source Hotel Project remains partially constructed and is governed by a variety of contracts, land use regulations and covenants, approvals and permits issued by the City. The general terms and conditions of the foregoing most material to the Hotel Project are described below.

- **Development Agreement.**   On October 14, 2008, the City approved Development Agreement No. DA008-003 ("Development Agreement" or "DA") with 6940 Beach LLC. The Development Agreement was recorded on the Property as of November 17, 2008 and remains in effect.

  - Permitted Use (DA §§ 1(d), 11).  The DA allows a mixed-use development featuring upscale retail, restaurants, entertainment, residential, hotel, and office uses as well as parking and open space amenities as provided in the Beach Orangethorpe Mixed Use Specific Plan ("BOSP"). More specifically the DA allows:

    - *Retail* – 350,000 square feet
    - *Hotel* – 300-room / 277,000 square feet in multi-level landmark building with conference facilities
    - *Residential* – 1,000 multifamily units
    - *Office Alternative* – 195,000 square feet per market demands in lieu of 177 multifamily units
    - *Open Space / Amenities*– 350,000 square feet of open area amenities

---

[1] **DISCLAIMER: This document was created and is being made available for informational purposes only and does not represent nor shall the legal or factual conclusions or the City. THE CITY EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES OR REPRESENTATIONS AS TO THE TRUTH OR ACCURACY OF THE INFORMATION PROVIDED OR THE POSITIONS TAKEN IN THIS DOCUMENT, and this document should not be relied for legal, due diligence, investigatory, or any other purpose by any person with an interest in the Property, any third-parties, institutions, or courts, or any member of the public. This document is intended as an informational and educational document only to give context to the complex history and nature of the subject project.**

- o  <u>Term (DA §§ 6, 7)</u>. Developer commenced construction activities within five (5) years form the effective date of the DA, as required, and thus the DA is scheduled to remain in place until December 4, 2028 (unless earlier terminated).

- o  <u>Construction Schedule (DA § 7)</u>. Developer was required to commence construction work pursuant to building permits issued by the City. If Developer fails to do so, the Development Agreement becomes null and void and the site reverts to the BOSP. Only one (1) extension of the schedule is permitted for up to two (2) years. There have been no known construction activities since the date of the last inspection (noted below).

- o  <u>Rights of Secured Lenders (DA § 19)</u>. Secured lenders have the right to do anything required by Developer under the DA and otherwise realize their security interest by acquiring or transferring the project. To forestall adverse action by the City, secured lenders are required to cure any defaults and keep and perform the terms, covenants, and conditions of the Development Agreement.

- **Beach Orangethorpe Mixed Use Specific Plan.** In October 2008, the City approved the BOSP allowing the aggregate site to be developed with a mix of upscale retail, restaurant, entertainment, residential, hotel, and office uses as detailed below. The BOSP remains effective and represents the "baseline" land use regulations governing the site.

| Phase | Residential | Commercial | Office (Alternative) | Hotel | Parking |
|---|---|---|---|---|---|
| **Phase I** | 681 units | 255,000 sqft. | 195,000 sqft. in lieu of 177 units | 270,000 sqft. hotel / 300 rooms | 2,920 stalls (subterranean and above-grade level) |
| **Phase II** | 319 units | 100,000 sqft. | - | - | 1,640 stalls |
| **Total** | 1000 units | 355,000 sqft. | 195,000 sqft. in lieu of 177 units | 270,000 sqft. hotel / 300 rooms | 4,560 stalls |

- **Disposition and Development Agreement.** On October 26, 2010, the former Redevelopment Agency ("RDA") approved a Disposition and Development Agreement ("DDA") with the "Source at Beach LLC" ("Source at Beach"). A memorandum of DDA was recorded on October 9, 2012. After the RDA's dissolution in February 2012, all rights to enforce and manage the DDA passed to the City as the RDA's "successor agency." (Health & Safety Code § *34170* et seq.)

- o  <u>Effect / Purpose</u>. The DDA does not replace the DA or BOSP but rather: (1) effectuated the sale of certain RDA-owned properties to Developer for subsequent development consistent with the DA and BOSP; and (2) provided financial assistance to incentivize Developer's completion of the Mixed Use Project described in the DDA; including installation of a high-quality tenant in the Hotel Project.

