1  RON BENDER (SBN 143364)
   JULIET Y. OH (SBN 211414)
2  LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
3  10250 Constellation Boulevard, Suite 1700
   Los Angeles, California 90067
4  Telephone:  (310) 229-1234
   Facsimile:  (310) 229-1244
5  Email:  RB@LNBYB.COM; JYO@LNBYB.COM

6  Attorneys for Chapter 11 Debtor and
   Debtor-in-Possession
7

8
                **UNITED STATES BANKRUPTCY COURT**
9
                **CENTRAL DISTRICT OF CALIFORNIA**
10
                    **SANTA ANA DIVISION**
11

12
   In re:                              Case No.: 8:21-bk-10525-ES
13
   THE SOURCE HOTEL, LLC, a            Chapter 11
14 California limited liability company,
                                       **OPPOSITION TO NOTICE OF MOTION
15         Debtor and Debtor in  Possession.   AND MOTION FOR RELIEF FROM THE
                                       AUTOMATIC STAY UNDER 11 U.S.C. §
16                                     363 (REAL PROPERTY); DECLARATION
                                       OF   DONALD   CHAE   IN   SUPPORT
17                                     THEREOF**
18
                                       [DECLARATION OF ROBERT "CHARLIE"
19                                     CERVANTES    FILED    CONCURRENTLY
                                       HEREWITH]
20
                                       Hearing:
21                                     Date:     April 22, 2021
22                                     Time:     10:00 a.m.
                                       Place:    ZoomGov
23

24

25

26

27

28

                              1

# TABLE OF CONTENTS

I.      INTRODUCTORY STATEMENT ............................................................................. 2

II.     STATEMENT OF FACTS ..................................................................................... 4

    A.      Background ............................................................................................ 4

    B.      Events Leading To Debtor's Bankruptcy Filing .................................. 6

    C.      Post-Petition Administration ............................................................... 10

    D.      The Debtor's Reorganization Efforts And Strategy ........................... 11

III.    THE DEBTOR HAS DILIGENTLY MAINTAINED, PROTECTED AND
    SECURED THE HOTEL, AND SHADY BIRD'S ALLEGATIONS TO
    THE CONTRARY ARE INACCURATE, GROSSLY EXAGGERATED
    AND MISLEADING .......................................................................................... 13

IV.     ARGUMENT ..................................................................................................... 20

    A.      Shady Bird Is Adequately Protected By A Substantial Equity Cushion
    in the Debtor's Assets ........................................................................ 20

    B.      There Has Been No Demonstrated Post-Petition Decline In The Value
    Of The Hotel And the Debtor's Other Assets, So There Is No Cause
    To Grant Relief From Stay ................................................................. 22

V.      CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*In re Anthem Communities/RBG, LLC*,
   267 B.R. 867 (Bankr. D. Colo. 2001) ...............................................................23, 24

*FSFG Service Corp. v. Kim (In re Kim)*,
   71 B.R. 1011 (Bankr. C.D. Cal. 1987)......................................................................23

*In re McGowan*,
   6 B.R. 241 (Bankr. E.D. Pa. 1980) ...........................................................................20

*In re Mellor*,
   734 F.2d 1396 (9th Cir. 1984) ...................................................................................20

*In re Opelika Manufacturing Corporation*,
   66 B.R. 444 (Bankr. N.D. Ill. 1986) .........................................................................20

*In re Panther Mountain Land Dev., LLC*,
   438 B.R. 169 (Bankr. E.D. Ark. 2010) ......................................................................23

*In re Rogers Development Corp.*,
   2 B.R. 679 (Bankr. E.D. Vir. 1980) ..........................................................................20

*In re Setzer*,
   47 B.R. 340 (Bankr. N.Y. 1985)................................................................................22

*United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*,
   484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988)...............................................24

**Federal Statutes**

11 U.S.C. §§ 101 *et seq.* Chapter 11 ...................................................................... *passim*

11 U.S.C. § 362(d)(1) ............................................................................................ *passim*

11 U.S.C. § 363 ...............................................................................................................2

11 U.S.C. § 1107.............................................................................................................4

11 U.S.C. § 1108.............................................................................................................4

**Other Authorities**

3 *Collier on Bankruptcy*, ¶362.10.................................................................................22

Federal Rules of Evidence Rule 201 .......................................................................11, 12

The Source Hotel, LLC, a California limited liability company and the chapter 11 debtor and debtor-in-possession herein (the "Debtor"), hereby files this opposition (the "Opposition") to that certain *Notice Of Motion And Motion For Relief From The Automatic Stay Under 11 U.S.C. § 363 (Real Property)* [Doc. No. 62] (the "Motion") filed by Shady Bird Lending, LLC ("Shady Bird").

## I.

## INTRODUCTORY STATEMENT

Pursuant to the Motion, Shady Bird seeks relief from the automatic stay so that it may foreclose on the Debtor's primary asset, namely, the Debtor's approximately 85% completed seven-story full-service hotel located in the City of Buena Park, County of Orange, State of California (the "Hotel"). Shady Bird contends that cause exists under 11 U.S.C. § 362(d)(1) to grant relief from the automatic stay because its interest in the Hotel is allegedly not adequately protected. Specifically, Shady Bird contends that its interest in the Hotel is not protected by an adequate equity cushion, and that the fair market value of the Hotel is declining and payments are not being made to Shady Bird sufficient to protect Movant's interest against such purported decline.

Contrary to Shady Bird's contentions in the Motion, Shady Bird's interest in the Hotel is more than adequately protected. By Shady Bird's own admission, its secured claim as of March 1, 2021 totaled approximately $30,950,000. The Debtor believes that the current value of the Hotel is approximately $50,000,000 and the current value of the Debtor's furniture, fixtures and equipment ("FF&E") is at least $2,700,000. However, even if the Debtor's estimation of the value of the Hotel is overly optimistic, the current value of the Hotel is at least $40,900,000, as set forth in a formal appraisal report prepared in October, 2019 (at which time the construction of the Hotel ceased) by HVS Consulting & Valuation, a highly regarded, internationally recognized hotel valuation and consulting company. Based on the appraised value of the Hotel, Shady Bird's interest in the Hotel is adequately protected by a substantial equity cushion, well in excess of the 20% range that the Ninth Circuit has indicated constitutes clear adequate protection of a secured creditor's interest in property. Other than Shady Bird's unsupported contentions that the

value of the Hotel has deteriorated, there is no basis to conclude that the value of the Hotel has deteriorated since October, 2019, and certainly no basis to conclude that the value of the Hotel has deteriorated to a point which eliminates Shady Bird's substantial equity cushion in the Hotel and other assets which constitute Shady Bird's collateral.

In its Motion, Shady Bird makes a number of allegations about the Debtor's purported failure to maintain, protect, and secure the Hotel and argues – without substantiation – that the value of the Hotel has declined in some unquantified amount.  As a preliminary matter, even if any of Shady Bird's allegations is accurate (which is not the case), Shady Bird fails to demonstrate – or even articulate – how and in what amount the value of the Hotel has declined.  Shady Bird's contention that the value of the Hotel is continuing to deteriorate is even more confounding since Shady Bird's state court appointed receiver ("Receiver") has been in place (and has effectively locked the Debtor out of the Hotel) since mid-February, 2021, prior to the filing of the Debtor's bankruptcy case.

Moreover, as discussed in detail below, each of the allegations regarding mismanagement and negligence is false, grossly exaggerated, and/or misleading.  The Debtor has spent years investing "blood, sweat and tears" into the development and construction of the Hotel (which is largely complete) and has every incentive to preserve and maximize the value of the Hotel for the benefit of its creditors and equity holder.  Accordingly, and as set forth in the declarations submitted in support of this Opposition, the Debtor and its non-member manager, M+D Properties, a California corporation ("M+D"), have been extremely diligent in maintaining and protecting the Hotel property, even after construction on the Hotel halted in October, 2019.  The Receiver has none of the historical knowledge, expertise, and resources that the Debtor has and will not be able to maintain and preserve the value of the Hotel as efficiently or cost-effectively as the Debtor can.

In short, no "cause" exists under 11 U.S.C. § 362(d)(1) to warrant relief from the automatic stay to permit Shady Bird to foreclose on the Hotel and the Debtor's other assets.  The Motion should therefore be denied.

## II.

## STATEMENT OF FACTS

A.    **Background.**

1.    On February 26, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). The Debtor is continuing to manage its financial affairs and operate its bankruptcy estate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.    The Debtor is a limited liability company that was organized in November 2012 in the State of California. DMC Investment Holdings, LLC is the sole member of the Debtor. Donald Chae and Min S. Chae, who are brothers, are the members and principals of DMC Investment Holdings, LLC.

3.    Since 2014, the Debtor has been developing the Hotel, which will include conference rooms, an executive lounge, fitness center, restaurant, bars, and cleaning services. The Hotel is part of a larger 12.8-acre mixed-use development project (the "Master Development"), which includes a 400,000 square-foot retail center and a 50,000 square-foot seven-story office building which were completed in 2016. The Debtor does not own the real property on which the Hotel is being constructed (which is located at the southeast corner of the Master Development), but is a lessee pursuant to a 99-year ground lease for such real property (the "Ground Lease") with the Debtor's affiliate, The Source at Beach, LLC (the "Ground Lessor").

4.    M+D is an affiliate and sole manager of the Debtor. Pursuant to the terms of a Development Fee Agreement dated July 1, 2014 entered into by M+D and the Debtor, M+D has rendered construction/development management services for the Debtor to assist in overseeing the development and construction of the Hotel.

