ORIGINAL

Christopher G. Cardinale (SBN 274453)    (NO FEE - GOVERNMENT CODE SECTION 6103)
ccardinale@agclawfirm.com
**ALVAREZ-GLASMAN & COLVIN**
13181 Crossroads Parkway North
Suite 400 – West Tower
City of Industry, CA  91746
562.699.5500 – Office
562.692.2244 – Facsimile

Attorneys for Party in Interest CITY OF
BUENA PARK



FILED

APR - 9 2021

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:                    Deputy Clerk

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>THE SOURCE HOTEL, LLC,<br><br>       Debtor. | **Case No.: 8:21-BK-10525-ES**<br><br>**Chapter 11**<br><br>**RESPONSE BY THE CITY OF BUENA PARK TO MOTION OF SHADY BIRD LENDING, LLC FOR ORDER EXCUSING STATE COURT RECEIVER FROM TURNOVER OF ASSETS PURSUANT TO 11 U.S.C. § 543; DECLARATION OF CHRISTOPHER G. CARDINALE IN SUPPORT THEREOF**<br><br>Hearing:<br>Date:     April 15, 2021<br>Time:    10:20 a.m.<br>Place:   ZoomGov |

1

# TABLE OF CONTENTS

2

3

I.  INTRODUCTORY STATEMENT ........................................................................ 1

4

II.  STATEMENT OF FACTS.................................................................................... 1

5

    A.  The Beach Orangethorpe Mixed Use Specific Plan and the Development Agreement .. 2

6

    B.  The Consolidated Redevelopment Project Area; Disposition and Development
    Agreement between the Community Redevelopment Agency and the Source at Beach

7

    LLC; Public Assistance to Mixed Use Project ................................................ 4

8

    C.  BP RDA Dissolved By Operation of Law; City Takes Over As Party to DDA ............. 5

9

    D.  Miscellaneous Material Background Noted in Parties' Pleadings.................... 6

    E.  Construction Status and Building Permits for the Hotel Project ...................... 7

10

11

III.  WHETHER THE RECEIVER SHOULD BE EXCUSED FROM COMPLIANCE WITH
THE TURNOVER REQUIREMENTS OF 11 U.S.C. § 543(b)................................... 8

12

13

IV.  CONCLUDING COMMENTS ........................................................................ 10

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    The City of Buena Park, a municipal corporation organized and existing pursuant to its

2    charter and California law (the "City" or "Buena Park"), hereby files this response (the

3    "Response") to that certain *Motion of Shady Bird Lending, LLC For Order Excusing State Court*

4    *Receiver From Turnover Of Assets Pursuant 11 U.S.C. § 543* [Doc No. 51] (the "Motion") filed

5    by Shady Bird Lending, LLC ("Shady Bird"), and to that certain *Opposition To Motion Of Shady*

6    *Bird Lending, LLC For Order Excusing State Court Receiver From Turnover Of Assets Pursuant*

7    *to 11 U.S.C. § 543* [Doc No. 65] (the "Opposition") filed by The Source Hotel, LLC (the

8    "Debtor").

9

**I.**

10

**INTRODUCTORY STATEMENT**

11    Buena Park only recently learned of this Action but respectfully submits that it is an

12    interested and vital party to these proceedings. As detailed below, the "Hotel Project" that serves

13    as security for Shady Bird's interest is part of a much larger "Mixed Use Project" that occupies

14    an entire city block (nearly 13 acres) at the corner of Beach Boulevard and Orangethorpe Avenue

15    in the City of Buena Park (the "Project Site").The entire Project Site is governed by and subject

16    to two (2) agreements with the City, both of which are recorded on the Project Site senior to the

17    interests of Debtor and Shady Bird, and which require the Hotel Project to be completed and

18    operated with a high-quality establishment, and which contemplate the City's provision of

19    ongoing taxpayer revenues to assist and incentivize the hotel's completion and operation. The

20    City lacks necessary information to formally oppose or support the Motion at this time, but

21    instead submits this Response to make known its interest in the Hotel Project, its desire to see the

22    Hotel Project completed and operated as currently approved, and to request that the Court

23    consider the interests and investment of the City and its residents in this project when reaching a

24    decision.

25

**II.**

26

**STATEMENT OF FACTS**

27    The City respectfully believes a broader perspective then offered by the Parties' papers is

28    necessary to evaluate the Motion; and specifically to determine – as Shady Bird contends –

**RESPONSE BY THE CITY OF BUENA PARK TO MOTION OF SHADY BIRD LENDING, LLC FOR ORDER EXCUSING STATE COURT RECEIVER FROM TURNOVER OF ASSETS; DECLARATION OF CHRISTOPHER G. CARDINALE**

1  whether all creditors would be benefited by the Court's granting of the Motion. The Project Site

2  – and therefore the Hotel Project and larger Mixed Use Project – are subject to and governed by

3  specific zoning regulations, contractual commitments, and recorded covenants and restrictions

4  that bear significantly on the Parties' interests and value of Debtor's estate, and thus should be

5  considered when determining how best to manage the assets and reorganize the liabilities at issue

6  in this Action.

7      **A.      The Beach Orangethorpe Mixed Use Specific Plan and the Development**

8  **Agreement**

9      The Project Site is located within and governed by the "Beach Orangethorpe Mixed Use

10  Specific Plan" (the "BOSP"), which was approved by the Buena Park City Council on October 8,

11  2008 pursuant to and in accordance with California's Planning and Land Use Law (Cal Gov't

12  Code § 65000 *et seq.*, hereinafter "California Planning Law"; see also Gov't Code § 65450 *et*

13  *seq.* [specific plans].) The BOSP generally allows (or restricts) the Project Site to be developed

14  with a mix of upscale retail, restaurant, residential, entertainment, hotel, and office uses.[1]

15      At the time it was approved by the City Council, the "Guarantors" (identified in Shady

16  Bird's Motion as Donald Chae and/or Min Chae) owned or controlled (directly or through

17  affiliated entities) a significant portion of the real property located within the BOSP, and the

18  BOSP is the result of the cooperative planning efforts of City and Guarantors for the Project Site.

19      On October 8, 2008 (the same day the BOSP was approved), the parties' efforts were

20  memorialized in that certain "Development Agreement No. DA08-003, Concerning Property

21  Located At 6940 Beach Boulevard, Buena Park, California (the "Development Agreement" and

22  attached hereto as Exhibit "A"),  by and between City and  6940 Beach, LLC".[2] The

23  Development Agreement was recorded on Property as of November 17, 2008 (Instrument No.

24  200800537057 of Official Records, Orange County), and allows – as relevant here – the Project

25  Site to be developed with large-scale "Mixed Use Project" with two (2) components: (1) a multi-

26  story building and "outdoor mall" providing in excess of 450,000 square feet of retail and

27

28  ---
[1] The Specific Plan also allows a high-density residential development on a portion of the Project Site; but that portion of the development is not implicated in this dispute.
[2] 6940 Beach, LLC was / is owned and controlled by Guarantors.

**RESPONSE BY THE CITY OF BUENA PARK TO MOTION OF SHADY BIRD LENDING, LLC FOR
ORDER EXCUSING STATE COURT RECEIVER FROM TURNOVER OF ASSETS; DECLARATION OF
CHRISTOPHER G. CARDINALE**

professional office space, and; (2) a 300-room hotel with conference facilities to be located in an adjoining landmark building.[3]

The Development Agreement is binding on owners of the Project Site and any successors in interest; including Shady Bird and Debtor. (Cal Gov't Code § 65864; Cal Gov't Code § 65868.5 ["From and after the date of…recordation, the [development] agreement shall impart such notice thereof as is afforded by the recording laws of this state. The burdens of the agreement shall be binding upon, and the benefits of the agreement shall inure to, all successors in interest to the parties to the agreement."].) Section 4 of the Development Agreement also states:

> "Developer hereby subjects the Project[[4]] and [Project Site]…to the covenants, reservations and restrictions as set forth in this Agreement. The City and Developer hereby declare their specific intent that the covenants, reservations and restrictions as set forth herein shall be deemed covenants running with the land and shall pass to and be biding upon Developer's successors and assigns in title or interest to the Project. Each and every contract, deed or other instrument hereinafter executed, covering or conveying the Project or any portion thereof shall conclusively be held to have been executed, delivered and accepted subject to the covenants, reservations and restrictions expressed in this Agreement, regardless of whether such covenants, reservations and restrictions are set forth in such contract, deed or other instrument. [¶] The City and Developer hereby further declare their understanding and intent that the benefit of such covenants touch and concern the land by enhancing and increasing the enjoyment and use of the Development by Developer and the future occupants of the Project, the intended beneficiaries of such covenants, reservations and restrictions, and by furthering the public purposes for which this Agreement is adopted."

Section 19 of the Development Agreement defines the rights of secured lenders of the Project Site, which have the right to do anything required under the Development Agreement and otherwise realize their security interest by acquiring or transferring the Project Site. However secured lenders are required to cure any defaults and keep and perform the terms, covenants, and conditions of the Development Agreement.

The Development Agreement remains in full force and effect and is scheduled to remain

---

[3] The Development Agreement also includes a residential component that is immaterial here.
[4] "Project" is defined by the Development Agreement in Section 1(d) with reference to the Project Area – which includes the Property – and the "Development Plan" attached as Exhibit B (Ex. A, page 17) to the Development Agreement.

-3-

1  so until approximately December 2028.

2      **B. The Consolidated Redevelopment Project Area; Disposition and Development**

3  **Agreement between the Community Redevelopment Agency and the Source at Beach LLC;**

4  **Public Assistance to Mixed Use Project**

5      The Project Site is located within the Consolidated Redevelopment Project Area

6  ("Redevelopment Area") of the Buena Park Redevelopment Agency ("BP RDA"), and at one

7  time the BP RDA owned 0.84 acres of the Project Site ("BP RDA Properties"). To facilitate and

8  incentivize development of the Mixed Use Project, on October 26, 2010, the BP RDA entered

9  into a Disposition and Development Agreement (the "<u>DDA</u>" and attached as <u>Exhibit "B"</u> hereto)

10  with The Source at Beach, LLC (identified in Shady Bird's Motion as "<u>Ground Lessor</u>"). A

11  memorandum thereof (attached as <u>Exhibit "C"</u> hereto was recorded on the Project Site as of

12  October 9, 2012 (Instrument No.2012000609611 in Official Records, Orange County), and the

13  DDA is binding on heirs and successors thereto.

14      As relevant here the DDA includes three (3) main components:

15      First, the DDA provided for the BP RDA's sale of the BP RDA Properties to Ground

16  Lessor for inclusion in the Project Site. No money was paid to the BP RDA in exchange, but

17  rather the return consideration was to be public benefits resulting from the Mixed-Use Project

18  (e.g. local jobs, amenities, tax revenue generation).

