3 of 3

8:21-bk-10525 ES

# EXHIBIT  B

# DISPOSITION AND DEVELOPMENT AGREEMENT

by and between

the COMMUNITY REDEVELOPMENT AGENCY
OF THE CITY OF BUENA PARK

and

THE SOURCE AT BEACH, LLC

.

11225-0001\1291351v5.doc

EXHIBIT B
PAGE 99

## DISPOSITION AND DEVELOPMENT AGREEMENT

THIS DISPOSITION AND DEVELOPMENT AGREEMENT (the or this "Agreement") is dated as of October 26, 2010 and is entered into by and between the COMMUNITY REDEVELOPMENT AGENCY OF THE CITY OF BUENA PARK, a public body, corporate and politic (the "Agency"), and THE SOURCE AT BEACH, LLC, a California limited liability company (including any permitted successors and assigns, "Developer").

## RECITALS

A.    The City Council of the City of Buena Park (the "City") has adopted a Redevelopment Plan for the Agency's Buena Park Consolidated Redevelopment Project Area (as amended from time to time, such redevelopment plan is hereinafter referred to as the "Redevelopment Plan" and such project area is hereinafter referred to as the "Project Area"). Pursuant to authority granted under California law, the Agency has the responsibility to implement the Redevelopment Plan, which affects and controls the development and use of real property in the Project Area.

B.    The purpose of this Agreement is to effectuate the Redevelopment Plan by facilitating improvements to certain land owned (or to be acquired) by the Developer within the Project Area that is described on Exhibits "A", "A-1" and "A-2" attached hereto (collectively, the "Land"). The Land and the improvements to be constructed thereon (including the improvements described in the Scope of Development attached hereto as Exhibit "C") are hereinafter collectively referred to as the "Project."

C.    Construction of each phase of the improvements (which will be developed in three phases, will generally consist of approximately 428,000 square feet of retail space including a movie theatre, a spa, entertainment uses and retail stores and required parking ("Phase I"), approximately 193,220 square feet of office space and required parking ("Phase II") and a Mobil 3-5 star voted or AAA 3-5 diamond voted full service hotel, and all required parking ("Phase III"), will assist in the elimination of blight in the Project Area, provide additional jobs, encourage new investment, and otherwise substantially improve the economic and physical conditions in the Project Area, all in accordance with the purposes and goals of the Redevelopment Plan.

D.    The land uses contemplated by this Agreement are consistent with the provisions of the Redevelopment Plan and with (i) the Beach and Orangethorpe Mixed-Use Specific Plan (Specific Plan No. SPC08-002) as amended (the "Specific Plan") and (ii) that certain "Development Agreement No. DA 08-003 Concerning Property Located at 6940 Beach Boulevard, Buena Park, California" entered into by and between 6940 Beach LLC, a California limited liability company, which was recorded on November 17, 2008 as Document No. 000537057 in the Official Records of Orange County, California (the "Development Agreement").

E.    A material inducement to the Agency to enter into this Agreement is the agreement by Developer to develop the Project as provided herein.

EXHIBIT B
PAGE 100

11225-0001\1291351v5.doc

<u>AGREEMENT</u>

NOW, THEREFORE, in consideration of the above recitals and of the mutual covenants contained in this Agreement, the parties hereto agree as follows:

1.    <u>DEFINITIONS.</u>

1.1   <u>Definitions</u>. The following capitalized terms used in this Agreement shall have the meanings set forth below:

1.1.1  "Agency" means the Community Redevelopment Agency of the City of Buena Park, a public body, corporate and politic, organized and existing under the Community Redevelopment Law of the State of California.

1.1.2  "Agency Land" means the land described on <u>Exhibit "A"</u>.

1.1.3  "Agreement" means this Disposition and Development Agreement.

1.1.4  "Approved Title Exceptions" is defined in Section 2.4.1.

1.1.5  "Building Permit" means, collectively, any and all permits necessary to grade land and construct the Phase I Improvements that would be issued by the City.

1.1.6  "Certificate of Completion" means, as to each Phase, the certificate described in Section 3.11.

1.1.7  "City" means the City of Buena Park, a municipal corporation.

1.1.8  "Close of Escrow" is defined in Section 2.3.

1.1.9  "Construction Contract" is defined in Section 3.3.

1.1.10 "Construction Loan" is defined in Section 3.4.

1.1.11 "Default" is defined in Section 7.1.

1.1.12 "Development Agreement" is defined in Recital D above.

1.1.13 "Escrow" is defined in Section 2.3.

1.1.14 "Escrow Holder" means First American Title Insurance Company at 2 First American Way, Santa Ana, California 92707, Attn: Robert C. Benavente, Escrow Officer (714/250-4721).

1.1.15 "Executive Director" means the Executive Director of the Agency.

1.1.16 "FIRPTA Certificate" is defined in Section 2.8.1.3.

1.1.17 "Force Majeure Delay" is defined in Section 7.7.

1.1.18 "General Contractor" is defined in Section 3.3.

1.1.19 "Grant Deed" is defined in Section 2.8.1.1.

1.1.20 "Hazardous Materials" means any chemical, material or substance now or hereafter defined as or included in the definition of hazardous substances, hazardous wastes, hazardous materials, extremely hazardous waste, restricted hazardous waste, toxic substances, pollutant or contaminant, imminently hazardous chemical substance or mixture, hazardous air pollutant, toxic pollutant, or words of similar import under any local, state or federal law or under the regulations adopted or publications promulgated pursuant thereto applicable to the Land, including, without limitation: the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. 9601, et seq. ("CERCLA"); the Hazardous Materials Transportation Act, as amended, 49 U.S.C. 1801, et seq.; the Federal Water Pollution Control Act, as amended, 33 U.S.C. 1251, et seq.; and the Resource Conservation and Recovery Act of 1976, 42 U.S.C. 6901, et seq. ("RCRA")  The term Hazardous Materials shall also include any of the following: any and all toxic or hazardous substances, materials or wastes listed in the United States Department of Transportation Table (49 CFR 172.101) or by the Environmental Protection Agency as hazardous substances (40 CFR. Part 302) and in any and all amendments thereto in effect as of the Close of Escrow Date; oil, petroleum, petroleum products (including, without limitation, crude oil or any fraction thereof), natural gas, natural gas liquids, liquefied natural gas or synthetic gas usable for fuel, not otherwise designated as a hazardous substance under CERCLA; any substance which is toxic, explosive, corrosive, reactive, flammable, infectious or radioactive (including any source, special nuclear or by product material as defined at 42 U.S.C. 2011, et seq.), carcinogenic, mutagenic, or otherwise hazardous and is or becomes regulated by any governmental authority; asbestos in any form; urea formaldehyde foam insulation; transformers or other equipment which contain dielectric fluid containing levels of polychlorinated byphenyls; radon gas; or any other chemical, material or substance (i) which poses a hazard to the Land, to adjacent properties, or to persons on or about the Land, (ii) which causes the Land to be in violation of any of the aforementioned laws or regulations, or (iii) the presence of which on or in the Land requires investigation, reporting or remediation under any such laws or regulations.

1.1.21 "Improvements" means all buildings, landscaping, infrastructure, utilities, and other improvements described in the Scope of Development.

1.1.22 "Land" means the land described on Exhibits "A", "A-1" and "A-2" attached hereto (it being understood that the Agency Land described in Exhibit "A" is the land to be sold by Agency to Developer hereunder, but the Improvements for Phase I are to be constructed on the Agency Land, the land described on Exhibit "A-1" currently owned by Developer, and the adjacent land described in Exhibit "A-1" that is yet to be acquired by Developer).

1.1.23 "Party" means any party to this Agreement, and "Parties" means all parties to this Agreement.

EXHIBIT B
PAGE 102

1.1.24 "Permitted Exceptions" is defined in Section 2.3.2.

1.1.25 "Phase" shall mean a phase of the Development described in the Scope of Development (i.e., Phase I, Phase II and Phase III).

1.1.26 "Phase I" shall means the Agency Land, the land described on Exhibit "A-1", and the Phase I Improvements described in the Scope of Development attached hereto as on Exhibit "C".

1.1.27 "Phase I Project Budget" is defined in Section 2.4.5.

1.1.28 "Plans and Specifications" means all drawings, landscaping and grading plans, engineering drawings, final construction drawings, and any other plans or specifications for construction of Improvements, which shall be submitted to both the City and the Agency for approval.

1.1.29 "Project" means the Land and the Improvements.

1.1.30 "Project Area" is defined in Recital A.

1.1.31 "Redevelopment Plan" is defined in Recital A.

1.1.32 "Released Parties" is defined in Section 2.6.3.

1.1.33 "Schedule of Performance" means the schedule attached hereto as Exhibit "B".

1.1.34 "Scope of Development" means the description of the Improvements in Exhibit "C" attached hereto.

1.1.35 "Specific Plan" is defined in Recital D above.

1.1.36 "Title Company" shall mean First American Title Insurance Company, 10535 Foothill Boulevard, Suite 382, Rancho Cucamonga, CA 91730, Attn: Ed Luque, Title Officer (909/257-3960).

1.1.37 "Transfer" is defined in Article 5.

1.1.38 "Withholding Affidavit" is defined in Section 2.7.1.2.

2.    PURCHASE AND SALE OF LAND.

2.1    Purchase and Sale of Land; Purchase Price.    In accordance with and subject to the terms and conditions hereinafter set forth, the Agency agrees to convey the Agency Land to Developer and consideration of the covenants of Developer in this DDA, and Developer agrees to acquire the Agency Land from the Agency. The consideration for the Agency Land shall be Developer's covenants under this Agreement. No monetary payment shall be required because the Agency and the City Council have found and determined pursuant to Section 33433 of the California Health and Safety Code that the fair reuse value of the Agency Land at the use

of the California Health and Safety Code that the fair reuse value of the Agency Land at the use and with the covenants and conditions and development costs under this Agreement is zero dollars ($0.00). Notwithstanding anything to the contrary contained herein, the Close of Escrow shall not occur until such time as the Closing Conditions, as defined in Section 2.4 below, have been satisfied.

2.2    Opening and Closing of Escrow. Within five (5) business days after the date this Agreement is executed by the Agency and delivered to Developer, the Agency and the Developer shall cause an escrow (the "Escrow") to be opened with Escrow Holder for the sale of the Agency Land by the Agency to Developer. The Parties shall deposit with Escrow Holder a copy of this executed Agreement as the escrow instructions for the Escrow. The Agency and Developer shall provide such additional instructions as shall be necessary and consistent with this Agreement. Provided that each of the conditions to closing described in Section 2.4 have been satisfied, Escrow shall close (the "Close of Escrow") on or before June 30, 2012 or such earlier date as may be requested by Developer. If the Close of Escrow does not occur by such date, the Party benefitted by the unsatisfied condition and which is not then in material default may terminate this Agreement by written notice to the other Party and all the funds and documents deposited with Escrow Agent by any Party not in material default shall be promptly refunded or returned, as the case may be, by Escrow Agent to the depositing party, except that all escrow and title cancellation fees shall be paid by Developer if neither party is in default, or by the defaulting party.

2.3    Title Exceptions.

2.3.1    Developer shall have the right to disapprove title exceptions listed in that certain preliminary title report under Order No. 0SA-3616478(18) dated October 12, 2010 issued by the Title Company on or before December 10, 2010 by written notice to Agency. Failure to give such notice shall constitute Developer's approval of the title exceptions. All such title exceptions not disapproved by Developer and deemed approved by Developer are hereinafter referred to as the "Approved Title Exceptions". If Developer disapproves any title exceptions Agency may terminate this Agreement by written notice to Developer given prior to the Close of Escrow or may cause such title exceptions to be removed or reasonably "insured over" by the Title Company (by endorsement or otherwise) at the Close of Escrow.

2.3.2    At the Close of Escrow, the Agency shall convey title to the Agency Land to Developer by grant deed in the form attached hereto as Exhibit "D" (the "Grant Deed"). Title to the Agency Land shall be conveyed subject to: (i) all Approved Title Exceptions; and (ii) any matters which arise out of the actions of Developer or its agents and representatives (collectively, the "Permitted Exceptions").

2.4    Conditions to Close of Escrow.

A.    The obligation of the Agency under this Agreement to close Escrow shall be subject to the satisfaction (or express written waiver by the Agency) of each of the following conditions (collectively, the "Agency Closing Conditions"), each of which is for the sole and exclusive benefit of Agency:

6

(1)    The representations and warranties of the Developer contained in this Agreement being true and correct.

(2)    The delivery by Developer of all documents and funds required to be delivered pursuant to Section 2.7 below.

(3)    Developer shall have submitted to the Executive Director of the Agency, and the Executive Director shall have approved: (i) a budget for Phase I of the Project, showing line items for each type of expenditure and otherwise in a form reasonably acceptable to the Executive Director (the "Phase I Project Budget"); (ii) a construction period "sources and uses of funds" schedule for Phase I of the Project; (iii) a schedule of permanent financing for Phase I of the Project in a form acceptable to the Executive Director (and Developer shall use commercially reasonable efforts to obtain permanent financing commitments prior to the Close of Escrow); (iv) evidence satisfactory to the Executive Director that Developer has sufficient equity funds available to cover all costs in the Phase I Project Budget not covered by debt financing; and (v) certified financial statements for Developer (including a balance sheet).

(4)    The Developer shall have delivered to the Agency a copy of the Construction Loan documents, including the construction loan budget for the Construction Loan, and such construction loan budget must be consistent with the Phase I Project Budget.

(5)    The Construction Loan for Phase I of the Project shall have closed or shall close concurrently with the Close of Escrow.

(6)    The executed Construction Contract for Phase I of the Project (or a photocopy thereof) shall have been submitted to the Executive Director and shall comply with the requirements of this Agreement pertaining thereto.

(7)    The Developer shall have submitted to the Executive Director a certified copy of the LLC-1 and Operating Agreement for the Developer, and the organizational documents for the sole member of Developer, and any authorization documents reasonably required by the Executive Director.

(8)    The Agency shall have received evidence reasonably acceptable to the Executive Director or its designee that the construction-period insurance required by Section 8.1 of this Agreement shall be in effect.

(9)    All conditions to the issuance of the Building Permit and any and all other governmental entitlements, permits, consents or authorizations required for the development, construction, operation or use of Phase I of the Project (including subdivision, but excluding certificates of occupancy) except for the payment of any fees that will be and are paid through escrow at the Close of Escrow;

(10)    If such bonds are required by the lender of the Construction Loan, the Developer shall have provided evidence to the Agency that the obligations of Developer's general contractor to construct and complete the Project (pursuant to the Construction Contract) have been bonded, or will be bonded prior to the commencement of construction, with payment and performance bonds.

EXHIBIT B
PAGE 105

(11) Developer shall have performed, observed and complied in all material respects with all covenants, agreements and conditions required by this Agreement to be performed, observed and complied with on its part prior to or as of the Close of Escrow.

(12) Developer shall have delivered to Agency copies of executed letters of intent (or the equivalent thereof) for leases with Retailers for sixty percent (60%) of the reasonably projected usable area of the Improvements for Phase I that include all material business terms for such leases.

