# EXHIBIT "A"



**SC Wright Group, CA License: 1053348**
**Phone:  (877) 839-6909**
**Fax:      (877) 882-6951**

---

### PROPERTY INSPECTION AND EVALUATION REPORT

---

**REPORT DATE:**               May 17, 2021

**INSPECTION DATE:**        April 14, 2021 & May 14, 2021

**CLIENT:**                             Meylan Davitt Jain Arevian & Kim LLP
                                              Mr. Raymond Kim Esq.

**PROJECT NAME:**            The Source OC Hilton Hotel

**PROJECT ADDRESS:**      6940 Beach Blvd.
                                              Buena Park, CA 90621

**INSPECTORS:**                  Matthew L. Sams
                                              David T. Smedley

## INTRODUCTION:

SC Wright Group (SCW) was requested to conduct visual, non-invasive inspections of the subject property.  Based on the inspections, SCW was requested to provide evaluation of the following:

    A.  Completion of Construction (Construction Advancement)
    B.  Property Maintenance/Repair Issues Raised by Shady Bird
    C.  Maintenance/Repair Proposals Entered into by Receiver

## DOCUMENTS REVIEWED:

As part of our assignment, SCW was provided with documents for evaluation.  These documents are identified as follows:

- March 10, 2021 Urban Advisory & Building Group LLC report (18-pages) (ATTACHEMNT 1)
- March 11, 2021 Declaration of Brent Little (ATTACHMENT 2)

- March 25, 2021 Motion of Shady Bird Lending (ATTACHMENT 3)
- April 1, 2021 Opposition to Motion of Shady Bird Lending (ATTACHMENT 4)
- April 5, 2021 Urban Advisory & Building Group LLC report (7-pages) (ATTACHMENT 5)
- April 8, 2021 Declaration of Andrew Trost (ATTACHMENT 6)
- April 8, 2021 Declaration of Brent Little (ATTACHMENT 7)
- April 8, 2021 Shady Bird Lending Reply to Opposition to Motion (ATTACHMENT 8)
- April 25, 2021 Proposal from American Integrated Resources, Inc (ATTACHMENT 9)
- April 29, 2021 Estimate from Lakewood Glass & Screen (ATTACHMENT 10)
- May 5, 2021 Proposal from Best Incorporated (ATTACHMENT 11)
- May 6, 2021 Proposal from Iron Mechanical (ATTACHMENT 12)
- May 13, 2021 Proposal from Iron Mechanical (ATTACHMENT 13)
- Undated Proposal from Contractors Door Supply (ATTACHMENT 14)

## PROJECT HISTORY:

The project is a 7-story hotel containing approximately 170 guest rooms, along with typical hotel support features.  Based on interviews, the project has sat idle for approximately 18-months.  When construction was underway, Greenland Construction was the General Contractor while Swinerton performed Project Manager duties.

## PRE-INSPECTION INTERVIEWS:

Prior to conducting our visual inspection and assessment, SCW interviewed the following individuals:

- Robert Charlie Cervantes who is an employee of M+D Properties who oversaw the day-to-day maintenance of the Project.

- Clay Tanaka of M+D Properties.

## CONSTRUCTION DOCUMENTS:

Prior to visual inspection and assessment, SCW did not perform a detailed analysis of the construction documents.  It should be noted that the project is part of a master planned development which includes parking structure, food services, retail services and office space.  The project in question (hotel) is incorporated into the master planned development.  A construction office was observed to be located directly adjacent to the hotel entry.  Within the construction office, SCW noted construction documents including construction drawings.

The March 10, 2021 Urban Advisory & Building Group, LLC (URBAN) report expresses criticism that the construction documents are not stored on the physical construction site. While URBAN may be "technically" correct, the construction office and the construction documents are immediately adjacent to the hotel entrance. The construction office is clearly labeled as such from the outside (ATTACHMENT 15). Industry standard of practice is to have a construction site typically contained in a portable construction trailer. However, the use of an on-site construction trailer is dependent on on-site logistics. This project is a "tight site" which would prohibit a construction trailer to be used as a construction office. When construction trailers are not feasible, industry standard permits for the construction office to be established near the site.

SCW concludes that the size and location of the construction office is within industry standard.

## A.  COMPLETION OF CONSTRUCTION (Construction Advancement):

SCW conducted our Construction Advancement visual inspection on April 14, 2021. Prior to conducting our inspection, SCW developed a 20-item inspection criteria which focused on major construction milestones with evaluation on the completion for each of those milestones.

Below lists the major construction milestones evaluated along with the completion percentage for each:

| Construction Milestone | Percentage Complete |
|---|---|
| Off-Site Utilities | 100% |
| Grading | 100% |
| Foundations | 100% |
| Structural Concrete | 100% |
| On-Site Utilities | 100% |
| Structural Framing | 100% |
| Mechanical/Electrical/Plumbing Rough | 90% |
| Fenestrations | 100% |
| Exterior Cladding | 100% |
| Interior Framing | 100% |
| Insulation | 98% |
| Drywall | 95% |
| Roofing | 95% |
| Waterproofing | 95% |
| Mechanical/Electrical/Plumbing Finish | 70% |
| Wall Coverings | 45% |
| Floor Coverings | 45% |
| Cabinetry | 30% |
| Pool Deck | 60% |
| Guest Rooms | 84% |
| **AVERAGE** | **85%** |

Based on the evaluated milestones, SCW finds that the project has an average completion advancement at 85% (ATTACHMENT 16).

Additionally, a 20-item inspection criteria was established for the guest rooms. Again, these 20-items measure key milestones in the progress of construction as related to the guest rooms. In summary, SCW inspected 165 guest rooms noting the advancement of construction related to the 20-item criteria.

- Construction advancement at the 4th floor guest rooms is at 93%.
- Construction advancement at the 5th floor guest rooms is at 92%
- Construction advancement at the 6th floor guest rooms is at 92%
- Construction advancement at the 7th floor guest rooms is at 54%
- Average construction advancement at guest rooms is at 84%
- (ATTACHMENT 17)

<u>OTHER KEY ITEMS:</u>

<u>PVC ROOF:</u>

Inspections of the building interior, with focus on the seventh floor (directly under the PVC roof) identified one (1) location with stains on the ceiling and wall gypsum board which may be as a result of water intrusion through the roof membrane. The unit in question is Unit 738. Careful measurements were taken to determine the location of the interior stains. These measurements were compared to the exterior roof system where SCW was able to confirm the likely source of the water intrusion had been patched (ATTACHMENT 18).

SCW physically walked each roof surface. Prior to any repairs, SCW estimates that the roofing assembly is at punch-list, with an overall outstanding remaining construction at 5%. Additional comments regarding the PVC roof will be addressed in the Property Maintenance and Proposals sections of this Report.

<u>POOL DECK:</u>

The pool deck area is located at the 4th floor. Currently a fluid-applied waterproof membrane assembly is present at the pool deck (ATTACHMENT 19). Sandbags and plastic sheets have been utilized to provide temporary protection. Close inspection of the pool deck area reveals approximately 10 locations each approximately 1 SF in size (10 SF total) where the existing membrane will require additional service prior to placement of the pedestal and paver traffic surface (ATTACHMENT 20). Additionally, six construction joints are incorporated into the design. Each of these construction joints will require additional service prior to placement of the pedestal and paver traffic surface (ATTACHMENT 21). SCW recommends after treatment of these areas a final application of fluid

applied waterproofing can be applied atop the existing layer prior to the placement of the pedestal and paver traffic surface.

SHOWER PAN:

162 of the 165 inspected shower pans were completed (98%). Additionally, SCW was able to confirm the shower pan assembly during inspection at Unit 724. Mortar bed is utilized at the pan, which then has a full application of RedGard at the pan and surround prior to the application of the ceramic tile (ATTACHMENT 22). As inspected, the assembly is appropriate. A copy of RedGard technical data is attached (ATTACHMENT 23).

SEWER SYSTEM:

SCW did not conduct a full evaluation of the sewer system. During our visual inspection, occasional sewer odors were noted, particularly in locations where non-flushed toilets were present.

**B: PROPERTY MAINTENANCE/REPAIR ISSUES RAISED BY SHADY BIRD:**

The March 11, 2021 declaration from Brent Little (ATTACHMENT 2) outlines areas of concern regarding property maintenance and need for repairs. SCW will respond to each of these items in order as they are listed in Paragraph 5 of the declaration.

i)     *Substantial roof issues which currently permit the intrusion of water into the structure.*

RESPONSE – During our inspection, SCW was able to identify that the roof consists of a single-ply PVC membrane. This type of roof is installed, in part, using a heating element to "weld" seams together. It is not uncommon during the roofing application for some of the welds to be incomplete or require post-installation attention. These are typically identified and addressed during "punch-list" which occurs after the roof-top mechanical equipment is in place. As identified within this report, SCW identified one area of the interior structure where possible water intrusion due to roofing may exist (Unit 738).

During our inspection conducted on May 14, 2021, Best Contracting Services Incorporated (BEST) was concluding service to the PVC roof, including addressing weld locations and pipe penetrations at boot jacks. As part of roofing maintenance, BEST serviced all pipe penetrations by verifying the clamping ring and adding a new bead of sealant at 100% of the boot locations (ATTACHMENT 24). This work included addressing the likely location of the water migration at Unit 738.

Clearly, BEST has now addressed the outstanding 5% punch-list items to the point where we can now project the completion of the PVC membrane at 100%.

ii)   *The construction assemblies on the roof are incomplete and create an opportunity for water infiltration.*

RESPONSE – During our April 14, 2021 inspections we noted a portion of the metal cap flashing at architectural projections was incomplete.  This unique design feature only occurs along the West elevation and only at the 7th floor.  In fact, only a portion of the metal cap flashing is incomplete.  The northwest portion was observed and recorded as complete.  Only the southwest portion remained incomplete.

No evidence of water migration into the structure was evidenced as a result of the incomplete metal cap flashings.

During our May 14, 2021 inspection, SCW observed BEST installing peel-and-stick membrane.  We also noted metal cap flashings staged for installation.  The staged metal cap flashing was leaning against the exterior building finish without providing protection to the building exterior finishes which could result in damage to the exterior cladding (ATTACHMENT 25).

Clearly, BEST has now addressed the incomplete work to the point where we can now project the completion of this issue at 100%.

iii)   *The fire sprinkler system is not currently capable of providing life-safety protection for the project:*

RESPONSE – The fire sprinkler system is unfinished.  While laterals, branches and drops are present, sprinkler heads are not installed until after ceilings are finished.  Progress of work halted prior to completion of the system.

Historically, construction projects do not commission the fire sprinkler system until just prior to Temporary Certificate of Occupancy.  CalOsha provides guidelines for the construction industry on how to address fire protection during construction.

iv)   *Due to neglect and exposure to UV rays, the pool deck will need substantial repair:*

RESPONSE – As shown in Attachments 19, 20 & 21, the pool deck consists of a fluid applied membrane.  When the project advances, a pedestal paver system will sit atop the fluid applied membrane.

During our April 14, 2021 visual inspections, SCW noted a series of plastic covers and sandbags that had been utilized to protect the membrane. This type of protection requires periodic maintenance and adjustment which requires accessibility to the project. As inspected, the membrane itself was in good condition, with isolated locations requiring minor attention.

As described in Section A above, SCW recommends after treatment of these areas a final application of fluid applied waterproofing can be applied atop the existing layer prior to the placement of the pedestal and paver traffic surface.

v)      *The pool has an accumulation of water and trash making it a breeding ground for mosquitos, which may carry the West Nile Virus:*

RESPONSE – As shown in Attachment 19, the pool was dry during our April 14, 2021 visual inspections.

vi)     *Completed business finishes are not being protected and are exposed to waste or damage:*

RESPONSE – Prior to departure from the project, the development/construction team neatly stored construction materials and equipment on site, including plastic protection at installed light fixtures and plastic wrap at staged equipment pending installation (ATTACHMENT 26).

vii)    *Potential hazardous situation may exist if the building sewer system is not connected to the public system:*

RESPONSE - SCW did not conduct a full evaluation of the sewer system. During our visual inspection, occasional sewer odors were noted, particularly in locations where non-flushed toilets were present.

viii)   *HVAC package units have been left unsecured and accessible to thieves and vandals:*

RESPONSE – The HVAC package units are being stored in a remote portion in the lower level of the attached parking structure. Vehicular barriers are in place to prevent traffic from entering the storage location. The HVAC units currently in boxes are held separately from those that have been uncrated. The uncrated units are secured behind a temporary construction fence. These barriers have and continue to prevent thieves and vandals (ATTACHMENT 27).

ix)     *Hazardous and caustic chemicals unsecured at the Project:*

RESPONSE – During our visual inspections on April 14, 2021 we inspected a total of 165 guest units. During that inspection we observed one 1-gallon jug of muriatic acid located in the bathroom cabinet at Unit 725. The material was

stored in the manufactured container with the seal on the cap intact.  Clearly, this is an anomaly (ATTACHMENT 28).

