

Incomplete attempted repair.

Rusted cap due to internal leak.

EXHIBIT D    138

## Pool and Pool Deck

The pool is exposed to the elements and has an accumulation of water and trash. It is unlikely this presents any potential damage to the structure, however it does serve as a breeding ground for mosquitos, which may carry West Nile Virus. It is believed that the local Vector Control Agency would recommend the pool be drained of any standing water.

The more substantive issue in the pool area is the exposure of the deck membrane to UV rays. Typically, these type of waterproofing systems are damaged by UV rays. During our tour of the property, we encountered Gary Reynolds, who is a contract building inspector for the City of Buena Park and has been dedicated to this project for nearly seven years. He confirmed the developer placed plastic sheeting over the membrane to protect it from UV rays. As can be seen in the accompanying pictures, the plastic did not maintain its coverage of the area. Furthermore, deterioration of the membrane is readily visible.



Plastic covering failing to protect roof membrane.

EXHIBIT D    139



Pool filled with water and trash.

Damage due to UV can be seen in the light patch, which readily rubs off.

Ripples in the membrane joint, which should be resealed.

EXHIBIT D 140

## Protection of Completed Finishes

There is inherent value in the completed work currently in place. These finishes include stone flooring, carpeting, cabinetry and plumbing fixtures. Unfortunately, because of a lack of care and protection, these finishes are being damaged or destroyed.

Some inadequate measures have been implemented at various locations in the building, but they are intermittent and generally unprotective of the underlying finishes.



Stains on carpet because of no protection.

Damaged stone flooring due to no protection.

EXHIBIT D    141

## Sewer System

Upon entering the upper floors, a strong smell of sewer gas is present in nearly all part of the building. We believe the gas is emanating from the open sewer stack located in the stairwell. The stack was fitted with a P trap to contain the smells, but it has long since dried. The stack opening is exposed to allow an air gap for a condensate drain. We also believe dry plumbing fixtures could be contributing to the problem.

However, given the size of the building and its distance from the public sewer system, we are concerned the sewer lines could be filling up into the building.

Typically, a public sewer agency will block or bulkhead the sewer line with a temporary device until the building sewer system has been finaled. At this point the block will be removed and the connection will be complete. As this building has not received its final inspection, there is some likelihood the blockage is in place.

Given the amount of time this project has been delayed, if there is a blockage, there could be a substantial failure of the system, either in the public right of way or the buildings piping, due to the head pressure of sewage in the line. Even in the event there is no damage to the systems, at some point the line could begin to overflow into the building.

To determine if this is a potential issue, the agency should be contacted to obtain permission to drain the line.



Sewer gas entering building through open pipes. Risk of backflow into building.



Toilets have been used or dry and creating hazard.

## Fire Systems

The fire sprinkler system is substantially complete, however it is not currently capable of providing life safety protection for the building. Although the system appears to be charged, the sprinkler heads are not uniformly installed.

It is also unclear if other fire systems are available for deployment, such as smoke seals and fire alarms.

Although the fire load for the building appears to be low, there has been valuable investment in the building and should be a consideration when determining the operation of the systems.

## Safety

The safety and protection of personal and visitors to the building is the utmost priority. Under normal circumstances, the project would be under the supervision of a general contractor and possibly a construction manager. The property would also be receiving regular in-spections from City and agency inspectors.

As these safeguards are not in place, a plan should be adopted for the improvement and regular inspection of the property to insure a safe working environment. Furthermore, consideration should be made to temporary fire protection or notification devices in the event of a fire.

Below is a list of safety issues identified on our inspection:

Hazardous and caustic chemicals improperly placed.

Regular inspection of the operational elevator and renewal of the permit.

Barriers placed around open chase/fall hazard.

Improved signage for safety and exiting.

Requirement for visitors and construction personal to wear appropriate safety clothing (vests, boots, masks and hard hats).

Accessible restroom facilities.

Fire extinguishers mounted in appropriate locations.





Left:: Expired elevator permit. Above: fall hazard. Right: Acid unprotected.

EXHIBIT D   145

Examples of improper construction techniques.

It is unusual to install carpet before drywall is complete.



Shower pan is incorrect and not water-proofed. Moreover, the walls are not the correct type of drywall.

## Further Recommendations

During our inspection, certain irregular or unidentifiable construction practices were observed. For any party wishing to restart construction, it is recommended that a detailed survey of the property be conducted with a comparison to the approved plans to ensure the current construction meets design and code requirements. We also recommend the Receiver retain additional construction experts to assess and protect immediate potential issues, such as the roof exposure, sewer connection, sewer gas mitigation, securing the building documents, closing unnecessary water valves and ensuring a safer work environment.

## Inspectors

The inspection was performed by Brent Little and Steve Cienfuegos.

Mr. Little is a licensed General Contractor and holds a bachelor of arts degree in Geography from California State University, Fullerton with an emphasis in urban planning. He has been the principal of several construction, development and consulting firms in his approximately twenty-five year career.

Mr. Cienfuegos is a licensed General Contractor and holds a bachelor's degree from Whittier College. He has supervised and managed the construction of many commercial buildings, including several high-rise and mixed use projects.

## Disclaimer

This site inspection report was completed without the benefit of any testing and merely observational nature. This includes review of visible major building assemblies such as fire protection, electrical, plumbing and the building structure.

Sincerely,

*Brent Little*

Brent Little
Principal

EXHIBIT D    147







Left: Incorrect type of drywall in bathroom. Left Above: Roof penetrations not properly sealed. Above Middle: Extensive HVAC equipment incomplete. Above Right: Model unit not protected from construction. Right: Seam exhibiting signs of degradation.

Appendix of Additional Photographs

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 333 South Grand Avenue, Suite 3400, Los Angeles, CA 90071.

A true and correct copy of the foregoing document entitled (specify):  MOTION OF SHADY BIRD LENDING, LLC FOR ORDER EXCUSING STATE COURT RECEIVER FROM TURNOVER OF ASSETS PURSUANT TO 11 U.S.C. § 543; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF RONALD RICHARDS, BELLANN R. RAILE, AND BRENT LITTLE IN SUPPORT THEREOF be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (date)  March 25, 2021  I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page.

**2. SERVED BY UNITED STATES MAIL**:
On (date)  March 25, 2021 , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

| | | |
|---|---|---|
| **Debtor** | The Honorable Erithe A. Smith | Nancy S Goldenberg |
| The Source Hotel, LLC | U.S. Bankruptcy Court | Office of the United States Trustee |
| 6988 Beach Blvd, Suite B-215 | Ronald Reagan Federal Building | 411 W Fourth St Ste 7160 |
| Buena Park, CA 90621-6822 | 411 W. Fourth Street, Suite 5040 | Santa Ana, CA 92701-8000 |
| | Santa Ana, CA 92701 | |

☐ Service information continued on attached page.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served)**: Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (date)  March 18, 2021 , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| March 25, 2021 | Cheryl Caldwell | /s/Cheryl Caldwell |
| Date | Printed Name | Signature |

CC 2710485v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                 **F 9013-3.1.PROOF.SERVICE**

**ADDITIONAL SERVICE INFORMATION (if needed):**

**1. SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

Ron Bender on behalf of Debtor The Source Hotel, LLC
rb@lnbyb.com

Michael G Fletcher on behalf of Creditor Evertrust bank
mfletcher@frandzel.com, sking@frandzel.com

Nancy S Goldenberg on behalf of U.S. Trustee United States Trustee (SA)
nancy.goldenberg@usdoj.gov

Daniel A Lev on behalf of Creditor Shady Bird Lending, LLC
dlev@sulmeyerlaw.com, ccaldwell@sulmeyerlaw.com;dlev@ecf.inforuptcy.com

Daniel A Lev on behalf of Interested Party Courtesy NEF
dlev@sulmeyerlaw.com, ccaldwell@sulmeyerlaw.com;dlev@ecf.inforuptcy.com

Grant A Nigolian on behalf of Interested Party Courtesy NEF
grant@gnpclaw.com, process@gnpclaw.com;grant.nigolian@gmail.com

Juliet Y Oh on behalf of Debtor The Source Hotel, LLC
jyo@lnbrb.com, jyo@lnbrb.com

Ho-El Park on behalf of Interested Party Courtesy NEF
hpark@hparklaw.com

Ronald N Richards on behalf of Interested Party Courtesy NEF
ron@ronaldrichards.com, morani@ronaldrichards.com

United States Trustee (SA)
ustpregion16.sa.ecf@usdoj.gov

CC 2710485v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                    **F 9013-3.1.PROOF.SERVICE**

1    RON BENDER (SBN 143364)
     JULIET Y. OH (SBN 211414)
2    LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
3    10250 Constellation Boulevard, Suite 1700
     Los Angeles, California 90067
4    Telephone:  (310) 229-1234
     Facsimile:  (310) 229-1244
5    Email:  RB@LNBYB.COM; JYO@LNBYB.COM

6    Proposed Attorneys for Chapter 11 Debtor and
     Debtor-in-Possession
7

8                    UNITED STATES BANKRUPTCY COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10                        SANTA ANA DIVISION

11

12

13   In re:                                Case No.: 8:21-bk-10525-ES

14   THE SOURCE HOTEL, LLC, a              Chapter 11
     California limited liability company,
15                                         **OPPOSITION TO MOTION OF SHADY
         Debtor and Debtor in Possession.   BIRD LENDING, LLC FOR ORDER
16                                          EXCUSING STATE COURT RECEIVER
                                            FROM      TURNOVER     OF    ASSETS
17                                          PURSUANT    TO    11    U.S.C.   §   543;
                                            DECLARATIONS OF DONALD CHAE IN
18                                          SUPPORT THEREOF**

19                                          [DECLARATION OF ROBERT "CHARLIE"
20                                          CERVANTES    FILED    CONCURRENTLY
                                            HEREWITH]
21
                                            Hearing:
22                                          Date:      April 15, 2021
                                            Time:      10:30 a.m.
23                                          Place:     ZoomGov
24

25

26

27

28

                                        1

# TABLE OF CONTENTS

I.     INTRODUCTORY STATEMENT ................................................................ 2

II.    STATEMENT OF FACTS ....................................................................... 3

    A.    Background .................................................................... 3

    B.    Events Leading To Debtor's Bankruptcy Filing ..................... 5

    C.    Post-Petition Administration ......................................... 10

    D.    The Debtor's Reorganization Efforts And Strategy............... 11

III.   THE DEBTOR HAS DILIGENTLY MAINTAINED, PROTECTED AND
SECURED THE HOTEL, AND SHADY BIRD'S ALLEGATIONS TO
THE CONTRARY ARE INACCURATE, GROSSLY EXAGGERATED
AND MISLEADING .............................................................................. 13

IV.   SHADY BIRD HAS NOT MET ITS BURDEN OF PROVING THAT THE
INTERESTS OF CREDITORS ARE BEST SERVED BY THE
RECEIVER'S RETENTION OF THE DEBTOR'S ASSETS ............................ 19

    1.    The likelihood of reorganization ................................. 21

    2.    The probability that funds required for reorganization will be
available ................................................................... 23

    3.    Whether there are instances of mismanagement by the debtor ................ 24

    4.    Whether turnover would be injurious to creditors ................... 25

    5.    Whether the debtor will use the turned over property for the benefit
of its creditors ........................................................... 26

    6.    Whether or not there are avoidance issues raised with respect to
property retained by a receiver, because a receiver does not possess
avoiding powers for the benefit of the estate ........................... 27

    7.    The fact that the bankruptcy automatic stay has deactivated the
state court receivership action ........................................ 27

V.    CONCLUSION ................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re Bryant Manor, LLC,*
   422 B.R. 278 (Bankr. D. Kan. 2010) ...........................................................................21, 24

*In re Franklin,*
   476 B.R. 545 (Bankr. N.D. Ill. 2012) ................................................................................. 20

*In re KCC-FUND V, Ltd.,*
   96 B.R. 237 (Bankr. W.D. Mo. 1989) ................................................................................ 20

*In re Northgate Terrace Apartments, Ltd.,*
   117 B.R. 328 (Bankr. D. Ohio 1990)......................................................................20, 21, 22

*In re Northgate Terrace Apartments, Ltd.,*
   17 B.R. ................................................................................................................................ 20

*In re Orchards Village Investments, LLC,*
   405 B.R. 341 (Bankr. D. Or. 2009) ........................................................................19, 25, 26

*In re Packard Square LLC,*
   575 B.R. 768 (Bankr. E.D. Mich. 2017) ..................................................................... *passim*

*Matter of Plantation Inn Partners,*
   142 B.R. 561 (Bankr. S.D. Ga. 1992)................................................................................. 27

*In re Skymark Properties II, LLC,*
   597 B.R. 391 (Bankr. E.D. Mich. 2019) ..................................................................21, 23, 24

*State Street Bank and Trust Company v. Park (In re Si Yeon Park, Ltd.),*
   198 B.R. 956 (Bankr. C.D. Cal. 1996) .............................................................................. 19

*In re Willowood East Apartments of Indianapolis II, Ltd.,*
   117 B.R. 320 (Bankr. S.D. Ohio 1990)....................................................................21, 22, 23

**Federal Statutes**

11 U.S.C. §§ 101 *et seq.* ....................................................................................... *passim*

11 U.S.C. § 305 ...................................................................................................... 27

11 U.S.C. § 543 ................................................................................................ *passim*

11 U.S.C. § 543(b) .........................................................................................19, 20, 28

11 U.S.C. § 543(d).............................................................................................20, 27

11 U.S.C. § 1107 .................................................................................................... 3

11 U.S.C. § 1108 .................................................................................................... 3

**Federal Rules**

Federal Rules of Evidence 201 ..................................................................... 10, 11, 12

1    The Source Hotel, LLC, a California limited liability company and the chapter 11 debtor

2  and debtor-in-possession herein (the "Debtor"), hereby files this opposition (the "Opposition") to

3  that certain *Motion Of Shady Bird Lending, LLC For Order Excusing State Court Receiver From*

4  *Turnover Of Assets Pursuant To 11 U.S.C. § 543* [Doc. No. 51] (the "Motion") filed by Shady

5  Bird Lending, LLC ("Shady Bird").

6                                              **I.**

7                              **INTRODUCTORY STATEMENT**

8    Pursuant to the Motion, Shady Bird seeks the entry of a Court order excusing Bellann R.

9  Raile (the "Receiver"), who was appointed as receiver over the Debtor's assets pursuant to an ex

10  parte order entered by the Los Angeles Superior Court on February 17, 2021, from complying

11  with the requirements of 11 U.S.C. § 543, specifically, the requirement to deliver to the Debtor

12  all property belonging to the Debtor over which the Receiver currently has possession, custody

13  or control. Shady Bird contends that the Receiver should be excused from compliance with such

14  requirement because the interests of creditors would be better served by permitting the Receiver

15  to remain in possession of the Debtor's property.

16    There is little doubt that Shady Bird, who only a few months ago acquired the first deed

17  of trust against the Debtor's primary asset, an approximately 85% completed seven-story full-

18  service hotel with 178 rooms in the City of Buena Park, County of Orange, State of California

19  (the "Hotel"), at the significantly discounted price of $19 million and then immediately turned

20  around to schedule a foreclosure sale for the Hotel, would like to see the Debtor's efforts to

21  reorganize fail. Such a result would bring Shady Bird, who appears to be a predatory lender that

22  "loans to own," one step closer to foreclosing on the Hotel, to the detriment of all of the Debtor's

23  other creditors. While Shady Bird may be better served by preventing the Debtor from being in

24  possession of its own property and taking the steps necessary to successfully reorganize in this

25  case, the interests of creditors as a whole are far better served by affording the Debtor a

26  reasonable opportunity to reorganize so that all creditors (not just Shady Bird) may receive a

27  recovery through this chapter 11 case. This, in turn, requires the Debtor to be in possession of,

28  and have unfettered access to, the Hotel and its other assets.

2

1    In its Motion, Shady Bird makes a number of allegations about the Debtor's purported

2    failure to maintain, protect and secure the Hotel.  As discussed in great detail below, each of

3    these allegations is false, grossly exaggerated, and/or misleading.  The Debtor has spent years

4    investing "blood, sweat and tears" into the development and construction of the Hotel (which is

5    largely complete) and has every incentive to preserve and maximize the value of the Hotel for

6    the benefit of its creditors and equity holder.  Accordingly, and as set forth in the declarations

7    attached to this Opposition, the Debtor and its non-member manager, M+D Properties, a

8    California corporation ("M+D"), have been extremely diligent in maintaining and protecting the

9    Hotel property, even after construction on the Hotel halted in late 2019.  The Receiver has none

10   of the experience, historical knowledge, and resources that the Debtor has, and will not be able to

11   maintain and preserve the value of the Hotel as efficiently or cost-effectively as the Debtor can.

12   In fact, it is clear from the Debtor's interactions with the Receiver since her appointment that the

13   Receiver has done virtually nothing to properly or regularly maintain the Hotel property, and is

14   continuing to rely on the Debtor and M+D to provide maintenance services for the Hotel.

15    Under these circumstances, Shady Bird cannot meet its burden of proof and demonstrate

16   that it is in the best interests of all creditors to keep the Receiver in place and to have the

17   Receiver excused from compliance with the turnover requirements of 11 U.S.C. § 543.  The

18   Motion should therefore be denied.

## II.

## STATEMENT OF FACTS

**A.    Background.**

21    1.    On February 26, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for

23   relief under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").  The Debtor is

24   continuing to manage its financial affairs and operate its bankruptcy estate as a debtor-in-

25   possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

26    2.    The Debtor is a limited liability company that was organized in November 2012 in

27   the State of California.  DMC Investment Holdings, LLC is the sole member of the Debtor.

28

Donald Chae and Min S. Chae, who are brothers, are the members and principals of DMC Investment Holdings, LLC.

3.      Since 2014, the Debtor has been developing the Hotel, which will include conference rooms, an executive lounge, fitness center, restaurant, bars, and cleaning services. The Hotel is part of a larger 12.8-acre mixed-use development project (the "Master Development"), which includes a 400,000 square-foot retail center and a 50,000 square-foot seven-story office building which were completed in 2016. The Debtor does not own the real property on which the Hotel is being constructed (which is located at the southeast corner of the Master Development), but is a lessee pursuant to a 99-year ground lease for such real property (the "Ground Lease") with the Debtor's affiliate, The Source at Beach, LLC (the "Ground Lessor").

4.      M+D is an affiliate and sole manager of the Debtor. Pursuant to the terms of a Development Fee Agreement dated July 1, 2014 entered into by M+D and the Debtor, M+D has rendered construction/development management services for the Debtor to assist in overseeing the development and construction of the Hotel.

5.      Construction of the Hotel began in 2016. To finance the construction of the Hotel, on May 24, 2016, the Debtor obtained a $29.5 million construction loan (the "Loan") from Evertrust Bank ("Evertrust") as well as financing by three tranches of EB-5 investments totaling $35.5 million. The Debtor's obligations under the Loan are secured by liens against substantially all of the Debtor's assets, including the Hotel and the Debtor's leasehold interest in the real property that is the subject of the Ground Lease (the "Leasehold Interest"). The original maturity date for the Loan was December 1, 2017, but was extended to November 1, 2019 pursuant to written extension agreements entered into by the parties.

6.      Through October 2019, approximately 85% of the Hotel construction had been completed, including: substantial completion of the core and shell, exterior painting, porte cochère, street lighting, ceiling framing, kitchen framing and glass block installation, food storages, all glass storefronts, electrical wiring and switchgear, guestroom flooring, ceiling fixtures, pool bar canopy structure, deck drains, window washing system, roof membrane, roof ductwork and HVAC vibration installation; nearly complete installation of bathroom fixtures (95%), acoustic ceiling

4

system (80%), HVAC electrical connections (90%), piping for HVAC and plumbing equipment (95%), and rooftop ductwork (99%). In addition, substantial materials have been procured and/or fabricated and are ready for installation pending completion of other items, such as first and second floor flooring, corridor carpeting, millwork (wall and ceiling panels, pool bar), passenger elevators, fire sprinklers, egress and accent lighting, pool equipment, guest room doors, locks and closures, bathroom fixtures, and rooftop HVAC equipment. The approximately 15% of the Hotel construction which remains outstanding consists of mostly "finish work" such as the installation of flooring and carpeting, lighting, appliances, trade fixtures, furniture, furnishings and equipment already purchased by the Debtor (collectively, "FF&E"). The Debtor and M+D believe that the Debtor can successfully complete the construction of the Hotel within 6-12 months with additional funding of approximately $12,000,000 - $16,000,000 (which funding would provide for, among other things, the satisfaction of valid and effective mechanics' liens).

7.    In late 2019, Evertrust refused to issue the remaining $4 million of the Loan, claiming a cost overrun on the construction of the Hotel. As a result of Evertrust's refusal to provide the final $4 million of the Loan, the Debtor was forced to cease construction activities. However, the Debtor believes strongly that, had Evertrust funded the final $4 million as expected, construction of the Hotel would have been completed, as the Debtor believes that its contractors would have carried fifty percent of the cost overrun and the Debtor and its affiliates would have covered the remaining fifty percent of the overrun.

**B.    Events Leading To Debtor's Bankruptcy Filing.**

8.    When Evertrust refused to issue the remaining $4 million of the Loan, the Debtor immediately and actively sought to refinance the Loan. The Debtor began discussions with a new lender named Hall Structured Finance ("Hall") in the fall of 2019 and was ultimately able to reach an agreement with Hall for refinancing in the total sum of $42 million. During the course of the Debtor's refinancing discussions with Hall, the Debtor kept Evertrust apprised of all developments, and even provided Evertrust with a copy of the loan commitment letter from Hall in early 2020. The Debtor and Hall were on the verge of closing on the refinancing, with a target closing date of March 20, 2020, when local, county, and State officials issued lockdown orders as a result of the

1    COVID-19 pandemic. At that point, Hall put an indefinite hold on the closing of the refinancing

2    with the Debtor.

3        9.    As a result, the Debtor went back to Evertrust and, between March 2020 and

4    December 2020, engaged in active forbearance negotiations with Evertrust to obtain a further

5    extension of the Loan maturity date so that the Hotel could recover from the effects of the COVID-

6    19 pandemic, and the Debtor could obtain refinancing or additional construction financing and

7    ultimately recommence construction of the Hotel.

8        10.    In the summer of 2020, while the Debtor and Evertrust were still engaged in

9    forbearance negotiations, Evertrust commenced litigation against the guarantors of the Loan,

10   Donald Chae and Min Chae, and recorded a Notice of Default against the Hotel (the "NOD"). In

11   light of such litigation and the recordation of the NOD, and given the ongoing COVID-19

12   pandemic, the Debtor requested that Evertrust convert the Loan (in the funded amount of

13   approximately $25 million) into a two-year term loan, and even offered to set aside one year's

14   worth of loan payments in escrow as assurance of repayment of such two-year term loan. Evertrust

15   declined the Debtor's offer.

