Daniel A. Lev (CA Bar No. 129622)
  dlev@sulmeyerlaw.com
**Sulmeyer**Kupetz
A Professional Corporation
333 South Grand Avenue, Suite 3400
Los Angeles, California 90071-1406
Telephone: 213.626.2311
Facsimile: 213.629.4520

Ronald Richards (CA Bar No. 176246)
  ron@ronaldrichards.com
Law Offices of Ronald Richards & Associates, APC
P.O. Box 11480
Beverly Hills, California 90213
Telephone:  310.556.1001
Facsimile:  310.277.3325

Attorneys for Shady Bird Lending, LLC

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION

| | |
|---|---|
| In re | Case No. 8:21-bk-10525-ES |
| THE SOURCE HOTEL, LLC, | Chapter 11 |
| Debtor. | **SHADY BIRD LENDING LLC'S SUPPLEMENTAL STATEMENT RE (1) MOTION OF SHADY BIRD LENDING, LLC FOR ORDER EXCUSING STATE COURT RECEIVER FROM TURNOVER OF ASSETS PURSUANT TO 11 U.S.C. § 543, AND (2) MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362 (WITH SUPPORTING DECLARATIONS) (REAL PROPERTY); DECLARATIONS OF BELLANN R. RAILE AND ANDREW TROST IN SUPPORT THEREOF** |
| | DATE:    June 3, 2021 <br> TIME:    2:00 p.m. <br> PLACE: Courtroom "5A" |

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

DAL 2711916v1

1    Shady Bird Lending, LLC ("Shady Bird"), hereby submits "Shady Bird

2   Lending LLC's Supplemental Statement Re (1) Motion of Shady Bird Lending, LLC for

3   Order Excusing State Court Receiver From Turnover of Assets Pursuant to 11 U.S.C. §

4   543, and (2) Motion for Relief From the Automatic Stay Under 11 U.S.C. § 362 (with

5   supporting declarations) (Real Property); Declarations of Bellann R. Raile and Andrew

6   Trost in Support Thereof" (the "Supplemental Statement"), in support of its (i) "Motion of

7   Shady Bird Lending, LLC for Order Excusing State Court Receiver From Turnover of

8   Assets Pursuant to 11 U.S.C. § 543; Memorandum of Points and Authorities;

9   Declarations of Ronald Richards, Bellann R. Raile, and Brent Little in Support Thereof"

10   (the "Section 543 Motion") and (ii) "Notice of Motion and Motion for Relief From the

11   Automatic Stay Under 11 U.S.C. § 362 (with supporting declarations) (Real Property) (the

12   "Relief From Stay Motion"), and represents as follows:

13   **I.**

14   **PREFATORY STATEMENT**

15    The Court continued the hearings on Shady Bird's Section 543 Motion and

16   Relief From Stay Motion in order to track what progress, if any, the Debtor has made

17   towards exiting this chapter 11 case and what measures the Receiver has undertaken to

18   further stabilize the Project.[1]  As the Court will recall, it permitted the Receiver to remain

19   in possession of the Project, on an interim basis, after Shady Bird elected to fund the

20   estate with up to $200,000 in order to allow desperately needed repairs to be made.

21   Shady Bird reached this decision because of its concern, which remains true today, that if

22   control of the Project was returned to the Debtor and the Receiver was displaced, the

23   Project would suffer further deterioration and diminution in value.

24   _____

25   [1] Unless otherwise stated, the use of capitalized terms herein shall have the meaning ascribed in the
"Motion of Shady Bird Lending, LLC for Order Excusing State Court Receiver From Turnover of Assets

26   Pursuant to 11 U.S.C. § 543; Memorandum of Points and Authorities; Declarations of Ronald Richards,
Bellann R. Raile, and Brent Little in Support Thereof" [Docket No. 51] and "Notice of Motion and Motion for

27   Relief From the Automatic Stay Under 11 U.S.C. § 362 (with supporting declarations) (Real Property)
[Docket No. 62].

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    As such, the Court specifically asked Shady Bird and the Receiver to

2    provide evidence demonstrating that the Receiver has been doing more than just baby-

3    sitting the Project.  This Supplemental Statement addresses the Court's concerns and

4    sets forth the steps being taken and the funds expended to remediate serious issues of

5    neglect identified by the Receiver.  After review, the Court surely will conclude that under

6    no circumstances should the Receiver be removed pending Shady Bird's request for

7    relief from stay.  The Debtor has offered nothing in the way of funds or expenditures to

8    manage or stabilize the Project, and it has yet to show it has any ability to complete the

9    Project which would cost the Debtor upwards of $20,000,000.

10    **II.**

11    **ABSENT RELIEF FROM STAY, THE RECEIVER MUST REMAIN IN CONTROL AND**

12    **POSSESSION OF THE PROJECT**

13    As a reminder, on April 28, 2021, the Court entered its "Order, After

14    Hearing, Granting, On An Interim Basis, Motion of Shady Bird Lending, LLC for Order

15    Excusing State Court Receiver From Turnover of Assets Pursuant to 11 U.S.C. § 543"

16    (the "Section 543 Order") [Docket No. 99].  According to the Section 543 Order, during

17    the interim period of the Receiver's continued possession of the Project, and in in

18    addition to the powers granted to the Receiver pursuant to the "Ex Parte Order

19    Appointing Receiver and Order to Show Cause" entered on February 17, 2021 (the

20    "Receivership Order"), Shady Bird was authorized to advance an amount no greater than

21    $200,000 (the "Gifted Advance") to the Receiver to be used to remediate, repair, and fix

22    problems with the Project.

23    As part of the Section 543 Order, the Receiver agreed to provide written

24    notice by e-mail to the Debtor's counsel within forty-eight hours after acceptance of any

25    bid or proposal by the Receiver for repairs or work to be done on the Project (with copies

26    of such accepted bids and/or proposals), and to provide written notice within two

27    business days following the completion of any repairs or work done on the Project by any

28    vendor or contractor.  The Receiver also agreed to provide the Debtor with access to the

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  Project following written (e-mail) notice by the Debtor and/or its counsel to both the

2  Receiver and counsel for Shady Bird, which access was to be provided by the Receiver

3  as reasonably requested but in no event later than forty-eight hours after the delivery of

4  such written e-mail notice.

5        Both the Receiver and Shady Bird have complied with the terms and

6  conditions of the Section 543 Order.[2]  With respect to advances, the Receiver received

7  an initial advance of $31,784.95 from Shady Bird on March 8, 2021, followed by a

8  subsequent advance of $63,305.82 on May 6.  The initial disbursements made by the

9  Receiver for various items totaled $58,234.08, after which the Receiver determined that

10  an additional $118,047.38 in expenses would need to be paid during the initial interim

11  period.  After subtracting the initial expenses from the first two advances, this left a

12  balance of $36,856.69, however, once the additional $118,047.08 was factored into the

13  equation, this left a deficit of $81,190.69, which Shady Bird has agreed to advance prior

14  to the hearing.[3]  See declaration of Bellann R. Raile, affixed hereto.

15        Specifically, the Receiver's first course of action was not only to identify the

16  most important items to complete to ensure the health and safety of the Project, but also

17  to consider what could be done within budget and the short timeframe for work to be

18  completed.  In consultation with various parties, the Receiver developed the following

19  working list:

20        •    Fire Sprinkler Protection - Investigate what was necessary to secure

21  the Project at all levels.

22        •    Freight Elevator - Schedule an inspection by KONE, an engineering

23  company specializing in elevator engineering, to determine the safety of the system and

24  _____

25  [2] In addition, on at least four occasions, the Debtor requested that access to the Project be permitted to
allow potential investors to inspect the property.  Each time, the Receiver consented to the request, and

26  unfettered access to the Project was granted to the Debtor and its representatives during the initial interim
period.

27  [3] This amount does not include any of the Receiver's fees or her expenses, including attorney's fees.

28

1  to make any necessary repairs, and thereafter have the state elevator inspector approve

2  the elevator for temporary use.

3       •     Roof Leaks - Repair roof leaks on both roof levels.

4       •     Temporary Closures - Provide temporary closure at all 4th Floor

5  openings leading to the exterior side of the Project where doors are not installed.

6       •     Mold - Perform a moisture and mold test to confirm mold damage as

7  well as secure a proposal to understand the costs associated with mold removal and

8  thereafter undertake the necessary remediation and repairs.

9       •     Pool Deck and Roof Deck - Secure both areas from adjacent

10 property, if possible.

11      •     Sewer - Continue to investigate sewer smell and make necessary

12 field repairs.

13      •     Rooftop Mechanical Equipment - Investigate the structural

14 requirements regarding the mechanical equipment and duct work at both roof levels and

15 complete proper anchoring.

16      •     Replace Broken Windows - Replace two broken windows and the

17 glass adjacent to the doorway in the front of the Project.

18      •     Pool Deck - Remove damaged plastic tarps and secure damaged

19 deck, if possible.

20      •     Pool - Confirm and implement the necessary protective measures for

21 pool safety.

22      •     Temp Power - Confirm where power is coming from that supports the

23 Project's temporary lighting.

24      •     Coupon Samples - Obtain samples from the exiting water lines to

25 understand if there is any corrosion and if any action items are required to repair

26 identified damage.

27      •     Carpet Protection - Provide protective plastic membrane over

28 carpeted floors in all hotel rooms.

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    These itemized areas of concern were provided to the City of Buena Park

2  (the "City") for comments.  After receipt, the City requested a walkthrough of the Project.

3  For the most part, and as noted in both the Section 543 Motion and the Relief From Stay

4  Motion, the majority of building permits are no longer active and the Receiver needed to

5  verify that the work being completed was not going to require reactivation of the existing

6  building permits.

7    On April 21, 2021, the Receiver attended an inspection with the City and its

8  representatives.  This meeting allowed the Receiver to understand the City's perspective

9  and its separate list of concerns which needed to be addressed.  For example, one of the

10 City's representatives pointed out that there were additional windows that did not appear

11 to be broken but, in fact, had one pane broken.  This made the window unstable since

12 they are designed to have two panes present.  The City also pointed out that the

13 balconies on the 7th Floor were unfinished and had boards and debris covering the upper

14 portion that could be hazardous.  These items were then added to the Receiver's initial

15 list of tasks to be completed.  At this meeting, it was further determined that the scope of

16 work anticipated would not require reactivation of the expired permits.

17    On April 21, the Receiver also met with a representative of Salamander Fire

18 Protection to inspect the Project's fire and safety components and to obtain a proposal to

19 complete the fire sprinkler system.  In this meeting, the Receiver learned that although

20 they could complete the sprinkler system, without all the smoke detectors and controllers

21 being installed, and all the drywall in place and completed, the existing system could not

22 function properly.  Given the state of the construction, the Receiver determined that it

23 was beyond the scope of a temporary safe-off.

24    The Receiver then contacted the Orange County Fire Authority (the "O.C.

25 Fire Authority") to discuss what would be required to maintain the Project in a safe

26 condition.  A representative from the O.C. Fire Authority and the Receiver conducted a

27 walkthrough of the Project on May 4, 2021.  Once on site, the O.C. Fire Authority also

28 requested to see the 3rd Floor which is not part of the hotel.  The Receiver then contacted

DAL 2711916v1    6

1    the Debtor who provided a representative to allow this portion of the Project to be

2    inspected by the O.C. Fire Authority.

3           During the May 4 inspection, the Receiver advised the O.C. Fire Authority

4    that she had received a proposal from a contractor to install temporary doors, but that

5    they were not fire rated.  The inspectors said that it would be acceptable to use the

6    temporary doors since it would not make a big difference considering the stage of the

7    Project's construction.  The O.C. Fire Authority then requested that the locks on the fire

8    escapes be rekeyed to Orange County standards as they believed that they were set for

9    Anaheim standards.  A locksmith was retained by the Receiver to accomplish this

10   requested repair.  The O.C. Fire Authority concluded by stating that since there were

11   guards on site, no further action would need to be taken at this time.

12           With respect to the freight/service elevator, the Receiver determined that

13   the elevator's certification had expired in December 2018.  Since a working freight

14   elevator is necessary to effectively reach all the floors on site, obtaining clearance to

15   ensure that the elevator can be accessed became an issue of paramount importance to

16   the Receiver.  This is especially true since the 3rd Floor of the Project is not part of the

17   hotel and the only stair access to all the floors of the hotel are through a fire escape

18   stairway.

19           As mentioned earlier, the Receiver retained KONE, a company specializing

20   in elevator engineering, to conduct an initial inspection of the elevator, which inspection

21   took place on May 4, 2021.  KONE noted that the elevator was generally in running

22   condition, but not all of the required lighting for the elevator lobbies was operational.

23   There also was a non-functioning light in the pit of the elevator which needed to be

24   replaced.  KONE requested that the Receiver purchase eight walkie-talkies and indicated

25   that they would provide signage and training on the elevator's usage.  KONE indicated

26   that they would also provide a proposal to maintain the system and to obtain certification

27   for temporary usage, and that it would take approximately eight hours to complete the

28   inspection and clean-up of the elevator.  KONE then agreed to meet with the Receiver

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  and the state for certification.  Since KONE expressed concern about past due balances

2  owed, the Receiver is awaiting completion of this aspect of her repair checklist.

3  During the initial interim period, the Receiver also has documented further

4  work which needs to be done to correct the electrical issues related to the Project's

5  lighting systems.  The Receiver has communicated with the Debtor and its counsel

6  regarding the scope of this work.  In this regard, the Receiver has requested information

7  related to how the power comes into the Project since it appears that the majority of the

8  power is coming in from the retail center space.  The elevator itself appears to be on

9  separate power.  To date, the Receiver has not received a response from the Debtor.

10  Prior to the hearing on the Section 543 Motion, the Receiver retained DC

11  Mechanical to cover the roof curb openings and ducting/ductwork openings on the roof

12  that could be causing leaks or damage to the HVAC systems.  On April 14, 2021, the

13  Receiver met with a roofing contractor regarding leaks that were discovered in some of

14  the rooms on the 7th Floor.  The Receiver was advised of the source of the leaks, but did

15  not receive a proposal for the repair work at the initial meeting.  The Receiver followed up

16  and also requested that the proposal include repairs to the Project's balcony caps, as first

17  raised by the City.  The Receiver was then provided a proposal which was reviewed and

18  accepted by the relevant parties, with work to be completed by the middle of May.

19  As mentioned previously, the 4th Floor had several doors that were not

20  installed.  This raised serious concerns about access into the Project by vagrants and/or

21  pests.  The Receiver received a proposal to provide the necessary repairs which was

22  reviewed and accepted by the relevant parties, and the work is expected to be completed

23  by the middle of May.

24  Given the various signs of leaks in the rooms, it was important for the

25  Receiver to determine if there was a mold issue so it could be addressed immediately to

26  avoid further damage to the Project.  The Receiver retained American Integrated

27  Resources, Inc. to investigate moisture intrusion into the building.  A proposal for

28  remediation was provided to the parties and the work was completed during the week of

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    May 10, 2021.  The report from this work indicated there are currently no moisture issues,

2    but recommended a mold and indoor air quality inspection because the Project's

3    temporal exposure to the elements suggests past water intrusion.  As a result, the

4    Receiver plans to obtain a proposal to test for mold.

5          Prior to the hearing on the Section 543 Motion, the Receiver also retained a

6    plumber to address the sewer smell issue.  In order to flush out the system, water was

7    placed down all open drains that were available to add water to the p-traps.  There were

8    openings that also were covered, which helped the situation but did not totally correct the

9    issues.  The Receiver was alerted to the fire sprinkler system drain that could be a

10    problem and water was placed in that p-trap as well.  This again helped, but did not

11    totally correct the situation.  As such, the Receiver has received a proposal to cap the

12    sewer and have sent the proposal to the City for review.  The City also expressed

13    concerns since the hotel and retail center share sewer lines.  Accordingly, the Receiver

14    intends to continue adding water to the drains.  Additionally, the contractor addressing

15    the rooftop mechanical equipment issues will cover select drains where possible and this

16    work is included in that proposal.  The Receiver will determine if this work can be

17    accomplished given the current status of the unexpired permits.

