RON BENDER (SBN 143364)
JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email:  RB@LNBYB.COM; JYO@LNBYB.COM

Attorneys for Chapter 11 Debtor and
Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>THE SOURCE HOTEL, LLC, a California limited liability company,<br><br>      Debtor and Debtor in  Possession. | Case No.: 8:21-bk-10525-ES<br><br>Chapter 11<br><br>**APPLICATION OF DEBTOR AND DEBTOR IN POSSESSION TO EMPLOY NAI CAPITAL COMMERCIAL, INC. AS REAL ESTATE BROKER PURSUANT TO 11 U.S.C. §§ 327 AND 328; DECLARATION OF CHRIS JACKSON IN SUPPORT THEREOF**<br><br>[No Hearing Required – Local Bankruptcy Rule 2014-1(b)] |

The Source Hotel, LLC, a California limited liability company and the Chapter 11 debtor and debtor-in-possession herein (the "Debtor"), hereby submits this application (the "Application") for Court approval of its employment of NAI Capital Commercial, Inc. (the "NAI Capital") as its real estate broker upon the terms and conditions described below.  In support of this Application, the Debtor respectfully represents as follows:

**A.    Background.**

1.    The Debtor commenced its bankruptcy case by filing a Voluntary Petition for relief under chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on February 26, 2021 (the "Petition Date").   Since the Petition Date, the Debtor has managed its financial affairs and bankruptcy estate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.    The Debtor is a limited liability company that was organized in November, 2012 in the State of California.  DMC Investment Holdings, LLC ("DMC") is a member of the Debtor which holds 100 units (or 100%) of Series 1 membership units in the Debtor.  Donald Chae and Min S. Chae, who are brothers, are the members and principals of DMC.  In addition to the Series 1 membership units held by DMC, an EB-5 investor entity called Beach Orangethorpe Hotel III, LLC ("BOH3") holds 29 units (or 100%) of Series 2 preferred membership units in the Debtor.

3.    Since at least 2014, the Debtor has been developing a full-service, seven-story hotel with 178 rooms in the City of Buena Park, County of Orange, State of California (the "Hotel"), which upon completion will include conference rooms, an executive lounge, fitness center, restaurant, bars, and cleaning services.   The Hotel is part of a larger 12.8-acre mixed-use development project (the "Master Development"), which includes a 400,000 square-foot retail center and a 50,000 square-foot seven-story office building which were completed in 2016.  The Debtor does not own the real property on which the Hotel is being constructed (which is located at the southeast corner of the Master Development), but is a lessee pursuant to a 99-year ground lease for such real property (the "Ground Lease") with the Debtor's affiliate, The Source at Beach, LLC.

4.     Construction of the Hotel began in 2016.  To finance the construction of the Hotel, on May 24, 2016, the Debtor obtained a $29.5 million construction loan (the "Loan") from Evertrust Bank ("Evertrust") as well as financing by three tranches of EB-5 investments totaling $35.5 million, including the EB-5 investment by BOH3 in the sum of $14,500,000, for which BOH3 acquired preferred membership units in the Debtor.  The Debtor's obligations under the Loan are secured by liens against substantially all of the Debtor's assets, including the Hotel and the Debtor's leasehold interest in the real property that is the subject of the Ground Lease (the "Leasehold Interest"), pursuant to the parties' Commercial Security Agreement and the Construction Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing (Leasehold) recorded in the County of Orange on June 3, 2016 as Document No. 2016000252446 (the "Deed of Trust").  The original maturity date for the Loan was December 1, 2017, but was extended to November 1, 2019 pursuant to written extension agreements entered into by the parties.

5.     Through October 2019, approximately 85% of the Hotel construction had been completed, including: substantial completion of the core and shell, exterior painting, porte cochère, street lighting, ceiling framing, kitchen framing and glass block installation, food storages, all glass storefronts, electrical wiring and switchgear, guestroom flooring, ceiling fixtures, pool bar canopy structure, deck drains, window washing system, roof membrane, roof ductwork and HVAC vibration installation; nearly complete installation of bathroom fixtures (95%), acoustic ceiling system (80%), HVAC electrical connections (90%), piping for HVAC and plumbing equipment (95%), and rooftop ductwork (99%).  In addition, substantial materials have been procured and/or fabricated and are ready for installation pending completion of other items, such as first and second floor flooring, corridor carpeting, millwork (wall and ceiling panels, pool bar), passenger elevators, fire sprinklers, egress and accent lighting, pool equipment, guest room doors, locks and closures, bathroom fixtures, and rooftop HVAC equipment.

6.     The approximately 15% of the Hotel construction which remains outstanding consists of mostly "finish work" such as the installation of flooring and carpeting, lighting,

appliances, trade fixtures, furniture, furnishings and equipment already purchased by the Debtor (collectively, "FF&E").

7.      In late 2019, Evertrust refused to issue the remaining $4 million of the Loan, claiming a cost overrun on the construction of the Hotel.  As a result of Evertrust's refusal to provide the final $4 million of the Loan, the Debtor was forced to cease construction activities. However, the Debtor believes strongly that, had Evertrust funded the final $4 million as expected, construction of the Hotel would have been completed, as the Debtor believes that its contractors would have carried fifty percent of the cost overrun and the Debtor and its affiliates would have covered the remaining fifty percent of the overrun.

8.      When Evertrust refused to issue the remaining $4 million of the Loan, the Debtor immediately and actively sought to refinance the Loan.  The Debtor began discussions with a new lender named Hall Structured Finance ("Hall") in the fall of 2019 and was ultimately able to reach an agreement with Hall for refinancing in the total sum of $42 million.  During the course of the Debtor's refinancing discussions with Hall, the Debtor kept Evertrust apprised of all developments, and even provided Evertrust with a copy of the loan commitment letter from Hall in early 2020. The Debtor and Hall were on the verge of closing on the refinancing, with a target closing date of March 20, 2020, when local, county, and State officials issued lockdown orders as a result of the COVID-19 pandemic.  At that point, Hall put an indefinite hold on the closing of the refinancing with the Debtor.

9.      As a result, the Debtor went back to Evertrust and, between March 2020 and December 2020, engaged in active forbearance negotiations with Evertrust to obtain a further extension of the Loan maturity date so that the Hotel could recover from the effects of the COVID-19 pandemic, and the Debtor could obtain refinancing or additional construction financing and ultimately recommence construction of the Hotel.

10.      In the summer of 2020, while the Debtor and Evertrust were still engaged in forbearance negotiations, Evertrust commenced litigation against the guarantors of the Loan, Donald Chae and Min Chae, and recorded a Notice of Default against the Hotel.

11.      Subsequently, in December 2020, Shady Bird purchased Evertrust's interests in the Loan at a significant discount, for a reported purchase price of approximately $19 million.  The Debtor's discussions and negotiations with Shady Bird to attempt to reach a consensual resolution of the parties' disputes were ultimately unsuccessful.

12.      On February 8, 2021, Shady Bird filed a complaint against the Debtor in the Orange County Superior Court ("Superior Court") for (i) specific performance and appointment of a receiver, and (ii) waste, thereby commencing the case bearing the number 30-2021-01183489-CU-OR-CJC (the "State Court Action").  Shady Bird also took steps to immediately foreclose on the Hotel and issued a Notice of a Trustee's Sale for the Hotel to be held on March 1, 2021.

13.      Shortly after filing its complaint to initiate the State Court Action, Shady Bird filed an ex parte application for an order appointing a receiver and other related relief.  On February 17, 2021, the Superior Court entered an order appointing Bellann R. Raile as Receiver to, among other things, take possession of the Hotel and all goods, furniture, fixtures, and equipment attached and/or related to the Hotel.

14.      As a result of the foregoing, the Debtor sought chapter 11 bankruptcy protection on the Petition Date (*i.e.*, February 26, 2021) in order to prevent the impending foreclosure of the Hotel, to regain possession of the Hotel and related assets and obtain refinancing or investments to enable the Debtor to complete construction of the Hotel, and to obtain a reasonable opportunity to restructure its financial affairs and repay its debts in an orderly fashion.

15.      Shady Bird contends that the outstanding balance of the Loan was $30,948,839.27 as of March 1, 2021.  As noted above, the Debtor's obligations under the Loan are secured by liens against substantially all of the Debtor's assets, including the Hotel, the Leasehold Interest, and the FF&E.

16.      The Debtor also received two tranches of EB-5 loans from Beach Orangethorpe Hotel, LLC and Beach Orangethorpe Hotel II, LLC (together, the "EB-5 Lenders," or individually, an "EB-5 Lender").  The Debtor's obligations under the loans from the EB-5 Lenders, in the total principal sum of $21,500,000, are secured by junior liens against the Hotel and the Leasehold

Interest.  There are a number of subcontractors that have recorded mechanics' liens against the Debtor and/or Hotel in the amount of approximately $2,900,000.  However, some of these recorded mechanics' liens appear to have expired or have not been properly perfected, or are otherwise disputed by the Debtor.

