## EXHIBIT 1

PPM

The Hotel at The Source

Memorandum No.____

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

## US$10,000,000

## 20 Class B Units of Membership Interest
### in
## BEACH ORANGETHORPE HOTEL, LLC
### a California limited liability company

## US$500,000 per Unit

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO PURCHASE, ANY UNIT BY OR TO ANY PERSON IN ANY JURISDICTION WHERE SUCH OFFER OR SOLICITATION WOULD BE UNLAWFUL.

February 12, 2014

10437766\V-2
LA 130898254v6

This Confidential Private Placement Memorandum (this "**Memorandum**") describes the confidential private placement of the securities of Beach Orangethorpe Hotel, LLC, a California limited liability company (the "**Company**"), which was formed to make a loan on the terms described in **IX. THE LOAN** (the "**Loan**") to The Source Hotel, LLC, a California limited liability company (the "**Developer**"), to develop a focused-service hotel with approximately 150 rooms ("Hotel Development"). The Hotel Development will be constructed as part of a larger developmental project consisting of approximately 12.8 acres of land located in Buena Park, California (Orange County) (the "**Property**"), as more particularly described in **VIII.A. Description of the Property.** The entire mixed-use development will include a Retail Center (Phase I), Office Building (Phase II), and the Hotel Development (Phase III) (collectively the "**Development**").

The following renderings describe that portion of the **Development** which the **Hotel Development** is planned:



The Hotel Development will be in the southeast corner of the 12.8 acre site which is described herein as the Property. The entire Development consisting of Phase I (Retail Center), Phase II (Office Building) and Phase III (Hotel Development) can be visualized by the renderings included herein. Phases I and II of the Development are separate developments within the Property and are subject to certain loans and financings relating to the construction of those phases of the overall development of the Property. Although Phases I and II are under the control and management of affiliates of the developer for the Hotel Development, they should be considered separate operations from the Hotel Development although the successful completion of those phases could affect the Hotel Development as more particularly described herein.

The Hotel Development will be a seven story building on that portion of the Property which the Developer will occupy pursuant to a 99-year ground lease, which the Developer is currently negotiating. The Loan (estimated at $10 million) will be a portion of approximately

10437766\V-2
LA 130898254v6

$26 million construction budget for the Hotel Development. A Construction Loan as more particularly described in **VIII.C. Financing the Hotel Development** is expected to provide the estimated balance needed for the Hotel Development.



The Hotel Development is pictured in the center of this rendering.



10437766\V-2
LA 130898254v6

The private offering covered by this Memorandum (the "**Offering**"), consisting of up to 20 Class B Units of membership interest in the Company (the "**Class B Units**"), will be:

(i)     Available at the subscription rate of US$500,000 per Class B Unit (without any fractional interest), subject to the Minimum Investment Requirement (as defined in **V.E. Minimum Investment Requirement**), for each Subscriber ("**EB-5 Investor**"),

(ii)    Offered only to "Accredited Investors" ("**Accredited Investors**"), as defined in Regulation D ("**Regulation D**") as promulgated under the Securities Act of 1933, as amended (the "**Securities Act**"), whom the Company deems, in its sole discretion, can bear the risks associated with investing in the Class B Units, and

(iii)   Consummated only with persons who have completed all of the following requirements:

(a) Executed and delivered by the Offering Termination Date (as defined in **V.B. Offering Termination Date**) the Subscription Agreement attached to this Memorandum as Exhibit A (the "**Subscription Agreement**"), a Joinder Agreement and Spousal Consent (if applicable) to the Operating Agreement for the Company in the form attached to this Memorandum as Exhibit B (the "**Operating Agreement**"), the Investment Representation Statement attached to this Memorandum as Exhibit C (the "**Representation Statement**"), the Escrow Agreement (if applicable) (the "**Escrow Agreement**") and a completed Form W-8BEN or W-9 attached to this Memorandum as Exhibit D,

(b) Delivered Evidence of Source of Funds (as defined in **V.G. Evidence of Source of Funds**),

(c) Delivered valid certified checks, cashier's checks or personal checks or made wire transfers for the amount of the subscription and an administration fee of US$45,000 ("**Administration Fee**"), which Administration Fee is for the Regional Center (as defined below), to an account designated by the Company, and

(d) Been accepted by the Company, in the Company's sole and absolute discretion (the persons who have delivered the items described in (a), (b), and (c), the "**Subscribers**"). Upon satisfaction of all conditions described in **V.I. Conditions to Release of Funds**, a Subscriber accepted by the Company will be admitted as a Class B Member pursuant to the terms of the Operating Agreement. The terms of the Offering and the rights and obligations of the Class B Units have been designed to comply with the EB-5 Immigrant Investor Visa Program (the "**EB-5 Program**").

As of the date of this Memorandum, the sole member of the Company is M&D Regional Center, LLC (the "**Regional Center**"), a California limited liability company designated as a

iv

regional center under the EB-5 Program by the U.S. Citizenship and Immigration Services (the "**USCIS**"). The Regional Center holds 20 Class A Units of membership interest in the Company ("**Class A Units**"). The sole member of the Regional Center is DMC Investment Holdings, LLC, a Delaware limited liability company ("**DMC**"), and the sole manager of the Regional Center is M + D Properties, a California corporation ("**M + D**"). Min Chae and Donald Chae, who beneficially own 100% of DMC and M + D, are currently the co-managers of DMC and the officers of M + D. As of the date of this Memorandum, DMC is the sole member of the Developer, and M + D is the sole manager of the Developer.

The following diagram outlines the membership interests in the Company together with the relationship with the Developer, Min Chae, Donald Chae and the entities providing security for the Loan.



10437766\V-2
*LA 130898254v6*

The Company shall have one manager (the "**Manager**"). The member holding Class A Units shall have the right to appoint the Manager and as of the date of this Memorandum, Regional Center has been appointed as the Class A Manager. The Class B Members shall have the right to appoint a special manager under certain circumstances as outlined the Operating Agreement ("**Special Manager**"). See **VI.C. The Manager/Special Manager**.

The Offering will terminate on the Offering Termination Date, which is the earliest of:

(i)     The date the Company determines that all 20 Class B Units have been subscribed to in a manner acceptable to the Company,

(ii)    The date the Company decides to accept subscriptions for less than all 20 Class B Units, or

(iii)   One year from the initial date of the offering, unless extended at the sole and absolute discretion of the Company, but not in any event beyond twelve (12) months thereafter.  See **V.B. Offering Termination Date**.  Subscribers' funds, as received by the Company, will be deposited with the Escrow Agent (as defined in **V.F. Escrow Account**), in a special escrow account.  The Company may accept or reject any subscription or may terminate the Offering (with respect to those subscriptions that have not closed) with less than all Class B Units sold, all in the Company's sole and absolute discretion.

This Memorandum and any related materials are submitted only to Accredited Investors and may not be used for any other purpose or reproduced in any manner.  Those persons not purchasing the Class B Units must immediately return to the Company this Memorandum and any materials provided to Subscribers by the Company in connection with this Memorandum. Except as authorized by the Company or this Memorandum, any distribution of this Memorandum by any person other than the Company, in whole or in part, or the divulgence of any of its contents, is unauthorized and strictly prohibited.

All initially capitalized terms not defined herein are used as defined in the Operating Agreement.

Please direct documents and checks to:

> Beach Orangethorpe Hotel, LLC
> 3100 E. Imperial Highway
> Lynwood, CA 90262
> Telephone: (714) 521-8858
> Facsimile: (714) 521-4256
> Attn: General Manager

THE COMPANY MAY, IN ITS SOLE AND ABSOLUTE DISCRETION, ACCEPT OR REJECT ANY SUBSCRIPTION.  ANY PERSON OR ENTITY DESIRING TO INVEST SHOULD PROMPTLY SIGN AND SUBMIT TO THE COMPANY A SUBSCRIPTION

10437760\V-2
LA 130898254v6

AGREEMENT (IN THE FORM ATTACHED AS EXHIBIT A TO THIS MEMORANDUM), A
JOINDER AGREEMENT AND SPOUSAL CONSENT (IF APPLICABLE) TO THE
OPERATING AGREEMENT (IN THE FORM ATTACHED AS EXHIBIT B TO THIS
MEMORANDUM), REPRESENTATION STATEMENT (IN THE FORM ATTACHED AS
EXHIBIT C TO THIS MEMORANDUM), AN ESCROW AGREEMENT (IF APPLICABLE),
A COMPLETED FORM W-8BEN OR W-9 (IN THE FORM ATTACHED AS EXHIBIT D TO
THIS MEMORANDUM), AND EVIDENCE OF SOURCE OF FUNDS TOGETHER WITH
VALID CERTIFIED CHECKS, CASHIER'S CHECKS OR PERSONAL CHECKS FOR THE
FULL AMOUNT OF THE DESIRED INVESTMENT AND THE ADMINISTRATION FEE
(OR HAVE SUCH AMOUNTS SENT BY WIRE TRANSFERS TO AN ACCOUNT
DESIGNATED BY THE COMPANY). ALL AMOUNTS MUST BE PAID IN LAWFUL
CURRENCY OF THE UNITED STATES OF AMERICA.

AT ANY TIME PRIOR TO THE OFFERING TERMINATION DATE, THE
COMPANY MAY, IN ITS SOLE AND ABSOLUTE DISCRETION, TERMINATE THE
OFFERING (WITH RESPECT TO THOSE SUBSCRIPTIONS THAT HAVE NOT CLOSED)
UPON GIVING WRITTEN NOTICE THEREOF TO ALL REMAINING SUBSCRIBERS
WHOSE SUBSCRIPTIONS HAVE NOT CLOSED AND RETURNING TO EACH SUCH
SUBSCRIBER THE FULL AMOUNT PAID BY SUCH SUBSCRIBER (INCLUDING THE
ADMINISTRATION FEE) WITHOUT INTEREST. IF THE TOTAL AMOUNT OF ALL
SUBSCRIPTIONS SUBMITTED IN RESPONSE TO THE OFFERING AND ACCEPTABLE
TO THE COMPANY IS LESS THAN THE TOTAL AMOUNT OF THE OFFERING, THE
COMPANY MAY, IN ITS SOLE AND ABSOLUTE DISCRETION, COMPLETE THE
OFFERING FOR SUCH LESSER AMOUNT.

THE UNITS OFFERED HEREBY ARE SPECULATIVE SECURITIES AND AN
INVESTMENT THEREIN INVOLVES A HIGH DEGREE OF RISK. THERE IS NO
ASSURANCE THAT THE COMPANY WILL BE ABLE TO MAKE ANY DISTRIBUTIONS,
THAT THE COMPANY WILL BE PROFITABLE, OR THAT THE COMPANY WILL BE
ABLE TO REPAY INVESTORS ANY OR ALL OF THEIR INVESTMENT. PROSPECTIVE
SUBSCRIBERS MUST RELY ON THEIR OWN ANALYSIS OF THE INVESTMENT AND
ASSESSMENT OF THE RISKS INVOLVED. PROSPECTIVE SUBSCRIBERS SHOULD
CAREFULLY REVIEW THE INFORMATION SET FORTH IN THIS MEMORANDUM
CONCERNING THE RISK OF INVESTING IN THE CLASS B UNITS INCLUDING,
WITHOUT LIMITATION, THE SECTIONS ENTITLED "**RISK FACTORS**" AND
"**CONFLICTS OF INTEREST**," BEFORE MAKING ANY SUCH INVESTMENT.

TRANSFERABILITY OF THE CLASS B UNITS IS LIMITED AND NO TRADING
MARKET EXISTS FOR THE CLASS B UNITS. SEE **II.S. LIMITED TRANSFERABILITY
OF THE CLASS B UNITS** AND **EXHIBIT B – OPERATING AGREEMENT OF BEACH
ORANGETHORPE HOTEL, LLC**.

THE CLASS B UNITS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES
ACT, OR THE SECURITIES LAWS OF ANY APPLICABLE U.S. STATE OR NON-U.S.
COUNTRY. THE CLASS B UNITS ARE BEING OFFERED PURSUANT TO AN
EXEMPTION FROM REGISTRATION UNDER SECTION 4(2) OF THE SECURITIES ACT
AND A SAFE HARBOR FROM REGISTRATION UNDER REGULATIONS D AND S, AS

10437766\V-2
*LA 130898254v6*

WELL AS ONE OR MORE EXEMPTIONS UNDER APPLICABLE SECURITIES LAWS AND REGULATIONS OF EACH APPLICABLE U.S. STATE, AND ONE OR MORE EXEMPTIONS FROM CERTAIN NON-U.S. SECURITIES LAWS.  HOWEVER, NEITHER THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE OR NON-U.S. SECURITIES COMMISSION HAS MADE AN INDEPENDENT DETERMINATION THAT THE SECURITIES OFFERED HEREBY ARE EXEMPT FROM REGISTRATION. THE CLASS B UNITS MAY NOT BE SOLD OR TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OR THE SECURITIES LAWS OF EACH APPLICABLE U.S. STATE AND NON-U.S. COUNTRY.  THERE IS NO PUBLIC MARKET FOR THE CLASS B UNITS AND NO SUCH MARKET IS LIKELY TO DEVELOP.

THE OFFERING IS BEING MADE PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT IN RELIANCE UPON INTENDED COMPLIANCE WITH REGULATION D AS AN OFFERING ONLY TO THOSE PERSONS WHO CERTIFY IN WRITING THAT THEY ARE ACCREDITED INVESTORS, AS DEFINED THEREUNDER.   THE OFFERING WILL BE MADE ONLY UPON COMPLIANCE WITH THE EXEMPTION, FILING AND/OR NOTICE REQUIREMENTS, IF ANY, OF THE SECURITIES LAWS OF EACH APPLICABLE U.S. STATE AND NON-U.S. COUNTRY.  EACH INVESTOR WHO ACQUIRES THE CLASS B UNITS OFFERED HEREBY MUST ACQUIRE SUCH UNITS FOR SUCH PERSON'S OWN ACCOUNT FOR INVESTMENT PURPOSES ONLY, AND NOT WITH ANY INTENTION OF DISTRIBUTING OR RESELLING THE CLASS B UNITS, EITHER IN WHOLE OR IN PART.  SEE **III. WHO MAY INVEST**.

NEITHER THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE OR NON-U.S. SECURITIES COMMISSION HAS PASSED UPON THE MERITS OF OR GIVEN ITS APPROVAL TO ANY SECURITIES OFFERED OR THE TERMS OF THE OFFERING, NOR HAVE THEY PASSED UPON THE ACCURACY OR COMPLETENESS OF THIS MEMORANDUM OR THE EXHIBITS ATTACHED HERETO OR OTHER OFFERING LITERATURE.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO PURCHASE, ANY UNIT BY OR TO ANY PERSON IN ANY JURISDICTION WHERE SUCH OFFER OR SOLICITATION WOULD BE UNLAWFUL.

THIS MEMORANDUM HAS NOT, PRIOR TO ITS ISSUANCE AND USE, BEEN FILED WITH OR REVIEWED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR ANY OTHER GOVERNMENTAL AUTHORITY IN ANY JURISDICTION OTHER THAN THE USCIS (EXCEPT THAT COPIES OF THIS MEMORANDUM MAY HAVE BEEN FILED WITH ONE OR MORE OF SUCH AUTHORITIES AS PART OF AN APPLICATION FOR EXEMPTION FROM SECURITIES REGISTRATION REQUIREMENTS OR IN COMPLIANCE WITH THE NOTICE REQUIREMENTS OF APPLICABLE LAWS).  NEITHER THE MERITS OF THE OFFERING NOR THE ACCURACY AND COMPLETENESS OF THIS MEMORANDUM HAVE BEEN

10437760\V-2
LA 130898254v6

PASSED UPON OR ENDORSED BY THE UNITED STATES SECURITIES AND
EXCHANGE COMMISSION, THE USCIS, OR ANY OTHER GOVERNMENTAL
AUTHORITY. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL AND IS A
CRIMINAL OFFENSE.

THE PROCEEDS OF THE OFFERING WILL BE RECEIVED AND HELD IN
ESCROW FOR THE BENEFIT OF SUBSCRIBERS IN A SEPARATE ACCOUNT OPENED
BY THE COMPANY. ONCE A SUBSCRIPTION HAS CLOSED, THE PROCEEDS (OTHER
THAN THE ADMINISTRATION FEE) WILL BE RELEASED TO THE COMPANY AND
USED TO FUND THE LOAN AS OUTLINED BY THE ESCROW AGREEMENT AND/OR
ANY ACCOMPANYING WAIVER.

IF A SUBSCRIBER BECOMES A MEMBER OF THE COMPANY, SUCH
SUBSCRIBER WILL BE PROVIDED ANNUALLY WITH FINANCIAL STATEMENTS,
INCLUDING A BALANCE SHEET, RELATED PROFIT AND LOSS STATEMENT AND
CASH FLOW STATEMENT, AND SUCH OTHER STATEMENTS, IF ANY, THAT THE
COMPANY IS REQUIRED BY LAW OR THE OPERATING AGREEMENT TO PROVIDE
TO MEMBERS.

PERSONS CONSIDERING THE PURCHASE OF ONE OR MORE CLASS B UNITS
SHOULD NOT CONSTRUE THIS MEMORANDUM AS LEGAL, TAX OR INVESTMENT
ADVICE. THEY ARE URGED TO CONSULT THEIR OWN COUNSEL OR OTHER
ADVISORS AS TO LEGAL, TAX AND INVESTMENT ADVICE AND ALL MATTERS
CONCERNING INVESTMENT IN THE CLASS B UNITS.

THIS MEMORANDUM SUMMARIZES CERTAIN DOCUMENTS. EACH SUCH
SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE TERMS OF THE ACTUAL
DOCUMENT. FOR THE EXACT TERMS OF ANY SUCH DOCUMENT, PROSPECTIVE
SUBSCRIBERS SHOULD EXAMINE THE CORRESPONDING DOCUMENT ATTACHED
AS AN EXHIBIT TO THIS MEMORANDUM IF SUCH DOCUMENT IS ATTACHED AS
AN EXHIBIT HERETO, AND MAY, UPON REQUEST TO THE COMPANY, EXAMINE A
COPY OF ANY SUCH DOCUMENT THAT IS NOT ATTACHED AS AN EXHIBIT TO THIS
MEMORANDUM.

PROSPECTIVE SUBSCRIBERS MAY OBTAIN ADDITIONAL INFORMATION
AND ACCESS TO PERTINENT DOCUMENTATION AS THE COMPANY MAY HAVE OR
MAY OBTAIN WITHOUT UNREASONABLE EFFORT OR EXPENSE. SEE
**XVI. ADDITIONAL INFORMATION**.

THE SALE OF THE CLASS B UNITS CAN BE CONSUMMATED ONLY BY THE
ACCEPTANCE BY THE COMPANY OF SUBSCRIPTIONS TENDERED BY ACCREDITED
INVESTORS. THE COMPANY, THROUGH ITS AUTHORIZED REPRESENTATIVES,
MAY, IN THE SOLE AND ABSOLUTE DISCRETION OF ITS AUTHORIZED
REPRESENTATIVES, AT ANY TIME PRIOR TO THE OFFERING TERMINATION DATE
AND ONLY WITH RESPECT TO THOSE SUBSCRIPTIONS THAT HAVE NOT CLOSED,
WITHDRAW OR MODIFY THE OFFERING AND REJECT FOR ANY REASON ANY
SUBSCRIPTION.

ANY PROJECTIONS INCLUDED IN OR ATTACHED TO THIS MEMORANDUM OR OTHERWISE PROVIDED TO PROSPECTIVE SUBSCRIBERS BY THE COMPANY ARE BASED UPON CERTAIN ASSUMPTIONS AND RELATE TO FUTURE EVENTS. THERE IS NO ASSURANCE THAT SUCH ASSUMPTIONS ARE ACCURATE, THAT SUCH EVENTS WILL TAKE PLACE, OR THAT ACTUAL RESULTS EXPERIENCED BY THE COMPANY OR THE SUBSCRIBERS WILL BE SIMILAR. SEE **II. RISK FACTORS**.

CERTAIN STATEMENTS UNDER THE CAPTIONS "**OFFERING SUMMARY**," "**INVESTMENT OBJECTIVES AND STRATEGY**," "**THE PROPERTY AND THE DEVELOPMENT**," "**RISK FACTORS**," AND ELSEWHERE IN THIS MEMORANDUM ARE "FORWARD-LOOKING STATEMENTS."     THESE   FORWARD-LOOKING STATEMENTS INCLUDE, BUT ARE NOT LIMITED TO, STATEMENTS ABOUT THE COMPANY'S OR DEVELOPER'S PLANS, OBJECTIVES, EXPECTATIONS, INTENTIONS AND ASSUMPTIONS AND OTHER STATEMENTS THAT ARE NOT HISTORICAL FACTS.     WHEN USED IN THIS MEMORANDUM, THE WORDS "EXPECT," "ANTICIPATE," "INTEND," "PLAN," "BELIEVE," "SEEK," "ESTIMATE," AND SIMILAR EXPRESSIONS ARE GENERALLY INTENDED TO IDENTIFY FORWARD-LOOKING STATEMENTS.   BECAUSE THESE FORWARD-LOOKING STATEMENTS INVOLVE RISKS AND UNCERTAINTIES, ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THOSE EXPRESSED OR IMPLIED BY THESE FORWARD-LOOKING STATEMENTS. NEITHER THE COMPANY NOR THE DEVELOPER INTENDS TO UPDATE OR REVISE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE. SEE **II. RISK FACTORS**.

10437766V-2
LA 130898254v6

## Table of Contents

Page

I.      OFFERING SUMMARY..................................................................................................................1

  A. INVESTMENT OBJECTIVES ...........................................................................................................1
  B. THE COMPANY, THE DEVELOPER, AND MANAGER.......................................................................1
  C. DESCRIPTION OF THE PROPERTY AND DEVELOPMENT..................................................................1
  D. DESCRIPTION OF THE HOTEL DEVELOPMENT...............................................................................2
  E. ECONOMIC PROJECTIONS OF THE HOTEL DEVELOPMENT .............................................................2
  F. THE HOTEL DEVELOPMENT AND DEVELOPMENT ON THE PROPERTY ............................................2

II.     RISK FACTORS..........................................................................................................................3

  A. GENERAL RISKS RELATING TO THE EB-5 PROGRAM....................................................................4
  B. RISKS RELATING TO THE PROGRAM ............................................................................................7
  C. RISKS OF THE COMPANY'S CLASS B UNITS.................................................................................8
  D. RISKS OF RETURN OF INVESTMENT ............................................................................................8
  E. RISKS RELATING TO OTHER LENDERS .........................................................................................8
  F. FRANCHISE REQUIREMENTS .......................................................................................................9
  G. RISKS RELATING TO THE VIABILITY AND MARKETABILITY OF THE DEVELOPMENT.........................9
  H. RISKS RELATING TO ENVIRONMENTAL ISSUES ..........................................................................10
  I. RISKS RELATING TO GEOLOGY AND SOILS ................................................................................10
  J. RISKS RELATING TO FINANCING GENERALLY ............................................................................10
  K. RISKS RELATING TO CREDIT CRISIS ..........................................................................................11
  L. RISKS ASSOCIATED WITH LEVERAGE ........................................................................................11
  M. RISKS RELATING TO ECONOMIC PROJECTIONS ..........................................................................12
  N. NO ASSURANCE OF DISTRIBUTIONS OR INCOME; DELAY IN REPAYMENT OF LOANS ....................12
  O. RISK OF RELYING ON MANAGEMENT AND THE PERFORMANCE BY OTHERS..................................13
  P. LIMITED CAPITAL RESOURCES ..................................................................................................14
  Q. LIMITATIONS ON INSURANCE ...................................................................................................14
  R. TAX RISKS ..............................................................................................................................14
  S. LIMITED TRANSFERABILITY OF THE CLASS B UNITS ..................................................................15
  T. CONFLICTS OF INTEREST ..........................................................................................................15
  U. LIMITED OPERATING HISTORY .................................................................................................16
  V. INDEMNIFICATION/EXCULPATION OF MANAGER AND OTHER INSIDERS......................................16
  W. GROUND LEASE/JUNIOR SECURITY INTEREST ...........................................................................16
  X. RISKS RELATING TO AVAILABILITY OF SECURITIES LAW EXEMPTION .........................................17
  Y. AMENDMENTS TO RULE 506 RELATING TO PERSONS ASSOCIATED WITH THE COMPANY AND THIS
     OFFERING................................................................................................................................17
  Z. NEITHER THE MANAGER, THE REGIONAL CENTER, NOR THE COMPANY IS REGISTERED AS AN
     "INVESTMENT ADVISER" UNDER THE INVESTMENT ADVISERS ACT OF 1940, AS AMENDED (THE
     "ADVISERS ACT")....................................................................................................................18
  AA. THERE CAN BE NO ASSURANCE THAT THE COMPANY IS NOT AN "INVESTMENT COMPANY" SUBJECT
     TO THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED, WHICH DOES NOT QUALIFY FOR AN
     EXEMPTION. ............................................................................................................................18
  BB. ADDITIONAL RISKS .................................................................................................................19

III.    WHO MAY INVEST .................................................................................................................19

IV.     INVESTMENT OBJECTIVES AND STRATEGY .............................................................20

V.      TERMS OF THE OFFERING ..................................................................................................21

  A. GENERAL ...............................................................................................................................21
  B. OFFERING TERMINATION DATE ................................................................................................22
  C. SUBSCRIPTION PROCEDURE......................................................................................................22
  D. SUBSCRIPTION PAYMENT AND ADMINISTRATION FEE.................................................................23

| E. | MINIMUM INVESTMENT REQUIREMENT | 23 |
|---|---|---|
| F. | ESCROW ACCOUNT | 23 |
| G. | EVIDENCE OF SOURCE OF FUNDS | 24 |
| H. | ACCEPTANCE AND REVOCATION OF SUBSCRIPTION | 24 |
| I. | CONDITIONS TO RELEASE OF FUNDS | 24 |
| J. | RETURN OF SUBSCRIPTION FUNDS | 25 |
| K. | IMMIGRATION-RELATED EXPENSES | 25 |
| L. | PROGRAM LOCATORS | 25 |

**VI.     THE COMPANY, THE DEVELOPER, AND THE MANAGER.............................................26**

| A. | THE COMPANY | 26 |
|---|---|---|
| B. | THE DEVELOPER | 26 |
| C. | THE MANAGER/SPECIAL MANAGER | 26 |

**VII.    SUMMARY OF THE OPERATING AGREEMENT............................................................28**

| A. | PURPOSES | 29 |
|---|---|---|
| B. | TERM | 29 |
| C. | CAPITAL CONTRIBUTIONS | 29 |
| D. | EXPENSES OF THE COMPANY | 30 |
| E. | TAX CLASSIFICATION | 30 |
| F. | DISTRIBUTIONS AND ALLOCATIONS | 30 |
| G. | MANAGEMENT, MANAGER AND OFFICERS | 30 |
| H. | SPECIAL MANAGER | 31 |
| I. | VOTING AND APPROVAL RIGHTS OF MEMBERS | 31 |
| J. | LIABILITIES OF MEMBERS AND MANAGER, AND OFFICERS | 32 |
| K. | TRANSFER AND ASSIGNMENT OF MEMBERSHIP INTEREST | 32 |
| L. | LIQUIDATION OF CLASS B UNITS | 33 |
| M. | REMUNERATION TO MEMBERS AND MANAGER | 34 |
| N. | COMPETING ACTIVITIES | 34 |
| O. | ACCOUNTING AND REPORTING | 34 |
| P. | DISSOLUTION AND WINDING UP | 34 |
| Q. | INDEMNIFICATION | 35 |

**VIII.   THE PROPERTY, DEVELOPMENT AND THE HOTEL DEVELOPMENT ....................35**

| A. | DESCRIPTION OF THE PROPERTY AND DEVELOPMENT | 35 |
|---|---|---|
| B. | DESCRIPTION OF THE HOTEL DEVELOPMENT | 36 |
| C. | FINANCING THE HOTEL DEVELOPMENT | 36 |
| D. | ZONING AND LAND USE | 37 |
| E. | ARCHITECTURAL PLANS AND SPECIFICATIONS | 37 |
| F. | ECONOMIC PROJECTIONS OF THE HOTEL DEVELOPMENT | 37 |

**IX.     THE LOAN..................................................................................................................38**

| A. | GENERAL TERMS | 38 |
|---|---|---|
| B. | GUARANTIES | 38 |
| C. | DEED OF TRUST | 38 |
| D. | USE OF LOAN PROCEEDS | 39 |

**X.      COMPENSATION AND FEES ......................................................................................39**

**XI.     CONFLICTS OF INTEREST .......................................................................................39**

| A. | CONFLICT AMONG THE COMPANY, BEACH ORANGETHORPE; LLC AND BEACH ORANGETHORPE II, LLC: BEACH ORANGETHORPE VENTURES, LLC; BEACH ORANGETHORPE SOURCE, LLC; BEACH ORANGETHORPE INVESTORS, LLC; BEACH ORANGETHORPE OFFICE, LLC | 39 |
|---|---|---|
| B. | RELATIONSHIP BETWEEN THE MANAGER AND DEVELOPER | 40 |
| C. | ALLOCATION OF MANAGER'S TIME | 40 |
| D. | COMPANY'S TRANSACTIONS WITH RELATED PARTIES | 40 |

|  | E. | DEVELOPER'S TRANSACTIONS WITH RELATED PARTIES | 40 |
| XII. | | FIDUCIARY RESPONSIBILITY OF THE MANAGER | 41 |
|  | A. | EXCULPATION | 41 |
|  | B. | INDEMNIFICATION | 41 |
| XIII. | | LEGAL PROCEEDINGS | 41 |
| XIV. | | TAX CONSIDERATIONS | 42 |
| XV. | | PLAN OF DISTRIBUTION | 45 |
|  | A. | SALE OF THE CLASS B UNITS | 45 |
|  | B. | ESCROW ARRANGEMENT | 46 |
| XVI. | | ADDITIONAL INFORMATION | 46 |

## EXHIBITS:

| | | |
|---|---|---|
| Exhibit A | – | SUBSCRIPTION AGREEMENT |
| Exhibit B | – | OPERATING AGREEMENT OF BEACH ORANGETHORPE HOTEL, LLC (INCLUDING JOINDER AGREEMENT AND SPOUSAL CONSENT IF APPLICABLE) |
| Exhibit C | – | INVESTMENT REPRESENTATION STATEMENT |
| Exhibit D | – | IRS FORMS W-8BEN AND W-9 |
| Exhibit E | – | FORM OF PROMISSORY NOTE |
| Exhibit F | – | FORM OF GUARANTY |

10437760\V-2
LA 130898254v6

# I.   OFFERING SUMMARY

## A.   Investment Objectives

The Company was organized as a California limited liability company to make the secured loan estimated at $10 million on the terms set forth in **IX. THE LOAN** to the Developer for the development of a Hotel Development consisting of an upscale focused-service hotel located on the Development and more particularly described in below in **D. Description of Hotel Development**. The Developer will provide security for the Loan by entering into a Deed of Trust which will secure the Loan with respect the ground lease to that portion of the Property upon which the Hotel Development will be situated. The Loan's security interest will be junior to a secured construction loan that the Developer expects to obtain in the approximate amount of $16 million borrowed to partially finance construction of the Hotel Development. *See* **IX.C. Deed of Trust**. The repayment of the Loan by the Developer will be guaranteed by Min Chae and Donald Chae. See **IX.B. Guaranties** and **IX.C.Deed of Trust**.

## B.   The Company, the Developer, and Manager

The Company was organized on April 22, 2013 as a California limited liability company. The Regional Center serves as the Manager. A majority of the Class B Members will have the right to appoint a Special Manager under certain circumstances. See **VI.C. The Manager/Special Manager**.

The Regional Center is the sole Class A Member and, as a result, will have certain economic and voting rights set forth in the Operating Agreement. M + D is the sole manager of the Regional Center.

The Developer was organized on November 20, 2012 as a California limited liability company. DMC is the sole member of the Developer, and M + D is the sole manager of the Developer.

DMC and M + D are beneficially owned, controlled, and managed by Min Chae and Donald Chae. Each of Min and Donald has more than 25 years of experience in real estate investment, development, and management.

## C.   Description of the Property and Development

The Property is located in Buena Park, California (Orange County) at the northeast corner of Beach Boulevard and Orangethorpe Avenue and is approximately 12.8 acres, which is owned by The Source at Beach, LLC, an affiliate of the Developer and M + D. A lifestyle retail center consisting of approximately 400,000 square-foot (37,000 square-meters) is currently under development on the Property (the "**Retail Development**" or "**Phase I**"). The development of an office complex (Phase II) will be independently financed and commenced construction in the second half of 2013.

**D.    Description of the Hotel Development**

The Developer proposes to construct a 3.5 to 4-star focused-service hotel facility on a portion of the Property contained in a seven-story building. The first three floors will consist of retail stores from a separate project, and the Hotel Development will be located on floors 4-7 and contain approximately 150 rooms (the "**Hotel Development**"). The proceeds of the Offering in addition to other loans or non-EB-5 funds obtained by the Developer will be used to construct and complete the Hotel Development.

**E.    Economic Projections of the Hotel Development**

The Developer anticipates that Hotel Development will commence site work during the first half of 2014 and will be completed by the end of 2015. Assuming these estimates materialize, the Hotel is expected to open by mid-2016. However, there can be no assurance that the Hotel Development will be completed on time or that the Members will receive any return of or on their investment. When or whether the Hotel Development generates income affects the ability of the Developer to obtain other financing to permit the Developer to repay the various loans made toward the construction of the Hotel Development (See **VIII.C. Financing the Hotel Development**).

**F.    The Hotel Development and Development on the Property**

Phase I (Retail Development) and Phase II (Office Development) have commenced after affiliates of the Developer secured all of the real estate parcels necessary to complete the 12.8 acre site. When completed, the Retail Development will consist of approximately 400,000 square feet 37,000 square-meters) of retail and space within the Property. Parking for the Development will be created in Phase I. The Developer believes its affiliates have secured the necessary financing for the completion of Phase I, primarily through a series of loans received for the development of Phase I, which the Property and Phase I improvements serve as collateral. See **VIII. C. Financing the Hotel Development**. As the Hotel Development is part of the overall development of the Property along with Phases I and II, the success of the Hotel Development is dependent upon the ability of affiliates of the Developer to complete successfully Phases I and II, including their ability to operate successfully both of these phases. Any inability to obtain all funds necessary for completion of and the commercial success of Phases I and II would adversely affect the viability and success of the Hotel Development.

The Phase I development of the Property has been financed by a series of secured real estate loans made to and through the sale of equity interests totaling US$150 Million of The Source at Beach, LLC, the developer of Phase I. The Source at Beach, LLC is an affiliate of the Developer and under the control of Min Chae and Donald Chae. Those secured real estate loans, which aggregate $130 Million, were loans from Beach Orangethorpe, LLC ("BOI"), Beach Orangethorpe II, LLC ("BOII"), Beach Orangethorpe Ventures ("BOIII"),    and Beach Orangethorpe Source ("BO Source") (collectively "Property Loans"). Beach Orangethorpe Investors, LLC ("BO Investors") purchased an equity interest for $20 Million in The Source at Beach, LLC to provide other capital for Phase I. All of the above described entities conducted offerings under the EB-5 program similar to this offering except the proceeds of such offerings

2

10437766\V-2
LA 130898254v6

were or will be used for the completion of Phase I. A private offering by Beach Orangethorpe Office, LLC is expected to provide funding for the Office Development (Phase II).

The Loan for the Hotel Development will be secured by the Developer's interest in a ground lease upon which the Hotel Development is constructed as well as obtaining the personal guarantees of Min Chae and Donald Chae who control the Developer and its affiliates. The Loan from the Company, while considered a secured loan, is junior to the security interest of the Construction Loan that the Developer expects to obtain in the estimated amount of $16 million to be provided by an independent financial institution, meaning that the security interest for the Company's Loan does not represent a first lien on the Hotel Development. The personal guarantee provided by Min Chae and Donald Chae could be affected by other guarantees which they have provided in connection with Phase I financings to the Development and are expected to provide in the Office Development. A default on any of the loans which financed the Development or call upon the personal guarantees of Min Chae or Donald Chae would materially and adversely affect the interest of the Class B Investors in the Company.

ANY PROJECTIONS INCLUDED IN OR ATTACHED TO THIS MEMORANDUM OR OTHERWISE PROVIDED TO PROSPECTIVE SUBSCRIBERS BY THE COMPANY ARE BASED UPON CERTAIN ASSUMPTIONS AND RELATE TO FUTURE EVENTS. THERE IS NO ASSURANCE THAT SUCH ASSUMPTIONS ARE ACCURATE, THAT SUCH EVENTS WILL TAKE PLACE, OR THAT ACTUAL RESULTS EXPERIENCED BY SUBSCRIBERS WILL BE SIMILAR. SEE **II. RISK FACTORS**.

