## EXHIBIT 2

**EVERTRUST LOAN AGREEMENT**

Loan No. 3215011734

## CONSTRUCTION LOAN AGREEMENT

This Construction Loan Agreement (the "Agreement") is made as of May 24, 2016, by and between THE SOURCE HOTEL, LLC, a California limited liability company ("Borrower"), and EVERTRUST BANK, a California banking corporation ("Lender"), with respect to the following facts:

RECITALS

A.     Borrower has applied to Lender for a loan in the maximum principal amount of Twenty Nine Million Five Hundred Thousand and No/100 Dollars ($29,500,000.00) ("Loan") for (i) the purposes of financing, in part, the construction of a portion of a 174-room, seven (7) story hotel building to be located on the Property (as hereinafter defined), and (ii) those purposes expressly set forth herein.

B.     Lender has agreed to make the Loan to Borrower for such purpose upon the terms and conditions set forth herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

ARTICLE I.<br>DEFINITIONS

1.     The definitions set forth in the Recitals or elsewhere in this Agreement are incorporated herein by reference.

For purposes of this Agreement, the following terms shall have the following meanings:

"Advance" shall mean any advance or disbursement of Construction Loan Proceeds by Lender pursuant to this Agreement.

"Advance Date" shall mean the date of each Advance.

"Affiliate" shall mean any Person, directly or indirectly, related to, in control of, controlled by, or under the common control of, Borrower, or of a successor thereof, whether through merger, consolidation, transfer of assets or otherwise.

"Agreement" shall mean this Construction Loan Agreement, as originally executed and as it may from time to time be supplemented, extended, renewed, modified, or amended.

"Agreement To Furnish Insurance" shall mean the Agreement To Furnish Insurance duly executed by Borrower in form and content as required by Lender.

"Anti-Money Laundering Laws" shall mean the USA Patriot Act of 2001, the Bank Secrecy Act, as amended through the date hereof, Executive Order 1 3324—Blocking Property and

Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, as amended through the date hereof, and other federal laws and regulations and executive orders administered by OFAC which prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals (such individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanction and embargo programs), and such additional laws and programs administered by OFAC which prohibit dealing with individuals or entities in certain countries regardless of whether such individuals or entities appear on any of the OFAC lists.

"Application for Payment" shall mean a written application in form satisfactory to Lender requesting an Advance of Construction Loan Proceeds, together with a certificate signed by Borrower, Fund Control and Contractor certifying, in regard to the Improvements completed at the time, inter alia, (a) that each Subcontractor or other Person specified in the Application for Payment has satisfactorily completed the work or furnished the materials for which payment is requested, in accordance with the applicable contract; (b) that all work for which an Application for Payment is made conforms to the Contract Documents and any approved changes, and is in place; (c) that each Subcontractor or other Person specified in the Application for Payment has been paid in full for the work performed or materials provided (together with evidence of such payment, including, without limitation, cancelled checks) or will be paid in full from the Construction Loan Proceeds; (d) if any Subcontractors or other Persons specified in the Application for Payment have not already been paid in full, the identity of each such Subcontractor or other Person for the work performed and materials supplied and the amount to be paid to each such Subcontractor or other Person, along with copies of any applicable invoices and evidence of any partial payment thereon; (e) that sufficient funds remain of the Undisbursed Project Funds to complete the Project; and (f) that all funds previously disbursed have been applied in accordance with previous Applications for Payment.

"Appraisal" shall mean an appraisal of the Project, as reviewed, adjusted and approved by Lender, performed and prepared for Lender at Borrower's sole expense by a duly licensed or certified appraiser designated by Lender and possessing all qualifications required by Lender and applicable Laws, setting forth the appraiser's opinion and determination of the fair market value of the Property before construction of the Improvements and the fair market value of the Project as though all Improvements thereon have been completed in full and timely compliance with this Agreement; said Appraisal shall be prepared in full narrative form meeting all requirements and approaches to value as shall be necessary or appropriate in order to comply with all customary and generally accepted appraisal standards within the appraisal industry and in accordance with Lender's requirements, and to Lender's satisfaction and all applicable Laws governing Lender's operations.

"Approved Costs" shall mean third party expenses in regard to the Project, including, without limitation, the cost of construction, FF&E (excluding leased items), fixed asset supplies, interest during construction, Loan Closing Costs, and other expenses described in this Agreement.

"Approved Lease" shall mean a lease between Borrower and any tenant for all or any portion of the Property, which lease is (a) substantially in a form pre-approved by Lender, the terms of which are satisfactory to Lender, and which tenant is satisfactory to Lender, all in Lender's reasonable discretion, or (b) for premises having a floor area not exceeding 5,000 square feet.

2

"Architect" shall mean Gene Fong Associates, the duly licensed and qualified architect to be retained by Borrower pursuant to the Architect's Contract, or such other duly licensed and qualified architect as may be retained by Borrower pursuant to an Architect's Contract and approved by Lender in its reasonable discretion.

"Architect's Contract" shall mean that certain written contract between Ground Lessor and Architect for architectural professional services in regard to the planning, design, and construction of the Project, in form and content approved by Lender, as originally executed and as it may from time to time be supplemented, modified or amended.

"Assignment of Architect's Contract/ Engineer's Consents / Plans and Specifications" shall mean the Assignment of Architect's Contract and Assignment of Plans and Specifications, along with the (i) Architect's Consent Certification and Assignment, attached thereto, (ii) Engineer's Consent and Certification (Englekirk Structural Engineers) in connection with the Englekirk Contract, attached thereto, (iii) Engineer's Consent and Certification (Jensen Hughes) in connection with the Jensen Contract, attached thereto, and (iv) Engineer's Consent and Certification (Syska Hennessy Group, Inc.) in connection with the Syska Contract, attached thereto; all in form and content as required by Lender, as originally executed, and as they may from time to time be supplemented, modified or amended.

"Assignment of Construction Contract/Engineer's Consents / Plans and Specifications" shall mean the Assignment of Construction Contract and Assignment of Plans and Specifications, along with (i) Contractor's Consent, Certification and Assignment, attached thereto, Engineer's Consent and Certification (Control Air Conditioning Corporation) in connection with the CACC Contract, attached thereto, (iii) Engineer's Consent and Certification (Pan-Pacific Plumbing Company) in connection with the PPPC Contract, attached thereto, and (iv) Engineer's Consent and Certification (Morrow Meadows Corporation) in connection with the MMC Contract, attached thereto; all in form and content as required by Lender, as originally executed, and as they may from time to time be supplemented, modified or amended.

"Assignment of Construction Manager's Contract" shall mean the Assignment of Construction Management Contract and Manager's Consent and Certification, in form and content as required by Lender, as originally executed, and as they may from time to time be supplemented, modified or amended.

"Assignment of Deposit Accounts" shall mean the Security Agreement (Assignment of Deposit Accounts), executed by Borrower, assigning to Lender all of its right, title and interest in and to certain deposit accounts maintained with Lender, including, without limitation, the Operating Account.

"Assignment of Deposit Accounts (EB5 Funds)" shall mean the Security Agreement (Assignment of Deposit Accounts) (EB5 Funds), executed by Borrower, assigning to Lender all of its right, title and interest in and to the EB5 Account.

"Assignment of Leases (Leasehold)" shall mean the Absolute Assignment of Leases, Lease Guaranties, Rents, Issues and Profits duly executed by Borrower, assigning to Lender all existing leases, subleases, rents and concession rights, if any, and all future leases, subleases and concession

rights affecting the leasehold estate established by the Ground Lease on the Property or any part thereof, and shall include delivery to Lender of the executed originals of each of said leases.

"Beach Orangethorpe Deeds of Trust" shall mean, individually and collectively, the following:

      1.1    Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated as of June 23, 2011, executed by Ground Lessor, as trustor, in favor of Beach Orangethorpe, LLC, a California limited liability company, as beneficiary, and recorded in the Official Records of Orange County, California, as Document No. 2011000306739 on June 23, 201.1 (as amended pursuant to that certain (i) Amendment to Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated as of September 14, 2011, executed by and between Beach Orangethorpe, LLC, and Ground Lessor, and recorded as Document No. 2011000458073 on September 15, 2011, (ii) Second Amendment to Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated as of October 21, 2011, executed by and between Beach Orangethorpe, LLC, and Ground Lessor, and recorded as Document No. 2011000544533 on October 28, 2011, and (iii) Third Amendment to Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated as of October 8, 2012, executed by and between Beach Orangethorpe, LLC, and Ground Lessor, and recorded as Document No. 2012000625295 on October 15, 2012);

      1.2    Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated as of October 8, 2012, executed by Ground Lessor, as trustor, in favor of Beach Orangethorpe II, LLC, a California limited liability company, as beneficiary, and recorded in the Official Records of Orange County, California, as Document No. 2012000625296 on October 15, 2012;

      1.3    Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated as of October 8, 2012, executed by Ground Lessor, as trustor, in favor of Beach Orangethorpe Ventures, LLC, a California limited liability company, as beneficiary, and recorded in the Official Records of Orange County, California, as Document No. 2012000625297 on October 15, 2012; and

      1.4    Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated as of January 6, 2014, executed by Ground Lessor, as trustor, in favor of Beach Orangethorpe Source, LLC, a California limited liability company, as beneficiary, and recorded in the Official Records of Orange County, California, as Document No. 2014000163784 on April 29, 2014.

The Beach Orangethorpe Deeds of Trust are attached to the fee simple absolute interest in the Property, but are not attached to, and shall not attach to, any leasehold interest in the Property or the Ground Lease.

"Beach Orangethorpe Hotel Financing" shall mean, individually and collectively, the following:

      1.1    Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated as of June 1, 2014, to be executed by Ground Lessor and in favor of BEACH ORANGETHORPE HOTEL, LLC, a California limited liability company; and

1.2     Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated as of December 31, 2015, to be executed by Ground Lessor and in favor of BEACH ORANGETHORPE HOTEL II, LLC, a California limited liability company.

"Beach Orangethorpe Hotel Financing Loan Documents" shall mean the Beach Orangethorpe Hotel Financing, and any and all loan agreements, notes, guaranties, instruments, agreements and documents evidencing the loans by the Beach Orangethorpe Hotel EB5 Lenders.

"Beach Orangethorpe Hotel EB5 Lenders" shall mean, individually and collectively, (a) BEACH ORANGETHORPE HOTEL LLC, a California limited liability company, and (b) BEACH ORANGETHORPE HOTEL II, LLC, a California limited liability company, who are lending the EB5 Funds to Borrower.

"Borrower's Deposit" shall mean the sum or sums of cash deposited or required to be deposited by Borrower, with Lender, and funded into the Project prior to the first disbursement of Construction Loan Proceeds (consisting of the sum of $14,100,635.22, which is in the form of invoices and cancelled checks to demonstrate the work to the Project completed to date), and the deposit by Borrower and/or Guarantor of any additional sums as described in and required from time to time by this Agreement. The Borrower's Deposit shall not bear interest.

"Business Day" shall mean Monday through Friday, excluding any day of the year on which banks are required or authorized to close in California.

"CACC" shall mean CONTROL AIR CONDITIONING CORPORATION.

"CACC Contract" shall mean that certain agreement Letter Agreement dated February 3, 2015 (as the same has been amended, supplemented and modified from time to time, and together with all attachments and addenda thereto) by and between Contractor and CACC.

"Collateral" shall mean all real and personal property of Borrower, or others, in which Lender has been and may hereafter be granted a lien, assignment or security interest to secure payment and performance of Borrower's obligations under the Loan.

"Commencement Date" shall mean the date by which Borrower must commence construction of Improvements upon the Property, which shall be no later than June 30, 2016.

"Completion Date" shall mean the date scheduled for completion of the Improvements as provided in the Construction Contract, which shall be no later than the Maturity Date, provided that the Completion Date shall be extended for a period equal to any extension of the Maturity Date if Borrower elects such an extension pursuant to Section 3.4 of this Agreement.

"Completion Guaranty" shall mean that certain agreement or agreements by that title described in Section 3.8 of this Agreement duly executed by each Guarantor.

"Construction Contract" shall mean the written building contract, with a stipulated maximum sum of $40,752,518.00, between Borrower and Contractor, in form approved by Lender, for the furnishing of labor, services, and materials to the Property in connection with the construction of the

Improvements, as originally executed and as it may from time to time be supplemented, modified or amended.

"Construction Deed of Trust (Leasehold)" shall mean the Construction Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing (Leasehold) duly executed and acknowledged by Borrower, for the benefit of Lender, as beneficiary, and any and all supplements, modifications or amendments thereto, to secure the Loan and encumbering the leasehold estate established by the Ground Lease on the Property and other assets and rights as therein provided, together with all such riders and exhibits thereto as Lender shall require.

"Construction Hard Costs" shall mean the cost of labor and/or materials incorporated into the work of improvement for construction of the Improvements, including the cost of shipping and other transportation, fringe benefits in accordance with labor contracts and the fees, Contractor's insurance, profit and overhead of the Contractor and Subcontractors actually paid directly as part of the Construction Contract or Subcontracts, as set forth in Exhibit "B-1" attached hereto.

"Construction Loan Proceeds" shall mean funds advanced by Lender to Borrower for purposes of paying Construction Hard Costs, the creation of an Interest Reserve, Loan and Carrying Costs and any other items identified in the Cost Breakdown, to the extent applicable hereunder, pursuant to the terms of this Agreement.

"Construction Soft Costs" shall mean the costs and expenses set forth in Exhibit "B-2" attached hereto. No Construction Loan Proceeds will be available for, and Lender shall have no obligation to make any Advances toward, Construction Soft Costs, except for Advances for the Construction Soft Costs Contingency.

"Construction Soft Costs Contingency" shall mean a reserve used to fund changes to the Cost Breakdown in connection with the Project in the event of overruns related to the Construction Soft Costs. In the event that any funds in the Construction Soft Costs Contingency are insufficient to cover the costs in connection with any changes to the Cost Breakdown, the same shall be paid by Borrower from Borrower's own funds. The sum of the Construction Soft Costs Contingency shall not exceed $363,749.00 and shall only be available for Construction Soft Costs.

"Construction Manager" shall mean SWINERTON BUILDERS, INC., a California corporation, the duly licensed and qualified construction manager to be retained by Borrower pursuant to the Construction Manager's Contract, or such other duly licensed and qualified construction manager as may be retained by Borrower pursuant to the Construction Manager's Contract and approved by Lender in its reasonable discretion.

"Construction Manager's Contract" shall mean that certain written contract between Borrower and Construction Manager for services in regard to the construction management of the Project, in form and content approved by Lender, as originally executed and as it may from time to time be supplemented, modified or amended.

"Contingency Reserve" shall mean a reserve used to fund changes to the Cost Breakdown for Construction Hard Costs in connection with the Project in the event of overruns related to the Project. In the event that any funds in the Contingency Reserve are insufficient to cover the costs in connection with any changes to the Cost Breakdown, the same shall be paid by Borrower from

6

Borrower's own funds. The sum of the Contingency Reserve shall not exceed $1,861,987.00 and shall only be available for Construction Hard Costs.

"Continuing Guaranty" shall mean that certain agreement or agreements by that title, duly executed by each Guarantor, unconditionally and irrevocably guaranteeing payment and performance of Borrower's obligations to Lender in connection with the Loan, as such agreement or agreements are originally executed and as such agreement or agreements may from time to time be reaffirmed, supplemented, modified or amended.

"Contract Documents" shall mean the Architect's Contract, the Construction Contract, the Engineer's Contract, the Plans and Specifications, the Construction Manager's Contract, the Englekird Contract, the Jensen Contract, the Syska Contract, the CACC Contract, the PPPC Contract, the MMC Contract and all other documents ancillary thereto, all of which shall be satisfactory to Lender in Lender's sole and absolute opinion and judgment.

"Contractor" shall mean GREENLAND CONSTRUCTION SERVICE, LLC, a California limited liability company, the duly licensed and qualified general building contractor retained by Borrower pursuant to the Construction Contract. Contractor is an Affiliate of Borrower.

"Cost Breakdown" shall mean the cost of constructing the Improvements, including, without limitation, the Construction Hard Costs as more specifically identified in Exhibit "B-1" hereto, and the Construction Soft Costs as more specifically identified in Exhibit "B-2" hereto. Borrower acknowledges and agrees that Borrower shall be responsible to pay all costs of constructing the Improvements from Borrower's own funds other than Construction Loan Proceeds in the event the Construction Loan Proceeds, the Contingency Reserve and the Construction Soft Costs Contingency have been disbursed in their entirety.

"Declaration (2016)" shall mean that certain Amended and Restated Declaration of Covenants, Conditions and Reciprocal Easement Agreement dated as of May 24, 2016 and to be recorded in the Official Records of Orange County, California.

"Development Fee" shall mean the development fee payable to Borrower for Borrower's development of the Property which shall be an amount not to exceed $1,043,283.00 and which shall be paid solely from EB5 Funds.

"Disbursement" shall mean any disbursement of Project Funds.

"EB5 Account" shall mean that certain deposit account to be maintained by Borrower with Lender, and into which Borrower shall deposit a sum equal to the full amount of Tranche 2B and Tranche 3. The EB5 Account shall be assigned to Lender pursuant to the Assignment of Deposit Accounts (EB5 Funds) as additional security for the Loan.

"EB5 Funds" shall mean, individually and collectively, Tranche 2B and Tranche 3, comprising the proceeds of the loans made by Beach Orangethorpe Hotel EB5 Lenders and/or equity contribution of BEACH ORANGETHORPE HOTEL III, LLC, a California limited liability company, to Borrower. The EB5 Funds shall be deemed a "Borrower's Deposit" and shall be presumed disbursed first and prior to the Construction Loan Proceeds, as set forth in Article III, below.

"Englekirk" shall mean ENGLEKIRK STRUCTURAL ENGINEERS.

"Englekirk Contract" shall mean that certain agreement originally dated as of November 20, 2012 (as the same has been amended, supplemented and modified from time to time, and together with all attachments and addenda thereto) by and between Architect and Englekirk.

"Environmental Indemnity" shall mean that certain Hazardous Substances Indemnity Agreement duly executed by Borrower and Guarantor as required by Lender, pursuant to which said parties shall indemnify and defend Lender from and against any loss or liability, direct or indirect, with respect to the presence or release of any hazardous or toxic material in, on, about or under the Property.

"Event of Default" shall mean any of those events specified in Article V hereof.

"Extension Fee" shall mean the sum of three-eighths of one percent (0.375%) of the then outstanding principal balance of the Loan, plus any Undisbursed Project Funds, payable by Borrower to Lender for any extension of the Maturity Date if requested in accordance with the provisions of Section 3.4, below.

"Fee Lenders" shall mean, individually and collectively, (a) BEACH ORANGETHORPE, LLC, a California limited liability company, (b) BEACH ORANGETHORPE II, LLC, a California limited liability company, (c) BEACH ORANGETHORPE VENTURES, LLC, a California limited liability company, and (d) BEACH ORANGETHORPE SOURCE, LLC, a California limited liability company.

