## **EXHIBIT 5**

### **BOH1 LOAN AGREEMENT**

**Construction Loan Agreement**

**by**

**and**

**between**

**The Source Hotel, LLC,**
**a California limited liability company,**

**Borrower,**

**and**

**Beach Orangethorpe Hotel, LLC,**
**a California limited liability company,**

**Lender**

**As of June 1, 2014**

{01018472}

## Table of Contents

**Page**

Article I DEFINITIONS AND INTERPRETATIONS..................................................................1

    1.1.    DEFINITIONS ...............................................................................................1
    1.2.    ACCOUNTING TERMS ..................................................................................7
    1.3.    USE OF DEFINED TERMS ...........................................................................7
    1.4.    SCHEDULES AND EXHIBITS ......................................................................7
    1.5.    REFERENCES...............................................................................................7
    1.6.    OTHER TERMS ............................................................................................7

Article II REPRESENTATIONS AND WARRANTIES OF BORROWER .................................7

    2.1.    BORROWER'S CAPACITY ...........................................................................8
    2.2.    VALIDITY OF LOAN DOCUMENTS................................................................8
    2.3.    NO DEFAULT ................................................................................................8
    2.4.    NO GOVERNMENTAL APPROVALS REQUIRED ........................................8
    2.5.    TAX LIABILITY .............................................................................................8
    2.6.    FINANCIAL STATEMENTS ...........................................................................9
    2.7.    PENDING LITIGATION..................................................................................9
    2.8.    VIOLATIONS OF LAWS ................................................................................9
    2.9.    COMPLIANCE WITH ZONING ORDINANCES AND SIMILAR LAWS ...........9
    2.10.    CONDITION OF PROPERTY ........................................................................9
    2.11.    COMMISSIONS AND FEES .........................................................................9
    2.12.    ENVIRONMENTAL AND GEOLOGICAL ISSUES .......................................9
    2.13.    ACCESS ......................................................................................................9
    2.14.    NO OTHER LIENS .......................................................................................9
    2.15.    PERMITS ...................................................................................................10
    2.16.    NO ERISA PLAN........................................................................................10
    2.17.    MATERIAL CONTRACTS ...........................................................................10
    2.18.    FULL DISCLOSURE ..................................................................................10
    2.19.    USE OF PROCEEDS; MARGIN STOCK....................................................10
    2.20.    GOVERNMENTAL REGULATION ..............................................................10
    2.21.    NO CONDEMNATION .................................................................................11
    2.22.    DEFAULTS .................................................................................................11
    2.23.    SUBSIDIARIES ..........................................................................................11
    2.24.    EMPLOYMENT AGREEMENTS..................................................................11
    2.25.    OWNERSHIP OF PROPERTY ....................................................................11
    2.26.    SENIOR LOAN............................................................................................11
    2.27.    TAX PARCELS ...........................................................................................11
    2.28.    ZONING .....................................................................................................11
    2.29.    DDA............................................................................................................11
    2.30.    AFFIRMATION OF REPRESENTATIONS AND WARRANTIES ..................11

Article III THE LOAN .......................................................................................................11

    3.1.    THE LOAN .................................................................................................11
    3.2.    LOAN CLOSING ........................................................................................11
    3.3.    DISBURSEMENT OF LOAN PROCEEDS ..................................................13
    3.4.    LOAN PURPOSE .......................................................................................15
    3.5.    LOAN TERM ..............................................................................................15
    3.6.    INTEREST RATE .......................................................................................16
    3.7.    REPAYMENT.............................................................................................16
    3.8.    BUDGET, LINE ITEM REALLOCATIONS; UTILIZATION OF CONTINGENCY. ............16
    3.9.    STORED MATERIALS NOT YET INCORPORATED....................................16

3.10.    HARD COSTS..........................................................................................17
3.11.    SOFT COSTS .........................................................................................17
3.12.    CO-EQUAL LOAN....................................................................................

Article IV CONSTRUCTION OF IMPROVEMENTS; BORROWER'S AFFIRMATIVE COVENANTS........17

4.1.    ACCEPTANCE OF CONSTRUCTION DOCUMENTS; COMPLETION OF CONSTRUCTION ...............................................................17
4.2.    CONSTRUCTION PROGRESS................................................................17
4.3.    PURCHASE OF MATERIALS UNDER CONDITIONAL SALES CONTRACT ................18
4.4.    INSPECTION; INSPECTOR ...................................................................18
4.5.    LIENS, TAXES, AND GOVERNMENTAL CLAIMS ......................................19
4.6.    INSURANCE ..........................................................................................20
4.7.    PRESERVE ITS EXISTENCE ...............................................................20
4.8.    PAYMENT OF TAXES ...........................................................................20
4.9.    COMPLY WITH APPLICABLE LAWS ......................................................20
4.10.    MAINTENANCE OF PROPERTIES..........................................................20
4.11.    TERRORISM AND ANTI-MONEY LAUNDERING ......................................20
4.12.    CONSTRUCTION ...................................................................................21
4.13.    APPROVAL OF CONSTRUCTION..........................................................21
4.14.    COMPLIANCE WITH LAWS; ENCROACHMENTS ....................................21
4.15.    INSPECTIONS; COOPERATION .............................................................21
4.16.    CONTRACTS, VOUCHERS AND RECEIPTS ...........................................21
4.17.    PAYMENT AND PERFORMANCE OF CONTRACTUAL OBLIGATIONS ......................21
4.18.    CORRECTION OF CONSTRUCTION DEFECTS........................................21
4.19.    ADJUSTMENT OF CONDEMNATION AND INSURANCE CLAIMS................21
4.20.    UTILIZATION OF NET PROCEEDS.........................................................22
4.21.    MANAGEMENT; KEY PERSONNEL.........................................................22
4.22.    BOOKS AND RECORDS; FINANCIAL STATEMENTS; TAX RETURNS ..................22
4.23.    ESTOPPEL CERTIFICATES ...................................................................23
4.24.    TAXES ..................................................................................................23
4.25.    LENDER'S RIGHTS TO PAY AND PERFORM...........................................23
4.26.    REIMBURSEMENT; INTEREST...............................................................23
4.27.    NOTIFICATION BY BORROWER .............................................................23
4.28.    INDEMNIFICATION BY BORROWER........................................................23
4.29.    FEES AND EXPENSES..........................................................................24
4.30.    FEDERAL TAX ID NUMBER ...................................................................24
4.31.    SENIOR LOAN DOCUMENTS ................................................................24

Article V BORROWER'S NEGATIVE COVENANTS .....................................................24

5.1.    CONDITIONAL SALES............................................................................24
5.2.    INSURANCE POLICIES AND BONDS......................................................24
5.3.    RESTRICTIONS ON INDEBTEDNESS.....................................................24
5.4.    RESTRICTIONS ON LIENS ....................................................................24
5.5.    MERGER, CONSOLIDATION AND DISPOSITION OF ASSETS. .....................25
5.6.    SALE AND LEASEBACK .......................................................................25
5.7.    TRANSACTIONS WITH AFFILIATES .......................................................25
5.8.    CHANGE IN NATURE OF BUSINESS; NEW LINE OF BUSINESS ................25
5.9.    CHANGE IN CONTROL ..........................................................................25
5.10.    LEASES ................................................................................................25
5.11.    SEPARATENESS COVENANTS..............................................................25
5.12.    AMENDMENTS TO SENIOR LOAN DOCUMENTS ....................................26

Article VI EVENTS OF DEFAULT ...........................................................................26

6.1.    DEFAULT UNDER LOAN DOCUMENTS...................................................26

6.2.    BREACH OF WARRANTY ................................................................. 27
6.3.    TRANSFER OF PROPERTY OR MEMBERSHIP INTEREST OF BORROWER ........... 27
6.4.    INSOLVENCY ............................................................................ 27
6.5.    BORROWER STATUS ................................................................... 27
6.6.    DEFAULT UNDER GUARANTY ........................................................ 27
6.7.    DEFAULT UNDER SENIOR LOAN DOCUMENTS ................................ 27
6.8.    DEFAULT UNDER CO-EQUAL LOAN DOCUMENTS ............................ 33
6.9     DEFAULT UNDER INDEBTEDNESS INCURRED IN THE ORDINARY COURSE
        OF BUSINESS ........................................................**Error! Bookmark not defined.**
6.10.   CESSATION OF CONSTRUCTION .................................................. 27
6.11.   LIEN CLAIM ............................................................................. 27
6.12.   ENTRY OF JUDGMENT ............................................................... 27
6.13.   EVENTS INVOLVING GUARANTOR ............................................... 27

Article VII REMEDIES ................................................................................ 28

7.1.    CEASE PAYMENT AND/OR ACCELERATE ...................................... 28
7.2.    ENFORCEMENT OF RIGHTS ........................................................ 28
7.3.    COLLATERAL ............................................................................ 28
7.4.    RIGHTS AND REMEDIES NON-EXCLUSIVE ................................... 28

Article VIII GENERAL CONDITIONS AND MISCELLANEOUS .......................... 28

8.1.    NONLIABILITY OF LENDER ......................................................... 28
8.2.    NO THIRD PARTIES BENEFITED ................................................. 28
8.3.    NONRESPONSIBILITY ............................................................... 29
8.4.    TIME IS OF THE ESSENCE ......................................................... 29
8.5.    BINDING EFFECT; ASSIGNMENT ................................................ 29
8.6.    EXECUTION IN COUNTERPARTS ................................................. 29
8.7.    INTEGRATION; AMENDMENTS ................................................... 29
8.8.    NEUTRAL INTERPRETATION ...................................................... 29
8.9.    NOTICES ................................................................................. 29
8.10.   GOVERNING LAW ..................................................................... 29
8.11.   SEVERABILITY OF PROVISIONS ................................................. 29
8.12.   JOINT AND SEVERAL OBLIGATIONS ........................................... 30
8.13.   CONSTRUCTION ....................................................................... 30
8.14.   HEADINGS ............................................................................... 30
8.15.   AGENCY .................................................................................. 30
8.16.   FURTHER ASSURANCES ............................................................ 30
8.17.   NO WARRANTY BY LENDER ....................................................... 30
8.18.   FORUM, ETC. ........................................................................... 30
8.19.   WAIVER OF JURY TRIAL ............................................................ 31
8.20.   USA PATRIOT ACT NOTICE ........................................................ 31

## CONSTRUCTION LOAN AGREEMENT

This Construction Loan Agreement is made as of June 1, 2014, by and between THE SOURCE HOTEL, LLC, a California limited liability company ("Borrower"), and BEACH ORANGETHORPE HOTEL, LLC, a California limited liability company ("Lender").

RECITALS

A.     Borrower has applied to Lender for a loan in the maximum principal amount of Ten Million and No/100 Dollars ($10,000,000) (the "Loan") for the purposes described hereafter.

B.     Lender has agreed to make the Loan to Borrower for such purposes upon the terms and conditions set forth herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

ARTICLE I
DEFINITIONS AND INTERPRETATIONS

1.1.   DEFINITIONS.

For purposes of this Agreement, the following terms shall have the following meanings:

The definitions set forth in the Recitals or elsewhere in this Agreement are incorporated herein by reference.

 "Advance" shall mean any advance or disbursement of Loan Proceeds by Lender to Borrower, including, without limitation, a disbursement from the Disbursement Account, pursuant to this Agreement.

"Affiliate" shall mean any Person, directly or indirectly, related to, in Control of, Controlled by, or under the common Control of, Borrower, or of a successor thereof, whether through merger, consolidation, transfer of assets or otherwise.

"Agreement" shall mean this Construction Loan Agreement, either as originally executed or as it may from time to time be supplemented, extended, renewed, modified, or amended.

"Agreement To Furnish Insurance" shall mean the Agreement To Furnish Insurance, of even date herewith, duly executed by Borrower in form and content as required by Lender.

"Anti-Money Laundering Laws" shall mean the USA Patriot Act of 2001, the U.S. Bank Secrecy Act, as amended through the date hereof, Executive Order 1 3324—Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, as amended through the date hereof, and other federal laws and regulations and executive orders administered by OFAC which prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals (such individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanction and embargo programs), and such additional laws and programs administered by OFAC which prohibit dealing with individuals or entities in certain countries regardless of whether such individuals or entities appear on any of the OFAC lists.

"Approved Lease" shall have the meaning given in the Senior Loan Documents.

"Architect" shall mean an architect retained by Borrower in connection with the development of the Project which is acceptable to Lender.

{01018472}

"Architect's Certificate" shall mean a certificate of Architect in a form reasonably acceptable to the Lender.

"Architect's Contract" shall mean an agreement between Borrower and Architect in form and substance satisfactory to Lender relating to the design and development of the Improvements, and any and all extensions, renewals, modifications, amendments, supplements and replacements thereto or therefor.

"Assets" shall have the meaning usually given that term in accordance with generally accepted accounting principles, consistently applied, but shall exclude sums due to Borrower from Affiliates.

"Balancing Deposit" shall mean any deposit made by Borrower to maintain Loan "in balance" pursuant to the terms of Section 3.3.4 herein.

"Borrower's knowledge" or "Borrower's actual knowledge" shall mean the actual, present knowledge of either or both of the individuals, Min Seok Chae and Donald Chae.

"Budget" shall mean the budget, setting forth a line item breakdown of all Hard Costs, Soft Costs, any other costs and expenses incurred or estimated to be incurred with respect to the Improvements and relevant assumptions.

"Business Day" shall mean Monday through Friday, excluding any day of the year on which banks are required or authorized to close in California.

"City" shall mean the City of Buena Park, California.

"Co-Equal Lender" means Beach Orangethorpe Hotel II, LLC, a California limited liability company.

"Co-Equal Loan" shall mean an EB-5 loan in an amount not to exceed $11,500,000.00 to be made to Borrower and secured by the Property, the proceeds of which shall be used to pay Project Costs.