2

o <u>Key Terms and Provisions of DDA.</u>

- *RDA Property Sale (DDA § 2).*  RDA sold several properties to Developer for consolidation with adjacent properties already owned by Developer. No money was paid for the RDA properties; rather the return consideration was public benefit resulting from Developer's completion and operation of the Mixed-Use Project.

- *Development Obligations (DDA § 3).*  Developer is required to construct a three (3) phased "Mixed-Use Project" on the Property:

  - Phase I – 428,000 square feet of retail space with a movie theatre, spa, entertainment uses, retail stores, and parking.
  - Phase II – 193,220 square feet of office space
  - Phase III – Mobil 3-5 star or AAA 3-5 diamond full-service hotel and parking.

- *Financial Assistance from RDA (DDA § 4).*

  - Property Tax Pledge – RDA returns 100% of tax increment revenues generated by the property by virtue of the Mixed-Use Project. Pledge expires in Fiscal Year 2029-2030 (unless earlier terminated for default).

  - Sales Tax Pledge – Return of sales tax revenue generated by the Mixed-Use Project at the general rate of 55% of revenues more than $1,712,000 (variable over time). Duration is 30 years (unless earlier terminated for default).

  - Termination for Default – This financial assistance may be terminated by the City upon expiration of the above deadlines or upon a default by Developer.

- *Prohibition on Transfers and Security Interests (DDA § 5).* Developer is prohibited from mortgaging or encumbering the property or Mixed-Use Project (or any part), or transferring or assigning its rights, prior to completing the Mixed-Use Project without City's advanced approval. Construction financing for each phase of the Project is a permitted exception if the financing satisfies the criteria in DDA § 3.4.

- *Events of Default (DDA § 7.1).*

  - Developer's failure to perform the Schedule of Performance in a timely manner.
  - A breach of the DDA consisting solely of the payment of money and continuing for ten (10) days or more.
  - The filing of a petition in bankruptcy or the appointment of a receiver or trustee over any property included in the Mixed-Use Project.

- *Remedies (DDA § 7.2).* The City has the right to terminate the DDA in the event of default by the Developer.

3

- **Interdepartmental Reviews.** Section 15 of the Development Agreement allows minor modifications and changes to the Mixed-Use Project to be approved by the City's Director of Community Development. Several such "Interdepartmental Review Approvals" have been issued for the Mixed-Use Project but those most relevant to the Hotel Project are below. Several "conditions of approval" for Interdepartmental Reviews remain incomplete for both portions.

  o Interdepartmental Review No. ID14-005. Approved on December 8, 2014 and made revisions to architectural features, landscaping, colors and materials for the parking structure, as well as site plan and architectural review of the Phase 1.5 building that includes the Hotel Project.

  o Interdepartmental Review No. ID17-003. Approved on March 21, 2017 and authorized modifications to the exterior and hardscaping for the Hotel Project.

- **Building Permits Status.** There are five (5) main building permits issued for the Hotel Project and most overlap or authorize related improvements associated with the Mixed-Use Project. Not all of these main permits were issued to the same legal entity all have now expired.

  - *B13-1388*: Foundations for Building B (or Phase 1.5) which houses both a portion of the retail and the hotel portion of the Mixed-Use Project.  This permit was issued as of 7.11.2014 and was complete as of 3.27.2018. Permit owner is "Source at Beach."

  - *B13-1389*: Shell retail work, various retail components, and hotel lobby. This permit was issued as of 1.29.2015 and is still open. The last inspection was conducted on 12.6.2016 meaning the permit has now expired. Permit owner is "Source at Beach."

  - *B13-1391*: Shell for Hotel Tower, Floors 4-7, Elevators, Stairwells, etc. This permit was issued on 1.19.2016 and remains open. The last inspection was 1.10.2020 meaning the permit has now expired. Permit owner is "Source at Beach."

  - *B15*-2102: Enclosed 3rd-Floor walkway between retail and hotel portions of Mixed-Use Project. This permit was issued on 2.10.2016 and is still open. The last inspection was conducted on 7.13.2016 meaning the permit has now expired. Permit owner is "Source at Beach."

  - *B13-2294*: Hotel interior tenant improvements. This permit was issued on 5.26.2017 and remains open. The last inspection was 7.2.2019 meaning the permit has now expired. Permit owner is "The Source Hotel."

  - *Various Sub-Permits Issued*: Various sub-building permits have been issued which authorize a specific scope of work related to one of the above main permits. The status of the sub-permits mirror that of the Main Permit under which it was issued; meaning any outstanding sub-permits for the Hotel Project have now also expired.