5.    Construction of the Hotel began in 2016. To finance the construction of the Hotel, on May 24, 2016, the Debtor obtained a $29.5 million construction loan (the "Loan") from Evertrust Bank ("Evertrust") as well as financing by three tranches of EB-5 investments totaling $35.5 million. The Debtor's obligations under the Loan are secured by liens against substantially all of the Debtor's assets, including the Hotel and the Debtor's leasehold interest in the real

property that is the subject of the Ground Lease (the "<u>Leasehold Interest</u>").  The original maturity date for the Loan was December 1, 2017, but was extended to November 1, 2019 pursuant to written extension agreements entered into by the parties.

6.    Through October 2019, approximately 85% of the Hotel construction had been completed, including: substantial completion of the core and shell, exterior painting, porte cochère, street lighting, ceiling framing, kitchen framing and glass block installation, food storages, all glass storefronts, electrical wiring and switchgear, guestroom flooring, ceiling fixtures, pool bar canopy structure, deck drains, window washing system, roof membrane, roof ductwork and HVAC vibration installation; nearly complete installation of bathroom fixtures (95%), acoustic ceiling system (80%), HVAC electrical connections (90%), piping for HVAC and plumbing equipment (95%), and rooftop ductwork (99%).  In addition, substantial materials have been procured and/or fabricated and are ready for installation pending completion of other items, such as first and second floor flooring, corridor carpeting, millwork (wall and ceiling panels, pool bar), passenger elevators, fire sprinklers, egress and accent lighting, pool equipment, guest room doors, locks and closures, bathroom fixtures, and rooftop HVAC equipment.  The approximately 15% of the Hotel construction which remains outstanding consists of mostly "finish work" such as the installation of flooring and carpeting, lighting, appliances, trade fixtures, furniture, furnishings and equipment already purchased by the Debtor (collectively, "<u>FF&E</u>").  The Debtor and M+D believe that the Debtor can successfully complete the construction of the Hotel within 6-12 months with additional funding of approximately $12,000,000 - $16,000,000 (which funding would provide for, among other things, the satisfaction of valid and effective mechanics' liens).

7.    In late 2019, Evertrust refused to issue the remaining $4 million of the Loan, claiming a cost overrun on the construction of the Hotel.  As a result of Evertrust's refusal to provide the final $4 million of the Loan, the Debtor was forced to cease construction activities.  However, the Debtor believes strongly that, had Evertrust funded the final $4 million as expected, construction of the Hotel would have been completed, as the Debtor believes that its contractors would have carried fifty percent of the cost overrun and the Debtor and its affiliates would have covered the remaining fifty percent of the overrun.

5

**B.      Events Leading To Debtor's Bankruptcy Filing.**

8.      When Evertrust refused to issue the remaining $4 million of the Loan, the Debtor immediately and actively sought to refinance the Loan.  The Debtor began discussions with a new lender named Hall Structured Finance ("Hall") in the fall of 2019 and was ultimately able to reach an agreement with Hall for refinancing in the total sum of $42 million.  During the course of the Debtor's refinancing discussions with Hall, the Debtor kept Evertrust apprised of all developments, and even provided Evertrust with a copy of the loan commitment letter from Hall in early 2020. The Debtor and Hall were on the verge of closing on the refinancing, with a target closing date of March 20, 2020, when local, county, and State officials issued lockdown orders as a result of the COVID-19 pandemic.  At that point, Hall put an indefinite hold on the closing of the refinancing with the Debtor.

9.      As a result, the Debtor went back to Evertrust and, between March 2020 and December 2020, engaged in active forbearance negotiations with Evertrust to obtain a further extension of the Loan maturity date so that the Hotel could recover from the effects of the COVID-19 pandemic, and the Debtor could obtain refinancing or additional construction financing and ultimately recommence construction of the Hotel.

10.      In the summer of 2020, while the Debtor and Evertrust were still engaged in forbearance negotiations, Evertrust commenced litigation against the guarantors of the Loan, Donald Chae and Min Chae, and recorded a Notice of Default against the Hotel (the "NOD").  In light of such litigation and the recordation of the NOD, and given the ongoing COVID-19 pandemic, the Debtor requested that Evertrust convert the Loan (in the funded amount of approximately $25 million) into a two-year term loan, and even offered to set aside one year's worth of loan payments in escrow as assurance of repayment of such two-year term loan.  Evertrust declined the Debtor's offer.

11.      During the latter half of 2020, while the Debtor was engaged in forbearance negotiations with Evertrust, the Debtor was also working actively with its loan broker, Ed Choi, to identify and obtain alternative financing for the Hotel.  In November or December, 2020, Mr. Choi

advised the Debtor that he had introduced Michael Schlesinger of Cambra Realty ("<u>Cambra</u>") to Evertrust to potentially purchase the Loan from Evertrust.

12.    Ed Choi, who represented that he was in direct discussions with Mr. Schlesinger regarding Cambra's pending purchase of the Loan, repeatedly assured the Debtor that, in conjunction with its purchase of the Loan, Cambra would extend the Loan maturity date for two years (at which time the Debtor could purchase back Cambra's interest in the Loan for $24-25 million) and Cambra would provide additional construction financing of $10-14 million so that the Debtor could complete the construction of the Hotel.  True and correct copies of correspondence exchanged by Donald Chae and Ed Choi on December 28, 2020, in which Ed Choi indicated that Michael Schlesinger of Cambra had confirmed these terms, is attached **<u>Exhibit 1</u>** to the Declaration of Donald Chae annexed hereto (the "<u>Chae Declaration</u>").  The Debtor and the guarantors repeatedly requested that the foregoing terms be reduced to writing and were assured by Ed Choi and Mr. Schlesinger that the terms would be set forth in a written offer or term sheet. Ultimately, the terms discussed by the Debtor, the guarantors, Ed Choi and Mr. Schlesinger were never reduced to writing.

13.    On December 30, 2020, Donald Chae was asked to meet with Ed Choi and Mr. Schlesinger at an office building in Beverly Hills, where they introduced him to Ronald Richards for the first time, introducing Mr. Richards only as an attorney and not as the principal for Shady Bird.  In December 2020, Shady Bird had just purchased Evertrust's interests in the Loan the day before at a significant discount, for a reported purchase price of approximately $19 million. Thereafter, the Debtor was advised that Mr. Richards of Shady Bird would be the Debtor's new contact.

14.    On January 2, 2021, the Debtor received initial deal points in writing from Mr. Richards which were generally egregious and not at all reflective of the terms that had been previously discussed by the parties.  On January 7, 2021, the Debtor returned a written counteroffer which reflected the terms that the Debtor understood had been previously agreed to by the parties. In response to the Debtor's counteroffer, Mr. Richards requested information from the Debtor

regarding its maintenance contracts, architectural contracts, and construction management contract

with Swinerton Builders.  At this point, the Debtor's trust in Shady Bird had severely deteriorated.

15.    At Mr. Richards' request, the Debtor coordinated with Ed Choi to provide Shady Bird's maintenance contact with access to the Hotel rooftop on January 27, 2021.  The Debtor was advised that there would be one individual who would inspect the rooftop equipment.  Instead, Mr. Schlesinger of Cambra showed up with a team of four individuals from Swinerton Builders at the designated meeting time.  Robert "Charlie" Cervantes, who is employed by M+D (the Debtor's manager) and had been overseeing the maintenance of the Hotel, was the Debtor's representative at the meeting that day.  Mr. Cervantes advised Mr. Schlesinger and his group that he had been directed to show one individual to the Hotel rooftop, and that he would need further directions from the Debtor to allow the entire group up.  Mr. Schlesinger contacted Ed Choi, who then contacted a member of the Debtor's team.  Ultimately, as a compromise, the Debtor permitted access to the Hotel to two individuals from Swinerton Builders.  However, once Mr. Cervantes had taken the two individuals to the Hotel rooftop to inspect the rooftop equipment, the two individuals from Swinerton Builders informed Mr. Cervantes that their company had been hired to inspect the Hotel project and that they would need to view the full Hotel building.  Mr. Cervantes responded that he had not been authorized to provide access to the entire Hotel building that day and requested that they schedule a new date/time with the Debtor for such access.

16.    At this point, the relationship between the Debtor and Shady Bird was severely strained, and the Debtor feared that Shady Bird had no intention of following through with the terms that the parties had previously discussed.  The "bait and switch" tactic at the Hotel meeting on January 27, 2021 and the comments made by the individuals from Swinerton Builders to Mr. Cervantes at such meeting only reinforced the Debtor's concerns that Shady Bird was not engaged in negotiations with the Debtor in good faith and was instead gathering information to take the Hotel from the Debtor.

17.    With the decision made to go into "litigation mode" and minimize contact with Shady Bird and Mr. Richards, the Debtor proceeded to take actions that it felt were necessary to protect the interests of the Debtor and its creditors in the Hotel.  In that context and in an

8

admittedly misguided attempt to get negotiations with Shady Bird "back on track," Donald Chae sent an email to Mr. Richards on February 2, 2021 threatening to suspend security at the Hotel property.  Of course, the Debtor did not do so and never had any intention of doing so, given that the Hotel is the result of many years of hard work and investment by the Debtor and constitutes the Debtor's primary asset.  The Debtor's utmost concern has always been, and continues to be, the preservation, maintenance and maximization of value of the Hotel.  There has never been any interruption of the security provided to the Hotel.

18.    Ultimately, the Debtor's concerns about Shady Bird were validated when, on February 8, 2021, Shady Bird filed a complaint against the Debtor in the Superior Court of the State of California for the County of Orange ("Superior Court") for (i) specific performance and appointment of a receiver, and (ii) waste, thereby commencing the Superior Court action bearing the case number 30-2021-01183489-CU-OR-CJC (the "State Court Action").  Shady Bird also took steps to immediately foreclose on the Hotel and issued a Notice of a Trustee's Sale for the Hotel to be held on March 1, 2021.