19      Second, the DDA expanded and modified the Mixed-Use Project from that described in

20  the Development Agreement. Specifically, the DDA requires Ground Lessor to develop a three-

21  phased Mixed Use Project as follows:

22      Phase 1:    428,000 square feet of retail space with a movie theatre, spa, entertainment

23                  uses, retail stores, and parking;

24      Phase II:    193,220 square feet of office space; and

25      Phase III:    a Mobil 3-5 star or AAA 3-5 diamond full-service hotel and parking (the

26                  "Hotel Project").

27      Third, to assist and incentivize Ground Lessor's performance of the DDA (and the

28  securing of a high-quality franchise for the Hotel Project) the BP RDA provided two (2) forms of

-4-

1  ongoing financial assistance to the Mixed-Use Project: the return of any increased property tax
2  revenues generated by the Project Site by virtue of the Mixed-Use Project (the "Property Tax
3  Amount"), and; sales tax revenues generated by the Mixed Use Project in excess of a specified
4  threshold (the "Sales Tax Amount").

5      The Property Tax Amount is expected to return in excess of $1,000,000 to Ground Lessor
6  in Fiscal Year 2020-21, this amount will increase over time, and is scheduled to expire in Fiscal
7  Year 2029-2030. The Sales Tax Amount has a term of thirty (30) years but the Mixed Use
8  Project has not yet generated sufficient revenues to trigger the contributions.

9      Section 4.5 of the DDA allows for early termination of the Property Tax Amount and the
10 Sales Tax Amount upon a default by Ground Lessor:

11      "The Agency's obligation to make payments of the Sales Tax Amount and
         Property Tax Amount to Developer shall terminate upon…a Default by Develop
12       under Section 7.1 below…"

13 Section 7.2 declares that the "Agency and the City shall…have the right to terminate this
14 Agreement in the event of a Default by Developer." Section 7.1 of the DDA (more accurately
15 Section 7.1.5) defines "Events of Default" or a "Default" as including:

16      "Filing of a petition in bankruptcy by or against any Party or appointment of a
17      receiver or trustee of any property of any Party, or an assignment by any Party for
         the benefit of creditors, or adjudication that such Party is insolvent by a court, and
18      in the case of a filing against a Partner, the failure of such Party to cause the
         applicable petition, appointment, or assignment to be removed or discharged
19      within one hundred and twenty (120) days."

20

21      **C.    BP RDA Dissolved By Operation of Law; City Takes Over As Party to DDA**

22      In February 2012, the BP RDA was dissolved by the California Legislature (Cal. Health
23 & Saf. Code § 34170 *et seq.*), and the City was appointed and now serves as the "Buena Park
24 Successor Agency" with ownership and control of the former BP RDAs' assets and liabilities. As
25 a matter of law the City (or the Buena Park Successor Agency) now "stands in the shoes" of the
26 BP RDA with respect to the DDA. (See, *e.g.* Cal. Health & Saf. Code § 34173(b) ["…all
27 authority, rights, powers, and obligations previously vested with the former redevelopment
28 agencies…are hereby vested in the successor agencies."].)

-5-

**D.    Miscellaneous Material Background Noted in Parties' Pleadings**

Shady Bird's Motion and Debtor's Opposition sets forth other material background facts including the following:

- On or about April 6, 2015, Ground Lessor entered into a ground lease (the "Ground Lease") with Debtor for the Hotel Project only. The Ground Lease only covers a portion of the Project Site, which is identified as the "Parcel" and defined reference to Exhibit A-1 to the Ground Lease which is titled "Hotel Airspace Parcel" (the "Leased Property") The Ground Lease is recorded on the Project Site junior to the Development Agreement and DDA.

- On or about May 24, 2016, Evertrust Bank (the "Original Lender") and Debtor entered into a construction loan in the principal amount of $24,988,800 (the "Construction Loan"), which is evidenced by a promissory note and was secured against the Leased Property only by a "Construction Deed of Trust (Leasehold)" recorded as of June 3, 2016 (Instrument No. 201600025446 in Official Records, Orange County, hereinafter the "Deed of Trust").

- Shady Bird acquired Original Lender's Construction Loan and Deed of Trust for the discounted amount of $19 million, as evidenced by an "Assignment of Deed of Trust" dated December 29, 2020 and recorded on January 4, 2021.

- On February 8, 2021, Shady Bird initiated the State Court Action in efforts to collect / enforce the Construction Loan, and preserve the value of the Leased Property pending foreclosure on the Deed of Trust.

- On February 17, 2021, the Receiver was appointed on an *ex parte* basis.

- On February 26, 2021, Debtor filed the Petition in this Court to forestall a non-judicial foreclosure sale of the Leased Property that had been scheduled by Shady Bird for March 1, 2021.

- The City did not learn of this Action until on or about March 4, 2021, when it learned of it from a third-party sources, and the City did not learn of the Receiver's appointment until after that date. The first opportunity City staff had to brief and obtain direction

-6-

from the Buena Park City Council with respect to its interests in this Action was its regular meeting on March 23, 2021.

**E.    Construction Status and Building Permits for the Hotel Project**

There are five (5) main building permits issued for the Hotel Project which also overlap or authorize work associated with the Mixed-Use Project. Only one of these permits (for interiors of the Hotel Project) was issued to Debtor, and the interconnected design and operation of the Mixed Use Project will require significant assistance and cooperation from Ground Lessor if the Hotel Project is to be completed and successfully. More specifically the main building permits are:

- *B13-1388*: Foundations for Building B (or Phase 1.5) which houses both a portion of the retail and the hotel portion of the Mixed-Use Project. This permit was issued as of 7.11.2014 and was complete as of 3.27.2018. Permit owner is the Ground Lessor.

- *B13-1389*: Shell retail work, various retail components, and hotel lobby. This permit was issued as of 1.29.2015 and is still open. The last inspection was conducted on 12.6.2016 meaning the permit has now expired. Permit owner is the Ground Lessor.

- *B13-1391*: Shell for Hotel Tower, Floors 4-7, Elevators, Stairwells, etc. This permit was issued on 1.19.2016 and remains open. The last inspection was 1.10.2020 meaning the permit has now expired. Permit owner is the Ground Lessor.

- *B15*-2102: Enclosed 3rd-Floor walkway between retail and hotel portions of Mixed-Use Project. This permit was issued on 2.10.2016 and is still open. The last inspection was conducted on 7.13.2016 meaning the permit has now expired. Permit owner is the Ground Lessor.

- *B13-2294*: Hotel interior tenant improvements. This permit was issued on 5.26.2017 and remains open. The last inspection was 7.2.2019 meaning the permit has now expired. Permit owner is the Debtor.

Various sub-building permits have been issued which authorize a specific scope of work. The status of the sub-permits mirror that of the main permit under which it was issued, meaning any outstanding sub-permits for the Hotel Project have now also expired.

-7-

## III.

### WHETHER THE RECEIVER SHOULD BE EXCUSED FROM COMPLIANCE WITH THE TURNOVER REQUIREMENTS OF 11 U.S.C. § 543(b)

Having only recently learned of this Action and the State Court Action preceding it, the City is not prepared to take a formal position to support or oppose the Motion. However, the City desires to emphasize to the Court and Parties that the City's objective is for the Hotel Project to be completed as currently approved: a high quality Hilton-brand facility. It has no desire for the Leased Property being acquired by speculative investors and rendered vacant indefinably.

To that end the City desires to highlight certain issues for consideration by the Court when deciding whether granting the Motion would benefit "all creditors," as is the predominate inquiry. (*In re Franklin*, 476 B.R. 545, 551 (Bankr. N.D. Ill. 2012); *see also In re Northgate Terrace Apartments, Ltd.*, 17 B.R. at 332.)

The City's Interest in this Action.    Completing the construction and operation of the Hotel Project is the consideration promised the City and its residents from: (a) transferring the BP RDA Properties to Guarantor; and (b) providing the Property Tax Pledge and Sales Tax Pledge. The commitments to develop and operate the Hotel Project "run with the land" and are binding on both Debtor and Shady Bird.  The City believes completing and operating the Hotel Project as currently approved would be beneficial to all creditors; as opposed to converting the use or allowing the site to remain vacant.

City's Right to Declare Default.    The filing of this Action, together with the previous appointment of the Receiver, gives clear grounds for the City to terminate the DDA together with the Property Tax Pledge and Sales Tax Pledge. The City has a fiduciary and legal obligation to terminate the ongoing commitment of these public revenues unless the Hotel Project is completed and operated pursuant to the terms of the DDA and Development Agreement. Terminating these agreements would deprive the entire Mixed Use Project of this assistance moving forward, and the processing of new discretionary land use entitlements. Both results would be detrimental to the value of the Leased Property against which Shady Bird is secured.

Value of Hotel Project.    As detailed fully herein, the Leased Property may only be

-8-

1  used for completion and operation of the Hotel Project. Any contrary outcome would not only

2  violate the Development Agreement and DDA (resulting in their termination), but also require

3  discretionary land use approvals from the Buena Park City Council under California's Planning

4  Law, and environmental analysis under California's Environmental Quality Act. Given the

5  City's investment in the Hotel Project (and Mixed Use Project generally), any alternative use is

6  speculative at this time; and would require extensive delays.

7      <u>Difficulties Completing Construction</u>.    The   Hotel   Project   is   designed   and

8  structurally connected with the Mixed Use Project, as is evidenced by the building permits issued

9  to different entities. The capital improvements required to successfully complete and operate the

10  Hotel Project are likely not entirely confined within the Leased Property, and the satisfaction of

11  all conditions necessary to complete the Hotel Project may not be within the control of the

12  ultimate owner of the Leased Property; and rather will require significant cooperation and

13  coordination with the Ground Lessor.

14                                  **IV.**

15                      **<u>CONCLUDING COMMENTS</u>**

16      The City thanks the Court for the opportunity to submit this Response, and counsel for

17  the City will be present at the upcoming hearing to provide further information or respond to any

18  questions from the Court. The City and its residents have a vested stake in the outcome of this

19  matter, and anxiously awaits the outcome of these proceedings to determine how best to protect

20  the publics' investment in the Project Site moving forward.

22  DATED:  April 9, 2021            ALVAREZ-GLASMAN & COLVIN

24                      By: _____
25                          Christopher G. Cardinale
26                          Attorneys for City of Buena Park, a California
                            charter city and municipal corporation.

27

28

**RESPONSE BY THE CITY OF BUENA PARK TO MOTION OF SHADY BIRD LENDING, LLC FOR
ORDER EXCUSING STATE COURT RECEIVER FROM TURNOVER OF ASSETS; DECLARATION OF
CHRISTOPHER G. CARDINALE**

## DECLARATION OF CHRISTOPHER G. CARDINALE

I, Christopher G. Cardinale, declare and state as follows:

1.     I am an attorney licensed to practice in the State of California and this Court, and am a Senior Partner in the law firm of Alvarez-Glasman & Colvin. Since September 2018, I have been and currently serve as the appointed City Attorney for the City of Buena Park, and as General Counsel for the Buena Park Successor Agency. I have personal knowledge of the facts set forth herein, and if called would testify to their accuracy under oath.