(13) The Executive Director of the Agency shall have received and approved the Plans and Specifications for Phase I of the Project, provided that such approval shall not be unreasonably withheld or delayed.

(14) The Executive Director of the Agency shall have received copies of Developer's title policies for all Land owned by Developer or any affiliate, and copies of current title reports for all Phase I Land not yet owned by Developer;

(15) Developer must have acquired all of the Phase I Land, as shown by copies of title policies delivered to Agency;

(16) Developer shall have completed all mitigation measures that are conditions to the issuance of the building permit(s) for Phase I, as well as all other conditions to the issuance of such building permit(s);

(17) Agency shall have acquired title to (or confirmed that it previously acquired title to) the portion of the Agency Land described in Paragraph 3 of Exhibit "A".

B. The obligation of Developer under this Agreement to close Escrow shall be subject to the satisfaction (or express written waiver by the Agency) of each of the following conditions (collectively, the "Developer Closing Conditions") each of which is for the sole and exclusive benefit of Developer:

(1) There shall have been no change to the physical condition of the Agency Land and no new title exceptions on or after October 12, 2010 that (in each case) would materially and adversely affect the development, construction, use or operation of Phase I of the Project.

(2) The delivery by the Agency of all documents required to be delivered pursuant to Section 2.7 below.

(3) The Agency and the City shall have performed, observed and complied in all material respects with all covenants, agreements and conditions required by this Agreement to be performed, observed and complied with on their parts prior to or as of the Close of Escrow.

(4) The Title Company shall have committed to issue at the Close of Escrow a CLTA Owner's Title Insurance Policy an amount reasonably determined by Developer (not to exceed the fair market value of the Agency Land) with any endorsements reasonably

8

requested by Developer, showing fee simple title to the Agency Land vested in Developer (or Developer's assignee as permitted by this Agreement), subject only to the Permitted Exceptions.

2.5    Costs; Escrow Holder Settlement Statement.

2.5.1    Each party shall pay one-half of the escrow charges. Agency shall pay recording charges and documentary transfer taxes, if any, and the cost of the owner's CLTA title policy.

2.5.2    Escrow Holder is authorized at the Close of Escrow to pay and charge the Developer for any fees, charges and costs payable under Section 2.5.1 as set forth on the settlement statements approved by the Parties. Before such payments are made, Escrow Holder shall notify the Agency and Developer of the fees, charges, and costs necessary to close under the Escrow by delivering draft settlement statements to the Parties for their mutual approval.

2.6    Condition of the Property.

2.6.1    "As-Is" Sale. Developer acknowledges and agrees that, except as expressly set forth herein, Developer is acquiring the Land in its "AS IS" condition, WITH ALL FAULTS, IF ANY, AND, EXCEPT AS EXPRESSLY SET FORTH HEREIN, WITHOUT ANY WARRANTY, EXPRESS OR IMPLIED and neither Agency nor any agents, representatives, officers, or employees of Agency have made any representations or warranties, direct or indirect, oral or written, express or implied, to Developer or any agents, representatives, or employees of Developer with respect to the condition of the Land, its fitness for any particular purpose, or its compliance with any laws, and Developer is not aware of and does not rely upon any such representation to any other party. Except as expressly set forth herein, neither Agency nor any of its representatives is making or shall be deemed to have made any express or implied representation or warranty, of any kind or nature, as to (a) the physical, legal or financial status of the Land, (b) the Land's compliance with applicable laws, (c) the accuracy or completeness of any information or data provided or to be provided by Agency, or (d) any other matter relating to the Land. Prior to the Close of Escrow, the Agency shall not cause or permit any change to the physical condition of the Agency Land or any new title exceptions on or after September 9, 2010 that would materially and adversely affect the development, construction, use or operation of Phase I of the Project.

2.6.2    Acknowledgement of Reports and Inspections.    Developer acknowledges receipt of photocopies of the documents listed on Exhibit "E" attached hereto. Developer has inspected the Land and its physical characteristics and existing conditions and has observed or has had sufficient opportunity to inspect or observe, conducted or had sufficient opportunity to conduct such investigations and studies on and of said Land and adjacent areas as it deems necessary, and hereby waives any and all objections to or complaints regarding the Land and its condition, including, but not limited to, federal, state or common law based actions and any private right of action under state and federal law to which the Land is or may be subject, including, but not limited to, CERCLA (as defined in Section 1.1.20), RCRA (as defined in Section 1.1.20), physical characteristics and existing conditions, including, without limitation, structural and geologic conditions, subsurface soil and water conditions and solid and hazardous

EXHIBIT B
PAGE 107

waste and Hazardous Materials on, under, adjacent to or otherwise affecting the Land. Developer further hereby assumes the risk of changes in applicable laws and regulations relating to past, present and future environmental conditions on the Land and the risk that adverse physical characteristics and conditions, including, without limitation, the presence of Hazardous Materials or other contaminants, may not have been revealed by its investigations.

   2.6.3 <u>Releases and Waivers</u>.  Developer and anyone claiming by, through or under Developer hereby waives its right to recover from and fully and irrevocably releases Agency, City and their respective council members, board members, employees, officers, directors, representatives, agents, servants, attorneys, successors and assigns ("Released Parties") from any and all claims, responsibility and/or liability that it may now have or hereafter acquire against any of the Released Parties for any costs, loss, liability, damage, expenses, demand, action or cause of action arising from or related to (i) the condition (including any defects, errors, omissions or other conditions, latent or otherwise, and the presence in the soil, air, structures and surface and subsurface waters of materials or substances that have been or may in the future be determined to be Hazardous Materials or otherwise toxic, hazardous, undesirable or subject to regulation and that may need to be specially treated, handled and/or removed from the Land under current or future federal, state and local laws regulations or guidelines), valuation, salability or utility of the Land, or its suitability for any purpose whatsoever, and (ii) any information furnished by the Released Parties under or in connection with this Agreement except to the extent Agency has actual knowledge that any of the documents described in Section 2.6.2 is materially inaccurate and Developer is not otherwise aware of such material inaccuracy.  This release includes claims of which Developer is presently unaware or which Developer does not presently suspect to exist which, if known by Developer, would materially affect Developer's release to Agency.  Developer specifically waives the provision of California Civil Code Section 1542, which provides as follows:

   "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR EXPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN TO HIM MUST HAVE MATERIALLY AFFECTED THE SETTLEMENT WITH THE DEBTOR."

In this connection and to the extent permitted by law, Developer hereby agrees, represents and warrants that Developer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Developer further agrees, represents and warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Developer nevertheless hereby intends to release, discharge and acquit Released Parties from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which might in any way be included as a material portion of the consideration given to Agency by Developer in exchange for Agency's performance hereunder.

Developer hereby agrees that, if at any time after the Close of Escrow any third party or any governmental agency seeks to hold Developer responsible for the presence of, or any loss, cost

or damage associated with, hazardous materials in, on, above or beneath the Land or emanating therefrom, then Developer waives any rights it may have against Agency in connection therewith, including, without limitation, under CERCLA (as defined in Section 1.1.20 and Developer agrees that it shall not (i) implead the Agency, (ii) bring a contribution action or similar action against Agency, or (iii) attempt in any way to hold Agency responsible with respect to any such matter. The provisions of this Section 2.6.3 shall survive the Close of Escrow.

Agency has given Developer material concessions regarding this transaction in exchange for Developer agreeing to the provisions of this Section 2.6.3. Agency and Developer have each initialed this Section 2.6.3 to further indicate their awareness and acceptance of each and every provision hereof.

| | |
|---|---|
| **AGENCY'S INITIALS** | **DEVELOPER'S INITIALS** |

2.6.4   Environmental Indemnity.   From or after the Close of Escrow, Developer shall indemnify, protect, defend and hold harmless the City and the Agency, and the City's and Agency's officials, officers, attorneys, employees, consultants, agents and representatives, from and against any and all claims, liabilities, suits, losses, costs, expenses and damages, including but not limited to attorneys' fees and costs, arising directly or indirectly out of any claim for loss or damage to any property, including the Land, injuries to or death of persons, or for the cost of cleaning up the Land and removing Hazardous Materials or toxic substances, materials and waste therefrom, by reason of contamination or adverse effects on the environment, or by reason of any statutes, ordinances, orders, rules or regulations of any governmental entity or agency requiring the clean up of any Hazardous Materials caused by or resulting from any Hazardous Material, or toxic substances or waste existing on or under, any portion of the Land acquired by Developer.

2.6.5   Assignment of Claims.   Concurrently with the Close of Escrow, the Agency shall conditionally assign to Developer, by an instrument reasonably satisfactory to Developer in form and content (the "Assignment of Claims"), all rights, claims and causes of action, whether known or unknown, and whether presently existing or accruing in the future, that Agency has or may have against any third party in connection with any Hazardous Material that was, is or at any time will be on, in, under or about the Land, but the assignment shall be expressly conditioned upon the Developer's continued compliance with Section 2.6.4 above.

2.7   Deposits into Escrow.

2.7.1   The Agency and Developer, as applicable, shall deliver to Escrow Holder prior to the Close of Escrow the following instruments and documents, the delivery of each of which shall be a condition of the Close of Escrow:

2.7.1.1 A Grant Deed duly executed and acknowledged by the Agency, in the form attached hereto as Exhibit "D" (the "Grant Deed").

2.7.1.2 The affidavit certificate contemplated by California Revenue and Taxation Code § 18662, executed by the Agency ("Withholding Affidavit");

11225-0001\1291351v5.doc

or damage associated with, hazardous materials in, on, above or beneath the Land or emanating therefrom, then Developer waives any rights it may have against Agency in connection therewith, including, without limitation, under CERCLA (as defined in Section 1.1.20 and Developer agrees that it shall not (i) implead the Agency, (ii) bring a contribution action or similar action against Agency, or (iii) attempt in any way to hold Agency responsible with respect to any such matter. The provisions of this Section 2.6.3 shall survive the Close of Escrow.

Agency has given Developer material concessions regarding this transaction in exchange for Developer agreeing to the provisions of this Section 2.6.3. Agency and Developer have each initialed this Section 2.6.3 to further indicate their awareness and acceptance of each and every provision hereof.

_____          _____
AGENCY'S INITIALS                       DEVELOPER'S INITIALS

2.6.4 <u>Environmental Indemnity</u>. From or after the Close of Escrow, Developer shall indemnify, protect, defend and hold harmless the City and the Agency, and the City's and Agency's officials, officers, attorneys, employees, consultants, agents and representatives, from and against any and all claims, liabilities, suits, losses, costs, expenses and damages, including but not limited to attorneys' fees and costs, arising directly or indirectly out of any claim for loss or damage to any property, including the Land, injuries to or death of persons, or for the cost of cleaning up the Land and removing Hazardous Materials or toxic substances, materials and waste therefrom, by reason of contamination or adverse effects on the environment, or by reason of any statutes, ordinances, orders, rules or regulations of any governmental entity or agency requiring the clean up of any Hazardous Materials caused by or resulting from any Hazardous Material, or toxic substances or waste existing on or under, any portion of the Land acquired by Developer.

2.6.5 Assignment of Claims. Concurrently with the Close of Escrow, the Agency shall conditionally assign to Developer, by an instrument reasonably satisfactory to Developer in form and content (the "Assignment of Claims"), all rights, claims and causes of action, whether known or unknown, and whether presently existing or accruing in the future, that Agency has or may have against any third party in connection with any Hazardous Material that was, is or at any time will be on, in, under or about the Land, but the assignment shall be expressly conditioned upon the Developer's continued compliance with Section 2.6.4 above.

2.7    <u>Deposits into Escrow</u>.

2.7.1   The Agency and Developer, as applicable, shall deliver to Escrow Holder prior to the Close of Escrow the following instruments and documents, the delivery of each of which shall be a condition of the Close of Escrow:

2.7.1.1 A Grant Deed duly executed and acknowledged by the Agency, in the form attached hereto as <u>Exhibit "D"</u> (the "Grant Deed").

2.7.1.2 The affidavit certificate contemplated by California Revenue and Taxation Code § 18662, executed by the Agency ("Withholding Affidavit");

11

2.7.1.3 A Certification of Non Foreign Status in accordance with I.R.C. Section 1445, executed by the Agency (the "FIRPTA Certificate');

2.7.1.4 A Memorandum of DDA covering all Land owned by Developer (excluding the Agency Land), duly executed and acknowledged by the Agency and Developer, and in form and substance reasonably acceptable to the Agency and Developer ("Memo of DDA").

2.7.1.5 Such proof of the Agency's authority and authorization to enter into this transaction as the Title Company may reasonably require in order to issue Developer's owner's policy of title insurance.

2.7.1.6 The Assignment of Claims executed by the Agency and the City.

2.8    Authorization to Record Documents and Disburse Funds. Escrow Holder is hereby authorized to record the documents and disburse the funds and documents called for hereunder upon the Close of Escrow, provided each of the following conditions has then been fulfilled or waived in writing by the party benefitted by the condition:

(i)    The Title Company shall be unconditionally and irrevocably committed to issue in favor of Developer an ALTA Extended Coverage or CLTA Coverage (as elected by Developer) Owner's Policy of Title Insurance, with liability equal to the Purchase Price (or such lesser amount as shall have been requested by Developer), showing the Land vested in Developer subject only to the Permitted Exceptions. In order to elect ALTA title insurance, Developer must have obtained at Developer's cost and submitted to the Title Company at least ten (10) days prior to the Close of Escrow an ALTA survey prepared by a California licensed surveyor showing all plottable Permitted Exceptions and certified to the Title Company. The condition specified in this paragraph (i) is for Developer's benefit.

(ii)    Developer shall have deposited in Escrow the documents required pursuant to be deposited by Developer pursuant to Section 2.7 and Developer's portion of all Escrow closing costs. The condition specified in this paragraph (ii) is for the Agency's benefit.

(iii)    The Agency shall have deposited in Escrow the documents required pursuant to be deposited by the Agency pursuant to Section 2.7. The condition specified in this paragraph (iii) is for Developer's benefit.

(iv)    The Agency shall have confirmed to Escrow Holder that all of the Agency Closing Conditions set forth in Section 2.4A have been satisfied or expressly waived in writing. The condition specified in this paragraph (iv) is for the Agency's benefit.

(v) Developer shall have confirmed to Escrow Holder that all of the Developer Closing Conditions set forth in Section 2.4B have been satisfied or expressly

waived in writing.   The condition specified in this paragraph (v) is for Developer's benefit.

Unless otherwise instructed in writing, Escrow Holder is authorized to record at the Close of Escrow any instrument delivered through this Escrow if necessary or proper for issuance of Developer's owner's title insurance policy.

      2.9    <u>Escrow's Closing Actions</u>.  On the Close of Escrow, Escrow Holder shall:

      2.9.1.1 Record the Grant Deed, the Memo of DDA, and the deed of trust securing the Construction Loan with the Orange County Recorder;

      2.9.1.2 Issue the Developer's owner's title policy;

      2.9.1.3 Prorate assessments and other charges as of the Close of Escrow in accordance with the settlement statement approved by the Parties.