## C: MAINTENANCE/REPAIR PROPOSALS BY RECEIVER:

I.    *April 25, 2021 American Integrated Resources, Inc. (Attachment 9):*

Comments – As described in detail above, there is no evidence of wholesale water intrusion into the building.  Only one location at Unit 738 (Attachment 18) had any evidence of post-construction possible water migration.  As evidenced, BEST addressed this area during roofing repairs, thus eliminating ongoing leak concerns.

The AIR proposal for $15,882.00 is an absolute waste of funds as the visual evidence does not support the need for the AIR proposed work.

In fact, AIR published its findings on May 17, 2021 wherein AIR concludes "no moisture levels were found to be elevated in any of the areas tested in this investigation." (ATTACHMENT 29)

II.    *April 29, 2021 Lakewood Glass & Screen (Attachment 10):*

Comments – As presented, the proposal identifies costs associated with three (3) window locations.

The first location: 83-7/8-inch x 95¼-inch curtain wall along Brenner drive.

The second location: 108-inch x 82-inch curtain wall along Brenner and Orangethroupe.

The third location: 72-inch x 42-inch loose transom at the front main entrance.

It appears that the costs for location 1 & 2 also include the cost of the temporary board-up.

During our inspections, SCW noted both locations 1 & 2, however did not note location 3.

SCW takes no exception to the proposed estimate.

III.    *May 5, 2021 Best Contracting Services Incorporated proposal (Attachment 11):*

Comments – As discussed in detail within the prior sections of this Report, SCW had identified that the advancement of the roofing was not complete at the time of stoppage in the work progress.

The proposal by BEST and the work progress observed during our May 14, 2021 inspection clearly have resulted in completion of the work.

SCW takes no exception to the proposed estimate and the work performed as of May 14, 2021.

IV.    *May 13, 2021 Iron Mechanical proposal (Attachment 13):*

Comment – Coordination between the work already performed by BEST and the proposed work by IRON is critical. Based on our May 14, 2021 inspection, BEST had already moved a significant amount of the roofing systems that are located on the roof. This work is also included in the IRON proposal and could potentially be a "double-dip."

Due to IRON not breaking down the costs per task, it is difficult to project the potential value of the "double-dip" should one exist.

Now that the roofing has been completed by BEST, it may be advantageous to have IRON re-bid his scope prior to execution of the work to ensure overlap of work is eliminated.

V.    *Undated Contractors Door Supply proposal (Attachment 14):*

Comment – Proposal is to provide temporary doors at the 4th floor (pool deck level) to better secure and protect the property.

SCW takes no exception to the proposed work.

## CONCLUSION:

As evidenced, SCW has concluded that the advancement of construction for the overall hotel stands at 85% complete. SCW further concludes that the individual guest rooms stand at 84% complete.

As evidenced, SCW disagrees with Shady Bird regarding maintenance and repairs related to the stoppage of construction advancement. While isolated items and/or anomalies may be present, the general condition of the project has been left in an organized and professional condition – in fact the project is in a condition that will require little effort by the construction team to begin construction activities once permitted to proceed.

While proposals have been put together to provide additional protection to the project during this stand-down, SCW does not take exception with these proposals, but does recommend a re-bid by IRON to avoid a possible overlap of scope that has been performed by BEST.

SCW projects an estimated cost to complete the project to be $4,030,000.00 to $6,055,000.00.  Finally, SCW projects a construction duration from the start of re-construction to Certificate of Occupancy (COO) to be 9-months.

**PROJECTED COST TO COMPLETE:**

| ITEM | LOW RANGE | HIGH RANGE |
|---|---|---|
| Guest Rooms | $850,000.00 | $1,250,000.00 |
| MEP (rough & finish) | $300,000.00 | $400,000.00 |
| Insulation | $50,000.00 | $75,000.00 |
| Drywall (non-guest room) | $200,000.00 | $250,000.00 |
| Roofing | $30,000.00 | $50,000.00 |
| Waterproofing (non-pool) | $50,000.00 | $80,000.00 |
| Wall Coverings | $200,000.00 | $300,000.00 |
| Floor Coverings | $300,000.00 | $400,000.00 |
| Cabinetry | $300,000.00 | $400,000.00 |
| Pool Deck | $250,000.00 | $350,000.00 |
| Misc. | $1,500,000.00 | $2,500,000.00 |
| **TOTAL** | **$4,030,000.00** | **$6,055,000.00** |

**QUALIFICATIONS:**

Matthew L. Sams is the Sr. Vice President of SC Wright Group.  Mr. Sams is a licensed general building contractor in California, Montana, and Nebraska.  Mr. Sams has been consistently involved in the construction industry for over 44-years, including the last 25-years with emphasis as a Forensic Contractor specializing the forensic analysis of structures and alleged failures, scopes of repair, costs of repair and industry standard of care.  Mr. Sams is an active voting member on 16 ASTM Committees and 52 Subcommittees all related to the construction industry.  Mr. Sams has provided expert testimony on over 80-occasions.

**SC Wright Group**
CA Contractors License 1053348


Matthew L. Sams
Sr. Vice-President
CA Contractors License 796054

EXHIBIT D 131

March 10, 2021

# Property Inspection Report for

## The Source OC Hilton Hotel

**Submitted To:**

Ms. Bellann Raile

Cordes & Company

**Submitted By:**

Mr. Brent Little

Urban Advisory & Building

Group, LLC

**CORDES**
CORDES&COMPANY


URBAN
ADVISORY
& BUILDING
Group, LLC

EXHIBIT D 132

## Introduction

On behalf of Urban Advisory and Building Group, LLC, we appreciate the opportunity to assist you in the analysis of the above referenced office property. To accomplish our review of the property we performed two on-site inspections. The first inspection was on March 3, 2021 and the second was on March 9, 2021. In addition, we reviewed various stamped approved plans and interviewed several individuals as either familiar with the project or a particular relevant building system.

## Project Understanding

The Source Hilton Hotel is an idled construction project, which is roughly seventy percent complete. The development of the building has been arrested at various stages and varies widely by floor. Generally, the plumbing, electrical and mechanical systems are completed through rough installation. Interior framing, drywall and finishes are in mid construction. Some portions of the building complete, while others are rough framed. As best as we could observe, framing is substantially complete.

Other aspects of the project had broad completion ranges as well. Substantial investment has been made to the buildings HVAC system, but key elements are either unprotected or exposed to potential damage. Both the domestic water and electrical are operational in limited areas of the building.

## Property Overview

The hotel is located on the northwest corner of Orangethorpe Avenue and Brenner Avenue in the City of Buena Park. The hotel is an integrated part of The Source OC, which is a mixed-use entertainment and lifestyle center. The entire project is approved under the Beach + Orangethorpe Mixed-Use Specific Plan.

Address:          6940 Beach Blvd Buena Park, CA90621

APN:              A portion of 276-361-03 through 18 Parcel Area:

Building Area:    134,500 sf

Rooms:            172 keys

2

EXHIBIT D 133

## Executive Summary

The items below represent several of the more substantial issues discovered during our investigation. It is recommended that action be taken on to resolve or better protect both the asset and those entering the structure.

- Substantial roof issues exist which currently permit the intrusion of water into the structure.
- Construction assemblies on the roof are incomplete and create an opportunity for water infiltration.
- Due to neglect, the pool deck will need substantial repair.
- Completed building finishes are not being protected and exposed to waste or damage.
- A potentially hazardous situation may exist if the building sewer system is not connected to the public system.
- An improved safety environment for building visitors and contractors should be implemented.
- Completion plans are held off site.



Roof HVAC equipment poorly protected with plastic. Should be sheet metal.



Unprotected pool deck, exposed to UV.

3









Top left: HVAC ducts exposed to elements,  Should be capped.
Middle: Damage to permanent finishes and fixtures. Upper
Right: Many important plans and job records are being stored
off site.  These will be important to restarting the project and
should be immediately inventoried and stored properly. Lower
Right: HVAC package units left easily accessible to thieves and
vandals.

4

EXHIBIT D 135

## Roof System

The roof system represents a significant and immediate potential impact to the building.

Most substantially, a significant portion of the roof has been removed above the 6th floor balconies. Although the element being removed is not directly connected to the main roof, it is a material opening into which water can gain access to the building.

It is apparent there has been some water intrusion. Repair work was being undertaken and demolition was mostly complete. This effort has obviously ceased as the project has stopped construction.

In addition to the water damage being repaired, near this same location corrosion is visible from either the same or a different failure. At the balcony walls, where they join the building, partial construction was made in an attempt to resolve the water intrusion.

Lastly, the main roof structures are predominately complete with PVC or PTO type roof systems. These are very reliable systems. However, they can leak at the joints and there were visible signs of repair near the roof access doorway. The repair does not appear to be compliant with the manufactures recommendation and should be inspected by a manufactures representative, which they will commonly perform.



Improper patch at roof door leak. Leaked into 6th floor hallway.



In numerous areas the PVC/PTO roofing is loose. May be normal, but also could be indicative of breach or installation failure. Needs to be investigated further.

Improperly installed flashing. Needs caulk and pipe clamp.

Missing flashing, above.



Corrected roof structure on northeast corner of building.



Damaged roof structure on southeast corner of building. This is a significant failure and needs to be addressed.

7

EXHIBIT D  138



Rusted cap due to internal leak.

Incomplete attempted repair.

EXHIBIT D 139

## Pool and Pool Deck

The pool is exposed to the elements and has an accumulation of water and trash. It is unlikely this presents any potential damage to the structure, however it does serve as a breeding ground for mosquitos, which may carry West Nile Virus. It is believed that the local Vector Control Agency would recommend the pool be drained of any standing water.

The more substantive issue in the pool area is the exposure of the deck membrane to UV rays. Typically, these type of waterproofing systems are damaged by UV rays. During our tour of the property, we encountered Gary Reynolds, who is a contract building inspector for the City of Buena Park and has been dedicated to this project for nearly seven years. He confirmed the developer placed plastic sheeting over the membrane to protect it from UV rays. As can be seen in the accompanying pictures, the plastic did not maintain its coverage of the area. Furthermore, deterioration of the membrane is readily visible.



Plastic covering failing to protect roof membrane.

Ripples in the membrane joint, which should be resealed.



Damage due to UV can be seen in the light patch, which readily rubs off.



Pool filled with water and trash.



## Protection of Completed Finishes

There is inherent value in the completed work currently in place. These finishes include stone flooring, carpeting, cabinetry and plumbing fixtures. Unfortunately, because of a lack of care and protection, these finishes are being damaged or destroyed.

Some inadequate measures have been implemented at various locations in the building, but they are intermittent and generally unprotective of the underlying finishes.

Damaged stone flooring due to no protection.

Stains on carpet because of no protection.

EXHIBIT D   142

## Sewer System

Upon entering the upper floors, a strong smell of sewer gas is present in nearly all part of the building. We believe the gas is emanating from the open sewer stack located in the stairwell. The stack was fitted with a P trap to contain the smells, but it has long since dried. The stack opening is exposed to allow an air gap for a condensate drain. We also believe dry plumbing fixtures could be contributing to the problem.

However, given the size of the building and its distance from the public sewer system, we are concerned the sewer lines could be filling up into the building.

Typically, a public sewer agency will block or bulkhead the sewer line with a temporary device until the building sewer system has been finaled. At this point the block will be removed and the connection will be complete. As this building has not received its final inspection, there is some likelihood the blockage is in place.

Given the amount of time this project has been delayed, if there is a blockage, there could be a substantial failure of the system, either in the public right of way or the buildings piping, due to the head pressure of sewage in the line. Even in the event there is no damage to the systems, at some point the line could begin to overflow into the building.

To determine if this is a potential issue, the agency should be contacted to obtain permission to drain the line.

12



Toilets have been used or dry and creating hazard.



Sewer gas entering building through open pipes. Risk of backflow into building.

13

EXHIBIT D  144

## Fire Systems

The fire sprinkler system is substantially complete, however it is not currently capable of providing life safety protection for the building. Although the system appears to be charged, the sprinkler heads are not uniformly installed.

It is also unclear if other fire systems are available for deployment, such as smoke seals and fire alarms.

Although the fire load for the building appears to be low, there has been valuable investment in the building and should be a consideration when determining the operation of the systems.