16       11.    During the latter half of 2020, while the Debtor was engaged in forbearance

17   negotiations with Evertrust, the Debtor was also working actively with its loan broker, Ed Choi, to

18   identify and obtain alternative financing for the Hotel. In November or December, 2020, Mr. Choi

19   advised the Debtor that he had introduced Michael Schlesinger of Cambra Realty ("Cambra") to

20   Evertrust to potentially purchase the Loan from Evertrust.

21       12.    Ed Choi, who represented that he was in direct discussions with Mr. Schlesinger

22   regarding Cambra's pending purchase of the Loan, repeatedly assured the Debtor that, in

23   conjunction with its purchase of the Loan, Cambra would extend the Loan maturity date for two

24   years (at which time the Debtor could purchase back Cambra's interest in the Loan for $24-25

25   million) and Cambra would provide additional construction financing of $10-14 million so that the

26   Debtor could complete the construction of the Hotel. True and correct copies of correspondence

27   exchanged by Donald Chae and Ed Choi on December 28, 2020, in which Ed Choi indicated that

28   Michael Schlesinger of Cambra had confirmed these terms, is attached **Exhibit 1** to the

6

Declaration of Donald Chae annexed hereto (the "Chae Declaration"). The Debtor and the guarantors repeatedly requested that the foregoing terms be reduced to writing and were assured by Ed Choi and Mr. Schlesinger that the terms would be set forth in a written offer or term sheet. Ultimately, the terms discussed by the Debtor, the guarantors, Ed Choi and Mr. Schlesinger were never reduced to writing.

13.    On December 30, 2020, Donald Chae was asked to meet with Ed Choi and Mr. Schlesinger at an office building in Beverly Hills, where they introduced him to Ronald Richards for the first time, introducing Mr. Richards only as an attorney and not as the principal for Shady Bird. Unbeknownst to Debtor, in December 2020, Shady Bird had just purchased Evertrust's interests in the Loan the day before at a significant discount, for a reported purchase price of approximately $19 million. Thereafter, the Debtor was advised that Mr. Richards of Shady Bird would be the Debtor's new contact.

14.    On January 2, 2021, the Debtor received initial deal points in writing from Mr. Richards which were generally egregious and not at all reflective of the terms that had been previously discussed by the parties. On January 7, 2021, the Debtor returned a written counteroffer which reflected the terms that the Debtor understood had been previously agreed to by the parties. In response to the Debtor's counteroffer, Mr. Richards requested information from the Debtor regarding its maintenance contracts, architectural contracts, and construction management contract with Swinerton Builders. At this point, the Debtor's trust in Shady Bird had severely deteriorated.

15.    At Mr. Richards' request, the Debtor coordinated with Ed Choi to provide Shady Bird's maintenance contact with access to the Hotel rooftop on January 27, 2021. The Debtor was advised that there would be one individual who would inspect the rooftop equipment. Instead, Mr. Schlesinger of Cambra showed up with a team of four individuals from Swinerton Builders at the designated meeting time. Robert "Charlie" Cervantes, who is employed by M+D (the Debtor's manager) and had been overseeing the maintenance of the Hotel, was the Debtor's representative at the meeting that day. Mr. Cervantes advised Mr. Schlesinger and his group that he had been directed to show one individual to the Hotel rooftop, and that he would need further directions from the Debtor to allow the entire group up. Mr. Schlesinger contacted Ed Choi, who then

1   contacted a member of the Debtor's team.  Ultimately, as a compromise, the Debtor permitted

2   access to the Hotel to two individuals from Swinerton Builders.  However, once Mr. Cervantes had

3   taken the two individuals to the Hotel rooftop to inspect the rooftop equipment, the two individuals

4   from Swinerton Builders informed Mr. Cervantes that their company had been hired to inspect the

5   Hotel project and that they would need to view the full Hotel building.  Mr. Cervantes responded

6   that he had not been authorized to provide access to the entire Hotel building that day and

7   requested that they schedule a new date/time with the Debtor for such access.

8        16.    At this point, the relationship between the Debtor and Shady Bird was severely

9   strained, and the Debtor feared that Shady Bird had no intention of following through with the

10  terms that the parties had previously discussed.  The "bait and switch" tactic at the Hotel meeting

11  on January 27, 2021 and the comments made by the individuals from Swinerton Builders to Mr.

12  Cervantes at such meeting only reinforced the Debtor's concerns that Shady Bird was not engaged

13  in negotiations with the Debtor in good faith and was instead gathering information to take the

14  Hotel from the Debtor.

15       17.    With the decision made to go into "litigation mode" and minimize contact with

16  Shady Bird and Mr. Richards, the Debtor proceeded to take actions that it felt were necessary to

17  protect the interests of the Debtor and its creditors in the Hotel.  In that context and in an

18  admittedly misguided attempt to get negotiations with Shady Bird "back on track," Donald Chae

19  sent an email to Mr. Richards on February 2, 2021 threatening to suspend security at the Hotel

20  property.  Of course, the Debtor did not do so and never had any intention of doing so, given that

21  the Hotel is the result of many years of hard work and investment by the Debtor and constitutes the

22  Debtor's primary asset.  The Debtor's utmost concern has always been, and continues to be, the

23  preservation, maintenance and maximization of value of the Hotel.  There has never been any

24  interruption of the security provided to the Hotel.

25       18.    Ultimately, the Debtor's concerns about Shady Bird were validated when, on

26  February 8, 2021, Shady Bird filed a complaint against the Debtor in the Superior Court of the

27  State of California for the County of Orange ("Superior Court") for (i) specific performance and

28  appointment of a receiver, and (ii) waste, thereby commencing the Superior Court action bearing

the case number 30-2021-01183489-CU-OR-CJC (the "State Court Action").  Shady Bird also took steps to immediately foreclose on the Hotel and issued a Notice of a Trustee's Sale for the Hotel to be held on March 1, 2021.

19.    As noted with disingenuous alarm by Shady Bird in its Motion, on February 16, 2021, the Debtor's Ground Lessor sent to Shady Bird a "Notice of Default Under, and Exercise of Option to Terminate, Ground Lease" (the "Ground Lease Notice").  However, the Ground Lease Notice should be viewed in the context of the parties' discussions and actions to date – the Ground Lease Notice was an extremely frustrated response by the principals of the Ground Lessor and Debtor to Shady Bird's actions and a desperate attempt to prevent or delay the foreclosure of the Hotel by Shady Bird, and was never intended to be (nor was ever actually) effectuated.  As Shady Bird's own counsel noted in his written response to the Ground Lease Notice, a true and correct copy of which is attached as **Exhibit 2** to the Chae Declaration, the purported termination of the Ground Lease was never effective nor valid because, among other reasons, notices of the alleged breaches of the Ground Lease were not previously provided to Evertrust or Shady Bird in accordance with the provisions of the Ground Lease.  Moreover, and in an effort to provide clarification on the issue, the Ground Lessor formally rescinded the Ground Lease Notice in writing.  A true and correct copy of the written notice from counsel for the Ground Lessor rescinding the Ground Lease Notice is attached as **Exhibit 3** to the Chae Declaration.

20.    Shortly after filing its complaint to initiate the State Court Action, Shady Bird filed an ex parte application for an order appointing a receiver and other related relief.

21.    On February 17, 2021, the Superior Court entered an order in the State Court Action appointing Bellann R. Raile as Receiver to, among other things, take possession of the Hotel and all goods, furniture, fixtures, and equipment attached and/or related to the Hotel.

22.    As a result of all of the foregoing, the Debtor sought chapter 11 bankruptcy protection in order to prevent the impending foreclosure of the Hotel, to preserve the equity in the Hotel for the benefit of all creditors (not just Shady Bird), to regain possession of the Hotel and related assets and obtain refinancing or investments to enable the Debtor to complete construction

of the Hotel, and to be afforded a reasonable opportunity to restructure its financial affairs and repay its debts in an orderly fashion.

**C.    Post-Petition Administration.**

23.    As of the Petition Date, the Debtor had cash totaling approximately $63,000 in bank accounts with Evertrust and Preferred Bank.  The Debtor took steps immediately after the Petition Date to close its pre-petition bank accounts at Evertrust and Preferred Bank, and to withdraw all funds contained in those pre-petition accounts so that such funds could be deposited into the Debtor's newly-established debtor-in-possession bank accounts at Axos Bank.

24.    On March 12, 2021, the Debtor filed the *Debtor's Notice Of Motion And Motion For Entry Of An Order: (A) Requiring Turnover Of Estate Cash By Evertrust Bank; (B) Authorizing Debtor To Use Cash Collateral; And (C) Authorizing Debtor To Obtain Post-Petition Financing From M+D Properties On An Unsecured Basis* [Doc. No. 21] (the "CC/Financing Motion").  Pursuant to the CC/Financing Motion, the Debtor sought the entry of a Court order (i) requiring Evertrust to turn over and deliver to the Debtor cash held in the Debtor's pre-petition bank accounts at Evertrust (as Shady Bird would not consent to the turnover of such cash until after the Debtor filed the CC/Financing Motion); (ii) authorizing the Debtor to use cash collateral in accordance with the Debtor's proposed 13-week operating budget (the "Budget"); and (iii) authorizing the Debtor to obtain post-petition unsecured financing up to $100,000 (the "DIP Loan") from the Debtor's manager, M+D.  The Budget provides for the payment of expenses critical to the maintenance and preservation of the Hotel, including insurance premiums, utility expenses, post-petition utility deposits, and real property taxes.[1]

25.    On March 23, 2021, the Court entered an order granting the CC/Financing Motion on an interim basis, pending a final hearing scheduled on May 6, 2021, subject to certain minor

---

[1] Pursuant to Rule 201 of the Federal Rules of Evidence ("Evidence Rules"), the Debtor respectfully requests that the Court take judicial notice of the Budget, which is attached as Exhibit A to the Declaration of Donald Chae annexed to the CC/Financing Motion [Doc. No. 21, page 37 of 358].

1    modifications agreed to by the Debtor and set forth in such order [Doc. No. 46] (the "<u>Interim</u>

2    <u>Order</u>").

3       26.    The Debtor filed its 7-Day Package with the Office of the United States Trustee

4    ("<u>OUST</u>") on a timely basis on March 5, 2021. The Debtor also filed its Schedules of Assets and

5    Liabilities ("<u>Schedules</u>") and Statement of Financial Affairs on a timely basis on March 12,

6    2021. The Debtor filed its first monthly operating report (covering the post-petition period of

7    February 26-28, 2021) with the Court, and remains in full compliance with the reporting and

8    other requirements of the Bankruptcy Code and the OUST.

9    **D.    The Debtor's Reorganization Efforts And Strategy.**

10       27.    The Debtor's primary assets consist of the Hotel, the Leasehold Interest, and the

11   FF&E. The Debtor believes that the current value of the Hotel in "as is" condition is

12   approximately $50,000,000 and that its fair market value upon completion will be at least

13   $60,000,000.[2] As reflected in the Debtor's Schedules, the Debtor believes that the total value of

14   the FF&E (calculated at cost, excluding fabrication labor costs) is approximately $2,700,000.[3]

15       28.    The Debtor's primary secured creditor is Shady Bird. According to the Notice of

16   Trustee's Sale recorded by Shady Bird on February 3, 2021,[4] Shady Bird contends that the

17   current balance of the Loan is approximately $30,720,000. The Debtor's obligations under the

18   Loan are secured by liens against substantially all of the Debtor's assets, including the Hotel, the

19   Leasehold Interest, the FF&E, and the Debtor's cash.

20       29.    There are a number of subcontractors that have recorded mechanics' liens against

21   the Debtor and/or Hotel. As reflected in the Debtor's Schedules, the Debtor believes that the

---

22       [2] As reflected in a prior appraisal report of the Hotel, a true and correct copy of which is

23   attached as **Exhibit 4** to the Chae Declaration, the Hotel was appraised at an "as is" value of
     $40,900,000 as of October 14, 2019, was projected to have a value of $55,800,000 upon

24   completion, and was projected to have a value of $61,300,00 upon stabilization. The Debtor's
     manager is in the process of obtaining an updated appraisal of the Hotel.

25       [3] Pursuant to Evidence Rule 201, the Debtor respectfully requests that the Court take

26   judicial notice of the Debtor's Schedule A/B Assets – Real and Personal Property [Doc. No.
     32, pages 3-25 of 66].

27       [4] Pursuant to Evidence Rule 201, the Debtor respectfully requests that the Court take
     judicial notice of the Notice of Trustee's Sale, which is attached as Exhibit E to the Declaration

28   of Donald Chae annexed to the CC/Financing Motion [Doc. No. 21 pages 219-235 of 358].

total amount of the mechanics' liens recorded against the Debtor and/or Hotel is approximately $2,900,000.[5] Some of these recorded mechanics' liens are disputed by the Debtor. In addition, there appear to be a number of other mechanic's liens asserted against the Hotel; however, such purported liens do not appear to have been properly perfected and are therefore likely invalid.

30.    The Debtor also received three tranches of EB-5 loans totaling approximately $35.5 million from Beach Orangethorpe Hotel, LLC, Beach Orangethorpe Hotel II, LLC, and Beach Orangethorpe Hotel III, LLC (collectively, the "EB-5 Lenders"). The Debtor's obligations under the loans from two of the EB-5 Lenders (i.e., Beach Orangethorpe Hotel, LLC and Beach Orangethorpe Hotel II, LLC) are secured by junior liens against the Hotel and the Leasehold Interest.[6]

31.    The Debtor believes that the EB-5 Lenders and the vast majority of its creditors will support the Debtor's efforts to reorganize through its chapter 11 bankruptcy case. The Debtor makes no secret of its intended exit strategy in this case. The Debtor has been, and continues to be, engaged in active discussions with numerous prospective lenders regarding the terms for debtor-in-possession financing, which will provide the Debtor with the funding necessary to complete the construction of the Hotel, service debt, and operate the Hotel until operations can be stabilized. The Debtor has already received a written commitment letter from one prospective lender for debtor-in-possession financing in the sum of $17,900,000 but, as noted above, the Debtor is still in the process of "vetting" terms with a number of prospective lenders. The Debtor intends to finalize loan terms with a lender and file a motion for Court approval of debtor-in-possession financing in this case in an expeditious manner.

32.    In conjunction with obtaining debtor-in-possession financing, the Debtor intends

---

[5] Pursuant to Evidence Rule 201, the Debtor respectfully requests that the Court take judicial notice of the Debtor's Schedule D: Creditors Who Have Claims Secured by Property [Doc. No. 32, pages 26-37 of 66].

[6] Pursuant to Evidence Rule 201, the Debtor respectfully requests that the Court take judicial notice of the Deeds of Trust recorded against the Hotel by Beach Orangethorpe Hotel, LLC and Beach Orangethorpe Hotel II, LLC, which are attached as Exhibit H to the Declaration of Donald Chae annexed to the CC/Financing Motion [Doc. No. 21 pages 303-350 of 358].

12

to file a plan of reorganization in this case which restructures and provides for repayment of the Debtor's secured debt (including the debt owed to Shady Bird) based upon market terms, and provides for a recovery to the Debtor's general unsecured creditors who would otherwise receive nothing (particularly upon a foreclosure of the Hotel by Shady Bird).[7]

**III.**

**THE DEBTOR HAS DILIGENTLY MAINTAINED, PROTECTED AND SECURED THE HOTEL, AND SHADY BIRD'S ALLEGATIONS TO THE CONTRARY ARE INACCURATE, GROSSLY EXAGGERATED AND MISLEADING**

Shady Bird alleges that the Debtor has failed to adequately maintain, protect and secure the Hotel.  As discussed in detail below, each allegation made by Shady Bird is false, grossly exaggerated, and/or misleading.  As the party who has invested a significant amount of time, money, and resources into the development and construction of the Hotel, the Debtor has every incentive to preserve and maximize the value of the Hotel for the benefit of its creditors and equity holder.  Accordingly, and as set forth in the declarations attached to this Opposition, the Debtor and its manager, M+D, have been extremely diligent in maintaining and protecting the Hotel, even after construction halted in late 2019.

The Receiver has none of the experience, historical knowledge, and resources that the Debtor has with respect to the Hotel, and will not be able to maintain and preserve the value of the Hotel as efficiently or cost-effectively as the Debtor can.  In fact, it is clear from the Debtor's interactions with the Receiver since her appointment approximately one month ago, that the Receiver is continuing to rely on the Debtor and M+D to provide maintenance services for the Hotel, and has done very little other than to "babysit" the Hotel property.  And while Shady Bird

---

[7] The Debtor acknowledges and appreciates the Receiver's responsiveness to the Debtor's requests for access to the Hotel when required (*e.g.*, to provide tours of the Hotel to prospective lenders and investors, and to review and respond to the Receiver's expressed concerns regarding certain maintenance issues). However, the Debtor requires unfettered access to the Hotel and its other assets, which access is not hampered by the extra administrative steps of requesting, obtaining approval of, and coordinating such access, in order to maintain the Hotel and formulate/implement its reorganization strategy in this case in an effective manner.

has apparently funded the Receiver's retention of a consultant to provide a property inspection report, Shady Bird has apparently not provided any funding to the Receiver to actually address the purported maintenance issues raised in such report. This is not at all surprising since (1) there were no maintenance issues under the Debtor's watch, and (2) Shady Bird has no incentive to ensure the proper maintenance and preservation of the Hotel while the Debtor owns the Hotel – in fact, it is in Shady Bird's interest to do the exact opposite, as any devaluation of the Hotel will assist Shady Bird in obtaining the relief that it has admitted it intends to seek in this case (*e.g.*, relief from the automatic stay to foreclose on the Hotel, the appointment of a trustee, etc.).

The fact is that the Hotel has been diligently and competently maintained by the Debtor and M+D (at least prior to the appointment of the Receiver, at which point the Debtor was locked out). The Debtor's responses to the maintenance issues alleged by Shady Bird in its Motion and in the property inspection report attached to the Motion are discussed at length below and in the Declaration of Robert "Charlie" Cervantes filed concurrently herewith (the "Cervantes Declaration"). Mr. Cervantes is an employee of M+D and oversaw the day-to-day maintenance of the Hotel until the Receiver was appointed. On March 25, 2021, Mr. Cervantes conducted a thorough walk-through of the Hotel to personally assess the maintenance issues raised by Shady Bird in its Motion and to take photos of the Hotel, which are included in the Cervantes Declaration.

| No. | Shady Bird's Allegation | Debtor's Response |
|---|---|---|
| 1 | There are substantial roof issues which currently permit the intrusion of water into the structure. | Air vent openings on the Hotel roof were left covered and maintained regularly by M+D until the Receiver took possession. Based on the March 25 walk-through, it appears that the Receiver has not regularly maintained the roof area, as the protective plastic coverings that M+D installed on the vent openings immediately before the Receiver's appointment were still present, but there had been no efforts to fix any tears in the covers or to refasten covers that were blown off. |
| 2 | The construction assemblies on the roof are incomplete and create an opportunity for water infiltration. | It is unclear what "construction assemblies" Shady Bird is referring to. Based on the March 25 walk-through, there appears to be no "construction assemblies" other than the air vent openings issue |

| No. | Shady Bird's Allegation | Debtor's Response |
|---|---|---|
| | | already discussed in Item No. 1 above. |
| 3 | The fire sprinkler system is not currently capable of providing life-safety protection for the Project. | The water supply lines and the automatic sprinklers have all been installed the Hotel, as confirmed for each of the floors visited on the March 25 walk-through (floors 1, 2, 4 and 7). However, the protective covers for the sprinklers are still in place because the ceiling drywall and finish have yet to be installed. |
| 4 | Due to neglect and exposure to UV rays, the pool deck will need substantial repair. | M+D's construction crew applied sealant over the pool deck and regularly maintained the area, which was covered with a plastic tarp, until the Receiver took possession. Based on the March 25 walk-through, it appears that the Receiver has not regularly checked or maintained the pool deck as the tarp installed by M+D was torn and had blown off by wind, and there had been no efforts to put the tarp back in place or make other protective arrangements. |
| 5 | The pool has an accumulation of water and trash making it a breeding ground for mosquitos, which may carry the West Nile Virus. | As part of M+D's maintenance duties, M+D had been pumping water out of the pool after each rainfall until the Receiver took possession. Accordingly, any water and trash accumulation in the pool occurred after the Receiver took possession. Based on the March 25 walk-through, it appears that the Receiver has not pumped water out of the pool on any regular basis. |
| 6 | Completed business finishes are not being protected and are exposed to waste or damage. | It is unclear what "completed business finishes" Shady Bird is referring to. There are some HVAC materials that have yet to be installed which are currently stored on the roof, but none of those materials are being wasted or damaged. Based on the March 25 walk-through, there appears to be no other "completed business finishes." |
| 7 | A potentially hazardous situation may exist if the building sewer system is not connected to the public system. | The building sewer system is connected to the public system, but unused drains can emanate sewer odors since the water that would otherwise drain down the pipes (like the P-traps, those U-shaped pipes under drains) to seal against odors from the sewer line would evaporate. As part of M+D's maintenance duties, M+D regularly flushed/drained/hosed water down these drains to |

| No. | Shady Bird's Allegation | Debtor's Response |
|---|---|---|
| | | maintain the water seal. Based on the March 25 walk-through, it appears that the Receiver has not performed proper maintenance by flushing toilets or filling the P-traps, which has resulted in odors from the sewer line to come out. The Receiver's staff acknowledged that the odor was likely from the toilet, shower and sink drains losing their water seal, and indicated they were unaware of any other chemical/hazardous reasons for the odor. |
| 8 | HVAC package units have been left unsecured and accessible to thieves and vandals. | HVAC units have been stored in the covered parking structure and have been monitored continuously by the security for the entire "The Source" complex. Even though the HVAC units are monitored regularly by security, the Debtor and M+D secured the HVAC units with fencing, which remain in place. |
| 9 | There are hazardous and caustic chemical unsecured at the Project. | It is unclear what "hazardous and caustic chemical" Shady Bird is referring as there is no detail provided in the Motion or the property inspection report. Based on the March 25 walk-through, it appears the reference is to a one-gallon yellow chemical that was left *sealed* on the bathroom counter of Room 725 (see photo in Cervantes Declaration). Nothing else that resembled a chemical was witnessed during the March 25 walk-through. |
| 10 | The Debtor's failure to take reasonable measures to maintain, protect, and secure the project under the operative deed of trust. | This appears to be a "catch all" reference to all of the Items discussed above, but the March 25 walk-through indicated nothing out of the ordinary. As discussed above, the Debtor took reasonable measures to maintain, protect and secure the Hotel before the Receiver took possession, but it appears that the Receiver has not continued such measures. |
| 11 | The Debtor's failure to prevent the project from becoming vandalized, damaged, destroyed, and deteriorated. | While the Debtor was in possession, there was an incident where a vandal broke the exterior layer of a dual-pane storefront glass window facing Orangethorpe Avenue, which Debtor cleaned out. After the Receiver took possession, there was another incident where a vandal broke through the same window, which resulted in the Receiver installing plywood to cover the opening. To the extent that Shady Bird contends that the first |