18          With respect to the Project's rooftop mechanical equipment, the Receiver

19    obtained a proposal that includes anchoring the HVAC equipment that is not currently

20    anchored on the 4th Floor roof.  The contractor is able to start this work the week of May

21    17, 2021.

22          Prior to the hearing on the Section 543 Motion, the Receiver received two

23    proposals to replace the Project's numerous broken windows.  The Receiver was

24    concerned with aspects of each proposal and, as a result, obtained a third proposal.  The

25    third proposed contractor was asked to include the broken windows that the only had one

26    pane broken as well.  This proposal was provided to the parties and accepted, and the

27    replacement windows have been ordered.

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    As noted in both the Relief From Stay Motion and the Section 543 Motion,

2   after her appointment the Receiver engaged Urban Advisory and Building Group, LLC

3   ("Urban Advisory") to provide a report of the current physical condition of the Project.

4   Urban Advisory advised the Receiver that it believed the pool deck coating had already

5   been damaged and that further efforts to save the coating would not be effective.

6    As such, the Receiver contacted a pool deck contractor who further

7   elaborated that covering the deck with plastic would protect the pool deck from the sun,

8   but it would hold rainwater and could cause damage.  The contractor stated that the

9   Receiver should consider the coating a "sacrificial coating" and when construction

10   resumed a fresh coat could be applied on top of the damaged coating.  The Receiver

11   also learned that there was noticeable pooling in some areas of the deck that would likely

12   require re-coating.  In addition, the Receiver was advised that since the deck is located in

13   an extremely windy area, the plastic poses a safety risk by blowing off of the Project.  To

14   reduce this risk, the Receiver has retained a laborer to fold up and move the plastic tarps

15   to storage.  This work is scheduled to be completed by the middle of May.

16    After investigation, the Receiver also learned that keeping the pool free of

17   water is all that needs to be done at this time.  Finally, the Receiver remains in the

18   process of obtaining proposals for temp power, and carpet protection, as alluded to

19   earlier.

20    Compounding the problems with the Project, it was recently determined by

21   Carine Consulting ("Carine"), one of the Receiver's consultants, that problems with the

22   Project's power and low voltage existed as far back as 2018, further evidencing the

23   irresponsible methods implemented by the Debtor in its build out of the Project.

24   Specifically, Enterprise Level Technology Solutions ("ELTS") was brought onto the

25   Project in August 2018 as the low voltage project manager.

26    ELTS's roles included (i) reviewing current plans and drawings, (ii)

27   overseeing the phone equipment installation by Newgens, Inc. ("Newgens"), (iii)

28   technology procurement, (iv) internet circuit procurement and contracts, (v) guest HSIA

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  vendor quotes and management, (vi) guestroom entertainment vendor quotes and

2  management, (vii) phone system vendor quotes and management, and (viii) due

3  diligence of existing plans and manage technology construction.  After reviewing some of

4  the proposals which were already going forward, ELTS discovered that (i) the phone

5  equipment being sold to the Project by Newgens was old phone equipment which had

6  reached end of life at that time (support was ending) for what ELTS considered to be an

7  egregious amount, (ii) the phone equipment did not have call accounting or voicemail

8  integration, and the Wi-Fi was not approved by Hilton Hotels, (iii) the cabling proposal did

9  not have a certification phase (where each cable run would need to have higher level of

10  testing instead of just continuity), and (iv) after securing quotes for the vendor contracts,

11  ELTS was able to find much newer equipment for a lower price than provided by

12  Newgens, which recommendation was rejected.  Shortly thereafter, ELTS was pulled off

13  of the Project.

14          A summary of ELTS's findings are integrated in the Preconstruction Phase

15  2A Progress Report (the "Phase 2A Report") dated May 20, 2021, prepared by Carine.

16  The report prepared by Carine also sets forth in great detail the remedial measures which

17  need to be taken in the short term to stabilize and repair the Project.  A true and correct

18  copy of the Phase 2A Report is attached hereto as Exhibit "A" to the declaration of

19  Andrew Trost, affixed hereto.

20          Separate and apart from the remedial steps which have been and remain to

21  be taken by the Receiver, with the sole financial assistance of Shady Bird, the City sent a

22  letter to the parties on May 14, 2021, underscoring its serious concerns with the Project's

23  future.  A true and correct copy of the May 14, 2021, letter is attached hereto as Exhibit

24  "B" and incorporated herein by reference.  According to the City, the Project and the

25  property are both governed by a series of agreements with the City or the former

26  Community Redevelopment Agency of the City of Buena Park ("Former RDA"), the most

27  notable of which is that certain Disposition and Development Agreement ("DDA") dated

28

1  October 26, 2010, by and between the Former RDA and The Source at Beach, LLC (the

2  "Developer").

3      The DDA required Developer to proceed with construction and operation of

4  the Project, which was required to include a high-quality (Mobil 3-5 Star or AAA 2-5

5  Diamond-voted) full-service Hotel Project.  To support and incentivize completion of the

6  Project, the Former RDA agreed to provide two forms of financial assistance to

7  Developer that are memorialized in the DDA:  (i) a portion of the increased property tax

8  revenues resulting from reassessment of the Property following completion of the Project

9  (also known as "tax increment" revenues); and (ii) a portion of sales tax revenues

10  generated by the Debtor (jointly "Financial Assistance"). The DDA directs the property tax

11  payments to be remitted to Developer annually for the next decade; with the sales tax

12  assistance lasting even longer.

13      However, due to the pre-petition actions taken by Shady Bird, resulting in

14  the Receiver's appointment, as well as the Debtor's subsequent chapter 11 filing, the City

15  (which now also serves as "successor agency" to the Former RDA) has determined that

16  these events justify early termination of this Financial Assistance, and in fact the DDA

17  altogether.

18      In light of the Receiver's appointment and the chapter 11 filing, and given

19  the unknown future of the Project, the City's May 14 letter provided the Debtor and

20  Developer notice that it intends to withhold all future Financial Assistance payments that

21  otherwise might be paid Developer under the DDA unless and until: (i) Developer cures

22  these defaults and proceeds with construction of the Hotel Project to the City's

23  reasonable satisfaction, in which case the withheld and future Financial Assistance

24  payments *might be* released on terms acceptable to the City; or (ii) the City declares

25  formal default of the DDA and terminates the Financial Assistance, in which case neither

26  the withheld nor future payments will be remitted to Developer.  According to the City, the

27  Financial Assistance payments will be held in an interest-bearing escrow account

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    established and managed by the City pending a decision on if or how such funds will be

2    remitted, if ever.

3            This letter, when read in conjunction with the serious issues discovered by

4    the Receiver before and during the initial interim period, further supports a finding of

5    "cause" justifying either relief from stay under section 362(d)(1) or the Receiver's

6    continued possession and control over the Project.

7            There is a mountain of irrefutable evidence showing that, due its current

8    neglected and dilapidated state, there is at least a threatened decline in value, such that

9    relief from stay for "cause" is warranted at this time under section 362(d)(1). The

10    uncontroverted evidence demonstrates that the Project has suffered dramatically during

11    the Debtor's ownership and but for the Receiver's appointment and Shady Bird's financial

12    commitment, it would only continue to deteriorate and diminish in value. The Debtor

13    admittedly lacks the ability to cure the existing loan default or service Shady Bird's debt,

14    and it has no ability to restart, let alone complete, construction, which could cost at least

15    $20 million to finish. Importantly, it is only due to Shady Bird's advances that the

16    Receiver is able to bring any sense of stability to the Project.

17            As a result, Shady Bird requests that relief from stay be granted under

18    section 362(d)(1). Alternatively, either the Section 543 Motion should be granted or, at a

19    minimum, the Court should keep the Section 543 Order in place for at least another 60-

20    90 days, on the same terms and conditions as presently codified in the order, until such

21    time as the Debtor (i) obtains an order authorizing DIP financing, or a sale of the Project,

22    in an amount to pay off Shady Bird's debt, in full, or (ii) files a plan of reorganization that

23    the Court has determined has a reasonable possibility of being confirmed with a

24    reasonable time.

25            Even if relief from stay is granted, the Debtor can always seek to reimpose

26    the stay in the event it is quickly able to conjure up a sale or refinancing transaction. But

27    this Court can no longer hold Shady Bird at bay based on nothing more that the

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

13

1  continued assurances - backed by no admissible evidence - that a refinance, sale, or

2  confirmable plan is in prospect.

3                                              III.

4                                       **CONCLUSION**

5              Based on the foregoing, Shady Bird respectfully requests that the Relief

6  From Stay Motion be granted in all respects, or, in the alternative, that the Section 543

7  Motion be granted in all respects or granted on a further interim basis, and for such other

8  and further relief as the Court deems just and proper under the circumstances.

9  DATED: May 20, 2021                    **Sulmeyer**Kupetz
                                          A Professional Corporation
10

11

12                                        By: /s/ Daniel A. Lev
                                              Daniel A. Lev
13                                            Attorneys for Shady Bird Lending, LLC

14  DATED: May 20, 2021                   Law Offices of Ronald Richards & Associates, APC

15

16

17                                        By: /s/ Ronald Richards
                                              Ronald Richards
18                                            Attorneys for Shady Bird Lending, LLC

19

20

21

22

23

24

25

26

27

28

DAL 2711916v1                              14

1

### DECLARATION OF BELLANN R. RAILE

2          I, Bellann R. Raile, declare and state as follows:

3          1.          I am over the age of eighteen, am a managing director of Cordes

4   and Company, LLC ("Cordes"), and am the duly appointed, qualified, and acting state

5   court receiver for the real property bearing APN Nos. 276-361-20 and 276-361-22,

6   consisting of a partially constructed 178-room, seven story hotel building located in

7   Buena Park, California (the "Project") owned by the debtor The Source Hotel, LLC (the

8   "Debtor").  The facts stated herein are true of my own personal knowledge and I could

9   and would competently testify thereto as follows.

10          2.          I make this declaration in support of "Shady Bird Lending LLC's

11  Supplemental Statement Re (1) Motion of Shady Bird Lending, LLC for Order Excusing

12  State Court Receiver From Turnover of Assets Pursuant to 11 U.S.C. § 543, and (2)

13  Motion for Relief From the Automatic Stay Under 11 U.S.C. § 362 (with supporting

14  declarations) (Real Property); Declarations of Bellann R. Raile and Andrew Trost in

15  Support Thereof" (the "Supplemental Statement").

16          3.          I am aware that on April 28, 2021, the Court entered its "Order, After

17  Hearing, Granting, On An Interim Basis, Motion of Shady Bird Lending, LLC for Order

18  Excusing State Court Receiver From Turnover of Assets Pursuant to 11 U.S.C. § 543"

19  (the "Section 543 Order") [Docket No. 99].  According to the Section 543 Order, during

20  the interim period of my continued possession of the Project, and in in addition to the

21  powers granted to the Receiver pursuant to the "Ex Parte Order Appointing Receiver and

22  Order to Show Cause" entered on February 17, 2021 (the "Receivership Order"), Shady

23  Bird was authorized to advance an amount no greater than $200,000 (the "Gifted

24  Advance") to me to be used to remediate, repair, and fix issues at the Project.

25          4.          As part of the Section 543 Order, I also agreed to provide written

26  notice by e-mail to the Debtor's counsel within forty-eight hours after acceptance of any

27  bid or proposal by me for repairs or work to be done on the Project (with copies of such

28  accepted bids and/or proposals), and to provide written notice within two business days

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  following the completion of any repairs or work done on the Project by any vendor or

2  contractor.  I further agreed to provide the Debtor with access to the Project following

3  written (e-mail) notice by the Debtor and/or its counsel to both me and counsel for Shady

4  Bird, which access was to be provided by me as reasonably requested but in no event

5  later than forty-eight hours after the delivery of such written e-mail notice.

6         5.     At all times, I have complied with the terms and conditions of the

7  Section 543 Order.  With respect to advances, I received an initial advance of $31,784.95

8  from Shady Bird on March 8, 2021, followed by a subsequent advance of $63,305.82 on

9  May 6.  The initial disbursements made by me for various items totaled $58,234.08, after

10  which I determined that an additional $118,047.38 in expenses would need to be paid

11  during the initial interim period.  After subtracting the initial expenses from the first two

12  advances, this left a balance of $36,856.69, however, once the additional $118,047.08

13  was factored into the equation, this left a deficit of $81,190.69, which Shady Bird has

14  agreed to advance to me.  This amount does not include any of the receiver's fees or

15  expenses, including attorney's fees.

16         6.     Specifically, upon my appointment, my first course of action was not

17  only to identify the most important items to complete to ensure the health and safety of

18  the Project, but also to consider what could be done within budget and the short

19  timeframe for work to be completed.  In consultation with various parties, I developed the

20  following working list:

21         •     Fire Sprinkler Protection - Investigate what was necessary to secure

22  the Project at all levels.

23         •     Freight Elevator - Schedule an inspection by KONE, an engineering

24  company specializing in elevator engineering, to determine the safety of the system and

25  to make any necessary repairs, and thereafter have the state elevator inspector approve

26  the elevator for temporary use.

27         •     Roof Leaks - Repair roof leaks on both roof levels.

28

1    •    Temporary Closures - Provide temporary closure at all 4th Floor

2    openings leading to the exterior side of the Project where doors are not installed.

3    •    Mold - Perform a moisture and mold test to confirm mold damage as

4    well as secure a proposal to understand the costs associated with mold removal and

5    thereafter undertake the necessary remediation and repairs.

6    •    Pool Deck and Roof Deck - Secure both areas from adjacent

7    property, if possible.

8    •    Sewer - Continue to investigate sewer smell and make necessary

9    field repairs.

10    •    Rooftop Mechanical Equipment - Investigate the structural

11    requirements regarding the mechanical equipment and duct work at both roof levels and

12    complete proper anchoring.

13    •    Replace Broken Windows - Replace two broken windows and the

14    glass adjacent to the doorway in the front of the Project.

15    •    Pool Deck - Remove damaged plastic tarps and secure damaged

16    deck, if possible.

17    •    Pool - Confirm and implement the necessary protective measures for

18    pool safety.

19    •    Temp Power - Confirm where power is coming from that supports the

20    Project's temporary lighting.

21    •    Coupon Samples - Obtain samples from the exiting water lines to

22    understand if there is any corrosion and if any action items are required to repair

23    identified damage.

24    •    Carpet Protection - Provide protective plastic membrane over

25    carpeted floors in all hotel rooms.

26    7.    These itemized areas of concern were provided by me to the City of

27    Buena Park (the "City") for comments.  After receipt, the City requested a walkthrough of

28    the Project.  For the most part, and as noted in both the Section 543 Motion and the

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  Relief From Stay Motion filed by Shady Bird, the majority of building permits are no

2  longer active and I needed to verify that the work being completed was not going to

3  require reactivation of the existing building permits.

4          8.      On April 21, 2021, I attended an inspection with the City and its

5  representatives.  This meeting allowed me to understand the City's perspective and its

6  separate list of concerns which needed to be addressed.  For example, one of the City's

7  representatives pointed out that there were additional windows that did not appear to be

8  broken but, in fact, had one pane broken.  This made the window unstable since they are

9  designed to have two panes present.  The City also pointed out that the balconies on the

10 7th Floor were unfinished and had boards and debris covering the upper portion that

11 could be hazardous.  These items were then added to my initial list of tasks to be

12 completed.  At this meeting, it was further determined that the scope of work anticipated

13 would not require reactivation of the expired permits.