**B.    Decision to Employ a Real Estate Broker and Summary of Key Employment Terms.**

17.    The Debtor has made the decision that the best interests of its estate are served by its employment of a highly qualified real estate broker to assist the Debtor either to sell the Hotel for the most money possible or to find an investment partner to team up with the Debtor either in connection with a sale process or a reorganization process.

18.    The Debtor interviewed and consulted with a number of qualified real estate brokers and decided that NAI Capital is the ideal broker for the Debtor.  NAI Capital has approximately 223 brokers working in 12 offices throughout Southern California, and NAI Capital has an extremely strong presence in Southern California yet is part of a worldwide network that provides NAI Capital with access to prospective buyers and investors worldwide.  The Debtor seeks to employ NAI Capital as its real estate broker in accordance with the listing agreement (the "Listing Agreement") attached as **Exhibit 1** to the annexed Declaration of Chris Jackson (the "Jackson Declaration").

19.    The Debtor seeks to employ NAI Capital as its real estate broker to render, among others, the following types of professional services:

a.    Identifying potential buyers and investors using NAI Capital's worldwide network;

b.    Assisting the Debtor to expeditiously formulate and implement a strategy for soliciting interest from potential buyers and investors, including by developing and implementing procedures and a timetable for marketing the Hotel for sale or investment;

c.    Introducing the Debtor to potential buyers and investors and coordinating due diligence investigations;

d.    Assisting the Debtor to evaluate proposals from interested parties, formulating negotiation strategies, and assisting in negotiations and closing of a sale or

investment; and

    e.    Participating in hearings before the Bankruptcy Court with respect to the matters upon which NAI Capital has provided services or advice, including, as relevant, providing testimony.

20.    The Debtor expects that NAI Capital will work closely in concert with the Debtor's bankruptcy counsel with respect to all of the foregoing.

21.    The NAI Capital team of brokers that will be representing the Debtor will be comprised of Chris Jackson (the co-CEO of NAI Capital) along with Philip Attalla, Executive Managing Director; Todd Lorber, Executive Vice President; David M. Shabby III, Senior Associate; and Grant Bullen, Associate.  Their respective professional resumes are collectively attached as **Exhibit 2** to the Jackson Declaration.

22.    NAI Capital has not received any retainer for this engagement and has not been paid any money by the Debtor at any time.

23.    The Listing Agreement is for a term of approximately six months, ending on November 30, 2021 (see Section 1.3 of the Listing Agreement).

24.    This is an exclusive Listing Agreement where NAI Capital will serve as the Debtor's sole and exclusive agent (see section 2.1 of the Listing Agreement).

25.    In the event of a transaction closing, NAI Capital shall be entitled to receive a commission (see section 5 of the Listing Agreement) in accordance with the Schedule of Commissions contained in Exhibit A to the Listing Agreement.  NAI Capital shall be entitled to a commission of 1% of the sale price unless the consummated transaction is with any of the "Excluded Persons" contained in Exhibit C to the Listing Agreement in which case NAI Capital shall be entitled to a commission of 0.25% of the sale price.  For confidentiality reasons, Exhibit C is not included in the attachment to the Jackson Declaration.

26.    Solely in order to save the expense of preparing a fee application, the Debtor is requesting that its employment of NAI Capital be pursuant to 11 U.S.C. § 328 and provide for NAI Capital to be paid its commission in connection with the closing of any transaction without

the need for a fee application or further Court order.  If the Court concludes otherwise, then of course the Debtor and NAI Capital will comply with the desires of the Court.

27.     Notwithstanding the foregoing request, no transaction involving any buyer or investor will proceed to a closing unless approved in advance by the Court.

28.     Pursuant to 11 U.S.C. § 328(a), notwithstanding the terms and conditions of the Broker's employment, "the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions."

29.     Other than the Listing Agreement and the terms of engagement set forth in this Application, there is no agreement between the Debtor and NAI Capital regarding the Debtor's employment of NAI Capital in connection with the Debtor's chapter 11 case.

### III.     NAI CAPITAL IS DISINTERESTED AND DOES NOT HOLD ANY INTEREST ADVERSE TO THE DEBTOR'S BANKRUPTCY ESTATE

22.     NAI Capital is not a creditor, an equity security holder or an insider of the Debtor.

23.     NAI Capital is not and was not an investment banker for any outstanding security of the Debtor.  NAI Capital has not been within three years before the Petition Date an investment banker for a security of the Debtor, or an attorney for such an investment banker in connection with the offer, sale or issuance of any security of the Debtor.

24.     NAI Capital is not now nor was within two years before the Petition Date, a director, officer or employee of the Debtor or of any investment banker for any security of the Debtor.

25.     To the best of the Debtor's knowledge and based upon the Jackson Declaration, NAI Capital does not hold or represent any interest materially adverse to the interest of the Debtor's estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtor or an investment banker for any security of the Debtor, or for any other reason.

26.     To the best of the Debtor's knowledge and based upon the Jackson Declaration, NAI Capital does not hold or represent any interest materially adverse to the Debtor or the Debtor's estate, and NAI Capital is a "disinterested person" as that term is defined in Section 101(14) of the Bankruptcy Code.  It is the Debtor's understanding that NAI Capital is also being retained by Plamex Investment, LLC ("Plamex"), an affiliate of the Debtor and a debtor-in-possession in its own chapter 11 bankruptcy case pending before this Court (bearing the case number 8:21-bk-10958-ES).  However, NAI Capital's proposed employment as the real estate broker for Plamex is subject to a separate listing agreement (which will need to be approved pursuant to a separate employment application filed in Plamex's case), relates to an entirely different property, and is not tied or linked in any way to the Debtor's proposed employment of NAI Capital in this case.  To the best of the Debtor's knowledge, other than as set forth herein and in the Jackson Declaration, NAI Capital has no prior connection with the Debtor, any creditors of the Debtor or its estate, or any other party in interest in this case, or their respective attorneys or accountants, the United States Trustee or any person employed by the United States Trustee.

27.     On January 31, 2020, NAI Capital, Inc. ("NCI") (which is not the broker the Debtor is seeking to employ herein) filed a voluntary petition under chapter 11 of the bankruptcy code in the Central District of California, San Fernando Valley Division, as Case Number 1:20-bk-10256-DS.  At the time of its bankruptcy filing, NCI was a privately held, full service commercial real estate brokerage firm headquartered in Encino, California.  The primary financial problem facing the company was ongoing litigation between the three primary shareholders of NCI.  On August 28, 2020, the Court entered an order approving a sale of certain assets that constituted the operating business portion of the bankruptcy estate to a newly formed corporation owned by a group of NCI's real estate brokers.  That newly formed corporation is what constitutes NAI Capital and is the broker the Debtor is seeking to employ herein.  That asset sale closed on September 30, 2020.  None of the three primary shareholders of NCI referenced above are involved with NAI Capital.  The only remaining financial connection between NAI Capital and the NCI bankruptcy estate is that, as part of the consideration for NAI Capital's purchase of

NCI's operating business, NAI Capital owes the NCI bankruptcy estate the remaining balance of a $250,000 promissory note, and NAI Capital is required to pay to the NCI bankruptcy estate for the next approximately 2.5 years 3% of the net commissions earned by NAI Capital after deducting costs of sale and payment of brokers' commissions. The Debtor's bankruptcy counsel, Levene, Neale, Bender, Yoo & Brill L.L.P. ("LNBYB"), filed NCI's chapter 11 bankruptcy case and served as NCI's bankruptcy counsel throughout its chapter 11 bankruptcy case. NCI's chapter 11 bankruptcy case remains open (although no longer an operating business), and LNBYB continues to serve as bankruptcy counsel to that chapter 11 entity. LNBYB is not serving as counsel to NAI Capital (*i.e.*, the broker the Debtor is seeking to employ herein), and LNBYB has never served as counsel to NAI Capital. The Debtor is simply providing this information as a matter of disclosure.

WHEREFORE, the Debtor respectfully submits that its employment of NAI Capital is in the best interests of the Debtor's bankruptcy estate, and the Debtor requests that it be authorized to employ NAI Capital as its real estate broker in accordance with the terms and conditions set forth above and in the Listing Agreement.