## II.   RISK FACTORS

**IN EVALUATING THE COMPANY, PROSPECTIVE SUBSCRIBERS SHOULD CAREFULLY CONSIDER THE FOLLOWING RISK FACTORS IN ADDITION TO THE OTHER INFORMATION CONTAINED IN THIS MEMORANDUM BEFORE PURCHASING ANY CLASS B UNITS. INVESTING IN THE CLASS B UNITS INVOLVES A HIGH DEGREE OF RISK AND IS SUITABLE ONLY FOR PERSONS OF FINANCIAL MEANS WHO HAVE NO NEED FOR LIQUIDITY IN SUCH INVESTMENTS AND WHO CAN AFFORD THE LOSS OF THEIR ENTIRE INVESTMENT. THIS MEMORANDUM CONTAINS FORWARD LOOKING STATEMENTS THAT INVOLVE RISKS AND UNCERTAINTIES. THE COMPANY'S AND THE DEVELOPER'S ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THESE FORWARD LOOKING STATEMENTS AS A RESULT OF CERTAIN FACTORS, INCLUDING THOSE SET FORTH IN THE FOLLOWING RISK FACTORS AND ELSEWHERE IN THIS MEMORANDUM. THE COMPANY AND THE DEVELOPER UNDERTAKE NO OBLIGATION TO UPDATE ANY FORWARD-LOOKING STATEMENTS TO REFLECT NEW INFORMATION, EVENTS OR CIRCUMSTANCES OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. POTENTIAL SUBSCRIBERS SHOULD CONSULT WITH THEIR OWN PROFESSIONAL ADVISORS TO CONSIDER CAREFULLY THE FOLLOWING RISK FACTORS AND OTHER MATTERS DISCUSSED IN THIS MEMORANDUM.**

3

10437760\V-2
LA 130898254v6

A.    **General Risks Relating to the EB-5 Program**

THE COMPANY MAKES NO REPRESENTATION OR WARRANTY OF ANY
KIND CONCERNING WHETHER AN INVESTMENT IN THE COMPANY WILL
MEET THE REQUIREMENTS OF AN EB-5 VISA OR OTHER U.S. IMMIGRATION
REQUIREMENTS.  NO ASSURANCES CAN BE GIVEN THAT AN INVESTMENT IN
THE COMPANY WILL RESULT IN THE USCIS GRANTING ANY CLASS B
MEMBER AN EB-5 VISA OR CONDITIONAL PERMANENT RESIDENT STATUS, OR
WILL RESULT IN THE REMOVAL OF ANY CONDITIONS TO PERMANENT
RESIDENT STATUS.  ALTHOUGH THE COMPANY AND THE DEVELOPER WILL
PROVIDE ASSISTANCE TO A CLASS B MEMBER, NO ASSURANCE CAN BE GIVEN
THAT SUCH ASSISTANCE WILL BE SUFFICIENT TO PERMIT A CLASS B
MEMBER TO OBTAIN AN EB-5 VISA OR CONDITIONAL PERMANENT RESIDENT
STATUS OR TO SATISFY ANY REQUIREMENTS FOR THE REMOVAL OF
CONDITIONS TO PERMANENT RESIDENT STATUS.

Purchase by an EB-5 Investor of a Class B Unit does not guarantee conditional or
unconditional permanent residency in the United States under the EB-5 Program.  The USCIS
has sole and absolute discretion with respect to the approval of conditional permanent residency
in the United States and the removal of any conditions to permanent residency, and the local U.S.
consulate office has sole and absolute discretion with respect to the granting of an immigrant
visa.  Furthermore, the requirements for the issuance of conditional permanent resident status or
an immigrant visa and the removal of conditions to permanent resident status under the EB-5
Program involves several factors and circumstances which are not within the control of the
Company.  These include, without limitation, a Class B Member's past history, the source of a
Class B Member's funds, quotas established by the U.S. government limiting the number of
immigrant visas available to qualified individuals seeking permanent resident status under the
EB-5 "Regional Center" program (the "**Program**"), and certain other risk factors described in
this Memorandum.   In addition, the U.S. Congress and/or USCIS may change the laws,
regulations, or interpretations of the laws applicable to the EB-5 Program without notice and in a
manner that may be detrimental to a Class B Member or the Company.  Accordingly, no
assurance can be given that any Class B Member will obtain approval of his or her particular
immigrant petition for conditional or unconditional permanent resident status by purchasing EB-
5 Investor Class B Units.

The EB-5 Program requires each immigrant investor to demonstrate that at least
10 full-time positions for U.S. workers have been or will be created.   This requirement is
imposed on each investor seeking U.S. permanent residence based on the EB-5 Program,
meaning the Company must create at least 10 jobs for each immigrant investor seeking U.S.
permanent residence as a result of the purchase of the EB-5 Investor Class B Units.  The total job
creation is estimated based on expert economic analysis.  Although our economic analysis
estimates sufficient job creation, we cannot guarantee that USCIS will accept the job creation
methodology or our economic analysis.

Our expert economic analysis utilizes what USCIS calls an "IMPLAN model for Los
Angeles and Orange Counties" that seeks credit for job creation from construction and hotel
operations developed by EB-5 funding.  We cannot guarantee the specific underlying facts for

4

each petition and, although our economic analysis estimates sufficient job creation, we cannot guarantee that USCIS will accept the job creation methodology or our economic analysis. Specifically, there has been increased USCIS scrutiny of EB-5 petitions and challenges to job creation methodologies.

USCIS requires proof of employment creation before it can remove the conditions to permanent resident status. There is no assurance that the actual number of jobs created by the development of Phase III – Hotel Development will be the same as the number predicted in the economist's report obtained by the Company or the Regional Center. Additionally, the Developer may not proceed with or may modify Phase III due to requirements of the City, conditions for the grant of gap financing by the City, (see **VIII.C.2. Gap Financing**), the risk factors described in this Memorandum, or for other reasons. In the event that the actual number of direct and indirect jobs created by the Development is less than the number predicted in the economist's report or if the Developer elects not to proceed with or substantially reduces the scope of the Development, the USCIS may not remove the conditions to permanent residency.

The EB-5 Program requires an immigrant investor to be engaged in the management of the commercial enterprise. This requirement may be satisfied by either day-to-day management responsibilities or participation in policy formulation. The management and approval rights of the Class B Member, coupled with the right to the establishment of the Advisory Committee under the Operating Agreement may not be sufficient for each Class B Member to meet the USCIS requirement that each such investor is actively participating in management of a new commercial enterprise or policymaking. See **VII.G. Management, Manager and Officers** and **VII.I. Voting and Approval Rights of Members**.

The investment must be at risk to qualify for the EB-5 Program. As part of the Form I-526 Immigrant Petition by Alien Entrepreneur ("**Form I-526 Petition**") immigrant investor must show evidence that he or she has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk.

Under the EB-5 Program, the amount of required capital to be invested is generally a minimum of US$1,000,000. The minimum investment amount is reduced to US$500,000 in cases where an investment is made in a "targeted employment area," which includes an area that experiences unemployment of at least 150% of the national average rate. The assessment of whether an investment is in a targeted employment area is generally based on statistical information at the time the I-526 petition is filed and the location where the enterprise is principally doing business. Because statistical information is subject to change, whether an area qualifies as a "targeted employment area" also may change from time to time. Thus, there is no assurance that the USCIS will consider the investment to be in a "targeted employment area" at the time it reviews an immigrant investor's petition.

As part of the Form I-526 Petition, an immigrant investor must present to the USCIS clear documentary evidence of the source of funds invested and that the funds belong to such immigrant investor. The USCIS generally requires copies of income tax returns and other financial records to satisfy the source of funds requirement. For immigrant investors who do not have such records, there may be other records that can be provided to the USCIS by an immigrant investor to demonstrate that the investment funds came from legal sources. All such

matters regarding the immigrant investor's petition should be discussed with the Subscriber's immigration counsel. Insufficient documentation of source of funds may result in USCIS denial of the Form I-526 Petition. Approval of the Form I-526 Petition is a prerequisite for becoming a U.S. permanent resident based on the EB-5 Program.

It is impossible to predict visa-processing times. Immigrant investors should not physically move to the United States until their visas have been issued. Additionally, China-born nationals may be subject to a visa backlog which could delay immigration to the United States and also could jeopardize the immigration of a child who has reached age 21. There is no guarantee that an I-526 petition or immigrant visa application can be expedited, and due to possible visa backlogs, there is no guarantee that a child will be eligible to immigrate with the I-526 petitioner based on an investment in the Company.

Each Form I-526 Petition must be supported by a comprehensive business plan. We believe the Company's business plan satisfies this requirement of the EB-5 Program. However no assurances can be made that USCIS will conclude the same. Moreover, if the USCIS determines that the business plan that was initially the basis for the petition for conditional residency was "materially changed," the USCIS may not remove the conditions to permanent resident status. As the Developer may not proceed with or may modify the Development due to the risk factors described in this Memorandum or for other reasons, there is no assurance that the USCIS will not find a "material change" in the business plan. All Subscribers should have their independent legal counsel advise them with respect to immigration requirements.

If USCIS approves the Form I-526 Petition, and the Class B Member immigrates to the United States, his or her U.S. permanent residence will be conditional for the first two years. Prior to the end of the two-year period, the investor must file the Form I-829 Petition by Entrepreneur to Remove Conditions ("**Form I-829 Petition**") with USCIS to request removal of the conditions. Failure to file the Form I-829 Petition could result in termination of the conditional permanent resident status.

USCIS requires that the Form I-829 Petition demonstrate that the Class B Member completed the required investment, has sustained the investment, and the commercial enterprise has created the required jobs. Accordingly, a Class B Member must sustain the investment in the Company. Also the Company must create the required jobs or prove the required jobs will be created within a reasonable period of time. Failure to satisfy the USCIS on any of the eligibility grounds for removal of conditions could result in denial of the Form I-829 Petition. In that case, the Class B Member's permanent resident status could be terminated and the investor may be required to depart the United States. The Company makes no assurances that the required number of jobs will be created so as to satisfy the USCIS for purposes of removal of conditions.

Class B Members who obtain conditional permanent resident status in the United States must intend to make the United States their primary residence. Conditional permanent residents who continue to live abroad risk revocation of their conditional permanent resident status. Once the conditions on permanent residence are removed, permanent residents must continue to intend to make the United States their primary residence or risk losing permanent resident status.

104377661V-2
LA 130898254v6

No advice can be given with respect to individual petitions for conditional permanent residency status or the removal of the conditions to permanent residency. Each prospective Subscriber who intends to obtain permanent residency status under the EB-5 Program on the basis of his or her purchase of EB-5 Investor Class B Units is encouraged, along with his or her advisors, to make his or her own independent review of the EB-5 program and the various risk factors relating to the process of obtaining a permanent residency status under the EB-5 Program to determine if an investment in the EB-5 Investor Class B Units is a suitable approach for such investor. Each prospective Subscriber should consult with his or her immigration counsel to review the likelihood that such Subscriber will be granted a visa or permanent resident status in the U.S. under the EB-5 Program before purchasing the EB-5 Investor Class B Units.

## B.   Risks Relating to the Program

Prospective Subscribers should be aware of certain risk factors involving the EB-5 Program and its administration. A description of the risks below are based on information obtained by the Company from third parties who the Company believes are reliable. However, there can be no assurance that such information is accurate or current or that it includes all of the risks relating to the Program for such investors.

The Company's Manager, the Regional Center, was designated as a "regional center" to participate in the Program on September 9, 2009. A prospective Subscriber's petition for conditional or unconditional permanent resident status in the U.S. is contingent on the Regional Center's continued designation as a regional center by the USCIS. If the Regional Center fails to comply with any ongoing obligations, including, without limitation, ongoing reporting requirements, the USCIS may terminate the Regional Center's designation as a regional center under the Program. If the Regional Center loses its regional center designation for any reason, including, but not limited to, the Regional Center's failure to comply with the ongoing obligations imposed upon a regional center, Class B Members may be unable to obtain conditional or unconditional permanent resident status under the EB-5 Program.

It is through the Company's affiliation with the Regional Center that Class B Members may claim job creation credit based on indirect jobs and the expert economic analysis. However, investment in the EB-5 Investor Class B Units is not "pre-approved" by USCIS. Each investor is the required to demonstrate to USCIS that he or she qualifies for the EB-5 Program and that the required number of jobs will be created. The Company makes no assurances that USCIS will conclude there will be a sufficient number of jobs created.

The Regional Center has a limited operating history, which could lead to delays for Subscribers/Members in the process of obtaining conditional or unconditional permanent resident status under the EB-5 Program or the loss of regional center designation.

The Immigrant Investor Program is currently authorized through September 30, 2015. Although the Program has been renewed several times since its initial authorization in 1992, the Company and its respective officers, employees, directors, managers, and agents make no representation, warranty, or assurance of any kind regarding whether or not there will be a future extension of the EB-5 Program.

7

## C.     Risks of the Company's Class B Units

The Developer intends to use the Loan proceeds to provide additional funding for the completion of the Hotel Development. In the event the Developer is unable to obtain "take out" financing to retire the Loan and other loans made to develop the Development, the Company will have no source of funds with respect to distributions to its Members. The security interest provided in connection with the Loan is subject to repayment of secured borrowings senior to the Loan as well as the successful completion of the Development.

## D.     Risks of Return of Investment

The Company's initial business activity is in connection with the investment in the Loan to be made to the Developer. Accordingly, the Company's only source of income will be interest and principal payments by the Developer which the Developer has the right to accrue. Moreover, upon liquidation of the Company the proceeds received by each Class B Member may be less than his or her original investment.

Real estate development is subject to inherent risks above and beyond those associated with general real estate investments. These risks include, without limitation, denial or delays of required land use approvals, permits or licenses or the imposition of onerous conditions in connection with such approvals; adoption of more onerous building standards (e.g., requirements under the Americans with Disabilities Act or seismic requirements); errors or omissions in architectural plans or other design documents; construction defects; failure by contractors to comply with the developers' designs, specifications, or standards; shortages of materials, equipment, contractors, or skilled labor; substantial increase in the cost of materials; difficult geotechnical issues; labor disputes; natural catastrophes; adverse weather conditions; cost overruns; lack of sufficient funds to complete construction; disputes with contractors; claims by neighboring property owners for nuisance, trespass and the like; and personal injury or damage to any person or their property. All of these risks could delay or prevent the completion of the Development and the Hotel Development according to the planned specifications or budget, which could materially and adversely affect the Developer's cash flow and financial condition as well as the Developer's ability to satisfy its obligations under any loan agreement, including the Loan to be made by the Company to the Developer. If the Developer is able to secure additional financing to cover cost overruns caused by such risks and/or to continue satisfying its obligations to lenders, the Developer may become more leveraged financially and may materially and adversely affect the cash flow and financial condition of the Developer. See **J. Risks Relating to Financing Generally** and **K. Risks Relating to Credit Crisis**. Any of the foregoing may impair the Developer's ability to repay the Loan which could result in the total loss of the Class B Members' investment.

## E.     Risks Relating to Other Lenders

The Developer's affiliates have borrowed a significant amount of funds from other sources for the development and construction of the Development. See discussion **I. OFFERING SUMMARY F. The Hotel Development and Development on the Property.** All such loans participate in the same security interests and guaranties with respect to the Development. A default with respect to any of the **Property Loans** which the Property serves as

collateral would materially and adversely affect the ability of the Developer to repay the Loan. Also all of the Property Loans and equity investment in the approximate amount of $130 million made in connection with the Phase I Development have also been guaranteed by Min Chae and Donald Chae. There is no assurance that Min Chae and Donald Chae, or their affiliate ISLT Investment LLC, will have adequate resources to honor their guarantees with respect to the loans (including the Loan) made to the Developer or its affiliates. See **VIII.C.1. Financing the Hotel Development.**

## F.     Franchise Requirements

The Developer has received Letters of Interest from multiple major hotel franchises, including Hyatt, Marriot, and Hilton Hotels. The Developer has already signed a term sheet with one of these franchises and has been approved by the Board of the franchise. The Developer is now in negotiations with regard to a potential franchise agreement. The Developer's ability to operate as part of a franchise requires it to conform to specific building requirements and conduct its operations under specific requirements. While the Developer has worked with highly experienced consultants in the design of the Hotel Development and received approval from the hotel franchise with respect to its specific development plans, no assurance can be given that if the project is not fully developed as intended nor operated within the hotel franchise guidelines that the hotel will be able to enjoy the benefits of being a part of this group of hotels.

## G.     Risks Relating to the Viability and Marketability of the Development

The Hotel Development is located within the Development (See renderings at pages iii and iv, above) and are inextricably linked to the success of the Development. The use of the hotel and its facilities are expected to benefit or suffer from the number of persons visiting the retail space as well as the office building. The concept of including a hotel property within a commercial retail and office development is not common although hotel facilities located within close proximity to (but not within) major office and shopping areas such as Fashion Island and South Coast Plaza (Orange County) and Century City (Los Angeles County) have been successful.

When completed, the Hotel Development will face competition from approximately a dozen hotel facilities located within a five-mile radius (5 within approximately 1 mile) all of which will compete for the same type of guests which the Hotel Development seeks to attract to its facilities. In addition, new hotel properties may come onto the market as the Hotel Development is being finalized and, if and when completed, will add to the number of hotel rooms and facilities in this area.

The marketability of the Hotel Development may be adversely affected by many factors, including, without limitation, continued weakness of the national or regional economy or an oversupply of, or insufficient demand for hotel space and meeting facilities. Although the Hotel Development is not anticipated to be completed for several years, there is no means to forecast when the local economy will recover from the current economic situation or to anticipate its lingering effects. Any impairment of the marketability of the Hotel Development may reduce the rates the Developer is able to obtain for hotel rooms and thus impair the Developer's profitability and viability, and its ability to obtain funding which will allow it to retire the Loan.

9

10437766\V-2
LA 130898254v6

**H.     Risks Relating to Environmental Issues**

The environmental studies undertaken by the Developer's consultants retained by affiliates of the Developer indicate that there were material amounts of hazardous substances located within the Property. The Developer believes that the Property has been successfully remediated in connection the construction of Phase I of the Development. To the extent that additional hazardous conditions are discovered or additional remediation is required, such remediation could prove costly and time consuming. There is no assurance that further investigations will not reveal additional environmental issues. Moreover, the Developer is unable to conduct any Phase III environmental studies with respect to the properties not currently owned by the Developer or its Affiliates. Also, there is no assurance that the applicable environmental laws will not change and that such changes will not impose additional or stricter requirements that will significantly increase the cost of remediation of the Property. Significant delays in remediating the Property will also result in increased costs in the form of interest expenses and other Development-related costs. Because the Property will generate little to no income until the completion of the Development, the Developer may not have sufficient funds to pay for such additional costs. In addition, the Developer may be liable for any harm caused to any individuals by such hazardous substances. Any of the foregoing could impair the Developer's ability to repay the Loan, which, in turn, could result in the total loss of the Class B Members' investment.

**I.     Risks Relating to Geology and Soils**

Earthquakes are a common occurrence in California and pose a risk for all properties located within the state. Because of the liquefaction, compression, and expansion issues affecting the Development, the Hotel Development may be more susceptible to damage in the event of an earthquake. Although the measures to be undertaken by the Developer are expected to substantially reduce those risks, there is no guaranty that such measures will be effective in the event of an earthquake of a significant magnitude. In addition, earthquake insurance is costly and often carries deductibles equal to a substantial percentage of the value of the Development. Even if the Developer were willing to obtain earthquake insurance, there is no guaranty that such insurance will continue to be offered in California. In the event of an earthquake that causes substantial damage to the Hotel Development, the Developer may need to raise additional capital to repair the Hotel Development even if insurance is obtained. If the Developer is unable to raise such capital, the Developer's ability to retire its loan obligations could be impaired and result in the total loss of the Class B Members' investment.

**J.     Risks Relating to Financing Generally**

The Developer's ability to complete the Hotel Development and repay its loan obligations depends primarily on its ability to (i) raise sufficient capital through equity offerings and the Company's sale of the Class B Units pursuant to the Offering, the proceeds of which would be loaned to the Developer for development of Phase III, (ii) deploy funds raised from other lenders, (iii) potentially raise additional capital through additional loans from private lenders or through equity offerings, and (iv) acquire permanent financing, the proceeds of which will be used to repay any loans, including the Loan which the Company will make to the Developer.

10

The Developer has no assurance that sufficient financing will be available to complete the Hotel Development, or that the costs and terms of any available financing will be reasonable. Many of the risk factors discussed herein may limit the Developer's financing opportunities or increase the cost thereof. If the Developer cannot obtain construction financing or permanent financing on reasonable terms and conditions, the Developer might be required to sell the Property, Development and/or the Hotel Development (potentially at a loss).

Relative to the interest rates that were common during recent decades, current interest rates are relatively low. However, interest rates may be higher at the time a construction loan or permanent financing is obtained. If any loans provide for a variable interest rate, interest rate increases during the term of the loans may result in higher-than-expected borrowing costs. Also, the costs of refinancing any such loans would increase.

Any significant delay in obtaining government approvals, construction, retail and commencement of hotel operations, or obtaining construction financing or permanent financing may cause the Developer or Developer's affiliates to be unable to repay their obligations. Any default under any of the loan agreements relating to the Development may lead to foreclosure of the Property, Development and the Developer's title to the Hotel Development. Any such default would impair the Developer's ability to repay its obligations, including the Loan, which, in turn, could result in the total loss of the Class B Members' investment.

Affiliates of the Developer plan to repay any loans, including the loans from BOI, BOII, BOIII, BO Source and BO Investors equity investment and the Company's Loan to the Developer, from the Developer's affiliates' capital, profits generated from the operation, management and possible sale of all or a portion of the Development, and proceeds from any refinancing loans. However, no guarantee can be made that the Developer or its affiliates will have the ability to raise sufficient capital, generate profits, or refinance any loans to sufficiently repay the above Property Loans, equity investment and the Loan.

## K. Risks Relating to Credit Crisis

Questionable lending practices during recent years have led to an excessive number of overleveraged borrowers and an increasing number of loan defaults. These circumstances have forced lenders to implement extremely stringent underwriting standards or to file for bankruptcy. Although the U.S. Department of the Treasury and the Board of Governors of the Federal Reserve System have undertaken a number of measures to improve the availability of credit, such measures have not had a significant impact on the capital markets. Access to credit continues to remain limited, and some experts believe it will take years for the capital markets to return to normalcy. In the event the Developer is able to secure financing, the current credit crisis may increase the cost of borrowing or require the Developer to accept onerous financing terms. Any of the foregoing may materially and adversely affect the cash flow and financial condition of the Developer and impair the Developer's ability to retire its loans (including the Loan), which, in turn, could result in the total loss of the Class B Members' investment.

## L. Risks Associated with Leverage

11

The Developer and its affiliates will be highly leveraged. The high degree of leveraging may impair the Developer's ability to obtain acquisition, construction, or permanent financing, increase the cost of borrowing, or require the Developer and its affiliates to accept onerous financing terms. In addition, the Developer could be required to dedicate a large portion of the Developer's cash flow from operations to fund payments on debt, thereby reducing the availability of cash flow to fund working capital, capital expenditures, and other general company purposes. Any substantial decrease in net operating cash flows or any substantial increase in expenses could make it difficult for the Developer and its affiliates to meet their debt service. For these reasons, leverage may cause the Developer and its affiliates to be more vulnerable to general, adverse economic or industry conditions.

## M.    Risks Relating to Economic Projections

The Developer's economic projections are estimates based on information known to the Developer at the time the projections were prepared and based on certain assumptions, and relate to future events. Many facts and circumstances material to the projections are outside the Developer's control and are subject to rapid change, and such changes could materially and adversely affect the viability of the Development and the Developer and impair the Developer's ability to repay its loans, which, in turn, could result in the total loss of the Class B Members' investment. For example, continued weakness in the economy could impair the Developer's ability to obtain financing or decrease the demand for retail space, office space, or hotel space, whereas unexpectedly strong economic growth could result in labor shortages, unavailability of materials, construction delays, increased construction costs and increased interest rates. As another example, changes in law could increase the cost of compliance with legal requirements, delay construction, require modification of the Development, result in unfavorable tax consequences, and/or preclude the Development altogether. The Developer's projections, economic or otherwise, do not take into account possible unexpected changes or their potential impact on the Development.

The economic projections discussed in this Memorandum are rough estimates based on preliminary data and assumptions and are subject to substantial change. The economic projections further assume that all 20 Class B Units will be sold and that lenders will make loans in the maximum amounts presently under discussion. There is no assurance that the assumptions and estimates on which the economic projections are based will be accurate. Any errors or faulty assumptions or changes over time could materially and adversely affect the profitability and viability of the Development and the Developer and impair the Developer's ability to retire its loans (including the Loan), which, in turn, could result in the total loss of the Class B Members' investment.

**ANY PROJECTIONS INCLUDED IN OR ATTACHED TO THIS MEMORANDUM OR OTHERWISE PROVIDED TO A PROSPECTIVE SUBSCRIBER BY THE COMPANY ARE BASED UPON CERTAIN ASSUMPTIONS AND RELATE TO FUTURE EVENTS. THERE IS NO ASSURANCE THAT SUCH ASSUMPTIONS ARE ACCURATE, THAT SUCH EVENTS WILL TAKE PLACE, OR THAT ACTUAL RESULTS EXPERIENCED BY MEMBERS WILL BE SIMILAR.**

## N.    No Assurance of Distributions or Income; Delay in Repayment of Loans

{0437766\V-2
LA 130898254v6

There can be no assurance that the Company will generate income for the Members, that the Company will have cash to distribute to Members, or that a Member's investment capital will be recovered. Furthermore, the Company's ability to make distributions may be subject to restrictions contained in any loan or other agreements with third parties as well as restrictions under California law. The Company's ability to make distributions and to realize income and net profit will, therefore, depend on many factors beyond the control of the Manager, including factors set forth in this Memorandum, and there can be no assurance that the Developer will be able to repay its loans in which case the Members will not suffer a total loss of their investment.

Any return to the Members on their invested capital will be dependent upon the ability of the Developer and its management to successfully and profitably execute the Developer's business and operation. Such successful execution will depend, in part, upon economic, regulatory, market and other factors and conditions beyond the control of the Developer and its management. There can be no assurance that the Developer and its management will be able to successfully and profitably execute the business and operation of the Development.

## O.   Risk of Relying on Management and the Performance by Others

The Manager has been appointed and is acting in a similar capacity providing similar services to the Company and other lenders of affiliates of the Developer, including, Beach Orangethorpe, LLC ("**BOI**"); Beach Orangethorpe, LLC II ("**BOII**"); Beach Orangethorpe Ventures, LLC ("**BOIII**"); Beach Orangethorpe Source, LLC ("**BO Source**"); Beach Orangethorpe Investors, LLC ("**BO Investors**"), and Beach Orangethorpe Office, LLC ("BO Office") in respect to furthering their common business purposes which include, without limitation, providing loans for the development and construction of the Development. The Manager may not be able to treat and manage the Company, BOI, BOII, BOIII, BO Source, BO Investors, and BO Office on a *pari passu* (i.e. the same) basis and may be conflicted in its duty to act in their respective interests.

The success of the Developer will depend on many factors, including the quality of the management of the Developer by M + D. M + D, as manager of the Developer, will have complete and exclusive authority, power, and discretion to manage and control the business, the Development and affairs of the Developer, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Developer's business, Development and affairs. In addition, M + D may delegate certain of such authority, power and discretion to certain officers. Neither the Company nor any of the Class B Members of the Company will have the right to or power to take part in the control or management of the Developer. Accordingly, no person should purchase a Class B Unit unless such person is willing to entrust the management and control of the business of the Developer to M + D, as manager of the Developer, and the officers appointed by M + D based upon such person's evaluation of the capabilities of M + D.

The Developer and its affiliates depend on the services provided by key management personnel. In particular, the Developer is highly dependent on Min Chae and Donald Chae. Min Chae and Donald Chae are officers of M + D, which is the Developer's manager. The Developer does not intend to obtain key employee insurance. The loss of any key management personnel may substantially limit the Developer's ability to successfully execute its business strategy,

13

particularly if the Developer is unable to identify and recruit suitable successors in a timely manner.

The Developer and its affiliates have entered into, or may enter into, contractual relationships with many other parties, including without limitation architects, engineers, contractors, consultants, attorneys, accountants, lenders and lessees of the Development. A failure by any of these parties to render timely and satisfactory performance may adversely affect the profitability or viability of the Development and the Developer.

Negligence or poor work quality by any of the architects, engineers, contractors, or consultants could result in defects in the Hotel Development, which could cause the Developer to suffer financial losses, harm the Developer's reputation, and/or expose the Developer to third-party claims. Although the agreements with the architects, engineers, contractors, and consultants contain provisions designed to protect the Developer, the Developer may be unable to enforce such rights and, even if the Developer were able to successfully enforce such rights, such parties may not have sufficient financial resources to compensate the Developer for liability caused by their negligence or poor work quality. In addition, the contractors may undertake projects from other property developers, engage in risky undertakings, or encounter financial or other difficulties, such as labor disputes, which may cause delays in the completion of the Development or increase the cost of the Hotel Development, any of which may adversely affect the profitability or viability of the Hotel Development and the Developer and impair the Developer's ability to retire its outstanding loan obligations, which, in turn, could result in the total loss of the Class B Members' investment.

## P.     Limited Capital Resources

The Operating Agreement of the Developer does not provide for mandatory assessments against the member(s) of the Developer for additional capital contributions. Accordingly, the Developer will have no ready means to obtain additional equity funds if needed, which may adversely affect the Developer's ability to raise funds if needed to complete the Development. See **K. Risks Relating to Financing Generally** and **K. Risks Relating to Credit Crisis**.

## Q.     Limitations on Insurance

The Developer intends to arrange for such comprehensive insurance for the Hotel Development, including liability, fire and extended coverage, as well as errors and omissions coverage, as is customarily obtained for similar properties and projects. However, there are certain types of losses (such as earthquakes, floods, terrorism, and wars) which may not be economically insurable. The cost of insurance may be higher than expected initially and/or for any renewal period. If an uninsured event occurs, the Developer could lose all or part of its invested capital and anticipated profits. An uninsured event could impair the Developer's ability to retire its loan obligations which, in turn, could result in the total loss of the Class B Members' investment.

## R.     Tax Risks

14

Each prospective Subscriber and Member should obtain the advice of his or her own tax adviser concerning the effect of an investment in the Company on his or her personal tax situation. See **XIV. TAX CONSIDERATIONS**.

## S.     Limited Transferability of the Class B Units

The Class B Units and any component thereof have not been registered under the Securities Act, or registered or qualified under any applicable securities laws of any U.S. state or non-U.S. country, in reliance on exemptions from the registration requirements of the Securities Act and from the registration or qualification requirements under state securities laws. The Class B Units may not be sold, pledged, assigned or otherwise disposed of in the absence of an effective registration statement for the Class B Units under the Securities Act and an effective registration or qualification under applicable securities laws of any U.S. state or non-U.S. country, or unless an exemption from all such registration and qualification is available.

The Operating Agreement contains substantial restrictions on the right of a Member to transfer, encumber or otherwise dispose of any part of such Member's Membership Interest. In general, no Member may transfer, encumber or otherwise dispose of any part of such Member's Membership Interest except with the approval by the Manager, which approval may be withheld in its sole and absolute discretion. The Manager's approval, however, is not required for the transfer of a Membership Interest to certain family members of such Member, any trust for the benefit of that Member or any Affiliate of that Member. In addition to the foregoing restriction and the other restrictions set forth in the Operating Agreement, a Member cannot transfer, encumber or otherwise dispose of any part of his, her or its Membership Interest which will result in the violation by that Member or by the Company of U.S. federal and/or state securities laws or any applicable non-U.S. securities laws, including but not limited to the registration requirements under the Securities Act, applicable tax laws or any other applicable laws.

No market currently exists for the Class B Units, and it is unlikely that a market will develop. There can be no assurance that any registration statement will ever be filed with respect to the Class B Units, or, even if filed, that it will become effective. Therefore, investment in the Class B Units is an illiquid investment, and Members must be able to bear the economic risk of investment for a substantial period of time. The Company has no obligation to create an exemption, file a registration statement or take any other action that would enhance the marketability or transferability of the Class B Units.

In addition to the restrictions described above in this Section, Members who intend to petition for conditional or unconditional permanent resident status in the U.S. under the EB-5 Program based on their investment in Class B Units will also be subject to the applicable restrictions on transferability under the EB-5 Program. A violation of those requirements could result in the denial of a Member's petition for conditional or unconditional permanent resident status in the U.S. even if the transfer is permitted or required under the Operating Agreement. Members should consult with their immigration counsel prior to transferring his or her Class B Units.

## T.     Conflicts of Interest

15

There may be risks associated with potential conflicts of interests, which may result in litigation or which may adversely affect the Company's profitability. For a detailed discussion of such conflicts of interest, *See* **XI. CONFLICTS OF INTEREST**.

## U.   Limited Operating History

The Company was organized on April 22, 2013. Accordingly, the Company has no significant operating history. The Developer was organized on November 20, 2012 and, as a result, also has a very limited operating history.

## V.   Indemnification/Exculpation of Manager and Other Insiders

Under the Operating Agreement the Manager and other Affiliates and Company insiders will be indemnified and/or exculpated from liability for certain acts and omissions with respect to the Company. For example, the Operating Agreement permits the Manager to be found liable based on gross negligence, but not on simple negligence. Accordingly, in the event the Company suffers losses as a result of acts or omissions of the Manager, Affiliates or other Company insiders within the scope of such indemnifications or exculpations, the Company will have no right or remedy against the Manager or such other insiders. Moreover, such losses may be uninsured.

## W.   Ground Lease/Junior Security Interest

Certain Affiliates of the Developer own various parcels which comprise the Property and Phase I of the Development. The Developer's Affiliates anticipate entering into a 99-year ground lease involving the property which will constitute the Hotel Development with an affiliate of the Developer. The Loan will be secured by the ground lease, including its rights and obligations, but will be subject to (junior to) the security interest of a bank construction loan that the Developer expects to obtain in the approximate amount of $16,000,000 which will be used for the development of the Hotel Development. The material terms of the ground lease, when finalized, are expected to provide the following:

(i)   Zero rent for twelve months after commencement of construction of the Hotel Development,

(ii)   A 99-year term with rental payments to commence after 12-month deemed construction period,

(iii)   Base annual rent of $240,000 (payable monthly) with Cost of Living upward adjustment every 5 years of term,

(iv)   Tenant to be responsible for prorated real estates and other taxes, insurance, repair and maintenance and utilities,

(v)   Tenant's interest in the ground lease may be mortgaged or pledged without landlord's approval.

16

## X.     Risks Relating to Availability of Securities Law Exemption

If any securities offering of the Company or its Affiliates fails to comply with state or federal securities laws, the Company and/or its affiliates may be required to refund to its investors their investment capital, plus interest, which may result in the Company's and/or affiliates' liquidation and potential economic loss and an investor's denial of a permanent visa under the EB-5 Program.

The Company is currently undertaking, and the Affiliates may undertake in the future, an offering of securities that is not registered with the SEC based on certain exemptions from state and federal registration requirements. If the SEC or applicable state regulatory agency later determines that any of these securities offerings did not fully comply with federal or state law, as applicable, the Company and/or the Affiliates may be required to refund to certain investors their investment capital, plus interest. If the Company or the Affiliates is required to return any such capital or make any such interest payment, both the capital and assets of the Company and/or the Affiliates could be adversely affected, thus jeopardizing the ability of the Company and/or the Affiliates to operate successfully. Additionally, if suits for rescission are brought under the Securities Act and successfully concluded for failure to register any of the Company's or Affiliates' securities offerings, or for acts or omissions constituting offenses under the Securities Act, the Securities Exchange Act of 1934, as amended or applicable state securities laws, the capital and assets of the Company and/or the Affiliates, could be adversely affected, jeopardizing the Company's and/or Affiliates' ability to operate successfully. Further, the Company and/or its Affiliates may be required to expend time and capital to defend an action by investigators of the SEC or state securities agencies of a particular state, even where the Company and/or Affiliates is ultimately exonerated. Additionally, if any portion of the Capital Contributions of investors seeking a visa under the EB-5 Program are used to pay the costs of defense or are returned to the investors seeking rescission, certain investors may be denied permanent visas under the EB-5 Program because funds were used for purposes other than to create jobs.

## Y.     Amendments to Rule 506 Relating to Persons Associated With the Company and This Offering

Recent changes to Rule 506 of Regulation D promulgated under the Securities Act prohibit an issuer from claiming an exemption from registration of its securities under such rule if the issuer, any of its predecessors, any affiliated issuer, any director, executive officer, other officer participating in the offering of the interests, general partner or managing member of the issuer, any beneficial owner of 20% or more of the voting power of the issuer's outstanding voting equity securities, any promoter connected with the issuer in any capacity as of the date hereof, any investment manager of the issuer, any person that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with such sale of the issuer's interests, any general partner or managing member of any such investment manager or solicitor, or any director, executive officer or other officer participating in the offering of any such investment manager or solicitor or general partner or managing member of such investment manager or solicitor has been subject to certain "Bad Actor" events described in Rule 506(d)(1) of Regulation D subsequent to September 23, 2013, subject to certain limited exceptions. The Company is required to exercise reasonable care in conducting an inquiry to determine whether any such persons have been subject to such "Bad Actor" events and is required to disclose any

17

"Bad Actor" events that occurred prior to September 23, 2013 to investors in the Company. Company. While the Company believes that it has exercised reasonable care in conducting an inquiry into "Bad Actor" events by the foregoing persons and is not aware of any required disclosures, it is possible that (a) additional "Bad Actor" events may exist of which the Company is not aware and (b) the SEC, a court or other finder of fact may determine that the steps that the Company has taken to conduct its inquiry were inadequate and did not constitute reasonable care. If such a finding were made, the Company may lose its ability rely upon Rule 506 of Regulation D promulgated under the Securities Act for the placement of the Class B Units and, depending on the circumstances, may be required to register the offering of the Company's Membership Interests with the SEC and under applicable state securities laws or to conduct a rescission offer with respect to the securities sold in the offering if no other exemption from the securities acts could be maintained.