"FF&E" shall mean all furniture, fixtures, machinery, tools, inventory and equipment owned by Borrower and used, or intended to be used, in connection with the Project.

"Financial Statements" shall mean balance sheets, income statements, reconciliations of capital structure, statements of sources and applications of funds, and income tax returns, all prepared in accordance with GAAP.

"Financing Statements" shall mean one or more financing statements (form UCC-1) given by Borrower to Lender, if required by Lender, covering the FF&E, Contract Documents, Project Rights, contracts, Construction Loan Proceeds, fees and all other personal property and/or fixtures included in the Project.

"Fiscal Year" shall mean Borrower's fiscal year, ending on December 31 of each calendar year.

"Force Majeure Events" shall mean Acts of God (which for purposes of the Loan Documents constitute earthquake, flood, tornado, rain and lightning) and Acts of War.

"Fund Control" shall mean HASZ FUND CONTROL, INC., a California corporation, the duly licensed and qualified fund control company to be retained by Lender.

"Fund Control Agreement" shall mean that certain agreement entered into by and among Lender, Borrower, Contractor and Fund Control, in form and content acceptable to Lender, for the

inspection of work in progress in connection with the construction and installation of the Improvements, and for the receipt and processing of documentation supporting each Application for Payment, and providing procedures for the review and control of Disbursements of Project Funds (excluding amounts disbursed to Lender under this Agreement or any other Loan Documents) in connection therewith.

"GAAP" shall mean generally accepted accounting principles consistently maintained and applied throughout the period indicated and consistent with the prior financial practice of the Person providing such financial information.

"General Contractors Fee" shall mean the fee paid to Contractor to compensate Contractor pursuant to the Construction Contract, as set forth in Exhibit "B-1" hereto.

"Governmental Agency" shall mean any governmental or quasi-governmental agency, authority, board, bureau, commission, department, instrumentality or public body, court, administrative tribunal, or public utility.

"Ground Lease" shall mean that certain Ground Lease dated as of April 6, 2015 entered into by and between Borrower, as lessee, and Ground Lessor, as lessor.

"Ground Lessor" shall mean THE SOURCE AT BEACH, LLC, a California limited liability company. Ground Lessor is an Affiliate of Borrower.

"Ground Lessor's Consent" shall mean the Ground Lessor's Consent, Estoppel Certificate and Fee Mortgagee Agreement for the Property, duly executed by (a) Ground Lessor, (b) Borrower, (c) Lender, and (d) Fee Lenders.

"Guarantor" shall mean (i) DONALD CHAE, an individual, and (ii) MIN CHAE, an individual.

"Hazard Insurance Disclosure" shall mean the Hazard Insurance Disclosure duly executed by Borrower in form and content as required by Lender.

"Hilton" shall mean Hilton Franchise Holding LLC, a Delaware limited liability company.

"Hilton Comfort Letter" shall mean that certain letter agreement by and among Hilton, Borrower and Lender, governing, among other things, the terms and conditions upon which Lender may succeed to Borrower's right, title and interest in, to and under the Hilton Franchise Agreement.

"Hilton Franchise Agreement" shall mean that certain Franchise Agreement dated August 4, 2015 by Borrower and dated August 19, 2015 by Hilton, and executed by each, in connection with the franchising of the hotel to be constructed on the Property.

"Improvements" shall mean the materials, structures and other improvements and fixtures to be constructed or installed on or about the Property in connection with the Project according to and as described in the Plans and Specifications, including, but not limited to, off-site and on-site improvements.

"Insurance Policies" shall mean any of the policies of insurance specified in Section 4.2 hereof.

"Interest Reserve" shall mean that portion of the Project Funds, totaling $1,700,000.00, for payment of interest due under the Note. Notwithstanding the existence of the Interest Reserve, Borrower shall be responsible to pay the interest due under the terms of the Note from funds other than the Construction Loan Proceeds in the event the Interest Reserve has been disbursed in its entirety or upon the occurrence of an Event of Default. The Interest Reserve shall remain undisbursed as to Borrower; provided, however, the Interest Reserve shall be funded from the Construction Loan Proceeds on a monthly basis for payment of interest due under the Note and subject to the terms of the Loan Documents.

"Interstate-Rim" shall mean Interstate-Rim Management Company, LLC, a Delaware limited liability company.

"Interstate-Rim Consent, Assignment and Subordination Agreement" shall mean that certain Consent, Assignment and Subordination Agreement (Management Agreement) by and among Interstate-Rim, Borrower and Lender, governing, among other things, the terms and conditions upon which Interstate-Rim shall subordinate all of its right, title and interest in and to the Interstate Rim Hotel Management Agreement to the Construction Deed of Trust (Leasehold), and by which Borrower shall assign all of its right, title and interest in and to the Interstate Rim Hotel Management Agreement to Lender.

"Interstate Rim Hotel Management Agreement" shall mean that certain Hotel Management Agreement dated October 8, 2015, and executed by Borrower and Interstate-Rim, in connection with the management by Interstate-Rim of the hotel to be constructed on the Property.

"Jensen" shall mean JENSEN HUGHES, formerly known as Rolf, Jensen & Associates, Inc.

"Jensen Contract" shall mean that certain Proposal for Fire Protection Consulting Services originally dated November 9, 2012 (as the same has been amended, supplemented and modified from time to time, and together with all attachments and addenda thereto) by and between Architect and Jensen.

"Laws" shall mean, individually and collectively, all federal, state, and local laws, rules, regulations, ordinances, and codes.

"Loan" shall mean the loan described in the Recitals and in Article III of this Agreement.

"Loan and Carrying Costs" shall mean those costs incurred in the Project other than labor, materials, and fees payable to Contractor or any Subcontractor (including, but not limited to, loan fees for the Loan, legal fees, interest, permits, hook-up fees, appraisals, and the like, and the other matters identified on the Cost Breakdown), but not including any cost of refinancing or financing other than the Loan.

"Loan Closing" shall mean the date on which the Loan closes in accordance with Section 3.2 of this Agreement, and the Construction Deed of Trust (Leasehold) is recorded.

"Loan Closing Costs" shall mean collectively, the Loan Fee, Processing Fee, Title Company recording fees and charges, attorneys' fees and costs, and other costs related to closing the transaction set forth herein.

"Loan Documents" shall mean this Agreement, the Note, Construction Deed of Trust (Leasehold), Financing Statements, Completion Guaranty, Continuing Guaranty, Applications for Payment, Assignment of Leases (Leasehold), Hazard Insurance Disclosure, Environmental Indemnity, Assignment of Architect's Contract/ Engineer's Consents / Plans and Specifications, Assignment of Construction Contract/Engineer's Consents / Plans and Specifications, Assignment of Construction Manager's Contract, Assignment of Engineer's Contract, Agreement To Furnish Insurance, Security Agreement, Assignment of Deposit Accounts, Assignment of Deposit Accounts (EB5 Funds), Fund Control Agreement, Ground Lessor's Consent, Hilton Comfort Letter, Interstate-Rim Consent, Assignment and Subordination Agreement, Subordination Agreement (Beach Orangethorpe Hotel, LLC), Subordination Agreement (Beach Orangethorpe Hotel II, LLC), and such other documents as Lender may require Borrower or any third party to give to Lender as authority for and/or evidence of and/or security for and/or guaranty of the Loan, as such documents are originally executed and as such documents may from time to time be reaffirmed, supplemented, extended, renewed, modified and/or amended.

"Loan Fee" shall mean the sum of $295,000.00, for the granting of the Loan, which shall be made payable to Lender as follows: (a) the sum of $261,810.00 from Construction Loan Proceeds, and (b) the sum of $33,190.00 payable by Borrower to Lender from Borrower's own funds, as provided in Section 3.3 of this Agreement. Except as set forth herein, no portion of the Construction Loan Proceeds shall be allocated to the Loan Fee.

"Maturity Date" shall mean December 1, 2017, at which time the entire principal balance of the Loan, plus accrued interest thereon, is and shall be due and payable as provided in this Agreement and the Note, subject to acceleration as provided in the Loan Documents, and also subject to the extension provision of Section 3.4 below.

"Minimum Equity" shall mean the minimum amount of equity investment by Borrower in the Project (including any cash down payment, other investments of Borrower's cash in the Project, land acquisition and/or carrying cost, evidence of payment of Project soft costs and Borrower's Deposit), which amount shall not be less than the sum of $14,100,635.22, which Borrower shall have expended on the Project at the time of Loan Closing, as set forth in evidence satisfactory to Lender, in its sole opinion and judgment.

"MMC" shall mean MORROW MEADOWS CORPORATION.

"PPPC Contract" shall mean that certain agreement Letter Agreement dated February 19, 2015 (as the same has been amended, supplemented and modified from time to time, and together with all attachments and addenda thereto) by and between Contractor and MMC.

"Note" shall mean the Promissory Note of Borrower in the amount of the Loan payable to the order of Lender, duly executed by Borrower, as required by Lender to evidence the Loan, as originally executed and as it may from time to time be supplemented, modified or amended.

"OFAC" shall mean the United States Department of the Treasury, Office of Foreign Assets Control.

"OFAC Prohibited Person" shall mean a country, territory, individual or person (i) listed on, included within or associated with any of the countries, territories, individuals or entities referred to on The Office of Foreign Assets Control's List of Specially Designated Nationals and Blocked Persons or any other prohibited person lists maintained by governmental authorities, or otherwise included within or associated with any of the countries, territories, individuals or entities referred to in or prohibited by OFAC or any other Anti-Money Laundering Laws, or (ii) which is obligated or has any interest to pay, donate, transfer or otherwise assign any property, money, goods, services, or other benefits from the Property directly or indirectly, to any countries, territories, individuals or entities on or associated with anyone on such list or in such laws.

"Operating Account" shall mean that certain deposit account to be maintained by Borrower with Lender, (i) which Borrower shall use as the sole operating account for the Property, and (ii) from which Borrower shall pay all monthly principal and interest payments under the Note in accordance with Sections 3.6 and 3.15 of this Agreement. The Operating Account shall be assigned to Lender pursuant to the Assignment of Deposit Accounts as additional security for the Loan.

"Organizational Documents" shall mean the duly filed, certified and/or executed documents or instruments evidencing or confirming the lawful formation and existence of Borrower and Guarantor, as applicable, and all written consents and certifications required by Lender from Persons having management and/or ownership interests in Borrower or Guarantor, as applicable.

"Permitted Encumbrances" shall mean only those matters and exceptions to title to the Property approved by Lender, as expressly disclosed in this Agreement or shown in the preliminary report of title and all supplements thereto issued by the Title Company in regard to the Property.

"Person" shall mean an individual, corporation, limited liability company, partnership, joint venture, trust or unincorporated organization or a Governmental Agency.

"Plans and Specifications" shall mean: (i) the plans and specifications for the Project prepared by the Architect, Engineer, Contractor and/or Construction Manager, as applicable, and approved by Borrower, which are submitted to Lender and approved by Lender, in Lender's sole opinion and judgment, all prior to the first Disbursement of Construction Loan Proceeds, and (ii) any changes, modifications or supplements thereto, which changes, modifications or supplements must be submitted to Lender and approved by Lender in writing, in Lender's sole opinion and judgment, prior to any Disbursement of Construction Loan Proceeds by reason of such change, modification or supplement.

"Pledge Agreement (Fee Lenders)" shall mean that certain Pledge Agreement entered into by and among DMC Investment Holdings, LLC, a Delaware limited liability company, and the Fee Lenders, whereby, among other things, DMC Investment Holdings, LLC, a Delaware limited liability company, has agreed to pledge its membership interest in Borrower as additional security for the performance of Ground Lessor's payment obligations under the loans in connection with the Beach Orangethorpe Deeds of Trust.

"PPPC" shall mean PAN-PACIFIC PLUMBING COMPANY.

"PPPC Contract" shall mean that certain agreement Letter Agreement dated February 19, 2015 (as the same has been amended, supplemented and modified from time to time, and together with all attachments and addenda thereto) by and between Contractor and PPPC.

"Processing Fee" shall mean the sum of $1,500.00, which shall be fully earned by Lender upon the making of the Loan, and shall be paid by Borrower from Borrower's own funds. No portion of the Construction Loan Proceeds shall be allocated to the Processing Fee.

"Project" shall mean the aggregate of the Property, the construction and installation of the Improvements, and the furnishing and equipping of the Improvements which, when completed, will consist of, without limitation, a portion of a 174-room, seven (7) story hotel building, all as set forth in the Plans and Specifications.

"Project Costs" shall mean those costs paid or incurred by Borrower in connection with constructing and financing the Project, including, but not limited to, Construction Hard Costs and Loan and Carrying Costs.

"Project Funds" shall mean the sum of the Construction Loan Proceeds plus Borrower's Deposit, if any.

"Project Rights" shall mean all those rights and interests relating to the Project and the Property as provided in Section 4.14 of this Agreement.

"Property" shall mean the real property described in Exhibit "A" hereto and in the Construction Deed of Trust (Leasehold) and all present and future improvements thereon and appurtenances thereto.

"Retentions" shall mean ten percent (10%) of Construction Hard Costs approved by Lender included in each Application for Payment, other than the final Application for Payment.

"Security Agreement" shall mean the Commercial Security Agreement executed by Borrower in favor of Lender.

"Subcontractors" shall mean those Persons furnishing labor or materials for the Project pursuant to the Subcontracts. All major Subcontractors, as determined by Lender in its sole opinion and judgment, shall be qualified for bonding.

"Subcontracts" shall mean the contracts between Contractor and its Subcontractors for the furnishing of labor or materials for the Project.

Subordination Agreement (Beach Orangethorpe Hotel, LLC)" shall mean that certain Subordination Agreement entered into by and among Lender, Borrower and BEACH ORANGETHORPE HOTEL, LLC, as originally executed and as it may from time to time be supplemented, modified or amended.

Subordination Agreement (Beach Orangethorpe Hotel II, LLC)" shall mean that certain Subordination Agreement entered into by and among Lender, Borrower and BEACH

ORANGETHORPE HOTEL II, LLC, as originally executed and as it may from time to time be supplemented, modified or amended.

"SNDA" shall mean a subordination, nondisturbance and attornment agreement by a tenant on the Property, in form and content satisfactory to Lender.

"Syska" shall mean SYSKA HENNESSY GROUP, INC.

"Syska Contract" shall mean that certain agreement originally dated as of November 21, 2012 (as the same has been amended, supplemented and modified from time to time, and together with all attachments and addenda thereto) by and between Architect and Syska.

"Tenant Estoppel" shall mean a tenant estoppel certificate by a tenant on the Property, in form and content satisfactory to Lender.

"The Source Office LLC" shall mean THE SOURCE OFFICE, LLC, a California limited liability company.

"Title Company" shall mean the title insurer designated by Lender, in its sole opinion and judgment, which shall issue the Title Policy (Leasehold).

"Title Policy (Leasehold)" shall mean an ALTA Loan Policy (2006 Policy Form) with ALTA Form 1 coverage, written as such at Loan Closing and rewritten upon the completion of construction (sometimes called an LP-10 policy form package) with such endorsements as Lender shall require, issued by the Title Company, with liability equal to the full amount of the Loan, in favor of Lender, as insured, insuring the lien of the Construction Deed of Trust (Leasehold) to be a valid first lien on the leasehold estate of the Ground Lease on the Property upon which the Project shall be completed subject only to the Permitted Encumbrances. Following the installation of foundation forms and before footings are poured, Borrower shall cause Title Company to furnish to Lender at least the following CLTA endorsements: CLTA Endorsement No. 102.5 disclosing no encroachment of foundations onto adjacent property, CLTA Endorsement No. 122 insuring against loss of priority of the lien of the Construction Deed of Trust (Leasehold) due to any mechanic's lien and related claims, and CLTA Endorsement Nos. 100 or 100.2, 101.6, 116 and 116.7, issued upon completion of construction with respect to all Improvements upon the Property, and all such other endorsements thereto as Lender shall require. If required by Lender, the title insurance coverage will provide for reinsurance.

"Tranche 2B" shall mean the sum of $7,399,364.78 and solely comprised of EB5 Funds.

"Tranche 3" shall mean the sum of $6,500,000.00 and solely comprised of EB5 Funds.

"Undisbursed Project Funds" shall mean the remaining undisbursed balance of the Project Funds existing from time to time under this Agreement.

## ARTICLE II.
## REPRESENTATIONS AND WARRANTIES OF BORROWER

2. <u>REPRESENTATIONS AND WARRANTIES</u>. Borrower hereby represents, warrants and covenants to Lender as of the date of this Agreement, the date of Loan Closing, the date of each Application for Payment, each Advance Date, and each and every date during the existence of the Loan, or any portion thereof, as the context admits or requires, that:

2.1 <u>BORROWER'S CAPACITY</u> - Borrower is a limited liability company, duly organized and existing under the Laws of the State of California, duly qualified to do business in California and in any other state in which the nature of its business requires it to be so qualified, and is lawfully empowered and possesses the capacity to enter into and carry out the provisions of this Agreement.

2.2 <u>VALIDITY OF LOAN DOCUMENTS</u> - The Loan Documents are in all respects valid and binding upon Borrower according to their terms, subject to all applicable Laws, including equitable principles, insolvency Laws, and other matters applying to creditors generally; provided, however, that the implementation of such Laws do not and will not affect the ultimate realization of the obligations and security afforded therefore. The execution and delivery by Borrower of and the performance by Borrower of all its obligations under the Loan Documents have been duly authorized by all necessary action and do not and will not:

2.2.1 Require any consent or approval not heretofore obtained of any other Person holding any interest in or entitled to receive any interest issued or to be issued by Borrower or otherwise; or

2.2.2 Violate any provision of the Organizational Documents or other agreements to which Borrower is bound; or

2.2.3 Result in or require the creation or imposition of any mortgage, deed of trust, pledge, lien, security interest, claim, charge, right of others, or other encumbrance of any nature (other than under the Loan Documents) upon or with respect to any property now owned or leased or hereafter acquired by Borrower; or

2.2.4 Violate any order, writ, judgment, injunction, decree, determination, or award of any court or of any Governmental Agency, or violate any provision of any Laws; or

2.2.5 Result in a breach of or constitute a default under, cause or permit the acceleration of any obligation owed under, or require any consent under any indenture or loan or credit agreement or any other agreement, lease, or instrument to which Borrower is a party or by which Borrower or any property of Borrower is bound or affected.

2.3 <u>BORROWER NOT IN DEFAULT</u> - Borrower is not in default under any order, writ, judgment, injunction, decree, determination, award, indenture, agreement, lease, or instrument of the type described in Section 2.2 above.

2.4    NO GOVERNMENTAL APPROVALS REQUIRED - No authorization, consent, approval, order, license, exemption from, or filing, registration, or qualification with, any Governmental Agency is or will be required to authorize, or is otherwise required in connection with:

2.4.1    The execution, delivery and the performance by Borrower of all or any of its obligations under the Loan Documents (excluding those required for construction of the Improvements); or

2.4.2    The creation of the liens, security interests, or other charges or encumbrances described in the Loan Documents, except that filing and/or recording with Governmental Agencies may be required to perfect such liens, security interests, or other charges or encumbrances.