"Co-Equal Loan Documents" means the documents evidencing, securing and/or guaranteeing the Co-Equal Loan, or any part thereof, as the same may from time to time be extended, amended, restated, supplemented or otherwise modified.

"Collateral" shall mean all real property, personal property and rights of Borrower, Guarantor or others in which Lender has been and may hereafter be granted a lien or security interest to secure payment and performance of Borrower's obligations pursuant to the Loan Documents.

"Construction Conditions Precedent" shall mean those conditions set forth in Section 3.2.2.

"Construction Contract" or "General Contract" shall mean a guaranteed maximum price contract or stipulated lump sum contract entered into by and between Borrower and the General Contractor for construction of the Improvements, and any and all extensions, renewals, modifications, amendments, supplements and replacements thereto and therefor.

"Construction Schedule" shall mean a schedule for construction of the Improvements in form and substance satisfactory to Lender.

"Contingency Line Item" shall mean a line item designated on the Budget as a contingency line item.

"Control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" or "Controlled" shall have meanings correlative thereto.

"<u>Declaration</u>" means that certain Amended and Restated Declaration of Covenants, Conditions and Restrictions and Reciprocal Easement Agreement among Borrower, Ground Lessor and The Source Office, LLC, a California limited liability company.

"<u>Deed of Trust</u>" shall mean the Leasehold Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing and any modifications, restatements, extensions or amendments thereof, duly executed and acknowledged by Borrower for the benefit of Lender, to secure the Loan and encumbering the Property or a portion thereof and other assets and rights as therein provided.

"<u>Disbursement Account</u>" shall have the meaning set forth in Section 3.3 hereof.

"<u>Disclosure Schedule</u>" shall mean Exhibit "B" as attached to this Agreement.

"<u>Draw Package</u>" shall have the meaning set forth in Section 3.3.1 hereof.

"<u>Environmental Indemnity</u>" shall mean that certain Hazardous Substances Indemnity Agreement, of even date herewith, duly executed by Borrower and such other Persons (including without limitation, each Guarantor) as may be required by Lender, pursuant to which Borrower and such other Persons shall indemnify and defend Lender from and against any loss or liability, direct or indirect, with respect to the presence or release of any hazardous or toxic material in, on, about or under the Property, and any modifications, restatements, extensions or amendments thereof.

"<u>Event of Default</u>" shall mean any of those events specified in Article V hereof.

"<u>Expected Completion Date</u>" shall mean the date which is twenty-four (24) months after the Loan Closing, provided that the Expected Completion Date shall be extended for a period of six (6) months if Borrower has exercised commercially reasonable efforts to meet the time frame specified in this definition above.

"<u>Final Completion Date</u>" shall mean the date that is one hundred eighty (180) days after the Expected Completion Date, but in no event later than the Maturity Date.

"<u>Financial Statements</u>" shall mean balance sheets, income statements, reconciliations of capital structure, statements of sources and applications of funds, and income tax returns, all prepared in accordance with GAAP and submitted to Lender prior to the date hereof.

"<u>Financing Statements</u>" shall mean one or more financing statements (form UCC-1) given by Borrower to Lender, if required by Lender, covering any and all personal property and/or fixtures included in the Property.

"<u>Fiscal Year</u>" shall mean Borrower's fiscal year, ending on December 31 of each calendar year.

"<u>GAAP</u>" shall mean generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"<u>General Contractor</u>" shall mean Greenland Construction Services, LLC, which is an Affiliate of Borrower, or another licensed and bonded contractor acceptable to Lender. Lender approval of a General Contractor shall be based on a commercially reasonable assessment of whether such contractor possesses the competence, resources and other qualities required to complete construction of the Improvements in a timely and workmanlike manner. Borrower's obligations under the Construction Contract when executed shall not constitute indebtedness to an Affiliate for purposes of Section 5.3 of the Agreement.

{01018472}                                         - 3 -

"Governmental Agency" shall mean any governmental or quasi-governmental agency, authority, board, bureau, commission, department, instrumentality or public body, court, service, district, administrative tribunal, public utility, or any instrumentality of any governmental entity.

"Ground Lease" shall mean that certain Ground Lease between Ground Lessor and Borrower.

"Ground Lessor" shall mean The Source at Beach, LLC, a California limited liability company.

"Guarantor" shall mean, individually and collectively, Min Seok Chae, an individual, and Donald Chae, an individual.

"Guaranty" shall mean that certain agreement or agreements by that title, duly executed by each Guarantor for the benefit of the Lender, bearing even date herewith, as such agreement or agreements are originally executed and as such agreement or agreements may from time to time be reaffirmed, supplemented, modified or amended.

"Hard Costs" shall mean costs for work, labor and materials required to demolish pre-existing structures on the Property (if applicable) and construct and complete the Improvements, all as specified in the Budget.

"Hazard Insurance Disclosure" shall mean the Hazard Insurance Disclosure, dated of even date herewith, duly executed by Borrower in form and content as required by Lender.

"Improvements" shall mean the improvements constructed or to be constructed on the Property by Borrower in accordance with the Plans and Specifications, as well as any fixtures, equipment and appurtenances now or later to be located on the Property.

"Initial Advance" has the meaning set forth in Section 3.3 hereof.

"Inspector" shall mean a construction consultant selected by Lender or any successor thereto selected by Lender.

"Intercreditor Agreement" shall mean that certain inter-creditor agreement to be negotiated in good faith between, and in form and content satisfactory to, Lender and Senior Lender.

"Insurance Policies" shall mean any of the policies of insurance specified in Section 4.6 hereof.

"Laws" shall mean, collectively, all federal, state, and local laws, statutes, rules, regulations, ordinances, codes, licenses, authorizations, decisions, injunctions, interpretations, orders or decrees of any court or other Governmental Agency having jurisdiction as may be in effect from time to time.

"Legal Requirements" shall mean any and all judicial decisions, statutes, rulings, directions, rules, regulations, permits, certificates, ordinances, decisions, injunctions, interpretations, orders or decrees of any Governmental Agency in any way applicable to Borrower or the Property or Improvements, including, without limitation, the ownership, division, use, occupancy, possession, operation, maintenance, alteration, repair or reconstruction thereof.

"Lender" shall mean Beach Orangethorpe Hotel, LLC, a California limited liability company.

"Loan" shall mean the loan described in the Recitals and in Article III of this Agreement.

"Loan Closing" shall mean the date on which the Loan closes in accordance with Section 3.2 of this Agreement.

"Loan Documents" shall mean this Agreement, the Note, the Deed of Trust, the Guaranty, Financing Statements, Environmental Indemnity, Agreement to Furnish Insurance, Hazard Insurance Disclosure, Assignment and Agreement, Subordination Agreement and such other documents as Lender

may reasonably require Borrower, Guarantor, or any other party to give to Lender evidencing, securing and/or guaranteeing the Loan, or any part thereof, as the same may from time to time be extended, amended, restated, supplemented or otherwise modified.

"Loan Proceeds" shall mean funds advanced by Lender to Borrower for purposes set forth in Article III hereof.

"Loss Threshold" shall mean the amount of $2,000,000.00.

"Management Agreement" shall mean that certain agreement bearing such title, of even date herewith, between Lender and a manager, as the same may from time to time be extended, amended, restated, supplemented or otherwise modified.

"Major Subcontract" shall mean any subcontract relating to the construction of the Improvements to which Borrower or the General Contractor is a party involving the provision of labor or materials, which together with labor or materials being provided under any subcontract with a related or affiliated subcontractor is valued in excess of Five Hundred Thousand Dollars ($500,000) and any extension, renewal, modification, amendment, supplement or replacement thereto or therefor.

"Major Subcontractor" shall mean any subcontractor, supplier and/or materialman party to a Major Subcontract.

"Maturity Date" shall have the meaning set forth in the Note.

"Member" shall mean a member of Lender admitted in accordance with the Amended and Restated Operating Agreement.

"Mortgaged Property" shall mean the Property, the Improvements and all other property of Borrower subject to a lien or security interest granted in the Deed of Trust and any other Loan Documents.

"Non-Construction Conditions Precedent" shall mean those conditions set forth in Section 3.2.1.

"Note" shall mean that certain promissory note of Borrower in the amount of the Loan, payable to the order of Lender, duly executed by Borrower to evidence the Loan, as the same may from time to time be extended, amended, restated, supplemented or otherwise modified.

"Obligations" shall mean all present and future debts, obligations and liabilities of Borrower to Lender arising pursuant to, or on account of, the provisions of this Agreement, the Note or any of the other Loan Documents, including the obligations:  (a) to pay all principal, interest and other amounts due at any time under the Note; (b) to pay all expenses, indemnification payments, fees and other amounts due at any time under the Deed of Trust or any of the other Loan Documents, together with interest thereon as provided in the Deed of Trust or such Loan Documents; and (c) to complete the construction of the Improvements, free and clear of liens and otherwise in accordance with applicable Laws, the Budget, the Plans and Specifications and the provisions of this Agreement and the other Loan Documents; and (d) to perform, observe and comply with all of the terms, covenants and conditions, expressed or implied, which Borrower is required to perform, observe or comply with pursuant to the terms of the Deed of Trust or any of the other Loan Documents.

"OFAC" shall mean the United States Department of the Treasury, Office of Foreign Assets Control.

"OFAC Prohibited Person" shall mean a country, territory, individual or person (i) listed on, included within or associated with any of the countries, territories, individuals or entities referred to on The Office of Foreign Assets Control's List of Specially Designated Nationals and Blocked Persons or any other prohibited person lists maintained by governmental authorities, or otherwise included within or associated with any of the countries, territories, individuals or entities referred to in or prohibited by OFAC

or any other Anti-Money Laundering Laws, or (ii) which is obligated or has any interest to pay, donate, transfer or otherwise assign any property, money, goods, services, or other benefits from the Property directly or indirectly, to any countries, territories, individuals or entities on or associated with anyone on such list or in such laws.

"Organizational Documents" shall mean the duly filed, certified and/or executed documents or instruments evidencing or confirming the lawful formation and existence of Borrower and such other Persons, and all written consents and certifications required by Lender from Persons having management and/or ownership interests in Borrower and/or such other Persons.

"Permitted Encumbrances" shall mean those matters and exceptions to title shown in the Title Policy (including the Senior Security Documents) as approved by Lender.

"Person" shall mean an individual, corporation, limited liability company, partnership, joint venture, trust or unincorporated organization or a Governmental Agency or any other entity.

"Petition" shall mean an I-526 petition filed by a Member.

"Plans and Specifications" shall mean the final plans and specifications and working drawings with respect to the Improvements as approved by Lender and all applicable Governmental Agencies, as modified, amended and supplemented from time to time in accordance with the terms and provisions of this Agreement.

"Project" shall mean the Property and the construction of the Improvements, all work and materials required in connection with the same, and the installation of all furniture, fixtures and equipment necessary to operate the same.

"Project Costs" shall mean all Hard Costs and Soft Costs set forth in the Budget for development of the Project.

"Property" shall mean, except as otherwise provided in Section 3.18, the real property identified on Exhibit "A" attached hereto and all present and future improvements thereon and appurtenances thereto, together with all fixtures and equipment.

"Property Management Agreement" shall mean an agreement between Borrower and a property manager acceptable to Lender, in form and substance satisfactory to Lender, as amended from time to time with the consent of Lender.

"Security Documents" shall mean the documents and instruments securing the Loan and encumbering the Property, including, without limitation, the Deed of Trust.

"Senior Lender" shall mean EverTrust Bank or another lender first approved in writing by Lender.

"Senior Loan" shall mean that certain loan made by Senior Lender to Borrower in an original principal amount not to exceed $29,500,000.00.

"Senior Loan Documents" shall mean the documents and instruments evidencing, guarantying and/or securing the Senior Loan, including, without limitation, the Senior Note and the Senior Security Documents.

"Senior Note" shall mean that certain promissory note of Borrower, payable to the order of Senior Lender, evidencing the Senior Loan.

"Senior Security Documents" shall mean the documents and instruments securing any Senior Loan and encumbering the Property, including, without limitation, any deed of trust and assignment of leases executed by Borrower in favor of Senior Lender securing the obligations of Borrower with respect to the Senior Loan.

"Soft Costs" shall mean those costs associated with the development, construction, marketing, leasing, operation and maintenance of the Improvements that are identified as "Soft Costs" on the Budget, including, without limitation, leasing commissions, architectural and engineering fees, consultant fees, professional fees, marketing fees and expenses, real estate taxes, insurance and bonding costs, interest and financing fees.

"Subordination Agreement" shall mean that certain Subordination Agreement of even date herewith among Borrower, Lender and EverTrust Bank.

"Substantial Completion" shall have the meaning set forth in Section 3.16.1 hereof; "Substantially Completed" shall have the meaning correlative thereto.

"Survey" means a map or plat of survey of the Property and Improvements which conforms with Lender's survey requirements and with the "Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys" jointly established and adopted by ALTA and NSPS in 2010 (effective February 23, 2011), and pursuant to the Accuracy Standards as adopted by ALTA and NSPS and in effect on the date when the Survey is certified to Lender in the form specified by Lender.

"Title Company" shall mean Stewart Title (or another title insurer selected by Borrower and reasonably satisfactory to Lender), which shall issue the Title Policy.

"Title Policy" shall mean an ALTA Loan Policy, issued by the Title Company, with liability equal to the full amount of the Loan, in favor of Lender, as insured, insuring the lien of the Deed of Trust to be a valid second lien on the Property, subject only to the Permitted Encumbrances.  The Title Policy shall have such endorsements thereto as Lender may reasonably require.

"Unrelated Documents" shall mean all written documents, agreements or instruments, if any, entered into by and between Borrower and Lender, or made by Borrower in favor of Lender, other than the Loan Documents.