4

# EXHIBIT F



April 5, 2021

Mr. Bellann Raile
Cordes & Company
2030 Main Street, Suite 1300
Irvine, CA 92614

Re: **Source Hilton Hotel Buena Park Follow Declaration**

Dear Ms. Raile:

This document has been prepared in response to statements made by Robert "Charlie" Cervantes in his Declaration in opposition to certain motions made by Shady Bird Lending, LLC.

The Declaration made by Mr. Cervantes appears to be a response to the statements and observations contained in our report following our March 9, 2021 inspection. Although Mr. Cervantes states he completed a walk-through inspection of the property on March 25, 2021, it appears his inspection was limited to his interpretation of our report.

1. **Roof Issues** – The roof has numerous penetrations and is the primary location for much of the HVAC equipment. Because the HVAC system has not been completed, significant and large openings exist through the roof and into ductwork. The Debtor has placed plastic sheeting (polyethylene film), sometimes referred to as Visqueen, to cover the openings. Unfortunately, this is not an appropriate long-term solution for the reasons stated below:

   a. The application of plastic is not universal and numerous opening did not contain any covering. See Picture 1 below.
   b. Several roof vents are missing, which will allow water and pests to enter the building. See Picture 2 below.
   c. In the Declaration by Mr. Cervantes, he seems to indicate the placement of plastic film is acceptable. However, polyethylene plastic is highly susceptible to degradation from exposure to the sun, through UV radiation. The correct permanent solution is a sheet metal duct cap, as seen in Picture 3.
   d. A review of Google Earth pictures seem to indicate the roof has had a long-term temporary solution to water intrusion. See Picture 4 below:

---



Picture 1 – Unprotected vent.



Picture 2 – Missing flashing.



Picture 3 – Duct cap.



Picture 4 – Roof in April 2018 with temp coverings.

2. **Incomplete Construction Assemblies Water Intrusion** – The term construction assembly is an industry recognized term that refers to all the components of given portion of building, which when assembled together serve a specific purpose. In the case of the roof, the assembly is comprised of all components designed to protect the structure from water intrusion. As can be seen from Pictures 5 and 6, a roof failure existed and was in the midst of being repaired when construction ceased. Picture 5 shows the completed repair with flashing covering, while Picture 4 shows the roof torn off and exposed wood. Picture 7 is a close up of the incomplete repair. Furthermore, it was evident the Debtor had tried to mitigate water intrusion by use of sand bags and plastic that were located near or on the roof at this area.



Picture 5 – Exposed roof substrate.



Picture 6 – Repaired area, opposite from the exposed area.



Picture 7 – Repaired area, opposite from the exposed area.

3. **Incomplete Fire Protection –** Mr. Cervantes accurately points out that the fire protection system has temporary construction covers over many sprinklers. This confirms what we identified in our report – the fire protection system is not capable of providing life-safety protection for the project. Until construction is remobilized and completed, the building will be at risk in the event of a fire.

4. **Pool Deck –** It is clear the pool deck water proofing has been exposed to years of excess exposure. Picture 8 below is a screen shot from Google Earth in May of 2019. In this picture, the pool deck is completely uncovered. Moreover, the damage from excessive sun and UV exposure was readily noticeable by the amount of friable roof material readily sloughing off. This can be seen in Picture 9 below. I am also concerned by Mr. Cervantes' statement that his construction crew applied sealant over the area. Typically, a contractor engaged in roofing or waterproofing would have either a C-39 roofing or C-

063

33 painting license.  Moreover, most manufactures of waterproofing systems require trained and licensed installers to performing maintenance and installation of their system or the warranty may be voided.



Picture 8 – Exposed pool deck 5/2019.



Picture 9 – Deteriorating and friable pool deck.

064

5. **Pool Water & Trash** – From our observations, the water and trash had been in the pool for some period of time. A review of both Weather.com and Weather Underground did not reveal any periods of rain between 2/17 (onset of Receivership) and 3/3 (first inspection). Several inches of rain occurred prior to the Receivership and it appears as though this water may not have been removed.