19.    As alluded to by Shady Bird in its Motion, on February 16, 2021, the Debtor's Ground Lessor sent to Shady Bird a "Notice of Default Under, and Exercise of Option to Terminate, Ground Lease" (the "Ground Lease Notice").  However, the Ground Lease Notice should be viewed in the context of the parties' discussions and actions to date – the Ground Lease Notice was an extremely frustrated response by the principals of the Ground Lessor and Debtor to Shady Bird's actions and a desperate attempt to prevent or delay the foreclosure of the Hotel by Shady Bird, and was never intended to be (nor was ever actually) effectuated.  As Shady Bird's own counsel noted in his written response to the Ground Lease Notice, a true and correct copy of which is attached as **Exhibit 2** to the Chae Declaration, the purported termination of the Ground Lease was never effective nor valid because, among other reasons, notices of the alleged breaches of the Ground Lease were not previously provided to Evertrust or Shady Bird in accordance with the provisions of the Ground Lease.  Moreover, and in an effort to provide clarification on the issue, the Ground Lessor formally rescinded the Ground Lease Notice in writing.  A true and

correct copy of the written notice from counsel for the Ground Lessor rescinding the Ground Lease Notice is attached as **Exhibit 3** to the Chae Declaration.

20.     Shortly after filing its complaint to initiate the State Court Action, Shady Bird filed an ex parte application for an order appointing a receiver and other related relief.

21.     On February 17, 2021, the Superior Court entered an order in the State Court Action appointing Bellann R. Raile as Receiver to, among other things, take possession of the Hotel and all goods, furniture, fixtures, and equipment attached and/or related to the Hotel.

22.     As a result of all of the foregoing, the Debtor sought chapter 11 bankruptcy protection in order to prevent the impending foreclosure of the Hotel, to preserve the equity in the Hotel for the benefit of all creditors (not just Shady Bird), to regain possession of the Hotel and related assets and obtain refinancing or investments to enable the Debtor to complete construction of the Hotel, and to be afforded a reasonable opportunity to restructure its financial affairs and repay its debts in an orderly fashion.

**C.     Post-Petition Administration.**

23.     As of the Petition Date, the Debtor had cash totaling approximately $63,000 in bank accounts with Evertrust and Preferred Bank.  The Debtor took steps immediately after the Petition Date to close its pre-petition bank accounts at Evertrust and Preferred Bank, and to withdraw all funds contained in those pre-petition accounts so that such funds could be deposited into the Debtor's newly-established debtor-in-possession bank accounts at Axos Bank.

24.     On March 12, 2021, the Debtor filed the *Debtor's Notice Of Motion And Motion For Entry Of An Order: (A) Requiring Turnover Of Estate Cash By Evertrust Bank; (B) Authorizing Debtor To Use Cash Collateral; And (C) Authorizing Debtor To Obtain Post-Petition Financing From M+D Properties On An Unsecured Basis* [Doc. No. 21] (the "CC/Financing Motion").  Pursuant to the CC/Financing Motion, the Debtor sought the entry of a Court order (i) requiring Evertrust to turn over and deliver to the Debtor cash held in the Debtor's pre-petition bank accounts at Evertrust (as Shady Bird would not consent to the turnover of such cash until after the Debtor filed the CC/Financing Motion); (ii) authorizing the Debtor to use cash collateral in accordance with the Debtor's proposed 13-week operating

budget (the "<u>Budget</u>"); and (iii) authorizing the Debtor to obtain post-petition unsecured financing up to $100,000 (the "<u>DIP Loan</u>") from the Debtor's manager, M+D.  The Budget provides for the payment of expenses critical to the maintenance and preservation of the Hotel, including insurance premiums, utility expenses, post-petition utility deposits, and real property taxes.[1]

25.    On March 23, 2021, the Court entered an order granting the CC/Financing Motion on an interim basis, pending a final hearing scheduled on May 6, 2021, subject to certain minor modifications agreed to by the Debtor and set forth in such order [Doc. No. 46] (the "<u>Interim Order</u>").

26.    The Debtor filed its 7-Day Package with the Office of the United States Trustee ("<u>OUST</u>") on a timely basis on March 5, 2021.  The Debtor also filed its Schedules of Assets and Liabilities ("<u>Schedules</u>") and Statement of Financial Affairs on a timely basis on March 12, 2021.  The Debtor filed its first monthly operating report (covering the post-petition period of February 26-28, 2021) with the Court, and remains in full compliance with the reporting and other requirements of the Bankruptcy Code and the OUST.

**D.    <u>The Debtor's Reorganization Efforts And Strategy.</u>**

27.    The Debtor's primary assets consist of the Hotel, the Leasehold Interest, and the FF&E.  The Debtor believes that the current value of the Hotel in "as is" condition is approximately $50,000,000 and that its fair market value upon completion will be at least $60,000,000.[2]  As reflected in the Debtor's Schedules, the Debtor believes that the total value of the FF&E (calculated at cost, excluding fabrication labor costs) is approximately $2,700,000.[3]

---

[1] Pursuant to Rule 201 of the Federal Rules of Evidence ("<u>Evidence Rules</u>"), the Debtor respectfully requests that the Court take judicial notice of the Budget, which is attached as Exhibit A to the Declaration of Donald Chae annexed to the CC/Financing Motion [Doc. No. 21, page 37 of 358].

[2] HVS Consulting & Valuation previously prepared an appraisal report for the Hotel, a true and correct copy of which is attached as **Exhibit 4** to the Chae Declaration, which reflects an "as is" value of $40,900,000 for the Hotel as of October 14, 2019.  The Debtor's manager is in the process of obtaining an updated appraisal of the Hotel.

[3] Pursuant to Evidence Rule 201, the Debtor respectfully requests that the Court take judicial notice of the Debtor's Schedule A/B Assets – Real and Personal Property [Doc. No. 32, pages 3-25 of 66].

28.    The Debtor's primary secured creditor is Shady Bird.  Shady Bird contends in the Motion that the outstanding balance of the Loan was $30,948,839.27 as of March 1, 2021.  The Debtor's obligations under the Loan are secured by liens against substantially all of the Debtor's assets, including the Hotel, the Leasehold Interest, the FF&E, and the Debtor's cash.

29.    There are a number of subcontractors that have recorded mechanics' liens against the Debtor and/or Hotel.  As reflected in the Debtor's Schedules, the Debtor believes that the total amount of the mechanics' liens recorded against the Debtor and/or Hotel is approximately $2,900,000.[4]  Some of these recorded mechanics' liens are disputed by the Debtor.  In addition, there appear to be a number of other mechanic's liens asserted against the Hotel; however, such purported liens do not appear to have been properly perfected and are therefore likely invalid.

30.    The Debtor also received three tranches of EB-5 loans totaling approximately $35.5 million from Beach Orangethorpe Hotel, LLC, Beach Orangethorpe Hotel II, LLC, and Beach Orangethorpe Hotel III, LLC (collectively, the "EB-5 Investors").    The Debtor's obligations under the loans from two of the EB-5 Investors (*i.e.*, Beach Orangethorpe Hotel, LLC and Beach Orangethorpe Hotel II, LLC) are secured by junior liens against the Hotel and the Leasehold Interest.[5]

31.    The Debtor believes that the vast majority of its creditors, including, without limitation, the EB-5 Investors, whose primary objective is to successfully obtain permanent residence status in the United States (which hinges on job creation), support the Debtor's efforts to reorganize through its chapter 11 bankruptcy case.  The Debtor is fully committed to the completion of the construction of the Hotel and fulfilling those job creation goals, while Shady Bird does not appear to share those goals.  The Debtor makes no secret of its intended exit

---

[4] Pursuant to Evidence Rule 201, the Debtor respectfully requests that the Court take judicial notice of the Debtor's Schedule D: Creditors Who Have Claims Secured by Property [Doc. No. 32, pages 26-37 of 66].

[5] Pursuant to Evidence Rule 201, the Debtor respectfully requests that the Court take judicial notice of the Deeds of Trust recorded against the Hotel by Beach Orangethorpe Hotel, LLC and Beach Orangethorpe Hotel II, LLC, which are attached as Exhibit H to the Declaration of Donald Chae annexed to the CC/Financing Motion [Doc. No. 21 pages 303-350 of 358].

strategy in this case.  The Debtor has been, and continues to be, engaged in active discussions with numerous prospective lenders regarding the terms for debtor-in-possession financing, which will provide the Debtor with the funding necessary to complete the construction of the Hotel, service debt, and operate the Hotel until operations can be stabilized.  The Debtor has already received a written commitment letter from one prospective lender for debtor-in-possession financing in the sum of $17,900,000 but, as noted above, the Debtor is still in the process of "vetting" terms with a number of prospective lenders.  The Debtor intends to finalize loan terms with a lender and file a motion for Court approval of debtor-in-possession financing in this case in an expeditious manner.

32.    In conjunction with obtaining debtor-in-possession financing, the Debtor intends to file a plan of reorganization in this case which restructures and provides for repayment of the Debtor's secured debt (including the debt owed to Shady Bird) based upon market terms, and provides for a recovery to the Debtor's general unsecured creditors who would otherwise receive nothing (particularly upon a foreclosure of the Hotel by Shady Bird).