2.     I serve as the City's senior legal advisor and am responsive for advising and providing guidance to the Buena Park City Council (and Buena Park Successor Agency Governing Board) on all legal matters involving the City. In this capacity I am familiar with the general facts and circumstances surrounding the subject Project Site; though the approvals and agreements that govern it were all negotiated and approved before I was with the City. The majority of my personal knowledge associated with this matter was gained through a review of public records, my personal investigations into files and records, and communications with City staff. Given the length of this project's history, there are few (if any) staff members at the City with first hand personal knowledge of all applicable facts and circumstances.

3.     From a regulatory, contractual, and land use perspective, the "Hotel Project" defined above is one part of the larger "Mixed Use Project" that occupies the "Project Site". The Project Site – and therefore the Hotel Project – are subject to and governed by and subject to the following:

a.     The "Beach Orangethorpe Mixed Use Specific Plan" (the "BOSP"), which was approved by the Buena Park City Council on October 8, 2008 pursuant to and in accordance with California's Planning and Land Use Law (Cal Gov't Code § 65000 *et seq.*, hereinafter "California Planning Law"; see also Gov't Code § 65450 *et seq.* [specific plans].) The BOSP limits the land uses that may be developed on the Project Site, which include generally includes a mix of upscale retail, restaurant, entertainment, hotel, and office uses.

b.     The "Development Agreement No. DA08-003, Concerning Property Located At 6940 Beach Boulevard, Buena Park, California (the "Development Agreement," by

-10-

1  and between City and  6940 Beach, LLC". A true and correct copy of the "Development

2  Agreement" as maintained in City files and records is attached hereto as Exhibit "A". As of the

3  date hereof the Development Agreement remains in full force and effect and is scheduled to

4  remain so until approximately December 2028.

5          c.     The "Disposition and Development Agreement" by and Between the

6  Buena Park Redevelopment Agency and The Source at Beach, LLC" (identified in Shady Bird's

7  Motion as "Ground Lessor"). A true and correct copy of the "DDA" as maintained in City files

8  and records is attached hereto as Exhibit "B". A true and correct copy of a memorandum thereof

9  reflecting its recordation on the Project Site is attached hereto as Exhibit "C.

10      4.     Based on my review of public records and communications with City staff, I am

11  informed and believe, and based thereon allege, that at the time the BOSP, Development

12  Agreement, and DDA were by the City Council, the "Guarantors" (identified in Shady Bird's

13  Motion as Donald Chae and/or Min Chae) owned or controlled, either directly or through

14  affiliated entities, a significant portion of the real property located within the BOSP, and the

15  BOSP is the result of the cooperative planning efforts of City and Guarantors for the Project Site.

16      5.     Based on my review of public records and communications with City staff, I am

17  informed and believe, and based thereon allege, that there are five (5) main building permits

18  issued for the Hotel Project. Only one of these permits (for interiors of the Hotel Project) was

19  issued to Debtor. More specifically the main building permits are as follows:

20        &bull;   *B13-1388*: Foundations for Building B (or Phase 1.5) which houses both a

21  portion of the retail and the hotel portion of the Mixed-Use Project. This permit was issued as of

22  7.11.2014 and was complete as of 3.27.2018. Permit owner is the Ground Lessor.

23        &bull;   *B13-1389*: Shell retail work, various retail components, and hotel lobby. This

24  permit was issued as of 1.29.2015 and is still open. The last inspection was conducted on

25  12.6.2016 meaning the permit has now expired. Permit owner is the Ground Lessor.

26        &bull;   *B13-1391*: Shell for Hotel Tower, Floors 4-7, Elevators, Stairwells, etc. This

27  permit was issued on 1.19.2016 and remains open. The last inspection was 1.10.2020 meaning

28  the permit has now expired. Permit owner is the Ground Lessor.

-11-

**RESPONSE BY THE CITY OF BUENA PARK TO MOTION OF SHADY BIRD LENDING, LLC FOR
ORDER EXCUSING STATE COURT RECEIVER FROM TURNOVER OF ASSETS; DECLARATION OF
CHRISTOPHER G. CARDINALE**

1      •   *B15*-2102: Enclosed 3rd-Floor walkway between retail and hotel portions of

2  Mixed-Use Project. This permit was issued on 2.10.2016 and is still open. The last inspection

3  was conducted on 7.13.2016 meaning the permit has now expired. Permit owner is the Ground

4  Lessor.

5      •   *B13-2294*: Hotel interior tenant improvements. This permit was issued on

6  5.26.2017 and remains open. The last inspection was 7.2.2019 meaning the permit has now

7  expired. Permit owner is the Debtor.

8      Additionally, various sub-building permits have been issued which authorize a specific

9  scope of work related to one of the above main permits. The status of the sub-permits mirror that

10  of the main permit under which it was issued; meaning any outstanding sub-permits for the Hotel

11  Project have now also expired.

12      6.     Based on my review of public records and communications with City staff,

13  including the Director of Finance, I am informed and believe, and based thereon allege, that the

14  Property Tax Amount required by the DDA was (or will be) valued in excess of $1,000,000 for

15  Fiscal Year 2020-2021, and that the Sales Tax Pledge required by the DDA has net yet been

16  triggered by virtue of the Mixed Use Project generating insufficient revenues.

17      7.     The City did not learn of this Action until on or about March 4, 2021, when I

18  personally learned of it from a third-party sources, and I did not learn of the Receiver's

19  appointment until after that date. The first opportunity City staff had to brief and obtain direction

20  from the Buena Park City Council with respect to its interests in this Action was its regular

21  meeting on March 23, 2021.

22

23  DATED: April 9, 2021             By: _____

24                               Christopher G. Cardinale

25

26

27

28

**RESPONSE BY THE CITY OF BUENA PARK TO MOTION OF SHADY BIRD LENDING, LLC FOR ORDER EXCUSING STATE COURT RECEIVER FROM TURNOVER OF ASSETS; DECLARATION OF CHRISTOPHER G. CARDINALE**

# EXHIBIT  A

FREE RECORDING
REQUESTED PURSUANT
TO GOV CODE 6103

*LFJ*

Record at the Request
Of And When Recorded
Mail To:

Shalice Reynoso
City Clerk
6650 Beach Boulevard
Post Office Box 5009
Buena Park, California 90622

Recorded in Official Records, Orange County
Tom Daly, Clerk-Recorder

NO FEE

2008000537057 04:05pm 11/17/08

116 45 A12 98
0.00  0.00  0.00  0.00  0.00  0.00  0.00  0.00

## DEVELOPMENT AGREEMENT NO. DA08-003, CONCERNING PROPERTY LOCATED AT 6940 BEACH BOULEVARD, BUENA PARK, CALIFORNIA

THIS AGREEMENT is made and entered into as of the "Effective Date" set forth herein by and between 6940 BEACH LLC, a California limited liability company ("Developer") and the CITY OF BUENA PARK, a municipal corporation organized and existing under the laws of the State of California ("City").

## W I T N E S S E T H:

A.    **Recitals.**

(i)    California Government Code Section 65864, et seq. authorizes cities to enter into binding development agreements with persons having legal or equitable interests in real property for the development of such property.

(ii)    Developer owns or has an equitable interest in and to all that real property located entirely within City, the common and legal description of which is set forth in Exhibit "A," attached hereto and incorporated herein by this reference and, subject to the provisions of Paragraph 3 below, hereinafter is referred to as the "Site."

(iii)    The Site is currently designated within the General Plan as "Tourist Entertainment, Commercial, and Low-Density Residential" and is zoned ECSP (Entertainment Corridor Specific Plan), CG (Commercial General), and RS-6 (One-Family Residential); The Developer is proposing General Plan Amendment No. GP08-003 and Zone Change No. Z08-002 to change the current designation within the General Plan to "Tourist Entertainment" as well the zoning to BOMUSP (Beach-Orangethorpe Mixed Use Specific Plan) pursuant to City General Plan and Specific Plan policies as well as the provisions of the City's Zoning Ordinance and Zoning Map. The Developer and the City desire to provide through this Development Agreement more specific development controls on the Site, which will provide for maximum efficient utilization of the Site in accordance with enhanced planning principles.

(iv)    On October 14, 2008, City adopted its Ordinance No. 1525, thereby approving this Development Agreement with Developer and said Ordinance was effective on November 14, 2008.

EXHIBIT A
PAGE 1

B.    **Agreement.**

NOW, THEREFORE, the parties hereto agree as follows:

1.    **Definitions**.    In this Agreement, unless the context otherwise requires, the following terms shall have the following meaning:

   a.    "City" is the City of Buena Park.

   b.    "Developer" is 6940 BEACH LLC, a California limited liability company.

   c.    "Development Plans" are those conceptual land use plans and specifications illustrated within the Beach-Orangethorpe Mixed Use Specific Plan attached hereto, marked as Exhibit "B" and incorporated herein by this reference, comprised of documents including, but not limited to, conceptual site plans, guiding principles, objectives, standards, and regulations, circulation plans, and architectural imagery stamped "RECEIVED OCTOBER 14, 2008 PLNG. DIV." The Project also includes the records of applications by Developer, the proceedings before the Planning Commission and City Council, and all such records and files in these matters are incorporated herein by this reference as though set forth in full.

   d.    "Project" is that development approved for the Site as provided in this Development Agreement comprised of a mixed use development featuring world-class upscale retail, restaurants, entertainment, residential, hotel, and office uses as well as parking and open space amenities as provided pursuant to a General Plan Amendment changing the land use designation from "Tourist Entertainment, Commercial, and Low-Density Residential" to "Tourist Entertainment," and Zone Change from ECSP (Entertainment Corridor Specific Plan), CG (Commercial General), and RS-6 (One-Family Residential) to BOMUSP (Beach-Orangethorpe Mixed Use Specific Plan), on property located at the northeast corner of Beach Boulevard and Orangethorpe Avenue, all as reflected in the Development Plans attached hereto as Exhibit "B".

   e.    "Effective Date" shall mean the date that this Agreement is fully executed.

2.    **Recitals Incorporated,**    The recitals are part of this Agreement and shall be enforced and enforceable as any other provision of this Agreement.

3.    **Interest of Property Owner.**    Developer warrants and represents that it has full legal title in or an equitable interest to the Site; that it has full legal right to enter into this Agreement; and that the persons executing this Agreement on behalf of Developer have been duly authorized to do so. As Developer acquires fee title to parcels or other discrete areas, located and specifically identified within the area subject to the Beach-Orangethorpe Mixed Use Specific Plan (the "Specific Plan"), such parcels or areas may be made a part of this Agreement in accordance with the provisions of Section 14 of this Agreement.