      2.9.1.4 From funds deposited by Developer, pay charges to be paid by or on behalf of Developer, and return any excess to Developer;

      2.9.1.5 Prepare and deliver to both Developer and the Agency one signed copy of Escrow Holder's closing statement showing all receipts and disbursements of the Escrow; and

      2.9.1.6 Deliver to Developer the FIRPTA Certificate and the Withholding Affidavit.

      2.10    <u>Additional Instructions</u>.   If required by the Escrow Holder, the Parties shall execute appropriate escrow instructions, prepared by the Escrow Holder, which are not inconsistent herewith.  If there is any inconsistency between the terms hereof and the terms of the escrow instructions, the terms hereof shall control unless an intent to amend the terms hereof is expressly stated in such instructions.

      3.    <u>DEVELOPMENT COVENANTS.</u>

      3.1    <u>Development of the Project</u>.  Developer shall develop the Improvements in accordance with the Scope of Development, the Schedule of Performance, the Specific Plan, the Development Agreement and all requirements of any and all applicable federal, state and local laws, rules and regulations (including any conditions of approval required by the City), the Plans and Specifications, and all other terms, conditions and requirements of this Agreement. Developer shall comply with the Schedule of Performance in a timely manner, provided that the time for performance of obligations of Developer set forth therein shall be delayed by (a) Force Majeure Delays, if applicable and (b) delays allowed under the Construction Contract, if applicable, and provided, further, that the Executive Director or its designee may extend any deadline therein in his sole and absolute discretion, not to exceed ninety (90) days per applicable deadline.  Until a Certificate of Completion is issued for a Phase, the Developer shall provide the Agency with periodic progress reports, as reasonably requested by the Executive Director or its designee, regarding the status of the construction of the Improvements for that Phase.

EXHIBIT B
PAGE 112

3.2     Agency's Right to Review Plans and Specifications. In connection with construction of the Project, Developer shall comply in all material respects with Plans and Specifications approved by the Agency and the City. The Executive Director or its designee shall have the right to review all Plans and Specifications for the Improvements prior to their submission to the City to ensure that the Improvements are constructed in accordance with the Scope of Development and the other applicable provisions of this Agreement.

3.3     Construction Contract(s). Developer shall retain a reputable and financially responsible general contractor (a "General Contractor") to undertake the construction of each Phase of the Project. The General Contractor shall be acceptable to and approved in writing by the Executive Director or its designee (in the exercise of reasonable discretion), licensed in California, shall have any other licenses reasonably required by the City, and shall be experienced in constructing the type of improvements constituting the Improvements to be constructed in the phase for which the General Contractor is retained. On or before the date set forth in the Schedule of Performance, Developer shall enter into a written contract, in form and substance reasonably acceptable to the Executive Director or its designee (the "Construction Contract"), with the General Contractor for performing the work constituting the construction of the applicable Phase. The Construction Contract shall be a guaranteed maximum cost contract or stipulated sum providing for construction of the Improvements for a fixed or maximum price, and shall obligate the General Contractor to commence and complete such construction in accordance with this Agreement and all applicable federal, state and local laws, rules and regulations. The Construction Contract shall provide for retention of at least five percent (and Developer shall use commercially reasonable efforts to cause the Construction Contract to provide for retention of up to ten percent) from each progress payment (except there shall be no retention for any items excused from retention as specified in the Construction Contract) until the final payment, and said final payment shall not be paid to the General Contractor until the Improvements for the applicable Phase shall have been completed, and Developer shall have obtained all appropriate lien waivers from the General Contractor and its subcontractors, or bonds acceptable to Developer in form and amount, insuring against loss arising from any mechanics', laborers', materialmen's or other like liens filed against the Land. The Parties acknowledge that where this Agreement requires certain provisions to be included in the Construction Contract, such provisions of the Construction Contract may be subject to customary or commercially reasonable exceptions whether or not such exceptions are set forth in this Agreement.

3.4     Construction Loan(s). As used in this Agreement, the term "Construction Loan" shall mean a loan made by a Holder that is in an aggregate amount no greater than: (a) the costs of land acquisition (including without limitation payoffs of existing loans secured with liens on the Phase I Land), environmental remediation and designing and constructing the applicable Improvements of the Phase I of the Project being financed with such loan, less (b) equity funds for such purposes to be provided by Developer and shown as such in the Project Budget and funds provided from other loans, the terms and budgets of which shall be subject to approval by the Executive Director or its designee.

3.5     Costs of Entitlement, Development and Construction. The Developer agrees that all costs, expenses and fees associated with the development and construction of the Project including the costs for developing and constructing the Improvements thereon (including,

but not limited to, the land acquisition costs and governmental permits and approvals) shall be borne by Developer.

      3.6   <u>Rights of Access and Inspection</u>.  In addition to those rights of access to and across the Land to which the Agency and the City may be entitled by law, members of the staffs of the Agency and the City shall have a reasonable right of access to the Land, without charge or fee, at any reasonable time, upon reasonable notice to Developer and submission of reasonably satisfactory evidence of insurance, to inspect the work being performed on the Land in connection with the development of the Project but shall not be obligated to do so and Agency shall not be liable for any failure to disclose any information discovered by Agency (or that could or should have been discovered by any Agency inspection).

      3.7   <u>City and Other Governmental Agency Permits and Approvals</u>.  Before commencement of construction or development of any work of improvement on the Land, Developer shall (at Developer's expense) secure, or cause to be secured, any and all permits, which may be required by the City or any other governmental agency having jurisdiction over such construction or development.

      3.8   <u>No Discrimination During Construction</u>.  Developer, for itself and its successors and assigns, agrees that it shall not discriminate against any employee or applicant for employment because of age, sex, marital status, race, handicap, color, religion, creed, ancestry, or national origin in the construction of the Improvements.

      3.9   <u>Taxes, Assessments, Encumbrances and Liens</u>.  Developer shall pay when due all real property taxes and assessments assessed or levied on portions of the Land from time to time owned by Developer, except that Developer retains the right to reasonably protest, reasonably contest and/or reasonably appeal such taxes and shall not be required to pay or comply with the same during the pendency of such reasonable legal protest, contest and/or appeal.

      3.10   <u>No Partnership or "Agency" Relationship Created</u>.  In performing this Agreement, Developer is an independent contractor and not the agent or "partner" of the Agency or the City.  The Agency and the City are not agents of Developer.  Neither the Agency nor the City shall have any responsibility whatsoever for payment to any contractor or supplier of Developer or its contractors.  Developer shall not have any responsibility whatsoever for payment to any contractor or supplier of the Agency or the City.

      3.11   <u>Certificate of Completion</u>.  Upon Developer's completion of each Phase of the construction of the Project, Developer may apply to the Agency for a Certificate of Completion for the applicable Phase.  The Agency's issuance of the Certificate of Completion for a Phase shall constitute the acknowledgement of the Agency that Developer has complied in all respects with its development obligations (but only the development obligations) set forth in this Article 3 as to that Phase.  If the Agency believes that the Developer is not in compliance with its obligations under this Article 3 as to the applicable Phase, the Agency shall promptly (and in no event more than thirty (30) days after Developer applies to the Agency for a Certificate of Completion) specify the nature of such non-compliance by written notice to Developer.  Provided that Developer is then in full compliance with all of its obligations under

Article 3 of this Agreement as to the applicable Phase, the Agency shall execute, acknowledge and deliver the Certificate of Completion for the applicable Phase within thirty (30) days following Developer's request, which shall be recorded in the Official Records of Orange County. If construction of any Phase is not complete solely because of punch-list items or the equivalent or any non-material non-compliance, the Agency shall execute, acknowledge and deliver the Certificate of Completion upon Developer's providing reasonably satisfactory security for performance.

3.12    Local, State and Federal Laws; Prevailing Wages.    Developer shall carry out the construction of the Improvements on the Land (and shall cause any and all ground tenants to carry out construction of the Improvements on the Land) in conformity with all applicable federal, state and local laws, including all applicable federal and state occupation, safety and health standards. Developer acknowledges, stipulates and agrees that the work required under this Agreement is a public work of improvement under California Labor Code Section 1720, and that Developer shall pay prevailing wages in connection with all of such work and shall cause its transferees (including ground tenants) who acquire an interest on below market terms, as determined by the Agency Executive Director, and pad purchasers who lease or purchase on "below-market" terms, as determined by Agency's Executive Director and their contractors to pay prevailing wages in connection with any such work that is to be constructed by such transferees. Developer shall defend, indemnify and hold Agency harmless from and against any and all claims, liabilities, losses, damages, costs and expenses arising from or relating to any failure by Developer or any Developer transferee or any of their contractors to pay prevailing wages and otherwise comply with California Labor Code Section 1720, et al.

4.    FINANCIAL ASSISTANCE FROM AGENCY.    In consideration of Developer's development, use and operation of the Project and Developer's execution and delivery of this Agreement, the Agency shall pay the Sales Tax Amount and the Property Tax Amount (as defined below), respectively, at the times, in the amounts and subject to the conditions set forth below.

4.1    Conditions for Suspension of Payment.    The Agency's obligations to pay the Sales Tax Amount and the Property Tax Amount (as applicable) to Developer are conditioned upon compliance with California Health and Safety Code Section 33426.7 and shall be suspended if and to the extent any of the following apply and until they are resolved: (i) any failure by a Retailer to pay any Sales Tax Revenues, provided that any such failure shall not affect Developer's right to receive the Sales Tax Amount with respect to Sales Tax Revenue that is paid by any Retailer and otherwise qualifies as Sales Tax Revenues, (ii) any failure to pay any real estate taxes for any portion of the Project that is owned by Developer, its successors or assigns or an affiliate of Developer (and it will be presumed that any real estate taxes not paid are Tax Increment Revenues), with the result that the amount otherwise payable as the Property Tax Amount if all real estate taxes had been paid for any portion of the Project that is owned by Developer, its successors or assigns or an affiliate of Developer shall be reduced by the amount of the unpaid real estate taxes for such portion of the Project, (iii) Developer's failure to timely deliver or to cause to be delivered to the Agency full and complete copies of the Sales Tax Reports (as defined below) in accordance with Section 4.3 below (and Developer shall include a provision in all leases requiring the timely filing and delivery to Developer of Sales Tax Reports and shall enforce it), provided that any such failure shall not affect Developer's right to receive

Sales Tax Revenues with respect to Sales for which Sales Tax Reports have been delivered to the Agency, (iv) a violation of Article 5; (v) the City or Agency's no longer having the legal right under state law to retain and control the disposition of any of its current portion of the Sales Tax Revenues or Tax Increment Revenues (as defined below), respectively, in which event the Sales Tax Amount and the Property Tax Amount, as applicable, shall be payable only with respect to Sales Tax Revenues and Tax Increment Revenues that the City or the Agency from time to time has a legal right under state law to retain and control the disposition of.

4.2    Definitions.

"**Contract Year**" shall mean a fiscal year (July 1 — June 30).

"**Property Tax Amount**" shall mean, for each Contract Year (as defined below), a sum in an amount equal to one hundred percent (100%) of the Tax Increment Revenues (as defined below) for that Contract Year.

"**Retailer**" shall mean any person or entity who owns or operates any store, restaurant or other business engaging in the retail sale, storage, use or other consumption of tangible personal property in or at Phase I of the Project.

"**Sales**" shall mean transactions that give rise to sales Tax Revenue.

"**Sales Tax Amount**" shall mean, for each Contract Year (as defined below) or portion thereof a sum in an amount equal to: (i) until December 31, 2016, fifty-five percent (55%) of the Sales Tax Revenues for each Contract Year; (ii) after December 31, 2016, one hundred percent (100%) of the Sales Tax Revenues in excess of $770,440 for that Contract Year until the Developer shall have received $941,600 for that Contract Year; and (iii) fifty-five percent (55%) of all Sales Tax Revenue in excess of $1,712,000. The dollar amounts in clauses (ii) and (iii) above a based on a scenario in which Phase I contains not less and not more than 428,000 usable square feet of retail space. If Phase I as built, consistent with plans approved by the Agency, consists of more or less than 428,000 usable square feet of retail space, the dollar amounts in clauses (ii) and (iii) above shall be proportionately reduced or increased, as applicable.

"**Sales Tax Reports**" shall mean the statements and quarterly reports, and any other or supplemental reports, statements or submissions, actually filed or required to be filed by Developer (and/or any Retailer) with the State Board of Equalization relating to or in connection with the collection, remittance and/or calculation of Sales Tax Revenues from the Project.

"**Sales Tax Revenues**" shall mean the total sales and use tax revenues from Phase I paid or caused to be paid by any Retailer and ultimately collected by the State Board of Equalization for the City (the disposition of which under then applicable state law is controlled by the City) and which is actually received by the City arising from the retail sale, storage, use or other consumption of tangible personal property in or at Phase I by any Retailer from time to time, pursuant to the Bradley-Burns Uniform Local Sales and Use Tax Law (California Revenue and Taxation Code Section 7200, et seq.). If the Bradley-Burns Uniform Local Sales and Use Tax Law is further amended, terminated or rescinded, and Sales Tax Revenues are calculated in an alternate manner or are replaced or partially replaced by an alternate revenue stream (i)

EXHIBIT B
PAGE 116

arising from the retail sale, storage, use or other consumption of tangible personal property by any Retailer, or (ii) designated as being a replacement for Sales Tax Revenues previously generated by the retail sale, storage, use or other consumption of tangible personal property within Phase I, then "Sales Tax Revenues" shall also mean those revenues actually paid or caused to be paid by any Retailer and ultimately collected for the City in the alternate manner of calculation or the alternate revenue stream, so long as the City receives its portion of such Sales Tax Revenues and has the legal right under state law to retain and control the disposition of substantially all of its portion thereof "Sales Tax Revenues" shall also mean and include any sales and use tax revenues arising from services provided by any Retailer from Phase I. Due to the fact that sales tax revenues exceeding one percent (1%) of taxable sales only are provided to a city based upon a special election and are limited to be used for a specified governmental function or functions, for purposes of this Agreement, Sales Tax Revenues shall be deemed never to exceed a maximum of one percent (1%) of the total taxable sales from businesses in Phase I unless the law is changed so that municipalities' use of sales tax revenues in excess of one percent (1%) of taxable sales is not so limited.