14

EXHIBIT D  145

## Safety

The safety and protection of personal and visitors to the building is the utmost priority. Under normal circumstances, the project would be under the supervision of a general contractor and possibly a construction manager. The property would also be receiving regular inspections from City and agency inspectors.

As these safeguards are not in place, a plan should be adopted for the improvement and regular inspection of the property to insure a safe working environment. Furthermore, consideration should be made to temporary fire protection or notification devices in the event of a fire.

Below is a list of safety issues identified on our inspection:

Hazardous and caustic chemicals improperly placed.

Regular inspection of the operational elevator and renewal of the permit.

Barriers placed around open chase/fall hazard.

Improved signage for safety and exiting.

Requirement for visitors and construction personal to wear appropriate safety clothing (vests, boots, masks and hard hats).

Accessible restroom facilities.

Fire extinguishers mounted in appropriate locations.





Left:: Expired elevator permit. Above: fall hazard. Right: Acid unprotected.

Shower pan is incorrect and not water-proofed. Moreover, the walls are not the correct type of drywall.



It is unusual to install carpet before drywall is complete.

Examples of improper construction techniques.

16

## Further Recommendations

During our inspection, certain irregular or unidentifiable construction practices were observed. For any party wishing to restart construction, it is recommended that a detailed survey of the property be conducted with a comparison to the approved plans to ensure the current construction meets design and code requirements. We also recommend the Receiver retain additional construction experts to assess and protect immediate potential issues, such as the roof exposure, sewer connection, sewer gas mitigation, securing the building documents, closing unnecessary water valves and ensuring a safer work environment.

## Inspectors

The inspection was performed by Brent Little and Steve Cienfuegos.

Mr. Little is a licensed General Contractor and holds a bachelor of arts degree in Geography from California State University, Fullerton with an emphasis in urban planning. He has been the principal of several construction, development and consulting firms in his approximately twenty-five year career.

Mr. Cienfuegos is a licensed General Contractor and holds a bachelor's degree from Whittier College. He has supervised and managed the construction of many commercial buildings, including several high-rise and mixed use projects.

## Disclaimer

This site inspection report was completed without the benefit of any testing and merely observational nature. This includes review of visible major building assemblies such as fire protection, electrical, plumbing and the building structure.

Sincerely,

*Brent Little*

Brent Little

Principal

17

Appendix of Additional Photographs







Left: Incorrect type of drywall in bathroom. Left Above: Roof penetrations not properly sealed. Above Middle: Extensive HVAC equipment incomplete. Above Right: Model unit not protected from construction. Right: Seam exhibiting signs of degradation.

18





1    **DECLARATION OF BRENT LITTLE**

2    I, Brent Little, declare and state as follows:

3    1.    I am over the age of eighteen and am a principal of Urban Advisory

4    and Building Group, LLC ("Urban Advisory").  I am a licensed general contractor and hold

5    a bachelor of arts degree in Geography from California State University, Fullerton, with

6    an emphasis in urban planning.  I have been the principal of several construction,

7    development, and consulting firms for the past twenty-five years.  The facts stated herein

8    are true of my own personal knowledge and I could and would competently testify thereto

9    as follows.

10    2.    I make this declaration in support of the "Motion of Shady Bird

11    Lending, LLC for Order Excusing State Court Receiver From Turnover of Assets

12    Pursuant to 11 U.S.C. § 543; Memorandum of Points and Authorities; Declarations of

13    Ronald Richards, Bellann R. Raile, and Brent Little in Support Thereof" (the "Motion"),

14    through which Shady Bird, the holder of the senior deed of trust on the real property

15    bearing APN Nos. 276-361-20 and 276-361-22, consisting of a partially constructed 178-

16    room, seven story hotel building located in Buena Park, California (the "Project") owned

17    by the debtor The Source Hotel, LLC (the "Debtor"), seeks an order, among other things,

18    excusing the state court receiver from turnover of the Debtor's assets, including the

19    Project, and authorizing the state court receiver, on an interim basis, to take the steps

20    necessary and appropriate to preserve and protect the assets of the Debtor pursuant to

21    11 U.S.C. § 543(d)(1).

22    3.    Recently, Urban Advisory was retained by Bellann R. Raile (the

23    "Receiver"), who I understand is duly appointed, qualified, and acting state court receiver

24    for the Project owned by the Debtor.  Urban Advisory specifically was retained by the

25    Receiver to provide her with an analysis and written report of the current physical

26    condition of the Project.

27    4.    In this regard, Steve Cienfuegos, a licensed general contractor

28    employed by Urban Advisory, and I conducted two on-site inspections of the Project, the

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  first on March 3, and the second on March 9, 2021. In addition to our personal

2  inspection, we also reviewed various stamped approved plans and interviewed several

3  individuals either familiar with the Project or a particularly relevant building system. As a

4  result of our on-site inspections and analysis, we prepared and sent to the Receiver a

5  "Property Inspection Report for The Source OC Hilton Hotel," dated March 10, 2021 (the

6  "Report"). A true and correct copy of the Report is attached hereto as Exhibit "D" and

7  incorporated herein by reference.

8          5.    In sum, and as detailed in the Report, the hotel is an idled

9  construction project which is roughly 70% complete. Crucially, there are significant

10  issues of neglect, potential hazardous situations, and safety and environmental concerns

11  at the Project. Among the areas of concern are the following:  (i) there are substantial

12  roof issues which currently permit the intrusion of water into the structure, (ii) the

13  construction assemblies on the roof are incomplete and create an opportunity for water

14  infiltration, (iii) the fire sprinkler system is not currently capable of providing life-safety

15  protection for the Project, (iv) due to neglect and exposure to UV rays, the pool deck will

16  need substantial repair, (v) the pool has an accumulation of water and trash making it a

17  breeding ground for mosquitos, which may carry the West Nile Virus, (vi) completed

18  business finishes are not being protected and are exposed to waste or damage, (vii) a

19  potentially hazardous situation may exist if the building sewer system is not connected to

20  the public system, (viii) HVAC package units have been left unsecured and accessible to

21  thieves and vandals, and (ix) there are hazardous and caustic chemicals unsecured at

22  the Project. As noted, these are merely some of the highlights of the Report.

23          I declare under penalty of perjury under the laws of the United States of

24  America that the foregoing is true and correct.

25  Executed this 11th day of March, 2021, at Los Angeles, California.

26

27  Brent Little

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

# EXHIBIT D

# Property Inspection Report for

## The Source OC Hilton Hotel

### Submitted To:

Ms. Bellann Raile

Cordes & Company

**CORDES**
CORDES&COMPANY



URBAN
ADVISORY
& BUILDING
Group, LLC

### Submitted By:

Mr. Brent Little

Urban Advisory & Building

Group, LLC

**March 10, 2021**

EXHIBIT D   131

## Introduction

On behalf of Urban Advisory and Building Group, LLC, we appreciate the opportunity to assist you in the analysis of the above referenced office property. To accomplish our review of the property we performed two on-site inspections. The first inspection was on March 3, 2021 and the second was on March 9, 2021. In addition, we reviewed various stamped approved plans and interviewed several individuals either familiar with the project or a particular relevant building system.

## Project Understanding

The Source Hilton Hotel is an idled construction project, which is roughly seventy percent complete. The development of the building has been arrested at various stages and varies widely by floor. Generally, the plumbing, electrical and mechanical systems are completed through rough installation. Interior framing, drywall and finishes are in mid construction. Some portions of the building complete, while others are rough framed. As best as we could observe, framing is substantially complete.

Other aspects of the project had broad completion ranges as well. Substantial investment has been made to the buildings HVAC system, but key elements are either unprotected or exposed to potential damage. Both the domestic water and electrical are operational in limited areas of the building.

## Property Overview

The hotel is located on the northwest corner of Orangethorpe Avenue and Brenner Avenue in the City of Buena Park. The hotel is an integrated part of The Source OC, which is a mixed-use entertainment and lifestyle center. The entire project is approved under the Beach + Orangethorpe Mixed-Use Specific Plan.

| | |
|---|---|
| Address: | 6940 Beach Blvd Buena Park, CA90621 |
| APN: | A portion of 276-361-03 through 18 Parcel Area: |
| Building Area: | 134,500 sf |
| Rooms: | 172 keys |

2

## Executive Summary

The items below represent several of the more substantial issues discovered during our investigation.  It is recommended that action be taken to resolve or better protect both the asset and those entering the structure.

- Substantial roof issues exist which currently permit the intrusion of water into the structure.

- Construction assemblies on the roof are incomplete and create an opportunity for water infiltration.

- Due to neglect, the pool deck will need substantial repair.

- Completed building finishes are not being protected and exposed to waste or damage.

- A potentially hazardous situation may exist if the building sewer system is not connected to the public system.

- An improved safety environment for building visitors and contractors should be implemented.

- Completion plans are held off site.



Unprotected pool deck, exposed to UV.



Roof HVAC equipment poorly protected with plastic. Should be sheet metal.

3





Top left: HVAC ducts exposed to elements, Should be capped. Middle: Damage to permanent finishes and fixtures. Upper Right: Many important plans and job records are being stored off site. These will be important to restarting the project and should be immediately inventoried and stored properly, Lower Right: HVAC package units left easily accessible to thieves and vandals.





4

## Roof System

The roof system represents a significant and immediate potential impact to the building.

Most substantially, a significant portion of the roof has been removed above the 6th floor balconies. Although the element being removed is not directly connected to the main roof, it is a material opening into which water can gain access to the building.

It is apparent there has been some water intrusion. Repair work was being undertaken and demolition was mostly complete. This effort has obviously ceased as the project has stopped construction.

In addition to the water damage being repaired, near this same location corrosion is visible from either the same or a different failure. At the balcony walls, where they join the building, partial construction was made in an attempt to resolve the water intrusion.

Lastly, the main roof structures are predominately complete with PVC or PTO type roof systems. These are very reliable systems. However, they can leak at the joints and there were visible signs of repair near the roof access doorway. The repair does not appear to be compliant with the manufactures recommendation and should be inspected by a manufactures representative, which they will commonly perform.



Improper patch at roof door leak. Leaked into 6th floor hallway.

Missing flashing, above.



Improperly installed flashing. Needs caulk and pipe clamp.

5



In numerous areas the PVC/PTO roofing is loose. May be normal, but also could be in-dicative of breach or installation failure. Needs to be investigated further.



Damaged roof structure on southeast corner of building.  This is a significant failure and needs to be addressed.

Corrected roof structure on northeast corner of building.

7



Incomplete attempted repair.

Rusted cap due to internal leak.

## Pool and Pool Deck

The pool is exposed to the elements and has an accumulation of water and trash. It is unlikely this presents any potential damage to the structure, however it does serve as a breeding ground for mosquitos, which may carry West Nile Virus. It is believed that the local Vector Control Agency would recommend the pool be drained of any standing water.

The more substantive issue in the pool area is the exposure of the deck membrane to UV rays. Typically, these type of waterproofing systems are damaged by UV rays. During our tour of the property, we encountered Gary Reynolds, who is a contract building inspector for the City of Buena Park and has been dedicated to this project for nearly seven years. He confirmed the developer placed plastic sheeting over the membrane to protect it from UV rays. As can be seen in the accompanying pictures, the plastic did not maintain its coverage of the area. Furthermore, deterioration of the membrane is readily visible.



Plastic covering failing to protect roof membrane.



Pool filled with water and trash.

Damage due to UV can be seen in the light patch, which readily rubs off.

Ripples in the membrane joint, which should be resealed.

## Protection of Completed Finishes

There is inherent value in the completed work currently in place. These finishes include stone flooring, carpeting, cabinetry and plumbing fixtures. Unfortunately, because of a lack of care and protection, these finishes are being damaged or destroyed.

Some inadequate measures have been implemented at various locations in the building, but they are intermittent and generally unprotective of the underlying finishes.



Stains on carpet because of no protection.



Damaged stone flooring due to no protection.

11

EXHIBIT D    141

## Sewer System

Upon entering the upper floors, a strong smell of sewer gas is present in nearly all part of the building. We believe the gas is emanating from the open sewer stack located in the stairwell. The stack was fitted with a P trap to contain the smells, but it has long since dried. The stack opening is exposed to allow an air gap for a condensate drain. We also believe dry plumbing fixtures could be contributing to the problem.

However, given the size of the building and its distance from the public sewer system, we are concerned the sewer lines could be filling up into the building.

Typically, a public sewer agency will block or bulkhead the sewer line with a temporary device until the building sewer system has been finaled. At this point the block will be removed and the connection will be complete. As this building has not received its final inspection, there is some likelihood the blockage is in place.