16

| No. | Shady Bird's Allegation | Debtor's Response |
|---|---|---|
|  |  | vandalism incident constitutes a failure by the Debtor to protect the Hotel, the second vandalism incident should also constitute a failure by the Receiver to protect the Hotel. |
| 12 | The Debtor's failure to prevent material physical waste of the project. | This appears to be another "catch all" reference to all of the Items discussed above, but the March 25 walk-through indicated nothing out of the ordinary. As discussed above, the Debtor took reasonable measures to maintain, protect and secure the Hotel before the Receiver took possession, but it appears that the Receiver has not continued such measures. |
| 13 | The Debtor's failure to allow Shady Bird to enter upon and inspect the project. | This appears to be a reference to the January 27, 2021 meeting at the Hotel, where Mr. Schlesinger of Cambra used a "bait and switch" tactic to bring in an entire team of people (including the Debtor's former contractor) to inspect the Hotel after only requesting access for one maintenance person to view the Hotel roof. While this incident may have angered the principals of Shady Bird and Cambra, the issue of access/inspection will not be an issue going forward, particularly given the oversight of the Bankruptcy Court. |
| 14 | The Debtor's failure to provide evidence of and certificates of insurance to Shady Bird upon request. | The Debtor provided evidence (and certificates) of insurance for the Hotel to the Receiver on the same day she made such request. Evidence of insurance was also submitted to the OUST as part of the Debtor's 7-Day Package, and the Debtor will provide evidence of insurance to any party upon written request. |
| 15 | The Debtor's failure to allow inspections by the City of Buena Park and ceasing communications with the City, negatively affecting the permitting process and the ability to complete the project. | This allegation has no basis in truth, and makes no sense given that a City Inspector from the City of Buena Park (Gary) has been stationed at "The Source" complex and still presently maintains an office full-time in the construction office adjacent to the Hotel. |
| 16 | The Debtor's failure to maintain various systems and improvements on the project such as the elevator, electrical, | This allegation is vague and does not specify how the Debtor has purportedly failed to maintain the elevator, electrical, HVAC and plumbing systems in the Hotel. Specified issues relating these |

| No. | Shady Bird's Allegation | Debtor's Response |
|---|---|---|
| | HVAC, and plumbing. | systems are already addressed in the Items above. The March 25 walk-through indicated nothing out of the ordinary and, as discussed above, the Debtor took reasonable measures to maintain, protect and secure the Hotel before the Receiver took possession, but it appears that the Receiver has not continued such measures. |
| 17 | The Debtor's failure to provide any security for the project and improvements. | There has always been, and continues to be, full time 24/7 security service for the entire "The Source" complex, including the Hotel, courtesy of the Ground Lessor (The Source at Beach, LLC). There has never been any interruption of the security provided to the Hotel. |
| 18 | The Debtor's failure to timely test the fire-life safety systems which could completely destroy the project. | The Debtor and M+D are not aware of any issues regarding the efficacy of the fire-life safety systems, and are not aware of any "deadline" to test such systems. The Debtor also notes that the Receiver does not appear to have taken any steps to address this issue herself. To the extent this is a real issue, the Debtor and M+D are willing and able to promptly address it. |
| 19 | Elevator certificate has not been renewed since 2018. *(issue raised by the Receiver on March 17, 2021)* | One of the three elevators installed in the Hotel was being used for construction access. The elevator supplier (Kone, Inc.) provided a temporary six-month certificate for the elevator, which needs to be renewed. When the Receiver requested assistance from the Debtor to address this issue, the Debtor promptly agreed to do so. The Debtor has contacted Kone to schedule an inspection to have the elevator re-certified. |
| 20 | An improved safety environment for building visitors and contractors should be implemented. *(issue raised in the property inspection report attached to the Motion)* | The Hotel remains under construction so it is not uncommon for materials to be left on site. There is no current construction activity, so this issue does not appear relevant at this time. However, the Debtor is willing and able to send in a crew to tidy up any loose equipment or materials. The Debtor notes that the Receiver does not appear to have taken any steps to address this issue herself. |
| 21 | Completion plans are held off site. *(issue raised in the property inspection report attached to* | As is typically the case, the Debtor's general contractor (Greenland Construction Service, LLC) is holding the completion plans for the Hotel. Those plans are currently stored by Greenland in |

| No. | Shady Bird's Allegation | Debtor's Response |
|-----|------------------------|-------------------|
| | *the Motion)* | its construction office, which is located within "The Source" complex adjacent to the Hotel. |
| 22 | Improper patch at roof door leak. *(issue raised in the property inspection report attached to the Motion)* | This issue was not visible to M+D during the March 25 walk-through, but the Debtor is willing and able to address it. However, neither M+D nor the Receiver were aware of any roof leaks. |
| 23 | Missing flashing/improperly installed flashing *(issue raised in the property inspection report attached to the Motion)* | This issue was not specifically inspected during the March 25 walk-through and appears to be more of a construction issue (which will be addressed during the completion of construction) and not a maintenance issue. In the meantime, however, the Debtor is willing and able to get the area covered. |

**IV.**

## SHADY BIRD HAS NOT MET ITS BURDEN OF PROVING THAT THE INTERESTS OF CREDITORS ARE BEST SERVED BY THE RECEIVER'S RETENTION OF THE DEBTOR'S ASSETS

11 U.S.C. § 543(b) requires that a custodian who is in possession, custody, or control of property belonging to a debtor as of the bankruptcy filing date turn over and deliver such property to the trustee or debtor-in-possession. Specifically, 11 U.S.C. § 543 requires a custodian, such as a receiver, to, among other things:

"deliver to the [debtor] any property of the debtor held by or transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case" and to "file an accounting of any property of the debtor, or proceeds, product, offspring, rents, or profits of such property, that, at any time, came into the possession, custody, or control of such custodian."

11 U.S.C. § 543(b).

1         As noted by the bankruptcy court in *State Street Bank and Trust Company v. Park (In re*

2   *Si Yeon Park, Ltd.)*, 198 B.R. 956 (Bankr. C.D. Cal. 1996), "Section 543's approach to turnover

3   issues is consistent with the Bankruptcy Code's fundamental premise: that the bankruptcy court

4   overseeing the entire bankruptcy proceeding is in the best position to evaluate all of the equitable

5   factors required for fair adjustment of claims and interests." *Id.* at 964; *see also In re Orchards*

6   *Village Investments, LLC*, 405 B.R. 341, 352 (Bankr. D. Or. 2009) ("Reorganization policy

7   generally favors turnover of business assets to the debtor in a chapter 11 case." (citation

8   omitted)).  As the court in *In re Northgate Terrace Apartments, Ltd.*, 117 B.R. 328 (Bankr. D.

9   Ohio 1990) stated:

10        "The turnover provisions of 11 U.S.C. § 543 are part of the statutory

11        expression of the Congressional preference that a Chapter 11 debtor be

12        permitted to operate and control its business during the reorganization

13        process.  Moreover, that operation is for the benefit of all constituencies

14        and is not solely for the benefit of the lender holding the primary mortgage

15        against the debtor's property."

16  *Id.* at 332-33 (noting that, "[a]bsent a bad faith filing lacking any possibility of reorganization,

17  the presence of grossly inept management of the Property, fraudulent behavior," the burden of

18  showing that the interests of all creditors are better served if a receiver is kept in place will be

19  hard to sustain); *see also In re KCC-FUND V, Ltd.*, 96 B.R. 237, 239-40 (Bankr. W.D. Mo.

20  1989) ("[G]enerally the basic equities would favor a debtor or debtor in possession.  If nothing

21  more, a substantial weight is added to the debtor's burden of attempting to reorganize and

22  promulgate an acceptable plan of reorganization if the debtor cannot have access to all of its

23  assets during its initial breathing spell.").

24        The bankruptcy court may, in the exercise of its discretion, excuse compliance with the

25  turnover requirements of 11 U.S.C. § 543(b) "if the interests of creditors and, if the debtor is not

26  insolvent, of equity security holders would be better served by permitting a custodian to continue

27  in possession, custody, or control of such property[.]" 11 U.S.C. § 543(d).

28

1      The party seeking to excuse compliance must show, by a preponderance of evidence, that

2   the best interests of creditors are served by permitting the custodian to retain control of estate

3   assets. *In re Franklin*, 476 B.R. 545, 551 (Bankr. N.D. Ill. 2012); *see also In re Northgate*

4   *Terrace Apartments, Ltd.*, 17 B.R. at 332 (because the Bankruptcy Code contemplates turnover,

5   the party seeking relief under § 543(d) "has the burden of all issues relating to that affirmative

6   relief"). "Turnover is the general rule, however, and excuse from compliance is the exception.

7   Therefore a party opposing turnover must demonstrate affirmatively how creditors will be better

8   served if the receiver is retained." *In re Bryant Manor, LLC*, 422 B.R. 278, 289 (Bankr. D. Kan.

9   2010) (quoting *In re Poplar Springs Apartments of Atlanta, Ltd.*, 103 B.R. 146, 150 (Bankr. S.D.

10  Ohio 1989)).

11     In determining whether it is in the best interests of creditors to relieve a state court

12  receiver of his or her mandatory obligation to turn over estate property to a Chapter 11 debtor-in-

13  possession, bankruptcy courts consider the following factors: (1) the likelihood of a

14  reorganization; (2) the probability that funds required for reorganization will be available; (3)

15  whether there are instances of mismanagement by the debtor; (4) whether turnover would be

16  injurious to creditors; (5) whether the debtor will use the turned over property for the benefit of

17  its creditors; (6) whether or not there are avoidance issues raised with respect to property

18  retained by a receiver, because a receiver does not possess avoiding powers for the benefit of the

19  estate; and (7) the fact that the bankruptcy automatic stay has deactivated the state court

20  receivership action. *In re Skymark Properties II, LLC,* 597 B.R. 391, 397 (Bankr. E.D. Mich.

21  2019); *In re Packard Square LLC*, 575 B.R. 768, 778-79 (Bankr. E.D. Mich. 2017).

22     An analysis of the foregoing factors demonstrates that, under the facts of the Debtor's

23  case, Shady Bird has not satisfied (and indeed cannot satisfy) its burden of proving that it is in

24  the best interests of creditors to keep the Receiver in place.

25     *1.      The likelihood of reorganization.*

26     While it is likely too early for the Court to be able to accurately assess the Debtor's

27  likelihood of reorganization (given that the Motion was filed in the ***first month*** of the Debtor's

28  bankruptcy case), the Debtor respectfully submits that, given the substantial equity in the Hotel,

1    it is reasonable to conclude that the Debtor will be able to obtain the debtor-in-possession

2    financing it requires to complete the construction of the Hotel and propose a confirmable plan of

3    reorganization in this case.

4        The Debtor, like the chapter 11 debtors in the *In re Northgate Terrace Apartments, Ltd.,*

5    *supra,* and *In re Willowood East Apartments of Indianapolis II, Ltd.*, 117 B.R. 320 (Bankr. S.D.

6    Ohio 1990), commenced its chapter 11 bankruptcy case on the eve of a scheduled foreclosure

7    sale of its property following the appointment of a state court receiver.  In both of the foregoing

8    cases, the lender/trust deed holder filed motions early in the debtors' cases seeking to have the

9    state court receiver excused from compliance with the turnover requirements of 11 U.S.C. § 543.

10        In *Northgate Terrace*, the court found that the existence of prepetition defaults in

11    payment to the lender was not sufficient to entitle a receiver to ignore the mandate of Section

12    543(a) and refuse to turn over a debtor's property and held that, even though there were

13    indications that a reorganization may not occur without the infusion of new capital (which "made

14    the possibility of reorganization somewhat problematic"), given the debtor's proven ability to

15    manage the property, the lender had not met its burden. *Northgate Terrace* at 332-33.

16        Like the debtor in *Northgate Terrace*, the Debtor here has diligently and competently

17    managed and maintained the Hotel and is fully capable of continuing to do so during the

18    pendency of its bankruptcy case.  Moreover, the Debtor acknowledges that it will need the

19    infusion of new financing to complete the construction of the Hotel and to bring the Hotel into

20    operation, and the Debtor is actively and diligently seeking such financing upon the best terms

21    available in the market.  Given the estimated fair market value of the Hotel (even in "as is"

22    condition), there is substantial equity in the Hotel which supports the Debtor's efforts to obtain

23    post-petition financing to complete the construction of the Hotel and to propose a feasible plan of

24    reorganization.  Under the circumstances, there is more than a reasonable possibility of a

25    successful reorganization in the Debtor's case, and the Debtor should be provided an adequate

26    and fair opportunity to effectuate such a reorganization.

27        In *Willowood*, the court stated that it was "simply too early in the case to determine

28    whether or not the Debtor will be able to reorganize successfully" given the timing of the

lender's motion to be excused from compliance with the turnover requirements of Section 543, which motion was filed during the first month of the debtor's chapter 11 bankruptcy case. *Willowood* at 322. The court in *Willowood* found that the acts of mismanagement alleged by the lender, including the debtor's failure to pay vendors on a timely basis and the debtor's failure to set aside tenant security deposits, did not rise to a level that demonstrated that the interest of creditors would be best served by retaining the receiver, particularly where the debtor had obtained the entry of a court order authorizing the use of cash collateral, had organized its books and records, and was in compliance with United States Trustee disbursement and reporting requirements, among other factors. *Id.* at 322-23.

In the Debtor's case, Shady Bird's allegations of mismanagement revolve around the maintenance and preservation of the Hotel property, which as discussed in detail above, are wholly inaccurate and misleading, and the purported pre-petition termination of the Ground Lease, which was an extremely frustrated and admittedly misguided response to Shady Bird's actions, and was never intended to be (nor was ever actually) effectuated. Like the debtor in *Willowood*, the Debtor here has obtained the entry of the Interim Order authorizing the Debtor to use its cash in accordance with the Budget to pay expenses that are critical to the maintenance of the Hotel property (including insurance premiums, utility expenses, and real property taxes), is maintaining accurate books and records, has opened debtor-in-possession bank accounts to ensure that no unauthorized payments (including payments of pre-petition debt) are made, and has fully complied with all of its reporting requirements under both the Bankruptcy Code and the guidelines of the OUST.

Under the circumstances herein, Shady Bird cannot demonstrate that there is no reasonable likelihood of reorganization by the Debtor in this case. Thus, this factor weighs against excusal of the Receiver's compliance with the turnover requirements of 11 U.S.C. § 543.

**2.** ***The probability that funds required for reorganization will be available.***

In the *Packard Square* case, the court considered numerous factors, but found that the most important factor, which overwhelmed all other factors, was the court's recent denial of the debtor's debtor-in-possession financing motion. The court noted that, given the denial of the

debtor's financing motion, the debtor had no funds available with which to perform any work on the project or to fund the debtor's chapter 11 bankruptcy case. *Id.* at 781. Similarly, in *Skymark Properties, supra*, the court identified as the most important factor, which overwhelmed all other factors, to be the court's denial of the debtors' cash collateral motion, which left the debtors with no income or source or funding to operate their real estate properties or to continue in their chapter 11 bankruptcy cases. *Skymark Properties*, 597 B.R. at 399-400. Unlike the debtors in *Packard Square* and *Skymark Properties*, the Debtor here has received Court authority (albeit on an interim basis, pending a final hearing) to use its cash on hand and the proceeds of the DIP Loan to fund the administration of its chapter 11 bankruptcy case and to pay expenses critical to the maintenance of the Hotel property during the next few months (or longer). In addition, as discussed above, the Debtor is actively seeking debtor-in-possession financing to complete the construction of the Hotel and to bring the Hotel into operation, which financing the Debtor believes is possible given the substantial equity in the Hotel.

The Debtor has demonstrated a probability that funds required for a successful reorganization will be available in its case. Accordingly, this factor weighs against excusal of the Receiver's compliance with the turnover requirements of 11 U.S.C. § 543.

### 3. *Whether there are instances of mismanagement by the debtor.*

As discussed in great detail in Section III above, each of the allegations made by Shady Bird regarding the Debtor's purported failure to properly maintain, protect, and secure the Hotel property is false, grossly exaggerated and/or misleading. The Hotel has been, and will be, far better maintained and protected by the Debtor and its manager, M+D, than by the Receiver, who has done almost nothing (likely through no fault of her own, given the lack of resources being provided to her) to properly or regularly maintain the Hotel property. As also discussed above, the Ground Lease Notice which purported to terminate the Ground Lease was a frustrated and desperate response to Shady Bird's actions, and was never intended to be (nor was ever actually) effectuated. As Shady Bird's own attorneys have acknowledged, the purported termination of the Ground Lease was never actually effective or valid, and has been rescinded.

Furthermore, given the acknowledgment by both the Debtor and the Ground Lessor that

24

1   the Ground Lease remains effective and in place, and given the application of the automatic stay

2   in the Debtor's bankruptcy case, there can be no legitimate concern about any potential future

3   attempts by the Ground Lessor to terminate the Ground Lease.

4           In short, there has been no mismanagement of the Hotel by the Debtor.  As noted by the

5   bankruptcy court in Bryant Manor, turnover is the general rule, and excuse from compliance with

6   the provisions of 11 U.S.C. § 543 is the exception.  *In re Bryant Manor, LLC*, 422 B.R. at 289

7   (excuse from compliance is warranted only when the party opposing turnover can demonstrate

8   affirmatively that creditors will be better served if the receiver is retained).  Here, where the

9   evidence demonstrates that the Debtor has properly and regularly maintained the Hotel, and is in

10  a far better position than the Receiver to continue doing so, there is no grounds for excusing the

11  Receiver from compliance with the turnover requirements of 11 U.S.C. § 543.

12          **4.      *Whether turnover would be injurious to creditors*.**

13          The Debtor is highly incentivized to preserve and maximize the value of the Hotel for the

14  benefit of its creditors.  Accordingly, the Debtor and its manager, M+D, have been diligent in

15  maintaining the Hotel property.  As discussed above, none of the allegations made by Shady Bird

16  about the Debtor's purported failure to maintain, protect and secure the Hotel is supported by the

17  facts or evidence before this Court.   The Receiver does not have the experience, historical

18  knowledge, and resources that the Debtor has to maintain and preserve the value of the Hotel as

19  efficiently or cost-effectively as the Debtor can.  In fact, it is clear from the Debtor's interactions

20  with the Receiver that the Receiver has done very little other than to "babysit" the Hotel and that

21  the Receiver is continuing to rely on the Debtor and M+D to provide maintenance services for

22  the Hotel.   While Shady Bird may be better served by preventing the Debtor from being in

23  possession of its own property or from taking the steps necessary to successfully reorganize in

24  this case, the interests of creditors as a whole are far better served by affording the Debtor a

25  reasonable opportunity to reorganize so that all creditors (not just Shady Bird) may receive a

26  recovery through this chapter 11 case.

27          When a custodian who is the subject of turnover request is a receiver who was appointed

28  by a state court pre-petition, bankruptcy courts consider the length of time that the receiver has

25

1  acted under receivership order, and what, if anything, the receiver has done, as factors bearing on

2  whether it would be in interests of creditors to excuse receiver from mandatory turnover

3  obligation. *In re Packard Square LLC*, *supra*, 575 B.R. at 779 (receiver was in place for more

4  than 10 months before the debtor's bankruptcy filing, during which time there was considerable

5  activity on the debtor's development project with the receiver controlling the construction of

6  such project and obtaining financing to continue such construction); *see also In re Orchards*

7  *Village Investments, LLC*, *supra*, 405 B.R. at 352 (excusing a receiver from turnover of assets

8  where receiver had been in place for approximately 6 months before the debtor's bankruptcy

9  filing and had substantially improved the conditions which caused the court to appoint the

10  receiver).   In contrast to the receivers in *Packard Square* and *Orchards Village*, the Receiver

11  here was only in place for **9 days** before the Debtor commenced its chapter 11 bankruptcy case.

12  During the brief period of time that the Receiver has been in place (including after the Petition

13  Date, with the Debtor's consent), the Receiver has done very little other than to re-key the Hotel

14  premises and retain a consultant to provide a property inspection report to assist Shady Bird in its

15  litigation efforts against the Debtor.  There is no evidence that the Receiver herself has taken any

16  steps, or expended any funds, to properly maintain the Hotel.  In fact, the Receiver has reached

17  out to the Debtor to address certain maintenance issues related to the Hotel, which indicates that

18  the Receiver has neither the ability nor the resources to address such issues herself.

19         Based on the foregoing, Shady Bird has failed to meet its burden of demonstrating that

20  there has been any mismanagement by the Debtor, or any significant benefits conferred by the

21  Receiver, to justify excusal from compliance with the turnover requirements of 11 U.S.C. § 543.

22  Accordingly, the Motion should be denied.

23         **5.      *Whether the debtor will use the turned over property for the benefit of its***

24              ***creditors.***

25         This factor appears to be relevant when a debtor is generating income and/or rent, which

26  could potentially be misused by the debtor, to the detriment of its creditors.  Here, the Debtor is

27  not currently generating any income or rent.  The only property at issue are the Hotel and the

28  FF&E, which the Debtor is in the best position to maintain, protect and preserve for the benefit

26

1  of all creditors.  Under the circumstances, there can be no doubt that the Debtor will manage the

2  Hotel and related assets for the benefit of its creditors.  Based on the foregoing, this factor

3  weighs against excusal of the Receiver's compliance with the turnover requirements of 11 U.S.C.

4  § 543.

5        **6.**    ***Whether or not there are avoidance issues raised with respect to property***

6        ***retained by a receiver, because a receiver does not possess avoiding powers for***

7        ***the benefit of the estate***.

8        This factor is relevant when a request is made to dismiss or suspend a chapter 11 case

9  under 11 U.S.C. § 305 or to permanently excuse a state court appointed receiver from turnover

10 under 11 U.S.C. § 543(d) in order to permit a state court action to proceed to its conclusion.

11 *Matter of Plantation Inn Partners*, 142 B.R. 561 (Bankr. S.D. Ga. 1992) (declining to dismiss or

12 suspend the debtor's case or to permanently excuse the receiver from turnover because the

13 powers of a debtor-in-possession to recover assets are broader than those of a receiver).  Here,

14 the Receiver does not possess the avoiding powers that the Debtor possesses – such as the power

15 to avoid and recover preferential transfers – so the Receiver cannot seek the avoidance and

16 recovery of any preferential liens that may have been recorded against the Hotel.  However, the

17 Debtor could still presumably seek to avoid preferential liens and transfers in connection with the

18 Hotel as long as the Debtor's bankruptcy case remains open, so this factor appears to be neutral.

19       **7.**    ***The fact that the bankruptcy automatic stay has deactivated the state court***

20       ***receivership action***.

21       While the State Court Action has been stayed as a result of the Debtor's bankruptcy

22 filing, it remains open and would likely resume if the Debtor's bankruptcy case were to be

23 dismissed or relief from the automatic stay were to be granted.  Accordingly, this factor appears

24 to be neutral.

25       In sum, virtually all of the factors considered by a court when determining whether it is in

26 best interests of creditors to relieve a state court receiver of his or her mandatory obligation to

27 turn over estate property to a chapter 11 debtor-in-possession weighs against excusal of such

28 obligation in the Debtor's case.  Since Shady Bird has not satisfied its burden of proving that it is

27

1   in the best interests of creditors to keep the Receiver in place in the Debtor's case, Shady Bird's

2   request to excuse the Receiver from compliance with the turnover provisions of 11 U.S.C. § 543

3   pursuant to the Motion must be denied.

4                                                    **V.**

5                                           **CONCLUSION**

6          Based upon all of the foregoing, the Debtor respectfully requests that this Court enter an

7   Order:

8          (1)    sustaining the Opposition and denying the Motion;

9          (2)    requiring the Receiver to immediately deliver to the Debtor possession of the

10  Hotel and any other property of the Debtor over which the Receiver currently has possession,

11  custody or control, in compliance with 11 U.S.C. § 543(b)(1);

12         (3)    requiring the Receiver to file an accounting of any property of the Debtor that

13  came into the possession of the Receiver, in compliance with 11 U.S.C. § 543(b)(2); and

14         (4)    granting such further relief as the Court deems just and proper.