14         9.      On April 21, 2021, I also met with a representative of Salamander

15 Fire Protection to inspect the Project's fire and safety components and to obtain a

16 proposal to complete the fire sprinkler system.  In this meeting, I learned that although

17 they could complete the sprinkler system, without all the smoke detectors and controllers

18 being installed, and all the drywall in place and completed, the existing system could not

19 function properly.  Given the state of the construction, I determined that it was beyond the

20 scope of a temporary safe-off.

21         10.     I then contacted the Orange County Fire Authority (the "O.C. Fire

22 Authority") to discuss what would be required to maintain the Project in a safe condition.

23 A representative from the O.C. Fire Authority and I conducted a walkthrough of the

24 Project on May 4, 2021.  Once on site, the O.C. Fire Authority also requested to see the

25 3rd Floor which is not part of the hotel.  I then contacted the Debtor who provided a

26 representative to allow this portion of the Project to be inspected by the O.C. Fire

27 Authority.

28

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

11.      During the May 4, 2021, inspection, I advised the O.C. Fire Authority that I had received a proposal from a contractor to install temporary doors, but that they were not fire rated.  The inspectors advised me that it would be acceptable to use the temporary doors since it would not make a big difference considering the stage of the Project's construction.  The O.C. Fire Authority then requested that the locks on the fire escapes be rekeyed to Orange County standards as they believed that they were set for Anaheim standards.  I then retained a locksmith to accomplish this requested repair.  The O.C. Fire Authority concluded by advising me that since there were guards on site, no further action would need to be taken at this time.

12.      With respect to the freight/service elevator, I independently determined that the elevator's certification had expired in December 2018.  Since a working freight elevator is necessary to effectively reach all the floors on site, obtaining clearance to ensure that the elevator can be accessed became an issue of paramount importance to me.  This is especially true since the 3rd Floor of the Project is not part of the hotel and the only stair access to all the floors of the hotel are through a fire escape stairway.

13.      As mentioned earlier, I retained KONE, a company specializing in elevator engineering, to conduct an initial inspection of the elevator, which inspection took place on May 4, 2021.  KONE noted that the elevator was generally in running condition, but not all of the required lighting for the elevator lobbies was operational.  There also was a non-functioning light in the pit of the elevator which needed to be replaced.  KONE requested that I purchase eight walkie-talkies and indicated that they would provide signage and training on the elevator's usage.  KONE further indicated that they would provide a proposal to maintain the system and to obtain certification for temporary usage, and that it would take approximately eight hours to complete the inspection and clean-up of the elevator.  KONE then agreed to meet with me and the state for certification.  Since KONE expressed concern about past due balances owed, I am awaiting completion of this aspect of my repair checklist.

14.     During the initial interim period, I also documented further work which needs to be done to correct the electrical issues related to the Project's lighting systems.  In this regard, I have communicated with the Debtor and its counsel regarding the scope of this work.  I have requested information related to how the power comes into the Project since it appears that the majority of the power is coming in from the retail center space.  The elevator itself appears to be on separate power.  To date, I have not received a response from the Debtor.

15.     Prior to the initial hearing on the Section 543 Motion, I retained DC Mechanical to cover the roof curb openings and ducting/ductwork openings on the roof that could be causing leaks or damage to the HVAC systems.  On April 14, 2021, I met with a roofing contractor regarding leaks that were discovered in some of the rooms on the 7th Floor.  I was advised of the source of the leaks, but did not receive a proposal for the repair work at the initial meeting.  I followed up and also requested that the proposal include repairs to the Project's balcony caps, as first raised by the City.  I was then provided a proposal which was reviewed and accepted by the relevant parties, with work to be completed by the middle of May.

16.     As mentioned previously, the 4th Floor had several doors that were not installed.  This raised serious concerns about access into the Project by vagrants and/or pests.  I received a proposal to provide the necessary repairs which was reviewed and accepted by the relevant parties, and the work is expected to be completed by the middle of May.

17.     Given the various signs of leaks in the rooms, it was important for me to determine if there was a mold issue so it could be addressed immediately to avoid further damage to the Project.  I retained American Integrated Resources, Inc. to investigate moisture intrusion into the building.  A proposal for remediation was provided to the parties and the work was completed during the week of May 10, 2021.  The report from this work indicates there are currently no moisture issues, but recommends a mold and indoor air quality inspection because the Project's temporal exposure to the elements

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  suggests past water intrusion.  As recommended, I plan to obtain a proposal to test for

2  mold.

3        18.    Prior to the initial hearing on the Section 543 Motion, I also retained

4  a plumber to address the sewer smell issue.  In order to flush out the system, water was

5  placed down all open drains that were available to add water to the p-traps.  There were

6  openings that also were covered, which helped the situation but did not totally correct the

7  issues.  I also was alerted to the fire sprinkler system drain that could be a problem and

8  water was placed in that p-trap as well.  This again helped, but did not totally correct the

9  situation.  As such, I have received a proposal to cap the sewer and have sent the

10 proposal to the City for review.  The City also expressed concerns since the hotel and

11 retail center share sewer lines.  Accordingly, I intend to continue adding water to the

12 drains.  Additionally, the contractor addressing the rooftop mechanical equipment issues

13 will cover select drains where possible and this work is included in that proposal.  I intend

14 to determine if this work can be accomplished given the current status of the unexpired

15 permits.

16        19.    With respect to the Project's rooftop mechanical equipment, I

17 obtained a proposal that includes anchoring the HVAC equipment that is not currently

18 anchored on the 4th Floor roof.  The contractor is able to start this work the week of May

19 17, 2021.

20        20.    Prior to the initial hearing on the Section 543 Motion, I received two

21 proposals to replace the Project's numerous broken windows.  I was concerned with

22 aspects of each proposal and, as a result, obtained a third proposal.  The third proposed

23 contractor was asked to include the broken windows that the only had one pane broken

24 as well.  This proposal was provided to the parties and accepted, and the replacement

25 windows have been ordered.

26        21.    After my appointment, I also engaged Urban Advisory and Building

27 Group, LLC ("Urban Advisory") to provide a report of the current physical condition of the

28 Project.  Urban Advisory advised me that it believed the pool deck coating had already

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

DAL 2711916v1

1  been damaged and that further efforts to save the coating would not be effective. As

2  such, I contacted a pool deck contractor who further elaborated that covering the deck

3  with plastic would protect the pool deck from the sun, but it would hold rainwater and

   could cause damage. The contractor stated that I should consider the coating a

5  "sacrificial coating" and when construction resumed a fresh coat could be applied on top

6  of the damaged coating. I also learned that there was noticeable pooling in some areas

   of the deck that would likely require re-coating. In addition, I was advised that since the

8  deck is located in an extremely windy area, the plastic poses a safety risk by blowing off

9  of the Project. To reduce this risk, I have retained a laborer to fold up and move the

10 plastic tarps to storage. This work is scheduled to be completed by the middle of May.

11        22.    After investigation, I also learned that keeping the pool free of water

12 is all that needs to be done at this time. Finally, I remain in the process of obtaining

13 proposals for temp power, and carpet protection, as alluded to earlier.

14        23.    In addition to the foregoing, on at least four occasions, the Debtor

15 requested that access to the Project be permitted to allow potential investors to inspect

16 the property. Each time, I consented to the request, and unfettered access to the Project

17 was granted to the Debtor and its representatives during the initial interim period.

18        I declare under penalty of perjury under the laws of the United States of

19 America that the foregoing is true and correct.

20        Executed this 20th day of May, 2021, at Los Angeles, California.

21

22                                    _Bellann Raile_
                                      Bellann R. Raile

23

24

25

26

27

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

**DECLARATION OF ANDREW TROST**

I, Andrew Trost, declare and state as follows:

1.      I am over the age of eighteen and am a principal of Carine

Consulting ("Carine") which I formed in 2012 to provide project solutions and complete

project management from inception to completion.  I have spent almost 30 years in all

facets of the industry, as a subcontractor, design consultant, general contractor, and

project/construction manager.  I hold a bachelor of science degree in Chemistry/Materials

Science from UCLA 1986, and I hold a Certificate, Fire Protection, from the University of

California, Irvine.  I also am registered as a Professional Engineer, Fire Protection, in the

State of California, and have the following professional affiliations:  PMI, CMAA, SFPE,

NFPA, and AIA.  The facts stated herein are true of my own personal knowledge and I

could and would competently testify thereto as follows.

2.      I make this declaration in support of "Shady Bird Lending LLC's

Supplemental Statement Re (1) Motion of Shady Bird Lending, LLC for Order Excusing

State Court Receiver From Turnover of Assets Pursuant to 11 U.S.C. § 543, and (2)

Motion for Relief From the Automatic Stay Under 11 U.S.C. § 362 (with supporting

declarations) (Real Property); Declarations of Bellann R. Raile and Andrew Trost in

Support Thereof" (the "Supplemental Statement").

3.      Recently, Carine was retained by Bellann R. Raile (the "Receiver"),

who I understand is duly appointed, qualified, and acting state court receiver for the real

property bearing APN Nos. 276-361-20 and 276-361-22, consisting of a partially

constructed 178-room, seven story hotel building located in Buena Park, California (the

"Project") owned by the debtor The Source Hotel, LLC (the "Debtor").  Carine specifically

was retained by the Receiver to provide her a preconstruction report of the Project

addressing certain identified areas of concern.  In this regard, Carine prepared a

Preconstruction Phase 2A Progress Report (the "Phase 2A Report") dated May 20, 2021.

A true and correct copy of the Phase 2A Report is attached hereto as Exhibit "A".

**SulmeyerKupetz,** A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    4.    As evidenced by the Phase 2A Report, problems with the Project's

2   power and low voltage existed as far back as 2018.  Specifically, Enterprise Level

3   Technology Solutions ("ELTS") was brought onto the Project in August 2018 as the low

4   voltage project manager.  According to Cyril Mario from ELTS, ELTS's roles included (i)

5   reviewing current plans and drawings, (ii) overseeing the phone equipment installation by

6   Newgens, Inc. ("Newgens"), (iii) technology procurement, (iv) internet circuit procurement

7   and contracts, (v) guest HSIA vendor quotes and management, (vi) guestroom

8   entertainment vendor quotes and management, (vii) phone system vendor quotes and

9   management, and (viii) due diligence of existing plans and manage technology

10   construction.

11    5.    According to Mr. Mario, after reviewing some of the proposals which

12   were already going forward, ELTS discovered that (i) the phone equipment being sold to

13   the Project by Newgens was old phone equipment which had reached end of life at that

14   time (support was ending) for what ELTS considered to be an egregious amount, (ii) the

15   phone equipment did not have call accounting or voicemail integration, and the Wi-Fi was

16   not approved by Hilton Hotels, (iii) the cabling proposal did not have a certification phase

17   (where each cable run would need to have higher level of testing instead of just

18   continuity), and (iv) after securing quotes for the vendor contracts, ELTS was able to find

19   much newer equipment for a lower price than provided by Newgens, which

20   recommendation was rejected.  Mr. Mario advised me that shortly thereafter ELTS was

21   pulled off of the Project.  A summary of ELTS's findings are integrated in the Phase 2A

22   Report.

23    I declare under penalty of perjury under the laws of the United States of

24   America that the foregoing is true and correct.

25    Executed this 20th day of May, 2021, at Los Angeles, California.

26   Andrew Trost, P_E

27   _____
        Andrew Trost

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

# EXHIBIT A

# The Source Hotel

6988 and 6986 Beach Blvd.
Buena Park, California 90621

## Construction Completion

## Preconstruction Phase 2A Progress Report

*Prepared for:*

Shady Bird Lending, LLC
P.O. Box 11480
Beverly Hills, CA 90213

*May 20, 2021 Rev. A*

*Prepared by:*

**Carine, Inc.**
1378 East 29th Street
Signal Hill, CA 90755
www.carineconsulting.com



EXHIBIT A    0025

 Carine

## 1.0   PHASE 2A - STATUS SUMMARY

On March 30, 2021 Carine, Inc. (Carine) completed Phase 1 – Due Diligence and issued a summary report to Shady Bird Lending, LLC (SBL) that outlined preliminary costs, schedule, and risks associated with completing construction and ramping up The Source Hotel for operation.  SBL engaged Carine in early April 2021 to begin Preconstruction activities to prepare for construction start in early summer 2021.

Over the last 5 weeks, the Carine team prepared a construction request for proposal (RFP), developed trade-specific scopes of work, issued RFP packages by trade, and performed several contractor pre-bid meetings and job walks necessary to prepare for construction start. The RFP packages included the original "Issue for Bid" drawings for hotel interior build-out, AIA-form draft construction contracts with exhibits, and updated project schedules, providing bidders the detailed project requirements necessary to submit complete proposals for completion.

Packages were issued to original trade contractors that have shown an interest in being part of the completion team. For trades where original contractors did not show an interest, Carine solicited trusted, well-established trade contractors to participate in the bidding. The project now has excellent coverage for all major trades and most minor trades to successfully complete the project.

The contractor job walks identified specific conditions and level of completion specific to each trade, on every floor and area of the facility.  The team also performed more in-depth studies of areas left unprotected (identified in Phase 1) and are now subject to weather/water intrusion and other degradation. Although there are still many unknowns, this deeper dive into construction status will translate into more complete scopes of work and more accurate pricing. Contractor bids will be submitted over the next 1-2 weeks to support the Phase 2A project budget update.

<u>Furniture, Fixtures & Equipment (FF&E)</u> - A complete item-by-item inventory of the FF&E purchased by the original developer was performed over a two-week period. The inventory covered products stored in three (3) large rooms on the retail side of The Source property, and ten (10) 53-foot-long box trailers stored at Westransco facility in Corona, CA. The inventory was expanded to include two (2) additional massive storage rooms in The Source retail spaces.  The Carine team is analyzing the data and is performing a line-by-line comparison with the drawings to account for all missing products.

<u>Construction Shutdown</u> – Carine has also been supporting the Court Receiver, Cordes & Company (Cordes) with contractor walks and pricing for the construction shutdown scope of work. When construction stopped two years ago, the construction site was not properly closed. The work associated with proper closure is underway and is expected to be completed by late June. Additional details follow in the body of this report.

<u>Hotel Operator</u> – Carine initiated discussions with the original hotel operators, Aimbridge Hotels. Aimbridge confirmed that Hilton Hotels is interested in establishing a new brand agreement with SBL for The Source Hotel.  The Aimbridge team is preparing a development support proposal and will be ready to re-engage within the next few weeks.

<u>City of Buena Park</u> – Carine was informed by Cordes that City building officials and Orange County Fire Authorities recently visited the site to inspect conditions and comment on steps necessary for renewing the permits.  See Project Risks below for additional comments.

Phase 2A is expected to be completed over the next 2 ½ weeks, resulting in updated project costs and schedule and an update to this report.



Cost and Schedule – Phase 2A Update

**\*\*\* PENDING – TO FOLLOW \*\*\***

## Project Risks

Although there has been significant progress during Phase 2A, the team has been constrained by many factors. For example, based on Court Order, Carine is not allowed to meet with City of Buena Park officials or other agencies. The Attorney representing the City issued a letter recommending that SBL engage with the architect of record, DKY Architects, Inc. to lead reinstating the building permits. As of the date of this report, DKY is unwilling to communicate or engage with SBL/Carine. The City's Attorney issued an earlier letter summarizing the original permits and inspections – this helped the team understand what work has been inspected/accepted by the approving agencies.