Dated:  June 2, 2021

THE SOURCE HOTEL, LLC

_____
Name: Donald Chae
Title:   Manager of DMC Investment Holdings, LLC, Member of Debtor


                                    THE SOURCE HOTEL, LLC


                                    By:___/s/ Ron Bender_____
                                           RON BENDER
                                           JULIET Y. OH
                                           LEVENE, NEALE, BENDER, YOO
                                              & BRILL L.L.P.
                                           Attorneys for Chapter 11 Debtor and
                                           Debtor-in-Possession

## DECLARATION OF CHRIS JACKSON

I, Chris Jackson, hereby declare as follows:

1.      I am the co-Chief Executive Officer of NAI Capital Commercial, Inc. (the "NAI Capital").

2.      I have personal knowledge of the facts stated herein, except where stated upon information and belief, and, as to such statements, I believe them to be true. I make this Declaration in support of the application of The Source Hotel, LLC, a California limited liability company and the Chapter 11 debtor and debtor-in-possession herein (the "Debtor"), for Court approval of its employment of NAI Capital as its real estate broker (the "Application").    Unless the context indicates otherwise, capitalized terms herein shall have the meanings as defined in the Application.

3.      I have reviewed the Application, and I believe that all of the contents of the Application are accurate.  I believe that I understand the facts of the Debtor's bankruptcy case as they have been presented to me, and I believe that NAI Capital is well qualified to serve as the Debtor's real estate broker.  My team and I have already conducted certain due diligence of the Debtor's partially completed seven-story hotel located in the City of Buena Park, County of Orange, State of California (the "Hotel").

4.      NAI Capital will work with the Debtor to assist the Debtor either to sell the Hotel for the most money possible or to find an investment partner to team up with the Debtor either in connection with a sale process or a reorganization process.

5.      NAI Capital has approximately 223 brokers working in 12 offices throughout Southern California, and NAI Capital has an extremely strong presence in Southern California yet is part of a worldwide network that provides NAI Capital with access to prospective buyers and investors worldwide.  Subject to the approval of the Court and of the Application, the Debtor and NAI Capital have entered into the listing agreement (the "Listing Agreement") attached hereto as **Exhibit 1**.

6.      As the real estate broker to the Debtor, NAI Capital expects to render, among others, the following types of professional services:

     a.      Identifying potential buyers and investors using NAI Capital's worldwide network;

     b.      Assisting the Debtor to expeditiously formulate and implement a strategy for soliciting interest from potential buyers and investors, including by developing and implementing procedures and a timetable for marketing the Hotel for sale or investment;

     c.      Introducing the Debtor to potential buyers and investors and coordinating due diligence investigations;

     d.      Assisting the Debtor to evaluate proposals from interested parties, formulating negotiation strategies, and assisting in negotiations and closing of a sale or investment; and

     e.      Participating in hearings before the Bankruptcy Court with respect to the matters upon which NAI Capital has provided services or advice, including, as relevant, providing testimony.

7.      NAI Capital will work in close concert with the Debtor's bankruptcy counsel with respect to all of the foregoing.

8.      The NAI Capital team of brokers that will be representing the Debtor will be comprised of me along with Philip Attalla, Executive Managing Director; Todd Lorber, Executive Vice President; David M. Shabby III, Senior Associate; and Grant Bullen, Associate.  All of our respective professional resumes are collectively attached hereto as **Exhibit 2**.

9.      NAI Capital has not received any retainer for this engagement and has not been paid any money by the Debtor at any time.

10.     The Listing Agreement is for a term of approximately six months, ending on November 30, 2021 (see Section 1.3 of the Listing Agreement).

11.     This is an exclusive Listing Agreement where NAI Capital will serve as the Debtor's sole and exclusive agent (see section 2.1 of the Listing Agreement).

12.    In the event of a transaction closing, NAI Capital shall be entitled to receive a commission (see section 5 of the Listing Agreement) in accordance with the Schedule of Commissions contained in Exhibit A to the Listing Agreement.  NAI Capital shall be entitled to a commission of 1% of the sale price unless the consummated transaction is with any of the "Excluded Persons" contained in Exhibit C to the Listing Agreement in which case NAI Capital shall be entitled to a commission of 0.25% of the sale price.  For confidentiality reasons, I have not included Exhibit C herein.

13.    Other than the Listing Agreement and the terms of engagement set forth in the Application, there is no agreement between the Debtor and NAI Capital regarding the Debtor's employment of NAI Capital in connection with this chapter 11 case.

14.    NAI Capital is not a creditor, an equity security holder or an insider of the Debtor.

15.    NAI Capital is not and was not an investment banker for any outstanding security of the Debtor.  NAI Capital has not been within three years before the Petition Date an investment banker for a security of the Debtor, or an attorney for such an investment banker in connection with the offer, sale or issuance of any security of the Debtor.

16.    NAI Capital is not now nor was within two years before the Petition Date, a director, officer or employee of the Debtor or of any investment banker for any security of the Debtor.

17.    To the best of my knowledge, NAI Capital does not hold or represent any interest materially adverse to the interest of the Debtor's estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtor or an investment banker for any security of the Debtor, or for any other reason.

18.    To the best of my knowledge, NAI Capital does not hold or represent any interest materially adverse to the Debtor or the Debtor's estate, and NAI Capital is a "disinterested person" as that term is defined in Section 101(14) of the Bankruptcy Code.  Also, to the best of my knowledge, other than as set forth herein, NAI Capital has no prior connection with the Debtor, any creditors of the Debtor or its estate, or any other party in interest in this case, or their

12

respective attorneys or accountants, the United States Trustee or any person employed by the United States Trustee.

19.     On January 31, 2020, NAI Capital, Inc. ("NCI") (which is not the broker the Debtors are seeking to employ herein) filed a voluntary petition under chapter 11 of the bankruptcy code in the Central District of California, San Fernando Valley Division, as Case Number 1:20-bk-10256-DS.  At the time of its bankruptcy filing, NCI was a privately held, full service commercial real estate brokerage firm headquartered in Encino, California.  The primary financial problem facing the company was ongoing litigation between the three primary shareholders of NCI.  On August 28, 2020, the Court entered an order approving a sale of certain assets that constituted the operating business portion of the bankruptcy estate to a newly formed corporation owned by a group of NCI's real estate brokers led primarily by me.  That newly formed corporation is what constitutes NAI Capital and is the broker the Debtors are seeking to employ herein.  That asset sale closed on September 30, 2020.  None of the three primary shareholders of NCI referenced above are involved with NAI Capital.  The only remaining financial connection between NAI Capital and the NCI bankruptcy estate is that, as part of the consideration for NAI Capital's purchase of NCI's operating business, NAI Capital owes the NCI bankruptcy estate the remaining balance of a $250,000 promissory note, and NAI Capital is required to pay to the NCI bankruptcy estate for the next approximately 2.5 years 3% of the net commissions earned by NAI Capital after deducting costs of sale and payment of brokers' commissions.  The Debtor's bankruptcy counsel, Levene, Neale, Bender, Yoo & Brill L.L.P. ("LNBYB"), filed NCI's chapter 11 bankruptcy case and served as NCI's bankruptcy counsel throughout its chapter 11 bankruptcy case.  NCI's chapter 11 bankruptcy case remains open (although no longer an operating business), and LNBYB continues to serve as bankruptcy counsel to that chapter 11 entity.  LNBYB is not serving as counsel to NAI Capital (i.e., the broker the Debtors are seeking to employ herein), and LNBYB has never served as counsel to NAI Capital.

1        I declare under penalty of perjury under the laws of the United States of America that the

2 foregoing is true and correct and that this Declaration was executed on June 2, 2021, at Los

3 Angeles, California.

4                                      *Chris Jackson*

5                                    CHRIS JACKSON

# EXHIBIT "1"

[LISTING AGREEMENT]



## EXCLUSIVE RIGHT TO REPRESENT OWNER
## FOR SALE ~~OR LEASE~~ OF REAL PROPERTY
(Non-Residential)

**1.     BASIC PROVISIONS ("BASIC PROVISIONS").**

1.1    **Parties:** This agency Agreement **("Agreement")**, dated for reference purposes only ___ .is made by and between The Source at Beach LLC, The Source Office LLC, The Source Hotel LLC, MD Properties, Donald Chae, whose address is 6988 Beach Boulevard Suite B-215, Buena Park, CA 90621, **("Owner")**, and NAI Capital Commercial, Inc., a California corporation., whose address is 970 W. 190th Street, Suite 100, Torrance CA 90502, telephone number (310) 878-6900, Fax No. (310) 878-6901, **("Agent")**.

1.2    **Property/Premises:** The real property, or a portion thereof, which is the subject of this Agreement is commonly known as (street, address, city, state, zip) Please see Exhibit "B" for the description of the properties, along with the corresponding addresses and parcel numbers, located in the County of Orange, and generally described as (describe briefly the nature of the property): The Source OC, which includes The Source Retail, The Source Office, The Source Hotel, the land zoned residential which has been entitled for approximately 255 residential units (located north of The Source OC on Melrose Street and Brenner Avenue and under the ownership of various entities controlled by M+D Properties and/or Donald Chae), the digital monument signage framing (one screen located on a portion of the office building and a second screen located on a portion of the retail building), and the existing tax rebate on The Source Retail. **("Property")**. (See also Paragraph 3).