## Z.     Neither the Manager, the Regional Center, nor the Company is registered as an "investment adviser" under the Investment Advisers Act of 1940, as amended (the "Advisers Act").

The Advisers Act defines an "Investment adviser" as any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities.

The Company does not believe that any of its affiliates need to register as "investment advisers" under the Advisers Act because the foregoing definition of "investment adviser" likely does not apply to the Company or its Affiliates with respect to the services provided by them in connection with this Offering, including, without limitation, taking into account the fact that all investment advice under this Offering is being provided to investors by independent, unaffiliated, third party, licensed and bonded migration agents outside the United States who would otherwise fall within the "foreign private adviser" exemption under Section 203(b)(3) of the Advisers Act. However, there can be no assurance that such is the case and that the Company or its Affiliates could not otherwise be deemed an "investment adviser" requiring registration as an "investment adviser" under the Advisers Act.

## AA.   There can be no assurance that the Company is not an "investment company" subject to the Investment Company Act of 1940, as amended, which does not qualify for an exemption.

The Company intends to avoid becoming subject to the Investment Company Act of 1940, as amended (the "1940 Act"); however, the Company cannot absolutely assure prospective investors that under certain conditions, changing circumstances or changes in the law, the Company may not become subject to the 1940 Act in the future as a result of the determination that the Company is an "investment company" within the meaning of the 1940 Act, which does not qualify for an exemption. Becoming subject to the 1940 Act could have a material adverse effect on the Company. Additionally, the Company could be terminated and liquidated due to the cost of registration under the 1940 Act.

In general, the 1940 Act provides that if there are 100 or more investors in a securities offering, then the 1940 Act could apply unless there is an exemption; however, the 1940 Act generally is intended to regulate entities that raise monies where the entity itself "holds itself out as being engaged primarily, or purposes to engage primarily, in the business of investing, reinvesting or trading in securities." (Section 3(a)(1)(A) of the 1940 Act).

If the Company were required to register as an investment company but failed to do so, the Company would be prohibited from engaging in the Company's business and criminal and civil actions could be brought against the Company, the Regional Center, and their respective management personnel. Additionally, the Company's contracts, including the Loan Documents, may become unenforceable, and a court could appoint a receiver to take control of the Company and liquidate the Company's business.

## BB.   Additional Risks

Any return to the Members on their invested capital will be dependent upon the ability of the Developer and its management along with the Developer's affiliates to successfully and profitably execute and finance the Developer's business and operations as well as the business and operations of the Development. Such successful execution will depend, in part, upon economic, regulatory, market and other factors and conditions beyond the control of the Developer and its management. There can be no assurance that the Developer and its management will be able to successfully and profitably execute the business and operation of the Developer.

IN ADDITION TO THE RISKS DESCRIBED IN THE FOREGOING PROVISIONS OF THIS MEMORANDUM, BUSINESSES ARE OFTEN SUBJECT TO RISKS NOT FORESEEN OR FULLY APPRECIATED BY MANAGEMENT. IN REVIEWING THIS MEMORANDUM, PROSPECTIVE SUBSCRIBERS SHOULD KEEP IN MIND OTHER POSSIBLE RISKS THAT COULD BE IMPORTANT.

## III.   WHO MAY INVEST

In light of the long-term nature of an investment in the Class B Units, their lack of liquidity, the various risks involved, and in order to ensure compliance with the Securities Act or the securities laws of each applicable U.S. State and other countries, an investment in the Class B Units may be suitable for individuals that have adequate financial means, are Accredited Investors, and have no need for liquidity with respect to this investment. An Accredited Investor is defined under Regulation D promulgated under the Securities Act to include (i) an individual whose net worth, together with that of his or her spouse, exceeds US$1,000,000, excluding such individual's primary residence and (ii) an individual who had income in the two most recent years in excess of US$200,000 individually (or US$300,000 with spouse) and reasonably expects income at that level in the current year. A prospective Subscriber must subscribe for the Class B Units for his/her own account, risk and beneficial interest, and with no intent to distribute or resell any of the Class B Units.

A prospective Subscriber should be aware that the transfer of a Class B Unit will be subject to restrictions imposed by the Operating Agreement, applicable U.S. federal and U.S.

state, and laws related to the EB-5 Program. See **EXHIBIT B – OPERATING AGREEMENT OF BEACH ORANGETHORPE HOTEL, LLC**. In the event a Subscriber is a resident or citizen of a country other than the U.S., the transfer of a Class B Unit also may be subject to the securities laws of those country(ies).

The foregoing standards are minimum requirements for Subscribers, and even if a prospective Subscriber satisfies such requirements, an investment in the Class B Units may not necessarily be suitable for any particular person. The Company may, in its sole and absolute discretion, apply higher suitability standards. The Class B Units are being offered only to individuals. No subscriptions will be accepted from any entity.

Any prospective Subscriber who decides to invest in Class B Units should promptly submit:

(i)     An executed Subscription Agreement,

(ii)    An executed Joinder Agreement and Spousal Consent (if applicable) to the Operating Agreement,

(iii)   An executed Representation Statement,

(iv)    An Escrow Agreement (if applicable),

(v)     A completed and executed Form W-8BEN or W-9,

(vi)    Evidence of Source of Funds, and

(vii)   Valid certified checks, cashier's checks or personal checks for the total purchase price of the desired number of Class B Units and the Administration Fee (or wire transfers of such amounts to a bank account designated by the Company). The Company may, in its sole and absolute discretion, accept or reject any subscription. See **V. TERMS OF THE OFFERING**.

## IV.     INVESTMENT OBJECTIVES AND STRATEGY

The Company was organized as a California limited liability company to engage in any lawful business activity, as determined by the Manager. As its first endeavor, the Company intends to make the Loan to the Developer. The Company will lend all of the proceeds of the Offering (not including the Administration Fee) to the Developer.

The Developer intends to develop the Hotel Development. Capital raised through the Offering and loaned to the Developer will be used to pay for a portion of the development costs of Phase III relating to the construction of the Hotel Development, as more particularly described in **IX.D. Use of Loan Proceeds**. The Developer also intends to finance the rest of the construction costs of the Hotel Development through a separate construction loan in the approximate amount of $16,000,000. See **VIII.C.1 Existing and Additional Debt Financing.**

20

10417766\V-2
LA 130898254v6

The following chart describes the construction budget for the Hotel Development.

| Construction Budget* | Security |
|---|---|
| $16 million Construction Loan ("**Construction Loan**") or other non-EB financing | Senior security interest in the Hotel Development and Ground Lease |
| $10 million Loan from the Company | Security interest in the Hotel Development and Ground Lease (both security interests are junior to Construction Loan) |

*All amounts are estimates.

The actual timing of the Hotel Development will depend significantly on the development progress of the lifestyle retail center portion of the Development upon which the Hotel Development will be attached, finalizing construction financing, as well as the requirements of any major hotel development. However, all permitting and governmental approvals is anticipated to be obtained before construction commences.

Once the Hotel Development has been completed, the Developer will seek to refinance, sell, or otherwise dispose of some or all of the Hotel Development and pay off the Loan. However, this projection is contingent on the Developer overcoming various challenges and there is no assurance that the Hotel Development will be completed and the Loan will be paid off in full.

## V. TERMS OF THE OFFERING

### A. General

The Offering, consisting of up to 20 Class B Units at a per Unit price of US$500,000 (for an aggregate investment of up to US$10,000,000), subject to the Minimum Investment Requirement, is being offered on a private placement basis to Accredited Investors who otherwise qualify to purchase one or more Class B Units. The Company will not accept subscriptions for fractional interests of Class B Units, investments in an amount less than US$500,000 per Class B Unit, or investments that do not satisfy the Minimum Investment Requirement. The Company may accept or reject any subscription. Subscriptions will close on a rolling basis as each Subscriber satisfies the conditions to closing described in V.I. Conditions to Release of Funds.

Offers are made only by the Company's delivery of this Memorandum and in a manner which meets the requirements for a non-public offering of securities under Section 4(2) of the Securities Act and the applicable rules and regulations promulgated thereunder and applicable securities laws and regulations of the applicable U.S. state or non-U.S. country. No offering of the Class B Units shall be made by any advertisement, article or other communication published in a newspaper, magazine or similar media or broadcast over television or radio or at a seminar or meeting attended by persons who have been invited by a general solicitation or general advertising. Subscribers must represent that they are purchasing the Class B Units for themselves, for investment purposes only and not with a view toward resale or distribution.

10437766\V-2
LA 130898254v6

Transfer of the Class B Units is subject to U.S. federal and state securities laws, the requirements of prior approval of the Manager in accordance with the terms of the Operating Agreement, and other substantial restrictions on transfer set forth in the Subscription Agreement. See **II.S. Limited Transferability of the Class B Units**. If a Subscriber is a resident or citizen of a country other than the U.S., the transfer of Class B Units also may be subject to the securities laws of such country(ies).

AT ANY TIME PRIOR TO THE OFFERING TERMINATION DATE, THE COMPANY MAY, IN ITS SOLE AND ABSOLUTE DISCRETION, TERMINATE THE OFFERING (WITH RESPECT TO THOSE SUBSCRIPTIONS THAT HAVE NOT CLOSED) UPON GIVING WRITTEN NOTICE TO THE REMAINING SUBSCRIBER(S) WHOSE SUBSCRIPTIONS HAVE NOT CLOSED AND RETURNING TO SUCH SUBSCRIBER(S) THE FULL AMOUNT PAID BY SUCH SUBSCRIBER (INCLUDING THE ADMINISTRATION FEE) WITHOUT INTEREST. IF THE TOTAL AMOUNT OF ALL SUBSCRIPTIONS SUBMITTED IN RESPONSE TO THE OFFERING AND ACCEPTABLE TO THE COMPANY IS LESS THAN THE TOTAL AMOUNT OF THE OFFERING, THE COMPANY MAY, IN ITS SOLE AND ABSOLUTE DISCRETION, COMPLETE THE OFFERING FOR SUCH LESSER AMOUNT.

## B.    Offering Termination Date

The Offering will terminate on the earliest of (i) the date the Company determines that all 20 Class B Units have been subscribed to in the manner acceptable to the Company, (ii) the date the Company decides to accept subscriptions for less than all 20 Class B Units, or (iii) one year from the initial date of this offering, unless extended at the sole and absolute discretion of the Company, but not in any event beyond twelve (12) months thereafter (the "**Offering Termination Date**").

## C.    Subscription Procedure

In order to subscribe for a Class B Unit, each prospective Subscriber must complete, execute, acknowledge and deliver to the Company the following subscription documents, and deliver to the Company the following payments:

1.    Subscription Agreement in the form attached as Exhibit A;

2.    Operating Agreement in the form attached as Exhibit B (only the original signed Joinder Agreement and Spousal Consent (if applicable) accompanying the Operating Agreement needs to be returned);

3.    Representation Statement in the form attached as Exhibit C;

4.    Escrow Agreement (if applicable);

22

5.    Form W-8BEN or W-9 in the form attached as Exhibit D;

6.    Evidence of Source of Funds;

7.    The subscription price of US$500,000 per Unit (subject to the Minimum Investment Requirement); and

8.    Administration Fee of US$45,000.

## D.    Subscription Payment and Administration Fee

The subscription purchase price of US$500,000 per Unit (subject to the Minimum Investment Requirement) and the Administration Fee of US$45,000 is to be paid by certified, cashier's, or personal checks or by wire transfers to a bank account designated by the Company. The subscription purchase price and the Administration Fee must be paid by separate checks or separate wire transactions.

## E.    Minimum Investment Requirement

Each Subscriber is required to purchase a sufficient number of Class B Units to satisfy the minimum investment requirement under the EB-5 Program (the "**Minimum Investment Requirement**"). The amount required to be invested under the EB-5 Program is contingent upon whether the area in which the Development is located is designated a "targeted employment area" by the "GO-Biz Office" of California at the time the Form I-526 Petition is filed by a Subscriber within the validity period of the TEA letter. In order to be designated a "targeted employment area," the area must have an unemployment rate that is at least 150% of the national average unemployment rate.

The Development is currently located in Census Tract Area 1105, which has been deemed in 2013 a "targeted employment area". Provided that Census Tract Area 1105 continues to be considered a "targeted employment area", each Subscriber will be required to purchase a minimum of one Class B Unit for a total minimum investment of US $500,000. However, Census Tract Area 1105 may lose its designation as a "targeted employment area" if the unemployment rate in Census Tract Area 1105 falls below 150% of the national average unemployment rate. In the event a Subscriber files a Form I-526 Petition during any period of time Census Tract Area 1105 is not considered a "targeted employment area", each Subscriber will be required to purchase a minimum of 2 Class B Units for a total minimum investment of US$1,000,000, subject to the right of revocation described in **V.H Acceptance and Revocation of Subscription**.

## F.    Escrow Account

All funds received from Subscribers and accepted by the Company will be deposited into an escrow account established with the escrow agent designated by the Company (the "**Escrow Agent**"), without interest. Depending on the Escrow Agent engaged, a Subscriber may be required to execute and deliver to the Company an Escrow Agreement. Such funds may be released to the Company (as to the subscription purchase price) and the Regional Center (as to the Administration Fee) from escrow pursuant to **V.I Conditions to Release of Funds**.

23

## G.     Evidence of Source of Funds

Under the EB-5 Program, immigrant investors are required to provide evidence to the USCIS that the capital invested in the Company was obtained through lawful means.  Immigrant investors are required to provide income tax returns for the preceding 5 years and any other evidence identifying sources of capital.  In order for the Company to determine whether to accept a Subscriber as a legitimate candidate for the EB-5 Program, each Subscriber is required to provide to the Company or the filing attorney copies of the documentation that will be submitted to the USCIS in order to demonstrate that the Subscriber's funds were obtained through lawful means, which include, but are not limited to, the following:

(i)     If the source of capital is in part from personal savings, copies of tax returns for the preceding 5 years;

(ii)    If the source of capital is in part from the sale of real or personal property, copies of the sale and title documents;

(iii)   If the source of capital is in part from the proceeds of a loan, copies of the loan documents;

(iv)    If the source of capital is in part from a gift, detailed information regarding the donor; and/or

(v)     Any other documentation requested by the Company relating to the source of funds being invested in the Company (collectively, "**Evidence of Source of Funds**").

Any decision of the Company regarding the source of a Subscriber's funds is not submitted to and is not binding upon the USCIS.  The USCIS has sole and absolute discretion to determine whether investment funds were lawfully obtained for purposes of the EB-5 Program.

## H.     Acceptance and Revocation of Subscription

The Company will review the subscription documents for completeness, due execution, and investor suitability.  The Company has the sole and absolute right to reject prior to the Offering Termination Date any subscription that is tendered but has not closed or to waive any defect in any subscription document.  If the Company rejects a subscription, the subscription documents, the subscription purchase price, and the Administration Fee will be returned without interest.  Notwithstanding the foregoing, acceptance of any subscription of a Subscriber by the Company is contingent on payment of the total subscription purchase price and the Administration Fee by such Subscriber.  Once the Company has accepted a subscription, the Subscriber may not cancel, terminate or revoke the subscription unless (i) such Subscriber decides not to proceed with his or her Form I-526 Petition or (ii) such Subscriber's Form I-526 Petition is denied and such denial becomes final.

## I.     Conditions to Release of Funds

24

The release of a Subscriber's funds from the escrow account to the Company (as to the subscription purchase price) and the Regional Center (as to the Administration Fee) is conditioned upon (i) acceptance by the Company of the Subscriber, (ii) acceptance by the Company of the Subscriber's cleared funds in the amount of the full subscription purchase price and the Administration Fee for deposit in escrow, and (iii) the approval of such Subscriber's Form I-526 Petition by the USCIS unless otherwise waived by such Subscriber.

## J.      Return of Subscription Funds

In the event the Company rejects a subscription or terminates the Offering, the Company will return the subscription purchase price and the Administration Fee, without interest, to the Subscribers who have been rejected or whose subscriptions have not closed, respectively. If a Subscriber cancels or revokes his or her subscription in accordance with certain conditions as set out in **V.H. Acceptance and Revocation of Subscription**, the subscription purchase price and the Administration Fee will be returned to such Subscriber in full without interest. If a Subscriber otherwise fails to obtain conditional permanent resident status in the U.S. pursuant to the EB-5 Program within 18 months after the date of the last submission of all I-526 petition documents required by a consular officer (or a USCIS examiner in case of an adjustment of status application) (See **VII.K. Liquidation of Class B Units**), the subscription purchase price, and such portion of the Administration Fee as determined by the Company at its sole discretion, will be returned to such Subscriber without interest.

## K.      Immigration-Related Expenses

Subscribers are solely responsible for paying any expenses related to their attempt to immigrate to the U.S. on the basis of their investment in Class B Units. Because participation in the EB-5 Program is complex, Subscribers are required to retain and pay the fees and expenses of a competent and duly licensed immigration counsel reasonably approved by the Company to assist them with the Form I-526 Petition, Form I-829 Petition, and any other matters related to their immigration to the U.S. The Company may provide Subscribers a list of preferred immigration attorney(s). Subscribers are not required to retain any immigration attorney on such list.

## L.      Program Locators

The Units are offered on a "best efforts" basis by the Company. The Company may utilize overseas/offshore registered finders and agents ("**Program Locator**") located outside the United States to seek potential investors in the Company and may pay such Program Locators reasonable consideration for providing such services. Program locators may receive up to the full amount of the administration fee ($45,000) for their services in addition to other fees which they may receive from the company for financial and marketing services. The fees will be paid from the Administrative Fees paid by subscribers; no part of the Capital Contributions made by the subscriber will be used to pay these fees. Notwithstanding the payment of any fee, such Program Locator is not an agent or representative of the Company, and the Company is not bound by any statements, agreements, or representations made by such Program Locator.

## VI. THE COMPANY, THE DEVELOPER, AND THE MANAGER

### A. The Company

The Company was organized on April 22, 2013 as a California limited liability company for the purpose of making the Loan to the Developer. The Regional Center, which has been designated as a regional center under the EB-5 Program by the USCIS, serves as the Manager of the Company. See **VI.C. The Manager**.

As of the date of this Memorandum, the Regional Center is the sole member of the Company. The Regional Center holds 20 Class A Units, which give the Regional Center certain economic and voting rights set forth in the Operating Agreement. DMC is the sole member of the Regional Center, and M + D is the sole manager of the Regional Center. DMC and M + D are beneficially owned, controlled, and managed by Min Chae and Donald Chae. The Company's primary asset will be the Loan to the Developer.

### B. The Developer

The Developer was organized on November 20, 2012 as a California limited liability company for purposes of acquiring the Property and developing the Development. The sole manager of the Developer is M + D and, as of the date of this Memorandum, DMC is the sole member of the Developer.

### C. The Manager/Special Manager

The Company shall have one manager. The member holding the Class A Units has the right to appoint the manager. At the date of this Memorandum, Regional Center has been appointed as the Manager. Class B Members holding a majority of outstanding Class B Units have the right to appoint a manager under certain circumstances as described in **VII.C.** below.

#### 1. Manager - Regional Center - Background

In general, the Company will be managed exclusively by the Manager. Approval of the Class B Members is required only for certain matters. See **VII. I. Voting and Approval Rights of Members**. The Members will have no power to participate in the management of the Company except as expressly authorized by the Operating Agreement or by the Act. Without in any way limiting the powers of the Manager, the Class B Members shall advise the Manager with respect to general policy matters through an Advisory Committee. The Manager may appoint one or more officers of the Company at the Manager's discretion. The officers of the Company, if appointed by the Manager, will have the duties and powers determined by the Manager and shall be subject to the supervisory powers and directions of the Manager.

The Manager and officers are not obligated to devote full time to the affairs of the Company, but will devote such time and skill as it deems appropriate for the reasonably proper, adequate and responsible operation of the Company.

26

The Manager may be removed at any time with or without cause only by the Class A Members who appointed such Manager.

The sole member of the Regional Center (which is the Class A Manager of the Company) and the Developer is DMC. The sole manager of the Regional Center and the Developer is M + D. Min Chae, age 58, and Donald Chae, age 56, are co-managers of DMC and officers of M + D, and each of them beneficially owns 50% of DMC and M + D. Min and Donald each have more than 25 years of experience in real estate investment, development, and management.

The crowning achievement of the Chaes' real estate career thus far has been the Plaza Mexico shopping center (www.plazamexico.com). In the late 1980s, the Chae brothers correctly predicted the demographic shift in Southern California and pursued developments in burgeoning Hispanic markets, ultimately leading to the development of the Plaza Mexico shopping center. Plaza Mexico is a lifestyle shopping center located in Lynwood, California and situated along two major commercial thoroughfares and the Century Freeway (I-105). With approximately 450,000 square feet (41,807 square meters) of retail space over 48 acres of land, Plaza Mexico is the only property of this size catering to the Hispanic community of Southern California where individuals can eat, shop, and spend time with family members.

Below is a partial list of real estate projects (in addition to the Development) that the Chae brothers have been and expect to be involved with over the next several years.

| | |
|---|---|
| 3171 Fair Oaks (Pasadena, CA): | US$18,000,000 office/retail development in Pasadena, California. The Chaes currently are constructing a three-story office/retail building with an aggregate area of 56,000 square feet (5,203 square meters). |
| 3000 E. Imperial Highway (Lynwood, CA): | The Chaes are currently working with the City of Lynwood on the second phase of the Plaza Mexico expansion project, which will be constructed on land just west of Plaza Mexico. The second phase will include additional retail and residential components. |

### 2.   Other Manager Projects - Plaza Mexico

Plaza Mexico is located in Lynwood, California and is situated along two major commercial thoroughfares and the Century Freeway (I-105).   With approximately 450,000 square feet (41,807 square meters) of retail space over 48 acres of land, Plaza Mexico is the only real property of this magnitude that caters to the Hispanic community of Southern California. Currently, Plaza Mexico is occupied by tenants that include Food 4 Less, Rite Aid, La Curacao, Anna's Linens, Hometown Buffet, Chuck E. Cheeses, and a wide variety of restaurants and retailers of clothing, electronics, shoes, toys, jewelry, and furniture.

Despite being a retail power center, Plaza Mexico provides a familiar small town shopping experience and has become the social epicenter for the City of Lynwood and its

27

neighboring communities. Plaza Mexico's design has been key to creating the feel of a town square. Its architecture, fountains, lush landscaping, and open plazas draw shoppers and visitors into a Mexican cultural experience. Plaza Mexico's design reproduces the ambiance and rich culture of Mexican pueblos. The colonial architecture found in prominent urban centers such as Guadalajara and Mexico City has been incorporated into the design of the plazas, entrances, buildings and kiosks.

The Plaza Mexico concept began in 1988 when the Chaes purchased a vacant 130,000 square-foot (12,077 square-meter) Montgomery Ward department store building located at 3100 E. Imperial Highway in Lynwood, California. The Chaes had a vision of creating a shopping center that would combine the attributes of a traditional American shopping mall with those of an open marketplace that are common in many Latin and Asian countries. The Chaes' project, which they had named the Lynwood Marketplace, almost immediately began to take on a life of its own. There were a number of external factors, primarily demographic and social, that bolstered the momentum of the project. Demographically, Lynwood and its neighboring cities of South Gate, Downey, Paramount, and Compton were experiencing a shift in the ethnicity base of the population. An area that was predominantly African-American was experiencing an increase in the Hispanic population.

As the economy started to boom in the mid-1990s, the Lynwood Marketplace was fully occupied and had a waiting list of 200 to 300 tenants. In 1998, the Chaes purchased the Lynwood Towne Center, a grocery/drug store-anchored (Food 4 Less/Rite-Aid) shopping center close to the Lynwood Marketplace that fronted Long Beach Boulevard. The acquisition of this property bolstered the Chae's vision of a retail town center experience. The Chaes also purchased and developed the land between the two centers and combined the properties (creating Plaza Mexico).

The Chaes shared their vision with the City of Lynwood and convinced the City Council that Plaza Mexico could serve as the premier retail project in the region as well as a cultural and social gathering point for the Southern California community. The Plaza Mexico concept won over not only the City Council but also the community. Plaza Mexico has since exceeded the expectations of all those involved and demonstrated itself to be a proven retail concept in Southern California.

## VII. SUMMARY OF THE OPERATING AGREEMENT

In connection with the subscription for the Class B Units, Subscribers are required to sign and deliver to the Company a joinder agreement and spousal consent (if applicable) to the Operating Agreement in the form attached as Exhibit B. The Operating Agreement is effective upon the Company admitting its first Class B Member in accordance with the Operating Agreement. Upon the satisfaction of all conditions described in **V.I. Conditions to Release of Funds**, a Subscriber will become a Class B Member. The rights and obligations of the Members, as well as the rights and obligations of the Manager and the officers of the Company, will be governed by the Operating Agreement in the form attached as Exhibit B and applicable law.

The following summary of certain provisions of the Operating Agreement is intended only for quick reference and is not intended to be complete. The Operating Agreement describes in detail numerous aspects of the Offering, which are material to the Members including those summarized below, and the Operating Agreement should be read in its entirety by prospective Subscribers. Those material aspects include, among other things: organizational matters; capital contributions, management and control of the Company; rights and obligations of the Members, Manager and the Company's officers; allocation and distribution of profits and losses to the Members; transfer and assignment of Membership Interests; accounting and reporting; and dissolution and winding up of the Company.

## A. Purposes

The purpose of the Company is to engage in any lawful activity for which a limited liability company may be organized under the Beverly-Killea Limited Liability Company Act (the "**Act**"), including, without limitation, making one or more loans to the Developer and engaging in such other activities related to or incidental to such purpose, or as may be necessary, advisable or appropriate, in the opinion of the Manager to further such purpose.

## B. Term

The term of the Company shall continue until the Company is dissolved upon (i) the entry of a decree of judicial dissolution, (ii) the approval of the Members and the Manager; or (iii) the sale of all or substantially all of the Company's assets, including full repayment of the Loan and completion of all enforcement of rights and powers held by the Company (including enforcement of security interests) against the Developer. VII.P. Dissolution and Winding Up. See **VII.P. Dissolution and Winding Up**.

## C. Capital Contributions

The Company expects to receive up to US$10,000,000 in Capital Contributions through the sale of its Class B Units pursuant to the Offering. Upon the satisfaction of all conditions described in **V.I. Conditions to Release of Funds**, each Class B Member will have contributed to the capital of the Company and will have a Capital Account balance equal to the amount that such Class B Member paid to the Company to purchase Class B Units (excluding the Administration Fee and other fees and expenses). As of the date of this Memorandum, the Regional Center holds 20 Class A Units and had a Capital Account balance equal to US$1,000. No Member will be entitled to any interest on any Capital Contribution. For purposes of clarification, any interest paid by the Developer to the Company will constitute profit to the Company.

No Member will be required to make any additional Capital Contributions. To the extent and on the terms approved by the Manager and permitted by applicable U.S. federal and state securities laws and applicable non-U.S. securities laws, the Members may be permitted (but do not have any right) to make additional Capital Contributions. Such additional contributions by Members and other persons will dilute any non-participating Member's membership interest in the Company. If such additional Capital Contributions are not made by all members pro rata, then approval will be required by the Members in accordance with the Operating Agreement.

29

## D.   Expenses of the Company

The Class A Member shall be responsible and pay all general and administrative expenses incurred and to be incurred by the Company. However, expenses incurred by the Company for the purpose of enforcing the Company's rights under the Loan agreement with the Developer upon the occurrence and continuance of an event of default (to be defined in the Loan agreement), to the extent not reimbursed by or otherwise recovered from the Developer shall be borne by all the Members in proportion to their respective Percentage Interests which may be by way of additional Capital Contributions as requested by the Manager from time to time.

## E.   Tax Classification

The Company is intended to be classified as a partnership for U.S. Federal income tax purposes. See **XIV. TAX CONSIDERATIONS**.

## F.   Distributions and Allocations

Subject to applicable law and any limitations contained in the Operating Agreement, the Company's Available Cash will be distributed to the Members from time to time. Such distribution, if otherwise authorized and permitted, will be made to the Members in proportion to their respective Percentage Interests. No Member has the right to demand any distribution of assets other than money. There are restrictions on distributions, including, among other things, restrictions based on the solvency, level of assets and other financial condition of the Company. With respect to a Class B Member, no distributions shall be made during the five year period from the date of admission as a member if such distributions would reduce such EB-5 Member's Capital Account below the Minimum Investment Requirement amount.

Upon the satisfaction of all conditions described in **V.I. Conditions to Release of Funds**, Subscribers of the Class B Units will become the Company's Class B Members. The Regional Center is now and is expected to remain the Company's sole Class A Member. In general, subject to certain special allocation rules set forth in the Operating Agreement, allocations of the Company's Net Profit and Net Loss will be made in accordance with the Members' respective Percentage Interests to other Class B Members.

The Operating Agreement contains certain allocation provisions (required by the Treasury Regulations), pursuant to which (i) Net Loss will not be allocated to a Member if such allocation will create an Adjusted Capital Account Deficit for that Member, and special allocation rules apply in such an event, and (ii) nonrecourse deductions, minimum gain chargebacks, etc. will be subject to special allocations rules.

## G.   Management, Manager and Officers

In general, the Company will be managed exclusively by the Manager. Approval of the Class B Members is required only for certain matters. See **VII.I. Voting and Approval Rights of Members**. The Members will have no power to participate in the management of the Company except as expressly authorized by the Operating Agreement or by the Act. Without in any way limiting the powers of the Manager, the Class B Members shall advise the Manager with respect to general policy matters through an Advisory Committee. The Manager may

30

appoint one or more officers of the Company at the Manager's discretion. The officers of the Company, if appointed by the Manager, will have the duties and powers determined by the Manager and shall be subject to the supervisory powers and directions of the Manager.

The Manager and officers are not obligated to devote full time to the affairs of the Company, but will devote such time and skill as it deems appropriate for the reasonably proper, adequate and responsible operation of the Company.

The Manager may be removed at any time with or without cause only by the Class A Members who appointed such Manager.

A Manager may be removed at any time with or without cause by the Members who appointed such Manager. The removal of the Special Manager shall require a majority approval of Class B Members. See **VII.I. Voting and Approval Rights of Members.**

## H.    Special Manager

In the event that the Loan is not paid by the Developer at the time specified between the Company and the Developer, a majority of Class B Members of the Company shall have the right to appoint a Special Manager. The Special Manager shall possess the right to enforce all of the Company's rights in connection with the Loan and against Min Chae and Donald Chae under with respect to their personal guarantees given with respect to the Loan.

The Special Manager shall be an independent manager of the Company, which will possess all rights on behalf of the Company to collect the Note and pursue any rights which the Company may possess, including but not limited to the Company's right under its security interest and the guarantees provided in connection with the Loan and be responsible to oversee and monitor the management of the business, property and affairs of the Company on behalf of the members holding Class B Units subject to the provisions of the Operating Agreement. Only a majority of the Class B Members may remove the Special Manager once appointed

## I.    Voting and Approval Rights of Members

The Operating Agreement provides that approval of the Class B Members is required with respect to: (i) the dissolution and winding up of the Company, (ii) the merger, consolidation, or other business combination of the Company with any entity or other entities, (iii) the sale, exchange, lease, mortgage, pledge or other transfer of all or substantial part of the assets of the Company other than in the ordinary course of its business or pursuant to the terms of the Operating Agreement, (iv) the incurrence of any obligation or indebtedness exceeding 50% of the value of the Company's assets other than in the ordinary course of the Company's business, (v) a change in the fundamental nature of the business of the Company or a change in the fundamental purpose of the Company, (vi) investing more than 10% of the Company's total assets in any entity other than the Developer and (vii) appointment of a Special Manager.

Where the consent or approval of Class B Members is required or permitted, approval of the majority of the total votes representing the EB-5 Investor Class B Units shall be required.

31

10437760\V-2
*LA 130898254v6*

## J.      Liabilities of Members and Manager, and Officers

Except as required under the Act, or as expressly set forth in the Operating Agreement, no Member shall be personally liable for the debt, obligation or liability of the Company. A Member may have personal liability, among other things, for breach of the Operating Agreement by such Member or to the extent that such Member has received unauthorized distribution from the Company in certain cases. The limitation on a Member's personal liability will not apply to a Member's acts or omissions in another capacity, if any, such as a Manager or an officer of the Company. A Member's Capital Contribution is subject to risks of the Company's business.

In general, pursuant to the Operating Agreement, the Members, Manager and the Company's officers will not be personally liable to the Company or any Member for any claims, actions, suits, demands, damages, debt, liabilities, obligations, losses, penalties, fines, settlements, judgments, costs and expenses ("**Loss**") of the Company or any Member, unless the Loss results from the active or gross negligence, reckless or intentional misconduct, material breach of the Operating Agreement or any other contractual or legal duty, fraud, deceit, bad faith or knowing violation of law by such Member, Manager or officer. Accordingly, the Manager, the Company's officers and the Special Manager (if appointed) generally will not be liable for errors in judgment or other acts or omissions not amounting to willful misconduct or gross negligence, and the Company and the Members have a more limited right to action than they would have absent such limitation on liability of the Manager and officers contained in the Operating Agreement.

## K.      Transfer and Assignment of Membership Interest

The Operating Agreement contains substantial restrictions on the right of a Member to transfer, encumber or otherwise dispose of any part of such Member's Membership Interest. In general, a Class B Member may not sell, transfer, encumber, or otherwise dispose of his or her Class B Units until the conditions to permanent resident status have been removed by the USCIS pursuant to the EB-5 Program, subject to the exceptions described in this paragraph and **VII.L. Liquidation of Class B Units**. Additionally, no Member may transfer, encumber or otherwise dispose of any part of such Member's Membership Interest except with the approval by the Manager, which approval may be withheld, conditioned or delayed in the Manager's sole and absolute discretion. With respect to any transfer by a Member of a Membership Interest to certain family members of such Member, any trust for the benefit of that Member or certain family members of that Member, or any Affiliate of that Member, the consent of the Manager is not required. In addition to the foregoing restriction and the other restrictions set forth in the Operating Agreement, a Member cannot transfer, encumber or otherwise dispose of any part of his, her or its Membership Interest which will result in the violation by that Member or by the Company of U.S. federal, state or foreign securities laws and all other applicable laws. The Company will not register or otherwise permit any resale or transfer of any Membership Interest that is not made in accordance with an exemption from registration requirements, as amended, under the Securities Act, or the securities laws of each applicable U.S. state and non-US country.

10437760\V-2
LA 130898254v6

## L.    Liquidation of Class B Units

The Company shall liquidate a Class B Member's Class B Units in the event that such Member (i) decides not to proceed with his or her Form I-526 Petition, (ii) is denied approval of his or her Form I-526 Petition and such denial becomes final, or (iii) fails to obtain conditional permanent resident status under the EB-5 Program within 18 months after the date of the last submission of all documents required by a consular officer (or a USCIS examiner in case of an adjustment of status application) or pursuant to reasonable current processing timelines as published by USCIS. If a Class B Member's Class B Units are liquidated for any reason referred to in (i), (ii) or (iii) of this paragraph, then such Class B Unit shall be liquidated at a price equal to the subscription purchase price and the Administration Fee in full. If a Class B Member's Class B Units are liquidated for any reason referred to in (iv) of this paragraph, then such Class B Unit shall be liquidated at a price equal to the subscription price and such portion of the Administration Fee as determined by the Manager in its sole discretion.

The Company may liquidate the Class B Units of a Class B Member in the event that such Class B Member delivers to the Company a written request for the liquidation of such Class B Member's Class B Units within three months from the latest of (i) the Company having received the full and final repayment of the loan owed by the Developer; (ii) such Class B Member's receipt of unconditional permanent resident status in the United States under the EB-5 Program, and (iii) the fifth anniversary of the date on which a Class B Member's Form I-526 Petition is approved by the USCIS. The purchase price of each Class B Unit purchased by the Company pursuant to this paragraph shall be the net asset value of the Company calculated on a per Class B Unit basis subject to a maximum cap of US$500,000 plus the Accrued Distribution (if any). Accrued Distribution is defined in the Operating Agreement as all the amounts, other than the principal of the Loan, receivable by the Company under the Loan agreement as allocated pro rata among the Class B Members in proportion to their Percentage Interests.

Subject to the paragraph below, liquidation amounts referred to in the two foregoing paragraphs will be paid within ninety (90) days of receipt by the Company of the request for liquidation.

The Company may suspend the liquidation of the Class B Units from a Class B Member may be suspended under certain circumstances. If the Manager determines that the liquidation of the Class B Units will have an adverse effect on the business or immigration objectives of the Company or the ability of other Class B Members to obtain unconditional permanent resident status in the U.S. pursuant to the EB-5 Program, the Company may suspend the liquidation of the Class B Units until the Manager determines that such adverse effects are no longer a concern. In addition, the Company's ability to liquidate the Class B Units may be limited by certain provisions of the Act (under the California Corporations Code) and/or the terms of the Company's loan or other agreements with third parties. Accordingly, even though the Company may liquidate certain Class B Units under certain circumstances, the consummation of any such liquidation transaction may be delayed and suspended until the applicable statutory or contractual restrictions have been removed.