2.5    TAX LIABILITY - Borrower has timely filed all tax returns (federal, state, and local) required to be filed by it and has paid all taxes shown thereon to be due and all property taxes due, including interest and penalties, if any.

2.6    FINANCIAL STATEMENTS - All Financial Statements of Borrower, Guarantor or any other Persons having an interest in Borrower or Guarantor (if Borrower or Guarantor is other than a natural person), which have heretofore been submitted to Lender fairly present the financial position of Borrower, Guarantor and of such other Persons at the respective dates of their preparation, in conformity with GAAP. Since the dates of such Financial Statements, there have been no adverse changes in the financial conditions of Borrower, Guarantor or such other Persons.

2.7    PENDING LITIGATION - Except as disclosed in Schedule 2.7 attached hereto, there are no actions, suits, or proceedings pending and served, or to the knowledge of Borrower, threatened against or affecting Borrower, Guarantor, the Property, the Project, or involving the validity or enforceability of any of the Loan Documents or the priority of the lien thereof, at Law or in equity, or before or by any Governmental Agency, except actions, suits, and proceedings that are fully covered by insurance or which, if adversely determined, would not substantially impair the ability of Borrower or Guarantor to perform each and every one of their obligations under and by virtue of the Loan Documents; and neither Borrower nor Guarantor is in default with respect to any order, writ, injunction, decree, or demand of any court or any Governmental Agency.

2.8    VIOLATIONS OF LAWS - There are no violations or notices of violations of any Laws relating to the Project or any of the Collateral.

2.9    COMPLIANCE WITH ZONING ORDINANCES AND SIMILAR LAWS —

2.9.1    The Plans and Specifications and construction and installation of the Improvements pursuant thereto and the use of the Project contemplated thereby comply with all applicable Laws and all permits and approvals issued thereunder, affecting the Project, the sale, operation, leasing or financing of the Project and the intended occupancy, use and enjoyment of the Project, including, but not limited to, applicable subdivision Laws, licenses and permits, building

codes, zoning ordinances, flood disaster, environmental protection and equal employment regulations and appropriate supervising boards of fire underwriters and similar agencies.

2.9.2 Borrower shall not seek, make or consent to any change in the zoning, conditions of use, or any other applicable land use permits, approvals or regulations pertaining to the Project, or any portion thereof, which would constitute a violation of the warranties and representations herein contained, or would otherwise impair the ability of Borrower or any other Person to complete construction of any Improvements constituting the Project, or would change the nature of the use or occupancy of the Project.

2.10    AVAILABILITY OF UTILITIES -

2.10.1 All utility services necessary for the proper operation of the Project for its intended purposes are available at the Project or will be made available to the Project prior to completion of the Improvements, at standard utility rates and hook-up charges, including water supply, storm and septic tank systems, sanitary sewer facilities, gas, electricity, and telephone facilities.

2.10.2 Borrower shall furnish to Lender service letters to evidence availability of utilities.

2.11    BUILDING PERMITS - All building permits, by every name, required for the construction and installation of the Improvements have been or will be obtained prior to such construction and/or installation, and prior to the Disbursement of any Construction Loan Proceeds for such construction and/or installation, copies of the same will be delivered to Lender.

2.12    CONDITION OF PROPERTY - Neither the Project nor the Property is now damaged or injured as a result of any fire, explosion, accident, flood, or other casualty, nor subject to any action in eminent domain.

2.13    APPROVAL OF PLANS AND SPECIFICATIONS — The Plans and Specifications for the Project shall conform to the requirements and conditions set out by applicable Laws or any effective restrictive covenant of all Governmental Agencies that exercise jurisdiction over the Property or the construction thereon, or any private restrictions. No material changes are to be made in the Plans and Specifications or any other Contract Documents as approved by Lender without Lender's prior written consent.

2.14    CONSTRUCTION CONTRACT — Borrower shall permit no default to exist under the Construction Contract and will timely perform its obligations thereunder and cause the Contractor to perform all of its obligations. Upon demand by Lender, Borrower will cause the Contractor to furnish Lender with a complete list of all Subcontractors which Contractor proposes to engage to furnish labor and/or materials, and/or the FF&E in constructing, furnishing, and equipping the Project, and will, from time to time, furnish Lender with true copies of all Contracts, Subcontracts therefor, and all other contracts and agreements therefor, as the same come into existence, all in accordance with the provisions of Section 4.13.3 hereof.

2.15    BROKERAGE COMMISSIONS - No brokerage commissions are or will be owed by Borrower in connection with the Loan, or if there are commissions due or payable,

the same will be paid by Borrower from Borrower's own funds. Borrower agrees to and shall indemnify and hold Lender harmless from all liability, claims, or losses arising by reason of any such brokerage commissions related to any or all acts of Borrower in connection with the Loan. This provision shall survive the repayment of the Loan and shall continue in full force and effect so long as the possibility of such liability, claims, or losses exists.

2.16    ENVIRONMENTAL IMPACT STATEMENT - All required environmental impact statements as required by any Governmental Agency having jurisdiction over the Property or the construction of the Improvements have been duly filed and approved or a negative declaration has been issued.

2.17    ACCESS - The Property fronts on a publicly maintained road or street and has both legal and practical access to the same, or will when the offsite improvements constituting a portion of the Project are completed. There also exists both practical and legal access to the leasehold estate under the Ground Lease.

2.18    PROJECT COMPLETION - The Project can be completed at a total cost not exceeding the Project Funds, and Borrower will cause the completion of the Project at a total cost equal to or less than the Project Funds, free of liens, demands and claims, not later than the Completion Date.

2.19    SUBORDINATE FINANCING AND LEASES - Borrower will not cause there to be deeds of trust, mortgages, security agreements, liens or encumbrances on the Project or any portion thereof or interest therein, except (a) the Beach Orangethorpe Deeds of Trust, (b) the Beach Orantethorpe Hotel Financing, and (c) as otherwise permitted by Lender with Lender's prior written consent. Except as expressly set forth in this Agreement, Borrower will not cause there to be deeds of trust, mortgages, security agreements, liens or encumbrances on the leasehold estate, or any portion thereof or interest therein, on the Ground Lease or the Property. Except for Approved Leases, Borrower will not, without the prior written consent of Lender, enter into a lease for all or any portion of the Property.

2.20    AIR RIGHTS - Borrower has not and will not transfer, assign, convey, hypothecate or encumber any of the air rights pertaining to the Property.

2.21    PRIORITY OF LIEN ON PERSONALTY - No lease, chattel mortgage, bill of sale, security agreement, financing statement, or other title retention agreement (except those executed in favor of Lender) has or will be executed by Borrower with respect to any personal property, chattel, or FF&E of Borrower used in conjunction with construction, operation, or maintenance of the Project, except with respect to removable trade fixtures, inventory, and personal property of any tenant of the Project or under an Approved Lease.

2.22    COMPLIANCE WITH ENVIRONMENTAL LAWS — Borrower will not use, store, manufacture, generate, transport to or from, or dispose of any toxic substances, hazardous materials, hazardous wastes, radioactive materials, flammable explosives, or related material on or in connection with any property or the business of Borrower on any property, including the Property. Borrower will not permit any lessee on any property to use, store, manufacture, generate, transport to or from, or dispose of any toxic substances, hazardous materials,

hazardous waste, radioactive materials, flammable explosives, related material on or in connection with any property or the business on any property. ("Toxic substances," "hazardous materials," and "hazardous waste" shall include, but not be limited to, such substances, materials and wastes which are or become regulated under applicable Laws or which are classified as hazardous or toxic under applicable Laws.)

    2.23   SOLVENCY — Borrower is and shall continue to be able to pay its debts as they mature and the realizable value of its Collateral is, and at all times that it may have obligations hereunder shall continue to be, sufficient to satisfy any and all obligations hereunder.

    2.24   PERMITS — Borrower possesses all licenses, approvals, permits, franchises, patents, copyrights, trademarks, and trade names, or rights thereto, that are necessary to own the Property and conduct business on the Property substantially as now conducted and as presently proposed to be conducted, and Borrower is not in material violation of any valid rights of others with respect to the foregoing. Additionally, all permits, by every name, required for the construction or renovation of any improvements on the Property have been or will be obtained prior to such construction or renovation.

    2.25   NO ERISA PLAN — Borrower does not maintain a plan under the Employee Retirement Income Security Act of 1974.

    2.26   FULL DISCLOSURE — All information in the loan application, Financial Statement, certificate, or other document and all information prepared and delivered by Borrower or its Affiliates to Lender in obtaining the Loan is correct and complete in all respects, and there are no omissions therefrom that result in such information being incomplete, incorrect, or misleading in any material adverse respect as of the date thereof. All information in any loan application, Financial Statement, certificate or other document prepared and delivered to Lender on behalf of Borrower by Persons other than Borrower or its Affiliates, and all other information prepared and delivered to Lender on behalf of Borrower by Persons other than Borrower or its Affiliates in applying for the Loan is true, correct and complete in all respects, and there are no omissions therefrom that result in any such information being incomplete, incorrect, or misleading in any material adverse respect as of the date thereof.

    2.27   USE OF PROCEEDS; MARGIN STOCK — The proceeds of each Advance and Disbursement will be used by Borrower solely for the purposes specified in this Agreement. None of such proceeds will be used for the purpose of purchasing or carrying any "margin stock" as defined in Regulation U of the Board of Governors of the Federal Reserve System (12 C.F.R. Part 221), or for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase or carry a margin stock or for any other purpose which might constitute this transaction a "purpose credit" within the meaning of such Regulation U. Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock. Neither Borrower nor any Person acting on behalf of Borrower has taken or will take any action which might cause any Loan Documents to violate Regulation U or any other regulations of the Board of Governors of the Federal Reserve System or to violate Section 7 of the Securities Exchange Act of 1934, or any rule or regulation thereunder, in each case as now in effect or as the same may hereafter be in effect. Borrower and Borrower's Affiliates own no "margin stock".

2.28   GOVERNMENTAL REGULATION — Borrower is not subject to regulation under the Federal Power Act, the Investment Company Act of 1940, the Interstate Commerce Act (as any of the preceding have been amended), or any other Law which regulates the incurring by Borrower of indebtedness, including but not limited to Laws relating to common or contract carriers or the sale of electricity, gas, steam, water, or other public utility services.

2.29   NO CONDEMNATION — No condemnation proceedings are pending, or threatened against the Property.

## ARTICLE III.
## THE LOAN

3.   THE LOAN.

3.1   LOAN AMOUNT - The Loan will be in an amount not exceeding the sum of Twenty Nine Million Five Hundred Thousand and No/100 Dollars ($29,500,000.00).

3.2   LOAN CLOSING

3.2.1   The Loan will close if, and only if, on or before June 3, 2016, Borrower, shall at its sole expense, deposit or cause to be deposited with Lender, the following in form and substance satisfactory to Lender, in Lender's sole opinion and judgment, duly executed by the party to be charged and acknowledged where required for recordation or other methods of perfection:

(a)   This Agreement;

(b)   The Loan Closing Costs;

(c)   The Note;

(d)   The Construction Deed of Trust (Leasehold);

(e)   The Assignment of Leases (Leasehold);

(f)   The Continuing Guaranty;

(g)   The Completion Guaranty;

(h)   The Environmental Indemnity;

(i)   The Security Agreement;

(j)   The Assignment of Deposit Accounts, and Borrower shall have opened the Operating Account with Lender;

(k)   The Assignment of Architect's Contract / Engineer's Consents / Plans and Specifications and a copy of the executed Architect's Contract and the Plans and Specifications for the Project;

2123922.6

(l) The Assignment of Construction Contract/Engineer's Consents / Plans and Specifications, and a copy of the executed Construction Contract;

(m) Evidence satisfactory to Lender, in Lender's sole discretion, that (i) the Property is free of mechanic's liens and (ii) no stop payment notices (whether bonded, unbonded or otherwise) have been served upon Lender.

(n) The Assignment of Construction Management Contract and a copy of the executed Construction Management Contract;

(o) The Agreement To Furnish Insurance including a flood insurance certificate or a certificate that the Property is not located in a flood zone, and the Hazard Insurance Disclosure;

(p) Such resolutions or other authorizations as Lender shall require of Borrower and any Person holding an interest in Borrower authorizing the Loan, or such other matters as Lender shall require;

(q) The Title Policy (Leasehold) or evidence of a commitment therefor. In connection therewith, Borrower shall have provided Lender true and complete copies of all covenants, conditions, declarations, restrictions, reciprocal easements, impositions, encumbrances, association documents, common area agreements, management and operating agreements, and all other documents, instruments, and agreements (hereinafter, "Title Matters") affecting the title, use, enjoyment, security, management and/or possession of the Property, and Lender shall have approved all such Title Matters, in its sole opinion and judgment. The Title Policy (Leasehold) shall show no blanket exceptions for anything a survey would show;

(r) The Appraisal, which shall be acceptable to Lender in Lender's sole discretion;

(s) A survey or surveys prepared by a licensed surveyor satisfactory to Lender, showing all easements and all improvements on the Property. The survey shall be conducted in compliance with ALTA standards as applied in California and shall be certified to the Title Company, Lender and its successors, nominees, and assigns, and Borrower in form and content acceptable to Lender;

(t) A Phase I, and if indicated, a Phase II environmental survey by a qualified environmental engineer indicating an absence of environmental concerns in regard to the Property, satisfactory to Lender and its counsel;

(u) A property inspection of the Property prepared by an inspection company approved by Lender;

(v) One or more Financing Statements;

(w) If required by Lender, UCC search certificates showing the Financing Statements to be subject only to such prior filings as are acceptable to Lender, in its sole opinion and judgment;

(x)  Assignment of Project Rights, which is provided for in Section 4.14 herein;

(y)  The Fund Control Agreement;

(z)  True and correct copies of Borrower's Organizational Documents, certificate(s) of fictitious business name, and Financial Statements, all of which documents must be first reviewed and approved by Lender, its counsel, or both;

(aa)  True and correct copies of Contractor's license, resume and Financial Statements, all of which documents must be first reviewed and approved by Lender, its counsel, or both;

(bb)  Evidence satisfactory to Lender in its sole opinion and judgment, that the Contractor and major Subcontractors, as determined by Lender, are bondable;

(cc)  Such seismic, soils and/or geology reports as Lender may require, which reports shall be satisfactory in all respects to Lender, in its sole and absolute discretion, prepared by such geologists, engineers and/or other consultants as are approved by Lender;

(dd)  Such reports as Lender may require, prepared by such cost engineers, project analysis consultants and/or other consultants as are approved by Lender (individually and collectively, "Budget Consultant"), setting forth such Budget Consultant's review, analysis and conclusions with respect to Borrower's construction budget and/or cost breakdown (including the Cost Breakdown), which reports must be satisfactory in all respects to Lender, in its sole and absolute discretion. Borrower shall be solely responsible for any and all fees, expenses, charges and payments relating to the Budget Consultant, from Borrower's own funds;

(ee)  Evidence of Minimum Equity, as well as verification (as determined by Lender and Fund Control in their sole discretion) that monies spent on the first three (3) floors of the hotel on the Property is proportionate to the work performed on the Property in accordance with the Cost Breakdown;

(ff)  To the extent that Borrower has not furnished evidence of sufficient Minimum Equity pursuant to Section 3.2.1(ee), above, Borrower shall deposit with Lender into the Deposit Account or the EB5 Account, as the case may be, in an amount equal to the difference between the Minimum Equity and the amounts actually expended by Borrower on the Project;

(gg)  Flood certification search, acceptable to Lender in Lender's discretion;

(hh)  Review and approval of Borrower's and Guarantor's Financial Statements, real estate schedules and tax returns (with all form K-1 s attached), either self-prepared or prepared by a certified public accountant satisfactory to Lender;

        (ii)     True, complete and correct copies of the Plans and Specifications, construction plans and any other architectural, structural or other plans or specifications requested by Lender, and all permits, authorizations and other approvals required for the development and/or construction of the Project and/or for the operation and use of the Property, all of which must be first reviewed and approved by Lender;

        (jj)     Satisfactory review and approval of a BICA report for Contractor;

        (kk)     Verification and approval of the Cost Breakdown;

        (ll)     If required by Lender, a favorable opinion of independent counsel to Borrower acceptable to Lender and its counsel opining to, among other things, Borrower being a validly organized and existing business entity in good standing with full power and authority to carry on its business as now being conducted, Borrower's execution and authority to execute the Loan Documents, the validity and binding effect of the Loan Documents, that the assignments, if any, are valid and enforceable in accordance with their terms against the parties thereto, the nonusurious character of the Loan, the absence of any agreement, covenant, judgment, order, restriction; or contract that would prohibit the Loan or the granting of the Construction Deed of Trust (Leasehold) or which would require consent be given to Borrower for the application for the Loan or for the granting of the Construction Deed of Trust (Leasehold), which consent has not been obtained, and further opining as to any additional matters required by Lender's counsel due to the nature of the Project;

        (mm)     IRS Form 4506 executed by Borrower, and IRS Form 4506 executed by Guarantor;

        (nn)     Evidence satisfactory to Lender in its sole opinion and judgment of the approval by all appropriate Governmental Agencies for the completion of the Project, in accordance with the applicable laws of the State of California, along with copies of the same;

        (oo)     SNDA's and Tenant Estoppels in connection with any Approved Leases on the Property, as Lender may require in its sole discretion;

        (pp)     Subordination Agreement (Beach Orangethorpe Hotel, LLC), and copies of all documents evidencing the loan by Beach Orangethorpe Hotel, LLC, to Ground Lessor, in the principal sum of $10,000,000.00;

        (qq)     Subordination Agreement (Beach Orangethorpe Hotel II, LLC), and copies of all documents evidencing the loan by Beach Orangethorpe Hotel II, LLC, to Ground Lessor, in the principal sum of $11,500,000.00;

        (rr)     Subordination agreements and related documents (including estoppel certificates) executed by Borrower and any entities affiliated with Borrower;

        (ss)     Ground Lessor's Consent and a copy of the fully executed Ground Lease;

(tt)    If required by Lender, an amendment to the Declaration (2016);

(uu)    Borrower shall have opened and shall maintain the Operating Account with Lender, and Borrower shall have executed and delivered to Lender such agreements and other documents as Lender shall require, in form and content satisfactory to Lender in its sole opinion and judgment, to establish, with respect to the Operating Account, an automatic debit system for the payment of the monthly principal and interest payments due under the Note;

(vv)    Borrower shall deliver to Lender evidence satisfactory to Lender that Borrower has obtained all hazard, liability and other insurance coverages required by Lender (including, without limitation, builder's risk-all risk insurance covering 100% of the replacement cost of all improvements during the course of construction in the event of fire or other risks normally covered by "all risk" coverage policies), and that such insurance coverages are in full force and effect with all premiums paid;

(ww)    Recertification of Phase I and Phase II reports, if required by Lender;

(xx)    Lender shall have received, reviewed and approved copies of all permits, approvals and authorizations required to operate and use the Property;

(yy)    An indemnity or indemnities acceptable to Title Company;

(zz)    A fully executed copy of the Hilton Franchise Agreement;

(aaa)    A fully executed copy of the Interstate-Rim Hotel Management Agreement, as well as the Interstate-Rim Consent, Assignment and Subordination Agreement executed by Borrower and Interstate-Rim;

(bbb)    Any and all incidental fees and charges incurred by Lender in connection with the Loan and the Loan Documents are to be paid to Lender by Borrower from Borrower's own funds;

(ccc)    Borrower shall have provided additional EB5 Funds and additional proof of costs paid to date totaling an amount equal to the sum of Tranche 2B, with the unutilized portion being deposited into the EB5 Account and assigned to Lender pursuant to the Assignment of Deposit Accounts (EB5 Funds).