"USCIS" shall mean United States Citizenship and Immigration Services.

1.2.    ACCOUNTING TERMS– All accounting terms not specifically defined herein shall be construed in accordance with GAAP, and all financial data submitted pursuant to this Agreement shall be prepared in accordance with GAAP, unless Lender agrees to another manner of preparation.

1.3.    USE OF DEFINED TERMS– Any defined terms used in the plural shall include the singular, and the masculine gender shall include the feminine and/or neuter, and such terms shall encompass all members of the relevant class.

1.4.    SCHEDULES AND EXHIBITS– All schedules and exhibits to this Agreement, either as originally existing or as the same may from time to time be supplemented, modified or amended, are incorporated herein by reference.

1.5.    REFERENCES– Any reference to this Agreement or any other document shall include such document, both as originally executed, and as it may from time to time be amended, supplemented and modified.  References herein to Articles, Sections and Exhibits shall be construed as references to this Agreement unless a different document is named.

1.6.    OTHER TERMS– The term "document" is used in its broadest sense and encompasses agreements, certificates, opinions, consents, instruments and other written material of every kind.  The terms "including" and "include" shall mean "including (include), without limitation."

ARTICLE II
REPRESENTATIONS AND WARRANTIES OF BORROWER

Borrower hereby represents and warrants to Lender as of the date of this Agreement that:

2.1.    <u>BORROWER'S CAPACITY</u>– Borrower is an entity duly organized and existing in good standing under the Laws of the State of California, duly qualified to do business in California and in any other state in which the nature of its business requires it to be so qualified, and is lawfully empowered and possesses the capacity to enter into and carry out the terms and provisions of the Loan Documents, and all Organizational Documents delivered by Borrower or which have been filed with any and all public officials are current and true and complete in all material respects.

2.2.    <u>VALIDITY OF LOAN DOCUMENTS</u>– The Loan Documents are in all material respects valid and binding upon Borrower according to their terms, subject to all Laws, including equitable principles, insolvency Laws, and other matters applying to creditors generally; <u>provided, however</u>, that to Borrower's actual knowledge, the implementation of such Laws do not and will not affect the ultimate realization of the security afforded thereby.    The execution and delivery by Borrower of and the performance by Borrower of all its obligations under the Loan Documents have been duly authorized by all necessary action and do not and will not:

2.2.1    Require any consent or approval not heretofore obtained of any other Person holding any interest in or entitled to receive any interest issued or to be issued by Borrower or otherwise; or

2.2.2    Violate any provision of the Organizational Documents or any other material agreements to which Borrower is bound; or

2.2.3    Result in or require the creation or imposition of any mortgage, deed of trust, pledge, lien, security interest, claim, charge, right of others, or other encumbrance of any nature (other than under the Loan Documents) upon or with respect to any property now owned or leased or hereafter acquired by Borrower; or

2.2.4    Violate any order, writ, judgment, injunction, decree, determination, or award, or violate any provision of any Laws; or

2.2.5    Result in a breach of or constitute a default under, cause or permit the acceleration of any obligation owed under, or require any consent under any indenture or loan or credit agreement or any other agreement, lease, or instrument to which Borrower is a party or by which Borrower or any property of Borrower is bound or affected.

2.3.    <u>NO DEFAULT</u>– Borrower is not in default under any order, writ, judgment, injunction, decree, determination, award, indenture, agreement, lease, or instrument of the type described in Section 2.2 above.

2.4.    <u>NO GOVERNMENTAL APPROVALS REQUIRED</u>– No authorization, consent, approval, order, license, exemption from, or filing, registration, or qualification with, any Governmental Agency is or will be required to authorize, or is otherwise required in connection with:

2.4.1    The execution, delivery and the performance by Borrower of all or any of its obligations under the Loan Documents; or

2.4.2    The creation of the liens, security interests, or other charges or encumbrances described in the Loan Documents, except that (i) filing and/or recording with Governmental Agencies may be required to perfect such liens, security interests, or other charges or encumbrances and (ii) Section 5 of the DDA requires that notice be given to the City of Buena Park as successor agency not less than twenty (20) days prior to the recordation of the Deed of Trust, which notice has been given.

2.5.    <u>TAX LIABILITY</u>- Borrower has timely filed all tax returns (federal, state, and local) required to be filed and has paid all taxes which have become due pursuant to such returns or any tax assessments received by Borrower, including interest and penalties, if any.

2.6.    FINANCIAL STATEMENTS- All Financial Statements of Borrower and each of the Guarantors which have heretofore been submitted to Lender fairly present the financial positions of Borrower and such Guarantor at the dates of such Financial Statements, in conformity with GAAP.  To Borrower's actual knowledge, all contingent liabilities of Borrower and each such Guarantor in excess of $50,000 have been disclosed in the Financial Statements. Since the dates of the Financial Statements, there have been no material adverse changes in the financial conditions of Borrower or any Guarantor.

2.7.    PENDING LITIGATION– Except as set forth in the Disclosure Schedule, there are no actions, suits, or proceedings pending and served, or to Borrower's actual knowledge, pending and unserved or threatened in writing against Borrower or any of its Affiliates, or the Property, or involving the validity or enforceability of any of the Loan Documents or the priority of the lien thereof, at Law or in equity, or before or by any Governmental Agency, except actions, suits, and proceedings that are fully covered by insurance or which, if adversely determined, would not substantially impair the ability of Borrower to perform each and every one of its obligations under and by virtue of the Loan Documents.

2.8.    VIOLATIONS OF LAWS– Borrower has not received any written notices of violations, and to Borrower's actual knowledge, there are no violations or notices or claims of violations of any Laws relating to the Property or any of the Collateral.

2.9.    COMPLIANCE WITH ZONING ORDINANCES AND SIMILAR LAWS– To Borrower's actual knowledge, the development of the Property in accordance with the Plans and Specifications, complies with all applicable Laws and all permits and approvals issued thereunder, affecting the Property, the development, sale, operation, leasing or financing of the Property and the intended occupancy, use and enjoyment of the Property, including, but not limited to, applicable subdivision Laws, licenses and permits, aviation regulations and determinations, building codes, zoning ordinances, flood disaster, environmental protection and equal employment regulations and appropriate supervising boards of fire underwriters and similar agencies.  Borrower shall not seek, make or consent to any change in the zoning, conditions of use, or any other applicable land use permits, approvals or regulations pertaining to the Property, or any portion thereof, which would constitute a violation of the warranties and representations herein contained.

2.10.    CONDITION OF PROPERTY– To Borrower's actual knowledge, the Property is not damaged or injured as a result of any fire, explosion, accident, flood, or other casualty.

2.11.    COMMISSIONS AND FEES- No commissions or fees are or will be owed by Borrower in connection with the Loan and/or the identification or recruitment of Members for Lender.  This provision shall survive the repayment of the Loan and shall continue in full force and effect so long as the possibility of such liability, claims or losses exists.

2.12.    ENVIRONMENTAL AND GEOLOGICAL ISSUES– To Borrower's actual knowledge, (i) all environmental impact reports as required by any Governmental Agency having jurisdiction over the Property have been duly filed and approved; (ii) except as disclosed in the Disclosure Schedule, there are no known environmental and geological issues relating to the Property or any portion thereof that may individually or in aggregate materially affect the development, use and operation of the Property for its intended purpose, and (iii) the remediation to the extent required by governmental authorities with jurisdiction by Borrower of all the known environmental and geological issues as disclosed in the Disclosure Schedule relating to the Property or any portion thereof is an anticipated project cost and therefore will not give rise to a material adverse effect on Borrower's ability to perform its obligations under the Loan Documents.

2.13.    ACCESS– The Property has both legal and practical access to a publicly maintained road or street pursuant to the Declaration.

2.14.    NO OTHER LIENS– Prior to the recordation of the Deed of Trust, (a) (i) Borrower has not made a contract or arrangement of any kind the performance of which by the other party thereto would give rise to a lien on the Property, or any portion thereof; and (ii) no work of any kind has been commenced or will be performed on any portion of the Property, no equipment or material has been or

will be delivered to or placed upon the Property for any purpose whatsoever, and no contract for the supplying of labor, materials, or services for the design or construction of the improvements on the Property, or the surveying thereof, has been or will be entered into which is likely to cause a mechanic's or materialman's lien or similar lien to achieve priority over the Deed of Trust or the rights of Lender thereunder or with respect of the Collateral; or (b) Borrower will cause the title insurance policy to be issued at Loan Closing to include a mechanic's lien endorsement.  Nothing in this Agreement shall be construed to prohibit the delivery and recordation of the Senior Security Documents.

2.15.    <u>PERMITS</u>– Borrower possesses all licenses, approvals, permits, franchises, patents, copyrights, trademarks, and trade names, or rights thereto, that are necessary to own the Property and Borrower is not in material violation of any valid rights of others with respect to the foregoing. All building, construction and other permits or approvals necessary or required in connection with the construction of improvements on the Property and the use and operation thereof for their intended purpose have been validly issued or, to Borrower's actual knowledge, will be issued in a timely manner by a date sufficient to ensure the completion of construction and commencement of the operation, leasing or financing of the Property and the intended occupancy, use and enjoyment of the Property.  All required fees have been paid and bonds and/or other security have been posted to the extent required in connection with all permits and approvals that have been issued.  Following the issuance thereof, Borrower shall use commercially reasonable efforts to cause all permits and approvals to remain in full force and effect or to cause other permits and approvals to be issued as necessary.

2.16.    <u>NO ERISA PLAN</u>– Borrower does not maintain a plan under the Employee Retirement Income Security Act of 1974.

2.17.    <u>MATERIAL CONTRACTS</u>– Except for the Loan Documents and the Senior Loan Documents, all contracts to which Borrower is a party or by which Borrower is bound related to the Project or the development thereof, all management contracts, and all other contracts to which Borrower is a party or by which Borrower is bound involving an aggregate transaction value in excess of $100,000 per contract (or series of related contracts) are described in the Disclosure Schedule.

2.18.    <u>FULL DISCLOSURE</u>–  All information in the loan application, financial statement, certificate, or other documents prepared and delivered by Borrower or its Affiliates to Lender or Lender's advisors in obtaining the Loan is correct and complete in all material respects, and, to Borrower's actual knowledge, there are no omissions therefrom that result in such information being incomplete, incorrect, or misleading in any material adverse respect as of the date thereof.  To Borrower's actual knowledge, all documents delivered by Borrower or its Affiliates to Lender or Lender's advisors in obtaining the Loan are true and correct photocopies of documents in the files of Borrower or its Affiliates.

2.19.    <u>USE OF PROCEEDS; MARGIN STOCK</u>–  The Loan Proceeds will be used by Borrower solely for the purposes specified in this Agreement.  None of such proceeds will be used for the purpose of purchasing or carrying any "margin stock" as defined in Regulation U or G of the Board of Governors of the Federal Reserve System (12 C.F.R.  Part 221 and 207), or for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase or carry a margin stock or for any other purpose which might constitute this transaction a "purpose credit" within the meaning of such Regulation U or G. Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock.  Neither Borrower nor any Person acting on behalf of Borrower has taken or will take any action which might cause any Loan Documents to violate Regulation U or G or any other regulations of the Board of Governors of the Federal Reserve System or to violate Section 7 of the Securities Exchange Act of 1934, or any rule or regulation thereunder, in each case as now in effect or as the same may hereafter be in effect.  Borrower owns no "margin stock".

2.20.    <u>GOVERNMENTAL REGULATION</u>–  Borrower is not subject to regulation under the Public Utility Holding Company Act of 1935, the Federal Power Act, the Investment Company Act of 1940, the Interstate Commerce Act (as any of the preceding have been amended), or any other Law which regulates the incurring by Borrower of indebtedness, including but not limited to laws relating to common or contract carriers or the sale of electricity, gas, steam, water, or other public utility services.

2.21.    NO CONDEMNATION– No condemnation or eminent domain proceedings are pending, or to Borrower's actual knowledge, threatened against the Property.

2.22.    DEFAULTS– No Event of Default under any of the Loan Documents or Senior Loan Documents has occurred and not been cured.

2.23.    SUBSIDIARIES– Borrower has no subsidiaries.

2.24.    EMPLOYMENT AGREEMENTS– Except as set forth in the Disclosure Schedule, Borrower has not executed any employment contract or service agreement with any existing employees, consultants, manager or officers and there is no management agreement, service agreement or other similar agreements among Borrower, Min Seok Chae, and Donald Chae.

2.25.    OWNERSHIP OF PROPERTY– Borrower is the ground lessee of the Property pursuant to that certain Ground Lease dated April 6, 2015 between Borrower and The Source at Beach, LLC, a California limited liability company.

2.26.    SENIOR LOAN- RESERVED.

2.27.    TAX PARCELS– RESERVED.

2.28.    ZONING– The contemplated construction on the Property, which consists of a hotel and related amenities, is permitted under the current zoning for the Property.

2.29.    DDA– RESERVED.

2.30.    AFFIRMATION OF REPRESENTATIONS AND WARRANTIES– Each Advance and request for Advance under this Agreement shall constitute an affirmation that all foregoing representations and warranties of Borrower and any Guarantor are true and correct as of the date of such disbursement or request for disbursement unless Borrower provides Lender written notice to the contrary.

ARTICLE III
THE LOAN

3.1.    THE LOAN– Lender agrees to lend to Borrower and Borrower agrees to borrow from Lender, subject to the terms and conditions set forth herein and in the Note, in incremental Advances which will not exceed, in the aggregate principal amount, Ten Million and No/100 Dollars ($10,000,000.00).  Borrower agrees to cause the proceeds of each Advance to be applied for the Project Costs specified in the applicable Draw Package and approved for disbursement, and for no other purposes.  No Advance shall be applied by Borrower to reimburse itself for costs funded with any Balancing Deposit.  The Loan is not a revolving loan and amounts repaid may not be re-borrowed without Lender's consent.