6. **Completed Business Finish Waste** – The construction phasing was performed in such a manner that completed finishes (carpet, floor tile, showers, plumbing fixtures, wall coverings and cabinetry) are subject to construction traffic and exposure. Very little protective measures have been instituted to guard against damage and destruction. Both the tile and carpet flooring are uncovered and being subjected to unusual damage. See pictures below:





7. **Sewer System Hazard** – Mr. Cervantes alleges the sewer system has been connected to the public system, which may be the case. However, it would be unusual for the sewer provider to provide this connection before the building receives its final inspection. This is an issue that can be understood, but needs to be verified. In the event the line is not connect, a potentially hazardous situation exists due to the current sewer use in the building with no outlet. This creates head pressure on the sewer system. Mr. Cervantes also claims he regularly refilled all the P traps to prevent sewer gas migration into the building, but many of the P traps are not connected to active water systems, so it is hard to imagine this was routinely performed.

8. **Roof Door Patch** – At the door that leads to the roof, it is apparent that someone other than a qualified PVC or PTO roofing contractor has patched a previous leak. Previously, this area leaked into the building below. The concern we have is that the improper repair may leak again and damage the unit below.

9. **Missing Flashing** – According to Mr. Cervantes the missing flashing is "more a construction issue (which is typically addressed during the completion of construction and not a maintenance issue." While it is true the completion would ordinarily follow construction, the course of construction has been interrupted for a protracted period of time and these openings will readily allow water and pests to enter the building. Moreover, even during the course of an active project, one would protect an opening when inclement weather is forthcoming and that has clearly not been done.

Should you have any question, please feel free to call me.

Sincerely,

*Brent Little*

Brent Little
Principal

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 333 South Grand Avenue, Suite 3400, Los Angeles, CA 90071.

A true and correct copy of the foregoing document entitled (*specify*): **SHADY BIRD LENDING LLC'S REPLY TO OPPOSITION TO MOTION OF SHADY BIRD LENDING, LLC FOR ORDER DESIGNATING CHAPTER 11 CASE AS SINGLE ASSET REAL ESTATE CASE PURSUANT TO 11 U.S.C. §§ 101(51B) AND 362(d)(3); DECLARATIONS OF BELLANN R. RAILE, BRENT LITTLE, AND ANDREW TROST IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) April 8, 2021, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

**See Attached**

⊠ Service information continued on attached page.

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) April 8, 2021 , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**VIA OVERNIGHT MAIL**
The Honorable Erithe A. Smith
U.S. Bankruptcy Court
Ronald Reagan Federal Building
411 W. Fourth Street, Suite 5040
Santa Ana, CA 92701

**VIA OVERNIGHT MAIL**
Nancy S Goldenberg
Office of the United States Trustee
411 W Fourth St Ste 7160
Santa Ana, CA 92701-8000

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 8, 2021 | Cheryl Caldwell | /s/Cheryl Caldwell |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

CC 2710485v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                            **F 9013-3.1.PROOF.SERVICE**

<u>ADDITIONAL SERVICE INFORMATION</u> (if needed):

1.  <u>**SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**</u>

Ron Bender on behalf of Debtor The Source Hotel, LLC
rb@lnbyb.com

Michael G Fletcher on behalf of Creditor Evertrust bank
mfletcher@frandzel.com, sking@frandzel.com

Robert P Goe on behalf of Creditor Westranco, Inc.
kmurphy@goeforlaw.com, rgoe@goeforlaw.com;goeforecf@gmail.com

Nancy S Goldenberg on behalf of U.S. Trustee United States Trustee (SA)
nancy.goldenberg@usdoj.gov

Daniel A Lev on behalf of Creditor Shady Bird Lending, LLC
dlev@sulmeyerlaw.com, ccaldwell@sulmeyerlaw.com;dlev@ecf.inforuptcy.com

Daniel A Lev on behalf of Interested Party Courtesy NEF
dlev@sulmeyerlaw.com, ccaldwell@sulmeyerlaw.com;dlev@ecf.inforuptcy.com

Grant A Nigolian on behalf of Interested Party Courtesy NEF
grant@gnpclaw.com, process@gnpclaw.com;grant.nigolian@gmail.com

Juliet Y Oh on behalf of Debtor The Source Hotel, LLC
jyo@lnbrb.com, jyo@lnbrb.com

Ho-El Park on behalf of Interested Party Courtesy NEF
hpark@hparklaw.com

Ronald N Richards on behalf of Interested Party Courtesy NEF
ron@ronaldrichards.com, morani@ronaldrichards.com

United States Trustee (SA)
ustpregion16.sa.ecf@usdoj.gov

CC 2710485v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                 **F 9013-3.1.PROOF.SERVICE**