**III.**

**THE DEBTOR HAS DILIGENTLY MAINTAINED, PROTECTED AND SECURED THE HOTEL, AND SHADY BIRD'S ALLEGATIONS TO THE CONTRARY ARE INACCURATE, GROSSLY EXAGGERATED AND MISLEADING**

Shady Bird alleges in the Motion that the Debtor has failed to adequately maintain, protect and secure the Hotel, which Shady Bird contends – without substantiation – has led to an unquantified decline in the value of the Hotel.  As discussed in detail below, each allegation made by Shady Bird is false, grossly exaggerated, and/or misleading and rests upon hyperbole and speculation rather than competent factual evidence.  Moreover, as the party who has pursued this project for over seven years and invested significant time, money, and resources into the development and construction of the Hotel, the Debtor has every incentive to preserve and maximize the value of the Hotel for the benefit of its creditors and equity holder.  Accordingly, and as set forth in the declarations attached to this Opposition, the Debtor and its manager, M+D, have been extremely diligent in maintaining and protecting the Hotel, even after construction

halted in late 2019.

The Receiver has none of the experience, historical knowledge, and resources that the Debtor has with respect to the Hotel, and will not be able to maintain and preserve the value of the Hotel as efficiently or cost-effectively as the Debtor can.  In fact, it is clear from the Debtor's interactions with the Receiver since her appointment in mid-February that the Receiver has done very little other than to "babysit" the Hotel property.  While Shady Bird has apparently funded the Receiver's retention of a consultant to provide a property inspection report, Shady Bird has apparently not provided any funding to the Receiver to actually address the purported maintenance issues raised in such report.  This is not at all surprising since (1) there were no out-of-the-ordinary maintenance issues under the Debtor's watch, and (2) Shady Bird has no incentive to ensure the proper maintenance and preservation of the Hotel while the Debtor remains the owner of the Hotel – in fact, it is in Shady Bird's interest to do the exact opposite, as any devaluation of the Hotel will assist Shady Bird in obtaining the very relief it is seeking by the Motion (*i.e.*, relief from the automatic stay to foreclose on the Hotel).  Thus, it is apparent that Shady Bird's actions to appoint a receiver were aimed at manufacturing a false controversy to advance its interests rather than redressing any legitimate concerns regarding the maintenance and preservation of the Hotel.

The fact is that the Hotel has been diligently and competently maintained by the Debtor and M+D.  The Debtor's responses to the maintenance issues alleged by Shady Bird in its Motion and in the property inspection report attached to the Motion are discussed at length below and in the Declaration of Robert "Charlie" Cervantes filed concurrently herewith (the "Cervantes Declaration").  Mr. Cervantes is an employee of M+D and oversaw the day-to-day maintenance of the Hotel from approximately August, 2019 until mid-February, 2021, when the Receiver was appointed.  On March 25, 2021, Mr. Cervantes conducted a thorough walk-through of the Hotel to personally assess the maintenance issues raised by Shady Bird in its Motion and to take photos of the Hotel, which are included in the Cervantes Declaration.

/ / /

| No. | Shady Bird's Allegation | Debtor's Response |
|---|---|---|
| 1 | There are substantial roof issues which currently permit the intrusion of water into the structure. | Air vent openings on the Hotel roof were left covered and maintained regularly by M+D until the Receiver took possession.  Based on the March 25 walk-through, it appears that the Receiver has not regularly maintained the roof area, as the protective plastic coverings that M+D installed on the vent openings immediately before the Receiver's appointment were still present, but there had been no efforts to fix any tears in the covers or to refasten covers that were blown off. |
| 2 | The construction assemblies on the roof are incomplete and create an opportunity for water infiltration. | It is unclear what "construction assemblies" Shady Bird is referring to.  Based on the March 25 walk-through, there appears to be no "construction assemblies" other than the air vent openings issue already discussed in Item No. 1 above. |
| 3 | The fire sprinkler system is not currently capable of providing life-safety protection for the Project. | The water supply lines and the automatic sprinklers have all been installed the Hotel, as confirmed for each of the floors visited on the March 25 walk-through (floors 1, 2, 4 and 7).  However, the protective covers for the sprinklers are still in place because the ceiling drywall and finish have yet to be installed. |
| 4 | Due to neglect and exposure to UV rays, the pool deck will need substantial repair. | M+D diligently protected the sealant that the construction crews applied onto the pool deck area by covering it regularly with a plastic tarp, until the Receiver took possession.  Based on the March 25 walk-through, it appears that the Receiver has not regularly checked or maintained the pool deck as the tarp installed by M+D was torn and had blown off by wind, and there had been no efforts to put the tarp back in place or make other protective arrangements. |
| 5 | The pool has an accumulation of water and trash making it a breeding ground for mosquitos, which may carry the West Nile Virus. | As part of M+D's maintenance duties, M+D had been pumping water out of the pool after each rainfall until the Receiver took possession.  Accordingly, any water and trash accumulation in the pool occurred after the Receiver took possession.  Based on the March 25 walk-through, it appears that the Receiver has not pumped water out of the pool on any regular basis. |

| No. | Shady Bird's Allegation | Debtor's Response |
|---|---|---|
| 6 | Completed business finishes are not being protected and are exposed to waste or damage. | It is unclear what "completed business finishes" Shady Bird is referring to.  There are some HVAC materials that have yet to be installed which are currently stored on the roof, but none of those materials are being wasted or damaged.  Based on the March 25 walk-through, there appears to be no other "completed business finishes." |
| 7 | A potentially hazardous situation may exist if the building sewer system is not connected to the public system. | The building sewer system is connected to the public system, but unused drains can emanate sewer odors since the water that would otherwise drain down the pipes (like the P-traps, those U-shaped pipes under drains) to seal against odors from the sewer line would evaporate.  As part of M+D's maintenance duties, M+D regularly flushed/drained/hosed water down these drains to maintain the water seal.  Based on the March 25 walk-through, it appears that the Receiver has not performed proper maintenance by flushing toilets or filling the P-traps, which has resulted in odors from the sewer line to come out.  The Receiver's staff acknowledged that the odor was likely from the toilet, shower and sink drains losing their water seal, and indicated they were unaware of any other chemical/hazardous reasons for the odor. |
| 8 | HVAC package units have been left unsecured and accessible to thieves and vandals. | HVAC units have been stored in the covered parking structure and have been monitored continuously by the security for the entire "The Source" complex.  Even though the HVAC units are monitored regularly by security, the Debtor and M+D secured the HVAC units with fencing, which remain in place. |
| 9 | There are hazardous and caustic chemical unsecured at the Project. | It is unclear what "hazardous and caustic chemical" Shady Bird is referring as there is no detail provided in the Motion or the property inspection report.  Based on the March 25 walk-through, it appears the reference is to a one-gallon yellow chemical that was left *sealed* on the bathroom counter of Room 725 (see photo in Cervantes Declaration).  Nothing else that resembled a chemical was witnessed during the March 25 walk-through. |

| No. | Shady Bird's Allegation | Debtor's Response |
|---|---|---|
| 10 | The Debtor's failure to take reasonable measures to maintain, protect, and secure the project under the operative deed of trust. | This appears to be a "catch all" reference to all of the Items discussed above, but the March 25 walk-through indicated nothing out of the ordinary. As discussed above, the Debtor took reasonable measures to maintain, protect and secure the Hotel before the Receiver took possession, but it appears that the Receiver has not continued such measures. |
| 11 | The Debtor's failure to prevent the project from becoming vandalized, damaged, destroyed, and deteriorated. | While the Debtor was in possession, there was an incident where a vandal broke the exterior layer of a dual-pane storefront glass window facing Orangethorpe Avenue, which Debtor cleaned out. After the Receiver took possession, there was another incident where a vandal broke through the same window, which resulted in the Receiver installing plywood to cover the opening. To the extent that Shady Bird contends that the first vandalism incident constitutes a failure by the Debtor to protect the Hotel, the second vandalism incident should also constitute a failure by the Receiver to protect the Hotel. |
| 12 | The Debtor's failure to prevent material physical waste of the project. | This appears to be another "catch all" reference to all of the Items discussed above, but the March 25 walk-through indicated nothing out of the ordinary. As discussed above, the Debtor took reasonable measures to maintain, protect and secure the Hotel before the Receiver took possession, but it appears that the Receiver has not continued such measures. |
| 13 | The Debtor's failure to allow Shady Bird to enter upon and inspect the project. | This appears to be a reference to the January 27, 2021 meeting at the Hotel, where Mr. Schlesinger of Cambra used a "bait and switch" tactic to bring in an entire team of people (including the Debtor's former contractor) to inspect the Hotel after only requesting access for one maintenance person to view the Hotel roof. While this incident may have angered the principals of Shady Bird and Cambra, the issue of access/inspection will not be an issue going forward, particularly given the oversight of the Bankruptcy Court. |
| 14 | The Debtor's failure to provide evidence of and certificates of insurance to Shady Bird upon | The Debtor provided evidence (and certificates) of insurance for the Hotel to the Receiver on the same day she made such request. Evidence of |

| No. | Shady Bird's Allegation | Debtor's Response |
|---|---|---|
| | request. | insurance was also submitted to the OUST as part of the Debtor's 7-Day Package, and the Debtor will provide evidence of insurance to any party upon written request. |
| 15 | The Debtor's failure to allow inspections by the City of Buena Park and ceasing communications with the City, negatively affecting the permitting process and the ability to complete the project. | This allegation has no basis in truth, and makes no sense given that a City Inspector from the City of Buena Park (Gary) has been stationed at "The Source" complex and still presently maintains an office full-time in the construction office adjacent to the Hotel. |
| 16 | The Debtor's failure to maintain various systems and improvements on the project such as the elevator, electrical, HVAC, and plumbing. | This allegation is vague and does not specify how the Debtor has purportedly failed to maintain the elevator, electrical, HVAC and plumbing systems in the Hotel. Specified issues relating these systems are already addressed in the Items above. The March 25 walk-through indicated nothing out of the ordinary and, as discussed above, the Debtor took reasonable measures to maintain, protect and secure the Hotel before the Receiver took possession, but it appears that the Receiver has not continued such measures. |
| 17 | The Debtor's failure to provide any security for the project and improvements. | There has always been, and continues to be, full time 24/7 security service for the entire "The Source" complex, including the Hotel, courtesy of the Ground Lessor (The Source at Beach, LLC). There has never been any interruption of the security provided to the Hotel. |
| 18 | The Debtor's failure to timely test the fire-life safety systems which could completely destroy the project. | The Debtor and M+D are not aware of any issues regarding the efficacy of the fire-life safety systems, and are not aware of any "deadline" to test such systems. The Debtor also notes that the Receiver does not appear to have taken any steps to address this issue herself. To the extent this is a real issue, the Debtor and M+D are willing and able to promptly address it. |
| 19 | Elevator certificate has not been renewed since 2018. *(issue raised by the Receiver on March 17, 2021)* | One of the three elevators installed in the Hotel was being used for construction access. The elevator supplier (Kone, Inc.) provided a temporary six-month certificate for the elevator, which needs to be renewed. When the Receiver |