4.    **Binding Effect of Agreement.**    Developer hereby subjects the Project and the land described in Exhibit "A" hereto to the covenants, reservations and restrictions as set forth in this

Agreement. The City and the Developer hereby declare their specific intent that the covenants, reservations and restrictions as set forth herein shall be deemed covenants running with the land and shall pass to and be binding upon Developer's successors and assigns in title or interest to the Project. Each and every contract, deed or other instrument hereinafter executed, covering or conveying the Project or any portion thereof shall conclusively be held to have been executed, delivered and accepted subject to the covenants, reservations and restrictions expressed in this Agreement, regardless of whether such covenants, reservations and restrictions are set forth in such contract, deed or other instrument.

The City and Developer hereby further declare their understanding and intent that the benefit of such covenants touch and concern the land by enhancing and increasing the enjoyment and use of the Development by Developer and the future occupants of the Project, the intended beneficiaries of such covenants, reservations and restrictions, and by furthering the public purposes for which this Agreement is adopted.

5.    **Relationship of Parties.**    It is understood that the contractual relationship between City and Developer is such that Developer is an independent party and is not the agent of City for any purpose whatsoever and shall not be considered to be the agent of City for any purpose whatsoever.

6.    **Term of Agreement.**    Subject to Paragraph 7, the term of the Agreement shall commence on the effective date and shall expire December 31, 2028, so long as no Event of Default, as defined in Paragraph 17 hereinbelow, shall have occurred.

7.    **Construction.**    Developer shall have five (5) years from the Effective Date to commence construction.    If the Developer has not initiated work on the Site or associated required public improvements within the time period specified to do so in this Paragraph 7 pursuant to a building permit or permits issued by the City, this Development Agreement shall be considered null and void and of no force or effect, and the development of the Site then and thereafter shall be governed accordingly by the then current provisions of the City's General Plan and Zoning Ordinance and/or applicable specific plan and/or zoning category succeeding thereto.    Developer shall not have an affirmative obligation to construct the Project. For good cause, prior to expiration, this Development Agreement may be renewed for a maximum of one (1) two (2) year extension by the City Council.    For the foregoing purpose, construction work shall not include preparation of plans, engineering work or grading activities.    Any and all construction by Developer shall be pursuant to detailed plans and specifications, including elevations, heights, footprints, and exterior designs, approved in advance by the City in accordance with all applicable Codes of the City.

8.    **Assignment.** Developer shall have the right to sell, mortgage, hypothecate, assign or transfer the Site to any person or entity at any time during the term of this Development Agreement. Any such transfer shall be deemed to include an assignment of all rights, duties and obligations created by this Development Agreement with respect to all or any portion of the Site. The assumption of all of the obligations of Developer under this Agreement pursuant to any such transfer shall relieve Developer, without any act or concurrence by the City, of its legal duty to perform those obligations except to the extent that Developer is in violation with respect to any and all obligations at the time of the proposed transfer.

9. **General Standards and Guiding Principles Pertaining to Development of the Site.**
The following specific restrictions and guiding principles shall apply to the use of the Site pursuant to this Development Agreement:

a. Developer shall have the right to develop the Project on the Site in accordance with the terms and conditions of this Agreement and City shall have the right to control development of the Site in accordance with the provisions of this Agreement.

b. The types, density, intensity, and configuration of uses allowed, size, and location of the buildings and other improvements and provisions for the reservation or dedication of land for public purposes, location of public improvements, together with other terms and conditions of development applicable to the Site, shall be as set forth in this Development Agreement and the attached Development Plans, as conditioned.

c. The Project shall provide a walkable downtown environment, providing the conveniences and attractions of a city, interspersed with generous pedestrian paths and open space.

d. The Project shall establish a sense of place created by an architecture that communicates a receptive quality and a clear notion of destination but still connected to the surrounding community.

e. The architecture shall be scaled to provide backdrop, support, and amenities for pedestrian activities and special events.

f. The overall collection of buildings and spaces shall create a unique identity for the Project and elevate the surrounding area and street audience with both contemporary and cutting edge urban iconography designed specifically for the Project.

g. The development shall include iconic elements created by tower-like structures and massing articulated by the different uses on the Site.

h. The highest quality materials shall be used throughout the Project to help achieve the world-class design aspirations of the City and property owner, as well as future residents and businesses.

i. The architecture, together with carefully crafted open spaces and amenities such as water features, environmental graphics, lighting, multi-media opportunities, shall define the unique quality of the Project.

j. This Agreement shall not become operative and Developer shall have no rights hereunder, unless and until General Plan Amendment No. GP08-003 and Zone Change No. Z08-002 become effective.

k. The Project and all aspects of its design and construction, shall comply with any and all local, state, and federal laws, statutes, codes, standards, policies, rules

and regulations, including, but not limited to, federal accessibility regulations and standards (ADA).

10.    **Effect of City Regulations on Development of Project.** Except to the extent that they conflict with this Development Agreement, all substantive and procedural requirements and provisions contained in City's ordinances, General Plan, specific plans, rules and regulations, including, but not limited to, the Zoning Ordinance, in effect as of the effective date of this Development Agreement, shall apply to the construction and development of the Site, including, but not limited to, site plan and design review.

a.    The provisions of this Paragraph 10 shall not preclude the application to the development of the Site those changes in City ordinances, regulations, plans or specifications which are specifically mandated and required by changes in state or federal laws or regulations as provided in California Government Code Section 65869.5 or any successor provision or provisions.

b.    The payment of fees associated with the construction of the Project, including land use approvals, development fees, building permits, etc., shall be determined at the time application is made for such approvals or permits. Fees payable to the City shall be determined in accordance with the fee structure in effect as of the date of this Agreement.

c.    City may apply any and all new ordinances, rules, regulations, plans and specifications to the development of the Site after the effective date provided such new rules and regulations do not conflict with the terms of this Development Agreement.

d.    Nothing herein shall prevent the application of health and safety regulations (i.e., fire, building, seismic, plumbing and electric codes) that become applicable to the City as a whole.

11.    **Permitted Land Uses.**

The Site shall be developed with a mixed use development consistent with the development limitations and standards contained within the Beach-Orangethorpe Mixed Use Specific Plan including up to the following:

- 355,000 sq. ft. of retail space
- 300-room (approximately 277,000 sq. ft.) hotel in a multi-level landmark building with conference facilities
- 1,000 multifamily residential units
- 195,000 sq. ft. office space per marketplace demands in lieu of 177 multifamily residential units
- 350,000 sq. ft. of open area amenities

City acknowledges that if the Site does not consist of the entire area that is subject to the Specific Plan, then with the written consent of the Director of Development Services, some of the improvements described above may be reduced in size or not developed.

12.    **Annual Review.**    During the term of this Development Agreement, City shall annually review the extent of good faith compliance by Developer with the terms of this

Development Agreement. Developer shall file an annual report with the City indicating information regarding compliance with the terms of this Development Agreement during the preceding calendar year no later than March 31 of each calendar year. Developer shall have the right to cause the annual report to be filed by the lessees then occupying the Site provided, however, that a failure by any such lessee to file the required report shall not relieve Developer from the filing requirement.

13.    **Indemnification.**    To the maximum extent permitted by law, Developer shall defend, indemnify and hold City and its elected officials, officers, agents, employees and volunteers, free and harmless with respect to any and all liabilities, including liability for damage or claims for damage for personal injuries, including death, all economic loss of any nature, and property damage, alleged to arise, directly or indirectly, from the City's entering this Agreement, or from the operations, acts and/or omissions of Developer, and/or those of Developer's contractor, subcontractor, agent, employee or other person acting on its behalf, relating to, arising out of or connected with, the design, construction, maintenance and/or operation of the Project or the Permitted Uses. This hold harmless, defense and indemnity provision applies to all liabilities, claims and damages suffered or alleged to have been suffered, regardless of whether or not the City prepared, supplied or approved the plans, specifications or other documents for the Project, or inspected the Project, and said hold harmless, defense and indemnity provision shall survive the expiration or sooner termination of this Development Agreement.

14.    **Amendments.**    The City Council hereby delegates authority to the Director of Development Services (the "Director") to approve in writing increase(s) to the total area of the Site, by adding additional parcels or discrete areas identified in the Specific Plan, upon written request of the Developer. The City agrees that such approval shall be given by the Director within twenty (20) days after Developer's request unless within that time the Director provides notice to Developer, which shall include a reasonably detailed explanation, that any of the following are true:  (a) Developer is in default under this Agreement and such default has not been cured or remedied; (b) as a result of the configuration and type of development of the Site that has occurred between the date of this Agreement and the date of the Director's response, the inclusion of the additional parcel(s) or discrete area(s) requested by Developer is not consistent with the goals and objectives of the Specific Plan; or (c) the inclusion of the additional parcel(s) or discrete area(s) requested by Developer would result in activity not within the scope of any previously certified environmental impact report and thus requires further review under CEQA. Any disapproval shall be without prejudice to Developer's right to renew its request for the inclusion of such additional parcel(s) or discrete area(s) in the event of a change in the relevant facts or circumstances.

Any such approval shall not become effective unless and until the Developer acknowledges in writing that such additional parcel or area shall be subject to all terms and conditions of this Agreement, and the Developer provides evidence satisfactory to the Director of having recorded a new Exhibit "A" to this Agreement accurately and legally describing the Site, as amended. Thereafter, use and development of the added area or parcel shall be subject to any and all requirements of Section 10 hereof.

15.    **Minor Amendments to Development Plans**.    Upon the written application of Developer, minor modifications and changes to the Development Plans including modifications to building design or footprint not affecting setbacks, parking layout and design, and landscape area design may be approved by the Director of Community Development. Other changes in the Development Plans, or plans and specifications approved by the City as required by

Paragraph 7, may be processed through a Conditional Use Permit or Site Plan, as determined by the Director of Community Development, pursuant to the City Zoning Ordinance.

16.    **Enforcement.**         In the event of a failure to comply with the provisions of this Agreement in any material respect (hereafter a "violation") by Developer, City shall give written notice to Developer (or its successor) by registered or certified mail addressed at the address stated in this Agreement, and if such violation is not corrected to the reasonable satisfaction of City within thirty (30) days after such notice is given, or if not corrected within such reasonable time as may be required to cure the breach if said violation cannot reasonably be cured within thirty (30) days (provided that acts to cure the violation must be commenced within said thirty (30) days and must thereafter be diligently pursued by Developer), then City may, without further notice, declare an Event of Default under this Agreement pursuant to Paragraph 17 hereinbelow and, upon any such declaration of an Event of Default, City may bring any action necessary to specifically enforce the obligations of Developer growing out of the operation of this Development Agreement, apply to any court, state or federal, for injunctive relief against any violation by Developer of any provision of this Agreement, or apply for such other relief as may be appropriate.