"**Tax Increment Revenues**" shall mean taxes annually allocated to and received by the Agency generated from the value of a completed Phase of the Project after the Close of Escrow (or portion of any completed Phase owned from time to time after the Close of Escrow by Developer, or any successors, assigns or affiliates of Developer permitted under Article 5 below, including portions of a Phase owned by an affiliate of Developer prior to the Close of Escrow but which are conveyed to Developer as of Close of Escrow and, subject to Article 5, remains owned by Developer and on which Improvements are later completed) to the extent that it exceeds the value thereof established by the Orange County Assessor for fiscal year 2010-2011 pursuant to Article 6 of Chapter 6 (commencing with Section 33670) of the Redevelopment Law and Section 16 of Article XVI of the Constitution of the State of California and as provided in the Redevelopment Plan, including all payments, subventions and reimbursements (if any) to the Agency specifically attributable to ad valorem taxes lost by reason of tax exemptions and tax rate limitations. However, Tax Increment Revenues shall not include the following:

(i)    that portion of such taxes which is required to be deposited into the Low and Moderate Income Housing Fund of the Agency in any fiscal year pursuant to Section 33334.3 of the Redevelopment Law;

(ii)    amounts of such taxes (if any) payable by the State of California to the Agency under and pursuant to the provisions of Chapter 1.5 of Part 1 of Division 4 of Title 2 (commencing with Section 16110) of the Government Code of the State of California, or any successor provision of law; and

(iii)    amounts of such taxes (if any) which are required to be paid by the Agency to any other public agency, under the Community Redevelopment Law (California Health and Safety Code Sections 33000, et seq.) or under any agreement between the Agency and such other public agency, including, without limitation, any pass-through amounts and administrative expenses.

4.3    Sales Tax Reports.    The Sales Tax Reports shall be delivered by Developer to the Agency on or before January 31, April 30, July 31 and October 31 of each

EXHIBIT B
PAGE 117

Contract Year during the term hereof, if and to the extent that Developer has theretofore received such Sales Tax Reports. Developer shall include a provision in all retail leases obligating the tenant to provide Sales Tax Reports to Developer on or before the dates specified above.

4.4    Time of Payment by City and Agency. The Sales Tax Amount shall be paid in arrears, annually, within sixty (60) days after the City's receipt of its share of Sales Tax Revenues for the preceding fiscal year (i.e., July 1 through June 30 of the next year), except that the Sales Tax Amount for the period prior to the issuance of a Certificate of Completion for Phase I shall be paid within sixty (60) days after the issuance of a Certificate of Completion for Phase I. The Property Tax Amount with respect to a Phase shall be paid after a Certificate of Completion is issued for the applicable Phase, in arrears, every six months of each calendar year, within sixty (60) days after the City's receipt of its share of Property Tax Revenues for that Phase for the preceding six month period.

4.5    Termination. The Agency's obligation to make payments of the Sales Tax Amount and Property Tax Amount to Developer shall terminate upon the earlier of: (i) a Default by Developer under Section 7.1 below; or (ii) with respect to the Sales Tax Amount, thirty (30) years after the Close of Escrow, and with respect to the Property Tax Amount, the end of the 2029-2030 Contract Year. Agency agrees not to terminate the Redevelopment Plan early.

5.    PROHIBITION ON TRANSFERS AND SECURITY INTERESTS. Developer shall not sell, assign, transfer, mortgage, lease, hypothecate, encumber, or convey (individually and collectively, a "Transfer") the Land, the Project or any part thereof or any of Developer's rights or obligations hereunder prior to the completion of the Project, without the Agency's prior written consent, which consent may be granted or withheld in the Agency's sole and absolute discretion, except that Developer may upon at least twenty (20) days' prior written notice to counsel designated by the Agency describing the transfer, the terms of the transfer and the transferee, and enclosing a copy of the applicable or proposed transfer document (i.e., lease; sale agreement; loan agreement and deed of trust, etc.):

(i)    enter into ground leases with Retailers;

(ii)    sell a subdivided parcel to an owner-user that is a Retailer or, with respect to a parcel on which a hotel is to be developed, a hotel developer or hotel operator, or, with respect to a parcel in which an office building is to be developed, an office building developer or office building operator;

(iii)    create, or cause to be created, a single asset entity to own Phase II and/or another to own Phase III, provided that Developer delivers to Agency copies of all of the organizational documents for such entities showing that such entities are directly or indirectly majority owned and controlled by Donald Chae and Min Chae;

(iv)    grant a lien securing a Construction Loan on each Phase.

Developer acknowledges that the identity of Developer is of particular concern to the Agency, and it is because of Developer's identity that the Agency has entered into this Agreement with Developer. Except for any Transfer expressly permitted in this Section 5 (on the terms and

EXHIBIT B
PAGE 118

subject to the conditions set forth above), or otherwise expressly approved in writing by the Agency pursuant to this Section 5, no voluntary or involuntary successor in interest of Developer shall acquire any rights or powers under this Agreement. Documents shall be submitted to counsel designated by the Agency. Notwithstanding any provision to the contrary in this Agreement, (a) Developer may at any time transfer up to an aggregate of forty-nine percent (49%) of the direct or indirect ownership interests in Developer upon prior written notice to Agency without need for the Agency's consent or approval, and any such Transfer shall be regarded as a permitted Transfer and shall not result in any loss of rights or powers under this Agreement, provided that Donald Chae and Min Chae remain owners, directly or indirectly, of at least fifty-one percent (51%) of the direct or indirect ownership interest in Developer and retain control of the Developer, as shown by reasonable evidence delivered to Agency prior to the applicable transfer; (b) Developer may lease spaces to Retailers, office tenants or other tenants for the uses contemplated in this Agreement for the Improvements so leased, without need for approval by or prior notice to the Agency, and (c) the restrictions in this Section 5 shall no longer apply to any Phase of the Project, or the land or rights or obligations associated therewith, for which a Certificate of Completion has been issued (but the foregoing clause (c) shall not affect the rights and remedies of the Agency for a violation of this Article 5 with respect to any Phase occurring prior to the issuance of a Certificate of Completion for that Phase).

6.    USE OF THE PROPERTY.

6.1    Obligation to Refrain from Discrimination. Developer covenants and agrees that there shall be no discrimination against or segregation of any person, or group of persons, on account of sex, marital status, age, handicap, race, color, religion, creed, national origin or ancestry in the sale, transfer, use, occupancy, tenure or enjoyment of the Project, and Developer (itself and any person claiming under or through Developer) shall not establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of vendors of the Project or any portion thereof.

6.2    Form of Nondiscrimination and Non Segregation Clauses. Developer shall refrain from restricting the sale of the Project or any portion thereof, on the basis of sex, age, handicap, marital status, race, color, religion, creed, ancestry or national origin of any person. All deeds, leases or contracts relating to the sale, lease or transfer of the Project or any portion thereof shall contain or be subject to substantially the following nondiscrimination or non segregation clauses:

1.    In deeds: "The grantee herein covenants by and for himself, his heirs, executors, administrators and assigns, and all persons claiming under or through them, that there shall be no discrimination against or segregation of, any person or group of persons on account of any basis listed in subdivision (a) or (d) of Section 12955 of the California Government Code, as those bases are defined in Sections 12926, 12926.1, subdivision (m) and paragraph (1) of subdivision (p) of Section 12955, and Section 12955.2 of the California Government Code, in the sale, lease, sublease, transfer, use, occupancy, tenure or enjoyment of the land herein conveyed, nor shall the grantee himself or any person claiming under or through him, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, subtenants,

EXHIBIT B
PAGE 119

subleases or vendors in the land herein conveyed.  The foregoing covenants shall run with the land.

Notwithstanding the immediately preceding paragraph, with respect to familial status, said paragraph shall not be construed to apply to housing for older persons, as defined in Section 12955.9 of the California Government Code.  With respect to familial status, nothing in said paragraph shall be construed to affect Sections 51.2, 51.3, 51.4, 51.10, 51.11, and 799.5 of the California Civil Code, relating to housing for senior citizens.  Subdivision (d) of Section 51 and Section 1360 of the California Civil Code and subdivisions (n), (o) and (p) of Section 12955 of the California Government Code shall apply to said paragraph."

2.    In leases:  "The lessee herein covenants, by and for himself or herself, his or her heirs, executors, administrators and assigns, and all persons claiming under or through him or her, and this lease is made and accepted upon and subject to the following conditions:

(a)    "That there shall be no discrimination against or segregation of any person or group of persons on account of any basis listed in subdivision (a) or (d) of Section 12955 of the Government Code, as those bases are defined in Sections 12926, 12926.1, subdivision (m) and paragraph (1) of subdivision (p) of Section 12955, and Section 12955.2 of the Government Code, in the leasing, subleasing, transferring, use, occupancy, tenure or enjoyment of the land herein leased, nor shall the lessee, himself or herself or any person claiming under or through him or her, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, subleases, subtenants or vendees in the land herein leased."

(b)    Notwithstanding paragraph (a), with respect to familial status, paragraph (a) shall not be construed to apply to housing for older persons, as defined in Section 12955.9 of the Government Code.  With respect to familial status, nothing in paragraph (a) shall be construed to affect Sections 51.2, 51.3, 51.4, 51.10, 51.11 and 799.5 of the Civil Code, relating to housing for senior citizens.  Subdivisions (d) of Section 51 and Section 1360 of the Civil Code and subdivision (n), (o), and (p) of Section 12955 of the Government Code shall apply to paragraph (a).

3.    In contracts relating to the sale or transfer of the Project, or any interest therein:  "There shall be no discrimination against or segregation of any person or group of persons on account of any basis listed in subdivision (a) or (d) of Section 12955 of the California Government Code, as those bases are defined in Sections 12926, 12926.1, subdivision (m) and paragraph (1) of subdivision (p) of Section 12955, and Section 12955.2 of the California Government Code, in the sale, lease, sublease, transfer, use, occupancy, tenure or enjoyment of the land, nor shall the transferee himself or any person claiming under or through him, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy, of tenants, lessees, subtenants, sublessees or vendees of the land.

EXHIBIT B
PAGE 120

11225-0001\1291351v5.doc

Notwithstanding the immediately preceding paragraph, with respect to familial status, said paragraph shall not be construed to apply to housing for older persons, as defined in Section 12955.9 of the California Government Code. With respect to familial status, nothing in said paragraph shall be construed to affect Sections 51.2, 51.3, 51.4, 51.10, 51.11, and 799.5 of the California Civil Code, relating to housing for senior citizens. Subdivision (d) of Section 51 and Section 1360 of the California Civil Code and subdivisions (n), (o) and (p) of Section 12955 of the California Government Code shall apply to said paragraph."

7.    EVENTS OF DEFAULT, REMEDIES AND TERMINATION.

7.1    Defaults - Definition. The occurrence of any or all of the following after the Close of Escrow shall constitute a default ("Default") under this Agreement:

7.1.1    Developer's failure to perform its obligations on a timely basis as contained in the Schedule of Performance (subject to Section 7.7 below) and, if the failure is curable within thirty (30) days after notice, then failure to cure or remedy such failure within thirty (30) days after the Agency has given written notice to Developer;

7.1.2    Any breach of this Agreement by any Party consisting solely of the payment of money, and the continuance of such breach for a period of ten (10) days after the non-defaulting Party has given written notice to the defaulting Party;

7.1.3    Except as otherwise provided in Section 7.1.1 above, a breach of any other term of this Agreement by any Party in any material respect not consisting solely of the payment of money and failure of such Party to cure such breach within thirty (30) days after the non defaulting Party has given written notice to the defaulting Party; provided, however, if such breach is not reasonably curable within such thirty (30) day period, then such Party shall be deemed in Default only if such Party does not commence to cure such breach within such thirty (30) day period and thereafter fails to diligently prosecute such breach to completion;

7.1.4    Any violation of Article 5 of this Agreement.

7.1.5    Filing of a petition in bankruptcy by or against any Party or appointment of a receiver or trustee of any property of any Party, or an assignment by any Party for the benefit of creditors, or adjudication that such Party is insolvent by a court, and in the case of a filing against a Partner, the failure of such Party to cause the applicable petition, appointment, or assignment to be removed or discharged within one hundred and twenty (120) days.

7.2    Remedies. Upon the occurrence of a Default by a Party, the non-defaulting Party may terminate this Agreement and shall also have all rights and remedies, including damages and specific performance, as may be available at law or in equity (except that upon a Default by a Party, the other Party shall be excused from continued performance), except that the Agency and the City shall only have the right to terminate this Agreement in the event of a Default by Developer.

7.3    No Speculation. The rights established in Article 5 and this Article are to be interpreted in light of the fact that the Agency will convey the Land to Developer for

redevelopment and not for speculation in undeveloped land or for speculation based directly or indirectly, in whole or in part, on the Agency's or City's obligations under Article 4 hereof.

7.4     No Personal Liability.  No representative, agent, attorney, consultant, or employee of the Agency shall personally be liable to the Developer or any successor in interest of Developer, in the event of any Default or breach by the Agency, or for any amount which may become due to Developer or any successor in interest, on any obligation under the terms of this Agreement.

7.5     Rights and Remedies are Cumulative.  The rights and remedies of the parties are cumulative, and the exercise by either party of one or more of such rights or remedies shall not preclude the exercise by it, at the same time or different times, of any other rights or remedies for the same default or any other default by the non defaulting Party; provided, however, that liquidated damages specified herein shall constitute the sole damages recoverable for the default giving rise to such liquidated damages.

7.6     Inaction Not a Waiver of Default.  Any failures or delays by either Party in asserting any of its rights and remedies as to any default shall not operate as a waiver of any default or of any such rights or remedies, or deprive either such Party of its rights to institute and maintain any actions or proceedings which it may deem necessary to protect, assert or enforce any such rights or remedies.  The acceptance by a Party of less than the full amount due from the other party shall not constitute a waiver of such Party's right to demand and receive the full amount due, unless such Party executes a specific accord and satisfaction.

7.7     Force Majeure.  Following the Close of Escrow, and notwithstanding anything to the contrary in this Agreement, nonperformance shall be excused when performance is prevented or delayed by reason of any of the following forces reasonably beyond the reasonable control of such party (a "Force Majeure Delay"): (i) failure to perform by Developer attributable to any strike, lockout or other labor disturbance (whether or not on the part of the employees of either party hereto), civil disturbance, future order claiming jurisdiction, act of the public enemy, war, riot, sabotage, blockade, embargo, inability to secure customary materials, supplies or labor through ordinary sources, regulation or order of any government or regulatory body, or any other cause beyond the reasonable control of the party from whom performance is required; (ii) delay attributable to severe weather, lightning, earthquake, fire, storm, hurricane, tornado, flood, washout, explosion, or any other similar cause beyond the reasonable control of the party from whom performance is required, or any of its contractors or other representatives, or (iii) litigation instituted or joined by a party (other than the Developer or any person or entity affiliated with the Developer) attacking the enforceability of this Agreement.  Any prevention, delay or stoppage due to any Force Majeure Delay shall excuse the performance of the party affected for a period of time equal to any such prevention, delay or stoppage (except the obligations of either party to pay money to the other party or to close escrow) provided that the Party claiming the Force Majeure Delay notifies the other Party of the Force Majeure Delay within a reasonable time (not to exceed ten (10) business days) after the commencement of the Force Majeure Delay; and provided, further, that if notice is not given within such ten (10) business day period, the extension of time shall not begin until the date on which written notice of the Force Majeure Delay is given by the Party claiming the Force Majeure Delay to the other Party.