Given the amount of time this project has been delayed, if there is a blockage, there could be a substantial failure of the system, either in the public right of way or the buildings piping, due to the head pressure of sewage in the line. Even in the event there is no damage to the systems, at some point the line could begin to overflow into the building.

To determine if this is a potential issue, the agency should be contacted to obtain permission to drain the line.

12



Sewer gas entering building through open pipes. Risk of backflow into building.

13

Toilets have been used or dry and creating hazard.

## Fire Systems

The fire sprinkler system is substantially complete, however it is not currently capable of providing life safety protection for the building. Although the system appears to be charged, the sprinkler heads are not uniformly installed.

It is also unclear if other fire systems are available for deployment, such as smoke seals and fire alarms.

Although the fire load for the building appears to be low, there has been valuable investment in the building and should be a consideration when determining the operation of the systems.

14

## Safety

The safety and protection of personal and visitors to the building is the utmost priority. Under normal circumstances, the project would be under the supervision of a general contractor and possibly a construction manager. The property would also be receiving regular inspections from City and agency inspectors.

As these safeguards are not in place, a plan should be adopted for the improvement and regular inspection of the property to insure a safe working environment. Furthermore, consideration should be made to temporary fire protection or notification devices in the event of a fire.

Below is a list of safety issues identified on our inspection:

Hazardous and caustic chemicals improperly placed.

Regular inspection of the operational elevator and renewal of the permit.

Barriers placed around open chase/fall hazard.

Improved signage for safety and exiting.

Requirement for visitors and construction personal to wear appropriate safety clothing (vests, boots, masks and hard hats).

Accessible restroom facilities.

Fire extinguishers mounted in appropriate locations.



Left:: Expired elevator permit. Above: fall hazard. Right: Acid unprotected.

46

Examples of improper construction techniques.



It is unusual to install carpet before drywall is complete.



Shower pan is incorrect and not water-proofed. Moreover, the walls are not the correct type of drywall.

16

## Further Recommendations

During our inspection, certain irregular or unidentifiable construction practices were observed. For any party wishing to restart construction, it is recommended that a detailed survey of the property be conducted with a comparison to the approved plans to ensure the current construction meets design and code requirements. We also recommend the Receiver retain additional construction experts to assess and protect immediate potential issues, such as the roof exposure, sewer connection, sewer gas mitigation, securing the building documents, closing unnecessary water valves and ensuring a safer work environment.

## Inspectors

The inspection was performed by Brent Little and Steve Cienfuegos.

Mr. Little is a licensed General Contractor and holds a bachelor of arts degree in Geography from California State University, Fullerton with an emphasis in urban planning. He has been the principal of several construction, development and consulting firms in his approximately twenty-five year career.

Mr. Cienfuegos is a licensed General Contractor and holds a bachelor's degree from Whittier College. He has supervised and managed the construction of many commercial buildings, including several high-rise and mixed use projects.

## Disclaimer

This site inspection report was completed without the benefit of any testing and merely observational nature. This includes review of visible major building assemblies such as fire protection, electrical, plumbing and the building structure.

Sincerely,

*Brent Little*

Brent Little
Principal

17







Left: Incorrect type of drywall in bathroom. Left Above: Roof penetrations not properly sealed. Above Middle: Extensive HVAC equipment incomplete. Above Right: Model unit not protected from construction. Right: Seam exhibiting signs of degradation.

Appendix of Additional Photographs

18

1 | Daniel A. Lev (CA Bar No. 129622)
  |   dlev@sulmeyerlaw.com
2 | **Sulmeyer**Kupetz
  | A Professional Corporation
3 | 333 South Grand Avenue, Suite 3400
  | Los Angeles, California 90071-1406
4 | Telephone: 213.626.2311
  | Facsimile: 213.629.4520
5 |
  | Ronald Richards (CA Bar No. 176246)
6 |   ron@ronaldrichards.com
  | Law Offices of Ronald Richards & Associates, APC
7 | P.O. Box 11480
  | Beverly Hills, California 90213
8 | Telephone:  310.556.1001
  | Facsimile:  310.277.3325
9 |
  | Attorneys for Shady Bird Lending, LLC
10 |

11

**UNITED STATES BANKRUPTCY COURT**

12

**CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION**

13

| In re | Case No. 8:21-bk-10525-ES |
|---|---|
| THE SOURCE HOTEL, LLC, | Chapter 11 |
| Debtor. | **MOTION OF SHADY BIRD LENDING, LLC FOR ORDER EXCUSING STATE COURT RECEIVER FROM TURNOVER OF ASSETS PURSUANT TO 11 U.S.C. § 543; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF RONALD RICHARDS, BELLANN R. RAILE, AND BRENT LITTLE IN SUPPORT THEREOF** |
| | DATE:    April 15, 2021 |
| | TIME:     10:30 a.m. |
| | PLACE: Courtroom "5A" |

DAL 2710605v1

SulmeyerKupetz, A F    sional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    **TO THE HONORABLE ERITHE SMITH, UNITED STATES BANKRUPTCY JUDGE,**

2    **THE OFFICE OF THE UNITED STATES TRUSTEE, THE DEBTOR, AND ALL OTHER**

3    **INTERESTED PARTIES:**

4                                                **MOTION**

5             Through its "Motion of Shady Bird Lending, LLC for Order Excusing State

6    Court Receiver From Turnover of Assets Pursuant to 11 U.S.C. § 543; Memorandum of

7    Points and Authorities; Declarations of Ronald Richards, Bellann R. Raile, and Brent

8    Little in Support Thereof" (the "Motion"), Shady Bird Lending, LLC ("Shady Bird"), the

9    holder of the senior deed of trust on the real property bearing APN Nos. 276-361-20 and

10   276-361-22, consisting of a partially constructed 178-room, seven story hotel building

11   located in Buena Park, California (the "Project") owned by the debtor The Source Hotel,

12   LLC (the "Debtor"), hereby seeks an order, among other things, excusing the state court

13   receiver from turnover of the Debtor's assets, including the Project, and authorizing the

14   state court receiver, on an interim basis, to take the steps necessary and appropriate to

15   preserve and protect the assets of the Debtor pursuant to 11 U.S.C. § 543(d)(1).

16             This Motion is made and based upon the moving papers, the attached

17   memorandum of points and authorities and the supporting declarations of Ronald

18   Richards, Bellann R. Raile, and Brent Little, the pleadings filed in the Debtor's case, all

19   judicially noticeable facts, the arguments and representations of counsel, and any oral or

20   documentary evidence presented prior to or at the scheduled hearing.

21             **WHEREFORE** Shady Bird respectfully requests that the Court enter an

22   order:

23             (1)      granting this Motion;

24             (2)      excusing the state court receiver from turnover of the Debtor's

25   assets, including the Project, and authorizing the state court receiver, on an interim basis,

26   to take the steps necessary and appropriate to preserve and protect the Debtor's assets

27   pursuant to 11 U.S.C. § 543(d)(1); and

28

DAL 2710605v1                                    2

1           (3)    granting such other and further relief as this Court deems just and

2    proper under the circumstances.

3    DATED: March 25, 2021          **Sulmeyer**Kupetz
                                      A Professional Corporation

4

5

6                                    By: _/s/ Daniel A. Lev_
                                        Daniel A. Lev

7                                          Attorneys for Shady Bird Lending, LLC

8    DATED: March 25, 2021          Law Offices of Ronald Richards & Associates, APC

9

10

11                                   By: _/s/ Ronald Richards_
                                        Ronald Richards

12                                         Attorneys for Shady Bird Lending, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Sulmeyer**Kupetz, A P   sional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

Sulmeyer Kupetz, A P  sional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1

# MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.

3

## JURISDICTION

4     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334(b).

5 Venue in this Court is proper pursuant to 28 U.S.C. § 1409(a). The Motion is a core

6 matter pursuant to 28 U.S.C. § 157(b)(2)(A) and, therefore, this Court has the

7 constitutional authority to enter a final ruling on the merits. Stern v. Marshall, 564 U.S.

8 462, 499, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011). The statutory predicate for the

9 Motion is 11 U.S.C. § 543(d).

10

## II.

11

## PREFATORY STATEMENT

12     By causing a receiver to be appointed, Shady Bird took appropriate steps to

13 ensure that the Debtor and its principals could no longer harm its collateral. And since

14 her recent appointment, the receiver already has undertaken measures to stabilize and

15 secure this ramshackle hotel project, which has become subject to recent acts of

16 vandalism. The receiver also commissioned an inspection report which details the

17 serious issues of neglect, waste, and disrepair at the Project.[1]

18     In light of these undeniable facts, returning the Debtor to the helm would

19 pose a significant and serious risk of irreparable harm to the estate's sole asset and

20 would seriously harm creditors, most notably, Shady Bird. Conversely, if the receiver is

21 excused from turning over the Project, there will be no harm to the Debtor or creditors. In

22 short, an independent fiduciary should remain in charge of the Project unless and until

23 the Debtor presents this Court with concrete evidence of its ability to finance and

24

25

26

27

28

[1] A true and correct copy of the "Property Inspection Report for The Source OC Hilton Hotel," dated March 10, 2021 (the "Report"), prepared by Urban Advisory and Building Group, LLC ("Urban Advisory") at the request of the receiver is attached as Exhibit "D" to the declaration of Brent Little, affixed hereto.

1 | complete construction, pay the numerous mechanic's liens, and, above all else, provide

2 | Shady Bird with a measure of adequate protection for its lien.

3 | III.

4 | **RELEVANT BACKGROUND**

5 | Shady Bird is owed in excess of $25,000,000 by the Debtor who not only is

6 | in default, but is not protecting and securing the property that serves as Shady Bird's

7 | collateral. In fact, after learning that the ill-fated Project and improvements were in a

8 | state of disrepair and were being damaged, Shady Bird was notified by the Debtor that it

9 | was no longer providing any security for the Project. To make matters worse, the Debtor

10 | refused to grant Shady Bird access to allow it to inspect, protect, and secure the Project.

11 | The Debtor also refused to provide Shady Bird with proof of insurance, in further breach

12 | of its obligations under the deed of trust and loan agreement.

13 | Presented with a Project which was deteriorating and was uninsured,

14 | Shady Bird had no choice but to seek the *ex parte* appointment of a receiver to prevent

15 | irreparable harm and immediate danger to its collateral and to ensure that it was insured

16 | against further loss, damage, and destruction. The state court agreed, and Bellann R.

17 | Raile (the "Receiver") was appointed receiver nine days before the petition was filed. As

18 | the Receiver herself attests, the hotel is in a complete state of disarray. Compelling the

19 | turnover of the Project to the Debtor at this time would, therefore, be egregious and

20 | prejudicial to the interests of creditors.

21 | **A.**    **The Loan, Loan Documents, and Deed of Trust**

22 | **1.**    **The Loan and Loan Agreement**

23 | On or about May 24, 2016, Evertrust Bank (the "Original Lender") and the

24 | Debtor entered into a construction loan (the "Loan") in the principal amount of

25 | $24,988,808.[2] The Loan was made pursuant to a Construction Loan Agreement (the

26 | ────────────────

27 | [2] The history of the Loan Agreement and its assignment to Shady Bird is detailed in the declaration of
Ronald Richards, affixed hereto.

28 |

**SulmeyerKupetz**, A  F         sional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA, 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    "Loan Agreement") dated May 24, 2016, between the Debtor and Original Lender.  The

2    purpose of the Loan was for the development and construction of a 178-room, 7 story

3    hotel project (the "Project").  In addition to the Project, the Debtor is the ground lessee

4    under a 99-year "Memorandum of Ground Lease" (the "Ground Lease") with ground

5    lessor, The Source at Beach, LLC (the "Ground Lessor").  Although the Ground Lease

6    was terminated on February 16, 2021, by Ground Lessor, not surprisingly, the termination

7    was just recently rescinded.

8             **2.    The Note**

9             In furtherance of the Loan Agreement, as evidence of the Loan, and for

10    value received in the maximum principal amount of $29,500,000 by the Debtor from

11    Original Lender, the Debtor executed and delivered to Original Lender the Promissory

12    Note (the "Note").  According to the Note, the Debtor agreed to make monthly payments

13    of interest commencing on July 1, 2016, until the Note's original maturity date of

14    December 1, 2017 (the "Original Maturity Date").  Upon the Original Maturity Date, the

15    entire unpaid principal, all accrued interest, and other costs and fees were due and

16    payable without demand or notice.  As explained below, pursuant to five extension

17    agreements, the Original Maturity Date was extended to November 1, 2019 (the "Maturity

18    Date").  An event of default under the Note is defined as any event of default under the

19    Loan Agreement.

20             **3.    The Deed of Trust**

21             To secure repayment and performance of the Debtor's obligations under,

22    *inter alia,* the Loan Agreement and Note, the Debtor executed and delivered to Original

23    Lender a deed of trust (the "Deed of Trust") pursuant to which, *inter alia,* Original Lender

24    was granted a first priority lien against the Debtor's rights in the Project and the Ground

25

26

27

28

**SulmeyerKupetz,** A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A.P.
sional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1   Lease.[3]  Specifically, the Deed of Trust grants Original Lender, and Shady Bird, as its

2   assignee, a first priority security interest and lien in the Debtor's leasehold interest in the

3   Project; all right, title, and interest in and to the Ground Lease; rents, income and profits

4   arising from or pursuant to the Ground Lease; and the use, occupancy, and enjoyment of

5   the Project along with all other real and personal property described in the Deed of Trust.