15  Dated: April 1, 2021                    THE SOURCE HOTEL, LLC

16

17

18                                          By:_____

19                                             RON BENDER
                                               JULIET Y. OH
20                                             LEVENE, NEALE, BENDER, YOO
                                                  & BRILL L.L.P.
21                                             Proposed Attorneys for Chapter 11 Debtor
                                               and Debtor-in-Possession
22

23

24

25

26

27

28

### DECLARATION OF DONALD CHAE

I, Donald Chae, hereby declare as follows:

1.      I am the Manager and a member of DMC Investment Holdings, LLC, which is the sole member of The Source Hotel, LLC, a California limited liability company and the debtor and debtor-in-possession herein (the "<u>Debtor</u>"), and I am therefore familiar with the business operations and financial records of the Debtor.  In addition, I have been indirectly and directly involved in the development, construction, and management of numerous commercial real estate development and construction projects, including within Orange County in the State of California, and therefore have knowledge and experience with respect to the commercial real estate market in Orange County.  I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

2.      I make this declaration in support of the Debtor's opposition (the "<u>Opposition</u>") to the motion filed by Shady Bird Lending, LLC ("<u>Shady Bird</u>") for the entry of an order excusing Bellann R. Raile (the "<u>Receiver</u>"), who was appointed as receiver over the Debtor's assets pursuant to an ex parte order entered by the Los Angeles Superior Court on February 17, 2021, from compliance with the requirements of the Bankruptcy Code to turn over and deliver to the Debtor assets belonging to the Debtor over which the Receiver has possession, custody and control (the "<u>Motion</u>"), to which Opposition this declaration is attached.  All capitalized terms not specifically defined herein shall have the meanings ascribed to them in the Opposition.

**A.      <u>Background</u>**

3.      On February 26, 2021 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor is continuing to manage its financial affairs and operate its bankruptcy estate as a debtor-in-possession.

4.      The Debtor is a limited liability company that was organized in November, 2012 in the State of California.  DMC Investment Holdings, LLC is the sole member of the Debtor.  My brother, Min S. Chae, and I are the members and principals of DMC Investment Holdings, LLC.

5.      Since 2014, the Debtor has been developing the Hotel, which will include conference rooms, an executive lounge, fitness center, restaurant, bars, and cleaning services.  The

29

Hotel is part of a larger 12.8-acre mixed-use development project (the "Master Development"), which includes a 400,000 square-foot retail center and a 50,000 square-foot seven-story office building which were completed in 2016. The Debtor does not own the real property on which the Hotel is being constructed (which is located at the southeast corner of the Master Development), but is a lessee pursuant to a 99-year ground lease for such real property (the "Ground Lease") with the Debtor's affiliate, The Source at Beach, LLC (the "Ground Lessor"). My brother, Min Chae, and I are also the principals of the Ground Lessor.

6.    M+D Properties, a California corporation ("M+D") is an affiliate and the sole manager of the Debtor. My brother, Min Chae, and I are also the principals of M+D. Pursuant to the terms of a Development Fee Agreement dated July 1, 2014 entered into by M+D and the Debtor, M+D has rendered construction/development management services for the Debtor to assist in overseeing the development and construction of the Hotel.

7.    Construction of the Hotel began in 2016. To finance the construction of the Hotel, on May 24, 2016, the Debtor obtained a $29.5 million construction loan (the "Loan") from Evertrust Bank ("Evertrust") as well as financing by three tranches of EB-5 investments totaling $35.5 million. The Debtor's obligations under the Loan are secured by liens against substantially all of the Debtor's assets, including the Hotel and the Debtor's leasehold interest in the real property that is the subject of the Ground Lease (the "Leasehold Interest"). The original maturity date for the Loan was December 1, 2017, but was extended to November 1, 2019 pursuant to written extension agreements entered into by the parties.

8.    Through October 2019, approximately 85% of the Hotel construction had been completed, including: substantial completion of the core and shell, exterior painting, porte cochère, street lighting, ceiling framing, kitchen framing and glass block installation, food storages, all glass storefronts, electrical wiring and switchgear, guestroom flooring, ceiling fixtures, pool bar canopy structure, deck drains, window washing system, roof membrane, roof ductwork and HVAC vibration installation; nearly complete installation of bathroom fixtures (95%), acoustic ceiling system (80%), HVAC electrical connections (90%), piping for HVAC and plumbing equipment (95%), and rooftop ductwork (99%). In addition, substantial materials have been procured and/or

fabricated and are ready for installation pending completion of other items, such as first and second floor flooring, corridor carpeting, millwork (wall and ceiling panels, pool bar), passenger elevators, fire sprinklers, egress and accent lighting, pool equipment, guest room doors, locks and closures, bathroom fixtures, and rooftop HVAC equipment. The approximately 15% of the Hotel construction which remains outstanding consists of mostly "finish work" such as the installation of flooring and carpeting, lighting, appliances, trade fixtures, furniture, furnishings and equipment already purchased by the Debtor (collectively, "FF&E"). I believe that the Debtor can successfully complete the construction of the Hotel within 6-12 months with additional funding of approximately $12,000,000 - $16,000,000 (which funding would provide for, among other things, the satisfaction of valid and effective mechanics' liens).

9. In late 2019, Evertrust refused to issue the remaining $4 million of the Loan, claiming a cost overrun on the construction of the Hotel. As a result of Evertrust's refusal to provide the final $4 million of the Loan, the Debtor was forced to cease construction activities. However, I believe strongly that, had Evertrust funded the final $4 million as expected, construction of the Hotel would have been completed, as I believe that the Debtor's contractors would have carried fifty percent of the cost overrun and the Debtor and its affiliates would have covered the remaining fifty percent of the overrun.

**B.    Events Leading To Debtor's Bankruptcy Filing.**

10. When Evertrust refused to issue the remaining $4 million of the Loan, the Debtor immediately and actively sought to refinance the Loan. The Debtor began discussions with a new lender named Hall Structured Finance ("Hall") in the fall of 2019 and was ultimately able to reach an agreement with Hall for refinancing in the total sum of $42 million. During the course of the Debtor's refinancing discussions with Hall, the Debtor kept Evertrust apprised of all developments, and even provided Evertrust with a copy of the loan commitment letter from Hall in early 2020. The Debtor and Hall were on the verge of closing on the refinancing, with a target closing date of March 20, 2020, when local, county, and State officials issued lockdown orders as a result of the COVID-19 pandemic. At that point, Hall put an indefinite hold on the closing of the refinancing with the Debtor.

11.    As a result, the Debtor went back to Evertrust and, between March 2020 and December 2020, engaged in active forbearance negotiations with Evertrust to obtain a further extension of the Loan maturity date so that the Hotel could recover from the effects of the COVID-19 pandemic, and the Debtor could obtain refinancing or additional construction financing and ultimately recommence construction of the Hotel.

12.    In the summer of 2020, while the Debtor and Evertrust were still engaged in forbearance negotiations, Evertrust commenced litigation against my brother, Min Chae, and me (as guarantors of the Loan), and recorded a Notice of Default against the Hotel (the "<u>NOD</u>").  In light of such litigation and the recordation of the NOD, and given the ongoing COVID-19 pandemic, the Debtor requested that Evertrust convert the Loan (in the funded amount of approximately $25 million) into a two-year term loan, and even offered to set aside one year's worth of loan payments in escrow as assurance of repayment of such two-year term loan.  Evertrust declined the Debtor's offer.

13.    During the latter half of 2020, while the Debtor was engaged in forbearance negotiations with Evertrust, the Debtor was also working actively with its loan broker, Ed Choi, to identify and obtain alternative financing for the Hotel.  In November or December, 2020, Mr. Choi advised the Debtor that he had introduced Cambra Realty ("<u>Cambra</u>") to Evertrust to potentially purchase the Loan from Evertrust.

14.    Ed Choi, who represented to me that he was in direct discussions with Cambra regarding its pending purchase of the Loan, repeatedly assured me that, in conjunction with its purchase of the Loan, Cambra would extend the Loan maturity date for two years (at which time the Debtor could purchase back Cambra's interest in the Loan for $24-25 million) and Cambra would provide additional construction financing of $10-14 million so that the Debtor could complete the construction of the Hotel.  True and correct copies of correspondence exchanged by Ed Choi and me on December 28, 2020, in which Ed Choi indicated to me that Michael Schlesinger of Cambra had confirmed these terms, is attached **<u>Exhibit 1</u>** hereto.  I repeatedly requested that the foregoing terms be reduced to writing and was assured by Ed Choi and Mr. Schlesinger that the terms would be set forth in a written offer or term sheet.  Ultimately, the terms

1    discussed by Ed Choi, Mr. Schlesinger and me were never reduced to writing.

2        15.    On December 30, 2020, I was asked to meet with Ed Choi and Mr. Schlesinger at

3    an office building in Beverly Hills, where they introduced me to Ronald Richards for the first time,

4    introducing him to me only as an attorney and not as the principal for Shady Bird.  Unbeknownst

5    to me, Shady Bird had just purchased Evertrust's interests in the Loan at a significant discount the

6    day before, which I am advised and believe was for a reported purchase price of approximately $19

7    million.    Thereafter, the Debtor was advised that Mr. Richards of Shady Bird would be the

8    Debtor's new contact.

9        16.    On January 2, 2021, the Debtor received initial deal points in writing from Mr.

10   Richards which were generally egregious and not at all reflective of the terms that had been

11   previously discussed by the parties. On January 7, 2021, the Debtor returned a written counteroffer

12   which reflected the terms that I understood had been previously agreed to by the parties.   In

13   response to the Debtor's counteroffer, Mr. Richards requested information from the Debtor

14   regarding its maintenance contracts, architectural contracts, and construction management contract

15   with Swinerton Builders. At this point, my trust in Shady Bird had severely deteriorated.

16       17.    At Mr. Richards' request, the Debtor coordinated with Ed Choi to provide Shady

17   Bird's maintenance contact with access to the Hotel rooftop on January 27, 2021.  The Debtor was

18   advised that there would be one individual who would inspect the rooftop equipment.  Instead, Mr.

19   Schlesinger of Cambra showed up with a team of four individuals from Swinerton Builders (the

20   Debtor's former contractor) at the designated meeting time.  Robert "Charlie" Cervantes, who is

21   employed by M+D (the Debtor's manager) and had been overseeing the maintenance of the Hotel,

22   was the Debtor's representative at the meeting that day.  I am advised and believe that, as a

23   compromise, the Debtor permitted access to the Hotel to two individuals from Swinerton Builders.

24   However, I am advised by Mr. Cervantes that the two individuals from Swinerton Builders

25   informed him that their company had been hired to inspect the Hotel project and that they would

26   need to view the full Hotel building.

27       18.    At this point, the relationship between Shady Bird and the Debtor was severely

28   strained, and I feared that Shady Bird had no intention of following through with the terms that the

parties had previously discussed. The "bait and switch" tactic at the Hotel meeting on January 27, 2021 and the comments that I am advised were made by the individuals from Swinerton Builders to Mr. Cervantes at such meeting only reinforced my concerns that Shady Bird was not engaged in negotiations with the Debtor in good faith and was instead gathering information to take the Hotel from the Debtor.

19.    With the decision made to go into "litigation mode" and minimize contact with Shady Bird and Mr. Richards, the Debtor proceeded to take actions that it felt were necessary to protect the interests of the Debtor and its creditors in the Hotel.  In that context and in an admittedly misguided attempt to get negotiations with Shady Bird "back on track," I sent an email to Mr. Richards on February 2, 2021 threatening to suspend security at the Hotel property.  Of course, I did not do so and I never had any intention of doing so, given that the Hotel is the result of many years of hard work and investment by the Debtor and constitutes the Debtor's primary asset.  My utmost concern for the Debtor has always been, and continues to be, the preservation, maintenance and maximization of value of the Hotel.  There has never been any interruption of the security provided to the Hotel.

20.    Ultimately, my concerns about Shady Bird were validated when, on February 8, 2021, Shady Bird filed a complaint against the Debtor in the Superior Court of the State of California for the County of Orange ("Superior Court") for (i) specific performance and appointment of a receiver, and (ii) waste, thereby commencing the Superior Court action bearing the case number 30-2021-01183489-CU-OR-CJC (the "State Court Action").  Shady Bird also took steps to immediately foreclose on the Hotel and issued a Notice of a Trustee's Sale for the Hotel to be held on March 1, 2021.

21.    On February 16, 2021, the Ground Lessor, the Source at Beach, LLC (of which I am a principal), sent to Shady Bird a "Notice of Default Under, and Exercise of Option to Terminate, Ground Lease" (the "Ground Lease Notice").  However, the Ground Lease Notice should be viewed in the context of the parties' discussions and actions to date – the Ground Lease Notice was an extremely frustrated response to Shady Bird's actions and ultimately a desperate attempt to prevent or delay the foreclosure of the Hotel by Shady Bird.  Neither the Ground Lessor

1    nor I ever intended to effectuate the termination of the Ground Lease, and I do not believe such a

2    termination was ever actually effectuated.    As Shady Bird's own counsel noted in his written

3    response to the Ground Lease Notice, a true and correct copy of which is attached as **Exhibit 2**

4    hereto, the purported termination of the Ground Lease was never effective nor valid.    Moreover,

5    and in an effort to provide clarification, the Ground Lease Notice was formally rescinded by the

6    Ground Lessor in writing.    A true and correct copy of the written notice from counsel for the

7    Ground Lessor rescinding the Ground Lease Notice is attached as **Exhibit 3** hereto.

8         22.    Shortly after filing its complaint to initiate the State Court Action, Shady Bird filed

9    an ex parte application for an order appointing a receiver and other related relief.

10        23.    I am advised and believe that, on February 17, 2021, the Superior Court entered an

11   order in the State Court Action appointing Bellann R. Raile as Receiver to, among other things,

12   take possession of the Hotel and all goods, furniture, fixtures, and equipment attached and/or

13   related to the Hotel.

14        24.    As a result of all of the foregoing, the Debtor sought chapter 11 bankruptcy

15   protection in order to prevent the impending foreclosure of the Hotel, to preserve the equity in the

16   Hotel for the benefit of all creditors (not just Shady Bird), to regain possession of the Hotel and

17   related assets and obtain refinancing or investments to enable the Debtor to complete construction

18   of the Hotel, and to be afforded a reasonable opportunity to restructure its financial affairs and

19   repay its debts in an orderly fashion.

20   **C.    Post-Petition Administration.**

21        25.    As of the Petition Date, the Debtor had cash totaling approximately $63,000 in bank

22   accounts with Evertrust and Preferred Bank.    The Debtor took steps immediately after the Petition

23   Date to close its pre-petition bank accounts at Evertrust and Preferred Bank, and to withdraw all

24   funds contained in those pre-petition accounts so that such funds could be deposited into the

25   Debtor's newly-established debtor-in-possession bank accounts at Axos Bank.

26        26.    On March 12, 2021, the Debtor filed a motion in its bankruptcy case seeking the

27   entry of a Court order (i) requiring Evertrust to turn over and deliver to the Debtor cash held in the

28   Debtor's pre-petition bank accounts at Evertrust (as Shady Bird would not consent to the turnover

35

1  of such cash until after the Debtor filed the CC/Financing Motion); (ii) authorizing the Debtor to

2  use cash collateral in accordance with the Debtor's proposed 13-week operating budget (the

3  "Budget"); and (iii) authorizing the Debtor to obtain post-petition unsecured financing up to

4  $100,000 (the "DIP Loan") from the Debtor's manager, M+D (the "CC/Financing Motion"). The

5  Budget provides for the payment of expenses critical to the maintenance and preservation of the

6  Hotel, including insurance premiums, utility expenses, post-petition utility deposits, and real

7  property taxes.

8       27.    I am advised and believe that, on March 23, 2021, the Court entered an order

9  granting the CC/Financing Motion on an interim basis, pending a final hearing scheduled on May

10  6, 2021, subject to certain minor modifications agreed to by the Debtor and set forth in such order

11  (the "Interim Order").

12      28.    The Debtor filed its 7-Day Package with the Office of the United States Trustee

13  ("OUST") on a timely basis on March 5, 2021. The Debtor also filed its Schedules of Assets and

14  Liabilities ("Schedules") and Statement of Financial Affairs on a timely basis on March 12, 2021.

15  The Debtor filed its first monthly operating report (covering the post-petition period of February

16  26-28, 2021) with the Court and, to the best of my knowledge, remains in full compliance with the

17  reporting and other requirements of the Bankruptcy Code and the OUST.

18  **D.    The Debtor's Reorganization Efforts And Strategy.**

19      29.    The Debtor's primary assets consist of the Hotel, the Leasehold Interest, and the

20  FF&E. I believe that the current value of the Hotel in "as is" condition is approximately

21  $50,000,000 and that its fair market value upon completion will be at least $60,000,000.[8]    As

22  reflected in the Debtor's Schedules, I believe that the total value of the Debtor's FF&E (calculated

23  at cost, excluding fabrication labor costs) is approximately $2,700,000.

24      30.    The Debtor's primary secured creditor is Shady Bird. According to the Notice of

25

26  _____

    [8] As reflected in a prior appraisal report of the Hotel, a true and correct copy of which is
    attached as **Exhibit 4** hereto, the Hotel was appraised at an "as is" value of $40,900,000 as of
27  October 14, 2019, was projected to have a value of $55,800,000 upon completion, and was
    projected to have a value of $61,300,00 upon stabilization. M+D is in the process of obtaining
28  an updated appraisal of the Hotel.

Trustee's Sale recorded by Shady Bird on February 3, 2021, Shady Bird contends that the current balance of the Loan is approximately $30,720,000. The Debtor's obligations under the Loan are secured by liens against substantially all of the Debtor's assets, including the Hotel, the Leasehold Interest, the FF&E, and the Debtor's cash.

31.    There are a number of subcontractors that have recorded mechanics' liens against the Debtor and/or Hotel. As reflected in the Debtor's Schedules, I believe that the total amount of the mechanics' liens recorded against the Debtor and/or Hotel is approximately $2,900,000. Some of these recorded mechanics' liens are disputed by the Debtor. In addition, there appear to be a number of other mechanic's liens asserted against the Hotel; however, such purported liens do not appear to have been properly perfected and may therefore be invalid.

32.    The Debtor also received three tranches of EB-5 loans totaling approximately $35.5 million from Beach Orangethorpe Hotel, LLC, Beach Orangethorpe Hotel II, LLC, and Beach Orangethorpe Hotel III, LLC (collectively, the "EB-5 Lenders"). The Debtor's obligations under the loans from two of the EB-5 Lenders (i.e., Beach Orangethorpe Hotel, LLC and Beach Orangethorpe Hotel II, LLC) are secured by junior liens against the Hotel and the Leasehold Interest.

33.    I believe that the EB-5 Lenders and the vast majority of the Debtor's creditors will support the Debtor's efforts to reorganize through its chapter 11 bankruptcy case. The Debtor makes no secret of its intended exit strategy in its bankruptcy case. The Debtor has been, and continues to be, engaged in active discussions with numerous prospective lenders regarding the terms for debtor-in-possession financing, which will provide the Debtor with the funding necessary to complete the construction of the Hotel, service debt, and operate the Hotel until operations can be stabilized. The Debtor has already received a written commitment letter from one prospective lender for debtor-in-possession financing in the sum of $17,900,000 but, as noted above, the Debtor is still in the process of "vetting" terms with a number of prospective lenders. The Debtor intends to finalize loan terms with a lender and file a motion for Court approval of debtor-in-possession financing in this case in an expeditious manner.

34.    In conjunction with obtaining debtor-in-possession financing, the Debtor intends to

37

1  file a plan of reorganization in this case which restructures and provides for repayment of the

2  Debtor's secured debt (including the debt owed to Shady Bird) based upon market terms, and

3  provides for a recovery to the Debtor's general unsecured creditors who would otherwise receive

4  nothing (particularly upon a foreclosure of the Hotel by Shady Bird).[9]

5      35.   In its Motion, Shady Bird alleges that the Debtor has failed to adequately maintain,

6  protect and secure the Hotel.  As discussed in detail in the declaration of Mr. Cervantes (who is

7  employed by M+D, the Debtor's manager) filed concurrently herewith (the "Cervantes

8  Declaration") and below, I believe each allegation made by Shady Bird is false, grossly

9  exaggerated, and/or misleading.  As the party who has invested a significant amount of time,

10  money, and resources into the development and construction of the Hotel, the Debtor and its

11  principals have every incentive to preserve and maximize the value of the Hotel for the benefit of

12  the Debtor's creditors and equity holder.  As described in the Cervantes Declaration and below, the

13  Debtor and M+D have been extremely diligent in maintaining and protecting the Hotel, even after

14  construction halted in late 2019.

15      36.   I do not believe that the Receiver has any of the experience, historical knowledge,

16  and resources that the Debtor has with respect to the Hotel, and will not be able to maintain and

17  preserve the value of the Hotel as efficiently or cost-effectively as the Debtor can.  In fact, it

18  appears from the Debtor's interactions with the Receiver since her appointment approximately one

19  month ago, that the Receiver is continuing to rely on the Debtor and M+D to provide maintenance

20  services for the Hotel, and has done very little other than to "babysit" the Hotel property.  And

21  while Shady Bird has apparently funded the Receiver's retention of a consultant to provide a

22  property inspection report, Shady Bird has apparently not provided any funding to the Receiver to

23

24      [9] I acknowledge and appreciate the Receiver's responsiveness to the Debtor's requests for
access to the Hotel when required (*e.g.*, to provide tours of the Hotel to prospective lenders and
25  investors, and to review and respond to the Receiver's expressed concerns regarding certain
maintenance issues).  However, I believe that the Debtor requires unfettered access to the Hotel
26  and its other assets, which access is not hampered by the extra administrative steps of requesting,
obtaining approval of, and coordinating such access, in order to maintain the Hotel and
27  formulate/implement its reorganization strategy in its bankruptcy case in an effective manner.

28

actually address the purported maintenance issues raised in such report.  This is not surprising since (i) I do not believe that there were actually any maintenance issues under the Debtor's watch, and (ii) Shady Bird has no incentive to ensure the proper maintenance and preservation of the Hotel while the Debtor owns the Hotel – in fact, it is in Shady Bird's interest to do the exact opposite, as any devaluation of the Hotel will assist Shady Bird in obtaining the relief that it has admitted it intends to seek in this case.