Communication with original trade contractors has been much more open during Phase 2A. Meetings have more clearly defined project risks identified during Phase 2A, and new risks have surfaced. Carine is gathering information on contractor agreements, situations resulting in subcontracts being terminated, non-Hilton-approved materials being installed, confusing scope of work limits, and a consensus that the project was disorganized and poorly managed. Additional details follow in the body of this report.

During the original construction phase the developer made significant design changes, assuming to reduce cost. Carine does not yet have access to documentation showing details of these changes. This is a schedule and cost risk for the project because some of the procured FF&E may not fit the conditions in the field. During Phase 2B, Carine expects to manage this and similar risks by having direct interface with the designers of record.

## Updated Risk Matrix

Carine updated the project risk matrix, See attached document, which includes potential risks for permitting, construction, and hotel flag negotiations. Although, no showstoppers are anticipated, the most effective way to mitigate the largest risks is to re-open direct lines of communication with the City of Buena Park, other agencies, Hilton Hotels, and the design team of record.



## 2.0   CONSTRUCTION RFP

Trades Solicited

1.  Fire Sprinklers – Salamander Fire Protection
2.  Drywall – Nevel Group, Inc.
3.  Doors/Frames/Hardware – Contractors Door Supply
4.  Glass/Storefront Doors – Lakewood Glass and Screen
5.  Paint and Wall Coverings – PDG Wall Coverings
6.  Fire Alarm –Radix Fire Alarm
7.  Millwork –Architectural Wood Working
8.  Millwork – SMI Architectural Millwork, Inc.
9.  Electrical – Evergreen Electric
10. Tile and Stone – City Tile
11. Tile and Stone – Alpha Tile & Stone
12. HVAC/Plumbing – Iron Mechanical
13. Plumbing Pan-Pacific Mechanical
14. Signage Tile and Stone – Landmark Signs, Inc.
15. Waterproofing – Sta-Dry
16. Pool – Mission Pools
17. Fire Alarm – Costco Fire Protection
18. Kitchen Equipment – Tri-Mark

Trades Pending RFP

19. Low Voltage Consultant – Enterprise Level Technology Solutions
20. Low Voltage – On Target (Numerous trades and contractors)
21. Millwork – 3D Designs
22. Restroom Fixtures - Stumbaugh
23. Suspended Ceilings – Nevel Group, Inc.
24. Suspended Ceilings – Ceiling Concepts
25. Final Cleaning – Ritz Companies
26. Commissioning – Enpowered Solutions
27. Furniture Artwork - TBD
28. Light Fixtures/Lighting Control – TBD
29. Landscaping – TBD
30. Rooftop Mechanical Noise Report – Martin Newsom & Associates

RFP Documents

The RFP documents as noted below were issued to all the trades.

31. Attachment A, Scope of Summary – Project Summary
32. Attachment B, Scope of Work – Trade Scope for all trades
33. Attachment C, Construction Bid Form
34. Attachment D, Conceptual Project Schedule
35. Attachment E, The Source Hotel Drawing List

EXHIBIT A   0028

 Carine

36. AIA Document A132-2019, Standard Form of Agreement Between Owner and Contractor, Construction Manager as Adviser Edition
37. AIA Document A132-2019, Exhibit A, Insurance and Bonds
38. AIA Document A132-2019, Exhibit B, Determination of the Cost of the Work
39. AIA Document A232-2019, General Conditions of the Contract for Construction, Contraction Manager as Adviser Edition

EXHIBIT A    0029

**Carine**

## 3.0   CONSTRUCTION SHUTDOWN

### Overview

At the request of Cordes & Company, Carine has provided additional support to help perform on site job walks, develop scope of work, review proposals, perform onsite kick-off meetings and inspect completed scopes of work regarding the Construction Shutdown/Safe-off services.  The purpose of the following services as noted below are to ensure the building and various systems throughout the building are secured while the project is on hold from construction activities. Estimated completion date is late June 2021.

### Scope of Work and Schedule

1. Freight Elevator – Kone (Schedule to start week of 5/24/21)
2. Roof and Balcony Repairs – Best Contracting Services (Completed as of 5/18/21)
3. Fire Sprinkler – Salamander Fire Protection (No work is required per OCFA)
4. Temp. Doors (4th Floor/Roof Level) – Contractors Door Supply (Completed as 5/13/21)
5. Glazing Repairs – Lakewood Glass and Screen (Materials ordered, completion target date is 6/25/21)
6. Moisture Testing – American Integrated Resources – Completed as of 5/174/21)
7. Pool – Mission Pools (No work is required at this time)
8. HVAC/Plumbing – Iron Mechanical (Work in progress, estimated date of completion 5/28/21)
9. Temp. Power – Evergreen Electric (Scheduled to start week of 5/24/21, completion date, 5/26/21
10. Plumbing – Pan-Pacific Mechanical (No work required)
11. HVAC Equipment Relocation/Storage Services – Giger Relocation Services (No work is required)
12. Water Damaged Drywall Removal – Nevell Group, Inc. (Scheduled to start week of 5/24/21, completion date 5/28/21)
13. Pool Deck Water Proofing – Sta-Dry Waterproofing (No work is required)
14. Misc. Onsite Labor Work – Cordes & Company (Estimated to start on Week of 5/24/21, 1-day duration)

### Site Photos


**Southeast Conner – Look North**


**Westside – Looking South**


**Porte-Cochere – Looking South**

EXHIBIT A   0030





Reception Area – Looking North



Lobby Area – Looking East



Lounge Area – Looking Southeast



Restaurant Area – Looking South



Kitchen Area – Looking West



Deck/Pool Area – Looking West



Deck Area – Looking North



Chiller Plant – Looking East



Generator – Looking South

 Carine

## 4.0    DESIGNER ENGAGEMENT and RENEWING PERMITS

Upon approval by the Architect and Engineers of Record (AOR/EOR), Carine anticipates the first step to re-engage with all design parties via telephone and confirm interest to continue with project as designers of record.  Second, Carin will schedule on site meetings engage the design professionals to help Carine understand the original scope of work and confirm existing conditions, unknowns, and balance of design work to be completed.  Carine has engaged with the Interior Designer, Hersch Bedner Associated (HBA), and the team is scheduled to meet onsite 5/25/21 to further understand the design and scope of work.

When access is approved by the City Attorney, Carine will schedule meetings with the local agencies: Community Development, Building & Safety, Public Works, Orange County Fire Authority (OCFA), Orange County Health Department (OCHD) and the State Elevator Inspector to determine requirements to renew the expired permits and restart construction.

## 5.0    CONSTRUCTION PLANNING

The following is a preliminary list of construction planning items that will be included in Phase 2B-Preconstruction. The costs are included in the Phase1 budget and will be refined with hard quotes:

1.  Parking and Staging Costs – All costs associated with construction parking, staging and storage of materials, tools, and equipment necessary to support project activities throughout the duration of the project.

2.  Off-site storage – Store FF&E tools, construction equipment and construction materials throughout the duration of the project.

3.  Temporary Utilities – Cost for temporary utilities during construction: Power, telephone/internet, and water throughout the duration of the project.

4.  Sanitation – Install and maintain temporary toilets and wash stations of quantity/capacity to support manpower on site, including regular servicing throughout the duration of the project.

5.  Mobilization Plan – Prepare a plan with narratives for site management and City approval as required. Plan shall include the following at a minimum.

    a.  Planned parking and estimated parking counts, on-site and off-site and defined trucking routes.
    b.  Security fencing and gates.
    c.  Dumpsters, sanitation facilities and roll-off containers/Mobile-Mini units.
    d.  Material staging/laydown areas.
    e.  Field fabrication areas as required.
    f.  Approved SWPPP's Plan - May be minimum due to project footprint.

6.  Safety Plan and procedures – Provie safety signage, first aid kits, etc.

7.  Temporary Fencing and Gates – Erect, maintain and disassemble all temporary fencing and gates necessary to maintain a secure and safe site throughout the duration of the project.

8.  Signage – Install and maintain signage per City of Buena Park and Cal-OSHA requirements.

EXHIBIT A   0032

**Carine**

9.  Dumpsters and Waste Management – Provide and maintain dumpsters throughout construction, include hauling and disposal costs. Maintain recycling and disposal reports as required by City of Buena Park, County and State requirements.

10. Progress Cleaning – Provide labor and material for progress cleaning daily. Maintain site in an orderly and broom-clean condition at the end of each shift (Labor Ready).

11. SWPPS – Maintain.

12. Flagmen and Traffic Control - Provide flagmen, traffic control and associated equipment as required (Labor Ready).

13. COVID-19 Protocol – Implement work procedures to help minimize the spread of the Novel Coronavirus ("COVID-19") at the project site.

14.

**6.0    PROJECT BUDGET and SCHEDULE – PHASE 2A UPDATE**

<mark>*** PENDING – TO FOLLOW ***</mark>

<u>Project Schedule</u> – Carine updated the schedule to reflect....

Refer to the file titled: **'Source Hotel Draft Schedule.2021-04-30.PDF'**.

<u>Assumptions</u> – The budget and schedule were developed with the following assumptions:

A)

B)

C)

D)

E)

**7.0    PROJECT RISK ASSESSMENT – PHASE 2A UPDATE**

See attached updated the project Risk Matrix. Refer to the file titled: **'Source Hotel-Project Risk Matrix_2021-05-19.PDF'** for details.   During Phase 2B, the matrix should be reviewed with ownership to agree on the mitigation measures necessary to minimize cost and schedule impacts.

EXHIBIT A    0033





EXHIBIT A   0035




Carine Inc.

| Description | Risk Type | Risk Level | Risk Brief | Estimated Cost | Mitigation Factors | Next Action | Notes |
|---|---|---|---|---|---|---|---|
| Sediment and Rust potential in Mechanical and plumbing systems | Cost | Medium | The project has been sitting unfinished for quite some time potentially allowing sediment and corrosion to settle and hardened in the plumbing and mechanical piping. These systems need to be inspected/assessed to determine extent of flushing or replacement required. | Assessment: $5K; Flushing: $25K-$50K | Inspection/Testing & Flushing | Schedule inspection | Iron Mechanical preferred. |
| No access to plans and specifications | Cost Schedule | Low | Without the latest set of drawings, the team cannot confirm the scope for finishes, especially Ground Level and 2nd Floor. | | Preliminary budget and schedule has allowances based on team experience. Need latest set of drawings to tighten up scope, schedule and budget, move to completion contracts. | Obtain latest set of plans | The DD set was provided to Carine. This helped the Phase 1 effort, but the project plan has many unknows at this time. |
| Inspection records are limited | Cost Schedule | Low | City of Buena Park inspection logs were recently provided, however, detailed inspection reports are not yet available. No inspection records are yet available from other agencies. No contractor daily reports or QA/QC logs are available. | | Reivew agency inspection logs and interview subs; prepare summary log of history and inspections/testing required. | Meet with agencies and contractors | |
| Warranty of Product | Cost Operational | Low | Warranties for each trade/system must understood, as some equipment/product has been installed and on-site for some time without beneficial occupancy or utilization. | | Suppliers/Manufacturers will need to be contacted to discuss product warranties on product that is already installed. Identify warranty holes and discuss mitigation measures with ownership. | Schedule meetings, develop status and plan by trade. | Likely new ownership will assume inherent warranty risk if original subs/ vendors or new subs/vendors will not provide warranties for work in place. |
| Testing Protocol for Installed Product | Cost | Medium | A testing program for product already installed will need to be established to determine if any remedial work for the project is required. An example of this is a leak test of the 7th floor roof, or moisture test at windows, and leak test of the 4th floor swimming pool. | | Perform leak tests, flushing of MEP piping systems, etc. | Develop list of systems to be tested; engage subs to test prior to starting construction; include any remediation in scope. | |
| Sound Attenuation | Cost Schedule Operational | Low | Construction documents for the project are not currently available and details pertaining to sound transmission and sound attenuation are not available for comportment to Hotel Branding requirements or existing constructed conditions. | | Discuss attenuation design with AOR and identify risks if any. Meet with Hilton to discuss requirements - negotiate. | | |

EXHIBIT A    0037

Carine Inc.

| Description | Risk Type | Risk Level | Risk Brief | Estimated Cost | Mitigation Factors | Next Action | Notes |
|---|---|---|---|---|---|---|---|
| Interstitial Space Fire Sprinkler Coverage | Cost | High | The interstitial space between the 3rd and 4th floors are not sprinklered. OC Fire Authority may require this space to be covered by the fire sprinkler system since there is access to this space (Code-required, code assumes space could be used for storage in the future due to access). | $150K | Seal access. | Discuss risk with ownership; obtain sub quote | |
| Water Intrusion | Cost Schedule Operational | High | There was mold identified during construction located at floors 4,6 and 7. The mold was abated during construction and Carine did not observe any mold on visible surfaces. Carine was told by the mold abatement subcontractor that the source of water intrusion has been repaired at some windows on the 4th, 6th, and 7th floors and at balconies on the 7th floor. It is not known if this issue has been completely resolved. | | Inspect for additional mold growth; mitigate if necessary. | Schedule thorough inspection with environmental firm | |
| Stucco Forms at Balconies not Complete | Cost | Low | The top of the stucco forms at the 7th Floor balconies appears to be not finished. The tops of these forms need to be evaluated for mold and remediated if mold is present and stucco finish completed. | $25K-$50K | Complete construction | Schedule inspection | |
| Unprotected Openings | Cost | Low | The exterior doors on the 4th floor have not been installed and it is not known to what extent the finishes will need to be replaced due to moisture intrusion into these openings. | $20K-$40K | Complete construction | Schedule inspection | |
| Mechanical Equipment | Cost Schedule | High | The mechanical equipment installation was underway when the project was stopped and some equipment has been installed, and potentially left open to the weather on the roof. Some of the equipment is stored in the parking structure and the condition of this equipment is not known and must be evaluated for acceptability of condition for new installation. | | Secure air handlers; Inspect for water intrusion; Complete construction | Schedule inspection to determine there was water intrusion | |

EXHIBIT A   0038



| Description | Risk Type | Risk Level | Risk Brief | Estimated Cost | Mitigation Factors | Next Action | Notes |
|---|---|---|---|---|---|---|---|
| Design Standards | Cost Schedule Operational | High | Construction is 70% complete based on Hilton Hotel design standards. Hilton-specified FF&E is purchased and partially installed. If Hilton or another operator requires design changes this could have a significant impact on project cost and schedule | Unknown | Schedule meetings with Hilton immediately with the goal of negotiating acceptance of current design; If Hilton does not continue partnership, solicit new brands/operators | Schedule meeting. | |
| Hotel Core & Shell Fire Alarm Final | Cost Schedule Operational | Medium | It is not known if the hotel Core and shell fire alarm has been finaled by OCFA. If the fire Alarm has not received final inspection then Building Final inspection for the core and shell may not have occured either. | Unknown | Contact OCFA and the Building Department to determine if the inspections on the Hotel Core & Shell is complete.are complete | Schedule meeting. | Date discovered 5/13/2021, Reported by Cosco |
| Fire Pump Protection for the Hotel | Cost Schedule Operational | Medium | It is not clear what areas the fire pump serves. Does the Fire Pump serve the hotel | Unknown | Track down the fire pump drawings and verify what the fire pump currently serves. | Schedule meeting. | |
| Low- Voltage Wiring | Cost Schedule Operational | High | The Low-voltage consultant that was on the project, and knows Hilton standards, Enterprise Level Technology Solutions, indicated that the wiring was not certified, and may not be able to be certified and may need to be removed and replaced. They feel that the contractors work is in question. | Unknown | Review the wiring, determine the maunfacturer, follow up with low-voltage consultant. | Schedule meeting. | Date discovered 5/13/2021, Reported by Cyril Mario, ELTS |
| Hotel Has (2) physical addresses | Cost Schedule Operational | Medium | The OCFA requires a control panel for each address. It is not known if the OCFA will require (2) separate panels. | Unknown | Talk with OCFA and the building department to confirm requirements. | Schedule meeting. | Date discovered 5/13/2021, Reported by Cosco |
| Make-up Air Units & Fan Removal from Roof | Cost Schedule Operational | High | It is not clear why the fully installed (5) MUA and (1)Fan units were removed from the Roof during construction. | Unknown | Talk with Iron Mechanical, and the Building Department to determine what the deficiency was that required the de-installation of the units and removal from the Roof. | Schedule meeting. | Date discovered 5/10/2021, Reported by Cosco |