1.3    **Term of Agreement:** The term of this Agreement shall commence on ___May 25_, 2021 and expire at 5:00 p.m. on November 30, 2021, except as it may be extended **("Term")**. (See also paragraph 4)

1.4    **Transaction:** The nature of the transaction concerning the Property for which Agent is employed **("Transaction")** is (check the appropriate box(es)):

(a) _X_  A sale for the following sale price and terms: Terms and Conditions acceptable to Seller and other additional standard terms reasonably similar to those contained in the "STANDARD OFFER, AGREEMENT AND ESCROW INSTRUCTIONS FOR THE PURCHASE OF REAL ESTATE" published by the AIR Commercial Real Estate Association **("AIR")**, or for such other price and terms agreeable to Owner;

**2.     EXCLUSIVE EMPLOYMENT AND RIGHTS.**

2.1    Owner hereby employs Agent as Owner's sole and exclusive agent to represent Owner in the Transaction and to find buyers or lessees/tenants **("lessees")**, as the case may be, for the Property or any portion thereof. Agent shall use reasonably diligent efforts to find such buyers ~~or lessees~~ and Owner agrees to and wilfully cooperate with Agent in connection with Agent's discharge of its duties arising from this Agreement. All negotiations and discussions for a Transaction shall be conducted by Agent on behalf of Owner. Owner shall promptly disclose and refer to Agent all written or oral inquiries or contacts received by Owner from any source regarding the Property and any possible Transaction.

2.2    Owner authorizes Agent to:
(a)    Place advertising signs on the Property;
(b)    Place a lock box on the Property if vacant;
(c)    Accept deposits from potential buyers or lessees; and

_____          _____
Owner                             Agent

(d)    Distribute information regarding the Property to participants in THE MULTIPLE (**"MULTIPLE"**) of the AIR and/or any other appropriate local commercial multiple listing service, to other brokers, and to potential buyers or lessees of the Property. Owner shall identify as "confidential" any information provided to Agent that Owner considers confidential and does not want disclosed. All other information provided by Owner may be disclosed as Agent may deem appropriate or necessary. After consummation of a Transaction, Agent may publicize the terms of such Transaction.

2.3    Agent shall comply with the Rules of Professional Conduct of the AIR, if a member or if not, the Rules of Professional Conduct of the Society of Industrial and Office Realtors, and shall submit the Property to the MULTIPLE. Agent shall cooperate with participants in the MULTIPLE and may, at Agent's election, cooperate with other real estate brokers (collectively **"Cooperating Broker"**).

2.5    Owner agrees that Agent may, during the ordinary and normal course of marketing the Property, respond to inquiries on the Property by showing and providing information on the Property, as well as on other competing properties, to prospective buyers and lessees and that such activities may result in the payment of a commission to Agent by a third party. Owner understands that Agent may also represent other lessors/sellers with competing properties.

3.    **PROPERTY.**

3.1    The term "Property" shall include all of the following which are currently located on the Property and owned by Owner: permanent improvements, electrical distribution systems (power panels, buss ducting, conduits, disconnects, lighting fixtures, etc.), telephone distribution systems (lines, jacks and connections), space heaters, air conditioning equipment, air lines, carpets, window coverings, wall coverings, partitions, doors, suspended ceilings, built-ins such as cabinets, and approximately 10,000 square feet of digital monument signage, one screen located on a portion of the office building and a second screen located on a portion of the retail building, an existing tax rebate on the "The Source Retail" located at 6940 Beach Boulevard, Buena Park, CA 90621, and land use entitlements attached to the specific addresses identified in Exhibit "B" (if there are no additional items write "NONE"). If the Transaction is a sale, the term "Property" shall additionally include, to the extent owned by Owner, oil and mineral rights, leases and other agreements which will continue in effect after Owner's transfer of title to the Property.

3.2    Within five business days after the commencement of the Term hereof, Owner shall provide Agent with the following:

(a)    A duly completed and fully executed Property Information Sheet on the most current form published by the AIR;

(b)    Copies of all leases, subleases, rental agreements, option rights, rights of first refusal, rights of first offer, or other documents containing any other limitations on Owner's right, ability and capacity to consummate a Transaction, and

(c)    If available to Owner, copies of building plans, and if the Transaction is a sale, title reports, boundary surveys, and existing notes and trust deeds which will continue to affect the Property after consummation of a sale.

(d)    Owner agrees that this is an on-going obligation to provide Agent, upon Owner learning of said information or receiving such documentation and without Agent having had to further request same, with (1) notification of any changes in the accuracy and completeness of the documents and information provided by Owner pursuant to this Paragraph 3.2 (and otherwise arising from this Agreement), (2) copies of such other and further documents bearing on the accuracy and completeness of the documents and information previously provided by or on behalf of Owner; and (3) notification of any anticipated, potential or other circumstances which may bear on the potential sale, condition or value of the Property or otherwise concerning any tenancy or subtenancy or related to the ownership of the Property.

Owner      Agent

3.3    Agent shall have no responsibility for maintenance, repair, replacement, operation, or security of the Property, all of which shall be Owner's sole responsibility. Unless caused by Agent's gross negligence, Agent shall not be liable for any loss, damage, or injury to the Property, to the person or property of Owner, any lessees of the Property, any buyer, prospective buyer, lessee, or prospective lessee, including, but not limited to, those which may occur as a result of or arising from Agent's use of a lock box or showing of the Property to prospective persons or entities.

3.4    HAZARD OR TOXINS DETECTION: Various construction materials may contain items that have been or may in the future be determined to be hazardous (toxic) or undesirable and may need to be specifically treated handled, or removed.  For example, some transformers or other electrical components contain PCBs, and asbestos has been used in the components such as fire-proofing, heating and cooling systems, air duct insulation, spray-on and tile acoustical materials, linoleum, floor tiles, roofing, dry wall, and plaster.  Due to prior or current uses of the Property or in the area, the Property may have hazardous or undesirable metals, minerals, chemicals, hydrocarbons, or biological hazards (including mold) or radioactive items (including electric and magnetic fields) in soils, water, building components, above or below-ground containers or elsewhere in areas that may or may not be accessible or noticeable.  Such items may leak or otherwise be released.  Agent has no expertise in the detection or correction of hazardous or undesirable items.  Expert inspections are necessary.  Current or future laws may require clean up by past, present, and/or future owners and/or operators.  It is the responsibility of the Owner to retain qualified experts to detect and correct such matters and to consult with legal counsel of their choice and at their sole expense to determine what provisions, if any, they may wish to include in transaction documents regarding the Property.

3.5    AMERICANS WITH DISABILITIES ACT:  The Americans With Disabilities Act is intended, among other things, to make many business establishments equally accessible to persons with a variety of disabilities; modifications to real property may be required.  State and local laws also may mandate changes.  Agent is not qualified to advise you as to what, if any, changes may be required now, or in the future. Owners, buyers, and tenants should consult the attorneys and other qualified design professionals of their choice, and at their sole expense, for information regarding these matters.

4.    **EXTENSION OF TERM.** If the Transaction is a sale, and a sale is not consummated for any reason after Owner accepts an offer to purchase the Property (**"Sale Agreement"**), then the expiration date of the Term of this Agreement shall be extended by the number of days that elapsed between the date Owner entered into the Sale Agreement and the later of the date on which the Sale Agreement is terminated or the date Owner is able to convey title to a new buyer free and clear of any claims by the prior buyer of the Property; provided, however, in no event shall the Term be so extended beyond one year from the date the Term would have otherwise expired.