**M.      Remuneration to Members and Manager**

In general, no Member is entitled to remuneration for acting in his or her capacity as a Member.

Each Manager is entitled to remuneration and other benefits for services provided in accordance with the terms of any service agreement, provided that such agreement shall have been approved by the Members in accordance with the Operating Agreement. See **VII.I. Voting and Approval Rights of Members**. Any remuneration paid by the Company to the Special Manager shall be reimbursed to the Company by the Developer.

**N.      Competing Activities**

Any Manager, Member, or officer of the Company may engage in any business activity even though it might be the same as or similar to the Company's business or might be in direct or indirect competition with the Company. Such persons are not obligated to present any business or investment opportunity to the Company, and have the right to engage in such opportunity for their own account or for the account of anyone other than the Company.

The Manager acts in a similar capacity in providing similar services to the Company, BOI, BOII, BOIII, BO Source, and BO Office with respect to the Loans for the Retail and Office phases of The Source development, and for the BO Investors equity investment. See **VIII.C.1. Existing and Additional Debt Financing, XI. Conflicts of Interest** and **II.O. Risk of Relying on Management and the Performance by Others**.

**O.      Accounting and Reporting**

The Company is required to maintain its books and records at its principal office. The Company is required to record its financial position and its operation in accordance with the accounting methods followed by the Company for federal income tax purposes.

The Company is required to send to each Member not later than 120 days after the close of a calendar year an unaudited financial report containing a balance sheet as of the end of that calendar year and a statement of profit and loss and a cash flow statement for that calendar year. The Company is also required to send to each Member within 90 days after the end of each taxable year (or as soon as practicable thereafter) such information as is necessary for the preparation of the federal and state income tax returns of such Member and a copy of the Company's federal, state, and local income tax or information returns for that year.

Upon reasonable request by a Member, the Company shall provide certain additional financial and other information, and permit the inspection and copying of certain documents by such Member or Members, or by their respective agents or attorneys.

**P.      Dissolution and Winding Up**

The Company will be dissolved and wound up upon the occurrence of any of the following:

10437766\V-2
*LA 130898254v6*

1. The entry of a decree of judicial dissolution;

2. The approval of the Members and the Manager; or

3. The sale of all or substantially all of the Company's assets, including full repayment of the Loan and completion of all enforcement of rights and powers (including enforcement of security) against the Developer.

In connection with Company's dissolution and winding up, the Company will, after determining that all known debts and liabilities of the Company have been paid or sufficiently provided for, distribute the remaining assets to the Members in accordance with the procedures set forth in the Operating Agreement.

## Q. Indemnification

Subject to certain limitations set forth in the Operating Agreement the Company is obligated to fully indemnify, hold harmless and defend any Member, Manager, officer, employee or agent of the Company against any Loss incurred by reason of any act or omission performed or omitted by such person in good faith undertaken on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such person by the Operating Agreement.

The Company also provides an indemnity to the Class B Manager pursuant to the Management Agreement. See **XII.B. Indemnification**.

## VIII. THE PROPERTY, DEVELOPMENT AND THE HOTEL DEVELOPMENT

## A. Description of the Property and Development

The Property is located in Buena Park, California (Orange County) at the northeast corner of Beach Boulevard and Orangethorpe Avenue and is approximately 12.8 acres, of which is owned by affiliates of the Developer and M + D. Approximately 400,000 square-foot (37,000 square-meter) lifestyle retail center (Phase I) is currently under development on the 12.8 acre site (the "**Property**"). The following table describes the three Phases of the Development:

| Phase of Construction | Development |
|---|---|
| I | Underway and consisting of approximately 400,000 square-foot (37,000square-meter) lifestyle retail center. This portion is expected to be completed prior to the opening of the Hotel Development. |
| II | Underway and consisting of approximately 57,000 gross square-foot (5,000 square-meter) office building with ground floor retail which will be constructed during the same time as the Hotel Development but not part of the Hotel Development project. |
| III | Hotel development built on top of three floors of retail (which will be constructed during the same time as the hotel, but as part of a separate development). The hotel will include four floors of a 3.5 to 4-star focused-service hotel with approximately 150 rooms. |

## B. Description of the Hotel Development

The Developer proposes to construct a 3.5- to 4-star hotel which includes approximately 150 rooms and amenities on the Property as part of the Development (the "**Hotel Development**"). This hotel will be situated on floors 4-7 of a seven-story building. The bottom three floors of this building would be retail space developed concurrently as part of a separate, but related, retail development project (see description of Phase I above). The total cost of the Hotel Development is projected to be approximately $26 million.

The Company intends to fund the above development costs with $10 million through this Offering where the proceeds of the Offering are loaned by the Company to the Hotel Developer ("**Loan**"). In addition, the Hotel Developer expects to obtain a $16 million loan from a commercial bank ("**Construction Loan**").

## C. Financing the Hotel Development

### 1. Existing Financing

The lifestyle retail center which is currently under construction has been financed by affiliates of the Developer through their own resources and by a series of loans and other financings which aggregate approximately $150,000,000. The loans total approximately $130,000,000 are secured by a first lien on the Property and Phase I of the Development and are subject to guarantees by the affiliates of the Developer ("**Property Loans**").

The Hotel Development and Loan by the Company in the amount of $10 million to the Developer will be secured by a security interest in the Hotel Development only and not the Property or other phases (Phase I and II) of the Development. Further the Loan will be junior to the lien held by the construction lender on the Hotel Development. Both the construction loan and Loan on the Hotel Development are subject to the Developer and its affiliates' ability to repay the various loans described above with respect to financing the development of the Property.

Following the completion of Phase I, after stabilization of the operations of the Development the developer of Phase I intends to obtain permanent financing to pay off the Property Loans, and certain other debt and obligations. The Developer of the Hotel Development is expected to seek such other refinancing for the Hotel Development and retire the Loan after the hotel opens and its operations stabilize. No assurance can be given that the Developer or other developments within the Property will be able to adhere to timetable described herein or that the permanent financing will be available or under terms acceptable to the Developer. In addition, the Developer may seek to sell up a portion of the Project to outside investors.

## D.    Zoning and Land Use

The various parcels that make up the Property previously were zoned as "Entertainment Corridor Specific Plan," "Commercial General," or "One-Family Residential." Due to the zoning change obtained by the Developer with respect to the Property, all of the parcels of the Property are now zoned "Beach-Orangethorpe Mixed Use Specific Plan" (the "**Specific Plan**"). The new zoning permits significantly more density on the Property than the prior zoning, which permitted only low-rise developments. Specifically, the Specific Plan permits the development of a mixed-use project with a maximum of 1,000 dwelling units and 355,000 square feet (32,980 square meters) of retail. The Specific Plan also permits a hotel with a maximum of 300 rooms. Under the Specific Plan, a maximum of 195,000 square-feet (18,116 square meters) of office space may be developed in place of 177 dwelling units. The City has indicated that the Developer may exceed the maximum square footage for a particular use set forth in the Specific Plan in the event the Developer uses less than the maximum square footage for another use and so long as the change does not result in an adverse environmental impact different from or more significant than as described in the Environmental Impact Report submitted to the City. Although the square footage of the retail center and office building in the Development exceed the maximum square footage set forth for such uses in the Specific Plan, the City has indicated that the Development will still fall within the scope of the Specific Plan if the Developer constructs fewer residential units than as contemplated by the Specific Plan.

## E.    Architectural Plans and Specifications

The Developer has retained Iroje Architects and Gene Fong Associates to design the Hotel Development. The final plans and specifications will be determined by the Developer, in its sole and absolute discretion, and may be affected by requirements of the City, franchisor, and tenants of the Development as well as economic conditions and various other factors.

## F.    Economic Projections of the Hotel Development

37

The Developer anticipates that Hotel Development will commence site work during the first half of 2014 and expects construction to be completed by the end of 2015. Assuming these estimates materialize, the Hotel is expected to open by mid-2016. However, there can be no assurance that the Hotel Development will be completed on time or that the Members will receive any return of or on their investment. When or whether the Hotel Development generates income affects the ability of the Developer to obtain other financing to permit the Developer to repay the various loans made toward the construction of the Hotel Development (See **VIII.C. Financing the Hotel Development**

## IX. THE LOAN

### A. General Terms

The Company will lend the entire amount of the proceeds from the Offering (not including the Administration Fee) to the Developer. Disbursements under the Loan will be made to the Developer in accordance with the conditions for the closing and disbursements of the Loan set forth in the Loan Agreement. The terms of the Loan are set forth in a promissory note in the form attached to this Memorandum as Exhibit E (the "**Note**"). The basic terms of the Loan will be as follows:

(i)     During the period commencing on the date of the Note and ending on the expiration of the term of the Loan (i.e., the maturity date), the unpaid principal balance of the Loan will accrue interest at the simple (non-compounded) rate of 1% per annum.

(ii)    The term of the Loan will be 5 years from the date of Loan closing or as soon thereafter as certain conditions have been satisfied.

(iii)   Unless any earlier right to repayment arises pursuant to sections 2 and 3 of the Note, the Developer will pay the outstanding principal amount of the Loan and any accrued but unpaid interest in a single balloon payment due on the maturity date of the Loan.

### B. Guaranties

Min Chae and Donald Chae will guarantee the repayment of the Loan by the Developer pursuant to a guaranty in the form attached to this Memorandum as Exhibit H. Subject to certain limited exceptions, the guaranty is a guarantee of the full repayment of all of the obligations under the Loan Agreement.

### C. Deed of Trust

The Note will be secured by a Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing (together the "**Deed of Trust**") given by the Developer to the Note holder (being the Company) which constitutes a lien over certain interests of the Developer in the Hotel Development and its interest (subject to obligations) in the ground lease.

10437766lV-2
LA 130898254v6

## D.     Use of Loan Proceeds

The Developer intends to use the Offering proceeds for the payment of the hard and soft costs in connection with the development and construction of the Hotel Development for Phase III along with approximately $16,000,000 that the Developer expects to obtain in a separate construction loan ("**Hotel Construction Loan**").

The Hotel Development is security for both the Loan from the Company to the Developer, estimated at $10 million and the Hotel Construction Loan. The Company Loan's security interest in the Hotel Development will be junior to the Hotel Construction Loan. See **VIII.C.1. Existing and Additional Debt Financing**).

## X.     COMPENSATION AND FEES

The Company does not anticipate payment of compensation and fees to any Manager, officer, Affiliate or any relative of any of the foregoing in connection with the Offering. However, after the Offering, the Company may pay its Manager and such other persons compensation and fees for their services to the Company. See **VII.L. Remuneration to Members and Manager**. For its development services, M + D, as manager of the Developer, will receive an annual development fee equal to 1.25% of the pre-development, development, and construction costs incurred by or on behalf of the Developer in connection with the Development.

## XI.     CONFLICTS OF INTEREST

## A.     Conflict Among the Company, Beach Orangethorpe; LLC and Beach Orangethorpe II, LLC: Beach Orangethorpe Ventures, LLC; Beach Orangethorpe Source, LLC; Beach Orangethorpe Investors, LLC; Beach Orangethorpe Office, LLC

The Manager has broad discretion in managing the affairs of the Company. Except for situations in which the approval of the Members is expressly required by the Articles of Organization or the Operating Agreement, the Manager has full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business, property and affairs.

The Manager acts in a similar capacity providing similar services to BOI, BOII, BOIII, BO Source and BO Investors in respect of the BOI Loan, BOII Loan, BOIII Loan, BO Source Loan and BOI Investors equity investment – the proceeds of which will or have been applied in connection with the development of Phase I of the Development. Additionally, Manager also provides similar services to BO Office in respect to the BO Office for Phase II of the Development. Subject to applicable laws and regulations, the Manager will, as far as practicable, treat the Company, the Property Loans on a *pari passu* (the same) basis. Nevertheless, the Manager may be conflicted in their duty to act in the interests of the Company, particularly in respect of the Loan, relative to the Property Loans. In addition, the Manager owes fiduciary

responsibilities to the Company. See **XII. FIDUCIARY RESPONSIBILITY OF THE MANAGER**.

### B. Relationship Between the Manager and Developer

The Class A Manager may have a conflict of interest in managing the business of the Company because (i) DMC is an Affiliate of both the Class A Manager and M + D, the sole manager of the Developer and the Manager, and (ii) DMC independently holds a membership interest in the Developer. However, the Class A Manager owes fiduciary responsibilities to the Company. See **XII. FIDUCIARY RESPONSIBILITY OF THE MANAGER**.

### C. Allocation of Manager's Time

The Manager may have conflicts of interest in allocating management time, services and functions between the Company and any business ventures in which any Manager may now or in the future be involved including without limitation, those associated with BOI, BOII, BOIII, BO Source, BO Investors, and BO Office respectively. The Manager will devote such time and resources to the Company as it determines appropriate for the reasonably proper, adequate and responsible operation of the Company in its sole and absolute discretion, exercised in good faith and in compliance with the Operating Agreement and its fiduciary obligations.

### D. Company's Transactions with Related Parties

The Company may, from time to time, enter into agreements with (i) the Manager, (ii) Members, (iii) employees of the Company, or (iv) Affiliates, members/shareholders, or employees of the Manager or the Members. Notwithstanding that it may constitute a conflict of interest, the Manager may, or may cause its Affiliates to, engage in any transaction (including, without limitation, the purchase, sale, lease, or exchange of any property or the rendering of any service, or the establishment of any salary, other compensation, or other terms of employment) with the Company, subject to the fiduciary responsibilities owed by the Manager to the Company. See **XII. FIDUCIARY RESPONSIBILITY OF THE MANAGER**.

### E. Developer's Transactions with Related Parties

The Developer may, from time to time, enter into agreements with (i) M + D, the Developer's and Manager's manager, (ii) its member(s), (iii) its employees, or (iv) Affiliates, members/shareholders, or employees of M + D. For example, the Developer may retain a property management company that is owned, controlled, and managed by Min Chae and Donald Chae, who together also own, control and/or manage, directly or indirectly, the Regional Center, DMC, the Developer, and M + D. Notwithstanding that it may constitute a conflict of interest, M + D may, or may cause its Affiliates to, engage in any transaction (including, without limitation, the purchase, sale, lease, or exchange of any property or the rendering of any service, or the establishment of any salary, other compensation, or other terms of employment) with the Developer, subject to the fiduciary responsibilities owed by M + D to the Developer. See **XII. FIDUCIARY RESPONSIBILITY OF THE MANAGER**.

## XII.  FIDUCIARY RESPONSIBILITY OF THE MANAGER

The Manager is accountable to the Company as a fiduciary and consequently must exercise good faith and integrity in handling the affairs of the Company. In general, the Manager is obligated to perform its managerial duties in good faith, in a manner it reasonably believes to be in the best interests of the Company and the Members, and with such care, including reasonable inquiry, as an ordinary prudent person in a like position would use under similar circumstances. The Developer's manager is subject to the same obligations with respect to the Developer and the members of the Developer.

### A.  Exculpation

In general, the Manager will not be personally liable to the Company or any Member for any loss or damage incurred by the Company or any Member, unless the loss or damage is the result of the Manager's fraud, deceit, gross negligence, reckless or intentional misconduct, or knowing violation of law. Accordingly, the Company and the Members may not have any right that may otherwise have existed to hold the Manager accountable for simple negligence. The Developer's operating agreement contains the same exculpation provisions with respect to the Developer's manager.

### B.  Indemnification

Pursuant to the Operating Agreement, the Company is obligated to fully indemnify, hold harmless and defend any Member, Manager, officer, employee or agent of the Company against any loss incurred by reason of any act or omission performed or omitted by such person in good faith undertaken on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such person by the Operating Agreement, subject to certain limitations. The Developer is subject to the same indemnification obligations with respect to the Developer's manager.

## XIII.  LEGAL PROCEEDINGS

There are no pending material legal proceedings known to the Manager affecting the Company or its asset or known by M + D affecting the Developer or its assets.

The Company has been informed by the Developer that no such person has been convicted or pled nolo contendere to a felony or a crime involving fraud, deceit or acts of moral turpitude and no such person has been and is currently a party to any pending or threatened litigation involving any felony or such crimes. In addition, the Company has been informed that no manager or officer of the Manager has been sanctioned or is party to pending or threatened action, by the United States Securities and Exchange Commission or any other governmental authority for any violations of the securities laws.

Placo San Bernardino, LLC, an entity affiliated with M + D ("Placo SB"), owned a regional shopping center in San Bernardino, California known as "Carousel Mall." While negotiating with Placo SB the plans for redeveloping Carousel Mall, the Economic Development Agency of the City of San Bernardino (the "EDA") acquired the note made by Placo SB in favor of a commercial lender, which was secured by Carousel Mall and guaranteed by DMC, Min

41

Chae, and Donald Chae. The EDA, claiming that Placo SB had defaulted under the note, foreclosed upon Carousel Mall.Placo SB filed an action in the U.S. District Court for the Central District of California against the City of San Bernardino and the EDA seeking damages and equitable relief for inverse condemnation, violation of civil rights (equal protection, due process), violation of contract rights, breach of contract, and interference with prospective economic advantage. In response, the EDA filed suit against DMC, Min Chae, and Donald Chae for breach of their respective guaranties. The two suits have been consolidated in the Superior Court of California, County of Los Angeles. The lawsuit currently is in the discovery phase. The EDA has since been dissolved and the city of San Bernardino is currently in bankruptcy proceedings.

## XIV.  TAX CONSIDERATIONS

**PURSUANT TO U.S. INTERNAL REVENUE SERVICE CIRCULAR 230, THE COMPANY HEREBY INFORMS SUBSCRIBERS THAT THE DESCRIPTION SET FORTH HEREIN WITH RESPECT TO U.S. FEDERAL TAX ISSUES IS NOT INTENDED OR WRITTEN TO BE USED, AND SUCH DESCRIPTION CANNOT BE USED, BY ANY SUBSCRIBER FOR THE PURPOSE OF AVOIDING ANY PENALTIES THAT MAY BE IMPOSED ON THE SUBSCRIBER UNDER THE U.S. INTERNAL REVENUE CODE.  THE FOLLOWING DESCRIPTION IS WRITTEN TO SUPPORT THE MARKETING OF THE CLASS B UNITS.  SUBSCRIBERS SHOULD SEEK ADVICE BASED ON THE SUBSCRIBER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

Each potential Subscriber should carefully consider the income tax consequences of an investment in the Company and the effect such consequences may have on the Subscriber's economic return. The following is a summary of certain U.S. federal income tax considerations relevant to an investment in the Company by a Subscriber who is an individual rather than an entity. The discussion is based on current provisions of the Internal Revenue Code of 1986, as amended, the applicable Treasury Regulations promulgated thereunder, judicial authority and current administrative rulings and practice, all of which are subject to change, possibly on a retroactive basis. This discussion does not purport to address (i) all aspects of U.S. federal income taxation that may be relevant to any particular Subscriber in light of such Subscriber's individual tax attributes and status; (ii) except as otherwise noted, the U.S. federal income tax consequences to any Subscriber that is not an individual or (iii) except as described below, any applicable state, local or foreign tax laws in connection with an investment in the Company.

**THE SUMMARY HEREIN IS NOT INTENDED TO PROVIDE LEGAL ADVICE WITH RESPECT TO ANY PARTICULAR SITUATION, AND NO LEGAL OR BUSINESS DECISION SHOULD BE BASED SOLELY ON ITS CONTENT. PROSPECTIVE SUBSCRIBERS ARE URGED TO CONSULT WITH THEIR PERSONAL TAX ADVISERS REGARDING THE POTENTIAL U.S. FEDERAL, STATE, AND LOCAL TAX CONSEQUENCES, AS WELL AS FOREIGN TAX CONSEQUENCES ARISING FROM THE PURCHASE, OWNERSHIP, AND SALE OF THE CLASS B UNITS.**

10437766\V-2
*LA 130898254v6*

It is intended that the Company will be classified and treated as partnership for U.S. federal income tax purposes. Under the entity classification regulations promulgated by the U.S. Treasury Department, in particular the "default rule" applicable in the absence of a contrary affirmative election, an unincorporated organization formed under the laws of a U.S. state (including a limited liability company) is generally treated as a partnership. However, there can be no assurance that the relevant regulations will not be changed during the life of the Company or that the Operating Agreement will not be amended in a manner that might cause the Company to be taxed as a corporation.

As a partnership for U.S. federal income tax purposes, the Company itself is not subject to federal income tax. Instead, the Company's items of income, deduction, loss and credits are allocated among the Members in accordance with the provisions of the Operating Agreement, and tax liability for any taxable income is borne by the Members. Under the operational structure described in this Memorandum, and the current provisions of the Internal Revenue Code relating to original issue discount on debt obligations, the Company will be required to accrue income annually in the amount of the daily accrued interest on the Loan, at an initial rate of slightly less than one percent (1%) per annum on the original loan balance and increasing gradually over the term of the loan. Thus, assuming a four-year maturity for a Loan of $10 million, original issue discount income will accrue at the rate of approximately $100,000 per year, or US$5,000 per Class B Unit (slightly less in the early years, slightly more in later years), pro-rated for partial calendar years. Accrued original issue discount will increase the cost basis of the Loan, and result in less taxable income for Members when the Loan (including accrued interest) is repaid.

The accrued original issue discount or interest income in each calendar year will be a positive income item that will be allocated among the Class B Members, in proportion to each Member's ownership interest in the Company. Except to the extent that the accrued discount is offset by deductible operating expenses of the Company, it will generally result in the Class B Members realizing taxable income on which they will be required to pay income tax, whether or not they receive any cash distributions from the Company.

However, if any Member is not a United States resident for any period in which he or she is a Member, his or her share of original issue discount or interest income during that period may not be included in gross income, provided that the interest income accrued by the Company on the Loan will not be considered effectively connected with a United States trade or business, and will qualify for the portfolio interest exemption set forth in Section 871(h) of the Internal Revenue Code and applicable regulations. The Company believes that this exemption will be applicable to Class B Members for periods when they are not United States residents, as defined in the applicable provisions of the Internal Revenue Code and Regulations.

However, all Class B Members who receive immigrant visas through the EB-5 program will be treated as United States residents for income tax purposes from and after the date that they enter the United States, until they surrender their status or it is revoked or terminated through failure to file the required forms with USCIS by the second anniversary of the date that their visa is issued. Similarly, a Class B Member already present in the United States who receives an adjustment of status to lawful permanent resident, will be treated as a United States

43

resident at least from that date, and possibly earlier under the "substantial presence rules" of the Internal Revenue Code.

A member who believes that the portfolio interest exemption may apply to some or all of his or her share of the Company's interest or original issue discount income shall provide such information, including but not limited to a properly completed and signed IRS Form W-8BEN, as the Manager may request, and the determination of the Manager with respect to his or her eligibility for the exemption shall be final.

However, if, in their discretion, and based on professional advice, the Manager determines that the exemption is not applicable to any Member who is not a United States resident for any period, certain withholding requirements will be applicable.

- If the interest income is considered effectively connected with a United States trade or business carried on by the Company, the Company will generally be required to remit to the Internal Revenue Service an amount equal to the product of multiplying (i) the non-resident Member's share of the Company's effectively connected taxable income (including the accrued interest on the loan, less applicable deductions for expenses and other deductible items incurred) for the period of non-residency by (ii) the highest rate of income tax then imposed on individuals. That rate is currently 39.6% but may change as a result of future legislation.

- If the interest income is not considered effectively connected with a United States trade or business, and the portfolio interest exemption is not applicable for other reasons, the withholding rate is 30%, or lower rate established by an applicable treaty, multiplied by the lesser of (i) the non-U.S. Member's share of accrued interest not yet taken into income, unreduced by any expenses or other deductions or (ii) the non-U.S. Member's share of any payments received by the Company on the Loan, or resulting from a disposition of the Loan.

If the amounts withheld from a non-U.S. Member during a year exceed his or her income tax liability for the year, the excess may be refunded provided the Member files timely and accurate income tax returns with the Internal Revenue Service.

Because Class B Members who are granted permanent resident status (conditional or unconditional) in the United States will thereafter be treated as United States residents for income tax purposes, federal withholding is not likely to be a material issue for most Class B Members, provided that they provide an appropriate certification of status to the Company when requested, on IRS Form W-9.

Each Class B Member who is an individual will be required to file United States federal state income tax returns for each year that he or she receives any distribution, or allocation of profit or loss, from the Company, and report on those returns his or her distributive share, whether or not actually distributed, of the income, gains, losses, deductions or credits of the Company. The Company will report to the Class B Members the amounts which it believes are

44

includible and any allowable deductions, using Schedule K-1, and provide this information to the federal and state tax authorities.

Although the Manager may attempt to cause the Company to make distributions to the Class B Members sufficient to provide funds that enable the Class B Members to pay their U.S. income tax liabilities arising out of the Company's operations, or to satisfy any withholding obligations the Company may have, there can be no assurance that the Company will be able to make such distributions or that the Manager will elect to make them even if the Company is able to do so. Any amounts which the Company is required to withhold and remit to the tax authorities for the account of a non-resident Member may, in the discretion of the Manager, be considered either as (i) an advance payment of future distributions or (ii) a loan to the applicable Member, repayable on demand, together with interest at the rate of eight percent (8%) per annum, and secured by the Member's interest in the Company and all distributions to which he or she is otherwise entitled to receive.

If the Company were not treated as a partnership for United States federal income tax purposes, but were taxed as a corporation in any year, its taxable income would be taxable to the Company and not to the Members, and distributions by the Company to the Members would, to the extent of the Company's earnings and profits, would be taxable to the Members as dividend income. The federal income tax rate on most dividends paid to United States citizens or residents is currently 20%, and is subject to change in future legislation. High income individuals may also be subject to an additional 3.8% tax on dividends, interest and certain other types of income, which was imposed effective in 2013 under the recent health care reform legislation generally known as "Obamacare."

Under current law, the tax rate on dividends paid to individuals who are not U.S. citizens or residents is thirty percent (30%), which is generally satisfied by withholding at the payor level, unless an applicable treaty provides for a lower rate, and the recipient provides evidence, generally in the form of a properly completed and signed IRS Form W-8BEN, that he or she qualifies for a lower rate under the treaty.

## XV. PLAN OF DISTRIBUTION

### A. Sale of the Class B Units

Subject to the conditions in this Memorandum, the Subscription Agreement and the Operating Agreement, the Company is offering 20 Class B Units, constituting membership interests in the Company, at US$500,000 per Class B Unit (subject to the Minimum Investment Requirement), for an aggregate amount of US$10,000,000. Subscriptions are not available for fractional interest in any Unit. The sale and purchase of a Class B Unit will occur only upon satisfaction of all conditions described in **V.I. Conditions to Release of Funds**.

The Offering will be consummated only with Subscribers who have (i) executed and delivered the Subscription Agreement, joinder agreement and spousal consent (if applicable) to the Operating Agreement, Escrow Agreement (if applicable), Representation Statement, and Form W-8BEN or W-9, (ii) provided Evidence of Source of Funds, (iii) delivered valid certified checks, cashier's checks or personal checks for the full amount of the subscription and the

10437766\V-2
LA 130898254v6

Administration Fee (or sent such amounts by wire transfers to an account designated by the Company) and (iv) been accepted by the Company (according to the requirements of **V.C. Subscription Procedure.** Those signed documents and check should be delivered to:

> Beach Orangethorpe Hotel, LLC
> 3100 E. Imperial Highway
> Lynwood, CA 90262
> Telephone: (714) 521-8858
> Facsimile: (714) 521-4256
> Attn: General Manager

## B.   Escrow Arrangement

Subscribers' funds will be deposited in an escrow account with the Escrow Agent. A Subscriber's funds will be released from the escrow account to the Company upon the satisfaction of all conditions described in **V.I. Conditions to Release of Funds**.

## XVI.   ADDITIONAL INFORMATION

Prospective Subscribers may request the additional information and documents referred to herein or other documents, which the Company has in its possession (or may obtain without unreasonable effort or expense), including the following:

1.   [Beach and Orangethorpe Mixed-Use Specific Plan (also attached to Environmental Impact Report)

2.   Development Agreement between the City of Buena Park and the Developer

3.   Environmental Impact Report, which includes as appendices copies of the following documents (Due to the length of the document, the Environmental Impact Report and its appendices must be reviewed at the offices of the Company):

   Appendix A:  Notice of Preparation, Initial Study and NOP Comment letters
   Appendix B:  Beach and Orangethorpe Mixed-Use Specific Plan
   Appendix C:  Photometric Analysis
   Appendix D:  Air Quality Analysis
   Appendix E:  Archaeological and Paleontological Resources Assessment
   Appendix F:  Geotechnical Feasibility Assessment
   Appendix G:  Hazards and Hazardous Materials Reports
   Appendix H:  Hydrology and Water Quality Reports
   Appendix I:  Noise Analysis
   Appendix J:  Traffic Analysis
   Appendix K:  Utilities and Service Systems Reports

**January 10, 2014**
Lynwood, California

46

# EXHIBIT A

## SUBSCRIPTION AGREEMENT

194377661V-2
LA 130898254v6

**SUBSCRIPTION AGREEMENT**
**Memorandum No. ___**

Beach Orangethorpe Hotel, LLC
3100 E. Imperial Highway
Lynwood, California 90262
Attention: General Manager

Gentlemen:

The undersigned acknowledges that the undersigned has received and reviewed a copy of the Confidential Private Placement Memorandum dated February 12, 2014 (the "**Memorandum**"), relating to the private offering by Beach Orangethorpe Hotel, LLC, a California limited liability company (the "**Company**"), of up to 20 Class B Units of membership interest in the Company ("**Unit**" or "**Units**") at a price of US$500,000 per Unit (without any fractional interest) (the "**Offering**"), subject to the Minimum Investment Requirement (as defined in the Memorandum). Certain terms used herein are defined in the Company's Operating Agreement, the form of which appears as Exhibit B to the Memorandum (the "**Operating Agreement**"). In addition to other requirements under the U.S. Securities Act of 1933 ("Securities Act") which the Company may require, each subscriber of the Units acknowledges that such subscriber is an "accredited investor" as defined in Regulation D ("**Accredited Investor**") promulgated under the Securities Act of 1933, as amended.

1.      Subscription. Subject to the terms and conditions contained herein and in the Memorandum, the undersigned hereby subscribes for and, if such subscription is accepted by the Company, shall purchase Units for the total amount set forth on Schedule A attached hereto ("**Investment Amount**"). The undersigned tenders herewith a certified check, cashier's check or personal check or tenders by wire transfer the sum of the Investment Amount plus the administration fee of US$45,000 ("**Administration Fee**") if the undersigned is a foreign resident, which Investment Amount and Administration Fee shall be deposited with an escrow agent designated by the Company in its sole and absolute discretion ("**Escrow Agent**"). The Investment Amount and the Administration Fee shall be paid to the Company and M&D Regional Center, LLC ("**M&D**"), respectively, upon the closing of the sale of the Units by the Company to the undersigned pursuant to Section 3. The undersigned understands and agrees that any subscription may be accepted or rejected by the Company in the sole and absolute discretion of the Company. If this subscription is rejected, this subscription shall be rendered void and shall have no further force or effect.

2.      Acceptance of Subscription. The undersigned understands and agrees that this subscription is made subject to the following terms and conditions:

(a)      Prior to the closing of this subscription, the Company has the right to reject this subscription in its sole and absolute discretion;

(b)    The Company has the right to terminate the Offering, in its sole and absolute discretion; provided, however, that such cancellation shall not affect this subscription after the closing of this subscription;

(c)    The Company shall have no obligation to accept subscriptions in the order received;

(d)    Acceptance of any subscription by the Company is contingent on payment of the Investment Amount and the Administration Fee in immediately available funds; and

(e)    The documents to be issued and delivered on account of this subscription will be issued only in the name of and delivered only to the undersigned.

3.    Closing. The closing of the sale of the Units by the Company to the undersigned pursuant to the Offering will occur, if at all, upon (i) the Company's delivery to the Escrow Agent of a written acceptance of this subscription by the Company, (ii) acceptance by the Company of the Subscriber's cleared funds in the amount of the full Investment Amount and the Administration Fee, and (iii) if a foreign resident, the approval of the undersigned's Form I-526 Immigrant Petition by Alien Entrepreneur ("**Form I-526 Petition**") by the U.S. Citizenship and Immigration Services (the "**USCIS**"), or (iv) the mutual written consent of the Company and the undersigned for the closing of the sale of the Units to the undersigned. Upon the closing of this subscription, the Investment Amount shall be paid to the Company, and the Administration Fee (if applicable) shall be paid to M&D.

4.    Return of Investment Amount and/or Administration Fee.

(a)    If this subscription shall have been rejected or the Offering (in its entirety) shall have been terminated by the Company, the Investment Amount and the Administration Fee shall be returned to the undersigned, without interest.

(b)    If the undersigned's Form I-526 Petition shall have been denied pursuant to a written decision of the USCIS pursuant to the EB-5 program, for any reason that cannot be readily remedied, the Investment Amount and the Administration Fee shall be returned to the undersigned without interest, subject to the undersigned's delivery of evidence reasonably satisfactory to the Company regarding the denial of approval or failure.

(c)    If the undersigned decides not to proceed with the undersigned's Form I-526 Petition, the Investment Amount and such portion of the Administration Fee (if any) at the sole and absolute discretion of the Class A manager of the Company shall be returned to the undersigned without interest.

5.    Revocation. Upon the acceptance of this subscription by the Company, this subscription may not be cancelled, terminated or revoked by the undersigned. In the event the undersigned fails to exercise such revocation right as provided under this Section, the undersigned shall remit to the Company such additional funds necessary to satisfy the Minimum Investment Requirement, which additional funds shall constitute a part of the Investment Amount. In the

event the undersigned revokes this subscription pursuant to this Section, the Investment Amount and the Administration Fee shall be returned to the undersigned without interest.

6.      Representations, Warranties, Covenants and Acknowledgments of the Undersigned. The undersigned represents, warrants, covenants and acknowledges as follows:

(a)      The undersigned is a bona fide resident, domiciliary and citizen of the country or countries set forth on the signature page hereof and has no present intention of becoming a resident of any other country other than the United States.

(b)      The undersigned represents and warrants that the undersigned reads and understands English or has had this Subscription Agreement, the Memorandum, the Operating Agreement, and any other documents provided to the undersigned by the Company in connection therewith translated by a competent translator into a language understood by the undersigned.

(c)      The undersigned acknowledges and agrees that (i) the USCIS has sole and absolute discretion with respect to the granting of conditional or unconditional permanent residency in the United States under the EB-5 immigrant investor visa program and may deny a Form I-526 Petition or a Form I-829 Petition by Entrepreneur to Remove Conditions ("**Form I-829 Petition**") for any reason; (ii) the U.S. consulates abroad have sole and absolute discretion with respect to the granting of an immigrant visa; (iii) the Company and its manager, officers, employees, representatives and agents have not made any statement, promise, or representation to the undersigned regarding the likelihood of the undersigned receiving conditional or unconditional permanent residency in the United States; (iv) the undersigned is solely responsible for filing a Form I-526 Petition, applying for conditional permanent residency in the United States, and filing a Form I-829 Petition and the costs and expenses related thereto, including, without limitation, fees and expenses of retaining immigration counsel; and (v) the Company has no obligation to assist or incur any cost on behalf of the undersigned in connection with any Form I-526 Petition, application for conditional permanent residency in the United States, or Form I-829 Petition other than to provide information and copies of documents that are in the Company's possession or can be obtained by the Company at a nominal expense and that is required by the USCIS in connection with such petition or application.

(d)      The undersigned understands and acknowledges that the Units are being offered and sold under an exemption from registration under the Securities Act, one or more exemptions under applicable securities laws of any applicable U.S. state, and one or more exemptions from certain non-U.S. securities law requirements; that the undersigned is purchasing the Units without being furnished any offering literature or prospectus other than the Memorandum; that this transaction has not been examined by the U.S. Securities and Exchange Commission (the "**SEC**") or by any other governmental authority, including, without limitation, any agency, public or regulatory authority, instrumentality, department, commission, court, ministry, tribunal or board of any government, whether foreign or domestic and whether national, federal, provincial, state, regional, local or municipal ("**Governmental Authority**") and that, notwithstanding the filing, if any, with any Governmental Authority, no such Governmental Authority has made any recommendation or endorsement as to, or otherwise passed on the merits of, purchasing the Units; that all documents, records and books pertaining to the investment in the Units have been made available by the Company to the undersigned and the undersigned's

representatives, including the undersigned's attorney, accountant and/or purchaser representative, if any; and that the books and records of the Company will be available upon reasonable notice for inspection by potential investors during reasonable business hours at the Company's offices.