(ddd)    The Assignment of Deposit Accounts (EB5 Funds) and Borrower shall have opened the EB5 Account with Lender;

(eee)    A fully executed copy of the Construction Manager's Contract, and the Assignment of Construction Manager's Contract, fully executed by the parties thereto;

(fff)    A fully executed copy of the Englekirk Contract;

(ggg)    A fully executed copy of the Jensen Contract;

(hhh)    A fully executed copy of the Syska Contract;

(iii)    A fully executed copy of that certain Pledge Agreement entered into by and among DMC Investment Holdings, LLC, a Delaware limited liability company, and the Fee Lenders;

(jjj)    A complete set of the fully executed Beach Orangethorpe Hotel Financing Loan Documents;

(kkk)    A fully executed copy of the CACC Contract;

(lll)    A fully executed copy of the PPPC Contract;

(mmm) A fully executed copy of the MMC Contract; and

(nnn)    Such additional assignments, agreements, certificates, reports, approvals, instruments, documents, financing statements, consents, and opinions as Lender may request, including, but not limited to any zoning variances, conditional use permits, development agreements or other land use requirements Borrower shall be required to obtain in connection with the construction and operation of the Property and any and all subordination agreements, SNDA's and Tenant Estoppels as Lender, in its sole and absolute discretion, shall require Borrower to obtain from the holders of any liens, claims, demands charges or encumbrances against the Property and/or tenants of the Project, due to the nature of the Project.

    3.2.2    Notwithstanding the closing of the Loan, the obligation of Lender to disburse Project Funds, or any portion thereof, is also subject to, without limitation, the conditions precedent to Disbursement set forth in Section 3.13 below.

    3.2.3    Subject to the terms of this Agreement, Borrower acknowledges that at Loan Closing, (a) the only Disbursement which Lender will be undertaking is with respect to the funding of Loan Closing Costs, and only the Loan Closing Costs, and (b) other than the Loan Closing Costs, Lender shall have no obligation to fund or otherwise disburse any other Construction Loan Proceeds unless and until Borrower completely and unconditionally satisfies any and all conditions set forth in Section 3.22, below.

    3.3    <u>LOAN FEE AND PROCESSING FEE</u> – The full amount of the Processing Fee, and a portion of the Loan Fee totaling $33,190.00, shall be paid by Borrower to Lender at Loan Closing from Borrower's own funds. The remainder of the Loan Fee shall be paid from a Disbursement of Construction Loan Proceeds. The Loan Fee and the Processing Fee will be in addition to all other fees mentioned in this Agreement. The Loan Fee and Processing Fee shall be deemed fully earned and non-refundable when paid, whether or not any Construction Loan Proceeds are disbursed at any time.

3.4    <u>LOAN TERM</u> –

(a)    The term of the Loan will commence on the date of Loan Closing and the Loan will mature upon the Maturity Date, subject to acceleration or adjustment as provided in this Agreement and the other Loan Documents.

(b)    If, as of the Maturity Date of December 1, 2017, there is not an uncured Event of Default under this Agreement or any of the Loan Documents, upon (i) Borrower's written request made not later than November 1, 2017, for an extension of the Maturity Date to June 1, 2018, (ii) payment to Lender and Lender's actual receipt of an Extension Fee concurrently with Borrower's written request in Section 3.4(b)(i), (iii) if required by Lender, execution by Borrower, Guarantor and Lender of a modification and/or extension agreement in form and content satisfactory to Lender, in Lender's reasonable opinion and judgment (and any other documents required by Lender), (iv) if required by Lender, Borrower's deposit of additional funds into the Interest Reserve, in an amount determined by Lender, in its sole and absolute opinion and judgment, and (v) if required by Lender, issuance of such endorsements to the Title Policy (Leasehold) as shall be satisfactory to Lender, in Lender's reasonable opinion and judgment, then the Maturity Date will be extended to June 1, 2018.

(c)    If the Maturity Date is extended under Section 3.4(b), above, and if, as of the Maturity Date of June 1, 2018, there is not an uncured Event of Default under this Agreement or any of the Loan Documents, upon (i) Borrower's written request made not later than May 1, 2018, for an extension of the Maturity Date to December 1, 2018, (ii) payment to Lender and Lender's actual receipt of an Extension Fee concurrently with Borrower's written request in Section 3.4(c)(i), (iii) if required by Lender, execution by Borrower, Guarantor and Lender of a modification and/or extension agreement in form and content satisfactory to Lender, in ]Lender's reasonable opinion and judgment (and any other documents required by Lender), (iv) if required by Lender, Borrower's deposit of additional funds into the Interest Reserve, in an amount determined by Lender, in its sole and absolute opinion and judgment, and (v) if required by Lender, issuance of such endorsements to the Title Policy (Leasehold) as shall be satisfactory to Lender, in Lender's reasonable opinion and judgment, the then Maturity Date will be extended to December 1, 2018.

(d)    The granting of any such extension, however, is not intended to imply any agreement for any further extension to the Maturity Date.

3.5    <u>INTEREST RATE</u> - The interest rate will be as set forth in the Note.

3.6    <u>REPAYMENT</u> - In addition to any other provisions set forth herein, repayment of the Loan will be required as follows:

3.6.1    Interest and principal payments under the Loan shall be due and payable to Lender pursuant to the provisions of the Note;

3.6.2    Borrower hereby authorizes Lender to charge against any account of Borrower with Lender (including, the Operating Account) an amount equal to the

principal and accrued interest from time to time due and payable to Lender under the Note or otherwise;

       3.6.3    All payments hereunder or under the Note shall be made by Borrower without any offset or deduction for or on account of any present or future taxes, imposts or duties, of whatever nature, imposed or levied by or on behalf of any Governmental Agency. If at any time, whether by reason of any present or future Law or other requirement, Borrower shall be compelled by such Law or other requirement to deduct or withhold such taxes, imposts or duties, Borrower shall pay such additional amounts to Lender as may be necessary such that every net payment under this Agreement and the Note on which Borrower is obligated, after such deduction or withholding, will not be less than the amount required hereunder or thereunder; and

       3.6.4    Whenever any payment to be made under this Agreement and the Note shall be due on a day other than a Business Day of Lender, such payment may be made on the next succeeding Business Day, and such extension of time shall in such cases be included in the computation of payment of interest hereunder and under the Note.

      3.7    SECURITY - The Loan shall be secured by the following, in each case subject only to the respective Permitted Encumbrances:

       3.7.1    A first priority lien upon the entire leasehold estate under the Ground Lease on the Property, along with the Improvements and other assets and rights as evidenced by the Construction Deed of Trust (Leasehold);

       3.7.2    [Intentionally deleted.]

       3.7.3    The Assignment of Leases (Leasehold);

       3.7.4    A first priority perfected security interest in all existing and future tangible and intangible personal property and/or fixtures relating to the Project owned by Borrower, as evidenced by the Construction Deed of Trust (Leasehold) and the Security Agreement, as applicable;

       3.7.5    The assignment of the rights of Borrower in the Project Funds;

       3.7.6    The assignment of the rights of Borrower in the Architect's Contract, the Construction Manager's Contract, the Plans and Specifications, the Construction Contract, the Engineer's Contract, the Englekirk Contract, the Jensen Contract, the Syska Contract, the CACC Contract, the PPPC Contract, and the MMC Contract;

       3.7.7    The assignment by Borrower of Borrower's rights in each and all of the agreements described in this Agreement;

       3.7.8    The Assignment of Project Rights pursuant to Section 4.14 of this Agreement;

       3.7.9    The Security Agreement;

3.7.10  The Assignment of Deposit Accounts; and

3.7.11  The Assignment of Deposit Accounts (EB5 Funds).

3.8  <u>COMPLETION GUARANTY AND CONTINUING GUARANTY</u> - Completion of the Project in accordance with the terms of this Agreement shall be guaranteed to Lender pursuant to the Completion Guaranty and the obligations of Borrower shall be guaranteed to Lender pursuant to the Continuing Guaranty.

3.9  <u>CONSTRUCTION ADVANCES; INTEREST RESERVE</u> -

3.9.1  Subject to compliance with the terms and conditions of this Agreement, Lender shall make Disbursements of Construction Loan Proceeds to Borrower and Borrower shall borrow Construction Loan Proceeds from Lender, but in a total amount not to exceed the amount of the Loan and as otherwise set forth in this Agreement.

3.9.2  Lender shall make Disbursements to Borrower, Contractor and/or Subcontractors (at Lender's option and discretion as to whom and the amounts in which payments are made) an amount equal to the costs listed in the Applications for Payment approved by Lender less Retentions, subject to the terms of this Agreement.

3.9.3  Borrower hereby authorizes Lender on a monthly basis to disburse from the Interest Reserve the amount of interest accrued and unpaid to Lender under the terms of the Loan, without further authorization on the part of Borrower. Upon the occurrence of any Event of Default, Lender may continue to make Disbursements from the Interest Reserve of the amounts of interest accrued and unpaid, in Lender's sole and absolute opinion and judgment, without further authorization on the part of Borrower. Notwithstanding the existence of the Interest Reserve, Borrower shall be responsible to pay interest due under the terms of the Note from funds other than Construction Loan Proceeds in the event the Interest Reserve has been disbursed in its entirety or upon the occurrence of an Event of Default. In the event that the Interest Reserve is insufficient to pay interest due under the terms of the Note, Borrower shall, within ten (10) calendar days after demand of Lender, deposit with Lender additional funds for the Interest Reserve, in such amounts as Lender may designate, in Lender's sole opinion and judgment. Borrower acknowledges that Lender has made no representation or warranty concerning the adequacy or sufficiency of the Interest Reserve for payment of interest on the Loan or any portion thereof.

3.9.4  Borrower hereby authorizes Lender to make Disbursements from Construction Loan Proceeds, without further authorization from Borrower, the amount of any Loan and Carrying Costs or other amounts due and payable to Lender under this Agreement including, without limitation, general and administrative fees, out of pocket costs, and title insurance fees.

3.10  <u>DISBURSEMENT PRESUMPTIONS</u> - Borrower hereby agrees that all Disbursements of Project Funds shall conclusively be deemed to have been made first from the funds deposited by Borrower, as Borrower's Deposit, or otherwise so that all funds so deposited by Borrower as Borrower's Deposit or otherwise shall be the first disbursed by Lender. Without limiting the foregoing, any and all sums deposited by Borrower with Lender into the Deposit Account pursuant to Section 3.2.1(ff), above, shall be treated as a Borrower's Deposit and shall be deemed

Advanced first (including any EB5 Funds), before any Advance of Construction Loan Proceeds subject to any and all conditions in this Agreement, including, without limitation, the conditions in Section 3.13, below. Without limiting the foregoing, Lender shall have no obligation to make any Advances or any Disbursements unless and until the requirements of Borrower's Deposit and Minimum Equity are satisfied in full, with such satisfaction acceptable to Lender in Lender's sole discretion.

   3.11 USE OF UNDISBURSED PROJECT FUNDS - Borrower acknowledges and agrees that in regard to Undisbursed Project Funds:

     3.11.1  Borrower has no right to Project Funds other than to have the same disbursed by Lender in accordance with this Agreement, which Disbursements Lender, upon acceptance of this Agreement, agrees to make for the purposes and on the conditions set forth herein;

     3.11.2  All funds received by or on behalf of Borrower hereunder are for the purpose of paying in full all duly licensed Contractors and Subcontractors (other than Borrower) engaged in construction of the Project, for the completion of on-site and off-site improvements as set forth in the Plans and Specifications, and for the purpose of furnishing and equipping the Project with the FF&E, all in accordance with the Cost Breakdown, and Borrower shall not have any beneficial interest in said funds unless and until said purpose has been fulfilled; and

     3.11.3  The amount to be disbursed hereunder for each item of the work of construction and/or for the FF&E, is not to exceed the amount specified therefor in the Cost Breakdown.

   3.12 DEPOSIT ACCOUNT - Borrower hereby grants, assigns, pledges and hypothecates to Lender all of Borrower's right, title and interest in and to all deposit accounts maintained by Borrower with Lender (including the Operating Account and the EB5 Account), as security for each and all of the obligations of Borrower to Lender under the Loan Documents.

   3.13 CONDITIONS PRECEDENT TO DISBURSEMENT - Prior to and as conditions precedent to any duty on the part of Lender to make the first, or any other, Disbursement of Construction Loan Proceeds (except for Advances made pursuant to Sections 3.9.3 or 3.9.4 of this Agreement), all of the following shall have occurred and/or have been furnished to Lender (and, where stated, Fund Control), as applicable (any matter once having been submitted and approved need not be resubmitted unless modified or superseded):

     3.13.1  The Loan shall have closed, the Loan Closing Costs shall have been paid, and all Loan Documents shall have been duly executed, acknowledged where appropriate, and delivered to Lender, all such documents and instruments shall be in full force and effect with no Event of Default thereunder, and all conditions therein shall have been satisfied.

     3.13.2  If required by Lender, issuance by the Title Company of (i) a CLTA 122 title policy endorsement insuring the continued priority of the lien of the Construction Deed of Trust (Leasehold) from all potential mechanic's lienholders, liens, encumbrances and defects except the Permitted Encumbrances, and (ii) such other title policy endorsements to the Title Policy (Leasehold) as Lender shall request.

3.13.3 Duly executed satisfactory forms of conditional waiver and release upon progress payment with respect to such Disbursement, and an unconditional waiver and release upon progress payment therefor within thirty (30) days from said payment.

3.13.4 Payment of all outstanding real estate taxes and assessments.

3.13.5 Evidence of soil compaction and/or borings and other soil tests indicating that the subsoil and geological conditions are suitable for the Improvements, and demonstrating that the quality of the land is such that it will support the Improvements in the manner contemplated by the Contract Documents. Such reports shall contain a recommendation with respect to the preferred types of footings and foundations.

3.13.6 Evidence satisfactory to Lender that all zoning and municipal approvals and all governmental or private contracts necessary for the development of the Project, including utilities, water, parking, storm, and sanitary sewers, have been obtained.

3.13.7 Evidence satisfactory to Lender that all utilities and water, storm, and sanitary sewer facilities are adequate, have the capacity to service the Project, are located and available at the boundaries of the Project, and may be utilized by Borrower for the Improvements.

3.13.8 Prior to the Disbursement of any Construction Loan Proceeds, Borrower shall submit to Lender copies of all permits and other approvals required for the development and/or construction of the Project, together with at least two (2) copies of the complete and final approved Plans and Specifications approved by Lender, and the appropriate Governmental Agencies (together with written confirmation by Borrower that such Plans and Specifications have received such approvals). All fees and costs of such review will be paid by Borrower. Each set of Plans and Specifications shall be signed and affixed with the Architect's registration seal. No changes or amendments to the Plans and Specifications shall be made, and no extra material shall be ordered, without Lender's prior written approval.

3.13.9 Certification from the Architect or other construction professionals such as soil engineers, geologists, mechanical engineers or environmental engineers, or other evidence approved by Lender:

(a) Certifying that the soil conditions and geology of the Property are suitable for the Project, that all necessary soil tests have been made, and such other matters required by Lender;

(b) Certifying that upon completion in accordance with the Contract Documents, the Project will comply with all applicable Laws, zoning ordinances, plat maps, subdivision Laws, environmental protection Laws, and building codes in effect at the time of such certification;

(c) Evidencing that all pollution and environmental Laws that are applicable to the Project and the use thereof have been satisfied. At Lender's option, Borrower shall cause to be prepared and delivered to Lender a complete written preliminary site assessment of the Property and all Improvements thereon, prepared exclusively for Lender by such

environmental consultants or other engineering firms approved by Lender, in its sole opinion and judgment, setting forth the results of an on-site inspection, evaluation, and reconnaissance of the Property, identification and description of surrounding land uses, a site history review, survey of geological and hydro geological conditions, review of regulatory agency records and lists, and other information and analysis which may be required by Lender in accordance with its policies and practices for loans secured by commercial real estate. The results of such preliminary site assessment must not indicate the presence or potential release or presence of any hazardous waste or other substance identified as such by any Governmental Agency having jurisdiction or responsibility for identifying, investigating, and/or remediation of hazardous or potentially hazardous environmental conditions; and

      (d)  Evidencing no presence of asbestos on or about the Property.

    3.13.10 A favorable Environmental Impact Report for the Project, when required by any Governmental Agency, or a negative declaration.

    3.13.11 Evidence that the Architect, the Engineer, the Contractor, the Construction Manager, Englekirk, Jensen, Syska, CACC, PPPC, MMC and major Subcontractors are licensed to do business and practice in the State of California.

    3.13.12 Submission to Lender of executed copies of the Construction Contract, the Architect's Contract, the Construction Manager's Contract, the Engineer's Contract, the Englekirk Contract, the Jensen Contract, the Syska Contract, the CACC Contract, the PPPC Contract, and the MMC Contract. All contracts for work in connection with the construction of the Improvements shall be subject to approval by Lender and its counsel, and if reasonably required by Lender, shall be fully bonded with payment and completion bonds naming Lender as joint beneficiary and providing for guaranteed fixed prices for the work of construction. Said bonds shall issued by an insurer or insurers satisfactory to Lender and in form and content reasonably satisfactory to Lender, and shall, at the request of Lender, be recorded in the official records of the County Recorder in which the Property is located.

    3.13.13 An agreement from selected Subcontractors as Lender shall choose, agreeing that, if there is an Event of Default on the part of Borrower under the Loan Documents, the Subcontractor will complete its contract for the Project. Upon the request of Lender, Borrower shall cause to be assigned to Lender such Subcontracts as Lender shall request. Further, upon request by Lender or Fund Control, Borrower shall cause Contractor to provide to Lender or Fund Control, as the case may be, a copy of any contracts between Contractor and a Subcontractor.

    3.13.14 Lender's rights and security in the Property shall not be subject to any right of first refusal, option, use restriction, covenant, condition, declaration or reciprocal easement which may, in Lender's reasonable opinion and judgment, adversely affect or impair Lender's security in the Property by any act or omission of Borrower or any other user or occupier of the Property, or impose upon Lender, directly or indirectly, a duty or condition which would require Lender to take any affirmative action to protect, preserve, or defend its rights and security in the Property. Additionally, prior to recording declarations of covenants, conditions, reciprocal easements and restrictions that are created or to be recorded after the Loan Closing, the

same shall be submitted to Lender for its prior review and approval and shall not be recorded unless and until Lender has provided its written approval, all in Lender's reasonable discretion.