3.2.    LOAN CLOSING– The Loan Closing shall occur on the date of this Agreement or as soon as the Non-Construction Conditions Precedent shall have been satisfied, as described below:

3.2.1    Satisfaction of the Non-Construction Conditions Precedent shall be subject to Lender's receipt of the following, all in form and substance reasonably satisfactory to Lender:

(a)    this Agreement;

(b)    the Note;

(c)    the Deed of Trust, which shall be recorded concurrently with the Senior Security Documents;

(d)    the Guaranty;

(e)      the Financing Statements;

(f)      the Environmental Indemnity;

(g)      a Secretary's Certificate/Incumbency Certificate, attaching:

        (i)      a certified copy of Borrower's articles of organization;

        (ii)      Borrower's operating agreement;

        (iii)      Borrower's good standing certificate;

        (iv)      Borrower's authorizing resolutions or other actions authorizing the execution, delivery and performance of the Loan Documents;

        (v)      articles of incorporation of Borrower's manager;

        (vi)      good standing certificate of Borrower's manager;

        (vii)      bylaws of Borrower's manager, if an entity; and

        (viii)      authorizing resolutions or similar actions of Borrower's manager, if an entity;

(h)      the Title Policy;

(i)      the Hazard Insurance Disclosure;

(j)      the most recent available financial statements of Guarantor;

(k)      copies of all Leases, if any, executed with respect to the Improvements, together with fully executed tenant estoppels in form and substance reasonably acceptable to Lender for each Lease;

(l)      a signed IRS Form W8 and W9 as applicable;

(m)      any such other information and documents reasonably required by Lender, with the understanding that the Construction Conditions Precedent are post-closing items.

      3.2.2    The Construction Conditions Precedent are not conditions precedent to the Loan Closing, but are conditions precedent to the disbursement of Loan Proceeds.  Satisfaction of the Construction Conditions Precedent shall be subject to Lender's receipt of the following, all in form and substance reasonably satisfactory to Lender, duly executed by the party to be charged if applicable:

(a)      the Plans and Specifications;

(b)      the Budget;

(c)      the Construction Schedule;

(d)      the Construction Contract;

(e)      the Architect's Contract;

(f)      the  Agreement;

(g)      copies of all permits, certificates, licenses and approvals required under all applicable Legal Requirements for the commencement of construction of the Improvements;

(h)      evidence of insurance;

(i)      copies of such financial statements of the General Contractor and each subcontractor as Lender may reasonably require, including balance sheets and profit and loss statements;

(j)      evidence that all utilities and municipal services required for the construction and operation of the Improvements are available at the Property;

(k)      reasonably satisfactory evidence of availability of funds in an amount sufficient to pay all otherwise unpaid Project Costs, subject to the following:  (i) with respect to any EB-5 financing, funds shall be regarded as available if the investor has deposited such funds into escrow, provided that the amount of funds deemed to be available shall not be diminished by an investor's withdrawal of funds from escrow if and to the extent that a replacement investor deposits funds into escrow within three (3) months after such withdrawal; and (ii) with respect to a funding source other than an EB-5 financing, funds shall be regarded as available if a reputable investor or lender is contractually obligated to provide the funds; and

(l)      additional due diligence documents and information as required by Lender.

3.3.    <u>DISBURSEMENT OF LOAN PROCEEDS</u>– As soon as the Construction Conditions Precedent have been satisfied, Lender shall disburse funds to Borrower (the "Initial Advance") pursuant to a Draw Package submitted in accordance with this <u>Section 3.3</u> and approved by Lender, which approval shall not be unreasonably withheld.  All Loan Proceeds not otherwise disbursed as part of the Initial Advance (except any funds from Members which have not yet been released to Lender, if Borrower elects to close prior to such release) shall be held in a segregated deposit account in Lender's name (the "Disbursement Account"), until disbursed upon submission of a Draw Package and satisfaction of the conditions set forth below.  If, and to the extent that, funds from Members are released to Lender after the date of the Initial Advance, such funds shall be deposited into the Disbursement Account within two (2) Business Days after such release.

All disbursements to Borrower shall be conditioned upon the fulfillment of each of the following conditions:

3.3.1    <u>Draw Package</u>.  Lender shall have received the following in form and substance satisfactory to Lender (collectively, a "<u>Draw Package</u>") at least ten (10) Business Days prior to the date of the Initial Advance and any Advance from the Disbursement Account:

(a)      a request for disbursement of Loan Proceeds in the form approved by Lender itemizing the purposes for which the funds will be used and confirmation that the amounts set forth in such Advance are consistent with the Budget, the limitations set forth in Section 3.13 relating to disbursements for stored materials, and provide for the withholding of a retainage as described in the Construction Contract as approved by Lender;

(b)      a draw request certification from the General Contractor covering the requested disbursement in the form of AIA Form G702 and G703 or an equivalent form acceptable to Lender (with the General Contractor's sworn statement and application for payment attached thereto);

(c)      with respect to any draw to pay for lienable work and materials, copies of unconditional partial lien waivers or releases of lien for all lienable work done and materials delivered in the full amount of all prior payments, along with copies of conditional partial lien waivers or releases of lien for all lienable work done and materials delivered in the full amount requested in the applicable Draw Package, conditioned only upon receipt of payment requested in such Draw Package;

(d)      a list of Soft Costs to be paid from the requested disbursement, and copies of invoices for each item of Soft Costs;

(e)      a copy of the then current change order log;

(f)      to the extent not previously delivered to Lender, copies of all subcontracts under which work and materials have been provided as of the date of the Draw Package;

(g)      to the extent not previously delivered to Lender, copies of all permits, certificates, licenses and approvals required under applicable Legal Requirements for the construction of the Improvements as of the date of the requested disbursement and copies of all subcontracts; and

(h)      such additional documentation requested by Lender.

3.3.2    Inspector's Report.  Lender shall have received a report from the Inspector approving the subject Draw Package, unless the applicable request is only for Soft Costs.  Such report shall further affirm all of the following:

(a)      that all work completed at the time of the submission of the Draw Package has been performed in a good and workmanlike manner;

(b)      that all materials and fixtures that would customarily have been furnished and installed by typical construction developers, for construction of projects that are similar to the Improvements and are at a comparable stage of construction, have been furnished and installed;

(c)      that the Improvements have been constructed in conformance with the Plans and Specifications;

(d)      that the Improvements can be completed in accordance with the Budget and Project Schedule; and

(e)      that the Loan is in balance as required by Section 3.3.4 of this Agreement.


3.3.3    Title Endorsements.  Lender shall have received a commitment from the Title Company to issue an endorsement to the Title Policy extending the coverage to include the date and the amount of the requested Advance, without exception for any matter not previously approved by Lender in writing and insuring over all mechanics' and materialmans' liens arising (or which may arise) from work performed on the Improvements through the date of the applicable contractor's sworn statement.

3.3.4    Loans In Balance.  The Loan shall be "in balance" as determined by Lender.

(a)      The Loan shall be deemed to be "in balance" only at such times as Lender determines that (A) amounts available for disbursement under the Loan Documents and the Senior Loan Documents for on the Loan and the Senior Loans together with (B) amounts available for disbursement pursuant to any other sources of debt and/or equity financing approved by Lender, which approval shall not be unreasonably withheld and (C) available undisbursed Balancing Deposits with respect to the Loan or any Senior Loan, will be sufficient (giving effect to the expected timing of availability) to complete and operate the Improvements in accordance with the requirements of this Agreement and pay all Project Costs including interest on the Loans as and when expected to be incurred through the Maturity Date, provided that such determination shall not be unreasonably withheld.

(b)      Within ten (10) days after written notice from Lender that the Loans are not "in balance," and prior to any subsequent Advance, Borrower shall deposit sufficient funds with Lender to bring the Loans "in balance."  Disbursements of Balancing Deposits shall be subject to the same conditions as would be applicable to an Advance hereunder.  Upon the occurrence and during the continuance of an Event of Default, Lender may apply all or any portion of any Balancing Deposit

(including accrued interest thereon) to the payment of the Obligations or any Project Costs.  In the event Lender makes a demand for a Balancing Deposit hereunder as a result of a casualty or condemnation, any insurance or condemnation proceeds held by Lender and available for disbursement for construction or reconstruction in accordance with Section 4.20 hereof shall be credited against the Balancing Deposit required to be made hereunder and shall be treated in the same manner as a Balancing Deposit.

3.3.5    No Default or Unmatured Default.  No Event of Default shall have occurred and be continuing, unless the disbursement will be used to cure the Event of Default, provided that the use of such disbursement to cure the Event of Default is a permissible use of proceeds in accordance with the Loan Documents.

3.3.6    Representations and Warranties.  The representations and warranties made hereunder or under any of the other Loan Documents, or in any certificate or other document executed by Borrower or Guarantor and delivered to Lender pursuant to or in connection with this Agreement, shall be true and correct in all material respects as of the date of the applicable Advance except to the extent any such representation or warranty is made as of a specified date, in which case such representation or warranty shall have been true and correct on and as of such specified date.

Each Draw Package submitted by Borrower shall constitute a representation and warranty by Borrower that, except as otherwise specifically disclosed in such Draw Package and labeled as a "Disclosure" (a "Disclosure"):  (i) Borrower is in compliance with all of the conditions to the applicable Advance set forth in this Agreement, (ii) all representations and warranties made hereunder or under any of the Loan Documents, or in any certificate or other document executed by Borrower or Guarantor and delivered to Lender pursuant to or in connection with this Agreement, are true and correct in all material respects as of the date of the applicable Advance except to the extent such representation and warranty is made as of a specified date, in which case such representation and warranty shall have been true and correct on and as of such specified date, and (iii) no Event of Default exists as of the date of the applicable Advance.  If Lender elects to make an Advance notwithstanding matters which are the subject of a Disclosure, the waiver of such matters shall be effective for that Advance only, and such matters must be corrected before the next Advance.

3.3.7    Timing of Draws.  Disbursements will not be made more frequently than once in any one month period, except that if an additional Draw Package and disbursement is necessary to avoid a delay in construction in connection with the payment demand of one or more subcontractors (a "Special Disbursement"), such a Draw Package may be submitted and the Special Disbursement shall be made in accordance with this Agreement regardless of whether any other disbursement has been made within the preceding one month period.  A Special Disbursement shall not affect the timing of the next regular disbursement, which may be made at any time not less than one month following the preceding regular disbursement.  The maximum number of Special Disbursements over the term of the Loan shall be six (6), except to the extent that additional Special Disbursements are approved by Lender.

3.3.8    Disbursement to Senior Lender. Notwithstanding the foregoing provisions of this Section 3.3, Loan Proceeds may be disbursed to Borrower and deposited into an account with Senior Lender pursuant to the Senior Loan Documents to pay for Project Costs upon submission of evidence satisfactory to Lender that Lender is adequately protected with respect to the amounts so disbursed and deposited.

3.4.    LOAN PURPOSE–  The Loan Proceeds disbursed shall be used at all times in accordance with the Budget and otherwise as approved by Lender solely for (i) the payment of Project Costs in connection with the development of the Property; (ii) any payment to Lender and other costs and expenses payable by Borrower under the Loan Documents; and (iii) payment of other costs and expenses reasonably necessary for the development of the Property.

3.5.    LOAN TERM-  The term of the Loan will commence on the date of Loan Closing and the Loan will mature upon the Maturity Date, subject to acceleration or adjustment as provided in this Agreement and the other Loan Documents.

3.6.    <u>INTEREST RATE</u>– Except as otherwise provided in the Note, the interest rate will be a fixed rate of one percent (1%) simple accrued interest per annum, solely with respect to funds from Members that are released to Lender from the date of such release.  Interest shall be computed for the actual number of days which have elapsed on the basis of a 360-day year.

3.7.    <u>REPAYMENT</u>- In addition to other provisions set forth herein, repayment of the Loan will be required as follows:

3.7.1    All outstanding principal, accrued interest and any other amounts payable under the Note or any other Loan Documents shall be due on the Maturity Date; provided, however, that Borrower shall have the right to extend the Maturity Date, not more than two (2) times, each for a period of one (1) year, by providing written notice to Lender on or before the Maturity Date of Borrower's election to extend the Maturity Date.

3.7.2    In the event of the final disapproval of any Petition, Borrower shall pay to Lender, within fifteen (15) days following notice from Lender, an amount equal to the capital contribution of the Member whose Petition was disapproved.  In the event of any such payment, Lender shall, as soon as practicable after a new investor Member is admitted to Lender and releases its capital contribution to Lender, disburse Loan Proceeds to Borrower in an amount equal to the payment made by Borrower pursuant to this Section 3.7.2.

3.7.3    Whenever any payment to be made under any of the Loan Documents shall be due on a day other than a Business Day of Lender, such payment may be made on the next succeeding Business Day, and such extension of time shall in such cases be included in the computation of payment of interest hereunder and under the Note.

3.8.    <u>BUDGET, LINE ITEM REALLOCATIONS; UTILIZATION OF CONTINGENCY</u>.

3.8.1    Borrower shall use the Loan Proceeds of the Loan to pay for Project Costs as specified in the applicable Draw Package.  The Lender shall not be obligated to disburse more than the amount shown in the Budget for any item of Project Cost.

3.8.2    From time to time, Borrower or Lender may determine that modifications are necessary in the Budget because of actual or anticipated changes in the Project Costs.  If, after due consultation and consideration of the views of the Borrower and supporting documentation, Borrower and Lender do not agree on the changes, Lender's reasonable determination shall control.  All references to the Budget shall mean the budget submitted pursuant to Article II, as modified and approved by Lender from time to time pursuant to this Section.