18

| No. | Shady Bird's Allegation | Debtor's Response |
|---|---|---|
| | | requested assistance from the Debtor to address this issue, the Debtor promptly agreed to do so. The Debtor has contacted Kone to schedule an inspection to have the elevator re-certified. |
| 20 | An improved safety environment for building visitors and contractors should be implemented. *(issue raised in the property inspection report attached to the Motion)* | The Hotel remains under construction so it is not uncommon for materials to be left on site. There is no current construction activity, so this issue does not appear relevant at this time. However, the Debtor is willing and able to send in a crew to tidy up any loose equipment or materials. The Debtor notes that the Receiver does not appear to have taken any steps to address this issue herself. |
| 21 | Completion plans are held off site. *(issue raised in the property inspection report attached to the Motion)* | As is typically the case, the Debtor's general contractor (Greenland Construction Service, LLC) is holding the completion plans for the Hotel. Those plans are currently stored by Greenland in its construction office, which is located within "The Source" complex adjacent to the Hotel. |
| 22 | Improper patch at roof door leak. *(issue raised in the property inspection report attached to the Motion)* | This issue was not visible to M+D during the March 25 walk-through, but the Debtor is willing and able to address it. However, neither M+D nor the Receiver were aware of any roof leaks. |
| 23 | Missing flashing/improperly installed flashing *(issue raised in the property inspection report attached to the Motion)* | This issue was not specifically inspected during the March 25 walk-through and appears to be more of a construction issue (which will be addressed during the completion of construction) and not a maintenance issue. In the meantime, however, the Debtor is willing and able to get the area covered. |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**IV.**

**ARGUMENT**

Shady Bird seeks relief from the automatic stay so that it may foreclose on the Debtor's primary asset, namely, the Hotel.[6]  The sole basis of the Motion is that "cause" for relief from the automatic stay exists under 11 U.S.C. § 362(d)(1) because Shady Bird's interest in the Hotel is allegedly not adequately protected.  Specifically, Shady Bird contends that its interest in the Hotel is not protected by an adequate equity cushion, and that the fair market value of the Hotel is declining and payments are not being made to Shady Bird sufficient to protect Movant's interest against such purported decline.  Contrary to Shady Bird's contentions in the Motion, and as discussed below, Shady Bird's interest in the Hotel is more than adequately protected.

**A.     Shady Bird Is Adequately Protected By A Substantial Equity Cushion in the Debtor's Assets.**

Shady Bird is adequately protected by a substantial equity cushion in the Debtor's assets which comprise Shady Bird's collateral (including the Hotel).

The Ninth Circuit made clear in *In re Mellor*, 734 F.2d 1396, 1401 (9th Cir. 1984) that an equity cushion of 20% is considered clear adequate protection of a secured creditor's interest in collateral.  *See also In re McGowan,* 6 B.R. 241, 243 (Bankr. E.D. Pa. 1980) (holding a 10% cushion is sufficient to be adequate protection); *In re Rogers Development Corp.*, 2 B.R. 679, 685 (Bankr. E.D. Vir. 1980) (court decided that an equity cushion of approximately 15% to 20% was sufficient adequate protection to the creditor, even though the debtors had no equity in the property).  Furthermore, in determining whether a secured creditor has equity in property, the Court should consider the "entire security package" not just a portion thereof.  *In re Opelika Manufacturing Corporation*, 66 B.R. 444, 447-48 (Bankr. N.D. Ill. 1986).

The Debtor believes that the current value of the Hotel is approximately $50,000,000 and that the current value of the Debtor's FF&E is at least $2,700,000.  However, even if the

---

[6] Although not entirely clear from the Motion, Shady Bird does not appear to seek relief from the automatic stay to foreclose on the Debtor's other assets, including, without limitation, the FF&E.

Debtor's estimation of the value of the Hotel is overly optimistic, the current value of the Hotel is at least $40,900,000, as set forth in the appraisal report prepared in October, 2019 by HVS Consulting & Valuation, a highly regarded, internationally recognized hotel valuation and consulting company (the "Appraisal").  The Appraisal, a true and correct copy of which is attached as **Exhibit 4** to the Chae Declaration, reflected an "as is" value of $40,900,000 for the Hotel as of October 14, 2019, a projected value of $55,800,000 upon completion, and a projected value of $61,300,00 upon stabilization.

Other than the inaccurate and exaggerated allegations made by Shady Bird that the Debtor has failed to adequately maintain, protect and secure the Hotel (which allegations are addressed in detail above), there is no basis to conclude that the value of the Hotel has deteriorated since October, 2019 (when construction activity at the Hotel ceased and the Appraisal was obtained), and certainly no basis to conclude that the value of the Hotel has deteriorated to a point which eliminates Shady Bird's substantial equity cushion in the Hotel and other assets.

The only evidence of value before the Court are the Debtor's best estimate of the current value of the Hotel and the Appraisal.[7]  Tellingly, Shady Bird has offered no indication of what it believes that the current value of the Hotel may be, much less any evidence of value.  Based on the Appraisal, the most "as is" value of the Hotel is at least $40,900,000.  Together with the Debtor's FF&E, which the Debtor estimates has an estimated value of at least $2,700,000, the aggregate value of the Debtor's assets (which comprise Shady Bird's collateral) is estimated to be $43,600,000.  Shady Bird acknowledges in the Motion that its secured claim totaled approximately $30,950,000 as of March 1, 2021.  Given the aggregate value of the Debtor's assets (*i.e.*, approximately $43,600,000), and the total estimated amount currently owed to Shady Bird (*i.e.*, approximately $30,950,000), Shady Bird is adequately protected by an equity cushion of more than 40%, which far exceeds the 20% range that the Ninth Circuit has indicated

---

[7] The Debtor's manager is in the process of obtaining an updated appraisal of the Hotel.

1    constitutes clear adequate protection of a secured creditor's interest in collateral.

2        Given that Shady Bird is adequately protected by a substantial equity cushion in the

3    Debtor's assets, no "cause" exists to grant relief from the automatic stay under 11 U.S.C. §

4    362(d)(1).

5    **B.    There Has Been No Demonstrated Post-Petition Decline In The Value Of The Hotel**

6        **And the Debtor's Other Assets, So There Is No Cause To Grant Relief From Stay.**

7        As discussed in detail above, Shady Bird makes a number of allegations about the

8    Debtor's purported failure to maintain, protect, and secure the Hotel, all of which the Debtor

9    strongly disputes and contends are false and greatly exaggerated.  Shady Bird goes on to argue –

10   without substantiation – that, as a result of the Debtor's actions (or inactions), the ***value of the***

11   ***Hotel*** has declined in some unquantified amount.  As a preliminary matter, even if any of Shady

12   Bird's allegations is accurate (which is not the case), Shady Bird fails to demonstrate – or even

13   explain – how and in what amount the value of the Hotel has declined since the Petition Date.

14       The party seeking relief from stay has the burden of presenting a *prima facie* case

15   demonstrating a factual and legal right to the relief it seeks.  3 *Collier on Bankruptcy*, ¶362.10, at

16   362-113 (Matthew Bender 15th Ed. Rev. 2002).  The policy foundations underlying the rule that

17   a party seeking relief under 11 U.S.C. § 362(d)(1) bears the burden of producing evidence

18   establishing a legally sufficient basis for such relief are clear.   It would be both illogical and

19   inefficient to require the debtor to demonstrate the nonexistence of every conceivable cause for

20   relief under § 362(d)(1).  *See, In re Setzer,* 47 B.R. 340, 345 (Bankr. N.Y. 1985).   Practical

21   considerations also underlie the allocation of the initial burden of production to the movant.  As

22   Professor Kennedy has noted, "facts providing a justification for modifying the stay will

23   ordinarily be more easily provable by the creditor than disprovable by the [debtor]."  Kennedy,

24   *The Automatic Stay in Bankruptcy,* 11 U.Mich.J.L.Ref. 175, 227 (1978).   Further, if the burden

25   of producing evidence were not initially allocated to the party seeking relief under Section

26   362(d)(1), debtors would encounter difficult, if not insurmountable, problems of proof.  As such,

27   sound policy considerations militate in favor of a rule requiring that the party seeking relief from

28   stay under § 362(d)(1) introduce a certain quantum of evidence sufficient to establish a *prima*

*facie* case, or cause, thereby putting the debtor to the burden of producing evidence to show that a movant's interest is adequately protected.