17.    **Event of Default.**      An "Event of Default" shall have occurred under this Agreement upon the happening of one or more of the following events or conditions:

   a.    If a material warranty, representation or statement is made or furnished by Developer in writing to City in this Agreement or in any annual report to be filed by Developer pursuant to Paragraph 12 hereinabove and is false or proved to have been false in any material respect when it was made;

   b.    If a finding and determination is made by City following an annual review pursuant to Paragraph 12 hereinabove, upon the basis of substantial evidence, that Developer has not acted in good faith to comply with any material terms and conditions of this Agreement, after notice and opportunity to cure as described in Paragraph 16 hereinabove; or

   c.    A breach by Developer of any of the provisions or terms of this Agreement, after notice and opportunity to cure as provided in Paragraph 16 hereinabove.

18.    **No Waiver of Remedies.**    City does not waive any claim of defect in performance by Developer if on periodic review City does not enforce any provision of this Agreement. Nonperformance by Developer shall not be excused because performance by Developer of the obligations herein contained would be unprofitable, difficult or expensive or because of a failure of any third party or entity, other than City. All other remedies at law or in equity which are not otherwise provided for in this Agreement are available to the parties to pursue in the event that there is a breach of this Development Agreement. Waiver by City of any violation under this Development Agreement shall not be deemed to be a waiver of any other subsequent violation hereunder.

19.    **Rights of Lenders Under this Agreement.**      Should Developer place or cause to be placed any encumbrance or lien on the Project, or any part thereof, the beneficiary ("Lender") of said encumbrance or lien shall have the right at any time during the term of this Agreement and the existence of said encumbrance or lien to:

Description: Orange,CA Document - Year.DocID 2008.537057 Page: 7 of 98
Order: doc Comment:

EXHIBIT A
PAGE 7

a. Do any act or thing required of Developer under this Agreement, and any such act or thing done or performed by Lender shall be as effective as if done by Developer;

b. Realize on the security afforded by the encumbrance or lien by exercising foreclosure proceedings or power of sale or other remedy afforded in law or in equity or by the security document evidencing the encumbrance or lien (hereinafter referred to as "a trust deed");

c. Transfer, convey or assign the title of Developer to the Project to any purchaser at any foreclosure sale, whether the foreclosure sale be conducted pursuant to court order or pursuant to a power of sale contained in a trust deed; and

d. Acquire and succeed to the interest of Developer by virtue of any foreclosure sale, whether the foreclosure sale be conducted pursuant to a court order or pursuant to a power of sale contained in a trust deed.

e. Should any Lender require or request an amendment of this Agreement in respect of the rights and remedies granted to a Lender, City hereby agrees to execute and deliver such an amendment so long as the proposed amendment does not materially and adversely affect the rights, powers, and remedies of the City in respect of a violation by Developer hereunder.

20. **Notice to Lender.**    City shall give written notice of any violation under this Agreement by Developer to Lender (if known by City) and afford Lender the opportunity after service of the notice to:

a. Cure the violation within thirty (30) days after service of said notice, where the violation can be cured by the payment of money;

b. Cure the violation within thirty (30) days after service of said notice where the violation can be cured by something other than the payment of money and can be cured within that time; or

c. Cure the violation in such reasonable time as may be required where something other than payment of money is required to cure the violation and cannot be performed within thirty (30) days after said notice, provided that acts to cure the violation are commenced within a thirty (30) day period after service of said notice of violation on Lender by City and are thereafter diligently continued by Lender.

21. **Action by Lender.**    Notwithstanding any other provision of this Agreement, a Lender may forestall any action by City for a violation under the terms of this Agreement by Developer by commencing proceedings to foreclose its encumbrance or lien on the Project. The proceedings so commenced may be for foreclosure of the encumbrance by order of court or for foreclosure of the encumbrance under a power of sale contained in the instrument creating the encumbrance or lien. The proceedings shall not, however, forestall any such action by the City for the violation by Developer unless:

a.    They are commenced within thirty (30) days after service on Developer (and on Lender if Lender's address is directly provided to the City) of the notice described herein- above;

b.    They are, after having been commenced, diligently pursued in the manner required by law to completion; and

c.    Lender keeps and performs all of the terms, covenants and conditions of this Agreement requiring the payment or expenditure of money by Developer until the foreclosure proceedings are complete or are discharged by redemption, satisfaction or payment.

22.    **Notice.**    Any notice required to be given by the terms of this Agreement shall be provided by certified mail, return receipt requested, at the address of the respective parties as specified below or at any other such address as may be later specified by the parties hereto.

| | |
|---|---|
| To Developer: | 6940 BEACH LLC<br>3100 E. Imperial Hwy.<br>Lynwood, CA 90262<br>Attention: Donald Chae |
| With a copy to: | Lim, Ruger & Kim, LLP<br>1055 West Seventh Street, Suite 2800<br>Los Angeles, California 90017<br>Attention:  Real Estate Department |
| To City: | City of Buena Park<br>6650 Beach Boulevard<br>Buena Park, California 90620<br>Attention:  Joel W. Rosen, AICP<br>Director of Community<br>Development |

23.    **Attorneys' Fees.**    In any proceedings arising from the enforcement of this Development Agreement or because of an Event of Default or alleged Event of Default hereunder, the prevailing party shall be entitled to recover its costs, reasonable attorneys' and experts' fees incurred during the proceeding as may be fixed within the discretion of the court.

24.    **Binding Effect.**    This Agreement shall bind, and the benefits and burdens hereof shall inure to, the respective parties hereto and their legal representatives, executors, administrators, successors and assigns, wherever the context requires or admits.

25.    **Applicable Law.**    This Agreement shall be construed in accordance with and governed by the laws of the State of California.

26.    **Partial Invalidity.**    If any provisions of this Agreement shall be deemed to be invalid, illegal or unenforceable, the validity, legality or enforceability of the remaining provisions hereof shall not in any way be affected or impaired thereby.

27.    **Recordation.**         This Agreement shall, at the expense of Developer, be recorded in the Official Records of the County Recorder of the County of Orange within ten (10) business days following the Effective Date.  Upon the expiration of the terms of this Development Agreement, upon the request of the Developer, the City will execute and deliver, in recordable form, an instrument confirming that the provisions of this Agreement have expired.

28.    **Integrated Agreement.**         This Development Agreement, together with all Exhibits and attachments, constitutes the entire agreement between the parties with respect to the subject matter herein.   Unless expressly set forth herein, no promise, representation or understanding, whether implied, express, written or verbal, by or between either or both of the parties, shall be binding or have any force or effect.

          IN WITNESS WHEREOF, this Agreement has been executed by the parties and shall be effective on the effective date set forth hereinabove.

                              CITY OF BUENA PARK,
                              a Municipal Corporation

Dated: _11/12/08_____          By: _____
                                              Mayor

                         ATTEST: _____
                                   Shalice Reynoso, City Clerk
                                   City of Buena Park

Approved as to form:
_____
City Attorney

                                        EXHIBIT A
                                        PAGE 10

6940 BEACH LLC, a California limited liability company,

6940 BEACH LLC
a California limited liability company

By: _____

Name: __Donald Chae_____

Its: __President_____

By: _____

Name: _____

Its: _____

EXHIBIT A
PAGE 11

ACKNOWLEDGMENT

State of California       )
County of ___Los Angeles___ )
                           )

On _October 24, 2008_ before me, _____Hanna Kim, a Notary Public____
                                       (insert name and title of the officer)

personally appeared _____Donald Chae_____,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s)

is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature_____     (Seal)
         Signature of Notary Public

> HANNA KIM
> Comm. # 1635623
> NOTARY PUBLIC - CALIFORNIA
> LOS ANGELES COUNTY
> My Comm. Exp. Jan. 7, 2010

ACKNOWLEDGMENT

State of California       )
County of ___ORANGE___ )
                           )

On _November 12, 2008_ before me, _Teresa A. Jackson, Notary Public_,
                                         (insert name and title of the officer)

personally appeared _James A. Dow and Shalice Reynoso_,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature_Teresa A. Jackson_     (Seal)
         Signature of Notary Public

> TERESA A. JACKSON
> Commission # 1792592
> Notary Public - California
> Orange County
> My Comm. Expires Mar 28, 2012

EXHIBIT "A"

LEGAL DESCRIPTION FOR DEVELOPMENT AGREEMENT NO. DA08-003
CITY OF BUENA PARK

Exhibit A
Legal Description
Development Agreement No. DA08-003

## PARCEL A

Parcel "A"

Lot 2 in Block 61 of Buena Park, in the City of Buena Park, County of Orange, State of
California, as per Map recorded in Book 18, Pages 50 to 52 inclusive, of Miscellaneous
Maps, in the Office of the County Recorder of said County, California, together with the
South 30 feet of the street adjoining said lot on the North abandoned by order of the
Board of Supervisors of Orange County, on August 2, 1911.

Excepting therefrom the Easterly 65 feet of the Southerly 120 feet thereof. Also
excepting therefrom that portion described as follows:

Beginning at the Northeast corner of said Lot 2, said point being in the East line of Beach
Boulevard (formerly Grant Avenue) 108 feet in width and running; thence Northerly
along said East line, 30 feet to the North line of the South 30 feet of the abandoned street
hereinbefore mentioned; thence Easterly along said North line 225 feet; thence Southerly
parallel with the East line of Beach Boulevard 170 feet; thence Westerly parallel with the
North line of said Lot 2, a distance of 225 feet to the East line of Beach Boulevard;
thence Northerly along said East line, 140 feet to the point of beginning.

Also excepting therefrom the West 250 feet of the South 259.21 feet to Lot 2 in Block 61
of Buena Park, County of Orange, State of California, as shown on a map recorded in
Book 18, Pages 50 to 52 inclusive of Miscellaneous Maps, in the Office of the County
Recorder of said County.

Parcel "B"

Lots 7, 8 and 9 of Tract No. 1756, in the City of Buena Park, County of Orange, State of
California, as shown on a map recorded in Book 60, Pages 20 and 21 of Miscellaneous
Maps, in the office of the County Recorder of said County.

## PARCEL E

The East 50 feet of Lot 21, Tract No. 551, in the City of Buena Park, County of Orange,
State of California, as per map recorded in Book 19, Page 43 of Miscellaneous Maps, in
the Office of the County Recorder of said County.

## PARCEL F
Lot 20 of Tract No. 551, in the City of Buena Park, County of Orange, State of
California, as per map recorded in Book 19, Page 43, inclusive of Miscellaneous Maps, in
the Office of the County Recorder of said County.

1 of 3

Exhibit A
Legal Description
Development Agreement No. DA08-003

**PARCEL I**

Lot 17 of Tract No. 551, in the City of Buena Park, County of Orange, State of
California, as per map recorded in Book 19, Page 43, of Miscellaneous Maps, in the
Office of the County Recorder of said Orange County.

**PARCEL K**

Lot 15 of Tract No. 551, in the City of Buena Park, County of Orange, State of
California, as per map recorded in Book 19, Page 43, of Miscellaneous Maps, in the
Office of the County Recorder of said Orange County.

**PARCEL Q**

Lot 4 and the South 5 feet of Lot 3, in Tract No. 1756, in the City of Buena Park, County
of Orange, State of California, as per map recorded in Book 60, Pages 20 and 21 of
Miscellaneous Maps, records of Orange County, California.