23

1125-0001\1201351v5.doc

8.    INSURANCE; INDEMNITY.

8.1    Insurance.

8.1.1    From and after the Close of Escrow, Developer shall obtain and maintain at no cost or expense to the Agency, with an insurance company reasonably acceptable to the Agency, (i) property insurance for the Improvements in an amount not less than the replacement cost of the Improvements (subject to a deductible not to exceed $10,000) with an inflation rider; (ii) general liability insurance, insuring against claims and liability for bodily injury and property damage arising from the construction, use, occupancy, condition, or operation of the Land, which liability insurance shall provide combined single limit protection of at least $5,000,000 and shall include contractual liability coverage and products and completed operations coverage, and (iii) commercial automobile liability insurance of at least $1,000,000 combined single limit.. Such liability insurance policies shall name the City and the Agency and their council members, board members, officers, agents and employees as additional insureds.

8.1.2    Developer shall obtain and maintain in force until completion of the Improvements (i) "all risk" builder's risk insurance, including coverage for vandalism and malicious mischief, in a form and amount and with a company reasonably acceptable to the Agency, and (ii) workers' compensation insurance covering all persons employed by Developer in connection with work on the Project, or any portion thereof.  During the construction of Improvements by Developer, such builder's risk insurance shall cover improvements in place and all material and equipment at the job site furnished under contract, but shall exclude contractors', subcontractors', and construction managers' tools and equipment and property owned by contractors' and subcontractors' employees.

8.1.3    Developer shall also furnish or cause to be furnished to the Agency evidence satisfactory to the Agency that any contractor with whom it has contracted for the performance of work or otherwise pursuant to this Agreement carries workers' compensation insurance as required by law.

8.1.4    With respect to each policy of insurance required above, Developer and each of Developer's general contractors shall furnish to the Agency a certificate on the insurance carrier's form setting forth the general provisions of the insurance coverage promptly after written request by Agency showing the additional insureds.  The certificate shall also be furnished by Developer prior to commencement of construction of any Improvements.

8.1.5    All such policies required by this Section shall contain (i) language to the effect that the policies cannot be cancelled or materially changed except after thirty (30) days' written notice by the insurer to the Agency; (ii) a waiver of the insurer of all rights of subrogation against the Agency and the other additional insureds; and (iii) an endorsement that said policy is primary and non-contributory.  All such insurance shall have deductibles that do not exceed $10,000.

8.2    Indemnity.  From and after the execution of this Agreement, Developer hereby agrees to indemnify, defend, protect, and hold harmless the Agency and any and all agents, employees, representatives, council members, board members, consultants, and offices of

11225-0001\1291351v5.doc

the Agency, from and against all losses, liabilities, claims, damages (including forseeable and unforeseeable consequential damages and punitive damages), penalties, fines, forfeitures, costs and expenses (including all reasonable out of pocket litigation costs and reasonable attorneys' fees) and demands of any nature whatsoever, related directly or indirectly to, arising out of or resulting from:

(i)    any negligence or willful misconduct on the part of Developer or its employees or agents in connection with the development and construction by Developer of the Improvements or the use, ownership, management, occupancy, or possession of the Land or adjacent land during Developer's period of ownership thereof, or

(ii)    any Default by Developer hereunder (subject to any liquidated damages provisions otherwise contained in this Agreement), or

(iii)    any claim that this Agreement is invalid, in whole or in part under or based on any provision of the California Redevelopment Law; or

(iv)    any of Developer's activities (or the activities of Developer's agents, employees, lessees, representatives, licensees, guests, invitees, contractors, or subcontractors), whether or not negligent;

except to the extent such losses or liabilities are not caused by item (iii) above and are caused by willful and unlawful conduct of the Agency that is not contributed to in any way by Developer, any affiliate of Developer, any of their employees, agents or contractors, or Donald Chae or Min Chae. The Agency may in its discretion, and at its own cost, participate in the defense of any legal action naming the Agency. The provisions of this Section shall survive the Close of Escrow or the termination of this Agreement, as applicable.

9.    REPRESENTATIONS AND WARRANTIES.

9.1    Developer Representations. Developer represents and warrants to the Agency as of the date of this Agreement and as of the Close of Escrow, except as otherwise noted, that:

(i)    Developer is a limited liability company validly existing and in good standing under the laws of the State of California.

(ii)    Developer has the authority to execute this Agreement (and the documents contemplated by this Agreement) on behalf of The Source at Beach, LLC.

(iii)    As of the Close of Escrow, Developer currently owns the Phase I Land, except for the portion described on Exhibit "A-1" described as not being currently owned by Developer.

(iv)    Developer's execution and performance of this Agreement and the closing documents will not violate any provision of the organizational documents of

Developer or any deed of trust, lease, contract, agreement, instrument, order, judgment or decree by which Developer is bound.

    (v)  The Developer has not engaged a broker with respect to the purchase of the Agency Land to Developer.

   9.2  <u>Agency Representations</u>.  The Agency hereby represents and warrants to the Developer that the Agency has not engaged a broker with respect to the sale of the Agency Land to Developer.

   10.  <u>GENERAL PROVISIONS.</u>

   10.1  <u>Notices</u>.  All notices and demands shall be given in writing by certified mail, postage prepaid, and return receipt requested, or by reputable overnight company.  Notices shall be considered given upon one business day following deposit or delivery with a nationally recognized overnight courier delivery charges prepaid, or on the date of delivery (or refusal to accept delivery) shown on the return receipt (as applicable).  Notices shall be addressed as provided below for the respective Party; provided that if any Party gives notice in writing of a change of name or address, notices to such Party shall thereafter be given as demanded in that notice:

| The Agency: | Community Redevelopment Agency of the City of Buena Park |
| | 6650 Beach Boulevard |
| | Buena Park, California 90621 |
| | Attn:  Executive Director |
| | |
| Developer: | The Source at Beach, LLC |
| | 3100 E. Imperial Highway |
| | Lynwood, California 90262 |
| | Attn:  Min Chae and Donald Chae |
| | |
| With a copy to: | Lim, Ruger & Kim, LLP |
| | 1055 West Seventh Street |
| | Los Angeles, California 90017 |
| | Attn:  Real Estate Department |

   10.2  <u>Construction</u>.  The Parties agree that each Party and its counsel have reviewed and revised this Agreement and that any rule of construction to the effect that ambiguities are to be resolved against the drafting Party shall not apply in the interpretation of this Agreement or any amendments or exhibits thereto.  This Agreement shall be construed as a whole according to its fair language and common meaning to achieve the objectives and purposes of the Parties.

   10.3  <u>Interpretation</u>.  In this Agreement the neuter gender includes the feminine and masculine, and singular number includes the plural, and the words "person" and "party" include corporation, partnership, firm, trust, or association where ever the context so requires.  Unless otherwise required by a specific provision of this Agreement, time hereunder is to be computed by excluding the first day and including the last day.  If the date for performance falls

EXHIBIT B
PAGE 125

on a Saturday, Sunday, or legal holiday, the date for performance shall be extended to the next business day. All references in this Agreement to a number of days in which either party shall have to consent approve or perform shall mean calendar days unless specifically stated to be business days.

> 10.4    Time of the Essence. Time is of the essence of this Agreement.

> 10.5    Warranty Against Payment of Consideration for Agreement. Developer warrants that it has not paid or given, and will not pay or give, to any third person, any money or other consideration for obtaining this Agreement, other than normal costs of conducting business and costs of professional services such as architects, engineers and attorneys.

> 10.6    Attorneys' Fees. If any Party brings an action to enforce the terms hereof or declare its rights hereunder, the prevailing Party in any such action shall be entitled to its reasonable attorneys' fees to be paid by the losing Party as fixed by the court.

> 10.7    Entire Agreement, Waivers and Amendments. This Agreement, together with all attachments and exhibits hereto, and all agreements executed pursuant hereto, constitutes the entire understanding and agreement of the Parties. This Agreement integrates all of the terms and conditions mentioned herein or incidental hereto, and supersedes all negotiations or previous agreements between the Parties with respect to the subject matter hereof. No subsequent agreement, representation or promise made by either Party hereto, or by or to any employee, officer, agent or representative of either Party, shall be of any effect unless it is in writing and executed by the Party to be bound thereby. No person is authorized to make, and by execution hereof Developer and the Agency acknowledge that no person has made, any representation, warranty, guaranty or promise except as expressly set forth herein; and no agreement, statement, representation or promise made by any such person which is not contained herein shall be valid or binding on Developer or the Agency. Notwithstanding the foregoing, this Agreement does not supersede or in any way diminish Developer's rights under the Development Agreement.

> 10.8    Severability. Each and every provision of this Agreement is, and shall be construed to be, a separate and independent covenant and agreement. If any term or provision of this Agreement or the application thereof shall to any extent be held to be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to circumstances other than those to which it is invalid or unenforceable, shall not be affected hereby, and each term and provision of this Agreement shall be valid and shall be enforced to the extent permitted by law, but shall be subject to modification if necessary to prevent the unenforceability of any provision to create an inequitable result.

> 10.9    Headings. All section headings and subheadings are inserted for convenience only and shall have no effect on the construction or interpretation of this Agreement.

> 10.10   No Third Party Beneficiaries. This Agreement is made and entered into for the sole protection and benefit of the Parties and their successors and assigns. No other person shall have any right of action based upon any provision of this Agreement.

11225-0001\1291351v5.doc

10.11  Governing Law; Jurisdiction: Service of Process.  This Agreement and the rights of the Parties shall be governed by California law.  The Parties consent to the exclusive jurisdiction of the California Superior Court for the County of Orange and the United States District Court for the Central District of California.  If any legal action is commenced by Developer against the Agency, service of process on the Agency shall be made by personal service upon the Executive Director or Secretary of the Agency, or in such other manner as may be provided by law.  If any legal action is commenced by Developer against the City, service of process on the Agency shall be made by personal service upon the City Clerk, or in such other manner as may be provided by law.  If any legal action is commenced by Agency against Developer, service of process on Developer shall be made by personal service on Donald Chae at the Developer's address for notices, or in such other manner as may be provided by law.  Developer agrees, for the benefit of the Agency, that it shall designate an agent for service of process in the State of California in the manner prescribed by law.

10.12  Assignability.  Except as otherwise expressly provided in Article 5, Developer may not assign, transfer or convey its rights and obligations under this Agreement without the prior written consent of the Agency, which Agency may withhold as provided in Article 5.

10.13  Survival.  The provisions hereof shall not merge into, but rather shall survive, any conveyance hereunder (including, without limitation, the delivery and recordation of the Grant Deed) and the delivery of all consideration.

10.14  Estoppel Certificates.  Upon written request of Developer, the Agency shall within thirty (30) days of the date of such request, execute and deliver to Developer a written statement certifying, to the Agency's actual knowledge, that (a) this Agreement in full force and effect, if such is the case, and has not been modified or amended, except as shall be stated; and (b) that no default by Developer exists under this Agreement.

10.15  Agency Actions.  In addition to provisions of this Agreement that give the Executive Director or its designee the authority to make decisions and grant approvals, the Agency hereby authorizes the Executive Director or its designee to (i) deliver such approvals and consents as are contemplated by this Agreement provided they are in writing and signed by the Executive Director; (ii) grant limited extensions of time for good cause, not to exceed ninety (90) days with respect to any particular deadline, provided the extension is in writing; and (iii) enter into written amendments to this DDA necessary or convenient to effectuate the intent hereof, provided they do not include a material change to any economic term (unless the change clearly benefits the Agency).

10.16  Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed as original but all of which together shall constitute one and the same instrument.

EXHIBIT B
PAGE 127

IN WITNESS WHEREOF, the Parties hereto have entered into this Agreement as of the day and year first above written.

**DEVELOPER:**

THE SOURCE AT BEACH, LLC,
a California limited liability company

    By:  DMC Investment Holdings, LLC,
          a Delaware limited liability company,
          sole member

    By:  _____
          Donald Chae,
          Manager

    By:  _____
          Min Chae,
          Manager

**AGENCY:**

COMMUNITY REDEVELOPMENT
AGENCY OF THE CITY OF BUENA PARK,
a public body, corporate and politic

By: _____
Print Name: _RICH HARSINSKI_
Title: _CITY MANAGER / EXECUTIVE DIRECTOR_

ATTEST:

_____

**APPROVED AS TO FORM:**

By: _____
    James Markman, Counsel to Agency

29

EXHIBIT B
PAGE 128

IN WITNESS WHEREOF, the Parties hereto have entered into this Agreement as of the day and year first above written.

**DEVELOPER:**

THE SOURCE AT BEACH, LLC,
a California limited liability company

    By:  DMC Investment Holdings, LLC,
          a Delaware limited liability company,
          sole member

        By: _____
             Donald Chae,
             Manager

        By: _____
             Min Chae,
             Manager

**AGENCY:**

COMMUNITY REDEVELOPMENT
AGENCY OF THE CITY OF BUENA PARK,
a public body, corporate and politic

By: _____
Print Name: _RICK WARSINSKI_
Title: _____CITY MANAGER/_
              _EXECUTIVE_

ATTEST:

_____

**APPROVED AS TO FORM:**

By: _____
     James Markman, Counsel to Agency

EXHIBIT B
PAGE 129

## EXHIBIT "A"

### LEGAL DESCRIPTION OF "AGENCY LAND"

1.  THE WEST 250.00 FEET OF THE SOUTH 259.21 FEET OF LOT 2 IN BLOCK 61 OF BUENA PARK, IN THE CITY OF BUENA PARK, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 18, PAGE(S) 50, 51 AND 52, OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

    EXCEPTING THEREFROM THE SOUTH 170.00 FEET THEREOF.

2.  THE NORTHERLY 70.00 FEET OF THE SOUTHERLY 170.00 FEET OF THE WESTERLY 200 FEET OF LOT 2, BLOCK 61 OF BUENA PARK, AS SHOWN ON A MAP RECORDED IN BOOK 18, PAGE 50 OF MISCELLANEOUS RECORDS OF LOS ANGELES COUNTY, CALIFORNIA.

    EXCEPTING THEREFROM ALL WATER RIGHTS, CLAIMS OR TITLE TO WATER, WHETHER OR NOT SHOWN BY PUBLIC RECORDS.

3.  THE EAST 20 FEET OF THE WEST 176 FEET OF THE SOUTH 100 FEET OF LOT 2 IN BLOCK 61 OF BUENA PARK, IN THE CITY OF BUENA PARK COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A MAP RECORDED IN BOOK 18, PAGES 50, 51 AND 52 OF MISCELLANEOUS RECORDS OF LOS ANGELES COUNTY, CALIFORNIA.