6   The Deed Trust further grants, transfers, and assigns to Shady Bird, as assignee, all of

7   the Debtor's right, title, and interest in and to any building, improvements, fixtures,

8   structures, and equipment located or erected on the Project (collectively, the

9   "Improvements").

10        The Deed of Trust also requires the Debtor to maintain insurance on the

11   Project (as defined therein) and to protect Shady Bird's security interest in the Project

12   against loss or damage by fire and other risks.  As assignee, Shady Bird also shall be

13   named as the primary loss payee under all of the insurance policies and the Debtor is

14   required to assure that Shady Bird receives a certificate from each insurance company

15   that acknowledges Shady Bird's position as loss payee and that states that the insurance

16   policy cannot be terminated as to Shady Bird except upon 30-days prior written notice.

17        The Deed of Trust further requires the Debtor to maintain and preserve the

18   Project, including, *inter alia*: (i) keeping the Project in good condition and repair; (ii) using

19   commercially reasonable efforts to complete or restore promptly and in good and

20   workmanlike manner the Project, or any part thereof, which may be damaged or

21   destroyed; (iii) not committing or permitting material physical waste of the Project or any

22   portion thereof; and (iv) doing all other acts which from the character or use of the Project

23   may be reasonably necessary to maintain, preserve, and enhance its value and

24   otherwise performing such appropriate upkeep and maintenance to the Project to ensure

25

26

27   [3] The Ground Lessor consented to the Loan, the encumbrance of the Debtor's interest in the Ground
    Lease, and the Deed of Trust by entering into a "Ground Lessor's Consent, Estoppel Certificate and Fee
28   Mortgagee Agreement" (the "Ground Lessor's Consent").

1 | that the Project, and each part thereof, is maintained in a first-class manner and retains

2 | at all times a first-class appearance and condition.

3 |       According to the Deed of Trust, Shady Bird is provided the right to inspect

4 | the Project for purposes of ensuring the Debtor's compliance with its obligations under

5 | the Deed of Trust.  Finally, the Deed of Trust not only gives Shady Bird the right to

6 | perform various acts in the event of the Debtor's failure to perform in order to protect the

7 | collateral, but it also allows Shady Bird to bring an action for specific performance or for

8 | appointment of a receiver to take possession of the Project and operate the business of

9 | the Debtor, if any, being conducted on the Project.

10 |       **4.**   **The Extension Agreements**

11 |       The Loan and Note originally matured on the Original Maturity Date of

12 | December 1, 2017.  Thereafter, at the request of the Debtor and the guarantors of the

13 | Loan and Note, namely, Donald Chae and Min Chae (collectively, the "Guarantors"), the

14 | Debtor, Guarantors, and Original Lender entered into a "First Extension Agreement"

15 | dated December 22, 2017 (the "First Extension"), whereby, *inter alia*, pursuant to the

16 | terms therein, (i) the Original Maturity Date was extended to June 1, 2018, and (ii) the

17 | completion date of the Project was extended to June 1, 2018.  Thereafter, pursuant to a

18 | "Second Extension Agreement," "Third Extension Agreement," "Fourth Extension

19 | Agreement," and "Fifth Extension Agreement" (collectively with the First Extension, the

20 | "Extension Agreements"), the Original Maturity Date of the Loan, Loan Agreement, and

21 | Note, and the completion date of the Project, were extended to November 1, 2019 (the

22 | "Maturity Date").

23 |     **B.**   **Assignment of Loan, Loan Agreement, Note, Deed of Trust, and Other**

24 |         **Loan Documents to Shady Bird**

25 |       As noted, Shady Bird is the assignee of all of Original Lender's right, title,

26 | and interest in and to, *inter alia,* the Loan, Loan Agreement, Note, and Deed of Trust.  In

27 | this regard, in exchange for good and valuable consideration and in furtherance of a

28 | "Non-Recourse Loan Sale Agreement and Joint Escrow Instructions" (the "Loan Sale

**SulmeyerKupetz,** A.P. · sional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311 · FAX 213.629.4520

Agreement") and an "Assignment of Loan Documents" dated December 29, 2020 (the "Assignment of Loan Documents"), Original Lender executed and delivered to Shady Bird an "Assignment of Deed of Trust" dated December 29, 2020, and recorded on January 4, 2021, whereby Original Lender assigned and transferred to Shady Bird all of Original Lender's right, title, and interest in and to the Loan Agreement, the Note, and Deed of Trust.  As such, Shady Bird is the lawful owner and holder of the Note and the Loan Agreement and is the beneficiary of the Deed of Trust.  Moreover, pursuant to an "Allonge" to the Note dated December 29, 2020, all amounts due and owing on the Note by the Debtor are now payable to Shady Bird.

**C.**     **The Debtor's Multiple and Continuing Defaults and Waste Resulting in the Appointment of the Receiver**

Due to the Debtor's defaults under the Loan Agreement, Note, and Deed of Trust for the following undisputed reasons, Shady Bird was left with no alternative but to exercise its rights to not only commence a non-judicial foreclosure sale, but to seek the appointment of a receiver.  Specifically, the following defaults warranted such drastic relief:

•      The Debtor's failure to make the payment of interest due under the Note on October 1, 2019;

•      The Debtor's failure to repay the total indebtedness on the Loan, Note, and Loan Agreement by the Maturity Date;

•      The Debtor's failure to complete the construction of the Project by the Maturity Date;

•      The Debtor's failure to timely pay its contractors and other third parties resulting in multiple mechanic's being recorded against the Project and the Debtor's failure to furnish a sufficient bond causing such liens to be released or giving other satisfactory indemnity within ten days of recording;

•      The Debtor's failure to take reasonable measures to maintain, protect, and secure the Project under the Deed of Trust;

SulmeyerKupetz, A P.    sional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1          •          The Debtor's failure to prevent the Project from becoming

2    vandalized, damaged, destroyed, and deteriorated;

3          •          The Debtor's failure to prevent material physical waste of the Project;

4          •          The Debtor's failure to allow Shady Bird to enter upon and inspect

5    the Project;

6          •          The Debtor's failure to provide evidence of and certificates of

7    insurance to Shady Bird upon request;

8          •          The Debtor's failure to allow inspections by the City of Buena Park

9    and ceasing communications with the City, negatively affecting the permitting process

10   and the ability to complete the Project;

11         •          The Debtor's failure to maintain various systems and improvements

12   on the Project such as the elevator, electrical, HVAC, and plumbing;

13         •          The Debtor's failure to provide any security for the Project and

14   improvements; and

15         •          The Debtor's failure to timely test the fire-life safety systems which

16   could completely destroy the Project.

17         Compounding the Project's serious problems, on February 16, 2021, the

18   day before the Receiver's appointment, Shady Bird received a "Notice of Default Under,

19   and Exercise of Option to Terminate, Ground Lease" from the Ground Lessor, advising

20   Shady Bird that the Ground Lease was being immediately terminated.[4]  As detailed in the

21   termination notice, the Ground Lease was terminated due to a number of defaults,

22   including "[the Debtor's] failure to construct or cause to be constructed to substantial

23   completion upon the Hotel Complex Premises all Improvements on or prior to December

24   1, 2019 in violation of Article 11.1, as amended" and "[Ground] Lessor has received

25   copies of Notices of Lis Pendens, copies attached, reflecting the commencement of

26   _____

27   [4] A true and correct copy of the termination notice is attached hereto as Exhibit "A" and incorporated herein
     by reference.

28

SulmeyerKupetz, A P.
...sional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    foreclosures of numerous mechanic's liens, a violation of Article 20.1(c)."  In order to

2    escape the ramifications of the termination, the Ground Lessor rescinded the termination

3    on March 22, 2021, however, the defaults that first occasioned the termination remain.[5]

4            As a result of the foregoing defaults, the principal sum of not less than

5    $24,988,808.74 is due and owing to Shady Bird.[6]  Hence, Original Lender, and now

6    Shady Bird as assignee, initiated a non-judicial foreclosure under the Deed of Trust, and

7    a foreclosure sale was scheduled for March 1, 2021.  Shady Bird also exercised its

8    remedies under the Deed of Trust by seeking the *ex parte* appointment of a receiver.  As

9    highlighted, on February 17, 2021, the state court granted Shady Bird's request and the

10    Receiver was appointed.[7]  The Receiver assumed immediate control of the Project, but

11    due to the chapter 11 filing, the March 1, 2021, foreclosure sale did not proceed.[8]

12

13

14

15

---

16 [5] Shockingly, Donald Chae, who directed the Ground Lessor to terminate the Ground Lease the day before
the hearing to appoint the Receiver, filed schedules under penalty of perjury which scheduled the Ground
17 Lease as an asset.  Only after Shady Bird pointed out the pre-petition termination of the Ground Lease in
its "Omnibus Response of Shady Bird Lending, LLC to (1) Motion for Entry of An Order: (A) Requiring
18 Turnover of Estate Cash By Evertrust Bank; (B) Authorizing Debtor to Use Cash Collateral; and (C)
Authorizing Debtor to Obtain Post-Petition Financing From M+D Properties On An Unsecured Basis, and
19 (2) Motion for Entry of Order Authorizing Debtor to Provide Adequate Assurance of Future Payment to
Utility Companies Pursuant to 11 U.S.C. § 366; Declaration of Ronald Richards in Support Thereof"
20 [Docket No. 39] did Mr. Chae then direct the Ground Lessor to rescind the termination.  This further
supports a finding that the Debtor's management is not only grossly incompetent, but is engaging in
21 dishonest behavior, to the point where the schedules actually contained knowingly false statements.  This
is the type of gamesmanship this Debtor's operator is capable of, and demonstrates why the Project has no
22 chance of survival under his leadership.

23 [6] The Debtor and the Guarantors also are liable for additional amounts on the Note, Loan Agreement, and
guaranty for interest, default interest, late fees, and costs and attorneys' fees incurred by Original Lender
24 and Shady Bird in connection with collection and enforcement of the Note, Loan Agreement, and guaranty.
These amounts are preserved by Shady Bird, and are not waived in any action or proceeding as a result of
this case.

25 [7] Pursuant to Rule 201 of the Federal Rules of Evidence, the Court is respectfully requested to take judicial
notice of the February 17, 2021, order, a true and correct copy of which is attached hereto as Exhibit "B"
26 and incorporated herein by reference.

27 [8] The events occurring since her appointment (including photographs detailing the current state of the
Project) are detailed in the declaration of Bellann R. Raile, affixed hereto.