37.    The Hotel has been diligently and competently maintained by the Debtor and M+D (at least prior to the appointment of the Receiver, at which point the Debtor was locked out).  The Debtor's responses to the maintenance issues alleged by Shady Bird in the Motion and in the property inspection report attached to the Motion are discussed at length below and in the Cervantes Declaration.  Mr. Cervantes is an employee of M+D and oversaw the day-to-day maintenance of the Hotel until the Receiver was appointed.  While Mr. Cervantes has addressed the purported maintenance issues raised by Shady Bird of which he has personal knowledge, I have addressed below the other issues raised by Shady Bird in its Motion.

| No. | Shady Bird's Allegation | Response/Observations |
|---|---|---|
| 14 | The Debtor's failure to provide evidence of and certificates of insurance to Shady Bird upon request. | The Debtor provided evidence (and certificates) of insurance for the Hotel to the Receiver on the same day she made such request.  Evidence of insurance was also submitted to the OUST as part of the Debtor's 7-Day Package, and the Debtor will provide evidence of insurance to any party in interest upon written request. |
| 15 | The Debtor's failure to allow inspections by the City of Buena Park and ceasing communications with the City, negatively affecting the permitting process and the ability to complete the project. | This allegation has no basis in truth, and makes no sense given that a City Inspector from the City of Buena Park (Gary) has been stationed at "The Source" complex and still presently maintains an office full-time in the construction office adjacent to the Hotel. |
| 17 | The Debtor's failure to provide any security for the project and improvements. | There has always been, and continues to be, full time 24/7 security service for the entire "The Source" complex, including the Hotel, courtesy of the Ground Lessor (The Source at Beach, LLC). There has never been any interruption of the |

39

| No. | Shady Bird's Allegation | Response/Observations |
|-----|------------------------|----------------------|
|  |  | security provided to the Hotel. |
| 18 | The Debtor's failure to timely test the fire-life safety systems which could completely destroy the project. | I am not aware of any issues regarding the efficacy of the fire-life safety systems, and I am not aware of any "deadline" to test such systems.  To the extent there is an issue, it does not appear that the Receiver has taken any steps to address the issue herself.  If there is a real issue with respect to the fire-life safety systems, the Debtor and M+D are willing and able to promptly address it. |
| 19 | Elevator certificate has not been renewed since 2018. *(issue raised by the Receiver on March 17, 2021)* | One of the three elevators installed in the Hotel was being used for construction access. The elevator supplier (Kone, Inc.) provided a temporary six-month certificate for the elevator, which needs to be renewed. When the Receiver requested assistance from the Debtor to address this issue, the Debtor promptly agreed to do so. The Debtor has contacted Kone to schedule an inspection to have the elevator re-certified. |
| 20 | An improved safety environment for building visitors and contractors should be implemented. *(issue raised in the property inspection report attached to the Motion)* | The Hotel remains under construction so it is not uncommon for materials to be left on site. There is no current construction activity, so this issue does not appear relevant at this time. However, the Debtor and M+D are able and willing to send in a crew to tidy up any loose equipment or materials, since the Receiver does not appear to have taken any steps to address this issue herself. |
| 21 | Completion plans are held off site. *(issue raised in the property inspection report attached to the Motion)* | As is typically the case, the Debtor's general contractor, Greenland Construction Service, LLC (of which I am a principal), is holding the completion plans for the Hotel. Those plans are currently stored by Greenland Construction Service, LLC in its construction office, which is located within "The Source" complex adjacent to the Hotel. |
| 23 | Missing flashing/improperly installed flashing *(issue raised in the property inspection report attached to the Motion)* | This issue is apparently more of a construction issue (which will be addressed during the completion of construction) and not a maintenance issue.  In the meantime, however, the Debtor is willing and able to get the area covered. |

1    I declare under penalty of perjury under the laws of the United States of America that the

2    foregoing is true and correct.

3    Executed this 1st day of April 2021, at Buena Park, California.

4

5

6    _____
DONALD CHAE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

41



April 5, 2021

Mr. Bellann Raile
Cordes & Company
2030 Main Street, Suite 1300
Irvine, CA 92614

Re:  **Source Hilton Hotel Buena Park Follow Declaration**

Dear Ms. Raile:

This document has been prepared in response to statements made by Robert "Charlie" Cervantes
in his Declaration in opposition to certain motions made by Shady Bird Lending, LLC.

The Declaration made by Mr. Cervantes appears to be a response to the statements and
observations contained in our report following our March 9, 2021 inspection.  Although Mr.
Cervantes states he completed a walk-through inspection of the property on March 25, 2021, it
appears his inspection was limited to his interpretation of our report.

1.  **Roof Issues** – The roof has numerous penetrations and is the primary location for much
    of the HVAC equipment.  Because the HVAC system has not been completed, significant
    and large openings exist through the roof and into ductwork.  The Debtor has placed
    plastic sheeting (polyethylene film), sometimes referred to as Visqueen, to cover the
    openings.  Unfortunately, this is not an appropriate long-term solution for the reasons
    stated below:

    a.  The application of plastic is not universal and numerous opening did not contain
        any covering.  See Picture 1 below.
    b.  Several roof vents are missing, which will allow water and pests to enter the
        building.  See Picture 2 below.
    c.  In the Declaration by Mr. Cervantes, he seems to indicate the placement of plastic
        film is acceptable.  However, polyethylene plastic is highly susceptible to
        degradation from exposure to the sun, through UV radiation.  The correct
        permanent solution is a sheet metal duct cap, as seen in Picture 3.
    d.  A review of Google Earth pictures seem to indicate the roof has had a long-term
        temporary solution to water intrusion.  See Picture 4 below:

---

California & Nevada          www.Urban-AB.com          B1038963



Picture 1 – Unprotected vent.



Picture 2 – Missing flashing.



Picture 3 – Duct cap.



Picture 4 – Roof in April 2018 with temp coverings.

2. **Incomplete Construction Assemblies Water Intrusion** – The term construction assembly is an industry recognized term that refers to all the components of given portion of building, which when assembled together serve a specific purpose. In the case of the roof, the assembly is comprised of all components designed to protect the structure from water intrusion. As can be seen from Pictures 5 and 6, a roof failure existed and was in the midst of being repaired when construction ceased. Picture 5 shows the completed repair with flashing covering, while Picture 4 shows the roof torn off and exposed wood. Picture 7 is a close up of the incomplete repair. Furthermore, it was evident the Debtor had tried to mitigate water intrusion by use of sand bags and plastic that were located near or on the roof at this area.



Picture 5 – Exposed roof substrate.



Picture 6 – Repaired area, opposite from the exposed area.



Picture 7 – Repaired area, opposite from the exposed area.

3. **Incomplete Fire Protection** – Mr. Cervantes accurately points out that the fire protection system has temporary construction covers over many sprinklers. This confirms what we identified in our report – the fire protection system is not capable of providing life-safety protection for the project. Until construction is remobilized and completed, the building will be at risk in the event of a fire.

4. **Pool Deck** – It is clear the pool deck water proofing has been exposed to years of excess exposure. Picture 8 below is a screen shot from Google Earth in May of 2019. In this picture, the pool deck is completely uncovered. Moreover, the damage from excessive sun and UV exposure was readily noticeable by the amount of friable roof material readily sloughing off. This can be seen in Picture 9 below. I am also concerned by Mr. Cervantes' statement that his construction crew applied sealant over the area. Typically, a contractor engaged in roofing or waterproofing would have either a C-39 roofing or C-

33 painting license. Moreover, most manufactures of waterproofing systems require
trained and licensed installers to performing maintenance and installation of their system
or the warranty may be voided.



Picture 8 – Exposed pool deck
5/2019.



Picture 9 – Deteriorating and
friable pool deck.

5. **Pool Water & Trash** – From our observations, the water and trash had been in the pool for some period of time. A review of both Weather.com and Weather Underground did not reveal any periods of rain between 2/17 (onset of Receivership) and 3/3 (first inspection). Several inches of rain occurred prior to the Receivership and it appears as though this water may not have been removed.

6. **Completed Business Finish Waste** – The construction phasing was performed in such a manner that completed finishes (carpet, floor tile, showers, plumbing fixtures, wall coverings and cabinetry) are subject to construction traffic and exposure. Very little protective measures have been instituted to guard against damage and destruction. Both the tile and carpet flooring are uncovered and being subjected to unusual damage. See pictures below:





7. **Sewer System Hazard** – Mr. Cervantes alleges the sewer system has been connected to the public system, which may be the case. However, it would be unusual for the sewer provider to provide this connection before the building receives its final inspection. This is an issue that can be understood, but needs to be verified. In the event the line is not connect, a potentially hazardous situation exists due to the current sewer use in the building with no outlet. This creates head pressure on the sewer system. Mr. Cervantes also claims he regularly refilled all the P traps to prevent sewer gas migration into the building, but many of the P traps are not connected to active water systems, so it is hard to imagine this was routinely performed.

8. **Roof Door Patch** – At the door that leads to the roof, it is apparent that someone other than a qualified PVC or PTO roofing contractor has patched a previous leak. Previously, this area leaked into the building below. The concern we have is that the improper repair may leak again and damage the unit below.

9. **Missing Flashing** – According to Mr. Cervantes the missing flashing is "more a construction issue (which is typically addressed during the completion of construction and not a maintenance issue." While it is true the completion would ordinarily follow construction, the course of construction has been interrupted for a protracted period of time and these openings will readily allow water and pests to enter the building. Moreover, even during the course of an active project, one would protect an opening when inclement weather is forthcoming and that has clearly not been done.

Should you have any question, please feel free to call me.

Sincerely,

*Brent Little*

Brent Little
Principal

1      **DECLARATION OF ANDREW TROST**

2      I, Andrew Trost, declare and state as follows:

3      1.    I am over the age of eighteen and am a principal of Carine

4 Consulting ("Carine") which I formed in 2012 to provide project solutions and complete

5 project management from inception to completion. I have spent almost 30 years in all

6 facets of the industry, as a subcontractor, design consultant, general contractor, and

7 project/construction manager. I hold a bachelor of science degree in Chemistry/Materials

8 Science from UCLA 1986, and I hold a Certificate, Fire Protection, from the University of

9 California, Irvine. I also am registered as a Professional Engineer, Fire Protection, in the

10 State of California, and have the following professional affiliations: PMI, CMAA, SFPE,

11 NFPA, and AIA. The facts stated herein are true of my own personal knowledge and I

12 could and would competently testify thereto as follows.

13      2.    I make this declaration in support of "Shady Bird Lending, LLC's

14 Reply to Opposition to Motion of Shady Bird Lending, LLC for Order Excusing State Court

15 Receiver From Turnover of Assets Pursuant to 11 U.S.C. § 543; Declarations of Bellann

16 R. Raile, Brent Little, and Andrew Trost in Support Thereof" (the "Reply").

17      3.    In preparing this declaration, I have reviewed the "Opposition to

18 Motion of Shady Bird Lending, LLC for Order Excusing State Court Receiver From

19 Turnover of Assets Pursuant to 11 U.S.C. § 543; Memorandum of Points and Authorities;

20 Declarations of Donald Chae in Support Thereof" (the "Opposition"), filed by the Debtor in

21 response to the "Motion of Shady Bird Lending, LLC for Order Excusing State Court

22 Receiver From Turnover of Assets Pursuant to 11 U.S.C. § 543; Memorandum of Points

23 and Authorities; Declarations of Ronald Richards, Bellann R. Raile, and Brent Little in

24 Support Thereof" (the "Motion"), filed by Shady Bird. I also reviewed the declaration of

25 Donald Chae (the "Chae Declaration") and the declaration of Robert "Charlie" Cervantes

26 (the "Cervantes Declaration") filed in support of the Opposition. As explained in detail

27 below, I find each of the declarations to be misleading and inaccurate. I submit this

28

*SulmeyerKupetz, A Professional Corporation*
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

DAL 2710806v1          29

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1 declaration to correct the record as to the misstatements, specifically those of Mr.

2 Cervantes.

3       4.     Recently, Carine was retained by Bellann R. Raile (the "Receiver"),

4 who I understand is duly appointed, qualified, and acting state court receiver for the real

5 property bearing APN Nos. 276-361-20 and 276-361-22, consisting of a partially

6 constructed 178-room, seven story hotel building located in Buena Park, California (the

7 "Project") owned by the debtor The Source Hotel, LLC (the "Debtor").  Carine specifically

8 was retained by the Receiver to provide her a report of the Project in response to the

9 Opposition.

10       5.     Initially, the Debtor insinuates that it has been extremely diligent in

11 maintaining and protecting the Project.  However, the following are just some examples

12 demonstrating why this is not the case:

13       •     The pool deck waterproofing has been exposed to UV rays for many

14 months, reducing its elasticity and rendering the membrane ineffective and out of

15 warranty; based on input from waterproofing experts, it must be replaced;

16       •     The roof membrane on the 7-story tower exhibits signs of lifting and

17 separation from the substrate; it is highly likely that water intrusion has occurred, and the

18 membrane must be repaired.  Signs of leaks are visible in the 7th floor corridor, and may

19 have occurred elsewhere on the 7th floor;

20       •     Mechanical shaft openings at the roof are not properly sealed,

21 contributing to additional water intrusion;

22       •     The Debtor's statement that the building is 85% complete is not

23 accurate in my opinion; at best, the Project is no more than 70% complete;

24       •     Four exterior doors at the 4th floor perimeter building line that lead to

25 the pool deck area are not installed allowing moisture into the building, therefore, in my

26 opinion, this has adversely affected the interior areas on the 4th floor and possibly other

27 levels with excessive amount of moisture and possibly mold;

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    •    The pool deck membrane replacement (mentioned above) may also

2    require a re-sloping of the deck in some areas, so that it will properly drain as ponding on

3    the deck is evident;

4    •    The TPO (roof membrane) at the mechanical equipment roof area

5    adjacent to the pool deck at the northside of the Project between the parking structure

6    appears to be damaged, and water may be seeping into the retail level below; moisture

7    and mold can be a factor whenever there is water intrusion;

8    •    Standing water in mechanical system pipes that are not being used

9    could be also a significant issue; corrosion can develop, attacking the walls of the pipe

10    and sediment can lead to performance issues in the system.  Extensive flushing will be

11    necessary to remediate this problem;

12    •    One of the structural equipment platforms at the 4th floor central plant

13    is reported (by the installing contractor of the equipment) to not be verified for structural

14    capacity; in other words, a structural engineer has not confirmed the platform's ability to

15    support the current equipment and the balance of equipment to be installed.  In addition,

16    several large pieces of mechanical equipment on the existing structural platforms are not

17    structurally anchored, which creates an immediate structural and safety issue;

18    •    One fire alarm contractor involved with the Project's installation

19    reported that OCFA will require a separate fire alarm panel for the hotel; currently, the

20    main fire alarm panel serves the hotel, retail, and other areas of the Project.  A separate

21    hotel panel will require new drawings, OCFA approval, and permits;

22    •    In its current state, the interstitial space above the 3rd floor and below

23    the 4th floor has access for maintenance; fire sprinkler code requires this space to be

24    sprinklered, as confirmed by the installing contractor for the Project.  The area currently is

25    not sprinklered, and it remains a risk for the Project;

26    •    The $4,000,000 estimate to complete the balance of work is grossly

27    understated as indicated in Carine's preliminary due diligence report (Phase 1); hard

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  construction costs alone are currently estimated at between $8,000,000 and $9,000,000,

2  plus FF&E installation and soft costs; and

3          •          Additionally, with the permits expired and the failure to maintain the

4  development agreement with the City of Buena Park, this Project will be severely

5  scrutinized by all governing agencies such as the Community Development, Building &

6  Safety, Orange County Fire Authority (OCFA), Orange County Health Department

7  (OCHD), and the State Elevator Inspector.  This Project will have to be re-evaluated by

8  all agencies to confirm if the codes and local ordinances will be applicable under the

9  original permit or if the new code and local ordinances will be required to be administered

10  to obtain new permits and certificate of occupancy moving forward.

11          I declare under penalty of perjury under the laws of the United States of

12  America that the foregoing is true and correct.

13          Executed this 8th day of April, 2021, at Los Angeles, California.

14

15                                                                  Andrew Trost

16

17

18

19

20

21

22

23

24

25

26

27

28

DAL 2710806v1                                         32

1

# DECLARATION OF BRENT LITTLE

2          I, Brent Little, declare and state as follows:

3          1.       I am over the age of eighteen and am a principal of Urban Advisory

4    and Building Group, LLC ("Urban Advisory").  I am a licensed general contractor (License

5    No. B1038963) and hold a bachelor of arts degree in Geography from California State

6    University, Fullerton, with an emphasis in urban planning.  I have been the principal of

7    several construction, development, and consulting firms for the past twenty-five years.

8    The facts stated herein are true of my own personal knowledge and I could and would

9    competently testify thereto as follows.

10          2.       I make this declaration in support of "Shady Bird Lending, LLC's

11    Reply to Opposition to Motion of Shady Bird Lending, LLC for Order Excusing State Court

12    Receiver From Turnover of Assets Pursuant to 11 U.S.C. § 543; Declarations of Bellann

13    R. Raile, Brent Little, and Andrew Trost in Support Thereof" (the "Reply").

14          3.       In preparing this declaration, I have reviewed the declaration of

15    Robert "Charlie" Cervantes (the "Cervantes Declaration") filed in support of the

16    "Opposition to Motion of Shady Bird Lending, LLC for Order Designating Chapter 11

17    Case As Single Asset Real Estate Case Pursuant to 11 U.S.C. §§ 101(51B) and

18    362(d)(3); Declaration of Donald Chae in Support Thereof" (the "Opposition"), filed by the

19    Debtor in response to the "Motion of Shady Bird Lending, LLC for Order Designating

20    Chapter 11 Case As Single Asset Real Estate Case Pursuant to 11 U.S.C. §§ 101(51B)

21    and 362(d)(3); Memorandum of Points and Authorities; Declarations of Ronald Richards,

22    Bellann R. Raile, and Brent Little in Support Thereof" (the "Motion"), filed by Shady Bird.

23    As explained in detail below, I find the Cervantes Declaration to be misleading and

24    inaccurate.  I submit this declaration to correct the record as to the misstatements of Mr.

25    Cervantes, who I have discovered is not a licensed contractor.

26          4.       Recently, Urban Advisory was retained by Bellann R. Raile (the

27    "Receiver"), who I understand is duly appointed, qualified, and acting state court receiver

28    for the real property bearing APN Nos. 276-361-20 and 276-361-22, consisting of a

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1 partially constructed 178-room, seven story hotel building located in Buena Park,

2 California (the "Project") owned by the debtor The Source Hotel, LLC (the "Debtor").

3 Urban Advisory specifically was retained by the Receiver to provide her an updated

4 report of the current physical condition of the Project in response to the Cervantes

5 Declaration.  At the Receiver's request, we prepared and sent to the Receiver an updated

6 report dated April 5, 2021 (the "Second Report").  A true and correct copy of the Second

7 Report is attached hereto as Exhibit "F" and incorporated herein by reference.

8          5.      As noted in the Second Report, the Cervantes Declaration appears

9 to be a response to the statements and observations contained in the initial report.

10 Although Mr. Cervantes states he completed a walk-through inspection of the Project on

11 March 25, 2021, it appears his inspection was limited to his interpretation of the first

12 report.

13          6.      As detailed in the two reports, the roof has numerous penetrations

14 and is the primary location for much of the HVAC equipment.  Because the HVAC system

15 has not been completed, significant and large openings exist through the roof and into

16 ductwork.  The Debtor has placed plastic sheeting (polyethylene film), sometimes

17 referred to as Visqueen, to cover the openings.  Unfortunately, this is not an appropriate

18 long-term solution for the reasons stated below:

19          •      The application of plastic is not universal and numerous opening did

20 not contain any covering (see Picture 1 in the Second Report);

21          •      Several roof vents are missing, which will allow water and pests to

22 enter the building (see Picture 2 in the Second Report);

23          •      In the Cervantes Declaration, Mr. Cervantes seems to indicate the

24 placement of plastic film is acceptable, however, polyethylene plastic is highly susceptible

25 to degradation from exposure to the sun, through UV radiation.  As a result, the correct

26 permanent solution is a sheet metal duct cap (see Picture 3 in the Second Report); and

27          •      A review of Google Earth pictures seem to indicate the roof has had

28 a long-term temporary solution to water intrusion (see Picture 4 in the Second Report).

DAL 2710806v1                          25

7.    In addition, the Second Report details the incomplete construction

assemblies water intrusion.  The term construction assembly is an industry recognized

term that refers to all the components of a given portion of a building, which when

assembled together serve a specific purpose.  In the case of the roof, the assembly is

comprised of all components designed to protect the structure from water intrusion.  As

can be seen from Pictures 5 and 6 in the Second Report, a roof failure existed and was in

the midst of being repaired when construction ceased.  Picture 5 shows the completed

repair with flashing covering, while Picture 4 shows the roof torn off and exposed wood.

Picture 7 in the Second Report is a close up of the incomplete repair.  Furthermore, as

noted in the Second Report, it was evident the Debtor had tried to mitigate water intrusion

by use of sand bags and plastic that were located near or on the roof at this area.

8.    The Second Report supports Urban Advisory's prior determination

that the fire protection system was incomplete.  In the Cervantes Declaration, Mr.

Cervantes accurately points out that the fire protection system has temporary

construction covers over many sprinklers.  This confirms what Urban Advisory identified

in its initial Report, specifically, that the fire protection system is not capable of providing

life-safety protection for the Project.  Until construction is remobilized and completed, the

building will be at risk in the event of a fire.

9.    The Second Report also supports the serious problems associated

with the pool deck, as identified in the initial Report.  In sum, it is clear the pool deck

water proofing has been exposed to years of excess exposure.  Picture 8 in the Second

Report is a screen shot from Google Earth in May of 2019.  In this picture, the pool deck

is completely uncovered.  Moreover, the damage from excessive sun and UV exposure

was readily noticeable by the amount of friable roof material readily sloughing off.  This

can be seen in Picture 9 in the Second Report.  In addition, I also am concerned by Mr.

Cervantes' statement that his construction crew applied sealant over the area.  Typically,

a contractor engaged in roofing or waterproofing would have either a C-39 roofing or C-

33 painting license.  Moreover, most manufactures of waterproofing systems require

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1   trained and licensed installers to perform maintenance and installation of their system or

2   the warranty may be voided.

3       10.    The Second Report also supports the conclusion that the water and

4   trash had been in the pool for some period of time.  A review of both Weather.com and

5   Weather Underground did not reveal any periods of rain between February 17, 2021 (the

6   onset of the receivership) and March 3, 3021, the first day of Urban Advisory's inspection.

7   Several inches of rain occurred prior to the Receivership Order and it appears as though

8   this water may not have been removed.

9       11.    In addition, the Second Report reveals that the construction phasing

10   was performed in such a manner that completed finishes (i.e., carpet, floor tile, showers,

11   plumbing fixtures, wall coverings, and cabinetry) are subject to construction traffic and

12   exposure.  Very little protective measures were instituted to guard against damage and

13   destruction and both the tile and carpet flooring are uncovered and being subjected to

14   unusual damage.

15       12.    With respect to the sewer system hazard, Mr. Cervantes alleges the

16   sewer system has been connected to the public system, which may be the case.

17   However, it would be unusual for the sewer provider to provide this connection before the

18   building receives its final inspection.  This is an issue that can be understood, but needs

19   to be verified.  In the event the line is not connected, a potentially hazardous situation

20   exists due to the current sewer use in the building with no outlet.  This creates head

21   pressure on the sewer system.  Mr. Cervantes also claims he regularly refilled all the P

22   traps to prevent sewer gas migration into the building, but many of the P traps are not

23   connected to active water systems, so it is hard to imagine this was routinely performed.

24       13.    In addition, at the door that leads to the roof, it is apparent that

25   someone other than a qualified PVC or PTO roofing contractor has patched a previous

26   leak.  Previously, this area leaked into the building as demonstrated by the Second

27   Report.  The concern I have is that the improper repair may leak again and damage the

28   unit below.  Further, according to Mr. Cervantes, the missing flashing is "more a

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.626.4520

1  construction issue" which is typically addressed during the completion of construction and

2  not a maintenance issue.  While it is true the completion would ordinarily follow

3  construction, the course of construction has been interrupted for a protracted period of

4  time and these openings will readily allow water and pests to enter the building.