EXHIBIT A   0039

**The Source Hotel, Bunea Park, CA**

**Constuction Shutdown and Safe-off**

| | Disciplines | Sub-Contractor | Contact Name | Email | Phone | Cost | Status |
|---|---|---|---|---|---|---|---|
| 1 | Freight Elevator | Kone | Troy Grooters | troy.grooters@kone.com | 562-577-7736 | | 5/04/21 - Pending proposal per field meeting |
| 2 | Roofs and Balcony Repairs | Best Contracting | Mike Jimenez | mjimenez@bestcontracting.com | 310-738-1022 | $ 31,650.00 | 5/05/21 - Proposal received |
| 3 | Fire Sprinkler | Salamander Fire Protection | Fred Krayndler | salamader@dslextream.com | 818-269-6932 | $ - | 5/04/21 - No work required per OCFA. |
| 4 | Temp. Doors | Contractors Door Supply | Kyle Phillips | kyle@contractors-doorsupply.c | 949-300-6236 | $ 4,700.00 | 5/06/21 - Proposal received |
| 5 | Glazing Repairs | Lakewood Glass | Mike Souse | msouza@lakewoodglass.com | 562-254-2710 | $ 25,823.00 | 4/30/21 - Proposal received |
| 6 | Moisture Testing | American Integrated Resou | Tony Soto | asoto@american-intratged.c | 714-588-4554 | $ 15,882.00 | 4/30/21 - Proposal received |
| 7 | Pool | Mission Pools | Christopher Carne | chris@missionpools.com | 949-588-0100 | $ - | 4/28/21 - No further action required at this time |
| 8 | **Mechanical/Plumbing** | Iron Mechanical | John Emerson | jemerson@ironmechanical.com | 916-708-4863 | **$ 16,800.00** | **5/14/21 - Proposal revised** |
| 9 | Electrical | Evergreen Electric Const. I | Cathy Pak | evergreenef11@gmail.com | 213-272-7882 | $ 6,300.00 | 5/11/21 - Proposal reveived |
| 10 | Plumbing | Pan Pacific Mechanical | Steve Valot | stevev@ppmechanical.com | 949-285-9736 | $ - | 5/04/21 - No further action required at this time |
| 11 | HVAC Equip. Move & Store | Geiger Relocation Solutions | Ryan Porter | ryan@grsrelo.com | 949-933-8695 | $ - | 5/11/21 - Fee: $8,460.00 On hold for now |
| 12 | FF&E Off Site Storage | TBD | TBD | | | $ - | 5/10/21 Fee pending, on hold for now |
| 13 | Labor (Pool Deck Clean-up) | TBD | TBD | | | | 5/05/21 - Waiting for proposal |
| 14 | Drywall Openings, City's Reques | NGI | Eric Crawford | Eric@nevellgroup.com | 714-356-4555 | $ 10,757.00 | 4/29/21 Proposal received |
| 15 | Waterproofing - Pool Deck | Sta-Dry Waterproofing & Construction Services, Inc. | Keith Cunningham | keith@sta-drywaqterproofing.c | 760-885-9927 | $ - | 5/05/21 No further action required at this time |
| | | | | | Sub Total | $ 111,912.00 | |

| | |
|---|---|
| | Proposal action completed |
| | Proposal action pending |
| | Contact information required |

# The SOURCE Hotel - Buena Park

## Shutdown Milestone Schedule

| ID | Task Name | Duration | Start | Finish | Resource Names | Approval Date | Notes |
|----|-----------|----------|-------|--------|----------------|---------------|-------|
| 1 | **Shutdown Process** | **52 days** | **Thu 4/15/21** | **Fri 6/25/21** | | NA | |
| 2 | Identify Scope & Contractors | 18 days | Thu 4/15/21 | Mon 5/10/21 | | NA | |
| 3 | Moisture Testing | 5 days | Mon 5/10/21 | Fri 5/14/21 | AIR | Fri 5/21/21 | |
| 4 | Roofing / Balcony | 5 days | Mon 5/10/21 | Fri 5/14/21 | BEST Constr | Thu 5/6/21 | |
| 5 | HVAC/Plumbing | 8 days | Mon 5/17/21 | Wed 5/26/21 | Iron Mech | Mon 5/10/21 | |
| 6 | FF&E Inventory - Part 3 | 3 days | Mon 5/10/21 | Wed 5/12/21 | BBI | Thu 5/6/21 | Approval to be confirmed |
| 7 | Window Repairs | 40 days | Mon 5/3/21 | Fri 6/25/21 | Lakewood Glass | Mon 5/3/21 | supply constraint |
| 8 | Temporary Doors | 3 days | Wed 5/12/21 | Fri 5/14/21 | CDS | Thu 5/6/21 | |
| 9 | Mechanical Equip Relocation & Storage | 3 days | TBD | | GDS | Thu 5/6/21 | |
| 10 | Pool Deck Cleaning | 1 day | Mon 5/17/21 | Mon 5/17/21 | Labor Ready | NA | |
| 11 | Electrical | 5 days | TBD | | Evergreen Elecrical | NA | |
| 12 | Freight Elevator | 5 days | TBD | | Kone | NA | |
| 13 | Drywall Removal | 3 days | TBD | | NGI | NA | |
| 14 | FF&E Relocation & Storage | 10 days | TBD | | BBI | NA | |

EXHIBIT A    0041

# The SOURCE Hotel - Buena Park

### Shutdown Milestone Schedule

| Predecessors |
| --- |
| |

EXHIBIT A    0042

 **Carine Inc.**

**REQUEST FOR PROPOSAL**
*to provide*
**Trade Contractor Construction Services**
*under a*
**Stipulated Sum Contract**

| | |
|---|---|
| **Project Name:** | The Source Hotel |
| **Project Address:** | 6986 and 6988 Beach Blvd., Buena Park, CA 90621 |
| **Project Type:** | New 4-Star Hotel Build Out |
| **Owner:** | Pending |
| **Architect:** | DKY Architects |
| **Project Manager:** | Carine, Inc. |

## TRADES

This RFP refers to the following trades:

Based on your firm's qualifications, specifically your experience with similar hospitality construction projects and/or prior involvement with this project, you are invited to submit a Stipulated Sum Proposal to perform Construction Services as outlined in this Request for Proposal (RFP). Please thoroughly review the Project requirements and other Project documents referenced herein.

## RFP SCHEDULE

| | |
|---|---|
| RFP Issue Date: | See Projectmates |
| Intent to Propose: | See Projectmates |
| Job Walk: | Contractors will be contacted to schedule job walk |
| RFI Deadline: | Wednesday, May 5, 2021, 3:00 PM |
| Proposals Due: | Friday, May 14, 2021, 3:00 PM written proposal, completed bid form and supporting documents received via Projectmates |
| Estimated Award Date: | June 2021, specific awards will vary by trade |

## RFP CONTACT
Please address proposals and questions concerning this RFP to the Owner's Project Manager (PM) via Projectmates:

Project Director:   Albert Barcelo, abarcelo@carineinc.com

EXHIBIT A   0043



## PROJECT OVERVIEW

The Source Hotel is a planned 178-key hotel located in Buena Park, California. It is part of an operational mixed-use development that includes retail, commercial offices, and a parking structure. Construction on the Hotel stopped in mid-2020. The hotel build out is approximately 70% completed.

Carine, Inc. (Carine) represents a principal lender on the project who is pursuing acquisition of the asset. Proposals are being solicited from trade contractors to complete construction and ready the hotel for opening.

The new hotel includes six (6) operating floors (Ground, 2nd, 4th through 7th) with the following features:

1. 1st Floor – 23,403 GSF: Porte Cochere/Valet, Lobby, Guest Reception, Lounge, Executive Lounge and Technology Center, Restaurant and Bar with full commercial kitchen, Restrooms, and staff office areas.
2. 2nd Floor – 18,084 GSF: Conference Center with five (5) Meeting Rooms, Pre-Function Area, Training Room, Prep Kitchen, Restrooms, and staff offices and support rooms.
3. Guest Floors 4-7 – 98,136 GSF: 178 guest rooms and suites supported by interior corridors and support areas. There is a fitness room on the 4th floor, and public restrooms, guest shower, and pool equipment room supporting the pool deck.
4. Pool Deck – 12,154 SF: Includes guest swimming pool and poolside bar, with direct access to the pool deck from (18) guestrooms facing the deck.

## PERMIT STATUS

The original building and trade permits held with the City of Buena Park, Orange County Health Department, and Orange County Fire Authority have expired.  The project team will re-engage with agency officials to confirm steps required to reinstate or renew all permits. The specific process to reinstate each permit is not known at this time, however, trades requiring a permit must include in the proposal price an allowance for a new permit.

## PROJECT COMPLETION PHASING

The overall project completion schedule is approximately twelve (12) months, including Phase 2A through Phase 5. Phases will overlap with the following estimated timeframes/durations:

- **Phase 1 – Discovery:** Completed.
- **Phase 2A – Planning:** On-Going. Expected completion 5/16/2021
- **Phase 2B – Permitting & Preconstruction:** 20 weeks, 5/19 to 8/18/2021
- **Phase 3 - Construction:** 28 weeks, 8/23/2021 to 2/25/2022
- **Phase 4 – FF&E Installation & System Commissioning:** 10 weeks, 12/6/2021 to 2/11/2022
- **Phase 5 – Turnover/Hotel Opening:** 8 weeks, 1/31 to 3/31/2022

EXHIBIT A    0044


## Carine Inc.

**SCOPE OF WORK**

1. **General**

   a. Refer to ATTACHMENT E – Project Drawings
   b. Refer to the following attachments for Scope of Work narratives:
      i. **ATTACHMENT A – Project Completion Scope of Work** for project scope overview
      ii. **ATTACHMENT B – Trade-Specific Scope of Work** for work applicable to your trade
   c. <u>Pre-Bid Meeting</u> – Attend Mandatory pre-bid meeting at the project site and become familiar with current site conditions necessary to execute the construction of the Project.

2. **Construction Activities**

   Contractor services during construction shall include but is not limited to the following:

   a. Comply with construction documents and applicable agency requirements.
   b. <u>Designated Foreman</u> – Contractor shall assign one (1) foreman as its lead craftsman to oversee trade field work, attend weekly foreman's meeting, attend tailgate safety meetings, coordinate deliveries, provide daily updates to Site Construction Manager (CM), and represent the Contractor for all inspections.
   c. <u>Scheduling</u> - Provide weekly schedule updates to Site CM for input into 3-week look-ahead schedule, showing all major activities by trade, crew size and any critical items.
   d. <u>Quality Control</u> - Contractor shall maintain quality control for trade-specific and trade interfaces throughout construction to ensure quality installations. Prior to the start of the job, a preparatory meeting will be held to discuss the subcontractor's Illness and Injury Prevention Plan, quality control plan, mobilization, scope of work, testing requirements, schedule.
   e. <u>Inspections</u> - Contractor is expected to coordinate and schedule all trade inspections and approvals by all relevant Building, Fire, Health department and any other government and utilities officials necessary for the approval of its work.
   f. <u>Drawing Redlines</u> – Foreman shall update the master redline set on a weekly basis to reflect any deviations from construction drawings. Master redline set will be maintained on site by the Site Construction Manager.
   g. <u>Rigging/Lifts</u> – Prepare and submit for Site CM approval a lift/move plan for all equipment and material requiring rigging. Include flagmen, dollies, rollers, and protection of work-in-place. Comply with applicable Cal-OSHA Safety Orders. One general lift/move plan is acceptable for daily truck off-loading and material staging. All equipment operators must be certified for operation – Provide certification paperwork upon request.
   h. <u>Special Inspections</u> – Coordinate directly with Owner's Deputy Inspector to schedule and complete special inspections per the contract documents. Provide copies of inspection reports to Site CM.
   i. <u>FF&E Scope of Work</u> – Coordinate Contractor trade work as necessary for interface with FF&E installations.

EXHIBIT A   0045


**Carine Inc.**

3. **Project Management**

   a. <u>Project Manager</u> – Contractor shall assign a Project Manager as the single point of contact responsible for contracts, scheduling, invoicing, change orders, permitting, and other tasks necessary manage the project.

   b. <u>Payment Applications</u> – Submit a detailed invoice/payment application to Owner's PM each month as stated in the Contract for work completed through the end of the previous month. Invoicing is to be consistent with AIA document G702s, with backup consistent with AIA Document G703S. Attach signed conditional progress lien releases for the current application period and signed unconditional progress lien releases for funds received on prior applications.

   c. <u>Final Retention Payment</u> only upon completion of construction, Owner/ PM/ Architect's satisfactory inspection, and "Unconditional Waiver and Release Upon Final Payment" provided by Contractor.

4. **Completion and Close-Out**

   a. Pre-Punch Walks – Perform pre-punch walks with Site CM as appropriate as work in each area is substantially complete.

   b. Final Punch Walk and Punch List – Attend final punch walk with Site CM, Owner's PM and Owner representatives. Complete punch list items in a timely manner and obtain Site CM approval.

   c. Provide Owner training for all MEP systems and Contractor provided and/or installed equipment.

   d. Contractor shall provide complete project close-out documentation in hard copy and digital form, including but not limited to:
      i. Owner training documentation
      ii. As-built redlines
      iii. Operation and maintenance manuals
      iv. Quality control records
      v. Contractor warranties
      vi. Attic stock of materials
      vii. Unconditional lien releases for Contractor and vendors

EXHIBIT A   0046

**Carine Inc.**

## PROPOSAL REQUIREMENTS

Contractor proposals must include the following information at a minimum:

1.  **Scope of Work**
    a.  Except as otherwise expressly provided herein, the Contractor shall furnish and supply, without limitation, all labor, supervision, tools, equipment, installed and consumable materials, taxes, services, testing devices, warehousing, all permits to construct, and each and every item of expense necessary for the supply, fabrication, field erection, field engineering, application, handling, hauling, unloading, receiving, installation, construction, assembly, testing, evaluation and quality assurance required for the completion of the construction of the Project.
    b.  Provide a detailed scope of work listed by project area: Ground Floor, 2nd Floor, 4th Floor, 5th Floor, 6th Floor, 7th Floor, Pool Deck, Central Plant, other areas if applicable.
    c.  Include coordination with all interfacing trades necessary for complete installations per construction documents.
2.  **Safety**
    a.  Furnish a current copy of Contractor's Injury, Illness, and Prevention Plan
    b.  Provide Contractor's current EMR and OSHA 300 forms for last three (3) years.
    c.  Prepare a project-specific Safety Plan with the company Safety Competent Person Identified for review and approval by Owner's PM. Safety Plan shall be updated/adjusted as necessary to accommodate changing site conditions.
3.  **Manpower**
    a.  Specify minimum, maximum, and average crew size expected to complete the project.
    b.  Quantity of parking stalls required. Assume parking will be provided in The Source on-site parking structure for passenger vehicles, and one (1) utility vehicle.
4.  **Qualifications and Exclusions**
    a.  Any qualifications or exclusions must be specified on the proposal.
    b.  Specify material and equipment assumed to be provided by Owner if applicable.
    c.  Note any discrepancies between project drawings and scope of work included in your proposal.
5.  **Stipulated Sum**
    a.  Provide stipulated sum costs, broken down per Projectmates entry.
    b.  Stipulated Sum price shall include all direct costs, overhead, and profit associated with completing the project scope of work.
    c.  Allowances – Specify assumed scope of work and dollar amount for each allowance included in Stipulated Sum.
    d.  Work Hours – Bids are to be based on a 5 day/week (M-F), 8 hour/day work schedule, normal hours in compliance with City of Buena Park construction ordinance.  In addition, bid shall include off-hours labor for utility cutovers, service connections and similar work as required.
6.  **Payment & Performance Bond** – A payment and performance bond shall be required for all contracts over $100,000. Bond rate and bond cost shall be specified on the Bid Form.
7.  **Unit Costs and Alternates**
    a.  Provide hourly rates for field labor and management.