5.    **COMMISSION.**

5.1    In the event that the Property, or any portion thereof or interest therein (or any interest in Owner) is sold, transferred, conveyed, or such other "Alternative Transaction" (defined below) to a prospect (or any successor or assignee, affiliate, officer, director, shareholder, managing member, manager, member, general or limited partner, and/or employee of prospect) (collectively, the "Prospect," or "Buyer") during the term of this Agreement (and any extension thereof), then, Owner shall pay Agent a commission __X__ in accordance with the commission schedule attached hereto as Exhibit A and incorporated herein (**"Agreed Commission"**), based on that Transaction, whether such Transaction is consummated as a result of the efforts of Agent, Owner, or some other person or entity. Agent shall also be entitled to the Agreed Commission if any of the Owner's representations and warranties described in paragraph 8 are shown to be false. Such Agreed Commission is payable:
　　　　　(a)    If the Transaction is a sale, the commission is due and accrued when (i) the Property is sold; (ii) Owner breaches or repudiates any Sale Agreement, escrow instructions or other documents executed by Owner regarding the sale of the Property; (iii) the Property or any interest therein is voluntarily or involuntarily sold, conveyed, contributed or transferred; (iv)

Owner        Agent

the Property or any interest therein is taken under the power of Eminent Domain or sold under threat of condemnation, or (v) if Owner is a partnership, joint venture, limited liability company, corporation, trust or other entity, and any interest in Owner is voluntarily or involuntarily sold, contributed, conveyed or transferred to another person or entity that, as of the date hereof, does not have any ownership interest in Owner;

    (b)

    (c)    For the avoidance of doubt (and in addition to the terms set forth in the Exhibit A hereto) and without limiting the terms of this Agreement, the commission, based on the amounts set forth in Exhibit A, shall be paid in full at the time of closing of the Transaction, transfer of title to the Property, upon sale of any interest of owners in the Property to a Prospect, upon the sale of any interest in Owner's entity(ies) that hold title to a Prospect, Owner's contribution of the Property (or any portion thereof) as consideration for Owner entering into a partnership or joint venture, obtaining an interest in another entity (or such other business transaction), and/or the closing of any Alternative Transaction. The entirety of the commission shall be due upon such trigger event, regardless whether the consideration being paid is paid on an installment or incremental basis.

    5.2    If the Transaction is a sale, the purchase agreement and/or escrow instructions to be entered into by and between Owner and a buyer of the Property shall provide that:

    (a)    Owner irrevocably instructs the escrow holder to pay from Owner's proceeds accruing to the account of Owner at the close of escrow the Agreed Commission to Agent;

    (b)    A contingency to the consummation of the sale shall be the payment of the Agreed Commission to Agent at or prior to close of the escrow; and

    (c)    No change shall be made by Owner or buyer with respect to the time of, amount of, or the conditions to payment of the Agreed Commission, without Agent's written consent.

**6.    ALTERNATIVE TRANSACTION.** If the Transaction changes to any other transaction, including, but not limited to, a sale, exchange, option to buy, right of first refusal, ground lease, lease, sublease or assignment of lease or other business transaction (including, without limitation, a merger, acquisition or other transaction wherein Owner [or any successor or assignee of Owner or any entity or affiliated entity owned or controlled by Owner (or by any agent, officer, directors, member, managing member, general or limited partner, employee or shareholder of Owner or of any affiliate of Owner)] (collectively, "Owner") is the Prospect (collectively **"Alternative Transaction"**), then Agent shall automatically be Owner's sole and exclusive Agent for such Alternative Transaction and represent Owner in such Alternative Transaction, under the terms and conditions of this Agreement. If, during the Term hereof, an Alternative Transaction is entered into, then Owner shall pay Agent the Agreed Commission.

**7.    EXCLUDED AND REGISTERED PERSONS.**

    7.1    Attached hereto a Exhibit "C" is the Schedule of Excluded Persons identifying the names of those persons or entities registered ith Owner (singularly, as an **"Excluded Person"** or, collectively, as the **"Excluded Persons"**)) and agents (**"Excluded Persons Agents"**) who introduced one or more Excluded Persons to Owner regarding a possible Transaction. If Owner enters into a binding Transaction with any of the Excluded Persons, then the Agreed Commission paid to Agent with respect to consummation of such Transaction with an Excluded Person shall be limited to 25 basis points (i.e., 0.25%) of the fair market value of the subject property as its Agreed Commission.

**8.    OWNER'S REPRESENTATIONS.**

    As a further inducement for Agent to provide the services called for under this Agreement, Owner represents and warrants that:

    (a)    Each person executing this Agreement on behalf of Owner has the full right, power and authority to execute this Agreement as or on behalf of Owner;

    (b)    Owner owns the Property and/or has the full right, power and authority to execute this Agreement and to consummate a

    Transaction as provided herein, and to perform Owner's obligations hereunder;

Owner    Agent

(c)     There are no effective, valid or enforceable option rights, rights of first refusal, rights of first offer or any other restrictions, impediments or limitations on Owner's right, ability and capacity to consummate a Transaction, except as disclosed in writing pursuant to Paragraph 3.2(b).

(d)     That as of the date of this Agreement the asking sales price is not less than the total of all monetary encumbrances on the Property; and

(e)     That the Property and al improvements thereto were constructed in compliance with al applicable laws, a valid certificate(s) of occupancy exist for all of the improvements to the Property, there is no pending notice or order to comply issued by any governmental or quasi-governmental agency, department or division and the Owner has (and, at all times during the term of this Agreement, shall have) general liability insurance in force listing the Property as an insured location.

Owner further agrees that it has an on-going obligation to notify Agent in writing in the event that any of the representations above become untrue in any respect, which notice shall be given to Agent within three (3) business days of Owner becoming aware of any such representation becoming untrue in any respect.

**9.     OWNER'S ACKNOWLEDGMENTS.** Owner acknowledges that it has been advised by Agent to consult and retain experts to advise and represent it concerning the legal and tax effects of this Agreement and consummation of a Transaction or Alternative Transaction, as well as the condition and/or legality of the Property, including, but not limited to, the Property's improvements, equipment, soil, tenancies, title and environmental aspects. Agent shall have no obligation to investigate any such matters unless expressly otherwise agreed to in writing by Owner and Agent. Owner further acknowledges that in determining the financial soundness of any prospective buyer, lessee or security offered, Owner will rely solely upon Owner's own investigation and that of Owner's legal and financial advisors (and not Agent), notwithstanding Agent's assistance in gathering such information (Owner acknowledges that Agent's gathering of such information and delivery of same to Owner [and Owner's legal and financial advisors] shall not and does not constitute a verification or affirmation by Agent that the information obtained by Agent is true and correct or reliable and Owner shall rely on its own investigation thereof).

**10.    MISCELLANEOUS.**

10.1     This Agreement shall not be construed either for or against Owner or Agent, but shall be interpreted, construed and enforced in accordance with the mutual intent of the parties ascertainable from the language of this Agreement. Signatures to this Agreement accomplished by means of electronic signature or similar technology shall be legal and binding.

10.2     All payments by Owner (or on Owner's behalf) to Agent shall be made in lawful United States currency. If Owner fails to pay to Agent any amount when due under this Agreement, then such amount shall bear interest at the rate of 15% per annum or the maximum rate allowed by law, whichever is less.

10.3     In the event of litigation or arbitration between Owner and Agent arising under or relating to this Agreement or the Property, the prevailing party shall be paid its attorney's fees and costs (and reimbursed its fees paid to any arbitrator/arbitration firm) by the losing party. The term, "Prevailing Party" shall include, without limitation, one who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other party of its claim or defense. The attorney's fees award shall not be computed in accordance with any court fee schedule, but shall be in an amount to fully reimburse all attorney's fees reasonably incurred in good faith.

10.6     In the event that the Transaction is not an outright sale, Owner agrees that if Agent is not paid the Agreed Commission provided for herein within thirty days of the date due, that Agent shall have a lien in the amount of such commission, and may record a notice of such lien, against the Property.

_____        _____
Owner                  Agent

.

10.8    At the request of the Seller, NAI Capital Commercial, Inc. will be focused on an international marketing campaign for the disposition of The Source OC.  Countries of primary focus will include China, Taiwan, South Korea, Australia, Canada, Holland and Germany.

10.9    IRS § 1445: Internal Revenue Code Section 1445 requires that buyers of any interest in any real property located in the United States withhold and pay over the Internal Revenue Service ("IRS") a portion of the purchase price unless the buyer can adequately establish that the seller is not a foreign individual or entity.  Depending on the structure of the transaction, the tax withholding liability could exceed the net cash proceeds to be paid to a foreign seller at closing.  Foreign sellers should be aware that there are mechanisms by which the withholding requirement can be mitigated, e.g., by obtaining a "qualified statement from the IRS before the transaction is consummated or by early refund after the transaction closes.  NAI recommends that Owner consult its tax advisors in order to comply with the code.  Owner agrees to provide Agent with evidence of compliance with Section 1445 at the time of closing.

10.10.        REPRESENTATION AND WARRANTY REGARDING TERRORISM: Owner and Agent represent and warrant to the other that each party, and all persons and entities owning (directly or indirectly) an ownership interest in each party: (a) is not, and will not become, a person or entity with whom Agent is restricted from doing business under the regulations of the Office of Foreign Asset Control ("OFAC") of the Department of Treasury (including but not limited to, those named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including, but not limited to, the September 24, 2001, Executive Order 13224 Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism), or other governmental action; and (b) is not knowingly engaged in, and shall not knowingly engage in, and any dealings or transaction or be otherwise associated with such persons or entities described in subparagraph (a) above.