(e)     The undersigned shall not make any sale, transfer or other disposition of the Units in violation of the Securities Act or the U.S. Securities Exchange Act of 1934 (the "1934 Act"), the applicable securities laws of any applicable U.S. state, any applicable non-U.S. securities laws, or the rules and regulations of the SEC or any securities authority of any U.S. state or other country in which the sale, transfer or disposition may be made, or in violation of any transfer restriction applicable to the Units pursuant to this Subscription Agreement or the Operating Agreement. The undersigned shall not make any sale, transfer or other disposition of all or any portion of the Units (or any interest therein) unless and until (i) (x) there is then in effect a registration statement under the Securities Act or the securities laws of the applicable jurisdiction covering such sale, transfer or disposition, and such sale, transfer or disposition is made in accordance with such registration statement or (y) such sale, transfer or disposition is made pursuant to a valid exemption from the registration and prospectus delivery requirements of applicable U.S. federal and state securities laws and applicable non-U.S. securities laws, and (ii) all transfer restrictions applicable to the Units pursuant to this Subscription Agreement or the Operating Agreement have been satisfied or are no longer applicable with respect to such sale, transfer or disposition. Upon request by the Company, the undersigned shall deliver to the Company an opinion of counsel, in form and substance satisfactory to the Company and its counsel, that such proposed sale, transfer or disposition is in full compliance with the requirements of this Section 6(e).

(f)     The undersigned understands that the Units are "restricted securities" within the meaning of Rule 144 promulgated by the SEC pursuant to the Securities Act, which Rule 144 permits limited public resale of securities acquired in a non-public offering, subject to the satisfaction of certain conditions, including but not limited to the availability of certain current public information about the issuer, the resale occurring only after the holding period required by Rule 144 has been satisfied, the sale occurring through an unsolicited "broker's transaction," and the amount of securities being sold during any three-month period not exceeding specified limitations. The undersigned acknowledges and understands that the conditions for resale set forth in Rule 144 have not been satisfied and that the Company has no plans to satisfy these conditions in the foreseeable future.

(g)     The undersigned acknowledges and agrees that the Company has no obligation to register any of the Units and that there can be no assurance that any registration statement will be filed with respect to the Units, or, if filed, that such registration statement will become effective. The undersigned acknowledges and agrees that, unless an exemption from the registration requirements under applicable law is available, the undersigned may be required to bear the economic risk of the undersigned's investment for an indefinite period of time.

(h)     The undersigned is an Accredited Investor and more specifically is one or more of the following:

(i)     an individual whose net worth, together with that of his or her spouse, excluding his or her primary residence, exceeds

US$1,000,000; or

(ii)    an individual who had income in the two most recent years in excess of US$200,000 individually (or US$300,000 with spouse) and reasonably expects income at that level in the current year.

In calculating net worth, you include all of your assets (other than your primary residence) whether liquid or illiquid, such as cash, stock, securities, personal property and real estate based on the fair market value of such property MINUS all debts and liabilities (other than a mortgage or other debt secured by your primary residence).

In the event that the amount of any mortgage or other indebtedness secured by your primary residence exceeds the fair market value of the residence, that excess liability should also be deducted from your net worth. Any mortgage or indebtedness secured by your primary residence incurred within 60 days before the time of the sale of the securities offered hereunder, other than as a result of the acquisition of the primary residence, shall also be deducted from your net worth.

(i)    The undersigned acknowledges that the Company was organized on April 22, 2013 as a California limited liability company to engage in any lawful business activity and as its first endeavor, the Company intends to make a loan to The Source Hotel, LLC as more particularly in the Memorandum / Beach Orangethorpe Hotel, a California limited liability company, with all the attendant business risks of a company that has no significant operating history as well as other business risks. The undersigned agrees and acknowledges that the investment in the Company as contemplated herein is a speculative investment and involves substantial risks, including the potential loss of the undersigned's entire investment contemplated herein, and the undersigned has read, understands, accepts and assumes all of the risk factors related to the purchase of the Units, including but not limited to those set forth in the Memorandum. The undersigned recognizes that the Memorandum does not purport to contain all the information which would be contained in a registration statement under the Securities Act or under the securities laws of any other jurisdiction.

(j)    The undersigned has such knowledge and experience in financial and business matters that the undersigned is capable of evaluating the merits and risks of an investment in the Units, which risks are substantial, and of making an informed investment decision.

(k)    The undersigned confirms that the undersigned (i) is able to bear the economic risk of investment in the Units, (ii) is able to hold the Units for an indefinite period of time, (iii) is presently able to afford a complete loss of the undersigned's investment, and (iv) has adequate means of providing for the undersigned's current needs and possible personal contingencies and has no need for liquidity in the undersigned's investment.

(l)    The undersigned confirms that, in making a decision to purchase the Units hereby subscribed for, the undersigned has carefully reviewed the Memorandum and that the undersigned has been given the opportunity to ask questions of and to receive answers from the Company concerning the information set forth in the Memorandum, and to obtain any additional

information which the Company possesses or can acquire without unreasonable effort or expense as is necessary to verify the accuracy of the information furnished in the Memorandum.

(m) The undersigned has consulted with and relied completely on the advice of the undersigned's own personal tax, investment, legal or other advisors regarding the tax, investment and legal matters discussed in the Memorandum, including but not limited to the risk factors described therein.

(n) The Units hereby subscribed for are being acquired by the undersigned in good faith solely for the undersigned's own personal account for investment purposes only and are not being purchased with a view to resell or for the resale thereof by way of distribution, subdivision, fractionalisation or other means; the undersigned has no understanding, agreement or arrangement, formal or informal, existing or intended, to sell or transfer to any person for consideration the Units for which the undersigned hereby subscribes or any part thereof.

(o) The undersigned confirms that the undersigned understands and has fully considered for purposes of this investment that there are substantial legal, contractual and practical restrictions on the transferability of the Units, including but not limited to the right of first refusal and repurchase rights of the Company and/or its members ("**Members**"), and that there will be no public market for the Units. Accordingly, it probably will not be possible for the undersigned to liquidate the undersigned's investment in the Units in case of an emergency or to use the Units as collateral for a loan.

(p) The undersigned understands and agrees that, regardless of whether the offering and sale of the Units have been registered under the Securities Act or any other applicable securities laws, the Company may impose restrictions upon the sale, transfer or disposition of Units (including the placement of appropriate legends on membership certificates or the imposition of stop-transfer instructions) if, in the sole and absolute discretion of the Company, such restrictions are necessary or desirable (i) to achieve compliance with the Securities Act, any other securities laws or any other law; or (ii) in light of the transfer and other restrictions set forth in this Subscription Agreement or the Operating Agreement. Without limiting the generality of the foregoing provisions, the undersigned consents to the placement of substantially the following legends on any document representing the Units being purchased by the undersigned:

**"THE MEMBERSHIP INTEREST REPRESENTED HEREBY HAS NOT BEEN REGISTERED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION PURSUANT TO THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY OTHER SECURITIES AUTHORITIES. IT IS BEING OFFERED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 4(2) OF THE SECURITIES ACT AND PURSUANT TO A SAFE HARBOR FROM REGISTRATION UNDER REGULATION D PROMULGATED UNDER THE SECURITIES ACT, ONE OR MORE EXEMPTIONS UNDER APPLICABLE U.S. STATE, AND ONE OR MORE EXEMPTIONS FROM CERTAIN NON-U.S. SECURITIES LAW REQUIREMENTS."**

**"THE MEMBERSHIP INTEREST REPRESENTED HEREBY MAY NOT BE**

**SOLD, ASSIGNED, TRANSFERRED, ENCUMBERED OR IN ANY MANNER DISPOSED OF, EXCEPT IN COMPLIANCE WITH THE TERMS OF THE WRITTEN OPERATING AGREEMENT BETWEEN THE COMPANY AND THE REGISTERED HOLDERS OF THE MEMBERSHIP INTEREST (OR THE PREDECESSOR IN INTEREST TO THE MEMBERSHIP INTEREST). SUCH OPERATING AGREEMENT GRANTS TO THE COMPANY AND ITS OTHER MEMBERS CERTAIN REPURCHASE RIGHTS AND RIGHTS OF FIRST REFUSAL TO ACQUIRE SUCH MEMBERSHIP INTEREST. THE SECRETARY OR MANAGER OF THE COMPANY WILL UPON WRITTEN REQUEST AT THE COMPANY'S PRINCIPAL PLACE OF BUSINESS FURNISH A COPY OF SUCH OPERATING AGREEMENT TO THE HOLDER HEREOF WITHOUT CHARGE."**

**"THE MEMBERSHIP INTEREST REPRESENTED HEREBY MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE U.S. STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED. ANY TRANSFER OF THE MEMBERSHIP INTEREST REPRESENTED HEREBY IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS, AND CONDITIONS WHICH ARE SET FORTH IN THE OPERATING AGREEMENT."**

(q)     To the best knowledge of the undersigned, the undersigned confirms that neither the Company nor any distributor participating in the Offering has conducted or directed selling efforts (including without limitation any activity undertaken for the purpose of, or that could reasonably be expected to have the effect of, conditioning the market in the United States for the Units), including without limitation mailing of printed material to Office residing in the United States, the holding of promotional seminars in the United States, the placing of advertising with radio or television stations broadcasting in the United States or in publications with a general circulation in the United States. To the best knowledge of the undersigned, there has been no public solicitation or advertisement of any offer in connection with the Offering.

(r)     The undersigned is not a distributor or dealer of the Units and is not taking the Units with the intent to make a "distribution" of the Units, as such term is defined in the Securities Act and the 1934 Act, as amended.

(s)     If the Company becomes subject to reporting requirements under the 1934 Act or any other applicable securities laws, the undersigned will provide such information and deliver such documents, within five (5) days after receipt of a request from the Company, as may reasonably be necessary to comply with any and all laws and ordinances to which the Company is subject.

(t)     The undersigned confirms that it has been called to the undersigned's attention, both in the Memorandum and by those individuals with whom the undersigned has dealt,

that no assurance is or has been made regarding any tax advantages which may accrue to an investor in the Units, and that existing tax laws and regulations could be modified in the future, thus denying the investor all or a portion of the tax benefits which may be currently available under existing tax laws and regulations. The undersigned acknowledges that an investment in the Units, as well as conversion, sale or other disposition of the Units, may result in tax consequences under federal, state or other tax laws in the United States or under non-U.S. tax laws. Therefore, the undersigned has made such independent inquiries as the undersigned deems necessary to evaluate properly an investment in the Units, including consultation with a personal tax adviser, to determine whether such investment is appropriate. The undersigned acknowledges that it is the undersigned's sole responsibility, and not the Company's, to file timely tax returns or any tax election relating to the undersigned's investment, conversion, sale or other disposition of the Units.

(u)     The undersigned confirms that the undersigned has not been convicted of any crime or been sanctioned by the SEC or any other Governmental Authority in connection with any violation of the securities laws. If the undersigned has been convicted of a crime or been sanctioned by the SEC for violation of the securities laws, the undersigned must provide complete details thereof in writing and attach such writing to this Subscription Agreement.

(v)     The undersigned's purchase of the Units is not a transaction, or any element of a series of transactions, that is part of a plan or scheme to evade the registration requirements of the Securities Act or any other applicable legal requirement. The undersigned has complied with all applicable securities, currency exchange, and other laws, including but not limited to the laws of the country in which the undersigned is currently domiciled or the undersigned's country of citizenship, in connection with the undersigned's purchase of the Units, and including but not limited to obtaining any required consents from any Governmental Authority or any other consents or observing any other applicable legal formalities.

(w)     The undersigned understands that the Units are being offered and sold in reliance on specific exemptions from the registration requirements of U.S. federal securities laws, one or more exemptions from securities law requirements of any applicable U.S. state, and one or more exemptions from certain non-U.S. securities law requirements. The undersigned further understands that the representations, warranties, agreements, acknowledgments and understandings of the undersigned as set forth herein and any of the exhibits hereto are being relied upon by the Company in determining the applicability of such exemptions and the suitability of the undersigned to acquire such Units.     The representations, warranties, covenants and acknowledgments of the undersigned herein have been made by the undersigned with the intent that they be relied upon in determining his or her suitability as an investor in the Company, and the undersigned hereby agrees that such representations and warranties shall survive the undersigned's purchase of the Units.

(x)     If more than one person is signing this Subscription Agreement, each representation, warranty, covenant and acknowledgment made herein by or on behalf of the undersigned shall be a joint and several representation, warranty or undertaking of each such person.

7.      Covenants of the Company. The Company shall notify the undersigned in writing of the cancellation of the Offering or the rejection of this subscription within a reasonable period of time after the occurrence of any such events.

8.      Covenants of Subscriber. If a foreign resident, the undersigned shall, or shall cause the undersigned's immigration counsel to, diligently prepare and submit to the USCIS a complete and accurate Form I-526 Petition, including, without limitation, any and all documents, records, and fees requested by the USCIS. The undersigned shall promptly notify the Company in writing of the filing of the undersigned's Form I-526 Petition, the USCIS's approval or denial of approval of the undersigned's Form I-526 Petition, the approval or denial of conditional permanent resident status, the filing of the undersigned's Form I-829 Petition, the USCIS's approval or denial of approval of the undersigned's Form I-829 Petition, and any change in the undersigned's address, which notice shall be accompanied by a copy of the Form I-526 Petition, the Form I-829 Petition, and the approval or denial letter (as the case may be) as well as any other documentation requested by the Company.

9.      Transferability. The undersigned agrees not to transfer or assign this subscription or any interest herein and further agrees that the assignment and transfer of the Units acquired pursuant hereto shall be effected only in accordance with the Operating Agreement and all applicable laws. The undersigned acknowledges that if he or she intends to petition for conditional or unconditional permanent resident status in the U.S. under the EB-5 Program, the restrictions on transferability will be subject to such program's requirements.

10.     No Waiver of Rights. Notwithstanding any of the representations, warranties, acknowledgements or agreements made herein by the undersigned, the undersigned does not thereby or in any other manner waive any right granted to the undersigned under federal or state securities laws.

11.     Indemnification. The undersigned hereby covenants and agrees to indemnify and hold harmless the Company and any of its successors, assigns, agents, affiliates, managers, members, and employees, against any loss or cost (including, without limitation, attorneys' fees and required tax withholdings) incurred by any of them by reason of any misrepresentation or misstatement of material fact in connection with this Subscription Agreement or of any other document or information supplied by the undersigned to the Company in connection with the Offering.

12.     Admission as Member. The undersigned shall be admitted as a Member of the Company as of the closing of the sale of the Units by the Company to the undersigned. If the Investment Amount is returned to the undersigned after such closing pursuant to the terms hereof, the undersigned shall cease to be a Member of the Company and the undersigned shall have no interest in the Company.

13.     Adoption of Operating Agreement. The undersigned, desiring to enter into the Operating Agreement in substantially the form attached as Exhibit B to the Memorandum and hereby confirms having received a copy of the executed Operating Agreement dated August 1, 2013, hereby agrees to be bound by the terms and provisions thereof as a Member by executing a joinder agreement to the Operating Agreement.

14.    Non-Foreign Status.

(a)     Unless otherwise indicated in the signature page hereto signed by the undersigned, the undersigned certifies that he or she is not a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended. Because the undersigned is not a "United States person," the undersigned acknowledges and agrees that the Company must withhold a tax equal to approximately 40% of the net income allocable to the undersigned. The undersigned acknowledges that, in general, a "United States person" means a citizen or resident of the United States. In the event the undersigned becomes a "United States person," the undersigned agrees to promptly notify Company of such fact in writing and to promptly execute and deliver to Company any documents or instruments deemed necessary by Company to comply with applicable tax laws.

(b)     If the undersigned has indicated in the signature page hereto signed by the undersigned, the undersigned hereby certifies that the undersigned is a United States person for purposes of United States income taxation; that the undersigned's United States taxpayer identification number (social security number or employer identification number) has been issued by, and his or her home address is in, the United States; and if the undersigned who is presently a United States person but subsequently becomes a non-United States person, the undersigned will notify the Company within sixty (60) days of becoming a non-United States person. In the event the undersigned is no longer a "United States person," the undersigned agrees to promptly notify Company of such fact in writing and to promptly execute and deliver to Company any documents or instruments deemed necessary by Company to comply with applicable tax laws.    The undersigned also understands and agrees that if he or she becomes a U.S. resident, but is not a resident of the State of California, when distributions are made, the Company will be required to withhold a California tax amount from any distributions made to the undersigned, which is currently at the rate of 7% of the amount distributed, but is subject to change in future legislation.

(c)     The undersigned understands and agrees that the foregoing certification of the undersigned may be disclosed to the Internal Revenue Service by the Company and that any false statement made could be punishable by fine, imprisonment, or both.

15.    Miscellaneous.

(a)     This subscription shall be binding upon the undersigned's heirs, executors, administrators, successors and assigns.

(b)     All notices or other communications given or made hereunder shall be in writing and shall be delivered personally, by messenger or by mail, postage prepaid, to the address set forth in this Subscription Agreement or by facsimile transmission to the facsimile number set forth in this Subscription Agreement. Delivery of any notice shall be deemed made on the date of actual receipt if personally delivered. Any such notice sent by regular mail shall be deemed delivered 10 days after the same is mailed. Notices delivered by a reputable overnight courier that guarantees next day delivery shall be deemed delivered two business days after delivery of the same to the courier. Notices transmitted by facsimile transmission shall be deemed delivered upon telephonic confirmation of receipt (confirmation report from fax machine is sufficient), provided

a copy is also delivered via mail. A party may change its address for notice by notice to each other party given in accordance with this Section. The Company's facsimile number is (310) 631-1645.

       (c)     This Subscription Agreement shall be governed by and construed in accordance with the laws of the State of California, U.S.A., without regard to the conflict of laws provisions thereof, applicable to contracts fully performed within that state. Each of the parties hereto submits to personal jurisdiction in the State of California for the enforcement of this Subscription Agreement and waives any and all personal rights to object to such jurisdiction with respect to any action or proceeding related to this Subscription Agreement.

       (d)     This Subscription Agreement and all other agreements required to be delivered by the undersigned to the Company under the Memorandum constitute the entire agreement among the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by the parties. The representations and the indemnification obligations of the undersigned herein shall survive the acceptance of his or her subscription. In the event of conflict between the English-language version and any other translated version of this Subscription Agreement, the Memorandum, the Operating Agreement, and any other documents provided to the undersigned by the Company, the English-language version shall control.

[<em>remainder of page intentionally left blank</em>]

IN WITNESS WHEREOF, the undersigned, the Company and M&D, intending to be legally bound hereby, has executed this Subscription Agreement as of the date set forth below.

**Investor**                                                          **Investor's Spouse (if any)**

_____                    _____
Signature                                                             Signature

_____                    _____
Print or Type Name                                               Print or Type Name

_____                    _____
Social Security Number                                         Social Security Number

Country of Citizenship:_____           Country of Citizenship:_____

_____                    _____
Executed at: _____              Executed at: _____

City _____             City _____

State _____             State _____

this ____ day of _____, 20____          this ____ day of _____, 20____

Current Mailing Address:                                 If known, address in U.S. where investor intends to
                                                                        reside after issuance of visa:
_____                    _____

_____                    _____

Country:_____

_____                    _____
Telephone Number                                               Telephone Number

_____                    _____
Facsimile Number                                                 Facsimile Number

_____
E-Mail Address

**CHECK BELOW ONLY IF INVESTOR (AND/OR SPOUSE) CURRENTLY IS A "UNITED STATES PERSON" (I.E., INVESTOR IS A CITIZEN OR RESIDENT OF THE UNITED STATES FOR UNITED STATES INCOME TAX PURPOSES):**

**INVESTOR _____          INVESTOR'S SPOUSE (IF ANY) _____**

M&D Regional Center, LLC signed for and on behalf of
itself and Beach Orangethorpe Hotel, LLC


_____

Signature
Date:

## SCHEDULE A

## TYPE OF OWNERSHIP
### (Check One)

☐   Individual (One signature required)

☐   Community Property (One signature required if interest held in one name, i.e., managing
spouse. Two signatures required if interest held in both names)

Please print here the exact name (registration) investor desires for securities.

_____

### Investment Amount

Number of Units                                         Investment Amount

_____ Units                 multiply by US$500,000              _____

### (Subject to Minimum Investment Requirement)

# EXHIBIT B

## OPERATING AGREEMENT OF BEACH ORANGETHORPE HOTEL, LLC

## OPERATING AGREEMENT

### FOR

## BEACH ORANGETHORPE HOTEL, LLC

## A CALIFORNIA LIMITED LIABILITY COMPANY

## DATED AS OF AUGUST 1, 2013

THE MEMBERSHIP INTERESTS REPRESENTED BY OR ISSUED PURSUANT TO THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, OR REGISTERED OR QUALIFIED UNDER ANY STATE SECURITIES LAWS. SUCH MEMBERSHIP INTERESTS MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE U.S. STATE AND FEDERAL SECURITIES LAWS AND APPLICABLE NON-U.S. SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED UNDER SUCH ACT AND LAWS. ANY TRANSFER OF THE MEMBERSHIP INTERESTS REPRESENTED BY OR ISSUED PURSUANT TO THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS, AND CONDITIONS WHICH ARE SET FORTH HEREIN.

THE SALE OF THE SECURITIES THAT ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO SUCH QUALIFICATION IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPT FROM QUALIFICATION BY SECTION 25100, 25102 OR 25105 OF THE CALIFORNIA CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

## OPERATING AGREEMENT
## FOR
## BEACH ORANGETHORPE HOTEL, LLC
## A CALIFORNIA LIMITED LIABILITY COMPANY

This Operating Agreement for Beach Orangethorpe Hotel, LLC, a California limited liability company (the "**Company**"), is made and entered into effective as of August 1, 2013 (the "Effective Date") by and among the Members (as defined below), with reference to the following facts:

A.      The Articles of Organization of the Company was filed with the California Secretary of State on April 22, 2013.

B.      M&D Regional Center, LLC, as the initial Member of the Company ("**Initial Member**"), entered into this Operating Agreement for the Company dated as of August 1, 2013.

NOW, THEREFORE, the Members of the Company hereby agree as follows:

### ARTICLE I

### DEFINITIONS

When used in this Agreement, unless the context otherwise requires, the following terms shall have the meanings set forth below (all terms used in this Agreement that are not defined in this Article I shall have the meanings set forth elsewhere in this Agreement):

"**Act**" means the California Beverly-Killea Limited Liability Company Act, as set forth in Title 2.5 (commencing with Section 17000) of the Corporations Code of the State of California, as the same may be amended or superseded from time to time.

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

a.      Credit to such Capital Account any amounts that such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5);

b.      Credit to such Capital Account the amount of the deductions and losses referable to any outstanding recourse liabilities of the Company owed to or guaranteed by such Member to the extent that no other Member bears any economic risk of loss and the amount of the deductions and losses referable to such Member's share (determined in accordance with the Member's Percentage Interest) of outstanding recourse liabilities

1

owed by the Company to non-Members to the extent that no Member bears any economic risk of loss; and

    c.    Debit to such Capital Account the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

    **"Advisory Committee"** has the meaning set forth in Section 5.1.3.

    **"Affiliate"** of any Person means any individual, partnership, corporation, trust or other entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with, such Person. The term "control," as used in the immediately preceding sentence, means, with respect to a corporation or limited liability company, the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights in such controlled corporation or limited liability company and, with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

    **"Agreement"** means this Operating Agreement, as originally executed and as amended and/or restated from time to time.

    **"Arbitration Service"** has the meaning set forth in Section 10.9.

    **"Articles"** means the Articles of Organization of the Company originally filed with the California Secretary of State on April 22, 2013.

    **"Available Cash"** means the net cash proceeds from the Company's operations, less the portion thereof used to pay or establish reserves for all Company expenses, debt payments, capital improvements, replacements, and contingencies, all as determined by the Manager.

    **"Capital Account"** means with respect to any Member the capital account that the Company establishes and maintains for such Member pursuant to Section 3.4 herein.

    **"Capital Contribution"** means a contribution in cash or property to the capital of the Company (and if required by the context of this Agreement, "Capital Contribution" shall also refer to the total amount of cash and the fair market value of property so contributed).

    **"Class A Member"** means the Initial Member, and  any Member of record holding and to the extent it holds Class A Units.

    **"Class A Units"** means any Unit denominated "Class A" hereunder.

    **"Class B Member"** means any Member of record holding and to the extent it holds Class B Units.

2

"**Class B Units**" means any Unit denominated "Class B" hereunder.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the Regulations.

"**Company**" has the meaning set forth in the preamble to this Agreement.

"**Company Counsel**" has the meaning set forth in Section 10.1.

"**Company Minimum Gain**" has the meaning ascribed to the term "Partnership Minimum Gain" in Regulations Section 1.704-2(d).

"**Company Person**" has the meaning set forth in Section 5.9.

"**Contribution Agreement**" has the meaning set for in Section 5.2.4.

"**Developer**" means The Source Hotel, LLC, a California limited liability company, which was organized to carry out the Development.

"**Development**" means that real estate development undertaken by the Developer at Buena Park, California at an approximate twelve-acre site which includes the construction of a mixed-used development, including a retail center in Phase I, office complex in Phase II and Hotel Development in Phase III.

"**EB-5 Member**" means a Class B Member who has made a Capital Contribution no less than the amount required under the EB-5 Program.

"**EB-5 Program**" means the EB-5 immigrant investor visa program of the Immigration and Nationality Act and the related regulations and standards adopted by the USCIS, as amended or superseded from time to time.

"**Effective Date**" shall be the date upon which the Company admits its first Class B Member in accordance with this Agreement.

"**Fiscal Year**" means the Company's fiscal year, which shall be the calendar year, or any portion of such period for which the Company is required to allocate Net Profits, Net Losses, or other items of Company income, gain, loss, or deduction pursuant hereto.

"**Form I-526 Petition**" means the USCIS Form I-526 Immigrant Petition by Alien Entrepreneur, as amended or superseded from time to time.

"**Hotel Development**" means Phase III of the Development which the Company will made a secured loan to the Developer for use in constructing Phase III Hotel.

"**Loan**" means the secured loan by the Company to the Developer for purposes of facilitating the Hotel Development.

3

"**Manager**" means the manager of the Company as designated from time to time pursuant to Section 5.2.1. Whenever the Company has more than one Manager pursuant to the terms of this Agreement, references to the term "Manager" (importing singular) in this Agreement shall be read to mean "Managers."

"**Member**" means each Person who (a) has been admitted to the Company as a Member in accordance with the Articles and this Agreement, or is an assignee who has become a Member in accordance with Article VII, and (b) has not retired, resigned, withdrawn, been expelled or removed as a Member, or, if other than an individual, dissolved.

"**Member Nonrecourse Debt**" has the meaning ascribed to the term "Partner Nonrecourse Debt" in Regulations Section 1.704-2(b)(4).

"**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulations Section 1.704-2(i)(3).

"**Member Nonrecourse Deductions**" means items of Company loss, deduction or Code Section 705(a)(2)(B) expenditures that are attributable to Member Nonrecourse Debt or to other liabilities of the Company owed to or guaranteed by a Member to the extent that no other Member bears the economic risk of loss.

"**Membership Interest**" means a Member's entire interest in the Company, including (i) the Member's right to share in income, gains, losses, deductions, credits, or similar items of, and to receive distributions from, the Company pursuant to this Agreement and the Act, (ii) the right to vote or participate in the management of the Company to the extent herein provided or as specifically required by the Act, (iii) the right to receive information concerning the business and affairs of the Company, and (iv) all other rights and obligations of a member of a limited liability company under the general provisions of the Act unless otherwise modified hereunder in accordance with the Act.

"**Net Profits**" and "**Net Losses**" means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

a. Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be added to such taxable income or loss;

b. Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be subtracted from such taxable income or loss;

4

     c.     If the book value of any Company asset is adjusted as a result of the application of Regulations Section 1.704-1(b)(2)(iv)(e) or Regulations Section 1.704-1(b)(2)(iv)(f), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Profits or Net Losses;

     d.     Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the book value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its book value;

     e.     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account book depreciation, amortization, and other cost recovery deductions for such Fiscal Year, computed in accordance with Regulations Section 1.704-1(b)(2)(iv)(g); and

     f.     Notwithstanding any other provision of this definition, any items that are specially allocated pursuant to Section 6.3 or Section 6.4 hereof shall not be taken into account in computing Net Profits or Net Losses (the amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Section 6.3 or Section 6.4 hereof shall be determined by applying rules analogous to those set forth in paragraphs a through e above).

The foregoing definition of Net Profits and Net Losses is intended to comply with the provisions of Regulations Section 1.704-1(b) and shall be interpreted consistently therewith. If the Manager determines that the Company is required to modify the manner in which Net Profits and Net Losses are computed in order to comply with such Regulations, the Manager may make such modification, provided that any material modification shall be conditioned upon the issuance of an opinion of counsel for the Company confirming the necessity of such modification.

**"Nonrecourse Deductions"** has the meaning set forth in Regulations Section 1.704-2(b)(1).

**"Nonrecourse Liability"** has the meaning set forth in Regulations Section 1.704-2(b)(3).

**"Offering"** means the private offering by the Company of Class B Units at a purchase price of US$500,000 per Unit.

**"Percentage Interest"** means, with respect to each Member, the percentage set forth opposite such Member's name on Exhibit A attached hereto, as modified or updated from time to time in accordance with the terms of this Agreement, which is computed by dividing (i) the sum of (x) the number of Class A Units held by such Member and (y) 500 times the number of Class B Units held by such Member by (ii) the sum of (x) the total number of Class A Units outstanding and (y) 500 times the total number of Class B Units outstanding (adjusted as appropriate to take into account changes in Members and Membership Interests from time to time).

5

"**Permitted Transferee**" has the meaning set forth in Section 7.1.3.

"**Person**" means any natural person, corporation, partnership, trust, voluntary association, limited liability company, joint venture, unincorporated organization, government (or any agency, instrumentality or political subdivision thereof) or other association or entity of any kind.

"**Personal Guarantees**" shall mean those personal guarantees provided by Min Chae and Donald Chae in connection with the Loan.

"**Regional Center**" means M&D Regional Center, LLC, a California limited liability company.

"**Regulations**" means the regulations currently in force from time to time as final or temporary that have been issued by the U.S. Department of the Treasury pursuant to its authority under the Code. If a word or phrase is defined in this Agreement by cross-referencing the Regulations, then to the extent the context of this Agreement and the Regulations require, the term "Member" shall be substituted in the Regulations for the term "partner", the term "Company" shall be substituted in the Regulations for the term "partnership", and other similar conforming changes shall be deemed to have been made in the Regulations for purposes of applying the Regulations.

"**Regulatory Allocations**" has the meaning set forth in Section 6.4.

"**Rules**" has the meaning set forth in Section 10.1.

"**Special Manager**" has the meaning set forth in Section 5.2.4.

"**Transfer**" means any sale, transfer, assignment, delegation, hypothecation, encumbrance or other disposition, whether voluntary or involuntary or by operation of law, and whether by gift, bequest or otherwise. In the case of a hypothecation, the Transfer shall be deemed to occur both at the time of the initial pledge and at any pledgee's sale or a sale by any secured creditor. For purposes hereof, "Transfer" shall include without limitation any material change of control or ownership of a party.

"**Units**" means the units of Membership Interest issued by the Company to its Members, which entitle the Members to certain rights set forth in this Agreement.

"**USCIS**" means the United States Citizenship and Immigration Services.

## ARTICLE II

## ORGANIZATIONAL MATTERS

2.1     Formation. Pursuant to the Act, the Initial Member caused the Company to be formed as a California limited liability company under the laws of the State of California through the filing of the Articles with the California Secretary of State and by entering into this

6

*LA 130990797v1*

Agreement. Any Manager, as an authorized person under the Act, shall execute and file any and all amendments or restatements of the Articles approved hereunder. The rights and obligations of the Members shall be determined pursuant to the Act and this Agreement. To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than such rights obligations would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2     Name. The name of the Company shall be "Beach Orangethorpe Hotel, LLC." The business and affairs of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Manager may deem appropriate or advisable. The Manager shall file any fictitious name certificates and similar filings, and any amendments thereto, that may be appropriate or advisable.

2.3     Term. The term of the Company shall commence on the date of the filing of the Articles with the California Secretary of State and shall continue until the Company is dissolved as provided by Article IX of this Agreement.

2.4     Principal Office; Registered Agent. The principal office of the Company shall be 3100 E. Imperial Highway, Lynwood, California 90262, or such other place or places as the Manager may from time to time designate. The Company shall continuously maintain an agent for service of process and office in the State of California as required by the Act. The registered agent shall be as stated in the Articles or as otherwise determined by the Manager. The name and address of the Company's agent for service as of the date of this Agreement is C T Corporation System, 818 West Seventh Street, Los Angeles, CA 90017, and such agent for service may be removed and replaced by the Manager in its sole discretion.

2.5     Purpose and Powers of the Company. The Company may carry on any lawful business, purpose, or activity that may be carried on by a limited liability company under applicable law and shall have all of the powers provided for a limited liability company under the Act. Without limiting the generality of the foregoing, the Company shall be permitted to make a Loan in the approximate amount of the proceeds from the issuance of Class B Units to the Developer, to be used for the purposes of facilitating the Hotel Development, and to engage in such other activities related to or incidental to any of the foregoing purposes, or as may be necessary, advisable or appropriate, in the good faith and reasonable opinion of the Manager to further any of the foregoing purposes, and further subject to the terms and restrictions of Article V of this Agreement.

## ARTICLE III

## CAPITAL CONTRIBUTIONS

3.1     Initial Capital Contributions; Units.

3.1.1    The Initial Member has paid certain expenses incurred in connection with the formation and initial operations of the Company (totaling US$1,000). The total amount of such payments shall be deemed to be the Initial Member's Capital

7

Contribution. In consideration for such Capital Contribution, the Regional Center has been admitted as a Class A Member of the Company.

3.1.2   In connection with the Offering, each Class B Member has contributed or will contribute as such Member's initial Capital Contribution an amount that is no less than the investment amount required under the EB-5 Program. The Company has issued or will issue one Class B Unit to a Class B Member for each US$500,000 in cash or immediately available funds that he or she has contributed to the capital of the Company.

3.2   Additional Capital Contributions. Except as provided in Section 3.3, no Member shall be required to make any Capital Contributions other than the Capital Contributions required by Section 3.1. The Members may be permitted (but shall not be required) from time to time to make additional Capital Contributions if the Manager determines that such additional Capital Contributions are necessary or appropriate for the conduct of the Company's business and affairs, including without limitation expansion or diversification. The Manager shall determine all aspects of any such additional Capital Contributions, such as the amount and nature of the consideration to be contributed to the Company, the resulting increase in interest to be received by the contributing Members, the resulting dilution of interest to be incurred by the other Member(s), and the extent to which Members will participate in the allocations and distributions of the Company as a result thereof; provided however that if such additional Capital Contributions are not to be made by all of the Members pro rata, then any such additional Capital Contributions and corresponding changes in the Membership Interests shall require the approval of the Members pursuant to Section 4.8 hereof. Except as provided in Section 3.3, no Member shall be required to make any loans or advances to Company.

3.3   Company's Expenses. The Class A Member shall be responsible and pay all general and administrative expenses incurred and to be incurred by the Company. However, expenses incurred by the Company for the purpose of enforcing the Company's rights under the Loan agreement with the Developer upon the occurrence and continuance of an event of default (as defined in the Loan agreement), to the extent not reimbursed by or otherwise recovered from the Developer shall be borne by all the  Class B Members in proportion to their respective Percentage Interests which may be by way of additional Capital Contributions as requested by the Manager from time to time. The expenses may include, without limitation, fees and expenses for legal services, any fees and expenses involved in registering and maintaining the registration or authorization of the Company, costs relating to compliance with applicable laws and regulations, costs relating to record keeping, accounting and auditing expenses, reporting and publishing expenses including the costs of printing and distributing the private placement memoranda of the Company and associated documentation, periodic reports or registration statements, taxes, duties, governmental and similar charges payable by the Company and other operating expenses including payments to the Company's personnel, bank charges, postage, telephone, and electronic transmissions such as facsimile and e-mail. Each separate loan from the Class A Member shall be bear interest at the adjusted federal rate for medium term obligations in effect when it is made pursuant to rulings of the Internal Revenue Service, and shall be repaid by the Company not later than the date on which occurs the full and final repayment of all amounts owed to the Company by the Developer.

8

3.4     Capital Accounts. The Company shall establish an individual Capital Account for each Member. The Capital Account balances of the Members as of the Effective Date are set forth opposite their names on Exhibit A. The Company shall determine and maintain each Capital Account in accordance with Regulations Section 1.704-1(b)(2)(iv) and, in pursuance thereof, the following provisions shall apply:

> 3.4.1     To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's allocated share of Net Profits and any items in the nature of income or gain that are specially allocated pursuant to Section 6.3 or Section 6.4 hereof, and the amount of any Company liabilities assumed by such Member or that are secured by any property distributed to such Member;
>
> 3.4.2     To each Member's Capital Account there shall be debited the amount of cash and the fair market value of any property distributed to such Member pursuant to any provision of this Agreement, such Member's allocated share of Net Losses and any items in the nature of expenses or losses that are specially allocated pursuant to Section 6.3 or Section 6.4 hereof, and the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company;
>
> 3.4.3     If all or a portion of a Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest; and
>
> 3.4.4     In determining the amount of any liability for purposes of Sections 3.4.1 and 3.4.2 hereof, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations. If the Manager determines that the Company is required to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such Regulations, the Manager may make such modification, provided that any material modification shall be conditioned upon the issuance of an opinion of counsel for the Company confirming the necessity of such modification.