      3.13.15 No improvements currently existing (or which are otherwise the basis for the appraised value of the Property) shall have been damaged or destroyed by any casualty whatsoever, or shall have been removed or replaced without the prior written consent of Lender.

      3.13.16 No eminent domain proceeding shall have been instituted against the Property.

      3.13.17 Lender shall have received, reviewed and approved, in its sole and absolute judgment, the final construction budget and/or Cost Breakdown.

      3.13.18 Evidence that the total amount of the Project Funds on hand shall be sufficient, in the reasonable judgment of Lender, to complete the Improvements free of liens and to pay interest and other sums as and when due under the Loan Documents. Borrower shall immediately pay any and all cost overruns in excess of the Contingency Reserve. Further, to the extent the total of Project Funds shall be insufficient at any time, in Lender's reasonable judgment, to complete the Project, or be less than the Project Costs, Borrower shall within ten (10) Business Days after demand of Lender deposit with Lender, an additional Borrower's Deposit in an amount equal to such deficiency.

      3.13.19 The Cost Breakdown and a timetable with a schedule of anticipated Advances, Disbursements and an estimate of initial and final Disbursements shall have been approved by Lender, in Lender's reasonable opinion and judgment.

      3.13.20 No Event of Default (or event which, with the giving of notice or the passage of time, or both, would become an Event of Default) shall exist under any of the Loan Documents.

      3.13.21 Each of the representations and warranties in Article II hereof shall be true and correct in all respects on and as of the date of each Disbursement.

      3.13.22 Borrower shall have complied with all of the covenants made by Borrower in Article IV hereof.

      3.13.23 A sworn statement of all Loan and Carrying Costs certified to Lender.

      3.13.24 An Application for Payment, submitted not more frequently than two (2) times per month, unless Lender and Borrower agree, in writing, to more frequent Disbursements. Materials for the Project may not be included within the Application for Payment unless segregated and irrevocably owned as part of the Project and, if off-site, warehoused, to the satisfaction of Lender in its sole opinion and judgment and unless Borrower provides to Lender proof of adequate insurance covering the materials and proof of actual payment for such materials. Lender may cause an inspection, at any time and from time to time, to be made of the progress of the construction. If any such inspection shows that the construction has reached a stage consistent with

the work and materials represented in the Application for Payment to have been incorporated into the work of improvement and upon the occurrence of all other conditions set forth in this Section 3.13, Lender will make Disbursements in accordance with this Agreement.

        3.13.25  Submission of:

              (a)     Proof that a period of twenty (20) days has expired after the furnishing of the labor, services and/or materials described in the Application for Payment, with no preliminary notice describing such labor, services and/or materials having been served upon Lender except by the Person named in the Application for Payment or the accompanying invoice(s);

              (b)     Such evidence as Fund Control or Lender may require that all funds disbursed pursuant to the immediately preceding Application for Payment have been utilized to pay the labor, services and/or materials described therein, and that such labor, services and/or materials have been paid in full; and

              (c)     Any other or further documentation required by Fund Control or Lender.

        3.13.26  The total amount of Undisbursed Project Funds shall be at least ten percent (10%) of the Construction Hard Costs.

        3.13.27  Borrower shall have deposited with Lender (a) the full amount of the Tranche 2B, as set forth herein, and (b) Tranche 3, as set forth in Section 3.22, below.

        3.13.28  By no later than thirty (30) calendar days after Loan Closing, Lender shall have actually received the Hilton Comfort Letter, fully executed by Borrower and Hilton.

      3.14    <u>FINAL DISBURSEMENT OF FUNDS; NOTICE OF COMPLETION</u>

        3.14.1  The Retentions for each subcontract shall be disbursed when:

              (a)     Each Subcontractor has completed the work for which it was engaged or provided the materials in accordance with the Contract Documents, the Plans and Specifications, and the work completed complies with all applicable Laws, and the Contractor and Architect have certified to the foregoing.

              (b)     Borrower has deposited with Lender an affidavit stating that all bills for labor and/or materials used in or related to such construction have been paid or ordered to be paid pursuant to Sections 3.13.24 and 3.13.25, except for bills against which appropriate bonds or funds are in the possession of Lender;

              (c)     Borrower shall have received final sign-off from the applicable Governmental Agency for the work or materials that are subject to the contract;

              (d)     [Reserved.]

(e)     The prescribed lien period has expired by time, and no liens shall be recorded against the title to the Property, and no bonded stop notices shall have been served and not released;

(f)     Each Subcontractor shall submit an unconditional lien release and waiver from Contractor; and

(g)     Borrower has submitted proof which, in the reasonable judgment of Lender, establishes that the amount available for construction has been used for the direct cost of the completion of the proposed Improvements, based upon an accounting and reconciliation or back-up provided by Borrower.

3.14.2 Promptly upon completion of the Project, Borrower shall ensure that the following occurs:

(a)     A valid notice of completion has been recorded;

(b)     A certificate of occupancy or other applicable approval from the appropriate Governmental Agency has been issued as to the Improvements;

(c)     All bonds, if any, have been exonerated; and

(d)     The Title Policy (Leasehold) has been rewritten and the required mechanic's lien endorsements are secured or equivalent coverage is obtained.

3.15     OPERATING ACCOUNT —

3.15.1 At or before Loan Closing, Borrower shall establish the Operating Account with Lender, which shall be assigned to Lender pursuant to the Assignment of Deposit Accounts. Borrower shall use the Operating Account as the sole operating account for the Property.

3.15.2 [Reserved.]

3.15.3 Notwithstanding the foregoing or anything else stated herein or in the other Loan Documents to the contrary, upon the occurrence and during the continuance of any Event of Default (or an event the occurrence of which with the giving of notice or passage of time would constitute an Event of Default hereunder), any and all rights of Borrower to utilize any or all of the funds in the Operating Account shall terminate without notice to Borrower, and thereafter, Borrower shall have no right to utilize funds from the Operating Account or to reduce the balance in the Operating Account in any manner or for any purpose; provided, however, that Lender shall at all times be entitled to exercise and enforce any and all rights and remedies accorded to Lender wider this Agreement, the Assignment of Deposit Accounts, and/or any of the other Loan Documents, including, without limitation, Lender's rights and remedies under Section 3.15.4 below.

3.15.4 Upon the occurrence and during the continuance of any Event of Default, Lender may continue to withdraw any funds from the Operating Account to pay any

amounts of principal and/or interest due and unpaid under the Note, in Lender's sole and absolute opinion and judgment, without further authorization on the part of Borrower.

3.15.5 If, with respect to the Operating Account, an automatic debit is entered to pay amounts of principal and/or interest due under the terms of the Note, but there are insufficient funds in the Operating Account to pay such amounts of principal and/or interest in full on the date such debit is entered, then Lender may, in its sole and absolute discretion, reverse such debit.

3.15.6 Borrower acknowledges that Lender has made no representation or warranty concerning the adequacy or sufficiency of the funds that may, at any time, be maintained in the Operating Account for payment of interest and/or principal on the Loan or any portion thereof.

3.16    WAIVER OF MECHANIC'S LIEN AND STOP PAYMENT NOTICE -Borrower hereby unconditionally and irrevocably waives all of its rights (and the rights of any successors and assigns) to assert any mechanic's liens, stop notice and stop payment notice claims with respect to the Property, the Project, the Project Funds and the Construction Loan Proceeds.

3.17    EB5 ACCOUNT

3.17.1 At or before Loan Closing, Borrower shall establish the EB5 Account with Lender, which shall be assigned to Lender pursuant to the Assignment of Deposit Accounts (EB5 Funds). Borrower shall use the EB5 Account as the sole deposit account for EB5 Funds.

3.17.2 As more particularly set forth in Section 3.22, below, Disbursements and/or Advances shall first be made from the EB5 Funds before the Construction Loan Proceeds, as and when required by the terms and conditions of this Agreement. Except and only to the extent EB5 Funds are Advanced by Lender pursuant to this Agreement, Borrower shall have no right to utilize funds from the EB5 Account or to reduce the balance in the EB5 Account in any manner or for any purpose; provided, however, that Lender shall at all times be entitled to exercise and enforce any and all rights and remedies accorded to Lender wider this Agreement, the Assignment of Deposit Accounts (EB5 Funds), and/or any of the other Loan Documents, including, without limitation, Lender's rights and remedies under Section 3.17.3 below.

3.17.3 Upon the occurrence and during the continuance of any Event of Default, Lender may continue to withdraw any EB5 Funds from the EB5 Account to be used toward the Project or otherwise, in Lender's sole and absolute opinion and judgment, without further authorization on the part of Borrower.

3.17.4 Borrower acknowledges that Lender has made no representation or warranty concerning the adequacy or sufficiency of the EB5 Funds that may, at any time, be maintained in the EB5 Account.

35

3.18    CHANGE ORDERS — Any and all change orders with respect to the Project, Cost Breakdown, the Construction Loan Proceeds and/or the Project Funds must first be approved by Lender, in Lender's sole discretion, and, if so approved, paid for by Borrower from Borrower's own funds.

3.19    GENERAL CONTRACTORS FEE – Subject to Borrower's satisfaction of any and all conditions in Section 3.13 above, Advances may be made for payment of the General Contractors Fee; provided, however, that (i) the maximum amount of the General Contractors Fee shall not exceed the amount of $89,686.00 and (ii) such fees shall be payable in equal monthly installments over the initial 18 calendar months of the Loan.

3.20    DEVELOPMENT FEE - Subject to Borrower's satisfaction of any and all conditions in Section 3.13 above, Advances may be made for payment of the Development Fee; provided, however, that (i) the maximum amount of the Development Fee shall not exceed the amount of $1,043,283.00, (ii) subject to Section 3.20(iii), below, such fees shall be payable in equal monthly installments over the initial 18 calendar months of the Loan, and (iii) no portion of the Construction Loan Proceeds shall be used for payment of the Development Fee, which shall only be paid from EB5 Funds, subject to the terms and conditions of this Agreement (including, but not limited to, Section 3.13, above). Any sums payable toward the Development Fee shall only be made available to Borrower upon Lender's actual receipt of the Development Fee from the Beach Orangethorpe Hotel EB5 Lenders and BEACH ORANGETHORPE HOTEL III, LLC, a California limited liability company.

3.21    RELEASE OF FF&E FUNDS – Borrower acknowledges and agrees with Lender that Borrower has budgeted the sum of $4,300,000.00 toward FF&E, which shall be comprised of Construction Loan Proceeds of $13,220.00 and EB5 Funds of $4,286,780.00. Subject and in addition to the terms and conditions of the Loan Documents, no Construction Loan Proceeds nor any EB5 Funds that are allocated for FF&E shall be disbursed or otherwise Advanced unless and until Borrower delivers to Lender a letter showing approval by Hilton of the interior design plan of the hotel to be constructed on the Property under the Loan Documents, and which letter must be acceptable to Lender in Lender's sole discretion.

3.22    ADDITIONAL EB5 FUNDS –

3.22.1  Subject to the terms and conditions of the Loan Documents, the EB5 Funds comprising Tranche 2B will be utilized first and prior to any Disbursement or Advances of Construction Loan Proceeds as Borrower's Deposit, and Lender shall have no obligation to make any Advances of any Construction Loan Proceeds unless and until all EB5 Funds comprising Tranche 2B are disbursed in their entirety. The EB5 Funds comprising Tranche 2 shall be deemed a Borrower's Deposit, and upon the deposit by Borrower with Lender of such EB5 Funds, the same shall be disbursed and advanced pursuant to the terms and conditions of this Agreement, including, without limitation, Section 3.13, above.

3.22.2  By no later than December 1, 2016, Borrower shall deposit the full amount of the EB5 Funds comprising Tranche 3 into the EB5 Account. The EB5 Funds comprising Tranche 3 shall be deemed a Borrower's Deposit, and upon the deposit by Borrower with Lender of such EB5 Funds, the same shall be disbursed and Advanced pursuant to the terms

and conditions of this Agreement, including, without limitation, Section 3.13, above. The EB5 Funds comprising Tranche 3 shall be deposited by Borrower into the EB5 Account and shall be pledged by Borrower to Lender pursuant to the Assignment of Deposit Accounts (EB5 Funds).

3.22.3 Borrower's failure to comply with the terms and conditions of this Section 3.22 shall constitute an Event of Default hereunder.

## ARTICLE IV.
## BORROWER'S COVENANTS

4. In addition to anything else herein stated, Borrower agrees:

4.1 PROMPTLY COMMENCE AND COMPLETE CONSTRUCTION -

(a) To commence construction and installation of the proposed Improvements promptly, and in no event later than the Commencement Date and to continue such construction and installation with speed and in a workmanlike manner. Borrower will complete such Improvements promptly, and in no event later than the Completion Date, in accordance with the Plans and Specifications, including any specifications prescribed by Lender, and with all requirements of all Governmental Agencies having or asserting jurisdiction, and will pay the cost thereof.

(b) If there is any difference between any such governmentally prescribed specifications and those furnished Lender pursuant hereto, the requirements of whichever thereof are the higher shall be met in construction and installation of the Improvements.

4.2 INSURANCE - To obtain and at all times maintain such insurance policies and coverages as are required under the Construction Deed of Trust (Leasehold), the Agreement To Furnish Insurance and/or any other Loan Documents, in amount, form and issued by a company or companies satisfactory to Lender.

4.3 REMEDY DEFECTS AND PROTECT PROPERTY - To remedy any defects and to cause any protective measures to be taken as may be apparent from any report(s) obtained pursuant to or described in this Agreement.

4.4 NO CHANGES IN CONTRACT DOCUMENTS - No changes in the Contract Documents shall be made after the same have been approved by Lender, without first obtaining the written consent of Lender, which approval shall not be unreasonably withheld.

4.5 REIMBURSE OR PAY ATTORNEYS' FEES AND COSTS - In the event that Lender shall be made a party to any legal proceedings instituted in connection with or arising out of the construction of said Improvements or the Loan herein provided for, to pay to Lender all sums paid and/or incurred by it as costs in said legal proceedings, together with such sums as may be paid or incurred by it in the employment of an attorney or attorneys to represent it in such legal proceedings.

37

4.6    <u>PRESERVE ITS EXISTENCE</u> - Borrower will, so long as Borrower remains obligated on the Loan, do all things necessary to preserve and keep in full force and effect its organizational status and will comply with all Laws, orders and decrees of any Governmental Agency or court applicable to Borrower and/or the Project.

4.7    <u>COMPLY WITH APPLICABLE LAWS</u> - Borrower shall comply with all applicable restrictive covenants, zoning and subdivision ordinances, building codes, health and environmental Laws and all other applicable Laws, directions, orders and notices of violations issued by any Governmental Agency relating to or affecting the premises or the business or activity being conducted thereon, whether by Borrower or by any occupant thereof, including without limitation, any and all Laws relating to hazardous or toxic waste or waste products or hazardous substances. Additionally, Borrower shall indemnify and hold Lender and the Trustee under the Construction Deed of Trust (Leasehold) harmless from the failure by Borrower to comply with such Laws in any respect.

4.8    <u>PAYMENT OF TAXES AND OTHER DEBT</u> — Borrower shall pay, or cause to be paid, and discharge, or cause to be discharged, (a) before delinquency all taxes, assessments, and governmental charges or levies imposed upon it, upon its income or profits, or upon any property belonging to it (including, without limitation, the Property); (b) when due all lawful claims (including, without limitation, claims for labor, materials, and supplies), which, if unpaid, might become a lien, charge, claim, demand or encumbrance upon any of its assets or property (including, without limitation, the Property); and (c) all its other obligations and indebtedness when due; provided, however, that Borrower may contest any of the foregoing in good faith and by appropriate proceedings diligently prosecuted by Borrower as long as Borrower has adequate reserves to pay any adverse determination or has otherwise provided Lender evidence of a surety or bond to pay any adverse determination.

4.9    <u>LIENS</u> - Borrower will not create, incur, assume or suffer to exist any mortgage, deed of trust, lease, pledge, lien, assignment, security interest or other charge or encumbrance (including the lien or retained security title of a conditional vendor) of any nature upon or with respect to the Property, or assign or otherwise convey any right to receive income; except that the foregoing restrictions shall not apply to (a) mortgages, deeds of trust, assignments, pledges, liens, security interests or other charges or encumbrances, including the Construction Deed of Trust (Leasehold), and the Assignment of Leases (Leasehold), covering the Property and created by or pursuant to or permitted by this Agreement; (b) taxes, assessments or governmental charges or levies on property of Borrower, or in respect of a judgment or award against Borrower, (i) if the same shall not at the time be delinquent or thereafter can be paid without penalty, or (ii) if Borrower shall have set aside adequate reserves therefor as determined or approved by its certified independent accounting firm, or, (iii) if, in the case of a judgment or award, execution on the same shall have been effectively stayed pending appeal or review or insured or bonded to the extent of Borrower's liability in respect thereof, and in the case of all of the foregoing, the same are being contested in good faith and by appropriate proceedings; (c) the Beach Orangethorpe Deeds of Trust (but not as to the leasehold estate associated with the Ground Lease or the Property); and (e) the Beach Orangethorpe Hotel Financing.

4.10    <u>TERRORISM AND ANTI-MONEY LAUNDERING</u> — Borrower warrants and agrees as follows:

(a)     As of the date hereof and throughout the term of the Loan: (i) Borrower; (ii) any Person controlling or controlled by Borrower; (iii) if Borrower is a privately held entity, any Person having a beneficial interest in Borrower; or (iv) any Person for whom Borrower is acting as agent or nominee in connection with this transaction, is not an OFAC Prohibited Person.

(b)     To comply with applicable U.S. Anti-Money Laundering Laws and regulations, all payments by Borrower to Lender or from Lender to Borrower will only be made in Borrower's name and to and from a bank account of a bank based or incorporated in or formed under the laws of the United States or a bank that is not a "foreign shell bank" within the meaning of the U.S. Bank Secrecy Act (31 U.S.C. § 5311 et seq.), as amended, and the regulations promulgated thereunder by the U.S. Department of the Treasury, as such regulations may be amended from time to time.

(c)     To provide Lender at any time and from time to time during the term of the Loan with such information as Lender determines to be necessary or appropriate to comply with the Anti-Money Laundering Laws and regulations of any applicable jurisdiction, or to respond to requests for information concerning the identity of Borrower, any Person controlling or controlled by Borrower or any Person having a beneficial interest in Borrower, from any governmental authority, self-regulatory organization or financial institution in connection with its anti-money laundering compliance procedures, or to update such information.

(d)     The representations and warranties set forth in this Section 4.10 shall be deemed repeated and reaffirmed by Borrower as of each date that Borrower makes a payment to Lender under the Note, this Agreement and the other Loan Documents or receives any payment from Lender. Borrower agrees promptly to notify Lender in writing should Borrower become aware of any change in the information set forth in these representations.