3.8.3    If Borrower demonstrates to the satisfaction of Lender that it has achieved a cost savings in a line item of the Budget, then such savings, other than for interest on the Loan, shall be available for costs in any other Budget line item.

3.8.4    A portion of the funds allocated to the Contingency Line Item shall be available for Project Costs in the same proportion as the percentage of completion of the Project as certified by the Architect and otherwise as approved by Lender.

3.9.    <u>STORED MATERIALS NOT YET INCORPORATED</u>.  No Advance shall be made for materials not yet incorporated into the Improvements (whether stored on-site or off-site) except as provided for herein.  Subject to Lender's prior acceptance of a schedule of materials for which Advances will be sought prior to incorporation into the Improvements (the "<u>Stored Materials Schedule</u>"), Borrower shall be entitled to receive such Advances so long as: (i) the amount to be advanced on account thereof does not include the cost of incorporating such materials into the work; (ii) the materials are safely and suitably stored on-site (or off-site, as applicable) and insured for the full value thereof against theft, destruction or other casualty under insurance policies designating Lender as loss payee as evidenced by insurance binders or endorsements satisfactory to Lender; (iii) immediately upon disbursement of the Advance thereof, Borrower will have absolute title to the stored materials as evidenced by appropriate

bills of sale and payment receipts; (iv) the materials to be so paid for comply with the Plans and Specifications and are of suitable quality for ultimate incorporation into the Improvements and are free from any apparent defect (with Borrower agreeing to pay for all reasonable travel expenses of the Inspector to view and inspect any such materials stored off-site); (v) all such off-site materials and components shall be physically segregated from the other assets of the vendor and earmarked for the Project, or placed in a bonded warehouse, (vi) Lender shall have a perfected security interest in the stored materials, and (vi) all other conditions precedent to Advances as set forth in this Agreement are satisfied.    Notwithstanding the foregoing, in no event shall Advances hereunder for stored materials (whether on-site or off-site, but not including amounts disbursed for any materials incorporated into the improvements prior to the date of a requested Advance) exceed an aggregate of Two Million Dollars ($2,000,000) without the written consent of Lender, which shall not be unreasonably withheld.

3.10.    <u>HARD COSTS</u>.  Advances for Hard Costs shall be limited to the amount actually payable to the General Contractor under the Construction Contract (including, without limitation, the provisions therein for the withholding and payment of retainage).

3.11.    <u>SOFT COSTS</u>.  Advances for Soft Costs shall be limited to amounts then due under the applicable contract or otherwise then due and payable, on the basis of invoices, statements or other evidence thereof acceptable to Lender.

3.12    <u>CO-EQUAL LOAN</u>.  Lender acknowledges and agrees that the Loan and the Co-Equal Loan shall be pari passu.  Lender agrees to enter into any agreements and perform all acts necessary or desirable to carry out the intent of this Section 3.12 and enable the Co-Equal Lender to obtain title insurance consistent with such intent.

ARTICLE IV<br>
<u>CONSTRUCTION OF IMPROVEMENTS; BORROWER'S AFFIRMATIVE COVENANTS</u>

4.1.    <u>ACCEPTANCE OF CONSTRUCTION DOCUMENTS; COMPLETION OF CONSTRUCTION</u>.

4.1.1    <u>Acceptance of Construction Documents</u>.  Lender's acceptance of the Plans and Specifications, the Architect's Contract, the Construction Contract, subcontracts, bonds and other construction documents (including Lender's acceptance of any modifications thereof and any Person providing work, labor or services pursuant thereto) shall not be deemed in any respect a representation or warranty, express or implied, that the Improvements will be structurally sound, have a value of any particular magnitude or otherwise satisfy a particular standard, and Lender shall have no duty to inform Borrower of Lender's assessment of any such construction document.

4.1.2    <u>Completion of Construction</u>.  Borrower shall cause the Improvements to be Substantially Completed on or before the Expected Completion Date; provided, however, that the time within which the Improvements must be Substantially Completed may be extended beyond the Expected Completion Date for a period equal to the period of delays caused by fire, earthquake, unusual weather conditions or other acts of God, acts of public enemies, riot, insurrection, governmental regulation of the sale of materials and supplies or the transportation thereof, strikes directly affecting the work of construction, shortages of material or labor resulting directly from general market shortages, governmental control or diversion and other causes beyond Borrower's reasonable control other than shortage of funds (collectively, "Force Majeure Causes"), but in no event may the time for Substantial Completion of the Improvements extend beyond the Final Completion Date.

4.2.    <u>CONSTRUCTION PROGRESS</u>.

4.2.1    <u>Material Changes in Plans and Specifications</u>.  There shall be no material change in the Plans and Specifications without the prior written consent of Lender.  A material change for purposes hereof shall be any change (whether such change increases or decreases the total cost of the Improvements), which (i) involves a cost, for any single item or series of related items, of more than Five Hundred Thousand Dollars ($500,000), (ii) when added to all previous change orders, causes Project

Cost to be increased or decreased by more than Two Million Five Hundred Thousand Dollars ($2,500,000) in the aggregate (provided that following a consent by Lender pursuant to this clause (ii), no further consent under this clause (ii) shall be required unless and until all change orders processed after the giving of a consent pursuant to this clause (ii) cause Project Cost to be increased or decreased by more than Two Million Five Hundred Thousand Dollars ($2,500,000) in the aggregate), (iii) impairs the structural integrity or the configuration of the Improvements, (iv) substantially changes the architectural appearance of the Improvements or (v) results in a violation of any applicable Legal Requirement. Changes shall be submitted to Lender for approval on a form acceptable to Lender which shall be accompanied by a copy of the Plans and Specifications applicable to the changes.  All changes in the Plans and Specifications must, prior to being effective, be duly approved by the Senior Lender (if and to the extent required under the Senior Loan Documents).  Lender's consent to any change in the Plans and Specifications may be conditioned upon Borrower's compliance with a demand for a Balancing Deposit if required pursuant to Section 3.3.4 hereof.

　　　　　4.2.2    <u>Foundation Survey and Endorsement</u>.  To the extent required by Lender, within thirty (30) days after completion of the construction of the foundation of the Improvements, and as a condition precedent to any further disbursements, Borrower shall deliver or cause to be delivered to Lender an update to the Survey showing the location of such foundation and an endorsement to the Title Policy insuring that such foundation is within the boundary lines of the Property, does not violate any applicable covenants, conditions, restrictions or agreements affecting the Property, and does not encroach upon any easements or rights of way affecting the Property or any portion thereof.

　　　　　4.2.3    <u>Title Policy Endorsements</u>.  Within thirty (30) days after Substantial Completion of the Improvements, Borrower shall deliver to Lender (a) an ALTA (or its equivalent in California) Zoning Endorsement 3.1 (with parking and loading) to the Title Policy with respect to the Improvements, and (b) a date down to the ALTA Form-9 Comprehensive Endorsement and Location – Accuracy of Survey Endorsement to the Title Policy with respect to the Improvements or other updated zoning and survey documentation approved by Lender.

　　　4.3.    <u>PURCHASE OF MATERIALS UNDER CONDITIONAL SALES CONTRACT</u>.  No materials, equipment, fixtures or any other part of the Mortgaged Property shall be purchased or installed under any security agreement or other arrangements wherein the seller reserves or purports to reserve the right to remove or to repossess any such items or to consider them personal property after their incorporation in the work of construction, unless authorized by Lender in writing.

　　　4.4.    <u>INSPECTION; INSPECTOR</u>.

　　　　　4.4.1    <u>Inspections</u>.  Lender, through its officers, agents and employees, shall have the right at all reasonable times, on reasonable prior notice and at Lender's sole risk (i) to enter upon the Mortgaged Property and inspect the work of construction and its progress; and (ii) to examine, books, records, accounting data and other documents pertaining to the Mortgaged Property.  Borrower will cooperate with Lender and Lender's representatives and consultants.

　　　　　4.4.2    <u>Inspector</u>.  In furtherance of Lender's rights hereunder, Lender may, at its option, require monitoring of lien waivers and a monthly inspection of the Mortgaged Property by the Inspector during the construction of the Improvements.  Without limitation of the provisions of Section 4.4.1 hereof, Borrower shall provide the Inspector with copies of any testing reports received by Borrower with respect to the Mortgaged Property promptly upon Borrower's receipt thereof.

　　　　　4.4.3    <u>Exculpation</u>.  It is expressly understood and agreed that Lender is under no duty to supervise or to inspect the work of construction, and that any such inspection by or on behalf of Lender is for the sole purpose of protecting the interests of Lender with respect to the Mortgaged Property.  Failure to inspect the work or any part thereof shall not constitute a waiver of any of Lender's rights hereunder.  Inspection not followed by notice of Default shall not constitute a waiver of any Event of Default then existing; nor shall it constitute an acknowledgment that there has been or will be compliance with the Plans and Specifications or applicable Legal Requirements or that the construction is free from defective materials or workmanship.  It is further understood and agreed that any consents or approvals

of Lender hereunder for the sole purpose of protecting the interests of Lender under the Loan Documents and Borrower shall have no right to rely on such approvals for Borrower's purposes.

   4.4.4 <u>Authority of Inspector</u>. Borrower acknowledges that (i) Inspector has been retained or may be retained by Lender to act as a consultant and only as a consultant to Lender in connection with the construction of the Improvements, (ii) Inspector shall in no event or under any circumstance have any power or authority to make any decision or to give any approval or consent or to do any other act or thing which is binding upon Lender and any such purported decision, approval, consent, act or thing by Inspector on behalf of Lender shall be void and of no force or effect, (iii) notwithstanding the recommendations of Inspector, Lender reserves the right to make any and all decisions required to be made by Lender under this Agreement and to give or refrain from giving any and all consents or approvals required to be given by  Lender under this Agreement and to accept or not accept any matter or thing required to be accepted by Lender under this Agreement, without in any instance being bound or limited in any manner or under any circumstance whatsoever by any opinion expressed or not expressed, or advice given or not given, or information, certificate or report provided or not provided, by Inspector to Lender or any other Person with respect thereto, (iv) Lender reserves the right in its reasonable discretion to disregard or disagree, in whole or in part, with any opinion expressed, advice given or information, certificate or report furnished or provided by Inspector to Lender or any other Person, and (v) Lender reserves the right in its reasonable discretion to replace Inspector with another inspecting professional at any time and without prior notice to or approval by Borrower.  Borrower shall have no right to receive copies of any written reports by Inspector unless Borrower agrees in writing to indemnify and hold harmless Lender and its affiliates, members, managers, directors, officers, employees agents and advisors from and against any and all claims arising out of or resulting from Lender's provision to Borrower of one or more written reports by Inspector.  In the event Lender does make one or more written reports available to Borrower, Borrower shall rely thereon at its own risk.

   4.5. <u>LIENS, TAXES, AND GOVERNMENTAL CLAIMS</u>.

   4.5.1 <u>Liens</u>.  Borrower agrees to pay, satisfy and obtain the release of all other claims and liens affecting or purporting to affect the title to, or which may be or appear to be liens on, the Mortgaged Property or any part thereof (other than the Permitted Encumbrances), and all costs, charges, interest and penalties on account thereof, including without limitation the claims of all Persons supplying labor or materials to the Mortgaged Property, and to give Lender, upon demand, evidence satisfactory to Lender of the payment, satisfaction or release thereof.  Notwithstanding the foregoing, nothing herein contained shall require Borrower to pay any claims or liens which Borrower in good faith disputes and which Borrower, at its own expense, is currently and diligently contesting, <u>provided</u> that Borrower complies with the provisions of Section 4.5.2 hereof.

   4.5.2 <u>Contest</u>. Borrower shall not be required to pay any taxes, claims or governmental charges, or claims, or liens being contested in accordance with the terms of Section 4.5.1 hereof, as the case may be, so long as (i) Borrower diligently prosecutes such dispute or contest to a prompt determination in a manner not prejudicial to Lender and promptly pays all amounts ultimately determined to be owing, and (ii) Borrower provides security for the payment of such tax, assessment or governmental charge, or claim, or lien (together with interest and penalties relating thereto) in an amount and in form and substance satisfactory to Lender.  If Borrower shall fail to pay any such amounts ultimately determined to be owing or to proceed diligently to prosecute such dispute or contest as provided herein, then, upon the expiration of ten (10) days after written notice to Borrower by Lender of Lender's determination thereof, and Borrower's failure to act diligently to prosecute such dispute or contest or pay such amount within that period, in addition to any other right or remedy of Lender, Lender may, but shall not be obligated to, discharge the same, and the cost thereof shall be reimbursed by Borrower to Lender.  The payment by Lender in accordance with the foregoing sentence of any delinquent tax, assessment or governmental charge, or any claim, or lien which Lender in good faith believes to be valid and prior hereto, shall be conclusive between the parties as to the legality and amount so paid, and Lender shall be subrogated to all rights, equities and liens discharged by any such expenditure to the fullest extent permitted by law.

4.6.    <u>INSURANCE</u>– Borrower shall obtain and at all times maintain insurance as required under the Deed of Trust and the Senior Loan Documents.

4.7.    <u>PRESERVE ITS EXISTENCE</u>– Borrower will, so long as Borrower remains obligated on the Loan, do all things necessary to preserve and keep in full force and effect its organizational status and will comply with all Laws, orders and decrees of any Governmental Agency or court applicable to Borrower or to the Property.

4.8.    <u>PAYMENT OF TAXES</u>– Borrower shall pay and discharge all taxes, assessments, and governmental charges or levies imposed upon Borrower upon its income or profits, or upon any properties belonging to it prior to the date on which penalties attach thereto, and all lawful claims which, if unpaid, might become a lien or charge of a material nature upon any of such properties; provided, that Borrower shall not be required to pay any such tax, assessment, charge, levy or claim which is being contested in good faith and by proper proceedings if it maintains adequate reserves with respect thereto.