Unless the quantum of proof on the issue of cause under § 362(d)(1) reaches a certain threshold, no *prima facie* case is established and the debtor is not required to introduce evidence to meet and rebut the *prima facie* case. *See, FSFG Service Corp. v. Kim (In re Kim),* 71 B.R. 1011, 1015 (Bankr. C.D. Cal. 1987); *see also In re Anthem Communities/RBG, LLC*, 267 B.R. 867, 871 (Bankr. D. Colo. 2001) ("Thus, before the debtor is put to its proof on the issue of adequate protection, the creditor must carry its initial burden of going forward with evidence of 'cause,' including a lack of adequate protection and then the burden will shift to the debtor to persuade the court that the creditor is adequately protected") (citations omitted); *In re Panther Mountain Land Dev., LLC*, 438 B.R. 169, 189 (Bankr. E.D. Ark. 2010) ("In order to establish a *prima facie* case of a lack of adequate protection, the moving party must provide evidence that the value of the collateralized property is declining, or at least threatened, as a result of the automatic stay") (citations omitted).

Here, the Motion is completely devoid of valid, competent evidence that would allow it to meet that burden. Shady Bird's argument that the value of the Hotel has declined is based entirely on Shady Bird's generalized allegations of mismanagement against the Debtor regarding the maintenance and preservation of the Hotel. Moreover, these allegations were based on essentially on a single visit to the Hotel. The fact is that the Debtor is highly incentivized to preserve and maximize the value of the Hotel for the benefit of its creditors. Accordingly, the Debtor and its manager, M+D, have been diligent in maintaining the Hotel property. As discussed above, none of the allegations made by Shady Bird about the Debtor's purported failure to maintain, protect and secure the Hotel is supported by the facts or evidence before this Court. To the contrary, the evidence before the Court demonstrates the Debtor has properly and regularly maintained the Hotel.

Although Shady Bird argues that, as a result of the Debtor's actions (or inactions), the value of the Hotel has declined in some unquantified amount, Shady Bird fails to demonstrate – or even articulate – how and in what amount the value of the Hotel has purportedly declined.

Without any information, much less evidence, to demonstrate that the value of the Hotel has declined since the Petition Date (and if so, in what amount), Shady Bird has not met (and indeed cannot meet) its burden of presenting a *prima facie* case for the granting of relief from stay under 11 U.S.C. § 362(d)(1).

Moreover, the relevant period of time for determining whether there has been any decline in the value of the assets which constitute Shady Bird's collateral is the time ***following the Petition Date***.  As the United States Supreme Court recognized, "the 'interest in property' referred to in § 362(d)(1) includes the right of a secured creditor to have the security applied in payment of the debt upon completion of the reorganization; and that that interest is not adequately protected if the security is depreciating during the term of the stay." *United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 370, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988).  Evidence of the erosion of the secured creditor's position or of a threatened erosion will satisfy the creditor's initial burden of presenting evidence of lack of adequate protection.  *In re Anthem Communities/RBG, LLC*, 267 B.R. at 871.

Here, Shady Bird has presented no evidence which indicates that the value of the Hotel has declined since the Petition Date.  Shady Bird's contention that the value of the Hotel is deteriorating is even more confounding since Shady Bird's state court appointed Receiver has been in place (and has effectively locked the Debtor out of the Hotel) since mid-February, 2021, *prior to* the Petition Date.  Any decline in the value of the Hotel since the Petition Date would arguably be attributable to the actions (or inactions) of the Receiver and Shady Bird.

Shady Bird and its interest in the Hotel and the Debtor's other assets are in no worse or better position than it was prior to the Petition Date and imposition of the automatic stay, particularly where, as here, the Receiver has been in sole possession and control of the Hotel since the Petition Date.  Shady Bird's interest in the Hotel and the Debtor's other assets is therefore adequately protected and no "cause" exists to grant relief from the automatic stay under 11 U.S.C. § 362(d)(1).

Since no "cause" exists under 11 U.S.C. § 362(d)(1) to warrant relief from the automatic stay to permit Shady Bird to foreclose on the Hotel and the Debtor's other assets, the Motion

1    should be denied.

2    **V.**

3    **<u>CONCLUSION</u>**

4         Based upon all of the foregoing, the Debtor respectfully requests that this Court enter an

5    Order:

6        (1)     sustaining the Opposition and denying the Motion; and

7        (2)     granting such further relief as the Court deems just and proper.

8    Dated:  April 8, 2021          THE SOURCE HOTEL, LLC

9

10

11              By:_____

12                 RON BENDER
             JULIET Y. OH

13                 LEVENE, NEALE, BENDER, YOO
               & BRILL L.L.P.

14                 Attorneys for Chapter 11 Debtor and
             Debtor-in-Possession

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# DECLARATION OF DONALD CHAE

I, Donald Chae, hereby declare as follows:

1.      I am the Manager and a member of DMC Investment Holdings, LLC, which is the sole member of The Source Hotel, LLC, a California limited liability company and the debtor and debtor-in-possession herein (the "Debtor"), and I am therefore familiar with the business operations and financial records of the Debtor.  In addition, I have been indirectly and directly involved in the development, construction, and management of numerous commercial real estate development and construction projects, including within Orange County in the State of California, and therefore have knowledge and experience with respect to the commercial real estate market in Orange County.  I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

2.      I make this declaration in support of the Debtor's opposition (the "Opposition") to the motion filed by Shady Bird Lending, LLC ("Shady Bird") for relief from the automatic stay (the "Motion"), to which Opposition this declaration is attached.  All capitalized terms not specifically defined herein shall have the meanings ascribed to them in the Opposition.

## A.      Background

3.      On February 26, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor is continuing to manage its financial affairs and operate its bankruptcy estate as a debtor-in-possession.

4.      The Debtor is a limited liability company that was organized in November, 2012 in the State of California.  DMC Investment Holdings, LLC is the sole member of the Debtor.  My brother, Min S. Chae, and I are the members and principals of DMC Investment Holdings, LLC.

5.      Since 2014, the Debtor has been developing the Hotel, which will include conference rooms, an executive lounge, fitness center, restaurant, bars, and cleaning services.  The Hotel is part of a larger 12.8-acre mixed-use development project (the "Master Development"), which includes a 400,000 square-foot retail center and a 50,000 square-foot seven-story office building which were completed in 2016.  The Debtor does not own the real property on which the Hotel is being constructed (which is located at the southeast corner of the Master Development),

but is a lessee pursuant to a 99-year ground lease for such real property (the "<u>Ground Lease</u>") with the Debtor's affiliate, The Source at Beach, LLC (the "<u>Ground Lessor</u>").  My brother, Min Chae, and I are also the principals of the Ground Lessor.

6.    M+D Properties, a California corporation ("<u>M+D</u>") is an affiliate and the sole manager of the Debtor.  My brother, Min Chae, and I are also the principals of M+D.  Pursuant to the terms of a Development Fee Agreement dated July 1, 2014 entered into by M+D and the Debtor, M+D has rendered construction/development management services for the Debtor to assist in overseeing the development and construction of the Hotel.

7.    Construction of the Hotel began in 2016.  To finance the construction of the Hotel, on May 24, 2016, the Debtor obtained a $29.5 million construction loan (the "<u>Loan</u>") from Evertrust Bank ("<u>Evertrust</u>") as well as financing by three tranches of EB-5 investments totaling $35.5 million.  The Debtor's obligations under the Loan are secured by liens against substantially all of the Debtor's assets, including the Hotel and the Debtor's leasehold interest in the real property that is the subject of the Ground Lease (the "<u>Leasehold Interest</u>").  The original maturity date for the Loan was December 1, 2017, but was extended to November 1, 2019 pursuant to written extension agreements entered into by the parties.

8.    Through October 2019, approximately 85% of the Hotel construction had been completed, including: substantial completion of the core and shell, exterior painting, porte cochère, street lighting, ceiling framing, kitchen framing and glass block installation, food storages, all glass storefronts, electrical wiring and switchgear, guestroom flooring, ceiling fixtures, pool bar canopy structure, deck drains, window washing system, roof membrane, roof ductwork and HVAC vibration installation; nearly complete installation of bathroom fixtures (95%), acoustic ceiling system (80%), HVAC electrical connections (90%), piping for HVAC and plumbing equipment (95%), and rooftop ductwork (99%).  In addition, substantial materials have been procured and/or fabricated and are ready for installation pending completion of other items, such as first and second floor flooring, corridor carpeting, millwork (wall and ceiling panels, pool bar), passenger elevators, fire sprinklers, egress and accent lighting, pool equipment, guest room doors, locks and closures, bathroom fixtures, and rooftop HVAC equipment.  The approximately 15% of the Hotel

construction which remains outstanding consists of mostly "finish work" such as the installation of flooring and carpeting, lighting, appliances, trade fixtures, furniture, furnishings and equipment already purchased by the Debtor (collectively, "FF&E").  I believe that the Debtor can successfully complete the construction of the Hotel within 6-12 months with additional funding of approximately $12,000,000 - $16,000,000 (which funding would provide for, among other things, the satisfaction of valid and effective mechanics' liens).

9.    In late 2019, Evertrust refused to issue the remaining $4 million of the Loan, claiming a cost overrun on the construction of the Hotel.  As a result of Evertrust's refusal to provide the final $4 million of the Loan, the Debtor was forced to cease construction activities.  However, I believe strongly that, had Evertrust funded the final $4 million as expected, construction of the Hotel would have been completed, as I believe that the Debtor's contractors would have carried fifty percent of the cost overrun and the Debtor and its affiliates would have covered the remaining fifty percent of the overrun.

**B.    Events Leading To Debtor's Bankruptcy Filing.**

10.    When Evertrust refused to issue the remaining $4 million of the Loan, the Debtor immediately and actively sought to refinance the Loan.  The Debtor began discussions with a new lender named Hall Structured Finance ("Hall") in the fall of 2019 and was ultimately able to reach an agreement with Hall for refinancing in the total sum of $42 million.  During the course of the Debtor's refinancing discussions with Hall, the Debtor kept Evertrust apprised of all developments, and even provided Evertrust with a copy of the loan commitment letter from Hall in early 2020.  The Debtor and Hall were on the verge of closing on the refinancing, with a target closing date of March 20, 2020, when local, county, and State officials issued lockdown orders as a result of the COVID-19 pandemic.  At that point, Hall put an indefinite hold on the closing of the refinancing with the Debtor.