**PARCEL S**

Lot 6 of Tract No. 1756, in the City of Buena Park, County of Orange, State of
California, as per map recorded in Book 60, Pages 20 and 21 of Miscellaneous Maps,
records of Orange County, California.

**PARCEL U**

The West 250 feet of the South 170 feet of Lot 2 in Block 61 of Buena Park, in the City
of Buena Park, County of Orange, State of California, as shown on a Map thereof
recorded in Book 18, Pages 50 to 52 inclusive, Miscellaneous Records, in the Office of
the County Recorder of Los Angeles County, California.

Except therefrom the North 70 feet of the West 200 feet thereof. Also except therefrom
the South 100 feet of the West 156 feet thereof.
Also except therefrom the East 20 feet of the West 176 feet of the South 100 feet thereof.

2 of 3

EXHIBIT A
PAGE 15

Exhibit A
Legal Description
Development Agreement No. DA08-003

**PARCEL X**

That portion of Lot 2 in Block 61 of "Buena Park", in the City of Buena Park, County of Orange, State of California, as per Map recorded in Book 18, Pages 50 to 52 inclusive, of Miscellaneous Records, in the Office of the County Recorder of said County, described as follows: Beginning at the Northwest corner of said Lot 2, said point being in the East line of Grand Avenue (being 108 feet wide); and running thence easterly along the North line of said Lot 2, 225 feet; thence southerly along a line parallel to the East line of said Grand Avenue, 140 feet; thence westerly along a line parallel to said Northerly line 225 feet; thence northerly along the East line of Grand Avenue, 140 feet to the Point of Beginning, together with the South 30 feet of the West 225 feet of street adjoining on the North abandoned by order to the Board of Supervisors of Orange County, California, August 2, 1911, adjoining said Lot 2.

EXHIBIT "B"

DEVELOPMENT PLANS

EXHIBIT A

PAGE 17



EXHIBIT A
PAGE 18





Beach and Orangethorpe

Mixed Use Specific Plan

# Table of Contents

**Chapters**

| Page | Chapters |
|---|---|
| 4 | Table of Contents |
| 5 | Document Organization |
| 6 | CHAPTER 1 Vision |
| 7 | CHAPTER 2 Executive Summary |
| 11 | CHAPTER 3 Illustrative Land Use Plans and Alternatives |
| 38 | CHAPTER 4 Guiding Principles |
| 40 | CHAPTER 5 Character Images |
| 57 | CHAPTER 6 Grading Plan |
| 58 | CHAPTER 7 Circulation Plan |
| 61 | CHAPTER 8 Infrastructure and Public Facilities Plan |
| 64 | CHAPTER 9 Development Objectives and Standards |
| 74 | CHAPTER 10 Greenhouse Gas Emissions and Sustainability |
| 77 | CHAPTER 11 Implementation Program |
| 78 | CHAPTER 12 General Plan Consistency |
| 81 | Credits, Acknowledgments and Participants |

**List of Tables**

| Page | Tables |
|---|---|
| 11 | Table 1 Land Use Summary |
| 77 | Table 2 Financing and Maintenance Plan - Responsible Parties |

**List of Figures**

| Page | Figures |
|---|---|
| 7 | Fig. 1 Site Location |
| 8 | Fig. 2 Context Plan |
| 9 | Fig. 3 Existing General Plan Map |
| 9 | Fig. 4 Proposed General Plan Map |
| 9 | Fig. 5 Existing Zoning Map |
| 9 | Fig. 6 Proposed Zoning Map |
| 10 | Fig. 7 Illustrative Plan |
| 12 | Fig. 8 Illustrative Land Use Plan - Overall |
| 13 | Fig. 9 Illustrative Land Use Plan - Phase 1 |
| 14 | Fig. 10 Illustrative Land Use Plan - Phase 2 |

| Page | Figures |
|---|---|
| 15 | Fig. 11 Illustrative Plan - Level 1 |
| 15 | Fig. 12 Illustrative Plan - Level 2 |
| 16 | Fig. 13 Illustrative Plan - Level 3 to 6 |
| 17 | Fig. 14 Illustrative Plan - Level 7 to 11 |
| 17 | Fig. 15 Illustrative Plan - Level 12 to 14 |
| 17 | Fig. 16 Illustrative Plan - Level 13 to 14 |
| 18 | Fig. 17 FAA Building Height Limit |
| 20 | Fig. 19a-b Building Height Limit |
| 21 | Fig. 20a-d Aerial Perspectives - Phase 1 |
| 22 | Fig. 21a-d Aerial Perspectives - Phase 2 |
| 23 | Fig. 22a Arena Plan |
| 24 | Fig. 22b Arena Plan - Level 1 |
| 24 | Fig. 22c Arena Plan - Level 2 |
| 25 | Fig. 22d Arena Plan - Level 3 to 9 |
| 25 | Fig. 22e Arena Plan - Level 10 and Above |
| 26 | Fig. 22f Aerial View of Arena Scheme From Beach Boulevard and Orangethorpe Avenue |
| 26 | Fig. 22g View of the Arena From Hotel |
| 26 | Fig. 22g Arena Axonometric by Land Use |
| 26 | Fig. 22h Aerial View of Arena Scheme From Brenner Avenue and Melrose Street |
| 27 | Fig. 22i View of Arena Scheme From Second Level Retail Toward Hotel |
| 27 | Fig. 22k View of Internal Street and Residential Towers |
| 27 | Fig. 22l View of Arena Space Toward Central Retail Space |
| 28 | Fig. 23a Strata Plan |
| 29 | Fig. 23b Strata Plan - Level 1 |
| 29 | Fig. 23b Strata Plan - Level 2 |
| 30 | Fig. 23d Strata Plan - Level 3 |
| 30 | Fig. 23e Strata Plan - Level 4 to 9 |
| 31 | Fig. 23f Aerial View of Strata From Beach Boulevard and Orangethorpe Avenue |
| 31 | Fig. 23g Strata Axonometric with Land Use |
| 31 | Fig. 23h Aerial View of Strata From Brenner Avenue and Melrose Street |
| 32 | Fig. 23i View of Strata Toward Residential Towers |
| 32 | Fig. 23k View of Commercial Retail and Residential Towers as Seen From Melrose Avenue |

| Page | Figures |
|---|---|
| 32 | Fig. 23l View of Central Open Space Facing Retail and Residential Towers Beyond |
| 32 | Fig. 23k View of Internal Street and Central Open Space with Residential Towers Beyond |
| 33 | Fig. 24a Wedge Plan |
| 34 | Fig. 24b Wedge Plan - Level 1 |
| 34 | Fig. 24c Wedge Plan - Level 2 |
| 35 | Fig. 24d Wedge Plan - Level 3 |
| 35 | Fig. 24e Wedge Plan - Level 4 and Above |
| 36 | Fig. 24f Aerial View of Wedge Scheme From Beach Boulevard and Orangethorpe Avenue |
| 36 | Fig. 24g Wedge Axonometric with Land Use |
| 36 | Fig. 24h Aerial View of Strata From Brenner Avenue |
| 37 | Fig. 24i View of Axial Path and Curved Building |
| 37 | Fig. 24j View of Ramps and Axial Alleyways Framed by Buildings |
| 37 | Fig. 24k View of Varying Levels of Connecting Public Plazas |
| 38 | Fig. 25 Guiding Principles Diagrams |
| 57 | Fig. 26 Illustrative Grading Plan |
| 59 | Fig. 27 Illustrative Circulation Plan - Phase 1 |
| 60 | Fig. 28 Illustrative Circulation Plan - Phase 2 |
| 62 | Fig. 29 Illustrative Utilities Plan |
| 66 | Fig. 30a Illustrative Open Space Plan |
| 66 | Fig. 30b Illustrative Open Space Plan - Area |

**Appendices**

An environmental impact report (EIR) and supporting technical studies for the Beach and Orangethorpe Mixed-Use Specific Plan is incorporated by reference under separate cover.

# Document Organization

The Beach and Orangethorpe Mixed Use Specific Plan is organized into the following chapters:

**Chapter 1 Vision**

This chapter describes the overall vision for the proposed mixed use development. The plans, design and development policies, objectives, and implementation included in subsequent chapters of this document serve to achieve the vision established in this chapter.

**Chapter 2 Executive Summary**

This section provides description of the maximum development anticipated and related policies or documents.

**Chapter 3 Illustrative Land Use Plans and Alternatives**

The land use plan states the type and maximum land uses allowed on site within given development constraints. This chapter also includes three possible alternative designs to be submitted for final design plan approval. The plans are in their conceptual phase and will comply to all vision statements, land uses, objectives, and standards established in this document.

**Chapter 4 Guiding Principles**

The principles established in this chapter guide the accomplishment of the vision and state the goals to be accomplished by the proposed development.

**Chapter 5 Character Images**

This chapter provides graphic and written description of various places provided within the proposed development and captures the essence of the specific places and conveys how the guiding principles are met.

**Chapter 6 Grading Plan**

The grading plan ensures the development complies with the American Disabilities Act and City grading requirements.

**Chapter 7 Circulation Plan**

This plan displays location and direction of vehicular and service egress and ingress and parking.

**Chapter 8 Infrastructure and Public Service Utilities Plan**

This section establishes infrastructure measures to ensure adequate sewage, storm drain, water service, and water quality during and post-construction of the proposed development.

**Chapter 9 Development Objectives and Standards**

The development objectives and standards established in this section must be met to meet the vision plan and the guiding principles stated in previous chapters.

**Chapter 10 Greenhouse Gas Emissions and Sustainability**

Per AB 32 California Global Warming Solutions Act of 2006, cities are required to report greenhouse gas emissions. Measures to mitigate greenhouse gas emission are established in this chapter.

**Chapter 11 Implementation**

This section assigns responsible parties to various implementation measures to be executed as part of the development.

**Chapter 12 General Plan Consistency**

As required by Government Code Section 65451 (b), this section states how the goals and policies for the specific plan are consistent with the City of Buena Park General Plan.

# CHAPTER 1 Vision

**The Beach and Orangethorpe Specific Plan area will be a "city within a city" – complete with a mix of world-class upscale retail, restaurants, entertainment, residential, hotel, and office uses.**

Yet, through well thought out urban design and architecture, the experience within the development will feel like a traditional walkable downtown community, providing the conveniences and attractions of a city, interspersed with generous pedestrian paths and open spaces. A sense of place will be created by an architecture that communicates a receptive quality and a clear notion of destination but still connected to the greater City beyond.

The architecture will be scaled to provide backdrop, support, and amenities for pedestrian activities and special events.

The overall collection of buildings and spaces is planned to create a unique identity for the project and elevate the surrounding area and street audience with both contemporary and cutting edge urban iconography designed specifically for the project.

Iconic elements will be created by tower-like structures and massing articulated by the different uses on the site.