## EXHIBIT "A-1"

### LEGAL DESCRIPTION OF REMAINDER OF LAND
### FOR PHASE I OF PROJECT

A.    LAND TO BE ACQUIRED BY DEVELOPER FROM PERSONS/ENTITIES OTHER THAN THE AGENCY:

6911 and 6941 Brenner Avenue; 7851 and 7751 Orangethorpe

B.    PHASE I LAND CURRENTLY OWNED BY DEVELOPER:

1.    #6890 Beach Blvd

THAT PORTION OF LOT 2 IN BLOCK 61 OF "BUENA PARK", IN THE CITY OF BUENA PARK, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 18 PAGE 50 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:
BEGINNING AT THE NORTHWEST CORNER OF SAID LOT 2, SAID POINT BEING IN THE EAST LINE OF GRAND A VENUE (BEING 108 FEET WIDE); AND RUNNING THENCE EASTERLY ALONG THE NORTH LINE OF SAID LOT 2,225 FEET; THENCE SOUTHERLY ALONG A LINE PARALLEL TO THE EAST LINE OF SAID GRAND AVENUE, 140 FEET; THENCE WESTERLY ALONG A LINE PARALLEL TO SAID NORTHERLY LINE 225 FEET; THENCE NORTHERLY ALONG THE EAST LINE OF GRAND AVENUE, 140 FEET TO THE POINT OF BEGINNING, TOGETHER WITH THE SOUTH 30 FEET OF THE WEST 225 FEET OF STREET ADJOINING ON THE NORTH ABANDONED BY ORDER OF THE BOARD OF SUPERVISORS OF ORANGE COUNTY, CALIFORNIA, AUGUST 2, 1911, ADJOINING SAID LOT 2.

2.    #6940 Beach Blvd, #6951 Brenner Ave, #6961 Brenner Ave, #6971 Brenner Ave

LOT 2 IN BLOCK 61 OF BUENA PARK, IN THE CITY OF BUENA PARK, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 18 PAGES 50 TO 52 INCLUSIVE OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, CALIFORNIA, TOGETHER WITH THE SOUTH 30 FEET OF THE STREET ADJOINING SAID LOT ON THE NORTH ABANDONED BY ORDER OF THE BOARD OF SUPERVISORS OF ORANGE COUNTY, ON AUGUST 2, 1911.
EXCEPT THEREFROM THE EASTERLY 65 FEET OF THE SOUTHERLY 120 FEET THEREOF.
ALSO EXCEPT THEREFROM THAT PORTION DESCRIBED AS FOLLOWS:
BEGINNING AT THE NORTHEAST CORNER OF SAID LOT 2, SAID POINT BEING IN THE EAST LINE OF BEACH BOULEVARD (FORMERLY GRANT AVENUE) 108 FEET IN WIDTH AND RUNNING; THENCE NORTHERLY ALONG

EXHIBIT B
PAGE 131

SAID EAST LINE, 30 FEET TO THE NORTH LINE OF THE SOUTH 30 FEET OF THE ABANDONED STREET HEREINBEFORE MENTIONED; THENCE EASTERLY ALONG SAID NORTH LINE 225 FEET; THENCE SOUTHERLY PARALLEL WITH THE EAST LINE OF BEACH BOULEVARD 170 FEET; THENCE WESTERLY PARALLEL WITH THE NORTH LINE OF SAID LOT 2, A DISTANCE OF 225 FEET TO THE EAST LINE OF BEACH BOULEVARD; THENCE NORTHERLY ALONG SAID EAST LINE, 140 FEET TO THE POINT OF BEGINNING.

ALSO EXCEPT THEREFROM THE WEST 250 FEET OF THE SOUTH 259.21 FEET TO LOT 2 IN BLOCK 61 OF BUENA PARK, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A MAP RECORDED IN BOOK 18 PAGES 50 TO 52 INCLUSIVE OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCELB:
LOTS 7, 8 AND 9 OF TRACT NO.1756, IN THE CITY OF BUENA PARK, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A MAP RECORDED IN BOOK 60, PAGES 20 AND 21 OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

3.     #6931 Brenner Ave

LOT 4 AND THE SOUTH 5 FEET OF LOT 3, TRACT 1756, CITY OF BUENA PARK, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 60, PAGES 20 AND 21 OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

4.     #6945 Brenner Ave

LOT 6 OF TRACT NO.1766, IN THE CITY OF BUENA PARK, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A MAP RECORDED IN BOOK 60, PAGES 20 AND 21 OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

5.     #7801 Orangethorpe Ave

PARCEL 1:
THE WEST 250 FEET OF THE SOUTH 170.00 FEET OF LOT 2 IN BLOCK 61 OF BUENA PARK, IN THE CITY OF BUENA PARK, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A MAP THEREOF RECORDED IN BOOK 18, P AGE(S) 50 TO 52 INCLUSSIVE, MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF LOS ANGELES COUNTY, CALIFORNIA.
EXCEPT THEREFROM THE NORTH 70.00 FEET OF THE WEST 200.00 FEET THEREOF.  ALSO EXCEPT THEREFROM THE SOUTH 100.00 FEET OF THE WEST 156.00 FEET THEREOF.

EXHIBIT B
PAGE 132

ALSO EXCEPT THEREFROM THE EAST 20.00 FEET OF THE WEST 176.00 FEET OF THE SOUTH 100.00 FEET THEREOF.

PARCEL 2:

A NON-EXCLUSIVE EASEMENT FOR INGRESS AND EGRESS AND VEHICULAR TRAFFIC OVER THE EAST 20.00 FEET OF THE WEST 176.00 FEET OF THE SOUTH 100.00 FEET OF LOT 2 IN BLOCK 61 OF BUENA PARK, IN THE CITY OF BUENA PARK, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A MAP THEREOF RECORDED IN BOOK 18, PAGE 50, MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF LOS ANGELES COUNTY, CALIFORNIA.

A.    #6911 Brenner Ave

LOT 3 OF TRACT NO.1756, IN THE CITY OF BUENA PARK., COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 60 P AGE(S) 20 AND 21 OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

B.    #6941 Brenner Ave

LOT 5 OF TRACT NO.1756 AS PER MAP RECORDED IN BOOK 60 PAGES 20 AND 21 OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID ORANGE COUNTY, CALIFORNIA.

COMMONLY KNOWN AS: 6941 BRENNER AVENUE, BUENA PARK, CA 90621

C.    #7851 Orangethorpe Ave

ALL THAT CERTAIN LAND SITUATED IN THE BUENA PARK SANITARY DISTRICT, COUNTY OF ORANGE, STATE OF CALIFORNIA, DESCRIBED AS FOLLOWS, TO WIT:

THE EASTERLY 65 FEET OF THE SOUTHERLY 120 FEET OF LOT TWO (2) IN BLOCK SIXTY -ONE (61) OF "BUENA PARK". AS SHOWN ON A MAP RECORDED IN BOOK 18, PAGE 50 OF MISCELLANEOUS RECORDS OF LOS ANGELES COUNTY, CALIFORNIA.

SAID LAND IS SHOWN ON A LICENSED SURVEYOR'S MAP FILLED IN BOOK 15, PAGE 27 OF RECORDS OF SURVEYS IN THE OFFICE OF THE COUNTY RECORDER OF ORANGE COUNTY, CALIFORNIA.

EXCEPTING THEREFROM THE NORTHERLY 20.00 FEET OF THE SOUTHERLY 30.00 FEET OF THE EASTERLY 65 FEET OF THE SOUTHERLY 120 FEET OF LOT 2 IN BLOCK 610F BUENA PARK AS SHOWN ON A MAP THEREOF RECORDED IN BOOK 18, PAGE 50, MISCELLANEOUS RECORDS OF LOS ANGELES COUNTY, CALIFORNIA.

D.    #7751 Orangethorpe Ave

THE SOUTH 100 FEET OF THE WEST 156 FEET OF LOT 2 IN BLOCK 61 OF
BUENA PARK, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP
RECORDED IN BOOK 18, PAGES 50, 51 AND 52 OF MISCELLANEOUS MAPS, IN
THE OFFICE OF THE COUNTY RECORDER OF SAID ORANGE COUNTY.  ALSO
KNOWN AS: 7751 ORANGETHROP AVENUE, BUENA PARK, CA 90621

**EXHIBIT "A-2"**

DESCRIPTION OF PHASE II AND PHASE III LAND

All land subject to the Specific Plan except the land described in Exhibit "A" and Exhibit "A-1".

## EXHIBIT "B"

### SCHEDULE OF PERFORMANCE

| PERFORMANCE | SCHEDULE |
|---|---|
| **Items 1 – 9:  Prior to the Close of Escrow (these do not cover all conditions to closing)** | |
| 1.  Opening of Escrow. The Parties shall open escrow for the conveyance of title to the site by the Agency to Developer. | Within five (5) business days after the execution and delivery of the DDA. |
| 2.  Insurance.  Developer shall submit evidence of insurance to the Agency. | Prior to the Close of Escrow. |
| 3.  Evidence of Financing.  Developer submits evidence of financing or funding for Phase I of the Project to the Agency (which must "close" concurrently with the Close of Escrow). | Prior to the Close of Escrow. |
| 4.  Project Plans and Budget.  Developer shall submit preliminary conceptual plans and project budget for Phase I for Agency approval. | Completed. |
| 5.  Approval of Project Plans.  The Agency shall issue approval of preliminary conceptual plans and preliminary Project budget. | Approved. |
| 6.  Entitlements; Plan Review.  Developer shall submit to the City and obtain approval of revised plans for Phase I and obtain all other governmental approvals and permits necessary for the development of Phase I (excluding certificates of occupancy) other than interior tenant improvements that are to be completed by space tenants. | As a condition to Close of Escrow; on or before June 30, 2012 |
| 7.  Phase I Building Permits.  Developer shall obtain the Building Permit(s) for the construction of the Phase I of the Project. | By June 30, 2012. |
| 8.  Phase I Construction Contract.  Developer shall submit the construction contract(s) for the construction of Phase I to the Agency for approval. | By June 30, 2012. |

| PERFORMANCE | SCHEDULE |
|---|---|
| 9. **Conveyance of Title/Close of Escrow.** Subject to the satisfaction of the conditions to closing, Developer shall purchase the Land from the Agency and the Agency shall convey title to Developer and close escrow. | Upon satisfaction of all conditions precedent and Developer's request; provided that if the conditions precedent are not satisfied by June 30, 2012, then the party benefitted by the applicable unsatisfied condition may terminate this Agreement (provided the terminating party is not then in material default). |
| 10. **Phase I Construction.** Developer shall commence construction of Phase I Improvements. | Within 30 days after Close of Escrow. |
| 11. **Phase I Completion.** Developer shall complete construction of Phase I Improvements. | Within two (2) calendar years after Close of Escrow. |

11225-0001\1291351v5.doc

## EXHIBIT "C"

## SCOPE OF DEVELOPMENT

The parties acknowledge that the cost estimates and the feasibility analysis are based on a level of quality, public amenities and architectural details comparable to Santana Row in San Jose, California, which the parties agree will serve as the benchmark of quality, public amenities and architectural details for the upscale lifestyle center contemplated in this Agreement. (The current concept plan contains elements found at Santana Row regarding pedestrian amenities, open space, and retail spaces.) See the examples on page C-2 attached hereto.

## PHASE I

Phase I will consist of approximately 428,000 usable square feet of retail space, including a movie theatre, a spa, entertainment uses and retail stores and required parking as shown on the conceptual plans attached hereto as pages C-3 through C-9.

The retail improvements will be built in a number of two- and three-story buildings, with a movie theatre to be located in the largest such building, near the corner of West Orangethorpe Avenue and Brenner Avenue.  A parking structure shall be built near the corner of Brenner Avenue and Melrose Street.

## PHASE II

Phase II will consist of approximately 193,000 rentable square feet of office space and required parking.

The office improvements will be located in a single, multi-story building near the corner of Beach Boulevard and West Orangethorpe Avenue, which will feature ground floor retail above a parking structure.

## PHASE III

Phase III will consist of a Mobil 3-5 star voted or AAA 3-5 diamond voted full service hotel, and all required parking.

The hotel, which is to be located near the corner of Beach Boulevard, and Melrose Street, is anticipated to be the tallest building in the Project.  The hotel structure will include ground floor retail above a parking structure.

## [NEED TO ATTACH PAGES C-2 THROUGH C-9]

**NOTE:**  The work required under this Agreement does not include interior improvements that are to be completed by space tenants.













Santana Row
San Jose CA

Exhibit C-2



Exhibit C-3



Exhibit C-4

Phase 2 & Phase 3



PARKING

Exhibit C-5

FLOOR PLAN: LEVEL B1

buena park/ THE SOURCE
June 22, 2010



Exhibit C-6

FLOOR PLAN: LEVEL L1

buena park/THE SOURCE
June 22, 2010



FLOOR PLAN: LEVEL L2

buena park/
june 22, 2010

Exhibit C-7



FLOOR PLAN: LEVEL L3

buena park/THE SQUARE
june 22, 2010

Exhibit C-8



Exhibit C-9

## EXHIBIT "D"

### FORM OF GRANT DEED

Recording Requested by, and when recorded return to
(and mail tax statements to):

Community Redevelopment Agency of the City of Buena Park
6650 Beach Boulevard
Buena Park, California 90621
Attn: Executive Director

Assessor's Parcel Map Number: 276-361-04; and 276-361-05

Exempt from Recording Fees Pursuant to
Government Code Section 27383 _____

### GRANT DEED

The undersigned grantor(s) declare(s):

Documentary transfer tax is $0.00; conveyance for no consideration; fair re-use value is zero.

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, the COMMUNITY REDEVELOPMENT AGENCY OF THE CITY OF BUENA PARK, a public body, corporate and politic ("Grantor") hereby GRANTS to _____, a _____ ("Grantee") the following described real property (the "Land") located in the City of Buena Park, County of Los Angeles, State of California:

1.  THE WEST 250.00 FEET OF THE SOUTH 259.21 FEET OF LOT 2 IN BLOCK 61 OF BUENA PARK, IN THE CITY OF BUENA PARK, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 18, PAGE(S) 50, 51 AND 52, OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

    EXCEPTING THEREFROM THE SOUTH 170.00 FEET THEREOF.

2.  THE NORTHERLY 70.00 FEET OF THE SOUTHERLY 170.00 FEET OF THE WESTERLY 200 FEET OF LOT 2, BLOCK 61 OF BUENA PARK, AS SHOWN ON A MAP RECORDED IN BOOK 18, PAGE 50 OF MISCELLANEOUS RECORDS OF LOS ANGELES COUNTY, CALIFORNIA.

    EXCEPTING THEREFROM ALL WATER RIGHTS, CLAIMS OR TITLE TO WATER, WHETHER OR NOT SHOWN BY PUBLIC RECORDS.

SUBJECT TO, all easements, covenants, conditions, restrictions, and rights of way of record.

EXHIBIT B
PAGE 147

11226.0001\129135[v5.doc]

1.      This Grant of the Land is subject to (i) the redevelopment plan for the Buena Park Central Business District Redevelopment Project Area (as amended from time to time, the "Redevelopment Plan") and (ii) a Disposition and Development Agreement entered into by and between Grantor and The Source at Beach, LLC dated as of _____, 2010 (the "Agreement"), the terms of which are hereby incorporated herein by reference.

2.      The Grantee covenants by and for itself, its representatives, its successors and assigns and every successor in interest to the Land or any part thereof, that during construction of improvements and thereafter the Land shall not be used or sold in violation of the Redevelopment Plan, and that Grantee and its successors and assigns shall comply with all applicable terms of the Agreement.