28

SulmeyerKupetz, A P. ......sional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**D.**    **The Inspection Report Commissioned By the Receiver Demonstrates**
**Why the Receiver Should Be Excused From Compliance With 11**
**U.S.C. § 543(b)**

As highlighted earlier, the Receiver commissioned an inspection report from Urban Advisory to provide her an analysis of the Project's current physical condition. Urban Advisory' conclusions (as detailed in the Report which is supported by additional photographs) are quite troubling.  The Report details the following:

•    The hotel is an idled construction project, which is roughly 70% complete

•    There are substantial roof issues which currently permit the intrusion of water into the structure

•    The construction assemblies on the roof are incomplete and create an opportunity for water infiltration

•    The fire sprinkler system is not currently capable of providing life-safety protection for the Project

•    Due to neglect and exposure to UV rays, the pool deck will need substantial repair

•    The pool has an accumulation of water and trash making it a breeding ground for mosquitos, which may carry the West Nile Virus

•    Completed business finishes are not being protected and are exposed to waste or damage

•    A potentially hazardous situation may exist if the building sewer system is not connected to the public system

•    HVAC package units have been left unsecured and accessible to thieves and vandals

•    There are hazardous and caustic chemical unsecured at the Project

As borne out by the Report, these are serious issues which quite obviously are negatively affecting Shady Bird's collateral, and jeopardizing the rights of other

SulmeyerKupetz, A.P.
sional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    creditors.  The Debtor, who solely is responsible for the shabby construction and neglect

2    of the Project, can no longer be trusted to preserve the Project's value.  Since the

3    interests of creditors, notably, Shady Bird, would be better served by permitting the

4    Receiver to remain in possession, custody, or control of the Project, the Receiver's

5    compliance with Section 543(b) must be excused.[9]

6                                                IV.

7    **THE RECEIVER SHOULD BE EXCUSED FROM COMPLIANCE WITH THE**

8    **TURNOVER REQUIREMENTS OF 11 U.S.C. § 543(b)**

9                Generally, upon the filing of a chapter 11 case, "[a] custodian with

10   knowledge of the commencement of a case under this title concerning the debtor may not

11   make any disbursement from, or take any action in the administration of, property of the

12   debtor . . . except such action as is necessary to preserve such property."  11 U.S.C. §

13   543(a).[10]  Instead, a custodian must "deliver to the trustee any property of the debtor held

14   by or transferred to such custodian . . . on the date that such custodian acquires

15   knowledge of the commencement of the case."  11 U.S.C. § 543(b)(1).[11]

16               A court, however, has discretion under Section 543(d)(1) to excuse a state

17   court receiver from its mandatory turnover obligation under Section 543(b)(1).  See In re

18   Corporate & Leisure Event Prods., Inc., 351 B.R. 724, 732 (Bankr. D. Ariz. 2006).  The

19   party requesting excusal from turnover must show, by a preponderance of evidence, that

20   _____

21   [9] Due to the Debtor's pre and post-petition gross mismanagement, dishonesty, and incompetence, Shady
     Bird anticipates filing a separate motion seeking the appointment of a chapter 11 trustee.

22

23   [10] In a letter dated March 1, 2021, the Debtor formally asked Shady Bird to order the Receiver to
     immediately comply with Section 543(b)(1) and (b)(2) by turning over and accounting for all of the Debtor's
     property now in the Receiver's possession, custody, or control. Shady Bird advised the Debtor that it would

24   not comply with the request pending a ruling on the Motion, which is timely under Section 27(a)-(c) of the
     February 17, 2021, order based on the Debtor's agreement not to use the delay in filing the Motion as a

25   defense.

26   [11] The obligation of a custodian to turn over property of the debtor to the "trustee," upon learning of the
     commencement of a bankruptcy case by the debtor, also requires a custodian to turn over such property to
     a debtor in possession in a chapter 11 case, where a trustee has not been appointed. See 11 U.S.C. §

27   1107(a). Shady Bird concedes that a receiver appointed by a state court is a "custodian" subject to Section
     543(b). See 11 U.S.C. § 101(11); In re Franklin, 476 B.R. 545, 551 (Bankr. N.D. Ill. 2012).

28

SulmeyerKupetz, A P. ... sional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1   the best interests of the creditors are served by permitting a custodian to retain control of

2   the estate.[12] Franklin, 476 B.R. at 551 (citing In re Falconridge, LLC, 2007 WL 3332769

3   at *6-7 (Bankr. N.D. Ill. 2007). If such a showing is made, the burden shifts to the debtor

4   to show why turnover is appropriate. In re Plihal, 97 B.R. 561, 564 (Bankr. D. Neb.

5   1989).

6           At all times, the "paramount and sole concern is the interests of *all*

7   creditors." Falconridge, 2007 WL 3332769, at *7 (citing In re KCC-Fund V, Ltd., 96 B.R.

8   237, 239 (Bankr. W.D. Mo. 1989) (emphasis in original). The interests of the debtor are

9   not to be considered. Falconridge, at *7 (citing Dill v. Dime Bank (In re Dill), 163 B.R.

10  221, 225 (E.D.N.Y. 1994)); Foundry of Barrington P'ship v. Barrett (In re Foundry of

11  Barrington P'ship), 129 B.R. 550, 557 (Bankr. N.D. Ill. 1991).

12          In determining whether a custodian of property of the debtor should be

13  excused from turnover, courts have reviewed the following:

14          •       The likelihood of reorganization, and whether funds held by the

15  receiver are required for reorganization;[13]

16          •       Whether the debtor mismanaged the property;

17          •       Whether turnover would injure the creditors;

18          •       Whether the debtor would use the property for the creditors' benefit;

19          •       Whether there are avoidance issues raised with respect to property

20  retained by a receiver, because a receiver does not possess avoiding powers for the

21  benefit of the estate; and

22

23

---

24  [12] The definition of a "preponderance of evidence" is evidence which is of greater weight or more
    convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows
25  that the fact sought to be proved is more probable than not. Turmon v. Cooper (In re Cooper), 2012 Bankr.
    LEXIS 6119, 2012 WL 8135655 (Bankr. E.D. Cal. 2012).
26
    [13] An alternative statement of this factor is "the likelihood of a reorganization, and the probability that funds
27  required for reorganization will be available." In re Northgate Terrace Apts., Ltd., 117 B.R. 328, 332 (Bankr.
    S.D. Ohio 1990).
28

SulmeyerKupetz, A P. sional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1          •          The fact that the automatic stay has deactivated the state court

2   Receiver Action.[14]

3          Reduced to its core, the primary factors courts consider include "(1)

4   whether there will be sufficient income to fund a successful reorganization; (2) whether

5   the debtor will use the property for the benefit of its creditors; and (3) whether there has

6   been mismanagement by the debtor." In re Orchards Vill. Invs., LLC., 405 B.R. 341, 353

7   (Bankr. D. Or. 2009) (quoting Dill, 163 B.R. at 225). Even if these three prongs are

8   resolved in favor of the debtor, the court still may excuse compliance if turnover would be

9   injurious to creditors. First Nat'l Bank v. Powers Aero Marine Services (In re Powers

10  Aero Marine Service), 42 B.R. 540 (Bankr. S.D. Tex. 1989). So, while "[r]eorganization

11  policy generally favors turnover of business assets to the debtor in a chapter 11 case," it

12  is not axiomatic that receivers must, in each instance, turnover assets to a debtor.

13  Orchards Vill. Invs., 405 B.R. at 352.

14         For instance, where there is evidence establishing that the interests of

15  creditors would be better served by allowing the receiver to remain in possession and

16  control of property of the estate, courts have denied turnover motions by the debtor and

17  granted motions to excuse turnover. See Orchards Vill. Invs., supra, (excusing state

18  court receiver from turnover of assets to debtor under Section 543(d)(1), after applying

19  three relevant factors, where receivership had been in place for approximately six months

20  before the debtor filed for relief under chapter 11 and had improved substantially the

21  conditions which caused the court to appoint the receiver); In re Wallace, 2011 Bankr.

22  LEXIS 4382, 2011 WL 5827623 (Bankr. D. Idaho 2011) (consideration of Orchards Vill.

23  Invs. factors in light of record suggested that excusing receiver from requirements of

24  Section 543 was appropriate since debtors were unable to show how there would be

25  sufficient income to fund chapter 11 plan and court was not convinced debtors would act

26  _____

27  [14] See In re Attack Properties, LLC, 478 B.R. 337 (N.D. Ill. 2012) (citing Franklin, 476 B.R. at 551); Dill, 163 B.R. at 225.

28

SulmeyerKupetz, A P..., ...sional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Pr... ..sional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    in best interests of creditors); In re Bryant Manor, LLC, 422 B.R. 278 (Bankr. D. Kan.

2    2010) (receiver excused from compliance with Section 543 after finding that there were

3    serious issues as to likelihood of reorganization and whether there would be funds

4    available for reorganization if debtor regained control over property, and there were

5    deferred maintenance and upkeep issues on the property prior to the appointment of

6    receiver mandating retention of receiver so value of secured creditor's collateral would

7    not be diminished by failure to perform routine maintenance).

8         Here, although this case is in its infancy, the Project is not, and the pre-

9    petition events leading to this filing demonstrate why the interests of creditors will be

10    better served by excusing compliance with Section 543(b). In fact, each of the three

11    Orchards Vill. Invs. factors militate in favor of excusing compliance with the turnover

12    provisions of the Code.

13         First, there presently is a complete lack of income, let alone sufficient

14    income, to fund a successful reorganization.[15] The Debtor has been in default of its

15    obligations under the Loan since October 1, 2019. Since that time, there has been no

16    refinancing of Shady Bird's debt, and a complete lack of any evidence showing that either

17    take out financing or additional construction financing has been (or will be) secured. In

18    fact, construction came to a halt due to the simple fact that the Debtor lacks the funds to

19    carry out even the most basic construction projects. Given the plight and deterioration of

20    the Project, there is no basis to assume that anything will change in the short term. And

21    during this time, the Project will continue to deteriorate as its infrastructure remains

22    subject to the elements and ongoing vandalism, which already has occurred.

23

24

25    ────────────────

26 [15] The Debtor's first Monthly Operating Report filed on March 22, 2021 [Docket No. 40] showed that the
Debtor had $0.00 in its debtor in possession accounts. Although the Debtor recently obtained an order
requiring the turnover of three accounts from Evertrust Bank and authorizing a DIP loan in an amount not to

27    exceed $100,000 from the Debtor's affiliate, this hardly demonstrates an entity with sufficient capitalization
to accomplish anything but keep the Project insured and the lights on.

28

1    Second, there is no reason to believe the Debtor will use the Project for the

2   benefit of its creditors, including Shady Bird.  As noted, the Project already has suffered

3   dramatically during the Debtor's ownership and its embarrassing attempt at construction,

4   and it will continue to suffer the longer it remains in the Debtor's hands.  The Debtor has

5   no ability to restart, let alone complete, construction, and it lacks the ability to cure the

6   existing loan default or service Shady Bird's debt.  This says nothing of the Debtor's

7   inability to compensate the multitude of vendors and contractors, many of whom have

8   filed mechanic's liens and *lis pendens* against the Property.  None of these creditors

9   believe the Project should be returned to the Debtor.

10    Finally, the evidence of mismanagement and negligence is overwhelming.

11   The events surrounding the pre-petition termination and post-petition resuscitation of the

12   Ground Lease more than demonstrates the Debtor's dishonesty.  In addition, the fact that

13   a Receiver was appointed further establishes that the state court agreed with Shady

14   Bird's concerns that the current state of disrepair and lack of insurance warranted the

15   drastic remedy of appointing a receiver to assume control over the Project.  The Report

16   prepared by Urban Advisory only reinforces why the appointment of a receiver was

17   desperately needed and should not be disturbed.

18    As such, only an independent state court neutral, not the incompetent,

19   dishonest, cash-poor Debtor, should remain in control of the Project.  This will ensure that

20   the Project is insured, that the Project is secured, and that either a buyer is located who

21   will fund the final construction costs and will ensure that past and future contractors and

22   suppliers are timely paid, or a foreclosure sale will occur which will allow Shady Bird to

23   take control over this Project.

24    Thus, it is in the best interests of creditors, as well as the Debtor, that the

25   construction project and development be stabilized by the Receiver.  Time is of the

26   essence with this Project; the longer it sits in its present dilapidated state, the more its

27   value erodes to the prejudice of Shady Bird and other creditors.  These objectives cannot

28   possibly be achieved if the Court displaces the Receiver and compels turnover under

SulmeyerKupetz, A F
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520
...sional Corporation

1    Section 543(b). The Debtor has no funds available that it can use to do any work

2    towards completing the construction of the Project, and, without post-petition financing

3    (which is unrealistic at this point), the Debtor has no money with which to perform any

4    work on the Project or to fund its chapter 11 case.

5         All of this compels the conclusion that the Debtor has no ability to complete

6    the Project, let alone complete and stabilize the Project. That leaves the existing state

7    court receivership as the only viable option for ensuring that the Project's value does not

8    further depreciate, and for stabilizing the Project pending a sale or foreclosure. Under

9    these circumstances, the only viable choice is for this Court to allow the Receiver to

10   continue to perform and control the stabilization of the Project, under the supervision and

11   control of the state court. That, in turn, requires this Court to excuse the Receiver's

12   compliance with Section 543(b). Not only is this decision compelled by the

13   circumstances, but also, it will avoid what appear to be delays and inefficiencies that

14   inevitably would result if the Debtor were permitted to displace the Receiver and regain

15   control of the Project.

16                    *[Remainder of page intentionally left blank]*

17

18

19

20

21

22

23

24

25

26

27

28

SulmeyerKupetz, A P... ...ssional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

## V.

## <u>CONCLUSION</u>

Based on the foregoing, Shady Bird respectfully requests that the Motion be granted in all respects, and for such other and further relief as the Court deems just and proper under the circumstances.