5  Moreover, even during the course of an active project, one would protect an opening

6  when inclement weather is forthcoming and that has clearly not been done.

7           14.    In sum, and as detailed in the Report and the Second Report, the

8  hotel is an idled construction project which is roughly 70% complete.  Crucially, there are

9  significant issues of neglect, potential hazardous situations, and safety and

10 environmental concerns at the Project.

11          I declare under penalty of perjury under the laws of the United States of

12 America that the foregoing is true and correct.

13          Executed this 8th day of April, 2021, at Irvine, California.

14

15          Brent Little

16

17

18

19

20

21

22

23

24

25

26

27

28

DAL 2710808v1                              28

1   Daniel A. Lev (CA Bar No. 129622)
        dlev@sulmeyerlaw.com
2   **Sulmeyer**Kupetz
    A Professional Corporation
3   333 South Grand Avenue, Suite 3400
    Los Angeles, California 90071-1406
4   Telephone: 213.626.2311
    Facsimile: 213.629.4520
5
    Ronald Richards (CA Bar No. 176246)
6       ron@ronaldrichards.com
    Law Offices of Ronald Richards & Associates, APC
7   P.O. Box 11480
    Beverly Hills, California 90213
8   Telephone:  310.556.1001
    Facsimile:  310.277.3325
9
    Attorneys for Shady Bird Lending, LLC
10

11              **UNITED STATES BANKRUPTCY COURT**

12      **CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION**

13

14   In re                              Case No. 8:21-bk-10525-ES

     THE SOURCE HOTEL, LLC,             Chapter 11
15
                                        **SHADY BIRD LENDING LLC'S REPLY**
16          Debtor.                      **TO OPPOSITION TO MOTION OF**
                                        **SHADY BIRD LENDING, LLC FOR**
17                                       **ORDER EXCUSING STATE COURT**
                                        **RECEIVER FROM TURNOVER OF**
18                                       **ASSETS PURSUANT TO 11 U.S.C. §**
                                        **543; DECLARATIONS OF BELLANN R.**
19                                       **RAILE, BRENT LITTLE, AND ANDREW**
                                        **TROST IN SUPPORT THEREOF**
20
                                        DATE:    April 15, 2021
21                                       TIME:    10:30 a.m.
                                        PLACE:  Courtroom "5A"
22

23

24

25

26

27

28

*SulmeyerKupetz, ...fessional Corporation*
*333 SOUTH GRAND AVENUE, SUITE 3400*
*LOS ANGELES, CALIFORNIA 90071-1406*
*TEL. 213.626.2311 • FAX 213.629.4520*

**SulmeyerKupetz**, A P...ssional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    Shady Bird Lending, LLC ("Shady Bird"), herby submits its "Shady Bird

2  Lending, LLC's Reply to Opposition to Motion of Shady Bird Lending, LLC for Order

3  Excusing State Court Receiver From Turnover of Assets Pursuant to 11 U.S.C. § 543;

4  Declarations of Bellann R. Raile, Brent Little, and Andrew Trost in Support Thereof" (the

5  "Reply"), in response to the "Opposition to Motion of Shady Bird Lending, LLC for Order

6  Excusing State Court Receiver From Turnover of Assets Pursuant to 11 U.S.C. § 543;

7  Memorandum of Points and Authorities; Declarations of Donald Chae in Support Thereof"

8  (the "Opposition"), filed in response to the "Motion of Shady Bird Lending, LLC for Order

9  Excusing State Court Receiver From Turnover of Assets Pursuant to 11 U.S.C. § 543;

10  Memorandum of Points and Authorities; Declarations of Ronald Richards, Bellann R.

11  Raile, and Brent Little in Support Thereof" (the "Motion"), filed by Shady Bird, and

12  represents as follows:

**I.**

**PREFATORY STATEMENT**

15    Expectedly, the Debtor blames Shady Bird, Evertrust, its numerous unpaid

16  mechanic's lien claimants, and even the Receiver, for its financial woes and the current

17  degraded state of the Project.[1]  This is the playbook debtors often follow in bankruptcy

18  cases, shifting the blame for their own ineptitude, incompetence, and dishonesty to their

19  lenders and creditors.  However, the Court should not be fooled by the Debtor's feigned

20  innocence and its new-found desire to act in the best interests of its creditors.

21    The Debtor has a seven-year track record of shoddy construction, defaults

22  of its Loan Agreement with Shady Bird, defaults of its development agreement with the

23  City of Buena Park, expired permits, mechanic's liens approaching $3,000,000, and a

24  demonstrated inability to cure any of the financial and physical problems plaguing the

---

26  [1] Unless otherwise stated, the use of capitalized terms herein shall have the meaning ascribed to them in
the "Motion of Shady Bird Lending, LLC for Order Excusing State Court Receiver From Turnover of Assets
27  Pursuant to 11 U.S.C. § 543; Memorandum of Points and Authorities; Declarations of Ronald Richards,
Bellann R. Raile, and Brent Little in Support Thereof" (the "Motion").

1  Project.  As opposed to the Debtor, who is ill-equipped to once again take control of this

2  Project, the Receiver will manage the Project with only one goal in mind - to preserve the

3  Project's value during this chapter 11 case.  Conversely, the Debtor has proven unable to

4  ensure that the Project will not continue to suffer an appreciable decline in value

5  jeopardizing the recovery of all creditors.

6          As such, the Receiver's ongoing supervision and maintenance of the

7  Project, which will not interfere in any way with the Debtor's reorganization efforts, must

8  be secured.  The Debtor does not require actual physical possession of the Project in

9  order to locate new financing or develop a confirmable plan.  And what does the Debtor

10  intend to accomplish if the Receiver is forced to turn over the Project?  Admittedly, the

11  Debtor has no income or available funds for this cash-starved construction project, which

12  even the Debtor concedes will require at least $20 million to finish.  Notably, when the

13  Debtor needed funds to simply keep the Project insured and maintain basic utility

14  services, its only path was to obtain a $100,000 unsecured line of credit from its non-

15  member Manager, M+D Properties, a California corporation ("M+D") and force the

16  turnover of approximately $60,000 in three accounts at Evertrust.  There are no other

17  funds in this estate, and none on the horizon.

18          The suggestion, therefore, that if the Project is returned to the Debtor new

19  construction will begin or new measures will be taken to secured and remediate the

20  significant safety and construction defects discovered by the Receiver and her

21  consultants is a complete ruse.  The Receiver, not the Debtor, is the only party the Court

22  and creditors should trust to preserve the Project's value while the Debtor meanders

23  through this short-lived chapter 11 case.

24

25

26

27

28

SulmeyerKupetz, A P..._ssional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

II.

**THE DEBTOR'S RELIANCE ON HEARSAY ALLEGATIONS NOT CORROBORATED**

**BY ANY ADMISSIBLE EVIDENCE REINFORCES WHY THE COURT SHOULD**

**EXCUSE THE RECEIVER FROM COMPLIANCE WITH 11 U.S.C. § 543(b)**

The Debtor spends page after page attacking Shady Bird, Evertrust, its unpaid vendors, and even the Receiver, for its financial woes and colossal failures. The allegations, which range from Evertrust's refusal to fund the remaining $4,000,000 of its Loan, to the refusal of a potential lender to fund a $42 million financing agreement due to COVID-19, to Evertrust's litigation against the Chae's and the commencement of foreclosure proceedings, to the broken oral and unsubstantiated promises of Cambra Realty to fund construction costs, to Shady Bird's subjective egregious demands, to the Receiver's failure to maintain and preserve the hotel, are nothing more than pathetic attempts to shield the Debtor from its own incompetence. Not only is the Debtor's tale of events leading to its chapter 11 pure fiction, comprised almost entirely of inadmissible hearsay statements not supported by a shred of competent evidence, but it reinforces the ends the Debtor will go to cover up its own inadequacies and outright dishonesty. Shady Bird welcomes the opportunity to refute the Debtor's outlandish series of lies, but need not do so at this time since the singular issue before the Court is whether, based solely on the credible and admissible evidence before it, the Receiver should be excused from compliance with Section 543(b).[2]

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

---

[2] In support of its Opposition, the Debtor also submitted the declaration of Robert "Charlie" Cervantes (the "Cervantes Declaration"), an employee of one of the Chae's affiliated entities. Although Mr. Cervantes attempts to attack the conclusions of the Receiver and Urban Advisory regarding the physical condition of the Project, Mr. Cervantes admittedly has no expertise in building construction, general contracting, design, or engineering. In fact, Mr. Cervantes states that he simply "oversee[s] maintenance and security" of the Project. The Court, therefore, should discount and disregard the entirety of Mr. Cervantes' declaration which is meant to undermine and contradict the findings of the Receiver and her consultants regarding the significant safety and construction issues at the Project.

III.

## THE RECEIVER SHOULD BE EXCUSED FROM COMPLIANCE WITH THE TURNOVER REQUIREMENTS OF 11 U.S.C. § 543(b) BASED ON THE DEBTOR'S HISTORY OF GROSS MISMANAGEMENT

The Debtor's attempt to refute the reports of the Receiver and her experts showing the extensive damage to the Project is comical. As opposed to trained and licensed professionals with decades of experience in commercial construction, the Debtor simply offers the unqualified views of a maintenance and security employee of M+D, one of the many Chae related entities used to prop up the Project. The Debtor cannot seriously believe that this Court should reject the expert opinions of the Receiver and two consultants, who together have more than 60 years of experience investigating and assessing defects in construction projects, in favor of one of the Chae's paid employees who simply provides maintenance services.

In order to demonstrate the multitude of inaccuracies found in the Cervantes Declaration, the Receiver again called on Urban Advisory to provide an updated report of the current physical condition of the Project. See declaration of Brent Little affixed hereto. At the Receiver's request, an updated report dated April 5, 2021 (the "Second Report") was prepared by Urban Advisory. A true and correct copy of the Second Report is attached hereto as Exhibit "F" and incorporated herein by reference.

As noted in the Second Report, the Cervantes Declaration appears to be a response to the statements and observations contained in the initial Report. Although Mr. Cervantes states he completed a walk-through inspection of the Project on March 25, 2021, it appears his inspection was limited to his interpretation of the original Report. The Second Report establishes, without question, that contrary to the statements of Mr. Cervantes, the Project remains incumbered with serious construction defects and flaws.

For instance, as detailed in the two Urban Advisory reports, the roof has numerous penetrations and is the primary location for much of the HVAC equipment. Because the HVAC system has not been completed, significant and large openings exist

SulmeyerKupetz, A Pr...ssional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1   through the roof and into ductwork.  The Debtor has placed plastic sheeting (polyethylene

2   film), sometimes referred to as Visqueen, to cover the openings.  Unfortunately, this is

3   not an appropriate long-term solution for the reasons stated below:

4   • The application of plastic is not universal and numerous opening did

5   not contain any covering (see Picture 1 in the Second Report);

6   • Several roof vents are missing, which will allow water and pests to

7   enter the building (see Picture 2 in the Second Report);

8   • In the Cervantes Declaration, Mr. Cervantes seems to indicate the

9   placement of plastic film is acceptable, however, polyethylene plastic is highly susceptible

10   to degradation from exposure to the sun, through UV radiation.  As a result, the correct

11   permanent solution is a sheet metal duct cap (see Picture 3 in the Second Report); and

12   • A review of Google Earth pictures seem to indicate the roof has had

13   a long-term temporary solution to water intrusion (see Picture 4 in the Second Report).

14   In addition, the Second Report details the incomplete construction

15   assemblies water intrusion.  The term construction assembly is an industry recognized

16   term that refers to all the components of a given portion of a building, which when

17   assembled together serve a specific purpose.  In the case of the roof, the assembly is

18   comprised of all components designed to protect the structure from water intrusion.  As

19   can be seen from Pictures 5 and 6 in the Second Report, a roof failure existed and was in

20   the midst of being repaired when construction ceased.  Picture 5 shows the completed

21   repair with flashing covering, while Picture 4 shows the roof torn off and exposed wood.

22   Picture 7 in the Second Report is a close up of the incomplete repair.  Furthermore, as

23   noted in the Second Report, it was evident the Debtor had tried to mitigate water intrusion

24   by use of sand bags and plastic that were located near or on the roof at this area.

25   The Second Report further supports Urban Advisory's prior determination

26   that the fire protection system was incomplete.  In his declaration, Mr. Cervantes

27   accurately points out that the fire protection system has temporary construction covers

28   over many sprinklers.  This confirms what Urban Advisory identified in its initial Report,

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  specifically, that the fire protection system is not capable of providing life-safety

2  protection for the Project.  Until construction is remobilized and completed, the building

3  will be at risk in the event of a fire.

4      The Second Report also supports the serious problems associated with the

5  pool deck, as identified in the first Report accompanying the Motion.  In sum, it is clear

6  the pool deck water proofing has been exposed to years of excess exposure.  Picture 8 in

7  the Second Report is a screen shot from Google Earth in May of 2019.  In this picture,

8  the pool deck is completely uncovered.  Moreover, the damage from excessive sun and

9  UV exposure was readily noticeable by the amount of friable roof material readily

10  sloughing off.  This can be seen in Picture 9 in the Second Report.  In addition, Urban

11  Advisory expressed its concern with Mr. Cervantes' statement that his construction crew

12  applied sealant over the area.  Typically, a contractor engaged in roofing or waterproofing

13  would have either a C-39 roofing or C-33 painting license.  Moreover, most manufactures

14  of waterproofing systems require trained and licensed installers to perform maintenance

15  and installation of their system or the warranty may be voided.

16      The Second Report further supports the conclusion that the water and trash

17  had been in the pool for some period of time.  A review of both Weather.com and

18  Weather Underground did not reveal any periods of rain between February 17, 2021 (the

19  onset of the receivership) and March 3, 3021, the first day of Urban Advisory's inspection.

20  Several inches of rain occurred prior to the Receivership Order and it appears as though

21  this water may not have been removed.

22      In addition, the Second Report reveals that the construction phasing was

23  performed in such a manner that completed finishes (i.e., carpet, floor tile, showers,

24  plumbing fixtures, wall coverings, and cabinetry) are subject to construction traffic and

25  exposure.  Very little protective measures were instituted to guard against damage and

26  destruction and both the tile and carpet flooring are uncovered and being subjected to

27  unusual damage.

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    With respect to the sewer system hazard, Mr. Cervantes alleges the sewer

2    system has been connected to the public system, which may be the case. However, it

3    would be unusual for the sewer provider to provide this connection before the building

4    receives its final inspection. This is an issue that can be understood, but needs to be

5    verified. In the event the line is not connected, a potentially hazardous situation exists

6    due to the current sewer use in the building with no outlet. This creates head pressure

7    on the sewer system. Mr. Cervantes also claims he regularly refilled all the P traps to

8    prevent sewer gas migration into the building, but many of the P traps are not connected

9    to active water systems, so it is hard to imagine this was routinely performed.

10    In addition, at the door that leads to the roof, it is apparent that someone

11    other than a qualified PVC or PTO roofing contractor has patched a previous leak.

12    Previously, this area leaked into the building as demonstrated by the Second Report.

13    The concern Urban Advisory has is that the improper repair may leak again and damage

14    the unit below. Further, according to Mr. Cervantes, the missing flashing is "more a

15    construction issue" which is typically addressed during the completion of construction and

16    not a maintenance issue. While it is true the completion would ordinarily follow

17    construction, the course of construction has been interrupted for a protracted period of

18    time and these openings will readily allow water and pests to enter the building.

19    Moreover, even during the course of an active project, one would protect an opening

20    when inclement weather is forthcoming and that has clearly not been done.

21    These conclusions are further buttressed by the findings of Andrew Trost of

22    Carine Consulting ("Carine"), a consulting firm retained by the Receiver. See declaration

23    of Andrew Trost affixed hereto. According to Mr. Trost, the Debtor's contention that it has

24    been extremely diligent in maintaining and protecting the Project is demonstrably false.

25    According to Mr. Trost, the following are just some examples demonstrating why this is

26    not the case:

27

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    •    The pool deck waterproofing has been exposed to UV rays for many

2    months, reducing its elasticity and rendering the membrane ineffective and out of

3    warranty; based on input from waterproofing experts, it must be replaced;

4    •    The roof membrane on the 7-story tower exhibits signs of lifting and

5    separation from the substrate; it is highly likely that water intrusion has occurred, and the

6    membrane must be repaired.  Signs of leaks are visible in the 7th floor corridor, and may

7    have occurred elsewhere on the 7th floor;

8    •    Mechanical shaft openings at the roof are not properly sealed,

9    contributing to additional water intrusion;

10    •    The Debtor's statement that the building is 85% complete is not

11    accurate; at best, the Project is no more than 70% complete;

12    •    Four exterior doors at the 4th floor perimeter building line that lead to

13    the pool deck area are not installed allowing moisture into the building, therefore, in my

14    opinion, this has adversely affected the interior areas on the 4th floor and possibly other

15    levels with excessive amount of moisture and possibly mold;

16    •    The pool deck membrane replacement (mentioned above) may also

17    require a re-sloping of the deck in some areas, so that it will properly drain as ponding on

18    the deck is evident;

19    •    The TPO (roof membrane) at the mechanical equipment roof area

20    adjacent to the pool deck at the northside of the Project between the parking structure

21    appears to be damaged, and water may be seeping into the retail level below; moisture

22    and mold can be a factor whenever there is water intrusion;

23    •    Standing water in mechanical system pipes that are not being used

24    could be also a significant issue; corrosion can develop, attacking the walls of the pipe

25    and sediment can lead to performance issues in the system.  Extensive flushing will be

26    necessary to remediate this problem;

27    •    One of the structural equipment platforms at the 4th floor central plant

28    is reported (by the installing contractor of the equipment) to not be verified for structural

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  capacity; in other words, a structural engineer has not confirmed the platform's ability to

2  support the current equipment and the balance of equipment to be installed.  In addition,

3  several large pieces of mechanical equipment on the existing structural platforms are not

4  structurally anchored, which creates an immediate structural and safety issue;

5  •  One fire alarm contractor involved with the Project's installation

6  reported that OCFA will require a separate fire alarm panel for the hotel; currently, the

7  main fire alarm panel serves the hotel, retail, and other areas of the Project.  A separate

8  hotel panel will require new drawings, OCFA approval, and permits;

9  •  In its current state, the interstitial space above the 3rd floor and below

10  the 4th floor has access for maintenance; fire sprinkler code requires this space to be

11  sprinklered, as confirmed by the installing contractor for the Project.  The area currently is

12  not sprinklered, and it remains a risk for the Project;

13  •  The $4,000,000 estimate to complete the balance of work is grossly

14  understated as indicated in Carine's preliminary due diligence report (Phase 1); hard

15  construction costs alone are currently estimated at between $8,000,000 and $9,000,000,

16  plus FF&E installation and soft costs; and

17  •  Additionally, with the permits expired and the failure to maintain the

18  development agreement with the City of Buena Park, this Project will be severely

19  scrutinized by all governing agencies such as the Community Development, Building &

20  Safety, Orange County Fire Authority (OCFA), Orange County Health Department

21  (OCHD), and the State Elevator Inspector.  This Project will have to be re-evaluated by

22  all agencies to confirm if the codes and local ordinances will be applicable under the

23  original permit or if the new code and local ordinances will be required to be administered

24  to obtain new permits and certificate of occupancy moving forward.

25  These expert reports, together with the opinions of the Receiver, belie the

26  Debtor's contention that it has diligently maintained, protected, and secured the Project.

27  The fact that the Debtor has invested significant time and money (borrowed

28  from Evertrust and its two wholly undersecured EB-5 lenders) is irrelevant to whether the

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    Receiver should now be displaced in favor of the Debtor which is incapable of securing

2    and preserving the Project during this chapter 11 case.  The additional fact that Shady

3    Bird undertook the extraordinary step of seeking the *ex parte* appointment of a receiver

4    demonstrates its commitment to preserving the Project's value.  Shady Bird is not, as the

5    Debtor cavalierly suggests, intent on watching the hotel fall into a further state of disrepair

6    for some ulterior means.  Truth be told, had the Debtor not defaulted under its Loan

7    Agreement and not allowed the hotel to fall into a state of disrepair, the Receiver would

8    not have been appointed in the first place.  Therefore, the Debtor actually should be

9    applauding Shady Bird for taking the steps necessary to protect the Project from further

10    degradation.

11            As such, Shady Bird has more than satisfied its burden of proof by

12    demonstrating, by a preponderance of the evidence, why the Receiver should be

13    excused from compliance with Section 543(b).

14            As noted in the Motion, and not refuted by the Debtor, there presently is a

15    complete lack of income, much less sufficient income, to maintain the Project or fund a

16    successful reorganization.  The Debtor has been in default of its obligations under the

17    Loan since November 1, 2019.  Since that time, there has been no refinancing of Shady

18    Bird's debt, and a complete lack of any evidence showing that either take out financing or

19    additional construction financing has been (or will be) secured.  In reality, construction

20    came to a halt in 2019 due to the simple fact that the Debtor lacks the funds to carry out

21    even the most basic construction projects.  Given the plight and continuing deterioration

22    of the Project, there is no basis to assume that anything will change in the short term.

23    And, during this time, the Project will continue to deteriorate as its infrastructure remains

24    subject to the elements and ongoing vandalism, which already has occurred.

25            Second, the Project already has suffered dramatically during the Debtor's

26    ownership and its embarrassing attempt at construction, and it will continue to suffer the

27    longer it remains in the Debtor's hands.  The Debtor lacks the ability to cure the existing

28    loan default or service Shady Bird's debt, and it has no ability to restart, let alone

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  complete, construction, which could cost at least $20 million to finish.  Importantly, many

2  of the construction permits issued by the City of Buena Park have expired, further

3  complicating any future construction efforts.  This says nothing of the Debtor's inability to

4  compensate the multitude of vendors and contractors who are owed millions of dollars,

5  many of whom have filed mechanic's liens and *lis pendens* against the Project.

6        Finally, the evidence of mismanagement and negligence is overwhelming.

7  The events surrounding the pre-petition termination and post-petition resuscitation of the

8  Ground Lease more than demonstrates the Debtor's dishonesty and mismanagement.

9  The Debtor's concocted excuse that the Ground Lease was terminated by Ground Lessor

10  due to *Shady Bird's* conduct in an attempt to stave off foreclosure, and it was never

11  intended to be effectuated, is a shocking admission.  If this explanation is to be believed,

12  the Debtor conspired with Ground Lessor just one day prior to Shady Bird's hearing to

13  appoint a receiver in order to fraudulently induce Shady Bird to either continue its

14  foreclosure sale, refrain from pursuing the appointment of a receiver, or forego other

15  remedies.  To actually admit that the termination was never meant to be a termination

16  and was, in fact, a complete ruse meant to induce Shady Bird to take actions to its own

17  detriment, constitutes grounds for the *sua sponte* appointment of a chapter 11 trustee.

18        Regardless, the fact that the Receiver was appointed despite the Debtor

19  and Ground Lessor's shenanigans establishes that the state court agreed with Shady

20  Bird's concerns that the current state of neglect, disrepair, and lack of insurance

21  warranted the drastic remedy of appointing a receiver to assume control over the Project.

22  As noted, the reports prepared by Urban Advisory and Carine only reinforce why the

23  appointment of a receiver was desperately needed and why there is a real threat to

24  Shady Bird's collateral if the Project is returned to the Debtor's hands.

25        In the face of this overwhelming evidence, the Debtor does not deserve the

26  benefit of the doubt like the debtors in In re Northgate Terrace Apartments, Ltd., 117 B.R.