EXHIBIT A   0047



     b.  Proposal should include alternates deemed appropriate by Contractor, including scope of work and stipulated sum cost.

8. **Schedule** – Specify durations for your work by project area. Provide a written statement affirming your firm's commitment to meeting the **Project Schedule (ATTACHMENT F)**.

9. **Contract Form of Agreement** - Include in proposal a statement accepting contract terms and conditions stated in AIA Contract form **ATTACHMENT D**.  Owner will not consider any modifications to the terms of the contract documents unless such requested changes are stated in the proposal and do not alter the intent.  In any case, all changes are subject to Owner approval.

10. **Subcontracts -** All subcontractors and suppliers shall be contracted under the same terms as stated in the agreement between Owner and the Contractor.

## ADDITIONAL REQUIREMENTS

The following additional terms shall apply:

1. **Licenses.**
   a.  Contractor must have a valid and current State of California B-General Contractor or C-Specialty Contractor license listed in good standing on: https://www.cslb.ca.gov/
   b.  City of Buena Park Business License
   c.  All required licenses must be maintained current and in good standing throughout the project duration.
   d.  Contractor, subcontractors, and vendors are responsible for furnishing their own flagman, traffic control, and lift riggers (if required), as required to complete the Scope of Work.

2. **Insurance.**
   a.  Contractor will procure and maintain at its own expense and throughout the course of construction insurance, of the types and with at least the minimum limits stated in the Contract (**ATTACHMENT D**), in full force and effect during the term thereof with insurer(s) and policy terms satisfactory to Owner.
   b.  All policies shall not exclude commercial construction.
   c.  Each policy shall name Owner, its affiliates, directors, officers, employees or agents as an additional insured for any claims, accidents, or injuries, which may occur relating to the work to be performed under this contract and shall provide not less than thirty (30) days prior written notice to Owner of any change or cancellation of coverage.  Contractor shall provide Owner with certificate of insurance evidencing such insurance prior to the start of work.
   d.  Companies with which insurance is placed shall have received an A.M. Best's rating of A-VII or better.
   e.  Certificates of Insurance must be delivered to Owner and Owner's PM prior to commencement of job.

3. **Indemnification.**  Contractor shall indemnify and hold Owner, its affiliates, directors, officers, agents, and employees harmless from all claims, actions, damages, liabilities, and expenses, as stated in the Contract.

EXHIBIT A   0048



1. NOTE: Contractor Contract will include a contract rider with the following language relative to Unavoidable Delays and the Novel Coronavirus ("COVID-19"):

   **UNAVOIDABLE DELAYS:** Any delays or failure by Contractor in performance hereunder shall be excused if and to the extent caused by occurrences beyond Contractor's reasonable control including, but not limited to, acts, omissions, decrees, or restraints of Federal, State, or Local government, acts of God, strikes or other labor disturbances, war and inability to obtain necessary equipment, facilities or supplies, or infections or outbreaks of the Novel Coronavirus ("COVID-19") at the Project site. Notwithstanding the foregoing, no emergency order issued by the Orange County, nor any other city, county, state or federal emergency orders, laws, regulations, or other emergency legal authority in effect as of the Effective Date that address the ongoing COVID-19 pandemic, nor the mere existence of the COVID-19 pandemic, without more, shall constitute an unavoidable delay as defined in this Rider. If either Party discovers that one of its agents, employees, directors, officers, or contractors has been infected with COVID-19, that party shall immediately notify the other Party. In such an event, the Parties shall take all reasonable and necessary precautions to prevent the further spread of the virus amongst the Parties and their agents, employees, directors, officers and contractors.  If Contractor claims unavoidable delays, Contractor shall give prompt written notice to Owner, specifying particulars thereof.  Upon receiving such notice, Contractor and Owner agree to promptly meet and confer regarding the nature and existence of the claimed unavoidable delay, and to negotiate a new schedule for completion of project in writing, if appropriate.

EXHIBIT A   0049



## RFP ATTACHMENTS

The following attachments are hereby incorporated into the RFP as bid documents.  RFP attachments or updated versions thereof will be incorporated as attachments to the Contractor construction contract:

**ATTACHMENT A** – Project Completion Scope of Work, dated 4/29/2021,10 pages.

**ATTACHMENT B** – Trade-Specific Scope of Work. (typ. 4 pages)

**ATTACHMENT C** – Bid Form, Excel Spreadsheet

**ATTACHMENT D** – Form of Contract

**ATTACHMENT E** – Project Drawings, by DKY Architects, Inc.

**ATTACHMENT F** – Project Schedule, dated 4/29/2021, 3 pages.

**Carine Inc.**

# ATTACHMENT A

## Scope of Work Summary
### 4/14/2021

| | |
|---|---|
| **Client/Facility Name:** | Shady Bird Lending-The Source Hotel |
| **Project Name:** | The Source Hotel |
| **Facility Address:** | 6988 Beach Boulevard, Buena Park, CA. 90621 |
| **Project Manager:** | Carine, Inc. |

---

### Project Overview

The Source Hotel is a planned 178-key hotel located in Buena Park, California. It is part of an operational mixed-use development that includes retail, commercial offices, and a parking structure. Construction on the Hotel stopped in mid-2020, however, the project is being restarted by Shady Bird Lending, LLC (SBL).  Preconstruction began in April 2021 with Carine, Inc. (Carine) serving as the Owner's Project Manager. The City of Buena Park, Orange County Health Department original building permits will be renewed or reinstated, and the project will begin construction by early Summer 2021 under and CM-Multi-Prime delivery method. The estimated project schedule is twelve (12) months from construction start to hotel opening.

The hotel project includes the following areas:

1.  1ˢᵗ Floor – 15,549 GSF: Porte Cochere/Valet, Lobby, Guest Reception, Lounge, Executive Lounge and Technology Center, Restaurant and Bar with full commercial kitchen, Restrooms, and staff office areas.

2.  2ⁿᵈ Floor – 11,000 GSF (estimated): Conference Center with five (5) Meeting Rooms, Pre-Function Area, Training Room, Prep Kitchen, Restrooms, and staff offices and support rooms.

3.  Floors 4-7 – 90,774 GSF: 178 guest rooms and suites supported by interior corridors and support areas. There is a fitness room on the 4ᵗʰ floor.

4.  Pool Deck – 12,000 SF (approx.): Includes guest swimming pool, poolside bar, restrooms, guest shower, and a pool equipment room.

5.  Hotel Building Infrastructure

    a.  **Elevators and Stair Wells** – There are two (2) guest elevators and one (1) service elevator serving Floors 1, 2 and 4-7. There are three fire rated stair wells serving the hotel building. There is no access to the 3ʳᵈ Floor retail area from the hotel building.

    b.  **Central Plant** – The hotel mechanical central plant is located on the north roof above the retail building (Hotel 4ᵗʰ Floor level). The plant includes air-cooled chillers, cooling towers, heating hot water boilers, domestic hot water system, and associated pumps and piping. The central plant is accessed from the 4ᵗʰ Floor Pool Deck.

EXHIBIT A   0051

**Carine Inc.**

## ATTACHMENT A

c. **Domestic Water Supply** - Water is supplied by a 6-inch service on the east side of the property and appears to serve the hotel and retail buildings. The domestic pump room is on the 1st Floor located off of the Porte Cochere, and contains a domestic booster pump, and a soft water system with three (3) large tanks dedicated to the hotel.

d. **Fire Protection** – The <u>Fire Pump Room</u> is located on the ground floor and contains a vertical, turbine fire pump with an approximately 45,000-gallon fire water storage tank below the room. The fire pump and tank serve fire sprinklers and standpipes for the hotel **and** the parking structure. Fire water is supplied by a 6-inch fire service that services the retail building and make-up water for the fire water tank.

   <u>Fire Alarm System</u> – The main fire alarm panel with fire department voice command system is in the Main Fire Control Room, accessed from Brenner Avenue on the east side of the property.  The fire alarm panel serves the hotel and other portions of the mixed-use facility. The system does not include a dedicated panel for the Hotel.  OCFA may require a dedicated panel for the Hotel.

e. **Emergency Generator** – The emergency generator is located in a dedicated room accessed from Orangethorpe Avenue on the south side of the property. The generator serves the hotel and may serve other portions of the facility.

### Scope of Work Outline

1) <u>Envelope/Porte Cochere/Pool & Pool Deck</u>
   a) **Building Envelope** - The hotel building envelope is substantially complete.  The TPO roof membrane on the 7-story tower requires some repairs (warranty work) and flashing/sealing at all MEP penetrations must be completed.  The TPO membrane at the 4th Floor Central Plant requires some repairs/touch-up when central plant MEP work is completed. Portions of the EIFS system and flashing are incomplete at the 7th Floor guest room balconies (North side).
      i)   Thermal & Moisture Protection-071000 Waterproofing, 075000 Roofing,
      ii)  Openings-081300 Metal Doors, 084100 Entrances and Storefront, 085100 Metal Windows, 089000 Louvers and vents,
      iii) Finishes-092600 EFIS,

   b) **Porte Cochere –** The building envelope appears to be complete with the exception of the ceiling of the Porte Cochere. The automatic doors have been installed, but it is not clear if the power has been connected or if the door installation is complete. The fire sprinkler system was installed surface mounted to the bottom of the Second Floor above the Porte Cochere. The fire sprinkler system needs to be re-configured so that a ceiling can be installed at the Porte Cochere with an adjusted lay-out. The Porte Cochere includes a Valet Room which is not complete. The door to the Valet Room is installed but hardware has not been completely installed. Minor repair work to the interior finishes of the valet Room will be required. The electrical, and fire alarm rough installation appears to be complete, but MEP and fire alarm finishes have not been installed. A landscape planter is located within this area and is

EXHIBIT A   0052

Carine Inc.   **ATTACHMENT A**

incomplete. The landscaping has not been installed and it is not known if irrigation and drainage rough installation have been provided to this planter.

   i)   Thermal & Moisture Protection - 071000 Waterproofing

   ii)  Openings - 081300 Metal Doors, 084100 Entrances and Storefront, 085100 Metal Windows, 089000

   iii) Finishes - 092600 EFIS, 095400 Specialty Ceilings, 096100 Flooring Treatment

   iv) Fire Suppression - 211300 Fire sprinklers, 284700 Mass Notification,

   v)  Electrical - 260500 Electrical Finish

   vi) Life Safety - 284600 Fire Alarm

c) **Pool & Pool Deck** – The pool construction is incomplete. The pneumatically applied concrete has been installed and the utilities to the pool has been roughed in. The pool coping and waterline tile has been installed. The pool equipment has not been installed. The pool deck has been waterproofed, and the pool deck drain lines have been installed. The waterproofing material has been exposed to UV rays, and weather and may need to be overlayed with an additional membrane. The slope of the deck to the drains may need to be improved as currently maintains minimum slopes. The pool deck finish currently designed with for a topping slab will receive pedestal pavers. The exterior shower construction is incomplete and is drywalled and plumbing roughed in only. This shower is lacking all the finish material installation. The Pool Bar is incomplete. Currently, only the steel structure for the Pool Bar is installed. The sliding glass doors from the guestrooms to the pool deck need to be cleaned and adjusted for improved operation.

   i)   Thermal & Moisture Protection-071000 Waterproofing

   ii)  Openings - 081300 Metal Doors, 083200 Sliding Glass Doors

   iii) Finishes-096200 Specialty Flooring Pedestal Pavers

   iv) Food Service Equipment – 114000 Food Service Equipment-Pool Bar

   v)  Special Construction-033700 Pneumatically placed concrete, 131100 Swimming Pools, 130800 commissioning of Swimming Pools

   vi) Plumbing-221000 Plumbing Piping, 224200 Commercial Water Fixtures, 225000 Pool Plumbing Systems

   vii) Electrical-260500 Common Work Results for Electrical, 265600 Exterior Lighting,

   viii) Communications-281000 Access Control

   ix) Life Safety-284600 Fire Detection and Alarm, 284700 Mass Notification,

2) Building Infrastructure

a) **HVAC** – The 4th Floor Central Plant provides water to the guestroom water source heat pumps and heating hot water and chilled water to tower roof top air handler units. All piping distribution (horizontal mains and risers appear to be installed and tested. Air handlers serving the hotel public spaces are not installed on the tower roof (stored in the parking structure) Toilet exhaust fans are staged on the tower roof but not installed.

The HVAC controls system (Building Management System) head-end equipment is installed at the 4th Floor Central Plant. The status of the completion of the controls installation is

**Carine Inc.**

## ATTACHMENT A

undetermined. The rough-in in the guestrooms appear to be complete. The equipment in the 4th Floor central plant is not anchored to the equipment racks and will need to be anchored per the equipment manufacturer. The central plant systems will need to be evaluated for completeness, and suitability for startup. HVAC finishes will need to be installed throughout the project. Equipment startup, test and balancing of the HVAC system, controls programming, and commissioning will need to be performed.

  i)   HVAC- 230500 Common work results for HVAC, 230700 HVAC insulation, 230800 commissioning of HVAC , 230900 Instrumentation and Control for HVAC, 233813 Diffusers, Registers, and Grilles

b)  **Plumbing** – Domestic water, waste and vent systems appear to be complete and tied into the City water supply and wastewater connections. The water is supplied by a 6-inch service on the East side of the property and appears to serve the hotel and retail buildings. Domestic pump and soft water system appear to be complete and ready for service. Domestic hot water boilers are installed and connected but have not been seismically anchored or tested. The grease interceptor installation is unknown. The plumbing rough installation is complete, and the plumbing finish installation appears to be complete on the 4th and 5th Floors.

  i)   Plumbing- 224000 Plumbing Fixtures, 224200 Commercial Plumbing Fixtures, 224700 Drinking Fountains, 225100 Swimming Pool Plumbing Systems

c)  **Fire Sprinkler System** – The fire sprinkler and standpipe risers were installed, connect to the fire pump and appear to be in service with valves open and water pressure showing on gauges. Fire sprinkler systems on each floor have been hydrostatically tested, inspected, and are tied into risers. There is an interstitial space between the 3rd and 4th Floors with access from the 4th Floor via access panels that currently is not covered by sprinklers. Orange County Fire Authority (OCFA) may require that this area be covered.

  i)   Fire Sprinkler System- 210500 Common Work Results for Fire Suppression, 211200 Fire-Suppression Standpipes, 211300 Fire-Suppression Sprinkler System, 211600 Fire-Suppression Pressure Maintenance Pumps

d)  **Fire Alarm** – The main fire alarm panel with fire department voice command system is in the Main Fire Control Room for the mixed-use development. There currently is not a separate dedicated panel for the hotel.

  i)   Fire Detection and Alarm – 284600 Fire Detection and Alarm, 284700 Mass Notification

e)  **Low Voltage Systems** – Horizontal cabling on the guestroom floors (4-7) and Ground Floor public areas has been installed and connectivity test completed. Horizontal cabling must be installed at the back offices, reception desk, pool deck, and the Second Floor. All vertical cabling must be installed, all systems performance-tested, and system equipment installed. The work covers the eight (8) systems: Network/WiFi, Point-of-Sale (POS), Cable TV, Security/CCTV, Access Control, Audio/Video, Telephone system (iPBX), Public Safety Radio (ERRCS), and the house music.