## 11.    INTENTIONALLY OMITTED.

**12.    OWNER'S TERMINATION RIGHTS.**  Owner may terminate this Agreement at Owner's sole and absolute discretion, upon 30-day written notice to Agent, at any time. If so terminated, Agent shall not be entitled to any Agreed Commission, but Owner shall reimburse Agent for the reasonable out-of-pocket expenses incurred by Agent in the marketing of the Property.

**13.    Additional Provisions:** In addition to Exhibits A, B and C to this Agreement, Additional provisions of this Agreement are set forth in the following blank lines or in an addendum attached hereto and made a part hereof consisting of paragraphs <u>None</u> through <u>None</u> (if there are no additional provisions write "NONE"):

**14.    Disclosures Regarding The Nature of a Real Estate Agency Relationship.** When entering into an agreement with a real estate agent an Owner should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction.
(i)    *Owner's Agent.* An Owner's agent may act as an agent for the Owner only. An Owner's agent or subagent has the following affirmative obligations: *To the Owner:* A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings. *To a potential buyer/lessee and the Owner:* a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

The above duties of the Agent do not relieve Owner from the responsibility to protect its own interests. By executing this Agreement below, Owner represents and warrants to Agent that Owner has carefully read this Agreement and all instruments made a part hereof and has relied on solely upon its own investigation and the advice of Owner's legal and financial advisors in electing to proceed to bind itself to this Agreement and all of the terms thereof (which Owner acknowledges are understood and agreed).

*[SIGNATURES APPEAR ON THE FOLLOWING PAGE]*

Owner            Agent

**OWNER:**

THE SOURCE AT BEACH, LLC,
a California limited liability company

By: _____

Name:  Donald Chae
Title:   Manager

THE SOURCE OFFICE, LLC,
a California limited liability company

By: _____

Name:  Donald Chae
Title:   Manager

THE SOURCE HOTEL, LLC,
a California limited liability company,
Chapter 11 Debtor and Debtor-in-Possession
By:   DMC Investment Holdings, LLC,
        a Delaware limited liability company,
        Its Sole Member

        By: _____

        Name:  Donald Chae
        Title:   Manager

M + D PROPERTIES,
a California corporation

By: _____

Name:  Donald Chae
Title:   CEO

**AGENT:**

NAI CAPITAL, INC.,

a California corporation

By: _____
Name:  Chris Jackson
Title:   Co-CEO
Broker DRE License No. 02130474
Agent DRE License No. 01255538
15821 Ventura Blvd., Suite 320
Encino, CA 91436
(818) 905-2400
(818) 905-2425
cjackson@naicapital.com

By: _____
Name:  Philip "Ted" Atalla
Title:   Executive Managing Director          5/26/2021
Broker DRE License No. 02130474
Agent DRE License No. 01049278
970 W. 190th Street, Suite 100
Torrance, CA 90502
(323) 201-3608
(323) 878-6901
pattalla@naicapital.com

_____        _____
Owner                    Agent

<u>EXHIBIT A</u>

<u>SCHEDULE OF COMMISSIONS</u>

**For Property at: (Please see below parcel numbers)**

276-323-01, 02, 03, 04, 05, 07, 08, 10, 14
276-361-01, 02, 03, 04, 05, 06, 07, 08, 09, 10, 11, 12, 13, 14, 15, 16, 17, 18
276-322-16

**This Exhibit A – Schedule of Commissions is incorporated into and a part of the concurrently executed Exclusive Right to Represent Owner agreement (the "Agreement") between Owner and Agent.**

**A.     SALES, EXCHANGES, AND OTHER TRANSFERS:**

      1.     **Sales:** Notwithstanding Owner entering into a binding Transaction with any of the Excluded Persons identified in the Schedule of Excluded Persons under Exhibit "C," Owner agrees to and will pay Agent one percent (1%) of the gross sales price of improved properties; one percent (1%) of financing which Agent secures for Owner, based on the total amount of such financing; and one percent (1%) of equity investment, based on the amount of investment made by an equity partner. In the event Owner enters into a binding Transaction with any of the Excluded Persons, the Agreed Commission paid to Agent shall be limited to 25 basis points (i.e., 0.25%) of the fair market value of the subject property as its Agreed Commission.

**B.     PAYMENT OF COMMISSIONS & MISCELLANEOUS PROVISIONS:**

      1.     **Payment of Sale and Exchange Commissions:** Commissions shall be paid through escrow upon the closing of a sales or exchange transactions. Absent an escrow, commissions shall be paid upon recordation of a deed or upon delivery of such deed or other instrument of conveyance. In the event of a contract or agreement of sale, merger, joint venture agreement, business opportunity or other transaction not involving the delivery of a deed, commissions shall be calculated on the fair market value of the property, rather than the gross sales price, multiplied by the percentage of interest so transferred and shall be paid upon execution of the agreement evidencing the transaction.

      2.     **Owner's Right to Terminate:** Pursuant to Section 12 of the Agreement, Owner may terminate this Agreement at Owner's sole and absolute discretion, upon 30-day written notice to Agent, at any time. If so terminated, Agent shall not be entitled to any Agreed Commission, but Owner shall reimburse Agent for the reasonable out-of-pocket expenses incurred by Agent in the marketing of the Property, which amount shall not exceed twenty thousand dollars ($20,000).

      3.     **Term Extended:** If, during the term of the attached agreement, an option or right of first refusal to purchase or lease the Property or any interest therein is granted, or an escrow is opened or negotiations involving the sale, transfer, conveyance or lease of the Property have commenced and are continuing, then the term of the attached agreement shall be extended with respect to such transaction(s) and negotiation for a period through the exercise of such option or right of first refusal, the closing of such escrow, the termination of such negotiations or the consummation of such transaction.

      4.     **Attorney's Fees:** If either party brings any action, suit, counter-claim, appeal, arbitration or mediation for any relief against the other, declaratory or otherwise, to enforce the terms of the Agreement (including this Schedule of Commissions) or to declare rights hereunder, the losing party shall pay to the prevailing party a reasonable sum for the attorney's fees and costs incurred in bringing such an action and enforcing a judgment or award. The court or arbitrator shall determine the prevailing party, which can be a party who agreed to dismiss an action on the other party's payment of the sums allegedly due or who substantially obtains the relief sought.

Owner      Agent

5.      Owner acknowledges and understands that Broker and its agents have listings on properties that may compete for the same tenants and/or buyers of the Owner's property. Owner has concluded that retaining Broker and its agents with other competing area listings is a benefit, in that Broker and its agents will market other properties to suitable, prospective buyers and tenants of the Property. Thereby, Owner consents to Broker and its agents representing competing properties. Owner acknowledges and understands that Broker and its agents have a fiduciary duty to uphold confidentiality in such transactions. Therefore, Broker and its agents shall not disclose the price and terms that one party will pay, or accept in the same transaction, or competing properties, or the existence of and the actual status of competing negotiations for transactions between the represented competing owners and prospective tenants or buyers.

Owner _____      Agent _____

# EXHIBIT "2"

[PROFESSIONAL RESUMES]







# Chris Jackson

Co-CEO

NAI Capital HQ - Encino

+1 818 933 2368

+1 818 802 2627

cjackson@naicapital.com

## Scope of Responsibilities

Christopher Jackson currently serves as Co-CEO with NAI Capital in Encino. As manager, he oversees more than 40 brokers at the Encino corporate branch and is focused on recruiting talented professionals to join the team. In 2019 he joined the NAI Capital management team to help with the company's growth. The selection of Chris as Executive Managing Director is clear indication of NAI Capital's dedication to its brokers and clients.

Chris remains committed to his clients and as a broker is active in the sale and leasing of industrial properties, and Investment. He is also a founding member of NAI Capital's Investment Services Group and specializes in investment properties throughout the United States.

## Background & Experience

Chris is highly regarded in the industry for his transactional prowess. He began his career in commercial real estate in 1997 when joined CB Richard Ellis as an assistant in the Industrial Division. After joining Grubb & Ellis in 1998, he won Rookie of the Year in 2001. Over the course of his career he has won several accolades, including being named one of the Top 30 Brokers in the San Fernando Valley by the San Fernando Valley Business Journal.

Christopher Jackson entered commercial real estate in 1997 when joined CB Richard Ellis as an assistant in the Industrial Division. In December of 1998 Chris joined Grubb & Ellis where he won Rookie of the Year in 2001. In 2004 Chris was named by the San Fernando Valley Business Journal as one of the Top 30 Brokers in the San Fernando Valley. In 2006 Chris joined NAI Capital and in 2007 Chris finished number Five in the company with total revenue in excess of $60 million. Since joining NAI Capital he has been a Capital Club Top Producer every year.