3.5     No Interest. No Member shall be entitled to receive any interest on such Member's Capital Contributions.

3.6     No Withdrawal. No Member shall have the right to withdraw such Member's Capital Contributions or to demand and receive property of the Company or any distribution in return for such Member's Capital Contributions, except as may be specifically provided in this Agreement or required by law.

9

## ARTICLE IV

## MEMBERS

4.1     Limited Liability. Except as required under the Act or as expressly set forth in this Agreement, no Member shall be personally liable for any debt, obligation or liability of the Company, whether that debt, obligation or liability arises in contract, tort or otherwise.

4.2     Admission of Additional Members. Except as set forth in Article VII, no additional Members shall be admitted unless approved by the Manager. No additional Member shall become a Member until such additional Member has made any required Capital Contribution and has become a party to this Agreement, and substitute Members may be admitted only in accordance with Article VII. The Members acknowledge that the admission of such new Members or the issuance of additional Membership Interests to pre-existing Members may dilute the economic interests of the Members.

4.3     Transactions with the Company. Subject to any limitations set forth in this Agreement, and if authorized by the Manager, a Member may lend money to and transact other business with the Company. Subject to applicable law, such Member has the same rights and obligations with respect thereto as a Person who is not a Member.

4.4     Meetings of Members. No annual or regular meetings of the Members as such shall be required. Any action that can be taken at a meeting of the Members may be taken without a meeting if a consent in writing setting forth the action so taken is signed and delivered to the Company by Members representing not less than the minimum vote necessary under this Agreement to approve the action.

4.5     Voting by Members. The Members, acting solely in their capacities as Members, shall have the right to vote on, consent to, or otherwise approve only those matters as to which this Agreement or the Act specifically requires such approval. Each Class A Unit shall be entitled to one vote. Each Class B Unit shall be entitled to 500 votes. For all matters as to which the vote, consent, or approval of the Members is required or permitted under this Agreement or the Act, the vote, consent, or approval of the majority of the total number of votes representing the Units shall be required (and shall be all that is required); provided that for any matter affecting the Class A Member or any of its Affiliates' compliance with the rules and regulations of the USCIS, the Class A Member must approve such matter, and provided further that any amendment of this Agreement with respect thereto shall be pursuant to the terms of Section 10.15 hereof. For all matters as to which the vote, consent, or approval of the Class B Members is required or permitted under this Agreement or the Act, the vote, consent, or approval of the majority of the total votes representing the Class B Units shall be required (and shall be all that is required).

4.6     Members Are Not Agents. No Member acting solely in the capacity of a Member is an agent of the Company, nor can any Member acting solely in the capacity of a Member bind the Company or execute any instrument on behalf of the Company.

10

4.7    No Withdrawal.  Except as provided in Articles VII and IX hereof, no Member may withdraw, retire, or resign from the Company without the prior consent of the Manager.

4.8    Voting Rights of the Members.  Notwithstanding any contrary provision of this Agreement and notwithstanding any rights or powers otherwise granted to the Managers hereunder, Members shall have the sole and exclusive right to approve or disapprove the following (and only the following) matters:

4.8.1    The dissolution and winding up of the Company.

4.8.2    The merger, consolidation, or other business combination of the Company with any entity or entities.

4.8.3    The sale, exchange, lease, mortgage, pledge or other transfer of all or substantial part of the assets of the Company other than in the ordinary course of its business or pursuant to the terms of this Agreement.

4.8.4    The incurrence of any obligation or indebtedness exceeding 50% of the value of the Company's assets other than in the ordinary course of the Company's business.

4.8.5    A change in the fundamental nature of the business of the Company or a change in the fundamental purpose of the Company.

4.8.6    Investing more than 10% of the Company's total assets in any entity or project other than the Developer.

4.8.7    Approval of any service or employment agreement (or any amendment thereof) in respect of any Manager.

4.8.8    Admission of additional Class A Members or Class B Members to the extent such admission would increase the total number of Members above and beyond forty-one;

4.8.9    Approval of any other matter or transaction as expressly provided under this Agreement with express reference to this Section 4.8.

4.9    Allocation of Job Creation Credit.  The job credit generated by the Development that is attributable to the Company shall be allocated to each Class B Member on a first-come-first-served manner, based on the date on which a Class B Member's Form I-829 "Petition by an Entrepreneur to Remove Conditions" ("**Form I-829 Petition**") is filed with the USCIS. If the Form I-829 Petition of any Class B Member is permanently denied, the job creation credit allocated to such Class B Member will be reallocated to other Class B Members in the manner described above.

11

*LA 130990797v1*

## ARTICLE V

## MANAGEMENT AND CONTROL OF THE COMPANY

5.1    Management of the Company by Manager.

5.1.1    Exclusive Management by Manager. Subject to the provisions of the Articles and this Agreement, the business, property, and affairs of the Company shall be managed, and all powers of the Company shall be exercised, by or under the direction of the "**Manager**." Without limiting the generality of the foregoing, the Manager shall have the rights, powers and authority in respect of the Company (without the Members' approval but subject to the other provisions of this Article V at all times, including but not limited to Section 5.5 hereof) to do or cause to be done each the following :

(a)    Lend funds from the issue of Class B Units ("**Loan**") to the Developer;

(b)    Consent to, approve or agree to settle any claim, litigation or threatened litigation involving the Company;

(c)    Make any tax election, settle any tax controversy or make tax decisions with respect to the Company;

(d)    Lend Company funds;

(e)    Hire employees to carry on the Company's business;

(f)    Appoint and remove the Company's legal counsel, accountant, tax adviser, registered agent, agent of service, and other professional service providers;

(g)    Negotiate, amend and/or supplement the terms of any investments or loans made or to be made by the Company in or to the Developer;

(h)    Subject to the rights of the Special Manager, enforce the rights of the Company with respect to any investments or loans made by the Company to the Developer and any agreement made between the Company and the Developer or affiliates of the Developer, including without limitation the commencement of foreclosure and legal proceedings against the Developer and collection under personal guarantees;

(i)    Execute any employment or service agreement between Manager and the Company, provided that such agreement has been approved by Members in accordance with Section 4.5 and Section 4.8 hereof; and

(j)    Make payments to Manager in accordance with or otherwise carry out the terms of any approved employment or service agreement between Manager and the Company.

12

          5.1.2   Agency Authority of Manager. The Manager may endorse checks, drafts, and other evidences of indebtedness made payable to the order of the Company, sign checks, drafts, and other instruments obligating the Company to pay money, and sign agreements or other documents. Subject to the provisions of the Articles and this Agreement, the Manager may delegate any power to any Person, including but not limited to, any officer or employee or agent of the Company in its reasonable discretion, provided that the Manager shall remain responsible for any act or omission of such officer or employee or agent to which such delegation is made, subject to the limitations on liability and indemnification provisions of this Article V.

          5.1.3   Advisory Committee. Without in any way limiting the powers of the Manager set forth in Section 5.1.1. or in any other provision of this Agreement, the Class B Members shall be engaged in general policy formulation with respect to the management of the Company by means of participation in an advisory committee of the Company (the "**Advisory Committee**"); provided, however, that under no circumstances shall the Manager be bound by or otherwise be required to comply with any policies established thereby.

5.2    Manager.

          5.2.1   Number, Term, and Qualifications. The Company shall have one Manager (the "**Manager**") appointed by the Class A Member(s). The Manager shall hold office for a term commencing on the date of designation and expiring upon the earlier of (i) the date on which such Manager is removed or (ii) the date on which such Manager resigns or dies or dissolves. A Manager does not need to be a Member. As of the Effective Date, the Class A Member has appointed the Regional Center as the initial Class A Manager. In the event of the removal, resignation, death or dissolution of the Manager, the Class A Member shall have the unilateral right and power to appoint a successor Manager.

          5.2.2   Resignation. The Manager may resign at any time by giving written notice to the Members without prejudice to the rights, if any, of the Company under any contract to which the Manager is a party. The resignation of the Manager shall take effect upon receipt of that notice or at such later time as shall be specified in the notice; and, unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make it effective. The resignation of the Manager shall not affect the Manager's rights as a Member and shall not by itself constitute a withdrawal of a Member.

          5.2.3   Removal. The Manager may be removed at any time with or without cause by the Class A Member(s). Any such removal shall be without prejudice to the rights, if any, of the Manager under any employment or service contract, and, if the Manager is also a Member, shall not affect the Manager's rights as a Member or constitute a withdrawal of a Member, except as otherwise provided in this Agreement or any other contract with such Member

          5.2.4   Special Manager. A majority of the Class B Members voting as a group or by written consent shall have the right to appoint a Special Manager who shall

13

have the sole right and responsibility to represent the Company in connection with negotiating, enforcing or otherwise dealing with the failure of the Developer to pay the Loan when due to the Company, including but not limited to, enforcing the Company rights under the Loan with the Developer, personal guarantees by Min Seok Chae, Donald Chae wherein Min Seok Chae and Donald Chae, have provided several personal guarantees in connection with the Loan made by the Company to the Developer.

## 5.3    Officers.

5.3.1    Appointment of Officers. The Manager may, at the expense of the Company, appoint officers of the Company at any time and from time to time. The officers of the Company, if deemed necessary by the Manager, may include, but are not limited to, a chairman, president, vice president, secretary, chief financial officer and treasurer. The officers shall act as agent of the Company and serve at the pleasure of the Manager, without prejudice to the rights, if any, of an officer under any contract of employment. Any individual may hold any number of offices. Subject to any limitations contained in this Agreement, the officers shall exercise such powers and perform such duties, and shall receive such salaries and other compensation paid by the Company, as are determined from time to time by approval of the Manager or as permitted or authorized in this Agreement. An officer need not be a Member or a Manager.

5.3.2    Removal, Resignation, and Filling of Vacancy of Officers. Any officer may be removed, either with or without cause, by the Manager at any time. Any officer may resign at any time by giving written notice to the Manager. Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice; and, unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective. Any resignation or removal is without prejudice to the rights, if any, of the parties under any contract to which the officer is a party. A vacancy in any office because of death, resignation, removal, disqualification, or any other cause shall be filled, if at all, by the Manager.

5.3.3    Signing Authority of Officers. Subject to any restrictions imposed by the Manager, any officer, acting alone, is authorized to endorse checks, drafts and other evidences of indebtedness made payable to the order of the Company, but only for the purpose of deposit into the Company's accounts. Subject to the terms of bank resolutions, if any, adopted by the Manager with respect to each Company disbursement account, all checks, drafts or other instruments obligating the Company to pay money may be signed on behalf of the Company by any officer, acting alone. Subject to any restrictions imposed by the Manager, the president or the chief financial officer (and such other officers as the Manager may designate from time to time), acting alone, shall be authorized to sign contracts and obligations on behalf of the Company.

5.4    Limitations on Authority. Neither any Manager nor officer shall do any act in contravention of this Agreement, or possess Company property or assign rights in Company property other than for Company purposes.

14

5.5     Fiduciary Duties of Manager. Notwithstanding any contrary provision of this Agreement or the Articles or any other agreement to which the Company or the Members are parties, each Manager shall have and owe to the Company and to the Members the fiduciary duties provided by Section 17153 of the California Corporations Code (as amended or superseded), including without limitation the duty of loyalty, the duty of care and the duty of good faith and fair dealing, and such additional duties as expressly set forth in this Agreement. Without limiting the generality of the foregoing, each Manager and officer of the Company shall perform its or his duties as Manager or officer in good faith, consistent with the terms of this Agreement and with any duties generally imposed by applicable law, in a manner that the Manager or officer reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances.

5.6     Limited Liability.

5.6.1     Acknowledgement. The Members expressly acknowledge that the Manager has been, and the officers may be, given very substantial responsibilities and discretion pursuant to this Agreement. In order to assure the Manager and officers that they may carry out their responsibilities and exercise their discretion hereunder, the Members agree that the following provisions governing limitation on liabilities and indemnities shall apply.

5.6.2     Limitations on Liability of Member, Manager, or Officer. To the extent not prohibited by applicable law, and notwithstanding any contrary provision of this Agreement or the failure of the essential purpose of any remedy of any kind, no Member, Manager or officer of the Company shall be personally liable under any judgment of a court or arbitrator, or in any other manner, for any claims, actions, suits, demands, damages, debt, liabilities, obligations, losses, penalties, fines, settlements, judgments, costs and expenses (collectively "Loss") of the Company, whether arising in contract, tort, or otherwise and whether or not involving a third party claim, solely by reason of its or his being a Member or Manager or officer of the Company. Notwithstanding the foregoing or any other provision of this Agreement to the contrary, however, in the event any Loss arises out of, relates to or results from the active or gross negligence, reckless or intentional misconduct, material breach of this Agreement or any other contractual or legal obligation or duty, fraud, deceit, bad faith or knowing violation of law by a Member, Manager or officer, including but not limited to any breach or violation of Section 5.5 of this Agreement (Fiduciary Duties), then such Member, Manager or officer shall be liable to the Company and to any other relevant parties to this Agreement in respect of such Loss. To the extent otherwise applicable, the foregoing sentence is intended to reference the respective provisions of Cal. Corp. Code § 17101(e) and §17158(b)(1) (as amended or superseded).

5.7     Indemnification.

5.7.1     Indemnification. To the extent not prohibited by applicable law, and notwithstanding any contrary provision of this Agreement or any failure of the essential purpose of any remedy of any kind, but subject at all times to Section 5.5 hereof (Fiduciary Duties), the Company agrees to fully indemnify, hold harmless and defend

15

(collectively "**indemnification**" or "**indemnify**" or any variation thereof) any Member, Manager, officer, employee, or agent of the Company (each an "**Indemnified Person**") from and against any Loss incurred by such Member, Manager or officer, to the extent (i) attributable to any actual or alleged act or omission of such Indemnified Person undertaken in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority (if any) conferred on such Indemnified Person by this Agreement or applicable law, and (ii) actually and reasonably incurred by such Indemnified Person with respect thereto and for which such Indemnified Person has not otherwise been reimbursed, except that no such Member, Manager, officer, employee or agent shall be entitled to be indemnified in respect of any Loss arising out of, relating to or resulting from the active or gross negligence, reckless or intentional misconduct, material breach of this Agreement or any other contractual or legal obligation or duty relating to the Company or the Members, fraud, deceit, bad faith or knowing violation of law by such Member, Manager, officer, employee or agent; provided further however, that notwithstanding the foregoing (a) any indemnity under this Section 5.7.1 shall be provided solely out of and to the extent of then net assets of the Company (including without limitation any director and officer liability insurance), and no debt or other obligation shall be incurred by the Members in order to provide an additional source of funds for any such indemnity, and no Member shall have any personal liability (or any liability to make any additional Capital Contributions) for such indemnity, (b) the foregoing indemnification obligations are not applicable to any financial losses of the Members generally (including but not limited to any diminution in value) which are attributable to the ordinary business operations and risks of the Company.

5.7.2 Indemnification Procedures. In the case of any claim, demand, action, suit or other proceeding in respect of any Loss (collectively "**Action**"), the Company shall control the defense of such Action with counsel of its choice, and no settlement or compromise or admission of liability or consent to judgment regarding any Loss shall occur without the prior consent of the Company, which approval will not be unreasonably withheld or delayed.

5.7.3 Expenses. To the extent not prohibited by applicable law, and subject at all times to the control and approval rights of the Company under Section 5.7.2 hereof, all reasonable expenses (including reasonable attorney's fees) incurred by an Indemnified Person in its or his capacity as such with respect to the defense of any Action brought by any third party (and excluding for the avoidance of doubt any Action brought by the Company or any other Member, Manager, officer, employee or agent in such capacity against such Indemnified Person) shall, from time to time, be advanced by the Company prior to the final disposition of such Action, upon receipt by the Company of an undertaking by or on behalf of the Indemnified Person to repay such amount if it shall be determined that such Person is not entitled to be indemnified as provided in Section 5.7.1 hereof.

5.8 Devotion of Time. Except as required by any separate contract and notwithstanding any other provision of this Agreement, no Manager or officer is obligated to devote all of such Manager or officer's time or business efforts to the affairs of the Company, but

16

shall devote such time and skill as it or he deems appropriate for the reasonably proper, adequate and responsible operation of the Company.

5.9    Competing Activities. Except as provided by any separate contract or to the extent otherwise limited under this Agreement: (i) any Member, Manager or officer of the Company (each, a "**Company Person**") may engage or invest in, independently or with others, any business activity of any type or description, including without limitation those that might be the same as or similar to the Company's business and that might be in direct or indirect competition with the Company; (ii) neither the Company nor any Member shall have any right in or to such other ventures or activities or to the income or proceeds derived therefrom; (iii) no Company Person shall be obligated to present any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company; and (iv) any Company Person shall have the right to hold any investment opportunity or prospective economic advantage for such Company Person's own account or to recommend such opportunity to Persons other than the Company. Each Member acknowledges that the other Company Persons might own or manage other businesses, including businesses that may compete with the Company for the time of the Company Person. To the fullest extent permitted by applicable law, each Member hereby waives any and all rights and claims that such Member may otherwise have against the other Company Persons as a result of any such permitted activities, including but not limited to the waiver of any claims otherwise subject to Section 1542 of the California Civil Code, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

5.10    Remuneration for Management or Other Services. The Manager shall be entitled to remuneration of 1.25% for services provided to the Company and other benefits in accordance with the terms of any employment or service agreement, provided such agreement shall have been approved by the Members in accordance with Section 4.8 hereof. The officers of the Company shall be entitled to remuneration and other benefits for their services to the Company, all as determined by the Manager in its reasonable and good faith judgment.

5.11    Transactions between the Company and an Interested Manager. Neither a Manager nor any Affiliate or employee or agent thereof shall directly or indirectly engage in any transaction (including without limitation the purchase, sale, lease, or exchange of any property, or the lending or borrowing of funds, or the rendering of any service) as an interested party with the Company; unless in each case (i) such transaction is not expressly prohibited by this Agreement, (ii) the terms and conditions of such transaction on an overall basis are fair and reasonable to the Company, (iii) all material facts about such transaction has been disclosed to the other Manager (if any), and (iv) the transaction has been approved in writing by the other Manager (if any). For purposes of clarification, the requirement set forth in the immediately-

17

preceding sentence shall be in addition to (and shall not limit in any way) the requirements of the Act or the other provisions of this Agreement with respect to interested party transactions.

5.12   Reimbursement of Expenses.  Subject to the foregoing limitations of this Article V, the Company shall reimburse the Manager and officers for the actual cost reasonably paid or incurred by them for goods, materials, and services solely used by or for the Company, except that, unless authorized by the Manager, no officer shall be reimbursed by the Company for any indirect or overhead expenses, including without limitation rent and general office expenses.

## ARTICLE VI

### ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS

6.1   Allocations of Net Profits.  After giving effect to the special allocations set forth in Sections 6.3 and 6.4 herein, Net Profits for any Fiscal Year shall be allocated to the Members in the following order of priority:

6.1.1   Chargeback to the Extent of Net Losses.  First, Net Profits shall be allocated to each Member to the extent of and in the reverse order of the aggregate amount of Net Losses previously allocated to such Member pursuant to Section 6.2.2, with respect to which Net Profits have not been previously allocated pursuant to this subsection.

6.1.2   Other Net Profits.  Second, except as provided in Section 6.1.1, Net Profits shall be allocated to the Members in accordance with their respective Capital Account balances.

6.2   Allocations of Net Losses.  After giving effect to the special allocations set forth in Sections 6.3 and 6.4 herein, Net Losses for any Fiscal Year shall be allocated to the Members in the following order of priority:

6.2.1   Chargeback to the Extent of Net Profits.  First, except as provided in Section 6.2.3, Net Losses shall be allocated to each Member to the extent of the excess, if any of (i) the aggregate amount of Net Profits previously allocated to such Member pursuant to Section 6.1.2 over (ii) the sum of the distributions previously made to such Member and the amount of Net Losses previously allocated to the Member under this Section 6.2.1.

6.2.2   Net Losses.  Second, except as provided in Sections 6.2.1 and 6.2.3, Net Losses shall be allocated to the Members in accordance with their positive Capital Account balances.

6.2.3   Adjusted Capital Account Deficit.  An allocation of Net Losses under Sections 6.2.1 and 6.2.2 hereof shall not be made to the extent it would create or increase an Adjusted Capital Account Deficit for a Member or Members at the end of any Fiscal Year. Any Net Losses not allocated because of the preceding sentence shall be allocated to the other Member or Members in proportion to such Member's or Members'

18

respective Percentage Interests; provided, however, that to the extent such allocation would create or increase an Adjusted Capital Account Deficit for another Member or Members at the end of any Fiscal Year, such allocation shall be made to the remaining Member or Members in proportion to the respective Percentage Interests of such Member or Members.

6.3     Special Allocations.

6.3.1     Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt or other liability to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i) and Regulations Section 1.704-1(b).

6.3.2     Nonrecourse Deductions Referable to Liabilities Owed to Non-Members. Any Nonrecourse Deductions for any Fiscal Year and any other deductions or losses for any Fiscal Year referable to a liability owed by the Company to a Person other than a Member to the extent that no Member bears the economic risk of loss shall be specially allocated to the Members in accordance with their Percentage Interests.

6.3.3     Member Minimum Gain Chargeback. Except as otherwise provided in Regulation Section 1.704-2(i)(4), notwithstanding any other provision of this Article VI, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Fiscal Year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Regulations Section 1.704-2(i)(5)) shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that portion of such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(i)(4) and 1.704-2(j)(2). This Section 6.3.3 is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

6.3.4     Minimum Gain Chargeback. Except as otherwise provided in Regulations Section 1.704-2(f), notwithstanding any other provision of this Article VI, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(g)(2). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(f)(6) and 1.704-

19

2(j)(2). This Section 6.3.4 is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

6.3.5    Qualified Income Offset. If any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5), or (6) or any other event creates an Adjusted Capital Account Deficit, items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 6.3.5 shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article VI have been tentatively made as if this Section 6.3.5 were not in the Agreement.

6.4    Curative Allocations. The allocations set forth in Section 6.2.3 and Sections 6.3.1 through 6.3.5, inclusive, hereof (the "**Regulatory Allocations**") are intended to comply with certain requirements of the Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 6.4. Therefore, notwithstanding any other provision of this Article VI (other than the Regulatory Allocations), the Manager shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner they determine appropriate so that, after such offsetting allocations are made, a Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Section 6.1 and Sections 6.2.1 and 6.2.2. In exercising their discretion under this Section 6.4, the Manager shall take into account any future Regulatory Allocations under Sections 6.3.3 and 6.3.4 that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 6.3.1 and 6.3.2.

6.5    Code Section 704(c) Allocations. The allocations specified in this Agreement shall govern the allocation of items to the Members for Code Section 704(b) book purposes, and the allocation of items to the Members for tax purposes shall be in accordance with such book allocations, except that solely for tax purposes and notwithstanding any other provision of this Article VI: (i) Code Section 704(c) shall apply to the allocation of items of income, gain, deduction, and loss related to contributed property having an adjusted federal income tax basis at the time of contribution that differs from its fair market value; and (ii) Regulations Section 1.704-1(b)(2)(iv)(f)(4) shall apply to the items of income, gain, deduction, and loss related to property the book value of which is adjusted, in the Manager' sole discretion, pursuant to Regulations Section 1.704-1(b)(2)(iv)(f). In cases where Code Section 704(c) or Regulations Section 1.704-1(b)(2)(iv)(f) applies, the Members' Capital Accounts shall be adjusted in accordance with Regulations Section 1.704-1(b)(2)(iv)(g).

6.6    Allocations in Respect of a Transferred Membership Interest. If any Membership Interest is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any Fiscal Year of the Company, each item of income, gain, loss, deduction,

20

*LA 130990797v1*

or credit of the Company for such Fiscal Year shall be allocated among the Members, as determined by the Manager in accordance with any method permitted by Code Section 706(d) and the Regulations promulgated thereunder in order to take into account the Members' varying interests in the Company during such Fiscal Year.

6.7     Obligations of Members to Report Consistently. The Members are aware of the income tax consequences of the allocations made by this Article VI and hereby agree to be bound by the provisions of this Article VI in reporting their shares of Company income and loss for income tax purposes.

6.8     Distributions by the Company to Members.

6.8.1     In General. Prior to the occurrence of any event specified in Section 9.1, and subject to applicable law and any limitations contained elsewhere in this Agreement, the Manager shall from time to time make distributions of Available Cash to the Members in proportion to their respective Capital Account balances. With respect to any EB-5 Member, it is not anticipated that any distributions shall be made to such Member during the four-year period (subject to extension) following the date on which such Member makes such person's required Capital Contribution and is admitted as a member of the Company. In the event that a distribution is made to an EB-5 Member during said four-year period (subject to extension), such distribution shall not be made from the Members' Capital Contributions so as to reduce such Capital Contributions to an amount that is less than the capital investment amount required under the EB-5 Program

6.8.2     Tax Distributions. Subject to Section 6.8.1 and any applicable limitations in a bank loan or other agreement , and unless prohibited by applicable law, not later than April 1 of each calendar year, the Manager shall use its best efforts to cause the Company to make cash distributions to each Member sufficient to cause the aggregate cash distributions to such Member pursuant to this Agreement with respect to the preceding Fiscal Year to equal at least forty percent (40%) of the Company's taxable income (allocable to such Member) for the preceding Fiscal Year.

6.8.3     Advances or Drawings. Distributions of money and property may be treated as advances or drawings of money or property against a Member's distributive share of income and as current distributions made on the last day of the Company's taxable year with respect to such Member.

6.8.4     Distributees; Liability for Distributions. All distributions made pursuant to this Section 6.8 shall be made only to the Persons who, according to the books and records of the Company, hold the Membership Interests in respect of which such distributions are made on the actual date of distribution. Neither the Company nor any Member, Manager, or officer shall incur any liability for making distributions in accordance with this Section 6.8.

6.9     Form of Distributions. A Member, regardless of the nature of the Member's Capital Contributions, has no right to demand and receive any distribution from the Company in any form other than money. No Member may be compelled to accept from the Company a

21

distribution of any asset in kind in lieu of a proportionate distribution of money being made to other Members.

6.10    Return of Distributions. Except for distributions made in violation of the Act, this Agreement, or, with respect to EB-5 Members only, the rules and regulations of the EB-5 Program, or as otherwise required by law, no Member shall be obligated to return any distribution to the Company or pay the amount of any distribution for the account of the Company or to any creditor of the Company.

6.11    Limitation on Distributions. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to make a distribution to any Member on account of such Member's interest in the Company if such distribution would violate the Act or other applicable law or, with respect to EB-5 Members only, would violate the rules and regulations of the EB-5 Program.

6.12    Withholding. Any tax required to be withheld with respect to any Member under Section 1446 or other provisions of the Code, or under state law, shall be treated for all purposes of this Agreement (i) as a distribution of cash to be charged against future distributions to which such Member would otherwise have been entitled, or (ii) if determined by the Manager, as a demand loan to such Member which is secured by the Member's entire Interest in the Company, and is repayable by offset against the first distributions to which the Member is otherwise entitled under the provisions of this Article VI, together with interest at the rate of 8 percent per annum on the unpaid balance.

## ARTICLE VII

## TRANSFER OF INTERESTS

7.1    Transfer of Interests In General.

7.1.1    Conditions to Transfer. No Member shall be entitled to Transfer all or any part of its Membership Interest unless all of the following conditions have been met: (a) the Company shall have received written notice of the proposed Transfer, setting forth the circumstances and details thereof; (b) except as provided in Section 7.1.3, the Transfer shall have been approved by the Manager, which consent may be given or withheld, conditioned or delayed (to the extent permitted by this Agreement or the Act or other applicable law), as the Manager may determine in its reasonable discretion; (c) the Company shall (at its option) have received a written opinion of legal counsel, in form and substance reasonably satisfactory to the Company, specifying the nature and circumstances of the proposed Transfer, and based on such facts stating that the proposed Transfer will not be in violation of any of the registration provisions of or other restrictions under the Securities Act of 1933 (the "Securities Act"), any applicable state securities laws, or any applicable non-U.S. securities laws, and any rules or regulations promulgated thereunder, each as may be amended or superseded; (d) the Company shall have received from the transferee (and the transferee's spouse if such spouse will receive a community property interest in the Membership Interest) a written consent to be bound by all of the terms and conditions of this Agreement; (e) the Transfer will not result in the

22

*LA 130990797v1*

loss of, or violate any of the terms or conditions of, any license or regulatory approval or exemption that has been obtained by, or is relied upon by, the Company and is materially useful in the conduct of its business as then being conducted or proposed to be conducted; (f) the Company is reimbursed upon request for its reasonable expenses in connection with the Transfer; and (g) the Transfer complies with all other applicable requirements of this Agreement, any applicable federal, state or foreign securities laws, and all other applicable laws.

          7.1.2   Invalid Transfers. Transfers in violation of this Section 7.1 or in violation of any other provision of this Article VII or this Agreement shall be null and void *ab initio* and of no effect whatsoever.

          7.1.3   Permitted Transfers. Notwithstanding any provision in this Agreement to the contrary, any Member may Transfer its or his or her Membership Interest, without compliance with Section 7.1.1(b), but subject to the other provisions of Section 7.1 and to Section 7.7 hereof, (i) to an Affiliate of any Member, or (ii) to any Member's spouse or children, or the trustee of a trust for the principal benefit of such persons (each such transferee, a **"Permitted Transferee"**); provided that in the case of any such Transfer, (x) the original transferring Member retains during his lifetime all voting rights (if any) in the Transferred Membership Interest and (y) the only Permitted Transferees of such transferee (and of any subsequent transferee of such Transferred Membership Interest or any portion thereof) shall be the Permitted Transferees of the original transferor Member as of the date of the original Transfer.

      7.2   Effective Date of Permitted Transfers. Any Transfer permitted under this Agreement of all or any portion of a Membership Interest shall be effective no earlier than the date following the date upon which the requirements of this Agreement have been met.

      7.3   Effect of Permitted Transfers. After the effective date of any Transfer of any part of a Membership Interest in accordance with this Agreement, the Membership Interest so Transferred shall continue to be subject to the terms, provisions, and conditions of this Agreement and any further Transfers shall be required to comply with all of the terms, provisions, and conditions of this Agreement. Any Transferee of all or any portion of a Membership Interest shall take subject to the restrictions on Transfer imposed by this Agreement.

      7.4   Substitution of Members. Notwithstanding anything to the contrary expressed or implied in this Agreement, a transferee of a Membership Interest shall not have the right to become a substitute Member until each of the following conditions are complied with: (a) the requirements of Section 7.1.1 are satisfied (other than the requirement of Section 7.1.1(b) for any Permitted Transferee); (b) the requirements of Section 7.7 are satisfied; (c) such Person (and such Person's spouse if such spouse will receive a community property interest in the Membership Interest) executes an instrument satisfactory to the Members approving the transfer and to the Manager accepting and adopting the terms, provisions, and conditions of this Agreement, with respect to the acquired Membership Interest; and (d) such Person pays any reasonable expenses in connection with such Person's admission as a new Member. The

23

admission of a substitute Member shall not result in the release of the Member who assigned the
Membership Interest from any liability that such Member may have to the Company.

7.5    Repurchase of Interest.

7.5.1    Subject to the remaining provisions of this Section 7.5, the
Company shall repurchase the Class B Units of a Class B Member in the event that such
Class B Member fails to obtain conditional permanent resident status under the EB-5
Program, for any reason that cannot be readily remedied (upon which event, such Class B
Member shall cease to be a Member of the Company and have no interest in the
Company), subject to the Class B Member's delivery of a evidence reasonably satisfactory
to the Company regarding the failure.

7.5.2    The purchase price of each Class B Unit purchased by the Company
pursuant to this Section shall be the subscription purchase price paid by the Class B
Member for such Class B Units, which, for purposes of clarification, does not include any
administration fee or other fees or charges paid by such Class B Member to the Company,
the Manager, or any other person in connection with the subscription of Class B Units.

7.5.3    Notwithstanding anything to the contrary in this Section, if the
Manager determines, in its sole and absolute discretion, that the repurchase of the Class B
Units pursuant to this Section would have an adverse effect on the business or
immigration objectives of the Company or the ability of other Class B Members to obtain
unconditional permanent resident status in the United States pursuant to the EB-5 Program
or the Company is restricted from purchasing any Class B Units under the Act or other
applicable law or under the terms of any loan agreements with its lenders or the Company
does not have the available cash to effect such repurchase of the Class B Units, then the
Company's obligation to purchase the Class B Units (and the Class B Member's rights
under this Section) shall be suspended until the Manager determines, in its sole and
absolute discretion, that the repurchase of the Class B Units no longer causes such adverse
effect or the Company is legally and contractually able to purchase all such Class B Units
or the Company has the available cash to effect such repurchase of the Class B Units, as
the case may be; provided, however, that the Company shall repurchase as many Class B
Units as the Manager deems appropriate or the Company is permitted to repurchase under
such laws and agreements, as the case may be.

7.5.4    The closing of the repurchase and sale of any Class B Units
pursuant to this Section shall be held within thirty (30)days after the effective exercise of
any option or, in the event that the purchase and sale of the any Class B Units is suspended
pursuant to Section 7.5.3, thirty (30) days after the date on which the Manager determines
that the repurchase of the Class B Units no longer causes an adverse effect or the
Company is legally and contractually able to repurchase all such Class B Units or the
Company has the available cash to effect such repurchase of the Class B Units, as the case
may be. The parties to such repurchase and sale shall do all things and execute and
deliver all papers as may be necessary fully to consummate such sale and repurchase in
accordance with the terms and provisions of this Agreement. The closing shall take place

24

at the then principal offices of the Company or such other place as is agreed upon by the parties thereto.

7.6     Prohibition of Redemption. Except as expressly provided in Section 7.5 relating to the failure of a Class B Member to obtain conditional permanent resident status, the Company is not obligated to redeem or repurchase the Class B Units of any Class B Member at any time or under any circumstances.

7.7     Regulation S Restrictions.   Notwithstanding the foregoing provisions or any other provision of this Agreement or the Articles to the contrary, the Company shall refuse to register or otherwise permit or effectuate any resale or other Transfer of any Membership Interest not made in accordance with the provisions of the Regulation S (Sections 230.901 through 230.905 of Part 230 of Title 17 of the US Code of Federal Regulations) as amended or superseded, pursuant to registration under the Securities Act, or pursuant to an available exemption from registration.

## ARTICLE VIII

### BOOKS AND RECORDS; ACCOUNTING; TAX MATTERS

8.1     Books and Records. The Manager shall cause the books and records of the Company to be kept, and the financial position and the results of its operations to be recorded, in accordance with the accounting methods followed for U.S. federal income tax purposes. The books and records of the Company shall reflect all the Company transactions and shall be appropriate and adequate for the Company's business.

8.2     Delivery to Members and Inspection.

8.2.1    Subject to such reasonable standards as may be established by the Manager in accordance with the Act, upon the request of any Member for purposes reasonably related to the Membership Interest of that Person as a Member, the Manager shall make available to the requesting Member information required to be maintained by Section 8.1 or such other information as the Company shall be required to provide to such Member under applicable law.

8.2.2    Any request, inspection, or copying of information by a Member under this Section 8.2 may be made by that Person or that Person's agent or attorney.

8.3     Financial Statements. If requested by a member, the Manager shall cause the Company to provide to the Members on or before the one hundred twentieth day (120th) day following the end of each calendar year, an unaudited financial report of the Company for such year, including (i) a balance sheet, (ii) a statement of profit and loss, and (iii) a cash flow statement.

8.4     Tax Returns. The Manager shall cause to be prepared at least annually information necessary for the preparation of the Members' federal and state income tax and information returns. The Manager shall send or cause to be sent to each Member within ninety

25

(90) days after the end of each taxable year, or as soon as practicable thereafter, such information as is necessary to complete such Member's federal and state income tax or information returns, and a copy of the Company's U.S. federal, state, and local income tax or information returns for that year. The Manager shall cause the income tax and information returns for the Company to be timely filed with the appropriate authorities.

8.5    Other Filings. The Manager also shall cause to be prepared and timely filed, with appropriate federal and state regulatory and administrative bodies, amendments to, or restatements of, the Articles and all reports required to be filed by the Company with those entities under the Act or other then current applicable laws, rules, and regulations.

8.6    Bank Accounts. The Manager shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

8.7    Accounting Decisions and Reliance on Others. All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Manager. The Manager may rely upon the advice of the Company's accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

8.8    Tax Matters.

8.8.1    Taxation as Partnership. The Company shall be treated as a partnership for tax purposes, and the Members shall cooperate with the Company in connection therewith and hereby authorize the Manager to take whatever actions and execute whatever documents are necessary or appropriate to effectuate the foregoing.

8.8.2    Elections; Tax Matters Partner. Subject to Section 8.8.1, the "tax matters partner" (as hereinafter defined) shall from time to time cause the Company to make such tax elections as he deems to be necessary or appropriate. The Regional Center (or another Member appointed by the Manager) shall be designated as the "tax matters partner" (within the meaning of Code Section 6231(a)(7)) to represent the Company in connection with all examinations of the Company's affairs by tax authorities, including without limitation resulting judicial and administrative proceedings, and shall expend Company funds for professional services and costs associated therewith.