4.11     REPORTING REQUIREMENTS - So long as Borrower shall have any obligation to Lender under this Agreement and/or the other Loan Documents, Borrower shall prepare, or cause to be prepared, and deliver, or cause to be delivered, to Lender the following Financial Statements and reports:

4.11.1 As soon as practicable and in any event within ten (10) days after Borrower knows or should reasonably have known, of the commencement of any legal action against it, except actions seeking money judgments that are fully insured or bonded, a report of the commencement of such action containing a statement signed by all managers or managing members of Borrower setting forth details of such legal action and any action Borrower proposes to take with respect thereto;

4.11.2 Within five (5) days of the occurrence of any Event of Default or event which, with the giving of notice or lapse of time, or both, would constitute an Event of Default, a report regarding such Event of Default or event setting forth details and describing any action which Borrower proposes to take with respect thereto, signed by Borrower;

4.11.3 Any change in the name of Borrower or use of any trade names or trade styles not presently used;

4.11.4 Borrower will cause DMC Investment Holdings, LLC, a Delaware limited liability company, to provide Lender with copies of all signed income tax returns (with all forms K-1 attached) of DMC Investment Holdings, LLC, a Delaware limited liability company, prepared and reviewed by a certified public accountant acceptable to Lender shall be furnished to Lender no later than thirty (30) days after they are filed with the relevant taxing authorities;

4.11.5 As soon as available, and in any event within ninety (90) days following the end of each calendar year during which the Loan has not been fully repaid and performed, and discharged, Borrower will cause each Guarantor to provide complete and accurate Financial Statements representing the financial condition of such Guarantor as of the date such Financial Statements are prepared and delivered to Lender, including such supplemental reports and schedules as Lender shall require in its sole and absolute discretion. All Financial Statements may be self-prepared, and shall contain a certification signed by any individual providing a Financial Statement certifying to the completeness and accuracy of all information, without exception. All such Financial Statements shall be prepared and presented in accordance with GAAP, consistently applied, or in such other form and content as Lender may permit, in its sole opinion and judgment. Additionally, Borrower shall cause each Guarantor to furnish to Lender copies of all signed income tax returns (with all forms K-1 attached) of such Guarantor no later than thirty (30) days after they are filed with the relevant taxing authorities;

4.11.6 Promptly upon receipt thereof, Borrower shall provide to Lender one (1) copy of any other report submitted to Borrower by independent accountants in connection with any annual, interim or special audit made by them of the books of Borrower;

4.11.7 Within ten (10) days of (i) any contact from any Governmental Agency concerning any environmental protection Laws, including, but not limited to, any notice of any proceeding or inquiry with respect to the presence of any hazardous waste, toxic substances or hazardous materials on the Property or the migration thereof from or to other property, (ii) any and all claims made or threatened by any third Person against or relating to the Property concerning any loss or injury resulting from toxic substances, hazardous waste, or hazardous materials, or (iii) Borrower's discovery of any occurrence or condition on any property adjoining or in the vicinity of the Property that could cause the Property, or any part thereof, to be subject to any restrictions on the ownership, occupancy, transferability, or loss of the Property under any Law, Borrower shall deliver to Lender a report regarding such contact and setting forth in detail and describing any action which Borrower proposes to take with respect thereto, signed by Borrower;

4.11.8 Within thirty (30) days following the end of each calendar month during which the Loan has not been fully repaid and performed, Borrower shall cause Fund Control to deliver to Lender a progress report on the construction of the Project in form and content satisfactory to Lender, in its sole and absolute discretion;

4.11.9 Within five (5) days of becoming aware of any developments or other information which may materially and adversely affect Borrower's properties, business, prospects, profits or condition (financial or otherwise) or Borrower's ability to perform this Agreement or the other Loan Documents, telephonic or written notice (delivered via facsimile)

specifying the nature of such development or information and such anticipated effect, which shall be promptly confirmed in writing;

4.11.10 Following issuance of the certificate of occupancy (or certificate of completion) for the Project, and no later than fifteen (15) days following the end of each calendar quarter (i.e., March 31, June 30, September 30 and December 31) during which the Loan has not been fully repaid and performed, a current operating statement for the immediately preceding calendar quarter for the Property, including income and expense statements, and such other information as Lender may request; and

4.11.11 Borrower shall prepare, or cause to be prepared, and deliver, or cause to be delivered, to Lender such other information respecting the business, properties or the condition or operations, financial or otherwise, of Borrower and/or Guarantor as Lender may from time to time reasonably request.

4.12 <u>CONSTRUCTION COST OVERRUNS</u> - Borrower will be responsible for and shall pay all costs not covered by the Loan including, but not limited to, title and recording charges, appraisal fees, interest and any other construction costs.

4.13 <u>ADDITIONAL ITEMS TO BE FURNISHED BY BORROWER</u> - In addition to anything else stated herein, and whether or not previously requested and/or provided, Borrower agrees to furnish to Lender each and all of the following:

4.13.1 <u>FUNDS TO SUPPLEMENT THE UNDISBURSED PROJECT FUNDS</u> - If and whenever Lender shall determine and notify Borrower that the Undisbursed Project Funds, after deduction of amounts theretofore paid out pursuant hereto, is less than the then estimated amount required to fully complete and pay for the Project, and Lender demands that Borrower make a Borrower's Deposit thereof with Lender in an amount equal to such deficiency, Borrower shall comply with such demand within ten (10) Business Days from the date thereof; the judgment of Lender shall be final and conclusive in this respect;

4.13.2 <u>PRELIMINARY NOTICES</u> - Promptly when received, copies of all preliminary notices delivered pursuant to section 8200 of the California Civil Code or any similar Law (a) to Borrower and/or (b) to the Property, addressed to Lender or to "Construction Lender";

4.13.3 <u>LISTS OF SUBCONTRACTORS</u> - From time to time, upon Lender's demand to Borrower or Contractor, or both, a true and correct list of every material Subcontractor employed in connection with the construction and/or installation of the Improvements and/or the furnishing of FF&E to the Project, including, but not limited to, contracts for grading, concrete, framing, roofing, HVAC/heating, landscaping, paving, electrical and plumbing. Each said list shall show, in regard to each such Subcontractor, (a) name, (b) address and telephone number, (c) an approximate estimate of the dollar value of the work, labor, and materials to be done or supplied, (d) a general statement of the nature of the work to be done, (e) the amount paid to date, and (f) the amount still owing. Each such demand shall be made in writing by Lender, and Borrower shall be responsible to see that each such list be delivered to Lender within ten (10) Business Days

after each such demand. Borrower acknowledges that Lender may directly contact the Subcontractors in connection with verifying the information contained in each such list;

4.13.4 <u>GENERAL CONTRACTS AND SUBCONTRACTS</u> - Copies of all contracts and agreements described in Section 4.13.3, above, within ten (10) Business Days after execution thereof, if required by Lender; and

4.13.5 <u>FOUNDATION SURVEY</u> - Upon request, a survey, made and certified by a licensed engineer or surveyor, showing that the foundations are located entirely within the property lines and do not encroach upon any easement or breach or violate any covenant, condition, or restriction of record, or any building or zoning Laws;

4.14 <u>SECURITY INTEREST IN PROJECT RIGHTS</u> - As additional security for the payment and performance of Borrower's obligations pursuant to the Loan Documents, Borrower hereby assigns and grants to Lender a security interest in and to all of Borrower's right, title, and interest in and to each and all of the rights, interests, property, privileges, licenses, reports, permits, instruments, general intangibles and documents, and all proceeds thereof (hereinafter, collectively, "Project Rights") relating to the Project:

4.14.1 As used herein, the term Project Rights shall include, but is not limited to, the following:

(a) All building permits, governmental permits, licenses, and authorizations, whether now issued or issued hereafter;

(b) All fees paid to or on behalf of Governmental Agencies, for whatever purpose and by whatever name;

(c) All utility deposits and rights to refund of utility deposits;

(d) All soils and/or geological studies and reports;

(e) All economic, marketing, and/or feasibility studies and reports;

(f) All other studies and reports obtained, or to be obtained, by Borrower, including, but not limited to, reports of architects, engineers, and other professionals relating to the Project;

(g) All appraisals and reports of appraisers;

(h) All water shares and water rights, if any;

(i) All licenses and privileges obtained by Borrower from non-governmental sources;

(j)     All claims, rights, causes of action, and choses in action in regard to damage done to the Property, FF&E, Improvements, and/or personal property thereon;

(k)     All certificates, certifications, approvals, and other documents;

(l)     All other fees, deposits, and rights to refunds held by Borrower;

(m)     All other tangible and intangible property rights, property interests, privileges, licenses, reports, instruments, and documents obtained by Borrower in connection with the Project;

(n)     All of the foregoing described items as and when the same come into existence in the future; and

(o)     All proceeds and products of the foregoing.

4.14.2  BORROWER'S REPRESENTATIONS AND WARRANTIES AS TO PROJECT RIGHTS - Borrower hereby represents and warrants to Lender that:

(a)     Borrower is the sole owner of the Project Rights, and each of them;

(b)     Borrower has the right to make this assignment and such Project Rights are granted and assigned free from liens, encumbrances, claims, and setoffs of every kind whatsoever;

(c)     The full title and right to Borrower's interests in the Project Rights are vested in Lender hereby;

(d)     The Project Rights are valid and in full force and effect in accordance with their terms;

(e)     Borrower is not in default under any of the terms, conditions, or covenants with respect to the Project Rights;

(f)     Borrower has not heretofore assigned or pledged Borrower's interest in the Project Rights, or any of them, and Borrower will not further pledge or assign Borrower's interest in the Project Rights, or any of them; and

(g)     In the event Persons that are not parties to this Agreement are required to consent to the assignment of all or any part of the Project Rights, Borrower shall obtain such consent.

4.14.3  ASSIGNMENT IRREVOCABLE - This assignment is irrevocable and shall remain in full force and effect until and unless the Loan is paid in full, and no event of termination or release shall have any effect unless and until Lender shall execute, in writing,

a certification that such event has occurred; and, until such certification is so executed by Lender and delivered, all Persons may rely upon this Agreement as an effective assignment of the Project Rights, and each of them, as hereinabove described.

4.14.4 <u>BORROWER'S COVENANTS WITH RESPECT TO PROJECT RIGHTS</u> - Borrower hereby covenants and agrees:

(a)     If Borrower's legal ability to assign any of the Project Rights to Lender is based upon the need for approval or consent from another Person, to obtain such approval or consent and furnish evidence thereof to Lender;

(b)     To observe and perform all obligations imposed on Borrower in regard to the Project Rights and to indemnify Lender from the consequences of any failure to do so;

(c)     To preserve the Project Rights in full force and effect for the benefit of Lender;

(d)     Not to execute any other assignment of Borrower's interest in the Project Rights;

(e)     Not to alter, amend, modify, terminate, cancel, or release the Project Rights without the prior written consent of Lender, which consent Lender may give or withhold in Lender's sole opinion and judgment;

(f)     That upon an Event of Default by Borrower under the Loan, and notice having been given in the manner and to the extent required by the Loan Documents:

(i)     Lender, at its option, without any requirement that it do so, may perform and enforce the Project Rights, or any of them, in its own name or in the name of Borrower; and

(ii)     For the purposes of completing the Project, Lender may reassign its right, title, and interest in the Project Rights, or any of them, to any Persons without any further requirement of Borrower's consent, and any such reassignment shall be valid and binding upon Borrower and all other Persons with any relationship to the Project Rights, or any of them, as fully as if each had expressly approved the same;

(g)     Borrower hereby indemnifies and holds Lender harmless from and against any and all claims, demands, liabilities, losses, lawsuits, judgments, awards, costs, and expenses, including, but not limited to, attorneys' fees, to which Lender may become subject, or which Lender may incur, in exercising any of its rights under this assignment.

4.14.5 <u>NO DUTY OF LENDER</u> - This assignment is made for security purposes only and, except to the extent the same is exercised by Lender upon notice, Lender shall have no obligation to perform any obligation with respect to the Project Rights, or any of them, nor shall Lender be required to enforce any obligations or duties of any Persons, and Borrower

hereby specifically waives any and all rights that Borrower may have to require Lender to undertake any duties or obligations relating to the Project Rights, to utilize the Project Rights, or any of them, in any manner whatsoever, or to enforce the Project Rights, or any of them, whether such duties may arise expressly, impliedly, by operation of Law, or otherwise.

4.14.6 POWER OF ATTORNEY - Upon the occurrence and during the continuance of any Event of Default, Borrower hereby irrevocably constitutes and appoints Lender as Borrower's attorney-in-fact, which power is deemed coupled with an interest and is, therefore, irrevocable, to demand, receive, and enforce Borrower's rights with respect to the Project Rights, and each of them, to make payments under the Project Rights, and to give appropriate receipts, releases, and satisfactions for, on behalf of, and in the name of Borrower, or, at the option of Lender, in the name of Lender, with the same force and effect as Borrower could do if this appointment had not been made.

4.15 LENDER HAS NO DUTY TO CONSTRUCT OR SUPERVISE - Lender is under no obligation to construct or supervise construction of the Project, or any portion thereof, and any inspection by or on behalf of Lender of the construction of said Project is for the sole purpose of protecting the security of Lender. Such inspection is not to be construed as a representation that there will be a strict compliance on the part of Borrower with the Plans and Specifications, or that the construction will be free from faulty materials or workmanship. Borrower will make or cause to be made such other independent inspections as Borrower may desire for Borrower's own protection.

4.16 RIGHT OF ENTRY - Lender and Lender's employees or agents shall have the right at all times to enter upon the Property for whatever purpose Lender deems appropriate, including, without limitation, inspection of the premises and the posting of such notices and other written or printed material thereon as Lender may deem appropriate or desirable.

4.17 LENDER'S RIGHT TO STOP WORK - If Lender determines that said work put in place since the last inspection is not in substantial conformance with the Plans and Specifications and/or the terms of this Agreement, Lender shall have the right (a) to stop said work ("Stoppage"), and/or order its replacement and/or repair, whether or not said unsatisfactory work has theretofore been incorporated in said Improvements, and/or (b) to withhold all further disbursements and advances until such work is satisfactory to it.

4.18 LENDER MAY EXAMINE BOOKS AND RECORDS - Lender and Lender's employees and agents shall have the right, from time to time, acting by and through its employees or agents, to examine the books, records, and accounting data of Borrower, and to make extracts therefrom or copies thereof. Borrower shall promptly make such books, records, and accounting data available to Lender, as stated above, upon written request, and upon like request shall promptly advise Lender, in writing, of the location of such books, records, and accounting data.

4.19 SIGNS - Lender may place a sign or signs on the construction premises, appropriate thereto, evidencing that construction financing is being made by Lender. Additionally, Lender shall have the right, at its option, to publish announcements concerning the Loan in the media, including newspapers and trade journals.

4.20    NO AUTOMATIC SET-OFF - That the existence of Undisbursed Project Funds, the Construction Loan Proceeds and/or the fact of any sum or sums being on deposit with Lender shall in no way constitute a set-off against or be deemed to compensate the obligations of the Loan or any payment or performance due under the Loan Documents or this Agreement, unless and until Lender, by affirmative action, shall so apply said accounts or any portion thereof, and then only to the extent thereof as so designated by Lender.

4.21    RELIANCE BY LENDER AND ACQUITTANCE - Lender may conclusively assume that the statements, facts, information, and representations contained herein and/or in any affidavits, orders, receipts, or other written instrument(s) that are filed with Lender or exhibited to it, are true and correct, and Lender may rely thereon without any investigation or inquiry, and any payment made by Lender in reliance thereon shall be a complete release in its favor for all sums so paid.

4.22    CIVIL CODE § 8700 ET SEQ. — Borrower shall provide evidence satisfactory to Lender that Borrower has complied with the provisions of California Civil Code § 8700 et seq., if applicable to Borrower.

4.23    NO LEASE, TRANSFER OR FURTHER ENCUMBRANCE — Borrower shall not, without the prior written consent of Lender:

(a)    Create, incur, assume, permit or suffer to exist, any mortgage, deed of trust, pledge, lien, hypothecation, charge (fixed or floating), security interest or other encumbrance whatsoever on the Property or any interest therein, except for the Permitted Encumbrances and otherwise expressly disclosed in this Agreement;

(b)    Transfer the Property, or any interest therein, or permit the same to occur;

(c)    Become a party to any transaction whereby the Property or any portion thereof, or all or any substantial part of the properties, assets or undertakings of Borrower (whether legally or beneficially owned by Borrower), would become the property of any other Person, whether by way of transfer, sale, conveyance, lease, sale and leaseback, or otherwise;

(d)    Change the use of the Property, or permit the same to occur;

(e)    Transfer, convey, hypothecate, or sell membership interests in Borrower, or permit the same to occur;

(f)    Change the manager of Borrower; or

(g)    Enter into any leases for all or any portion of the Property, except for the Approved Leases.

4.24    MAINTENANCE OF PROPERTIES AND PRESERVE EXISTENCE -Borrower shall maintain and preserve, or cause to be maintained and preserved, all of its properties, necessary or useful in the proper conduct of its business, including such as may be under lease, in

good working order and condition, ordinary wear and tear excepted. Borrower, so long as Borrower remains obligated on the Loan, shall do all things necessary to preserve and keep in full force and effect Borrower's organizational status, and will comply with all Laws, orders and decrees of any Governmental Agency or court applicable to Borrower or to the Property.

4.25 <u>BOOKS AND RECORDS; AUDIT AND EXAMINATION</u> — Borrower shall keep and maintain all books and records in original form, as shall be required and as shall otherwise be appropriate, in Lender's opinion and judgment, pertaining to the performance by Borrower of its covenants and other obligations hereunder, and otherwise pertaining to its operations and activities. Borrower shall at all times permit Lender to review, audit and examine all such books and records, either directly or through one or more auditors designated by Lender, including independent contractors.

4.26 <u>PROTECTION OF LIENS</u> — Borrower shall maintain the lien of the Construction Deed of Trust (Leasehold) as a first priority lien on the entire leasehold estate under the Ground Lease on the Property and take all actions, and execute and deliver to Lender all documents, required by Lender from time to time in connection therewith.

4.27 <u>TITLE INSURANCE ENDORSEMENTS</u> — Borrower shall deliver to Lender, at Borrower's sole expense and in form and content required by Lender from time to time, in Lender's sole discretion, such endorsements to the Title Policy (Leasehold) as Lender shall request.

4.28 <u>CORPORATION RESTRICTIONS</u> — Borrower will not consolidate or merge with any corporation, any limited partnership, any limited liability company, or any other Person.

4.29 <u>NAME, FISCAL YEAR, ACCOUNTING METHOD, AND LINES OF BUSINESS</u> — Borrower will not change its name, Fiscal Year, or method of accounting. Borrower will not directly or indirectly engage in any business other than the business in which Borrower is engaged on the date of this Agreement, discontinue any existing lines of business that are material to the business or operations of Borrower, or substantially alter its method of doing business.