4.9.    <u>COMPLY WITH APPLICABLE LAWS</u>– Borrower shall comply in all material respects with all applicable restrictive covenants, zoning and subdivision ordinances and building codes, all health and environmental Laws and all other applicable Laws, directions, orders and notices of violations issued by any Governmental Agency relating to or affecting the Property whether by Borrower or by any occupant thereof, including, without limitation, any and all Laws relating to hazardous or toxic waste or waste products or hazardous substances. Borrower will not use, store, manufacture, generate, transport to or from, or dispose of any toxic substances, hazardous materials, hazardous wastes, radioactive materials, flammable explosives, or related material on or in connection with any property or the business of Borrower on any property, except for those used in the ordinary course of Borrower's business, and only in compliance with all applicable laws.  Borrower will not permit any lessee on any property to use, store, manufacture, generate, transport to or from, or dispose of any toxic substances, hazardous materials, hazardous waste, radioactive materials, flammable explosives, related material on or in connection with any property or the business on any property, except for those used in the ordinary course of such tenant's business, and only in compliance with all applicable laws.  ("Toxic substances," "hazardous materials," and "hazardous waste" shall include, but not be limited to, such substances, materials and wastes which are or become regulated under applicable Laws or which are classified as hazardous or toxic under applicable Laws.)

4.10.    <u>MAINTENANCE OF PROPERTIES</u>– Borrower shall use commercially reasonable efforts to maintain and preserve, or cause to be maintained and preserved, all of its properties, necessary or useful in the proper conduct of its business.

4.11.    <u>TERRORISM AND ANTI-MONEY LAUNDERING</u>- Borrower warrants and agrees as follows:

(a)    As of the date hereof and throughout the term of the Loan: (i) Borrower; (ii) any Person controlling or controlled by Borrower; (iii) if Borrower is a privately held entity, any Person having a beneficial interest in Borrower; or (iv) any Person for whom Borrower is acting as agent or nominee in connection with this transaction, is not an OFAC Prohibited Person.

(b)    To comply with applicable U.S. Anti-Money Laundering Laws and regulations, all payments by Borrower to Lender or from Lender to Borrower will only be made in Borrower's name and to and from a bank account of a bank based or incorporated in or formed under the laws of the United States or a bank that is not a "foreign shell bank" within the meaning of the U.S. Bank Secrecy Act (31 U.S.C. § 5311 et seq.), as amended, and the regulations promulgated thereunder by the U.S. Department of the Treasury, as such regulations may be amended from time to time.

(c)    Borrower agrees promptly to notify Lender in writing should Borrower become aware of any change in the information set forth in these representations.

4.12.    <u>CONSTRUCTION</u>- Borrower shall cause all construction of the Improvements to be commenced, prosecuted, and completed in a good and workmanlike manner in accordance with the Plans and Specifications in all material respects.

4.13.    <u>APPROVAL OF CONSTRUCTION</u>-   No work associated with the construction of the Improvements shall be commenced by Borrower unless and until all applicable conditions precedent included herein have been satisfied.

4.14.    <u>COMPLIANCE WITH LAWS; ENCROACHMENTS</u>- The Improvements shall be constructed in all material respects in accordance with all applicable (whether present or future) laws. The Improvements shall be constructed entirely on the Property and shall not encroach upon any easement or right-of-way, or upon the land of others. Construction of the Improvements shall occur wholly within all applicable building restriction lines and set-backs, however established, and shall be in compliance with all applicable use or other restrictions and the provisions of any prior agreements, declarations, covenants and all applicable zoning and subdivision ordinances and regulations.

4.15.    <u>INSPECTIONS; COOPERATION</u>- Borrower shall permit representatives of Lender to enter upon the Property, to inspect the Improvements and any and all materials to be used in connection with the development of the Property and the construction of the Improvements, to examine all detailed plans and shop drawings and similar materials as well as all records and books of account maintained by or on behalf of Borrower relating thereto and to discuss the affairs, finances and accounts pertaining to the Loan and the Improvements with representatives of Borrower. Borrower shall at all times cooperate and cause the General Contractor and each and every one of its subcontractors, sub-subcontractors and material suppliers to cooperate with the representatives of Lender in connection with or in aid of the performance of Lender's functions under this Agreement. Except in the event of an emergency or during the occurrence and continuance of an Event of Default, Lender shall give Borrower at least forty-eight hours' notice by telephone in each instance before entering upon the Property and/or exercising any other rights granted in this Section.

4.16.    <u>CONTRACTS, VOUCHERS AND RECEIPTS</u>- Borrower shall furnish to Lender any contracts, subcontracts, sub-subcontractors, bills of sale, statements, receipted vouchers or other agreements relating to the development of the Property or the construction of the Improvements, including any such items pursuant to which Borrower has any claim of title to any materials, fixtures or other articles delivered or to be delivered to the Property or incorporated or to be incorporated into the Improvements. Borrower shall furnish to Lender a verified written statement setting forth the names and addresses of all contractors, subcontractors, sub-subcontractors and suppliers furnishing labor or materials in the development of the Property or the construction of the Improvements and showing all amounts paid for labor and materials and all items of labor and materials furnished or to be furnished for which payment has not been made and the amounts to be paid therefor.

4.17.    <u>PAYMENT AND PERFORMANCE OF CONTRACTUAL OBLIGATIONS</u>- Borrower shall perform in a timely manner all of its material obligations under contracts and agreements related to the construction or operation of the Improvements, and Borrower will pay when due all bills for services or labor performed and materials supplied in connection with the development of the Property and the construction of the Improvements. Within thirty (30) days after the filing of any mechanic's lien or other lien or encumbrance against the Property, Borrower will promptly discharge the same by payment or filing a bond or as otherwise as permitted by Law. So long as the priority of Lender's security interest in the Property and all other assets pledged to Lender has been protected, Borrower shall have the right to contest any claim, lien or encumbrance, provided that Borrower does so diligently and without prejudice to Lender.

4.18.    <u>CORRECTION OF CONSTRUCTION DEFECTS</u>- Borrower shall correct or cause the correction of any structural defects in the Improvements and any material departures or deviations from the Plans and Specifications.

4.19.    <u>ADJUSTMENT OF CONDEMNATION AND INSURANCE CLAIMS</u>- Borrower shall give prompt notice to Lender of any casualty or any condemnation or threatened condemnation.  Except as

provided below, Lender is authorized, at its sole and absolute option, to commence, appear in and prosecute, in its own or Borrower's name, any action or proceeding relating to any condemnation or casualty, and to make proof of loss for and to settle or compromise any claim in connection therewith. In such case, Lender shall have the right to receive all condemnation awards and insurance proceeds, and may deduct therefrom all payments of its reasonable expenses. However, so long as no Event of Default has occurred and is then continuing, and Borrower is diligently pursuing its rights and remedies with respect to a claim, (i) Lender will obtain Borrower's written consent (which consent shall not be unreasonably withheld or delayed) before making proof of loss for or settling or compromising such claim and (ii) Lender shall allow Borrower within a reasonable period of time to make proof of loss, settle or compromise any claim and to use the available net proceeds after recovery of Borrower's expenses for the purposes described in Section 4.20. Borrower agrees to diligently assert its rights and remedies with respect to each claim and to promptly pursue the settlement and compromise of each claim, subject to Lender's prior written approval if the claim is in excess of the Loss Threshold, which approval shall not be unreasonably withheld or delayed.  Notwithstanding any provision to the contrary in this Agreement, if prior to the receipt by Lender of any condemnation award or insurance proceeds, the Property shall have been sold pursuant to the provisions of the Deed of Trust, Lender shall have the right to receive such funds (a) to the extent of any deficiency found to be due upon such sale with interest thereon (whether or not a deficiency judgment on the Deed of Trust shall have been sought or recovered or denied), and (b) to the extent necessary to reimburse Lender for its expenses.

4.20.    <u>UTILIZATION OF NET PROCEEDS</u>.

(a)    All net insurance proceeds or net condemnation proceeds shall be used in accordance with the Senior Loan Documents.  Subject to the preceding sentence, all such proceeds must be utilized either for payment of the obligations under the Loan Documents or the Senior Loan Documents or for the restoration of the Property. Net proceeds above the Loss Threshold may be utilized for the restoration of the Property only if no Event of Default shall exist and is then continuing.

(b)    If net proceeds are to be utilized for the restoration of the Property, the net proceeds must be deposited in Borrower's deposit account established with a financial institution reasonably satisfactory to Lender, which account will be assigned to Lender as additional security for the Loan. Disbursements of funds from the deposit account will be made in a manner consistent with, and subject to, the requirements for the funding of Advances of the Loan and the terms of this Agreement regarding the disbursement of Loan proceeds.

4.21.    <u>MANAGEMENT; KEY PERSONNEL</u>- Borrower at all times shall provide for the competent and responsible management and operation of the Property and the conduct of Borrower's business.  Borrower at all times shall cause Min Seok Chae and/or Donald Chae to own in the aggregate an interest of greater than 50% in Borrower.  Borrower shall notify Lender in writing prior to the hiring of any new management personnel (being any employee whose compensation exceeds $200,000 per year) or the termination of any existing management personnel of each of Borrower or the project manager ("Manager").

4.22.    <u>BOOKS AND RECORDS; FINANCIAL STATEMENTS; TAX RETURNS</u>- Borrower will furnish or cause to be furnished to Lender annual financial statements, including balance sheets and income statements, for Borrower, each Guarantor and the Property, within ninety (90) days after each fiscal year end for the respective reporting party.  Borrower will furnish or cause to be furnished to Lender quarterly statements (cash flow, balance sheet and profit and loss only) for Borrower within forty-five (45) days after the end of each calendar quarter.  All financial statements must be in form and detail reasonably acceptable to Lender and must be certified as to accuracy by Borrower or the respective Guarantor, as the case may be. Borrower shall provide, upon Lender's request, convenient facilities for the inspection and verification of any such statement at Lender's expense. All certifications and signatures on behalf of corporations, partnerships, limited liability companies and other entities shall be by a representative of the reporting party satisfactory to Lender. All financial statements for individuals shall be on Lender's then-current personal financial statement form or in another form reasonably satisfactory to Lender.   At Lender's request, Borrower shall audit Borrower's financial statements at Lender's expense.

4.23.    <u>ESTOPPEL CERTIFICATES</u>- Within ten (10) Business Days after any request by Lender or a proposed assignee or purchaser of the Loan or any interest therein, Borrower shall certify in writing to Lender, or to such proposed assignee or purchaser, the then unpaid balance of the Loan and whether Borrower claims any right of defense or setoff to the payment or performance of any of the Obligations, and if Borrower claims any such right of defense or setoff, Borrower shall give a detailed written description of such claimed right.

4.24.    <u>TAXES</u>- Borrower shall pay and discharge all taxes with respect to the Property prior to the date on which penalties are attached thereto unless and to the extent only that such taxes are contested in accordance with the terms of the Deed of Trust.

4.25.    <u>LENDER'S RIGHTS TO PAY AND PERFORM</u>- If, after any required notice, Borrower fails to promptly pay or perform any of the obligations owing or due to any third party in connection with the construction of the Improvements or otherwise related to the transactions contemplated by the Loan Documents within any applicable grace or cure periods, Lender, without advance notice to or demand upon Borrower, and without waiving or releasing any such obligation or Event of Default, may (but shall be under no obligation to) at any time thereafter make such payment or perform such act for the account and at the expense of Borrower.  Lender may enter upon the Property for that purpose and take all action thereon as Lender reasonably considers necessary or appropriate for that purpose.

4.26.    <u>REIMBURSEMENT; INTEREST</u>.  If Lender shall incur any expenses or pay any claims by reason of an Event of Default and remedies provided under the Loan Documents (regardless of whether or not any of the Loan Documents expressly provide for an indemnification by Borrower against such claims), Lender's payment of such expenses and claims shall constitute Advances to Borrower which shall be paid by Borrower to Lender on demand, together with interest thereon from the date incurred until paid in full at the rate of interest then applicable to the Loan under the terms of the Note. Each Advance shall be secured by the Deed of Trust and the other Security Documents fully as if made to Borrower, regardless of the disposition thereof by the party or parties to whom such Advance is made. Notwithstanding the foregoing, however, in any action or proceeding to foreclose the Deed of Trust, to exercise Lender's rights with respect to any other Collateral or to recover or collect amounts due under this Agreement, the provisions of Law governing the recovery of costs, disbursements and allowances shall prevail unaffected by this Section.

4.27.    <u>NOTIFICATION BY BORROWER</u>- Borrower will promptly give Notice to Lender of the occurrence of any Event of Default hereunder or under any of the other Loan Documents. Borrower will also promptly give Notice to Lender of any claim of a default by Borrower, or any claim by Borrower of a default by any other party, under any contract with value in excess of $50,000 with respect to the design or construction of the Improvements. If none of the foregoing events has occurred, the chief financial officer of Borrower shall certify thereto, based on actual knowledge, to Lender in writing which shall be delivered to Lender, together with the delivery of the annual financial statement referred to in Section 4.22.