11.    As a result, the Debtor went back to Evertrust and, between March 2020 and December 2020, engaged in active forbearance negotiations with Evertrust to obtain a further extension of the Loan maturity date so that the Hotel could recover from the effects of the COVID-19 pandemic, and the Debtor could obtain refinancing or additional construction financing and

28

1    ultimately recommence construction of the Hotel.

2        12.    In the summer of 2020, while the Debtor and Evertrust were still engaged in

3    forbearance negotiations, Evertrust commenced litigation against my brother, Min Chae, and me

4    (as guarantors of the Loan), and recorded a Notice of Default against the Hotel (the "<u>NOD</u>").  In

5    light of such litigation and the recordation of the NOD, and given the ongoing COVID-19

6    pandemic, the Debtor requested that Evertrust convert the Loan (in the funded amount of

7    approximately $25 million) into a two-year term loan, and even offered to set aside one year's

8    worth of loan payments in escrow as assurance of repayment of such two-year term loan.  Evertrust

9    declined the Debtor's offer.

10        13.    During the latter half of 2020, while the Debtor was engaged in forbearance

11   negotiations with Evertrust, the Debtor was also working actively with its loan broker, Ed Choi, to

12   identify and obtain alternative financing for the Hotel.  In November or December, 2020, Mr. Choi

13   advised the Debtor that he had introduced Cambra Realty ("<u>Cambra</u>") to Evertrust to potentially

14   purchase the Loan from Evertrust.

15        14.    Ed Choi, who represented to me that he was in direct discussions with Cambra

16   regarding its pending purchase of the Loan, repeatedly assured me that, in conjunction with its

17   purchase of the Loan, Cambra would extend the Loan maturity date for two years (at which time

18   the Debtor could purchase back Cambra's interest in the Loan for $24-25 million) and Cambra

19   would provide additional construction financing of $10-14 million so that the Debtor could

20   complete the construction of the Hotel.  True and correct copies of correspondence exchanged by

21   Ed Choi and me on December 28, 2020, in which Ed Choi indicated to me that Michael

22   Schlesinger of Cambra had confirmed these terms, is attached **Exhibit 1** hereto.  I repeatedly

23   requested that the foregoing terms be reduced to writing and was assured by Ed Choi and Mr.

24   Schlesinger that the terms would be set forth in a written offer or term sheet.  Ultimately, the terms

25   discussed by Ed Choi, Mr. Schlesinger and me were never reduced to writing.

26        15.    On December 30, 2020, I was asked to meet with Ed Choi and Mr. Schlesinger at

27   an office building in Beverly Hills, where they introduced me to Ronald Richards for the first time,

28   introducing him to me only as an attorney and not as the principal for Shady Bird.  I learned that

Shady Bird had just purchased Evertrust's interests in the Loan at a significant discount the day before, which I am advised and believe was for a reported purchase price of approximately $19 million. Thereafter, the Debtor was advised that Mr. Richards of Shady Bird would be the Debtor's new contact.

16. On January 2, 2021, the Debtor received initial deal points in writing from Mr. Richards which were generally egregious and not at all reflective of the terms that had been previously discussed by the parties. On January 7, 2021, the Debtor returned a written counteroffer which reflected the terms that I understood had been previously agreed to by the parties. In response to the Debtor's counteroffer, Mr. Richards requested information from the Debtor regarding its maintenance contracts, architectural contracts, and construction management contract with Swinerton Builders. At this point, my trust in Shady Bird had severely deteriorated.

17. At Mr. Richards' request, the Debtor coordinated with Ed Choi to provide Shady Bird's maintenance contact with access to the Hotel rooftop on January 27, 2021. The Debtor was advised that there would be one individual who would inspect the rooftop equipment. Instead, Mr. Schlesinger of Cambra showed up with a team of four individuals from Swinerton Builders (the Debtor's former contractor) at the designated meeting time. Robert "Charlie" Cervantes, who is employed by M+D (the Debtor's manager) and had been overseeing the maintenance of the Hotel, was the Debtor's representative at the meeting that day. I am advised and believe that, as a compromise, the Debtor permitted access to the Hotel to two individuals from Swinerton Builders. However, I am advised by Mr. Cervantes that the two individuals from Swinerton Builders informed him that their company had been hired to inspect the Hotel project and that they would need to view the full Hotel building.

18. At this point, the relationship between Shady Bird and the Debtor was severely strained, and I feared that Shady Bird had no intention of following through with the terms that the parties had previously discussed. The "bait and switch" tactic at the Hotel meeting on January 27, 2021 and the comments that I am advised were made by the individuals from Swinerton Builders to Mr. Cervantes at such meeting only reinforced my concerns that Shady Bird was not engaged in negotiations with the Debtor in good faith and was instead gathering information to take the Hotel

from the Debtor.

19.    With the decision made to go into "litigation mode" and minimize contact with Shady Bird and Mr. Richards, the Debtor proceeded to take actions that it felt were necessary to protect the interests of the Debtor and its creditors in the Hotel.  In that context and in an admittedly misguided attempt to get negotiations with Shady Bird "back on track," I sent an email to Mr. Richards on February 2, 2021 threatening to suspend security at the Hotel property.  Of course, I did not do so and I never had any intention of doing so, given that the Hotel is the result of many years of hard work and investment by the Debtor and constitutes the Debtor's primary asset.  My utmost concern for the Debtor has always been, and continues to be, the preservation, maintenance and maximization of value of the Hotel.  There has never been any interruption of the security provided to the Hotel.

20.    Ultimately, my concerns about Shady Bird were validated when, on February 8, 2021, Shady Bird filed a complaint against the Debtor in the Superior Court of the State of California for the County of Orange ("Superior Court") for (i) specific performance and appointment of a receiver, and (ii) waste, thereby commencing the Superior Court action bearing the case number 30-2021-01183489-CU-OR-CJC (the "State Court Action").  Shady Bird also took steps to immediately foreclose on the Hotel and issued a Notice of a Trustee's Sale for the Hotel to be held on March 1, 2021.

21.    On February 16, 2021, the Ground Lessor, the Source at Beach, LLC (of which I am a principal), sent to Shady Bird a "Notice of Default Under, and Exercise of Option to Terminate, Ground Lease" (the "Ground Lease Notice").  However, the Ground Lease Notice should be viewed in the context of the parties' discussions and actions to date – the Ground Lease Notice was an extremely frustrated response to Shady Bird's actions and ultimately a desperate attempt to prevent or delay the foreclosure of the Hotel by Shady Bird.  Neither the Ground Lessor nor I ever intended to effectuate the termination of the Ground Lease, and I do not believe such a termination was ever actually effectuated.  As Shady Bird's own counsel noted in his written response to the Ground Lease Notice, a true and correct copy of which is attached as **Exhibit 2** hereto, the purported termination of the Ground Lease was never effective nor valid.  Moreover,

31

and in an effort to provide clarification, the Ground Lease Notice was formally rescinded by the Ground Lessor in writing. A true and correct copy of the written notice from counsel for the Ground Lessor rescinding the Ground Lease Notice is attached as **Exhibit 3** hereto.

22.    Shortly after filing its complaint to initiate the State Court Action, Shady Bird filed an ex parte application for an order appointing a receiver and other related relief.

23.    I am advised and believe that, on February 17, 2021, the Superior Court entered an order in the State Court Action appointing Bellann R. Raile as Receiver to, among other things, take possession of the Hotel and all goods, furniture, fixtures, and equipment attached and/or related to the Hotel.

24.    As a result of all of the foregoing, the Debtor sought chapter 11 bankruptcy protection in order to prevent the impending foreclosure of the Hotel, to preserve the equity in the Hotel for the benefit of all creditors (not just Shady Bird), to regain possession of the Hotel and related assets and obtain refinancing or investments to enable the Debtor to complete construction of the Hotel, and to be afforded a reasonable opportunity to restructure its financial affairs and repay its debts in an orderly fashion.

**C.    Post-Petition Administration.**

25.    As of the Petition Date, the Debtor had cash totaling approximately $63,000 in bank accounts with Evertrust and Preferred Bank. The Debtor took steps immediately after the Petition Date to close its pre-petition bank accounts at Evertrust and Preferred Bank, and to withdraw all funds contained in those pre-petition accounts so that such funds could be deposited into the Debtor's newly-established debtor-in-possession bank accounts at Axos Bank.

26.    On March 12, 2021, the Debtor filed a motion in its bankruptcy case seeking the entry of a Court order (i) requiring Evertrust to turn over and deliver to the Debtor cash held in the Debtor's pre-petition bank accounts at Evertrust (as Shady Bird would not consent to the turnover of such cash until after the Debtor filed the CC/Financing Motion); (ii) authorizing the Debtor to use cash collateral in accordance with the Debtor's proposed 13-week operating budget (the "Budget"); and (iii) authorizing the Debtor to obtain post-petition unsecured financing up to $100,000 (the "DIP Loan") from the Debtor's manager, M+D (the "CC/Financing Motion"). The

1    Budget provides for the payment of expenses critical to the maintenance and preservation of the

2    Hotel, including insurance premiums, utility expenses, post-petition utility deposits, and real

3    property taxes.

4          27.    I am advised and believe that, on March 23, 2021, the Court entered an order

5    granting the CC/Financing Motion on an interim basis, pending a final hearing scheduled on May

6    6, 2021, subject to certain minor modifications agreed to by the Debtor and set forth in such order

7    (the "Interim Order").