The highest quality materials will be used throughout the project to help achieve the world-class design aspirations of the property owner and the future residents and businesses. The architecture, together with carefully crafted open spaces and amenities such as water features, environmental graphics, lighting, multi-media opportunities, will define the unique quality of the project and will give the Beach and Orangethorpe Specific Plan a dynamic, colorful identity.

# CHAPTER 2 Executive Summary

## Introduction

The Beach and Orangethorpe Mixed Use Specific Plan establishes guidelines and development standards for a retail-focused, mixed-use development located near the junction of two major freeways (Interstate 5 and State Route 91) and along major arterial roads (Beach Boulevard and Orangethorpe Avenue) (Figure 1 Site Location). The development will function as the north gateway to the City's Tourist Entertainment District located along Beach Boulevard to the south city boundary (Figure 2 Context Plan). The development is unique in its public realm focus. It abounds with public space elements, landmark buildings, and a variety of outdoor retail experiences, emphasizing high-quality design in buildings and public space to raise the standard for future developments in Buena Park.

## Plan Overview & Summary of Preparation Process

The development program proposes the following uses:

• maximum of 1,000 dwelling units (some of which may be replaced with office uses).
• maximum of 355,000 square feet of retail space (with a minimum of 200,000 square feet unless finding is made that the development meets the goals and objectives of the specific plan).
• 300-room hotel totaling 270,000 square feet with associated uses,
• 4,560 parking stalls in subterranean and above grade parking structures, and
• 350,000 square feet of open area amenities.

The development is anticipated to take place in the following two phases over an estimated four-year period:

• Phase 1: Includes 270,000 square feet hotel with 300 rooms, 681 dwelling units, 255,000 square feet of retail space, and 2,920 parking stalls. (An alternative plan that replaces portions of residential development with office

development is also being studied under the environmental impact report (EIR)).
• Phase 2: Includes 319 dwelling units, 100,000 square feet of retail space, and 1,640 parking stalls.

Buildings within the development are designed to maximize sustainability and accommodate an urban modern mixed-use style that enhances outdoor activity and gathering. The resulting one-tainment-focused environment strengthens the gateway to the existing retail/entertainment corridor along Beach Boulevard, and provides a culturally rich environment that meets the retail, housing, office, hotel, parking, and open space demands in Buena Park, while preserving the rights of adjacent residential development.

## Reservation of Rights - Single-Family Residential Development

The current development rights of single-family residences on Melrose Street and Brenner Avenue will be fully returned with development standards included as part of the Specific Plan. Single-family residences will be legal conforming uses with all associated entitlements and privileges of the RS-6 (One-Family Residential) zone, including current right to rebuild and expand as well as buffering, separation, and distance requirements of adjacent development.

## Site Location

The site location is the approximately 12.75-acre block located at the northeast corner of Beach Boulevard and Orangethorpe Avenue in the City of Buena Park. Buena Park is regionally known as the home of a major attraction, Knott's Berry Farm, and other smaller, themed entertainment attractions located along Beach Boulevard.

## Existing and Surrounding Uses

Streets bounding the development site are Beach Boulevard to the west, Orangethorpe Avenue to the south, Brenner Avenue to the east, and Melrose Street to the north. Existing site uses include single-family residential homes located along Brenner Avenue and Melrose Street, a gas station at the southwest corner, and other auto-related uses and restaurants along Beach Boulevard. The majority of the development site is vacant, unused, and generally flat. Surrounding uses include retail stores along Beach Boulevard (west and southwest of the site), a seven-story



Fig. 1 Site Location

0   100   200   400   800 ft

—— Beach and Orangethorpe
Mixed Use Specific Plan
Site Boundary

hotel (Hampton Inn) on Orangethorpe Avenue (south of the site), and single-family residences along Melrose Street and Brenner Avenue (north and east of the site).

## Authority and Scope

The Beach and Orangethorpe Mixed Use Specific Plan has been prepared and established under the authority granted to the City of Buena Park in accordance with the requirements of the California Government Code, Title 7, Division 1, Chapter 3, Article 8, Section 65450. The City Council of Buena Park will adopt the Beach and Orangethorpe Mixed Use Specific Plan by ordinance after a public hearing. The document will function as the zoning regulation for the property, and replace all existing zoning for the properties identified.

## Relationship to Applicable Plans and Policies

### City of Buena Park General Plan

The City of Buena Park General Plan is the primary policy planning document that provides the framework for management and utilization of the City's physical, economic, and human resources. Per the General Plan's Land Use Plan, the specific plan site is located in the Central Planning area and the following land uses apply (City of Buena Park General Plan, Exhibit 2-8 Land Use Plan, Central Planning Area):

- Tourist Entertainment for parcels along Beach Boulevard,
- Commercial for parcels along Orangethorpe Avenue, and
- Low-Density Residential for parcels along Brenner Avenue and Melrose Street.

The Land Use Element of the General Plan references the specific plan site as the northern gateway of the City's Tourist Entertainment District. Land use policies for the Central Planning Area designate a change from "Commercial" to "Tourist Entertainment" for the properties along Beach Boulevard.

To accommodate the proposed mixed uses of the Beach and Orangethorpe Specific Plan, a General Plan land use amendment is required (See Figures 3 and 4 General Plan Map).



Fig. 2 Context Plan

Fig. 3 Existing General Plan Map



Fig. 4 Proposed General Plan Map



Fig. 5 Existing Zoning Map



Fig. 6 Proposed Zoning Map

**Legend (Fig. 3 & 4):**
- Beach and Orangethorpe Mixed Use
- Tourist Entertainment
- Commercial
- Light Industrial
- High-Density Residential
- Low-Density Residential
- Open Space
- Site Boundary

**Legend (Fig. 5 & 6):**
- Beach and Orangethorpe Mixed Use Specific Plan (BOSP)
- Entertainment Corridor Specific Plan (ECSP)
- Commercial General (CG)
- Single Family Residential - 6 dwelling units per acre (RS-6)
- Site Boundary

## City of Buena Park Zoning Ordinance

The City implements goals and policies of the General Plan by establishing development standards in the Zoning Ordinance. Under the Zoning Ordinance, the specific plan site is currently designated as follows:

- Entertainment Corridor Specific Plan (ECSP) for parcels along Beach Boulevard,
- Commercial General (CG) for the northwest parcels along Beach Boulevard, and
- Single-family residential (RS-6) for the parcels along Brenner Avenue and Melrose Street.

To accommodate the proposed development, all zoning will be changed to Beach and Orangethorpe Mixed Use Specific Plan. (See Figures 5 and 6 Zoning Map).

## Beach Boulevard Entertainment Corridor Specific Plan

In 1986, the City established the Beach Boulevard Entertainment Corridor Specific Plan (Entertainment Corridor Specific Plan) to encourage developments focused on entertainment and tourism along Beach Boulevard, between the specific plan site and Knott's Berry Farm, located less than a mile south of the specific plan site. The Entertainment Corridor Specific Plan identifies most of the site as Planning Area A-1. The ECSP will be amended to delete Planning Area A-1.

## California Environmental Quality Act (CEQA)

The purpose of the California Environmental Quality Act is to assess potential environmental impacts resulting from the implementation of proposed developments. For an in-depth assessment of the significance of potential environmental impacts and to provide appropriate mitigation measures, the City prepared an Environmental Impact Report (EIR) for the Beach and Orangethorpe Mixed Use Specific Plan. The final EIR is hereby adopted by reference in this Specific Plan under separate cover.



Fig. 7 Illustrative Plan

The illustrative plan and
descriptions contain information to
indicate the expected level of details
required for future submittals and
precise development plans.

Features
1. Framed Views, Striking Gateway
2. Entry Plaza
3. Urban Lounge
4. Promenade
5. Strata
6. Beach Blvd Parkway
7. Park Lane
8. Neighborhood Edge
9. Rooftop Experience, Observation Deck

See Chapter 5 for character images of
each place.

0    75    150    300 ft

EXHIBIT A
PAGE 27

# CHAPTER 3
# Illustrative Land Use Plans and Alternatives

## Land Use Plan and Statistical Summary

The primary purpose of the land use plan is to introduce a unique mixed-use development with retail emphasis. The statistical summary of the planned development is shown on Table 1 Proposed Land Use Summary. The intent of the Specific Plan is to maximize market opportunities at time of development by providing flexibility and mix of uses, and allowing modification in total square footage and types of dwelling units so long as development limits are not exceeded.

Development limitations of the Specific Plan include the following:

- 355,000 sf of retail space
- 300-room (approximately) 270,000 sf hotel in a multi-level landmark building with conference facilities
- 195,000 sf office space optional per marketplace demands in lieu of 1 residential units
- 1,000 residential units

## Land Use Plan Goals and Policies

Land use goals of the Beach and Orangethorpe Mixed Use Specific Plan emphasize well-designed public space that enhances the retail experience. To address market opportunities at the time of development, the land use plan (Figure 7 Illustrative Plan) allows flexibility in distribution of land uses across the development site. The land use plan strives to meet the following goals:

1. Create unprecedented, high-quality, mixed-use development with a coherent, robust, "urban" shopping experience.
2. Integrate a variety of public spaces with retail spaces.
3. Provide an exemplary development that serves as catalyst for high-quality development along the entertainment corridor.
4. Serve as a gateway to the Beach Boulevard Entertainment Corridor.

## Illustrative Plan Description

The following illustrative plan (Figure 8 Illustrative Land Use Plan Overall) has been developed to provide one example of how the Specific Plan could be implemented. The illustrative plan demonstrates the scale and quality expected from implementation of the Specific Plan. Three additional alternative designs have been developed (see figures 22 - 24) and other alternative designs may be developed as long as they comply with the Specific Plan goals, policies, development standards, and program objectives.

To break down the block into a more walkable environment, the illustrative plan divides the site into parcels (Figure 9 Illustrative Land Use Plan - Phase 1 and Figure 10 Illustrative Land Use Plan - Phase 2). Building height limitation is shown in Figure 17 FAA Building Height Limit, and in site sections shown in Figures 18, 19a, and 19b. Figures 20 and 21 a-d Perspectives show the massing of the potential development.

The following describes the development character and features of various potential spaces within the development as shown in Chapter 5 Character Images.

The Main Entry Plaza at the northeast corner of Beach Boulevard and Orangethorpe Avenue is a major pedestrian entrance framed by angled walls of buildings. The view framed by these iconic structures provides an intriguing glimpse into the focal center of the development: the Urban Lounge and an inviting view into the curve of the Promenade. The paving of this Main Entry Plaza distinguishes this corner of the intersection from the street and surrounding sidewalk.

Visible from Beach Boulevard and Orangethorpe Avenue, the Urban Lounge should have a focal element such as a dramatic fountain with people eating and relaxing outdoors at cafes and restaurants and accessed by a stand-off area. The buildings surrounding the plaza should contain unique elements that blend art and architecture. The Urban Lounge should be designed to restrict vehicular traffic during community festivals, farmer's markets or performances.