3.      By acceptance hereof, Grantee agrees, for itself, its successors and assigns, to refrain from restricting the rental, sale or lease of the Land on the basis of race, color, creed, religion, ancestry, sex, marital status, national origin or age of any person in the sale, lease, sublease, transfer, use, occupancy, tenure or enjoyment of the Land, nor shall the Grantee itself or any persons claiming under or through it establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, subtenants, sublessees, or vendees in the Land.  The foregoing covenants shall run with the land.

All deeds or contracts entered into with respect to the sale or other transfer of the Land shall contain or be subject to substantially the following nondiscrimination or nonsegregation clauses:

(a)      In deeds: "The grantee herein covenants by and for himself or herself, his or her heirs, executors, administrators and assigns, and all persons claiming under or through them, that there shall be no discrimination against or segregation of, any person or group of persons on account of any basis listed in subdivision (a) or (d) of Section 12955 of the California Government Code, as those bases are defined in Sections 12926, 12926.1, subdivision (m) and paragraph (1) of subdivision (p) of Section 12955, and Section 12955.2 of the California Government Code, in the sale, lease, sublease, transfer, use, occupancy, tenure or enjoyment of the land herein conveyed, nor shall the grantee himself or herself, or any person claiming under or through him or her, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, subtenants, sublessees or vendees in the land herein conveyed.  The foregoing covenants shall run with the land.

Notwithstanding the immediately preceding paragraph, with respect to familial status, said paragraph shall not be construed to apply to housing for older persons, as defined in Section 12955.9 of the California Government Code.  With respect to familial status, nothing in said paragraph shall be construed to affect Sections 51.2, 51.3, 51.4, 51.10, 51.11, and 799.5 of the California Civil Code, relating to housing for senior citizens.  Subdivision (d) of Section 51 and Section 1360 of the California Civil Code and subdivisions (n), (o) and (p) of Section 12955 of the California Government Code shall apply to said paragraph."

(b)      In leases: "The lessee herein covenants by and for himself or herself, his or her heirs, executors, administrators and assigns, and all persons claiming under or through him or her, and this lease is made and accepted upon and subject to the following conditions: That there be no discrimination against or segregation of any person or group of persons, on account of any basis listed in subdivision (a) or (d) of Section 12955 of the California Government Code, as those bases are defined in Sections 12926, 12926.1, subdivision (m) and paragraph (1) of subdivision (p) of Section 12955, and Section 12955.2 of the California Government Code, in the leasing, subleasing, transferring, use or occupancy, tenure or enjoyment of the land herein leased nor shall the lessee himself or herself, or any person claiming under or through him or her, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, sublessees, subtenants or vendees in the land herein leased.

Notwithstanding the immediately preceding paragraph, with respect to familial status, said paragraph shall not be construed to apply to housing for older persons, as defined in Section 12955.9 of the California Government Code. With respect to familial status, nothing in said paragraph shall be construed to affect Sections 51.2, 51.3, 51.4, 51.10, 51.11, and 799.5 of the California Civil Code, relating to housing for senior citizens. Subdivision (d) of Section 51 and Section 1360 of the California Civil Code and subdivisions (n), (o) and (p) of Section 12955 of the California Government Code shall apply to said paragraph."

(c)      In contracts with respect to the sale or other transfer of the Land: "There shall be no discrimination against or segregation of, any person, or group of persons on account of any basis listed in subdivision (a) or (d) of Section 12955 of the California Government Code, as those bases are defined in Sections 12926, 12926.1, subdivision (m) and paragraph (1) of subdivision (p) of Section 12955, and Section 12955.2 of the California Government Code, in the sale, lease, sublease, transfer, use, occupancy, tenure or enjoyment of the land, nor shall the transferee himself or herself or any person claiming under or through him or her, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, subtenants, sublessees or vendees of the land.

Notwithstanding the immediately preceding paragraph, with respect to familial status, said paragraph shall not be construed to apply to housing for older persons, as defined in Section 12955.9 of the California Government Code. With respect to familial status, nothing in said paragraph shall be construed to affect Sections 51.2, 51.3, 51.4, 51.10, 51.11, and 799.5 of the California Civil Code, relating to housing for senior citizens. Subdivision (d) of Section 51 and Section 1360 of the California Civil Code and subdivisions (n), (o) and (p) of Section 12955 of the California Government Code shall apply to said paragraph."

The foregoing shall be a covenant running with the land for the benefit of, and as a burden upon, the Land.

EXHIBIT B
PAGE 149

4.      All covenants contained in this Grant Deed shall run with the land and shall be binding for the benefit of Grantor and its successors and assigns and such covenants shall run in favor of the Grantor and for the entire period during which the covenants shall be in force and effect, without regard to whether the Grantor is or remains an owner of any land adjacent to the Land or interest in such adjacent land or any other land.  The Grantor, in the event of any breach of any such covenants, shall have the right to exercise all of the rights and remedies available under the Agreement or at law or in equity.  The covenants contained in this Grant Deed shall be for the benefit of and shall be enforceable only by the Grantor and its successors and assigns.

IN WITNESS WHEREOF, the undersigned has executed this Grant Deed as of the date set forth below.

Dated: _____                    COMMUNITY REDEVELOPMENT
                                                   AGENCY OF THE CITY OF BUENA PARK
                                                   a public body, corporate and politic


                                                   By: _____
                                                   Print Name: _____
                                                   Title: _____



                                                   ATTEST:



                                                   _____
                                                   Secretary

11225-0001\1291351v5.doc

## EXHIBIT "E"

### LIST OF DOCUMENTS DELIVERED TO DEVELOPER

Former Franklin Motel- 6950 Beach Boulevard

- Phase I Environmental Assessment, Franklin Motel Site, prepared for the Community Redevelopment Agency of Buena Park, prepared by SCS Engineers dated June 2007, File No. 01207035.00

- Asbestos Survey for 6950 Beach Boulevard, Buena Park, California, addressed to Mr. Chris Hoang, Community Redevelopment Agency of the City of Buena Park, prepared by SCS Engineers dated June 7, 2007, File No. 1207035.00

- Soil Vapor Investigation, Franklin Motel Site, prepared for the Community Redevelopment Agency, prepared by SCS Engineers dated June 2007, File No. 1207035.01

- Final Report of Asbestos Abatement Activities, Franklin Motel, addressed to Mr. Chris Hoang, Community Redevelopment Agency of the City of Buena Park, prepared by SCS Engineers dated February 7, 2007, File No. 01207035.02

- Completion Letter for Asbestos Abatement Activities Franklin Motel, addressed to Mr. Chris Hoang, Community Redevelopment Agency of the City of Buena Park, prepared by SCS Engineers dated November 29, 2007, File No. 0120735.02

Former Buena Park Car Wash- 6976 Beach Boulevard

- No Further Action Letter, Buena Park Car Wash, addressed to Mr. Frank Tsui, Owner Buena Park Car Wash, prepared by the California Regional Water Quality Control Board Santa Ana Region dated January 17, 2008

- Phase II Investigation Report Buena Park Car Wash, prepared for the Community Redevelopment Agency of the City of Buena Park, prepared by SCS Engineers dated June 27, 2008, File No. 01208046.00

- Inspection Report for Asbestos-Containing Materials, 6976 Beach Boulevard, addressed to Mr. Chris Hoang, Community Redevelopment Agency of the City of Buena Park, prepared by SCS Engineers dated July 8, 2008, File No. 1208046.00

- Completion Letter for Asbestos Abatement Activities, 6976 Beach Boulevard, addressed to Ms. Melissa Dhauw, Community Redevelopment Agency of the City of Buena Park, prepared by SCS Engineers dated January 8, 2009, File No. 01208046.01

- Clarifier Removal Report, Former Buena Park Car Wash, prepared for the Community Redevelopment Agency of the City of Buena Park, prepared by SCS Engineers dated January 29, 2009, File No. 01208046.02

EXHIBIT B
PAGE 151

Document that included former Franklin Motel, Former Car Wash and the Valero Gas Station:

-        Vapor intrusion Health Risk Assessment for the Properties Located at 7751 Orangethorpe Avenue, 6976 Beach Boulevard and 6950 Beach Boulevard, addressed to Mr. Ruben Lopez, The Community Redevelopment Agency of the City of Buena Park, prepared by SCS Engineers dated March 20, 2009, File No. 01208173.02

Documents prepared for Valero Service Station 7751 Orangethorpe Avenue that included information on Former Franklin Motel and Former Car Wash Site:

-        Phase II Site Investigation Report Valero Service Station 7751 Orangethorpe Avenue, prepared by SCS Engineers dated February 2009, File No. 01208173.00

EXHIBIT B
PAGE 152

## TABLE OF CONTENTS

**Page**

1. DEFINITIONS ..................................................................................................... 3
   1.1    Definitions .............................................................................................. 3
2. PURCHASE AND SALE OF LAND .................................................................... 5
   2.1    Purchase and Sale of Land; Purchase Price ......................................... 5
   2.2    Opening and Closing of Escrow ............................................................ 6
   2.3    Title Exceptions .................................................................................... 6
   2.4    Conditions to Close of Escrow ............................................................. 6
   2.5    Costs; Escrow Holder Settlement Statement ........................................ 9
   2.6    Condition of the Property ...................................................................... 9
   2.7    Deposits into Escrow ............................................................................ 11
   2.8    Authorization to Record Documents and Disburse Funds .................... 12
   2.9    Escrow's Closing Actions ..................................................................... 13
   2.10   Additional Instructions ......................................................................... 13
3. DEVELOPMENT COVENANTS ......................................................................... 13
   3.1    Development of the Project ................................................................... 13
   3.2    Agency's Right to Review Plans and Specifications ............................. 14
   3.3    Construction Contract(s) ...................................................................... 14
   3.4    Construction Loan(s) ............................................................................ 14
   3.5    Costs of Entitlement, Development and Construction ........................... 14
   3.6    Rights of Access and Inspection .......................................................... 15
   3.7    City and Other Governmental Agency Permits and Approvals ............. 15
   3.8    No Discrimination During Construction ............................................... 15
   3.9    Taxes, Assessments, Encumbrances and Liens .................................... 15
   3.10   No Partnership or "Agency" Relationship Created .............................. 15
   3.11   Certificate of Completion ..................................................................... 15
   3.12   Local, State and Federal Laws; Prevailing Wages ............................... 16
4. FINANCIAL ASSISTANCE FROM AGENCY .................................................... 16
   4.1    Conditions for Suspension of Payment ................................................. 16
   4.2    Definitions ............................................................................................ 17
   4.3    Sales Tax Reports ................................................................................. 18
   4.4    Time of Payment by City and Agency ................................................... 19
   4.5    Termination ........................................................................................... 19
5. PROHIBITION ON TRANSFERS AND SECURITY INTERESTS ....................... 19
6. USE OF THE PROPERTY .................................................................................. 20
   6.1    Obligation to Refrain from Discrimination ........................................... 20
   6.2    Form of Nondiscrimination and Non Segregation Clauses .................... 20
7. EVENTS OF DEFAULT, REMEDIES AND TERMINATION .............................. 22
   7.1    Defaults - Definition ............................................................................. 22
   7.2    Remedies ............................................................................................... 22
   7.3    No Speculation ...................................................................................... 22

# TABLE OF CONTENTS (cont.)

**Page**

| | | | |
|---|---|---|---|
| | 7.4 | No Personal Liability | 23 |
| | 7.5 | Rights and Remedies are Cumulative | 23 |
| | 7.6 | Inaction Not a Waiver of Default | 23 |
| | 7.7 | Force Majeure | 23 |
| 8. | | INSURANCE; INDEMNITY | 24 |
| | 8.1 | Insurance | 24 |
| | 8.2 | Indemnity | 24 |
| 9. | | REPRESENTATIONS AND WARRANTIES | 25 |
| | 9.1 | Developer Representations | 25 |
| | 9.2 | Agency Representations | 26 |
| 10. | | GENERAL PROVISIONS | 26 |
| | 10.1 | Notices | 26 |
| | 10.2 | Construction | 26 |
| | 10.3 | Interpretation | 26 |
| | 10.4 | Time of the Essence | 27 |
| | 10.5 | Warranty Against Payment of Consideration for Agreement | 27 |
| | 10.6 | Attorneys' Fees | 27 |
| | 10.7 | Entire Agreement, Waivers and Amendments | 27 |
| | 10.8 | Severability | 27 |
| | 10.9 | Headings | 27 |
| | 10.10 | No Third Party Beneficiaries | 27 |
| | 10.11 | Governing Law; Jurisdiction; Service of Process | 28 |
| | 10.12 | Assignability | 28 |
| | 10.13 | Survival | 28 |
| | 10.14 | Estoppel Certificates | 28 |
| | 10.15 | Agency Actions | 28 |
| | 10.16 | Counterparts | 28 |

EXHIBIT B
PAGE 154

## <u>TABLE OF CONTENTS (cont.)</u>

<u>Page</u>

EXHIBIT A   LEGAL DESCRIPTION OF "AGENCY LAND"
        EXHIBIT A-1   LEGAL DESCRIPTION OF REMAINDER OF LAND FOR
                PHASE I OF PROJECT
        EXHIBIT A-2   DESCRIPTION OF PHASE II AND PHASE III LAND
EXHIBIT B   SCHEDULE OF PERFORMANCE
EXHIBIT C   SCOPE OF DEVELOPMENT
EXHIBIT D   FORM OF GRANT DEED
EXHIBIT E   LIST OF DOCUMENTS DELIVERED TO DEVELOPER

EXHIBIT B
PAGE 155

# EXHIBIT  C

RECORDING REQUESTED BY
STEWART TITLE

Recorded in Official Records, Orange County
Tom Daly, Clerk-Recorder

||| *$R0005219177$*    36.00
2012000609611 8:00 am 10/09/12
117 408 M10   13
0.00 0.00 0.00 0.00 36.00 0.00 0.00 0.00

*Recording Requested By:*
*    Stewart Title*
*And when recorded mail to:*
*City of Buena Park*
*6650 Beach Blvd*
*Buena Park, Ca 90621*
*Attn: City Manager*

494394

*Space above this line for Recorder's Use*

*This page added to provide adequate*
*recording information*

*Type of Document:   Memorandum of DDA Agreement*

*This document is being re-recorded to correct the*
*legal description in parcel 3. See attached exhibit "A-*
*1" for a complete corrected legal description.*

EXHIBIT C
PAGE 157

RECORDING REQUESTED BY
STEWART TITLE

This Document was electronically recorded by
Stewart Title

Recorded in Official Records, Orange County
Tom Daly Clerk-Recorder

Recording Requested by:
*when Recorded return to:*
City of Buena Park
6650 Beach Boulevard
Buena Park, California 90621
Attn: City Manager

NO FEE
2012000530409 04:30pm 09/11/12
37 402 M10 9
0.00 0.00 0.00 0.00 24.00 0.00 0.00 0.00

Assessor's Parcel Map Numbers: 276-361-04,
276-361-05, 276-361-07
Exempt from Recording Fees Pursuant to
Government Code Section 27383

494394          MEMORANDUM OF DDA  *Agreement*

    This MEMORANDUM OF DISPOSITION AND DEVELOPMENT
AGREEMENT (this "Memorandum") is made as of September 4, 2012, by and between
the CITY OF BUENA PARK, as successor agency to the Community Redevelopment
Agency of the City of Buena Park (the "City") and THE SOURCE AT BEACH, LLC, a
California limited liability company ("Developer").    The City and Developer
acknowledge and agree as follows:

    1.    The Community Redevelopment Agency of the City of Buena Park and
Developer entered into that certain Disposition and Development Agreement dated as of
October 26, 2010 (the "DDA"), which is incorporated herein by this reference. The DDA
is available for inspection by the public at the Office of the City Clerk of the City of
Buena Park.  The DDA includes provisions relating to the development and use of that
certain real property more particularly described in Exhibit "A" attached hereto (the
"Property").