DATED: March 25, 2021          **Sulmeyer**Kupetz
                               A Professional Corporation


By: */s/ Daniel A. Lev*_____
          Daniel A. Lev
          Attorneys for Shady Bird Lending, LLC

DATED: March 25, 2021          Law Offices of Ronald Richards & Associates, APC


By: */s/ Ronald Richards*_____
          Ronald Richards
          Attorneys for Shady Bird Lending, LLC

**DECLARATION OF RONALD RICHARDS**

I, Ronald Richards, declare and state as follows:

1.      At all times relevant hereto, I have been the non-member, manager for Shady Bird Lending, LLC, a California limited liability company ("Shady Bird"). In this capacity, I have personal knowledge of the facts set forth in this declaration, and if called as a witness for this purpose, I could and would testify competently under oath to them.

2.      I make this declaration in support of the "Motion of Shady Bird Lending, LLC for Order Excusing State Court Receiver From Turnover of Assets Pursuant to 11 U.S.C. § 543; Memorandum of Points and Authorities; Declarations of Ronald Richards, Bellann R. Raile, and Brent Little in Support Thereof" (the "Motion"), through which Shady Bird, the holder of the senior deed of trust on the real property bearing APN Nos. 276-361-20 and 276-361-22, consisting of a partially constructed 178-room, seven story hotel building located in Buena Park, California (the "Project") owned by the debtor The Source Hotel, LLC (the "Debtor"), seeks an order, among other things, excusing the state court receiver from turnover of the Debtor's assets, including the Project, and authorizing the state court receiver, on an interim basis, to take the steps necessary and appropriate to preserve and protect the assets of the Debtor pursuant to 11 U.S.C. § 543(d)(1).

3.      I am not a member or owner of Shady Bird, but I am the only one who is authorized to execute settlements or act on behalf of the entity.

4.      Shady Bird is the assignee of that certain construction loan (the "Loan") entered into on or about May 24, 2016, by and between Evertrust Bank (the "Original Lender") and the Debtor, in the principal amount of $24,988,808.  The Loan was made pursuant to a Construction Loan Agreement (the "Loan Agreement") dated May 24, 2016, between the Debtor and Original Lender.  The purpose of the Loan was for the development and construction of a 178-room, 7 story hotel project.  In addition to the Project, the Debtor is the ground lessee under a 99-year "Memorandum of Ground Lease" (the "Ground Lease") with ground lessor, The Source at Beach, LLC (the "Ground

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  Lessor"). Although the Ground Lease was terminated on February 16, 2021, by Ground

2  Lessor, not surprisingly, the termination was just rescinded. However, the defaults which

3  caused the termination notice to be sent still remain.

4        5.    In furtherance of the Loan Agreement, as evidence of the Loan, and

5  for value received in the maximum principal amount of $29,500,000 by the Debtor from

6  Original Lender, the Debtor executed and delivered to Original Lender the Promissory

7  Note (the "Note"). According to the Note, the Debtor agreed to make monthly payments

8  of interest commencing on July 1, 2016, until the Note's original maturity date of

9  December 1, 2017 (the "Original Maturity Date"). Upon the Original Maturity Date, the

10  entire unpaid principal, all accrued interest, and other costs and fees were due and

11  payable without demand or notice. As explained below, pursuant to five extension

12  agreements, the Original Maturity Date was extended to November 1, 2019 (the "Maturity

13  Date"). An event of default under the Note is defined as any event of default under the

14  Loan Agreement.

15        6.    To secure repayment and performance of the Debtor's obligations

16  under, *inter alia,* the Loan Agreement and Note, the Debtor executed and delivered to

17  Original Lender a deed of trust (the "Deed of Trust") pursuant to which, *inter alia,* Original

18  Lender was granted a first priority lien against the Debtor's rights in the Project and the

19  Ground Lease. Specifically, the Deed of Trust grants Original Lender, and Shady Bird,

20  as its assignee, a first priority security interest and lien in the Debtor's leasehold interest

21  in the Project; all right, title, and interest in and to the Ground Lease; rents, income and

22  profits arising from or pursuant to the Ground Lease; and the use, occupancy, and

23  enjoyment of the Project along with all other real and personal property described in the

24  Deed of Trust. The Deed Trust further grants, transfers, and assigns to Shady Bird, as

25  assignee, all of the Debtor's right, title, and interest in and to any building, improvements,

26  fixtures, structures, and equipment located or erected on the Project (collectively, the

27  "Improvements").

28

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

7.    The Deed of Trust also requires the Debtor to maintain insurance on the Project (as defined therein) and to protect Shady Bird's security interest in the Project against loss or damage by fire and other risks.  As assignee, Shady Bird also shall be named as the primary loss payee under all of the insurance policies and the Debtor is required to assure that Shady Bird receives a certificate from each insurance company that acknowledges Shady Bird's position as loss payee and that states that the insurance policy cannot be terminated as to Shady Bird except upon 30-days prior written notice.

8.    The Deed of Trust further requires the Debtor to maintain and preserve the Project, including, *inter alia*: (i) keeping the Project in good condition and repair; (ii) using commercially reasonable efforts to complete or restore promptly and in good and workmanlike manner the Project, or any part thereof, which may be damaged or destroyed; (iii) not committing or permitting material physical waste of the Project or any portion thereof; and (iv) doing all other acts which from the character or use of the Project may be reasonably necessary to maintain, preserve, and enhance its value and otherwise performing such appropriate upkeep and maintenance to the Project to ensure that the Project, and each part thereof, is maintained in a first-class manner and retains at all times a first-class appearance and condition.

9.    According to the Deed of Trust, Shady Bird is provided the right to inspect the Project for purposes of ensuring the Debtor's compliance with its obligations under the Deed of Trust.  Finally, the Deed of Trust not only gives Shady Bird the right to perform various acts in the event of the Debtor's failure to perform in order to protect the collateral, but it also allows Shady Bird to bring an action for specific performance or for appointment of a receiver to take possession of the Project and operate the business of the Debtor, if any, being conducted on the Project.

10.    The Loan and Note originally matured on the Original Maturity Date of December 1, 2017.  Thereafter, at the request of the Debtor and the guarantors of the Loan and Note, namely, Donald Chae and Min Chae (collectively, the "Guarantors"), the Debtor, Guarantors, and Original Lender entered into a "First Extension Agreement"

DAL 2710605v1

22

SulmeyerKupetz, A P  ...ssional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

1   dated December 22, 2017 (the "First Extension"), whereby, *inter alia*, pursuant to the

2   terms therein, (i) the Original Maturity Date was extended to June 1, 2018, and (ii) the

3   completion date of the Project was extended to June 1, 2018. Thereafter, pursuant to a

4   "Second Extension Agreement," "Third Extension Agreement," "Fourth Extension

5   Agreement," and "Fifth Extension Agreement" (collectively with the First Extension, the

6   "Extension Agreements"), the Original Maturity Date of the Loan, Loan Agreement, and

7   Note, and the completion date of the Project, were extended to November 1, 2019 (the

8   "Maturity Date").

9       11.    As noted, Shady Bird is the assignee of all of Original Lender's right,

10  title, and interest in and to, *inter alia,* the Loan, Loan Agreement, Note, and Deed of

11  Trust. In this regard, in exchange for good and valuable consideration and in furtherance

12  of a "Non-Recourse Loan Sale Agreement and Joint Escrow Instructions" (the "Loan Sale

13  Agreement") and an "Assignment of Loan Documents" dated December 29, 2020 (the

14  "Assignment of Loan Documents"), Original Lender executed and delivered to Shady Bird

15  an "Assignment of Deed of Trust" dated December 29, 2020, and recorded on January 4,

16  2021, whereby Original Lender assigned and transferred to Shady Bird all of Original

17  Lender's right, title, and interest in and to the Loan Agreement, the Note, and Deed of

18  Trust. As such, Shady Bird is the lawful owner and holder of the Note and the Loan

19  Agreement and is the beneficiary of the Deed of Trust. Moreover, pursuant to an

20  "Allonge" to the Note dated December 29, 2020, all amounts due and owing on the Note

21  by the Debtor are now payable to Shady Bird.

22      12.    Due to the Debtor's defaults under the Loan Agreement, Note, and

23  Deed of Trust for the following undisputed reasons, Shady Bird was left with no

24  alternative but to exercise its rights to not only commence a non-judicial foreclosure sale,

25  but to seek the appointment of a receiver. Specifically, the following defaults warranted

26  such drastic relief:

27      •    The Debtor's failure to make the payment of interest due under the

28  Note on October 1, 2019;

SulmeyerKupetz, A P. ssional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1          •          The Debtor's failure to repay the total indebtedness on the Loan,

2    Note, and Loan Agreement by the Maturity Date;

3          •          The Debtor's failure to complete the construction of the Project by

4    the Maturity Date;

5          •          The Debtor's failure to timely pay its contractors and other third

6    parties resulting in multiple mechanic's being recorded against the Project and the

7    Debtor's failure to furnish a sufficient bond causing such liens to be released or giving

8    other satisfactory indemnity within ten days of recording;

9          •          The Debtor's failure to take reasonable measures to maintain,

10   protect, and secure the Project under the Deed of Trust;

11         •          The Debtor's failure to prevent the Project from becoming

12   vandalized, damaged, destroyed, and deteriorated;

13         •          The Debtor's failure to prevent material physical waste of the Project;

14         •          The Debtor's failure to allow Shady Bird to enter upon and inspect

15   the Project;

16         •          The Debtor's failure to provide evidence of and certificates of

17   insurance to Shady Bird upon request;

18         •          The Debtor's failure to allow inspections by the City of Buena Park

19   and ceasing communications with the City, negatively affecting the permitting process

20   and the ability to complete the Project;

21         •          The Debtor's failure to maintain various systems and improvements

22   on the Project such as the elevator, electrical, HVAC, and plumbing;

23         •          The Debtor's failure to provide any security for the Project and

24   improvements; and

25         •          The Debtor's failure to timely test the fire-life safety systems which

26   could completely destroy the Project.

27         13.          In addition, as alluded to earlier, on February 16, 2021, Shady Bird

28   received a "Notice of Default Under, and Exercise of Option to Terminate, Ground Lease"

SulmeyerKupetz, A P...ssional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A       ssional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1   from the Ground Lessor, advising Shady Bird that the Ground Lease was being

2   immediately terminated.  A true and correct copy of the termination notice is attached

3   hereto as Exhibit "A" and incorporated herein by reference.  On March 22, 2021, Shady

4   Bird received a notice of recission from the Ground Lessor, however, the defaults that

5   first occasioned the termination remain.

6          14.    As a result of the foregoing defaults, the principal sum of not less

7   than $24,988,808.74 is due and owing to Shady Bird.  Hence, Shady Bird, as assignee,

8   initiated a non-judicial foreclosure under the Deed of Trust, and a foreclosure sale was

9   scheduled for March 1, 2021.  Shady Bird also exercised its remedies under the Deed of

10  Trust by seeking the *ex parte* appointment of a receiver.  On February 17, 2021, the state

11  court granted Shady Bird's request and the Receiver was appointed.  A true and correct

12  copy of the February 17, 2021, order is attached hereto as Exhibit "B" and incorporated

13  herein by reference.  The Receiver assumed immediate control of the Project, but due to

14  the chapter 11 filing, the March 1, 2021, foreclosure sale did not proceed.

15         15.    The Debtor and Guarantors also are liable for additional amounts on

16  the Note, Loan Agreement, and guaranty for interest, default interest, late fees, and costs

17  and attorneys' fees incurred by Original Lender and Shady Bird in connection with

18  collection and enforcement of, *inter alia*, the Note, Loan Agreement, and guaranty.

19  These amounts are preserved by Shady Bird, and are not waived in any action or

20  proceeding as a result of these cases.

21                      *[Remainder of page intentionally left blank]*

22

23

24

25

26

27

28

16.     Due to the serious issues identified by the Receiver, it is in the best interests of Shady Bird and other creditors that the Project remain under the custody, control, and possession of the Receiver.  Time is of the essence with this Project; the longer it sits in its present dilapidated state, the more its value erodes to the prejudice of Shady Bird and other creditors.  As such, only the Receiver should remain in control of the Project.  This will ensure that the Project is insured, that the Project is secured, and that either a buyer is located who will fund the final construction costs and will ensure that past and future contractors and suppliers are timely paid, or a foreclosure sale will occur which will allow Shady Bird to take control over this Project.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 25th day of March, 2021, at Los Angeles, California.

/s/ Ronald Richards
Ronald Richards

SulmeyerKupetz, A ... ssional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

### DECLARATION OF BELLANN R. RAILE

I, Bellann R. Raile, declare and state as follows:

1.     I am over the age of eighteen and am the duly appointed, qualified, and acting state court receiver for the real property bearing APN Nos. 276-361-20 and 276-361-22, consisting of a partially constructed 178-room, seven story hotel building located in Buena Park, California (the "Project") owned by the debtor The Source Hotel, LLC (the "Debtor").  The facts stated herein are true of my own personal knowledge and I could and would competently testify thereto as follows.