27  328 (Bankr. S.D. Ohio 1990) and In re Willowood East Apartments of Indianapolis II, Ltd.,

28  117 B.R. 320 (Bankr. S.D. Ohio 1990).  Unlike the debtors in Northgate and Willowood,

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  decision compelled by the circumstances, but it will also avoid what appear to be delays

2  and inefficiencies that inevitably would result if the Debtor were permitted to displace the

3  Receiver and regain control of the Project.

4  IV.

5  **SHADY BIRD DISPUTES THE DEBTOR'S UNSUPPORTED CONTENTION THAT DIP**

6  **FINANCING IS READILY AVAILABLE, SO IF THE MOTION TURNS ON THAT**

7  **ISSUE, SHADY BIRD REQUESTS A CONTINUANCE AND DISCOVERY**

8  The Court's decision is of paramount importance not only to Shady Bird, but

9  to other legitimate creditors, including the countless holders of mechanic's liens against

10  the Project. The Debtor's expectation that DIP financing or a confirmable plan is in the

11  offing is a pipe dream, and merely one in a series of misrepresentations the Chae's have

12  been spreading for years. There is no financing in prospect; and there certainly will not

13  be not only due to the degraded condition of the Project, but the Chae's lack of financial

14  credibility rendering any guaranty (which would be required by any DIP lender) worthless.

15  Shady Bird is entitled to put these contentions, as well as the Debtor's alleged

16  redevelopment and reorganization plan, to the test if the Court finds any merit to the

17  arguments.

18  As a reminder, the permits for this Project have expired. The City of Buena

19  Park has lost all confidence in the debtor and the Chae's, as evidenced by the most

20  recent letter from the City dated April 2, 2021, revealing the dismal state of the permits

21  and this blighted Project. A true and correct copy of the April 2, 2021, letter is attached

22  hereto as Exhibit "E" and incorporated herein by reference. According to the City, the

23  following permits have now expired, rendering the Debtor's dreams of completing the

24  Project largely unattainable:

25  • B13-1389: Shell retail work, various retail components, and hotel

26  lobby. This permit was issued as of January 29, 2015, and is still open. The last

27  inspection was conducted on December 6, 2016, meaning the permit has now expired.

28  The permit owner is "Source at Beach."

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1        •    B13-1391:  Shell for Hotel Tower, Floors 4-7, Elevators, Stairwells,

2  etc.  This permit was issued on January 19, 2016, and remains open.  The last inspection

3  was January 10, 2020, meaning the permit has now expired.  The permit owner is

4  "Source at Beach."

5        •    B15-2102:  Enclosed 3rd Floor walkway between retail and hotel

6  portions of Mixed-Use Project.  This permit was issued on February 10, 2016, and is still

7  open.  The last inspection was conducted on July 13, 2016, meaning the permit has now

8  expired.  The permit owner is "Source at Beach."

9        •    B13-2294:  Hotel interior tenant improvements.  This permit was

10  issued on May 26, 2017, and remains open.  The last inspection was July 2, 2019,

11  meaning the permit has now expired.  The permit owner is "The Source Hotel."

12        •    Various Sub-Permits Issued:  Various sub-building permits have

13  been issued which authorize a specific scope of work related to one of the above main

14  permits.  The status of the sub-permits mirror that of the Main Permit under which it was

15  issued; meaning any outstanding sub-permits for the Project have now also expired.

16            In short, the Debtor and the Chae's know that, under these circumstances,

17  they will be unable to file a plan that has a reasonable possibility of being confirmed

18  within a reasonable time, particularly in the next sixty plus days if the Court, as expected,

19  designates the Debtor as a "single asset real estate" case.  As a result, at a minimum, the

20  Court should grant the Motion, on an interim basis, and allow the Receiver to be excused

21  from compliance with Section 543(b) until such time as the Debtor (i) obtains an order

22  authorizing DIP financing in an amount to pay off Shady Bird's debt, in full, or (ii) files a

23  plan of reorganization that the Court has determined has a reasonable possibility of being

24  confirmed with a reasonable time.  If the Court adopts this option, and grants the Motion,

25  on an interim basis, Shady Bird suggest a continuance of the hearing for a period of sixty

26  days to chart the Debtor's progress on these two issues.

27

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

## V.

## <u>CONCLUSION</u>

Based on the foregoing, Shady Bird respectfully requests that the Opposition be overruled in its entirety, that the Motion be granted in all respects, and for such other and further relief as the Court deems just and proper under the circumstances.

DATED: April 8, 2021                    **Sulmeyer**Kupetz
                                        A Professional Corporation


                                        By: /s/ Daniel A. Lev
                                           Daniel A. Lev
                                           Attorneys for Shady Bird Lending, LLC

DATED: April 8, 2021                    Law Offices of Ronald Richards & Associates, APC


                                        By: /s/ Ronald Richards
                                           Ronald Richards
                                           Attorneys for Shady Bird Lending, LLC

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1           **DECLARATION OF BELLANN R. RAILE**

2           I, Bellann R. Raile, declare and state as follows:

3           1.     I am over the age of eighteen, am a managing director of Cordes

4  and Company, LLC ("Cordes"), and am the duly appointed, qualified, and acting state

5  court receiver for the real property bearing APN Nos. 276-361-20 and 276-361-22,

6  consisting of a partially constructed 178-room, seven story hotel building located in

7  Buena Park, California (the "Project") owned by the debtor The Source Hotel, LLC (the

8  "Debtor").  The facts stated herein are true of my own personal knowledge and I could

9  and would competently testify thereto as follows.

10           2.     I make this declaration in support of "Shady Bird Lending, LLC's

11  Reply to Opposition to Motion of Shady Bird Lending, LLC for Order Excusing State Court

12  Receiver From Turnover of Assets Pursuant to 11 U.S.C. § 543; Declarations of Bellann

13  R. Raile, Brent Little, and Andrew Trost in Support Thereof" (the "Reply").

14           3.     In preparing this declaration, I have reviewed the "Opposition to

15  Motion of Shady Bird Lending, LLC for Order Excusing State Court Receiver From

16  Turnover of Assets Pursuant to 11 U.S.C. § 543; Memorandum of Points and Authorities;

17  Declarations of Donald Chae in Support Thereof" (the "Opposition"), filed by the Debtor in

18  response to the "Motion of Shady Bird Lending, LLC for Order Excusing State Court

19  Receiver From Turnover of Assets Pursuant to 11 U.S.C. § 543; Memorandum of Points

20  and Authorities; Declarations of Ronald Richards, Bellann R. Raile, and Brent Little in

21  Support Thereof" (the "Motion"), filed by Shady Bird.  I also reviewed the declaration of

22  Donald Chae (the "Chae Declaration") and the declaration of Robert "Charlie" Cervantes

23  (the "Cervantes Declaration") filed in support of the Opposition.  As explained in detail

24  below, I find each of the declarations to be misleading and inaccurate.  I submit this

25  declaration to correct the record as to the misstatements, specifically those of Mr.

26  Cervantes.

27           4.     As background, I have nearly 30 years-experience serving as a

28  state-court receiver and/or a custodian under federal bankruptcy courts.  A true and

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  correct copy of my resume is attached hereto as Exhibit "A" and incorporated herein by

2  reference. I have been a receiver in hundreds of different types of cases, ranging from

3  small cases involving apartment buildings to large cases involving operating businesses

4  to massive development projects. Most recently, Cordes and I served as a custodian in

5  a case before this court styled <u>In re Air Force Village West, Inc. d/b/a Altavita Village</u>,

6  bearing Case No. 6:19-bk-11920-SC, which involved the sale of a $50 million plus senior

7  living community comprised largely of military veterans. Regardless of the size of the

8  case, I take my receivership responsibilities very seriously. The goal is always to

9  preserve and protect the receivership estate in the most efficient and prudent way

10  possible.

11         5.    To put things in perspective, from the date of my appointment to the

12  petition date of this case, I served as receiver for the Debtor for a mere ten days before it

13  filed for bankruptcy. As is common with many receiverships, I inherited a complicated

14  situation involving a mess, and put forth my best efforts to resolve things impartially

15  pursuant to my duties under the February 17, 2021, order appointing me as receiver (the

16  "Receivership Order"), a true and correct copy of which was attached as Exhibit "B" to the

17  Motion. After my appointment, my oath and bond were filed on February 18, 2021, and I

18  assumed my duties that day.

19         6.    That same day, I sent an email asking Donald Chae, a principal of

20  the Debtor, to contact me. We spoke that same day, and Mr. Chae told me that he would

21  have Robert "Charlie" Cervantes contact me and that Mr. Cervantes would be my primary

22  contact for items that I needed related to the Project.

23         7.    The next day, February 19, 2021, Mr. Cervantes met with Gloria

24  Torres, an employee of Cordes and a member of my receivership team. Mr. Cervantes

25  showed Ms. Torres around the Project, including areas where considerable FFE was

26  stored. Ms. Torres took extensive photos of the property, and also had the locks

27  changed. True and correct copies of the photos that Ms. Torres took at my direction are

28  attached hereto as Exhibit "B" and incorporated herein by reference. In order to

1   streamline the numerous problems plaguing this Project for the Court, I am summarizing

2   the results of Ms. Torres' photos and inspection.  These photos, in addition to the photos

3   attached to the Motion as Exhibit "C", reveal that virtually every problem that Mr.

4   Cervantes is complaining about in his declaration pre-existed my appointment, as there

5   were already serious problems with the construction and development with the Project.

6   In particular, Ms. Torres identified the following issues, which I confirmed a few days later

7   when I completed a thorough walk-through:

8              •        The building appeared abandoned some time ago;

9              •        There were no electrical accounts;

10             •        The elevator certificate had expired in June 2018;

11             •        There was a strong sewer smell on the second floor of the building

12   that was also noticeable on the floors above;

13             •        Tarps protecting the decking by the pool were no longer covering the

14   deck and were in poor condition;

15             •        The pool was partially filled with water and was stagnant;

16             •        The roof had vent openings that were not screened which is unusual

17   in my experience; and

18             •        It appeared that the roof was being damaged by the rain as there

19   were soft spots when you walked on it and pooling water.

20             8.        Given these initial visible problems, I immediately hired a property

21   inspector to quantify the problems and report back to me so that I could determine the

22   best way to proceed.  In this regard, I retained Brent Little of Urban Advisory & Building

23   Group, LLC ("Urban Advisory") to review and advise me of what needed to be done to

24   protect and secure the Project from further damage during my tenure.  As detailed in the

25   declaration of Brent Little filed in support of the Motion, both Mr. Little and Steve

26   Cienfuegos, a licensed general contractor employed by Urban Advisory, conducted two

27   on-stie inspections of the Project, the first on March 3, and the second on March 9, 2021.

28   In addition to their personal inspection, Mr. Little and Mr. Cienfuegos also reviewed

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    various stamped approved plans and interviewed several individuals either familiar with

2    the Project or a particularly relevant building system.  As a result of their on-site

3    inspections and analysis, Urban Advisory prepared and sent to me a "Property Inspection

4    Report for The Source OC Hilton Hotel," dated March 10, 2021 (the "Report").  A true and

5    correct copy of the Report was attached to the Motion as Exhibit "D".

6           9.    Among other things, the Report confirmed the following serious

7    problems:

8           •    Substantial roof issues exist which currently permit the intrusion of

9    water into the structure;

10          •    Incomplete construction on the roof, creating an opportunity for water

11   infiltration;

12          •    The pool deck was neglected and needed substantial repair;

13          •    Building finishes are not being protected and are exposed to waste

14   or damage;

15          •    A potentially hazardous situation may exist if the building sewer

16   system is not connected to the public system; and

17          •    The roof HVAC equipment is poorly protected with plastic and should

18   be covered with sheet metal.

19          10.    In response to these significant problems, the Cervantes Declaration

20   incorrectly asserts in paragraph 5 that I have neglected my duties.  However, the items

21   that the Cervantes Declaration identifies were lifted from the Urban Advisory Report

22   which I commissioned.  Put another way, Mr. Cervantes is inaccurately and

23   inappropriately trying to blame me for acts that occurred well before I was appointed as

24   receiver.  This is further confirmed by a review of Ms. Torres' photographs, which were

25   taken within three days of my appointment.

26          11.    In addition, the Cervantes Declaration misleadingly asserts that I

27   failed to take any action to remediate these problems.  To be clear, I was receiver for only

28   ten days before there was a bankruptcy filing.  And, under the terms of the Receivership

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    Order, my powers are limited if there is a bankruptcy.  Specifically, paragraph 27(b)(4) of

2    the Receivership Order provides that "the receiver shall do nothing that would effect a

3    material change in the circumstances of the property."

4            12.    In my experience as a receiver and a custodian in bankruptcy in the

5    time before turnover is decided, it is best to ascertain if either of the primary parties to the

6    case object to my taking action to correct some of the most important maintenance

7    issues.  This is precisely what I did in this case.

8            13.    In this regard, following my receipt and review of the Report, on

9    March 17, 2021, I contacted Ronald Richards, attorney for Shady Bird, and explained that

10    I was concerned about a number of the issues at the Project needing to be addressed

11    prior to the hearing on the "Motion of Shady Bird Lending, LLC for Order Excusing State

12    Court Receiver From Turnover of Assets Pursuant to 11 U.S.C. § 543; Memorandum of

13    Points and Authorities; Declarations of Ronald Richards, Bellann R. Raile, and Brent

14    Little in Support Thereof" (the "Section 543 Motion") seeking to excuse my turnover of the

15    Project, and authorizing me, as state court receiver, on an interim basis, to take the steps

16    necessary and appropriate to preserve and protect the assets of the Debtor pursuant to

17    11 U.S.C. § 543(d)(1).  In response, Mr. Richards stated that Shady Bird did object to my

18    taking care of the elevator, sewer smell, and roof leakage issues.

19            14.    As a result, On March 17, 2021, I then contacted Steven Kahn,

20    attorney for the Chae's and the Debtor, to ascertain if they were going to object to my

21    taking action to correct the most serious issues.  I explained to Mr. Kahn that I was

22    concerned about the elevator and the sewer smell and I needed to get contractors out to

23    address these issues as they could be safety concerns.  I also explained to Mr. Kahn that

24    the roof issues were concerning, not for safety reasons, but, rather, for risk of causing on-

25    going damage to the Project.  I also discussed with Mr. Kahn the problems associated

26    with the pool deck.  Mr. Kahn indicated that he wanted to "run it up the flag pole" and

27    would get back to me.  As of this date, Mr. Kahn has never responded to my requests

28

*SulmeyerKupetz*, A P......ssional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  with respect to these issues, nor did he otherwise request or authorize me to take any

2  action to protect and secure the Project.

3          15.     Following Mr. Kahn's statement that he would "run it up the flag

4  pole," I was contacted by Juliet Oh, attorney for the Debtor, via email on March 24, 2021.

5  A true and correct copy of this email is attached hereto as Exhibit "C" and incorporated

6  herein by reference.  Ms. Oh stated that "Steve [Kahn] informed The Source Hotel, LLC

7  (Debtor) of your concerns about the elevator inspection and sewer gas smell on the

8  building…. The Debtor would like to access the building to get a gauge on these issues

9  so it can work with you to address them in a timely and cost-effective manner."  Ms. Oh

10  then asked me to coordinate a time and date to access the building, which I did.  The

11  next day, I granted Mr. Cervantes access to the building pursuant to his counsel's

12  request.  Therefore, I was extremely surprised and quite disappointed by Mr. Cervantes'

13  declaration accusing me of failing to timely act, when, in fact, I did act promptly and

14  worked in good faith with the Debtor's and the Chae's counsel.  To be clear, despite my

15  identifying problems that needed immediate attention, and their making statements that

16  they would look at it, neither the Debtor nor the Chae's, not their counsel, ever got back

17  to me, and instead, chose to file the Cervantes Declaration, which was simply not

18  accurate.

19          16.     In addition to falsely creating the impression that I created or caused

20  problems to exist, the Cervantes Declaration incorrectly states that "[n]either the Receiver

21  nor I are aware of any leaks."  Actually, I am aware of some stained ceiling tiles in the

22  rooms on the 7th floor.  True and correct copies of photographs I commissioned

23  evidencing potential leaks are attached hereto as Exhibit "D" and incorporated herein by

24  reference.

25          17.     Furthermore, this past week I learned that The City of Buena Park

26  has a number of problematic issues with the project, including expired permits and

27  multiple events of default.  Attached hereto as Exhibit "E" and incorporated herein by

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  reference is a true and correct copy of a report dated April 2, 2021, provided to me by the

2  City of Buena Park summarizing the City's perspective.

3         18.     Finally, in order to address the inaccurate and misleading statements

4  contained in the Cervantes Declaration, I commissioned a second report from Urban

5  Advisory.  A true and correct copy of the updated report dated April 5, 2021 (the "Second

6  Report"), prepared by Urban Advisory is attached hereto as Exhibit "F" and incorporated

7  herein by reference.

8         19.     In sum, the Debtor's partially constructed hotel is plagued by serious

9  problems, is completely non-operational, and is not generating a single dollar of income.

10 In this regard, I have assumed control over the Project, and have taken the steps to

11 ensure that the Project and the improvements located at the site are insured and

12 secured.  Given the current physical state of the Project, and the lack of any income to

13 allow for construction to be completed, in my experience, the only viable alternative is to

14 allow me to continue to perform and control the stabilization of the Project, which, in turn,

15 requires this Court excuse my compliance with Section 543(b).  I believe that such a

16 decision would be in the best interests of creditors of the Debtor's estate.

17         I declare under penalty of perjury under the laws of the United States of

18 America that the foregoing is true and correct.

19         Executed this 8th day of April, 2021, at Irvine, California.

20

21                                                     Bellann Raile

22

23

24

25

26

27

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1    **DECLARATION OF BRENT LITTLE**

2    I, Brent Little, declare and state as follows:

3    1.    I am over the age of eighteen and am a principal of Urban Advisory

4    and Building Group, LLC ("Urban Advisory"). I am a licensed general contractor (License

5    No. B1038963) and hold a bachelor of arts degree in Geography from California State

6    University, Fullerton, with an emphasis in urban planning. I have been the principal of

7    several construction, development, and consulting firms for the past twenty-five years.

8    The facts stated herein are true of my own personal knowledge and I could and would

9    competently testify thereto as follows.

10    2.    I make this declaration in support of "Shady Bird Lending, LLC's

11    Reply to Opposition to Motion of Shady Bird Lending, LLC for Order Excusing State Court

12    Receiver From Turnover of Assets Pursuant to 11 U.S.C. § 543; Declarations of Bellann

13    R. Raile, Brent Little, and Andrew Trost in Support Thereof" (the "Reply").

14    3.    In preparing this declaration, I have reviewed the declaration of

15    Robert "Charlie" Cervantes (the "Cervantes Declaration") filed in support of the

16    "Opposition to Motion of Shady Bird Lending, LLC for Order Designating Chapter 11

17    Case As Single Asset Real Estate Case Pursuant to 11 U.S.C. §§ 101(51B) and

18    362(d)(3); Declaration of Donald Chae in Support Thereof" (the "Opposition"), filed by the

19    Debtor in response to the "Motion of Shady Bird Lending, LLC for Order Designating

20    Chapter 11 Case As Single Asset Real Estate Case Pursuant to 11 U.S.C. §§ 101(51B)

21    and 362(d)(3); Memorandum of Points and Authorities; Declarations of Ronald Richards,

22    Bellann R. Raile, and Brent Little in Support Thereof" (the "Motion"), filed by Shady Bird.

23    As explained in detail below, I find the Cervantes Declaration to be misleading and

24    inaccurate. I submit this declaration to correct the record as to the misstatements of Mr.

25    Cervantes, who I have discovered is not a licensed contractor.

26    4.    Recently, Urban Advisory was retained by Bellann R. Raile (the

27    "Receiver"), who I understand is duly appointed, qualified, and acting state court receiver

28    for the real property bearing APN Nos. 276-361-20 and 276-361-22, consisting of a

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1 partially constructed 178-room, seven story hotel building located in Buena Park,

2 California (the "Project") owned by the debtor The Source Hotel, LLC (the "Debtor").

3 Urban Advisory specifically was retained by the Receiver to provide her an updated

4 report of the current physical condition of the Project in response to the Cervantes

5 Declaration.  At the Receiver's request, we prepared and sent to the Receiver an updated

6 report dated April 5, 2021 (the "Second Report").  A true and correct copy of the Second

7 Report is attached hereto as Exhibit "F" and incorporated herein by reference.

8        5.     As noted in the Second Report, the Cervantes Declaration appears

9 to be a response to the statements and observations contained in the initial report.

10 Although Mr. Cervantes states he completed a walk-through inspection of the Project on

11 March 25, 2021, it appears his inspection was limited to his interpretation of the first

12 report.

13        6.     As detailed in the two reports, the roof has numerous penetrations

14 and is the primary location for much of the HVAC equipment.  Because the HVAC system

15 has not been completed, significant and large openings exist through the roof and into

16 ductwork.  The Debtor has placed plastic sheeting (polyethylene film), sometimes

17 referred to as Visqueen, to cover the openings.  Unfortunately, this is not an appropriate

18 long-term solution for the reasons stated below:

19        •     The application of plastic is not universal and numerous opening did

20 not contain any covering (see Picture 1 in the Second Report);

21        •     Several roof vents are missing, which will allow water and pests to

22 enter the building (see Picture 2 in the Second Report);

23        •     In the Cervantes Declaration, Mr. Cervantes seems to indicate the

24 placement of plastic film is acceptable, however, polyethylene plastic is highly susceptible

25 to degradation from exposure to the sun, through UV radiation.  As a result, the correct

26 permanent solution is a sheet metal duct cap (see Picture 3 in the Second Report); and

27        •     A review of Google Earth pictures seem to indicate the roof has had

28 a long-term temporary solution to water intrusion (see Picture 4 in the Second Report).

SulmeyerKupetz, A P. ...sional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1          7.      In addition, the Second Report details the incomplete construction

2    assemblies water intrusion.  The term construction assembly is an industry recognized

3    term that refers to all the components of a given portion of a building, which when

4    assembled together serve a specific purpose.  In the case of the roof, the assembly is

5    comprised of all components designed to protect the structure from water intrusion.  As

6    can be seen from Pictures 5 and 6 in the Second Report, a roof failure existed and was in

7    the midst of being repaired when construction ceased.  Picture 5 shows the completed

8    repair with flashing covering, while Picture 4 shows the roof torn off and exposed wood.

9    Picture 7 in the Second Report is a close up of the incomplete repair.  Furthermore, as

10   noted in the Second Report, it was evident the Debtor had tried to mitigate water intrusion

11   by use of sand bags and plastic that were located near or on the roof at this area.

12          8.      The Second Report supports Urban Advisory's prior determination

13   that the fire protection system was incomplete.  In the Cervantes Declaration, Mr.

14   Cervantes accurately points out that the fire protection system has temporary

15   construction covers over many sprinklers.  This confirms what Urban Advisory identified

16   in its initial Report, specifically, that the fire protection system is not capable of providing

17   life-safety protection for the Project.  Until construction is remobilized and completed, the

18   building will be at risk in the event of a fire.