**Carine Inc.**

# ATTACHMENT A

    i) Low-Voltage Systems – 270500 Common Work Results for Communications, 271000 Structured Cabling, 272000 Data Communications Network Equipment, 273000 Voice Communications, 274000 Audio-Video Communication, 275000Distributed Communications and Monitoring Systems

f) **Elevators –** There are two (2) guest elevators and one (1) service elevator serving Floors 1,2, and 4 thru 7. There is no access to the 3rd Floor retail area from the hotel building. All three elevators appear to be substantially complete. Call lanterns and buttons are missing on all floors, and the service elevator has the protective plywood sheathing installed which will remain throughout the construction duration.

3) <u>First Floor Areas</u>

a) **Lobby –** Wall framing and MEP rough-in appear to be complete. Drywall is installed in some areas and is approximately 20% complete. Doors and door frames are not installed. Painting and wallcovering is 0% complete, Flooring is 0% complete. Sprinkler system lines are installed but the finish needs to be installed.
    i) Architectural Woodwork - 064100 Interior Architectural Woodwork
    ii) Openings - 081000 Doors and Frames, 083100 Access Doors and Frames
    iii) HVAC Finishes – 233813 Diffusers, Registers, and Grilles
    iv) Finishes-092116 Gypsum Board Assemblies, 095400 Specialty Ceilings, 096800 Carpeting, 096300 Stone Flooring, 099000 Painting, 101400 Signage, 102600 Wall and Door Protection
    v) Restroom Accessories - 102100 Toilet Partitions, 102800 Restroom Accessories
    vi) Artwork - 121200 Wall Decorations
    vii) Window Treatments – 122100 Window Blinds, 122200 Curtains and Drapes
    viii) FF& E – 124800 Rugs & Mats, 125400 Hospitality Furniture
    ix) Fire Suppression – 211300 Fire Sprinkler System, 212000 Fire Extinguishing System
    x) Plumbing – 224200 Commercial Plumbing Fixtures, 224700 Drinking Fountains
    xi) HVAC Distribution – 233200 HVAC Ducts and Casings
    xii) Communication - 270500 Common Work Results for Communications
    xiii) Access Control – 281000 Access control
    xiv) Life Safety –284600 Fire Detection and Alarm, 284700 Mass Notification

b) **Kitchen/Restaurant & Bar/lounge & Pantry –** The Kitchen and Bar are framed with some drywall installed.  The Kitchen has been roughed in for MEP and the main kitchen hood is installed. The Ansul system was not observed to be installed in the hood. The ceilings have not been installed. The food service equipment has not been installed.
    i) Architectural Woodwork - 064100 Interior Architectural Woodwork,
    ii) Openings - 081000 Doors and Frames, 083100 Access Doors and Frames
    iii) HVAC Finishes – 233813 Diffusers, Registers, and Grilles

**Carine Inc.**

## ATTACHMENT A

  iv) Finishes-092116 Gypsum Board Assemblies, 095400 Specialty Ceilings, 096800 Carpeting, 096300 Stone Flooring, 099000 Painting, 101400 Signage, 102600 Wall and Door Protection

  v) Restroom Accessories - 102100 Toilet Partitions, 102800 Restroom Accessories

  vi) Food Service Equipment – 114000 Food Service Equipment

  vii) Artwork - 121200 Wall Decorations

  viii) Window Treatments – 122100 Window Blinds, 122200 Curtains and Drapes

  ix) FF& E – 124800 Rugs & Mats, 125400 Hospitality Furniture

  x) Fire Suppression – 211300 Fire Sprinkler System

  xi) Plumbing – 224200 Commercial Plumbing Fixtures

  xii) HVAC Distribution – 233200 HVAC Ducts and Casings,

  xiii) Communication - 270500 Common Work Results for Communications

  xiv) Access Control – 281000 Access control

  xv) Life Safety –284600 Fire Detection and Alarm, 284700 Mass Notification

c) **Back-of-House** – Wall framing and MEP rough-in appear to be complete. Drywall is installed in some areas and is approximately 20% complete. Doors and door frames are not installed. Painting and wallcovering is 0% complete, Flooring is 0% complete. Sprinkler system lines are installed but the finish needs to be installed.

  i) Architectural Woodwork - 064100 Interior Architectural Woodwork,

  ii) Openings - 081000 Doors and Frames, 083100 Access Doors and Frames

  iii) HVAC Finishes – 233813 Diffusers, Registers, and Grilles

  iv) Finishes-092116 Gypsum Board Assemblies, 096800 Carpeting, 099000 Painting, 101400 Signage, 102600 Wall and Door Protection

  v) Storage Specialties –105100 Metal Lockers

  vi) Artwork - 121200 Wall Decorations

  vii) Window Treatments – 122100 Window Blinds, 122200 Curtains and Drapes

  viii) FF& E – 125400 Hospitality Furniture

  ix) Fire Suppression – 211300 Fire Sprinkler System

  x) Plumbing – 224200 Commercial Plumbing Fixtures

  xi) HVAC Distribution – 233200 HVAC Ducts and Casings,

  xii) Communication - 270500 Common Work Results for Communications

  xiii) Access Control – 281000 Access control

  xiv) Life Safety –284600 Fire Detection and Alarm, 284700 Mass Notification

d) **Executive Suites** - Wall framing and MEP rough-in appear to be complete. Drywall is installed in some areas and is approximately 20% complete. Doors and door frames are not installed. Painting and wallcovering are 0% complete, Flooring is 0% complete. Sprinkler system lines are installed but the finish needs to be installed.

  i) Architectural Woodwork - 064100 Interior Architectural Woodwork,

  ii) Openings - 081000 Doors and Frames, 083100 Access Doors and Frames

  iii) HVAC Finishes – 233813 Diffusers, Registers, and Grilles

EXHIBIT A  0056

**Carine Inc.**

## ATTACHMENT A

    iv) Finishes-092116 Gypsum Board Assemblies, 096800 Carpeting, 099000 Painting, 101400 Signage, 102600 Wall and Door Protection

    v) Artwork - 121200 Wall Decorations

    vi) Window Treatments – 122100 Window Blinds, 122200 Curtains and Drapes

    vii) FF& E – 125400 Hospitality Furniture

    viii) Fire Suppression – 211300 Fire Sprinkler System

    ix) Plumbing – 224200 Commercial Plumbing Fixtures

    x) HVAC Distribution – 233200 HVAC Ducts and Casings,

    xi) Communication - 270500 Common Work Results for Communications

    xii) Access Control – 281000 Access control

    xiii) Life Safety –284600 Fire Detection and Alarm, 284700 Mass Notification

4) <u>Second Floor Areas</u>

    a) **Conference Center** - Wall framing and MEP rough-in appear to be mostly complete. Drywall is installed on the walls and are 90% complete. The ceiling framing appears to be complete; however, no ceiling drywall is installed. Suspended ceilings at back-of-house areas are not installed. Fire sprinkler appears to be installed, but no confirmation of the system being charged. Doors and door frames are not installed. Painting and wallcovering are 0% complete, Flooring is 0% complete.

        i) Architectural Woodwork - 064100 Interior Architectural Woodwork,

        ii) Openings - 081000 Doors and Frames, 083100 Access Doors and Frames

        iii) HVAC Finishes – 233813 Diffusers, Registers, and Grilles

        iv) Finishes-092116 Gypsum Board Assemblies, 096800 Carpeting, 099000 Painting, 101400 Signage, 102600 Wall and Door Protection

        v) Artwork - 121200 Wall Decorations

        vi) Window Treatments – 122100 Window Blinds, 122200 Curtains and Drapes

        vii) FF& E – 125400 Hospitality Furniture

        viii) Fire Suppression – 211300 Fire Sprinkler System

        ix) Plumbing – 224200 Commercial Plumbing Fixtures

        x) HVAC Distribution – 233200 HVAC Ducts and Casings,

        xi) Communication - 270500 Common Work Results for Communications

        xii) Access Control – 281000 Access control

        xiii) Life Safety –284600 Fire Detection and Alarm, 284700 Mass Notification,

5) <u>Hotel Floors 4-7</u>

    a) <u>4th Floor</u> -The construction of the guestroom on the Fourth Floor appears to be substantially complete. The guestroom finishes, bathroom showers, vanities and plumbing finishes have been installed. The operability of the plumbing fixtures cannot be determined at this time. The guestroom fire sprinkler, fire alarm, and electrical finishes installation appears to be 0% complete. The guestroom entry doors are installed but the locks are not installed. Corridor drywall and wallcovering installations appear to be complete; but may need to be repaired in

**Carine Inc.**

## ATTACHMENT A

some areas. Guestroom carpet is over 90% complete; but corridor carpet installation is 0% complete. Corridor electrical, fire sprinkler, and fire alarm finishes are 0% complete.

i)    Architectural Woodwork - 064100 Interior Architectural Woodwork,
ii)   Openings - 081000 Doors and Frames, 083100 Access Doors and Frames
iii)  HVAC Finishes – 233813 Diffusers, Registers, and Grilles
iv)   Finishes-096800 Carpeting, 097200 Wall covering, 099000 Painting, 101400 Signage, 102600 Wall and Door Protection
v)    Artwork - 121200 Wall Decorations
vi)   Window Treatments – 122100 Window Blinds, 122200 Curtains and Drapes
vii)  FF& E – 125400 Hospitality Furniture
viii) Fire Suppression – 211300 Fire Sprinkler System
ix)   Plumbing – 224100 Residential Plumbing Fixtures
x)    HVAC Distribution – 233200 HVAC Ducts and Casings,
xi)   Communication - 270500 Common Work Results for Communications
xii)  Access Control – 281000 Access control
xiii) Life Safety –284600 Fire Detection and Alarm, 284700 Mass Notification

b)  **5th Floor** -The guestroom drywall installation appears to be complete, and the finish of the drywall is approximately 85% complete. The vanities/millwork installation, plumbing finish, and shower glass installation are approximately 85% complete (not installed at the Southwest corner, lift station in-fill). The flooring installation – Bathroom floor tile installation is approximately 90% complete. The guestroom doors are installed but locks have not been installed. The guestroom fire sprinkler, fire alarm, and electrical finishes need to be installed. Corridor drywall wallboard finishes appear to be 90% complete; corridor drywall ceiling installation is approximately 90% complete. Corridor carpet installation is 0% complete. Corridor electrical, fire sprinkler fire alarm finishes are 0% complete.

i)    Architectural Woodwork - 064100 Interior Architectural Woodwork,
ii)   Openings - 081000 Doors and Frames, 083100 Access Doors and Frames
iii)  HVAC Finishes – 233813 Diffusers, Registers, and Grilles
iv)   Finishes-096800 Carpeting, 097200 Wall covering, 099000 Painting, 101400 Signage, 102600 Wall and Door Protection
v)    Artwork - 121200 Wall Decorations
vi)   Window Treatments – 122100 Window Blinds, 122200 Curtains and Drapes
vii)  FF& E – 125400 Hospitality Furniture
viii) Fire Suppression – 211300 Fire Sprinkler System
ix)   Plumbing – 224100 Residential Plumbing Fixtures
x)    HVAC Distribution – 233200 HVAC Ducts and Casings,
xi)   Communication - 270500 Common Work Results for Communications
xii)  Access Control – 281000 Access control
xiii) Life Safety –284600 Fire Detection and Alarm, 284700 Mass Notification

**Carine Inc.**

## ATTACHMENT A

c) <u>6th Floor</u> -The guestroom drywall installation appears to be complete, and the finish of the drywall is approximately 90% complete. The vanities/millwork installation is approximately 90% complete and the plumbing is 50% complete (not yet installed at showers) and guestroom carpet is approximately 75% complete. Guestroom interior doors installation appears to be approximately 75% complete. The guestroom entry doors are installed but the locks are not installed. The guestroom fire sprinkler, fire alarm, and electrical finishes need to be installed. Corridor drywall wallboard finishes appear to be 90% complete and drywall finish is approximately 25% complete; corridor drywall ceiling installation is approximately 50% complete and drywall finish is 0% complete. Corridor carpet installation is 0% complete. Corridor electrical, fire sprinkler fire alarm finishes are 0% complete.

   i) Architectural Woodwork - 064100 Interior Architectural Woodwork,
   ii) Openings - 081000 Doors and Frames, 083100 Access Doors and Frames
   iii) HVAC Finishes – 233813 Diffusers, Registers, and Grilles
   iv) Finishes-096800 Carpeting, 097200 Wall covering, 099000 Painting, 101400 Signage, 102600 Wall and Door Protection
   v) Artwork - 121200 Wall Decorations
   vi) Window Treatments – 122100 Window Blinds, 122200 Curtains and Drapes
   vii) FF& E – 125400 Hospitality Furniture
   viii) Fire Suppression – 211300 Fire Sprinkler System
   ix) Plumbing – 224100 Residential Plumbing Fixtures
   x) HVAC Distribution – 233200 HVAC Ducts and Casings,
   xi) Communication - 270500 Common Work Results for Communications
   xii) Access Control – 281000 Access control
   xiii) Life Safety –284600 Fire Detection and Alarm, 284700 Mass Notification

d) <u>7th Floor</u> -The guestroom drywall installation appears to be approximately 60% complete, and the finish of the drywall is 0% complete. The vanities/millwork installation is 0% complete and the plumbing finishes installation is 0% complete and glass installation is 0% complete. Wallcovering installation is 0% complete. HVAC rough-in appears to be complete. Electrical and plumbing rough-in work is approximately 90% complete.  The flooring installation-guestroom tile is approximately 90% complete, carpet is 0% complete. Guestroom interior doors and entry doors are 0% complete. Corridor drywall installation is approximately 50% complete. Corridor carpet installation is 0% complete. Corridor electrical, fire sprinkler fire alarm finishes are 0% complete.

   i) Architectural Woodwork - 064100 Interior Architectural Woodwork,
   ii) Openings - 081000 Doors and Frames, 083100 Access Doors and Frames
   iii) HVAC Finishes – 233813 Diffusers, Registers, and Grilles
   iv) Finishes-096800 Carpeting, 097200 Wall covering, 099000 Painting, 101400 Signage, 102600 Wall and Door Protection
   v) Artwork - 121200 Wall Decorations
   vi) Window Treatments – 122100 Window Blinds, 122200 Curtains and Drapes
   vii) FF& E – 125400 Hospitality Furniture

 **Carine Inc.**

# ATTACHMENT A

viii) Fire Suppression – 211300 Fire Sprinkler System

ix)    Plumbing – 224100 Residential Plumbing Fixtures

x)    HVAC Distribution – 233200 HVAC Ducts and Casings,

xi)    Communication - 270500 Common Work Results for Communications

xii)    Access Control – 281000 Access control

xiii) Life Safety –284600 Fire Detection and Alarm, 284700 Mass Notification

* * * END OF SCOPE OF WORK SUMMARY * * *

## Andy Trost

| | |
|---|---|
| **From:** | Cyril Mario <cmario@eltscorp.com> |
| **Sent:** | Tuesday, May 18, 2021 1:48 PM |
| **To:** | James Roberts |
| **Cc:** | Andy Trost |
| **Subject:** | RE: The Source Site Meeting - Low Voltage |

ELTS was brought onto the Source Hotel Project in August of 2018.  Our many roles included the following:

-Review current plans and drawings
-Oversee Newgens Inc
-Technology Procurement
-Internet Circuit Procurement and contracts
-Guest HSIA Vendor quotes and management
-Guestroom Entertainment Vendor quotes and management
-Phone system Vendor quotes and management
-Due diligence of existing plans and manage Technology construction

After reviewing some of the proposals which were already going forward we discovered that:

-The phone equipment being sold to the hotel by Newgens was old phone equipment which had reached end of life at that time (support was ending) for what we considered was an egregious amount.  We verified this through a 3rd party phone company.  Also didn't have Call Accounting, Voicemail Integration.  Wifi HSIA not approved by Hilton.  Guestroom entertainment is not an approved Hilton provider.