In August 2014 Chris Jackson's accepted promotion to Executive Managing Director to assume the mantle as Branch Manager of our Encino corporate HQ office. With his guidance in 2020, Chris led the successful sale of NAI





Capital to its brokers and employees. This was a tremendous achievement for NAI Capital. The selection of Chris to be the Co-CEO is clear indication of NAI Capital's commitment to its brokers, clients and customers in Southern California.

Awards and Professional Affiliations:

Named as one of the Top 200 most influential people by San Fernando Valley Business Journal

Capital Club 2019 Platinum Award

Capital Club 2018 Platinum Award

Capital Club 2017 Platinum Award

Capital Club 2016 Gold Award

Capital Club 2015 Silver Award

Capital Club 2014 Gold Award

Capital Club 2013 Gold Award

Capital Club 2012 Gold Award

Capital Club 2011 Platinum Award

Capital Club 2010 Gold Award

Capital Club 2009 Gold Award

Capital Club 2008 Gold Award

Capital Club 2007 Platinum Award

Grubb & Ellis LA North: Top Producer Award, 2001- 2006

Circle of Excellence: Grubb & Ellis nationwide for 2005

Top 40 Under 40 for Brokers - San Fernando Valley Business Journal, 2004

Top 30 Brokers - San Fernando Valley Business Journal, 2004

Rookie of the Year 2001 – Grubb & Ellis Company



Professional
Profile

## Professional Affiliations & Designations

**Awards and Professional Affiliations:**

- American Industrial Real Estate Association (AIR)
- Capital Club 2019 Gold Award
- Capital Club 2018 Platinum Award
- Capital Club 2017 Platinum Award
- Capital Club 2016 Gold Award
- Capital Club 2015 Silver Award
- Capital Club 2014 Gold Award
- Capital Club 2013 Gold Award
- Capital Club 2012 Gold Award
- Capital Club 2011 Platinum Award
- Capital Club 2010 Gold Award
- Capital Club 2009 Gold Award
- Capital Club 2008 Gold Award
- Capital Club 2007 Platinum Award
- Top 200 Most Influential Leaders - San Fernando Valley Business Journal, 2019
- Grubb & Ellis LA North: Top Producer Award, 2001- 2006
- Circle of Excellence: Grubb & Ellis nationwide for 2005
- Top 40 Under 40 for Brokers - San Fernando Valley Business Journal, 2004
- Top 30 Brokers - San Fernando Valley Business Journal, 2004
- Rookie of the Year 2001 – Grubb & Ellis Company

## Educational Background

Chris Jackson graduated from Woodbury University with a B.S. in Business Administration and a minor in International Business.

## Significant Transactions

Investment Sales and Leasing Transaction Volume

- 2019 $275 million
- 2018: $150 million
- 2017: $85 million
- 2016: $68 million

# Philip "Ted" Attalla
## Executive Managing Director



Philip T. Attalla has thirty-two years of professional experience representing corporations in the acquisition/disposition of industrial/commercial real estate. His client services focus on facilitation of negotiations in order to achieve below-market rates; and on providing in-depth knowledge on government permitting and licensing processes. Mr. Attalla has completed real estate transactions representing over ten million square feet of warehouse/distribution and commercial facilities in over twenty-nine (29) states throughout the Continental U.S.

# Todd Lorber



**NAI Capital, Inc.**
15821 Ventura Boulevard
Suite 320
Encino, CA 91436

**Phone:** +1 (818) 933-2376
**Email:** tlorber@naicapital.com

**Title:** Executive Vice President

## Career Summary

After graduating from the University of California at Berkeley with a degree in Biological Science, Todd Lorber joined Grubb & Ellis as a Research Associate for the San Fernando Valley.  In this capacity, he maintained the industrial inventory system and authored the 1988 L.A. North Real Estate Forecast for Grubb & Ellis and the Ventura County Market Profile for the Urban Land Institute.

In June of 1989, Todd began his career in the Industrial Division of the San Fernando Valley Office, where he quickly found acceptance from industrial users and investors because of his understanding of the technical and financial aspects of industrial real estate.  Since this time, Todd has concentrated his efforts in the San Fernando and Santa Clarita Valley Industrial marketplaces where his time is spent on the leasing and sales of Industrial/R&D product in both the user and investor arenas.  He also has acquired significant development and product repositioning experience via his own portfolio and those of his clients.

In January of 2007 Todd relocated to NAI CAPITAL, the Southern California franchise of NAI GLOBAL as a Senior Vice President, where he has been a member of its Capital Club each year since.  He continues to be one of the most productive brokers in his marketplace, adding value to transactions with his expertise in adapting product to the evolving logistics models and maximizing asset value for his clients.

## Experience

Below is a partial list of clients:

| | |
|---|---|
| Easton Sports | AEW Capital Management |
| Rexford Industrial | Nestle |
| St. Judes Medical | First Industrial Realty Trust |
| Northrup/Grumman | Pinkerton |
| Anheuser Busch | LA Unified School District |
| ARKA Properties | Prudential Realty Company |
| TA Associates | |

## Education

University of California at Berkeley with a degree in Biological Science.  Todd has been an active member of the AIR Industrial Multiple since he began his career.  He is held in high regard by his clients and partners, and by his peers within the brokerage community.



<span style="color:red">Committed to Southern California Connected to the World.</span>
**800.468.2618 ▪ naicapital.com**

# BUSINESS REFERENCES

Ms. Kathy Schreiber
**Ambassador Foods**
16625 Saticoy Street
Van Nuys, CA  91406
(818) 571-8090

Mr. Dean Daily
**Van Nuys Airport Industrial Center**
7647 Mulholland Drive
Los Angeles, CA  90046
(818) 994-6231

Mr. Danny Finkelstein
**Pacific Suppliers**
8541 Lankershim Boulevard
Sun Valley, CA  91352
(818) 219-0788

Mr. Dick Decker
**Woodmart Window Coverings**
15800 Strathern Street
Van Nuys CA  91406
(818) 785-1528

Mr. Gary Blackwell
**EPI General Contractors**
7655 Haskell Avenue
Van Nuys, CA  91406
(818) 908-0348

**Ms. Carol Woodard Kozimor**
Graywood Properties
440 NW Columbia Street
Bend OR  97701
(541) 389-8666

Mr. Vincent Bohanec
**ARKA Properties**
9350 Wilshire Blvd. Suite 302
Beverly Hills, CA  90212
(310) 274-2259

Mr. Jonathan Bass
**Pro Tour Memorabilia**
20362 Plummer Street
Chatsworth, CA  91311
(818) 909-5937



# Projects

### Project Leasing:

| | |
|---|---|
| Creative Technologies | 110,000s.f. |
| First Industrial/Port to Port Dist. | 121,000s.f. |
| Greywood Properties | 82,000 s.f. |
| Lamsco West | 75,000 s.f. |
| Paiho Mfg | 62,000 s.f. |
| Pro Tour Memorabilia | 25,000s.f. |
| Sara Lee Baking Corp. | 16,000 s.f. |
| AEK | 18,000 s.f. |
| Norman Wright/Airelink | 15,900 s.f. |
| TRE Motorsports | 20,000 s.f. |
| ATK Technologies | 52,000s.f. |
| Alberto Culver Labs | 213,000s.f. |

### Recent Project Sales:

| | |
|---|---|
| First Industrial | 173,000 s.f. Investment Santa Clarita |
| Titan Pacific | 110,000 s.f. Leased Investment, Van Nuys |
| Titan Atlantic | 100,000 s.f. Leased Investment,Van Nuys |
| Sherman Family | 411,000 s.f. Leased Investment De Kalb Il |
| Sherman Family | 140,000 s.f. Leased Investment Stafford TX |
| Kavli Portfolio | 398,000 s.f. User Sale, Oxnard |
| Canyon Plastics | 110,000 s.f. User Sale, Santa Clarita |
| Bocci Laboratories | 2 acre land purchase, Santa Clarita |
| Bocci Laboratories | 96,000 s.f. Santa Clarita |
| King Bros | 75,055 s.f. Sant Clarita |
| Arka Properties | 126,000 s.f. Chatsworth |
| Dean Metropolis | 47,000 s.f. Van Nuys |



# David Shaby III
## Senior Associate



David Shaby III has six years of professional experience representing both institutional and noninstutional clients. He specializes in industrial and retail real estate brokerage, with extensive experience leasing shopping centers. Between 2017 and 2020, David completed real estate transations representing over five million square feet of mixed-used property. David completed his B.S. in Real Estate Finance from New York University and is set to attend USC's Masters in Real Estate Development program in Summer 2021.