## ARTICLE IX

### DISSOLUTION AND WINDING UP

Subject to the requirements of Section 17350 et seq. of the California Corporations Code concerning the dissolution and winding up of a limited liability company under California law, to the extent such requirements may not be modified by this Agreement in accordance with the Act:

9.1    Dissolution. The Company shall be dissolved, its assets shall be disposed of, and its affairs shall be wound up on the first to occur of the following:

26

9.1.1   The entry of a decree of judicial dissolution pursuant to the Act;

9.1.2   The approval of the Members (pursuant to Section 4.5 and Section 4.8 hereof), and the Manager; or

9.1.3   The sale or disposition of substantially all of its assets, including full repayment of the Company's loan to the Developer and completion of any and enforcement of all rights and powers (including enforcement of security interests) with respect to the Developer.

9.2   Winding Up. Upon the occurrence of any event specified in Section 9.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors. The Manager shall be responsible for overseeing the winding up and liquidation of the Company, shall take full account of the assets and liabilities of the Company, shall either cause its assets to be sold to any Person or distributed to a Member, and if sold, as promptly as is consistent with obtaining the fair market value thereof, shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided in Section 9.5 herein.

9.3   Distributions in Kind. Any non-cash asset distributed to one or more Members shall first be valued at its fair market value to determine the gain or loss that would have been included in the amounts allocated pursuant to Article VI if such asset were sold for such value. Such gain or loss shall then be allocated pursuant to Article VI, and the Members' Capital Accounts shall be adjusted to reflect such allocations. The amount distributed and charged to the Capital Account of each Member receiving an interest in such distributed asset shall be the fair market value of such interest (net of any liability secured by such asset that such Member assumes or takes subject to).

9.4   Determination of Fair Market Value. For purposes of Sections 9.2 and 9.3, the fair market value of each asset of the Company shall be determined in good faith by the Manager with reference to standard valuation methodologies.

9.5   Order of Distributions Upon Liquidation. After determining that all known debts and liabilities of the Company in the process of winding up, including without limitation debts and liabilities to Members who are creditors of the Company, have been paid or adequately provided for, the remaining assets shall be distributed to the Members in accordance with their positive Capital Account balances, after taking into account income and loss allocations, as specified in Article VI, for the Company's taxable year during which liquidation occurs. Such liquidating distributions shall be made by the end of the Company's taxable year in which the Company is liquidated, or, if later, within ninety (90) days after the date of such liquidation.

9.6   Limitations on Payments Made in Dissolution. Each Member shall be entitled to look solely to the assets of the Company for the return of such Member's positive Capital Account balance. Notwithstanding that the assets of the Company remaining after payment of or due provision for all debts, liabilities, and obligations of the Company may be insufficient to return the Capital Contributions or share of Net Profits reflected in such Member's positive

27

Capital Account balance, a Member shall have no recourse against the Company or any other Member.

9.7     Certificate of Dissolution. Upon completion of the winding up of the affairs of the Company, the Manager, or other Person(s) winding up the affairs of the Company, shall cause to be filed in the office of, and on a form prescribed by, the California Secretary of State, a certificate of dissolution.

9.8     Termination. The Company shall terminate when all of the assets of the Company have been distributed in the manner provided for in this Article IX, and the certificate of dissolution is filed in accordance with Section 9.7.

9.9     No Action for Dissolution. Except as expressly permitted in this Agreement, a Member shall not take any voluntary action that directly causes a dissolution of the Company.

## ARTICLE X

## MISCELLANEOUS

10.1     Counsel to the Company. Any counsel to the Company ("**Company Counsel**") may also be counsel and provide legal representation to any Member in any matter. The Company, if approved by the Manager, may execute any retainer letter and/or consent to the representation of the Company that Company Counsel may request pursuant to the California Rules of Professional Conduct or similar rules in any other jurisdiction ("**Rules**"). In the event any dispute or controversy arises between any Member and the Company, or between a Member and another Member, then each Member agrees that, although no Person shall be obligated to use Company Counsel, Company Counsel may represent either the Company or any Member, or both, in any such dispute or controversy to the extent permitted by and subject to compliance with the Rules, and each Member hereby consents to such representation. Each Class B Member acknowledges and agrees that the Company's special immigration counsel, as appointed by the Manager from time to time, is the sole person authorized to respond on behalf of the Company or the Manager in any matter before the USCIS. Each Class B Member agrees to supply a Form G-28 appointing such special immigration counsel to facilitate such response by the Company or the Manager.

10.2     Complete Agreement. This Agreement (including any schedules or exhibits hereto), the investment representation statement of each Member, the Articles and any other agreements executed contemporaneously herewith constitute the complete and exclusive statement of agreement among the parties with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the parties or any of them with respect to the subject matter hereof. No representation, statement, condition, or warranty not contained in this Agreement or the Articles shall be binding on the Members or the Company or the other parties have any force or effect whatsoever. To the extent that any provision of the Articles conflicts with any provision of this Agreement, the Articles shall control.

28

10.3    Binding Effect.  Subject to the provisions of this Agreement relating to Transfer, this Agreement shall be binding upon and inure to the benefit of the Members, and their respective successors and permitted assigns.

10.4    Parties in Interest.  Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and their respective successors and permitted assigns or the other named parties to this Agreement, nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

10.5    Pronouns; Statutory References.  All references using the singular shall include the plural (and vice versa); and all pronouns and all variations thereof shall be deemed to refer to the masculine, feminine or neuter, as the context in which they are used may require.  Any reference to the Code, the Regulations, the Act, or other statutes or laws shall include all amendments, modifications, or replacements of the specific sections and provisions concerned.

10.6    Headings.  All headings herein are inserted only for convenience and ease of reference and shall not be considered in the construction or interpretation of any provision of this Agreement.

10.7    References to this Agreement.  Numbered or lettered articles, sections, and subsections herein contained refer to articles, sections, and subsections of this Agreement unless otherwise expressly stated.

10.8    Governing Law.  This Agreement and all matters arising out of or relating to this Agreement shall be governed by and construed in accordance with the internal laws of the State of California without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the internal laws of the State of California to the rights and duties of the parties; provided however that any right to arbitration hereunder shall be interpreted and governed solely by the Federal Arbitration Act, 9 U.S.C. §1 et seq. (as amended or superseded).

10.9    Arbitration of Disputes.  Any controversy, dispute, or claim between the parties to this Agreement arising out of, in connection with, or in relation to the formation, negotiation, interpretation, performance or breach of this Agreement  shall be submitted to JAMS (hereafter, the **"Arbitration Service"**)  and shall be settled exclusively by arbitration, before a three-member arbitration panel, in accordance with this Section 10.9.  This agreement to resolve any disputes by binding arbitration shall extend to claims against any parent, subsidiary or Affiliate of each party, and, when acting within such capacity, any officer, director, member, employee or agent of each party, or of any of the above, and shall apply as well to claims arising out of state and federal statutes and local ordinances as well as to claims arising under the common law.  Arbitration shall be the exclusive remedy for determining any such dispute, whether in tort, contract or otherwise, regardless of its nature. Arbitration shall be governed by the Comprehensive Arbitration Rules and Procedures and International Arbitration Rules (or similar commercial arbitration rules) of the Arbitration Service.  In the event of a conflict between the

29

applicable rules of the Arbitration Service and these procedures, the provisions of these procedures shall govern. To select the three-member arbitration panel, the parties shall each name one neutral arbitrator, and those two arbitrators shall select a third neutral arbitrator from a list of potential arbitrators jointly prepared by the parties. The arbitration proceeding shall be decided by majority vote of the three-arbitrator panel. Unless mutually agreed by the parties otherwise, any arbitration shall take place in the City of Los Angeles, California.

In the event of a dispute subject to this Section 10.9, (a) the parties shall be entitled to reasonable discovery subject to the discretion of the arbitrator, (b) all testimony of witnesses shall be taken under oath, and the admission of evidence shall be governed by the rules of evidence applicable to civil proceedings under applicable law, and (c) a stenographic record shall be kept of all oral hearings. The remedial authority of the arbitrator shall be the same as, but no greater than, would be the remedial power of a court having jurisdiction over the parties and their dispute; provided, however, that the arbitrator shall have no power or authority under this Agreement or otherwise to award or provide for the award of punitive or consequential damages against any party. The arbitrator shall, upon an appropriate motion, dismiss any claim without an evidentiary hearing if the party bringing the motion establishes that he or it would be entitled to summary judgment if the matter had been pursued in court litigation. The parties and the arbitrator shall keep confidential all matters relating to any arbitration hereunder (including without limitation the existence of the dispute and the arbitration).

In interpreting this Agreement, the arbitrator shall be bound by and follow the substantive law of the State of California. To the extent applicable and not inconsistent with this Section 10.9, the arbitrator shall apply the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

Any filing or administrative fees shall be borne initially by the party requesting administration by the Arbitration Service. If both parties request such administration, the fees shall be borne initially by the party incurring such fees as provided by the rules of the Arbitration Service. The initial fees and costs of the arbitrator shall be borne equally by the parties. The prevailing party in such arbitration, as determined by the arbitrator, and in any enforcement or other court proceedings, shall be entitled to reimbursement from the other party for all of the prevailing party's costs (including but not limited to the arbitrator's compensation), expenses, and attorneys' fees.

The arbitrator shall render an award and written opinion, and the award shall be final and binding upon the parties. Judgment upon any award rendered by the arbitrators may be entered by any state or federal court having jurisdiction thereof, in accordance with the terms of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

If any of the provisions of this Section 10.9 are determined to be unlawful or otherwise unenforceable, in whole or in part, such determination shall not affect the validity of the remainder of this Section 10.9, and this Section 10.9 shall be reformed to the extent necessary to carry out its provisions to the greatest extent possible and to insure that the resolution of all conflicts between the parties, including those arising out of statutory claims, shall be resolved by neutral, binding arbitration. If a court should find that the arbitration provisions of this Section 10.9 are not absolutely binding, then the parties intend any arbitration decision and award to be

30

fully admissible in evidence in any subsequent action, given great weight by any finder of fact, and treated as determinative to the maximum extent permitted by law.

10.10   Jurisdiction. Subject in all events to the foregoing provisions on arbitration, all actions to enforce or interpret this Agreement shall be brought exclusively in the federal or state courts located in Los Angeles, California and each of the parties agrees that such courts shall have exclusive jurisdiction and venue for any such actions. If a suit or other legal proceeding is brought by a party to this Agreement to enforce its provisions, or to seek remedy for any breach hereof, then the prevailing party shall be entitled to recover all costs and expenses reasonably incurred in connection with such suit or proceeding. Any judgment may be entered in any court having competent jurisdiction wherever located. Process in any action or proceeding may be served on any party anywhere in the world, and service by written notice in the manner provided by Section 10.14 hereof (Notices) shall be deemed fully valid and effective service on such party for all purposes, to the fullest extent not prohibited by law.

10.11   Severability. If any provision of this Agreement or the application of such provision to any Person or circumstance shall be held invalid or unlawful or unenforceable, the remainder of this Agreement or the application of such provision to Persons or circumstances other than those to which it is held invalid or unlawful or unenforceable shall not be affected thereby.

10.12   Waiver. Any failure to enforce or delay in enforcing any of rights or obligations for the benefit of a party shall not be treated as a waiver thereof. Any waiver of any breach of this Agreement shall not operate as a waiver of any subsequent breaches.

10.13   Additional Documents and Acts. Each Member agrees to execute and deliver, from time to time, such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out, and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

10.14   Notices. Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement shall be in writing (which may include facsimile) and shall be deemed to have been given and received when delivered to the address specified by the party to receive the notice. The respective address of each Member shall be as set forth on Exhibit A hereto. Any party may, at any time by giving five (5) days' prior written notice to the other parties, designate any other address in substitution of the foregoing address to which such notice shall be given.

10.15   Amendments. Notwithstanding anything to the contrary in this Agreement, any amendment to this Agreement shall be adopted and be effective as an amendment hereto only if approved in writing by the Class A Member and the Class B Members holding a majority of the Class B Units outstanding; provided that the Manager may, without the consent of the Members, amend Exhibit A hereto at any time and from time to time to reflect the admission or withdrawal of any Member, or the change in any Member's Capital Contributions or Percentage Interests, or any changes in the Members' addresses, all as contemplated by this Agreement.

31

10.16 No Interest in Company Property; Waiver of Action for Partition. No Member has any interest in specific property of the Company. Without limiting the foregoing, each Member irrevocably waives during the duration of the Company any right that such Member may have to maintain any action for partition with respect to the property of the Company.

10.17 Multiple Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

10.18 Remedies Cumulative. The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any Person may be lawfully entitled.

10.19 Investment Representation. As further provided in the investment representation statement of each Member, which statement is hereby incorporated by reference as if fully set forth herein, each Member hereby represents to, and agrees with, the other Members and the Company that such Member is acquiring the Membership Interest for investment purposes for such Member's own account only and not with a view to or for sale in connection with any distribution of all or any part of the Membership Interest; and further that the Membership Interest is being acquired for investment by the Member and not for the account of a United States Person, and not with a view to the resale or distribution of any part of such interest in the United States or to a United States Person, within the meaning of Regulation S of the Securities Act. No other Person will have any direct or indirect beneficial interest in or right to the Membership Interest.

10.20 Spousal Consent. Each Member who is a married individual shall, upon becoming a Member or, if later, upon becoming married, cause his spouse to execute a spousal consent in the form attached hereto as Exhibit B and shall furnish such consent to the Company.

10.21 English Language. Each of the parties are competent in the English language and understand all of the provisions of this Agreement. The English language text and American usage thereof shall control the interpretation and construction of this Agreement and all other writings between the parties.

10.22 Representations. Each of the parties represents and warrants that this Agreement has been duly executed and delivered personally (in the case of an individual Member) or by its duly authorized officer or representative and that this Agreement is its valid and legally binding agreement and obligation enforceable in accordance with its terms.

10.23 Effective Date. Notwithstanding anything to the contrary in this Agreement, this Agreement shall not become effective and shall have no force and effect until the Effective Date.

32

IN WITNESS WHEREOF, Members have executed this Agreement, effective as of the
date first written above.

**CLASS A MEMBER:**

M&D Regional Center, LLC

By: M + D Properties, its Manager

By: _____
    Donald Chae, President

**CLASS B MEMBERS:**

[See Joinder Agreements]

The following entities hereby accept its
appointment as Manager of the Company under and
to the extent provided in Article V of this
Agreement, and solely in such capacity as Manager
hereby consent to and agree to be bound by the
terms and conditions of this Agreement:

**MANAGER:**

M&D Regional Center, LLC

By: _____
Name:
Title:

33

## EXHIBIT A

### CAPITAL ACCOUNT AND PERCENTAGE INTERESTS

| Member's Name and Address | Capital Account | Class A Units | Class B Units | Percentage Interest | |
|---|---|---|---|---|---|
| M&D Regional Center, LLC<br>3100 E. Imperial Highway<br>Lynwood, California 90262<br>Fax: (310) 631-1645 | $1,000.00 | 20 | 0 | 100 % | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

34

## EXHIBIT B

### SPOUSAL CONSENT

The undersigned is the spouse of _____ and
acknowledges that he/she has read the Operating Agreement for Beach Orangethorpe Hotel,
LLC, a California limited liability company, dated as of August 1, 2013 and the Joinder
Agreement attached thereto (collectively the "Operating Agreement") and the related Investment
Representation Statement of my spouse ("Statement"), and that the undersigned understands the
provisions of the Operating Agreement and the Statement. All capitalized terms used herein
shall have the same meaning as the Operating Agreement. The undersigned is aware that my
spouse has executed and entered into the Operating Agreement, by the provisions of the
Operating Agreement, his/her spouse has agreed to purchase one or more Membership Interests
(as defined in the Operating Agreement) and to subject such Membership Interests to the
Operating Agreement, including any community property interest or quasi-community property
interest, in accordance with the terms and provisions of such Agreement. The undersigned
hereby expressly approves of and agrees to be bound by the provisions of the Operating
Agreement and the Statement in their entirety, including, but not limited to, those provisions
relating to the purchase, sales and Transfers of Membership Interests and the restrictions thereon.
If the undersigned predeceases his/her spouse when his/her spouse owns any Membership
Interest, he/she hereby agrees not to devise or bequeath or otherwise Transfer whatever
community property interest or quasi-community property interest he/she may have in any
Membership Interest in contravention of the Operating Agreement or the Statement.

Date: _____        _____
                                             Signature

                                             _____
                                             Print Name

☐ Check this box if Spousal Consent is NOT applicable and sign and complete the section
below.

Date: _____        _____
                                             Signature

                                             _____
                                             Print Name

35

*LA 130990797v1*

## JOINDER AGREEMENT

The undersigned is currently a prospective member of Beach Orangethorpe Hotel, LLC, a California limited liability company (the "**Company**"). The undersigned hereby consents to and agrees to be bound by the terms and conditions of that certain Operating Agreement for the Company dated as of August 1, 2013 attached hereto as Exhibit A (the "**Operating Agreement**").

The arbitration provision as contained in Section 10.9 of the Operating Agreement is hereby expressly incorporated into this Agreement.

Signed as of _____, 2014

_____
Signature

_____
Print Name

**Acknowledged and accepted by:**          Beach Orangethorpe Hotel, LLC ("Company")

By: _____
Name:
Title:
Date signed:

M&D Regional Center, LLC, as the
Manager of the Company

By: _____
Name:
Title:
Date signed:

27361497\V-2

36

*LA 130990797v1*

# EXHIBIT C

## INVESTMENT REPRESENTATION STATEMENT

10437760\V-2
LA 130898254v6

## BEACH ORANGETHORPE HOTEL, LLC
## INVESTMENT REPRESENTATION STATEMENT

In connection with the purchase by and issuance to the undersigned of one or more units of Class B Membership Interests (the "Units") of Beach Orangethorpe Hotel, LLC, a California limited liability company ("Company"), the undersigned ("Member") represents and warrants and covenants to the Company the following ("Representation") for purposes of determining Member's suitability as an investor in the Units and for purposes of confirming the availability of Regulation D and Regulation S exemptions from the registration requirements of the U.S. Securities Act of 1933, as amended (the "Securities Act"):

### 1.1 Authorization

Member has full power and authority to enter into this Investment Representation Statement, and any other agreement or documentation in connection with the Units (collectively "agreements"), and each such agreement constitutes a valid and legally binding obligation, enforceable against Member in accordance with its terms.

### 1.2 Purchase Entirely for Own Account

The Units are being acquired by Member for investment for its or his or her own account and not as a nominee or agent, and not with a view to or for the sale of the Units in connection with any distribution of Units. Member has no present intention of selling, granting any participation in, or otherwise distributing the Units. Member further agrees that the Units are being acquired for investment by Member and not for the account of a United States Person, and not with a view to the resale or distribution of any part of the Units in the United States or to a United States Person.

### 1.3 Disclosure of Information

Member has received all of the information Member considers necessary or appropriate for deciding whether to invest in and purchase the Units. Member further represents that Member has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Units and the business, properties, prospects and financial condition of the Company.

### 1.4 Experience

Member is able to protect its own interests in connection with the investment in the Units, can bear the economic risk of its investment, and has such knowledge and experience in financial or business matters that Member is capable of evaluating the merits and risks of the investment in the Units.

### 1.5 Accredited Member/Resident Status

Member is an "accredited investor" within the meaning of Rule 501 of Regulation D of the Securities Act, the relevant portions of which are attached hereto and made a part hereof as Exhibit A.

1

1.6   Non-U.S. Person

At the time of the decision to purchase the Units, Member was, and Member currently is, outside of the United States, and Member is not a U.S. person as defined in Regulation S of the Securities Act, and is not acquiring such Units for the account or benefit of a U.S. person. In particular, Member affirms that Member is not organized or incorporated under the laws of the United States and was not formed by U.S. Persons principally for the purpose of investing in securities not registered under the Securities Act.

1.7   Restricted Securities

An investment in the Company will be illiquid. No market exists for the Units, none is expected to develop and the Company will not be listed on an exchange or otherwise regularly traded.

Member acknowledges that the Units have not been registered under the Securities Act and that the Units are being issued by the Company under one or more of the exemptions from the registration requirements provided under the Securities Act.

Member further acknowledges and agrees that the Units are "restricted securities" within the meaning of Rule 144 of the Securities Act and may not be offered or resold in the United States or to U.S. persons unless in accordance with the provisions of Regulation S under the Securities Act, pursuant to registration under the Securities Act, or pursuant to an available exemption from the registration requirements of the Securities Act. Member further agrees to resell such Units only in accordance with the provisions of Regulation S under the Securities Act, pursuant to registration under the Securities Act, or pursuant to an available exemption from the registration requirements of the Securities Act.

Notwithstanding Member's ability to sell the Units under the Securities Act, the Units will not likely be transferable for a period of approximately five years in compliance with restrictions imposed by the United States Citizenship and Immigration Services and the EB-5 Program promulgated thereunder.

1.8   Hedging Transactions

Member agrees not to engage in hedging transactions with regard to such Units unless in compliance with the Securities Act.

1.9   Legends

Member acknowledges that any certificate(s) for such Units may bear restrictive legends relating to the above restrictions.

1.10   English Language

Member is competent in the English language and understands all of the provisions of this Investment Representation Statement.

1.11    Reliance by Company

Member    understands    that    the    representations,    warranties,    covenants    and
acknowledgements set forth herein constitute a material inducement to the Company entering
into the sale and issuance of the Units to Member.

IN WITNESS WHEREOF, Member has entered into and executed this Investment
Representation Statement as of the date indicated below.

MEMBER: _____

Print Name: _____
         Title (if any):

Date Signed: _____

## EXHIBIT A

Rule 501. Definitions and Terms Used in Regulation D.

As used in Regulation D, the following terms have the meaning indicated:

(a)     Accredited Investor. "Accredited investor" shall mean any person who comes within any of the following categories, or who the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:

(1)     Any bank as defined in section 3(a)(2) of the Act or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; insurance company as defined in Section 2(13) of the Act; investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000; or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

(2)     Any private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

(3)     Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4)     Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(5)     Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000 (excluding such person's primary residence);

In calculating net worth, you include all of your assets (other than your primary residence) whether liquid or illiquid, such as cash, stock, securities, personal property and real estate based on the fair market value of such property MINUS all debts and liabilities (other than a mortgage or other debt secured by your primary residence).

In the event that the amount of any mortgage or other indebtedness secured by your primary residence exceeds the fair market value of the residence, that excess liability should also be deducted from your net worth. Any mortgage or indebtedness secured by your primary residence incurred within 60 days before the time of the sale of the securities offered hereunder, other than as a result of the acquisition of the primary residence, shall also be deducted from your net worth

(6)     Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(7)     Any trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii); and

(8)     Any entity in which all of the equity owners are accredited investors.

[Remainder omitted]

4

# EXHIBIT D

## IRS FORMS W-8BEN AND W-9

| Form **W-8BEN** | **Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding** | |
|---|---|---|
| (Rev. February 2006) | ► Section references are to the Internal Revenue Code.   ► See separate instructions. | OMB No. 1545-1621 |
| Department of the Treasury Internal Revenue Service | ► Give this form to the withholding agent or payer. Do not send to the IRS. | |

**Do not use this form for:**

Instead, use Form:

- A U.S. citizen or other U.S. person, including a resident alien individual . . . . . . . . . . . . . . . . . . . . . W-9
- A person claiming that income is effectively connected with the conduct of a trade or business in the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . W-8ECI
- A foreign partnership, a foreign simple trust, or a foreign grantor trust (see instructions for exceptions) . . . . . . W-8ECI or W-8IMY
- A foreign government, international organization, foreign central bank of issue, foreign tax-exempt organization, foreign private foundation, or government of a U.S. possession that received effectively connected income or that is claiming the applicability of section(s) 115(2), 501(c), 892, 895, or 1443(b) (see instructions) . . . . . . . . . W-8ECI or W-8EXP

Note: *These entities should use Form W-8BEN if they are claiming treaty benefits or are providing the form only to claim they are a foreign person exempt from backup withholding.*

- A person acting as an intermediary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . W-8IMY

Note: *See instructions for additional exceptions.*

### Part I   Identification of Beneficial Owner (See instructions.)

| 1  Name of individual or organization that is the beneficial owner | 2  Country of incorporation or organization |
|---|---|

3  Type of beneficial owner:   ☐ Individual   ☐ Corporation   ☐ Disregarded entity   ☐ Partnership   ☐ Simple trust
☐ Grantor trust   ☐ Complex trust   ☐ Estate   ☐ Government   ☐ International organization
☐ Central bank of issue   ☐ Tax-exempt organization   ☐ Private foundation

4  Permanent residence address (street, apt. or suite no., or rural route). Do not use a P.O. box or in-care-of address.

| City or town, state or province. Include postal code where appropriate. | Country (do not abbreviate) |
|---|---|

5  Mailing address (if different from above)

| City or town, state or province. Include postal code where appropriate. | Country (do not abbreviate) |
|---|---|

| 6  U.S. taxpayer identification number, if required (see instructions)   ☐ SSN or ITIN   ☐ EIN | 7  Foreign tax identifying number, if any (optional) |
|---|---|

8  Reference number(s) (see instructions)

### Part II   Claim of Tax Treaty Benefits (if applicable)

9  I certify that (check all that apply):

a ☐ The beneficial owner is a resident of ................................................within the meaning of the income tax treaty between the United States and that country.

b ☐ If required, the U.S. taxpayer identification number is stated on line 6 (see instructions).

c ☐ The beneficial owner is not an individual, derives the item (or items) of income for which the treaty benefits are claimed, and, if applicable, meets the requirements of the treaty provision dealing with limitation on benefits (see instructions).

d ☐ The beneficial owner is not an individual, is claiming treaty benefits for dividends received from a foreign corporation or interest from a U.S. trade or business of a foreign corporation, and meets qualified resident status (see instructions).

e ☐ The beneficial owner is related to the person obligated to pay the income within the meaning of section 267(b) or 707(b), and will file Form 8833 if the amount subject to withholding received during a calendar year exceeds, in the aggregate, $500,000.

10  Special rates and conditions (if applicable—see instructions): The beneficial owner is claiming the provisions of Article ...............of the treaty identified on line 9a above to claim a .................% rate of withholding on (specify type of income): ...................................... .

Explain the reasons the beneficial owner meets the terms of the treaty article: ......................................................................

......................................................................

### Part III   Notional Principal Contracts

11 ☐ I have provided or will provide a statement that identifies those notional principal contracts from which the income is not effectively connected with the conduct of a trade or business in the United States. I agree to update this statement as required.

### Part IV   Certification

Under penalties of perjury, I declare that I have examined the information on this form and to the best of my knowledge and belief it is true, correct, and complete. I further certify under penalties of perjury that:

1 I am the beneficial owner (or am authorized to sign for the beneficial owner) of all the income to which this form relates,

2 The beneficial owner is not a U.S. person,

3 The income to which this form relates is (a) not effectively connected with the conduct of a trade or business in the United States, (b) effectively connected but is not subject to tax under an income tax treaty, or (c) the partner's share of a partnership's effectively connected income, and

4 For broker transactions or barter exchanges, the beneficial owner is an exempt foreign person as defined in the instructions.

Furthermore, I authorize this form to be provided to any withholding agent that has control, receipt, or custody of the income of which I am the beneficial owner or any withholding agent that can disburse or make payments of the income of which I am the beneficial owner.

**Sign Here** ►

| Signature of beneficial owner (or individual authorized to sign for beneficial owner) | Date (MM-DD-YYYY) | Capacity in which acting |
|---|---|---|

For Paperwork Reduction Act Notice, see separate instructions.     Cat. No. 25047Z     Form **W-8BEN** (Rev. 2-2006)

Ⓡ Printed on Recycled Paper

| Form **W-9**<br>(Rev. August 2013)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer<br>Identification Number and Certification** | Give Form to the<br>requester. Do not<br>send to the IRS. |
|---|---|---|

**Print or type**
**See Specific Instructions on page 2.**

Name (as shown on your income tax return)

Business name/disregarded entity name, if different from above

Check appropriate box for federal tax classification:
☐ Individual/sole proprietor  ☐ C Corporation  ☐ S Corporation  ☐ Partnership  ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶

☐ Other (see instructions) ▶

Exemptions (see instructions):

Exempt payee code (if any) _____
Exemption from FATCA reporting
code (if any) _____

Address (number, street, and apt. or suite no.)

Requester's name and address (optional)

City, state, and ZIP code

List account number(s) here (optional)

## Part I — Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on the "Name" line to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN on page 3.*

Note. If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number

Employer identification number

## Part II — Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (defined below), and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

**Sign Here**  Signature of U.S. person ▶                        Date ▶

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** The IRS has created a page on IRS.gov for information about Form W-9, at *www.irs.gov/w9*. Information about any future developments affecting Form W-9 (such as legislation enacted after we release it) will be posted on that page.

### Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, payments made to you in settlement of payment card and third party network transactions, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued), or

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the

withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct.

**Note.** If you are a U.S. person and a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien,

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,

• An estate (other than a foreign estate), or

• A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax under section 1446 on any foreign partners' share of effectively connected taxable income from such business. Further, in certain cases where a Form W-9 has not been received, the rules under section 1446 require a partnership to presume that a partner is a foreign person, and pay the section 1446 withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid section 1446 withholding on your share of partnership income.

Cat. No. 10231X                                            Form **W-9** (Rev. 8-2013)

Form W-9 (Rev. 8-2013)

Page **2**

In the cases below, the following person must give Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States:

• In the case of a disregarded entity with a U.S. owner, the U.S. owner of the disregarded entity and not the entity,

• In the case of a grantor trust with a U.S. grantor or other U.S. owner, generally, the U.S. grantor or other U.S. owner of the grantor trust and not the trust, and

• In the case of a U.S. trust (other than a grantor trust), the U.S. trust (other than a grantor trust) and not the beneficiaries of the trust.

**Foreign person.** If you are a foreign person or the U.S. branch of a foreign bank that has elected to be treated as a U.S. person, do not use Form W-9. Instead, use the appropriate Form W-8 or Form 8233 (see Publication 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the payee has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items:

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

**Example.** Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity, give the requester the appropriate completed Form W-8 or Form 8233.

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS a percentage of such payments. This is called "backup withholding." Payments that may be subject to backup withholding include interest, tax-exempt interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, payments made in settlement of payment card and third party network transactions, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1. You do not furnish your TIN to the requester,

2. You do not certify your TIN when required (see the Part II instructions on page 3 for details),

3. The IRS tells the requester that you furnished an incorrect TIN,

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See Exempt payee code on page 3 and the separate Instructions for the Requester of Form W-9 for more information.

Also see Special rules for partnerships on page 1.

**What is FATCA reporting?** The Foreign Account Tax Compliance Act (FATCA) requires a participating foreign financial institution to report all United States account holders that are specified United States persons. Certain payees are exempt from FATCA reporting. See Exemption from FATCA reporting code on page 3 and the Instructions for the Requester of Form W-9 for more information.

## Updating Your Information

You must provide updated information to any person to whom you claimed to be an exempt payee if you are no longer an exempt payee and anticipate receiving reportable payments in the future from this person. For example, you may need to provide updated information if you are a C corporation that elects to be an S corporation, or if you no longer are tax exempt. In addition, you must furnish a new Form W-9 if the name or TIN changes for the account, for example, if the grantor of a grantor trust dies.

## Penalties

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of federal law, the requester may be subject to civil and criminal penalties.

## Specific Instructions

### Name

If you are an individual, you must generally enter the name shown on your income tax return. However, if you have changed your last name, for instance, due to marriage without informing the Social Security Administration of the name change, enter your first name, the last name shown on your social security card, and your new last name.

If the account is in joint names, list first, and then circle, the name of the person or entity whose number you entered in Part I of the form.

**Sole proprietor.** Enter your individual name as shown on your income tax return on the "Name" line. You may enter your business, trade, or "doing business as (DBA)" name on the "Business name/disregarded entity name" line.

**Partnership, C Corporation, or S Corporation.** Enter the entity's name on the "Name" line and any business, trade, or "doing business as (DBA) name" on the "Business name/disregarded entity name" line.

**Disregarded entity.** For U.S. federal tax purposes, an entity that is disregarded as an entity separate from its owner is treated as a "disregarded entity." See Regulation section 301.7701-2(c)(2)(iii). Enter the owner's name on the "Name" line. The name of the entity entered on the "Name" line should never be a disregarded entity. The name on the "Name" line must be the name shown on the income tax return on which the income should be reported. For example, if a foreign LLC that is treated as a disregarded entity for U.S. federal tax purposes has a single owner that is a U.S. person, the U.S. owner's name is required to be provided on the "Name" line. If the direct owner of the entity is also a disregarded entity, enter the first owner that is not disregarded for federal tax purposes. Enter the disregarded entity's name on the "Business name/disregarded entity name" line. If the owner of the disregarded entity is a foreign person, the owner must complete an appropriate Form W-8 instead of a Form W-9. This is the case even if the foreign person has a U.S. TIN.

**Note.** Check the appropriate box for the U.S. federal tax classification of the person whose name is entered on the "Name" line (individual/sole proprietor, Partnership, C Corporation, S Corporation, Trust/estate).

**Limited Liability Company (LLC).** If the person identified on the "Name" line is an LLC, check the "Limited liability company" box only and enter the appropriate code for the U.S. federal tax classification in the space provided. If you are an LLC that is treated as a partnership for U.S. federal tax purposes, enter "P" for partnership. If you are an LLC that has filed a Form 8832 or a Form 2553 to be taxed as a corporation, enter "C" for C corporation or "S" for S corporation, as appropriate. If you are an LLC that is disregarded as an entity separate from its owner under Regulation section 301.7701-3 (except for employment and excise tax), do not check the LLC box unless the owner of the LLC (required to be identified on the "Name" line) is another LLC that is not disregarded for U.S. federal tax purposes. If the LLC is disregarded as an entity separate from its owner, enter the appropriate tax classification of the owner identified on the "Name" line.

**Other entities.** Enter your business name as shown on required U.S. federal tax documents on the "Name" line. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on the "Business name/disregarded entity name" line.

### Exemptions

If you are exempt from backup withholding and/or FATCA reporting, enter in the Exemptions box, any code(s) that may apply to you. See Exempt payee code and Exemption from FATCA reporting code on page 3.

**Exempt payee code.** Generally, individuals (including sole proprietors) are not exempt from backup withholding. Corporations are exempt from backup withholding for certain payments, such as interest and dividends. Corporations are not exempt from backup withholding for payments made in settlement of payment card or third party network transactions.

**Note.** If you are exempt from backup withholding, you should still complete this form to avoid possible erroneous backup withholding.

The following codes identify payees that are exempt from backup withholding:

1—An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2)

2—The United States or any of its agencies or instrumentalities

3—A state, the District of Columbia, a possession of the United States, or any of their political subdivisions or instrumentalities

4—A foreign government or any of its political subdivisions, agencies, or instrumentalities

5—A corporation

6—A dealer in securities or commodities required to register in the United States, the District of Columbia, or a possession of the United States

7—A futures commission merchant registered with the Commodity Futures Trading Commission

8—A real estate investment trust

9—An entity registered at all times during the tax year under the Investment Company Act of 1940

10—A common trust fund operated by a bank under section 584(a)

11—A financial institution

12—A middleman known in the investment community as a nominee or custodian

13—A trust exempt from tax under section 664 or described in section 4947

The following chart shows types of payments that may be exempt from backup withholding. The chart applies to the exempt payees listed above, 1 through 13.

| IF the payment is for . . . | THEN the payment is exempt for . . . |
|---|---|
| Interest and dividend payments | All exempt payees except for 7 |
| Broker transactions | Exempt payees 1 through 4 and 6 through 11 and all C corporations. S corporations must not enter an exempt payee code because they are exempt only for sales of noncovered securities acquired prior to 2012. |
| Barter exchange transactions and patronage dividends | Exempt payees 1 through 4 |
| Payments over $600 required to be reported and direct sales over $5,000¹ | Generally, exempt payees 1 through 5² |
| Payments made in settlement of payment card or third party network transactions | Exempt payees 1 through 4 |

¹ See Form 1099-MISC, Miscellaneous Income, and its instructions.

² However, the following payments made to a corporation and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees, gross proceeds paid to an attorney, and payments for services paid by a federal executive agency.

**Exemption from FATCA reporting code.** The following codes identify payees that are exempt from reporting under FATCA. These codes apply to persons submitting this form for accounts maintained outside of the United States by certain foreign financial institutions. Therefore, if you are only submitting this form for an account you hold in the United States, you may leave this field blank. Consult with the person requesting this form if you are uncertain if the financial institution is subject to these requirements.

A—An organization exempt from tax under section 501(a) or any individual retirement plan as defined in section 7701(a)(37)

B—The United States or any of its agencies or instrumentalities

C—A state, the District of Columbia, a possession of the United States, or any of their political subdivisions or instrumentalities

D—A corporation the stock of which is regularly traded on one or more established securities markets, as described in Reg. section 1.1472-1(c)(1)(i)

E—A corporation that is a member of the same expanded affiliated group as a corporation described in Reg. section 1.1472-1(c)(1)(i)

F—A dealer in securities, commodities, or derivative financial instruments (including notional principal contracts, futures, forwards, and options) that is registered as such under the laws of the United States or any state

G—A real estate investment trust

H—A regulated investment company as defined in section 851 or an entity registered at all times during the tax year under the Investment Company Act of 1940

I—A common trust fund as defined in section 584(a)

J—A bank as defined in section 581

K—A broker

L—A trust exempt from tax under section 664 or described in section 4947(a)(1)

M—A tax exempt trust under a section 403(b) plan or section 457(g) plan

## Part I. Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see *How to get a TIN* below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN. However, the IRS prefers that you use your SSN.