4.30 <u>LOANS</u> - Borrower will not directly or indirectly (a) make any loan or advance to any other Person other than advances made in the ordinary course of Borrower's business; (b) purchase or otherwise acquire any capital stock or any securities of any other Person, any limited liability company interest or partnership interest in any other Person, or any warrants or other options or rights to acquire any capital stock or securities of any other Person or any limited liability company interest or partnership interest in any other Person; (c) make any capital contribution to any other Person; (d) otherwise invest in or acquire any interest in any other Person or establish any subsidiaries, (e) guarantee or otherwise become obligated in respect of any indebtedness of any other Person, or (f) subordinate any claim against or obligation of any other Person to Borrower to any other indebtedness of such Person.

4.31 <u>INDEBTEDNESS</u> - Borrower shall not assume, create, incur, or permit to exist any obligations or indebtedness in favor of any Person except trade obligations and

normal accruals in the ordinary course of business not yet due and payable. Borrower shall not assume, create, incur, or permit to exist any contingent liabilities, including, without limitation, contingent reimbursement obligations under letters of credit.

      4.32   ACQUISITION OF ASSETS - Borrower shall not acquire by purchase, lease or otherwise all or substantially all the assets of any other Person.

      4.33   DISTRIBUTIONS - Borrower shall not make, declare or permit any distribution to any officer, member or manager, partner or other direct or indirect beneficial owner of Borrower at any time that an Event of Default (or event that with the giving of notice or passage of time, or both, would constitute an Event of Default) has occurred and is continuing or if any such distribution would cause or contribute to an Event of Default (or event that with the giving of notice or passage of time, or both, would constitute an Event of Default).

      4.34   TRANSACTIONS WITH AFFILIATES - Borrower will not enter into, or cause, suffer or permit to exist, any arrangement or contract with any of its Affiliates, including, without limitation, any management contract, unless such transaction is on terms that are no less favorable to Borrower than those that could have been obtained in a comparable transaction on an arms' length basis from a Person that is not an Affiliate.

      4.35   LEASES -

      (a)   Borrower shall only enter into Approved Leases for the Property (this restriction shall apply to all leases for the Property entered into by Borrower, including, without limitation, all new and renewal leases).

      (b)   If requested by Lender, Borrower shall, immediately upon execution by Borrower of any new or renewal lease with respect to the Property, provide Lender with a true, correct and complete copy of such lease, as signed by all parties thereto.

      4.36   SINGLE PURPOSE ENTITY - Borrower shall, at all times, remain an entity which (i) exists solely for the purpose of owning and operating the Ground Lease on Property, (ii) conducts business only in its own name, (iii) does not engage in any business other than the ownership, management and operation of the Ground Lease on the Property, (iv) does not hold, directly or indirectly, any ownership interest (legal or equitable) in any entity or any real or personal property other than the interest which it owns in the Ground Lease on the Property, (v) does not have any Assets other than those related to its interest in the Ground Lease in the Property and does not have any debt other than as permitted by this Agreement and does not guarantee or otherwise obligate itself with respect to the debts of any other Person, (vi) has its own separate books, records, accounts, financial statements and tax returns (with no commingling of funds or assets), (vii) hold itself out as being a company separate and apart from any other entity, and (viii) observes limited liability company formalities, independent of any other entity.

      4.37   GROUND LEASE — Borrower shall pay and perform any and all of its obligations under the Ground Lease on or before the date any such payment or performance is due and Borrower shall not permit to exist any condition that would give the Ground Lessor the right to terminate the Ground Lease. Borrower shall also not terminate, amend, modify or alter the Ground Lease (or permit the same to occur), but shall keep the Ground Lease in full force and effect.

4.38   ENGINEER'S CONTRACT — If required by Lender, in Lender's sole discretion, Borrower shall cause Architect and Engineer to assign any and all rights with respect to the Engineer's Contract to Lender, pursuant to the Assignment of Engineer's Contract.

4.39   INITIAL CAPITAL CONTRIBUTION – Consistent with the capital requirements applicable to a Federal Deposit Insurance Corporation-supervised institution described in Part 324, "Capital Adequacy of FDIC-Supervised Institutions," of Chapter III of Title 12, Code of Federal Regulations, Borrower represents, warrants and agrees as follows:

4.39.1  Borrower has contributed capital to the Project in the form of cash or unencumbered readily marketable assets (or has paid development expenses out-of-pocket) in an amount equal to at least fifteen (15%) of the appraised "as completed" value of the Project ("Initial Capital Contribution"), and the Initial Capital Contribution was made prior to any Advance (the appraised "as completed" value shall be determined by an Appraisal prepared for Lender); and

4.39.2  Throughout the term of the Loan, Borrower will continuously maintain the Initial Capital Contribution and retain such Initial Capital Contribution in the Project until the Loan is paid in full.

4.40   HILTON FRANCHISE AGREEMENT – Borrower shall not enter into, permit or consent to any amendments, modifications, restatements or termination of the Hilton Franchise Agreement without Lender's prior written consent, which consent may be granted, denied or conditioned by Lender in Lender's commercially reasonable discretion.

4.41   INTERSTATE RIM HOTEL MANAGEMENT AGREEMENT – Borrower shall not enter into, permit or consent to any amendments, modifications, restatements or termination of the Interstate Rim Hotel Management Agreement without Lender's prior written consent, which consent may be granted, denied or conditioned by Lender in Lender's commercially reasonable discretion.

4.42   PLEDGE AGREEMENT (FEE LENDERS) – Except as expressly set forth in the Pledge Agreement (Fee Lenders), Borrower shall not permit any further pledge, assignment, transfer, hypothecation or any other conveyance of the membership interest of DMC Investment Holdings, LLC, a Delaware limited liability company.

4.43   BEACH ORANGETHORPE HOTEL FINANCING LOAN DOCUMENTS – Borrower shall perform, as and when due, any and all of Borrower's obligations in connection with the Beach Orangethorpe Hotel Financing Loan Documents.

ARTICLE V.
EVENTS OF DEFAULT

5.   An "Event of Default" occurs hereunder if:

5.1   DEFAULT UNDER LOAN DOCUMENTS. (a) Borrower shall fail to pay principal or interest, or both, when due under the terms of the Note within five (5) days of the

due date of such payment; or (b) Borrower shall fail to pay an amount owing under this Agreement or any of the other Loan Documents when due within five (5) days following notice of failure to perform from Lender; or (c) Borrower shall fail to perform or observe any term, covenant, or agreement contained in this Agreement or in any of the other Loan Documents within fifteen (15) days following notice of failure to perform from Lender (or if the failure of such performance cannot reasonably be cured by Borrower within such period of fifteen (15) days, then Borrower shall have promptly commenced, and diligently prosecute, such cure within such fifteen (15) day period, but in no event shall such cure exceed forty five (45) days); or

5.2    FAILURE TO COMPLETE CONSTRUCTION - Except for Force Majeure Events which may delay construction (but such Force Majeure Events shall not serve to extend the Maturity Date), the construction of the Improvements shall not have been completed by the Maturity Date with a valid notice of completion having been recorded by Borrower; or

5.3    BREACH OF REPRESENTATIONS OR WARRANTIES - Any representations or warranties made or agreed to be made in any of the Loan Documents or this Agreement, or otherwise in connection with the Loan, shall be breached in any material respect or shall prove to be false or misleading in any material respect when made; or

5.4    LITIGATION AGAINST BORROWER - Any suit shall be filed against Borrower, which, if adversely determined, could substantially impair the ability of Borrower to perform any or all of its obligations under and by virtue of this Agreement or any of the other Loan Documents, unless Borrower's counsel furnishes to Lender its opinion, to the satisfaction of Lender and Lender's counsel, that, in Borrower's counsel's judgment, the suit is essentially without merit; or

5.5    LEVY UPON THE PROPERTY - A levy be made on the Property or any other Collateral under any process or any lien creditor commences suit to enforce a judgment lien against the Property or any other Collateral, and such levy or action shall not be bonded against by sureties deemed by Lender to be sufficient in its reasonable opinion and judgment; or

5.6    CROSS-DEFAULT; OTHER OBLIGATIONS - Borrower commits a breach or default in the payment or performance of any other obligation of Borrower, or breaches any warranty or representation of Borrower, under the provisions of any other instrument, agreement, guaranty, or document evidencing, supporting, or securing any other loan or credit extended by Lender, or by any affiliate of Lender, to Borrower or to any Affiliate of Borrower (said financing is hereinafter referred to as "other financing"), including, but not limited to, any and all term loans, revolving credits, or flooring lines of credit extended from time to time to Borrower (or any Person signing this Agreement on behalf of Borrower), or any other Person with which Borrower is affiliated and is conducting business on the Property; or Borrower causes the other financing, or any portion thereof, to be refinanced or repaid with funds lent, advanced, paid, or contributed, in whole or in part, directly or indirectly, by any other commercial lender to or for the benefit of Borrower, or any Affiliate of Borrower, and any such matter referenced in this Section 5.6 is not cured within fifteen (15) days following notice of failure to perform from Lender. For purposes of this Agreement, the term "commercial lender," shall mean any bank, savings and loan association, savings association, savings bank, credit union, insurance company, commercial finance

lender, and any other person or entity which engages in the business of lending money for commercial, investment, or business purposes; or

5.7 TRANSFER OF PROPERTY - Borrower shall voluntarily or by operation of Law, sell, transfer, convey, lease, or encumber the Property, or any interest therein (except as otherwise permitted under the Construction Deed of Trust (Leasehold) or this Agreement), or shall contract for such sale, transfer, conveyance, or encumbrance without the prior written consent of Lender, which consent Lender may either give or withhold in its sole and absolute opinion and judgment; or

5.8 ABANDONMENT – Subject to any notice and applicable cure period set forth in Section 5.1(c), the Project is abandoned by Borrower or work ceases or is delayed thereon for a period of thirty (30) calendar days or more, or construction is delayed for any period of time for any reason whatsoever so that completion of the Improvements cannot be accomplished, in the reasonable judgment of Lender, on or before the Completion Date; or

5.9 INSOLVENCY - (i) Borrower shall fail to pay its debts as they become due, or shall make an assignment for the benefit of its creditors, or shall admit, in writing, its inability to pay its debts as they become due, or (ii) Borrower shall file a petition under any chapter of the United States Bankruptcy Code or any similar Law, now or hereafter existing, or shall become "insolvent" as that term is generally defined under the United States Bankruptcy Code, or shall in any involuntary bankruptcy case commenced against it file an answer admitting insolvency or inability to pay its debts as they become due, or shall fail to obtain a dismissal of such case within thirty (30) calendar days after its commencement or shall convert the case from one chapter of the United States Bankruptcy Code to another chapter, or be the subject of an order for relief in such bankruptcy case, or be adjudged a bankrupt or insolvent, or shall have a custodian, trustee, or receiver appointed for, or have any court take jurisdiction of, its property, or any part thereof, in any voluntary or involuntary proceeding, including, but not limited to, those for the purpose of reorganization, arrangement, dissolution, or liquidation, and such custodian, trustee, or receiver shall not be discharged, or such jurisdiction shall not be relinquished, vacated, or stayed within thirty (30) calendar days after the appointment; or

5.10 BORROWER STATUS - Without Lender's prior written consent, Borrower shall be liquidated, dissolved, or fail to maintain its status as a going concern or there shall be a change in the manager or entity form of Borrower; or

5.11 ATTACHMENT - Any proceeding shall be brought the object of which is that any part of Lender's commitment to make the Advances hereunder shall at any time be subject or liable to attachment or levy during the course of the suit of any creditor of Borrower unless Borrower's counsel furnishes to Lender its opinion, to the satisfaction of Lender and Lender's counsel, that, in its judgment and after investigation, the suit is essentially without merit; or

5.12 EXECUTION LEVY - Execution shall have been levied against the Property or any lien creditor(s) commence(s) suit to enforce a judgment lien against the Property and such action or suit shall not have been bonded over and shall continue unstayed and in effect for a period of more than thirty (30) calendar days.

5.13  <u>DESTRUCTION</u> - Any part of the Improvements or any other Collateral are materially damaged or destroyed by fire or other casualty and the loss shall prove to be inadequately covered by insurance actually collected or in the process of collection; or

5.14  <u>EMINENT DOMAIN</u> - The Property shall be the subject of an eminent domain proceeding or a taking adverse to the security interest of Lender; or

5.15  <u>NONCONFORMANCE OF CONSTRUCTION</u> - If work is not made satisfactory to Lender, and Borrower has not commenced to make works satisfactory to Lender, within fifteen (15) calendar days from the date of a Stoppage by Lender; or

5.16  <u>STOP NOTICE OR MECHANIC'S LIEN</u> - In the event of the filing with Lender of a notice to withhold or the recording of a mechanic's lien pursuant to section 8000, et seq., of the California Civil Code relating to liens upon real property or any similar Law, and Borrower fails to furnish Lender a sufficient bond causing such notice or lien to be released, or give other indemnity, satisfactory to Lender, within ten (10) calendar days after such filing or recording, unless Borrower's counsel furnishes to Lender its opinion, without qualification, and in form and content satisfactory to Lender, that the Construction Deed of Trust (Leasehold) has priority over such notice or such lien; or

5.17  <u>FINANCIAL CONDITION</u> - There shall be any material adverse changes in the financial condition of Borrower or any Guarantor; or

5.18  <u>DEFAULT UNDER GUARANTY</u> - Any Guarantor fails to perform any term, condition or agreement contained in the Continuing Guaranty or the Completion Guaranty, and fails to cure the same within fifteen (15) days following notice of failure to perform from Lender, or revokes or notifies Lender of an intention to revoke the Continuing Guaranty or the Completion Guaranty; or

5.19  <u>MISREPRESENTATION AND/OR NON-DISCLOSURE</u> - Borrower has made certain written statements and written disclosures in order to induce Lender to make the Loan and enter into this Agreement, and, in the event Borrower has made material misrepresentations in written or failed to disclose any material fact which causes any such written statement or written disclosure to be materially misleading, Lender may treat such misrepresentation or omission as a breach of this Agreement. Such action shall not affect any remedies Lender may have for such misrepresentation or non-disclosure, as such, or under the Construction Deed of Trust (Leasehold) for such misrepresentation or concealment; or

5.20  <u>DEFAULT UNDER GROUND LEASE</u> – There exists one or more beaches, defaults or events of default under the Ground Lease, and the same is (are) not cured under any applicable notice and cure periods under the Ground Lease; or

5.21  <u>DEFAULT UNDER HILTON FRANCHISE AGREEMENT</u> – (a)There exists one or more beaches, defaults or events of default under the Hilton Franchise Agreement, and the same is (are) not cured under any applicable notice and cure periods under the Hilton Franchise Agreement; or (b) Borrower fails to comply with Section 4.40 of this Agreement; or

5.22   DEFAULT UNDER INTERSTATE RIM HOTEL MANAGEMENT AGREEMENT – (a) There exists one or more beaches, defaults or events of default under the Interstate Rim Hotel Management Agreement, and the same is (are) not cured under any applicable notice and cure periods under the Interstate Rim Hotel Management Agreement; or (b) Borrower fails to comply with Section 4.41 of this Agreement; or

5.23   DEFAULT UNDER PLEDGE AGREEMENT (FEE LENDERS) – (a) Any or all of the Fee Lenders exercise any of their rights and remedies with respect to the Pledge Agreement (Fee Lenders) (including, without limitation, the transfer of any membership interest in Borrower or the exercise of any voting rights in Borrower by or on behalf of the Fee Lenders); or (b) except as expressly permitted in Section 4.42 of this Agreement, there exists one or more pledges, assignments, transfers, hypothecations or any other conveyances of (i) the membership interest of DMC Investment Holdings, LLC, a Delaware limited liability company, in Borrower, or (ii) any of the membership interests in DMC Investment Holdings, LLC, a Delaware limited liability company; or

5.24   DEFAULT UNDER BEACH ORANGETHORPE HOTEL FINANCING LOAN DOCUMENTS – (a) There exists one or more beaches, defaults or events of default under the Beach Orangethorpe Hotel Financing Loan Documents, and the same is (are) not cured under any applicable notice and cure periods under the Beach Orangethorpe Hotel Financing Loan Documents; or (b) Borrower fails to comply with Section 4.43 of this Agreement; or

5.25   DEFAULT UNDER BEACH ORANGETHORPE DEEDS OF TRUST – There exists one or more beaches, defaults or events of default under the Beach Orangethorpe Deeds of Trust or any documents in connection therewith, and the same is (are) not cured under any applicable notice and cure periods thereunder.

## ARTICLE VI.
## REMEDIES

6.   REMEDIES.

6.1   CEASE DISBURSEMENT AND/OR ACCELERATE -

6.1.1   Upon, or at any time after, the occurrence of an Event of Default and during the continuance thereof, Lender shall have no obligation to disburse any further Project Funds, all obligations to repay Construction Loan Proceeds disbursed or advanced by Lender and all accrued and unpaid interest thereon shall, at the option of Lender, become immediately due and payable, and Lender shall be released from any and all obligations of performance to Borrower under the terms of this Agreement.

6.1.2   Upon, or at any time after, the occurrence of an Event of Default and during the continuance thereof, Lender shall have no obligation to advance any further Construction Loan Proceeds, all obligations to repay Construction Loan Proceeds advanced by Lender and all accrued and unpaid interest thereon shall, at the option of Lender, become immediately due and payable, and Lender shall be released from any and all obligations of performance to Borrower under the terms of this Agreement.

6.2     LENDER'S RIGHT TO APPLY UNDISBURSED PROJECT FUNDS
– Upon, or at any time after, the occurrence of an Event of Default and during the continuance thereof, Lender may, at its option, withdraw any sum or sums on deposit with Lender constituting Undisbursed Project Funds under the terms of this Agreement and credit the same upon the interest and/or principal of the Note. Thereupon, Lender shall be released from any and all obligations to Borrower under the terms of this Agreement to the extent of the sum or sums so credited. It is further understood and agreed that in the event such sums are so credited on the Note, the same shall not in any respect cure or waive any default under the Note, the Construction Deed of Trust (Leasehold), or any notice of default, or invalidate any act done pursuant to any such notice, and such credit on said Note shall not change, alter, or prejudice any rights of the beneficiary given by the Construction Deed of Trust (Leasehold).

6.3     RIGHT TO COMPLETE CONSTRUCTION - Upon, or at any time after, the occurrence of an Event of Default and during the continuance thereof, and in addition to any other right or remedy described in this Agreement, Lender shall have the right, but not the obligation, to take over and complete the work of construction and, for that purpose, Lender may (a) take possession of the Property, the Project, and each part and portion thereof, (b) employ watchmen to protect the Project from injury, (c) let contracts for and/or proceed with the finishing of the Improvements, and pay the cost thereof, plus additional fees for supervision of construction, (d) make any payment or cure any default in regard to any obligation of Borrower to any contractor(s), subcontractors, materialmen and/or suppliers of work, labor, services and/or material furnished in regard to the work of improvement, and (e) charge Borrower a fee for Lender's work in supervision and/or administration of such construction, and for the costs and expenses of appointment of a receiver in aid of such completion, disbursing all or any part of the Project Funds for such purposes. Should the cost of completing the Improvements plus such fee amount to more than the undisbursed balance of the Undisbursed Project Funds, then such additional costs may be expended by Lender, at its option, in which event such expenditure shall be considered and be an additional loan to Borrower and the repayment thereof, together with interest thereon at the rate provided in the Loan, shall be secured by the Construction Deed of Trust (Leasehold), and repaid within thirty (30) calendar days after written demand made by Lender. Borrower agrees to repay such expenditures. Lender may contest any claims and/or liens related to the work of improvement. Any contract entered into, indebtedness incurred, or claim or lien so contested upon the exercise of such right may be in the name of Borrower. Lender is irrevocably appointed attorney-in-fact (said appointment being coupled with an interest) to enter into said contracts, incur such obligations, enforce any contracts or agreements theretofore made by or on behalf of Borrower, contest such claims and/or liens, and do any and all things necessary or proper to complete the work of construction, including the signing of Borrower's name to such contracts and documents as may be deemed necessary by Lender.