4.28.    <u>INDEMNIFICATION BY BORROWER</u>- Borrower agrees to indemnify Lender and Lender's affiliates, members, managers, directors, officers, employees, agents and advisors (collectively the "Indemnified Parties") and to hold harmless the Indemnified Parties from and against, and to defend the Indemnified Parties by counsel approved by Lender against, any and all claims arising out of or resulting from (a) construction of any Improvements, including any defective workmanship or materials; (b) any failure by Borrower to comply with the requirements of any Laws or to comply with any agreement that applies or pertains to the Property, including any agreement with a broker claiming through Borrower in connection with the Loan or other financing of the Property; (c) any Event of Default hereunder or under any of the other Loan Documents; or (d) any assertion or allegation that Lender is liable for any act or omission of Borrower or any other Person in connection with the ownership, development, financing, leasing, operation or sale of the Property; provided, however, that Borrower shall not be obligated to indemnify the Indemnified Parties with respect to any claim to the extent arising from the breach of contract, gross negligence or willful misconduct of any of the Indemnified Parties. The agreements and indemnifications contained in this Section shall apply to claims arising both before and after the repayment of the Loan and shall survive the repayment of the Loan, any foreclosure or deed, assignment

or conveyance in lieu thereof and any other action by Lender to enforce the rights and remedies of Lender hereunder or under the other Loan Documents.

4.29.    FEES AND EXPENSES- Borrower shall pay all fees, charges, costs and expenses required to satisfy the conditions of the Loan Documents. Without limitation of the foregoing, Borrower will pay, when due, and if paid by Lender will reimburse Lender on demand for, all reasonable fees and expenses of the title insurer, environmental engineers, Inspector, insurance consultant, appraisers, surveyors and the fees and expenses of Lender's counsel in connection with the Loan Closing or, if an Event of Default has occurred and is continuing, the enforcement of Lender's rights and remedies under any of the Loan Documents.    Amounts owed by Borrower to Lender under this Section for fees and expenses in connection with the Loan Closing shall be payable to Lender at the time of the Loan Closing.

4.30.    FEDERAL TAX ID NUMBER- Borrower's Internal Revenue Taxpayer ID Number is 20-3994634, and Borrower shall use such number as its exclusive Internal Revenue Taxpayer ID Number until Borrower's obligations under the Loan Documents have been satisfied in full.

4.31.    SENIOR LOAN DOCUMENTS- Borrower shall (i) comply with all terms, conditions, and obligations set forth in the Senior Loan Documents in effect as of the date hereof, or as may be amended, modified, or replaced from time to time, (ii) provide Lender with copies of any notices received from any Senior Lender pursuant to the Senior Loan Documents, and (iii) not amend or modify any of the Senior Loan Documents without the prior written consent of Lender, which consent shall not unreasonably be withheld.

ARTICLE V
BORROWER'S NEGATIVE COVENANTS

5.1.    CONDITIONAL SALES- Borrower shall not incorporate into the Property any parcels acquired under a conditional sales contract or lease or as to which the vendor retains title or a security interest, without the prior written consent of Lender.

5.2.    INSURANCE POLICIES AND BONDS- Borrower shall not do or permit to be done anything that would materially and adversely affect the coverage or indemnities provided for pursuant to the provisions of any insurance policy, performance bond, labor and material payment bond or any other bond given in connection with the development of the Property or the construction of the Improvements.

5.3.    RESTRICTIONS ON INDEBTEDNESS- Borrower will not create, incur, assume, guarantee or be or remain liable, contingently or otherwise, with respect to any indebtedness other than:

(a)    Indebtedness to Lender under any of the Loan Documents;

(b)    Indebtedness to Senior Lender under the Senior Loan Documents;

(c)    Indebtedness on the Co-Equal Loan, in an original principal amount not to exceed $11,500,000.00.

(d)    Indebtedness to Affiliates so long as such indebtedness is subordinated to (I) Borrower's obligations to Lender pursuant to a subordination agreement in form and substance reasonably satisfactory to Lender and (II) Borrower's obligations to Sender Lender pursuant to a subordination agreement in form and substance reasonably satisfactory to Senior Lender (provided that indebtedness to an Affiliate in connection with such Affiliate's service as General Contractor shall not count as indebtedness for purposes of this Section 5.3); and

(e)    Indebtedness incurred in the ordinary course of business.

5.4.    RESTRICTIONS ON LIENS- Borrower will not enter into or permit to exist any arrangement or agreement (excluding the Loan Documents and the Senior Loan Documents) which directly or indirectly prohibits Borrower from creating, assuming or incurring any lien upon its properties,

revenues or assets whether now owned or hereafter acquired in favor of Lender under the Loan Documents.

     5.5.   <u>MERGER, CONSOLIDATION AND DISPOSITION OF ASSETS.</u>

     (a)   Borrower will not become a party to any merger, amalgamation or consolidation, or agree to or effect any asset acquisition or stock acquisition (other than the acquisition of assets in the ordinary course of business).

     (b)   Borrower will not become a party to or agree to or effect any disposition of assets, other than the sale of inventory and the disposition of obsolete assets, in each case in the ordinary course of business.

     5.6.   <u>SALE AND LEASEBACK</u>- Borrower will not enter into any arrangement, directly or indirectly, whereby Borrower shall sell or transfer any property owned by it in order then or thereafter to lease such property or lease other property that Borrower intends to use for substantially the same purpose as the property being sold or transferred.

     5.7.   <u>TRANSACTIONS WITH AFFILIATES</u>- Without Lender's prior written consent, Borrower will not enter into, or cause, suffer or permit to exist, any arrangement or contract with any of its Affiliates, including, without limitation, any management contract, if such transaction is on terms that are less favorable to Borrower than those that could have been obtained in a comparable transaction on an arms' length basis from a Person that is not an Affiliate.

     5.8.   <u>CHANGE IN NATURE OF BUSINESS; NEW LINE OF BUSINESS</u>- Borrower will not engage in any line of business substantially different from the lines of business conducted by Borrower on the date hereof or engage or enter into any new line of business.  Borrower shall not acquire any material asset other than the Property, the Improvements and such incidental property as may be necessary or desirable for the construction or operation of the Property and the Improvements.

     5.9.   <u>CHANGE IN CONTROL</u>-  Without the prior written consent of Lender, there shall be no material change in the day-to-day control and management of Borrower, and no material change in the Organizational Documents of Borrower.

     5.10.   <u>LEASES</u>– Except as otherwise permitted under the Senior Loan Documents, Borrower shall not enter into any lease other than an Approved Lease.

     5.11.   <u>SEPARATENESS COVENANTS</u> Borrower shall not:

     5.11.1  engage in any business or activity other than the acquisition, development, construction, ownership, leasing, operation and maintenance of the Mortgaged Property, and activities incidental thereto;

     5.11.2  acquire or own any material asset other than the Property, the Improvements, and such incidental personal property as may be necessary for the construction and operation of the Improvements;

     5.11.3  commingle its assets with the assets of any of its partner(s), members, shareholders, Affiliates, or of any other Person or transfer any assets to any such Person other than distributions on account of equity interests in the Borrower permitted hereunder and properly accounted for;

     5.11.4  fail to correct any known misunderstandings regarding the separate identity of Borrower;

     5.11.5  hold itself out to be responsible or pledge its assets or creditworthiness for the indebtedness of another Person;

5.11.6  make any loans or advances to any third party, including any shareholder, partner, member, principal or Affiliate of Borrower, or any shareholder, partner, member, principal or Affiliate thereof;

5.11.7  fail to file its own tax returns (if required to file);

5.11.8  use contracts, purchase orders, stationery, invoices or checks in the name of any other Person;

5.11.9  fail either to hold itself out to the public as a legal entity separate and distinct from any other Person or to conduct its business solely in its own name in order not (i) to mislead others as to the entity with which such other party is transacting business, or (ii) to suggest that Borrower is responsible for the indebtedness of any third party (including any shareholder, partner, member, principal or affiliate of Borrower, or any shareholder, partner, member, principal or affiliate thereof);

5.11.10 fail to allocate fairly and reasonably among Borrower and any third party (including, without limitation, any Guarantor) any overhead for common employees, shared office space or other overhead and administrative expenses;

5.11.11 allow any Person to pay the salaries of its own employees or fail to maintain a sufficient number of employees for its contemplated business operations;

5.11.12 fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

5.11.13 share any common logo with or hold itself out as or be considered as a department or division of (i) any shareholder, partner, principal, member or Affiliate of Borrower, (ii) any affiliate of a shareholder, partner, principal, member or Affiliate of Borrower, or (iii) any other Person, or allow any Person to identify Borrower as a department or division of that Person; or

5.11.14 conceal assets from any creditor, or enter into any transaction with the intent to hinder, delay or defraud creditors of Borrower or the creditors of any other Person.

5.12.   AMENDMENTS TO SENIOR LOAN DOCUMENTS– Borrower shall not enter into any amendment to the Senior Loan Documents without prior written consent of Lender, which consent shall not be unreasonably withheld.  Lender agrees to participate in good faith discussions to resolve grounds for intended disapproval, if any.

ARTICLE VI<br>EVENTS OF DEFAULT

An "Event of Default" shall be deemed to have occurred hereunder if:

6.1.   DEFAULT UNDER LOAN DOCUMENTS- (a) Borrower shall fail to pay principal or interest, or both, when due under the terms of the Note, and such failure shall continue for a period of five (5) business days from the date such payment was due; or (b) Borrower shall fail to pay an amount owing under this Agreement, any of the other Loan Documents or any Unrelated Document when due, and such failure shall continue for a period of ten (10) calendar days from the date Borrower receives written notice thereof from Lender; or (c) Borrower shall fail to perform or observe any term, covenant, or agreement contained in this Agreement, any of the other Loan Documents or any Unrelated Document, which failure may be cured by the payment of money, and, in any of such events, such failure shall continue for a period of ten (10) calendar days from the date Borrower receives written notice thereof from Lender; or Borrower shall fail to perform or observe any term, covenant or agreement contained in this Agreement, any of the other Loan Documents or any Unrelated Document, which failure cannot be cured by the payment of money and such failure shall continue for a period of thirty (30) calendar days after Lender shall have given a written notice to Borrower specifying such default; provided, however, that if such default is curable but is of a nature that such cure cannot be completed within such thirty (30) day period,

Borrower shall be allowed to cure such default if Borrower shall promptly commence such cure after receipt of such notice and diligently prosecutes the same to completion within sixty (60) days of the date Lender gave written notice to Borrower specifying such default, (provided further, however, that in no event shall such extension operate to extend the Maturity Date) and provided further, however, in the event that any Section of this Article VI has a specific time period for curing any default, such specific time period shall control; or

6.2.    <u>BREACH OF WARRANTY</u>- Any warranties made or agreed to be made in any of the Loan Documents or this Agreement shall be breached in any material respect or shall prove to be false or misleading in any material respect when made; or

6.3.    <u>TRANSFER OF PROPERTY OR MEMBERSHIP INTEREST OF BORROWER</u>–Borrower shall sell or transfer its ground leasehold interest in the Property without the prior written consent of Lender, or Borrower shall permit a sale or transfer of direct or indirect ownership interests in Borrower without the prior written consent of Lender, which consent shall not be unreasonably withheld, except that Borrower shall have the right to permit a sale or transfer of up to 49% of the direct or indirect ownership interests in Borrower without Lender's consent; or

6.4.    <u>INSOLVENCY</u>– Borrower shall file a petition under any chapter of the United States Bankruptcy Code or any similar Law, now or hereafter existing, or shall in any involuntary bankruptcy case commenced against it file an answer admitting insolvency or inability to pay its debts as they become due; or

6.5.    <u>BORROWER STATUS</u>- Without Lender's prior written consent, Borrower shall be liquidated, dissolved, or fail to maintain its status as a going concern;

6.6.    <u>DEFAULT UNDER GUARANTY</u>– Any Guarantor fails to perform any term, condition or agreement contained in the Guaranty, and such failure shall continue for a period of ten (10) calendar days from the date Borrower receives written notice thereof from Lender.

6.7.    <u>DEFAULT UNDER SENIOR LOAN DOCUMENTS</u>- Borrower shall default under the Senior Loan Documents and such default is not cured or remedied within the applicable period under the Senior Loan Documents or waived by Senior Lender.

6.8.    <u>DEFAULT UNDER CO-EQUAL LOAN DOCUMENTS</u>– Borrower shall default under the Co-Equal Loan Documents and such default is not cured or remedied within the applicable period under the Senior Loan Documents or waived by Co-Equal Lender;

6.9.    <u>DEFAULT UNDER INDEBTEDNESS INCURRED IN THE ORDINARY COURSE OF BUSINESS</u>– Borrower shall default under any indebtedness incurred in the ordinary course of business where said indebtedness is greater than $150,000.00, and such default is not cured or remedied within the applicable period under the terms of the agreement with the affected creditor or waived by such creditor;

6.10.    <u>CESSATION OF CONSTRUCTION</u>- Construction shall cease for more than 30 consecutive days unless due to circumstances (other than financial inability) beyond the reasonable control of Borrower;

6.11.    <u>LIEN CLAIM</u>– A lien claim shall be filed and is not bonded over or insured by a title insurer within thirty (30) days following demand by Lender;

6.12.    <u>ENTRY OF JUDGMENT</u>– A judgment shall be entered against Borrower or Guarantor in an amount in excess of $100,000.00 and such judgment is not within thirty (30) days paid or stayed pending an appeal; and

6.13.    <u>EVENTS INVOLVING GUARANTOR</u>– Any Guarantor shall die and a reasonably satisfactory replacement guaranty from a reasonably satisfactory replacement guarantor is not provided

within thirty (30) days or except as disclosed to Lender in writing prior to the date of this Agreement, any Guarantor is in default beyond any applicable cure period in an amount in excess of $200,000.00 under any indebtedness other than the Guaranty.

ARTICLE VII
REMEDIES

7.1.    <u>CEASE PAYMENT AND/OR ACCELERATE</u>- Upon, or at any time after, the occurrence of an Event of Default, and for so long as such Event of Default is continuing, all Loan Proceeds disbursed or advanced by Lender and all accrued and unpaid interest thereon shall, at the option of Lender, become immediately due and payable, except that such acceleration shall be automatic upon an Event of Default under Section 6.4, and Lender shall be released from any and all obligations to Borrower under the terms of this Agreement.