8          28.    The Debtor filed its 7-Day Package with the Office of the United States Trustee

9    ("OUST") on a timely basis on March 5, 2021. The Debtor also filed its Schedules of Assets and

10    Liabilities ("Schedules") and Statement of Financial Affairs on a timely basis on March 12, 2021.

11    The Debtor filed its first monthly operating report (covering the post-petition period of February

12    26-28, 2021) with the Court and, to the best of my knowledge, remains in full compliance with the

13    reporting and other requirements of the Bankruptcy Code and the OUST.

14    **D.    The Debtor's Reorganization Efforts And Strategy.**

15          29.    The Debtor's primary assets consist of the Hotel, the Leasehold Interest, and the

16    FF&E. I believe that the current value of the Hotel in "as is" condition is approximately

17    $50,000,000 and that its fair market value upon completion will be at least $60,000,000.[8]   As

18    reflected in the Debtor's Schedules, I believe that the total value of the Debtor's FF&E (calculated

19    at cost, excluding fabrication labor costs) is approximately $2,700,000.

20          30.    The Debtor's primary secured creditor is Shady Bird. Shady Bird contends in the

21    Motion that the outstanding balance of the Loan was $30,948,839.27 as of March 1, 2021. The

22    Debtor's obligations under the Loan are secured by liens against substantially all of the Debtor's

23    assets, including the Hotel, the Leasehold Interest, the FF&E, and the Debtor's cash.

24          31.    There are a number of subcontractors that have recorded mechanics' liens against

25    the Debtor and/or Hotel. As reflected in the Debtor's Schedules, I believe that the total amount of

26

27    [8] HVS Consulting & Valuation previously prepared an appraisal report for the Hotel, a true
     and correct copy of which is attached as **Exhibit 4** hereto, which reflects an "as is" value of
     $40,900,000 for the Hotel as of October 14, 2019. M+D is in the process of obtaining an
28    updated appraisal of the Hotel.

the mechanics' liens recorded against the Debtor and/or Hotel is approximately $2,900,000. Some of these recorded mechanics' liens are disputed by the Debtor. In addition, there appear to be a number of other mechanic's liens asserted against the Hotel; however, such purported liens do not appear to have been properly perfected and may therefore be invalid.

32.    The Debtor also received three tranches of EB-5 loans totaling approximately $35.5 million from Beach Orangethorpe Hotel, LLC, Beach Orangethorpe Hotel II, LLC, and Beach Orangethorpe Hotel III, LLC (collectively, the "EB-5 Investors"). The Debtor's obligations under the loans from two of the EB-5 Investors (*i.e.*, Beach Orangethorpe Hotel, LLC and Beach Orangethorpe Hotel II, LLC) are secured by junior liens against the Hotel and the Leasehold Interest.

33.    I believe that the vast majority of the Debtor's creditors, including, without limitation, the EB-5 Investors, whose primary objective is to successfully obtain permanent residence status in the United States (which hinges on job creation), support the Debtor's efforts to reorganize through its chapter 11 bankruptcy case. The Debtor is fully committed to the completion of the construction of the Hotel and fulfilling those job creation goals. The Debtor makes no secret of its intended exit strategy in this case. The Debtor has been, and continues to be, engaged in active discussions with numerous prospective lenders regarding the terms for debtor-in-possession financing, which will provide the Debtor with the funding necessary to complete the construction of the Hotel, service debt, and operate the Hotel until operations can be stabilized. The Debtor has already received a written commitment letter from one prospective lender for debtor-in-possession financing in the sum of $17,900,000 but, as noted above, the Debtor is still in the process of "vetting" terms with a number of prospective lenders. The Debtor intends to finalize loan terms with a lender and file a motion for Court approval of debtor-in-possession financing in this case in an expeditious manner.

34.    In conjunction with obtaining debtor-in-possession financing, the Debtor intends to file a plan of reorganization in this case which restructures and provides for repayment of the Debtor's secured debt (including the debt owed to Shady Bird) based upon market terms, and provides for a recovery to the Debtor's general unsecured creditors who would otherwise receive

1    nothing (particularly upon a foreclosure of the Hotel by Shady Bird).

2       35. In its Motion, Shady Bird alleges that the Debtor has failed to adequately maintain,

3    protect and secure the Hotel.  As discussed in detail in the declaration of Mr. Cervantes (who is

4    employed by M+D, the Debtor's manager) filed concurrently herewith (the "<u>Cervantes</u>

5    <u>Declaration</u>") and below, I believe each allegation made by Shady Bird is false, grossly

6    exaggerated, and/or misleading.  As the party who has invested a significant amount of time,

7    money, and resources into the development and construction of the Hotel, the Debtor and its

8    principals have every incentive to preserve and maximize the value of the Hotel for the benefit of

9    the Debtor's creditors and equity holder.  As described in the Cervantes Declaration and below, the

10   Debtor and M+D have been extremely diligent in maintaining and protecting the Hotel, even after

11   construction halted in late 2019.

12      36. I do not believe that the Receiver has any of the historical knowledge, expertise,

13   and resources that the Debtor has with respect to the Hotel, and will not be able to maintain and

14   preserve the value of the Hotel as efficiently or cost-effectively as the Debtor can.  In fact, it

15   appears from the Debtor's interactions with the Receiver since her appointment in mid-February,

16   2021, that the Receiver has done very little other than to "babysit" the Hotel property.  While

17   Shady Bird has apparently funded the Receiver's retention of a consultant to provide a property

18   inspection report, Shady Bird has apparently not provided any funding to the Receiver to actually

19   address the purported maintenance issues raised in such report.  This is not surprising since (i) I do

20   not believe that there were actually any out-of-the-ordinary maintenance issues under the Debtor's

21   watch, and (ii) Shady Bird has no incentive to ensure the proper maintenance and preservation of

22   the Hotel while the Debtor remains the owner of the Hotel – in fact, it is in Shady Bird's interest to

23   do the exact opposite, as any devaluation of the Hotel will assist Shady Bird in obtaining the very

24   relief that it is seeking by the Motion.

25      37. The Hotel has been diligently and competently maintained by the Debtor and M+D.

26   The Debtor's responses to the maintenance issues alleged by Shady Bird in the Motion and in the

27   property inspection report attached to the Motion are discussed at length below and in the

28   Cervantes Declaration.  Mr. Cervantes is an employee of M+D and oversaw the day-to-day

1    maintenance of the Hotel from approximately August, 2019 until mid-February, 2019, when the

2    Receiver was appointed.    While Mr. Cervantes has addressed the purported maintenance issues

3    raised by Shady Bird of which he has personal knowledge, I have addressed below the other issues

4    raised by Shady Bird in its Motion.

| No. | Shady Bird's Allegation | Response/Observations |
|---|---|---|
| 14 | The Debtor's failure to provide evidence of and certificates of insurance to Shady Bird upon request. | The Debtor provided evidence (and certificates) of insurance for the Hotel to the Receiver on the same day she made such request.  Evidence of insurance was also submitted to the OUST as part of the Debtor's 7-Day Package, and the Debtor will provide evidence of insurance to any party in interest upon written request. |
| 15 | The Debtor's failure to allow inspections by the City of Buena Park and ceasing communications with the City, negatively affecting the permitting process and the ability to complete the project. | This allegation has no basis in truth, and makes no sense given that a City Inspector from the City of Buena Park (Gary) has been stationed at "The Source" complex and still presently maintains an office full-time in the construction office adjacent to the Hotel. |
| 17 | The Debtor's failure to provide any security for the project and improvements. | There has always been, and continues to be, full time 24/7 security service for the entire "The Source" complex, including the Hotel, courtesy of the Ground Lessor (The Source at Beach, LLC).  There has never been any interruption of the security provided to the Hotel. |
| 18 | The Debtor's failure to timely test the fire-life safety systems which could completely destroy the project. | I am not aware of any issues regarding the efficacy of the fire-life safety systems, and I am not aware of any "deadline" to test such systems.  To the extent there is an issue, it does not appear that the Receiver has taken any steps to address the issue herself.  If there is a real issue with respect to the fire-life safety systems, the Debtor and M+D are willing and able to promptly address it. |

| No. | Shady Bird's Allegation | Response/Observations |
|---|---|---|
| 19 | Elevator certificate has not been renewed since 2018. *(issue raised by the Receiver on March 17, 2021)* | One of the three elevators installed in the Hotel was being used for construction access. The elevator supplier (Kone, Inc.) provided a temporary six-month certificate for the elevator, which needs to be renewed. When the Receiver requested assistance from the Debtor to address this issue, the Debtor promptly agreed to do so. The Debtor has contacted Kone to schedule an inspection to have the elevator re-certified. |
| 20 | An improved safety environment for building visitors and contractors should be implemented. *(issue raised in the property inspection report attached to the Motion)* | The Hotel remains under construction so it is not uncommon for materials to be left on site. There is no current construction activity, so this issue does not appear relevant at this time. However, the Debtor and M+D are able and willing to send in a crew to tidy up any loose equipment or materials, since the Receiver does not appear to have taken any steps to address this issue herself. |
| 21 | Completion plans are held off site. *(issue raised in the property inspection report attached to the Motion)* | As is typically the case, the Debtor's general contractor, Greenland Construction Service, LLC (of which I am a principal), is holding the completion plans for the Hotel. Those plans are currently stored by Greenland Construction Service, LLC in its construction office, which is located within "The Source" complex adjacent to the Hotel. |
| 23 | Missing flashing/improperly installed flashing *(issue raised in the property inspection report attached to the Motion)* | This issue is apparently more of a construction issue (which will be addressed during the completion of construction) and not a maintenance issue. In the meantime, however, the Debtor is willing and able to get the area covered. |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 8th day of April 2021, at Buena Park, California.



DONALD CHAE