From the Urban Lounge, shoppers can meander onto the Promenade, with a curved building facade unveiling changing views of various retail fronts and eateries to visitors at each step. The wide sidewalks provide ample space for ornamental street trees, benches and landscaped parkways, emphasizing the pedestrian experiences. Storefronts are highly visible to pedestrians and drivers along the street, with parking to provide easy access to stores. North of the Strata, the street transforms into a quiet, park-like environment.

From the Promenade, patrons can turn onto the Strata where dense rows of boutique stores and restaurants can be found. This street is designed to emphasize the view of a striking entrance to the building at the end of the street. Slopes along the Strata have unique interiors, exteriors, and narrow storefront widths that add dense character and variety to the street.

Beach Boulevard Parkway is a well-landscaped street that encourages pedestrian connection to the Entertainment Corridor and themed attractions nearby.

From the Strata or the Urban Lounge, patrons can enter Park Lane north of the Urban Lounge, an area closed to vehicular traffic, facilitating intimate outdoor eating areas, and small local vendors.

Rooftop areas should be designed for outdoor roof gardens and plazas. Landscaping and outdoor furniture should be designed to frame distinct views. Pedestrian bridges, elevators, and public stairs should connect plazas in different buildings and various levels. Private gardens for residents and offices should be secured and separated from public entry. Public plazas and gardens should accommodate retail uses located on the second retail level.

To ensure compatibility with the built fabric, the proposed development should provide building massing and design that best suits existing and anticipated uses along neighborhood edges of Melrose Street and Bremner Avenue.

In Phase 1, a temporary street connects the Strata to Melrose Street to provide ingress and egress without disrupting traffic along Beach Boulevard. The street should be designed to minimize negative impacts to existing uses along Melrose Street while accommodating vehicular circulation within the development.

In addition to retail stores, the development may include residential towers with a maximum of 1,000 dwelling units, built above the retail platforms to create a dynamic skyline in Buena Park and bring residents closer to entertainment, work, and other amenities, and to create a dynamic community while reducing vehicle trips. Depending on market opportunities, some residential components may be replaced with office uses.

A hotel should be strategically located either along Orangethorpe Avenue, Beach Boulevard, or deeper within the site. The hotel should be an iconic architecturally significant building that accommodates 300 rooms and

### Table 1 Land Use Summary

| Phase | Residential | Commercial | Office* (Alternate) | Hotel | Parking** |
|---|---|---|---|---|---|
| 1 | 681 du | 255,000 sf | (195,000 sf in place of 177 residential dwelling units) | 270,000 sf 300 rooms | 2,920 stalls (subterranean and above-grade levels) |
| 2 | 319 du | 100,000 sf | (195,000 sf in place of 177 residential dwelling units) | - | 1,640 stalls |
| Total | 1,000 du | 355,000 sf | - | 270,000 sf 300 rooms | 4,560 stalls |

Notes:

sf = square feet; du = dwelling units

*As an option, one of the residential towers in Phase 1 may be developed with office uses

** The final parking requirements will be set through a comprehensive parking demand study.

associated uses such as a restaurant, fitness rooms, and conference rooms.

**Beach Boulevard** is a major north-south thoroughfare that connects existing entertainment uses in Buena Park. The City envisions Beach Boulevard as a street that accommodates pedestrian traffic, landscaping, and signage to unify and provide a distinct street character. Street improvements along this development will coordinate with Caltrans requirements to accommodate primary access to the site. Additionally, bus turnouts will be accommodated in the final site design.

**Orangethorpe Avenue** is an east-west arterial street that accommodates entrances into the development, designed to architecturally and artfully accentuate the retail uses, and the landmark hotel. Those driving along Orangethorpe Avenue may get a glimpse of activities along Park Lane as well as fountains and sculptures of the Urban Lounge.

From Orangethorpe Avenue, visitors pass under the pedestrian bridge that connects the buildings and enter the secondary Entry Plaza at Park Lane. Those arriving at the hotel may valet at the porte cochère, and retail visitors may continue to the Urban Lounge and the Promenade.

Entrances to parking structures for retail, office, and residential uses may be located off of Brenner Avenue and Melrose Street. Service vehicles may also use Melrose Street and Brenner Avenue.

**Parking** may comprise both subterranean and above grade parking structures. Parking should be designed to minimize parking entrances along the internal streets, and structures that face streets should be designed to match the existing character of the street. Parking for residential, commercial, and office uses should be separated by level or secured gates.

Details regarding circulation and parking is continued in Chapter 7 Circulation Plan. See Figures 27 and 28 for circulation and 18n and 18o for site sections.

**Fig. 8 Illustrative Land Use Plan - Overall**

0    50    100    200 ft



Fig. 18a

Fig. 18b

Brenner Avenue

Melrose Street

Fig. 18o

Fig. 18b

Strata

Park Lane

Orangethorpe Avenue

Beach Boulevard

Mixed Use

Note: This illustrative land use plan shows one type of building layout and may not be indicative of the final development plan.

| Phase | Residential | Commercial | Office* (Alternate) | Hotel | Parking |
|-------|-------------|------------|---------------------|-------|---------|
| 1 | 681 du | 255,000 sf | 195,000 sf | 270,000 sf/ 300 rooms | 2,920 stalls |

Note: sf = square feet; du = dwelling units
*As an option, one of the residential towers in Phase 1 may be developed with office uses.

### Phasing

The proposed development will be constructed as shown in Figures 9 and 10. To allow flexibility and to market conditions at time of development, the mixed use land use categories will allow the mix and maximum land uses listed in Table 1. However, as a mixed-use mixed use development, emphasis shall be places on retail and hotel uses over residential.

### Fig. 9 Illustrative Land Use Plan – Phase 1

Figures 8, 9, and 10 show illustrative land use plans for Phase 1, and Phase 2, and the overall site development. The plans convey the overall site development. The plans convey the design intent of the site build out, showing potential location of building footprints and allocation of uses. Actual building footprint and distribution of land uses may differ from the illustrative plans.



Description: Orange,CA Document - Year.DocID 2008.537057 Page: 30 of 98
Order: doc Comment:



Fig. 10 Illustrative Land Use Plan - Phase 2

| Phase | Residential | Commercial | Office (Alternate) | Hotel | Parking |
|-------|-------------|------------|--------------------|-------|---------|
| 2 | 319 du | | 100,000 sf | | 1,640 |

Note: du = dwelling units, sf = square feet

Description: Orange,CA Document - Year.DocID 2008.537057 Page: 31 of 98
Order: doc Comment:





Fig. 12 Illustrative Plan - Level 2





Fig. 11 Illustrative Plan - Level 1

EXHIBIT A
PAGE 32



Hotel (113,000 sf)
Residential (457,500 sf)
Buildings Below

Fig. 14 Illustrative Plan - Level 7 to 11

Hotel (113,000 sf)
Residential (396,000 sf)
Buildings Below

Fig. 13 Illustrative Plan - Level 3 to 6

Description: Orange,CA Document - Year.DocID 2008.537057 Page: 33 of 98
Order: doc Comment:

EXHIBIT A
PAGE 33





Fig. 17 FAA Building Height Limit

Figure 17 shows building height limits of Federal Aviation Administration's Regulation Part 77 Subpart C requirements. This regulation ensures safe air traffic by limiting the building height, material, and land uses that may interfere with air travel.

### = Height of Average Ground Level
### = Height of Above Mean Sea Level
—— FAA Height Limit
—— FAR Part 77 Contour



Fig. 18a Facing East

Fig. 18b Facing South

Note: Figures 18a-b do not reflect required height restrictions if there are retained or remaining single-family uses on Melrose Street or Brenner Avenue. See Figures 19a-b for building height restrictions adjacent to single-family residential uses.

Ht limit = 15 ft max.

Ht limit = 50 ft - 1:1 slope max.

R.6 PL. = Property line at single-family residential zone

## Fig. 19a-b Building Height Limit

Building heights are also limited by proximity to single-family properties. In case the residential properties on site are not acquired at time of development, the following height limits apply.

- Buildings located within 50 feet of single-family residential property shall be limited to 15-foot maximum height limit. Buildings located at a distance greater than 50 feet from single-family residential property shall be limited to 50-foot height plus 1 additional vertical foot for every horizontal foot separation from single-family residential property (1:1 slope).

Retained single-family residences may remain as legal conforming uses and enjoy all the rights, privileges, and requirements of the Buena Park Zoning Code RS-6 (Single-Family Residential) zone criteria.

If, at time of development, the residential properties to the north of Melrose Street and east of Brenner Avenue remain single-family residential uses, the height limits shown in Figure 19a shall apply.

If, at time of development, both the existing residential uses to the south and north of Melrose Street as well as to the east and west of Brenner Avenue remain single-family residential height limits shown in Figure 19b shall apply.

Fig. 19a

Fig. 19b

50 ft setback from R.6 PL.

R.6 PL.

50 ft setback from R.6 PL.

R.6 PL.

35'-0"
T.O.R.

80'-0"
T.O.R.

50'-0"

15'-0"
0'-0"
STREET

Fig. 19a Height Limit

Residential Towers Beyond

Park Lane

Residential

Subterranean Parking

Parking

development site

RS-6
single family
zone

50'-0"
setback
PL.

adopt F.L.

50'-0"

15'-0"
0'-0"
STREET

Fig 19b Height Limit

Promenade

Residential Towers Beyond

Subterranean Parking

development site

adopt F.L.

RS-6
single family zone

50'-0"
setback
PL.



Fig. 20a-d Aerial Perspectives – Phase 1

Notes:
These figures do not reflect setback requirements for any rezoned or adjacent single-family residential uses.

☐ Residential
☐ Commercial
☐ Retail or Office
☐ Hotel
☐ Parking

··· Represents residential uses than may be replaced with office uses.

20a. View facing southeast.

20b. View facing northeast.

20d. View facing southwest.

20c. View facing northwest.



21a. View facing northeast. Buildings at the corner of Orangethorpe Avenue and Beach Boulevard activate the major intersection by framing the Urban Lounge and reveal glimpses of people shopping along the Promenade.

21b. View facing southeast. Patrons can enter the retail center from Beach Boulevard. Residential towers above two-story retail on Beach. The setback of these buildings provide a linear park, wide sidewalk, street trees, streetlights with banners, and other street improvements along Beach Boulevard.

21c. View facing northwest. An entrance along Orangethorpe Avenue leads to the Urban Lounge. Buildings along Orangethorpe Avenue comprise residential or office towers, ground-level retail, and a landmark hotel. Buildings provide rooftop gardens, overlooks, and other amenities.

21d. View facing southwest. The residential towers along Brenner and Melrose are divided and set back to create a variety of open spaces above retail buildings.

Residential
Commercial
Retail or Office
Hotel
Parking

Note: These figures do not reflect setback requirements for any retained or adjacent single-family residential uses.

Fig. 21a-d Aerial Perspectives - Phase 2