    2.    Developer agrees, for itself, its successors and assigns, to refrain from
restricting the rental, sale or lease of the Property on the basis of race, color, creed,
religion, ancestry, sex, marital status, national origin or age of any person in the sale,
lease, sublease, transfer, use, occupancy, tenure or enjoyment of the Property, nor shall
Developer itself or any persons claiming under or through it establish or permit any such
practice or practices of discrimination or segregation with reference to the selection,
location, number, use or occupancy of tenants, lessees, subtenants, sublessees, or vendees
in the Property.  The foregoing covenants shall run with the land.

All deeds or contracts entered into with respect to the sale or other transfer of the
Property shall contain or be subject to substantially the following nondiscrimination or
nonsegregation clauses:

    (a)    In deeds: "The grantee herein covenants by and for himself or
herself, his or her heirs, executors, administrators and assigns, and all persons
claiming under or through them, that there shall be no discrimination against or
segregation of, any person or group of persons on account of any basis listed in
subdivision (a) or (d) of Section 12955 of the California Government Code, as
those bases are defined in Sections 12926, 12926.1, subdivision (m) and

;00757952.DOC;

EXHIBIT C
PAGE 158

paragraph (1) of subdivision (p) of Section 12955, and Section 12955.2 of the California Government Code, in the sale, lease, sublease, transfer, use, occupancy, tenure or enjoyment of the land herein conveyed, nor shall the grantee himself or herself, or any person claiming under or through him or her, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, subtenants, sublessees or vendees in the land herein conveyed. The foregoing covenants shall run with the land.

Notwithstanding the immediately preceding paragraph, with respect to familial status, said paragraph shall not be construed to apply to housing for older persons, as defined in Section 12955.9 of the California Government Code. With respect to familial status, nothing in said paragraph shall be construed to affect Sections 51.2, 51.3, 51.4, 51.10, 51.11, and 799.5 of the California Civil Code, relating to housing for senior citizens. Subdivision (d) of Section 51 and Section 1360 of the California Civil Code and subdivisions (n), (o) and (p) of Section 12955 of the California Government Code shall apply to said paragraph."

(b)     In leases: "The lessee herein covenants by and for himself or herself, his or her heirs, executors, administrators and assigns, and all persons claiming under or through him or her, and this lease is made and accepted upon and subject to the following conditions: That there be no discrimination against or segregation of any person or group of persons, on account of any basis listed in subdivision (a) or (d) of Section 12955 of the California Government Code, as those bases are defined in Sections 12926, 12926.1, subdivision (m) and paragraph (1) of subdivision (p) of Section 12955, and Section 12955.2 of the California Government Code, in the leasing, subleasing, transferring, use or occupancy, tenure or enjoyment of the land herein leased nor shall the lessee himself or herself, or any person claiming under or through him or her, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, sublessees, subtenants or vendees in the land herein leased.

Notwithstanding the immediately preceding paragraph, with respect to familial status, said paragraph shall not be construed to apply to housing for older persons, as defined in Section 12955.9 of the California Government Code. With respect to familial status, nothing in said paragraph shall be construed to affect Sections 51.2, 51.3, 51.4, 51.10, 51.11, and 799.5 of the California Civil Code, relating to housing for senior citizens. Subdivision (d) of Section 51 and Section 1360 of the California Civil Code and subdivisions (n), (o) and (p) of Section 12955 of the California Government Code shall apply to said paragraph."

(c)     In contracts with respect to the sale or other transfer of the Land: "There shall be no discrimination against or segregation of, any person, or group of persons on account of any basis listed in subdivision (a) or (d) of Section 12955 of the California Government Code, as those bases are defined in Sections 12926, 12926.1, subdivision (m) and paragraph (1) of subdivision (p) of Section

;00757952.DOC;

EXHIBIT C
PAGE 159

12955, and Section 12955.2 of the California Government Code, in the sale, lease, sublease, transfer, use, occupancy, tenure or enjoyment of the land, nor shall the transferee himself or herself or any person claiming under or through him or her, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, subtenants, sublessees or vendees of the land.

Notwithstanding the immediately preceding paragraph, with respect to familial status, said paragraph shall not be construed to apply to housing for older persons, as defined in Section 12955.9 of the California Government Code. With respect to familial status, nothing in said paragraph shall be construed to affect Sections 51.2, 51.3, 51.4, 51.10, 51.11, and 799.5 of the California Civil Code, relating to housing for senior citizens. Subdivision (d) of Section 51 and Section 1360 of the California Civil Code and subdivisions (n), (o) and (p) of Section 12955 of the California Government Code shall apply to said paragraph."

The foregoing shall be a covenant running with the land for the benefit of, and as a burden upon, the Property.

3.    All covenants contained in this Memorandum shall run with the land and shall be binding for the benefit of the City and its successors and assigns and such covenants shall run in favor of the City and for the entire period during which the covenants shall be in force and effect, without regard to whether the City is or remains an owner of any land adjacent to the Property or interest in such adjacent land or any other land. The City, in the event of any breach of any such covenants, shall have the right to exercise all of the rights and remedies available under the DDA or at law or in equity. The covenants contained in this Memorandum shall be for the benefit of and shall be enforceable only by the City and its successors and assigns.

[Signature Page Follows]

;00757952.DOC;

EXHIBIT C
PAGE 160

IN WITNESS WHEREOF, the undersigned have executed this Memorandum as of the date set forth below.

Dated: _9/4/12_

**CITY OF BUENA PARK**, as successor agency to the Community Redevelopment Agency of the City of Buena Park

By: _____

Print Name: _James B. Vanderpool_

Title: _City Manager_

ATTEST:

_____ Secretary

Dated: _9/10/12_

**THE SOURCE AT BEACH, LLC.** a California limited liability company

By: _____

;00757952.DOC;

IN WITNESS WHEREOF, the undersigned have executed this Memorandum as of the
date set forth below.

Dated: _9/4/12_____

**CITY OF BUENA PARK**, as successor
agency to the Community Redevelopment
Agency of the City of Buena Park

By: _____
Print Name:  James B. Vanderpool
Title:       City Manager

ATTEST:

_____
Secretary

Dated: _1⁰/3/12_____

**THE SOURCE AT BEACH, LLC**, a
California limited liability company

SIGNED IN COUNTERPART

By: _____

{00757052.DOC}

EXHIBIT C
PAGE 162

STATE OF CALIFORNIA                    )
                                       ) ss:
COUNTY OF  *Orange*                    )

On September _4_, 2012, before me, _Lana Ardaiz_ a Notary Public, personally appeared _James B Vanderpool_, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity/capacities, and that by his/her/their signature(s) on the instrument the person(s), or the entity on behalf of which the person(s) acted, executed the instrument.


I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.


WITNESS my hand and official seal.

_Lana Ardaiz_
Notary Public

My Commission expires: _May 25, 2013_

LANA ARDAIZ
Commission # 1846917
Notary Public - California
Orange County
My Comm. Expires May 25, 2013

{00757952.DOC}

EXHIBIT C
PAGE 163

STATE OF CALIFORNIA          )
                             ) ss:
COUNTY OF Los Angeles )

    On September ___, 2012, before me, _____, a Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity/capacities, and that by his/her/their signature(s) on the instrument the person(s), or the entity on behalf of which the person(s) acted, executed the instrument.

    I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public

My Commission expires: _____

;00757952.DOC;

EXHIBIT C
PAGE 164

GOVERNMENT CODE SECTION 27361.7

I CERTIFY UNDER PENALTY OF PERJURY THAT THE NOTARY SEAL
ON THE DOCUMENT TO WHICH THIS STATEMENT IS ATTACHED
READS AS FOLLOWS:

NAME OF NOTARY:        CHRISTINA EDWARDS-CONG

DATE COMMISSION EXPIRES        MAY 11, 2016

COUNTY COMMISSION FILED:        LOS ANGELES

COMMISSION NUMBER:        1977829

VENDOR NUMBER:        NNA1

PLACE OF EXECUTION:        IRVINE, CA

DATE:        SEPTEMBER 11, 2012

STEWART TITLE OF CALIFORNIA

BY: _____

JEFF PASCHAL

STATE OF CALIFORNIA        )
                          ) ss:
COUNTY OF LOS ANGELES      )

On _____, before me, _____, personally appeared
_____, who proved to me on the basis of satisfactory evidence to be the
person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity/capacities, and that by
his/her/their signature(s) on the instrument the person(s), or the entity on behalf of which the
person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.

CHRISTINA DIANE EDWARDS-CONG
Commission # 1977829
Notary Public - California
Los Angeles County
My Comm Expires May 11, 2016

_____
Notary Public

My Commission expires: _____

{00749015 DOC}

EXHIBIT C
PAGE 166

STATE OF CALIFORNIA )
                    ) ss:
COUNTY OF *Orange*  )

On September *26*, 2012, before me, *Lana Ardaiz* a Notary Public, personally appeared *James B Vanderpool*, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity/capacities, and that by his/her/their signature(s) on the instrument the person(s), or the entity on behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

*Lana Ardaiz*
Notary Public

My Commission expires: *May 25, 2013*

LANA ARDAIZ
Commission # 1846917
Notary Public - California
Orange County
My Comm. Expires May 25, 2013

{00757952.DOC}

EXHIBIT A
LEGAL DESCRIPTION

THE WEST 250.00 FEET OF THE SOUTH 259.21 FEET OF LOT 2 IN BLOCK 61 OF
BUENA PARK, IN THE CITY OF BUENA PARK, COUNTY OF ORANGE, STATE OF
CALIFORNIA, AS PER MAP RECORDED IN BOOK 18 PAGE(S) 50, 51 AND 52 OF
MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID
COUNTY.

EXCEPTING THEREFROM THE SOUTH 170.00 FEET THEREOF.

APN: 276-361-04


THE NORTHERLY 70.00 FEET OF THE SOUTHERLY 170.00 FEET OF THE WESTERLY
200 FEET OF LOT(S) 2, BLOCK 61 OF BUENA PARK, IN THE CITY OF BUENA PARK,
COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A MAP RECORDED
IN BOOK 18 PAGE(S) 50, OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE
COUNTY RECORDER OF SAIL COUNTY.

EXCEPTING THEREFROM ALL WATER RIGHTS, CLAIMS OR TITLE TO WATER,
WHETHER OR NOT SHOWN BY THE PUBLIC RECORDS.

APN: 276-361-05


THE EAST 20 FEET OF THE WEST 176 FEET OF THE SOUTH 100 FEET OF LOT 21W
BLOCK 61 OF BUENA PARK, AS SHOWN ON A MAP RECORDED IN BOOK 18 PAGE(S)
50 OF MISCELLANEOUS RECORDS, OF LOS ANGELES COUNTY, CALIFORNIA.

APN: 276-361-02

{00757952.DOC}

EXHIBIT C
PAGE 168



`` Exhibit A-1 ''

## LEGAL DESCRIPTION

The land referred to herein is situated in the State of California, County of Orange, City of  Buena Park, and described as follows:

### Parcel 1:

THE WEST 250.00 FEET OF THE SOUTH 259.21 FEET OF LOT 2 IN BLOCK 61 OF BUENA PARK, IN THE CITY OF BUENA PARK, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 18 PAGE(S) 50, 51 AND 52 OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM THE SOUTH 170.00 FEET THEREOF.

APN: 276-361-04

### PARCEL 2:

THE NORTHERLY 70.00 FEET OF THE SOUTHERLY 170.00 FEET OF THE WESTERLY 200 FEET OF LOT(S) 2, BLOCK 61 OF BUENA PARK, IN THE CITY OF BUENA PARK, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A MAP RECORDED IN BOOK 18 PAGE(S) 50, OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM ALL WATER RIGHTS, CLAIMS OR TITLE TO WATER, WHETHER OR NOT SHOWN BY THE PUBLIC RECORDS.

APN: 276-361-05

### PARCEL 3:

THE EAST 20 FEET OF THE WEST 176 FEET OF THE SOUTH 100 FEET OF LOT 2 IN BLOCK 61 OF BUENA PARK, IN THE CITY OF BUENA PARK, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A MAP RECORDED IN BOOK 18 PAGE(S) 50 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

APN: 276-361-07

(End of Legal Description)

File Number:  494394

EXHIBIT C
PAGE 169

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 13181 Crossroad Parkway North, Suite 400, City of Industry, California 91746.

A true and correct copy of the foregoing document entitled (*specify*): **RESPONSE BY THE CITY OF BUENA PARK TO MOTION OF SHADY BIRD LENDING, LLC FOR ORDER EXCUSING STATE COURT RECEIVER FROM TURNOVER OF ASSETS PURSUANT TO 11 U.S.C. § 543; DECLARATION OF CHRISTOPHER G. CARDINALE IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **April 9, 2021**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

***Via Personal Delivery***
The Honorable Erithe A. Smith
United States Bankruptcy Court
Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 5040 / Courtroom 5A
Santa Ana, CA 92701-4593

☒  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 9, 2021 | Melissa L. Gonzalez | |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                    **F 9013-3.1.PROOF.SERVICE**

## ADDITIONAL SERVICE INFORMATION

### 3. SERVED BY EMAIL

- Ron Bender on behalf of Debtor The Source Hotel, LLC
  rb@lnbyb.com

- Juliet Y. Oh on behalf of Debtor The Source Hotel, LLC
  jyo@lnbrb.com

- Michael G. Fletcher on behalf of Creditor Evertrust Bank
  mfletcher@frandzel.com, sking@frandzel.com

- Robert P. Goe on behalf of Creditor Westranco, Inc.
  kmurphy@goeforlaw.com

- Nancy S. Goldenberg on behalf of U.S. Trustee United States Trustee (SA_
  Nancy.goldenber@usdoj.gov

- United States Trustee (SA)
  Ustpregion16.sa.ecf@usdoj.gov

- Daniel A. Lev on behalf of Creditor Shady Bird Lending, LLC
  dlev@sulmeyerlaw.com, ccaldwell@sulmeyerlaw.com, dlev@ecf.inforuptcy.com

- Ronald N. Richards on behalf of Shady Bird Lending, LLC
  ron@ronaldrichards.com, morani@ronaldrichards.com

- Grant A. Nigolian on behalf of Interested Party Courtesy NEF
  grant@gnpclaw.com, process@gnpclaw.com, grant.nigolian@gmail.com

- Ho-El Park on behalf of Interested Party Courtesy NEF
  hpark@hparklaw.com

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                     **F 9013-3.1.PROOF.SERVICE**