2.     I make this declaration in support of the "Motion of Shady Bird Lending, LLC for Order Excusing State Court Receiver From Turnover of Assets Pursuant to 11 U.S.C. § 543; Memorandum of Points and Authorities; Declarations of Ronald Richards, Bellann R. Raile, and Brent Little in Support Thereof" (the "Motion"), through which Shady Bird Lending, LLC ("Shady Bird"), the holder of the senior deed of trust on the real property bearing APN Nos. 276-361-20 and 276-361-22, consisting of a partially constructed 178-room, seven story hotel building located in Buena Park, California owned by the debtor The Source Hotel, LLC (the "Debtor"), seeks an order, among other things, excusing me, as the appointed state court receiver, from turnover of the Debtor's assets, including the Project, and authorizing me, as receiver, on an interim basis, to take the steps necessary and appropriate to preserve and protect the assets of the Debtor pursuant to 11 U.S.C. § 543(d)(1).

3.     After my appointment as receiver on February 17, 2021, I immediately undertook those duties imposed on me by the operative order and applicable state law.  I have personally viewed and inspected the Project, have ordered an inspection report from Urban Advisory and Building Group, LLC ("Urban Advisory"), and have attempted to gain an understanding of the financial position and structure of the Debtor.  Although I was only appointed on February 17, 2021, it is clear to me that there are no substantial business operations being performed by the Debtor at the Project.

SulmeyerKupetz, A     ssional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1          4.      Specifically, the Debtor's hotel is only partially constructed and is

2    completely non-operational.  For instance, the hotel is not permitted for occupancy and is

3    not generating a single dollar of income.  There are no rooms for let, there is no

4    electricity, there is no running water, there are no functioning systems for HVAC or fire-

5    life safety, there are no restaurants, there are no bars, there are no gift shops, there are

6    no retail stores, there are no pools or spas, there are no ballrooms, there is no fitness or

7    business center, and there is no convention space.  In other words, this is not a

8    functioning hotel.  More troubling are the conclusions of Urban Advisory as contained in

9    its "Property Inspection Report for The Source OC Hilton Hotel," dated March 10, 2021

10   (the "Report").  The Report details the serious issues of neglect, waste, and disrepair at

11   the Project.

12         5.      As further evidence of this fact, I commissioned a series of

13   photographs to be taken of the Project, showing its current state of construction and

14   disrepair as of the date of my appointment.  True and correct copies of a series of

15   photographs I commissioned are attached hereto as Exhibit "C" and incorporated herein

16   by reference.

17         6.      As receiver, I am tasked with, among other things, taking possession

18   of and managing the Project, collecting any income from the Project (of which there is

19   none in this case), caring for the Project and incurring expenses necessary for that care,

20   including procuring the necessary insurance, and securing the Project, including

21   changing any locks.

22              *[Remainder of page intentionally left blank]*

23

24

25

26

27

28

SulmeyerKupetz, A
...ssional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1    7.    In this regard, I have assumed control over the Project, and have

2  taken the steps to ensure that the Project and the improvements located at the site are

3  insured and secured.  My goal is to stabilize the Project pending a sale or foreclosure.

4  Given the current physical state of the Project, and the lack of any income to allow for

5  construction to be completed, in my experience, the only viable alternative is to allow me

6  to continue to perform and control the stabilization of the Project, under the supervision

7  and control of the state court.  That, in turn, requires this Court excuse my compliance

8  with Section 543(b).  I believe that such a decision would be in the best interests of

9  creditors of the Debtor's estate.

10    I declare under penalty of perjury under the laws of the United States of

11  America that the foregoing is true and correct.

12    Executed this 11th day of March, 2021, at Los Angeles, California.

13

14    Bellann R. Raile

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

## DECLARATION OF BRENT LITTLE

I, Brent Little, declare and state as follows:

1.    I am over the age of eighteen and am a principal of Urban Advisory and Building Group, LLC ("Urban Advisory"). I am a licensed general contractor and hold a bachelor of arts degree in Geography from California State University, Fullerton, with an emphasis in urban planning. I have been the principal of several construction, development, and consulting firms for the past twenty-five years. The facts stated herein are true of my own personal knowledge and I could and would competently testify thereto as follows.

2.    I make this declaration in support of the "Motion of Shady Bird Lending, LLC for Order Excusing State Court Receiver From Turnover of Assets Pursuant to 11 U.S.C. § 543; Memorandum of Points and Authorities; Declarations of Ronald Richards, Bellann R. Raile, and Brent Little in Support Thereof" (the "Motion"), through which Shady Bird, the holder of the senior deed of trust on the real property bearing APN Nos. 276-361-20 and 276-361-22, consisting of a partially constructed 178-room, seven story hotel building located in Buena Park, California (the "Project") owned by the debtor The Source Hotel, LLC (the "Debtor"), seeks an order, among other things, excusing the state court receiver from turnover of the Debtor's assets, including the Project, and authorizing the state court receiver, on an interim basis, to take the steps necessary and appropriate to preserve and protect the assets of the Debtor pursuant to 11 U.S.C. § 543(d)(1).

3.    Recently, Urban Advisory was retained by Bellann R. Raile (the "Receiver"), who I understand is duly appointed, qualified, and acting state court receiver for the Project owned by the Debtor. Urban Advisory specifically was retained by the Receiver to provide her with an analysis and written report of the current physical condition of the Project.

4.    In this regard, Steve Cienfuegos, a licensed general contractor employed by Urban Advisory, and I conducted two on-site inspections of the Project, the

SulmeyerKupetz, A ___ ssional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  first on March 3, and the second on March 9, 2021.  In addition to our personal

2  inspection, we also reviewed various stamped approved plans and interviewed several

3  individuals either familiar with the Project or a particularly relevant building system.  As a

4  result of our on-site inspections and analysis, we prepared and sent to the Receiver a

5  "Property Inspection Report for The Source OC Hilton Hotel," dated March 10, 2021 (the

6  "Report").  A true and correct copy of the Report is attached hereto as Exhibit "D" and

7  incorporated herein by reference.

8         5.      In sum, and as detailed in the Report, the hotel is an idled

9  construction project which is roughly 70% complete.  Crucially, there are significant

10  issues of neglect, potential hazardous situations, and safety and environmental concerns

11  at the Project.  Among the areas of concern are the following:  (i) there are substantial

12  roof issues which currently permit the intrusion of water into the structure, (ii) the

13  construction assemblies on the roof are incomplete and create an opportunity for water

14  infiltration, (iii) the fire sprinkler system is not currently capable of providing life-safety

15  protection for the Project, (iv) due to neglect and exposure to UV rays, the pool deck will

16  need substantial repair, (v) the pool has an accumulation of water and trash making it a

17  breeding ground for mosquitos, which may carry the West Nile Virus, (vi) completed

18  business finishes are not being protected and are exposed to waste or damage, (vii) a

19  potentially hazardous situation may exist if the building sewer system is not connected to

20  the public system, (viii) HVAC package units have been left unsecured and accessible to

21  thieves and vandals, and (ix) there are hazardous and caustic chemicals unsecured at

22  the Project.  As noted, these are merely some of the highlights of the Report.

23         I declare under penalty of perjury under the laws of the United States of

24  America that the foregoing is true and correct.

25  Executed this 11th day of March, 2021, at Los Angeles, California.

26

27  Brent Little

28

Stulmeyer Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

# EXHIBIT A

**TO:**

The Source Hotel, LLC ("Lessee")
3100 E. Imperial Highway
Lynwood, CA 90262
Attention: Min Chae and Donald Chae

With a copy to: Lim, Ruger & Kim, LLP
1055 West Seventh Street, Suite 2800
Los Angeles, CA 90017
Attention: Real Estate Department

Shady Bird Lending, LLC ("Lender")
c/o LAW OFFICES OF RONALD RICHARDS & ASSOCIATES, A.P.C.
Ronald N. Richards
P.O. Box 11480
Beverly Hills, CA 90213

LAW OFFICES OF GEOFFREY LONG, A.P.C.
Geoffrey S. Long
1601 N. Sepulveda Blvd., No. 729
Manhattan Beach, CA 90266

Trustee:

STEWART TITLE OF CALIFORNIA, INC.
200 E. Sandpointe Ave., Suite 150
Santa Ana, California 92707

### NOTICE OF DEFAULT UNDER, AND EXERCISE OF OPTION TO TERMINATE, GROUND LEASE

The Source at Beach, LLC ("Lessor") as the ground lessor under that certain *GROUND LEASE by and between THE SOURCE AT BEACH, LLC, a California limited liability company ("Lessor") and THE SOURCE HOTEL, LLC, a California limited liability company ("Lessee") dated as of the 6th day of April, 2015, including any amendments thereto* ("Ground Lease"), hereby gives notice to the Lessee, Lender and Trustee named above of the occurrence of Events of Default under the Ground Lease, and further gives notice of and does hereby, exercise its option to terminate the Ground Lease effective immediately. Such exercise is based on, *inter alia*, the following:

Article 21.1 of the Ground Lease defines certain events, the occurrence of which constitutes an Event of Default. Events of Default include, among others, (1) any failure by Lessee to observe and perform any provision of the Ground Lease [Article 21.1(b)] and (2) the foreclosure of any mechanic's lien [Article 21.1(g)].

Article 11.1 of the Ground Lease, as amended on June 14, 2019, requires Lessee "to construct or cause to be constructed to substantial completion upon the Hotel Complex Premises on or prior to

**December 1, 2019**, all Improvements, which Improvements shall be constructed in accordance with plans and specifications first approved in writing by Lessor." (bold in original).

An Event of Default has occurred as a result of Lessee's failure to construct or cause to be constructed to substantial completion upon the Hotel Complex Premises all Improvements on or prior to December 1, 2019 in violation of Article 11.1, as amended.

Further, Lessor has received copies of Notices of *Lis Pendens*, copies attached, reflecting the commencement of foreclosures of numerous mechanic's liens, a violation of Article 20.1(c) and hence an Event of Default.

The foregoing notice is given and the exercise of said option to terminate is made, without prejudice to any other rights Lessor may have under the Ground Lease or any other agreements, documents or instruments related thereto.

Dated: February 16, 2021

By: _____

Name:  Raymond B. Kim
        Meylan Davitt Jain Arevian & Kim LLP

Title:   Attorneys for Ground Lessor
        The Source at Beach, LLC

1

RECORDING REQUESTED BY

Splinter & Thai, LLP
WHEN RECORDED MAIL TO

Splinter & Thai, LLP
25124 Narbonne Ave., #106
Lomita, CA 90717

**Recorded in Official Records, Orange County**
**Hugh Nguyen, Clerk-Recorder**

|||||||||||||||||||||||||||||  100.00
* R 0 0 1 1 5 3 0 4 7 4 8 *
2020000094236 1:22 pm 03/03/20
7 413A L08   6
0.00 0.00 0.00 0.00 15.00 0.00 0.000.0075.00 3.00

HITS

_____
SPACE ABOVE THIS LINE RESERVED FOR RECORDER'S USE

NOTICE OF PENDENCY OF

ACTION (LIS PENDENS)

EXHIBIT A   034

Robert G. Splinter, Esq., Bar #78284
Min N. Thai, Esq., Bar #232770
SPLINTER & THAI, LLP
25124 Narbonne Avenue, Ste. 106
Lomita, California 90717-2140
(310) 539-6334 telephone
(310) 539-2467 facsimile

Attorney for Plaintiff,
RESCO ELECTRIC INC.,
a California corporation

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ORANGE

| | |
|---|---|
| RESCO ELECTRIC INC.,<br>a California corporation,<br><br>    Plaintiff<br><br>    vs.<br><br>GREENLAND CONSTRUCTION SERVICE, LLC,<br>THE SOURCE HOTEL, LLC,<br>and DOES 1 through 50, inclusive,<br><br>    Defendants | CASE NO.:  30-2020-01135027<br>CU-OR-CJC<br><br>NOTICE OF PENDENCY<br>OF ACTION (LIS PENDENS) |

NOTICE IS HEREBY GIVEN that the above-entitled action stating a real property claim was commenced on February 27, 2020, in the above named Court by plaintiff, Resco Electric, Inc., a California corporation, against Greenland Construction Service, LLC, The Source Hotel, LLC and DOES 1 through 50, inclusive, which is now pending in the above-named Court.

NOTICE OF PENDENCY OF ACTION