19          9.      The Second Report also supports the serious problems associated

20   with the pool deck, as identified in the initial Report.  In sum, it is clear the pool deck

21   water proofing has been exposed to years of excess exposure.  Picture 8 in the Second

22   Report is a screen shot from Google Earth in May of 2019.  In this picture, the pool deck

23   is completely uncovered.  Moreover, the damage from excessive sun and UV exposure

24   was readily noticeable by the amount of friable roof material readily sloughing off.  This

25   can be seen in Picture 9 in the Second Report.  In addition, I also am concerned by Mr.

26   Cervantes' statement that his construction crew applied sealant over the area.  Typically,

27   a contractor engaged in roofing or waterproofing would have either a C-39 roofing or C-

28   33 painting license.  Moreover, most manufactures of waterproofing systems require

1    trained and licensed installers to perform maintenance and installation of their system or

2    the warranty may be voided.

3          10.     The Second Report also supports the conclusion that the water and

4    trash had been in the pool for some period of time. A review of both Weather.com and

5    Weather Underground did not reveal any periods of rain between February 17, 2021 (the

6    onset of the receivership) and March 3, 3021, the first day of Urban Advisory's inspection.

7    Several inches of rain occurred prior to the Receivership Order and it appears as though

8    this water may not have been removed.

9          11.     In addition, the Second Report reveals that the construction phasing

10    was performed in such a manner that completed finishes (i.e., carpet, floor tile, showers,

11    plumbing fixtures, wall coverings, and cabinetry) are subject to construction traffic and

12    exposure. Very little protective measures were instituted to guard against damage and

13    destruction and both the tile and carpet flooring are uncovered and being subjected to

14    unusual damage.

15          12.     With respect to the sewer system hazard, Mr. Cervantes alleges the

16    sewer system has been connected to the public system, which may be the case.

17    However, it would be unusual for the sewer provider to provide this connection before the

18    building receives its final inspection. This is an issue that can be understood, but needs

19    to be verified. In the event the line is not connected, a potentially hazardous situation

20    exists due to the current sewer use in the building with no outlet. This creates head

21    pressure on the sewer system. Mr. Cervantes also claims he regularly refilled all the P

22    traps to prevent sewer gas migration into the building, but many of the P traps are not

23    connected to active water systems, so it is hard to imagine this was routinely performed.

24          13.     In addition, at the door that leads to the roof, it is apparent that

25    someone other than a qualified PVC or PTO roofing contractor has patched a previous

26    leak. Previously, this area leaked into the building as demonstrated by the Second

27    Report. The concern I have is that the improper repair may leak again and damage the

28    unit below. Further, according to Mr. Cervantes, the missing flashing is "more a

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  construction issue" which is typically addressed during the completion of construction and

2  not a maintenance issue.  While it is true the completion would ordinarily follow

3  construction, the course of construction has been interrupted for a protracted period of

4  time and these openings will readily allow water and pests to enter the building.

5  Moreover, even during the course of an active project, one would protect an opening

6  when inclement weather is forthcoming and that has clearly not been done.

7          14.     In sum, and as detailed in the Report and the Second Report, the

8  hotel is an idled construction project which is roughly 70% complete.  Crucially, there are

9  significant issues of neglect, potential hazardous situations, and safety and

10  environmental concerns at the Project.

11          I declare under penalty of perjury under the laws of the United States of

12  America that the foregoing is true and correct.

13      Executed this 8th day of April, 2021, at Irvine, California.

14

15  Brent Little

16

17

18

19

20

21

22

23

24

25

26

27

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

DAL 2710806v1                              28

Case 8:21-bk-10525-ES    Doc 132-3    Filed 05/20/21    Entered 05/20/21 15:25:28    Desc
Case 8:21-bk-10525-ES    Doc 72    Part 3 of 4    Page Entered 04/08/21 15:22:40    Desc
Exhibit A Part 3 of 4    Page 5 of 11
Main Document    Page 29 of 78

1    **DECLARATION OF ANDREW TROST**

2         I, Andrew Trost, declare and state as follows:

3         1.    I am over the age of eighteen and am a principal of Carine

4    Consulting ("Carine") which I formed in 2012 to provide project solutions and complete

5    project management from inception to completion.  I have spent almost 30 years in all

6    facets of the industry, as a subcontractor, design consultant, general contractor, and

7    project/construction manager.  I hold a bachelor of science degree in Chemistry/Materials

8    Science from UCLA 1986, and I hold a Certificate, Fire Protection, from the University of

9    California, Irvine.  I also am registered as a Professional Engineer, Fire Protection, in the

10   State of California, and have the following professional affiliations:  PMI, CMAA, SFPE,

11   NFPA, and AIA.  The facts stated herein are true of my own personal knowledge and I

12   could and would competently testify thereto as follows.

13        2.    I make this declaration in support of "Shady Bird Lending, LLC's

14   Reply to Opposition to Motion of Shady Bird Lending, LLC for Order Excusing State Court

15   Receiver From Turnover of Assets Pursuant to 11 U.S.C. § 543; Declarations of Bellann

16   R. Raile, Brent Little, and Andrew Trost in Support Thereof" (the "Reply").

17        3.    In preparing this declaration, I have reviewed the "Opposition to

18   Motion of Shady Bird Lending, LLC for Order Excusing State Court Receiver From

19   Turnover of Assets Pursuant to 11 U.S.C. § 543; Memorandum of Points and Authorities;

20   Declarations of Donald Chae in Support Thereof" (the "Opposition"), filed by the Debtor in

21   response to the "Motion of Shady Bird Lending, LLC for Order Excusing State Court

22   Receiver From Turnover of Assets Pursuant to 11 U.S.C. § 543; Memorandum of Points

23   and Authorities; Declarations of Ronald Richards, Bellann R. Raile, and Brent Little in

24   Support Thereof" (the "Motion"), filed by Shady Bird.  I also reviewed the declaration of

25   Donald Chae (the "Chae Declaration") and the declaration of Robert "Charlie" Cervantes

26   (the "Cervantes Declaration") filed in support of the Opposition.  As explained in detail

27   below, I find each of the declarations to be misleading and inaccurate.  I submit this

28

**SulmeyerKupetz,** A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1 declaration to correct the record as to the misstatements, specifically those of Mr.

2 Cervantes.

3          4.      Recently, Carine was retained by Bellann R. Raile (the "Receiver"),

4 who I understand is duly appointed, qualified, and acting state court receiver for the real

5 property bearing APN Nos. 276-361-20 and 276-361-22, consisting of a partially

6 constructed 178-room, seven story hotel building located in Buena Park, California (the

7 "Project") owned by the debtor The Source Hotel, LLC (the "Debtor").  Carine specifically

8 was retained by the Receiver to provide her a report of the Project in response to the

9 Opposition.

10         5.      Initially, the Debtor insinuates that it has been extremely diligent in

11 maintaining and protecting the Project.  However, the following are just some examples

12 demonstrating why this is not the case:

13         •       The pool deck waterproofing has been exposed to UV rays for many

14 months, reducing its elasticity and rendering the membrane ineffective and out of

15 warranty; based on input from waterproofing experts, it must be replaced;

16         •       The roof membrane on the 7-story tower exhibits signs of lifting and

17 separation from the substrate; it is highly likely that water intrusion has occurred, and the

18 membrane must be repaired.  Signs of leaks are visible in the 7th floor corridor, and may

19 have occurred elsewhere on the 7th floor;

20         •       Mechanical shaft openings at the roof are not properly sealed,

21 contributing to additional water intrusion;

22         •       The Debtor's statement that the building is 85% complete is not

23 accurate in my opinion; at best, the Project is no more than 70% complete;

24         •       Four exterior doors at the 4th floor perimeter building line that lead to

25 the pool deck area are not installed allowing moisture into the building, therefore, in my

26 opinion, this has adversely affected the interior areas on the 4th floor and possibly other

27 levels with excessive amount of moisture and possibly mold;

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

Case 8:21-bk-10525-ES    Doc 132-3    Filed 05/20/21    Entered 05/20/21 15:25:28    Desc
Case 8:21-bk-10525-ES    Doc 72 Part 3 of 4    Filed 04/08/21    Entered 04/08/21 15:22:40    Desc
Exhibit A Part 3 of 4    Page 31 of 78
Main Document    Page 31 of 78

1          •          The pool deck membrane replacement (mentioned above) may also

2     require a re-sloping of the deck in some areas, so that it will properly drain as ponding on

3     the deck is evident;

4          •          The TPO (roof membrane) at the mechanical equipment roof area

5     adjacent to the pool deck at the northside of the Project between the parking structure

6     appears to be damaged, and water may be seeping into the retail level below; moisture

7     and mold can be a factor whenever there is water intrusion;

8          •          Standing water in mechanical system pipes that are not being used

9     could be also a significant issue; corrosion can develop, attacking the walls of the pipe

10    and sediment can lead to performance issues in the system.  Extensive flushing will be

11    necessary to remediate this problem;

12         •          One of the structural equipment platforms at the 4th floor central plant

13    is reported (by the installing contractor of the equipment) to not be verified for structural

14    capacity; in other words, a structural engineer has not confirmed the platform's ability to

15    support the current equipment and the balance of equipment to be installed.  In addition,

16    several large pieces of mechanical equipment on the existing structural platforms are not

17    structurally anchored, which creates an immediate structural and safety issue;

18         •          One fire alarm contractor involved with the Project's installation

19    reported that OCFA will require a separate fire alarm panel for the hotel; currently, the

20    main fire alarm panel serves the hotel, retail, and other areas of the Project.  A separate

21    hotel panel will require new drawings, OCFA approval, and permits;

22         •          In its current state, the interstitial space above the 3rd floor and below

23    the 4th floor has access for maintenance; fire sprinkler code requires this space to be

24    sprinklered, as confirmed by the installing contractor for the Project.  The area currently is

25    not sprinklered, and it remains a risk for the Project;

26         •          The $4,000,000 estimate to complete the balance of work is grossly

27    understated as indicated in Carine's preliminary due diligence report (Phase 1); hard

28

SulmeyerKupetz, A P,  ...sional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1 construction costs alone are currently estimated at between $8,000,000 and $9,000,000,

2 plus FF&E installation and soft costs; and

3 •   Additionally, with the permits expired and the failure to maintain the

4 development agreement with the City of Buena Park, this Project will be severely

5 scrutinized by all governing agencies such as the Community Development, Building &

6 Safety, Orange County Fire Authority (OCFA), Orange County Health Department

7 (OCHD), and the State Elevator Inspector.  This Project will have to be re-evaluated by

8 all agencies to confirm if the codes and local ordinances will be applicable under the

9 original permit or if the new code and local ordinances will be required to be administered

10 to obtain new permits and certificate of occupancy moving forward.

11          I declare under penalty of perjury under the laws of the United States of

12 America that the foregoing is true and correct.

13          Executed this 8th day of April, 2021, at Los Angeles, California.

14

15 Andrew Trost

16

17

18

19

20

21

22

23

24

25

26

27

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

# EXHIBIT A



**Bellann Raile**

**Statement of Qualifications**

## COURT APPOINTED RECEIVER

**Bellann Raile** is a managing director with Cordes & Company. She has over 20 years of experience managing receiverships with Cordes & Company. With a total of 30 years' experience in operations management, she has managed businesses, both large and small, in a wide variety of industries. She and other members of Cordes & Company have been appointed as receiver in many real estate cases and have extensive experience as receivers in development-related projects. Ms. Raile works closely with the other experts in the firm who provide accounting, project management and technical support. She puts together the best and most cost-effective group to work on each particular project.

Cordes and Company has offices in Denver, Irvine and Minneapolis. Ms. Raile leads the California office that manages most Cordes & Company engagements located in the Western region.

Ms. Raile is widely recognized as an effective negotiator, mediator and focused businessperson who adds considerable value in every engagement she leads.

## EXPERIENCE

Ms. Raile has led or been personally appointed as a receiver in well over 200 cases. Below is a representative list of real estate development engagements she and Cordes & Company have played a significant role:

- **Laing-CP Lake Elsinore** (Lake Elsinore, CA) – a development project that consisted of 1,261 raw lots, a raw commercial site, a raw school site and an operating golf course. *(Receiver)*

- **Peterson** (Various CA locations) – Post judgement receivership including liquation of development properties *(Receiver)*

- **Victory Plaza,** (Los Angeles, CA) a 133,000 sf retail shopping center entitled for redevelopment into a City Center type development with environmental issues. *(Receiver)*

- **Rutter/Pacifica** (Newport Beach, CA) – 32 unit residential town house condominium units adjacent to a 5-story parking facility plus 206 acres of vacant land approved for future development. *(Receiver)*

- **Village Court** (Palm Desert, CA) – Partially compete 42,000 square foot medical/office condominium. *(Receiver)*

- **Irvine Partners, LLC** (Irvine, CA) - a 314,000 sf Class A office building-mostly completed. *(Receiver)*

- **Angeleno Properties, LLC** (Glendale, CA) Completed construction and liquidated 5-unit two story condominium building. *(Receiver)*

- **New Town** (St. Charles, MO) – a $100 million planned community development project in severe financial distress where Cordes was advisor to the secured lender. *(Advisor)*

- **Kings Road** (Los Angeles, CA) - a vacant, primarily constructed three story, twelve (12) unit condominium/townhome project with one level of subterranean parking with a total building area of 18,599 square feet. *(Receiver)*

- **Opus Northwest** (Minneapolis, Denver, Seattle) – a development company with a $400 million distressed portfolio. Cordes was advisor to the company board of directors and built restructure plan. *(Advisor)*



033



**Bellann Raile Appointments**

| Engagement Name | Brief Description | State |
|---|---|---|
| *Receivership Appointments* | | |
| A Lotta Storage | Storage Units | AZ |
| Blackhawk Enterprises | Real Estate Arizona | AZ |
| Bullhead City Chevron AZ | Gas Station/Convenience Store in Bullhead City, AZ | AZ |
| CF2, LLC | Executive Office Suites | AZ |
| Cottonwood Medical Office | Vacant Medical Office | AZ |
| Desert Sunshine | 214 Unit Apartment Complex located in Phoenix, AZ | AZ |
| Glen Harbor | Vacant Office Building | AZ |
| Greer Lodge | Recreational Lodge - Hospitality | AZ |
| Grotte | Office Building | AZ |
| Grow Trust | Retail Center- Good Year, AZ | AZ |
| Hipolito Trust | 32 Unit Apartment Complex located in Phoenix, AZ | AZ |
| Lionshops Inc | Strip mall in Phoenix, AZ 99th and Grand | AZ |
| Marina Vista | Office/Retail Plaza | AZ |
| Mirage Crossing | Real Estate | AZ |
| Palm Creek | Apartment Complex/small | AZ |
| Parkway Village | Commercial office/business space | AZ |
| Plaza 777 | Strip Mall - Scottsdale, AZ | AZ |
| Quality Mart | C-Store | AZ |
| Reems | Office Suites | AZ |
| RF BESD AZ | Solar Panels in AZ | AZ |
| Sabah Properties - Phoenix & Mesa | two retail strip malls | AZ |
| Sunrise Valero Nogales | Gas Stations | AZ |
| Sunrise Valero Tuscon | Gas Station | AZ |
| Triple E Holdings Phoenix | Retail Commercial Complex | AZ |
| 1617 Westcliff | Commercial | CA |
| 4th Street Investors | Self Storage in Lancaster, CA | CA |
| 801 Gateway | 801 Gateway - 5 Story 136K sq ft office building | CA |
| Advocacy for Domestic Violence | Non-profit woman's shelter | CA |
| Angeleno Properties LLC | 5 Condo Project LA | CA |
| Arbuckle Shell | Closed Shell Station in Arbuckle, CA | CA |
| Barcelo Enterprises | Commercial Nurseries | CA |
| Bi_Coastal | 7 Unit Condominium Project located in North Hollywood, CA | CA |
| Bonilla | Meat Market- Partnership dispute | CA |
| Calexico Crossings LLC | Warehouse - Calexico | CA |
| Camarillo Ranch | Office Condo located in Camarillo, CA | CA |
| Commons at Chino Hills | Power Center Development | CA |
| Cornelio | 9 Unit Apartment Complex located in Long Beach, CA | CA |
| Creative Video Logic | 27 Unit apartments in 15 buildings | CA |
| David L Shane Kings | Apartment complex | CA |
| David L Shane Laurel | Apartment Complex | CA |
| David L. Phares | Industrial Buildings | CA |
| Days Inn Stockton | Hotel located in Stockton, CA | CA |
| Del Sur | 17 SFH Lots and 4 model homes | CA |
| Desert Brook | 18 Hole Golf Course/development located in Desert Hot Springs | CA |
| Dorothy Heller Rev Trust | 2 industrial buildings | CA |
| El Cajon Lexington | Residential Real Estate | CA |
| Encino | Office Building | CA |
| Esplanade Commercenter | Light Industrial complex in Hemet CA. | CA |



**Bellann Raile Appointments**

| Engagement Name | Brief Description | State |
|---|---|---|
| Fallbrook Development Group | Apt complex- 30 units Class C Fallbrook | CA |
| Fremont Shell | Shell Station Stockton, CA | CA |
| Fremont Tech Center | 10 Flex (Office/R&D) Buildings | CA |
| Granger Villa Apartments | Apartment Complex in Modesto, CA | CA |
| Irvine Center Partners III | Class A Office Building located in Irvine, CA | CA |
| Kang Medical | Medical Commercial Center | CA |
| Kathy A. Hoke | Office Property/Building | CA |
| Kings Road | 12 Unit Condominium Project located in West Hollywood, CA | CA |
| L and W Stone | Stone Quarry and Distribution Centers | CA |
| Links at Summerly | Golf course and residental development, Lake Elsinore | CA |
| Majestic Hotel | 58 Room Hotel located in San Francisco, CA | CA |
| Medi Pedic Bedding | Mattress Manufacturer | CA |
| Medina Antioch | Commercial | CA |
| Medina Maie Ave | Commercial | CA |
| Medina Pacific | Commercial | CA |
| Medina San Jose | Commercial | CA |
| Medina Slauson Ave | Commercial | CA |
| Melrose Harper LLC | Strip Mall/2 apartments in Hollywood, CA | CA |
| Menifee/Gallery Project | 8 Unit Housing Project and 23 finished lots located in Menifee | CA |
| Mustang Market | Chevron-branded convenience store and gas station | CA |
| Nickel Back | Commercial building in Costa Mesa, CA | CA |
| NP Gas 2 | NP Gas revised | CA |
| NP Gas I | Gas Station | CA |
| NP Gas US Gasup | Gas Station/C Store | CA |
| O.R.E.P., Inc. | 2 story Office Building in Orange County | CA |
| Old Church LLC | Banquet Center | CA |
| Old Town La Quinta | Office/Retail | CA |
| Oroville Post Judgement | Post judgement involving rental property and land | CA |
| Oroville Self Storage | 660 Unit Self Storage- Oroville, CA | CA |
| Oxnard Arts Lofts | Live/Work 18 unit space | CA |
| Oxnard Shell | Convenience Store in Oxnard, CA | CA |
| Pacific Property Assets Long Beach | Vacant 3 story office building | CA |
| Palacio Del Sol LLC | Residential | CA |
| Peterson | Rental property and land | CA |
| Pine Manor Guest Home Inc | Adult Personal Care Home | CA |
| PLI Las Vegas LLC | 100k sf office building in Pomona, CA. | CA |
| PPA Holdings Fountain Blue | 18 unit apartment complex - Riverside, CA | CA |
| Punla | Strip Mall | CA |
| Rutter/Pacifica | 28 Unit Townhome Project located in Costa Mesa, CA | CA |
| SAL-PDC | Assisted living facility | CA |
| San Ramon Court | Apartment Buildings, Fresno, CA | CA |
| Scripps Ranch | 3 Building Business Park located in San Diego, CA | CA |
| Shoppes at Chino Hills | Large lifestyle retail and office center | CA |
| Strata Realty LLC | Multi-building mixed use business park | CA |
| Style Up Inc | Commercial Warehouse | CA |
| Sunflower Apartments | 39 unit apartment complex in Downey | CA |
| Sunland Ventures, Inc. | Dial Automotive & Sourdough Pizza | CA |
| Ten Forward Dining | 2- leased Jack in the Box's Retail Strip Center | CA |
| Trustee Properties W 48 Street | Commercial Property | CA |
| Trustee Properties W 62 Street | Commercial Property | CA |



**Bellann Raile Appointments**

| Engagement Name | Brief Description | State |
|---|---|---|
| Twin Springs LLC | Large office-older buildings | CA |
| Vanatta Show Low | Single Family Residence | CA |
| Victory Boulevard Shopping Center | Shopping Center- LA | CA |
| Village at Nipomo | Real Property Located in the County of San Luis Obispo | CA |
| Village Court | Medical Office Condo | CA |
| Watsonville Self Storage | Self-Storage Facility in Watsonville, CA | CA |
| WL Newland | Land & Improvements 123 Bungalow Triplexes & 27 SFH | CA |
| Zander | Vacant Building | CA |
| Zarate | Trucking company and yard. | CA |
| Triple E Holdings Idaho | Retail Commercial Complex | ID |
| Incred A Bowl LLC | Bowling Alley | KS |
| 305 Las Vegas LLC | Parking Lot and 3 separate 2 Story office buildings | NV |
| Chaddah | 107 Unit Apartment Complex located in Las Vegas, NV | NV |
| Chai Storage | 2 large storage complexes in N Las Vegas | NV |
| Crossroads Las Vegas | Apartment Complex- Las Vegas | NV |
| Douglas J. Seip MD LTD | Physician office | NV |
| Hop Over LLC | 228 Unit apartment complex | NV |
| Jed Property | Commercial Real Estate | NV |
| KB Worldwide Holdings LLC | 4,057 sf commercial sing story medical office building | NV |
| Korte Revocable Indenture of Trust | Mini Storage | NV |
| LMGC Apartments | 28 Unit Apartment Building | NV |
| MP AMS Holdings LLC | Mini Storage Facility | NV |
| Rustigian Receivership | Abandoned property in Elco NV | NV |
| Save Most Alicia Hills | Commercial Property | NV |

## Bankruptcy Advisor Cases (for Creditor)

| | | |
|---|---|---|
| South Loop 2600 LLC | Bankruptcy Plan Agent | CA |
| BHG El Paso | Disbursement of cash assets | TX |
| Arizona Oil | 16 C- Stores throughout AZ | AZ |
| Black Hawk | C- Store | AZ |
| Jump Oil | 73 C-Stores in Missouri and Oklahoma | MO |
| Stacy's Greenhouses | Creditor advisor in Ch 11 BK proceeding. | SC |
| Ws China Bistro | Restaurant - Redondo Beach | CA |

## Other Engagements

| | | |
|---|---|---|
| Trademark Visual | Retail liquidation | AZ |
| 7 Elephants | Liquidation of electronics inventory | CA |
| Tile Outlet | Multi State Tile Company Liquidation | CA |
| Paradise Kay Marina | Validate rent roll reporting | CA |
| Hemet West | Partnership dissolution | CA |
| 801 Gateway Asset Management | Asset Management services | CA |
| Barcelona Motorcoach LLC | 3 phase (238 space) RV Park | NV |
| Camino El Norte | Commercial property | NV |
| Greer Lodge Asset Management | Post receiver asset management | AZ |
| JED Property Management | Post receiver asset management | NV |
| Miss Donuts | Commercial property | CA |

# EXHIBIT B