-The cabling proposal didn't have a certification phase (where each cable run would need to have higher level of testing instead of just continuity)

-After securing quotes for the vendor contracts, we were able to find much newer equipment for a lower price than provided by Newgens.

We raised a red flag to ownership regarding this findings and met with pushback from Newgens.  We were at a meeting where we explained to them that this phone equipment being sold to the hotel by Newgens was EOS and that we needed to keep the best interest of the property itself and the ownership group in consideration.  After having an argument in the meeting with Ted, we were informed by Ted that he is also an owner of this hotel and to just let them handle this.  We stated that this was unethical from our viewpoint.  We were quickly pulled off of the project.

Cyril Mario
**Please note new mailing address below
Enterprise Level Technology Solutions
16478 Beach Blvd. #288
Westminster, CA 92683
949.612.1415 x3001

strategic . dynamic . efficient

**From:** Cyril Mario
**Sent:** Monday, May 17, 2021 12:49 PM
**To:** James Roberts <jroberts@carineinc.com>

EXHIBIT A   0061

**Cc:** Andy Trost <atrost@carineinc.com>
**Subject:** RE: The Source Site Meeting - Low Voltage

Hello James,

We are finishing up the quick write up on what happened when we were involved with the project.

You should have it by EOD

Cyril Mario
**Please note new mailing address below
Enterprise Level Technology Solutions
16478 Beach Blvd. #288
Westminster, CA 92683
949.612.1415 x3001

strategic . dynamic . efficient

**From:** James Roberts <jroberts@carineinc.com>
**Sent:** Friday, May 14, 2021 10:52 AM
**To:** Cyril Mario <cmario@eltscorp.com>
**Cc:** Andy Trost <atrost@carineinc.com>
**Subject:** RE: The Source Site Meeting - Low Voltage


Hi Cy:

It was really great to meet you and Marcello. I just wanted to follow up with you on the email report you were going to send us.

Also, you mentioned, that you could send us a list of contractors that are qualified to do the work. Please send and we will reach out to them. Thanks again for all your assistance.

I also left you a voice mail message.

Regards

James Roberts
951 365 8204

Sent from my Galaxy



-------- Original message --------
**From:** Cyril Mario <cmario@eltscorp.com>
**Date:** 5/13/21 9:00 AM (GMT-08:00)
**To:** Albert Barcelo <abarcelo@carineinc.com>, James Roberts <jroberts@carineinc.com>, Gloria Torres <Grossi@cordesco.com>
**Cc:** Andy Trost <atrost@carineinc.com>, Bellann Raile <bellann@cordesco.com>
**Subject:** RE: The Source Site Meeting - Low Voltage

FYI we are at the entrance area to the construction office.

2

EXHIBIT A   0062

Cyril Mario
**Please note new mailing address below
Enterprise Level Technology Solutions
16478 Beach Blvd. #288
Westminster, CA 92683
949.612.1415 x3001

strategic . dynamic . efficient


-------- Original message --------
From: Albert Barcelo <abarcelo@carineinc.com>
Date: 5/11/21 1:46 PM (GMT-08:00)
To: James Roberts <jroberts@carineinc.com>, Cyril Mario <cmario@eltscorp.com>, Gloria Torres
<Grossi@cordesco.com>
Cc: Andy Trost <atrost@carineinc.com>, Bellann Raile <bellann@cordesco.com>
Subject: The Source Site Meeting - Low Voltage

On site meeting, please forward to your colleagues as required.  Thank you!

3

EXHIBIT A   0063

# EXHIBIT B



Office of the City Attorney

May 14, 2021

***VIA OVERNIGHT DELIVERY
AND EMAIL***

Mr. Donald Chae
Mr. Min Chae
The Source at Beach, LLC
3100 E. Imperial Highway
Lynwood, California 90262

*Copy to:*

The Source Hotel, LLC
Summer Bridges
Agent for Service of Process
6988 Beach Blvd., B-215
Buena Park, CA 90621

Raymond B. Kim
Meylan Davitt Jain Arevian & Kim LLP
444 S. Flower Street, Suite 1850
Los Angeles, CA 90071
rkim@mdjalaw.com

Ron Bender, Esq.
Juliet Y. Oh, Esq.
Levene, Neale, Bender, Yoo & Brill LLP
10250 Constellation Blvd., Suite 1700
Los Angeles, CA 90067
rb@lynbyb.com
jyo@lnbyb.com

Daniel A. Lev, Esq.
SulmeyerKupetz
333 South Grand Avenue, Suite 3400
Los Angeles, CA 90071
dlev@sulmeyerlaw.com

Ronald Richards, Esq.
Law Offices of Ronald Richards
& Associates APC
P.O. Box 11480
Beverly Hills, CA 90213
ron@ronaldrichards.com

**RE:    NOTICE OF INTENT TO WITHHOLD FINANCIAL ASSISTANCE PAYMENTS
TO THE SOURCE AT BEACH LLC; RESERVATION OF RIGHTS**

Property:       6986 Beach Boulevard, Buena Park, California.
Project:         The Source at Beach; The Source Hotel Project
Agreement:    Disposition and Developer Agreement

Dear Messrs. Donald and Min Chae:

This office serves as City Attorney for the City of Buena Park ("City"), and by this correspondence provides notice of the City's intent to take action to protect its interests in the above-identified Property and Project, and to demand that the concerns raised in this letter be expeditiously remediated to the City's reasonable satisfaction.

EXHIBIT B   0064

Mr. Donald Chae
Mr. Min Chae
May 14, 2021
Page | 2

As you know the Source Hotel Project (or simply "Hotel Project") is part of the larger mixed-use project known as "The Source" (jointly the "Project") that is located at 6986 Beach Boulevard, Buena Park, California (the "Property"). The Project and the Property are both governed by a series of agreements with the City or the former Community Redevelopment Agency of the City of Buena Park ("Former RDA"), the most notable of which is that certain Disposition and Development Agreement ("DDA") dated October 26, 2010, by and between the Former RDA and The Source at Beach, LLC ("Developer").[1]

As relevant here, the DDA required Developer to proceed with construction and operation of the Project, which was required to include a high-quality (Mobil 3-5 Star or AAA 2-5 Diamond-voted) full-service Hotel Project. To support and incentivize completion of the Project, the Former RDA agreed to provide two (2) forms of financial assistance to Developer that are memorialized in the DDA: (1) a portion of the increased property tax revenues resulting from reassessment of the Property following completion of the Project (also known as "tax increment" revenues); and (2) a portion of sales tax revenues generated by The Source (jointly "Financial Assistance"). The DDA directs the property tax payments to be remitted to Developer annually for the next decade; with the sales tax assistance lasting even longer.

However over recent weeks, the City (which now also serves as "successor agency" to the Former RDA)[2] has learned of events that justify early termination of this Financial Assistance; and in fact the DDA altogether. Specifically:

- Secured lender for the Hotel Project, Shady Bird Lending LLC ("Lender"), filed an action in state court (*Shady Bird Lending, LLC v. The Source Hotel, LLC*; Orange County Superior Court Case No. 30-2021-01183489-CU-OR-CJC) against Developer's assignee and lessor of the Hotel Project, The Source Hotel LLC ("Hotel LLC"). This state court action seeking appointment of a receiver and waste in relation to the Hotel Project, and on February 17, 2021, the court ordered the appointment of a receiver (the "Receiver") whom remains in place as of the date of this letter.

- On February 26, 2021, the Hotel LLC filed a Chapter 11 Voluntary Bankruptcy Petition (the "Bankruptcy Petition") (United States District Court – Central District of California; Case No. 8:21-bk-10525-ES) to avoid the Lender's scheduled foreclosure on the Hotel Project, and as of the date of this letter this action remains pending.

Please be advised that appointment of the Receiver, the filing and pendency of the Bankruptcy Petition, and any foreclosure by the Lender are all "Defaults" under the DDA giving rise to the City's right to terminate both the Financial Payments and the DDA. Key sections of the DDA include the following:

---

[1] The DDA is recorded on the Property via a Memorandum thereof dated September 4, 2012 (Instrument No. 2012000530409 in the Official Records of Orange County).

[2] All redevelopment agencies in California were dissolved by the Legislature in February 2012, and the City as "successor agency" to the Former RDA now manages its rights and affairs. (See Health & Safety Code section 34170 *et seq.*)

Mr. Donald Chae
Mr. Min Chae
May 14, 2021
Page | 3

- Section 7.1.6 defines "Defaults" of the DDA as including: "Filing of a petition in bankruptcy by or against any Party or appointment of a receiver or trustee of any property of any Party, or an assignment by any Party for the benefit of creditors, or adjudication that such Party is insolvent by a court, and in the case of a filing against a Partner, the failure of such Party to cause the applicable petition, appointment, or assignment to be removed or discharged within one hundred and twenty (120) days."

- Section 4.5 states: "The Agency's [now the Successor Agency's] obligation to make payments of the [Financial Assistance] to Developer shall terminate upon…a Default by Developer under Section 7.1…"

- Section 7.2 states in relevant part that "the Agency and the City shall…have the right to terminate this Agreement in the event of Default by Developer."

In light of the Receiver and Bankruptcy Petition, and given the unknown future of the Project and Property or Developer's continued involvement therewith, and the clear language of the DDA quoted above, *the City hereby provides notice that it intends to withhold all future Financial Assistance payments that otherwise might be paid Developer under the DDA unless and until: (a) Developer cures these defaults and proceeds with construction of the Hotel Project to the City's reasonable satisfaction, in which case the withheld and future Financial Assistance payments might be released on terms acceptable to the City; or (b) the City declares formal default of the DDA and terminates the Financial Assistance, in which case neither the withheld nor future payments will be remitted to Developer.* The Financial Assistance payments will be held in an interest-bearing escrow account established and managed by the City pending a decision on if / how such funds will be remitted.

The City understands that Developer and Hotel LLC are working to identify financing to complete the Hotel Project (which has remained partially constructed for the past two (2) years), and ultimately hopes to restructure existing debt, complete construction, and proceed with operating the Hotel Project as required by the DDA. But unless and until the City is assured that the Hotel Project will be completed and operated as required, either by a Developer or a third-party approved in the City's discretion, the public interest demands that the City withhold the Financial Assistance payments.

Additionally, the City expressly reserves its rights to declare default and terminate the DDA or any other agreements relating to the Property or Project, and to otherwise seek to enforce its rights thereunder. Given the City's investment and recorded interests in the Project and Property, the City will continue to actively monitor the pending legal proceedings, and recommends that Developer and other interested parties keep the City apprised of their activities and intentions moving forward should they desire the DDA and Financial Assistance to remain in place.

Mr. Donald Chae
Mr. Min Chae
May 14, 2021
Page | 4

Please contact the undersigned should you have any questions or desire to discuss the contents
of this letter.

Respectfully,

Christopher G. Cardinale, Partner
ALVAREZ-GLASMAN & COLVIN

13181 Crossroads Pkwy. North, Suite 400
City of Industry, CA 91746
tel 562.699.5500 | fax 562.692.2244
email   ccardinale@agclawfirm.com

cc:     Buena Park City Council
        Aaron France, City Manager

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 333 South Grand Avenue, Suite 3400, Los Angeles, CA 90071.

A true and correct copy of the foregoing document entitled (*specify*): **SHADY BIRD LENDING LLC'S SUPPLEMENTAL STATEMENT RE (1) MOTION OF SHADY BIRD LENDING, LLC FOR ORDER EXCUSING STATE COURT RECEIVER FROM TURNOVER OF ASSETS PURSUANT TO 11 U.S.C. § 543, AND (2) MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362 (WITH SUPPORTING DECLARATIONS) (REAL PROPERTY); DECLARATIONS OF BELLANN R. RAILE AND ANDREW TROST IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) May 20, 2021, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

**See Attached**

☒ Service information continued on attached page.

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*)  May 20, 2021, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

The Honorable Erithe A. Smith
U.S. Bankruptcy Court
Ronald Reagan Federal Building
411 W. Fourth Street, Suite 5040
Santa Ana, CA 92701

☐ Service information continued on attached page.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) May 20, 2021, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**VIA Email**
**Request for Special Notice**
Attorney for City of Buena Park
Christopher G. Cardinale, Esq.
ccardinale@agclawfirm.com

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| May 20, 2021 | Cheryl Caldwell | /s/Cheryl Caldwell |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

CC 2710485v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                      **F 9013-3.1.PROOF.SERVICE**

<u>ADDITIONAL SERVICE INFORMATION</u> (if needed):

**1. <u>SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")</u>**

Ron Bender on behalf of Debtor The Source Hotel, LLC
rb@lnbyb.com

Christopher G. Cardinale on behalf of Creditor City Of Buena Park
ccardinale@agclawfirm.com

Michael G Fletcher on behalf of Creditor Evertrust bank
mfletcher@frandzel.com, sking@frandzel.com

Amir Gamliel on behalf of Interested Party Courtesy NEF
amir-gamliel-9554@ecf.pacerpro.com, cmallahi@perkinscoie.com;DocketLA@perkinscoie.com

Robert P Goe on behalf of Creditor Westranco, Inc.
kmurphy@goeforlaw.com, rgoe@goeforlaw.com;goeforecf@gmail.com

Nancy S Goldenberg on behalf of U.S. Trustee United States Trustee (SA)
nancy.goldenberg@usdoj.gov

Peter F Jazayeri on behalf of Interested Party Cordes & Company, by and through Bellann Raile
peter@jaz-law.com

Peter F Jazayeri on behalf of Other Professional Cordes & Company, by and through Bellann Raile
peter@jaz-law.com

Daniel A Lev on behalf of Creditor Shady Bird Lending, LLC
dlev@sulmeyerlaw.com, ccaldwell@sulmeyerlaw.com;dlev@ecf.inforuptcy.com

Daniel A Lev on behalf of Interested Party Courtesy NEF
dlev@sulmeyerlaw.com, ccaldwell@sulmeyerlaw.com;dlev@ecf.inforuptcy.com

Grant A Nigolian on behalf of Interested Party Courtesy NEF
grant@gnpclaw.com, process@gnpclaw.com;grant.nigolian@gmail.com

Juliet Y Oh on behalf of Debtor The Source Hotel, LLC
jyo@lnbrb.com, jyo@lnbrb.com

Ho-El Park on behalf of Interested Party Courtesy NEF
hpark@hparklaw.com

Ronald N Richards on behalf of Creditor Shady Bird Lending, LLC
ron@ronaldrichards.com, morani@ronaldrichards.com

Ronald N Richards on behalf of Interested Party Courtesy NEF
ron@ronaldrichards.com, morani@ronaldrichards.com

United States Trustee (SA)
ustpregion16.sa.ecf@usdoj.gov

CC 2710485v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                 **F 9013-3.1.PROOF.SERVICE**