# DAVID M. SHABY III

426 Altair Pl, Venice, CA 90291 ▪ davidshaby14@gmail.com ▪ (310)683-8767 ▪ CA DRE License #02081248

## EDUCATION

**NEW YORK UNIVERSITY**                                                                    **NEW YORK, NY**
*B.S. in Real Estate, Schack Institute of Real Estate, School of Professional Studies*         *September 2013 – May 2017*
- ▪ **Relevant Coursework:** Real Estate Capital Markets, Risk and Portfolio Management, Real Estate Development Process, Accounting, Financial Modeling in Excel and Argus, Commercial Lease Analysis, Real Estate Appraisal and Valuation, Real Estate Market Analysis

**Every-day Work Experience in:** Microsoft Excel, VTS, Argus-Developer, Argus-Enterprise, Adobe Photoshop, Adobe InDesign

## WORK EXPERIENCE

**NAI CAPITAL**                                                                    **TORRANCE, CA**
*Senior Associate, Industrial Brokerage*                                              *October 2020 – Present*
- ▪ Specialize in the acquisition, disposition, and leasing of industrial real estate assets in the Greater Los Angeles area.
- ▪ Represented and consulted both Landlords and Tenants on industrial real estate-based decisions; was responsible for preparing marketing material, scheduling property tours, overseeing LOI and Lease negotiations, Sale and Purchase Agreements, Broker Opinion of Value presentations, and conducting financial analyses.
- ▪ Actively canvassed industrial real estate located in the cities of Gardena, Carson, and along with the Alameda Corridor.

**SEISMIC RETROFIT SPECIALISTS, LLC**                                          **CULVER CITY, CA**
*Co-Founder, Vice President*                                                         *June 2020 – Present*
- ▪ Co-Founder of Seismic Retrofit Specialists (SRS), a full-service general contracting start-up, licensed by Contractor State License Board #549884. SRS specializes in bringing multi-family and commercial buildings into compliance with current earthquake and seismic building codes, such as Ordinance 183893, Ordinance 184081, and SB-721. Services include soft-story retrofitting, basement expansion, balcony repairs, earthquake bolting, sister foundation, and spalling concrete repair.
- ▪ Current responsibilities include managing and overseeing finances, marketing (website in progress), client procurement, and business development.

**JONES LANG LASALLE (JLL)**                                                    **LOS ANGELES, CA**
*Leasing Associate, National Retail Group*                                        *September 2017 – October 2020*
- ▪ Assisted in the leasing of 9 shopping centers in excess of 5.53M SF, representing the following Clients: DWS–Deutsche Bank, Brixton Capital, Nuveen Capital, Rialto Capital, and Gerrity Group. Properties included: Manhattan Village Shopping Center, Forum Carlsbad Shopping Center, Marina Marketplace Shopping Center, SouthBay Pavilion, Rogue Valley Mall, Sherwood Mall, Everett Mall, Salem Center, and Provo Towne Center.
- ▪ Main duties included: Generating new leads, negotiating LOI's into Lease (new deals and renewals), maintaining Client and Tenant relations, financial modeling in Microsoft Excel, preparing property-wide leasing budgets and quarterly investment reports, creating marketing material such as flyers, merchandising plans, and custom renderings all using Adobe Photoshop.
- ▪ During entire employment, supported the leasing of the Manhattan Village Shopping Center, a $200M redevelopment in Manhattan Beach, CA. Working alongside Kristin Grove and Devin Klein, our team closed 75+ deals, earning over $2.64M in leasing revenue.

**MARCUS & MILLICHAP**                                                              **NEW YORK, NY**
*Brokerage Assistant*                                                               *February 2017 – May 2017*
- ▪ Gained experience in real estate evaluation and appraisal, market analysis, data basing, and client research under elite New York City based commercial real estate broker, Nat Rockett.
- ▪ Projects included researching and creating sale comps for recent retail and office sales to consolidate neighborhood-specific price per square foot and cap rates, as well as client research and database management; using Apto, Salesforce, LexisNexis, CoStar, Property Shark, and Reonomy.

## EXTRACURRICULAR

**NYU ICE HOCKEY**                                                                   **NEW YORK, NY**
*2x National Champion, Academic All-American, 4-Year Athlete*                         *September 2013 – March 2017*
- ▪ 2017 ACHA National Champions, 2015 ACHA National Champions, 2017 & 2015 SECHL Division Champions
- ▪ Received President's Service Award in 2015, 2016, and 2017 for community service work in Greater New York City area.

**AVIATION**                                                                         **LOS ANGELES, CA**
*Complex, High Performance Endorsed*                                                  *Summer 2012-Present*
- ▪ Received FAA Private Pilots license in the Summer of 2015.
- ▪ Received FAA High Performance and Complex license in the Summer of 2016.

**COMMUNITY SERVICE:** NYU Hockey: President's Service Award (2015-2017), State of California Assembly Award for Environmental Awareness work with Grades of Green as the Youth Co-Chair (2012-2013), Patient Discharge Volunteer at Providence Little Company of Mary Hospital in Torrance, CA (2012)



## BROKER PROFILE

**Professional Profile**
Grant Bullen serves as an Associate with NAI Capital. He specializes in investment transactions throughout Southern California. He utilizes his in-depth financial knowledge and analytical skills to develop effective investment and disposition strategies for his clients.

**Background & Experience**
Grant Bullen possesses a wide range of financial as well as commercial real estate experience. He began his career working in corporate finance and management consulting where he provided financial and strategic advisory for clients in a variety of industries. He leveraged his distinct blend of financial analysis and data management skills to help clients stabilize accounting operations, streamline data flows, and provide management reporting & analysis.

Throughout his career he has demonstrated a proven ability to boost company performance by identifying inefficiencies, developing solutions, and translating those solutions into clear results.

**Education**
Grant Bullen earned a Bachelor of Science degree in Marketing from the W.P. Carey School of Business at Arizona State University. Additionally, he completed independent coursework in Finance Theory at MIT, Financial Markets at Yale, and Principles of Microeconomic at MIT, and Financial Analysis and Decision Making at Tsinghua University.



Grant Bullen
Associate
NAI Capital
O: (818) 815-2414
M: (435) 760-6094
gbullen@naicapital.com
Cal DRE Lic. #02060015

15821 Ventura Boulevard   Suite 320  |  Encino, California USA   91436  |  +1 818 905 2400  |  naccapital.com

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **APPLICATION OF DEBTOR AND DEBTOR IN POSSESSION TO EMPLOY NAI CAPITAL COMMERCIAL, INC. AS REAL ESTATE BROKER PURSUANT TO 11 U.S.C. §§ 327 AND 328; DECLARATION OF CHRIS JACKSON IN SUPPORT THEREOF** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1.    TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **June 2, 2021**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Ron Bender    rb@lnbyb.com**
- **Christopher G. Cardinale    ccardinale@agclawfirm.com, mgonzalez@agclawfirm.com**
- **Michael G Fletcher    mfletcher@frandzel.com, sking@frandzel.com**
- **Amir Gamliel    amir-gamliel-9554@ecf.pacerpro.com,
  cmallahi@perkinscoie.com;DocketLA@perkinscoie.com**
- **Robert P Goe    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;goeforecf@gmail.com**
- **Nancy S Goldenberg    nancy.goldenberg@usdoj.gov**
- **Peter F Jazayeri    peter@jaz-law.com**
- **Daniel A Lev    dlev@sulmeyerlaw.com,
  ccaldwell@sulmeyerlaw.com;dlev@ecf.inforuptcy.com**
- **Grant A Nigolian    grant@gnpclaw.com,
  process@gnpclaw.com;grant.nigolian@gmail.com**
- **Juliet Y Oh    jyo@lnbrb.com, jyo@lnbrb.com**
- **Ho-El Park    hpark@hparklaw.com**
- **Ronald N Richards    ron@ronaldrichards.com, morani@ronaldrichards.com**
- **United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov**

**2.    SERVED BY UNITED STATES MAIL**: On **June 2, 2021**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Nancy S Goldenberg
United States Trustee (SA)
411 W Fourth St Ste 7160
Santa Ana, CA 92701-8000

☐ Service List continued on attached page

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

1   **3.    SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR
    EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR,
2   on **June 2, 2021**, I served the following persons and/or entities by personal delivery, overnight mail
    service, or (for those who consented in writing to such service method), by facsimile transmission and/or
3   email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight
    mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

4
    *Served via Overnight Mail*
5   Hon. Erithe A. Smith
    United States Bankruptcy Court
6   411 West Fourth Street, Suite 5040 / Courtroom 5A
    Santa Ana, CA 92701-4593
7

8   I declare under penalty of perjury under the laws of the United States of America that the foregoing is
    true and correct.
9
    | June 2, 2021 | Lourdes Cruz | /s/ Lourdes Cruz |
10  | Date | Type Name | Signature |

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                **F 9013-3.1.PROOF.SERVICE**