If you are a single-member LLC that is disregarded as an entity separate from its owner (see *Limited Liability Company (LLC)* on page 2), enter the owner's SSN (or EIN, if the owner has one). Do not enter the disregarded entity's EIN. If the LLC is classified as a corporation or partnership, enter the entity's EIN.

**Note.** See the chart on page 4 for further clarification of name and TIN combinations.

**How to get a TIN.** If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local Social Security Administration office or get this form online at *www.ssa.gov*. You may also get this form by calling 1-800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can apply for an EIN online by accessing the IRS website at *www.irs.gov/businesses* and clicking on Employer Identification Number (EIN) under Starting a Business. You can get Forms W-7 and SS-4 from the IRS by visiting IRS.gov or by calling 1-800-TAX-FORM (1-800-829-3676).

If you are asked to complete Form W-9 but do not have a TIN, apply for a TIN and write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

**Note.** Entering "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

**Caution:** *A disregarded U.S. entity that has a foreign owner must use the appropriate Form W-8.*

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if items 1, 4, or 5 below indicate otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). In the case of a disregarded entity, the person identified on the "Name" line must sign. Exempt payees, see *Exempt payee code* earlier.

**Signature requirements.** Complete the certification as indicated in items 1 through 5 below.

**1. Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983.** You must give your correct TIN, but you do not have to sign the certification.

**2. Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983.** You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

**3. Real estate transactions.** You must sign the certification. You may cross out item 2 of the certification.

**4. Other payments.** You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments made in settlement of payment card and third party network transactions, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

**5. Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), IRA, Coverdell ESA, Archer MSA or HSA contributions or distributions, and pension distributions.** You must give your correct TIN, but you do not have to sign the certification.

Form W-9 (Rev. 8-2013)

Page 4

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) | The actual owner of the account or, if combined funds, the first individual on the account [1] |
| 3. Custodian account of a minor (Uniform Gift to Minors Act) | The minor [2] |
| 4. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee [1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner [1] |
| 5. Sole proprietorship or disregarded entity owned by an individual | The owner [3] |
| 6. Grantor trust filing under Optional Form 1099 Filing Method 1 (see Regulation section 1.671-4(b)(2)(i)(A)) | The grantor* |

| For this type of account: | Give name and EIN of: |
|---|---|
| 7. Disregarded entity not owned by an individual | The owner |
| 8. A valid trust, estate, or pension trust | Legal entity [4] |
| 9. Corporation or LLC electing corporate status on Form 8832 or Form 2553 | The corporation |
| 10. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 11. Partnership or multi-member LLC | The partnership |
| 12. A broker or registered nominee | The broker or nominee |
| 13. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |
| 14. Grantor trust filing under the Form 1041 Filing Method or the Optional Form 1099 Filing Method 2 (see Regulation section 1.671-4(b)(2)(i)(B)) | The trust |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name and you may also enter your business or "DBA" name on the "Business name/disregarded entity" name line. You may use either your SSN or EIN (if you have one), but the IRS encourages you to use your SSN.

[4] List first and circle the name of the trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.) Also see Special rules for partnerships on page 1.

*Note. Grantor also must provide a Form W-9 to trustee of trust.

Note. If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## Secure Your Tax Records from Identity Theft

Identity theft occurs when someone uses your personal information such as your name, social security number (SSN), or other identifying information, without your permission, to commit fraud or other crimes. An identity thief may use your SSN to get a job or may file a tax return using your SSN to receive a refund.

To reduce your risk:

• Protect your SSN,

• Ensure your employer is protecting your SSN, and

• Be careful when choosing a tax preparer.

If your tax records are affected by identity theft and you receive a notice from the IRS, respond right away to the name and phone number printed on the IRS notice or letter.

If your tax records are not currently affected by identity theft but you think you are at risk due to a lost or stolen purse or wallet, questionable credit card activity or credit report, contact the IRS Identity Theft Hotline at 1-800-908-4490 or submit Form 14039.

For more information, see Publication 4535, Identity Theft Prevention and Victim Assistance.

Victims of identity theft who are experiencing economic harm or a system problem, or are seeking help in resolving tax problems that have not been resolved through normal channels, may be eligible for Taxpayer Advocate Service (TAS) assistance. You can reach TAS by calling the toll-free case intake line at 1-877-777-4778 or TTY/TDD 1-800-829-4059.

Protect yourself from suspicious emails or phishing schemes. Phishing is the creation and use of email and websites designed to mimic legitimate business emails and websites. The most common act is sending an email to a user falsely claiming to be an established legitimate enterprise in an attempt to scam the user into surrendering private information that will be used for identity theft.

The IRS does not initiate contacts with taxpayers via emails. Also, the IRS does not request personal detailed information through email or ask taxpayers for the PIN numbers, passwords, or similar secret access information for their credit card, bank, or other financial accounts.

If you receive an unsolicited email claiming to be from the IRS, forward this message to phishing@irs.gov. You may also report misuse of the IRS name, logo, or other IRS property to the Treasury Inspector General for Tax Administration at 1-800-366-4484. You can forward suspicious emails to the Federal Trade Commission at: spam@uce.gov or contact them at www.ftc.gov/idtheft or 1-877-IDTHEFT (1-877-438-4338).

Visit IRS.gov to learn more about identity theft and how to reduce your risk.

## Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons (including federal agencies) who are required to file information returns with the IRS to report interest, dividends, or certain other income paid to you; mortgage interest you paid; the acquisition or abandonment of secured property; the cancellation of debt; or contributions you made to an IRA, Archer MSA, or HSA. The person collecting this form uses the information on the form to file information returns with the IRS, reporting the above information. Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation and to cities, states, the District of Columbia, and U.S. commonwealths and possessions for use in administering their laws. The information also may be disclosed to other countries under a treaty, to federal and state agencies to enforce civil and criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism. You must provide your TIN whether or not you are required to file a tax return. Under section 3406, payers must generally withhold a percentage of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to the payer. Certain penalties may also apply for providing false or fraudulent information.

# EXHIBIT E

## FORM OF PROMISSORY NOTE

## PROMISSORY NOTE
### (Beach Orangethorpe Hotel)

$10,000,000.00                                     Lynwood, California

_____, 2014

FOR VALUE RECEIVED, THE SOURCE HOTEL, LLC, a California limited liability company ("**Borrower**"), hereby unconditionally promises to pay to the order of BEACH ORANGETHORPE HOTEL, LLC, a California limited liability company (together with any successors in trust or subsequent holder of this Promissory Note ("**Note**"), and their respective successors and assigns, "**Holder**"), without any counterclaim, setoff or deduction whatsoever, at such place or to such other parties as the holder of this Note may from time to time designate in writing, the aggregate unpaid principal amount of all advances made by Holder to Borrower in accordance with the terms and conditions of the Loan Agreement between Borrower and Holder, of even date herewith (as amended from time to time, the "**Loan Agreement**"), up to a maximum principal amount of TEN MILLION DOLLARS ($10,000,000.00) ("**Principal Sum**"), together with interest thereon as set forth below, on the Maturity Date, hereafter defined, in lawful money of the United States of America, which shall at the time of payment be legal tender in payment of all debts and dues, public and private.

1.    Rate of Interest. Interest shall accrue on the unpaid principal balance from the date of this Note at a per annum, simple (non-compounded) interest rate of one percent (1%) (the "**Note Rate**"). Interest shall be calculated and applied on the basis of a 360-day year consisting of twelve 30-day months, and paid for the actual number of days elapsed for any whole or partial month in which interest is being calculated.

2.    Payment. Borrower promises and agrees to pay the principal amount and unpaid accrued interest thereon on or prior to the date which is five (5) years after the Loan Closing (as defined in the Loan Agreement) (the "**Maturity Date**") or such earlier date on which amounts payable under this Note may become due pursuant to Section _____ of the Loan Agreement.

3.    Prepayment. Borrower shall have the right to pay, without penalty or premium, all or any portion of the outstanding principal amount of this Note prior to the Maturity Date at any time after each investor member of Holder has received notice from the United States Citizenship and Immigration Services regarding the final approval or disapproval of such individual's respective EB-5 immigrant investor petition or has otherwise become disqualified from participating from the EB-5 immigrant investor program or withdrawn their petition under the EB-5 immigrant investor program, whether voluntarily or involuntarily. If any one or more investor member(s) of Holder has not received such notice, Borrower shall have the right to pay, without penalty or premium, a portion of the outstanding principal amount of this Note prior to the Maturity Date, provided that the amount so paid does not cause the outstanding principal amount of this Note to be less than the aggregate amount of funds invested by any investor member(s) of Holder who has not received such notice.

*LA 131007826v2*

1

4.   Security. This Note is secured by, among other things, that certain Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing (hereinafter referred to as the **"Deed of Trust"**) given by Borrower for the benefit of Holder, constituting a lien on Borrower's fee interest in certain real estate and a security interest in personal property, in the County of Orange, State of California subordinated to the lien given by Borrower for up to $25 million in initial construction financing for the hotel facilities.

5.   Collection and Enforcement Costs. Borrower, upon demand, shall pay Holder for all costs and expenses, including without limitation reasonable attorneys' fees, paid or incurred by Holder in connection with the collection of any sum due hereunder, or in connection with enforcement of any of Holder's rights or Borrower's obligations under this Note, the Deed of Trust, or any of the other Loan Documents (hereinafter defined) resulting from a default by Holder.

6.   Continuing Liability. The obligation of Borrower to pay the outstanding Principal Sum on the Note, interest and all other sums due hereunder shall continue in full force and effect and in no way be impaired, until the actual payment thereof to Holder, or in case of any agreement given to secure the payment of this Note, or in case of any agreement or stipulation extending the time or modifying the terms of payment above recited, Borrower shall nevertheless continue to be liable on this Note, as extended or modified by any such agreement or stipulation, unless released and discharged in writing by Holder.

7.   Waiver. The acceptance by the holder of any payment under this Note after the date that such payment is due shall not constitute a waiver of the right to require prompt payment when due of future or succeeding payments or to declare a default as herein provided for any failure to so pay. The acceptance by Holder of the payment of a portion of any payment at any time that such payment is due and payable in its entirety shall neither cure nor excuse the default caused by failure to pay the whole of such payment and shall not constitute a waiver of the holder's right to require full payment when due of all future or succeeding installments.

8.   Method of Payment. All payments made on this Note shall be made without setoff or counterclaim in lawful money of the United States of America in either immediately available or next day available funds, free and clear of and without deduction for any taxes, fees or other charges of any nature whatsoever.

9.   Default. Upon the occurrence of any Event of Default (as defined in the Loan Agreement), Holder, at its election, may declare the entire balance of principal and interest thereon immediately due and payable, together with all costs of collection, including, but not limited to, reasonable attorneys' fees and all expenses incurred in connection with protection of, or realization on, the principal balance.

10.   Notice. Any notice, payment, demand, or other communication required or permitted to be given by any provision of this Note shall be in writing and shall be deemed to have been delivered and given for all purposes if delivered personally or by courier to the party to whom the notice is directed, or if sent by registered or certified mail, return receipt requested, applicable postage and charges prepaid, addressed to Borrower at Borrower's address appearing

below, or to such other address as such party may from time to time specify by written notice to all other parties. Any such notice shall be deemed given when received by the person to be notified to the extent that the other provisions hereof provide that notice is given upon such receipt. In all other cases, such notice shall be deemed given when delivered if delivered personally, or as of forty-eight (48) hours after the date when the same was deposited in a regularly maintained receptacle for the deposit of the United States Mail, addressed and sent as aforesaid, and upon receipt by or for the notified party if sent by courier.

11.     Entire Agreement. This Note, together with the Loan Agreement, the Deed of Trust, the Guaranty, and all other documents pertaining to the loan executed contemporaneously herewith (collectively the "**Loan Documents**"), constitutes the parties' entire agreement with respect to the subject matter hereof and supersedes all agreements, representations, warranties, statements, promises, and understandings, whether oral or written, with respect to the subject matter herewith.

12.     No Oral Changes; Waivers.

(a)     This Note may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of a change is sought. The provisions of this Note shall extend and be applicable to all renewals, amendments, extensions, consolidations, and modifications of the other Loan Documents, and any and all references herein to the Loan Documents shall be deemed to include any such renewals, amendments, extensions, consolidations, or modifications thereof.

(b)     Borrower and any future endorsers, sureties, and guarantors hereof, jointly and severally, waive presentment for payment, demand, notice of nonpayment, notice of dishonor, protest of any dishonor, notice of protest, and protest of this Note, and all other notices in connection with the delivery, acceptance, performance, default (except notice of default required hereby, if any), or enforcement of the payment of this Note, and they agree that the liability of each of them shall be unconditional without regard to the liability of any other party and shall not be in any manner affected by an indulgence, extension of time, renewal, waiver, or modification granted or consented to by the Holder; and Borrower and all future endorsers, sureties and guarantors hereof consent to any and all extensions of time, renewals, waivers, or modifications that may be granted by the Holder hereof with respect to the payment or other provisions of this Note, and to the release of the collateral, or any part thereof, with or without substitution, and agree that additional makers, endorsers, guarantors, or sureties may become parties hereto without notice to them or affecting their liability hereunder.

(c)     Holder shall not by any act of omission or commission be deemed to waive any of its rights or remedies hereunder unless such waiver be in writing and signed by Holder, and then only to the extent specifically set forth therein; a waiver on one event shall not be construed as continuing or as a bar to or waiver of such right or remedy on a subsequent event. The acceptance by Holder of payment hereunder that is less than payment in full of all amounts due at the time of such payment shall not without the express written consent of Holder: (i) constitute a waiver of the right to exercise any of

Holder's remedies at that time or at any subsequent time, (ii) constitute an accord and satisfaction, or (iii) nullify any prior exercise of any remedy.

(d)     To the maximum extent permitted by law, Borrower hereby waives and renounces for itself, its heirs, successors and assigns, all rights to the benefits of any statute of limitations and any moratorium, reinstatement, marshalling, forbearance, valuation, stay, extension, redemption, appraisement, exemption now provided, or which may hereafter be provided, by the Constitution and laws of the United States of America and of any state thereof, both as to itself and in and to all of its property, real and personal, against the enforcement and collection of the obligations evidenced by this Note.

13.     As Illegality or Invalidity.  If any provision of this Note or the application hereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, neither the remainder of this Note nor the application of such provision to any other person or circumstance shall be affected thereby, but rather the same shall be enforced to the greatest extent permitted by law.

14.     Assumption.  This Note is not assumable without the express prior written consent of Holder.

15.     Choice of Law.  This Note, the rights of the parties hereunder, and any documents, instruments or agreements mentioned or referred to herein shall be governed by and construed according to the laws of the State of California without reference to conflict of laws doctrines. The parties hereto acknowledge that such courts have the jurisdiction to interpret and enforce the provisions of this Note, and the parties waive any and all objections that they may have.

16.     Severability.  Every provision hereof is intended to be several.  If any provision of this Note is determined by a court of competent jurisdiction to be illegal, invalid or unenforceable, such illegality, invalidity or unenforceability shall not affect the other provisions hereof, which shall remain binding and enforceable.

17.     Presentment.  Borrower does hereby severally waive presentment, demand, protest and notice of protest, dishonor and nonpayment; expressly consents to the extension of time for the performance of any obligation hereunder and the release of any party liable for the obligation. The release of any party liable hereon shall not operate to release any other party liable hereon.

*[signature page follows]*

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the day and year first above written.

BORROWER:

THE SOURCE HOTEL, LLC,
a California limited liability company

By: _____
Name: _____
Title: _____

Borrower's Address:

3100 E. Imperial Highway
Lynwood, California 90262
Telephone: (310) 631-6789
Fax: (310) 631-1645

# EXHIBIT F

## FORM OF GUARANTY

## GUARANTY
## (BEACH ORANGETHORPE HOTEL)

On this day, _____, the undersigned, MIN SEOK CHAE, an individual, and DONALD CHAE, an individual, (each a "**Guarantor**", and collectively, "**Guarantors**"), at the solicitation of THE SOURCE HOTEL, LLC, a California limited liability company ("**Borrower**"), requests for BEACH ORANGETHORPE HOTEL, LLC, a California limited liability company (herein called "**Lender**"), to extend a loan in an amount up to TEN MILLION DOLLARS ($10,000,000.00) (the "**Loan**") to Borrower evidenced by a certain Promissory Note of even date herewith (the "**Note**") which is secured by, among other things, a Deed of Trust, Security Agreement and Fixture Filing (the "**Deed of Trust**") from Borrower for the benefit of Lender, encumbering that certain real property situated in the County of Orange, State of California, as more particularly described in the Deed of Trust, together with the buildings, structures and other improvements now or hereafter located thereon (said real property, buildings, structures and other improvements together with all other properties, rights and interests now or at any time hereafter securing the payment of the Note being hereinafter collectively referred to as the "**Property**"), and by other documents and instruments (the Note, the Deed of Trust and such other documents, agreements, and instruments, as the same may from time to time be amended, consolidated, renewed or replaced, being collectively referred to herein as the "**Loan Documents**"). In order to induce Lender to extend the loan to Borrower, and in consideration of the loan heretofore, now or hereafter granted to Borrower by Lender, Guarantor agrees as follows:

1.      The term "**Indebtedness**" as used throughout this Guaranty ("**Guaranty**") means and includes, without limitation, the Loan, and any and all loans, advances, debts, obligations and liabilities of any kind or nature owed by Borrower to Lender, heretofore, now, or hereafter made, incurred or created, which arise from the Loan Documents, whether due or not due, absolute or contingent, determined or undetermined, secured or unsecured, whether on original, renewed, extended or revised terms (including, without limitation, those evidenced by new or additional instruments or agreements), whether principal, interest, fees, or expenses, whether Borrower may be liable individually or jointly with others, whether recovery upon such indebtedness may be or hereafter becomes barred by any statute of limitations, and whether such indebtedness may be or hereafter becomes invalid or otherwise unenforceable.  In the event a petition under the United States Bankruptcy Code is filed by or against Borrower, the term "Borrower" shall also mean and include Borrower in its status as a debtor, debtor-in-possession and/or reorganized debtor under the United States Bankruptcy Code.

2.      (a) If there is more than a single entity or person included in the terms "Guarantor" or "Borrower," respectively, each reference herein to such terms shall mean any and all, and one or more of such entities and persons both jointly and severally, and (b) if more than one person or entity executes this Guaranty, the obligations and liabilities hereunder of Guarantors are and shall be both joint and several.  If Borrower is a corporation, partnership, limited liability company or association, each reference herein to the term "Borrower" shall include any successor entity to Borrower.  As used in this Guaranty, neuter terms include the masculine and feminine, and vice versa.

3.     Guarantor's liability hereunder shall be unlimited. N otwithstanding the foregoing, Lender, at its discretion, may allow the loan to exceed Guarantor's liability hereunder. A ny payment by Guarantor shall reduce the obligation of Guarantor hereunder. A ny payment received by Lender from Borrower, from any other person or from proceeds of collateral granted by Borrower or any other person shall reduce Guarantor's liability hereunder.

4.     Guarantor unconditionally guarantees and agrees to pay to Lender, in lawful money of the United States of America, an amount equal to the shortfall amount of the Indebtedness, such amount to be the amount, if any, remaining unpaid after Lender has exhausted any and all remedies and proceedings against Borrower, and all such recoveries are first applied to satisfy or discharge the Indebtedness. Except as expressly provided in Section 5, this Guaranty is limited to a guaranty of collection. Any and all payments received by Lender from Borrower or any other person or from proceeds of collateral granted by Borrower or any other person shall reduce Guarantor's liability hereunder.

5.     Guarantor, hereby unconditionally and irrevocably guarantees to Lender: (A) The complete and timely payment to Lender of all damages resulting from any of the following: (1) fraudulent acts or omissions of the Borrower or its partners, officers, directors or agents, (2) the application in violation of the terms of the Loan Documents of any insurance proceeds, condemnation awards, tenant security deposits or tenant tax or insurance deposits, or of any rental or other income which was required by the Loan Documents to be paid or applied in a specified manner, arising, in any such case, with respect to the Property (which violation is not cured in accordance with the terms of the Loan Documents), (3) willful material misrepresentations by Borrower in any of the Loan Documents, (4) physical waste of the Property, (5) the use of Loan proceeds in a manner which violates the terms of the Loan Agreement, and (6) application of rent and security deposits and any net operating income following an Event of Default under any of the Loan Documents in violation of the terms of the Loan Documents; and (B) all obligations of Borrower under the Loan Documents in the event of: (1) a voluntary bankruptcy, or insolvency proceeding against Borrower, or (2) an involuntary bankruptcy, or insolvency proceeding brought against Borrower, if Borrower, Guarantor, or any entity affiliated with them acted in concert with any other party to induce or support the filing of such bankruptcy or insolvency proceedings. Lender shall not be required to exhaust any remedies against Borrower prior to the enforcement of Guarantor's obligations under this Section 5.

6. Guarantor authorizes Lender at its sole discretion, with or without notice, and without affecting Guarantor's liability hereunder, from time to time to (a) change the time or manner of payment of any Loan by modification, renewal, extension, acceleration or otherwise, (b) amend or change any other provision of any Loan including the rate of interest thereon, (c) accept partial payment on a ny Loan, (d) accept new or additional instruments, agreements or documents relative to any Loan, (e) release, substitute or add one or more endorsers, cosigners or guarantors for any Loan, (f) enter into forbearances with Borrower even though the result of such forbearance is to increase the amount of accrued and unpaid interest, cost, fees and/or expenses attributable to the Loan, (g)

*LA 131007799v1*

2

amend or modify the terms of any guaranty executed by a co-guarantor, including the maximum liability thereunder, (h) obtain collateral for the payment of any Loan and/or any guaranty thereof, (i) waive, release, exchange, substitute, or modify, in whole or in part, existing, after-acquired or later acquired collateral securing payment of the Loan or any guaranty therefor on such terms as Lender at its sole discretion shall determine, (j) subordinate payment of all or any part of the Loan to other creditors of Borrower or other persons on such terms as Lender deems appropriate, (k) apply any sums received from Borrower, any other guarantor, endorser or cosigner or from the sale or collection of collateral or its proceeds to any indebtedness whatsoever in any order and regardless of whether or not such indebtedness is guaranteed hereby, is secured by collateral, or is due and payable, (l) without limiting the foregoing, apply any sums received from Guarantor or from the sale of collateral granted by Guarantor to any, all, or any portion of the Loan in any order regardless of whether or not the Loan is secured by collateral or is due and payable, and (m) exercise any right or remedy it may have with respect to any Loan or any collateral securing any Loan, this Guaranty or any other guaranty, including, without limitation, bidding and purchasing at any sale of any such collateral, and compromising, collecting or otherwise liquidating any collateral or any Loan.

7.      Guarantor and Lender acknowledge that Guarantor may have certain rights under applicable law which might provide Guarantor with defenses against Guarantors' liability under this Guaranty. A mong those rights, are certain rights of subrogation, reimbursement, indemnification and contribution, and rights provided in sections 2787 to 2855, inclusive, of the California Civil Code.

8.      Guarantor also waives all rights and defenses that Guarantor may have because the Borrower's debt is secured by real property. This means that if Lender forecloses on any real property collateral pledged by the Borrower: (A) The amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, (B) Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower. This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because Borrower's debt is secured by real property. These rights and defenses include, but are not limited to, any rights or defenses directly or indirectly based upon Section 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.

9.      Guarantor also waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against the principal by the operation of Section 580d of the California Code of Civil Procedure or otherwise.

10.     Guarantor waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of acceptance, notices of the existence, creation or increase of any new or additional credit, notice of sale in regard to judicial or non-judicial foreclosure of real or personal property collateral

and all other notices and demands of any kind or nature whatsoever except as expressly set forth herein.

11.     Notwithstanding any foreclosure of the lien of any security agreements, deeds of trust, mortgages or other security instruments, with respect to the Indebtedness or any other guaranty, whether by the exercise of the power of sale contained therein, by any action for judicial foreclosure, or by any acceptance of a deed or other transfer in lieu of foreclosure, whether or not such method of foreclosure or transfer in lieu of foreclosure was for a consideration equal to or greater than the fair market value of the security property, Guarantor shall remain bound unde r this Guaranty for the obligations of Borrower to Lender and shall be liable to Lender for any and all of the Indebtedness remaining unpaid after any such foreclosure and exhaustion of all of Lender's remedies against Borrower; provided, however, that if prior to the Loan Closing (as defined in the Loan Documents) an Event of Default has occurred and is then continuing under the Loan Documents, Lender shall not be required to exhaust any and all remedies against Borrower prior to proceeding against Guarantor.

12.     Guarantor represents and warrants to Lender that: ( a) Lender has made no representation to Guarantor in regard to Borrower, the Indebtedness or any matters pertaining thereto, upon which Guarantor is relying in giving this Guaranty; and (b) Guarantor assumes the responsibility for being and keeping informed of the financial condition of Borrower and of all other circumstances bearing upon the risk of nonpayment of the credit which diligent inquiry would reveal, and Lender shall have no duty to advise Guarantor of information known to Lender regarding such condition or any such circumstance.

13.     In addition to all liens upon and rights of setoff against monies, securities or other property of Guarantor given to Lender by law or otherwise as security for this Guaranty, Guarantor hereby pledges to Lender and grants to Lender a security interest in, and Lender shall have a right of setoff against, all monies, securities and other property of Guarantor now or hereafter in the possession of or on deposit with Lender, whether held in a general or special account or deposit or for safekeeping or otherwise; and each such security interest or right of setoff may be enforced or exercised without demand upon, or notice to, Guarantor. No action or lack of action by Lender with respect to any security interest or right of setoff or otherwise shall be deemed a waiver thereof, and every right of setoff or security interest or otherwise shall continue in full force and effect until specifically released by Lender in writing. The security interests created hereby shall secure all of Guarantor's obligations to Lender under this Guaranty or any subsequent guaranty executed by Guarantor.

14.     Any and all indebtedness of Borrower now or hereafter owed to Guarantor and all claims of Guarantor against Borrower, whenever arising, are hereby subordinated to the Indebtedness and assigned to Lender as additional collateral. If Lender so requests, any note or other instrument evidencing such indebtedness and all claims of Guarantor against Borrower shall be delivered to Lender, and such indebtedness and all claims of Guarantor against Borrower shall be collected, enforced and received by Guarantor as trustee for Lender and be paid over to Lender on account of the Indebtedness but without

*LA 131007799v1*

4

reducing or affecting in any manner the liability of Guarantor hereunder. S hould Guarantor fail to collect proceeds of debt owed to it by Borrower and pay the proceeds to Lender, Lender, as Guarantor's attorney-in-fact may do such acts and sign such documents in Guarantor's name as Lender considers necessary, at its discretion, to effect such collection, and Guarantor hereby irrevocably appoints Lender as Guarantor's attorney-in-fact for such purposes. If Borrower is a corporation, limited liability company or partnership, Guarantor will not withdraw or accept, without Lender's prior written consent, any return of any capital invested or equity interest in Borrower in the event (a) Borrower is in default under the Loan Documents, (b) the withdrawal or distribution would create a default under the Loan Documents, or (c) Guarantor is in default under this Guaranty.

15.     Guarantor agrees that to the extent Borrower makes a payment or payments or is credited for any payment or payments made for the account of or on behalf of Borrower to Lender, which payment or payments, or any part thereof, are subsequently invalidated, determined to be fraudulent or preferential, voided, set aside and/or required to be repaid to any trustee, receiver, assignee or any other party whether under any Bankruptcy, State or Federal Law, common law or equitable cause or otherwise, then to the extent thereof, the obligation or part thereof intended to be satisfied thereby, together with the guaranty thereof hereunder, shall be revived, reinstated and continued in full force and effect as if said payment or payments had not originally been made by or for the account of or on behalf of Borrower.

16.     Guarantor agrees that to the extent Guarantor makes a payment or payments or is credited for any payment or payments made for the account of or on behalf of Guarantor to Lender, which payment or payments, or any part thereof, are subsequently invalidated, determined to be fraudulent or preferential, voided, set aside and/or required to be repaid to any trustee, receiver, assignee or any other party whether under any Bankruptcy, State or Federal Law, common law or equitable cause or otherwise, then to the extent thereof, the obligation or part thereof intended to be satisfied thereby, shall be revived, reinstated and continued in full force and effect as if said payment or payments had not originally been made by or for the account of or on behalf of Guarantor.

17.     This Guaranty is not made in consideration of the liability of any other guarantor or surety of the Indebtedness. The release or death of any guarantor of the Indebtedness or the revocation of any guaranty shall not release or otherwise affect the liability of any other non-revoking guarantor.

18.     To the maximum extent permitted by law and so long as Lender has pursued any and all remedies and proceedings against the Borrower and all such recoveries are first applied to satisfy or discharge the Indebtedness, Guarantor specifically waives the benefit of the statute of limitations affecting its liability hereunder or the enforcement hereof, or the collection of any Indebtedness, including, without limiting the foregoing, any and all special statutes of limitations arising out of California Code of Civil Procedure sections 580a or 726(b). Any partial payment by Borrower which operates to toll any statute of limitations as to Borrower shall likewise toll the statute of limitations as to Guarantor.

19.   Any married person who signs this Guaranty expressly agrees that recourse may be had against his/her separate property as well as all community property over which that person has a power of management and control, for all of his/her obligations hereunder.

20.   Should any one or more provisions of this Guaranty be determined to be illegal or unenforceable, all other provisions shall remain effective.

21.   Lender may, with or without notice, assign this Guaranty in whole or in part. This Guaranty shall inure to the benefit of Lender, its successors and assigns, and shall bind Guarantor and Guarantor's heirs, executors, administrators, representatives, successors and assigns.

22.   Guarantor warrants and represents to Lender that:

(a)   All financial statements and other financial information furnished or to be furnished to Lender by Guarantor are or will to their actual knowledge be true and correct and to their actual knowledge do and will fairly represent the financial condition of Guarantor (including all contingent liabilities) as of the dates thereof; and

(b)   To Guarantor's actual knowledge, there has been no material adverse change in Guarantor's financial condition since the dates of the financial statements and other information furnished to Lender, except as previously disclosed to Lender in writing.

23.   Lender may declare Guarantor in default under this Guaranty upon the occurrence of any of the following events:

(a)   Guarantor fails to pay or perform any of Guarantor's obligations under this Guaranty; or

(b)   Any representation or warranty made or given by Guarantor to Lender in this Guaranty proves to be false or misleading in any material respect; or

(c)   A petition or action for relief shall be filed by or against Guarantor, pursuant to the Federal Bankruptcy Code (Title 11, U.S. Codes) in effect from time to time, or under any other law relating to bankruptcy, insolvency, reorganization, moratorium, creditor composition, arrangement or other relief from debts; the appointment of a receiver, trustee, custodian or liquidator of or for any property of Guarantor; or upon the death, incapacity, insolvency, dissolution, or termination of the business of Guarantor; or

(d)   Guarantor revokes or attempts to revoke this Guaranty.

24.   If Borrower is a corporation, limited liability company or partnership, Lender need not inquire into the power of Borrower or the authority of its officers, directors, partners, agents, members or managers acting or purporting to act in its behalf, and any

Indebtedness granted in reliance upon the purported exercise of such power or authority is guaranteed hereunder.

25.     Guarantor understands and agrees that Lender's acceptance of this Guaranty shall not constitute a commitment of any nature whatsoever by Lender to extend, renew or hereafter extend credit to Borrower. G uarantor agrees that this Guaranty shall be effective with or without notice from Lender of its acceptance of this Guaranty.

26.     If Guarantor has executed more than one Guaranty of any or all indebtedness of Borrower owed to Lender, any limits of liability thereunder and hereunder shall be cumulative. The parties further agree that any subsequent guaranty hereafter executed by any Guarantor for a construction loan on t he Property (including any or all advances made or to be made upon the construction loan) ("**Construction Guaranty**") shall be prior to this Guaranty, and this Guaranty shall be subordinate and subject to the Construction Guaranty.

27.     Guarantor waives all rights to interpose any setoffs or counterclaims of any nature in any action or proceeding instituted by Lender with respect to this Guaranty, the collateral therefor, or any matter arising therefrom or relating thereto and the posting of any bond which may otherwise be required, and waives any and all benefits of cross-demands pursuant to section 431.70 of the California Code of Civil Procedure.

28.     Guarantor and Lender each hereby irrevocably submits and consents to the jurisdiction of any federal or state court of competent jurisdiction within California in connection with any action or proceeding arising out of or relating to this Guaranty. In any such litigation, Guarantor and Lender each consents to service of process by any means authorized by California or federal law or as otherwise agreed in writing between Lender and Guarantor.

29.     All rights, remedies, powers and benefits granted to Lender under this Guaranty, the Indebtedness, any oral or other written agreement or applicable law whether expressly granted or implied in law or otherwise, are cumulative and not exclusive, and are enforceable alternatively, successively, or concurrently on any one or more occasions at Lender's discretion.

30.     Lender shall not, by any act, delay, omission or otherwise be deemed to have expressly or impliedly waived any security interest granted to Lender hereunder or Lender's rights, powers and/or remedies hereunder (including any right of setoff) unless such waiver shall be in writing and signed by an authorized officer of Lender. Any such waiver shall be enforceable only to the extent specifically set forth therein. A waiver by Lender of any default, right, power and/or remedy on any one occasion shall not be construed as a bar to or waiver of any such default, right, power and/or remedy which Lender would otherwise have on a ny future occasion whether similar in kind or otherwise.

31.     Neither this Guaranty nor any related agreement, document or instrument nor any provision hereof or thereof shall be amended, modified or discharged orally or by course

of conduct, but only by a written agreement signed by an authorized officer of Lender expressly referring to this Guaranty and to the provisions so amended, modified or discharged.

32. The provisions of this Guaranty shall be construed and interpreted and all rights and obligations hereunder determined in accordance with the laws of the State of California.

33. GUARANTOR ACKNOWLEDGES THAT LENDER HAS OR MAY IN THE FUTURE EXTEND INDEBTEDNESS TO BORROWER IN RELIANCE ON GUARANTOR'S UNCONDITIONAL PROMISE TO REPAY ANY AND ALL INDEBTEDNESS AND LENDER IS RELYING ON THE WAIVERS, WARRANTIES AND PROMISES MADE BY GUARANTOR IN THIS GUARANTY. GUARANTOR AGREES THAT EACH OF THE WAIVERS, WARRANTIES AND PROMISES SET FORTH IN THIS GUARANTY ARE MADE WITH GUARANTOR'S UNDERSTANDING OF THEIR SIGNIFICANCE AND C ONSEQUENCES AND THAT THEY ARE REASONABLE. IF ANY WAIVERS, WARRANTIES AND PROMISES ARE DETERMINED TO BE CONTRARY TO ANY APPLICABLE LAW OR PUBLIC POLICY, SUCH WAIVERS, WARRANTIES AND PROMISES SHALL BE EFFECTIVE TO THE MAXIMUM EXTENT PERMITTED BY LAW. B EFORE SIGNING THE GUARANTY, GUARANTOR HAS EITHER SOUGHT THE ADVICE OF COUNSEL TO EXPLAIN THE WAIVERS OF ITS RIGHTS AND DEFENSES AS STATED HEREIN AND THE EFFECT THEREOF, OR HAS HAD T HE OPPORTUNITY TO SEEK SUCH COUNSEL.

34. GUARANTOR ACKNOWLEDGES THAT NEITHER LENDER NOR ANY OF LENDER'S OFFICERS OR EMPLOYEES HAS MADE ANY P ROMISE OR REPRESENTATION, NOT INCORPORATED HEREIN, WHETHER ORAL, WRITTEN OR IMPLIED, TO CAUSE GUARANTOR TO SIGN THIS GUARANTY. GUARANTOR IS NOT SIGNING THIS GUARANTY IN RELIANCE ON ANY PROMISE, CONDITION OR THE ANTICIPATION OF THE OCCURRENCE OF ANY EVENT, AND THERE ARE NO OR AL UNDERSTANDINGS, STATEMENTS OR AGREEMENTS WHICH HAVE NOT BEEN INCLUDED IN THIS GUARANTY. GUARANTOR UNDERSTANDS THAT LENDER HAS THE RIGHT TO ENFORCE PAYMENT OF THE INDEBTEDNESS AGAINST BORROWER OR GUARANTOR IN ANY ORDER AND LENDER IS NOT OBLIGATED TO OBTAIN ANY OTHER OR ADDITIONAL GUARANTORS OF THE INDEBTEDNESS OR TO TAKE ANY OTHER COURSE OF ACTION.

35. This Guaranty constitutes the entire agreement between the parties with respect to the subject matter of this Guaranty, and any and all previous or contemporaneous correspondence, statements, or agreements by or between the parties hereto with respect to the subject matter of this Guaranty (but not previous or other guarantees given to Lender by Guarantor) are superseded hereby. This Guaranty may be modified only by a written instrument signed by the parties hereto.

*[signature page follows]*

*LA 131007799v1*

8

IN WITNESS WHEREOF, each Guarantor has executed this Continuing Guaranty as of the date first written above.

GUARANTORS:

_____
MIN SEOK CHAE, an individual

_____
DONALD CHAE, an individual