6.4     RIGHT TO ACT TO CAUSE CONSTRUCTION TO BE COMPLETED - Borrower further hereby authorizes Lender, at its option, upon or at any time after an Event of Default and during the continuance thereof, and in addition to any other right or remedy described in this Agreement, either in its own name or in the name of Borrower and/or Contractor, to do any and all things necessary or expedient in the opinion of Lender to secure the performance of the construction contracts and to secure the erection and completion of the Improvements substantially in accordance with the Plans and Specifications, and to accept the Improvements as completed or substantially completed, and to do any and every act or thing pertaining to or arising

out of the construction or completion of the Improvements or any contract therefor, disbursing all or any part of the Undisbursed Project Funds for such purposes.

6.5    <u>COLLATERAL</u> — Upon the occurrence of an Event of Default and during the continuance thereof, Lender may, at its option, without notice to Borrower or any Affiliate of Borrower or without regard to the adequacy of the Collateral for the payment of the Loan, appoint one or more receivers of the Collateral, and Borrower hereby irrevocably consents to such appointment, with such receivers having all the usual powers and duties of receivers in similar cases, including the full power to maintain, sell, dispose and otherwise operate the Collateral upon such terms that may be approved by a court of competent jurisdiction.

6.6    <u>RIGHTS AND REMEDIES NON-EXCLUSIVE</u> - In addition to the specific rights and remedies hereinabove mentioned, upon the occurrence of an Event of Default and during the continuance thereof, Lender shall have the right to avail itself of any other rights or remedies to which it may be entitled under any then existing Laws including, but not limited to, the right to realize upon any or all of the Collateral and/or the right to enforce the Continuing Guaranty and/or the Completion Guaranty, and to do so in any order. Furthermore, the rights and remedies set forth above are not exclusive, and Lender may avail itself of any individual right or remedy set forth in this Agreement, or available under such Laws, without utilizing any other right or remedy. By way of example, and not by way of limitation, no remedy set forth herein shall affect any statutory or common law remedies that Lender may have for any misrepresentation, non-disclosure or concealment by Borrower.

6.7    <u>ENFORCEMENT OF RIGHTS</u> - Upon, or at any time after, the occurrence of an Event of Default, Lender may enforce any and all rights and remedies under the Loan Documents, the Construction Deed of Trust (Leasehold) and all other documents delivered in connection therewith and against any or all Collateral and may pursue all rights and remedies available at Law or in equity.

ARTICLE VII.
<u>GENERAL CONDITIONS AND MISCELLANEOUS</u>

7.

7.1    <u>NONLIABILITY OF LENDER</u> - Borrower acknowledges and agrees that by accepting or approving anything required to be observed, performed, fulfilled, or given to Lender pursuant to the Loan Documents, including any certificate, statement of profit and loss, or other Financial Statement, survey, appraisal or insurance policy, Lender shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision, or condition thereof, and such acceptance or approval thereof shall not be or constitute any warranty or representation to anyone with respect thereto by Lender.

7.2    <u>NO THIRD PARTIES BENEFITTED</u> - This Agreement is made for the purpose of defining and setting forth certain obligations, rights, and duties of Borrower and Lender in connection with the Loan and shall be deemed a supplement to the Note and the Loan Documents, and shall not be construed as a modification of the Note or the Loan Documents, except as provided herein. This Agreement is made for the sole protection of Borrower and Lender, and

Lender's successors and assigns. No Persons other than Borrower and Lender shall have any rights of any nature hereunder or by reason hereof or the right to rely hereon. In the event of a conflict between this Agreement and the Note, the provisions of the Note shall control. In the event of a conflict between this Agreement and the Construction Deed of Trust (Leasehold), this Agreement shall control.

      7.3    INDEMNITY BY BORROWER - Except to the extent arising from Lender's gross negligence or willful misconduct, Borrower hereby indemnifies and agrees to hold Lender and its directors, officers, agents, and employees (individually and collectively, the "Indemnitee(s)") harmless from and against:

      7.3.1    Any and all claims, demands, actions, or causes of action that are asserted against any Indemnitee by any Person if the claim, demand, action, or cause of action, directly or indirectly, relates to a claim, demand, action, or cause of action that the Person has or asserts against Borrower;

      7.3.2    Any and all claims, demands, actions, or causes of action that are asserted against any Indemnitee by any Person which arise from or relate to any stop notice, stop payment notice, mechanics' lien or related proceeding relating to the Property, the fee estate in the real property which is bounded by Orantethorpe Avenue, Brenner Avenue, Melrose Street and Beach Boulevard to the extent now owned or hereafter owned by Borrower, Ground Lessor, or any affiliate of Borrower or Ground Lessor (the "Block"), (including the Property described in Exhibit "C"), the Project, the Project Funds, the Undisbursed Project Funds, the Construction Loan Proceeds, or any other actual or alleged failure to pay or perform in connection with the Property, the Block (including the fee estate in the Property described in Exhibit "C"), the Project, the Project Funds, the Undisbursed Project Funds, or the Construction Loan Proceeds; or

      7.3.3    Any and all liabilities, losses, costs, or expenses (including court costs and attorneys' fees) that any Indemnitee suffers or incurs as a result of the assertion of any claim, demand, action, cause of action, mechanics' lien or other matter specified in this Section 7.3.

      7.4    CHANGE IN LAWS - In the event of the enactment, after the date of this Agreement, of any Laws: (a) deducting from the value of property for the purpose of taxation any lien or security interest thereon; (b) imposing upon Lender the payment of the whole or any part of the taxes or assessments or charges or liens herein required to be paid by Borrower; (c) changing in any way the Laws relating to the taxation of deeds of trust or mortgages or security agreements, or debts secured by deeds of trust or mortgages or security agreements, or the interest of the mortgagee or secured party in the property covered thereby; or (d) the manner of collection of such taxes; then, to the extent any of the foregoing may affect the Construction Deed of Trust (Leasehold) or the indebtedness secured thereby, or Lender, then, and in any such event, Borrower, upon demand by Lender, shall pay such taxes, assessments, charges, or liens, or reimburse Lender therefor. If Borrower shall be prohibited from paying such tax or from reimbursing Lender for the amount thereof, Borrower shall execute a modification to the Loan Documents and the Note, which modification shall increase the interest rate payable pursuant to the Note so as to permit Lender to maintain its yield as if such tax had not been imposed. If Borrower shall be prohibited from executing the above-referenced modifications, Lender may, in Lender's sole discretion, declare the

principal of all amounts disbursed and owing under the Note, this Agreement, and the other Loan Documents (including all obligations secured by the Loan Documents) and all other indebtedness of Borrower to Lender, together with interest thereon, to be forthwith due and payable, regardless of any other specified maturity or due date.

7.5     <u>POWER OF ATTORNEY</u> - Upon the occurrence of an Event of Default and during the continuance thereof, Borrower does hereby irrevocably appoint, designate, empower, and authorize Lender, as Borrower's agent, under power of attorney, coupled with an interest, to sign and file for record any notices of completion, notices of cessation of labor, or any other notice or written document that it may deem necessary to file or record to protect Lender's interests.

7.6     <u>NONRESPONSIBILITY</u> - Lender shall in no way be liable for any acts or omissions of Borrower, Borrower's agents or employees, Contractor, and Subcontractor, or any Person furnishing labor and/or materials used in or related to such construction.

7.7     <u>TIME IS OF THE ESSENCE</u> - Time is of the essence of this Agreement and of each and every provision hereof, to the full extent that time can be of the essence of an agreement under the Laws of the State of California.

7.8     <u>NON-WAIVER</u> - The waiver by Lender of any breach or breaches hereof shall not be deemed, nor shall the same constitute, a waiver of any subsequent breach or breaches.

7.9     <u>BINDING EFFECT; ASSIGNMENT</u> - This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns, except that Borrower may not assign its rights hereunder or any interest therein without the prior written consent of Lender. Lender shall have the right to assign its rights under this Agreement and to grant participations in the Loan to others, but all waivers or abridgements of Borrower's obligations that may be granted from time to time by Lender shall be binding upon such assignees or participants, but any such waivers or agreements, to be effective, must be in writing and signed by Lender. Borrower shall, promptly upon demand, provide Lender or any such purchaser or participant, one or more written statements confirming Borrower's indebtedness to Lender and all obligations in connection with the Loan, including the existence of any default thereunder.

7.10     <u>EXECUTION IN COUNTERPARTS</u> - This Agreement and any other Loan Documents, except the Note, the Construction Deed of Trust (Leasehold), and the Assignment of Leases (Leasehold), may be executed in any number of counterparts, and any party hereto or thereto may execute any counterpart, each of which, when executed and delivered, will be deemed to be an original, and all of which counterparts of this Agreement or any other Loan Document, as the case may be, taken together will be deemed to be but one and the same instrument. The execution of this Agreement or any other Loan Document by any party or parties hereto will not become effective until counterparts hereof or thereof, as the case may be, have been executed by all the parties hereto or thereto.

7.11     <u>INTEGRATION; AMENDMENTS; CONSENTS</u> - This Agreement, together with the documents referred to herein, constitutes the entire agreement of the parties

touching upon the subject matter hereof, and supersedes any prior negotiations or agreements on such subject matter. No amendment, modification, or supplement of any provision of this Agreement or any of the other Loan Documents shall be effective unless in writing, signed by Lender and Borrower; and no waiver of any of Borrower's obligations under this Agreement or any of the other Loan Documents or consent to any departure by Borrower therefrom shall be effective unless in writing, signed by Lender,, and then only in the specific instance and for the specific purpose given.

      7.12   <u>NEUTRAL INTERPRETATION</u> - This Agreement is the product of the negotiations between the parties, and in the interpretation and/or enforcement hereof is not to be interpreted more strongly in favor of one party or the other.

      7.13   <u>COSTS, EXPENSES, AND TAXES</u> - Borrower shall pay to Lender, on demand:

      7.13.1  Attorneys' fees and out-of-pocket expenses incurred by Lender in connection with the negotiation, preparation, execution, delivery, and administration of this Agreement and any other Loan Document and any matter related thereto, including, but not limited to, consultants and appraisal of the Project, all of which shall also be deemed to be Approved Costs;

      7.13.2  The costs and expenses of Lender in connection with theenforcement of this Agreement and any other Loan Document and any matter related thereto, including the fees and out-of-pocket expenses of any legal counsel, independent public accountants, and other outside experts retained by Lender and including all costs and expenses of enforcing any judgment or prosecuting any appeal of any judgment, order or award arising out of or in any way related to the Loan, this Agreement, or the Loan Documents; and

      7.13.3  All costs, expenses, fees, premiums, and other charges relating to or arising from the Loan Documents or any transactions contemplated thereby or the compliance with any of the terms and conditions thereof, including, but not limited to, recording fees, filing fees, credit report fees, release or reconveyance fees, title insurance premiums, all fees, costs and charges of the Fund Control, all fees costs and charges in connection with any third party project analysis, construction inspection fees, and the cost of realty tax service for the term of the Loan.

      Except as otherwise provided in the Environmental Indemnity, all sums paid or expended by Lender under the terms of this Agreement shall be considered to be, and shall be, a part of the Loan. All such sums, together with all amounts to be paid by Borrower pursuant to this Agreement, shall bear interest from the date of expenditure at the rate provided in the Note, shall be secured by the Loan Documents, and shall be immediately due and payable by Borrower upon demand.

      7.14   <u>SURVIVAL OF REPRESENTATIONS AND WARRANTIES</u> - All representations and warranties of Borrower contained herein or in any and all other Loan Documents shall survive the making of the Loan and the execution and delivery of the Note, and are material and have been or will be relied upon by Lender, notwithstanding any investigation made by Lender or on behalf of Lender. For the purpose of this Agreement, all statements contained in any certificate, agreement, Financial Statement, appraisal or other writing certified and by or on behalf of Borrower, delivered by or on behalf of Borrower pursuant hereto or to any other Loan Document or

in connection with the transactions contemplated hereby or thereby shall be deemed to be representations and warranties of Borrower contained herein or in the other Loan Documents, as the case may be.

       7.15   NOTICES - Except as provided in the Construction Deed of Trust (Leasehold), all notices, requests, demands, directions, and other communications provided for hereunder and under any other Loan Document (a "Notice") must be in writing and must be mailed, delivered, or sent by facsimile transmission to the appropriate party at its respective address set forth below or, as to any party, at any other address as may be designated by it in a written Notice sent to the other parties in accordance with this Section 7.15. Any Notice given by facsimile transmission must be confirmed within forty-eight (48) hours by letter mailed or delivered to the appropriate party at its respective address. If any Notice is given by mail it will be effective three (3) calendar days after being deposited in the mails with first-class or airmail postage prepaid; if given by facsimile transmission, when sent; or if given by personal delivery, when delivered.

       7.16   FURTHER ASSURANCES - Borrower shall, at its sole expense and without expense to Lender, do, execute, and deliver such further acts and documents as Lender from time to time may reasonably require for the purpose of assuring and confirming unto Lender the rights hereby created or intended, or for carrying out the intention or facilitating the performance of the terms of any Loan Document, or for assuring the validity of any security interest.

       7.17   GOVERNING LAW - The Loan shall be deemed to have been made in California, and the Loan Documents shall be governed by and construed and enforced in accordance with the Laws of the State of California. If there is a lawsuit, Borrower agrees, upon Lender's request, to submit to the jurisdiction of the courts, state or federal, of Los Angeles County, California.

       7.18   SEVERABILITY OF PROVISIONS - Any provision in any Loan Document that is held to be inoperative, unenforceable, or invalid shall be inoperative, unenforceable, or invalid without affecting the remaining provisions, and to this end the provisions of all Loan Documents are declared to be severable.

       7.19   JOINT AND SEVERAL OBLIGATIONS - If this Agreement is executed by more than one Person as Borrower, the obligations of each of such Persons hereunder shall be joint and several obligations.

       7.20   CONSTRUCTION - Whenever the context of this Agreement requires, the singular shall include the plural and the masculine gender shall include the feminine and/or neuter.

       7.21   HEADINGS - Article and section headings in this Agreement are included for convenience of reference only and are not part of this Agreement for any other purpose.

       7.22   AGENCY — Nothing in this Agreement shall be construed to constitute the creation of a partnership or joint venture between Lender and Borrower. Lender is not an agent or representative of Borrower.

7.23   USA PATRIOT ACT NOTICE — Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account or obtains a loan. Lender will ask for Borrower's legal name, address, tax ID number or social security number and other identifying information. Lender may also ask for additional information or documentation or take other actions reasonably necessary to verify the identity of Borrower, Guarantor or other related persons.

7.24   WAIVER OF RIGHT TO TRIAL BY JURY; JUDICIAL REFERENCE IN THE EVENT OF JURY TRIAL WAIVER UNENFORCEABILITY.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (1) ARISING UNDER THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION THEREWITH, OR (2) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY. NOTWITHSTANDING THE FOREGOING TO THE CONTRARY, IN THE EVENT THAT THE JURY TRIAL WAIVER CONTAINED HEREIN SHALL BE HELD OR DEEMED TO BE UNENFORCEABLE, EACH PARTY HERETO HEREBY EXPRESSLY AGREES TO SUBMIT TO JUDICIAL REFERENCE ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION ARISING HEREUNDER FOR WHICH A JURY TRIAL WOULD OTHERWISE BE APPLICABLE OR AVAILABLE. PURSUANT TO SUCH JUDICIAL REFERENCE, THE PARTIES AGREE TO THE APPOINTMENT OF A SINGLE REFEREE AND SHALL USE THEIR BEST EFFORTS TO AGREE ON THE SELECTION OF A REFEREE. IF THE PARTIES ARE UNABLE TO AGREE ON A SINGLE REFEREE, A REFEREE SHALL BE APPOINTED BY THE COURT TO HEAR ANY DISPUTES HEREUNDER IN LIEU OF ANY SUCH JURY TRIAL. EACH PARTY ACKNOWLEDGES AND AGREES THAT THE APPOINTED REFEREE SHALL HAVE THE POWER TO DECIDE ALL ISSUES IN THE APPLICABLE ACTION OR PROCEEDING, WHETHER OF FACT OR LAW, AND SHALL REPORT A STATEMENT OF DECISION THEREON; PROVIDED, HOWEVER, THAT ANY MATTERS WHICH WOULD NOT OTHERWISE BE THE SUBJECT OF A JURY TRIAL WILL BE UNAFFECTED BY THIS WAIVER AND THE AGREEMENTS CONTAINED HEREIN. THE PARTIES HERETO HEREBY AGREE THAT THE PROVISIONS CONTAINED HEREIN HAVE BEEN FAIRLY NEGOTIATED ON AN ARM'S-LENGTH BASIS, WITH BOTH SIDES AGREEING TO THE SAME KNOWINGLY AND BEING AFFORDED THE OPPORTUNITY TO HAVE THEIR RESPECTIVE LEGAL COUNSEL CONSENT TO THE MATTERS CONTAINED HEREIN. ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY AND THE AGREEMENTS CONTAINED HEREIN REGARDING THE APPLICATION OF JUDICIAL REFERENCE IN THE EVENT OF THE INVALIDITY OF SUCH JURY TRIAL WAIVER.

Borrower and Lender have each initialed this Section 7.24 to further indicate their awareness and acceptance of each and every provision hereof.

_____          _____
Borrower's Initials                Lender's Initials

IN WITNESS WHEREOF, Borrower and Lender have hereunto caused this Agreement to be executed as of the date first above written.

BORROWER:

THE SOURCE HOTEL, LLC,
a California limited liability company

By: M + D Properties, a California corporation
Its:     Manager

By:     _Pamela Chae_
Name: Donald Chae
Its:     President

LENDER:

EVERTRUST BANK,
a California banking corporation

By:     _____
Name: Robert Sato
Its:     EVP/COO

Borrower's Address:

Borrower's Address:
3100 East Imperial Highway
Lynwood, California 90262
Attn: Donald Chae & Min Chae
Fax:  714-521-4256

With a copy to:
LIM, RUGER & KIM, LLP
1055 West 7th Street, Suite 2800
Los Angeles, California 90017
Attn: Real Estate Department
Fax: (213) 955-9511

Lender's Address:
18645 E. Gale Avenue, Suite 110
City of Industry, California 91748
Attn: Annie Ng, First Vice President / Loan
Service Manager Administration
Fax: (626) 854-9710

2123922.6

62