7.2.    <u>ENFORCEMENT OF RIGHTS</u>- Upon, or at any time after, the occurrence of an Event of Default, and for so long as such Event of Default is continuing, Lender may enforce any and all rights and remedies under the Loan Documents, the Deed of Trust and all other documents delivered in connection therewith and against any or all Collateral and may pursue all rights and remedies available at Law or in equity.  Without limiting the foregoing, while an Event of Default is continuing, Lender shall have the right to cure any defaults under the Senior Loan Documents and to complete the construction of the Improvements, and the cost thereof shall be added to the debt secured by the Deed of Trust.

7.3.    <u>COLLATERAL</u>- Upon, or at any time after, the occurrence of an Event of Default, and for so long as such Event of Default is continuing, Lender may, at its option, without notice to Borrower or any Affiliate of Borrower or without regard to the adequacy of the Collateral for the payment of the Loan, appoint one or more receivers of the Collateral, and Borrower hereby irrevocably consents to such appointment, with such receivers having all the usual powers and duties of receivers in similar cases, including the full power to maintain, sell, dispose and otherwise operate the Collateral upon such terms that may be approved by a court of competent jurisdiction.

7.4.    <u>RIGHTS AND REMEDIES NON-EXCLUSIVE</u>- Upon, or at any time after, the occurrence of an Event of Default, and for so long as such Event of Default is continuing, in addition to the specific rights and remedies hereinabove mentioned, Lender shall have the right to avail itself of any other rights or remedies to which it may be entitled under any then existing Laws including, but not limited to, the right to realize upon any or all of its security, and to do so in any order.  Furthermore, the rights and remedies set forth above are not exclusive, and Lender may avail itself of any individual right or remedy set forth in this Agreement, or available under such Laws, without utilizing any other right or remedy.

ARTICLE VIII
GENERAL CONDITIONS AND MISCELLANEOUS

8.1.    <u>NONLIABILITY OF LENDER</u>- Borrower acknowledges and agrees that by accepting or approving anything required to be observed, performed, fulfilled, or given to Lender pursuant to the Loan Documents, including any certificate, statement of profit and loss, or other financial statement, survey, appraisal or insurance policy, Lender shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision, or condition thereof, and such acceptance or approval thereof shall not be or constitute any warranty or representation to anyone with respect thereto by Lender.

8.2.    <u>NO THIRD PARTIES BENEFITED</u>- This Agreement is made for the purpose of defining and setting forth certain obligations, rights, and duties of Borrower and Lender in connection with the Loan and shall be deemed a supplement to the Note and the Loan Documents, and shall not be construed as a modification of the Note or the Loan Documents, except as provided herein.  It is made for the sole protection of Borrower and Lender, and Lender's successors and assigns.  No other Person shall have any rights of any nature hereunder or by reason hereof or the right to rely hereon.  In the event of a conflict between this Agreement and the Note, the provisions of the Note shall control.  In the event of a conflict between this Agreement and the Deed of Trust, this Agreement shall control.

8.3.    <u>NONRESPONSIBILITY</u>- Lender shall in no way be liable for any acts or omissions of Borrower or Borrower's agents or employees.

8.4.    <u>TIME IS OF THE ESSENCE</u>- Time is of the essence of this Agreement and of each and every provision hereof.  The waiver by Lender of any breach or breaches hereof shall not be deemed, nor shall the same constitute, a waiver of any subsequent breach or breaches.

8.5.    <u>BINDING EFFECT; ASSIGNMENT</u>- This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns, except that Borrower may not assign its rights hereunder or any interest herein without the prior written consent of Lender. Lender shall have the right to assign its rights under this Agreement and to grant participations in the Loan to others, but all waivers or abridgements of Borrower's obligations that may be granted from time to time by Lender shall be binding upon such assignees or participants.  Borrower shall, at the time specified in Section 4.23, provide Lender or any such purchaser or participant, one or more written statements confirming Borrower's indebtedness to Lender and all obligations in connection with the Loan, including the existence of any default thereunder.

8.6.    <u>EXECUTION IN COUNTERPARTS</u>- This Agreement and any other Loan Documents, except the Note and the Deed of Trust, may be executed in any number of counterparts, and any party hereto or thereto may execute any counterpart, each of which, when executed and delivered, will be deemed to be an original, and all of which counterparts of this Agreement or any other Loan Document, as the case may be, taken together will be deemed to be but one and the same instrument.  The execution of this Agreement or any other Loan Document by any party or parties hereto or thereto will not become effective until counterparts hereof or thereof, as the case may be, have been executed by all the parties hereto or thereto.

8.7.    <u>INTEGRATION; AMENDMENTS</u>- This Agreement, together with the documents referred to herein constitutes the entire agreement of the parties touching upon the subject matter hereof, and supersedes any prior negotiations or agreements on such subject matter.  No amendment, modification, waiver or supplement of any provision of this Agreement or any of the other Loan Documents shall be effective unless in writing, signed by the party to be charged.  None of the terms or provisions of this Agreement shall be deemed to have been abrogated or waived by reason of any failure or failures to enforce the same.

8.8.    <u>NEUTRAL INTERPRETATION</u>- This Agreement is the product of the negotiations between the parties, and in the interpretation and/or enforcement hereof is not to be interpreted more strongly in favor of one party or the other.

8.9.    <u>NOTICES</u>- Except as provided in the Deed of Trust, all notices, requests, demands, directions, and other communications provided for hereunder and under any other Loan Document (a "Notice") must be in writing and must be sent by facsimile transmission and email (or domestic or international courier, as applicable, if an original signature is required) to the appropriate party at its respective address set forth below or, as to any party, at any other address as may be designated by it in a written notice sent to the other parties in accordance with this Section 8.9.  If any notice is given by courier it will be effective when delivered; and if given by facsimile transmission and email, when sent by both means.

8.10.    <u>GOVERNING LAW</u>- The Loan shall be deemed to have been made in California, and the Loan Documents shall be governed by and construed and enforced in accordance with the laws of the State of California.

8.11.    <u>SEVERABILITY OF PROVISIONS</u>- Any provision in any Loan Document that is held to be inoperative, unenforceable, or invalid shall be inoperative, unenforceable, or invalid without affecting the remaining provisions, and to this end the provisions of all Loan Documents are declared to be severable.

8.12.    JOINT AND SEVERAL OBLIGATIONS- If this Agreement is executed by more than one Person as Borrower, the obligations of each of such Persons hereunder shall be joint and several obligations.

8.13.    CONSTRUCTION- The words "hereof," "herein," "hereunder," "hereto," and other words of similar import refer to this Agreement in its entirety. The terms "agree" and "agreements" mean and include "covenant" and "covenants." The words "include" and "including" shall be interpreted as if followed by the words "without limitation." All references (a) made in the neuter, masculine or feminine gender shall be deemed to have been made in all such genders, (b) made in the singular or plural number shall be deemed to have been made, respectively, in the plural or singular number as well, (c) to the Loan Documents are to the same as extended, amended, restated, supplemented or otherwise modified from time to time unless expressly indicated otherwise, (d) to the Improvements or the Property shall mean all or any portion of each of the foregoing, respectively, and (e) to Articles, Sections and Schedules are to the respective Articles, Sections and Schedules contained in this Agreement unless expressly indicated otherwise.

8.14.    HEADINGS- The captions and headings contained in this Agreement are included herein for convenience of reference only and shall not be considered a part hereof and are not in any way intended to define, limit or enlarge the terms hereof.

8.15.    AGENCY– None of the covenants or other provisions contained in this Agreement shall, or shall be deemed to, give Lender the right or power to exercise control over the affairs or management of Borrower, the power of Lender being limited to the rights to exercise the remedies referred to in the Loan Documents. The relationship between Borrower and Lender is, and at all times shall remain, solely that of debtor and creditor. No covenant or provision of the Loan Documents is intended, nor shall it be deemed or construed, to create a partnership, joint venture, agency or common interest in profits or income between Lender and Borrower or to create an equity in the Property in Lender. Lender neither undertakes nor assumes any responsibility or duty to Borrower or to any other Person with respect to the Property or the Loan, except as expressly provided in the Loan Documents; and notwithstanding any other provision of the Loan Documents: (a) Lender is not, and shall not be construed as, a partner, joint venturer, alter ego, manager, controlling person or other business associate or participant of any kind of Borrower or its stockholders, members, or partners and Lender does not intend to ever assume such status; (b) Lender shall in no event be liable for any debts, expenses or losses incurred or sustained by Borrower; and (c) Lender shall not be deemed responsible for or a participant in any acts, omissions or decisions of Borrower or its stockholders, members, or partners. Lender and Borrower disclaim any intention to create any partnership, joint venture, agency or common interest in profits or income between Lender and Borrower, or to create any equity in the Project in Lender, or any sharing of liabilities, profits, losses, costs or expenses.

8.16.    FURTHER ASSURANCES- At any time, and from time to time, upon reasonable  request by Lender, Borrower will, at Borrower's expense, (a) correct any error which may be discovered in the form or content of any of the Loan Documents, and (b) make, execute, deliver and record, or cause to be made, executed, delivered and recorded, any and all further instruments, certificates and other documents as may, in the opinion of Lender, be reasonably necessary or desirable in order to complete, perfect or continue and preserve the lien of the Deed of Trust and the other Security Documents.

8.17.    NO WARRANTY BY LENDER- By accepting or approving anything required to be observed, performed or fulfilled by Borrower or to be given to Lender pursuant to this Agreement, including any certificate, Survey, receipt, appraisal or insurance policy, Lender shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision or condition thereof and any such acceptance or approval thereof shall not be or constitute any warranty or representation with respect thereto by Lender.

8.18.    FORUM, ETC.- TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH OF LENDER AND BORROWER IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF CALIFORNIA SITTING IN ORANGE COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE CENTRAL DISTRICT OF CALIFORNIA,

AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH COURTS.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

**EACH OF LENDER AND BORROWER IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.**

**EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN THIS AGREEMENT. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.**

8.19.    <u>WAIVER OF JURY TRIAL</u>.  BORROWER AND LENDER WAIVE TRIAL BY JURY IN RESPECT OF ANY DISPUTE AND ANY ACTION ON SUCH DISPUTE. THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE BY BORROWER AND LENDER, AND BORROWER AND LENDER HEREBY REPRESENT THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY PERSON OR ENTITY TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THE LOAN DOCUMENTS. BORROWER AND LENDER ARE EACH HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER OF JURY TRIAL. BORROWER FURTHER REPRESENTS AND WARRANTS THAT IT HAS BEEN REPRESENTED IN THE SIGNING OF THIS AGREEMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED BY INDEPENDENT LEGAL COUNSEL SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.

8.20.    <u>USA PATRIOT ACT NOTICE</u>- Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account or obtains a loan.  Lender will ask for Borrower's legal name, address, tax ID number or social security number and other identifying information.  Lender may also ask for additional information or documentation or take other actions reasonably necessary to verify the identity of Borrower, Guarantor or other related persons.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Borrower and Lender have hereunto caused this Agreement to be executed as of the date first above written.

**BORROWER:**

THE SOURCE HOTEL, LLC,
a California limited liability company

By:    M+D Properties, a California corporation, its Manager

By:_____
Donald Chae, CEO

**LENDER:**

BEACH ORANGETHORPE HOTEL, LLC,
a California limited liability company

By:    M&D Regional Center, LLC, a California limited liability company, its Manager

        By:  M+D Properties, a California corporation, its Manager

        By:_____
            Donald Chae, CEO

Address:

3100 E. Imperial Hwy.
Lynwood, California 90262
Attention: Min Chae and/or Donald Chae, Managers
Email: dc@mdproperties.com
Fax: 310-631-6999

Address:

3100 E. Imperial Hwy.
Lynwood, California 90262
Attention: Min Chae and/or Donald Chae, Managers
Email: dc@mdproperties.com
Fax: 310-631-6999

and to:

Lim, Ruger & Kim, LLP
1055 West Seventh Street, Suite 2800
Los Angeles, CA 90017
Attention:  John Lim
Fax:  (213) 955-9511
Email:  john.lim@limruger.com

{01018472}

**EXHIBIT "A"**

**LEGAL DESCRIPTION**

{01018472}

EXHIBIT "B"

DISCLOSURE SCHEDULE

This disclosure schedule is provided referencing the following Sections numbered referenced in this Agreement.

**Section 2.7 - <u>Litigation</u>:**
- Placo San Bernardino, LLC, an Affiliate of Borrower, filed an action in the Superior Court for San Bernardino County against the City of San Bernardino and its redevelopment agency known as Economic Development Agency (the "Agency"), with respect to a project known as Carousel Mall, in which plaintiff seeks damages and equitable relief for inverse condemnation, violation of civil rights (equal protection, due process), violation of contract rights, breach of contract, and interference with prospective economic advantage.  The Agency filed an action in the Superior Court for San Bernardino County against DMC Investment Holdings, LLC, Min Chae and Donald Chae alleging breach of contract with respect to the Carousel Mall project.  The City of San Bernardino is the successor agency for the Agency, which by statute has ceased to exist.  The litigation is presently subject to an automatic stay because the City has commenced a Chapter 9 bankruptcy proceeding.  Borrower is not directly involved in either litigation, and it is not anticipated that the Project or Borrower's obligations under the Loan Documents will be adversely affected by such litigation.

**Section 2.12 - <u>Environmental and Geological Issues</u>:**

**Section 2.17 - <u>Material Contracts</u>:**

| Category | Vendor | Total |
|---|---|---|
| **Development Contracts** | | |
| to be added | | |
| **Leasing Contracts** | | |
| To be added | | |

**Section 2.24 - <u>Employment Agreements</u>:**
- None